IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DERRELL FULTON, aka DARRYL FULTON | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 cv 8696 |
| | ) | |
| v. | ) | Honorable Martha M. Pacold, |
| | ) | District Judge |
| CHICAGO POLICE OFFICER WILLIAM FOLEY, et al., | ) | |
| | ) | Honorable Sunil R. Harjani, |
| | ) | Presiding Magistrate Judge |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| NEVEST COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 CV 998 |
| | ) | |
| v. | ) | Honorable Martha M. Pacold, |
| | ) | District Judge |
| CITY OF CHICAGO, et al., | ) | |
| | ) | Honorable Sunil R. Harjani |
| Defendants. | ) | Presiding Magistrate Judge |

**PLAINTIFFS' STATEMENT OF**
**ADDITIONAL MATERIAL FACTS UNDER LR 56.1(b)(3)**

Plaintiffs Derrell Fulton and Nevest Coleman, by and through their attorneys, Kathleen T.
Zellner & Associates and Loevy & Loevy, respectively, hereby submit Plaintiffs' Statement of
Additional Material Facts Under LR 56.1(b)(3):

1.      Derrell Fulton is innocent of the rape and murder of Antwinica Bridgeman. Ex. 32,
Fulton COI; Ex. 34, 11/29/17 ISP DNA Report; Ex. 35, 7/18/17 ISP DNA Report; Ex. 36, 9/25/17
ISP DNA Report; Ex. 37, 12/14/17 ISP DNA Report; Ex. 2, Fulton Dep., at 89:3-7; PSOAF 2, 4-7,
131-135.

2.      Nevest Coleman is innocent of the rape and murder of Antwinica Bridgeman. PSOAF
1, 4-8, 131-135; Ex. 55, Coleman 2021.08.03 Affidavit; Ofc. DSOF 109, 114, 118; Pls.' Resp. to Ofc.

DSOF 109, 118, 119; COI; Ex. 31, Coleman 2018.01.18 Affidavit; Ex. 34, 2017.11.29 DNA Report, at Fulton 7279; Ex. 33, Coleman COI. At the time of his arrest in 1994, Mr. Coleman had been working full-time as a groundskeeper for the Chicago White Sox for two seasons, and had been continuously employed since he graduated high school. He was 25 years old and had never before been convicted of a crime. Ex. 31, Coleman 2018.01.18 Affidavit; Ex. 1, Coleman Dep., at 51:13-22; Ex. 9, All GPRs, at DEFS 376, 387.

### Forensic Testing of the Physical Evidence Performed
### Prior to Trial Excluded Plaintiffs and Eddie Taylor

3.     On April 28, 1994, Plaintiff Coleman and Michael Barber viewed a body through a window looking into the basement of the Coleman residence. *See* Ex. 57, Foley Supp. Report dated 4/29/94; Ex. 4, Barber Trial Tr., H11:14–H14:2. Defendants Foley and Clancy learned at the scene that the basement is seldom used and vacant, and that the basement door did not have a lock on it. *See* Ex. 57, Foley Supp. Report dated 4/29/94. After a canvass of the area, Antwinica Bridgeman's family made a tentative identification of her at the scene. *See* Ex. 57, Foley Supp. Report dated 4/29/94.

4.     Police discovered two condoms—both of which appeared to have been used—at the scene. Police found one of the condoms in the room adjacent to where Bridgeman's body was found. Police found the other condom on the wooden stairs leading down to the basement. Police collected the condoms as evidence. *See* Ex. 71, Excerpts of Officer Stella's 5/6/97 Trial Testimony, "Stella Trial Tr.", H75:9–76:8; *see* Ex. 27, Supplementary Report dated 6/9/94, "6/9/94 Supp. Report", pp. 4, 9. In December of 1994, biologist Pamela Fish examined the condoms recovered from the scene for the presence of spermatozoa. *See* Ex. 72, Excerpts of Pamela Fish 5/8/97 Trial Testimony, "Fish Trial Tr.", 87:2–99:17. Fish observed spermatozoa on a sample taken from the inside of the condom found at the bottom of the stairs. *See* Ex. 72, Fish Trial Tr., 87:17–89:18, 94:19–95:15. DQ Alpha testing and DNA testing performed by a private lab excluded Bridgeman, Taylor, and Plaintiffs Fulton and

Coleman from contributing to the DNA obtained from the outside and inside of that condom. *See* Ex. 72, Fish Trial Tr., 91:1–92:19, 96:16–100:14, 105:12–15, 107:22–108:6; *see* Ex. 73, LabCorp Report dated 3/13/97. Fish's examination of the condom located in the room adjacent to where Bridgeman's body was found was negative for the presence of spermatozoa and, for that reason, was not tested for DNA. *See* Ex. 72, Fish Trial Tr., 96:9–15, 116:4–9.

5. The pathologist who performed Bridgeman's autopsy collected several items of evidence, including the following: 1) one vial of Bridgeman's blood; 2) a sample of Bridgeman's head hair; 3) a sample of Bridgeman's pubic hair; 4) fingernails from Bridgeman's right and left hands; and 5) several items of Bridgeman's clothing, including one pair of brown boots, one pair of white long-johns, three pairs of socks, one pink pullover, one pair of blue pants, one red jacket, one blue jacket, one white bra, and one pair of white and blue underwear. *See* Ex. 74, Off. Small Supp. Report dated 4/28/94; *see* Ex. 75, Det. Kelly Crime Scene Processing Report dated 4/29/94; *see* Ex. 76, Cogan Trial Tr., pp. I-7, I-32–33, I-51–52, I-67–70.

6. In 1994, police sent Bridgeman's clothing, the pipe, and the rock to the Chicago Police Department Crime Laboratory. *See* Ex. 77, Chicago Police Crime Laboratory Report dated 11/26/94, "11/26/94 Lab Report", p. 1. Police also submitted head and pubic hair standards from Bridgeman, Taylor, and Plaintiffs Fulton and Coleman to the lab. *See* Ex. 77, 11/26/94 Lab Report, pp. 1–2. Microscopic examination of Bridgeman's clothing, the pipe, and the rock revealed the presence of hairs and fibers. *See* Ex. 77, 11/26/94 Lab Report, pp. 2–3. Microscopic comparisons between the unknown hairs recovered from the evidence and the submitted standards eliminated Plaintiff Fulton as the contributor of the unknown hairs. *See* Ex. 77, 11/26/94 Lab Report, p. 3. None of the unknown hairs were consistent with Plaintiff Coleman's head hair or Taylor's pubic hair. *See* Ex. 77, 11/26/94 Lab Report, p. 3. Due to similarities between Bridgeman's and Plaintiff Coleman's head hairs and

Bridgeman's and Taylor's pubic hairs, no other conclusions could be made. *See* Ex. 77, 11/26/94 Lab Report, p. 3.

7.      Evidence technicians processed several larger items at the scene for fingerprints, without obtaining any prints suitable for comparison. *See* Ex. 71, Stella Trial Tr., H78:24–80:22. Evidence collected from the scene—including Bridgeman's eyeglasses, two juice bottles, and two beer cans—were processed for fingerprints. *See* Ex. 78, Off. Codina Crime Scene Processing Report dated 4/29/94, "4/29/94 Codina Report"; *see* Ex. 79, Excerpts of Officer Codina's 5/8/97 Trial Testimony, "Codina Trial Tr.", L14:6–19:9. The results were negative, except that a partial print was recovered from one of the beer cans. *See* Ex. 78, 4/29/94 Codina Report; *see* Ex. 79, Codina Trial Tr., L14:6–19:9. The fingerprint did not match Bridgeman, Taylor, or Plaintiffs Fulton and Coleman. *See* Ex. 80, Excerpts of Officer Patterson's 5/8/97 Trial Testimony, 35:1–36:24. The rock and the pipe were also processed for fingerprints, the results of which were negative. *See* Ex. 79, Codina Trial Tr., L19:20–20:10.

## Defendants Coerced and Fabricated Plaintiff Coleman's "Confession"

8.      Mr. Coleman was questioned by Boudreau and Halloran his first time at Area 1, and then taken home. Foley and Clancy picked him up at his house a few hours later and brought him back to Area 1. Ofc. DSOF 27, 52; Pls.' Resp. to Ofc. DSOF 28, 52.

9.      Defendant Clancy's general progress report, "GPR", indicates that he and Defendant Foley transported Plaintiff Coleman to Area 1 at 11:45 p.m. on April 28, 1994. *See* Ex. 9, Clancy's Timeline GPR, at DEFS 384-85.

10.     The Defendant Detectives placed Plaintiff Coleman in a room with tables and chairs. *See* Ex. 1, Coleman Dep. at 374:21–375:16. Defendants Clancy and Foley brought in a photo album and showed Plaintiff Coleman two pictures. *See* Ex. 1, Coleman Dep. at 376:7–22, 377:15–378:20. The pictures were of Plaintiff Fulton and Eddie Taylor. *See* Ex. 1, Coleman Dep., 378:21–22. Defendants

4

Clancy and Foley asked Plaintiff Coleman if he knew "these two guys," and he said, "Yeah." *See* Ex. 1, Coleman Dep. 378:23–379:3.

11.     Defendants Clancy and Foley left the room, returned, handcuffed Plaintiff Coleman, and moved Plaintiff Coleman to a different, smaller room with one table and two or three chairs. *See* Ex. 1, Coleman Dep., 379:8–381:11. At that time, a total of approximately eight detectives, including Defendants Foley, Clancy, Halloran, and Boudreau, and four other Defendants entered the room. *See* Ex. 1, Coleman Dep., 381:12–21; *see* Ex. 11, Excerpts of Nevest Coleman Testimony at 6/28/96 Suppression Hearing, "Coleman MTS Testimony", J-20:10–24; *see* Ex. 81, Coleman Arrest Report; Pls.' Resp. to Ofc. DSOF 54, 60, 87. The windowless room was small, with a metal bench, a locked door, a ring on the wall for handcuffs, and no bedding. Ex. 8, Boudreau Dep., at 212:17-215:23.

12.     Defendant O'Brien admitted that it would be intimidating to a criminal suspect to be interrogated about a murder in a room with eight detectives standing over him. Ex. 17, O'Brien Dep., at 57:17-59:24.

13.     Defendants Clancy and Foley asked Plaintiff Coleman what happened. Plaintiff Coleman asked them, "What do you mean, what happened?" *See* Ex. 1, Coleman Dep., 382:1–6. Defendants Clancy and Foley brought up the name Antwinica Bridgeman. Because Plaintiff Coleman did not know the victim by that name, he denied knowing anything about her. *See* Ex. 1, Coleman Dep., 383:21–384:8.

14.     Defendants Clancy, Foley, and one of the other Defendant Detectives started yelling and screaming at Coleman. *See* Ex. 1, Coleman Dep., 384:9–24; *see* Ex. 11, Coleman MTS Testimony, J-22:24–23:6. Coleman continued to deny involvement when they questioned him about the murder. *See* Ex. 1, Coleman Dep., 385:3–10. Eventually, all the Defendant Detectives left the room. *See* Ex. 1, Coleman Dep., 385:17–386:8.

15.     The two detectives who questioned Mr. Coleman together the first time he was at Area 1—Boudreau and Halloran—were two of the detectives among the eight present in the interrogation room when Clancy and Foley were interrogating him. Ex. 55, Coleman 2021.08.03 Affidavit; Ex. 50, Coleman Supp. Resp. to Boudreau Interrog., at 4; Pls.' Resp. to Ofc. DSOF 54.

16.     At some point, another Defendant Detective entered the room. *See* Ex. 1, Coleman Dep., 387:3–388:18; *see* Ex. 11, Coleman MTS Testimony, J-25:4–15. The Defendant Detective—who fits the description of Defendant O'Brien—hit Plaintiff Coleman hard on the right side of his face. *See* Ex. 1, Coleman Dep., 387:20–389:12; Ex. 11, Coleman Mot. to Supp. Tr., at 25:1-27:21; Pls.' Resp. to Ofc. DSOF 60; PSOF 33. Defendant O'Brien called Plaintiff Coleman "a lying-ass nigger." Plaintiff Coleman asked him, "Why? I'm not lying." Defendant O'Brien then hit Plaintiff Coleman again. *See* Ex. 1, Coleman Dep., 389:13–17; *see* Ex. 1, Coleman MTS Testimony, J-26:19–22, 27:16–28:1. Mr. Coleman balled up in the fetal position, with his hands covering his face. Ex. 11, Coleman Mot. to Supp. Tr., at 28:11-19. Defendant O'Brien then moved Plaintiff Coleman to another room and left him there. *See* Ex. 1, Coleman Dep., 392:1–9.

17.     Defendants Foley and Clancy entered the room. *See* Ex. 1, Coleman Dep., 392:10–20. They asked Plaintiff Coleman what happened. Plaintiff Coleman told them how he found the body, and he denied any involvement in the crime. *See* Ex. 1, Coleman Dep., 392:21–393:6. Defendants Foley and Clancy yelled and screamed obscenities at Plaintiff Coleman and told him that he was lying. *See* Ex. 1, Coleman Dep., 393:7–19.

18.     At that point in time, Plaintiff Coleman learned that "Mikey" was Antwinica Bridgeman. *See* Ex. 1, Coleman Dep., 394:15–20. Plaintiff Coleman explained to Defendants Foley and Clancy that he did not know that Mikey's name was Antwinica Bridgeman. *See* Ex. 1, Coleman Dep., 394:21–395:6.

19.     Defendants Foley and Clancy told Plaintiff Coleman that Bridgeman had been found with a brick in her mouth and a pipe in her vagina, although they used the word "pussy." *See* Ex. 1, Coleman Dep., 401:4–13. Defendants Foley and Clancy also told Plaintiff Coleman that they did not want him, *i.e.*, Plaintiff Coleman, but that they wanted "Chip and Dap," *i.e.*, Taylor and Plaintiff Fulton. *See* Ex. 1, Coleman Dep., 403:3–9. Defendants Foley and Clancy informed Plaintiff Coleman that they wanted Coleman to help them by saying that he acted as a lookout while Taylor and Plaintiff Fulton raped and killed Bridgeman. *See* Ex. 1, Coleman Dep., 404:9–16.

20.     Defendants Foley and Clancy then gave Plaintiff Coleman "the whole statement" about the crime. *See* Ex. 1, Coleman Dep., 404:17–24; Pls.' Resp. to Ofc. DSOF 57. Defendants Foley and Clancy told Plaintiff Coleman to say that he met up with Plaintiff Fulton, Taylor, and Bridgeman. *See* Ex. 1, Coleman Dep., 406:17–24. Coleman could not recall for certain, but they told him to say that either Plaintiff Fulton shoved a brick in Bridgeman's mouth and Taylor shoved the pipe in her or the other way around. *See* Ex. 1, Coleman Dep., 406:17–407:4. They also told Plaintiff Coleman to say that he "smacked" Bridgeman. *See* Ex. 1, Coleman Dep., 407:5–10.

21.     At some point, the "short little white officer" entered the room. Ex. 11, Coleman Mot. to Supp. Tr., at 29:10-30:1. Of the detectives involved in the Bridgeman investigation, Boudreau was the only shorter officer, standing around 5'9". Ex. 8, Boudreau Dep., at 62:21-63:7, 69:9-18; Ex. 17, O'Brien Dep., at 22:9-23:9; Ex. 18, Clancy Dep., at 40:12-19, 41:1-2, 42:23-43:3; Pls.' Resp. to Ofc. DSOF 54, 63; Ofc. DSOF 63 64.

22.     Defendants Foley, Clancy, and Boudreau promised Plaintiff Coleman that if he helped them, he would be able to go home. *See* Ex. 1, Coleman Dep., 409:21–410:9; *see* Ex. 11, Coleman MTS Testimony, J-29:10–30:1; Pls.' Resp. to Ofc. DSOF 54, 66. Plaintiff Coleman told them that he was scared and that he wanted to go home, and they told him he could go home after he finished giving them "this story." *See* Ex. 1, Coleman Dep., 411:3–11.

23.     Coleman was questioned almost continuously between when he was hit in the face and when Defendant Garfinkel arrived. Ex. 1, Coleman Dep., at 392:1-20; 400:13-401:3.

24.     Later, Defendant Garfinkel entered the interrogation room by himself. *See* Ex. 1, Coleman Dep., 408:8–10. According to the 6/9/94 Supplementary Report, Mr. Coleman did not adopt any inculpatory statements until after Garfinkel arrived to speak to him. Ex. 27, 6/9/94 Supplementary Report, at DEFS 212. Plaintiff Coleman asked Defendant Garfinkel who he was, and Defendant Garfinkel told Plaintiff Coleman that he was there to help Plaintiff Coleman. *See* Ex. 1, Coleman Dep., 408:11–15. Plaintiff Coleman did not know what a "prosecutor" was. *See* Ex. 1, Coleman Dep., 422:3-5. Plaintiff Coleman told Defendant Garfinkel that the police hit him twice in the face, and Defendant Garfinkel responded along the lines of, "We'll deal with that matter later." *See* Ex. 1, Coleman Dep., 408:16–23; *see* Ex. 11, Coleman MTS Testimony, 31:8–20, 32:17–21. By the time Defendant Garfinkel told Plaintiff Coleman, "We'll deal with that later," Defendant Clancy had returned and was standing in the room. *See* Ex. 1, Coleman Dep., 408:24–409:4, 414:14–20; *see* Ex. 11, Coleman MTS Testimony, J-31:21–32:5.

25.     Right before Plaintiff Coleman gave his court reported statement, Defendants Foley and Clancy—while Defendant Garfinkel was in the room—told Plaintiff Coleman that they would relocate him, his son, and his son's mother. *See* Ex. 1, Coleman Dep., 416:6–17.

26.     Defendant Garfinkel did not document anywhere Mr. Coleman's statement that he had been hit by police or the Detectives' promise to relocate Coleman and his family members in Garfinkle's presence. Ex. 46, Coleman Felony Review Jacket; Ex. 47, Coleman Felony Minute Sheet.

27.     Up until Defendant Garfinkel took Plaintiff Coleman's court reported statement, none of the Defendants had read Plaintiff Coleman his *Miranda* rights. Ex. 11, Mot. to Supp. Tr., at 19:1-15; 22:5-23; 53:16-54:20; Ex. 1, Coleman Dep., at 420:4-15.

8

28.     After nearly 10 hours of interrogation and no sleep for nearly 36 hours, Plaintiff Coleman agreed to give the fabricated court-reported statement because he was tired of being yelled at, disrespected, and hit, and because he was scared that it was going to get worse if he did not cooperate. *See* Ex. 1, Coleman Dep., at 290:13-17, 393:13-19, 416:1-17; 422:14-423:8; Ex. 11, Coleman Supp. Hrg. Tr., at 23:3-24:6, 29:10-16, 33:21-24:6, 45:19-23, 60:23-61:12; Ex. 9, All GPRs, at DEFS 385; Ex. 30, Coleman Typed Statement, at Plaintiff 2660. He believed that if he gave the fabricated statement, he would be allowed to go home. Ex. 1, Coleman Dep., 409:12-411:11; 414:4-11; 421:19-423:8; Ex. 11, Mot. to Supp. Tr., at 63:19-64:8. Defendant Garfinkel also told Mr. Coleman that if he signed the statement, he could go home. Ex. 11, Coleman Mot. to Supp. Tr., at 31:8-12, 39:3-17, 63:14-64:8.

### Defendant Detectives Involved in Coercing and Fabricating Plaintiff Coleman's "Confession"

29.     The following Defendant Detectives are listed as "Arresting Officers" in the arrest report documenting Plaintiff Coleman's arrest, which states that his arrest occurred at Area 1 Detective Headquarters, 5101 S. Wentworth, and is signed by Defendant Foley: Defendants Foley, Clancy, Halloran, Boudreau, Moser, Graf, O'Brien, and Carroll. *See* Ex. 81, Coleman Arrest Report. Each of the foregoing Defendant Detectives is also listed as contributing to the supplementary report detailing the investigation leading up to Plaintiffs Coleman's and Fulton's "confessions." *See* Ex. 27, 6/9/94 Supp. Report, p. 16.

30.     Defendant Garfinkel listed the following detectives as "Investigators" in his felony review jacket pertaining to Plaintiff Coleman: Defendants Boudreau, O'Brien, Graf, and Moser. *See* Ex. 46, Garfinkel Felony Review Jacket – CCSAO 906, 908. Defendant Garfinkel listed Defendant Clancy as an "Arresting Officer" in his felony review jacket pertaining to Plaintiff Coleman. *See* Ex. 46, Garfinkel Felony Review Jacket – CCSAO 906. Asked why he listed the foregoing detectives on his felony review jacket, Defendant Garfinkel testified, "They might—you know, there were lots of

people. It was—you know, it was a big case; there were lots of people there that night—that day. I just remember seeing those figures that played a significant role." *See* Ex. 42, Garfinkel Dep., 192:16–24.

31.     Coleman described the Defendant Detective who struck him as being a white male between 6'4" and 6'6" tall with a slim or medium build, no facial hair, black hair, and glasses. *See* Ex. 1, Coleman Dep., 387:5–388:1; *see* Ex. 11, Coleman MTS Testimony, J-25:8–26:15. Back in April of 1994, Defendant O'Brien was one of the tallest detectives at Area 1, and the tallest detective involved in the Bridgeman investigation. *See* Ex. 17, O'Brien Dep., 27:11–14; *see* Ex. 8, Boudreau Dep., 66:17–20. Defendant O'Brien described his appearance in 1994 as 6'4" or 6'5" with dark brown hair starting to gray and no facial hair. Defendant O'Brien also wore both glasses and contact lenses. *See* Ex. 17, O'Brien Dep., 26:4–21, 28:11–14. Other Defendant Detectives described Defendant O'Brien as having dark hair—either brown or black—and a medium build.  *See* Ex. 18, Clancy Dep., 42:6–11; *see* Ex. 12, Carroll Dep., 47:14–19; *see also* Pls.' Resp. to Ofc. DSOF 60.

32.     Defendant O'Brien was the only Area 5 detective who participated in the Bridgeman investigation who was 6'4" or taller. He was the tallest of the Area 1 detectives who participated in the Bridgeman investigation. Ex. 7, Kelly Dep., at 74:6-15, 111:24-112:4; Ex. 1, Coleman Dep., at 387:5-388:24; Ex. 9, Boudreau Dep., at 64:12-18; 66:17-20; Ex. 18, Clancy Dep., at 41:16-42:11; Ex. 12, Carroll Dep., at 206:23-207:6; Ofc. DSOF 71; Pls.' Resp. to Ofc. DSOF 60; *see also* PSOAF 33.

33.     Defendant O'Brien has hit, punched, or slapped numerous people in the face, head, and body. For instance, Dan Young testified that Defendant O'Brien was among a group of people who kicked him and hit him until he agreed to sign a false, inculpatory statement. Ex. 43, Dan Young Testimony, at 17:16-18:8; Ex. 52, Dan Young Statement. Jerry Gillespie also alleged that O'Brien was among the Area 1 officers who physically abused him in order to obtain a false statement in which

Mr. Gillespie stated that he acted as the lookout during a shooting. Ex. 44, Gillespie Mot. to Hold in Abeyance, at ¶¶6, 8, 15; Ex. 45, Gillespie Petition for Post-Conviction Relief, at ¶¶32, 35, 36.

### **Defendants Coerced and Fabricated Plaintiff Fulton's "Confession"**

34.     In the evening hours of April 28, 1994, Defendants Foley and Clancy went to Plaintiff Fulton's residence at 5517 S. Sangamon. *See* Ex. 2, Fulton Dep., 74:7–9; 277:5–279:5; *see* Ex. 82, Excerpts of Derrell Fulton Testimony at 4/16/96 Suppression Hearing, "Fulton MTS Testimony", A17:19–18:7;[1] *see* Ex. 112, Foley 5/7/97 Trial Tr., J-77:13–78:17, K-28:14–31:11. Defendants Foley and Clancy asked Plaintiff Fulton when the last time was that he saw Eddie Taylor. *See* Ex. 2, Fulton Dep., 279:6–280:3; *see* Ex. 82, Fulton MTS Testimony, A18:7–11. Plaintiff Fulton told Defendants Foley and Clancy that it had been a while since he had seen Taylor. *See* Ex. 2, Fulton Dep., 280:3–6. Defendants Foley and Clancy told Plaintiff Fulton that they would be back if they learned that he was lying. *See* Ex. 2, Fulton Dep., 281:8–13; *see* Ex. 82, Fulton MTS Testimony, A18:12–17.

35.     Later that evening, Plaintiff Fulton went to bed. *See* Ex. 2, Fulton Dep., 284:8–17; *see* Ex. 82, Fulton MTS Testimony, A18:18–20. Early the next morning, while Plaintiff Fulton was in bed, the police came back to his residence. *See* Ex. 2, Fulton Dep., 284:18–20; *see* Ex. 82, Fulton MTS Testimony, A18:22–19:4. Four or five officers came up to Plaintiff Fulton's bedroom and asked him if he would have any problems coming down to the police station. *See* Ex. 2, Fulton Dep., 284:21–285:4, 286:13–287:16. Plaintiff Fulton told them that he did not have any problem with coming down to the police station. *See* Ex. 2, Fulton Dep., 285:5–7; *see* Ex. 82, Fulton MTS Testimony, A19:4–10.

36.     Defendants Foley, Clancy, Halloran, Boudreau, O'Brien, and Carroll were among the officers who went to Plaintiff Fulton's residence the morning of April 29, 1994. *See* Ex. 112, Foley

---

[1] During the hearing on Fulton's motion to suppress, Fulton's attorney asked him about how he ended up at the Area on April 30, 1994. Based on the police reports, trial testimony, and depositions conducted in this lawsuit, it is undisputed that Fulton arrived at the Area in the morning on April 29, 1994, and that his attorney misspoke during the suppression hearing.

Trial Tr., U-81:13–82:2; *see* Ex. 94, Excerpts of William Foley Testimony at 4/16/96 Suppression Hearing, "Foley 4/16/96 MTS Testimony", A93:1–94:3. Defendants Foley and Clancy transported Plaintiff Fulton to Area 1 in an unmarked squad car. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A93:1–94:3. According to Defendant Foley, Plaintiff Fulton was placed under arrest at his residence before being transported to Area 1. *See* Ex. 24, Foley Trial Tr., U-81:13–82:5.

37.    After Plaintiff Fulton arrived at the Area, he was placed in a room by himself for a while. *See* Ex. 2, Fulton Dep., 289:9–13. Two Defendant Detectives then entered the room, at which time Plaintiff Fulton was placed in handcuffs. *See* Ex. 2, Fulton Dep., 289:14:–20, 294:22–295:10; *see* Ex. 82, Fulton MTS Testimony, A20:6–21:24, 52:6–10.

38.    Over the course of about the next 40 hours, the Defendant Detectives interrogated Plaintiff Fulton approximately four or five times before Defendant Garfinkel arrived. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A93:1–92:15; *see* Ex. 83, Fulton Statement, p. 1; *see* Ex. 2, Fulton Dep., 290:17–291. None of the Defendant Detectives ever gave Plaintiff Fulton his *Miranda* rights. *See* Ex. 2, Fulton Dep., 349:14–18.

39.    During the first interrogation session, the Defendant Detectives made statements to Plaintiff Fulton such as, "We know you did it," and, "We know you were there." *See* Ex. 2, Fulton Dep., 295:14–19; *see* Ex. 82, Fulton MTS Testimony, A21:17–20, 24:4–10. Plaintiff Fulton told the Defendant Detectives that he did not know what they were talking about and denied whatever it was they were accusing him of. *See* Ex. 2, Fulton Dep., 295:14–22.

40.    During the second round of questioning, the Defendant Detectives repeated their accusations against Plaintiff Fulton over and over again. *See* Ex. 2, Fulton Dep., 299:10–19. Plaintiff Fulton again denied their accusations. *See* Ex. 2, Fulton Dep., 299:20–22.

41.    Hours later, during the third round of questioning, the Defendant Detectives continued accusing Plaintiff Fulton of the crime, and Plaintiff Fulton continued to deny any

involvement in it. *See* Ex. 2, Fulton Dep., 305:6–308:1. Towards the end of the third and going into the fourth interrogation, the Defendant Detectives started "hollering" at Plaintiff Fulton and telling him about the victim, Antwinica Bridgeman. *See* Ex. 2, Fulton Dep., 309:19–310:11; *see* Ex. 82, Fulton MTS Testimony, A23:19–23.

42.     During the second or third round of questioning, an African American Detective—Defendant Turner based on his description—entered the room, struck Plaintiff Fulton on the side of his head, and threatened to take Fulton somewhere and put a bullet in his brain. *See* Ex. 2, Fulton Dep., 64:16–18, 298:10–18, 301:7–20; *see* Ex. 82, Fulton MTS Testimony, A24:13–22, 26:20–27:2; *see* Ex. 84, Fulton Arrest Report. Defendant Turner punched Plaintiff Fulton on the left side of Plaintiff Fulton's face with a closed hand. *See* Ex. 2, Fulton Dep., 291:19–292:24. Defendant Turner struck Plaintiff Fulton because Plaintiff Fulton "did not give him a direct answer or the answer he was looking for." *see* Ex. 82, Fulton MTS Testimony, A24:13–22.

43.     Based on the arrest report documenting Plaintiff Fulton's arrest, Defendants Foley and Clancy were in the room when Defendant Turner struck Plaintiff Fulton and threatened to put a bullet in his brain. *See* Ex. 2, Fulton Dep., 301:21–302:4; *see* Ex. 84, Fulton Arrest Report. Defendants Foley and Clancy did not intervene when Defendant Turner struck and threatened to shoot Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 302:5-7.

44.     Hours later, during the fourth interrogation, the Defendant Detectives continued to "holler" at Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 312:24–313:2, 315:14–1. One of the Defendant Detectives asked Plaintiff Fulton if he knew Nevest Coleman. *See* Ex. 2, Fulton Dep., 316:9–317:24. The Defendant Detectives told Plaintiff Fulton that a girl was killed, and they knew that he had killed her. *See* Ex. 2, Fulton Dep., 318:1–5.

45.    Before Defendant Garfinkel arrived at the Area, Plaintiff Fulton had minimal sleep, was not given anything to drink or eat since the beginning of his interrogation and had not used the restroom. *See* Ex. 2, Fulton Dep., 289:21–290:6, 322:4–19.

46.    Plaintiff Fulton was taken to another room to speak with Defendant Garfinkel. *See* Ex. 2, Fulton Dep., 336:5–11. The Defendant Detective did not introduce Defendant Garfinkel to Plaintiff Fulton or say anything. *See* Ex. 2, Fulton Dep., 337:5–12. Defendant Garfinkel told Plaintiff Fulton that he was an attorney. *See* Ex. 2, Fulton Dep., 338:16–23. Defendant Garfinkel told the Defendant Detective to leave the room. *See* Ex. 2, Fulton Dep., 337:13–17. The Defendant Detective then left the room. *See* Ex. 2, Fulton Dep., 338:2–5.

47.    Defendant Garfinkel did not give Plaintiff Fulton his *Miranda* rights before he started speaking with Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 349:19–350:3. Defendant Garfinkel told Plaintiff Fulton that he knew Plaintiff Fulton "did it." *See* Ex. 2, Fulton Dep., 341:8–22. Plaintiff Fulton "constantly" told Defendant Garfinkel that he did not know anything about the crime. *See* Ex. 2, Fulton Dep., 27:15–28:9. At that point, Plaintiff Fulton knew Defendant Garfinkel was on the side of the police. *See* Ex. 2, Fulton Dep., 341:23–342:6.

48.    Defendant Garfinkel left the room to retrieve Coleman's court reported statement from his briefcase. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A57:22–58:3.  Garfinkel showed Plaintiff Coleman's court reported statement to Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 363:15–17; Ex. 82, Fulton MTS Testimony, A37:13–16. Plaintiff Fulton glanced or scanned the statement enough to know that it alleged his involvement in the assault of the victim. *See* Ex. 2, Fulton Dep., 363:18–364:21; Fulton MTS Testimony, 29:3–17. Plaintiff Fulton continued to tell Defendant Garfinkel that he was not involved in the crime. *See* Ex. 2, Fulton Dep., 37:13–22.

49.    Defendant Garfinkel told Plaintiff Fulton that if he did not cooperate, Defendant Garfinkel would charge him with murder, he would "never see the streets again," and that he would

14

"surely get the death penalty." *See* Ex. 2, Fulton Dep., 342:17–24; *see* Ex. 82, Fulton MTS Testimony, A25:15–23, 37:22–38:12.

50.  Defendant Garfinkel's threats, along with Defendant Turner hitting Plaintiff Fulton, Defendant Turner threatening to put a bullet in Plaintiff Fulton's brain in front of Defendants Clancy and Foley, and the length of time Plaintiff Fulton had been in custody "messed" with Plaintiff Fulton and wore him down. *See* Ex. 2, Fulton Dep., 343:1–24. Plaintiff Fulton felt as though he did not have a way out. *See* Ex. 2, Fulton Dep., 344:1–6. He felt "scared to death" for his life. *See* Ex. 2, Fulton Dep., 345:2–20.

51.  After Defendant Garfinkel threatened him, Plaintiff Fulton tried to give Defendant Garfinkel a statement by making one up. *See* Ex. 2, Fulton Dep., 350:4–15. Defendant Garfinkel did not like the statement, so he balled up the paper on which he was writing and threw it to the side. *See* Ex. 2, Fulton Dep., 350:15–17; *see* Ex. 82, Fulton MTS Testimony, A31:8–11.

52.  Defendant Garfinkel wrote down a second statement. *See* Ex. 83, Handwritten Statement Attributed to Derrell Fulton, "Fulton Statement", pp. 1–3. Defendant Garfinkel told Plaintiff Fulton that the statement had to say that the victim gave him oral sex. *See* Ex. 2, Fulton Dep., 350:4–17; *see* Ex. 82, Fulton MTS Testimony, A31:4–13. The statement includes an allegation that Plaintiff Fulton told Defendant Garfinkel that the victim performed oral sex on him. *See* Ex. 83, Fulton Statement, p. 2. The statement indicates that Plaintiff Fulton confessed to participating in the assault and murder with Plaintiff Coleman and Taylor. *See* Ex. 83, Fulton Statement, pp. 1–3.

53.  Defendant Garfinkel told Plaintiff where to sign the statement. *See* Ex. 82, Fulton MTS Testimony, A52:22–53:11. Plaintiff Fulton's statement is dated May 1, 1994. *See* Ex. 83, Fulton Statement, p. 1. Plaintiff Fulton signed the statement at about 1:30 a.m., which was approximately 42 hours after Plaintiff Fulton was first brought to the Area. *See* Ex. 120, Excerpts of Garfinkel 5/13/97 Trial Testimony, "Garfinkel 5/13/97 Trial Tr.", O-86:5–16; *see* Ex. 112, Foley Trial Tr., J-81:13–82:5.

The statement was signed by Plaintiff Fulton, Defendant Garfinkel, and Defendant Foley. *See* Ex. 83, Fulton Statement; *see* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-29:8–18.

54.      Apart from his age and that he obtained his GED, Plaintiff Fulton did not give Defendant Garfinkel any of the information that is in the statement. *See* Ex. 2, Fulton Dep., 351:5– 23; *see* Ex. 83, Fulton Statement. Defendant Garfinkel wrote the statement without Plaintiff Fulton volunteering a single fact. *See* Ex. 2, Fulton Dep., 352:3–8. Plaintiff Fulton did not read the statement before signing it, and Defendant Garfinkel did not read the statement to Plaintiff Fulton before Plaintiff Fulton signed it. *See* Ex. 2, Fulton Dep., 358:21–359:11; *see* Ex. 82, Fulton MTS Testimony, A36:23–37:3. After Defendant Garfinkel wrote out the statement, he told Plaintiff Fulton where to sign it. *See* Ex. 2, Fulton Dep., 53:6–11. Although Defendant Foley signed the statement, he was not in the room when Plaintiff Fulton signed it. *See* Ex. 2, Fulton Dep., 359:12–14.

55.      Plaintiff Fulton signed the statement because he felt that he did not have anything "left in [him]" after being "locked up for all of that time" despite his repeated denials and, moreover, because he feared for his life after Defendant Turner struck him, threatened to put a bullet in his brain, and Defendant Garfinkel threatened to charge him with a murder for which Plaintiff Fulton could receive the death penalty. *See* Ex. 2, Fulton Dep., 428:19–429:17; *see* Ex. 82, Fulton MTS Testimony, A26:20–27:10, 37:4–7, 37:20–24.

### Defendant Detectives Involved in Coercing and Fabricating Plaintiff Fulton's "Confession"

56.      Four or five white Defendant Detectives rotated in and out to interrogate Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 294:22–295:3, 306:3–10, 315:14–21; *see* Ex. 82, Fulton MTS Testimony, A:23:4–18.

57.      The following Defendant Detectives are listed as "Arresting Officers" in the arrest report documenting Plaintiff Fulton's arrest signed by Defendant Clancy: Defendants Clancy, Foley, Halloran, Boudreau, O'Brien, Carroll, Moser, Graf, and Turner. *See* Ex. 84, Fulton Arrest Report. The

arrest report lists the time of arrest as 11:50 p.m. on April 30, 1994. *See* Ex. 84, Fulton Arrest Report. Each of the foregoing Defendant Detectives is also listed as contributing to the supplementary report detailing the investigation leading up to Plaintiffs Coleman's and Fulton's "confessions." *See* Ex. 27, 6/9/94 Supp. Report.

58.     Of the Defendant Detectives listed on Defendant Clancy's arrest report documenting Fulton's arrest, Defendant Turner is the only African American detective listed. *See* Ex. 12, Carroll Dep., 56:24–58:4; *see* Ex. 18, Clancy Dep., 43:20–44:5. Although a definitive identification of Turner could not be made, a crime scene photograph was taken of what appears to be an African American detective walking down the front stairs of the Coleman residence. *See* Ex. 8, Boudreau Dep., 201:21–206:4; *see* Ex. 23, Scene Photo.

59.     In preparation for his deposition in this lawsuit, Defendant Clancy reviewed the supplementary reports, general progress reports, Defendant Foley's trial testimony, and Plaintiffs Fulton's and Coleman's "confessions" to refresh his recollection. *See* Ex. 18, Clancy Dep., 26:1–32:11. Despite his review, Defendant Clancy could not recall Defendant Turner's role in the investigation. *See* Ex. 18, Clancy Dep., 112:8–113:20.

60.     Neither the 6/9/94 supplementary report, the general progress reports, arrest reports, nor any other report indicate what role Defendant Turner had in the investigation to explain his being listed on Plaintiff Fulton's arrest report apart from his having been involved in the interrogation of Plaintiff Fulton. *See* Ex. 27, 6/9/94 Supp. Report; *see* Ex. 81, Coleman Arrest Report; *see* Ex. 84, Fulton Arrest Report; *see* Ex. 9, Additional General Progress Reports at DEFS 339.

61.     Given that Defendant Clancy credited Defendant Turner as being involved in Plaintiff Fulton's arrest—and, therefore, Plaintiff Fulton's interrogation—in the arrest report, Defendant Clancy was one of the Defendant Detectives present when Defendant Turner struck Plaintiff Fulton and threatened to put a bullet in his brain. *See* Ex. 84, Fulton Arrest Report. Moreover, because

17

Defendant Clancy was partnered with Defendant Foley and the two interrogated Plaintiff Fulton together, Defendant Foley was the other officer present when Defendant Turner struck Plaintiff Fulton and threatened to put a bullet in his brain. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A89:9–17, 98:19–99:8; *see* Ex. 18, Clancy Dep., 54:3–11.

62.     Defendants O'Brien and Carroll interviewed Kimberly Johnson concerning Plaintiff Fulton's whereabouts on April 11, 1994. Defendant Carroll prepared a GPR summarizing the interview. *See* Ex. 12, Carroll Dep., 128:5–129:4; *see* Ex. 9, GPRs at DEFS 339.

63.     The supplementary report detailing the investigation leading up to Plaintiffs Coleman's and Fulton's "confessions" states in part as follows:

> The R/Ds then had occasion to locate and interview Kimberly JOHNSON and at that time she stated that at the date and time of this incident FULTON was not with her and that she did not know anything about FULTONs whereabouts at the time of this incident.
>
> FULTON was then confronted with K. JOHNSONs account and at that time stated that he had been un-truthful in his account of the night of the incident. He went on to say that on the date and time of this incident he was in the alley behind 917 W. 55th St. He then went on to say that he then observed "Chip" and Nevest and Antwinica go into the basmt. at 917 W. 55th St. He then stated that he stayed in the alley for a short time and that he then went down into the basement and while he was standing in the basement door way he observed the victim orally copulating "Chip" and Nevest COLEMAN was having vaginal intercourse with the victim. He then went on to say that "Chip" and Nevest COLEMAN turned towards FULTON and saw that FULTON was standing in the doorway. FULTON then went on to say that he then panicked and ran from the scene and went home.

*See* Ex. 27, 6/9/94 Supp. Report, p. 14.

64.     Defendant Foley took notes and/or prepared GPRs related to the investigation on plain paper, *i.e.*, a non-standard Chicago Police Department GPR form. *See* Ex. 18, Clancy Dep., 187:15–189:1; *see* Ex. 9, (All GPRs) at DEFS 339. An unsigned note on a non-standard GPR form consistent with Defendant Foley's other notes states as follows:

> Fulton
> Carroll & O'Brien
> denial
> in alley
> Left alley bsmt
>
> seen
>
> > stood till [ ] turned
> > Confession

*See* Ex. 87, Foley Timeline GPR.

65.    Given that, 1, Defendants Carroll and O'Brien spoke with Johnson, 2, the Defendant Detectives allege that Fulton was then confronted with the information Johnson ostensibly provided to the Defendant Detectives, and 3, the Foley timeline GPR could be construed as indicating that Carroll and O'Brien questioned Fulton, Defendants Carroll and O'Brien were the two other Defendant Detectives involved in Fulton's interrogations. *See* Ex. 9, GPRs at DEFS 339; *see* Ex. 27, 6/9/94 Supp. Report, p. 14; *see* Ex. 87, Foley Timeline GPR.

66.    Although Fulton believes that Defendants O'Brien and Carroll are the other two detectives who participated in his interrogation, a reasonable jury could conclude that it was either Defendants Boudreau and Halloran or Moser and Graf. Defendants Boudreau and Halloran claim that they spoke with Fulton to obtain his biographical information when he was first brought to the Area, and that Fulton denied involvement in the murder. *See* Ofc. DSOF 83. During his time at the Area when he wrote out Plaintiff Fulton's statement, Defendant Garfinkel denied that he dealt primarily with Defendants Foley and Clancy. Rather, Defendant Garfinkel testified that "[t]here were a number of detectives who were coming in" of whom he asked questions which they answered. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., 82:10–20. In his felony review jacket pertaining to Plaintiff Fulton, Defendant Garfinkel listed Defendants Foley, Moser, Boudreau, and O'Brien as "Arresting Officer(s)," and he further listed Defendants Graf and Halloran as "Investigator(s)." *See* Ex. 88, Fulton Felony Review Jacket – Fulton, p. 1.

19

## The Record Evidence Corroborates Plaintiffs' Claims
## That Their "Confessions" Were Coerced and Fabricated

*The Defendants' Various Descriptions of the Confessions are Inconsistent*

67.     Defendant Clancy's timeline GPR indicates that Plaintiff Coleman admitted to "his part in [the] crime" at 0200 hours, *before* Defendant Garfinkel arrived at the Area. *See* Ex. 9, All GPRs, at DEFS 384-385. Defendant Clancy's timeline GPR states that Plaintiff Coleman gave another statement admitting that he hit the victim twice and told Plaintiff Fulton to put concrete in the victim's mouth *before* Defendant Garfinkel arrived at the Area. *See* Ex. 9, All GPRs, at DEFS 384-385.

68.     The 6/9/94 supplementary report indicates that Plaintiff Coleman told the Defendant Detectives that he observed the victim orally copulating "Chip" and that "Dap" was engaged in anal intercourse with her. *See* Ex. 27, 6/9/94 Supp. Report, p. 12. The supplementary report states that Plaintiff Coleman told the Defendant Detectives that he "became frightened" and ran into his apartment one floor above the crime scene. *See* Ex. 27, 6/9/94 Supp. Report, p. 12. The supplementary report indicates that only *after* Defendant Garfinkel arrived did Plaintiff Coleman admit his involvement in the offense by acting as a lookout, slapping the victim in the face, sexually assaulting her, and telling "Dap" to put a piece of concrete in her mouth. *See* Ex. 27, 6/9/94 Supp. Report, pp. 12–13.

69.     At the hearing on Plaintiff Fulton's motion to suppress his statements, Defendant Garfinkel testified that prior to Plaintiff Fulton making any admissions, he asked Defendant Foley to leave the room so he could express to Plaintiff Fulton that he had a court-reported statement taken from another individual who had participated in the crime and that Plaintiff Fulton might feel more comfortable speaking with him about the situation. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A58:7–59:6. At the same hearing, Defendant Garfinkel contradicted himself and testified that Defendant Foley was present initially when Defendant Garfinkel confronted Plaintiff Fulton with Plaintiff Coleman's statement, but then left. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A87:24–

88:6. Contradicting himself further, Defendant Garfinkel testified that neither he nor Plaintiff Fulton asked Defendant Foley to leave the room. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A88:7–10.

70.     At the hearing on Plaintiff Fulton's motion to suppress his statements, Defendant Foley testified that he did not remember Defendant Garfinkel confronting Plaintiff Fulton with Plaintiff Coleman's court reported statement. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A109:4–12. At Plaintiff Fulton's later criminal trial, Defendant Foley testified that he was present when Defendant Garfinkel confronted Plaintiff Fulton with Plaintiff Coleman's court reported statement. *See* Ex. 112, Foley Trial Tr., J-101:6–18.

71.     At Plaintiff Fulton's criminal trial, Defendant Foley testified that Plaintiff Fulton dictated his handwritten statement to Defendant Garfinkel. *See* Ex. 112, Foley 5/7/97 Trial Tr., K-62:6–15. Per Defendant Foley, the handwritten statement was not word-for-word what Plaintiff Fulton said, but that Defendant Garfinkel wrote out the statement while Plaintiff Fulton was sitting next to him. *See* Ex. 112, Foley 5/7/97 Trial Tr., K-62:16–63:1.

72.     At Plaintiff Fulton's criminal trial, Defendant Garfinkel testified that he wrote two-and-a-half pages of Plaintiff Fulton's statement—the portion of the statement related to the assault and murder of Bridgeman—outside of Plaintiff Fulton's and Defendant Foley's presence. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-23:13–27:24, 28:22–29:7, 53:4–54:5. At Plaintiff Fulton's motion to suppress hearing, Defendant Garfinkel testified that he wrote the entire statement outside of Plaintiff Fulton's and Defendant Foley's presence, although Defendant Foley may have stopped by to ask him if the "statement [was] clear." *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A61:3–64:18, A.85:8–86:3. Foley, however, testified that Garfinkel wrote the statement in Fulton's presence when they were sitting "side by side." *See* Ex. 112, Foley Trial Tr., K-62:9–63:1.

*Miraculously Similar False Stories*

73.     The 6/9/94 supplementary report indicates that Plaintiffs Coleman and Fulton gave nearly identical false stories about what occurred. Per the supplementary report, Plaintiff Coleman told the Defendant Detectives that he observed Plaintiff Fulton and Taylor speaking with Ms. Bridgeman and watched them go into the basement; that after a short time he went to the basement door and saw the victim orally copulating Taylor while Plaintiff Fulton had anal intercourse with her; and that Plaintiff Coleman became frightened and ran up to his apartment. *See* Ex. 27, 6/9/94 Supp. Report, p. 12. The Defendant Detectives then contacted Defendant Garfinkel and, after Garfinkel arrived, Coleman "confessed" to the rape and murder. *See* Ex. 27, 6/9/94 Supp. Report, pp. 12–14. Per the supplementary report, Plaintiff Fulton told the Defendant Detectives that he observed Plaintiff Coleman and Taylor go into the basement; after a short time, he went to the basement door and saw the victim orally copulating Taylor while Plaintiff Coleman had vaginal intercourse with her; and Plaintiff Fulton panicked and ran home. *See* Ex. 27, Supp Report dated 6/9/94, p. 14. The Defendant Detectives then contacted Defendant Garfinkel and, after Garfinkel arrived, Fulton "confessed" to the rape and murder. *See* Ex. 27, Supp. Report dated 6/9/94, p. 15.

74.     Bridgeman's body was found with a triangular piece of concrete in her mouth measuring approximately four by three by one-and-a-half inches. *See* Ex. 76, Cogan Trial Tr., I-9:10–10:15. Despite the object being a triangular piece of concrete, in Plaintiff Coleman's court reported statement he described instructing Plaintiff Fulton to put a medium-sized "brick" in Bridgeman's mouth. *See* Ex. 30, Coleman's Statement, 14–15. Likewise, in Plaintiff Fulton's handwritten statement, he is reported as having told Defendant Garfinkel that Plaintiff Coleman instructed Taylor to insert a brick in Bridgeman's mouth. *See* Ex. 83, Fulton's Statement, p. 2.

*Plaintiff Fulton's Statement Includes an Impossibility*

75.     In Fulton's handwritten statement, it states:

> Derrell states that on the evening of April 11, 1994 at approximately
> 11:30 P.M. at the location of 55th, between Sangamon and Peoria, he
> met Nevest Coleman, Eddie Taylor, and Antwinica Bridgeman. Derrell
> states that Antwinica Bridgeman agreed to go back to Nevest
> Coleman's residence located at 917 W. Garfield with Eddie Taylor and
> Derrell Fulton. Derrell states that *once inside Nevest Coleman's residence*,
> Antwinica, along with Eddie Taylor, Nevest Coleman, and Derrell
> Fulton, *went downstairs to Nevest Coleman's basement*.

*See* Ex. 83, Fulton Statement, pp. 1–2 (emphasis added). However, the basement could only be
accessed from *outside* Coleman's residence. *See* Ex. 1, Coleman Dep., 204:2–10.

## Plaintiffs Would Not Have Been Prosecuted or Convicted
## Absent the Coerced and Fabricated "Confessions"

76.     Brian Sexton was assigned to prosecute the criminal cases against Plaintiffs Coleman
and Fulton. *See* Ex. 89, Sexton Dep., 120:8–23.

77.     Sexton agreed that he would not have been able to prosecute Plaintiff Coleman
without Plaintiff Coleman's statement. *See* Ex. 89, Sexton Dep., 64:15–23. None of the physical
evidence connected Plaintiff Coleman to the crime scene, and no witnesses testified that they observed
him participate in the assault and murder of Bridgeman. *See* Ex. 89, Sexton Dep., 64:24–65:22. Fulton's
statement was also inadmissible against Coleman unless Fulton testified. *See* Ex. 42, Garfinkel Dep.,
320:8–13.

78.     Sexton agreed that he would not have been able to prosecute Plaintiff Fulton without
Plaintiff Fulton's statement. *See* Ex. 89, Sexton Dep., 72:2–73:2. None of the physical evidence
connected Plaintiff Fulton to the crime scene, and no witnesses testified that they observed him
participate in the assault and murder of Bridgeman. *See* Ex. 89, Sexton Dep., 73:3–21. Coleman's
statement against Fulton was inadmissible against Fulton unless Fulton testified. *See* Ex. 42, Garfinkel
Dep., 320:8–13.

79.     Sexton was compelled to drop the charges against Eddie Taylor because he could not use Plaintiffs Coleman's or Fulton's statements against him, and there was no physical evidence establishing his presence at the crime scene. *See* Ex. 89, Sexton Dep., 66:3–23.

### The Defendant Detectives Fabricated Other Evidence to Bolster the Prosecution and Conceal the Fabrication and Coercion of Coleman's and Fulton's Confessions

80.     Sexton's actions in prosecuting Plaintiffs Coleman and Fulton were based on information provided to him by the Defendant Detectives and Defendant Garfinkel. *See* Ex. 89, Sexton Dep., 39:6–19.

*Fabrication of Barber Statement re: "I think that it may be a body"*

81.     On April 19, 1994, at approximately 7:45 a.m., Defendant Garfinkel prepared a handwritten statement signed by Michael Barber and witnessed by Defendant Graf. *See* Ex. 41, Michael Barber Handwritten Statement. The statement indicates as follows:

> Michael states that on April 28, 1994 at 5:30 p.m. at the residence of Nevest Coleman that he had a conversation exclusively with Nevest Coleman out in front of Nevest Coleman's residence. Michael Barber states that Nevest Coleman told Michael Barber that, "There is a real bad smell coming from the basement of my house and I think that it may be a body."

*See* Ex. 41, Michael Barber Handwritten Statement.

82.     Sexton argued at Plaintiffs Coleman's and Fulton's criminal trials that the statement, "I think that it may be a body," was crucial to the prosecution's case. "He says the defendant is saying there's a body in there before there's even discovered there's anything in there at all." *See* Ex. 4, Michael Barber 5/6/97 Trial Testimony, "Barber Trial Tr.", 15:2–17:17.

83.     Two GPRs reflect prior interviews of Michael Barber. *See* Ex. 9, (All GPRs) at DEFS 375, 378. Neither report indicates that Barber told police that Plaintiff Coleman said to him that Plaintiff Coleman thought the smell may be a body before the body was discovered; instead, they are consistent with Mr. Coleman's initial account. *See* Ex. 9, (All GPRs) at DEFS 375, 378. The 6/9/94

24

supplementary report, which summarizes Barber's interviews with police, does not indicate that Barber told police that Plaintiff Coleman said to him that Plaintiff Coleman thought the smell coming from the basement may be a body, but rather provides an account that was consistent with Mr. Coleman's initial account. *See* Ex. 27, 6/9/94 Supp Report, pp. 10–11; Pls.' Resp. to Ofc. DSOF 16.

84. Plaintiff Coleman did not tell Barber that he thought there was a body in the basement before they went and checked out the smell coming from the basement. *See* Ex. 1, Coleman Dep., 249:19–250:2; Pls.' Resp. to Ofc. DSOF 16.

85. On May 18, 1994, Michael Barber testified before the grand jury. Barber did not testify that Plaintiff Coleman told him that Plaintiff Coleman thought the bad smell coming from his basement was a body. *See* Ex. 3, Barber 5/18/94 Grand Jury Testimony. Barber later testified at Plaintiffs Coleman's and Fulton's criminal trials that he had no recollection of telling Defendant Garfinkel that Plaintiff Coleman told him that Plaintiff Coleman thought the smell coming from his basement was a body. *See* Ex. 4, Barber Trial Tr., 19:22–22:21. At his deposition, Barber testified he had no memory of telling Defendant Garfinkel that Plaintiff Coleman told him "there's a real bad smell coming from the basement of my house, and I think that it may be a body." *See* Ex. 5, Barber Dep., 150:2–151:2.

86. Neither Garfinkel nor anyone else provided an explanation for why 17 year-old Barber changed his statement from an account consistent with Mr. Coleman's exculpatory statement to claiming Mr. Coleman said "I think it may be a body" when he signed his handwritten statement at 7:45 a.m. after spending the night at Area 1 detective headquarters. Ex. 41, Barber Handwritten Statement; Ex. 27, 6/9/94 Supp. Report., at DEFS 205, 207; Ex. 9, All GPRs, at DEFS 375, 378; Ofc. DSOF 14; Ex. 42, Garfinkel Dep., at 95:4-23, 96:10-97:15.

25

*Fabrication of Latham Statements*

87. On April 28, 1994, Defendant Foley interviewed Chester Latham, the victim's boyfriend, at the morgue. *See* Ex. 18, Clancy Dep., 290:13–293:6; *see* Ex. 27, Supp. Report dated 6.9.1994; Ex. 6, Latham Dep., at 20:18-23. Although Defendant Clancy testified that he had no recollection of the investigation, he was Defendant Foley's partner and the two conducted their investigation—including several other interviews—together. *See* Ex. 18, Clancy Dep., 80:12–18; *see* Ex. 27, Foley 5/7/97 Trial Tr., J-71:24–72:14, 75:4–16, 77:1–15, 87:13–88:8, 89:3–6, 99:20–24. Defendant Clancy was present at the morgue when the interview of Latham occurred. *See* Ex. 27, Foley 5/7/97 Trial Tr., J-75:4–16.

88. The 6/9/94 supplementary report documents that Chester Latham provided the following information to Defendants Foley and Clancy:

> While at the morgue the R/Ds had occasion to interview the boyfriend of the victim Chester LATHAM who related the following in summary; He related that the last time he saw the victim was on the day before the victims birthday April 10, 1994 and at that time he dropped her off at approx. 2000hrs at her mothers house 852 w. 54th Pl. He then went on to say that while he was with her he noticed that the victim had a bruise, hickey, on her neck. He then asked her how she got the bruise and the victim stated that she had been assaulted several days prior by a M/1 by the name of "Chip" or "Ship". She then told LATHAM that "CHIP" had tried to forcibly sexually assault the victim but she had fought him off and ran away from "Chip". LATHAM then related that the victim had been a member of the Gangster Disciples and had changed allegiances to the Vice Lords. LATHAM concluded this interview by stating that the victim mentioned that "Chip" and "Dap" were Gangster Disciples and they had been bothering her for changing gangs.

*See* Ex. 27, 6/9/94 Supp Report, pp. 9–10.

89. The information Latham allegedly provided to Defendant Foley as documented in the 6/9/94 supplementary report contributed to Sexton's decision to prosecute Plaintiffs Coleman and Fulton and Sexton's belief that they were guilty because it "point[ed] the police into that direction of Eddie Taylor and Derrell Fulton." *See* Ex. 89, Sexton Dep., 148:8–150:3. Sexton also testified that

Latham's statements contributed to probable cause to arrest Plaintiff Fulton. *See* Ex. 89, Sexton Dep., 160:15–24.

90. Chester Latham denied telling police that "Chip" and "Dap" were Gangster Disciples that were bothering Bridgeman because she changed gangs. *See* Ex. 6, Latham Dep., 70:8–12. Latham did not tell police anything about a guy named "Dap," nor did he say anything about Gangster Disciples harassing Bridgeman. *See* Ex. 6, Latham Dep., 86:12–87:3. Latham had no knowledge of Bridgeman ever switching her allegiance or affiliation to the Vice Lords, and he did not say anything to police about Bridgeman switching gangs. *See* Ex. 6, Latham Dep., 31:11–32:2, 47:16–22; *see also* Pls.' Resp. to Ofc. DSOF 22, 23.

*Fabrication of Calimee and Williams Statements*

91. According to Defendants Boudreau and Halloran, late in the evening on April 28, 1994, Francine Calimee and Shaunice Williams approached Defendants Boudreau and Halloran near the Coleman residence. *See* Ex. 8, Boudreau Dep., 147:4–148:2, 169:20–170:16; *see* Ex. 10, Halloran Dep., 130:2–15; *see* Ex. 13, Halloran Trial Tr., J-12:15–14:8. According to Defendant Boudreau, Calimee and Williams told Defendants Boudreau and Halloran that they could not talk earlier because they were afraid of Plaintiff Coleman. *See* Ex. 8, Boudreau Dep., 171:6–9. According to Defendant Halloran, Calimee told them that she was afraid of the Gangster Disciples and that she would be the next victim. *See* Ex. 10, Halloran Dep., 130:16–21; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

92. Calimee, who was 18-years old, and Williams, who was 16-years old, were then transported to Area 1 by Boudreau and Halloran. *See* Ex. 8, Boudreau Dep., 172:3–23; *see* Ex. 10, Halloran Dep., 135:9–136:1; *see* Ex. 13, Halloran Trial Tr., J-14:9–5; Ex. 48, Calimee Handwritten Statement, at Plaintiff 5224; Ex. 49, Williams Handwritten Statement, at CCSAO 898. Defendant Foley interviewed Calimee and Williams at the Area. *See* Ex. 24, Foley Trial Tr., 85:11–89:1. Although Defendant Clancy could not recall whether he participated in the interviews with Calimee and Williams

during his deposition, he was Defendant Foley's partner and the two conducted their investigation—including several other interviews—together. *See* Ex. 18, Clancy Dep., 80:9–11; *see* Ex. 24, Foley Trial Tr., 71:24–72:14, 75:4–16, 77:1–15, 87:13–88:8, 89:3–6, 99:20–24. After being at the station all night, Calimee and Williams each signed handwritten statements in front of Defendant Garfinkel, and either Defendant O'Brien or Defendant Boudreau. Ex. 48, Calimee Handwritten Statement; Ex. 49, Williams Handwritten Statement. Calimee signed her handwritten statement at 10:25 a.m. Ex. 48, Calimee Handwritten Statement.

93. The 6/9/94 supplementary report documents that Francine Calimee and Shaunice Williams provided the following information to Defendants Foley, Clancy, Halloran, and Bourdeau:

> The R/Ds then had occasion to reinterview both Francine CALIMEE and Shaunice WILLIAMS and at that time both girls stated that when they were first interviewed by the R/Ds then withheld information regarding this investigation. They then went on to say that they were both afraid of the Gangster Disciples and that the victim had left the party at CALIMEEs house with a GD, Nevest COLEMAN on the night that she disappeared. . .[WILLIAMS] and CALIMEE then related that they were extremely afraid for their safety and that is the reason that they never told anyone that COLEMAN had left the party with the victim. They both were afraid that they would be the next victims.

*See* Ex. 27, 6/9/94 Supp Report, p. 11.

94. Sexton viewed the fact that Calimee and Williams were afraid of Plaintiff Coleman as a significant piece of information. *See* Ex. 89, Sexton Dep., 157:4–9. Sexton relied on the 6/9/94 supplementary report to form a belief that Calimee and Williams were afraid of Plaintiff Coleman, and he considered that fact in opining that there was probable cause to arrest and prosecute Plaintiff Coleman. *See* Ex. 89, Sexton Dep., 155:3–156:12. Sexton viewed the information as "very incriminating." *See* Ex. 89, Sexton Dep., 181:19–183:14.

95. There are no GPRs that indicate that Francine Calimee told any of the Defendant Detectives that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 9, All GPRs,. Calimee's handwritten statement does not indicate that she was afraid of the Gangster Disciples or

Coleman. *See* Ex. 48, Francine Calimee Handwritten Statement. Calimee did not testify at trial that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 90, Francine Calimee Trial Testimony; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

96.     Francine Calimee was never afraid of Plaintiff Coleman or the Gangster Disciples. Although Calimee could not remember exactly what she told police, she would not have told them that she was afraid of the Gangster Disciples or Plaintiff Coleman because that was not true. *See* Ex. 14, Calimee Dep., 48:19–50:8. Calimee was surprised or thought it was strange to find out that the police reported that she said to them that she was afraid of Plaintiff Coleman because she does not remember saying that and it is not true. *See* Ex. 14, Calimee Dep., 144:21–145:4; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

97.     There are no GPRs that indicate that Shaunice Williams told any of the Defendant Detectives that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 9, All GPRs,. Williams's handwritten statement does not indicate that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 49, Shaunice Williams Handwritten Statement. Williams did not testify at trial that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 91, Shaunice Williams Trial Testimony; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

98.     In 1994, after Bridgeman's body was found, Shaunice Williams was not afraid of Plaintiff Coleman or the Gangster Disciples. Williams did not tell the police that she was afraid of the Gangster Disciples. Williams did not tell police that she had withheld information because she was afraid of Plaintiff Coleman. *See* Ex. 15, Williams Dep., 278:21–280:2. Williams denied telling police the statements attributed to her in the 6/9/94 supplementary report about being afraid of the Gangster Disciples and Plaintiff Coleman. *See* Williams Dep., 281:3–282:20; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

*Fabrication of Coleman Statements re: Last Time he Saw Bridgeman*

99.     Per the 6/9/94 supplementary report, on April 28, 1994, Defendants Foley and Clancy interviewed Plaintiff Coleman at Area 1. *See* Ex. 24, Foley 5/7/97 Trial Tr., V-85:11–89:19. The 6/9/94 supplementary report documents that Plaintiff Coleman made the following statements to Defendants Foley and Clancy during the interview:

> The R/Ds then had occasion to ask COLEMAN if he knew the victim Antwinica BRIDGEMAN and at that time COLEMAN stated that in fact he did know the victim and that he knew her for several years. He then related that he had not seen her for sometime at least several months.

* * *

*See* Ex. 27, 6/9/94 Supp Report, p. 10. According to the report, Defendants Foley and Clancy then reinterviewed Plaintiff Coleman after he was brought back to the Area. *See* Ex. 24, Foley 5/7/97 Trial Tr., V-90:18–92:20. The 6/9/94 supplementary report documents that Plaintiff Coleman made the following statements to Defendants Foley and Clancy during the interview:

> The R/Ds then had occasion to reinterview COLEMAN and after again advising him of his cons. rights, which he again stated that he understood. He then was confronted with the accounts of 11 APR 94 by CALIMEE and WILLIAMS and at that time COLEMAN stated that he had lied to the police and that in fact he had left the party at CALIMEEs house with the victim.

*See* Ex. 27, 6/9/94 Supp Report, pp. 10–12.

100.    Sexton relied on the 6/9/94 supplementary report to form a belief that Plaintiff Coleman lied about the last time he saw the victim. *See* Ex. 89, Sexton Dep., 39:23–40:18, 155:3–156:12. Sexton introduced Plaintiff Coleman's alleged lie about the last time he saw the victim through Defendant Foley's testimony at the hearing on Plaintiff Coleman's motion to suppress and Coleman's criminal trial. *See* Ex. 16, Foley 6/5/96 MTS Testimony, 32:12–34:5; *see* Ex. 24, Foley 5/7/97 Trial Tr., V-89:12–90:17, 92:12–93:8.

101.    During his interviews at Area 1, Plaintiff Coleman did not tell Defendants Foley and Clancy that he had not seen "Mikey"—the name by which he knew Antwinica Bridgeman—for a

couple of months. *See* Ex. 11, Coleman MTS Testimony, J-52:5–53:2; *see* Ex. 1, Coleman Dep., 398:8–14. Defendant Foley's GPR reflecting the interview does not indicate that Coleman stated that he had not seen the victim "in months," but rather only that Plaintiff Coleman "hasn't seen V." and "hasn't been around the] neighborhood." *See* Ex. 18, Clancy Dep., 188:22–189:24; *see* Ex. 9, All GPRs, at DEFS 371. *See also* Pls.' Resp. to Ofc. DSOF 72.

*Concealment of Defendant Turner's Role in Investigation*

102.     Based on his custom and practice, Sexton likely spoke with Defendant Foley before calling Defendant Foley to testify at the hearing on Plaintiff Fulton's motion to suppress. *See* Ex. 89, Sexton Dep., 137:16–24. During the hearing on Plaintiff Fulton's motion to suppress centered around Futlon's claim he was struck by an African American detective, Sexton asked Defendant Foley, "Just so we're clear, was there ever an African American detective even assigned remotely to this case?" Defendant Foley answered, "No, sir." *See* Ex. 94, Foley 4/16/96 MTS Testimony, A101:10–16.

*Fabrication of Fulton's Attempt to Avoid Apprehension*

103.     Defendant Halloran has met with Sexton on multiple occasions regarding various cases. *See* Ex. 10,, Halloran Dep., 101:4–13. The two worked together "quite a bit" in the gang unit. *See* Ex. 10, Halloran Dep., 101:14–22. Defendant Halloran would meet with an assistant state's attorney before testifying at trial if the prosecutor wanted to meet. *See* Ex. 10, Halloran Dep., 101:23–102:6. Sexton met with lay witnesses and detectives before calling them as witnesses to testify at Coleman's and Fulton's criminal proceedings. *See* Ex. 10, Sexton Dep., 13:1–10; 137:16–24.

104.     Based on his custom and practice, Sexton likely spoke with Defendant Halloran before calling Halloran to testify at the hearing on Plaintiff Fulton's trial. *See* Ex. 89, Sexton Dep., 137:16–24. At Plaintiffs Fulton's and Coleman's criminal trials, Defendant Halloran testified that on April 29, 1994, at approximately 7:00 a.m., he and Defendants Boudreau, Foley, Clancy, Carroll, O'Brien, Moser, and Graf went to Plaintiff Fulton's residence at 5517 S. Sangamon. *See* Ex. 13, Halloran Trial

31

Tr., J-16:9–18. Defendant Halloran testified that while his fellow officers were entering through the front of Plaintiff Fulton's house, he observed Plaintiff Fulton enter the residence through the rear. *See* Ex. 13, Halloran Trial Tr., J-17:2–15. According to Halloran, he and Defendant Boudreau went up to the back porch, and as they got up to the back porch, Plaintiff Fulton came out the rear of the residence. *See* Ex. 13, Halloran Trial Tr., J-17:16–21. Per Halloran, he and Defendant Boudreau stopped Plaintiff Fulton from fleeing. *See* Ex. 13, Halloran Trial Tr., J-17:22–23.

105.    Defendant Halloran did not prepare a GPR documenting his allegation that he observed Plaintiff Fulton enter and then exit the rear of his residence as other detectives entered the front of the residence. *See* Ex. 9, All GPRs,. The 6/9/94 supplementary report does not document Defendant Halloran's allegation that he observed Plaintiff Fulton enter and then exit the rear of his residence as other detectives entered the front of the residence. *See* Ex. 27, 6/9/94 Supp Report, p. 14.

106.    Defendant Halloran's testimony was false; Plaintiff Fulton was in his bedroom at the time the Defendant Detectives arrived at his residence and never tried to flee. *See* Ex. 82, Fulton MTS Testimony, A17:11–19:12; Ex. 2, Fulton Dep., 284:8–285:7, 286:13–20; *see* Ex. 92, Davis Dep., 164:10–167:2; *see* Ex. 93, Griffin Dep., 133:10–134:9. The Defendant Detectives did not document in their supplementary report that they stopped Fulton as he was trying to leave his residence. *See* Ex. 27, Supp. Report dated 6/9/94.

**Additional Evidence that Defendant Garfinkel was
Acting as an Investigator and not a Prosecutor**

*Felony Review Acting as an Investigative Body*

107.    Sexton worked in felony review in approximately 1990 and then returned to felony review as a trial supervisor in approximately 1994. *See* Ex. 89, Sexton Dep., 102:6–16. Sexton testified that in felony review, he was never trained that there was a line between acting as a prosecutor and acting as a detective. *See* Ex. 89, Sexton Dep., 106:2–5. Sexton agreed that felony review prosecutors

would confront a suspect with evidence in an effort to get the suspect to tell "the truth" or to "get to the bottom of what happened." *See* Ex. 89, Sexton Dep., 107:3–108:5. Sexton could not explain the difference between how felony review prosecutors interviewed suspects and how detectives interview suspects. *See* Ex. 89, Sexton Dep., 108:6–13.

108.    Lisette Mojica joined the Cook County State's Attorney's Office as a prosecutor in November of 1997. *See* Ex. 69, Excerpts of Lisette Mojica 1/12/05 Trial Testimony in *People v. Roberto Mata*, 02-CR-9220, "Mojica Trial Tr.", 53:2–14. In March of 2002, Mojica was assigned to felony review. *See* Ex. 69, Mojica Trial Tr., 53:19–54:1. Mojica testified that as a prosecutor in the felony review unit, her duties were to assist the Chicago Police Department in their investigations by speaking to victims, witnesses, and defendants who chose to speak with her. *See* Ex. 69, Mojica Trial Tr., 54:2–11.

109.    Patrick Waller joined the Cook County State's Attorney's Office as a prosecutor in approximately March of 2006. *See* Ex. 70, Excerpts of Patrick Waller 1/12/05 Trial Testimony in *People v. Clint Massey*, 14-CR-06853-01, "Waller Trial Tr.", 110:23–111:12. Waller was assigned to the felony review unit in January to July of 2104. *See* Waller Trial Tr., 111:20–112:3. Waller testified that the felony review unit "works with police agencies throughout Cook County during the investigation portion of cases, and for certain cases, specifically violent crimes. We'll go out to police stations, interview witnesses and take statements as well." *See* Waller Trial Tr., 112:4–11. Waller further testified that felony review prosecutors "work with police agencies during the investigation of criminal offenses, and to respond in certain situations to interview witnesses and take statements where appropriate." *See* Waller Trial Tr., 112:6–21.

*Defendant Garfinkel's Admissions that He was Acting as an Investigator*

110.    At Plaintiff Fulton's motion to suppress hearing, Defendant Garfinkel testified that prior to interviewing Plaintiff Fulton he told Plaintiff Fulton that he was a lawyer, he was assigned as

an assistant state's attorney, and he was "assigned to investigate the homicide." *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, A56:1–57:2.

111.    At Plaintiff Fulton's trial, Defendant Garfinkel agreed that on April 29, 1994, he was assigned to assist in the investigation of Bridgeman's murder. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-6:24–7:3. Defendant Garfinkel agreed that on April 30, 1994, he was present at the Area "in conjunction with the investigation of the murder[.]" *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-7:17–8:2. During his testimony, Defendant Garfinkel testified that he is aware of procedures that a felony review prosecutor engages in in a criminal investigation. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-41:11–16. Defendant Garfinkel testified that he was interested in "finding out the truth involved in this investigation." *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-45:18–21.

112.    Defendant Garfinkel testified at his deposition that as a felony review prosecutor, he worked "hand-in-hand" and "in tandem" with the police department. *See* Ex. 42, Garfinkel Dep., 41:13–23.

*Defendant Garfinkel's Actions Were Inconsistent with Those of a Prosecutor*

113.    In 1994, if a suspect told a felony review prosecutor that they had been abused by police, protocol required the prosecutor to immediately cease interviewing the suspect and notify their trial supervisor and the deputy supervisors on felony review of the allegation. *See* Ex. 89, Sexton Dep., 143:11–145:3; *see* Ex. 42, Garfinkel Dep., 37:9–23.

114.    A felony review prosecutor's job was to document statements they believed to be truthful and credible. *See* Ex. 42, Garfinkel Dep., 47:24–48:12. A felony review prosecutor was not supposed to feed facts to a suspect. *See* Ex. 42, Garfinkel Dep., 63:10–13.

115.    As a felony review prosecutor, it was inappropriate for Defendant Garfinkel to respond to Plaintiff Coleman's report of abuse by telling him, "We'll deal with that later." *See* Ex. 89, Sexton Dep., 145:4–18.

116.     Defendant O'Brien testified during his deposition that if a suspect had not made an inculpatory statement, a detective would not contact felony review to have a felony review prosecutor come speak with a suspect. *See* Ex. 17, O'Brien Dep., 192:2–193:20. Defendant O'Brien agreed that based on the 6/9/94 supplementary report, Plaintiff Fulton did not implicate himself in the assault and murder of Bridgeman before Defendant Garfinkel arrived at the Area. *See* Ex. 17, O'Brien Dep., 197:14–198:15; *see* Ex. 27, (6.9.1994 Supp. Report), pp. 14–15. Based on his experience and the information in the supplementary report, Defendant O'Brien testified that he did not know why felony review would have been contacted to interview Plaintiff Fulton. *See* Ex. 17, O'Brien Dep., 198:16–24.

### Additional Evidence of Defendant Garfinkel's Participation in the Conspiracy to Frame Coleman and Fulton

117.     Prior to the Bridgeman homicide investigation, Defendant Garfinkel had worked on other cases with Defendants Clancy, Foley, Boudreau, Halloran, Graf, O'Brien, Moser. *See* Ex. 42, Garfinkel Dep., 82:10–83:23.

118.     Defendant Garfinkel started his investigation into the Bridgeman homicide on April 29, 1994 at 6:15 a.m. *See* Ex. 88, Fulton Felony Review Jacket — Coleman, p. 1. Plaintiff Coleman did not give his court reported statement until 9:57 a.m. *See* Ex. 30, Coleman Statement, p. 1.  According to Garfinkel, he had a conversation with Coleman about the "facts and circumstances surrounding" Bridgeman's death before obtaining Coleman's court reported statement. *See* Ex. 42, Garfinkel Dep., 125:3–126:16. In the "Incident Summary" portion of Garfinkel's felony review jacket, he wrote in part the following:

> On above [date, time and location], [Shaunice Williams] and [Nevest Coleman] left [the] home of [Francine Calimee] after spending three hours at [Francine Calimee's] residence "partying." [Bridgeman] and [Coleman] walked [Williams] to her residence, and [Bridgeman] and [Coleman] went to purchase beer at 55th [and] Halstead. [Coleman] went to purchase beer while [Bridgeman] went to her home to change her clothes. [Bridgeman] and [Coleman] decided to return to [Williams's] [*sic*] residence to party again, when they met two of [Coleman's] friends "Dap" [and] "Ship."

35

*See* Ex. 46, Coleman Felony Review Jacket, pp. 1, 3–4; *see* Ex. 42, Garfinkel Dep., 200:20–201:18.

119. Contrary to the summary of information supposedly provided by Coleman as memorialized in the "Incident Summary" portion of Defendant Garfinkel's felony review jacket, Bridgeman was found dressed in the same clothes she had been wearing when she left the gathering at Francine Calimee's residence on April 11, 1994. *See* Ex. 90, Francine Calimee 5/5/97 Trial Testimony, 96:21–97:1. By the time Defendant Garfinkel took Coleman's statement at approximately 9:57 a.m. on April 29, 1994, Plaintiff Coleman said nothing about Bridgeman going home to change clothes before the assault occurred. *See* Ex. 30, Coleman Court Reported Statement, p. 5–7.

120. Defendant Garfinkel's felony review jacket indicates that when he was at the Area the morning of April 29, 1994, he was aware that Plaintiff Fulton was already in custody but had not been charged. *See* Ex. 88, Fulton Felony Review Jacket — Coleman, p. 1.

121. In 1994, felony review was comprised of teams that worked 12-hour shifts: a morning shift and an evening shift. *See* Ex. 42, Garfinkel Dep., 65:13–21. The morning shift started at 6:00 a.m., and the evening shift started at 6:00 p.m. *See* Ex. 42, Garfinkel Dep., 73:16–74:3. A prosecutor would do a month of day shifts, and then a month of night shifts. *See* Ex. 42, Garfinkel Dep., 74:4–9.

122. On April 29, 1994, when Defendant Garfinkel had his first contact in the Bridgeman investigation, he was assigned to the morning shift. *See* Ex. 42, Garfinkel Dep., 75:11–23. Defendant Garfinkel testified that he arrived at Area 1 at approximately 8:00 a.m. *See* Ex. 42, Garfinkel Dep., 79:13–16. However, the notes from his felony review jacket indicate that his "Start Time" for his investigation was 6:15 a.m. *See* Ex. 88, Fulton Felony Review Jacket – Coleman, p. 1.

123. If Defendant Garfinkel were scheduled to work in felony review on April 30, 1994— the date he obtained Plaintiff Fulton's statement—he would have been scheduled to work the day shift starting at 6:00 a.m. *See* Ex. 42, Garfinkel Dep., 214:23–215:2. Working the day shift, Defendant Garfinkel would not have worked beyond 6:00 p.m. unless he received an assignment prior to 6:00

p.m. *See* Ex. 42, Garfinkel Dep., 217:11–218:10. Nevertheless, on April 30, 1994, between approximately 9:00 p.m. and 10:00 p.m., Defendant Garfinkel arrived at Area 1. *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, 55:14–56:7.

124.    After Defendant Garfinkel arrived at Area 1 on April 30, 1994, he spoke with Plaintiff Fulton in the presence of Defendant Foley. *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, 56:8–18. Defendant Garfinkel ultimately prepared a handwritten statement which Plaintiff Fulton signed at approximately 1:30 a.m. on May 1, 1994. *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, A57:22–61:22; *see* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-86:5–16; *see* Ex. 83, Fulton Statement, p. 1.

125.    Defendant Garfinkel could not remember how he was assigned to take Fulton's statement. *See* Ex. 42, Garfinkel Dep., 219:22–220:8. Defendant Garfinkel admitted that although he usually would not get specifically assigned to work on a case he had worked on previously, there were a couple of exceptions when an officer asked him to handle a case even though he was not on that specific unit or team. *See* Ex. 42, Garfinkel Dep., 220:9–24.

### Plaintiffs' Convictions and Sentences

126.    Plaintiffs Coleman's and Fulton's statements were admitted at their respective criminal trials as substantive evidence of their guilt. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., M-23:12–20, 28:22–50:6, O-31:8–39:12. The prosecutors at Plaintiffs' criminal trials relied almost entirely on the statements in arguing Plaintiffs' guilt. *E.g.*, *see* Ex. 95, Prosecutor's Closing Arguments dated 5/12/97, at Z-15:7–19:6; Ex. 103, Prosecutor's Closing Arguments dated 5/13/1997 Closing Argument, at O-135:9–141:21.

127.    The jury convicted both Plaintiffs of criminal sexual assault and first- degree murder. *See* Ex. 96, Coleman Verdict Forms. The State sought the death penalty. Ex. 53, Coleman Sentencing Tr., at CC25. The trial court sentenced both Plaintiffs to terms of natural life on the murder

convictions, and a consecutive 30-year term on the criminal sexual assault convictions. *See* Ex. 97, Coleman Sentencing Order; *see* Ex. 98, Fulton Sentencing Order.

### The Physical and Forensic Evidence Exonerates
### Plaintiffs and Establishes Clarence Neal's Guilt

*The Physical Evidence Implicates Neal*

128.    Police observed condoms in Bridgeman's pockets at the scene. *See* Ex. 27, Supp. Report dated 6/9/94, p. 9. During Bridgeman's autopsy, the pathologist recovered two packaged condoms from the pocket of Bridgeman's outer jacket. *See* Ex. 99, Autopsy Report, p. 1; *see* Ex. 76, Cogan Trial Tr., pp. I-8, I-31.

129.    Consistent with the nature of the assault, evidence at the scene was that Bridgeman fought with her attacker. Police found a pink ponytail holder, Bridgeman's broken eyeglasses, and a broken fingernail next to her body. *See* Ex. 27, Supp. Report dated 6/9/94, p. 8; *see* Ex. 71, Stella Trial Tr., p. H58. A broken stepladder was partially resting on Bridgeman's right arm. *See* Ex. 27, Supp. Report dated 6/9/94, p. 8; *see* Ex. 71, Stella Trial Tr., p. H69.  The pathologist noted during Bridgeman's autopsy that the artificial fingernail over Bridgeman's right thumb was missing, again indicating that Bridgeman struggled with the perpetrator. *See* Ex. 99, Autopsy Report, p. 2; *see* Ex. 76, Dr. Cogan's Trial Tr., p. I-61–62.

130.    In 2016, clothing and samples of clothing Bridgeman wore during the assault were sent to the Illinois State Police Division of Forensic Services, ("the ISP Lab"). *See* Ex. 21, ISP Lab Report dated 5/31/17 ("5/31/17 Lab Report"). Bridgeman's nail clippings were also sent to the ISP Lab. *See* Ex. 21, 5/31/17 Lab Report. Testing indicated the presence of semen on Bridgeman's sweatshirt, red/black "Bulls" coat, and underwear. *See* Ex. 21, 5/31/17 Lab Report.

131.    Subsequent DNA testing performed on the semen in Bridgeman's underwear, Lab Exhibit 5K1, yielded a profile from which convicted serial rapist Clarence Neal cannot be excluded. *See* Ex. 34, ISP Lab Report dated 11/29/17, "11/29/17 Lab Report", pp. 2–4. The expected frequency

of occurrence for the male DNA profile found in Bridgeman's underwear, calculated for the African American, Caucasian, and Hispanic population groups, was found to be no more common than approximately 1 in 1.7 septillion unrelated individuals. *See* Ex. 34, 11/29/17 Lab Report, p. 2.

132. DNA testing performed on Bridgeman's left hand nail clippings, Lab Exhibit 3B, yielded a profile from which Neal cannot be excluded. *See* Ex. 34, 11/29/17 Lab Report, p. 4; *see* Ex. 21 5/31/17 Lab Report, p. 2. The expected frequency of occurrence for the male DNA profile found in Bridgeman's underwear, calculated for the African American, Caucasian, and Hispanic population groups, was found to be no more common than approximately 1 in 180,000 unrelated individuals. Coleman, Fulton, and Taylor were excluded as possible contributors. *See* Ex. 34, 11/29/17 Lab Report, p. 4.

133. Although less probative than the above results, DNA testing on the following items also yielded profiles from which Neal could not be excluded: 1) a swabbing from the pipe used to impale Bridgeman, Lab Exhibit 7A; 2) a swabbing from the rock shoved into Bridgeman's mouth, Lab Exhibit 12A; 3) the non-sperm fraction of a cutting from Bridgeman's sweatshirt where semen was indicated, Lab Exhibit 5B1; and 4) the non-sperm fraction of a different cutting from Bridgeman's sweatshirt where semen was indicated, Lab Exhibit 5B2. *See* Ex. 34, 11/29/17 Lab Report, p. 4; *see* ISP Lab Report dated 7/18/17, 7/18/17 Lab Report", p. 1; *see* Ex. 101, ISP Lab Report dated 3/2/18, "3/2/18 Lab Report", pp. 2–3.

134. Y-STR testing was also performed on extracted DNA from three cuttings of Bridgeman's sweatshirt where semen was indicated, Lab Exhibits 5B2A and 5B9A. *See* Ex. 37, ISP Lab Report dated 12/14/17 ("12/14/17 Lab Report"). The testing of the non-sperm fractions of all three samples yielded a mixture of Y-STR DNA haplotypes from which Neal could not be excluded. *See* Ex. 37, 12/14/17 Lab Report.

135. The postconviction DNA and forensic testing either excluded Plaintiffs Coleman and Fulton entirely or failed to yield any probative evidence connecting them to the scene or the crime. *See* Ex. 19, Sussman Dep., 187:11–188:11.

*Neal's Prior Violent Rapes*

136. On July 3, 1998, at approximately 11:30 p.m., a woman, hereinafter referred to as "Victim A", was violently sexually assaulted in an abandoned building. A summary of the incident she provided to police, in relevant part, is as follows:

> Victim related to R/O's that while walking home from 45th Street, at St. Lawrence Victim was approached from behind by Offender with a box cutter in his hand and he stated to victim "If you don't get in the car, I'll kill you." Victim A proceeded to the offender's car. Victim proceeded to offender's car . . . Offender took victim to address of occurrence and took victim to 2nd floor of abandoned building. . . Offender began kissing her neck and victim asked him to stop. Offender requested victim to take off her clothes or he would kill her. Offender told victim that she was going to suck his **** or **** him and asked which did she prefer. Victim replied neither. Offender picked up an empty wine bottle and began hitting victim about the leg and upward to thigh and arm. After a tussle on the bed offender demanded victim take off all her clothes or he was going to cut her. . . Offender then got on top of victim and sexually assaulted her.

*See* Ex. 68, Officer Santana's General Offense Case Report. A sexual assault kit was collected from Victim A after the assault. *See* Ex. 61, Supplementary Report dated 2/4/99, Bates Nos. City 653–55, p. 2.

137. On October 19, 1998, at approximately 4:00 a.m., a woman, hereinafter referred to as "Victim F", was violently sexually assaulted in an alley by multiple offenders. A summary of the incident she provided to police, in relevant part, is as follows:

> Victim related to O/O's that she went to pick up her God sister at 103rd [&] Michigan and got out of the car and started walking E/B on 103rd Street when she was approached by Offenders #1 and #2 who asked victim did she think she was too good to talk to them. Victim then related that the offenders punched her in the stomach and arm knocking her to the ground. Offenders then picked victim up and put her into offenders car in the back seat. Once victim got into vehicle she noticed a 3rd offender. They then drove victim to alley at about 107th [&] Michigan where offender #1 had intercourse and oral

> sex with victim followed by offender #2 having oral sex then intercourse with victim.

*See* Ex. 59, Officer Jones's General Offense Case Report. A sexual assault kit was collected from Victim F after the assault. *See* Ex. 67, Supplementary Report dated 8/31/04, Bates Nos. City1568–70.

138.    On August 17, 2001, at approximately 5:25 a.m., a woman, hereinafter referred to as "Victim E", was violently sexually assaulted in an alley. A summary of the incident she provided to police, in relevant part, is as follows:

> Victim related to R/O that she was waiting for the bus at 117th & Michigan when offender picked her up as a livery cab. Victim paid offender to take her to 95th [&] Dan Ryan El. Upon missing train offender offered to catch train at 63rd. Upon arrival at 67th [&} State, Offender made a right turn on Wabash and doubled back into the alley between State/Wabash . . . Victim began requesting to get out of vehicle . . . [the] Offender then parked at a garage placing Victim's door against the garage making it impossible for her ot exit vehicle. He then stated after they argued, "I just want my **** sucked then I will let you go. If you are in love, it's not worth you getting beat up, and me choking you, I can still do it." Victim responded, "Just do what you're going to do to me, cause I'm not doing it." He then pulled out an orange screwdriver and put it up to her neck and stated "It's not worth your life, you either going to **** or ****."

*See* Ex. 60, Officer Stubbs's General Offense Case Report. Victim E went on to tell police that, after the sexual assault, the Offender told her, "You can flag the police if you want to. I know I'm going back to prison. I was sentenced 85 years and I did 12 years straight for double murder. *See* Ex. 60, Officer Stubbs's General Offense Case Report. A sexual assault kit was collected from Victim E after the assault. *See* Ex. 64, Supplementary Report dated 8/27/01, Bates Nos. City685–88.

139.    In approximately April 2002, the ISP Lab notified police that testing of the vaginal swabs from the rape kits of Victims A, F, and E yielded the same DNA profile. *See* Ex. 62, Supplementary Report dated 4/9/02, Bates Nos. City1600–03, p. 2. In approximately July 2004, the ISP Lab notified police that the suspect profile hit on CODIS offender Clarence Neal. *See* Ex. 102, Supplementary Report dated 9/7/04, Bates Nos. City1604–06, pp. 2–3; Ex. 66, Supplementary Report

dated 8/31/04, Bates Nos. City1568–70, p. 2; *see* Ex. 63, Supplementary Report dated 8/9/04, Bates Nos. City 1138–42, p. 3.

140.    On July 30, 2004, Victim E viewed a photo array and identified Clarence Neal as the person who sexually assaulted her. *See* Ex. 65, Supplementary Report dated 8/29/04, Bates Nos. City 1143–45, pp. 2–3. On August 29, 2004, Victim E viewed a photo array and again identified Neal as the person who sexually assaulted her. *See* Ex. 65, Supplementary Report dated 8/29/04, Bates Nos. City 1143–45, pp. 2–3. On July 22, 2005, Neal pled guilty to the aggravated criminal sexual assault of Victim E. *See* Ex. 56, 7/22/05 Guilty Plea Transcript, 2:7–3:4.

141.    On September 7, 2004, Victim F viewed a lineup of six individuals, including Neal. She was unable to make an identification. *See* Ex. 104, Supplementary Report dated 9/8/04, Bates Nos. City 1571–74, p. 3. Law enforcement's investigation of Victim F's assault was suspended after they made multiple unsuccessful attempts to contact her. *See* Ex. 105, Supplementary Report dated 9/18/17.

142.    On June 3, 2012, police were able to locate Victim A. *See* Ex. 106, Supplementary Report dated 6/24/12, p. 3. Victim A viewed a photo array and identified Clarence Neal as her attacker. *See* Ex. 106, Supplementary Report dated 6/24/12, p. 3. An investigative alert was issued for Neal. *See* Ex. 106, Supplementary Report dated 6/24/12, p. 3. Police located Neal, who was living in North Carolina. *See* Ex. 107, Supplementary Report dated 8/20/12, pp. 3–4. After Victim A learned that Neal was living in another state, had been charged in two other cases, and had served 7 years for another rape, she decided that she no longer wished to pursue charges but requested information on counseling. *See* Ex. 107, Supplementary Report dated 8/20/12, pp. 3–4.

*Clarence Neal's Admissions*

143.    Clarence Neal was interviewed by the Conviction Integrity Unit ("CIU") on August 28, 2017. *See* Ex. 58, Neal Interview, 2:1–4. Neal initially stated that he was locked up doing four years

42

in prison when Bridgeman was murdered. *See* Ex. 58, Neal Interview, 53:17–54:10. The CIU investigators pointed out that according to court records, Neal was not incarcerated at the time of Bridgeman's murder. *See* Ex. 58, Neal Interview, 57:6–60:8, 67:4–68:4.

144.    Neal denied having a relationship with Bridgeman. *See* Ex. 58, Neal Interview, 65:23–66:10. Then Neal stated that he had known Bridgeman not long, "not even a month," and he only saw her in passing. *See* Ex. 58, Neal Interview, 77:8–22. Neal denied having any kind of physical relationship with Bridgeman. *See* Ex. 58, Neal Interview, 78:17–79:6. Neal explicitly denied having sex with Bridgeman. *See* Ex. 58, Neal Interview, 81:14–22.

145.    After again being confronted with the fact that his DNA was on Bridgeman's clothing, Neal stated that "if anything happened," he and Bridgeman may have stuck their hands down each other's pants. *See* Ex. 58, Neal Interview, 81:23–82:11, 85:4–20. Neal again denied having had sex with Bridgeman. *See* Ex.58, Neal Interview, 85:15–86:5. Asked again if it was fair to say that there was something going on between you and her of a sexual nature, Neal stated, "That was not our relationship." *See* Ex. 58, Neal Interview, 91:9–15. The CIU investigators then led Neal to agree that he had, on one occasion during the summer, had a "quickie" with Bridgeman. *See* Ex. 58, Neal Interview, 97:15–98:17, 99:12–100:3, 143:23–144:4. But Neal again denied that he and Bridgeman had intercourse. *See* Ex. 58, Neal Interview, 100:4–12.

146.    The CIU investigators asked Neal about Victim E. *See* Ex. 58, Neal Interview, 160:10–17. Neal denied that he raped Victim E, and claimed that he "could" have had consensual sex with her. *See* Ex. 58, Neal Interview, 160:18–25.

147.    During his deposition in this lawsuit, Neal testified that he only had oral sex with Bridgeman on one occasion. *See* Ex. 26, Neal Deposition, "Neal Dep.", 53:10–23. Neal denied that Bridgeman removed any of her clothes during the encounter. *See* Ex. 26, Neal Dep., 168:22–169:18.

Neal was unable to explain how his semen ended up in Bridgeman's underwear. *See* Ex. 26, Neal Dep., 56:25–57:5.

### Plaintiffs' Convictions Were Vacated, the Charges Dismissed, and COIs Granted

148.     On November 17, 2017, based on the results of the CIU's investigation, the Cook County State's Attorney's Office moved to vacate Plaintiffs' convictions and agreed to a new trial. *See* Ex. 108, Transcripts from 11/17/17 Court Hearing, 2:14–20.

149.     The CIU made a recommendation about whether the CCSAO should move to vacate the convictions, but the decision to move to vacate Plaintiff's convictions was made by Cook County State's Attorney Kimberly Foxx. Likewise, Sussman, Brassil, and Block recommended to SA Kim Foxx that the CCSAO should not retry Plaintiffs. However, the ultimate decision not to retry Plaintiffs was made by Foxx. Ex. 19, Sussman Dep., at 141:19-142:24, 153:2-14, 174:18-175:9, 232:6-18; Ex. 25, Rotert Dep., at 69:22-72:11, 120:9-123:1, 255:16-8.

150.     On December 1, 2017, the Cook County State's Attorney's Office moved to dismiss the charges against Plaintiffs because the State "would be unable to meet [its] burden of proof on retrial." *See* Ex. 109, Transcripts from 12/1/17 Court Hearing, 2:20–3:5. The trial court dismissed the charges upon the State's motion. *See* Transcripts from 12/1/17 Court Hearing, 3:16.

151.     On December 1, 2017, Plaintiff Fulton filed a Petition for Certificate of Innocence. *See* Ex. 110, Fulton Petition for Certificate of Innocence. On January 19, 2018, Plaintiff Coleman filed a Petition for Certificate of Innocence. *See* Ex. 111, Coleman Petition for Certificate of Innocence. The CCSAO did not oppose them. Ofc. DSOF 156. On March 9, 2018, the Circuit Court of Cook County entered an order granting the petitions for certificates of innocence, and certificates of innocence were issued to both Plaintiffs. *See* Ex. 32, Order Granting Fulton Petition for Certificate of Innocence; *see* Ex. 33, Order Granting Coleman Petition for Certificate of Innocence. Mr. Coleman's and Mr. Fulton's COIs state that each "has satisfied his burden under 735 ILCS 5/2-702 and is entitled

to a Certificate of Innocence." *See* Ex. 32, Order Granting Fulton Petition for Certificate of Innocence;

*see* Ex. 33, Order Granting Coleman Petition for Certificate of Innocence.


Respectfully submitted,

/s/ Russell Ainsworth
Russell Ainsworth
Attorney for Nevest Coleman
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312, 243-5900

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Attorney for Derrell Fulton
Kathleen T. Zellner & Associates
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630, 955-1212