```
1    STATE OF ILLINOIS  )
                        )  SS:
2    COUNTY OF COOK     )

3              IN THE CIRCUIT COURT OF COOK COUNTY
               COUNTY DEPARTMENT-CRIMINAL DIVISION
4
     THE PEOPLE OF THE  )
5    STATE OF ILLINOIS  )
                        )
6                       )  Indictment No. 94 13344
          VS            )
7                       )  Charge:  Murder
     NEVEST COLEMAN,    )
8    DARRYL FULTON      )

9              REPORT OF PROCEEDINGS

10             BE IT REMEMBERED that on the 7th day of May

11   A.D., 1997, this cause came on for trial before the

12   Honorable DENNIS J. PORTER, Judge of said court, and a

13   jury, upon the indictment herein, the defendants

14   having entered pleas of not guilty.

15             APPEARANCES:

16                  HON. RICHARD DEVINE,
                    State's Attorney of Cook County, by
17                  MESSRS. BRIAN SEXTON and JAMES SANFORD,
                    Assistant State's Attorneys,
18                     appeared for the People;

19                  MR. RICHARD KLING,
                       appeared for the Defendant Coleman;
20
                    HON. RITA A. FRY,
21                  Public Defender of Cook County, by
                    MS. MARY JANE PLACEK and
22                  MS. JACQUELINE ROSS,
                    Assistant Public Defenders,
23                     appeared for the Defendant Fulton.

24
```

10/5 EXHIBIT 26
5
Planet Depos, LLC

Plaintiff 001577

Pls.' Exhibit 24

1       WILLIAM FOLEY,

2 called as a witness on behalf of the People of the

3 State of Illinois, having been first duly sworn, was

4 examined and testified as follows:

5       DIRECT EXAMINATION

6      BY MR. SEXTON:

7   Q  Detective, in a nice loud voice could you

8 introduce yourself to both folks on the juries?

9   A  Detective William Foley, F-o-l-e-y, star

10 20450.

11   Q  Who are you employed by, sir?

12   A  City of Chicago, the police department.

13   Q  Where are you currently assigned?

14   A  Area One, Violent Crimes, located at

15 5101 South Wentworth.

16   Q  What is your current assignment?

17   A  Violent Crimes.

18   Q  And how long have you been a Violent Crimes

19 detective?

20   A  Twenty years.

21   Q  How long have you been a Chicago police

22 officer?

23   A  Twenty-eight years.

24   Q  And, sir, directing your attention back to

Plaintiff 001646

1    April 28, 1994, where were you assigned back then?

2        A    Area One, Violent Crimes.

3        Q    Did you have a partner back then?

4        A    Michael Clancy, C-l-a-n-c-y.

5        Q    And what shift were you working back then?

6        A    Afternoons, 3:00 o'clock in the afternoon to

7    11:30 in the evening.

8        Q    And directing your attention to approximately

9    sometime after 8:00 p.m., did you receive an

10   assignment of a body being found in the basement at

11   917 West Garfield?

12       A    I did.

13       Q    Did you and your partner proceed there?

14       A    We did.

15       Q    And were you driving in an unmarked police

16   vehicle?

17       A    We were.

18       Q    Is that the standard detective vehicle?

19       A    Yes, sir.

20       Q    And were there police personnel already there

21   by the time you got there?

22       A    There were.

23       Q    Specifically uniform police officers?

24       A    Yes, sir.

U-72

1  Q And did you learn of any witness, possible

2 witnesses, who found the body at that time?

3  A I learned that two male blacks had found the

4 body.

5  Q Michael Barber and Nevest Coleman?

6  A Yes, sir.

7  Q What kind of arrangements were made for

8 Mr. Barber and Mr. Coleman?

9  A The patrol officers had made arrangements to

10 take them -- those two witnesses into my office at

11 51st and Wentworth.

12  Q And what did you then proceed to do?

13  A Inspect the crime scene.

14  Q And specifically where did you go?

15  A To the rear entrance at 917 West Garfield

16 Boulevard.

17  Q And what did you observe once you got there?

18  A Several steps leading to the basement.

19  Q And did you go to the basement then?

20  A I did.

21  Q And can you please tell us what you observed

22 once you got to the basement?

23  A There was a female black lying on her back

24 naked from the waist down.  Her upper clothing was

U-73

Plaintiff 001648

1    pulled up around her head.  There was a large pole

2    protruding from her vaginal area and there was a piece

3    of concrete wedged into her mouth.

4        Q    Now, were there other detectives at the scene

5    who were assisting you in this investigation?

6        A    Yes, sir.

7        Q    Do you recall what those detectives' names

8    were?

9        A    O'Brien and Carroll, Graf and Moser and

10   myself and my partner.

11       Q    Was Detectives Halloran and Boudreau also

12   there as well?

13           MS. PLACEK:  Objection.  Leading.

14           THE COURT:  Overruled.

15           THE WITNESS:  Yes, sir.

16   BY MR. SEXTON:

17       Q    And did you stay at the scene for a while?

18       A    I did.

19       Q    Did any family members of the victim ever

20   come to the scene at all, if you recall?

21       A    The mother, the grandmother and the uncle.

22       Q    And did anything happen then?

23       A    The mother and the uncle made a tentative

24   identification of the victim while the body was in the

U-74

1    squadrol.

2         Q    When you mean squadrol you mean like a wagon?

3         A    Yes, sir.

4         Q    And did you and your partner proceed anywhere

5    after that?

6         A    Arrangements were then made to meet the

7    family at the morgue.

8         Q    And did you then proceed to go to the morgue?

9         A    I did.

10        Q    And is that official title the medical

11   examiner's office?

12        A    Yes, sir, it is.

13        Q    And what happened once you and your partner

14   got to the morgue?

15        A    Arrangements were made for the family to view

16   the victim's remains.

17        Q    Was the victim in fact identified at that

18   point?

19        A    Positively, sir.

20        Q    Did you have occasion to interview anybody at

21   the morgue?

22        A    The victim's boyfriend, Mr. Chester Latham.

23        Q    Where did Mr. Latham live at the time?

24        A    I believe 74th or 75th and Ingleside.

U-75

Plaintiff 001650

1       Q       And can you describe his demeanor as you were

2       talking to him?

3       A       He was very upset over the death of the

4       victim.

5       Q       And about how long did you have a

6       conversation with him?

7       A       Ten or fifteen minutes.

8       Q       And after that conversation were you looking

9       for anybody in connection with this homicide?

10      A       Two male blacks.

11              THE COURT:  Just answer yes or no.

12              THE WITNESS:  Yes.

13      BY MR. SEXTON:

14      Q       Who were you looking for at this point?

15              MS. PLACEK:  Objection.  Hearsay.

16              THE COURT:  Objection sustained.  Ask your

17      next question.

18      BY MR. SEXTON:

19      Q       Well, what did you do after you talked to

20      them?

21      A       Went back to Area One.

22      Q       And did you have occasion to interview

23      anybody there at Area One?

24      A       Yes, sir.

U-76

Plaintiff 001651

1    Q    Specifically directing your attention to

2    approximately 11:00 p.m., did you have occasion to

3    interview a Nevest Coleman?

4    A    I did.

5    Q    And without for right now telling us the

6    content of his statement did you have a conversation

7    with him?

8    A    I did.

9    Q    And who was present for that conversation?

10   A    Myself and my partner, Detective Clancy.

11   Q    Approximately how long did that conversation

12   take place?

13   A    Ten or fifteen minutes.

14   Q    What did you do after that conversation?

15   A    Took Mr. Coleman home.

16   Q    Did you in fact take Mr. Coleman home?

17   A    Yes.

18   Q    And did you go anywhere after you took him

19   home?

20   A    5517 South Sangamon.

21   Q    What was your purpose in going over --

22        THE COURT:  Just a moment.  I'm sorry.  You

23   may continue.  Go ahead.

24

U-77

Plaintiff 001652

BY MR. SEXTON:

1
2    Q    What was your purpose in going over to

3    5517 South Sangamon?

4    A    To locate one or two individuals.

5    Q    Specifically who?

6    A    Chip.

7        MS. PLACEK:  Objection.

8        THE COURT:  Overruled.

9        MS. PLACEK:  Foundation.

10       THE COURT:  Overruled.  He may answer.

11       THE WITNESS:  Chip or Dap.

BY MR. SEXTON:

13    Q    Did you in fact go to 5517 South Sangamon?

14    A    I did.

15    Q    Were you able to locate a Chip or a Dap at

16    that point?

17    A    No, sir.

18    Q    Now, what happened after you weren't able to

19    locate a Chip or a Dap there at 5517 South Sangamon?

20    A    I was returning to my vehicle and was

21    approached by Detectives Boudreau and Halloran.

22    Q    And did you learn of the substance of a

23    conversation that they had with a Francine Calimee?

24    A    I did.

U-78

Plaintiff 001653

```
 1        Q    And what, if anything, did you do after you

 2   learned of the substance of that conversation?

 3        A    Went to the home of Nevest Coleman and asked

 4   him if he would come back to Area One with us, that we

 5   had additional questions to ask him.

 6        Q    Why did you go back over to Coleman's house?

 7        A    Because Francine Calimee told --

 8             MR. KLING:  Objection, judge.

 9             THE COURT:  Objection sustained.

10   BY MR. SEXTON:

11        Q    After you went back to Coleman's house -- Who

12   was there at Coleman's house?

13        A    I believe his mother and his father.

14        Q    And was he subsequently transported to Area

15   One, Violent Crimes?

16        A    He was.

17        Q    What did you do with respect to Mr. Coleman?

18        A    Put him in an interview room.

19             MR. SEXTON:  All right.

20             THE COURT:  Ladies and gentlemen, at this

21   point those of you who are seated in the jury box,

22   again until the case is submitted to you for your

23   deliberation you must not discuss the case with anyone

24   or remain in the hearing of anyone discussing it.
```

                              U-79

Plaintiff 001654

1          You're to keep an open mind.  You're not

2   to decide any issue in the case until it has been

3   submitted to you for your deliberations under the

4   instructions of the court.

5          All right.  You may now -- Mary, do you

6   want to take them back to the other jury room and then

7   the sheriff is going to take you over for lunch and

8   we'll see you back after lunch.  And you may now

9   retire to your jury room.  We're going to keep working

10  but you can go to lunch now.

11          DEPUTY SHERIFF:  All rise for the jury.

12                    (Coleman jury excused.)

13          THE COURT:  You may continue.

14  BY MR. SEXTON:

15      Q     Detective, did you subsequently have several

16  conversations with Nevest Coleman concerning the

17  homicide of Antwinica Bridgeman?

18      A     I did.

19          MS. PLACEK:  Objection.

20          THE COURT:  Overruled.  That answer may

21  stand.  You may continue.

22  BY MR. SEXTON:

23      Q     And after those conversations did you notify

24  the state's attorney's office?

U-80

Plaintiff 001655

1      A    Yes, sir.

2      Q    And did an assistant state's attorney by the

3  name of Hal Garfinkel come to the station?

4      A    Yes, sir.

5      Q    Did you have an opportunity to talk with a

6  Mr. Garfinkel?

7      A    Yes, sir.

8      Q    Was the substance -- Well, strike that.

9  Was --

10          THE COURT:  Move it along.

11          MR. SEXTON:  All right, judge.

12  BY MR. SEXTON:

13     Q    Well, directing your attention to about 7:00

14  a.m. what, if anything, did you do with respect to

15  this investigation?

16     A    Went to 5517 South Sangamon.

17     Q    And what was your purpose in going over

18  there?

19     A    To talk to an individual by the name of Dap.

20     Q    All right.  And did you go there with some

21  fellow detectives?

22     A    I did.

23     Q    Who else did you go there with?

24     A    Myself, my partner -- Not my partner.

U-81

1    Myself, Detective Halloran, Detective O'Brien and

2    Detective Boudreau and Jerry Carroll.

3        Q    And at that location was Mr. Fulton placed

4    under arrest?

5        A    Yes, sir.

6        Q    Do you see Mr. Fulton here in court today?

7        A    Yes, sir.

8        Q    Can you please point and identify something

9    that he's wearing?

10       A    The gentleman in I believe it's a gray suit,

11   white shirt.  (Indicating.)

12           MR. SEXTON:  Judge, let the record reflect

13   the in-court identification of the defendant, Darryl

14   Fulton.

15           THE COURT:  It may.

16   BY MR. SEXTON:

17       Q    In fact when you first saw him was he already

18   in custody from Detective Halloran?

19       A    Yes, sir.

20       Q    Now, what did you do with respect to

21   Mr. Fulton at this point?

22       A    Transported him into my office at 51st and

23   Wentworth.

24       Q    Was he handcuffed at that time?

U-82

1    A    No, sir.

2    Q    And did you then arrive at Area One, Violent

3  Crimes?

4    A    I did.

5    Q    And what did you do with respect to

6  Mr. Fulton at that point?

7    A    Placed him in an interview room.

8    Q    Was he handcuffed in the interview room?

9    A    No, sir.

10   Q    Did you have an opportunity to talk to him at

11  approximately 7:30 a.m.?

12   A    I did.

13   Q    Who was present for that conversation?

14   A    Myself, Detective Clancy.

15   Q    And did you advise the defendant of anything

16  at that point?

17   A    His Constitutional Rights from my FOP book.

18   Q    Do you have your FOP book with you here

19  today?

20   A    Yes, sir.

21   Q    Does that contain the same rights that you

22  gave the defendant back in 1994?

23   A    Yes, sir.

24        MR. SEXTON:  Judge, I ask that it be marked

U-83

1   as People's Exhibit --

2           THE COURT:  55.

3           MR. SEXTON:  55, judge?

4           THE COURT:  55.

5           MR. SEXTON:  Judge, I ask that it be marked

6   as People's No. 55.

7           THE COURT:  All right.  It may be so marked.

8           MR. SANFORD:  No.  I'm sorry.  56.

9           THE COURT:  What do you have as 55?

10          MR. SANFORD:  Officer O'Toole's -- There were

11  objects, but I think all parties agree it's 56.  We'll

12  clarify that.

13          THE COURT:  Okay.

14          MR. SEXTON:  May I continue?

15          THE COURT:  All right.  You may continue.

16  BY MR. SEXTON:

17      Q   Could you please read the rights that you

18  read to Mr. Fulton back on April 29, 1994 in the

19  morning hours?

20      A   Before we ask you any questions it's our duty

21  to advise you of your rights.  Number One, do you

22  understand that you have the right to remain silent?

23              Number Two, do you understand that

24  anything you say can and may be used against you in

U-84

1    court or other proceedings?

2           Number Three, do you understand that you

3    have the right to talk to a lawyer before we ask you

4    any questions and to have him with you during

5    questioning?

6           Number Four, if you cannot afford or

7    otherwise obtain a lawyer and you want one a lawyer

8    will be appointed for you and we will not ask any

9    questions until he has been appointed.

10          Number Five, if you decide to answer

11    now, with or without a lawyer, you will still have the

12    right to stop the questioning at any time or to stop

13    the questioning for the purposes of consulting a

14    lawyer.

15          Number Six, you may waive the right of

16    advice of counsel and your right to remain silent and

17    you may answer questions or make a statement without

18    consulting a lawyer if you so desire.

19          Number Seven, do you understand each of

20    these rights?

21          Number Eight, do you wish to answer

22    questions at this time?

23    Q   Did he indicate after each right was given

24    that he understood those rights?

Plaintiff 001660

1    A    Yes, sir, he did.

2    Q    Did he agree to talk to you about this

3    murder?

4    A    He did.

5    Q    Did he ask you to explain any of the terms at

6    all?

7    A    No, sir.

8    Q    Did you have any difficulty comprehending

9    what he was saying?

10    A    No, sir.

11    Q    Did you then inform him of anything?

12    A    Yes, sir.

13    Q    What is that?

14    A    The contents of Mr. Coleman's statement.

15    Q    Let me ask you this, did you ask him

16    regarding -- did you ask him about where he was during

17    this homicide?

18    A    Yes, sir.

19    Q    And what, if anything, did he tell you at

20    that point?

21    A    He said he didn't know anything about the

22    homicide and he wasn't in the area, he was with his

23    girlfriend, a Miss Kimberly Johnson.

24    Q    And about how long did that conversation

U-86

Plaintiff 001661

1    last?

2    A    Less than ten minutes.

3    Q    And what did you do then with respect to this

4    investigation?

5    A    Went and looked for Miss Kimberly Johnson.

6    Q    Were you also looking for an individual by

7    the name of Chip as well?

8    A    Yes, sir.

9    Q    At that time were you able to locate Kimberly

10    Johnson or Chip or Eddie Taylor during the day of

11    April 29, 1994?

12    A    No, sir.

13    Q    Did you and your partner -- Was your partner

14    also interviewing Mr. Coleman at that time as well

15    with the state's attorney?

16    MS. PLACEK:  Objection.  Foundation.

17    THE COURT:  Objection sustained -- Strike

18    that.  Overruled.  You may answer that question.  It's

19    preliminary.

20    THE WITNESS:  Do you want me to answer?

21    THE COURT:  You may answer.

22    THE WITNESS:  Yes, sir, he was.

23

24

U-87

1    BY MR. SEXTON:

2        Q    And was a court reported statement taken from

3    Mr. Coleman the morning of April 29, 1994?

4        A    Yes, sir.

5        Q    Now, about what time did you and your partner

6    leave the station?

7        A    About 1:00 o'clock in the afternoon, 1:30

8    maybe.

9        Q    And did you hand off so to speak the

10   investigation to anybody at that time?

11       A    Yes, sir.

12       Q    And who did you hand it off to?

13       A    My supervisor, the watch commander on duty at

14   the time.

15       Q    And did you give him any instructions with

16   regard to Mr. Fulton at that time?

17       A    Yes, sir, that all of his personal needs will

18   be met and that nobody else interview him or

19   interrogate him and that I would be back in several

20   hours.

21       Q    Were efforts still being made to locate a

22   Kimberly Johnson as well as an Eddie Taylor or Chip?

23       A    Yes, sir.

24       Q    Would that be assigned to detectives who

U-88

1  would come on duty during the day then?

2      A    Yes, sir.

3      Q    Do you recall what time you returned that day

4  to work with your partner on April 29, 1994?

5      A    I believe it was about 5:30 or 6:00 o'clock

6  in the evening.

7      Q    And when you returned were you aware of --

8  did you become aware of any fingerprints that were

9  taken from one of the beer cans that was found in the

10  basement?

11      A    Yes, sir.

12      Q    In fact did you learn the results of a

13  fingerprint analysis on April 29, 1994?

14      A    I did.

15      Q    The results of that fingerprint analysis --

16  Can you tell us the results that you learned?

17      A    There were no additional prints found.

18      Q    Let me ask you this, was a comparison made by

19  a fingerprint examiner on April 29, 1994?

20          MS. PLACEK:  Objection.

21          MR. SEXTON:  That he's aware of.

22          MS. PLACEK:  Objection sustained.  It's

23  hearsay.

24

U-89

Plaintiff 001664

BY MR. SEXTON:

Q   Did you continue in your efforts to try and find an Eddie Taylor when you came back on the job about 5:30 or 6:00 or so?

A   Yes, sir.

Q   Were you able to locate Eddie Taylor or Chip at all?

A   No, sir.

MS. PLACEK:   Objection.

THE COURT:   Overruled.   The answer may stand.

BY MR. SEXTON:

Q   In fact what kind of efforts were you making in order to try and find an Eddie Taylor?

A   Going to previous addresses as well as acquaintances' homes.

Q   And directing your attention to sometime after 8:00 p.m., did you become aware whether your fellow detectives had in fact located a Kimberly Johnson?

A   Yes.   She was located by Detectives O'Brien and Carroll.

Q   Did you sometime after that learn the contents of what Miss Johnson had told Detectives Carroll and O'Brien?

U-90

Plaintiff 001665

1          MS. PLACEK:  Objection to leading.

2          THE COURT:  Objection to the form of the

3    question sustained.

4    BY MR. SEXTON:

5        Q    Well, did you talk to Detectives Carroll and

6    O'Brien after that?

7        A    I did.

8        Q    And did you learn the contents of what

9    Miss Johnson had stated?

10          MS. PLACEK:  Objection, judge.

11          THE COURT:  Objection sustained as to the

12    form of the question.

13    BY MR. SEXTON:

14        Q    You talked to them, is that correct, after

15    they had interviewed Miss Johnson?

16        A    Yes, sir.

17        Q    And sometime after that at approximately

18    around 9:00 p.m. did you have an opportunity to talk

19    to Mr. Fulton once again?

20        A    I did.

21        Q    And was that in the same interview room?

22        A    Yes, sir.

23        Q    And do you recall who was present for that

24    conversation?

U-91

```
 1       A      Myself and Detective Clancy.

 2       Q      At that time did you confront the defendant

 3   with anything?

 4              MS. PLACEK:  Objection.  Ask for a side bar,

 5   judge.

 6              THE COURT:  All right.  Side bar.

 7                          (The following proceedings

 8                           were had out of the presence

 9                           and hearing of the jury:)

10              THE COURT:  Your objection is?

11              MS. PLACEK:  Judge, what was said to her by

12   the detectives or what she said to the two detectives

13   was I believe, and I'm summarizing, if you tell me the

14   date he was there.  I don't know the exact dates.

15   Now, the word confront would be he said I was there

16   and then, well, no, she said he wasn't, and that's not

17   what she said.

18              THE COURT:  Okay.  I'm going to instruct the

19   jury that the statements made by the detective are not

20   to be taken as to the -- for the truth of what this --

21   What's her name, Johnson?

22              MS. PLACEK:  Kimberly Johnson.

23              THE COURT:  -- may have said.  They're only

24   to be taken to determine the circumstances under which
```

Plaintiff 001667

1  these alleged statements were made.  You may not

2  accept them for the truth of the fact that is asserted

3  and I'll explain to them the best I can in my limited

4  way as to the difference between taking something for

5  the fact that it was said as apposed to, I usually do

6  that with a rain analogy and a raincoat and umbrella

7  on a sunny day.

8  　　　　　MS. PLACEK:  No.  No.  No.  Is that the same

9  analogy because this is he told him he lied.

10  　　　　　THE COURT:  I understand that.

11  　　　　　MS. PLACEK:  To Fulton.

12  　　　　　THE COURT:  That's a fact that they can use

13  in considering the weight to be given to the

14  statement.

15  　　　　　MS. PLACEK:  Okay.  Fine.  Do what you got to

16  do.

17  　　　　　THE COURT:  All right.  Do you want to sit

18  here or do you want to go eat lunch?

19  　　　　　MR. KLING:  I'd like to sit here.

20  　　　　　　　　　　　(The following proceedings

21  　　　　　　　　　　　were had in the presence and

22  　　　　　　　　　　　hearing of the jury:)

23  　　　　　THE COURT:  Ladies and gentlemen, you're

24  about to hear some testimony which is going to involve

U-93

1   statements that were made or allegedly made by other

2   people, Kimberly Johnson.  You may not consider this

3   testimony for the purpose of the truth of whether

4   these statements were made or for -- whether --

5   actually whether the statements were made or whether

6   the statements were true.

7            You may only consider this evidence

8   insofar as it is a fact or circumstance to be

9   considered by you that these words were said to the

10  defendant and to consider the fact that these words

11  were said as being a fact or circumstance to consider

12  by you in determining the credibility that you wish to

13  give to any subsequent statements, should there be

14  any.

15           To put it another way, the statements of

16  an out of court witness, in this case Kimberly

17  Johnson, having somebody else testify to what Kimberly

18  Johnson said would be hearsay if it were offered for

19  the truth of that statement.  However, on this case

20  these statements are only being offered to show the

21  circumstances made and the giving of these alleged

22  statements by the defendant so as that -- as such they

23  are -- the fact that these words were said to the

24  defendant are relevant in determining the weight to be

U-94

Plaintiff 001669

1    given to any subsequent statements. You may consider

2    them for that purpose and that purpose only.

3            I'll give you another example. If I

4    were to tell you right now, since we're sitting in

5    this windowless room, and I were to tell you that it's

6    raining outside right now and so you went and got your

7    umbrella and your overcoat and your galoshes and you

8    went outside and when you get outside you discover

9    it's a bright sunny day out there and so you're the

10   only person walking down the street with all your rain

11   equipment on and somebody comes up to you and says why

12   are you wearing -- carrying an umbrella and wearing

13   your galoshes and your raincoat and you could say, you

14   could testify then if you were asked that question,

15   Judge Porter told me it was raining outside. All

16   right.

17           Now, what you couldn't testify to though

18   would be going over to somebody else on the jury and

19   saying it's raining outside, Judge Porter told me

20   that. You couldn't do that to prove that it was

21   raining outside. You could only do it to prove -- to

22   show what affect those words had on you. You see?

23           Likewise, the fact that certain things

24   may have been said or may not have been said by

U-95

Plaintiff 001670

1    somebody out of court, the fact the defendant was told

2    that certain things were said is something that you

3    may consider in determining the facts and

4    circumstances surrounding any alleged statements which

5    were given after that. You may consider that for that

6    affect and that only. You may continue.

7         MR. SEXTON: Thanks, judge.

8    BY MR. SEXTON:

9         Q    Now, did you confront the defendant with

10   anything at that point?

11        A    Yes, sir.

12        Q    What did you confront him with?

13        A    That Miss Johnson did not support his alibi.

14        Q    And at that time did Mr. Fulton then change

15   his story to you?

16        A    Yes, sir.

17        Q    Now, what did he tell you regarding this

18   offense?

19        A    He said he had lied in his previous account

20   and that Miss Johnson wasn't his alibi. He then went

21   on to say that he had occasion to be in the alley

22   behind Nevest Coleman's house and he observed Nevest

23   Coleman and Eddie Taylor and the victim down in Nevest

24   Coleman's basement.

U-96

Plaintiff 001671

1        Q      What did he state had happened then?

2        A      He then said he observed Chip, Eddie Taylor,

3    being orally copulated by the victim and Nevest

4    Coleman having intercourse with the victim.

5        Q      And did he state anything had happened --

6    What, if anything, did he state happened while he was

7    observing this?

8        A      He said that both of those individuals looked

9    at him, I believe he got afraid and ran home.

10       Q      Now, what kind of arrangements were then made

11   with regard to Mr. Fulton at this point, sir -- Let me

12   ask you this, how long did the conversation take

13   place?

14       A      Maybe fifteen or twenty minutes.

15       Q      And what kind of arrangements, if any, were

16   made with respect to Mr. Fulton at this point?

17       A      I again informed my supervisor that

18   Mr. Fulton should be allowed to sleep and go to the

19   bathroom and have water, if he so desired.

20       Q      And at that point were you also aware of any

21   other physical -- of any other tests that were done on

22   the physical evidence that was recovered from the

23   basement?

24       A      There were supposed to be some laser tests

U-97

Plaintiff 001672

1    done on the physical evidence.

2         Q     And as of April 29, 1994 that had not been

3    done yet; is that correct?

4         A     Arrangements were made to have it done on the

5    30th, sir.

6         Q     Were efforts also being made -- Did you also

7    make efforts to try and locate -- still locate Chip or

8    Eddie Taylor?

9         A     Numerous efforts.

10        Q     And approximately what time did you leave on

11   the evening of April 29, 1994?

12        A     It was about 1:30 or 2:00 o'clock in the

13   morning.

14        Q     Mr. Taylor had still not been located?

15        A     No, sir.

16        Q     Now, what time did you get back to work on

17   April 30, 1994?

18        A     About 3:00 o'clock in the afternoon.

19        Q     When you got back to work at 3:00 in the

20   afternoon had your fellow detectives been able to

21   locate Mr. Taylor yet?

22        A     No, sir.

23        Q     Did you also learn the results of the laser

24   test that was done on the additional physical evidence

Plaintiff 001673

1    from the basement?

2        A    Yes, sir, I did.

3        Q    What exactly is a laser test, just so we're

4    all clear?

5        A    A laser light is put on the physical evidence

6    from different angles to see if any impressions can be

7    found.

8        Q    When you say impressions, are you talking

9    about additional fingerprints that could be found?

10       A    Yes, sir.

11       Q    Was that done on the bottles as well as the

12   beer cans that were found in that basement?

13       A    Yes, sir.

14       Q    Did you learn the results of the laser tests

15   from the bottles on April 30, 1994 when you got back

16   to work?

17       A    I did.

18       Q    What was the results of those tests?

19       A    No additional fingerprints were found.

20       Q    Did you continue to look for, yourself and

21   your partner, to look for Eddie Taylor?

22       A    Yes, sir.

23       Q    Were you able to find him on that day?

24       A    No, sir.

U-99

1    Q    And at approximately 9:00 p.m. did you notify

2    Felony Review?

3    A    Yes, sir, I did.

4    Q    Did a state's attorney eventually arrive at

5    Area One, Violent Crimes?

6    A    At about 9:30, yes, sir.

7    Q    And do you remember that state's attorney's

8    name?

9    A    Hal Garfinkel.

10   Q    Is that the same state's attorney that had

11   come out the night before?

12   A    Yes, sir.

13   Q    And directing your attention to approximately

14   10:00 p.m., did you have occasion to be present for an

15   interview that the state's attorney had with

16   Mr. Fulton?

17   A    I was.

18   Q    Do you recall where that conversation took

19   place?

20   A    The same interview room.

21   Q    And did the state's attorney advise the

22   defendant of anything at that point?

23   A    His Constitutional Rights.

24   Q    And are those the same rights that you had

U-100

Plaintiff 001675

1    previously given to him the day before?

2        A    Essentially, yes, sir.

3        Q    Did Mr. Fulton again indicate that he

4    understood those rights?

5        A    Yes, sir, he did.

6        Q    And did Mr. Fulton then proceed to have a

7    conversation with Mr. Garfinkel?

8        A    Yes, sir, he did.

9        Q    In that conversation did Mr. Garfinkel

10   confront the defendant with anything?

11       A    Yes, sir.

12            MS. PLACEK:  Objection.  Leading and

13   suggestive, judge.

14            THE COURT:  Overruled.  The answer may stand.

15   BY MR. SEXTON:

16       Q    What is that, detective?

17       A    He informed him of Mr. Coleman's statement

18   implicating him.

19            MS. PLACEK:  Objection.

20            THE COURT:  Objection overruled.  Again,

21   ladies and gentlemen, this isn't taken for the truth

22   of the matter asserted.  This is taken only for the

23   fact that the witness -- that the defendant was told

24   such a thing and you may consider that fact that the

                          U-101

1    words were said only insofar as it may affect the

2    believability or the credibility or the weight to be

3    given to any subsequent statements that may follow.

4    You may not consider that as the truth of the matter

5    asserted in the codefendant's statement.

6              MR. SEXTON:  May I proceed, judge?

7              THE COURT:  You may.

8    BY MR. SEXTON:

9         Q    At that time did Mr. Fulton make any special

10   requests?

11        A    Yes, sir, he did.

12        Q    And do you recall what that request was?

13        A    He asked to speak with the state's attorney

14   alone.

15        Q    At that point what did you do then?

16        A    Left the room.

17        Q    And approximately how long did the state's

18   attorney talk to Mr. Fulton alone?

19        A    Approximately forty-five minutes to an hour.

20        Q    And what happened after about forty-five

21   minutes to an hour?

22        A    Mr. Garfinkel came out -- came for me and I

23   went back into the room with him.

24        Q    What happened once you got back into the

U-102

1  room?

2      A    Mr. Fulton related a different story.

3      Q    And do you recall what he then related to you

4  regarding his involvement in the homicide of Antwinica

5  Bridgeman then?

6      A    Yes, sir.

7      Q    Can you please tell us?

8      A    He said basically that all of the

9  individuals, himself, Mr. Taylor, Mr. Coleman and the

10  victim were in the alley behind Nevest Coleman's house

11  at 917 West Garfield.  He then went on to say they all

12  agreed to engage in sex and went down to the basement.

13      Q    Did he state what happened once they all got

14  down to the basement?

15      A    When they all got down to the basement the

16  victim orally copulated Taylor and engaged in

17  intercourse with Mr. Coleman.

18      Q    Was it Mr. Taylor or Mr. Fulton that she

19  engaged in oral --

20      A    I'm sorry.  Orally copulated --

21           MS. PLACEK:  Objection, judge.  Impeaching

22  his own witness?

23           THE COURT:  Overruled.

24           THE WITNESS:  I'm sorry.  I made a mistake.

U-103

Plaintiff 001678

1     She was orally copulating Mr. Fulton.

2     BY MR. SEXTON:

3       Q    Did he state whether Mr. Coleman was having

4     sex with her as well at the same time?

5       A    He stated that he was having sexual

6     intercourse with the victim.

7       Q    And did he state what Taylor was doing while

8     this was going on?

9       A    Taylor was just standing around watching.

10       Q    Did he state if anything happened after that?

11       A    He stated after a short time Mr. Taylor

12     wanted to have sex with the victim.

13       Q    And did he state what the victim did after

14     Mr. Taylor stated that he wanted to have sex with the

15     victim?

16       A    The victim wanted to leave and at that point

17     Mr. Coleman and Mr. Taylor forced her to the ground.

18       Q    Did he state what happened after they forced

19     her to the ground?

20       A    At that point Mr. Coleman forced her to

21     orally copulate him and Mr. Taylor had sexual

22     intercourse with her.

23       Q    Did Mr. Fulton tell you what he was doing as

24     Mr. Coleman forced the victim to orally copulate him

Plaintiff 001679

1    and Taylor was having vaginal intercourse with the

2    victim?

3         A    He was stating that he was acting as a

4    lookout because the victim was screaming.

5         Q    Did he state what he would do as the lookout?

6         A    Yes.  Watch the back door, that nobody came

7    to discover them.

8         Q    Now, you stated that he -- Mr. Fulton told

9    you that the victim was screaming at this point?

10        A    Yes, sir.

11        Q    Did Mr. Fulton tell you what happened as the

12   victim continued to scream?

13        A    Yes.  He said that Mr. Coleman told

14   Mr. Taylor to put concrete in the victim's mouth to

15   stop her from screaming, at that point he said that

16   Mr. Taylor put a piece of concrete in the victim's

17   mouth.

18        Q    Did Mr. Fulton tell you what he was doing as

19   Taylor was putting a brick in Miss Bridgeman's mouth

20   per the directions of Coleman?

21        A    Acting as a lookout.

22        Q    Did he tell you what happened after concrete

23   was put in Bridgeman's mouth, the victim's mouth?

24        A    Yes.  Mr. Taylor then picked up a piece of

U-105

Plaintiff 001680





1   pipe and said to the victim you want something hard, I

2   got something hard for you and at that point stuck the

3   pipe into the vaginal area of the victim.

4       Q    And, again, what did Mr. Fulton tell you that

5   he was doing as Taylor jammed the pipe into the

6   victim's vagina?

7       A    Acting as a lookout.

8       Q    Did he tell you what he observed about

9   Ms. Bridgeman once Taylor jammed the pipe into her

10   vaginal area?

11       A    Yes, sir.  He said that the victim's body

12   began to shiver and shake and that a large amount of

13   blood started coming from her vaginal area.

14       Q    Did he tell you what he did then?

15       A    Yes.  He said they all got up and ran from

16   the basement.

17       MR. SEXTON:  One moment, judge.

18   BY MR. SEXTON:

19       Q    Just one more question, Detective Foley.  Was

20   the conversation that you just related subsequently

21   reduced to handwritten form and signed by Nevest --

22   I'm sorry.  -- by Darryl Fulton?

23       A    Yes, sir.

24       MS. PLACEK:  Objection.



Plaintiff 001681

1          THE COURT:  Overruled.

2          MR. SEXTON:  One moment, judge.

3          MR. SEXTON:  I have nothing further, judge.

4          MS. PLACEK:  Very briefly just two questions

5     before we break.

6                    CROSS-EXAMINATION

7                    BY MS. PLACEK:

8          Q     What time was the oral conversation you spoke

9     of that you just related to the ladies and gentlemen

10    of the jury?

11         A     That would have been about 11:00 o'clock,

12    ma'am, on the 30th.

13         Q     And isn't it correct in fact that the written

14    conversation consists of three pages?

15         A     Yes, I believe it is.  If I could see it I

16    could further refresh my memory.

17         Q     Surely.  As a matter of fact am I correct in

18    saying that no one was writing down anything at 11:30,

19    correct?

20         A     Not that I saw, no, ma'am.

21         Q     Well, isn't it correct that in fact the

22    written statement was taken the next day?

23         A     If I could see that I could tell you.

24         Q     Is your memory exhausted?

                         U-107



1    A    I believe it was the next day, but I'm not

2    certain.

3    Q    About 12:30 a.m.?

4    A    That's correct.

5    Q    So even though -- Let me ask you this, when

6    did the oral statement that you've described through

7    the leading of Mr. Sexton first take place, when did

8    that start, when you were allowed back into the room?

9    A    At roughly 11:00 p.m., ma'am.

10   Q    And it lasted until when?

11   A    I would say about a half hour.

12   Q    So that would be 11:30, completion?

13   A    Roughly, yes.

14   Q    11:30, 11:20, 11:45, somewhere around there?

15   A    That's correct.

16   Q    By the way, it wasn't reduced to writing by

17   Mr. Fulton, was it?

18   A    No, ma'am.

19   Q    It wasn't reduced to a -- any kind of court

20   reporter coming in, was it?

21   A    I believe that was his choice, ma'am.  You

22   could either record it and memorialize it by a

23   handwritten statement or by a court reported

24   statement.

U-108

Plaintiff 001683

1     Q    Well, let's talk about that.  When you say

2  record it, you, of course, have a tape recorder,

3  correct?

4     A    I don't.  No, ma'am.

5     Q    Was there one in the station?

6     A    There could have been.

7     Q    Did you look for it?

8     A    No, ma'am.

9     Q    Did you ask him whether or not you in fact

10  might tape what he was saying just in case he didn't

11  change his mind?

12     A    We never tape record any conversations,

13  ma'am.

14     Q    Okay.  Let me ask you this, when you say you

15  never tape record any conversations -- Do you want to

16  break now or --

17          THE COURT:  Yeah, we can break now.

18          Ladies and gentlemen, again until the

19  case has been submitted to you for your deliberation

20  you must not discuss the case with anyone or remain in

21  the hearing of anyone discussing it or read any

22  newspapers articles.

23          After the case has been submitted to you

24  you must discuss the case only in the jury room when

U-109

Plaintiff 001684

**In the Matter Of:**

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.

**MARK ROTERT**

*March 19, 2021*



3C Litigation Support, Inc.

*Courtesy, Commitment, Consistency*

lit3c.com

773.979.2415
info@lit3c.com

Pls.' Exhibit 25

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4   DERRELL FULTON, AKA DARRYL    )

 5   FULTON,                       )

 6            Plaintiff,           ) Case No. 17 CV 8696

 7     v.                          ) Hon. J. Pacold

 8   CITY OF CHICAGO, et al.,      ) Mag. J. Harjani

 9            Defendants.          )

10   --------------------------    )

11   NEVEST COLEMAN,               )

12            Plaintiff,           ) Case No. 18 CV 998

13     v.                          ) Hon. J. Pacold

14   CITY OF CHICAGO, et al.,      ) Mag. J. Harjani

15            Defendants.          )

16

17              The deposition of MARK ROTERT, called
     for examination pursuant to the Rules of Civil
18   Procedure for the United States District Courts
     pertaining to the taking of depositions, taken
19   remotely via Zoom videoconference
     before Tracy Jones, a Certified Shorthand Reporter
20   within and for the County of Cook and State of
     Illinois on the 19th day of March 2021 at the hour
21   of 10:05 a.m.

22

23   Reported by:    Tracy Jones, CSR, RPR, CLR

24   License No.:    084-004553
```

*3C Litigation Support, Inc.*
*312.535.2542*

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 2..5

Page 2

```
 1   APPEARANCES:
 2      LOEVY & LOEVY, by
        RUSSELL AINSWORTH, ESQUIRE (Remotely)
 3      311 North Aberdeen Street, 3rd Floor
        Chicago, Illinois  60607
 4      312.243.5900
        russell@loevy.com
 5         On behalf of Plaintiff Coleman;
 6      KATHLEEN T. ZELLNER & ASSOCIATES, P.C., by
        NICHOLAS CURRAN, ESQUIRE (Remotely)
 7      DOUGLAS H. JOHNSON, ESQUIRE (Remotely)
        1901 Butterfield Road
 8      Downers Grove, Illinois 60515
        630.955.1212
 9      attorneys@zellnerlawoffices.com
           On behalf of Plaintiff Fulton;
10
        THE SOTOS LAW FIRM, P.C., by
11      LISA MEADOR, ESQUIRE (Remotely)
        141 West Jackson Boulevard, Suite 1240A
12      Chicago, Illinois  60143
        630.735.3300
13      lmeador@jsotoslaw.com
           On behalf of Defendant City of Chicago;
14
        ROCK FUSCO & CONNELLY, LLC
15      PATRICK R. MORAN, ESQUIRE (Remotely)
        ANDREW GRILL, ESQUIRE (Remotely)
16      321 North Clark Street, Suite 2200
        Chicago, Illinois  60654
17      312.494.1000
        pmoran@rfclaw.com
18         On behalf of Individual Defendant
           Officers;
19
        COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
20      JESSICA SCHELLER, ESQUIRE (Remotely)
        500 Richard J. Daley Center
21      Chicago, Illinois 60602
        312.603.3151
22      jessica.scheller@cookcountyil.gov
           On behalf of Cook County State's
23         Attorney's Office:
24
```

Page 3

```
 1
        APPEARANCES (Cont'd):
 2
        COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
 3      LYLE HENRETTY, ESQUIRE (Remotely)
        500 Richard J. Daley Center
 4      Chicago, Illinois 60602
        312.603.3151
 5      lyle.henretty@cookcountyil.gov
 6         On behalf of the Deponent;
 7      TRIBLER ORPETT & MEYER, P.C., by
        AMY KUNZER, ESQUIRE (Remotely)
 8      225 West Washington Street
        Suite 2550
 9      Chicago, Illinois 60606
        312.201.6400
10      amkunzer@tribler.com
11         On behalf of Hal Garfinkel and Cook
           County.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                   I N D E X
 2   WITNESS                          EXAMINATION
 3   MARK ROTERT
 4     Examination By Attorney Meador            7
       Examination By Attorney Moran           235
 5     Examination By Attorney Kunzer          242
       Examination By Attorney Moran           244
 6     Examination By Attorney Curran          246
       Examination By Attorney Ainsworth       310
 7
 8
 9              E X H I B I T S
10   NUMBER          DESCRIPTION          PAGE
     Exhibit No. 1                         30
11   Exhibit No. 2                         39
     Exhibit No. 3                         73
12   Exhibit No. 4                         83
     Exhibit No. 5                         90
13   Exhibit No. 6                         93
     Exhibit No. 7                         98
14   Exhibit No. 8                        112
     Exhibit No. 9*                       154
15   Exhibit No. 10                       154
     Exhibit No. 11*                      181
16   Exhibit No. 12                       199
     Exhibit No. 13                       202
17   Exhibit No. 14*                      209
     Exhibit No. 15                       219
18   Exhibit No. 16                       251
     Exhibit No. 17                       258
19   Exhibit No. 18                       259
     Exhibit No. 19                       261
20   Exhibit No. 20                       262
     Exhibit No. 21                       268
21   Exhibit No. 22                       278
     Exhibit No. 23                       296
22   Exhibit No. 24                       300
     Exhibit No. 25                       313
23   Exhibit No. 26                       321
24   *Exhibit retained by counsel.
```

Page 5

```
 1
 2      THE VIDEOGRAPHER:  Okay.  I've started the
 3   recording.
 4      THE COURT REPORTER:  This is Tracy Jones,
 5   Illinois CSR No. 084-004553, 3C Litigation
 6   Support, here today, March 19, 2021, the time of
 7   10:05 a.m. Central Standard Time, for the Zoom
 8   video deposition of Mr. Mark Rotert taken in the
 9   matter of Fulton, et al., v. City of Chicago,
10   et al., and Coleman, et al. v. City of Chicago, et
11   al., pending in the United States District Court
12   for the Northern District of Illinois, Eastern
13   Division, Case No. 17 CV 8696 and
14   18 CV 998, respectively.
15      We are being video recorded.  Our CLVS
16   today is Mr. Joe Willis, also in association with
17   3C Litigation Support.
18      Will all counsel please identify
19   themselves, state whom they represent, and please
20   indicate your agreement with the witness being
21   sworn remotely, beginning with plaintiff's
22   counsel, please.
23      ATTORNEY CURRAN:  Good morning.  Nicholas
24   Curran on behalf of Plaintiff Derrell Fulton, and
     no objection.
```

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                          Pages 6..9

Page 6

1    ATTORNEY AINSWORTH:  This is Russell Ainsworth
2  appearing on behalf of Plaintiff Nevest Coleman,
3  and no objection to the witness being sworn
4  remotely.
5    ATTORNEY MEADOR:  Lisa Meador on behalf of the
6  City of Chicago.  No objection.
7    ATTORNEY KUNZER:  Amy Kunzer on behalf of Hal
8  Garfinkel and Cook County.  No objection.
9    ATTORNEY GRILL:  Andrew Grill on behalf of the
10 individual police officers.  No objection.
11   THE COURT REPORTER:  Messrs. Moran and
12 Henretty and Johnson, please just identify
13 yourselves for the record.
14   ATTORNEY HENRETTY:  This is Lyle Henretty on
15 behalf of the witness.  No objection.
16   ATTORNEY JOHNSON:  Doug Johnson on behalf of
17 Plaintiff Fulton.  No objection.
18   THE COURT REPORTER:  Mr. Moran, did we get
19 you?
20   ATTORNEY SCHELLER:  I don't know if you got
21 him, but Jessica Scheller on behalf of the Cook
22 County State's Attorney's office, and I also have
23 no objection.
24   ATTORNEY MEADOR:  Andrew, do you want to

Page 7

1  address Pat's appearance?
2    ATTORNEY GRILL:  Yes.  Mr. Moran is here as
3  well, and he and I both represent the individual
4  police officers.  And I will assume that he also,
5  like myself, has -- as I just said, has no
6  objection.
7    THE COURT REPORTER:  Thank you so much.
8              (Witness sworn.)
9  WHEREUPON:
10               MARK ROTERT,
11 called as a witness herein, having been first duly
12 sworn, was examined and testified as follows:
13               EXAMINATION
14 BY ATTORNEY MEADOR:
15   Q.  Good morning, Mr. Rotert.  My name is
16 Lisa Meador.  I represent the City of Chicago in
17 these cases.
18       Can you please state your name and spell
19 it for the record?
20   A.  My name is Mark Rotert.  First name is
21 M-A-R-K; last name is R-O-T-E-R-T.
22   Q.  Okay.  Thank you for appearing here
23 today, and I also want to thank you for
24 accommodating the rescheduling that was required

Page 8

1  on my behalf last month.
2       So is -- since we are appearing all
3  remotely, I just wanted to clarify that there's no
4  one else present there with you at this time?
5    A.  That's correct.  I'm alone here in my
6  house.
7    Q.  Okay.  And, Mr. Rotert, you're an
8  attorney, correct?
9    A.  I am.
10   Q.  Okay.  So is it fair to say that you're
11 familiar with the procedures of a deposition?
12   A.  Yes.
13   Q.  Okay.  So is it fine with you that I just
14 dispense with going over the rules?
15   A.  Yes.  If I have any difficulty or issues
16 with a question, I'll be sure to raise my hand and
17 ask for clarification.
18   Q.  Wonderful.
19       And of course if at any time you want to
20 take a break, feel free to let me know, and I'm
21 happy to do that for you.
22       I do want to also note, I'm not sure if
23 you had any experience doing remote depositions
24 lately, sometimes there's a little bit of a time

Page 9

1  delay, and some attorneys may be making objections
2  to some questions.  So if you do hear an
3  objection, I would just ask that you stop your
4  answer so that the court reporter and the
5  videographer can get it all down without people
6  talking over each other.  Is that fair?
7    A.  That's correct.  I will do that.
8    Q.  Okay.  Great.  And, Mr. Rotert, you are
9  represented by counsel today, correct?
10   A.  Yes, Mr. Henretty.
11   Q.  Mr. Henretty.  Okay.  And was
12 Mr. Henretty retained by you personally, or was he
13 provided -- were you provided counsel through the
14 state's attorney's office?
15   A.  The latter.
16   Q.  Okay.  And you understand the subject
17 matter of the deposition today is related to your
18 work while in the state's attorney's office
19 related to the People v. Derrell Fulton and People
20 v. Nevest Coleman matters?
21   A.  Yes.
22   Q.  Okay.  Do you have an independent
23 recollection of your work on those -- on those two
24 cases?

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 10..13

Page 10

1    A.   I have an independent recollection of a
2  lot of the events and circumstances, but -- I
3  haven't looked at some of the materials in years.
4  So like anything else, some things are more clear
5  than others.
6    Q.   Fair enough.
7         So when we talk about the Fulton and
8  Coleman cases, is it your understanding that those
9  were -- those two individuals were codefendants in
10 a criminal case?
11   A.   That's right.
12   Q.   Okay.
13   A.   Yes, they were.
14   Q.   Okay.  Let me ask you, in -- did you do
15 any preparation for your deposition today?
16   A.   I talked with Mr. Henretty on a couple of
17 occasions.  I was sent yesterday and again this
18 morning pdf files of documents that might be used
19 as exhibits, and I looked at those.  And I
20 wouldn't say I studied them, but I looked at
21 those.
22        I did review a memo that was prepared in
23 connection with this matter, and that really
24 constitutes what I did to prepare.

Page 11

1    Q.   Okay.  How many times did you talk with
2  Mr. Henretty about your deposition?
3    A.   We spoke yesterday morning and again very
4  briefly this morning.
5    Q.   How long did you speak with him
6  yesterday?
7    A.   It was somewhere between 90 minutes and a
8  couple hours.
9    Q.   Okay.  When you said that you reviewed a
10 memo, is that the November 2017 memo that you
11 prepared related to the Fulton and Coleman
12 matters?
13   A.   That's the one, yes.
14   Q.   Okay.  All right.  Any other documents
15 that stand out in your mind that you reviewed in
16 preparation for your deposition?
17   A.   No.  I went -- I know there were some
18 notes that had what I recognized as my
19 handwriting.  I looked at some of those materials.
20 And as I said, I looked at the exhibits that
21 Mr. Curran and I think Mr. Ainsworth had shared
22 with Mr. Henretty.  So I just looked at materials.
23 The only thing I sat and read from start to finish
24 was the November memo that you referenced earlier.

Page 12

1    Q.   Okay.  That sounds good.  Thank you.
2         Okay.  So, Mr. Rotert, I'm just going to
3  quickly ask you to -- if we can just talk a little
4  bit about your employment.  I understand that you
5  were formerly with the U.S. Attorney's Office.
6    A.   There was a time in my career that I was
7  with the U.S. Attorney's Office.  That was the
8  second job that I had.  So yes.
9    Q.   If that's okay, I'm just going to hit
10 some the highlights.  You've had a very long and
11 distinguished career.  So I'm just going to hit a
12 few things.  But by all means, if you feel there's
13 something else you want to add, please feel free
14 to do so.
15        And can you tell me generally when you
16 were at the U.S. Attorney's Office?
17   A.   I joined the U.S. Attorney's Office in
18 1987, and I left in November of 1994.
19   Q.   And did you have an area of focus when
20 you worked at the U.S. Attorney's Office?
21   A.   Yes, white collar criminal prosecutions.
22 I ran a unit there that was -- they called it the
23 Major Crimes Unit for whatever reason.  But we
24 essentially focused on what people would

Page 13

1  characterize as white collar prosecutions.  It was
2  commodities fraud, insurance fraud, that kind of
3  thing.
4    Q.   Did you ever handle cases involving
5  corruption within police departments while at the
6  U.S. Attorney's Office?
7    A.   Yes.
8    Q.   Okay.  Can you describe for me what time
9  period that was?
10   A.   I think around 1991 or '92.  I prosecuted
11 a case that -- that resulted from a Chicago Police
12 Department sergeant wearing a recording device and
13 recording other officers in the 2nd District as
14 well as some people running gambling and narcotics
15 operations, and the officers were taking money for
16 protection of those operations.  The undercover
17 officer who recorded those people, and we had a
18 prosecution of, I believe it was 12 Chicago Police
19 officers and I want to say 11 non police officer
20 defendants in a prosecution that went to trial.
21 And I was the lead prosecutor on that case.
22   Q.   Okay.  Did you ever work with Eric
23 Sussman while at the U.S. Attorney's Office?
24   A.   No.  As I recall, I think Eric arrived

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 14..17

Page 14

1   after I left. I'm not positive of that. I am
2   positive that while I was an AUSA, I did not work
3   with Eric.
4        Q.   Okay. What about April Perry, did you
5   work with April Perry while you were at the U.S.
6   Attorney's Office?
7        A.   No.
8        Q.   You also were employed with the Illinois
9   Attorney General's office, correct?
10       A.   That's my first job, yes.
11       Q.   First job. Okay. And can you tell me
12  generally when you were employed there?
13       A.   From 1977 until very early in 1987.
14       Q.   And generally what kind -- I understand
15  that's a significant period of time. But if you
16  can tell me generally what kind of cases you
17  handled during that tenure?
18       A.   For probably the first five or six years,
19  I was mostly a trial level prosecutor. In those
20  days, the Attorney General would provide trial
21  prosecution assistance in communities mostly
22  downstate, and so I prosecuted murder cases,
23  essentially. I did about -- I think I counted 13
24  murder cases I did in places like Edgar County,

Page 15

1   Whiteside County, places downstate.
2            The last four years, I got tired of
3   downstate, and I stayed as -- and I became the
4   chief of the Criminal Appeals Division. And I
5   primarily focused on criminal appellate work in
6   the appeals courts.
7        Q.   Okay. And did you also work at
8   Winston & Strawn?
9        A.   I worked at Winston & Strawn for ten
10  years from 1994 until Groundhog Day of 2004.
11       Q.   And what kind of work did you do there?
12       A.   Major commercial litigation and some
13  white collar defense. But even the white collar
14  defense was primarily for major corporations.
15       Q.   And then did you leave Winston & Strawn
16  to start your own firm?
17       A.   I probably would have termed it I escaped
18  Winston & Strawn to start my own firm.
19       Q.   Your words, not mine.
20       A.   I shouldn't say that. They're nice
21  people.
22            I started my own firm on February 2nd of
23  2004.
24       Q.   And how long did you maintain your firm?

Page 16

1        A.   I was solo until 2007. And I was
2   subleasing space from a couple of colleagues that
3   I had befriended at the U.S. Attorney's Office.
4   In 2007, we agreed it made more sense for us to
5   just form a larger firm, so I merged my solo
6   practice into a boutique firm that was called
7   Stetler, Duffy & Rotert, which continued until
8   July 1st of 2017.
9        Q.   And what did you do at that point in July
10  of 2017?
11       A.   In 2017, I accepted an appointment as an
12  assistant state's attorney and as Director of the
13  Conviction Integrity Unit.
14       Q.   And why did you make that decision?
15       A.   Well, first, the firm I was at was -- was
16  coming to its end for all sorts of good reasons.
17  No bad reasons, but it was coming to its end. And
18  I was in this sort of area where I didn't feel I
19  wanted to retire, but I was very, very tired of
20  chasing clients and bills and personnel issues and
21  running a business. And so I was trying to find
22  something that I would think to be rewarding that
23  didn't involve trying to generate business and
24  find clients. And in a coincidental way, I

Page 17

1   encountered Eric Sussman, and he asked me,
2   essentially, what I was planning to do. And he
3   suggested the position. And after thinking about
4   it, I decided to give it a shot.
5        Q.   Did you know Eric Sussman before this
6   encounter with him?
7        A.   Yes. Eric had been a prosecutor in cases
8   where I represented defendants. But I had only
9   occasional dealings with him. Then Eric had gone
10  into private practice, and I had encountered Eric
11  on a number of occasions while we were both in
12  private practice, almost invariably because we
13  would have clients wrapped up in the same criminal
14  investigation, and we were working in conjunction
15  with those cases. But I got to know Eric
16  primarily when we both were in the defense bar.
17       Q.   Okay. And when you spoke with Eric about
18  this position, can you tell me how it is that he
19  described it to you?
20       A.   He said that there were -- that they were
21  going to -- the state's attorney's office was
22  going to try to develop a methodology to identify
23  cases where there had been a wrongful conviction,
24  and they wanted to have somebody run the shop.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                      Pages 18..21

Page 18

1  And I think they were thinking because I -- I was
2  given to understand that some of the
3  recommendations that had been made at the state's
4  attorney's office included the idea that a job
5  like that is something you want to consider having
6  an outsider do.  In other words, taking someone
7  from within the ranks of the state's attorney's
8  office to review the work of colleagues presents
9  some at least optical issues that you can avoid by
10 having an outsider.  And so I fit that criteria.
11      Q.  Okay.  And what about the position was
12 interesting to you to -- for you to consider
13 signing on with the state's attorney's office?
14      A.  Well, the subject matter.  I mean, I -- I
15 did, as a prosecutor, find it very frustrating
16 when I would read cases of people who had been in
17 the prison system unfairly and incorrectly
18 convicted.  Any of us, and I'm sure most of us,
19 have been to the IDOC or to the prisons, and a day
20 there is more than you can handle.  And to be
21 there when you're not even guilty of the crime
22 would be just -- you know, it would be a very
23 difficult thing.  And it always had troubled me.
24 It was a subject that I felt strongly about in

Page 19

1  terms of if there were such mistakes made, it was
2  important to develop a methodology to identify it
3  and correct it.  And so it was just one of those
4  opportunities that seemed like it was sort of
5  meant for me, I guess.  I felt like -- like there
6  was a reason Eric happened to bring it up.
7      Q.  Okay.  Fair enough.
8          Did you interview for the position?
9      A.  I did.  I talked with -- talked,
10 obviously, with Eric, and then I came over and sat
11 and met with April Perry.  I met with the State's
12 Attorney and her chiefs of staff and a couple of
13 other senior personnel in the office.  I must say
14 in candor I didn't feel like I was being
15 interviewed.  I -- I didn't feel like there was --
16 there was a lot of candidates I was competing
17 against.  So I -- but I was speaking with all of
18 those people.
19      Q.  When you were -- Was that all one
20 meeting?
21      A.  No.  I think I went over there a few
22 times, at least three times, for various meetings.
23      Q.  Okay.  During any of those meetings, were
24 you advised of directives that the state's

Page 20

1  attorneys -- that the State's Attorney wanted to
2  accomplish with the Conviction Integrity Unit and
3  the position they were considering you for?
4      A.  I don't think directives would be the
5  term I would use.  They were certainly -- I was
6  given to understand that the State's Attorney felt
7  this was a very strong idea, something that she
8  had considered part of her platform, I guess, for
9  lack of a better word.
10         The big thing was they had been
11 consulting with the Manhattan or the Brooklyn DA's
12 office, which is sort of credited with starting
13 this conceptual idea.  And they had been dealing
14 with a professor of law at Harvard University's
15 law school whose name escapes me.  But that person
16 had been out to Chicago and had been making
17 various recommendations.  And so I wasn't really
18 given a list or an itemization of what he had
19 recommended so much as I was told that they had
20 some thoughts about how it would look and how it
21 would function and -- and wanted someone to sort
22 of forward the process.
23      Q.  Was it your understanding that this would
24 be a newly created unit or a reworking of an

Page 21

1  existing unit within the state's attorney's
2  office?
3      A.  My understanding that it was going to be
4  reworking an existing unit.
5      Q.  Okay.  And then you came to be hired,
6  correct?
7      A.  That's right.
8      Q.  Okay.  And when did you start with the
9  state's attorney's office?
10     A.  I started July 1st of 2017.
11     Q.  And what was your official position?
12     A.  I think the title was -- I assume I was
13 listed as an assistant state's attorney, but my
14 title on letterhead would have been Director of
15 the Conviction Integrity Unit.
16     Q.  What were your responsibilities in that
17 position?
18     A.  Well, I think it was an idea without a
19 plan, if you will.  In other words, the concept of
20 trying to identify and address wrongful
21 convictions was very prominent.  But there wasn't
22 a lot of how to that had been developed.  And so I
23 think essentially, I was given a very broad
24 mandate of how should this work.  I was given an

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 22..25

Page 22

1  assigned group of people, first of all, and I was
2  told, Here's where you're going to be and here's
3  the people with whom you'll work, and sort of the
4  very essential functions like that. Beyond that,
5  it was kind of, Figure this out, and tell us what
6  we should be doing.
7         I know that one of the first things I did
8  when I assembled the assistants in my unit was to
9  ask them what their policy memos looked like, or
10 to give me the documents that were being used to
11 do the job. And they all smiled and said there
12 are no such documents. Nothing has been written
13 down. And so I spent the first couple of months
14 focused primarily on addressing that and
15 developing a policy and developing something that
16 was a standard and then trying to figure out how
17 to sort of spread the word that we were there.
18 Spent a lot of time meeting with the public
19 defender, meeting with the center for wrongful
20 convictions, meeting with people at
21 Mr. Ainsworth's organization, meeting with the
22 bench, and just trying to get some sea legs under
23 us.
24     Q.   Okay. You said you had an assigned group

Page 23

1  of people already. Who were those folks when you
2  first came on?
3      A.   The deputy that was -- Well, my deputy
4  was a woman named Nancy Adduci, A-D-D-U-C-I.
5  There were two people that I would characterize as
6  the permanent members of the organization. They
7  were Gina Savini, S-A-V-I-N-I, and Cathy DeWald,
8  capital D-E, capital W-A-L-D.
9         There was a younger assistant state's
10 attorney who had recently rotated into the group
11 from the felony trial courts, a woman named
12 Kirsten Olson. And I had a woman who was an
13 assistant state's attorney who was primarily
14 involved with what I would characterize as the
15 forensic science side of the issue. Her name was
16 Christy Brewer. And she dealt a lot with, as I
17 said, the scientific and physical evidence
18 questions. And as far as assistant state's
19 attorneys, that was it.
20        I did have an individual named Hal
21 Johnson who was not a lawyer but who was a
22 scientist, a serologist and a very knowledgeable
23 fellow. And he was a part-time employee but very,
24 very helpful to us.

Page 24

1      Q.   And at some point, did Kara Stefanson
2  also work with your unit?
3      A.   Yeah. Kara was this invaluable resource,
4  an extremely intelligent person. And particularly
5  I thought she was enormously useful in terms of
6  DNA evidence, which I don't have much facility
7  for. And she was not in my group. She was just
8  very generous about sharing her time with me.
9      Q.   What group was she in?
10     A.   Well, I'm not -- I don't know that I
11 can --
12     Q.   Hard to say?
13     A.   It's hard to say. She worked a lot with
14 the Post-Conviction Unit, but I think she was --
15 she was a resource for the Felony Trial Division
16 in general.
17     Q.   Okay. Understood.
18        When you first came on to the state's
19 attorney's office, can you estimate about how many
20 cases there were currently in review?
21     ATTORNEY SCHELLER: I'm going to object. I
22 think this goes to the law enforcement
23 investigatory privilege and is beyond the topics
24 that the Court has permitted inquiry into today.

Page 25

1      ATTORNEY HENRETTY: Based on that, I'll
2  instruct the witness not to answer.
3      ATTORNEY MEADOR: I'm sorry. It's the law
4  enforcement investigatory privilege as to how many
5  cases generally?
6      ATTORNEY SCHELLER: Correct. I think that
7  goes -- I could add other privileges, and I may as
8  well if we're going to be certifying questions.
9         I also think it goes to deliberative
10 process and work product. The Court was very
11 specific about what could be inquired into and
12 what could not. And the number of cases being
13 reviewed by CIU was not specifically articulated.
14 Other cases under review by CIU was not
15 specifically articulated, and so we'll stand on
16 that objection.
17     ATTORNEY MEADOR: So if you're making this
18 long verbal objection, I will say this is just a
19 general question about how many cases were being
20 handled in a unit. They are not specific in any
21 way as to what particular cases. And the judge's
22 ruling was not, you know, encompassing of the
23 entirety of the scope of this deposition.
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 26..29

Page 26

BY ATTORNEY MEADOR:

Q.   So, Mr. Rotert, are you following your
counsel's advice, declining to answer that
question about how many cases generally were in
the unit when you came on board?

A.   I am going to do what my lawyer asks me
to do, yes.

Q.   Okay.  How did cases come to the
awareness of the unit when you began?

A.   Well, one of the first things we tried to
develop was a document that would be circulated
within the Department of Corrections that would
help a layperson understand what the -- what the
criteria were, what the relevant analysis would
be.  I would say that at least
90 percent of the material that we worked on came
to us through communications by the convicted
defendant.  We got -- Especially in the early
months, we got a lot of mail every day.  Probably
the other 10 percent would be a combination of
organizations like that Mr. Ainsworth represents
or the Northwestern Clinic.  The public defender's
office.  Certainly private counsel.  Pro bono
programs at the major law firms.  But in terms of

Page 27

raw numbers, the great majority came from the
defendants themselves.

Q.   Okay.  When you -- You said that you
spent the first couple of months developing
protocols for the consideration of cases.  Did I
describe that correctly?

A.   Yes, policies that would say what we do
and what we don't do.

Q.   Okay.  Until those policies were in
effect, did you cease agreeing to review cases; or
did the process continue under kind of the old
parameters?

A.   Well, we -- I didn't feel we could afford
to just stop and think about things.  We continued
to work on existing matters.  We continued to take
in whatever was sent to us.  Simultaneously, I
tried to get the document in hand that would be a
guidepost for all concerned.

Q.   Was the Conviction Integrity Unit
responsible for reviewing claims of actual
innocence?

A.   Yes.

Q.   Okay.  And can you explain to me what you
considered to be actual innocence?

Page 28

ATTORNEY HENRETTY:  Object to the form.
Go ahead.

THE WITNESS:  We were trying to identify a
circumstance where a person factually was not
responsible in a legal sense for the offense for
which he or she had been convicted.  In other
words, I didn't do that.  I wasn't the person who
committed that act, whatever that criminal act
might have been.

BY ATTORNEY MEADOR:

Q.   Okay.  And is it fair to say that that is
distinguished from claims by a criminal defendant
of ineffective assistance of counsel or Brady
violations or, you know, some other sort of
constitutional claim?

A.   That's exactly right.  And we tried to
emphasize that in the materials that we generated.
But yes, we were looking at matters strictly from
a perspective of do we have the right person here.

Q.   Okay.  The -- Can you explain to me how a
wrongful conviction would be the result of a
prosecution by the Cook County State's Attorney's
Office?

ATTORNEY AINSWORTH:  This is Russell --

Page 29

ATTORNEY SCHELLER:  I'm going to object to the
question as an incomplete hypothetical.

ATTORNEY HENRETTY:  Object to form and
foundation.

ATTORNEY AINSWORTH:  And, Lisa, can we -- is
one objection by a party good enough for all of
us?

ATTORNEY MEADOR:  Sure.  That's fine.

ATTORNEY AINSWORTH:  Or by an attorney?

ATTORNEY MEADOR:  Sure.  That's fine by me.

THE WITNESS:  Well, as a -- as a general
proposition, a conviction can be wrong simply
because although the evidence available to the
prosecutors points in one direction, it's a false
positive; it points in the wrong direction, and a
person's been inculpated in a murder even though
that, in fact, is not a murder that that person
has committed or is responsible for.  Why that
evidence points in the wrong direction, how it
comes to be, that really is a case-by-case
analysis.  But it's just a question of people not
understanding what the facts really are.

ATTORNEY MEADOR:  Okay.  Joe, if you could
please bring up Exhibit -- it is City 27387 to

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                              Pages 30..33

Page 30

```
1   27388.
2               (Whereupon, a discussion was had
3               off the record.)
4        THE VIDEOGRAPHER:  We're off the record at
5   10:43 a.m.
6               (Whereupon, a short break was
7               taken.)
8        THE VIDEOGRAPHER:  Okay.  We are recording.
9   Back on the record at 10:52.
10  BY ATTORNEY MEADOR:
11       Q.   Okay.  Mr. Rotert, thank you for
12  accommodating our little technical glitch.  I'm
13  going to try and do the sharing.  So bear with me
14  if it's a little clumsy on my part.
15            Okay.  So are you able to see this
16  exhibit?
17       A.   I'm able to see the heading in bold, and
18  I'm seeing, like, the first paragraph.
19       Q.   That's fine.  We're marking this as
20  Exhibit 1.
21               (Whereupon, Rotert Deposition
22               Exhibit No. 1 was marked for
23               identification.)
24
```

Page 31

```
1   BY ATTORNEY MEADOR:
2        Q.   I am going to scroll down.  And if you
3   want me to go slower, that's fine.  At this point,
4   just showing you the exhibit marked 27387 to
5   27388.  And that's the Act.  Okay?
6        A.   Okay.
7        Q.   Have you ever seen this document before?
8        A.   I would imagine that I have.  I haven't
9   seen it in a while, but I would imagine that I
10  did, yes.
11       Q.   Okay.  Is it fair to say that this is a
12  press release or statement related to you being
13  hired on at the state's attorney's office to head
14  up the Conviction Integrity Unit?
15       A.   That's what it appears to be, yes.
16       Q.   Okay.  And I'm just going to scroll down
17  a little bit to the bottom.  You can see that
18  there's a quote there from you; is that correct?
19       A.   Yes.
20       Q.   Okay.  And did you provide this statement
21  to the state's attorney's office related to your
22  hiring?
23       A.   Well, I don't want to shatter any
24  illusions.  I agreed -- I believe I was given a
```

Page 32

```
1   suggested statement, with which I agreed and was
2   comfortable that it would have reflected my
3   feelings.  So I -- I see that it's in quotation
4   marks.  I'm absolutely confident that I was given
5   a chance to look at that and agree that this
6   reflected my beliefs.
7        Q.   Okay.  Fair enough.  Thank you for
8   clarifying that for me.
9             So then here at the bottom, are you --
10  are you able to see the entirety of the
11  paragraphs?
12       A.   I'm only able to see it through the
13  bottom of the page right above the Bates number.
14  If you can just scroll it up a little more, I'll
15  be able to see it.
16       Q.   Sure.  Is that better?
17       A.   Yeah.  That's great.  That's perfect.
18       Q.   Okay.  So that paragraph starting on
19  27387 says:  "The State's Attorney's Conviction
20  Integrity Unit is responsible for reviewing claims
21  of actual innocence or wrongful conviction
22  resulting from prosecutions by the Cook County
23  State's Attorney's Office."
24            Is that correct?
```

Page 33

```
1        A.   That's what it says.
2        Q.   Okay.  And did you participate in
3   providing that information for this press release?
4        A.   I don't know that -- I don't recall one
5   way or the other.  I don't recall.
6        Q.   Okay.  And did you understand that to be
7   one of your responsibilities in heading up the
8   Conviction Integrity Unit?
9        A.   Yes.
10       Q.   Okay.  And so what did that mean to you
11  to fulfill that responsibility?
12       A.   Well, it meant that I was going to be
13  asked to look at a number of cases that were of
14  varying ages and trying to determine if the wrong
15  person was in jail or had been put in jail.
16       Q.   Okay.  And then there is in the quote
17  that is attributed to you, if we can take a look
18  at that, it says, quote "I am impressed by State's
19  Attorney Foxx's earnest desire to correct any
20  wrongful convictions and her commitment to this
21  work as a way to build and preserve the public's
22  trust in the criminal justice system."
23            Is it accurate to say that you share that
24  belief with State's Attorney Foxx?
```

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Pages 34..37

Page 34

1     ATTORNEY HENRETTY:  I'm going to object to
2  form and foundation.
3     THE WITNESS:  Yes.
4  BY ATTORNEY MEADOR:
5     Q.  Did you understand that to be State's
6  Attorney Foxx's desire?
7     ATTORNEY SCHELLER:  Objection:  Form.
8     ATTORNEY HENRETTY:  Join.
9     THE WITNESS:  Yes, I did.
10  BY ATTORNEY MEADOR:
11     Q.  Okay.  And how did you come to be aware
12  that that was one of her desires?
13     ATTORNEY SCHELLER:  Objection:  Form.
14     ATTORNEY HENRETTY:  Join.
15     THE WITNESS:  Well, when I met with the
16  State's Attorney and some of her senior personnel
17  before formally accepting the job, she really
18  stressed her desire to have a mechanism in place
19  to identify and ameliorate these kinds of
20  problems.  So she did impress me as a person who
21  truly thought it was a priority.
22  BY ATTORNEY MEADOR:
23     Q.  Then the quote goes on to say, quote, "I
24  share that belief and am excited for the

Page 35

1  opportunity to put it into action.  My goal is
2  that the recommendations made by the unit have a
3  reputation for fairness and reliability, and I
4  commit to coming to each case without bias or
5  assumptions and to making decisions based only on
6  the law and the facts."
7     Did I read that correctly?
8     A.  You did.
9     Q.  Okay.  And does that accurately reflect
10  your sentiment about the work you would be doing
11  in the Criminal Conviction Integrity Unit?
12     A.  Yes.
13     Q.  Okay.  Did you consider this to be one of
14  your personal goals in taking on this position?
15     A.  Yes.
16     Q.  And when it says here "recommendations
17  made by the unit," is it fair to say that means
18  the Conviction Integrity Unit?
19     A.  Yes.
20     Q.  And it was important for you that the
21  recommendations made by the unit were considered
22  fair and reliable, correct?
23     A.  Yes.
24     Q.  When you say here that you are committed

Page 36

1  to making decisions based only on the law and the
2  facts, what do you mean by that?
3     A.  I'm not sure if I can expand on it very
4  much.  I was just trying to say that -- that I
5  would try to take a fresh look at the assertions
6  made by a person about why the conviction was
7  wrongful and that I was -- I was going to just try
8  and live within the confines of what the law and
9  the facts told me.
10     Q.  Were you aware of decisions being made
11  based on factors other than the law and the facts?
12     ATTORNEY HENRETTY:  Object to form;
13  foundation.
14     Go ahead.
15     THE WITNESS:  No.  No.  I -- I was trying to
16  be -- state my aspirations.  I wasn't intending
17  any inference of anybody else not living to that
18  standard, no.
19  BY ATTORNEY MEADOR:
20     Q.  Okay.  From your perspective, given your
21  experience and knowledge, what did you believe
22  suited you for this position?
23     A.  Well, I think experience was part of it.
24  I think more specifically I believed then and now

Page 37

1  that it was desirable, if possible, that the
2  person in this job have some experience
3  prosecuting cases and some experience defending
4  cases.  I -- I believed that having -- I believed
5  in my own career that my perspective about things
6  was more mature after I had worked on both sides
7  of the aisle so to speak.  So I -- I felt that
8  that attribute of my own that I -- I have sat next
9  to people while they were found guilty as a
10  prosecutor; I've sat next to them as a defense
11  lawyer when they were found guilty, and I have
12  experienced things that I thought would help me in
13  understanding that mistakes can be made.  And it
14  doesn't mean that evil people are involved.  It
15  just means that we're human, and we have the
16  limitations of a human system.  And it can make
17  mistakes.  And if that happens, it's important to
18  fix them.
19     Q.  Okay.  Mr. Rotert, who was your chain of
20  command when you started at the state's attorney's
21  office in 2017?
22     A.  My direct report was April Perry, who at
23  that time was, I felt -- I felt my direct report
24  was to her because she was -- held the title of

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 38..41

Page 38

1  Chief Ethics Officer.  And Eric Sussman was the
2  First Assistant at that -- at the time I joined,
3  and I certainly felt like I would have placed him
4  next in the direct report chain.  And then above
5  that I would have placed the State's Attorney.
6      Q.   Okay.  When you came onto the state's
7  attorney's office, were you provided a list of
8  cases to focus on?
9      A.   No.
10      Q.   Just go get 'em?
11      A.   There were -- Yeah.  I mean, I was told
12  here are the people who are laboring in the field.
13  This is your unit.  And I started to meet with
14  them, and they began to tell me -- you know, I
15  asked what are we doing, what are we working on,
16  what's -- what's been here the longest, what's
17  closest to being resolved, the kinds of things I
18  would expect any supervisor to say as he or she
19  came into a new job.
20      Q.   Okay.  And as you've talked about
21  already, you then endeavored to create some
22  protocols for your unit, correct?
23      A.   Right.
24      Q.   Okay.  Give me one second.

Page 39

1           Okay.  Did that work?
2      A.   I can see it.
3      Q.   Okay.  Wonderful.  Okay.
4           So this is going to be Exhibit 2 for the
5  record.  It is Bates No. RFC1915 to 1919.
6           And, Mr. Rotert, I'm just going to scroll
7  down for you so you have an opportunity to look at
8  the entire exhibit before I ask you questions
9  about it.  It's just a few pages, so bear with me.
10           (Whereupon, Rotert Deposition
11            Exhibit No. 2 was marked for
12            identification.)
13  BY ATTORNEY MEADOR:
14      Q.   Okay.  Were you able to take a look at
15  that exhibit?
16      A.   Yes.
17      Q.   Okay.  And do you recognize what it is?
18      A.   I believe I do.  Let me indicate this.
19  The -- It looks very much like, as I saw it
20  scrolled past, the text that was developed as the
21  policy statement for the Conviction Integrity Unit
22  that I developed in 2017.  I will note that the
23  heading, the piece of it that's on the screen
24  right now, has an address at 50 West Washington,

Page 40

1  which I think is the Daley Center, the 27th floor.
2  I will say under oath on the record when I took
3  this job, the one thing I was promised was that I
4  was going to get a nice office on the 27th floor
5  of the Daley Center that would have a view of the
6  lake.  I never set foot in that office.  I never
7  spent a day in that office.  I was never given
8  that nice suite that they now have.  So this
9  clearly -- this clearly was generated after I
10  left.
11           But it looks to me in text to be the one
12  that I developed.
13      Q.   Okay.
14           Give me one second.
15      A.   And I'm not bitter about it.
16      Q.   You don't sound it.
17           So from your perspective, the change on
18  there is the address; is that accurate?
19      A.   It looks to me like it's the policy that
20  we used and that I developed, and it's just the
21  same wine in a different bottle.
22      Q.   Okay.  All right.  Fair enough.
23           How did you endeavor to come up with this
24  policy?

Page 41

1      A.   Well, that -- I don't want to burden the
2  record too much.  That was a process of trying to
3  decide what we wanted to accomplish and then
4  overlaying the question of what was appropriate
5  for us to accomplish.  And it really gets into
6  some kind of complicated questions of what's --
7  should such a unit exist, and if so, how should it
8  function and where does it fit into the scheme of
9  things.  I was very sensitive to the fact that
10  there is not a statutory foundation, nobody -- no
11  legislature has enacted a Conviction Integrity
12  Unit in Illinois.  At least at that time, they
13  hadn't.  There was a post-conviction procedure,
14  which I think we're going to talk about.  There
15  were just an awful lot of kind of I guess I would
16  say philosophic questions that had to be answered
17  about how you would justify doing this kind of
18  work and how you would go about doing it in a way
19  that didn't inadvertently undermine the criminal
20  justice system.
21           So to put it as briefly as I can, how did
22  I come about it?  I did a lot of thinking, a lot
23  of debating, a lot of consulting with other
24  states.  I -- I put a lot of time and energy into

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 42..45

Page 42

1   it.
2       Q.   Okay.  Do you know -- Strike that.
3            Was there a version of this policy
4   that -- issued with a different address on it
5   during your tenure?
6       A.   Well, when I was there, we -- we got this
7   up on the website.  And it was a page on the
8   State's Attorney's website.  I didn't -- I don't
9   remember that we ever -- and I'm not saying we
10  didn't; I don't know that -- well, I guess we did
11  print it out.  I know I've printed out dozens and
12  dozens of copies and got the Department of
13  Corrections to put them in the law libraries
14  throughout IDOC.  So I suppose those might have
15  had -- I don't know that those had much of a
16  caption on it.  I mean, I'm not -- other than
17  joking about it, the address doesn't seem to me
18  like it's very significant.  I think it looks like
19  the same policy.
20      Q.   Okay.  All right.  I just want to make
21  sure that, you know, I'm showing you the
22  appropriate document.
23           ATTORNEY MEADOR:  I would state to counsel for
24  both Mr. Rotert and the state's attorney's office,

Page 43

1   if you can let me know if you have any objections
2   to this being described as the policy created
3   under Mr. Rotert's tenure, as we haven't been
4   provided with a different policy from the state's
5   attorney's office.
6            ATTORNEY SCHELLER:  On behalf of the state's
7   attorney's office, I would defer to the witness.
8   If he says this is the same policy, it's the same
9   policy.  If he says it's a different policy, then
10  we can discuss that.  As we've said, I'm not aware
11  of any other printed version of a policy.
12           THE WITNESS:  Well, on behalf of the witness,
13  let me say it looks to me to be the same policy.
14  If in the course of Counsel's questions, if I see
15  something that doesn't appear to me to be the
16  same, I'll highlight that fact, and we'll address
17  it.  When I -- When I looked at it as it was being
18  scrolled past, it certainly looked to me to be the
19  same policy.  And I don't know of any changes that
20  have been made since I left.  So I believe this
21  would appear to me to be the policy.
22  BY ATTORNEY MEADOR:
23      Q.   Fair enough.  Thank you very much.  I
24  appreciate that.

Page 44

1            Okay.  Did you obtain input from the
2   folks within the Conviction Integrity Unit in
3   drafting the policy?
4       A.   Yes.
5       Q.   Okay.  Did you collaborate with them in
6   order to draft up these -- I'm going to call it a
7   policy because it's one document.  But did you
8   collaborate with them in drafting the provisions
9   established in this policy?
10      A.   Yes.  I met with my group, and we talked
11  about what we were doing and how we viewed the job
12  and what the issues were.  And after spending many
13  hours talking about that with them, I then
14  prepared a draft of the policy which I
15  disseminated -- circulated among those in the
16  unit --
17           ATTORNEY SCHELLER:  I'm sorry.  I'm sorry to
18  interrupt you.  I'm a little late with an
19  objection, but I am going to object:  Deliberative
20  process as to how the policies were developed.
21           ATTORNEY HENRETTY:  Based on that privilege, I
22  will instruct him not to answer any further.
23           ATTORNEY MEADOR:  Well, I think that the
24  witness has already begun his answer.  And I'm not

Page 45

1   sure how it's deliberative process related to the
2   policy that we are entitled to question the
3   witness about pursuant to Judge Harjani's order.
4            ATTORNEY SCHELLER:  You are entitled to
5   examine the witness about what the polices were
6   but not our deliberative process as to how the
7   policies were developed.  There is no affirmative
8   ruling on that point.  And I am asserting the
9   objection.
10           ATTORNEY MORAN:  Can I just interject?  His
11  point -- The judge's point 3 says questions
12  regarding the policies and procedures.  He didn't
13  limit it -- you know, he didn't say we couldn't
14  ask these types of questions.
15           You're muted, Jessica.
16           ATTORNEY SCHELLER:  I'm sorry.  My computer
17  was freezing.  This is really an unfortunate
18  timing.
19           I'm going to stand on the objection.
20  There's been no waiver as to our deliberative
21  process as to how we develop Conviction Integrity
22  Unit policies.  It wasn't explored at all in the
23  briefing.  It wasn't something you said you wanted
24  to get into.  And the Court has not found a

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021            Pages 46..49

Page 46

1 waiver.
2     ATTORNEY MEADOR: So again I would then state
3 in response that it wasn't -- Judge Harjani's
4 order was not intended to be encompassing about
5 every topic that could be addressed. And this
6 was, as Mr. Moran has pointed out, addressed
7 generally in Judge Harjani's order that was
8 appropriate for questioning of this witness.
9     Mr. Henretty, do you have any follow-up?
10     ATTORNEY HENRETTY: No. Given the state's
11 attorney's privilege, we would -- I will instruct
12 him not to answer. Instruction of privilege;
13 excuse me. I will instruct the witness not to
14 answer.
15 BY ATTORNEY MEADOR:
16     Q. Mr. Rotert, are you following your
17 counsel's objections -- Strike that.
18     Are you following your counsel's
19 instructions? Excuse me.
20     **A. I am following them, yes.**
21     Q. Okay. So can you tell me when the policy
22 was finalized?
23     **A. I believe it was late summer, August,**
24 **September time frame.**

Page 47

1     Q. Of 2017?
2     **A. Yes. I'm sorry. Yes. I'm sorry. 2017.**
3     Q. Okay. And I think you mentioned that the
4 policy was printed out and disseminated; is that
5 correct?
6     **A. Yes.**
7     Q. Okay. Is it fair to say that this wasn't
8 for internal use only then?
9     **A. That's fair to say. It was -- It was**
10 **expressly intended to be available to lawyers and**
11 **defendants and family members, anybody that wanted**
12 **to know what would we look at and what would we be**
13 **using as our yardstick. We wanted it to be**
14 **available generally.**
15     Q. Okay. So I'm just going to scroll down a
16 little bit into the policy itself. And in the
17 first paragraph, you can see that it says "The
18 Conviction Integrity Unit investigates claims of
19 actual innocence." And we have discussed that
20 that was one of the responsibilities of the unit,
21 correct?
22     **A. Yes.**
23     Q. Okay. What was the standard that was
24 utilized to determine whether a claimant was

Page 48

1 actually innocent?
2     **A. We ultimately came to the position that a**
3 **defendant who made clear and convincing showing, a**
4 **clear and convincing showing that he was not the**
5 **right person was someone we felt was entitled to**
6 **relief.**
7     Q. And when you conducted a review of a
8 case, an investigation was conducted; is that
9 accurate?
10     ATTORNEY SCHELLER: I'm going to object to
11 form. Are you asking generally or about this
12 specific case?
13     ATTORNEY MEADOR: I'm asking generally because
14 I didn't identify the specific case. So I'm
15 asking generally.
16     ATTORNEY SCHELLER: I'm going to object to any
17 inquiry into the process of the CIU as it relates
18 to any case other than this one.
19     ATTORNEY MEADOR: On what basis?
20     ATTORNEY SCHELLER: Deliberative process, work
21 product. Also relevance.
22     ATTORNEY MEADOR: This is directly related to
23 the terms of the policy that we're discussing and
24 that are within the parameters of this deposition.

Page 49

1     ATTORNEY MORAN: Can I interject real quick?
2 This is Dan Moran.
3     Jessica, page 16 of the judge's
4 opinion -- I'm sorry, ruling, addresses this
5 issue. It talks about general policies and
6 procedures being a subject matter he's allowing
7 for context. So I think the judge has
8 contemplated this and is allowing it.
9     ATTORNEY SCHELLER: Well, I agree that he has
10 agreed that you can conduct an inquiry into
11 general policies and procedures. But I don't
12 believe he has agreed that you can look at those
13 procedures and ask how they were applied in any
14 case other than this one and, in certain
15 instances, not even in this case, depending upon
16 what the topic is. So I would just ask that you
17 either make your questions more specific, you
18 know, or I'll unfortunately be interrupting with
19 objections. And I'm not trying to be
20 obstructionist, but I am trying to honor the
21 ruling while also preserving the privileges that
22 we believe are applicable here.
23     ATTORNEY MEADOR: Okay. So I think it's clear
24 that we can ask generally about the procedures.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                                    Pages 50..53

Page 50

1  So, you know, maybe if we can have the question,
2  the original question to the witness read back,
3  perhaps based on our discussion, there might be a
4  different perspective.
5              (Whereupon, the record was read as
6                  requested.)
7      ATTORNEY MEADOR:  So perhaps that's not the
8  best phrased question.
9      ATTORNEY SCHELLER:  Let's try another one.
10 BY ATTORNEY MEADOR:
11     Q.  So, Mr. Rotert, as part of a review of a
12 case within the Conviction Integrity Unit, an
13 investigation is conducted into the case and the
14 claims made by the criminal defendant, correct?
15     A.  I have to say not -- not precisely.
16     Q.  Okay.  Can you clarify for me?
17     A.  I want -- And a lot of this comes to, I
18 guess, vocabulary.  And here's the way that I
19 personally or subjectively looked at it.  A
20 person -- a defendant or a lawyer could present to
21 me a -- a conviction and say this one should be
22 looked at by CIU.  The first thing I did was
23 review the assertion to find out a few things in
24 terms of eligibility.  And I would estimate that

Page 51

1  the great majority of the materials brought to me
2  for review stopped at that level.  In other words,
3  after a review of the case on its -- on its face,
4  so to speak, it was my judgment that this case
5  wasn't eligible for various reasons for further
6  action by the Conviction Integrity Unit.
7          For example, the defendant says, I only
8  shot him in self-defense.  Well, policy clearly
9  said we won't look at that.  A defendant says --
10     ATTORNEY HENRETTY:  Hold on, Mark.  I'm going
11 to just instruct you to answer the question that
12 was asked.  And --
13     THE WITNESS:  Okay.  So if I --
14     ATTORNEY MEADOR:  Hold on one second.
15          Counsel, if you can stop interrupting the
16 witness when he's answering, I would appreciate
17 it.
18          Go ahead, Mr. Rotert.
19     THE WITNESS:  The point I made is I considered
20 an investigation to occur when I assigned it to
21 one of the assistant in the unit and asked that
22 person to pursue the issues raised by the claimant
23 and conduct whatever investigation they felt
24 appropriate.  So not -- My only point really is

Page 52

1  not everything that crossed my desk resulted in an
2  investigation.  Everything was reviewed.  Not
3  everything resulted in an investigation.
4  BY ATTORNEY MEADOR:
5      Q.  Understood.  Thank you so much for that
6  clarification.
7          So based on what you've said, is it fair
8  to say that you personally conducted that initial
9  review of a case that came in?
10     A.  Yes.
11     Q.  Okay.  And then you can see in that first
12 paragraph, it indicates that "The CIU makes
13 recommendations to the Cook County State's
14 Attorney about the appropriate remedy, if any,
15 that should result from its findings."
16         Is that -- Did I read that correctly?
17     A.  You did.
18     Q.  Okay.  And that's part of the policy that
19 was in effect in your time --
20     A.  Yes.
21     Q.  Okay.  And what were the potential
22 remedies that were available?
23     A.  I might recommend that the person be
24 released and the conviction vacated and no further

Page 53

1  action taken.  I might recommend that the claim
2  was not sustained in clear and convincing evidence
3  and that no further action should be taken.  And
4  then I might -- there were various intermediate
5  things that I might recommend based on
6  circumstances or facts of the case.
7      Q.  Would that include recommending that a
8  case be retried?
9      A.  Yes.
10         Well, let me -- Let me amend that answer.
11 It would include recommending that the case be
12 assessed for a retrial.
13     Q.  And who conducts that assessment?
14     A.  I don't know that I --
15     ATTORNEY SCHELLER:  Objection:  Form.
16     ATTORNEY HENRETTY:  Join.
17     THE WITNESS:  I'm not certain that I'm aware.
18 I'm -- I'm confident that it was in the Criminal
19 Division, the Felony Trial Division.  But I'm
20 not -- I can't give you a lot more specificity
21 about who did what.
22 BY ATTORNEY MEADOR:
23     Q.  And who did you make your recommendations
24 to?

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 54..57

Page 54

1    A.  Well, the --
2    ATTORNEY SCHELLER:  Objection:  Form.
3    THE WITNESS:  The first person to receive my
4  recommendation would have been April Perry.
5  BY ATTORNEY MEADOR:
6    Q.  And is it fair to say that depending on
7  what those recommendations were, other people
8  might then be involved in reviewing your
9  investigation and recommendations?
10    ATTORNEY HENRETTY:  Object to form and
11  foundation.
12    THE WITNESS:  Well, it's correct to say that
13  April would determine based on our conversation
14  and my materials what she felt needed to happen
15  next.
16  BY ATTORNEY MEADOR:
17    Q.  Thank you.
18        And you're aware that at times, that
19  involves the -- including the head of the Criminal
20  Division --
21    ATTORNEY SCHELLER:  Objection:  Form.
22  BY ATTORNEY MEADOR:
23    Q.  -- as you discussed?
24    A.  That was my understanding.

Page 55

1    Q.  Okay.  Thank you.
2        So then taking a look at the end of the
3  second paragraph, it indicates "Its mission is to
4  determine whether new evidence shows that an
5  innocent person has been wrongfully convicted for
6  a crime and to recommend steps to rectify such
7  situations."
8        Did I read that correctly?
9    A.  You did.
10    Q.  Okay.  And is that accurate in describing
11  the mission of the Conviction Integrity Unit?
12    A.  I believe so.
13    Q.  Okay.  And just scrolling down a little
14  bit, there's a section beginning with a question,
15  "What kinds of cases are eligible for review by
16  CIU?"
17        Do you see that?  Can you see all that
18  okay?
19    A.  I can.  Thank you.
20    Q.  Okay.  And it looks like there are a
21  couple of criteria that are identified.  One is
22  that the claimant must assert actual innocence; is
23  that correct?
24    A.  Correct.

Page 56

1    Q.  Okay.  And it says "... which means that
2  there must be conclusive evidence available
3  showing that the defendant was wrongfully
4  convicted."
5        Is that accurate?
6    A.  That's what it reads, yes.
7    Q.  Okay.  And what does that mean to you?
8    A.  It goes back to the clear and convincing
9  standard.  We -- We wanted -- We were trying to
10  specify that the material that you rely upon must
11  make a difference.  It has to say if this is true, it
12  really does seem convincingly
13  clear that this person was not the right person.
14    Q.  Okay.  And then it indicates that the
15  second component is that the claim of actual
16  innocence must be based on evidence that was not
17  considered by the trier of fact during the
18  proceedings that led to the conviction.  Correct?
19    A.  That's correct.
20    Q.  Okay.  And is that true as applied -- as
21  you applied the policy?
22    ATTORNEY SCHELLER:  I'm objecting.  I'm
23  objecting to the form of the question and also
24  that this invades several privileges so far as the

Page 57

1  question seeks to find out the application of this
2  policy to any case other than this one.
3    ATTORNEY MEADOR:  Okay.  I'll rephrase.
4  BY ATTORNEY MEADOR:
5    Q.  Mr. Rotert, was it your procedure to
6  review a case requiring it to meet an essential
7  criteria that the claim of actual innocence be
8  based on evidence that was not considered by the
9  trier of fact during the proceedings that led to
10  conviction?
11    ATTORNEY SCHELLER:  Same objection.
12    ATTORNEY HENRETTY:  Based on the state's
13  attorney's assertion of privilege, I will instruct
14  the witness not to answer.
15  BY ATTORNEY MEADOR:
16    Q.  Mr. Rotert, are you following your
17  counsel's instruction?
18    A.  I will.
19    Q.  Okay.  Mr. Rotert, the second criteria
20  that is described here in the policy, was that a
21  consideration generally in your review of cases
22  submitted for investigation by the Conviction
23  Integrity Unit?
24    ATTORNEY SCHELLER:  Before you answer, may I

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 58..61

Page 58

1   have the question read back, please.
2                  (Whereupon, the record was read as
3              requested.)
4       ATTORNEY SCHELLER:  I'm going to raise the
5   same objections as before.  This question seeks
6   the application of the policy to cases other than
7   this one.  And I believe that that invades
8   deliberative process as well as work product.
9       ATTORNEY HENRETTY:  Based on that, I'll
10  instruct the witness not to answer.
11      ATTORNEY MEADOR:  Okay.  Understanding that,
12  again, we're back at the same situation, this is
13  asking him to merely explain the policy and
14  procedures in place during this time period, which
15  is allowed under Judge Harjani's order.  I ask you
16  to reconsider.
17      ATTORNEY SCHELLER:  Counsel --
18      ATTORNEY MORAN:  Can I just add -- This is
19  again --
20      ATTORNEY SCHELLER:  If I may respond, Pat,
21  before we have another person arguing as well.
22          I disagree.  What Judge Harjani said you
23  could explore was what were the policies and,
24  secondarily, were those policies and procedures

Page 59

1   followed in this case.  He did not say that you
2   could conduct a general inquiry into the policies
3   and procedures and whether those policies and
4   procedures were applied and followed in other
5   circumstances.  There's been a very clear argument
6   about privileges and waivers of same in this case,
7   and we're not waiving any privileges as to any
8   other determination, investigation, review of CIU,
9   or otherwise.  So I'm standing on my objection.
10      ATTORNEY MORAN:  So just to add real quick,
11  this is on page 6.  And I'm just going to read it
12  into the record.  "These policies and procedures
13  are the general policies and procedures that the
14  state's attorney's office follows, if there are
15  any, if indeed they exist, with regard to the
16  decision to not retry, to dismiss, and to not
17  oppose a Certificate of Innocence.  They do not
18  necessarily -- Because they're policies and
19  procedures, they do not necessarily apply to this
20  case as well.  They are the general policies and
21  procedure the Court find that's relevant because
22  it is important to give context to the ultimate
23  decision that was made to allow the jury to
24  understand what policies and procedures exist and

Page 60

1   how the decision is made by the state's attorney's
2   office about these issues."
3          I think the judge squarely addressed this
4   issue, and this is an appropriate question.
5       ATTORNEY SCHELLER:  Mr. Moran, I agree the
6   judge squarely addressed the issue, but my reading
7   of that same finding is different than yours.  He
8   said you could inquire what the policies and
9   procedures were and also inquire whether they were
10  followed in this case.  But the question was
11  asking generally how these policies and procedures
12  were applied, and that would necessarily mean in
13  other cases.  And that is not something we believe
14  the Court has authorized defendants to inquire
15  upon so.  I stand on my objection.
16      ATTORNEY MORAN:  But the problem is that --
17  Well, forget it.  We agree to disagree, obviously.
18  You're not going to let him answer, so we'll just
19  move on.
20      ATTORNEY HENRETTY:  I think I said it already.
21  But for the record, based on the objection, I'll
22  instruct the witness not to answer.
23  BY ATTORNEY MEADOR:
24      Q.  Okay.  And, Mr. Rotert, are you following

Page 61

1   your counsel's instruction?
2       A.  Yes.
3       Q.  Okay.  Mr. Rotert, did you follow the
4   procedures indicated here when evaluating claims
5   to determine whether or not they would be
6   investigated?
7       ATTORNEY SCHELLER:  I'm going to object to the
8   question again insofar as you're asking whether
9   these procedures were properly followed and
10  applied in any case other than the case before us,
11  which is the case -- the cases that have been
12  consolidated for discovery involving Derrell
13  Fulton and Nevest Coleman.
14      ATTORNEY HENRETTY:  Based on that objection,
15  I'll instruct the witness not to answer.
16      ATTORNEY MEADOR:  We'll state our same
17  response as before.
18  BY ATTORNEY MEADOR:
19      Q.  Mr. Rotert, are you following your
20  counsel's instruction not to answer?
21      A.  Yes, I am.
22      Q.  Okay.  Mr. Rotert, were these the
23  policies and procedures in effect in the
24  Conviction Integrity Unit during your tenure?

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 62..65

Page 62

1    A.  Well, they -- this document came into
2  effect or came into being after I joined the
3  office.  But from the time that they were first
4  published, which, again, I think was around
5  September, until I left, those were the policies
6  that were in effect.
7    Q.  Okay.  In putting the policies into
8  effect, was it your expectation that they would be
9  followed?
10   A.  Yes.
11   ATTORNEY SCHELLER:  Objection:  Form.
12 BY ATTORNEY MEADOR:
13   Q.  So I'm just going to ask you then to take
14 a look at the second paragraph.  It says "CIU also
15 may investigate claims of actual innocence based
16 on a showing that the investigative or factfinding
17 process that led to the conviction was so
18 fundamentally flawed that the guilty verdict
19 cannot reasonably be relied upon as accurate."
20        Did I read that correctly?
21   A.  You did.
22   Q.  Okay.  What does that mean?
23   A.  It means that there was an additional
24 basis on which we would look at a conviction that

Page 63

1  was what I would characterize as supplemental to
2  the procedures or the standards that we've already
3  discussed.  And that related to where there was a
4  concern about the processes as opposed to the
5  verdict itself in addition to the verdict itself.
6  We were concerned about the processes that might
7  have involved a police officer, it might have
8  involved a prosecutor, a juror; it could have
9  involved other circumstances.  So it was a
10 supplemental matter that we felt was appropriate
11 to add.
12   Q.  What do you mean by "processes"?
13   ATTORNEY SCHELLER:  I'm going to object to
14 form.
15   THE WITNESS:  I'm sorry.  I didn't hear that.
16   ATTORNEY SCHELLER:  Objection:  Form.
17   ATTORNEY HENRETTY:  Join.
18   THE WITNESS:  Okay.  But a process might be
19 the basis on which a custodial statement was
20 taken.  It might be the performance of a
21 prosecutor.  It might be evidence that a juror had
22 been corrupted or -- or in some fashion involved
23 in misconduct.  There were -- It was, without
24 trying to specify any particular part of the

Page 64

1  process, it was a matter of there was concerns
2  about the ability of the procedure to give us a
3  reliable result.  And if someone said, "I'm
4  innocent," and we found the procedure itself to be
5  flawed, we would take a look at that case.
6  BY ATTORNEY MEADOR:
7    Q.  Thank you.
8        I'm going to scroll down to RFC1917.  And
9  if you see -- you can see in -- there's a section
10 designated by the question "Who will investigate
11 and evaluate the claim of actual innocence?"
12        Do you see that?
13   A.  I do.
14   Q.  Okay.  And it says, the second sentence,
15 "Consistent with its mission, CIU stands apart as
16 an independent division within the state's
17 attorney's office."
18        Do you see that?
19   A.  I do.
20   Q.  Okay.  What does that mean?
21   A.  It means that this is not one of the
22 divisions within the Felony Trial Division or the
23 Criminal Division which might be perceived by
24 someone who is underinformed as a suggestion that

Page 65

1  cases weren't being considered fairly because they
2  were being considered by people who were -- had a
3  vested interest in seeing that all convictions
4  should be sustained.
5    Q.  Okay.  And then the last section of that
6  paragraph indicates that "The recommendations
7  of the Conviction Integrity Unit will be brought
8  directly to the Chief Ethics Officer at the
9  state's attorney's office."
10        Is that accurate?
11   A.  That's what it says.
12   Q.  Okay.  And is that what took place?
13   A.  That's right.
14   ATTORNEY SCHELLER:  Objection.
15   THE WITNESS:  April Perry was the Chief Ethics
16 Officer.
17 BY ATTORNEY MEADOR:
18   Q.  Okay.  When formulating the producers
19 that -- and the policy that we're talking about,
20 was it your decision to have the recommendations
21 brought to the Chief Ethics Officer?
22   A.  No.
23   ATTORNEY SCHELLER:  Objection to form.  Are we
24 discussing this particular case --

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Pages 66..69

Page 66

1    ATTORNEY MEADOR:  No.  I'm asking about
2    generally --
3        ATTORNEY SCHELLER:  -- of the policies --
4        ATTORNEY MEADOR:  I'm asking generally about
5    the policies and procedures in place in the
6    Conviction Integrity Unit during his tenure.
7        ATTORNEY SCHELLER:  I'm going to continue to
8    object to any questions that ask about the
9    application of this policy to any case or
10   investigation conducted by the Conviction
11   Integrity Unit other than those raised in the
12   actual caption of this lawsuit.
13       ATTORNEY MORAN:  So since I have the Court's
14   transcript in front of me, there was one more part
15   I missed, Jessica, which I think is worth adding
16   to the mix here.  The second topic the Court
17   allows, in addition to a discussion of the general
18   policy, is whether the policies and procedures
19   were followed in this case.  So clearly the Court
20   is expecting us to ask questions about general
21   policies and the generic application of policy
22   without to respect to any other individual
23   specific case.
24       ATTORNEY SCHELLER:  So, Pat, I agree with you

Page 67

1    as to how the transcript reads but again disagree
2    with you as to the application.  I agree the Court
3    has -- has ruled that you can ask how the policy
4    was applied in this case and if it followed in
5    this case.  But I don't believe the Court has
6    ruled that you can inquire as to the policy and
7    how it was applied in every other case, any other
8    case, or generally.
9        The limits of the inquiry, I think, were
10   fairly clear.  I have the transcript up as well.
11   And while you can certainly inquire of Mr. Rotert
12   as to whether or not he followed these policies in
13   this case, I do not believe the Court has given
14   you carte blanche to expand your inquiry into
15   general questions of application.
16       I think the Court has ruled yes, you can
17   inquire what the policies and procedures were, and
18   were they followed here.  So on that point we
19   agree.
20       ATTORNEY MEADOR:  That's not even the question
21   that's posed to Mr. Rotert.  So ...
22       ATTORNEY SCHELLER:  I believe your question
23   was whether he reported to the Chief Ethics
24   Officer generally.  Was that not the question?

Page 68

1        ATTORNEY MEADOR:  That was not the question.
2        **THE WITNESS:  That was my understanding of the**
3    **question.**
4        **Can we read it back.**
5        (Whereupon, the record was read as
6        requested.)
7        ATTORNEY SCHELLER:  I would then add a layer
8    of deliberative process privilege to my objection.
9        ATTORNEY HENRETTY:  Based on those objections,
10   I would instruct the witness not to answer.
11       ATTORNEY MEADOR:  Mr. Rotert, are you
12   following your counsel's instruction not to the
13   answer?
14       **THE WITNESS:  Yes, I will.**
15   BY ATTORNEY MEADOR:
16   Q.   Okay.  So I'm going to scroll down.  The
17   last paragraph on RFC1918, do you see that?
18   A.   I do.
19   Q.   Okay.  And it says -- it's under the
20   section entitled "How will I know what conclusions
21   have been reached by CIU?"
22       It states "Upon receipt of a written
23   claim, CIU conducts an initial screening process
24   to determine whether the claim is eligible for

Page 69

1    consideration based on the two criteria discussed
2    above."
3        Did I read that correctly?
4    A.   Yes.
5    Q.   And is that an accurate indication --
6    Strike that.
7        Is that an accurate delineation of the
8    procedure --
9    A.   Yes.
10   Q.   -- that took place?
11       Okay.  And when it says "based on the two
12   criteria discussed above," is that referencing the
13   claims -- strike that -- the two criteria
14   discussed on the first page of the policy -- I'm
15   going to scroll up for you -- which indicates
16   first, the claimant must assert actual innocence;
17   and, second, the claim of innocence must be based
18   on evidence that was not considered by the trier
19   of fact?
20   A.   That is correct.
21   Q.   Thank you.
22       Okay.  Scrolling down to the section
23   underneath the question "What relief can be
24   granted by CIU," do you see that?

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 60 of 612 PageID #:8718

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                Pages 70..73

Page 70

1   A.   I do.
2       Q.   And it says "CIU evaluates, investigates,
3   and recommends, but the final decision whether to
4   grant relief rests with the State's Attorney of
5   Cook County."
6           Is that an -- Did I read that correctly?
7   A.   You did.
8       Q.   And is that an accurate delineation of
9   the procedures --
10  ATTORNEY SCHELLER:  I would -- Sorry.
11  ATTORNEY MEADOR:  Can I finish my question?
12  ATTORNEY SCHELLER:  Sure.  I thought you were
13  finished.  I apologize.
14  BY ATTORNEY MEADOR:
15      Q.   Is that an accurate delineation of the
16  procedures in place in the Conviction Integrity
17  Unit during your tenure?
18          Strike that.  Let me clarify.
19          Is that an accurate delineation of the
20  procedures in place effective September 2017?
21  A.   Yes.
22      Q.   Just so that I can make sure I've got the
23  timing correct for you.
24          And then it states "Further, the nature

Page 71

1   or form of any relief likewise is a matter solely
2   within the State's Attorney's discretion."
3           Did I read that correctly?
4   A.   You did.
5       Q.   Okay.  And is that an accurate
6   delineation of the procedures in place at the
7   Conviction Integrity Unit effective September
8   2017?
9   A.   Yes.
10      Q.   And then the next paragraph states "Where
11  the investigation shows a substantial probability
12  that the claimant is actually innocent of the
13  charge of conviction, the CIU will recommend that
14  the state's attorney's office should take steps to
15  undo that conviction and vacate any resulting
16  sentence."
17          Did I read that correctly?
18  A.   Yes.
19      Q.   And is that an accurate delineation of
20  the procedures in place effective September of
21  2017?
22  A.   Yes.
23      Q.   Okay.  And that's part of what we
24  discussed already earlier, that that was one of

Page 72

1   the recommendations that you could make, correct?
2   A.   Correct.
3       Q.   Okay.  And then it says "Depending on the
4   particular circumstances of a given case, however,
5   other remedies may be recommended."
6           Did I read that correctly?
7   A.   You did.
8       Q.   And is that an accurate delineation of
9   the procedures in place in the Conviction
10  Integrity Unit effective September 2017?
11  A.   Yes.
12      Q.   Okay.  And those other remedies we
13  discussed earlier as well, correct?
14  A.   Correct.
15  ATTORNEY MEADOR:  Okay.  All right.  This is
16  probably a good time to take a break.  Okay.  Take
17  maybe 10 minutes.
18  THE VIDEOGRAPHER:  Let's go off the record at
19  11:48 a.m.
20          (Whereupon, a short break was
21           taken.)
22  THE VIDEOGRAPHER:  We're back on the record at
23  12:01.
24  ATTORNEY CURRAN:  Before you start your exam,

Page 73

1   I do want to put on the record that plaintiffs do
2   anticipate having about an hour to an hour and a
3   half worth of questions for Mr. Rotert.  Based on
4   the current pace and the number of exhibits, I'm a
5   little concerned about time.  So I just want to
6   put that on the record.
7   ATTORNEY MEADOR:  Okay.
8   BY ATTORNEY MEADOR:
9       Q.   So I am going to share an exhibit.
10          Can you see that exhibit, Mr. Rotert?
11  A.   Yes, I can.
12      Q.   Okay.  I moved it to my bigger screen and
13  I wasn't sure I was doing it correctly without
14  Russell's direction.
15          So marking this as Exhibit -- Tracy, is
16  this 3?
17  THE COURT REPORTER:  That is correct.
18          (Whereupon, Rotert Deposition
19           Exhibit No. 3 was marked for
20           identification.)
21  BY ATTORNEY MEADOR:
22      Q.   I am going to state for the record
23  this RFC1925 to 1929.  And, Mr. Rotert, I'm just
24  going to scroll down so you can take a look at the

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 74..77

Page 74

1 exhibit.  There's that big office again with the
2 nice view.  Okay.
3          Did you have an opportunity to look at
4 the exhibit?
5     A.   I did.
6     Q.   Okay.  Do you recognize this?
7     A.   I do.
8     Q.   What is it?
9     A.   It's a form that we assembled intended to
10 be a questionnaire for an applicant to use that
11 would try to focus the applicant in providing us
12 the data that we really needed to make the initial
13 review of a case.
14    Q.   And did you prepare this application
15 form?
16    A.   I did.
17    Q.   Okay.  And when was it put into effect?
18    A.   It was a parallel project with the
19 development of the policy itself.  And both
20 documents, the policy and this questionnaire, were
21 posted at essentially the same time.
22    Q.   And if my memory serves me correctly,
23 that would have been sometime around September of
24 2017; is that correct?

Page 75

1     A.   That's my best recollection, yeah.
2     Q.   Okay.  Thank you.
3          Mr. Rotert, is it fair to say that for
4 any cases that were already being reviewed by the
5 Conviction Integrity Unit you did not require that
6 the applicants submit an application form related
7 to their claims?
8          ATTORNEY SCHELLER:  I'm going to object to the
9 form of the question to the extent it seeks the
10 application of the form to any case other than
11 this one.
12         ATTORNEY HENRETTY:  Based on the objection,
13 I'll instruct the witness not to answer.
14 BY ATTORNEY MEADOR:
15    Q.   Mr. Rotert, are you following your
16 counsel's instruction?
17    A.   Yes, I am.
18    Q.   Okay.  Mr. Rotert, did you require either
19 Derrell Fulton or Nevest Coleman to submit an
20 application form pursuant to this procedure?
21    A.   No, I did not.
22    Q.   And why not?
23    A.   They were both -- When I became
24 acquainted with their case, they were both

Page 76

1 represented by very able counsel.  And the
2 information I was trying to gather through use of
3 this form was already available, and it would --
4 there was no need for it.
5     Q.   Okay.  Thank you.
6          Okay.  Mr. Rotert, are you aware of any
7 policies or procedures that were in effect related
8 to the consideration for cases for Certificates of
9 Innocence during your tenure?
10    A.   Well, I was aware that the Certificate of
11 Innocence statutory structure was in place.  I was
12 aware that COI was something that was resolved --
13 was managed or handled as a litigation matter by
14 the Civil Division of the state's attorney's
15 office.  So I'm not sure if that's responsive.
16 But, I mean, I knew what COI was.  It was not --
17 It was not a conviction integrity -- It was not in
18 the business of deciding or litigation the
19 question of a Certificate of Innocence.
20    Q.   Were you ever made aware during your
21 tenure at the state's attorney's office of any
22 internal policies or procedures generated related
23 to consideration of matters for certificates of
24 innocence?

Page 77

1     A.   Yes.
2     Q.   Okay.  Who generated those policies and
3 procedures?
4          ATTORNEY SCHELLER:  I'm going to object to
5 that question based on the deliberative process
6 privilege.  I think you can question as to whether
7 policies and procedures existed and what they were
8 but not the genesis of those procedures.
9          ATTORNEY MEADOR:  The question -- Perhaps
10 you're misunderstanding the question, Counsel.
11 This is really just he said they weren't his, so
12 I'm asking where the policies came from, what
13 unit, so I can clarify.
14         ATTORNEY SCHELLER:  The objection still
15 applies.
16         ATTORNEY HENRETTY:  Based on that, the
17 objection of the state's attorney, I'll instruct
18 the witness not to answer.
19         ATTORNEY MEADOR:  Perhaps you can explain what
20 unit established those.  That's exactly what the
21 parameters are here.
22         ATTORNEY SCHELLER:  So I think we're going to
23 have to agree to disagree.  I believe the
24 parameters are you may explode whether there were

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 78..81

Page 78

1  policies and procedures and whether or not they
2  were followed.  But how they were developed, by
3  whom, who weighed in, et cetera, would all be
4  subject to the deliberative process privilege.
5      ATTORNEY MEADOR:  Okay.  I disagree.  But it
6  looks like this is going to be a very long day.
7  BY ATTORNEY MEADOR:
8      Q.   Mr. Rotert, are you going to follow your
9  counsel's instruction not to answer?
10     A.   Yes.
11     Q.   Okay.  How did you become aware of the
12  existence of policies and procedures related to
13  consideration of cases for Certificates of
14  Innocence?
15     A.   I knew that the Certificate of Innocence
16  existed, and I was addressed by Jakob (phonetic)
17  Patterson, who then was the head of the group, who
18  once told me that it was something that he would
19  like my thinking about.
20     Q.   Okay.  And just for clarification, we're
21  only talking about internal policies or
22  procedures, correct?
23     A.   Internal policies or the statute that was
24  on the books.

Page 79

1      Q.   Understood.  Okay.
2           Did you ever see any -- any physical
3  written policies and procedures internal to the
4  state's attorney's office related to consideration
5  of cases for Certificates of Innocence.
6      ATTORNEY SCHELLER:  I'm going to object
7  insofar as the question seeks an unpublished,
8  unfinalized proposed policy or procedure under the
9  deliberate process privilege.  I have no objection
10  to the question to the extent it seeks a final
11  determination as to a policy or procedure in this
12  area.
13     ATTORNEY HENRETTY:  And with that objection, I
14  would instruct the witness not to discuss any
15  policies or procedures other than finalized ones
16  in his answer.
17     ATTORNEY MEADOR:  Okay.  Again, not my
18  question.
19  BY ATTORNEY MEADOR:
20     Q.   But can you answer my question,
21  Mr. Rotert?
22     A.   I can say that I don't believe I ever saw
23  a document that would analogous to the policy you
24  showed me from CIU.  I don't believe I ever saw a

Page 80

1  document that was purported to be a written
2  statement of internal policy on the COI issue.
3      Q.   Okay.  During your tenure at the state's
4  attorney's office, were -- generally, were cases
5  for consideration of a Certificate of Innocence
6  handled by the Conviction Integrity Unit?
7      A.   No.
8      ATTORNEY SCHELLER:  I still object.
9  BY ATTORNEY MEADOR:
10     Q.   Were the -- During your tenure in the
11  state's attorney's office, you testified that
12  cases for consideration of Certificates of
13  Innocence were handled by the Civil Division; is
14  that accurate?
15     A.   That's my understanding.
16     Q.   Okay.  And are you aware of a time period
17  prior to your tenure that the consideration of
18  cases for Certificates of Innocence were handled
19  by the Conviction Integrity Unit?
20     ATTORNEY HENRETTY:  Object to form and
21  foundation.
22     THE WITNESS:  I'm not aware whether or not
23  they ever were.
24

Page 81

1  BY ATTORNEY MEADOR:
2      Q.   Okay.  Thank you.
3           Mr. Rotert, at some point, you became
4  aware of the Conviction Integrity Unit's review of
5  the Derrell Fulton and Nevest Coleman convictions,
6  correct?
7      A.   Can I interrupt for a second?
8      Q.   Sure.
9      A.   Is the noise on my end a bother to
10  anybody?  Can you hear that?
11     Q.   I don't hear anything.
12     A.   Then please, can you please restate your
13  question?
14     ATTORNEY MEADOR:  Sure.
15          Tracy, can you read it back, please.
16          (Whereupon, the record was read as
17           requested.)
18     THE WITNESS:  That is a correct statement,
19  yes.
20  BY ATTORNEY MEADOR:
21     Q.   Okay.  When did that happen?  When did
22  you become aware of the unit's review of those
23  cases, convictions?
24     A.   Very -- Among the -- In the very first

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 82..85

Page 82

1   meetings I had with the assistants in the group,
2   that case was identified to me as one that was
3   under active review at the time.
4       Q.   All right.  Who was handling the review
5   at that time?
6       A.   Primarily it was being done by assistant
7   state's attorney Gina Savini.
8       Q.   And what were you advised as to the
9   status of that review?
10      A.   As I recall, the first thing that I was
11  told was that there had been testing done on the
12  underwear found on the victim of the crime, which
13  had produced DNA results that did not support or
14  did not provide evidence against either
15  Mr. Coleman or Mr. Fulton; in other words, neither
16  of them were considered donors of the material in
17  her underwear.  And if I may, this was -- I was
18  learning about a statute, Section 116-3, which I
19  hadn't known about, which allows a defendant to
20  seek testing.  And so it was really as I was
21  trying to learn how that statute functioned that
22  Coleman and Fulton case was sort of used as the
23  exemplar of here's what would happen.
24      Q.   Okay.  Were you advised that the review

Page 83

1   was being conducted based on the DNA testing
2   request or for other reasons as well?
3       A.   Well, the DNA testing, the forensic
4   testing was the topic that was brought to my
5   attention, and that was the focus of the energy
6   when I first learned about the case.
7       Q.   Okay.  Were you advised that both
8   Mr. Coleman and Mr. Fulton were claiming actual
9   innocence?
10      A.   I believe that to be the case.  I don't
11  remember a particular conversation or comment, but
12  I believe that that was my understanding.
13      Q.   Okay.  One sec.  I'm just trying to pull
14  up an exhibit.  I think this is going to be
15  Exhibit 4.
16      THE COURT REPORTER:  That is correct.
17              (Whereupon, Rotert Deposition
18              Exhibit No. 4 was marked for
19              identification.)
20  BY ATTORNEY MEADOR:
21      Q.   Can you see this Exhibit.  Mr. Rotert?
22      A.   I can.
23      Q.   Okay.  I'm just going to scroll down.
24  I'm sorry.  It looks like there's a duplicate in

Page 84

1   there, so my apologies.  It's just a duplicate of
2   one letter.
3           Do you recognize this document?
4       A.   I believe I might know what it is.  I
5   don't know that I can say I recognize it.
6       Q.   Okay.  So I'm going to represent to you
7   that this is a letter from Derrell Fulton to the
8   Conviction Integrity Unit on October 9 of 2013
9   requesting a review of his case.  Have you seen
10  this letter before today?
11      A.   I am -- I am -- I don't remember if I've
12  seen the letter.  Certainly the fact of the letter
13  was made known to me, and the substance of the
14  letter was related to me.  I would not be
15  surprised if I once actually saw the document
16  itself, but I don't have a specific recollection
17  of doing so.
18      Q.   Okay.  And do you have -- Strike that.
19          Were you advised that Mr. Fulton claimed
20  that the -- that his confession was fabricated by
21  the Felony Review assistant State's Attorney Hal
22  Garfinkel?
23      ATTORNEY CURRAN:  I'm going to object to form.
24          This is Nick Curran.

Page 85

1       ATTORNEY HENRETTY:  Join.
2       THE WITNESS:  I became aware during the course
3   of my work in this area that was a claim,
4   that Mr. Fulton felt his confession was
5   inappropriately obtained.
6   BY ATTORNEY MEADOR:
7       Q.   Did you also become aware that
8   Mr. Fulton claimed that he told the police he had
9   an alibi for the evening of the murder of
10  Antwinica Bridgeman?
11      A.   Again, I became aware of that fact.  The
12  origin of my knowledge, whether it was this letter
13  or somebody telling me about this letter, I can't
14  speak to that.
15      Q.   Okay.  Did you become aware that
16  Mr. Fulton conveyed to the Conviction Integrity
17  Unit that he believed Nevest Coleman was guilty of
18  the murder of Antwinica Bridgeman?
19      A.   I was aware that he had made that
20  assertion.
21      Q.   Okay.  Were you apprised as to the
22  reasons ASA Savini was reviewing Mr. Fulton's
23  claims?
24      A.   Yeah.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 86..89

Page 86

1    ATTORNEY SCHELLER:  I'm going to -- I would
2  like to object at this point.  If you look at the
3  Court's rulings on Topic 3, nature and the source
4  materials into the investigation on both issues,
5  so that would be the retry, dismissal, or
6  Certificate of Innocence, has been allowed.  But I
7  think the Court was fairly clear that the analysis
8  or the why behind certain people were doing
9  certain things is not necessarily discoverable.
10    ATTORNEY HENRETTY:  So based on that, I will
11  instruct the witness not to answer.
12    ATTORNEY SCHELLER:  And I am referencing the
13  Court's ruling on the third topic.
14    ATTORNEY MEADOR:  Right.  Which is the nature
15  and source of materials reviewed and considered.
16    ATTORNEY SCHELLER:  Right.
17    ATTORNEY MEADOR:  All right.  So my belief is,
18  my position is that this is part of what was
19  considered and the reasoning, which is allowed
20  for -- as to the decisionmaking process.
21    ATTORNEY MORAN:  Yeah.  As a matter of fact,
22  the entire deliberative process is waived with
23  respect to the CIU's reinvestigation, the decision
24  to retry, and the decision not to retry.

Page 87

1    ATTORNEY SCHELLER:  So if you look at the
2  Court's ruling on Topic No. 3, and if -- if I'm
3  looking at the wrong thing, please point it to me,
4  but my understanding is the Court said, these
5  aren't just discussing the nature and source of
6  materials, they're not.  They are not.  They're
7  not invading the deliberative process privilege or
8  the work product privileges.  So the testimony
9  such as, We considered the witness interviews, we
10  considered DNA evidence, things like that, are
11  going to give context to the ultimate decision
12  that is -- that was made by the state's attorney's
13  office.
14    My -- In your opinion, Mr. Moran or
15  Ms. Meador, am I looking at the wrong portion of
16  this ruling?  Because I -- you know, I do want to
17  be fair.  I do want to honor the Court's rulings.
18  But that is what I'm seeing on paper.
19    ATTORNEY MORAN:  I think it's -- you've got to
20  scroll up a couple pages.  He address deliberative
21  process more generally.  But frankly, I don't want
22  to waste time on a deposition, especially with the
23  plaintiffs indicating they have questions as well,
24  parsing through this document.  If you think this

Page 88

1  is what the appropriate objection is, I'm not
2  going to, you know, go through and find every
3  angle or every point where the judge said it's
4  waived.  The end result will be if we're correct,
5  Mr. Rotert will be coming back to discuss this
6  issue.  So, you know, you're just going to have to
7  be -- you're going to have to take the position
8  you think is appropriate in that situation.
9    ATTORNEY SCHELLER:  I think that's fair.  I'll
10  stand on the objection.
11    ATTORNEY HENRETTY:  If I didn't say it, based
12  on that, I'll instruct the witness not to answer.
13  BY ATTORNEY MEADOR:
14    Q.  Mr. Rotert, are you following your
15  counsel's instruction?
16    A.  I am.
17    Q.  Okay.
18    ATTORNEY MORAN:  But, Lisa, one thing.  I
19  would add, though, as I said that, I'm looking at
20  page 13 and 14.  He does squarely address it.  So
21  it's there if you want to follow it.  I think you
22  should.  But otherwise, we do agree to disagree.
23    ATTORNEY SCHELLER:  Ms. Meador, I'm sorry.
24  May I have just one moment to look at the

Page 89

1  referenced pages.
2    ATTORNEY MEADOR:  Do you want to go off the
3  record?
4    ATTORNEY SCHELLER:  I don't think that will be
5  needed.
6    Thank you, Mr. Moran.  Based on my
7  reading, and I believe the question was did
8  Ms. Savini inform you as to the reason, I'll
9  withdraw the objection.
10    ATTORNEY HENRETTY:  As will I based on that.
11  BY ATTORNEY MEADOR:
12    Q.  Did Ms. Savini advise you as to the
13  reasons of her conducting the review of
14  Mr. Fulton's claims?
15    A.  Yes.
16    Q.  What were they?
17    A.  She believed that -- She had received a
18  letter not from an attorney, but from Mr. Fulton,
19  as you've seen, alleging that there was a basis to
20  conduct additional tests.  She believed that
21  Section 116-3, if Mr. Fulton had been aware of it
22  and understood what its terms provided, that he
23  probably would have sought relief under that.  So
24  she basically followed the 116-3 procedure to get

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 65 of 612 PageID #:8723

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 90..93

Page 90

1    additional testing done.
2        Q.   Okay.  Just pulling up another exhibit.
3    Exhibit 5, which is CCSAO3495.
4                    (Whereupon, Rotert Deposition
5                    Exhibit No. 5 was marked for
6                    identification.)
7    BY ATTORNEY MEADOR:
8        Q.   Do you see that document, Mr. Rotert?  Is
9    it big enough?  Do you want me to make this
10   larger?
11       A.   No.  I'm good.  Yes, I see it.
12       Q.   Okay.  And this is a motion that was
13   filed in Mr. Fulton's case; is that correct?
14       A.   That appears to be the case.
15       Q.   Okay.  And it's dated -- stamped February
16   2 of 2016, correct?
17       A.   I believe that's what that stamp says.
18       Q.   Will you accept my representation that
19   that's what it says?
20       A.   I will.
21       Q.   Okay.  And this was filed by ASA Savini,
22   correct?
23       A.   That appears to be the case.
24       Q.   Okay.  And the motion, it states that

Page 91

1    "Petitioner wrote a letter to the Conviction
2    Integrity Unit of the Cook County State's
3    Attorney's Office raising DNA issues which would
4    require testing of evidence in the case.  The
5    Conviction Integrity Unit has agreed to DNA
6    testing under 725 ILCS 5/116-3."
7            Did I read that correctly?
8        A.   Yes, you did.
9        Q.   Okay.  And is this motion reflective of
10   what you just explained to me was the reasoning
11   related to Ms. Savini's review of Mr. Fulton's
12   claims?
13       A.   It corresponds with what Ms. Savini told
14   me roughly a year later when she described how the
15   case came into motion; that this is corroborative
16   of what she told me.
17       Q.   Okay.  It also indicates on here that the
18   State will be inquiring whether the petitioner
19   would like to proceed pro se or request an
20   attorney to be appointed to represent him related
21   to the DNA testing, correct?
22       A.   That's what it says.
23       Q.   Okay.  Were you made aware that
24   Mr. Fulton had initially -- was representing

Page 92

1    himself in the matter?
2        A.   My understanding was that the letter
3    obviously -- Well, my understanding was that the
4    letter came from Mr. Fulton.  But I believe that
5    at some point, an assistant public defender stood
6    up to assist or represent his interests.  And --
7    But I don't really know the whole back story on
8    when he obtained counsel or which counsel came in
9    at which point.
10       Q.   Okay.  And you did become aware at some
11   point that Mr. Fulton obtained counsel through
12   Kathleen Zellner's office?
13       A.   That's correct.
14       Q.   And did you become aware at some point
15   that Mr. Coleman, who was a codefendant of
16   Mr. Fulton, also became involved in the DNA
17   retesting process pursuant to Section 116-3?
18       A.   Yes.
19       Q.   Okay.  And did you become aware of that
20   at the same time you were being apprised of the
21   review of these cases when you first came on with
22   the state's attorney's office?
23       A.   At some point.  I mean, initially, my
24   concern was less about which lawyers are in the

Page 93

1    case and more about what is this DNA showing and
2    what's this case about.  But I knew that there was
3    counsel involved by the time I got there.
4        Q.   Okay.  Understood.  Thank you.
5            And do you know where the DNA testing was
6    being conducted?
7        A.   My understanding, I believe it was at the
8    Illinois State Police Crime Laboratory.
9        Q.   Okay.  As you sit here, do you recall
10   what evidence was being -- Strike that.
11           Do you recall what evidence was sent to
12   the ISP for potential testing?
13       A.   My understanding was that virtually
14   everything that had been recovered at the scene
15   was at some point being evaluated for whether it
16   could be suitable for testing.  This would have
17   included objects, clothing, things of that sort.
18       Q.   Okay.  I am going to share what will be
19   Exhibit 6.
20                   (Whereupon, Rotert Deposition
21                   Exhibit No. 6 was marked for
22                   identification.)
23   BY ATTORNEY MEADOR:
24       Q.   Can you see that okay, Mr. Rotert?

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 66 of 612 PageID #:8724

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 94..97

Page 94

1    A.   I can.
2    Q.   Okay.  So this is a lengthy letter, so
3  just give me a second, and I'll scroll down for
4  you to review it.
5       Okay.  Were you able to see it in its
6  entirety?  I scrolled fast.
7    A.   It's I -- I can discern what it is and
8  what it's discussing.
9    Q.   Okay.  Fair enough.
10       So I will represent to you that this is a
11  letter from the Illinois State Police Forensic
12  Division dated November 16, 2016, which delineates
13  the evidence that it has at its facilities for
14  potential testing related to the Fulton/Coleman
15  matter.  Okay?
16    A.   Okay.
17    Q.   And is that reflective of what you just
18  referenced, that all the evidence was sent, and
19  then ISP would make a determination as to what
20  could or couldn't be tested?
21    A.   It seems consistent with what was
22  represented to me about the case.
23    Q.   Okay.  At some point, did you become
24  aware that there was an order entered granting the

Page 95

1  transfer of clothing from the Clerk's impound to
2  ISP for testing in this case?
3    A.   I -- I don't know if I was ever -- that
4  fact was teased out and explained to me.  I knew
5  that the lab had the stuff that we wanted to see
6  if it could be tested.
7    Q.   Okay.  Is it fair to say, then, you have
8  no knowledge as to the state of that evidence
9  prior to being transferred to the State Police's
10  Forensic's Division?
11       ATTORNEY CURRAN:  This is -- I'm sorry.  This
12  is Nick Curran.  I'm just going to object on form.
13       ATTORNEY MEADOR:  You know what?  That's fair,
14  Nick.  I'll -- I'll rephrase.
15  BY ATTORNEY MEADOR:
16    Q.   Is it fair to say, Mr. Rotert, that you
17  don't know how the clothing was maintained in the
18  Clerk's Office's impound prior to it being
19  transferred to the State Police?
20    A.   Yes, it is.
21    Q.   Okay.  Were you ever given -- Strike
22  that.
23       We talked about you making your final
24  recommendations related to the CIU's investigation

Page 96

1  of these convictions, correct?
2    A.   Yes.
3    Q.   Prior to you issuing those findings, were
4  you given any directives on how to handle the
5  matter from your chain of command?
6       ATTORNEY CURRAN:  Sorry.  This is Nick Curran.
7       I'm just going to object based on form.
8  BY ATTORNEY MEADOR:
9    Q.   Do you understand what I'm asking,
10  Mr. Rotert?
11    A.   Well, if I understand -- if I use the
12  common understanding of directives, the answer is
13  no.
14    Q.   Okay.  Did you have any initial
15  impressions of the case when you were first
16  discussing it with ASA Savini?
17       ATTORNEY HENRETTY:  Object to form.
18       THE WITNESS:  Yes.
19  BY ATTORNEY MEADOR:
20    Q.   What were they?
21    A.   I was -- I was interested in the DNA
22  angle and because I wanted to learn more about DNA
23  and how it -- how it -- I wanted to learn more
24  about it.  So that aspect of the case interested

Page 97

1  me.  And I think I wanted to do something that
2  looked like work so that the people in my unit
3  would think that I wasn't just some new guy that
4  got to sit around and give orders.  I wanted to
5  get involved in something that I could -- I could
6  show that I was willing to work.
7    Q.   And did you get -- become personally
8  involved in the investigation of the Fulton and
9  Coleman claims under review?
10    A.   I did.  I want it to be clear that Gina
11  Savini did, in my estimation, highly professional
12  and capable work on this.  And whatever product
13  came out was -- was certainly a reflection of her
14  work.  But I did work with her, and I worked
15  personally and directly on the investigation.
16    Q.   When did that begin?
17    A.   Very soon after it was brought to my
18  attention as a case.  I don't remember -- I think
19  at this point in time, there was a lot of
20  communications, especially, I think, with
21  Mr. Ainsworth.  But I think there was a lot of
22  discussion underway about what's out there, what
23  could possibly be tested, what have we tested,
24  what haven't we.  There were a lot of, I would

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 98..101

Page 98

1  say, logistics issues. And I just started to sit
2  in on those to get a sense for the -- how things
3  worked.
4      Q.   Okay. And what was the plan that was in
5  place to conduct the investigation?
6      A.   I don't know that I would say that there
7  was a plan that was unique to this case. We were
8  certainly aware that the DNA results were highly
9  significant. Okay? They made it -- They made a
10  big impression. So I think the plan was to do
11  what due diligence required. We had to get into
12  the facts of the case and learn as much as we
13  could about it to find out how to -- how to assess
14  what this evidence meant, this new DNA result
15  meant.
16     Q.   Okay. Okay. I am going to show you what
17  we'll mark as Exhibit 7.
18              (Whereupon, Rotert Deposition
19              Exhibit No. 7 was marked for
20              identification.)
21  BY ATTORNEY MEADOR:
22     Q.   Now, this again is a lengthy document.
23  For the record, it is Bates stamped CCSAO3447 to
24  3482. I'm just going to scroll down so that you

Page 99

1  can see the entirety of the document.
2      Am I going too fast?
3      A.   No.
4      Q.   It's long.
5      Okay. Have you been able to do a scan of
6  this document?
7      A.   I've been able to associate it with the
8  Fulton/Coleman matter. It's clearly chock full of
9  highly specific data.
10     Q.   For sure.
11     Have you ever seen this document before?
12     A.   Undoubtedly, I have.
13     Q.   And can you tell me what it reflects?
14     A.   Not really. I mean, I'm sure that it --
15  well, I'm not sure. I believe it reflects the
16  results of efforts to see if more DNA could be
17  identified on any of the objects in evidence. And
18  it's clear to me that the listing in the second
19  left column is a listing or an itemization of
20  items of evidence that were recovered that were
21  relevant to the case, probably from the scene.
22  And then from there on, it just gives a technical
23  discussion about what we were able to determine,
24  if anything, as to that specific item.

Page 100

1      Q.   Okay. Thank you.
2      And when you prepared your final
3  recommendation and -- in this case, do you know,
4  was this document attached as an exhibit?
5      A.   I don't recall that. It seems unlikely
6  to me, but I don't recall that it was attache as
7  an exhibit.
8      Q.   Okay. Do you know who prepared this
9  document?
10     A.   I understood it to be prepared by an
11  analyst at the lab, I believe. I'd have to see
12  the first page to be certain.
13     Q.   Okay. When you say the first page, this
14  one that I'm showing you?
15     A.   If that's the first page.
16     Q.   That's the first page.
17     A.   Okay. Then I withdraw it. I don't know
18  who prepared this.
19     Q.   Okay. So if you look at the top, it's
20  got the criminal case number, CPD RD number, and
21  ISP lab number, correct?
22     A.   That looks right to me.
23     Q.   And then indicates 4 May of 2017 at
24  10:00 a.m., call from ISP lab. And it

Page 101

1  indicates --
2      A.   Okay.
3      Q.   -- those individuals the call was from.
4  Is that accurate?
5      A.   That appears to be the case.
6      Q.   Okay. And then underneath that, it
7  states ASA Gina Savini and Kara Stefanson; is that
8  accurate?
9      A.   Okay. Looks like it.
10     Q.   Okay. So -- I'm sorry. And to the left
11  of those names of Ms. Savini and
12  Ms. Stefanson, it says "Spoke to."
13     A.   I see it.
14     Q.   Okay. And then moving on to page 2,
15  there's a similar heading at the top, you know,
16  delineating calls from the ISP lab speaking with
17  ASA Savini and Kara Stefanson?
18     A.   Okay.
19     Q.   Okay. Do you know if this document was
20  prepared by either Gina Savini or Kara Stefanson?
21     A.   I don't know.
22     Q.   Okay. All right. So I'm just going to
23  take -- if you can take a look at -- I'm
24  showing -- I'm talking specifically about

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Pages 102..105

Page 102

1   CCSAO3451, okay?  And at the top, it indicates a
2   June 7, 2017, call between Yongfei Wu and ASAs
3   Savini and Stefanson, correct?
4       A.   That's what it says.
5       Q.   And then at the bottom, it talks --
6   Strike that.  It's referring to discussions of DNA
7   examination related to semen collected on the
8   underwear, presumably for the victim Antwinica
9   Bridgeman, right?
10      A.   Well, I -- This is a document and a phone
11  call that predated my coming aboard.  I wasn't on
12  this call.  I didn't prepare this document.  I
13  don't deny that it might well have been something
14  I saw and reviewed.  But I don't know that I'm in
15  a position to address what the document says or
16  what it means.
17      Q.   Fair enough.
18           You testified earlier that the DNA
19  inquiries were highly significant in this case.
20  Do you recall that?
21      A.   I do.
22      Q.   Okay.  And can you explain to me why they
23  were highly significant?
24      A.   Yes.  The understanding that I had was

Page 103

1   that in the underwear, one of the panels of
2   underwear, one of the panels in the underwear of
3   the victim, a stain that was apparently semen had
4   been identified.  DNA had been isolated from that
5   stain.  And the DNA standard or the DNA sample
6   that was obtained was sufficiently complete in the
7   number of alleles to exclude both Mr. Fulton and
8   Mr. Taylor as the individual who deposited that
9   material.  And considering the nature of the
10  prosecution and the assertions that were in the
11  confessions or attributed to those two, the fact
12  that that stain was not tied to either of them was
13  significant.
14      Q.   And did you become aware at some point
15  that the stain was tied to someone else pursuant
16  to a CODIS hit?
17      A.   Yes.  I know that one of the first things
18  said to me was that the two defendants convicted
19  on the offense didn't tie to the stain and that,
20  in fact, the stain tied to an individual who had a
21  record that included aggravated criminal sexual
22  assault.
23      Q.   And was that -- Did you become aware that
24  that individual was Clarence Neal?

Page 104

1       A.   I did.
2       Q.   And did you become aware that the DNA
3   testing related to the evidence matters was
4   ongoing?
5       A.   Definitely, yes.
6       Q.   Did you -- Strike that.
7            Once you became personally involved in
8   the investigation of the Fulton/Coleman matters,
9   were you then contemporaneously advised of the
10  results relating to the DNA testing as they were
11  coming in?
12      A.   Yes.
13           ATTORNEY AINSWORTH:  Object to form of the
14  question.
15           This is Russell.
16           And foundation.
17      THE WITNESS:  Let me say that I was being
18  periodically brought up-to-date on what was
19  happening in the testing area.
20  BY ATTORNEY MEADOR:
21      Q.   Okay.  So maybe you can -- Maybe I
22  misunderstood how you described your involvement
23  in sitting in on meetings.  Maybe you can just
24  explain to me how it is that you were involved

Page 105

1   during this time period.
2       A.   Well, I was trying to be involved in the
3   investigation while simultaneously trying to run a
4   unit, trying to develop the procedures, trying to
5   meet with the bench and the bar.  And there were
6   just a lot of things going on.  Gina Savini was,
7   in my estimation, the person running the operation
8   and was very gracious about letting me tag along.
9   I was not -- I did not think that I had taken this
10  case over.  I thought that I was being permitted
11  to watch another pro at work.
12           She would tell me when I was in if there
13  were developments.  She and Kara Stefanson
14  undertook the very difficult task of helping me
15  understand some of this material.  I was a slow
16  student in some respects.  So my involvement on
17  the DNA side was what does it tell us?  I didn't
18  get into detail about, well, how many alleles were
19  found, or why couldn't they isolate that fraction
20  of -- I mean, there were levels beyond which I
21  couldn't go.  I was limited in my understanding.
22  But I was getting the -- what I considered to be
23  the bottom line information I needed to evaluate
24  the case.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                                    Pages 106..109

Page 106

1    Q.   Okay.  So I'd like to just ask you about
2    your knowledge as to certain items that were being
3    tested, understanding the parameters you've just
4    explained to me about the scope or limited scope
5    of your knowledge.  Okay?
6    A.   Okay.
7    Q.   Did you become aware that DNA testing was
8    done on nail clippings from the victim, Antwinica
9    Bridgeman?
10   A.   I was aware that that was done.
11   Q.   And did you become aware that for one of
12   the fingernails, the swabbing was not suitable for
13   a comparison?
14   A.   I knew that there were difficulties with
15   many of the items.  I can't parse out fingernails
16   versus beer cans versus socks, whatever the items
17   were.
18   Q.   Okay.  Understood.
19        Did you become aware that testing was
20   being done on the pipe that was --
21   A.   I know what pipe you mean.
22   Q.   Thank you.
23        That there was testing being done on the
24   pipe?

Page 107

1    A.   Certainly was.
2    Q.   Okay.  And did you become aware that that
3    testing indicated Mr. Coleman could not be
4    excluded?
5    A.   I -- I didn't specifically recall that.
6    But I assume that's what the documents reflect.
7    Q.   Okay.  And did you become aware that DNA
8    testing was being done on the victim's eyeglasses.
9    A.   I remember that, but I guess I remember
10   that Mikey wore glasses.  So that would make
11   sense.
12   Q.   Okay.  So fair to say, then, you don't
13   have knowledge as to what the testing results
14   indicated related to the eyeglasses?
15   A.   That is fair to say.
16   Q.   Okay.  Did you become aware that DNA
17   testing was done on the rock or concrete that was
18   found in the victim's mouth?
19   A.   I believe yes, I was aware.
20   Q.   And did you become aware that Eddie
21   Taylor's DNA couldn't be excluded, but that Fulton
22   and Coleman's DNA could be excluded related to
23   that piece of evidence?
24   A.   I don't have that -- I don't have a

Page 108

1    recollection of that particular split.  I'm sure
2    that that's reflected in the documents.
3    Q.   Okay.  And who was Eddie Taylor?
4    A.   Eddie Taylor was an individual who was
5    among those suspected of involvement in this
6    offense and actually, I believe, was questioned at
7    some length by the police.  I don't know if he was
8    ever arrested or not.  But in any event, he never
9    made any admissions, and there wasn't any other --
10   because of Bruton issues and other things, my
11   understanding was that back in those days, a
12   determination was made that there wasn't
13   sufficient evidence to pursue a case against
14   Mr. Taylor.  And so although he was of interest to
15   us, he was not a person who had been convicted in
16   the case.
17   Q.   Did you become aware that DNA testing was
18   done on a swab from the mouth of a can found in
19   the basement where the victim was found?
20   A.   I assume that was done.  I don't
21   have a specific recollection of it.
22   Q.   Okay.  And the documents from the
23   Illinois State Police would reflect the results of
24   those findings?

Page 109

1    A.   Yeah.  There were -- This was -- My
2    recollection is that all of the testing was fairly
3    documented, and each item was individually
4    identified.
5    Q.   Okay.  Did you become aware that there
6    were several tests done related to hair from the
7    pipe?
8    A.   Yes.
9    Q.   And those were DNA tests, correct?
10   A.   Yes.
11   Q.   Okay.  And did you become aware that
12   Mr. Coleman could not be excluded from having
13   contributed to the DNA related to a hair from the
14   pipe?
15   A.   I don't recall the specific results.  But
16   again, I recall that that was done.
17   Q.   Okay.  And do you recall there was also
18   hair from the victim's clothing that was tested as
19   well?
20   A.   Yes.
21   Q.   And that hair from the rock from the
22   victim's mouth was tested as well?
23   A.   That, I don't specifically recall.  But
24   I -- I know that we looked at every -- the

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 110..113

Page 110

1 possibility of any hairs that might produce a DNA
2 that could be analyzed.  We pursued those ideas.
3      Q.   Understood.
4           And then the documents from ISP would
5 reflect the results of those findings?
6      A.   I'm confident they would.
7      Q.   Okay.  And that was part of the
8 information and evidence considered by the
9 Conviction Integrity Unit in analyzing Mr. Fulton
10 and Mr. Coleman's claims, correct?
11      A.   True.
12      Q.   And we already talked about the DNA
13 testing done related to the victim's underwear and
14 not excluding Messrs. Fulton, Taylor, and Coleman,
15 but hitting to Clarence Neal, correct?
16      A.   Correct.
17      Q.   Okay.  And then did you become aware that
18 DNA testing was done on cuttings from the victim's
19 sweatshirt?
20      A.   The sweatshirt I recall being a subject
21 of a lot of conversation.
22      Q.   Okay.  Why was it the subject of a lot of
23 conversation?
24      A.   I -- I just mean that I feel like there

Page 111

1 were many days when Gina would stop into my office
2 and would be talking about cuttings from the
3 sweatshirt, that maybe a new stain or maybe a
4 sweat mark that might have been available.  And so
5 I just -- it seemed to me like the hair and the
6 sweatshirt cuttings came up in conversation with
7 some frequency.
8      Q.   Okay.  When -- Strike that.
9           Did you become aware also that some
10 additional fingerprint testing was done related to
11 a liquor bottle found in the basement?
12      A.   I don't have an individual recollection
13 about that, so I can't say one way or the other.
14      ATTORNEY MEADOR:  Okay.  So it is 1:00
15 o'clock.  How is everyone feeling about a break?
16 I mean, I'm open to what the witness would prefer.
17      THE WITNESS:  The witness would be happy for a
18 three-minute comfort stop and then a resumption.
19 It is Friday, and I think all of us have lives
20 we'd like to rejoin.  So I'm not looking for
21 lunch.  I don't want to have anybody else pass out
22 from hunger.  But that's the witness's
23 perspective.
24      ATTORNEY AINSWORTH:  I'm fine with that.

Page 112

1      THE COURT REPORTER:  Why don't we go off the
2 record.
3           Joe, take us off.
4      THE VIDEOGRAPHER:  We're off the record at
5 12:58 p.m.
6           (Whereupon, a short break was
7            taken.)
8      THE VIDEOGRAPHER:  We're back on the record at
9 1:13 p.m.
10 BY ATTORNEY MEADOR:
11      Q.   I'm going to show what you I'm marking as
12 Exhibit 8, which, for the record, is
13 CCSAO5622 to 5643.  And I'll scroll down for you,
14 Mr. Rotert so -- long memo.
15           (Whereupon, Rotert Deposition
16            Exhibit No. 8 was marked for
17            identification.)
18 BY ATTORNEY MEADOR:
19      Q.   Have you had a chance to see this
20 document?
21      A.   Yes.
22      Q.   And do you recognize it?
23      A.   Yes, I do.
24      Q.   What is it?

Page 113

1      A.   It's a memorandum that Gina Savini and I
2 prepared to summarize the conclusions and
3 recommendations we had made in this Fulton/Coleman
4 matter.
5      Q.   Okay.  Did anyone else contribute to this
6 memo other than you and ASA Savini?
7      A.   In terms of the writing of the memo, no.
8 It was just us two.
9      Q.   It's fair to say that this memo -- Strike
10 that.
11           This memo is dated November 3 of 2017,
12 correct?
13      A.   I see that, yes.
14      Q.   Is it fair to say that the memo reflects
15 a delineation of all of the components of the
16 investigation conducted up to that point?
17      A.   Well, "all" is little bit of a word that
18 I want to tease out.
19      Q.   That's because you're a lawyer.
20      A.   Right.  Hair splitter.
21           It certainly reflects our evaluation of
22 what we determined are the most significant facts
23 and circumstances of the case.
24      Q.   Okay.  When you and ASA Savini drafted

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 114..117

Page 114

1  this memo of the conclusions and recommendations
2  of your investigation, were you in agreement with
3  each other?
4      A.   Yes.
5      Q.   Okay.  Who had the final approval of this
6  memo?
7      ATTORNEY AINSWORTH:  Object to form of the
8  question.
9          This is Russell.
10     ATTORNEY MEADOR:  I can clarify.
11 BY ATTORNEY MEADOR:
12     Q.   Who had approval to send -- to issue this
13 memo?
14     A.   Well, I was the ranking assistant in the
15 unit, the director, so I would have required that
16 any memo going up to April Perry be something that
17 I reviewed and thought was the right work product.
18 And so ultimately, that would have been my
19 decision as the director.
20     Q.   Was your name included on the memo
21 because you were the director or because you
22 assisted in the investigation and determining your
23 conclusions and recommendations?
24     ATTORNEY CURRAN:  I'm going to object based on

Page 115

1  form.
2          This is Nick.
3      ATTORNEY HENRETTY:  I'm going to join that
4  objection.
5  BY ATTORNEY MEADOR:
6      Q.   Do you understand my question?
7      A.   I do.  My answer is yes.
8      Q.   For both?
9      A.   Yeah.  I mean, I considered that both
10 were bases on which I should have my name on the
11 masthead.
12     Q.   Okay.  Was it your procedure to -- Strike
13 that.
14          Was it your procedure in compiling
15 conclusions and recommendations to be made to
16 April Perry that you would conduct a review and
17 analysis of the investigation done by the ASA
18 within your unit?
19     ATTORNEY AINSWORTH:  Objection:  Foundation.
20          This is Russell.
21     ATTORNEY HENRETTY:  Join.
22     THE WITNESS:  Now I am going to ask Counsel to
23 rephrase.  I'm not confident I understand the
24 thrust of her question.

Page 116

1  BY ATTORNEY MEADOR:
2      Q.   Okay.  So you've indicated -- I'll try
3  and break it down a little bit.  You've indicated
4  that your name is on the memo.  One of the reasons
5  is because there are recommendations being made to
6  April Perry, correct?
7      A.   Yes.
8      Q.   Okay.  Was -- Was it your procedure to be
9  involved in an analysis and conclusions for an
10 investigation for the purpose of making --
11 drafting this memo to go to April Perry?
12     ATTORNEY HENRETTY:  Object to the form.
13     THE WITNESS:  I would say not exactly, no.
14 And at this time, I don't think it's accurate to
15 portray this as being consistent with the
16 procedure because this memo, in my estimation,
17 kind of was intended in part to establish a
18 procedure which would be that we would make a
19 thorough analysis of the case and the basis for
20 our conclusions.  After this memo issued, if an
21 investigation were concluded and -- conducted and
22 concluded by one of the people in my unit, and I
23 was aware of it in agreement with the
24 recommendation, that assistant would probably end

Page 117

1  up drafting a memo that would be sent to me.  And
2  if I liked it, I would forward it down to April.
3      ATTORNEY SCHELLER:  I'm going to object
4  insofar as we're discussing how other cases were
5  evaluated and all recommendations made and
6  reported upon insofar that it is privileged.
7      ATTORNEY HENRETTY:  And based on that, I'll
8  instruct the witness not to speak about other
9  cases or how -- what was done generally, even
10 generally as it relates to other cases and
11 applications.
12     ATTORNEY MEADOR:  Okay.  So I'm going to
13 object to that instruction given that he's
14 testifying about his general procedures for
15 reviewing and making determinations for cases.
16 But he's already answered.  So ...
17 BY ATTORNEY MEADOR:
18     Q.   So we talked earlier that the policies
19 and procedures that you put in place were done
20 about September of 2017.  So it was a couple of
21 months before this memo, correct?
22     A.   That's right.
23     Q.   Okay.  So was this the first memo that
24 you were sending to April Perry under those

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 118..121

Page 118

1   policies and procedures?
2       A.   So far as I can recall, yes.
3       Q.   Okay.  And was this then intended by you
4   to be the format for providing the recommendations
5   and analysis generally to April Perry pursuant to
6   those policies and procedures?
7       ATTORNEY SCHELLER:  I'm going to object on the
8   basis that this question -- this question seeks a
9   discussion of the witness's intent as to how to
10  make recommendations to the state's attorney's
11  office concerning the review of matters not
12  implicated by this case.  And such discussions
13  would certainly be covered by several applicable
14  privileges, including deliberative process and
15  work product.
16      ATTORNEY HENRETTY:  Based on that objection,
17  I'll instruct the witness not to answer.
18      ATTORNEY MEADOR:  Okay.  This is a general
19  procedures question.
20  BY ATTORNEY MEADOR:
21      Q.   But, Mr. Rotert, are you following your
22  counsel's instruction?
23      A.   I am.
24      Q.   Okay.  So are you aware of -- Strike

Page 119

1   that.
2            I just want to go through this a little
3   bit kind of in terms of your format that you have
4   here.  In the beginning, you have a brief summary
5   of the incident as well as indications of
6   documents that you reviewed related to police
7   reports, trial evidence, and records of
8   proceedings, correct?
9       A.   Right.
10      Q.   Okay.  And then you have what's called an
11  executive summary.  What is that?
12      A.   That's an vestige of my Winston & Strawn
13  training.  When one is presenting a reviewer with
14  a 23-page opus, I think, polite to cut to
15  the chase early on and say this is what I'm going
16  to ultimately conclude, but now I'm going to
17  explain why I've concluded that.
18      Q.   Okay.  And I apologize.  On the page
19  prior, in the second paragraph, it indicates the
20  reasons why this case came to be reviewed by CIU,
21  correct?
22      A.   Correct.
23      Q.   In that second paragraph?
24           Okay.  Thank you.

Page 120

1            And that's consistent with what you've
2   testified here to today?
3       A.   I hope so.
4       Q.   Okay.  It also indicates that the --
5   makes reference to the DNA testing conducted by --
6   or the scientific testing, excuse me, conducted by
7   the ISP crime lab?
8       A.   It does.
9       Q.   Okay.  Then in the executive summary, it
10  states in the first paragraph, "We conclude that
11  the results drawn from new DNA testing of the
12  victim's clothing were of sufficient importance
13  that had those DNA test results been introduced
14  into evidence at trial, the outcome of that trial
15  may have been different."
16           Did I read that correctly?
17      A.   Yes, you did.
18      Q.   Okay.  And does that accurately reflect
19  one of your conclusions related to your
20  investigation of the Fulton/Coleman matter?
21      A.   Yes, it does.
22      Q.   And can you explain to me what you mean
23  by it.
24      A.   It was our determination, what I meant by

Page 121

1   it was, it would not be appropriate to permit
2   these defendants to continue serving the sentences
3   imposed by Judge Porter after their trial because
4   a significant piece of evidence was not known to
5   the jury at that trial.  And it was not, in our
6   estimation, an appropriate exercise of the power
7   of the State's Attorney's Office to overlook that
8   fact, and that instead, it was -- an appropriate
9   resolution would be to say this case can't stand
10  on the current circumstance.  We can't let these
11  people continue to be in prison when the jury that
12  determined they should be there didn't know
13  something as apparently significant as this.
14      Q.   And why wasn't that information provided
15  to the jury at the time of the criminal trials?
16      ATTORNEY HENRETTY:  Object to form and
17  foundation.
18      THE WITNESS:  I believe because it was not
19  known to be in existence.
20  BY ATTORNEY MEADOR:
21      Q.   And when you're talking about not known
22  to be in existence, was that related to the DNA
23  testing?
24      A.   Correct.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                Pages 122..125

Page 122

1    Q.   Okay.  And in your investigation, did you
2    come to understand that certain DNA testing that
3    was conducted under your investigation was not
4    possible to have been conducted at the time of the
5    trials?
6    A.   That was my understanding, yes.
7    Q.   Just differentiating between the -- a
8    claim of withholding of DNA evidence, correct?
9    This is different?
10   A.   There -- We were not looking at
11   allegations that evidence had been improperly
12   suppressed or withheld.  It was, as I indicated
13   it, a matter of technology providing us things
14   that we didn't have before.
15   Q.   Okay.  And then it states "Under those
16   circumstances, we believe that the State's
17   Attorney's Office should agree that both
18   defendants should be granted a new trial."
19        Did I read that correctly?
20   A.   You did.
21   Q.   And was that your recommendation?
22   A.   Yes.
23   Q.   And that was your recommendation as of
24   November 3rd, 2017, correct?

Page 123

1    A.   Correct.
2    Q.   Did that recommendation ever change at
3    any point?
4    A.   Not to my knowledge.
5    Q.   The next paragraph says "We also are in
6    agreement, however, that the totality of available
7    evidence is not sufficient to persuade us that
8    Mr. Coleman and Mr. Fulton probably are innocent
9    of the murder.  We ask ourselves do the DNA test
10   results discussed herein raise a reasonable
11   likelihood that the victim was murdered by the
12   person whose DNA was identified on her underwear?"
13        Can you explain to me what -- Strike
14   that.
15        Did I read that accurately?
16   A.   You did.
17   Q.   Okay.  Can you explain to me what you
18   meant by that?
19   A.   I don't know that I can improve on those
20   carefully chosen words.  We did not believe, or we
21   had not concluded that the standards we had set
22   for asserting there was actual innocence, we
23   didn't feel those standards had been met.
24   Q.   And I'm accurate the standards you

Page 124

1    indicated earlier in your testimony were clear and
2    convincing; is that correct?
3    A.   That's correct.
4    Q.   Then it goes on to state "We think that
5    proposition is unlikely in view of all the
6    evidence in this case.  Because we do not accept
7    that DNA testing has identified a different
8    suspect who probably committed the murder, we do
9    not find a sufficient reason to undo the results
10   of the jury trials held in this case."
11        Can you explain to me what you mean
12   there?
13   A.   Well, we understood that there might be
14   some -- someone might wonder if you're agreeing
15   that they're entitled to a new trial, can't we
16   agree that they should just be exonerated and
17   declared not to have committed this crime?  We
18   felt that one did not necessarily lead to the
19   other.  We felt very clearly and strongly that a
20   new trial was necessary in the interests of
21   fairness.  And while we weren't predicting
22   anything, we were also answering the question we
23   felt was following from the first proposition.  If
24   we agree there should be a new trial, we have to

Page 125

1    ask ourselves, why would we try this case again?
2    And the answer was because we have not concluded
3    that these men probably are innocent.
4    Q.   Okay.  So your investigation concluded
5    that there was not a sufficient basis to vacate
6    the convictions; is that correct?
7        ATTORNEY HENRETTY:  Object to form.
8        ATTORNEY AINSWORTH:  I'm going to join that.
9        THE WITNESS:  We understood that we would have
10   to vacate the convictions in the context of
11   granting a new trial.
12   BY ATTORNEY MEADOR:
13   Q.   Okay.  So let me rephrase.
14        So your investigation concluded that
15   there was not sufficient basis to nolle the
16   charges against Mr. Fulton and Mr. Coleman,
17   correct?
18        ATTORNEY HENRETTY:  Object to form.
19        ATTORNEY SCHELLER:  Object to form.
20        THE WITNESS:  I wouldn't -- I wouldn't
21   summarize the result in the manner that you just
22   did.  That wouldn't be the locution that I would
23   use.
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 126..129

Page 126

1  BY ATTORNEY MEADOR:
2      Q.   Okay.  Can you clarify for me, then?
3      ATTORNEY AINSWORTH:  Object to the form of
4  that question.
5          This is Russell.
6      THE WITNESS:  CIU was asked, are you -- do you
7  believe that sufficiently clear and convincing
8  evidence has been brought forward to say that
9  these men are the wrong people; that they did not
10 commit this crime?  We didn't feel that that
11 burden had been met.
12 BY ATTORNEY MEADOR:
13     Q.   Okay.  So why don't we move to the
14 summary section.  And can you explain to me what
15 the summary section is about?
16     A.   Well, I wanted the reader to understand
17 what the crime was, when and where it occurred,
18 what the witnesses and evidence appeared to
19 demonstrate at trial, how did we come to this
20 conviction in the first place.  It's -- It's
21 somewhat loosely analogous to the statement of
22 facts in the brief.
23     Q.   Okay.  Were these your statements of
24 fact, essentially?

Page 127

1      ATTORNEY HENRETTY:  Objection:  Form.
2      ATTORNEY AINSWORTH:  Object to the form.
3      THE WITNESS:  Well, I will answer by saying
4  this was my effort to give an objective recitation
5  of what the evidence appeared to be at the trial.
6  BY ATTORNEY MEADOR:
7      Q.   Fair enough.  Thank you.
8          Looking at page 2, this paragraph
9  beginning "Mikey's birthday gathering."
10         Do you see that?
11     A.   I do.
12     Q.   And then toward the end, it says "It is
13 undisputed that Nevest Coleman came to the Calimee
14 apartment on this occasion."
15         Do you see that?
16     A.   I do.
17     Q.   Okay.  And is it your understanding
18 that -- Strike that.
19         Can you tell me what the basis is for
20 that statement?
21     A.   I believe that Mr. Coleman's statement to
22 the police indicated that he had been there.  We
23 also had testimony from others present at the
24 party that Mr. Coleman had been there.  And I

Page 128

1  don't understand at any point in the proceedings
2  below or during our investigation that anyone
3  disputed that he had been there.
4      Q.   Did you become aware at any time that
5  when Nevest Coleman initially spoke with the
6  police, that he disputed having been in the
7  Calimee apartment on that evening when -- of the
8  murder?
9      A.   I have a recollection about questions
10 coming up in terms of how recently Mr. Coleman had
11 said that he had seen the victim.  There were
12 assertions by the police that he had made a
13 statement about how long it had been since he had
14 seen the victim.  When Mr. Coleman met with me, he
15 denied that he had made the statements attributed
16 to him by the police.  I knew that -- and I recall
17 that there were those controversies.
18     Q.   Okay.  If you look to page -- scroll down
19 to page 4, this paragraph that begins "The medical
20 examiner concluded."
21     A.   Yes.
22     Q.   Do you see that?
23     A.   I do.
24     Q.   Okay.  So then a few sentences in, I

Page 129

1  don't know if you can see me marking this, but it
2  says "Any bodily fluids that may have been present
3  in Mikey's vagina would have been flushed out as
4  she bled from her injuries."
5          Do you see that?
6      A.   I do.
7      Q.   And just for clarification, Mikey, when
8  you refer to Mikey, is that Antwinica Bridgeman,
9  the victim?
10     A.   That's correct.
11     Q.   Okay.  So this statement, "Any bodily
12 fluids that may have been present in Mikey's
13 vagina would have been flushed out as she bled
14 from her injuries," can you tell me the source of
15 that information?
16     A.   I don't know that I can point to a
17 specific source.  So the answer is I don't
18 remember the specific source of that information.
19     Q.   Do you recall being advised through
20 either Kara Stefanson or Hal Johnson of that
21 information?
22     A.   That sees unlikely that it would have
23 been either of those two.  But again, I don't -- I
24 am confident I had a basis for this assertion, but

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 130..133

Page 130

1  I don't have a specific recollection today of what
2  the origin was.
3      Q.  Okay.  And is it fair to say that the
4  inference from that is that there may have been
5  additional DNA evidence that could not be obtained
6  based on the injuries the victim sustained?
7      ATTORNEY CURRAN:  I'm going to object:  Form;
8  foundation; beyond this witness's expertise.
9      ATTORNEY HENRETTY:  Form.
10     THE WITNESS:  I believe the point I was
11 attempting to make is a logical person might think
12 what DNA, if any, were we able to derive if
13 this -- The facts of the case implied that there
14 may have been a sexual assault.  What did we learn
15 from the victim's body?  And I wanted to indicate
16 to the reader that facts we might ordinarily have
17 hoped to determine weren't available to us under
18 the circumstances present.
19     Q.  And by "facts," do you mean the presence
20 of DNA?
21     A.  Yeah, things that, yes.  Ultimately that
22 would be what we would hope to have been able to
23 obtain.
24     Q.  Okay.  Just moving to page 5.

Page 131

1          Sorry.  Give me two seconds.  I
2  apologize.  I lost my page.
3          So here in this last paragraph where it
4  says "After this interview was concluded,
5  detectives gave Coleman a ride back to his home,"
6  do you see that?
7      A.  I do.
8      Q.  So in terms of time period of this event
9  specifically relating to Mr. Coleman being taken
10 back to his residence after initially being at the
11 Area, the last sentence states "For our purpose,
12 the more interesting fact is that Coleman at this
13 point was being treated by the police as a
14 witness, not a subject of their investigation."
15         Do you see that?
16     A.  I do.
17     Q.  Okay.  And can you explain to me why for
18 your purpose that is a more interesting fact?
19     A.  Because Mr. Coleman had been raising
20 concerns or expressed concerns about the police
21 treatment and whether the police were correctly
22 attributing statements to him and whether he was
23 doing things voluntarily or not.  So one of the
24 factual questions was, what was the course of the

Page 132

1  police investigation?  And our determination based
2  on all of the circumstances was that it appeared
3  that police thought he was the man who discovered
4  the body and was a witness, but not someone
5  suspected of having participated in the crime.
6      Q.  Okay.  And then you have a section
7  entitled "Suspicion increases about Nevest
8  Coleman," and there's several paragraphs
9  discussing Mr. Coleman being brought back to the
10 Area and questioned by detectives.  And in this
11 section, you delineate the recounting or the
12 stories provided by Nevest Coleman to the police.
13 Is that the reason why you've entitled this
14 section "Suspicion increases about Nevest
15 Coleman"?
16     ATTORNEY CURRAN:  This is Nick.  I'm going to
17 object to the form of the question.
18     THE WITNESS:  I guess I'll do like the Supreme
19 Court reporters do.  The head notes are not
20 substantive.  I'm trying to break up what
21 admittedly is a very lengthy and dense text.  I'm
22 trying to put little headings in the middle that
23 will kind of help the reader along and understand
24 where we are in a continuum.  There's really no

Page 133

1  more intent behind them than just crafting a
2  document.
3  BY ATTORNEY MEADOR:
4      Q.  Okay.  So the heading there is not
5  reflective of your personal conclusions about that
6  point in the investigation; is that accurate?
7      A.  Well, I -- it's an effort that --
8      ATTORNEY HENRETTY:  Before you answer that, I
9  just got a text from Ms. Scheller.  Apparently her
10 computer crashed.  Can we take a five-minute break
11 while she gets back online?
12     ATTORNEY MEADOR:  Absolutely.
13     ATTORNEY HENRETTY:  I appreciate it.
14         (Whereupon, a short break was
15          taken.)
16         (Whereupon, the record was read as
17          requested.)
18     THE WITNESS:  It doesn't reflect my
19 conclusion.  It's just a stylistic effort to help
20 the reader understand what topic I'm now going to
21 now discuss.
22 BY ATTORNEY MEADOR:
23     Q.  Okay.  Scrolling to page 9 of the memo,
24 you have a section entitled "Court proceedings,"

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 134..137

Page 134

1  and then a subsection entitled "Defendant's move
2  to suppress their confessions." And is it fair to
3  say that the discussion here about the court
4  proceedings is based off of the review of the
5  court file?
6      A.  Yes, and particularly the trial
7  transcripts.
8      Q.  Okay. And then this last paragraph on
9  page 9, it continues onto page 10, related to the
10 motion to suppress by Mr. Coleman from -- it
11 indicates "Coleman's essential claims at his
12 suppression hearing were that he had been
13 physically abused by the police and that he was
14 tricked by ASA Garfinkel into making a confession.
15 Defense counsel called Coleman's parents and a
16 family friend, who testified that when they
17 visited Coleman at Area 1, his face was swollen,
18 and he complained of having been punched by a
19 detective. Kling also called a private attorney
20 as a witness. Her testimony largely was excluded
21 when she probably surprised Kling by saying that
22 when she saw Coleman at Area 1, he did not appear
23 to have swelling in the face."
24      Did I read that correctly?

Page 135

1      A.  Yes, you did.
2      Q.  Okay. And what was your -- What was your
3  conclusions based on the claims presented and the
4  testimony at the motion to suppress related to
5  Mr. Coleman?
6      ATTORNEY HENRETTY:  Object to form.
7      Go ahead.
8      THE WITNESS:  I don't know that -- I'm not --
9  I'm not necessarily reaching a conclusion here.
10 I'm -- I'm in the process of telling the reader
11 what the defendants have said in the past.
12 Because, look, the fact that defendants were
13 alleged to have made admissions is important. And
14 so I wanted to present what the defendants
15 attempted to prove or did prove at a hearing on
16 those claims so that the reader could judge those
17 admissions against that backdrop.
18 BY ATTORNEY MEADOR:
19      Q.  Okay. And is the inference to the reader
20 here that Coleman's claims were not successfully
21 established through the evidence presented?
22      ATTORNEY AINSWORTH:  Object to form of the
23 question.
24      ATTORNEY CURRAN:  Same.

Page 136

1      THE WITNESS:  Well, the reader learns that
2  Judge Porter didn't consider that the claims had
3  been sustained. The only inference I made here, I
4  think, in the paragraph you teased out was that
5  Richard Kling, whom I know and respect, had the
6  experience I've had, which is a witness said
7  something that he hadn't anticipated or
8  particularly wanted to hear. That being said, the
9  rest of it I'm hopeful is asserting here's what
10 was said in the court below, here's what the
11 evidence appeared to show in the court below.
12 BY ATTORNEY MEADOR:
13      Q.  Okay. And then on page 10, you talk
14 about Mr. Coleman testifying at his trial in his
15 defense, correct?
16      A.  Which paragraph, Counsel?
17      Q.  I'm just -- generally. So it looks like
18 it's the first three, several paragraphs.
19      A.  I don't think these are -- I think these
20 are -- this is related to testimony that he gave
21 at his motion to suppress hearing.
22      Q.  I'm sorry. I'm sorry. I didn't mean to
23 say trial. Yes. That's correct.
24      A.  So with that caveat --

Page 137

1      Q.  With that qualification, yes.
2      And if you look at the second full
3  paragraph, it indicates "Coleman denied making any
4  inculpatory statements to the police." And then a
5  couple of sentences later, "Coleman said that ASA
6  Garfinkel told him that he only needed to agree
7  with everything that the police told him to say,
8  and he would be allowed to go home."
9      Did I read that correctly?
10      A.  Yes, you did.
11      Q.  And did you investigate those claims made
12 by Mr. Coleman at his motion to suppress hearing?
13      A.  Well, we reviewed the suppression hearing
14 itself. We did talk to Mr. Garfinkel, who is, I
15 believe, now in private practice. But I did not
16 conduct the interview. Gina Savini conducted the
17 interview. But I was aware of the substance of
18 the interview. So ...
19      Q.  And you're aware that Mr. Coleman's
20 confession was a court reported confession,
21 correct?
22      A.  I'm aware of that.
23      Q.  And it indicates in the third full
24 paragraph toward the middle, "He," meaning

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 138..141

Page 138

1  Coleman, "insisted that he was only parroting what
2  the police had told him he must say and that he
3  did so because ASA Garfinkel assured him that he
4  could then go home," correct?
5      A.   That's what it says.
6      Q.   Okay.  And is that a reflection of what
7  was presented in the motion to suppress hearing?
8      A.   I believe so.
9      Q.   Okay.  So then scrolling down to the
10 section entitled "CIU investigation."
11     A.   On which page?
12     Q.   I'm so sorry.  On page 12.  Do you have
13 it in front of you?  That makes it easier.
14     A.   I do.
15     Q.   Okay.  Great.  Okay.  So what's the
16 purpose of this section?
17     A.   Well, now that I have established what
18 proceedings, primarily what facts and
19 circumstances gave rise to the conviction, I'm now
20 going to start to say here's why CIU is taking up
21 your time reading this; here's what is being
22 asserted to us and what we've done in response.
23     Q.   Okay.  So then the first paragraph of
24 this discusses Derrell Fulton's claims to the CIU

Page 139

1  initially when he requested a review of his case;
2  is that correct?
3      A.   Yes.
4      Q.   Okay.  And that's essentially documenting
5  the beginning of the CIU's investigation into the
6  Fulton/Coleman matters; is that right?
7      A.   That's right.
8      Q.   And then, you know, proceeding along,
9  you're providing the reader with essentially a
10 time line, then, of what was done, the DNA testing
11 was done, and Mr. Fulton obtained counsel, and
12 Mr. Coleman then became involved with his counsel
13 as well; is that accurate?
14     A.   Right.
15     Q.   Okay.  Then on page 13, the first full
16 paragraph, it says "On July 11, 2016, Fulton and
17 Coleman's attorneys met with CIU to view the case
18 evidence in the clerk's office."
19          Do you see that?
20     A.   Yes.
21     Q.   Were you present for that evidence
22 viewing?
23     A.   No.  It was a year before I had the job.
24     Q.   Okay.  And was that ASA Savini?

Page 140

1      A.   That's a fair assumption.
2      Q.   Okay.  Is there any information that you
3  have that you can look to to determine whether or
4  not that's accurate?
5      A.   No.  I don't know of any other ASA that
6  was working on the file other than Gina.  But no,
7  I don't have anything extrinsic I can refer to.
8      Q.   Okay.  And we talked some earlier about
9  the various DNA testing and evidence that was
10 being done.  And there's a section entitled
11 "Scientific testing for DNA."  And I know that you
12 indicated you weren't as familiar with all of the
13 testing that was being done.  In this section, was
14 this prepared by ASA Savini based on her
15 engagement in the DNA testing?
16     A.   Well, it absolutely would have been
17 carefully reviewed by Gina.  Which of us drafted
18 this specific section of the memo, I don't
19 remember.  But both of us would have been
20 carefully reviewing the product before it went out
21 the door.
22     Q.   Okay.  And is it fair to say that it
23 indicates various pieces of evidence that were
24 being reviewed for possible testing and

Page 141

1  subsequently tested if possible?
2      A.   That's part of what it's doing,
3  certainly, yes.
4      Q.   Okay.  All right.  And the first sentence
5  of the second paragraph says "As of the date this
6  memo was drafted, a small number of laboratory DNA
7  test results have not yet been received."
8          Do you see that?
9      A.   I do.
10     Q.   Okay.  Do you know which test results had
11 not been received at the time this memo was
12 drafted on November 3rd, 2017?
13     A.   I don't recall as I'm here today, no.
14     Q.   Okay.  Is it fair to say that you were
15 confident in the evidence and information you had
16 up until that point to make the conclusions and
17 recommendations that you do in this memo?
18          ATTORNEY AINSWORTH:  Object to form of the
19 question.
20          This is Russell.
21          THE WITNESS:  I was confident that the
22 conclusions in the memo were a good reflection of
23 those drawn by myself and by the unit.  I also
24 believe that the DNA material or the test results

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 142..145

Page 142

1  that hadn't yet been received, I believe that
2  there was not a lot of optimism that they might be
3  game changers or, in fact, that they might even be
4  feasible to produce a result.  In other words, a
5  lot of stuff that the answer came back we can't do
6  anything with this.  And so I am confident that by
7  the time we issued this memo, we did not
8  anticipate receiving additional DNA material or
9  information that would materially
10  affect our conclusion.
11  BY ATTORNEY MEADOR:
12    Q.  Okay.  Thank you.
13        Just moving down to page 15, for a few
14  pages, there is what is called the summary of
15  Clarence Neal's three criminal sexual assault
16  cases.  Do you see that?
17    A.  Yes.
18    Q.  Okay.  It goes from page 15 through page
19  18.
20        Can you tell me the reason why you
21  included this information?
22    A.  Because Mr. Neal appeared to be
23  scientifically linked to that stain in the
24  victim's underwear.  So it was also known that

Page 143

1  Mr. Neal at some point in time relative to this
2  inquiry had lived in this area.  So it was
3  certainly in our judgement a relevant circumstance
4  for the reader to know that this person was linked
5  to that stain, this person was thought to be in
6  the area at the time of the offense, and this
7  person had a demonstrated problem with sex
8  offenses, committing sex offenses.  So those were
9  all very significant facts that we wanted to make
10  sure were understood correctly.
11    Q.  And did you understand that the cases
12  related to Clarence Neal were after the victim's
13  death in this case?
14    A.  Yes.
15    Q.  Did you consider the MO of Clarence Neal
16  as demonstrated through these three sexual assault
17  cases?
18    A.  Yes.
19        Well, let me -- Let me amend my answer.
20  I paid attention to the nature of his offenses,
21  the way that they were committed, and I considered
22  those circumstances as part of the overall picture
23  that we were looking at.
24    Q.  Okay.  And did you draw any conclusions

Page 144

1  about the MOs as indicated in these three sexual
2  assault cases as compared to the sexual assault
3  and murder of Antwinica Bridgeman?
4    ATTORNEY CURRAN:  Object to the form and
5  foundation.
6    THE WITNESS:  Well, I -- I drew the conclusion
7  that Mr. Neal hadn't in these incidences
8  participated in a crime that was comparable on a
9  number of levels with what happened to Mikey
10  Bridgman.  And what I mean by that is obviously,
11  the sexual assaults are a comparison point.  But
12  our view was the murder of Mikey Bridgeman in all
13  likelihood involved multiple offenders.  These
14  instances did not involve multiple offenders.
15        There were other circumstances that you
16  could argue were comparable or were not
17  comparable.  The sheer brutality of what happened
18  to Michael Bridgeman -- Mikey Bridgeman to me was
19  remarkable.  And it's not that Mr. Neal wasn't
20  capable of that.  These crimes did not involve the
21  kind of just over the top brutality that we saw
22  with the Bridgeman murder.  So I noted those facts
23  and wanted the reader to be aware of those
24  circumstances.

Page 145

1  BY ATTORNEY MEADOR:
2    Q.  Did you also consider in comparing the
3  sexual assault cases related to Clarence Neal to
4  the sexual assault and murder of Antwinica
5  Bridgeman the fact that Antwinica was murdered,
6  and the sexual assault cases related to Clarence
7  Neal later did not involve a death of the victim?
8    A.  I'm sure that was noted, yes.
9    Q.  Okay.  Did you consider in evaluating the
10  cases related to Clarence Neal, the sexual assault
11  cases related to Clarence Neal, his indication to
12  the victims afterwards that he wanted to talk with
13  them and get together with them again as different
14  from this case?
15    ATTORNEY CURRAN:  I'm just going to object
16  based on form, foundation, and I think it
17  misstates the evidence in the record.
18        But go ahead.
19    THE WITNESS:  Well, I would say that I tried
20  to catalog what I was able to determine about
21  those criminal sexual assaults by Mr. Neal, and I
22  wasn't trying to tease out this fact or
23  circumstance as opposed to that.  I was trying to
24  make as complete a portrayal of the facts of those

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 146..149

1 other cases as I could.

2 BY ATTORNEY MEADOR:

3    Q. And, you know, understand, Mr. Rotert,
4 I'm just trying to flush out the factors that you
5 considered in your analysis and ultimately your
6 recommendations. So my questions, you know, if I
7 wasn't clear before, are directed toward what
8 factors you considered. Is that fair?

9    A. Well, it is. But I'm -- And I appreciate
10 that. And I don't have any objection or problem
11 with your question. I just -- I want to -- I want
12 to make this point. These are discussions in here
13 intended to help us think about the Fulton/Coleman
14 convictions and where to go next. These are not
15 really in the order of making an assertion that
16 Clarence Neal is or isn't guilty or more or less a
17 suspect or anything like that. My -- The end of
18 my participation in all of this was what are we
19 going to do with Mr. Fulton and Mr. Coleman? And
20 in that context, these facts seemed to us
21 relevant.

22    Q. Okay. And you -- Strike that.

23       As part of the investigation conducted,
24 an interview was done of Clarence Neal, correct?

1    A. Yes, it was.

2    Q. Okay. You didn't participate in that
3 personally, did you?

4    A. I did not.

5    Q. Was that interview video recorded?

6    A. Yes, it was.

7    Q. Do you know why it was video recorded?

8    A. Well, I -- At that time, I believe that
9 the policy and practice in Illinois generally, and
10 by statute, I believe, was to videotape custodial
11 statements. And because we had a fairly good idea
12 that Mr. Neal was going to be a significant figure
13 in our analysis, I was only too happy to have a
14 video record of what he said, what was said to
15 him, the sequence of the discussion, the reactions
16 he displayed, and so forth. So I was fully in
17 support of videotaping that interview.

18    Q. Did you watch the videotaped interview?

19    A. Yes.

20    Q. You did?

21       Did you draw any conclusions about
22 Mr. Neal's behavior during that interview?

23    ATTORNEY HENRETTY: Object to form;
24 foundation.

1    But go ahead.

2    THE WITNESS: I had im- -- I had impressions.
3 There were things that I noted about the way the
4 interview went down. I don't know that
5 "conclusions" is the word I want to apply. But I
6 certainly formed impressions during my watching of
7 the video.

8 BY ATTORNEY MEADOR:

9    Q. Okay. Fair enough. Can you just explain
10 to me what your impressions were after watching
11 the video?

12    ATTORNEY SCHELLER: Object to form.

13    THE WITNESS: My impression was that Mr. Neal
14 started to figure out fairly early that there was
15 something unusual about these people suddenly
16 showing up at his doorstep. They identified their
17 office, so he began to wonder why people had come
18 all the way to Carolina from Chicago to talk with
19 him. And he became increasingly, and
20 understandably, I think, curious and wary. And
21 when it became apparent that they were there to
22 talk about a murder case about a woman he says he
23 knew had been murdered, and that it was a very, I
24 think he used the word gruesome murder, he did not

1 react in a manner that to me indicated panic. He
2 did not react by saying, "Wait a second. It's
3 obvious to me I need a lawyer," or, "You have to
4 leave me now," or -- it certainly was my
5 impression that if he had participated in that
6 particular crime and years later was being
7 questioned about it by a couple of people who
8 sought him out like that, many people in his
9 circumstance would have shown a more exaggerated
10 response to the questions than he did.

11 BY ATTORNEY MEADOR:

12    Q. Okay. Then further down after the
13 discussion of those cases, there's a section
14 entitled "Interviews."

15    A. Yes.

16    Q. Okay. And there were quite a lot of
17 interviews conducted in this case. I think I
18 totaled maybe 20 or so of various people of
19 interest, family and friends of the victim,
20 neighbors, and so forth. Were you involved in any
21 of the interviews listed?

22    A. Yes.

23    Q. Okay. Which ones?

24    A. Well, clearly, nothing before July of

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 150..153

Page 150

1    2017. I didn't participate in the Garfinkel
2    thing. Latham, who I believe was the -- thought
3    he was the boyfriend of the victim, I think I
4    participated in that one. I know that I've been
5    in the presence of and spoken with Shaunice
6    Williams, Michael Barber. I went down to
7    interview Mr. Coleman and Mr. Fulton. I remember
8    vividly meeting with Chip -- Eddie "Chip" Taylor.
9    Those are the ones that I'm pretty certain of.
10   And the others, I'm not sure.
11       Q.   Okay. You said that you remember vividly
12   meeting with Eddie "Chip" Taylor. Why is that a
13   vivid memory for you?
14       A.   Because on the other side of what looked
15   to be a very flimsy door, there was a dog that
16   sounded like the Hound of the Baskervilles on
17   steroids who was quite anxious to get out that
18   door and come in and bite whoever was in the room
19   I was in. And Mr. Taylor kept telling me that it
20   wasn't an issue I should worry about, and I kept
21   not believing him.
22       Q.   Okay. So it was related to the
23   circumstances as opposed to the substance of the
24   interview; is that right?

Page 151

1        A.   Well, the substance is -- I mean, the
2    substance as well. He -- He had unkind things to
3    say about Mr. Fulton and Mr. Coleman. But he
4    also -- I had -- I remember that we talked with
5    him for quite a while, and he denied any
6    involvement in the murder.
7        Q.   Okay. So I just want to touch on a few
8    things related to these interviews; that as to
9    each of the interviews, there indicates "See
10   attached report." Do you see that?
11       A.   Yes.
12       Q.   Okay. And is that referencing the
13   investigative reports that were prepared in
14   relation to these interviews?
15       A.   Yes.
16       Q.   Okay. So what I'm going to do just so
17   that I make sure that I have them documented
18   correctly since you're our State's Attorney
19   representative, I'm going to take this exhibit
20   down just for a second.
21       ATTORNEY MEADOR:   And I'm going to -- This
22   will be Group Exhibit --
23       What are we on, Tracy?
24       THE WITNESS:   9.

Page 152

1        ATTORNEY MEADOR:   9. Thank you.
2        ATTORNEY CURRAN:   This is Nick. If I can just
3    have 30 seconds to step away. I don't need a full
4    break unless anybody wants one. But I just
5    need --
6        THE COURT REPORTER:   What is happening?
7        Oh.  Sorry.
8            (Whereupon, a discussion was had
9             off the record.)
10       THE VIDEOGRAPHER:   We're off the record at
11   2:16 p.m.
12           (Whereupon, a short break was
13            taken.)
14       THE VIDEOGRAPHER:   We're back on the record at
15   2:25 p.m.
16   BY ATTORNEY MEADOR:
17       Q.   Okay. So, Mr. Rotert, we have had a
18   little bit of a discussion off the record related
19   to the memo referencing the CIU investigative
20   reports. I had compiled those reports prior to
21   your deposition and sent them to all counsel this
22   morning. Because I am having some kind of
23   technical logistical issues, and for expediency's
24   sake, rather than having you look at each one of

Page 153

1    these exhibits now, over a break, we've agreed
2    you're going -- you can speak with your counsel
3    and counsel for the State's Attorney's Office to
4    take a look at that and offer a potential
5    stipulation that those investigative reports are
6    the reports that were sent with your memo.
7        ATTORNEY MEADOR:   Does everyone agree with
8    what I've said?
9        ATTORNEY AINSWORTH:   Yes.
10       ATTORNEY SCHELLER:   State's Attorney's Office
11   agrees.
12       ATTORNEY HENRETTY:   Yeah, that's fine. I just
13   am looking at what you sent this morning, and it
14   looks like it's more than that. So obviously
15   we'll have to make sure we know which documents
16   we're talking about. But yeah, that's fine.
17       ATTORNEY MEADOR:   Right. Just the CIU
18   investigative reports.
19       ATTORNEY HENRETTY:   Okay.
20       ATTORNEY MEADOR:   Okay?
21       I will pull up -- So and that will be
22   addressed Group Exhibit 9.
23
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 154..157

Page 154

```
1              (Whereupon, Rotert Group
2              Deposition Exhibit No. 9 was
3              marked for identification.)
4       ATTORNEY MEADOR:  I will then pull up what
5  will be Exhibit 10, which is CCSA05762 through
6  5765, which relates to the CIU investigative
7  report for Eddie Taylor.
8              (Whereupon, Rotert Deposition
9              Exhibit No. 10 was marked for
10             identification.)
11 BY ATTORNEY MEADOR:
12      Q.   Because in your memo, Mr. Rotert, you
13 indicate that the report of this interview would
14 be provided soon.  So outside of the stipulation
15 we've talked about, if you can take a look at this
16 report and let me know if this is the CIU report
17 related to the interview of Eddie Taylor that you
18 were testifying about earlier today.
19      A.   It appears to be, yes.
20      Q.   Okay.  Thank you.
21           Okay.  Can you see, then, the memo now
22 up?
23      ATTORNEY MEADOR:  Does everybody see that?
24 Did I do that correctly?
```

Page 155

```
1       THE WITNESS:  Yes.
2  BY ATTORNEY MEADOR:
3       Q.   Okay.  So I just want to touch a little
4  bit on a couple of these interviews that were
5  conducted.  Were you advised at any time that that
6  the information obtained from the witnesses was
7  different than what the witness told the police
8  back in 1994?
9       ATTORNEY HENRETTY:  Object to form.
10           Go ahead.  You can answer.
11      THE WITNESS:  Well, I'm not sure what I can
12 help you with.  I -- I don't remember any
13 circumstance where a witness gave us a
14 significantly different or new understanding.
15 There were certainly -- I think -- Well, by and
16 large, when we would talk to people, we might
17 flesh out something that didn't appear in a police
18 report or in a transcript that was a natural
19 followthrough of what was said.  I don't remember
20 in this case that any witness just flipped us,
21 where it's like this -- this is
22 180 degrees different from what you had said
23 previously.  I don't have a recollection of that.
24
```

Page 156

```
1  BY ATTORNEY MEADOR:
2       Q.   Okay.  Thank you.
3            And aside from the interviews of Nevest
4  Coleman and Derrell Fulton, were you ever made
5  aware that a witness claimed that the police
6  coerced their statement?
7       A.   I don't recall that, no.
8       Q.   Looking at on page 19, you discuss the
9  interview of Kimberly Johnson Adams.  And was it
10 your understanding that Kimberly Johnson Adams was
11 a person that Derrell Fulton claimed could provide
12 him with an alibi for the time of the murder?
13      A.   That was my understanding, yes.
14      Q.   Okay.  And did the interview of
15 Ms. Johnson Adams by CIU indicate that she could
16 not provide an alibi for Derrell Fulton?
17      A.   I don't believe that I participated in
18 that interview.  But I believe that my
19 recollection is that she was not -- she did not
20 establish the alibi.
21      Q.   Okay.  And you note in here in -- and
22 toward the end of the paragraph, "She did not
23 appear as an alibi witness at trial."
24           What's the significance of that factor to
```

Page 157

```
1  you?
2       A.   Well, an alibi is -- can be a dispositive
3  defense if it's -- if it's proven.  But alibi
4  frequently is claimed, and then people aren't
5  really able to produce proof in support of it.
6  Since I previously noted that Mr. Fulton suggested
7  an alibi defense to the police, I thought it was
8  important to note how that turned out.
9       Q.   And then it indicates "The trial
10 prosecutors had work records for Ms. Johnson Adams
11 including her punch/timecard indicating the days
12 and hours on which she worked."
13           Do you see that?
14      A.   I do.
15      Q.   Is that information that you obtained in
16 the review -- from the review of the state's
17 attorney's file?
18      A.   That would be plausible.  I don't
19 remember precisely.
20      Q.   Okay.  And then on page 20, you indicate
21 that an interview was conducted of Nevest Coleman
22 on September 11, 2017; is that accurate?
23      A.   Yes.
24      Q.   And were you present for that interview?
```

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                      Pages 158..161

Page 158

1      A.    I believe I was.
2      Q.    Did you conduct that interview of
3   Mr. Coleman?
4      A.    I believe so.
5      Q.    Was his attorney present?
6      A.    Yes.
7      Q.    And the interview was videotaped,
8   correct?
9      A.    Yes.
10     Q.    And is it fair to say it's for the same
11  reasons as to the custodial environment that you
12  testified to earlier related to Clarence Neal?
13     A.    Well, I would say this.  When a person is
14  accompanied by counsel, I think the concern about
15  voluntariness or intelligibility is reduced.  But
16  the main reason that I think is everybody's notes,
17  you're making accurate -- you try to make your
18  notes accurate, but there are nuances in answers
19  that you just don't always capture or doesn't
20  everybody agree about what the person had to say
21  is a benefit to the videotape because it just
22  removes a lot of dispute about how things were
23  stated or what the intent was.
24     Q.    Okay.  Did you feel that you were able to

Page 159

1   ask Mr. Coleman all of the questions that you
2   sought answers to?
3      A.    Mr. Coleman was polite and cooperative in
4   all respects.
5      Q.    And were you able to assess his
6   credibility when you interviewed him?
7      A.    To some extent.
8      Q.    What do you mean by that?
9      A.    I mean assessing credibility is a -- is a
10  circumstantial thing.  There is a level of
11  assessment that differs from place to place and
12  time to time.  When a person is sitting in a
13  prison next to an attorney, that's a different
14  evaluation than a person in a back of a squad car
15  at the scene of a crime.  There's just different
16  circumstances.
17     Q.    Okay.  Thank you for that clarification.
18           Then you also interviewed Derrell Fulton;
19  is that correct?
20     A.    Yes.
21     Q.    Okay.  That was on September 14 of 2017
22  as indicated on your memo?
23     A.    Yes, it was.
24     Q.    Okay.  And were you present for that

Page 160

1   interview?
2      A.    Yes, I was.
3      Q.    Did Mr. Fulton have his attorneys present
4   with him?
5      A.    Yes.
6      Q.    And did you also record that interview?
7      A.    Yes.
8      Q.    And was it for the same reasons that
9   you've discussed in relation to recording the
10  interview of Mr. Coleman?
11     A.    Yes.
12     Q.    Did you feel that you were able to ask
13  all of the questions that you sought answers to
14  from Mr. Fulton?
15     A.    Yes.  And as was true of Mr. Coleman,
16  Mr. Fulton was very polite and was -- answered all
17  the questions I put to him.
18     Q.    Okay.  Then looking at the interview of
19  Kimberly Miller Green, did you understand that
20  Ms. Green was identified as a possible alibi
21  witness for Mr. Coleman?
22     A.    Yes.  I have to say that I have less
23  recollection about Ms. Green and these
24  interactions than maybe some of the other things

Page 161

1   you've asked me about.  I suspect that this was
2   something that Gina Savini took the primary
3   responsibility to pursue.  Certainly I'm aware of
4   what's in the memo, but I don't believe I
5   participated in that interview.
6      Q.    Okay.  So the first full sent- -- Strike
7   that.
8           The second full sentence indicates
9   "Recently, Coleman's current attorney suggested
10  that Ms. Green might be Coleman's alibi."
11          Can you explain to me the terminology
12  that's used there when you say "recently"?
13     A.    I can't.  I'm afraid I can't.  I construe
14  that to mean that Mr. Ainsworth at some point
15  might have commented that probably Gina, perhaps
16  me, but I suspect it might have been Gina, that we
17  should look in that area or that that was
18  something he thought we might want to pursue.  And
19  we did.  That's my construction of what that says.
20     Q.    Okay.  And so there's some information
21  that follows that states "Ms. Green was not listed
22  as a defense witnesses on Coleman's answer to
23  discovery."  It says "not," but I think it means
24  "nor."

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 162..165

Page 162

1    A.   Yes.
2    Q.   "Was alibi was ever interposed as an
3  affirmative defense during the trial proceedings.
4  Ms. Green did not testify as an alibi witness at
5  trial, but she did testify in mitigation at his
6  sentencing hearing.  At no time during that
7  testimony did Ms. Green state that Coleman was
8  innocent or that he was with her at the time of
9  the murder.  Ms. Green has never filed an
10 affidavit in this case claiming she is able to
11 provide an alibi for Coleman."
12      Did I read that correctly?
13   A.   You did.
14   Q.   Is that accurate?
15   A.   Yes.  I believe it is.
16   Q.   Okay.  And did you draw a conclusion
17 based on that information or whether -- Strike
18 that.
19      Did you draw a conclusion based on that
20 information as to the viability of Ms. Green being
21 an alibi witness for Mr. Coleman?
22   A.   I believe yes, we determined that she did
23 not present a compelling support for an alibi
24 defense.

Page 163

1    Q.   Okay.  Moving, then, to the next section
2  that's entitled "Conclusions and recommendations."
3  At the risk of asking a silly question, can you
4  explain what the purpose of this section is?
5    A.   It encourages the reader that the end is
6  in sight.
7    Q.   Fair enough.
8       So I just wanted to ask you quickly
9  before we talk about the substance of it, this --
10 the copy of the memo I have ends at
11 page 22.  Is that the end of the report?
12      ATTORNEY CURRAN:  If I may interject, there is
13 another page that was produced by the state's
14 attorney's office.
15      ATTORNEY MEADOR:  Yeah.  I'm sorry.  It looks
16 like I have -- Okay.
17      ATTORNEY CURRAN:  Do you want me to e-mail it
18 to you?
19      ATTORNEY MEADOR:  Yes.  I have it.  Just for
20 some reason -- You know what?  I can substitute --
21 I can substitute the exhibit.  I apologize.
22 BY ATTORNEY MEADOR:
23      Q.   So let's talk substantively for a little
24 bit.  Okay.  So I think we talked about this a

Page 164

1  little bit.  But the first sentence, you say "As
2  we acknowledge that the DNA test results obtained
3  in this case are significant."
4       Is there any other information that we
5  haven't talked about which caused you to draw the
6  conclusion that the DNA test results that you all
7  obtained were significant?
8    A.   Well, I don't know if we talked about
9  every fact that we discussed in this memo.  But I
10 just think that in the context of the case as a
11 whole, the conclusion about their significance was
12 we were pretty comfortable in saying that the
13 conclusion, that the results were significant.
14   Q.   Okay.  And the memo does include, as we
15 talked about, the significant DNA findings that
16 you all obtained?
17   A.   Right.  Right.
18   Q.   Okay.  And the next sentence says "Those
19 results give rise to a very strong presumption
20 that Clarence Neal had sexual relations with Mikey
21 Bridgeman at some [point]" -- I'm sorry, "at some
22 near point in time when she was murdered."
23      Is that accurate?
24      "These results give rise to a very strong

Page 165

1  presumption" --
2       Did I read it incorrectly?  I'm sorry.
3    A.   You did not read this text incorrectly.
4    Q.   Okay.  Is that accurate?
5    A.   The statement, yes, I believe -- I
6  believe personally it is correct to say it, yes.
7    Q.   Okay.  And that's part of the conclusions
8  that you drew based on your investigation?
9    A.   Yes.
10   Q.   Okay.  And then it goes on to say "The
11 results cannot, however, whether the sexual
12 encounter was consensual or whether the sexual
13 encounter occurred at the time of her murder."
14      Did I read that correctly?
15   A.   You did.
16   Q.   Okay.  So you spent some time talking
17 about the limitations that can be drawn as to the
18 semen being found on the victim's underwear; is
19 that accurate?
20   A.   Yes.
21   Q.   Please feel free to correct me.  I don't
22 want to --
23   A.   Well, I -- I guess what I was -- my
24 earlier comment, if I recall it correctly, was

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 166..169

Page 166

1    just to say that DNA can be decisive and
2    informative sometimes, but not all the time.
3        Q.    Okay.  And so then you've indicated on
4    here some information which leads you to draw that
5    conclusion; is that correct?
6        A.    Which conclusion?
7        Q.    The one that the results, however,
8    cannot -- strike that -- "The results cannot,
9    however, establish whether or not the sexual
10   encounter was consensual or whether the sexual
11   encounter occurred at the time of her murder."
12       A.    Yeah.  Yes.  I wanted to try to expand on
13   that thought.
14       Q.    Okay.  So let's maybe if we do it this
15   way.  So why don't you explain to me in your words
16   what your conclusions were related to the finding
17   of the DNA semen connected to Clarence Neal on the
18   victim's underwear.
19       A.    Okay.  I will.  I'll start by saying I
20   don't know that there's a singular conclusion.
21   But here are the things that I was working with.
22            I believe it was scientifically
23   demonstrated that Mr. Neal had sex with
24   Ms. Bridgeman.  And as I say here, it must have

Page 167

1    been in a time near to, if not at the time of, her
2    murder.  My job was to recommend to the State's
3    Attorney whether or not that fact was dispositive
4    or was at least clear and convincing evidence that
5    Mr. Coleman and Mr. Fulton were not guilty of the
6    murder.  My conclusion was that it is possible in
7    a logical analysis to conclude that both of the
8    following statements are true:  Mr. Neal had sex
9    with the victim at some near point in time to her
10   death, and Mr. Coleman and Mr. Fulton participated
11   in her murder.  Those two facts can be asserted,
12   and one does not logically or necessarily make the
13   other impossible.  And then as I go on to discuss,
14   looking at it from the perspective that I drew,
15   which was had Mr. Fulton and Mr. Coleman provided
16   clear and convincing evidence that they are not
17   guilty of the murder, my conclusion was they have
18   not provided such information and, more
19   specifically, this DNA evidence does not establish
20   such clear and convincing evidence.
21       Q.    So you have a bit of a detailed
22   discussion here in your memo about more specifics
23   related to these conclusions.  If you look at the
24   end of that first paragraph, you indicate "CIU has

Page 168

1    developed information showing that Mikey was
2    sexually active in 1994 with more than one
3    partner."
4        Do you see that?
5        A.    Yes.
6        Q.    And that -- was that a factor that was
7    part of your considerations?
8        A.    Yes.
9        Q.    Okay.  And why is that?
10       A.    Because if -- if Mikey were thought to
11   be, or perceived, or in fact was either a virgin
12   or one who was very, very cautious about sexual
13   encounters, it would suggest that any semen found
14   in her underwear was there because of a criminal
15   act.  On the other hand, if it were known that she
16   was sexually active, the inference of criminality
17   is affected.
18       Q.    Okay.  And then the next sentence says
19   "The question nevertheless remains, do the DNA
20   test results require the conclusion that Clarence
21   Neal murdered Mikey Bridgeman?"
22            And is that -- I feel like you addressed
23   that in terms of Mr. Neal possibly having -- you
24   know, having had sex with the victim doesn't

Page 169

1    necessarily draw the conclusion that he murdered
2    her; is that accurate?
3        A.    I think I've addressed that too.
4        Q.    Okay.  Then in the second paragraph, just
5    touching on a little bit of a different piece of
6    information, the sentence starts out "Forensic
7    scientists advise that if a woman has sexual
8    intercourse, semen may continue to drain from her
9    vaginal vault for many hours, or even days
10   thereafter."
11            Do you see that?
12       A.    I do.
13       Q.    Do you know where you obtained that
14   information?
15       A.    I would anticipate that it was in
16   conversation with Hal Johnson and Kara Stefanson
17   and others in the unit.
18       Q.    And that's information that you relied
19   upon in drawing your conclusions?
20       A.    It was information that was part of the
21   fabric of information we were looking at.
22       Q.    Okay.
23       A.    I mean, "reliance" is a word I'm going to
24   resist.  But it was certainly information that we

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 170..173

Page 170

1  considered.

2      Q.   Fair enough.

3           Then you talk about whether or not the

4  victim was wearing clean underwear.  Do you see

5  that discussion?

6      A.   Yes, I do.

7      Q.   Okay.  Can you explain to me how that

8  factored into your considerations?

9      A.   Well, how it factored, look, I'm trying

10  to think logically.  If I'm saying that this semen

11  could have been there from an experience that was

12  hours or even a day or two in advance of the

13  murder, that begs the question is she wearing the

14  same clothing for more than one day.  I'm just

15  trying to understand what's the logical extent of

16  the things that we're looking at and are we -- are

17  we accounting for that logic.

18      Q.   Okay.  Okay.  So then down to the next

19  paragraph, you indicate that "We conclude that we

20  do not accept the proposition that the DNA results

21  show Mr. Fulton and Mr. Coleman to be probably

22  innocent of Mikey's murder.  Various aspects of

23  the case support our conclusion, but two factors

24  seem to us as being of primary importance."

Page 171

1           Do you see that?

2      A.   I do.

3      Q.   And is that accurate?

4      A.   That's what it says, yes.

5      Q.   Does that reflect your conclusion --

6  Strike that.

7           Does that reflect one of your conclusions

8  as a result of your investigation in this case?

9      A.   Well, let's back up.  We've got a lot of

10  text here.  My -- Our conclusion was, as stated,

11  the DNA results, while significant enough to merit

12  granting a new trial didn't persuade us that it

13  was clear and convincing that these two men were

14  not guilty.  Along the way, we felt should we

15  account for what must -- not must -- Strike that.

16  Should we account for our thinking about how this

17  could have happened in light of the DNA evidence.

18      Q.   Okay.  And so is it fair to say then you

19  continue your discussion addressing those

20  questions as to how it could happen in light of

21  the DNA evidence?

22      A.   Yes.

23      Q.   Okay.  And these were important factors

24  to you?

Page 172

1      A.   These were things that I've -- Look.  I'm

2  asking the State's Attorney to vacate a conviction

3  but not to tell the people that these two men are

4  innocent.  And she and everybody that's going to

5  read this has a right to know well, Mark, how can

6  those two facts both be true?  How can the Neal

7  DNA definitely be there but these two guys still

8  be guilty?  What's the story.  And so I wanted to

9  put forth Mark's thinking, not because I'm

10  infallible or I am incapable of having an

11  incorrect thought, but because the person who's

12  got to make the decision here ought to know what

13  I'm thinking and be able to test my logic and

14  challenge it or reject it if it doesn't work for

15  her.

16      Q.   And so for those reasons, you felt it

17  important to provide that information?

18      A.   Yes.

19      Q.   Okay.  So then the first factor that you

20  reference -- Strike that.

21           Understanding -- Trying to understand

22  what you've written here, "To be clear, these two

23  factors that you indicate are two of several

24  factors, not the only two."

Page 173

1           Is that accurate?

2      A.   They're two factors that we wanted to tee

3  up for discussion.  I don't think that they're the

4  only factors, and I don't know that I can put a

5  number around the factors.  These were two points

6  that I thought merited -- I thought merited

7  specific conversation.

8      Q.   Okay.  And your thinking is reflected

9  here in your memo as to your analysis of the

10  investigations and the conclusions you've drawn?

11      A.   Yes.

12      Q.   Okay.  So then you talk about the -- one

13  factor that you consider to be of primary

14  importance is the crime scene itself and the

15  brutal nature of this murder.  Can you talk to me

16  about that?

17      A.   Well, it was a brutal murder, but it --

18  the crime scene was indicative that the victim had

19  been stripped and then assaulted and then

20  brutalized with objects.  It seemed to us

21  implausible to think that there was an

22  interruption or a detour in the midst of that

23  continuum under which the victim, having had sex,

24  pulled her pants back up, but then was subjected

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 174..177

Page 174

1　to the brutality that resulted in her death.
2　That's not physically impossible.  It seemed not a
3　plausible or likely account of what must have been
4　happened when you looked at the nature of the body
5　and the condition of her clothing and all of the
6　other circumstances at the crime scene.
7　　　　　And if that underwear is not replaced to
8　where it usually is worn, it would be more
9　difficult to account for how the sperm of Mr. Neal
10　got into that underwear.
11　　　Q.　If he had been the --
12　　　A.　If he had been involved in the assault.
13　　　Q.　So then moving down to page 22, you
14　discuss another alternative scenario, about that
15　Mr. Neal ejaculated on her underwear during the
16　course of the murder.  Can you talk to me about
17　that, explain to me what significance that has to
18　you?
19　　　A.　Well, it was just related to the topic of
20　the interjection that I made beyond there.  We had
21　to -- We accept that Mr. Neal's sperm found its
22　way into her underwear.  So now we think about the
23　events that we believe led to her death, her
24　murder.  Is it likely Mr. Neal made a deposit on

Page 175

1　her underwear down around her ankles?  We didn't
2　consider that to be the most likely conclusion.
3　　　Q.　I'm sorry.  I seem to have messed up my
4　screen sharing.  Not sure that it matters since
5　you have the exhibit.  I told you I'm not great at
6　this.
7　　　A.　I claim no expertise in technology, so I
8　won't criticize.
9　　　Q.　Okay.  Give me two seconds to get
10　straight here.
11　　　　　Okay.  Then you have at the next
12　paragraph a discussion of your -- of another
13　factor related to the neighborhood and the
14　individuals involved if I'm explaining that
15　correctly.  Is that accurate?
16　　　A.　It is.
17　　　Q.　Can you tell me about this factor?
18　　　A.　Well, it relates to Garfield Boulevard,
19　which I'm sure people know, but it's worth
20　mentioning.  This is not -- You don't look across
21　the street on 55th.  You look across a boulevard.
22　There's parking, and then there's a long and wide
23　grass boulevard, and then there's another street
24　with parking.  So it's a very significant dividing

Page 176

1　line just sort of geographically or
2　topographically.  But more to the point, it was in
3　those days pretty well known that it was a border
4　between two rival gangs, and the Blackstone Nation
5　were the people north of 55th Street in this
6　neighborhood, and the Gangster Disciples were the
7　people south of 55th Street.  Police officers and
8　gang crimes specialists had advised us that it was
9　a real deal, that the border was a real deal, and
10　that one crossing from the Gangster Disciple
11　territory, if you were a GD and you went north of
12　55th Street, you were taking a significant risk,
13　and vice versa.
14　　　　　When we spoke with both Mr. Fulton and
15　Mr. Coleman, I asked about whether their
16　experience in life had been that that border was
17　real and that crossing it was a risk factor.  And
18　both of them acknowledged that that was the case.
19　　　　　If we were to consider that Mr. Neal
20　murdered Mikey Bridgeman, he would have had to
21　come from Blackstone territory, where he was a
22　member of the B Rangers, as I understood it, and
23　he would have had to go into so-called enemy
24　territory.  And then he would have had to have

Page 177

1　grabbed Mikey or encountered her, and he would
2　have had to have taken her into the basement of a
3　home that was not known to him, and not a
4　home of a Blackstone Ranger or an ally, and in
5　fact, as the facts have it, was the home of a
6　Gangster Disciple.  And he would have had to go
7　into the basement of that home not knowing
8　anything about who lived there or when they might
9　come into that basement or who they might be, and
10　he would have decided that he was going to conduct
11　this pretty brutal exercise in that basement.  And
12　while none of that is physically or theoretically
13　impossible, it didn't seem to us a particularly
14　plausible story.
15　　　Q.　Okay.  Then at the end of the last full
16　paragraph, you ask questions that I assume you
17　felt compelled to answer on behalf of questions
18　you thought the reader might be asking; is that
19　accurate?
20　　　A.　Well, I think they're rhetorical
21　questions, and it's a device to say now we're at
22　the end of the road.  What have we determined?
23　Here's what questions we posed.  Here are the
24　responses we give.  And so you'll see in those

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                      Pages 178..181

Page 178

1    questions we acknowledge that the possibilities
2    are what they are; but the issue isn't what's
3    possible, and I will add nor was the issue whether
4    or not we were going to prove Clarence Neal guilty
5    of something. The issue was, do these two men
6    present us evidence, including specifically the
7    DNA evidence, that is compelling enough and clear
8    and convincing enough to say that they are --
9    there's a substantial probability that they didn't
10   commit this crime. Our answer was negative.
11        Q.   Okay. All right. Thank you.
12        ATTORNEY MEADOR:  So can we take a quick break
13   so I can try and address this exhibit situation?
14   Is that okay with everybody, just a few minutes.
15        THE VIDEOGRAPHER:  Yes. We're off the record
16   at 3:06 p.m.
17             (Whereupon, a short break was
18             taken.)
19        THE VIDEOGRAPHER:  We're back on the record,
20   then, at 3:20.
21        ATTORNEY MEADOR:  Okay. Welcome back. I am
22   going to share again -- I apologize.
23             The memo is Exhibit ...
24        ATTORNEY CURRAN:  8.

Page 179

1        ATTORNEY MEADOR:  8. Thank you.
2    BY ATTORNEY MEADOR:
3        Q.   If you recall, earlier today, Mr. Rotert,
4    we talked about a chart of DNA information. And I
5    just wanted to bring to your attention, you said
6    you weren't sure if it was attached to the report.
7    I'm going to show you the section in the report
8    that identifies where it is if you give me two
9    seconds.
10        A.   Let me say as you're doing that that I
11   noted this when you were scrolling through the
12   document, and I was incorrect. I think I asserted
13   in my answer that the chart of DNA results hadn't
14   been appended to this memo. But it looked to me
15   from the memo itself that that was a mistake on my
16   part and that it had been added as an exhibit.
17        Q.   Perfect. Okay. That clarifies my
18   question. I don't need to find it. I appreciate
19   that.
20             Then moving to the last section, this
21   last paragraph, you indicate that you understand
22   that there is an impact that the DNA evidence has
23   on a criminal -- on any criminal prosecution
24   and -- but the role for the CIU is to evaluate

Page 180

1    claims of actual innocence, and you have done so.
2             Does that reflect your conclusion here?
3        A.   It reflects my belief about the posture
4    CIU was in having done this work.
5        Q.   Okay. And you indicate that you believe
6    the situation merits the grant of a new trial to
7    both defendants and that it should be a question
8    of fact determined by a jury; is that accurate?
9        A.   That's what I say.
10        Q.   Okay. And these are the recommendations
11   and conclusions that you have made based on all of
12   the evidence that you had on November 3rd, 2017,
13   correct?
14        A.   Yes.
15        Q.   Okay. And I think you indicated earlier
16   that it also considers that there was still some
17   outstanding DNA testing that you had not received
18   the results for but that you felt was not material
19   to your conclusions and recommendations; is that
20   accurate?
21        A.   Yes.
22        Q.   Okay. So then let's take a look. This
23   will be Exhibit 11.
24        ATTORNEY MEADOR:  Am I correct?

Page 181

1        THE COURT REPORTER:  That is correct.
2             (Whereupon, Rotert Deposition
3             Exhibit No. 11 was marked for
4             identification.)
5    BY ATTORNEY MEADOR:
6        Q.   So based on my earlier questions, it
7    appears that there has been a slightly different
8    memo produced by the State's Attorney's Office.
9    And so I just want to go through a couple of
10   points with you on them.
11             So this is not part of what the -- what
12   was circulated in the exhibits. But for
13   reference, it is CCSAO Supplemental 63 through 85.
14   Okay?
15             So I will represent to you that in this
16   memo, I'm just noting a couple of differences. I
17   haven't had the opportunity to compare them line
18   for line, but we'll do so. But in this very first
19   paragraph, this last sentence of the paragraph
20   states "The central feature of this case is that
21   DNA has been found on the victim's clothing that
22   does not match to either convicted defendant."
23             Do you see that on the screen?
24        A.   I do.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 182..185

Page 182

1    Q.   Okay.  Did you make that change?
2    A.   I don't -- I don't know --
3    ATTORNEY HENRETTY:  I'm just objecting to
4  foundation.
5         Go ahead, Mark.
6    THE WITNESS:  I don't know, and I'm not
7  really -- I can't explain why there are two --
8  apparently two iterations of this memo, whether
9  one was a draft and the other was a final.  I just
10 can't explain it.  And I -- And in particular with
11 respect to your question, I don't remember who
12 added the sentence or the clause that you
13 referenced.
14 BY ATTORNEY MEADOR:
15   Q.   Okay.  So as you sit here today, you
16 don't have a specific recollection of submitting
17 your memo and then making changes to it for
18 resubmission?
19   A.   I don't recall doing that, no.
20   Q.   Okay.  Is that a possibility?
21   ATTORNEY SCHELLER:  Objection:  Form;
22 incomplete hypothetical.
23   THE WITNESS:  It is a possibility.  It
24 isn't -- It isn't necessarily congruent with my

Page 183

1  memory, but it's a possibility.
2  BY ATTORNEY MEADOR:
3    Q.   When you say "congruent," what do you
4  mean?
5    A.   I worked very hard on this with Gina.
6  And it went through many iterations back and
7  forth.  Like any big document, it gets tweaked and
8  sanded and so forth.  But I can -- I believe that
9  we produced at the end of the day a memo that was
10 the form and the text we wanted April Perry and
11 the State's Attorney to see.  I do not recall
12 sending them something and then saying, Oh, here,
13 throw that away; read this instead, because I kind
14 of am fussy about that stuff.  So I don't know why
15 these are both out there.  But that's what I
16 recall about the production of the memo.
17   Q.   Okay.  Both versions of the memo have the
18 state's attorney's office letterhead on them.  Is
19 that indicative to you in any way that this was in
20 final form because it was on letterhead?
21   A.   No.
22   Q.   Okay.  Why not?
23   A.   Because when I started writing, I would
24 have started with memo format material.  And so

Page 184

1  drafts would have also borne -- in my
2  recollection, I think drafts also would have borne
3  that same earmark.
4    Q.   Okay.  So for clarification, the
5  letterhead doesn't reflect an actual printing onto
6  a letterhead document; it's reflective of what's
7  already formatted on the document.  Would that be
8  correct?
9    A.   That's the best of my recollection.
10   Q.   Okay.  Okay.  Fair enough.
11   ATTORNEY SCHELLER:  Counsel, to the extent
12 it's helpful, I can represent that we maintain
13 multiple forms of digital letterhead and memoranda
14 so that it can be embedded in the header of a Word
15 document if that helps.
16   ATTORNEY MEADOR:  Yeah.  I think the witness
17 just said that that's likely what he did.  So
18 thank you.  That's helpful.
19 BY ATTORNEY MEADOR:
20   Q.   Okay.  So, then, Mr. Rotert, I'm
21 going to move to the last two pages, CCSAO
22 Supplemental 84 and 85.  And this iteration of
23 this last paragraph is slightly different.  I know
24 that you have Exhibit 8 in front of you.  If you

Page 185

1  want to work with me in comparing what's displayed
2  here as Exhibit 11.
3    A.   Counsel, actually, I now recognize that I
4  have Exhibit 11 as the text that I have been
5  referencing and checking as we've gone along.  I
6  don't have 8 readily handy.  But you can tell me
7  what the differences are, and I can work with
8  that.  I don't need necessarily to see it.
9    Q.   Okay.  That's fine.  If I knew how to put
10 them both up, I would.  But I think that's well
11 beyond my capabilities.
12   A.   Me too.
13   Q.   Okay.  So the first sentence here says
14 "That said, we acknowledge the impact."  And in
15 the version Exhibit 8, it says "That said, we also
16 do not gainsay the impact."
17        Do you recall making that change?
18   A.   No, I don't.  But that strikes me as
19 thinking, Mark, you're getting cute with words
20 like gainsay.  Who says gainsay?  My impression
21 would be that's just a self edit.
22   Q.   Okay.  Then it continues on here "DNA
23 evidence can have on a criminal prosecution," and
24 Exhibit 8 says "that DNA evidence can have on any

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Pages 186..189

Page 186

1  criminal prosecution."
2          Do you recall making that change?
3      A.   No, I don't.  I would believe it to be
4  just a stylistic matter, but I don't recall making
5  it.
6      Q.   Okay.  Then it seems we've got some
7  changes where the next line here in this
8  Exhibit 11 says "It also should be remembered that
9  a few laboratory results still are expected, and
10 there is a small chance that future lab results
11 could affect our views of the case."  And I will
12 represent to you that that change is not in
13 Exhibit 8.
14         Do you recall making that change?
15     A.   No, but it strikes me as a good one.  I
16 think that I was -- I was concerned that I was
17 omitting a fact that could become relevant.  And
18 so I don't recall it.  It does incline me to think
19 that Exhibit 11 is the one that actually I blessed
20 as the final work product here, but I'm surmising
21 that.  I'm not asserting that.
22     Q.   Okay.  And understanding that you have
23 testified here today that it was your belief that
24 the outstanding DNA test -- tests were not

Page 187

1  material to your recommendations and conclusions,
2  do you agree that what's stated here, they could
3  affect the case?
4      ATTORNEY SCHELLER:  Objection to form.
5      ATTORNEY HENRETTY:  Join.
6  BY ATTORNEY MEADOR:
7      Q.   Do you understand?  That might have been
8  a convoluted question.  I can rephrase.
9      A.   Well --
10     Q.   Let me rephrase.  Just so -- Okay.  So in
11 looking at Exhibit 8 today, and you've testified a
12 couple of times that there were outstanding DNA
13 test results, but they weren't material; and, in
14 fact, you felt they wouldn't change the
15 information in evidence.  I think here, this seems
16 to say something different, correct?
17     A.   Well, let me -- If I testified earlier
18 that the results that were still outstanding
19 weren't material, I wasn't as helpful or precise
20 as I think I should have been.  My recollection is
21 that we had little reason to believe that there
22 were -- it was scientifically possible to get more
23 results.  It wasn't that we thought more results
24 might be coming in, but they didn't think they

Page 188

1  would change our minds.  It was more on the order
2  of having tested everything we could find and
3  conducting every kind of sophisticated analysis
4  that was known to science and all this other
5  stuff, we were not optimistic that we were going
6  to get lucky and have other test results that
7  meant anything.
8          So I hope the distinction is clear.  I
9  believe that we were skeptical of the idea that it
10 was scientifically feasible to develop more
11 information.
12     Q.   And as you sit here today, do you know
13 what DNA evidence that was?
14     A.   I do not recall as I sit here today which
15 open issues were outstanding at this time.
16     Q.   Okay.  So then in Exhibit 11, the next
17 sentence is "At this juncture, CIU has fulfilled
18 its responsibility to evaluate claims of actual
19 innocence and to reach a recommendation as to
20 whether the evidence suggests that a person has
21 been wrongfully convicted."
22         And I will represent to you that that
23 sentence is not in memo Exhibit 8.
24         Did you make that change in that

Page 189

1  sentence?
2      A.   I believe that I did.
3      Q.   When did you make that change?
4      A.   At some point in the -- probably toward
5  the end of the editing process.  This document was
6  a work in progress for weeks.  This was a -- This
7  was a lot of work.
8      Q.   When did you begin writing this memo?
9      A.   I don't remember.
10     Q.   But you think you were working on it for
11 weeks?
12     A.   Yes.
13     Q.   Okay.  So was -- Did you at the time you
14 started drafting your memo, did you already know
15 what your conclusions and recommendations would
16 be?
17     A.   I don't think we had come to what we
18 thought of as our final determination.  I knew
19 that no matter what our final determination was, I
20 was going to be -- I felt it was necessary to make
21 a fairly thorough explanation for how this victim
22 died and what the evidence at the trial was.  And
23 I believe, and I'm pretty -- pretty confident in
24 this belief, that I started to draft this thing

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 190..193

Page 190

1  before we had sat down and looked across the table
2  at each other and said here's where we come down
3  on this story. But I wanted to get started on it
4  because I knew that just bringing things up to the
5  current time, or bringing things up to the time
6  when Mr. Fulton's letter was received, was going
7  to take eight or ten pages of work.
8      Q.  Okay. Then the next sentence states "Our
9  determination of that question, however, is not at
10  odds with our parallel conclusion that the
11  evidence in this case merits the grant of a new
12  trial for both defendants."
13         Did you make that change?
14     A.  Is there a change?
15     Q.  I'm so sorry. That is not in the memo as
16  Exhibit 8.
17     A.  Well, I'm sure I did. I think I've
18  spoken to this already. But I wanted to address
19  the sort of natural tendency to think that the DNA
20  evidence in this case established the innocence of
21  these two defendants, and I wanted to be express
22  in saying that that wasn't necessarily the --
23  following the logic that would follow.
24     Q.  Okay. And the next sentence, "The

Page 191

1  question of their guilt or innocence should be
2  determined by a jury that is aware of all relevant
3  facts, and the DNA results tied to Clarence Neal
4  obviously are among the relevant facts of this
5  case."
6         That is not in the memo. Did you make
7  that change?
8      A.  I believe I would have been the one to
9  make that change or to add that language.
10     Q.  And would you agree that your conclusions
11  and recommendations in Exhibit 11 are the same as
12  your conclusions and recommendations in memo 8 in
13  that that case -- you were recommending that the
14  case be retried; is that correct?
15     A.  That's correct.
16     Q.  Okay. I just want to ask you one
17  question. Okay. I have put Exhibit 8 back up.
18  Do you see at the bottom of the page, it says "CI
19  Memo"?
20     A.  I do.
21     Q.  Do you know what that is?
22     A.  I do not.
23     Q.  Okay. Do you recall printing out drafts
24  of your memo with "CI Memo" at the bottom?

Page 192

1      A.  No.
2      Q.  Other than what we have talked about, did
3  you submit any other documents in writing to
4  anyone in the state's attorney's office reflecting
5  your recommendations and conclusions related to
6  the Fulton/Coleman matters?
7      A.  You know, I don't -- I don't remember
8  submitting any other documents that discussed our
9  investigation or that are analogous to this.
10  We -- In the unit, we periodically were asked to
11  list the actions or the cases that we had disposed
12  of in a period of time. I wouldn't be surprised
13  if I included references to this case in those
14  kinds of compilations. Someone might have said,
15  you know, Please describe every case where the
16  convictions were vacated this past year and -- you
17  know, so those kinds of things might have been
18  requested of me. But in terms of discussion
19  pieces aimed at informing and recommending, this
20  was the only one.
21     Q.  Okay. And I think I would like to
22  clarify something. I think in asking you about
23  Exhibit 11 versus Exhibit 8, so the first memo we
24  talked about and the second version of your memo

Page 193

1  that we talked about, I made a preemption that
2  Exhibit 11 was the latter. Is it possible that
3  Exhibit 11 was an earlier version, and your final
4  version was Exhibit 8?
5      A.  It's possible.
6      Q.  Okay. Do you have anything that you can
7  rely on to determine which was the final version?
8      A.  Only the comment that I made earlier that
9  the differences -- and we only looked at the last
10  couple of paragraphs -- the differences you
11  highlighted there, I liked 11 better than 8, so
12  I'm going to hope that it was the second one and
13  not the first one.
14     Q.  Okay. Fair enough.
15         Did you follow the policies and
16  procedures that you had established in the
17  Conviction Integrity Unit in conducting this
18  investigation and formulating your conclusions and
19  recommendations?
20     A.  I believe so.
21     Q.  Did you participate in any discussions
22  with April Perry after you submitted your
23  recommendation and conclusions?
24         ATTORNEY SCHELLER: Objection to form.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 194..197

Page 194

1    ATTORNEY HENRETTY:  Join.
2       THE WITNESS:  I don't specifically recall if
3    the answer is yes or no.
4    BY ATTORNEY MEADOR:
5       Q.   Did you have any discussions with -- You
6    know what?  Strike that.
7            Let me ask it this way.  At the time you
8    submitted your recommendations and conclusions
9    related to the Fulton/Coleman matters, was your
10   chain of command still the same with April Perry,
11   Eric Sussman, and the State's Attorney?
12      A.   Ye- -- Yes.
13      Q.   You seem hesitant.
14      A.   No.  I want to point out that the
15   circumstances triggered by my memo would have
16   involved the Criminal Division.  I wouldn't have
17   participated in them, but what I had -- what I had
18   done meant other people had to make decisions now.
19   And I was aware of that.  But I didn't participate
20   in that, and that wasn't inside my chain of
21   command.
22      Q.   Okay.  Understood.
23            Did you have any discussions with anyone
24   in your chain of command, specifically April

Page 195

1    Perry, Eric Sussman, or the State's Attorney,
2    regarding your recommendations and conclusions
3    that you submitted on or about November 3rd of
4    2017?
5       ATTORNEY SCHELLER:  I'm going to object to the
6    question only insofar as it seeks any
7    conversations that might have been had related to
8    the Certificate of Innocence, but not any
9    conversations related to the recommendations in
10   the memo or the decision to retry.
11      ATTORNEY MEADOR:  That's fair.
12      ATTORNEY SCHELLER:  So you can --
13      ATTORNEY MEADOR:  Understood.  Yes.
14   BY ATTORNEY MEADOR:
15      Q.   So with that limitation.
16      A.   The answer is yes.  And as I think the
17   record makes clear, Eric Sussman was interested in
18   the case and the outcome.  And I mean that in the
19   context of his role as First Assistant.  He should
20   be interested in it.  And he went to, and I recall
21   pretty clearly he was at the court proceeding at
22   which we determined or, excuse me, informed the
23   court that we were going to move to vacate the
24   convictions.  And Eric was there.  And it's --

Page 196

1    it's certain that Eric and I would have spoken
2    prior to that because like any good lawyer, he
3    wanted to know what he needed to know to be an
4    effective advocate in court.
5       Q.   Do you know when you had those
6    discussions with him?
7       A.   No.  I couldn't give you specific dates.
8    Whatever the -- Whatever the dates of the court
9    appearances were, you could assume that they
10   likely would have occurred the 24 hour period
11   previous.
12      Q.   So it appears based on a review of the
13   record that the case was up in court on
14   November 8 of 2017, a few days after you issued
15   your memo.  Does that sound accurate?
16      A.   Sure.  I mean, I ...
17      Q.   Okay.
18      A.   Yeah.
19      Q.   You assume it's correct?
20      A.   I assume it's correct.
21      Q.   Okay.
22      A.   The normal effect.
23      Q.   Do you recall appearing in court and
24   advising the court that you were waiting on lab

Page 197

1    results and requested that the matter be set for
2    December 1st?  Does that sound accurate?
3       A.   Yeah.  They were -- I went in in front of
4    Judge Porter on this at least a couple of times.
5       Q.   Did you feel pressure to finalize your
6    conclusions and recommendations regarding these
7    cases?
8       A.   External pressure?  No.  I mean, I -- the
9    only reason I get out of bed every morning is
10   because I put pressure on myself.  I did not feel
11   pressured by external factors.
12      Q.   Okay.  When you were drafting your
13   recommendations and conclusions, were you aware of
14   media stories putting pressure on the State's
15   Attorney and the State's Attorney's Office to come
16   to resolution relating to the Fulton and Coleman
17   matters?
18      ATTORNEY CURRAN:  I'm going to object to form.
19      ATTORNEY HENRETTY:  Form and foundation.
20      ATTORNEY MEADOR:  I asked him if he was aware
21   as to foundation.
22   BY ATTORNEY MEADOR:
23      Q.   Go ahead.
24      A.   Well, I know there was a column by Eric

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 198..201

Page 198

1    Zorn in the Chicago Tribune that discussed this
2    case.  And the last time I was asked about this, I
3    completely messed up when that column appeared in
4    relation to other events.  So I'm not going to
5    guess.  I knew that Eric Zorn had written about
6    this case.
7        Q.   Okay.  Are you aware also that
8    Mr. Coleman and Mr. Fulton were engaging in
9    interviews with the Tribune and other media
10   outlets after this time regarding their --
11       ATTORNEY CURRAN:  I object.  The question
12   misstates the evidence.  It's not actually
13   accurate.
14       Go ahead, Mark.
15       THE WITNESS:  I don't recall giving a moment's
16   thought to whether or not either of those men
17   might have been talking to the media.
18   BY ATTORNEY MEADOR:
19       Q.   Okay.  But you were aware of the Eric
20   Zorn article?
21       A.   Yeah.
22       Q.   And did you print it out and put it in
23   the CIU file?
24       A.   No.  I read it in the paper.  I subscribe

Page 199

1    to the paper.  But I did not -- I don't recall --
2    I can't believe I would do that.  No.  I don't
3    think so.
4        Q.   Okay.  I'm going to mark as an exhibit --
5        ATTORNEY MEADOR:  Are we on 12?
6        THE COURT REPORTER:  We are.
7            (Whereupon, Rotert Deposition
8            Exhibit No. 12 was marked for
9            identification.)
10   BY ATTORNEY MEADOR:
11       Q.   Okay.  Showing you what has been marked
12   as Exhibit 12.  Okay.  Is this the Eric Zorn
13   article that you were talking about?
14       A.   It appears to be.
15       Q.   And you were never aware of anyone else
16   printing this out and putting it into the CIU
17   file?
18       A.   I don't have any particular recollection
19   about it.  It would have struck me as relevant
20   information that the file should contain.  It
21   doesn't bother me that they did it.  I didn't do
22   it myself.  To my recollection, I didn't do it
23   myself.
24       Q.   Why did you consider it to be relevant

Page 200

1    information for the file?
2        A.   I found when I was going through files of
3    cases of 10 or 15 or even 20 years old, I often
4    learned things that were helpful to me from
5    contemporaneous newspaper accounts.  And so I --
6    Information is good.  If it's -- And this column
7    may be inaccurate factually, but it is relevant in
8    the same breath.  So it's the kind of thing that
9    should go in a file.
10       Q.   Okay.  And this article was November 9,
11   2017, correct?
12       A.   That's what it appears to be, yes.
13       Q.   Okay.  And the article is critical of
14   State's Attorney Foxx in relation to her work on
15   the wrongful conviction claims including?
16       ATTORNEY SCHELLER:  Objection to form.
17       Sorry.
18       ATTORNEY MEADOR:  That's okay.  I paused.
19   That was my fault.
20   BY ATTORNEY MEADOR:
21       Q.   -- including the Fulton and Coleman
22   matters, correct?
23       ATTORNEY CURRAN:  Object to form.
24       THE WITNESS:  Yeah.  It's -- You could

Page 201

1    characterize it as such, yes.
2    BY ATTORNEY MEADOR:
3        Q.   And subsequent to that, did you appear in
4    court -- I'm sorry.  Strike that.
5            Subsequent to that, were you made aware
6    that Eric Sussman, and Joe Magats appeared in
7    court in the Fulton case on November 17 of 2017?
8        A.   I -- If it was in connection with this
9    case, I believe I would have been made aware of
10   that.
11       Q.   Okay.  And you weren't present for that
12   hearing?
13       A.   I don't think I was, no.
14       Q.   How were you made aware of what
15   transpired at that hearing?
16       A.   When the First Assistant and the Chief of
17   the Criminal Division show up in court on a case,
18   somebody's going to tell me about that,
19   particularly when it's a case that came out of
20   CIU.  Somebody told me.
21       Q.   Were you made aware prior to this that
22   the First Assistant and the Chief of the Criminal
23   Division would be appearing in your stead?
24       ATTORNEY CURRAN:  Objection:  Form.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 202..205

Page 202

1    ATTORNEY HENRETTY:  Join.
2       THE WITNESS:  They weren't appearing in my
3    stead.  Whatever they were doing, they were --
4    they ranked me.  But in any event, I'm sure that
5    they told me that they were -- somebody told me
6    that they were going to do this beforehand.  I'm
7    confident of that.  Eric probably stopped up, and
8    he used to stop up into my office for a little
9    coffee before court if he were in the building.
10   So I'm sure I knew about it.
11   BY ATTORNEY MEADOR:
12      Q.  Okay.  So I'm just going to -- See, I'm
13   getting faster at this now -- show you what has
14   been marked as Exhibit 13.
15               (Whereupon, Rotert Deposition
16               Exhibit No. 13 was marked for
17               identification.)
18   BY ATTORNEY MEADOR:
19      Q.   It is a transcript of the proceedings
20   from the Fulton matter on November 17, 2017,
21   showing that Messrs. Sussman and Magats appeared
22   as well as Mr. Ainsworth and Ms. Zellner on behalf
23   of Coleman and Fulton.
24      ATTORNEY SCHELLER:  Object to form;

Page 203

1    foundation.
2       ATTORNEY HENRETTY:  Join.
3    BY ATTORNEY MEADOR:
4       Q.  Do you see in the middle of page
5    RIC 492, Mr. Sussman advises the court:
6          MR. SUSSMAN:  Your Honor, at this point
7       in time after a careful review and
8    meticulous review of the evidence, the
9    state's attorney's office has concluded      that
10   the new DNA evidence could change         the
11   results of the trial, and we would         ask that
12   the convictions be vacated, the
13   sentences, I believe, be vacated, and we     will
14   agree to a new trial in this matter.
15         Do you see that?
16      A.   I do.  And it refreshes my recollection.
17   I did not stand up and identify myself to the
18   court.  I was surrounded by such luminaries that I
19   don't think it was necessary.  But I do remember
20   being -- I had thought this was when the court was
21   advised about the decision on a retrial.  But this
22   is where the court was advised about the decision
23   to vacate the convictions.  I believe I was
24   present as an observer at this.

Page 204

1       Q.  Okay.  And the information that
2    Mr. Sussman conveyed to the court was consistent
3    with your recommendations, correct?
4       ATTORNEY CURRAN:  Objection:  Form.
5       THE WITNESS:  It appears so.
6    BY ATTORNEY MEADOR:
7       Q.  Did you have any discussions with
8    Mr. Sussman prior to this that he did not intend
9    to follow your recommendations?
10      ATTORNEY CURRAN:  Objection:  Form.
11      THE WITNESS:  Eric never indicated that he was
12   not going to follow the recommendation, no.
13   BY ATTORNEY MEADOR:
14      Q.  Okay.  Did anyone indicate to you that
15   the state's attorney's office was not going to
16   follow your recommendations for setting these
17   matters for a new trial?
18      ATTORNEY CURRAN:  Objection to form.
19      THE WITNESS:  No.
20      ATTORNEY SCHELLER:  Objection to form;
21   foundation.
22      ATTORNEY CURRAN:  Also compound, yeah.
23   BY ATTORNEY MEADOR:
24      Q.  And at the time of this hearing on

Page 205

1    November 17, 2017, both Mr. Fulton and Mr. Coleman
2    were released on $50,000 I-bonds, correct?
3       A.  That appears to be the case, yes.  That's
4    what the transcript seems to reflect.
5       Q.  Did you have any discussions with anyone
6    about Mr. Coleman or Mr. Fulton being released on
7    I-bond as a result of vacating the sentences prior
8    to this?
9       A.  I don't recall whether I did or not.
10      Q.  Based on the -- what you describe as the
11   violent nature of the crime and your inability to
12   conclude that Mr. Coleman or Mr. Fulton were
13   innocent, did you think that there was a problem
14   with allowing them to be released on I-bonds?
15      ATTORNEY SCHELLER:  Objection to form;
16   foundation.
17      ATTORNEY HENRETTY:  Join.
18      THE WITNESS:  I'm a believer in staying in
19   your lane.  Bond and retrial and what to do next
20   were not what I was hired to do.  And so I was
21   smart enough to express opinions about things I
22   had a right to an opinion about and to keep my
23   mouth shut if I didn't have a right to say
24   anything.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 206..209

Page 206

BY ATTORNEY MEADOR:
      Q.   Well, the retrial was within your realm
of responsibility, correct?
      A.   No.
      ATTORNEY SCHELLER:  Object to form;
foundation.
      ATTORNEY CURRAN:  Join.
      THE WITNESS:  No, it wasn't.  My job --
BY ATTORNEY MEADOR:
      Q.   Wasn't that part of -- I'm sorry.  I
didn't mean to interrupt you.  Go ahead.
      A.   My job was to find out whether or not --
what we should do in regard to these very
significant DNA results.  I made a recommendation,
which the office followed.  That was when the
baton was handed over.  It was now a matter of a
criminal prosecution question for the Criminal
Division to manage as they saw fit, and I had no
interest in or business in helping them to decide
what to do next or what should be done about bond
or any of those issues, because that's not
consistent with the role of CIU in my opinion.
      Q.   It is true, Mr. Rotert, that part of your
role was determining whether the case should be

Page 207

retried, correct?
      ATTORNEY SCHELLER:  Objection to form;
foundation.
      ATTORNEY HENRETTY:  Foundation.
      ATTORNEY SCHELLER:  Also asked and answered.
      ATTORNEY HENRETTY:  Mischaracterizes former
testimony.
      THE WITNESS:  The answer is no.
BY ATTORNEY MEADOR:
      Q.   Why not?
      A.   Because that's a matter that involves a
lot of different considerations that are outside
my purview.  The character of the evidence in
2017, the ability of the office to proceed, the
allocation of resources, all of those questions
are properly reposed in the First Assistant and
the Chief of the Criminal Division, the two men on
this transcript.
      Q.   Okay.  Perhaps we're speaking past each
other.
           You made a recommendation that the case
should be retried, correct?
      A.   That's correct.
      Q.   Okay.

Page 208

      A.   Well, no.  I withdraw that answer.
That's not correct.  That's incorrect.
      Q.   Okay.  Why is it incorrect?
      A.   My determination was should these men
continue to be in jail under the conviction that
was obtained against them at the trial that was
held before Judge Porter?  My determination and
recommendation was they should not continue to sit
in jail pursuant to that conviction.  What to do
with that recommendation then became a matter of
the discretion of the State's Attorney.
      Q.   Okay.  So going back to Exhibit 8, which
I assume is the same as Exhibit 11, but can't
confirm that, your executive summary, I think we
went over this earlier.  You indicated you believe
that the state's attorney's office should agree
that both defendants should be granted a new
trial, correct?
      A.   Correct.
      Q.   And that was within the purview of
your responsibilities, correct?
      A.   Yeah.
      Q.   After the court appearance on
November 17 of 2017, did you have any discussions

Page 209

with Joe Magats, Eric Sussman, April Perry, or the
State's Attorney regarding retrying -- the case
being retried?
      A.   As to the State's Attorney, I did not
have any such conversation.  As to the other three
in your question, I don't have a particular
recollection of having such a conversation, but
it -- I don't want to exclude the possibility that
some conversation was held.  I don't remember it.
      Q.   Did you become aware that on
December 1st of 2017, the charges against
Mr. Fulton and Mr. Coleman were nolle'd by the
state's attorney's office, and there would be no
retrial?
      A.   I did become aware.
      Q.   Were you in court on that day?
      A.   I am pretty certain that I was not in
court on that day.
      Q.   Okay.  Marking this as Exhibit --
      ATTORNEY MEADOR:  Are we on 14, Tracy?
      THE COURT REPORTER:  We are on 14, yes.
           (Whereupon, Rotert Deposition
           Exhibit No. 14 was marked for
           identification.)

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 210..213

Page 210

1  BY ATTORNEY MEADOR:
2     Q.  Showing you Exhibit 14, which is the
3  transcript from the December 1, 2017, proceedings
4  related to Nevest Coleman and Derrell Fulton, do
5  you see it indicated on the first page that you
6  were present?
7     A.  Yes.  I'm impeached.  Yes.
8     Q.  That's not my intention, just, you know,
9  refreshing recollection.
10    A.  And I heard that being impeached doesn't
11 mean you have to say you're sorry.  So I'll let it
12 go at that.
13    Q.  For sure.  Fair enough.
14        So do you recall having any conversations
15 with anyone that this was the decision that was
16 being made with regard to the cases against
17 Mr. Fulton and Mr. Coleman?
18    A.  Oh, I'm sure that there were
19 conversations about the fact that this was the
20 determination that was made.  I couldn't give you
21 particulars.  I know that Gina Savini and I talked
22 about it, and I'm reasonably sure I talked with
23 other people about it.  We've put a lot of time
24 into the matter, and so we were interested.

Page 211

1     Q.  So can you tell me how you became aware
2  that the position of the office as to retrying
3  Fulton and Coleman had changed?
4     ATTORNEY SCHELLER:  Object to the
5  characterization of the witness's prior testimony
6  about a decision having been made to retry Fulton
7  and Coleman.
8     ATTORNEY HENRETTY:  Join.
9     THE WITNESS:  I -- My best recollection is
10 that Gina Savini had learned from sources, I
11 couldn't tell you whom, that there was not going
12 to be a further prosecution of those gentlemen and
13 that she related that information to me.  That's
14 my best recollection.
15 BY ATTORNEY MEADOR:
16    Q.  And do you have any information to
17 indicate where she obtained that knowledge?
18    A.  No.  Her ability to gather information at
19 26th and California was prodigious.
20    Q.  And you would agree with me, just for
21 clarification, that at the November 17, 2017,
22 hearing, the information from Eric Sussman to the
23 court was that the matters were going to be
24 retried, correct?

Page 212

1     ATTORNEY SCHELLER:  Object to the
2  characterization of the transcript.
3     ATTORNEY HENRETTY:  Join.
4     THE WITNESS:  I mean, I saw the transcript.
5  It says what it says.
6  BY ATTORNEY MEADOR:
7     Q.  Okay.  Mr. Rotert, I'm not trying mince
8  words.  But you understand that between
9  November 17 of 2017 and December 1st of 2017, a
10 decision had been made to no longer retry
11 defendants Fulton and Coleman, correct?
12    ATTORNEY SCHELLER:  Object to the form of the
13 question in that it again suggests a change such
14 that I believe it mischaracterizes the testimony
15 in the record and in the transcript.
16    ATTORNEY HENRETTY:  Join.
17    THE WITNESS:  I knew at -- I at some point
18 knew that the office was not going to pursue a
19 further prosecution of those two defendants.
20 BY ATTORNEY MEADOR:
21    Q.  What were the reasons behind the decision
22 to not retry Fulton and Coleman?
23    ATTORNEY CURRAN:  Objection: Foundation.
24    ATTORNEY SCHELLER:  Objection to form;

Page 213

1  foundation.
2     ATTORNEY HENRETTY:  Join.
3     THE WITNESS:  Because I did not participate in
4  the decisionmaking process and in fact don't know
5  with certitude who all did participate in the
6  decisionmaking process, I'm unable to answer your
7  question.
8  BY ATTORNEY MEADOR:
9     Q.  Did you become aware from any source who
10 was involved in that decision?
11    ATTORNEY HENRETTY:  Object to form.
12    THE WITNESS:  I don't remember anybody ever
13 saying, Mark, let us explain to you our thinking.
14 I knew from my own work that we were thinking
15 about whether or not we could
16 re prosecute a case from 1994.  That struck me at
17 the outset as a daunting proposition.  So although
18 no one ever sat down and gave it to me chapter and
19 verse, I probably just concluded from what I knew
20 about the case and the witnesses and the DNA
21 evidence and all of the circumstances that I was
22 aware of that probably those were the
23 circumstances that had been under discussion.  But
24 I don't know that for a fact, and I wasn't in the

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                      Pages 214..217

Page 214

1  room.
2  BY ATTORNEY MEADOR:
3      Q.   Okay.  Did you ever convey your opinion
4  to anyone within your chain of command that you
5  disagreed with the case not being retried?
6      ATTORNEY CURRAN:  Object to the form.
7      ATTORNEY SCHELLER:  Object to the form;
8  mischaracterizes the witness's prior statement.
9      ATTORNEY HENRETTY:  Join.
10     ATTORNEY MEADOR:  I'm not characterizing his
11 statement.  So you need to make appropriate
12 objections.  I'm asking him if he ever conveyed.
13     ATTORNEY CURRAN:  You definitely
14 characterized, Lisa.
15     ATTORNEY MEADOR:  Absolutely not.
16     ATTORNEY CURRAN:  Have the question read back.
17     ATTORNEY MEADOR:  Have the question -- Fine.
18 Read back the question.
19              (Whereupon, the record was read as
20              requested.)
21     THE WITNESS:  Am I at liberty to answer now?
22 BY ATTORNEY MEADOR:
23     Q.   Yes.
24     ATTORNEY SCHELLER:  Same objections.

Page 215

1      THE WITNESS:  Okay.  Good.
2          I did not ever tell anybody in my chain
3  of command that I disagreed with the decision to
4  not prosecute Mr. Coleman and Mr. Fulton further.
5  BY ATTORNEY MEADOR:
6      Q.   As we sit here today, you have no
7  recollection of anyone in your chain of command
8  coming to you and explaining why the decision had
9  been made to not follow your recommendations to
10 retry the case?
11     ATTORNEY CURRAN:  Objection: Mischaracterizes
12 his testimony.
13     ATTORNEY HENRETTY:  And asked and answered.
14     ATTORNEY SCHELLER:  Same objections; join.
15     THE WITNESS:  It's fair to say that the
16 section of the memo that you pointed talks about
17 whether they should be granted a new trial.  And
18 that was, I now realize, imprecise.  It should
19 better have said their convictions should be
20 vacated for purposes of evaluating what to do
21 next.
22          So that having been said, I wanted to
23 keep my eye on the ball, which was have I got
24 information sufficient to say that these men are

Page 216

1  probably innocent?  Having resolved that question,
2  whether correctly or incorrectly, but to the best
3  of my ability, I consciously strove to not worry
4  about what other people were deciding to do in
5  their division with their cases.
6          This was somebody else's decision to
7  make, and I respected that it was theirs to make
8  and not mine.
9  BY ATTORNEY MEADOR:
10     Q.   Okay.  So are you saying that your
11 testimony previously that your conclusions
12 included a recommendation that the case be retried
13 is not accurate?
14     A.   I'm saying that I never purported in any
15 memorandum or in any other statement I made to
16 assert a view about whether the office could or
17 should initiate a re prosecution in 2017 or
18 thereafter because I did not consider that it was
19 any of my business to so determine.
20     Q.   At some point, did you become aware that
21 the -- Strike that.
22          At some point, did you become aware that
23 Fulton and Coleman filed petitions for
24 Certificates of Innocence?

Page 217

1      A.   At some point.
2      Q.   Do you recall how you became aware of
3  that?
4      ATTORNEY SCHELLER:  Objection.  There's the
5  potential for the witness to be giving privileged
6  information that's subject to the deliberative
7  process or work product with this line of inquiry.
8      ATTORNEY MEADOR:  Are you giving him an
9  instruction?  I don't know.
10     ATTORNEY HENRETTY:  I think he answered.
11     ATTORNEY SCHELLER:  He answered as I was
12 objecting, and it was innocuous.  So I think we're
13 safe to go to the next --
14     ATTORNEY MEADOR:  All I heard was you,
15 Jessica.  So I didn't hear the witness.  I guess
16 the perils of remote.
17 BY ATTORNEY MEADOR:
18     Q.   Okay.  I apologize.  I didn't hear what
19 your answer was.
20     A.   I don't remember how I became aware.
21     Q.   Okay.  In -- Do you recall at the court
22 appearance of December 1st of 2017 the families of
23 Mr. Coleman and Mr. Fulton being in court?
24     A.   I do recall that.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 218..221

Page 218

```
 1       Q.   Okay.  Are you aware that that they were
 2  advised prior to that date that the convictions
 3  were going to be nolle'd --
 4       ATTORNEY CURRAN:  Objection.
 5  BY ATTORNEY MEADOR:
 6       Q.   -- the prior convictions would be
 7  nolle'd?
 8       ATTORNEY CURRAN:  I'm sorry.
 9       ATTORNEY MEADOR:  No, that's okay.  I trailed
10  in my question.
11       THE WITNESS:  I had no knowledge one way or
12  the other about what was communicated to the
13  families of those two men.
14  BY ATTORNEY MEADOR:
15       Q.   Okay.  Did you have any communications
16  with the attorneys for Mr. Fulton or Mr. Coleman
17  prior to the December 1st, 2017, hearing regarding
18  the -- what would be done during that hearing?
19       A.   I can't exclude the possibility.  But my
20  best recollection is that Eric Sussman kind of
21  became the person who dealt with Mr. Ainsworth and
22  Ms. Zellner directly.
23       Q.   Okay.  Showing you what is marked as
24  Exhibit 15.
```

Page 219

```
 1            (Whereupon, Rotert Deposition
 2             Exhibit No. 15 was marked for
 3             identification.)
 4  BY ATTORNEY MEADOR:
 5       Q.   I will represent to you that this was
 6  provided to us from the state's attorney's office,
 7  and it reflects an e-mail from Kathleen Hill to
 8  Eric Sussman and Robert Foley on December 1, 2017.
 9            Have you ever seen this e-mail before?
10       A.   I don't recall.
11       Q.   Have you ever seen the substance
12  contained within the e-mail before?
13       A.   Well, the substance is everything we've
14  been talking about all day.
15       Q.   Okay.  Let me -- Let me rephrase.
16            This has been purported to be a press
17  statement.
18       A.   Right.
19       Q.   For the Fulton and Coleman cases.
20            Have you ever seen a press statement like
21  this related to the Fulton and Coleman cases?
22       A.   I've seen such things, yes.
23       Q.   Okay.  Have you seen this one?
24       A.   It's entirely possible.  It isn't
```

Page 220

```
 1  addressed to me, so I'm not sure.  It's entirely
 2  possible that it was shown to me, but not because
 3  anybody really cared whether I liked it or not.  I
 4  saw a lot of stuff.
 5       Q.   Did you ever provide any input for a
 6  press statement on or around December 1, 2017,
 7  related to the Fulton/Coleman matters?
 8       A.   I don't recall.
 9       Q.   Okay.  So just taking a look at the last
10  paragraph, the first sentence states "The CIU did
11  not conclude that the defendants are innocent of
12  the charges for which they were convicted."
13            Did I read that correctly?
14       A.   You did.
15       Q.   And is that accurate?
16       A.   It is.
17       Q.   An accurate reflection of your
18  conclusions?
19       A.   It is.
20       Q.   Okay.  And that's coming from the
21  Conviction Integrity Unit, correct?
22       ATTORNEY SCHELLER:  Objection to form.
23       ATTORNEY HENRETTY:  Join.
24       THE WITNESS:  I mean, this is Katie Hill's
```

Page 221

```
 1  writing.  It's a correct -- That sentence is a
 2  correct reflection of what happened at CIU.
 3  BY ATTORNEY MEADOR:
 4       Q.   Okay.  And then the second sentence says,
 5  "However, the CIU determined that the new DNA
 6  evidence was sufficient to support a grant of a
 7  new trial."
 8            Did I read that correctly?
 9       A.   Yes.
10       Q.   And is that an accurate reflection of the
11  determination from the CIU?
12       A.   Yes.
13       ATTORNEY SCHELLER:  Objection to form.
14  BY ATTORNEY MEADOR:
15       Q.   And then it says "Now that DNA testing is
16  complete, and in light of all available evidence,
17  the state's attorney's office has concluded that
18  it will not proceed with the retrial of either
19  Mr. Fulton or Mr. Coleman because it would be
20  unable to meet its burden of proof."
21            Did I read that correctly?
22       A.   You read that correctly.
23       Q.   Do you know what DNA testing was
24  completed that had not been completed at the time
```

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 222..225

Page 222

1  of your recommendation and conclusion memo?
2      A.   Not -- No.
3      ATTORNEY HENRETTY:  Object to form.
4  BY ATTORNEY MEADOR:
5      Q.   Do you, as you sit here today, do you
6  know why the state's attorney's office determined
7  it would be unable to meet its burden of proof on
8  retrial?
9      A.   As I indicated, I don't know because of
10  any participation I made or played in the
11  decisionmaking.  I can only guess and make an
12  educated guess.
13      Q.   Okay.  What's your educated guess?
14      ATTORNEY SCHELLER:  Objection: Foundation.
15      ATTORNEY HENRETTY:  Foundation.
16      ATTORNEY CURRAN:  Speculation.
17      THE WITNESS:  My educated guess is they felt
18  they would be unable to meet their burden of
19  proof.
20  BY ATTORNEY MEADOR:
21      Q.   Do you know why?
22      ATTORNEY SCHELLER:  Objection: Foundation.
23      ATTORNEY HENRETTY:  Join.
24      THE WITNESS:  I -- I've prosecuted murder

Page 223

1  cases.  It's a very heavy weight.  If you don't
2  have an absolutely certain conviction that you're
3  going to have enough evidence to persuade the jury
4  you it dare not go further.  I can -- I can guess
5  that they viewed it similarly.
6      ATTORNEY HENRETTY:  And just for the record,
7  Lisa, I think that was a confidential document.
8  We would ask that pursuant to the protective
9  order, this portion of the deposition be marked as
10  confidential.
11      ATTORNEY MEADOR:  Well, we can talk about it.
12  It can be marked for now.  But we can talk about
13  it.
14      ATTORNEY HENRETTY:  I think we have to make it
15  now.
16      ATTORNEY MEADOR:  For sure.  Yeah.  Whether or
17  not it should be maintained as confidential we can
18  address moving forward.
19  BY ATTORNEY MEADOR:
20      Q.   What was the sentiment between you and
21  Gina Savini related to the decision to nolle the
22  charges against Mr. Fulton and Mr. Coleman?
23      ATTORNEY SCHELLER:  Object to form;
24  foundation.

Page 224

1      ATTORNEY AINSWORTH:  Objection: Form.
2      ATTORNEY HENRETTY:  Form and foundation.
3      THE WITNESS:  I'm grappling with the question
4  of sentiment.  Can you rephrase?
5  BY ATTORNEY MEADOR:
6      Q.   Sure.  You had discussions with Gina
7  Savini after the decision to nolle the charges,
8  correct?
9      A.   Yes.
10      Q.   And did you discuss your feelings about
11  that decision with Ms. Savini?
12      ATTORNEY SCHELLER:  I'm going to object to
13  form, and I question the relevance.
14      THE WITNESS:  Well --
15      ATTORNEY HENRETTY:  Join.
16      THE WITNESS:  Gina and I talked about the fact
17  that the case wasn't going to be
18  re prosecuted.  I think Gina, I would say she and
19  I, I would believe, had -- were like-minded in two
20  respects.  The first aspect was we had great
21  confidence in the people that we thought were
22  making the decision and that what they were doing
23  was what they thought was the right decision.  But
24  we were distressed.  This case was a learning

Page 225

1  experience for me in one respect.  We hadn't done
2  a good job of communicating to the family of
3  Ms. Bridgeman and the people who had an interest
4  in these proceedings and who were emotionally
5  invested in this case.  And we weren't comfortable
6  with how those people learned this disappointing
7  news.  And that's really the memory that lasts
8  with me longest.  But I think in terms of how she
9  felt about the decision not to retry it, that the
10  best people in the office had put their best
11  efforts into making that judgment, and we
12  respected it.
13  BY ATTORNEY MEADOR:
14      Q.   And you talked about people who had an
15  interest in the proceedings.  Can you explain to
16  me the Certificate of Innocence process.
17      A.   Not very well.
18      ATTORNEY CURRAN:  Object to the form of that
19  question.
20      ATTORNEY SCHELLER:  Object to the form.
21      THE WITNESS:  Here's what I understand.  The
22  legislature in its finite wisdom created a
23  statutory construct that allows a court to issue a
24  document or an order, I guess, that's called a

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 226..229

Page 226

1  Certificate of Innocence.  And there are statutory
2  reasons or elements that have to be satisfied in
3  order for that to be awarded by a judge.  And as I
4  understand it, the intent at the time was to
5  provide a mechanism by which people could go and
6  make claims in the Court of Claims to get
7  compensation for imprisonment that was
8  inappropriate or unjust.  And so a person who
9  believed that he or she met the statutory criteria
10 could go to court and say, Judge, I'd like one of
11 these certificates, and that certificate in turn,
12 at the minimum, could be the basis or the premise
13 for a payment of a damage award to that claimant.
14 That's generally what I understood.
15 BY ATTORNEY MEADOR:
16      Q.   And do you know what factors are
17 considered generally by the state's attorney's
18 office whether to oppose or not oppose someone's
19 petition for a Certificate of Innocence?
20      A.   I -- I've had interactions with my chain
21 of command on the topic of the Certificate of
22 Innocence and how the office ought to deal with
23 those.
24      Q.   What is your knowledge as to the factors

Page 227

1  considered generally?  I'm trying to be very
2  conscious of the parameters of questions that I
3  can ask you without drawing an objection.
4       A.   And I respect that --
5       ATTORNEY SCHELLER:  And I just have a tiny
6  objection; that is, at that time.  If we can limit
7  it to --
8       ATTORNEY MEADOR:  Very well.
9       ATTORNEY SCHELLER:  -- at that time.
10      ATTORNEY MEADOR:  Fair enough.
11      THE WITNESS:  All right.  Well I'm going to go
12 until somebody tells me not to.
13           There was a time, and I don't honestly
14 recall the month or even probably the year, when
15 April Perry asked me for my thinking about how the
16 office could develop --
17      ATTORNEY SCHELLER:  Mark, I didn't object to a
18 question asking you what the factors were we
19 considered.
20      THE WITNESS:  Okay.
21      ATTORNEY SCHELLER:  I would object to a
22 question asking for the development of the
23 process.
24      THE WITNESS:  All right.  Then this is why I'm

Page 228

1  trying to walk slowly.
2       ATTORNEY SCHELLER:  Sure.
3       THE WITNESS:  So maybe you should rephrase the
4  question if you could, please.
5       ATTORNEY MEADOR:  Sure.
6       ATTORNEY SCHELLER:  Or maybe just reask it
7  because I think I was okay with the original
8  question, but then I objected, and maybe that
9  caused you --
10      THE WITNESS:  Maybe I'm not catching a
11 subtlety, so could somebody read the question.
12           (Whereupon, the record was read as
13            requested.)
14      THE WITNESS:  My knowledge is that there were
15 three different categories of case that the factor
16 would -- now we're getting into vocabulary.  When
17 you say factors, there were three different things
18 that would be relevant to the office's reaction to
19 a Certificate of Innocence petition.  Let me say
20 it as simply as I can.  Okay?
21 BY ATTORNEY MEADOR:
22      Q.   Okay.  Did you -- Is it fair to say that
23 you were -- Strike that.
24           I'm trying to be careful as well.

Page 229

1           At any point during your -- this time
2  period, your tenure with the state's attorney's
3  office, did you handle reviewing petitions for
4  Certificates of Innocence?
5       A.   No.
6       Q.   Okay.  At some point, did you become
7  aware that the state's attorney's office objected
8  to the petitions for Certificates of Innocence
9  filed by Fulton and Coleman?
10      ATTORNEY CURRAN:  I'm going to just object
11 because I'm not -- I'm going to object to the form
12 of the question.
13      THE WITNESS:  I -- The answer to your question
14 is no.
15 BY ATTORNEY MEADOR:
16      Q.   Okay.  Did you -- Did you have any
17 discussions with anyone -- Strike that.
18           Let me ask you this.  Was the -- Were the
19 petitions for Certificate of Innocence filed by
20 Fulton and Coleman being handled by Jim Hanlon in
21 the Civil Division?
22      ATTORNEY SCHELLER:  Objection:  Form
23 foundation.
24      THE WITNESS:  That was my understanding.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 230..233

Page 230

BY ATTORNEY MEADOR:

1  Q.  Did you ever have a conversation with Jim
2  Hanlon regarding your investigation, your
3  conclusions, and your recommendations?
4
5      ATTORNEY SCHELLER:  I'm going to object that
6  question insofar as it invades the deliberative
7  process as to the decision or determination as to
8  how the CCSAO was going to respond to a petition
9  for a Certificate of Innocence.
10     ATTORNEY HENRETTY:  With that objection, I
11  will instruct the witness not to answer.
12     ATTORNEY MEADOR:  For clarification, that is
13  not the question.  The question relates to him
14  conveying information about his investigation.
15     ATTORNEY SCHELLER:  Right.  But I think the
16  deliberative process and what was considered by
17  the person handling it, whom you've established
18  was Jim Hanlon, includes anyone who he would have
19  spoken to, any information he would have
20  considered, anything that was conveyed to him,
21  anything he felt was significant or not
22  significant, et cetera.  So I think --
23     ATTORNEY MEADOR:  But --
24     ATTORNEY SCHELLER:  I'm not finished.

Page 231

1      So any inquiry into what was considered
2  or what was discussed during the pendency of the
3  petition for a Certificate of Innocence with Jim
4  Hanlon is subject to that privilege.
5      ATTORNEY MEADOR:  Okay.  Jim Hanlon is not
6  within the apex of deliberative process privilege
7  exclusions for this purpose.
8      ATTORNEY SCHELLER:  I don't recall any court
9  ruling to that effect or that being the applicable
10  law.
11     ATTORNEY MEADOR:  Well, it certainly wasn't
12  put forth by you.  But it is what it is.
13     Mr. Henretty, are you directing your
14  client not to answer?
15     ATTORNEY HENRETTY:  Yes.  I believe I did
16  already; but if I didn't tell him, I will now
17  instruct him not to answer.
18  BY ATTORNEY MEADOR:
19     Q.  Are you following the instruction of your
20  attorney, Mr. Rotert?
21     A.  Both of them, yes.
22     Q.  Well, Ms. Scheller doesn't represent you,
23  correct?
24     A.  My understanding is Ms. Scheller

Page 232

1  represents a different party, yes.  Mr. Henretty
2  is my lawyer.  One --
3     Q.  You don't want to upset Mr. Henretty.
4     A.  No, I don't.  He's very expensive.  I
5  need his help.
6     ATTORNEY HENRETTY:  Very delicate feelings.
7  BY ATTORNEY MEADOR:
8     Q.  Okay.  Did you have discussions with
9  anyone after -- Strike that.  Let me rephrase.
10     After you issued your memo of conclusions
11  and recommendations, did you participate in an
12  interview by Steve Bogira?
13     A.  I did sit for an interview.  And if you
14  tell me that the date was after the memo, I accept
15  that.  I don't remember the precise date of my
16  interview, but I did sit with that fellow, yes.
17     Q.  Okay.  I'll represent to you that that
18  was on November 21st of 2017.
19     A.  Good.  Thank you.
20     Q.  Okay.  Did -- And just for time period
21  purposes, that was prior to the state's attorney's
22  office agreeing to nolle the charges against
23  Fulton and Coleman, which happened on December 1st
24  of that year, correct?

Page 233

1     A.  That seems to follow, yes.
2     Q.  Can you tell me, was that an interview
3  set up by the state's attorney's office?
4     A.  Apparently.  I was --
5     Q.  What do you mean, "apparently"?
6     A.  Mr. Foley, who at that time was working
7  in the front office, called and asked me to meet
8  him in a conference room.  And I went into the
9  conference room, and this other gentleman was
10  there.  And I was told that this gentleman was
11  doing some kind of a story.  I believe I was led
12  to understand that he was from the New Yorker
13  Magazine, which in any event, I was told he was
14  doing some kind of a story about the State's
15  Attorney, and he was interested in the Conviction
16  Integrity Unit, and would I sit and speak with
17  him.  And I did.
18     Q.  Okay.  And did you talk with him about
19  your investigation of the Fulton and Coleman
20  matters?
21     A.  I believe I did.
22     Q.  And did you advise him that you were
23  comfortable with your recommendation that
24  Mr. Fulton and Mr. Coleman be given a new trial?

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                          Pages 234..237

Page 234

1    A.   I have to confess that I don't remember
2    almost anything about this -- this -- what I said.
3    I wish -- I don't remember.
4        Q.   Okay.  Do you know why you were asked to
5    give that interview?
6        ATTORNEY CURRAN:  Object to form; foundation.
7        THE WITNESS:  Not specifically, no.
8    BY ATTORNEY MEADOR:
9        Q.   Okay.  Did anybody tell you why?
10       A.   No.  No.  I mean, no.  Why Mark was the
11   guy that should sit, no.  Nobody ever gave me an
12   explanation for that.  They thought I had a lot of
13   time on my hands, I think.
14       Q.   I don't think they thought that.
15           Did you ever become aware of the language
16   in the orders granting the petitions for
17   Certificate of Innocence for Fulton or Coleman?
18       A.   The language of the actual certificate
19   itself?
20       Q.   Yes, sir.
21       A.   I don't recall that I was, no.
22       ATTORNEY MEADOR:  Okay.  So I am going to -- I
23   think I'm just about completed.  But if we could
24   take a break so I can just go through my notes

Page 235

1    real quick and confer.  If everybody wants to take
2    a break.
3        THE VIDEOGRAPHER:  Okay.  We're off the record
4    at 4:41 p.m.
5                (Whereupon, a short break was
6                taken.)
7        THE VIDEOGRAPHER:  We're back on the record at
8    4:50.
9        ATTORNEY MEADOR:  So, Mr. Rotert, I have
10   completed my questions for now.  Thank you for
11   enduring this with me.  I appreciate it.  I'm
12   going to pass it along.  I think Pat or Amy might
13   have questions.
14       ATTORNEY MORAN:  I just -- I have a couple of
15   follow-ups.  I promise I will go as fast as I can,
16   Mr. Rotert.
17                    EXAMINATION
18   BY ATTORNEY MORAN:
19       Q.   My name is Pat Moran.  I represent the
20   detectives who were sued in both lawsuits.  Sorry
21   I didn't get to introduce myself earlier.
22           As you sit here today, do you still stand
23   by your position that -- set forth in your memo
24   that you didn't think there was sufficient

Page 236

1    evidence to establish the innocence of Mr. Coleman
2    and Mr. Fulton?
3        ATTORNEY HENRETTY:  Objection to form.
4        THE WITNESS:  Nothing is -- No additional
5    information has come to my attention since I made
6    that recommendation, so my recommendation is
7    unchanged.
8    BY ATTORNEY MORAN:
9        Q.   Okay.  I want to go back to that clear
10   and convincing standard you talked about a little
11   bit earlier.  Obviously, you're aware that there
12   are several different evidentiary standards in the
13   law; clear and convincing is one of them, correct?
14       A.   Yes.
15       Q.   And other standards are by preponderance
16   of the evidence or beyond a reasonable doubt.
17   You're familiar with those as well, I'm sure,
18   right?
19       A.   Yes.
20       Q.   And the clear and convincing standard is
21   commonly used in, for example, cases of civil
22   fraud.  In order to prove the fraud, you have to
23   prove it by clear and convincing evidence, right?
24       A.   Right.

Page 237

1        Q.   Okay.  Is that the standard, clear and
2    convincing evidence, that same standard common in
3    the -- among the standards of evidence that you
4    were applying when you did apply the clear and
5    convincing standard with respect to your work as
6    Director of the Conviction Integrity Unit?
7        A.   We tried --
8        ATTORNEY SCHELLER:  Object to form.
9        ATTORNEY AINSWORTH:  Object to form.
10       THE WITNESS:  We tried to apply it uniformly.
11   BY ATTORNEY MORAN:
12       Q.   Okay.  And was that the standard you
13   applied with respect to Mr. Fulton and
14   Mr. Coleman?
15       A.   Yes.
16       Q.   Okay.  And I know there was some talk
17   about what you know about a retrial and things of
18   that nature.  I want to focus more on what facts
19   may have become aware -- come to the attention of
20   the state's attorney's office between November
21   17th and -- 2017 and
22   December 1st, 2017.  Are you aware of any new
23   evidence the state's attorney's office became
24   aware of with respect to Mr. Coleman or Mr. Fulton

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 238..241

Page 238

1  between those two dates?
2      A.   I am not aware of any, no.
3      Q.   Okay.  And did you have any discussions
4  with either anyone at the state's attorney's
5  office with respect to your conclusion that you
6  did not think there was sufficient evidence to
7  find Mr. Coleman or Mr. Fulton innocent of the
8  crimes for which they were convicted?
9      A.   Other than as I've discussed already, no.
10  I mean, I know that I had interchanges with Eric
11  Sussman about my conclusion.  I know that I had
12  interchanges with April Perry about my conclusion.
13      Q.   Did anyone at the state's attorney's
14  office, regardless of who, push back on your
15  conclusion that you did not think there was
16  evidence to support a finding that Mr. Fulton and
17  Mr. Coleman were innocent?
18      ATTORNEY CURRAN:  Objection:  Form.
19      ATTORNEY SCHELLER:  I'm going to object to
20  form in that I think Mr. Rotert has been very
21  clear that they were looking at actual innocence,
22  which I think might be different than a legal
23  finding of innocence.
24

Page 239

1  BY ATTORNEY MORAN:
2      Q.   Well, let me clarify.  Are we talking
3  about anything other than the actual innocence
4  standard that you were applying in your work as
5  Director of the Conviction Integrity Unit?
6      ATTORNEY SCHELLER:  Object to form.
7      ATTORNEY HENRETTY:  Join.
8      THE WITNESS:  Now I'm not -- Let me say this.
9  No one -- No state's attorney or assistant state's
10  attorney, I think you used this term, pushed back
11  against -- pushed back to me about the idea that I
12  wasn't -- and I didn't conclude that the two
13  convictions should be vacated and the men declared
14  innocent.  No one objected to or quarreled with me
15  about that determination.
16  BY ATTORNEY MORAN:
17      Q.   So that's right.  You made a finding in
18  your memo about innocence.  And that's what I'm
19  talking about.
20      A.   Right.
21      Q.   Did anyone push back or disagree or
22  suggest that it should be a different conclusion
23  than the one you made in your memo with respect to
24  innocence?

Page 240

1      ATTORNEY CURRAN:  Objection to form, the word
2  "finding."
3      Go ahead.
4      ATTORNEY SCHELLER:  I'm also going to object
5  to the question insofar as it seeks any
6  conversation about Mr. Rotert's conclusion as it
7  pertains to the petition for Certificate of
8  Innocence as opposed to his recommendations in the
9  November 2017 memo.
10  BY ATTORNEY MORAN:
11      Q.   My understanding, Mr. Rotert, was you
12  were not involved in the Certificate of Innocence
13  decisions; is that correct?
14      A.   That is correct.
15      Q.   Okay.  The memos that we were looking at,
16  the one that had -- had your name on it, drafted
17  by you and Ms. Savini, the one said "CI Memo" at
18  the bottom, and the one did not, are you in a
19  position to say at all which memo came first?
20      A.   Not with --
21      ATTORNEY AINSWORTH:  Objection:  Asked and
22  answered.
23      ATTORNEY HENRETTY:  Just object to the form of
24  the question.

Page 241

1      Go ahead.
2      THE WITNESS:  Not with certitude.  I -- I
3  personally am of the opinion that the Exhibit 11
4  was the latter of the two documents, but I can't
5  assure that.  I can't state that with absolute
6  certainty.
7  BY ATTORNEY MORAN:
8      Q.   In your work as the Director of the
9  Conviction Integrity Unit, did you ever send memos
10  up the chain of command to be reviewed prior to
11  making it official?
12      A.   No.  I don't recall ever doing anything
13  like that, no.
14      Q.   In other words, nobody like Mr. Sussman
15  or anyone in the executive team for the State's
16  Attorney would have seen your memo before you
17  finalized it and decided to send it in their
18  direction?
19      A.   That is a true statement.
20      Q.   The recommendations that you made in your
21  memo -- I mean, one of those two memos obviously
22  must have ended up being your final memo to be
23  sent up the chain of command, right?
24      A.   Yes.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                              Pages 242..245

Page 242

1    Q.   Okay.  The conclusions and
2  recommendations you made were made in your
3  capacity as Director of the Conviction Integrity
4  Unit; is that correct?
5    A.   Yes.
6    ATTORNEY MORAN:  I'm going to stop there and
7  pass it along to the next contestant.
8    ATTORNEY KUNZER:  I just have a few questions.
9  My name is Amy Kunzer.  I represent Hal Garfinkel.
10   THE WITNESS:  Okay.
11                 EXAMINATION
12 BY ATTORNEY KUNZER:
13   Q.   Based on your experience, would you agree
14 that Mr. Garfinkel was acting in his capacity as
15 an assistant state's attorney and not as an
16 investigator?
17   ATTORNEY CURRAN:  Objection:  Foundation;
18 calls for a legal conclusion.
19   THE WITNESS:  And can I ask Counsel in regard
20 to your question, is it aimed at the period of
21 time in which he was taking statements from the
22 defendants in this case?
23 BY ATTORNEY KUNZER:
24   Q.   Yes.

Page 243

1    A.   My understanding was that he was acting
2  as an ASA on the Felony Review Unit and was acting
3  as a prosecutor.
4    Q.   Okay.  Very good.
5         And in your review of the confessions in
6  this case, was it your opinion you did not see any
7  signs of coercion, whether psychological or
8  physical, in the statement of Coleman and Fulton?
9    ATTORNEY CURRAN:  Objection:  Form;
10 foundation.
11   ATTORNEY SCHELLER:  Join.
12   ATTORNEY HENRETTY:  Join.
13   THE WITNESS:  "Any" is a very expansive word.
14 I concluded after my review I couldn't see any
15 basis -- and here I'm using the word -- I did not
16 find a basis to think that Judge Porter's ruling
17 on the motion to suppress was a wrong ruling
18 factually or legally.
19 BY ATTORNEY KUNZER:
20   Q.   Okay.  And so you didn't disagree with
21 the finding that there was probable cause for the
22 charges that were brought against Fulton and
23 Coleman?
24   ATTORNEY CURRAN:  Foundation.

Page 244

1    ATTORNEY HENRETTY:  Objection.
2    ATTORNEY SCHELLER:  Calls for a legal
3  conclusion.
4    ATTORNEY HENRETTY:  Yeah.  Foundation.
5    ATTORNEY KUNZER:  That's all I have?
6    ATTORNEY MORAN:  Nick, I forgot to ask.  I
7  know you want to ask questions.  I forgot to ask
8  two.  If you don't mind, I can just --
9    ATTORNEY CURRAN:  No.  Go ahead, pat.
10                 EXAMINATION
11 BY ATTORNEY MORAN:
12   Q.   Mr. Rotert, you did have an opportunity
13 evaluate the statements by Mr. Coleman and
14 Mr. Fulton in the course of your work as the
15 Director of the Conviction Integrity Unit; is that
16 right?
17   A.   Yes.
18   Q.   Okay.  And obviously, the one's a court
19 reported statement, and once's a handwritten
20 statement, right?
21   A.   That's correct.
22   Q.   Okay.  Did you find any evidence in your
23 review of those statements that any of the
24 detectives had done -- had acted in a coercive

Page 245

1  manner with either Mr. Coleman or Mr. Fulton?
2    ATTORNEY HENRETTY:  Object to foundation.
3    ATTORNEY SCHELLER:  I'll object to form and
4  foundation.
5    THE WITNESS:  Nothing in those statements to
6  my mind provided evidentiary support for coercive
7  behavior.
8  BY ATTORNEY MORAN:
9    Q.   And outside the context of those
10 statements, and considering the totality of the
11 circumstances you reviewed as the Director of the
12 Conviction Integrity Unit, did you find any reason
13 to believe that any of the detectives had acted in
14 a coercive manner with either Mr. Coleman or
15 Mr. Fulton?
16   ATTORNEY HENRETTY:  Object to foundation.
17   ATTORNEY SCHELLER:  I'm objecting.  I'm
18 objecting to form and foundation.
19   THE WITNESS:  I want to say that -- Well, it
20 wasn't squarely in the realm of the issues I was
21 asked to decide.  The confessions, I did not find
22 reason to think that the confessions were the
23 product of improper coercive conduct by the
24 detectives.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 246..249

Page 246

1    ATTORNEY MORAN:  That's all I have.  Thank
2  you.
3    ATTORNEY CURRAN:  Good afternoon, Mark.  How
4  are you?
5    THE WITNESS:  Very good, Nick.  Nice to see
6  you.
7              EXAMINATION
8  BY ATTORNEY CURRAN:
9    Q.   Thank you, sir.
10    Obviously, you were not present when
11  either of these statements were given by either
12  Mr. Coleman or Mr. Fulton?
13    A.   You are correct.
14    Q.   Did you, with an eye towards evaluating
15  whether or not these statements might have been
16  coerced consider the allegations of other
17  misconduct by these detectives in coercing
18  criminal suspects?
19    A.   In the main, I would say the answer is
20  no.
21    Q.   Okay.  And why not?
22    A.   Because all the -- Well, let me back up.
23    ATTORNEY SCHELLER:  I think I'm objecting to
24  the form of that question.

Page 247

1    Yeah.  I am.
2    THE WITNESS:  Okay.  I would say a majority of
3  the time that I was looking at a case involving a
4  confession, I was looking at a companion claim
5  that the confession was the product of coercion.
6  And those are issues that usually have been
7  resolved at the trial court.  So I would look at
8  the material in the motion to suppress.  But to
9  cut to the chase, it's -- no one presented me with
10  what I considered to be significant evidentiary
11  basis to say these police officers have been shown
12  to have engaged systematically in misconduct in
13  that area.
14    I was told many times, He's a bad cop,
15  he's a bad cop, he's a cheater.  But when I would
16  say all right, give me something to work with, I
17  would get names.  I would get look at how many
18  times this guy has been accused of wrongdoing.
19  But I couldn't say I was given a substantial basis
20  to say I must disregard this police officer's
21  explanation for this confession.
22  BY ATTORNEY CURRAN:
23    Q.   Are you aware of any other cases in which
24  these detectives are involved in which DNA

Page 248

1  evidence has come to light to suggest that a
2  confession they obtained might be false?
3    ATTORNEY SCHELLER:  I'm going to object.
4  Parameters around this particular deposition have
5  been very specific.  We have not waived any
6  privileges, deliberative process, or anything
7  else, over his examination of any other case
8  regarding any detective that was implicated here
9  or otherwise.
10    ATTORNEY CURRAN:  Jessica, I disagree because
11  it goes to the thoroughness of his review and the
12  opinions he's offered in this memorandum
13  concerning the validity of the confessions, which
14  are things that he's testified to exhaustively
15  here today.
16    ATTORNEY SCHELLER:  I understand your position
17  and --
18    ATTORNEY CURRAN:  Go ahead.
19    ATTORNEY SCHELLER:  -- and yet I do not
20  believe there's been any waiver as to any other
21  case.  And so I defer to Mr. Henretty as to how
22  he'll instruct his witness.
23    ATTORNEY HENRETTY:  Based on that objection, I
24  will instruct him not to answer that question.

Page 249

1  BY ATTORNEY CURRAN:
2    Q.   As part of your review of the convictions
3  of Mr. Fulton and Mr. Coleman, did you consider
4  any allegations of misconduct that had been made
5  by other suspects against these detectives?
6    A.   I know that Mr.- --
7    ATTORNEY SCHELLER:  May I ask a clarification?
8  Nick, do you mean any suspects in the Fulton and
9  Coleman investigations?
10    ATTORNEY CURRAN:  I'm saying as it relates to
11  his investigation of these convictions.
12    ATTORNEY SCHELLER:  Okay.  Then I have no
13  objection.  I apologize.
14    ATTORNEY MORAN:  But the question goes to
15  other -- you're talking about 404(b), for lack of
16  a better way to put it, type evidence, if I'm not
17  mistaken, Nick.
18    ATTORNEY CURRAN:  Actually, just it goes to
19  the bases for his opinions.
20  BY ATTORNEY CURRAN:
21    Q.   So did you understand my question,
22  Mr. Rotert?
23    A.   I think I did.  And my answer is I recall
24  that Mr. Ainsworth, I think, provided me with a

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                      Pages 250..253

Page 250

1  document that had the names of several Chicago
2  Police officers and, I believe, defendants and
3  assertions about coerced confessions in other
4  cases. And my only hesitation really is that I
5  don't remember if that was provided in the context
6  of my work on the Fulton/Coleman matter, but I
7  certainly had such a document. I -- It was on my
8  desk for much of my tenure in this job. And I
9  won't go further than that at this point.
10         But that's -- So the answer is in this
11  case, I believe at least Mr. Ainsworth and perhaps
12  Ms. Zellner urged upon me the idea that these
13  police officers warranted further scrutiny.
14  BY ATTORNEY CURRAN:
15     Q.   Did you ever develop an opinion during
16  your course of investigating these convictions
17  that -- whether or not their concerns were valid?
18     ATTORNEY MORAN: Object to form.
19     THE WITNESS: I did not find evidence in these
20  convictions that gave me a basis to worry that
21  these detectives misbehaved in this investigation.
22  BY ATTORNEY CURRAN:
23     Q.   Okay. I'm going to show you an exhibit.
24  I think we're at Exhibit 16, unless somebody wants

Page 251

1  to correct.
2              (Whereupon, Rotert Deposition
3               Exhibit No. 16 was marked for
4               identification.)
5  BY ATTORNEY CURRAN:
6     Q.   Are you able to see that, Mr. Rotert?
7     A.   I am.
8     Q.   We'll say this is Exhibit 16. It's been
9  Bates stamped CCSAO Supplemental 209 through, it
10  looks like, 217.
11         Let me ask you sir, do you see
12  handwriting there on the lower right-hand corner
13  of this exhibit?
14     A.   I do.
15     Q.   Okay. Is that -- Do you recognize this
16  handwriting?
17     A.   It's mine.
18     Q.   Okay. And it appears to me that that
19  says "Received from Russell Ainsworth August 3,
20  2017."
21     A.   That's exactly right.
22     Q.   Does that refresh your recollection at
23  all as to receiving this during the pendency of
24  the CIU's review into the convictions of

Page 252

1  Mr. Fulton and Mr. Coleman?
2     A.   It does. And I believe now that Russell
3  provided it to me for my use in that case.
4     Q.   Okay. And this document at least
5  purports to be, I think, sort of a summary of
6  allegations that have been made of misconduct
7  against various detectives. Would you agree with
8  that?
9     ATTORNEY HENRETTY: Object to form.
10     THE WITNESS: It -- I think that's the way I
11  look at it, yes.
12  BY ATTORNEY CURRAN:
13     Q.   And do you know, in connection with your
14  review in this case, whether or not you conducted
15  any investigations into the evidence or lack
16  thereof supporting any of these allegations?
17     A.   I know that I did not investigate the
18  evidence or lack thereof in support of the
19  allegations reflected on this chart.
20     Q.   Thank you, sir.
21         All right. Like Lisa, I have to figure
22  out how this works. So stop share.
23         I want to talk about some nomenclature
24  briefly. So in your memo, you talk quite a bit

Page 253

1  about whether or not the defendants should receive
2  a new trial, correct?
3     A.   Correct.
4     Q.   So in order to get to that point, first
5  you have to have the convictions vacated; is that
6  correct?
7     A.   Correct.
8     Q.   And if I'm understanding your testimony
9  and your memo correctly, you are of the opinion
10  based on the review, which would include the DNA
11  evidence, that the convictions of Derrell Fulton
12  and Nevest Coleman should be vacated; is that
13  correct?
14     A.   Yes.
15     Q.   And it was the CIU's role in this case
16  first and foremost to make a recommendation as to
17  whether or not the conviction should be vacated,
18  correct?
19     A.   Yes.
20     Q.   And I think it's clear based on what
21  you've testified to that the CIU was not involved
22  in the decision whether or not Fulton and Coleman
23  should be re prosecuted; is that correct?
24     A.   It is correct.

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 254..257

Page 254

1    Q.   Okay.  And I think you also said, of
2   course, that you were not involved in that
3   decision?
4    **A.   That is correct.**
5    Q.   Okay.  And so is it safe to say that your
6   memo should not be read to suggest that the
7   state's attorney's office, at least at one point,
8   had made a decision to re prosecute Fulton and
9   Coleman?
10   ATTORNEY MORAN:  Object to form; speculation.
11   **THE WITNESS:  The memo certainly is not -- The**
12  **intent of the memo was never to establish the**
13  **decision about re prosecution.  It was meant to**
14  **establish the decision about the currently**
15  **existing convictions.**
16  BY ATTORNEY CURRAN:
17   Q.   And the reason I ask that is because I
18  think sometimes the term "new trial" has been
19  interpreted to mean a decision to re prosecute.
20  And so my question for you is, is it fair to say
21  that at least in this context, new trial was sort
22  of a placeholder while the decision whether or not
23  to re prosecute was made?
24   ATTORNEY MORAN:  Object to form.

Page 255

1    ATTORNEY MEADOR:  Objection:  Form.
2    **THE WITNESS:  Let me say, if I may answer,**
3   **Mr. Curran, this way.  I mentioned to Ms. Meador**
4   **when she was questioning me, she's right, you're**
5   **right.  If we look at the second page of the memo**
6   **and we say both defendants should be granted a new**
7   **trial, that was imprecise terminology.  It really**
8   **should have read we agree both defendants'**
9   **convictions should be vacated so that the office**
10  **can determine what next to do.  And so I did not**
11  **intend to imply what the office should do or even**
12  **to imply what I thought the office should do.**
13  **What I intended was to tell the office that the**
14  **unit believed these convictions ought not stand.**
15  BY ATTORNEY CURRAN:
16   Q.   And it was -- Correct me if I'm wrong,
17  but it was Kim Foxx who had the final
18  decisionmaking authority with regard to whether or
19  not the convictions should be vacated?
20   ATTORNEY SCHELLER:  I'm going to object to the
21  form of the question as it mischaracterizes the
22  witness's prior testimony.  I believe he said he
23  never discussed these decisions with Ms. Foxx.
24   ATTORNEY CURRAN:  And that wasn't my question.

Page 256

1   My question was who had the final decisionmaking
2   authority.
3    **THE WITNESS:  We certainly -- My understanding**
4   **was that ultimately, the decision would rest with**
5   **the State's Attorney.**
6   BY ATTORNEY CURRAN:
7    Q.   And that would be Kim Foxx?
8    **A.   At the time, yes.**
9    Q.   And apart from your opinion or your
10  recommendation that the convictions should be
11  vacated, do you know, apart from that
12  recommendation, whether or not Kim Foxx agreed
13  with any of the other opinions that you give in
14  your memo that's been marked Exhibit 8 and
15  Exhibit 11?
16   ATTORNEY SCHELLER:  Objection:  Form;
17  foundation.
18   ATTORNEY HENRETTY:  Object to form.
19   **THE WITNESS:  I do not know anything about how**
20  **Ms. Foxx reviewed or evaluated or what she thought**
21  **about my memo.**
22  BY ATTORNEY CURRAN:
23   Q.   Okay.  So I think you testified that one
24  of the reasons you questioned whether Clarence

Page 257

1   Neal was the perpetrator based on the DNA results
2   was because this rape and murder was committed in
3   Gangster Disciple territory; is that right?
4    **A.   That's part of it, yes.**
5    Q.   Sure.  And your understanding is that he
6   was a self-professed Blackstone Ranger; is that
7   correct?
8    ATTORNEY MORAN:  Object to form.  Misstates
9   his testimony.
10   **THE WITNESS:  Mr. Neal, as I understand it,**
11  **was a Ranger.**
12  BY ATTORNEY CURRAN:
13   Q.   Neal has a pretty extensive arrest
14  history; is that true?
15   **A.   That's my understanding.**
16   Q.   Were you provided with his arrest history
17  in connection with your review of these
18  convictions?
19   **A.   I was -- I requested.  It was provided**
20  **with materials about the sexual assaults that he**
21  **had engaged in.  Those were the primary focus.  If**
22  **I had asked for his entire sheet and all the**
23  **police reports, undoubtedly it would have been**
24  **given to me.  I don't recall ever asking for that.**

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 258..261

Page 258

1    Q.   That's information that could have
2    been -- you could have obtained if you had wanted
3    it, though?
4    A.   Yes.
5    ATTORNEY SCHELLER:  Objection:  Form.
6    ATTORNEY HENRETTY:  Join.
7    BY ATTORNEY CURRAN:
8    Q.   Sir, I'm going to show you what we'll
9    mark as Exhibit 17.
10                (Whereupon, Rotert Deposition
11                Exhibit No. 17 was marked for
12                identification.)
13   BY ATTORNEY CURRAN:
14   Q.   Do you see that, Mr. Rotert?  I'm going
15   to try to Zoom out.
16   A.   I can see it.
17   Q.   Okay.  For the record, this is a two-page
18   document, City 1630 to 1631.  And I will represent
19   to you, sir, that this is a document that was
20   disclosed to us during the course of discovery in
21   this lawsuit, and it purports to be an arrest
22   report for Clarence Neal.  Do you see that?
23   A.   Yes.
24   Q.   Okay.  And it looks like he was arrested

Page 259

1    February 2nd, 1994, and he was charged with
2    vehicular hijacking.  Is that fair?
3    A.   That's right.
4    Q.   And you see he's got a residence address
5    listed there, 6734 South Justine?
6    A.   Okay.
7    Q.   And I understand you don't know whether
8    or not he provided that information.  But my
9    question for you, sir, is do you know whether 6734
10   South Justine was located in Gangster Disciple
11   territory back in 1994?
12   A.   I don't.
13   Q.   Okay.  Do you know whether or not it was
14   Blackstone territory in 1994?
15   A.   I do not.
16   Q.   Okay.  I'm going to show you another
17   exhibit here.  We'll mark this one 18.
18                (Whereupon, Rotert Deposition
19                Exhibit No. 18 was marked for
20                identification.)
21   BY ATTORNEY CURRAN:
22   Q.   And are you able to see this document?
23   I'll go ahead and zoom out.
24   A.   I can see it.

Page 260

1    Q.   And again, this is a document that's been
2    produced to us.  For the record, it's a two-page
3    document, City 1632 through 1633.  And again,
4    would you agree with me that this purports to be
5    another arrest report of Clarence Neal?
6    A.   That's what it looks like, yes.
7    Q.   And it looks like this date of arrest is
8    from October 24th, 1996.  Do you see that?
9    A.   Yes.
10   Q.   Okay.  If you want me to zoom in --
11   A.   No, no, no.  I'm sure that's right.
12   Q.   Okay.  And you see here we have -- I'll
13   see if I can point it out for you here.  So they
14   have an address of arrest listed here as
15   730 East 41st.  Do you see that?
16   A.   Yes.
17   Q.   Okay.  And it look like on this occasion,
18   Mr. Neal, was, at least according to this report,
19   arrested in possession of a sawed-off shotgun.  Do
20   you see that?
21   A.   Okay.  Yes.
22   Q.   Okay.  Do you happen to know whether in
23   1996, the address of this arrest, 730 East 41st,
24   was in Gangster Disciple territory?

Page 261

1    A.   I do not.
2    Q.   Do you know if it was in Blackstone
3    territory?
4    A.   I do not.
5    Q.   I'm going to pull up another exhibit for
6    you.  And again I will represent to you this is a
7    document that has been disclosed to us during the
8    course of this lawsuit.
9                (Whereupon, Rotert Deposition
10                Exhibit No. 19 was marked for
11                identification.)
12   BY ATTORNEY CURRAN:
13   Q.   For the record, it's Bates stamped
14   City 676 through 677.  Are you able to see it?
15   A.   Yes.
16   Q.   And it looks like again that this is
17   another arrest of Clarence Neal; is that correct?
18   A.   That's what it looks like.
19   Q.   Okay.  And it looks like we have an
20   occurrence address of 11265 South Laflin Street.
21   Do you see that?
22   A.   I do see that.
23   Q.   Okay.  And again my question is, do you
24   happen to know whether or not that address is in

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 262..265

Page 262

1  Gangster Disciple territory?
2      A.   No, I don't.
3      Q.   And again, for the record, that's
4  Exhibit 19.
5           Do you kind of get where I'm going with
6  some of this, Mr. Rotert?
7  ATTORNEY MORAN:  Object to form.
8  ATTORNEY HENRETTY:  Object to form.
9  ATTORNEY SCHELLER:  Same.
10     THE WITNESS:  I kind of do.
11 BY ATTORNEY CURRAN:
12     Q.   Let me pull up another exhibit for you.
13              (Whereupon, Rotert Deposition
14               Exhibit No. 20 was marked for
15               identification.)
16 BY ATTORNEY CURRAN:
17     Q.   Is this one showing up?
18     A.   It is now, yes.
19     Q.   Okay.  So this again looks like another
20 arrest of Mr. Neal.
21     A.   Yeah.
22     Q.   Do you see that?
23     A.   I do.
24     Q.   Okay.  And it looks like the location of

Page 263

1  this address, or at least the occurrence, is
2  listed as 11450 South Laflin.  Do you see that?
3      A.   I do.
4      Q.   And it looks like that was also the --
5  Well, no.  Strike that.
6           Let me ask you this.  Do you happen to
7  know whether or not that address is in Gangster
8  Disciple territory?
9      A.   No, I don't.
10     Q.   For the record, we'll mark this as
11 Exhibit 20.
12          Let's -- Let's jump to your memo.  I
13 think it's been marked Exhibit 11.  It's the copy
14 that you have.
15     A.   Yes.
16     Q.   And I want to talk about the other sexual
17 assaults in which Clarence Neal was implicated.
18     A.   Okay.
19     Q.   If you go to page 15.
20     A.   I'm there.
21     Q.   Okay.  So it looks like here you
22 summarize an incident in which a victim whose
23 initials are AP was raped by Mr. Neal.  Do you
24 agree with that?

Page 264

1      A.   Yes.
2      Q.   As you described it here, it looks like
3  she was abducted at 45th and St. Lawrence?
4      A.   That's what I got from the police
5  reports.
6      Q.   Okay.  Do you happen to know if that's in
7  any particular gang's territory?
8      A.   I don't have much of a grasp of the
9  geographic borders of the gangs in 1994.  So
10 across the board, I would say no, I'm not
11 confident to testify about that.
12     Q.   And just to be clear, this occurred in
13 1998.  I'm asking more so about whether or not in
14 1998 this was in GD's territory or Blackstone
15 territory or some other territory?
16     A.   Same answer.
17     Q.   Okay.  Would it surprise you to find out
18 that that in 1998 was GD territory?
19     ATTORNEY SCHELLER:  Objection to form.
20     THE WITNESS:  Same answer.
21 BY ATTORNEY CURRAN:
22     Q.   Okay.  And then he drove her -- again,
23 according to your summary here in this memo -- he
24 drove her to an abandoned building at

Page 265

1  4091 South Wells?
2      A.   Okay.  Yes.
3      Q.   I think that's just west of the
4  Dan Ryan between 43rd and Pershing.  I don't know
5  if you're familiar with the area?
6      A.   Generally.
7      Q.   Do you happen to know what gang territory
8  that was in 1998?
9      A.   I do not.
10     Q.   Let me ask you, with regard to the other
11 rapes that occurred, is it safe to say you don't
12 know whether or not those occurred in GD
13 territory, Blackstone territory, or some other
14 gang's territory?
15     A.   I didn't make any such analysis.  I
16 didn't try to identify geographic gang regions,
17 no.
18     Q.   Would you agree that whether Neal
19 ventured into rival gang territory to commit other
20 crimes is relevant to whether or not he murdered
21 Mikey?
22     ATTORNEY SCHELLER:  Objection to form.
23     THE WITNESS:  Relevant?  Yeah.
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                        Pages 266..269

Page 266

BY ATTORNEY CURRAN:

   Q.  And that's not something your office considered, is it?

   ATTORNEY SCHELLER:  Objection: Argumentative; form.

   ATTORNEY HENRETTY:  Join.

BY ATTORNEY CURRAN:

   Q.  The location of Mr. Neal's other sexual assaults.

   A.  Well, I think that we considered the location.  But those were assaults that he -- as I recall it, he's in a vehicle.

   Q.  For one of them, yes.  That's correct.

   A.  For one of them.  So I -- I guess to get to the point that I think you're making, I didn't sit down and track the other events or the other criminal episodes in his life to decide did this guy stay only inside Blackstone territory for his entire adult life, or did he venture out.  My point was not that he was just going into Gangster Disciple territory.  He was going into an occupied residence, and he was committing a violent and noisy crime in a home where he had two choices. He doesn't know who lives there, or he's complicit

Page 267

with who does live there, which is Mr. Coleman.  I didn't think either of those conclusions was helpful to him.

   Q.  You don't know whether or not he knew that Mr. Coleman lived there, correct?

   A.  I don't know.

   Q.  And, in fact, he denied knowing Mr. Coleman, correct?

   A.  He did, I believe.  I didn't -- I believe he did deny knowing him, yes.

   Q.  Okay.  And you agree one of the things you mention in this memo is the idea that he would cross over into rival gang territory didn't seem plausible, correct?

   A.  It didn't seem plausible that he would cross into rival gang territory and commit a crime in a home that he couldn't say was a safe place.

   Q.  And all I'm -- all I'm wondering is the extent to which the CIU investigated whether he committed any other sexual assaults in rival gang territory.

   A.  Half of the sentence is yes.  We did investigate whether he committed other sexual assaults.  We didn't overlay onto that which

Page 268

gang's territory he was in when he committed those sexual assaults.  That is correct.

   Q.  Let me pull up, I believe this will be Exhibit 21.

         (Whereupon, Rotert Deposition
         Exhibit No. 21 was marked for
         identification.)

BY ATTORNEY CURRAN:

   Q.  If you look here, Mr. Rotert, I will again represent to you that this is a document that's been disclosed to us during the course of this litigation, City 628 through 629 -- 1628 through 1629.

   Are you able to see it?

   A.  Yes.  Thank you.

   Q.  Okay.  And I'll just kind of summarize it for you, if you could kind of look here.  But it appears to me to relate to an arrest of Clarence Neal on -- let's see here, July 1st, 1994, so a matter of months after Mikey's murder, correct?

   A.  Yes.

   Q.  And it looks like he was arrested on signed complaints from the victim, whose name here is Flora Matthews?

Page 269

   A.  Okay.

   Q.  That the two got into an argument and he hit her with a wooden stick.  Do you see that?

   A.  Okay.  Yes.

   Q.  Did the Conviction Integrity Unit, to your knowledge, ever speak with Ms. Matthews concerning her knowledge of Clarence Neal?

   A.  I do not believe so.  Certainly not to my recollection, no.

   Q.  Okay.  Did the CIU ever conduct any investigation to determine who Clarence Neal might have spent time with around the time of Ms. Bridgeman's murder?

   A.  Well, I have to say CIU was not trying to prove Clarence Neal was guilty of something.  We were trying to evaluate the claims of Mr. Fulton and Mr. Coleman.  So we didn't try to run down every lead relating to Mr. Neal except to the extent that it informed us about the issues that we had in front of us with Mr. Coleman and Mr. Fulton.

   Q.  So my question, though, is did the CIU ever conduct any investigation to determine who else Clarence Neal might have spent time with

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 270..273

Page 270

1  around the time of Ms. Bridgeman's murder?
2       ATTORNEY SCHELLER:  I'm going to object to the
3  form of the question.
4       THE WITNESS:  The answer is I'm not aware of
5  that inquiry being done.  I can't speak to whether
6  or not Gina Savini asked the detectives or the
7  investigators to make that kind of an analysis.
8  BY ATTORNEY CURRAN:
9       Q.   Okay.  So, for example, you don't know if
10  the CIU ever tried to find out with whom Neal was
11  living in '94 to see if there was ever a time when
12  he came home with blood on his clothes?
13       A.   I know that CIU tried to find out what
14  they could about Mr. Neal.  And by CIU, I mean
15  Gina Savini and the investigators working on the
16  case.  I can't speak with a lot of clarity or
17  precision about all of the data that they
18  gathered.
19       Q.   Did Ms. Savini ever share any of that
20  kind of data with you?
21       A.   If she did, I'm not able to recall now
22  what she said or when she said it.
23       Q.   Okay.  Do you know if she ever spoke with
24  Theresa Harris?

Page 271

1       A.   I do not.
2       Q.   Do you recall who Theresa Harris is?
3       A.   No.
4       Q.   Okay.  My understanding is that Theresa
5  Harris is a mother of some of Clarence Neal's
6  children.  Does that refresh your recollection at
7  all?
8       A.   It does not.
9       Q.   Do you have any knowledge of Gina Savini
10  or anyone in the CIU speaking with any of the
11  women who bore children to Clarence Neal?
12       A.   I don't recall ever being told that we
13  were trying to pursue the various women who were
14  impregnated by Mr. Neal.  I don't recall that
15  being an investigative work that we did.
16       Q.   Okay.  Do you recall what the motives
17  were for the CIU to conduct new forensic testing
18  at the very beginning?
19       ATTORNEY HENRETTY:  Object to form.
20       THE WITNESS:  Well, my understanding was that
21  Ms. Savini took a handwritten letter from a
22  prisoner, which was the kind of letter we got in
23  bulk, and read it and took it seriously enough to
24  start the process of getting forensic testing done

Page 272

1  when Mr. Fulton was basically reliant upon the
2  good wishes of the people reading his letter.  And
3  Ms. Savini decided to do what I thought was the
4  right thing and asked for tests to be conducted.
5  BY ATTORNEY CURRAN:
6       Q.   Do you recall in your memo indicating
7  that -- you used the word, something along the
8  lines that there was a boon for Eddie Taylor in
9  that he did not confess, and there was no other
10  evidence against him.  And so the charges against
11  him were dismissed?
12       ATTORNEY MORAN:  I'm sorry.  I object because
13  I think that misstates the actual language of the
14  report.
15       ATTORNEY HENRETTY:  Same.  I'll object to the
16  form.
17       ATTORNEY SCHELLER:  Join.
18       THE WITNESS:  I recall that I commented that
19  because Mr. Taylor had not made any admissions,
20  and because of the Bruton issues that would govern
21  a joint trial with the other -- Mr. Coleman and
22  Mr. Fulton, that he was able to escape charges in
23  this case.
24

Page 273

1  BY ATTORNEY CURRAN:
2       Q.   Did Gina Savini ever express to you that
3  she had initiated testing in the hopes that it
4  would implicate Eddie Taylor?
5       A.   We certainly wondered about Mr. Taylor's
6  role because it was, I think, your client who
7  brought his name up.  So we wanted to find out A,
8  are these people innocent; B, does this evidence
9  tell us who actually murdered this girl.  So
10  certainly we wanted to know everything we could
11  about who was responsible for that crime.
12       Q.   So at least certainly at the beginning of
13  testing, there was a thought that DNA testing
14  might implicate Eddie Taylor?
15       A.   Again, not having been there, I can only
16  surmise.  But I thought that the purpose of the
17  testing was to gather more reliable information.
18       Q.   Okay.  And again, part of that would be
19  potentially forensic evidence of Mr. Taylor's
20  involvement in the homicide, correct?
21       ATTORNEY SCHELLER:  Objection to the form;
22  argumentative.
23       THE WITNESS:  Well, I mean, when you do the
24  DNA testing, you're hopeful that it's going to

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 111 of 612 PageID #:8769

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 274..277

Page 274

1  produce solid leads.  I'm sure that there was a
2  hope that the DNA testing would tell us something
3  solid.
4  BY ATTORNEY CURRAN:
5    Q.  Okay.  When you were -- Strike that.  Let
6  me back up a little bit.
7        You agree that there was a DNA profile, a
8  partial profile found under the victim's left hand
9  fingernails from which Clarence Neal could not be
10 excluded; is that correct?
11   A.  Well, you have the advantage of me,
12 Mr. Curran, because there were so many items
13 tested and so many different results that pointed
14 in every direction.  Sometimes one person was
15 possibly included.  Sometimes that same person was
16 definitely excluded.  I know that fingernails, as
17 I think is common in any sexual assault case,
18 there was an interest in finding out can we get
19 anything out of this woman's fingernails.  And
20 they're well -- and you've got the documents.
21 Whatever they show the results to have been, I was
22 aware of those results.
23   Q.  Well, I think you -- you had indicated in
24 your memo, and if you'll indulge me for a moment,

Page 275

1  I think other than stating that Clarence Neal
2  could not be excluded from the partial profile
3  that was found under her left hand fingernails,
4  you didn't really attribute much significance to
5  that finding; is that fair?
6    A.  It's fair to say the memo says what it
7  says.  I mean, significance, I don't know.  I put
8  in what I thought, as much as I could, to inform
9  the reader about everything that I could think of
10 that might be relevant.
11   Q.  Okay.  And then my question is, how did
12 you view the relevance of the partial DNA results
13 under her fingernails?
14   ATTORNEY SCHELLER:  Objection:  Form;
15 foundation.
16   ATTORNEY HENRETTY:  Join.
17   THE WITNESS:  You know, I don't know that I
18 can tease out or isolate that particular finding
19 and say what I -- how I viewed it.  My view was
20 that with the exception of the panel that tied to
21 Clarence Neal, the remaining DNA testing that we
22 did wasn't decisive or even especially useful in
23 figuring out who was responsible for this offense.
24 And this has to do with what I learned about DNA

Page 276

1  can be present, but four or five alleles out of
2  23.  So you can draw some imperfect or limited
3  conclusions.  But the science of all that, the
4  bottom line for me was we know darn well that Neal
5  contributed his DNA in this girl's underwear.
6  After that, it's not very clear what this stuff
7  shows.
8  BY ATTORNEY CURRAN:
9    Q.  My question is, did anybody with whom you
10 were consulting from a scientific perspective
11 about the DNA results under the left hand
12 fingernails give you that opinion?
13   A.  Well, they had to help me --
14   ATTORNEY HENRETTY:  Object to form.
15   THE WITNESS:  I would be the first to admit
16 that they had to help me understand first what the
17 science showed and second what that meant.  And I
18 learned that -- Let me use an analogy that was
19 helpful to me.  There are certain DNA findings
20 that could be analgized to he was wearing a blue
21 baseball cap.  Okay, well, it's Chicago.  It's a
22 Cubs town.  Lots of guys are wearing blue baseball
23 caps.  If you really want to get specific, he was
24 wearing a size 8 and a half that had a stain on

Page 277

1  the front bill and then had his sweat in -- so the
2  levels of specificity are variable.  And we were
3  getting results that were not specific, but they
4  were results that could be reported.
5  BY ATTORNEY CURRAN:
6    Q.  Are you familiar with the idea sometimes
7  DNA is left under a victim's fingernails during
8  the course of a struggle?
9    A.  That's why we were -- That's why I was
10 asking about the fingernails.  And I'm not saying
11 how the reports are written.
12        When I was talking to Kara Stefanson and
13 Gina and Hal Johnson, one of the first things I
14 believe I asked was did we look for DNA under the
15 victim's fingernails?  Because everybody who
16 watches TV knows that that's something that might
17 be a source of good evidence.
18   Q.  And, in fact, there was a partial profile
19 that was obtained that was -- from which Clarence
20 Neal could not be excluded, correct?
21   A.  That's -- You have the advantage of me.
22 I'm prepared to accept that that's what the
23 documents showed.  But I want to underscore the
24 word "partial."  Okay?

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 112 of 612 PageID #:8770

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 278..281

Page 278

```
 1    Q.  Let me show you an exhibit, sir.
 2        Were you provided with copies of lab
 3 reports that came in on this case?
 4    A.  Yes, I was.
 5    Q.  So I'm showing on the screen what I
 6 think --
 7    ATTORNEY CURRAN:  Tracy, help me out here.
 8 Are we at 22?
 9    THE COURT REPORTER:  You are on 22, yes.
10            (Whereupon, Rotert Deposition
11             Exhibit No. 22 was marked for
12             identification.)
13 BY ATTORNEY CURRAN:
14    Q.  Can you see what we're going to mark as
15 Exhibit 22, Mr. Rotert?
16    A.  I can.
17    Q.  And would you agree with me it appears to
18 be a laboratory report dated November 29th, 2017?
19    A.  It does.
20    Q.  Okay.  And for the record here --
21    ATTORNEY CURRAN:  And I -- Counsel, I don't
22 know why this is not Bates stamped.  I would have
23 received this from the ISP document production.
24 Maybe they didn't Bates stamp all of their
```

Page 279

```
 1 document production.  That might be why.
 2    ATTORNEY MORAN:  Can you just put the date on
 3 it.
 4    ATTORNEY CURRAN:  Yeah.  So for the record,
 5 it's November 29th, 2017.  It purports to be a lab
 6 report, I believe authored by Yongfei Wu.  And it
 7 is a six-page report.
 8 BY ATTORNEY CURRAN:
 9    Q.  Mr. Rotert, would you have received a
10 copy of this report at some point?
11    A.  Well, I would have been able to look at
12 the report and read it.  Whether -- It wouldn't
13 have been sent to me.  It would have been brought
14 to my attention.
15    Q.  Okay.  I want to direct your attention to
16 a particular portion of this report.  Now, this
17 would require me cross-referencing with another
18 report, which I'm not going to do.  I'm going to
19 ask you to take my word for something.  You don't
20 have to, but I'm going to represent to you here
21 that if we look at page 4 of this report, there's
22 a reference here to an
23 Exhibit 3B1.  And I will tell you that that was --
24 Exhibit 3B1 is a sample from the victim's left
```

Page 280

```
 1 hand fingernails.  Okay?
 2        Now, it says here that "Clarence Neal
 3 cannot be excluded from having contributed to the
 4 minor human DNA profile previously identified in
 5 Exhibit 3B1 at," and then it lists, I think, five
 6 low side plus the gender typing low side.  Do you
 7 see that?
 8    ATTORNEY SCHELLER:  I need to interpose an
 9 objection.  I think it's compound.  We have a form
10 problem, a foundation problem, and it's not clear
11 to me why this witness would be discussing this
12 document if he in fact has not seen it and he has
13 not testified that it informed his analysis of
14 this case in any way.
15    ATTORNEY HENRETTY:  Join.
16    ATTORNEY CURRAN:  Well, Jessica, the failure
17 to have it inform his analysis is a relevant fact,
18 correct?
19    ATTORNEY SCHELLER:  No.  I don't think so
20 because I think his report was dated
21 November 3rd.  This is dated November 29th.
22    ATTORNEY CURRAN:  You made your objection.
23 BY ATTORNEY CURRAN:
24    Q.  Sir, do you see here, I'm going to say
```

Page 281

```
 1 here, it says the expected -- it says "Clarence
 2 Neal do not be excluded from having contributed to
 3 this minor human male DNA profile under the left
 4 hand fingernails," and that the expected frequency
 5 of occurrence for this profile was calculated for
 6 the African-American, Caucasian, and Hispanic
 7 population groups, and is found to be no more
 8 common than approximately 1 in 180,000 unrelated
 9 individuals.
10        Do you see that?
11    A.  I do.
12    Q.  Okay.  Do you know whether this statistic
13 was ever brought to your attention during the
14 course of your review?
15    A.  You know, it might have been.  But my job
16 was not to find out whether or not Clarence Neal
17 should or could be prosecuted for this case.  I'm
18 sure that I would have been brought and made aware
19 of findings that people thought were significant
20 to the decision.  But we knew that Clarence Neal
21 had to deposited substances around this girl.  And
22 we knew that Mr. Fulton and Mr. Coleman couldn't
23 be excluded, much like the language here.  So I'm
24 sure that if I wasn't aware of it, somebody in the
```

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 113 of 612 PageID #:8771

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                          Pages 282..285

Page 282

1  organization was aware of it.  I consider it not
2  relevant to the question before CIU.
3      Q.   Well, Mr. Rotert, you know, I think you
4  offered quite a few opinions in your memo about
5  whether or not the evidence was sufficient to
6  prove Mr. Fulton and Mr. Coleman innocent.  Do you
7  agree with that?
8      A.   Yes.
9      Q.   And part of that inquiry is whether or
10  not in fact Mr. Neil committed the assault and
11  murder of Antwinica Bridgeman, correct?
12      ATTORNEY SCHELLER:  Object to form;
13  argumentative.
14      ATTORNEY HENRETTY:  Yeah, argumentative.
15  You're sort of starting to bully the witness here.
16      THE WITNESS:  Look, if I had irrefutable proof
17  that Mr. Neal committed this murder, that
18  obviously would have impacted in a just dramatic
19  way on my conclusions about Mr. Fulton and
20  Mr. Coleman.  Mr. Neal had deposited his bodily
21  substances in and around this person.  And there
22  was no question about that.  But he hadn't
23  confessed to killing her as Mr. Fulton and
24  Mr. Coleman had.  So I had to just look at it all

Page 283

1  in the context of the big picture.
2  BY ATTORNEY CURRAN:
3      Q.   Do you know how resistant DNA is under
4  the fingernails to hand washing?
5      A.   I do not.
6      Q.   Do you have any experience -- Strike
7  that.
8          Do you have any knowledge how long DNA is
9  likely to persist under fingernails?
10      A.   No.
11      Q.   Do you know or have any knowledge as to
12  how likely it is that someone with Clarence Neal's
13  profile at these loci encountered the victim who
14  was not -- Let me reask that question.  It's a bad
15  question.
16          Do you know how likely it is that someone
17  who has this same profile as Clarence Neal at
18  these loci was to come in contact with the victim
19  at or near the time of her death?
20      ATTORNEY HENRETTY:  Objection:  Form.
21      THE WITNESS:  No, I do not.
22  BY ATTORNEY CURRAN:
23      Q.   And you're aware of cases where evidence
24  has been offered by the prosecution that the

Page 284

1  victim of a murder had the perpetrator's DNA under
2  fingernails, correct?
3      A.   Yes.
4      Q.   Okay.
5      ATTORNEY MORAN:  Sorry, Nick.  I was going to
6  ask, do we know how much time is left?  Because I
7  have a couple of follow-ups.
8      ATTORNEY CURRAN:  Well, Pat, most -- five and
9  a half, more than five and a half was taken up by
10  defense questioning.  So ...
11      ATTORNEY MORAN:  Well, I'm just trying to find
12  out.  I have about half an hour.  It might
13  somewhere in that neighborhood.  It might be a
14  little more.
15      ATTORNEY CURRAN:  I would like to hear where
16  we are with time.
17      THE COURT REPORTER:  Stand by.
18          Let's go off the record briefly, please.
19      THE VIDEOGRAPHER:  We're off the record at
20  5:47.
21              (Whereupon, a discussion was had
22              off the record.)
23      THE VIDEOGRAPHER:  We're back on the record at
24  5:51.

Page 285

1  BY ATTORNEY CURRAN:
2      Q.   Okay.  Sir, on page 21 of your memo, you
3  indicate "Forensic scientists advise that if a
4  woman has sexual intercourse, semen may continue
5  to drain from her vaginal vault for many hours or
6  even days thereafter."
7          Do you recall that?
8      A.   I was asked about that on the other
9  examination, yes.
10      Q.   And to be clear, you can't recall the
11  source of that information?
12      A.   I don't recall as I sit here today, no.
13      Q.   And that's not based on your own
14  expertise, correct?
15      A.   Correct.
16      Q.   Okay.  When the CIU interviewed Clarence
17  Neal on August 28th, 2017, he at first denied that
18  he had had any sort of sexual contact with
19  Ms. Bridgeman, correct?
20      A.   Yes.
21      Q.   And in fact he did that on multiple
22  times, correct?
23      A.   Yes.
24      Q.   And then he suggested that the two of

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 286..289

Page 286

1  them may have been physically intimate by sticking
2  their hands down each other's pants; do you recall
3  that?
4      A.   Something along those lines, yeah.
5      Q.   And you would agree with me that he was
6  given ample opportunity to explain how it was his
7  DNA ended up on the victim's underwear; is that
8  correct?
9      A.   I believe that they made every effort to
10 give him a chance, yeah.
11     Q.   Okay.  And at one point, he was asked
12 whether or not he and Antwinica Bridgeman had
13 full-blown intercourse.  Do you remember that?
14     A.   Not specifically.  But I would -- I'm
15 sure that that would -- they got to that point,
16 yeah.
17     Q.   And, sir, I'm trying to expedite this.
18 Okay?
19     A.   I know.  I know.  I know.  And I'm not
20 trying to fight you.  I just don't remember.
21     Q.   Okay.  And he said no in response to that
22 question?
23     A.   That's right, yeah.
24     Q.   Okay.  And at some point, I think perhaps

Page 287

1  Gina kind of led him into saying perhaps he had
2  had sexual intercourse on one occasion with her.
3  Do you recall that?
4      A.   I know that he got there ultimately but
5  reluctantly.
6      Q.   And, in fact, he was fairly definitive
7  that that had occurred in the summertime; is that
8  correct?
9      A.   I don't remember summertime.  I remember
10 it wasn't close in time to the date of the crime.
11     Q.   So needless to say, you would agree with
12 me that Clarence Neal did not come up with an
13 explanation for how it was his semen ended up in
14 the underwear of Antwinica Bridgeman, correct?
15     A.   Not a satisfactory explanation.
16     Q.   Okay.  Are you aware that Clarence Neal
17 has given a deposition in this case?
18     A.   Actually, no.
19     Q.   If I told you that he has since recanted
20 and now said that he in fact did not have
21 intercourse with Antwinica Bridgeman, would that
22 affect your -- any of the opinions you offer in
23 your memo here?
24     ATTORNEY MORAN:  Objection:  Misstates the

Page 288

1  record and speculation.
2      THE WITNESS:  Well, I'm inclined to say it
3  would not.  Because I think we're focusing on a
4  different question than the one I was trying to
5  answer.
6  BY ATTORNEY CURRAN:
7      Q.   I'm focusing on Clarence Neal's guilt,
8  right?
9      A.   Which is a different question than the
10 one I was trying to answer.
11     Q.   Right.  So is your memo, then, should
12 your memo be interpreted to offer opinions on
13 whether or not Clarence Neal is guilty of the rape
14 and murder of Antwinica Bridgeman?
15     ATTORNEY SCHELLER:  I'm objecting to this
16 question, and there's a specific reason why.  To
17 the extent Mr. Rotert did have any information
18 about whether the state's attorney's office had an
19 opinion about Clarence Neal's guilt, that would
20 certainly be subject to the law enforcement
21 investigatory privilege which applies here.  He
22 has not yet been prosecuted.  And it has nothing
23 to do with decisions that they made with regard to
24 Mr. Fulton and Mr. Coleman.  I don't believe

Page 289

1  there's been a waiver on this issue.  I don't
2  think it has anything to do with your case.  And
3  six hours into this deposition, I wish, you know,
4  we could move on to the focus, which is the memo
5  he made as to Mr. Fulton and Mr. Coleman.
6      ATTORNEY CURRAN:  You're taking up our time
7  with the speaking objection.  That's not even the
8  question that I asked.
9      ATTORNEY SCHELLER:  You asked about Mr. Neal's
10 guilt.
11     ATTORNEY CURRAN:  I said should your memo be
12 interpreted as to offering opinions as to
13 Mr. Neal's guilt.
14     ATTORNEY SCHELLER:  I understand what you're
15 saying you said.
16     ATTORNEY HENRETTY:  I'm going to object.  I'm
17 going to instruct the witness not to answer the
18 question based on --
19     ATTORNEY CURRAN:  That's totally
20 inappropriate, Jessica.
21     Tracy, can you reread my question.  I
22 want to make sure that we have a clear record.
23     THE COURT REPORTER:  Sure.  Stand by.
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021
Pages 290..293

Page 290

1           (Whereupon, the record was read as
2            requested.)
3    ATTORNEY CURRAN:  Do you still stand by your
4 objection, Jessica?
5    ATTORNEY SCHELLER:  I do.
6    ATTORNEY CURRAN:  Okay.  It will be part of
7 the motion.
8 BY ATTORNEY CURRAN:
9    Q.  Sir, are you not going to answer that
10 question?
11    **THE WITNESS:  Mr. Henretty?**
12    ATTORNEY HENRETTY:  I did instruct you.  I
13 think it got lost in the shuffle.
14       I did instruct the witness not to answer
15 based on the assertion of privilege.
16    **THE WITNESS:  I'll obey my client's direction**
17 **[sic].**
18 BY ATTORNEY CURRAN:
19    Q.  Okay.  You practiced for a number of
20 years as a criminal defense attorney?
21    **A.  I did.**
22    Q.  Okay.  Would you agree with me that an
23 individual's denial of having sexual contact with
24 someone, intercourse with someone when their semen

Page 291

1 is found in that individual's underwear would
2 raise a certain level of suspicion as to that
3 person's credibility?
4    ATTORNEY MORAN:  Objection:  Form; foundation;
5 calls for speculation.
6    **THE WITNESS:  I would have questions in my**
7 **mind under those circumstances, I think, yes.**
8 BY ATTORNEY CURRAN:
9    Q.  Sure.  And the reason I ask is because
10 you had offered some opinions about your view on
11 Mr. Neal's credibility.  So I'm just --
12    **A.  I don't think that I did.  But I'll let**
13 **you ask your question.  I don't believe I offered**
14 **any opinions about his credibility.  I offered**
15 **opinions about his apparent reactions to the**
16 **questions being posed to him.**
17    Q.  Okay.  Do you have an opinion on
18 Mr. Neal's credibility?
19    **A.  No.**
20    Q.  Okay.  If Derrell Fulton's DNA had been
21 found on the semen stain on the victim's
22 underwear, would he still be incarcerated?
23    ATTORNEY HENRETTY:  Objection:  Form;
24 foundation.

Page 292

1    ATTORNEY SCHELLER:  Objection:  Improper
2 hypothetical.
3    **THE WITNESS:  Well, I guess I'm allowed to**
4 **answer that question.**
5       It wouldn't have gone well for him.  It
6 seems like it would have been a difficult fact.
7 BY ATTORNEY CURRAN:
8    Q.  Because it would have corroborated his
9 involvement in the crime, right?
10    **A.  I think it would have corroborated his**
11 **confession --**
12    ATTORNEY SCHELLER:  Objection:  Argumentative.
13    **THE WITNESS:  -- Mr. Coleman's confession.**
14 BY ATTORNEY CURRAN:
15    Q.  Right.  But as it stands, we don't have
16 any forensic evidence corroborating those
17 confessions, do we?
18    **A.  Well, I don't think -- "any" is a tricky**
19 **word.  We've had this problem earlier.  You in**
20 **fact earlier in your questioning brought out some**
21 **of the DNA results that could not exclude**
22 **Mr. Coleman or Mr. Fulton.  So I think "any" is a**
23 **little expansive.**
24       I would say that the forensic, as I say

Page 293

1 in the memo, there's not a wealth of forensic
2 evidence that ties these defendants to this crime.
3    Q.  As you sit here today, are you able to
4 point to any forensic evidence specifically that
5 ties them to the crime?
6    **A.  Well, any, yeah.  There are findings with**
7 **relation to these many, many, many objects that**
8 **were tested for DNA where Mr. Fulton and**
9 **Mr. Coleman cannot be excluded.  So if you want to**
10 **say any, I would say I would point to those.**
11    Q.  I'm asking, though, can you tell me a
12 specific piece of evidence?
13    **A.  Not without going back into the documents**
14 **and the charts and all of the materials.  I**
15 **haven't memorized this case.**
16    Q.  So you had talked about how one of the
17 things you found implausible was this idea that
18 Clarence Neal had consensual sex with Mikey, and
19 then she pulled back up her pants?
20    **A.  That's not correct.**
21    Q.  Okay.  It's not.  Tell me what it is you
22 found implausible or -- Do you know what it is I'm
23 referencing in your memo?
24    **A.  I think so.  I found it implausible that**

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 116 of 612 PageID #:8774

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                              Pages 294..297

Page 294

1  the assailant tore this woman's garments down to
2  her ankles to the point of pulling off laced boots
3  and socks, violently raped her, then inserted
4  foreign, inanimate objects into her vagina until
5  it ruptured her cervix, but then replaced her
6  panties up around her waist so that that sperm
7  could be deposited there, but then pulled them
8  back down for the condition of the body when it
9  was found.  That one struck me as a bit far
10 afield.
11      Q.   Do you recall -- As you sit here today,
12 do you generally recall Nevest Coleman's court
13 reported statement?
14      A.   Generally.
15      Q.   Do you recall how in that statement he
16 recounted a scenario in which Derrell Fulton and
17 Eddie Taylor went into the basement with Antwinica
18 Bridgeman and began having, at least according to
19 the statement, what appears to be consensual sex?
20      A.   Yes.
21      Q.   And then he briefly left the basement.
22 Do you recall that?
23      A.   Yes.
24      Q.   And I think he indicated that before he

Page 295

1  left, he actually saw Derrell Fulton having
2  intercourse with Antwinica Bridgeman.  Do you
3  recall that?
4       A.   I don't recall that particularity, but
5  that's consistent with the way the statement ran,
6  I think, yes.
7       Q.   Okay.  And then Mr. Coleman said that he
8  then returned to the basement, and as he was
9  returning to the basement, the three individuals,
10 Antwinica Bridgeman being clothed again, were
11 exiting the basement.  Do you recall that?
12      A.   I don't.  But I'll accept your
13 representation if that's what the statement says.
14      Q.   Okay.  And then after that is when the
15 assault and murder took place, at least according
16 to Mr. Coleman's court reported statement.  Do you
17 recall that?
18      A.   I can't say that I do.  I would need --
19 and I'm not saying it's not a correct
20 characterization.  I just haven't read that
21 statement in some time.
22      ATTORNEY CURRAN:  Russell, do you happen to
23 have a copy of the court reported statement handy?
24      ATTORNEY AINSWORTH:  Yeah, I do.

Page 296

1       ATTORNEY CURRAN:  I seem to have lost track of
2  mine.  Can we go ahead and show that to the
3  witness.
4       ATTORNEY AINSWORTH:  Yes.  Let me just --
5       THE COURT REPORTER:  Would you like to mark
6  that as the next exhibit?
7       ATTORNEY CURRAN:  Yes, if we could.
8       THE COURT REPORTER:  That's going to be No. 23.
9            (Whereupon, Rotert Deposition
10           Exhibit No. 23 was marked for
11           identification.)
12 BY ATTORNEY CURRAN:
13      Q.   Sir, do you see what we're going to mark
14 as Exhibit 23 here?
15      A.   Yes, I do.
16      ATTORNEY CURRAN:  Okay.  And, Russell, if you
17 could go to --
18 BY ATTORNEY CURRAN:
19      Q.   I'm going to direct you, sir, to page 9
20 of the statement.  If we could scroll a little
21 further down.
22           There we go.
23           So this is a conversation where according
24 to, again, to the statement, it's recounting where

Page 297

1  I think what we're jumping in here midstream is
2  Derrell Fulton approaching Nevest Coleman, asking
3  him about if there was any place they could go to
4  have sex with Antwinica Bridgeman.  Do you see
5  that?
6       A.   Yes.
7       Q.   And I'm going to ask just if you could
8  read from page 9 to 13.
9       A.   You mean read it into the record?
10      Q.   No, no, no, no.  Just read it to
11 yourself.
12      A.   Okay.  I'm reading.
13           You can move on.
14           Okay.  What's your question?
15      Q.   Okay.  You would agree with me that that
16 recounts a similar sequence of events that you
17 found somewhat implausible as to Clarence Neal,
18 would you not?
19      A.   No, I --
20      ATTORNEY HENRETTY:  Objection:  Foundation;
21 calls for speculation; incomplete hypothetical.
22 BY ATTORNEY CURRAN:
23      Q.   How is it different?
24           How is it different?

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 298..301

Page 298

1    A.   Well, to the extent that your questioning
2 has led to the point that Mikey had her pants
3 down, and then put them back on, I don't see that
4 in the transcript.  I don't see --
5    Q.   I'm sorry, Mr. Rotert, to cut you off.
6 I'm trying to expedite things.
7    ATTORNEY CURRAN:  Could you scroll down.
8 Scroll down, the other direction.
9         Go back up.
10 BY ATTORNEY CURRAN:
11   Q.   QUESTION:  What was Chip doing at this
12 point?
13        ANSWER:  Pulling her pants down and
14 taking her shoes off.
15   A.   Right.  So your inference is that
16 earlier, he's describing sex when she had her
17 pants down, then she pulls it back up, and now
18 he's saying that it's back down?
19   Q.   Correct.
20   A.   Okay.  Well, okay.  So if that -- So now
21 give me your question.
22   Q.   So the same implausibility that you found
23 to this scenario in which Clarence Neal deposited
24 his semen in the victim's underwear would also

Page 299

1 apply to this court reported statement, at least
2 in terms of the sequence of events; would you not
3 agree with that?
4    A.   I don't agree --
5    ATTORNEY SCHELLER:  I'm sorry, Mr. Rotert.
6         Objection:  Mischaracterizes the exhibit.
7    ATTORNEY HENRETTY:  Form; foundation.
8    ATTORNEY MORAN:  Join.
9    THE WITNESS:  I don't agree with it.
10 BY ATTORNEY CURRAN:
11   Q.   Okay.  Why not?
12   A.   Because the assertions by Mr. Coleman in
13 this statement was that she had been agreeable to
14 the consensual sex and then was starting to get
15 dressed.  And then when she was leaving, things
16 got violent.  The hypothesis that I talked about
17 in my memo was that Mr. Neal would have abducted
18 her, dragged her into the basement, violated her
19 in the very, very serious ways she was violated,
20 and then the panties were pulled back up.  I don't
21 consider those to be comparable.
22   Q.   Okay.  That's fine.
23        If we could -- I'm almost done, sir.  I'm
24 trying my best here.

Page 300

1    A.   Use all your time.  I want you to use all
2 of your time today because the next time I see you
3 I hope it's purely social.
4    Q.   Play golf maybe.
5    A.   Yeah.  That would be fine.
6    Q.   Okay.  I'm going to just very briefly, as
7 part of the discovery here, we were given some
8 documents that were -- they look like handwritten
9 notes.
10   A.   Yes.
11   ATTORNEY CURRAN:  And for the record, Tracy, I
12 think this is 24.
13   THE COURT REPORTER:  That's correct.
14        (Whereupon, Rotert Deposition
15         Exhibit No. 24 was marked for
16         identification.)
17 BY ATTORNEY CURRAN:
18   Q.   And, sir, I'm not going to go through
19 these in detail.  I would just like you to
20 generally tell me whether or not they're your
21 notes or if you recognize them as being someone
22 else's.
23   A.   No.  They're my -- that's definitely my
24 handwriting.

Page 301

1    Q.   Okay.
2    A.   I'm left handed, and it's bad
3 handwriting.
4    Q.   Okay.  Actually, it's not too bad.  I can
5 kind of make it out.
6         Let's see here.  And I'm going to slowly
7 click through the pages to make sure that these
8 are all yours.  So --
9    A.   Okay.  That one's mine.
10   Q.   Page 2 is yours?
11   A.   Yup.
12   Q.   Page 3, page 4?
13   A.   That's mine.
14   Q.   I'm going to ask you very briefly about
15 this.
16   A.   Okay.
17   Q.   It looks like here, is there a date here?
18   A.   Yea.
19   Q.   8/16, do you know what that refers to?
20   A.   That's the date on which the memorandum
21 of interview is dated.  In other words, that's the
22 date that this interview took place.
23   Q.   And is this an interview of Hal
24 Garfinkel?

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                Pages 302..305

Page 302

1      A.    That's correct.
2      Q.    Okay.  Do you recall writing these notes?
3      A.    Not specifically.  But this is my general
4  practice when I'm getting my thoughts collected.
5      Q.    Okay.  And is it your recollection that
6  there was a report prepared concerning the
7  interview of Hal Garfinkel?
8      A.    I must have had some compilation or
9  writing from which I -- because I don't believe
10 that I sat with Mr. Garfinkel during the
11 interview.  I might be wrong, but I don't recall
12 sitting with him in the interview.  My best
13 recollection was that I was looking at a writing
14 when I made these notes.
15     ATTORNEY CURRAN:  Okay.  And, Jessica, I would
16 just ask, again, trying to move things along here,
17 are you aware of any of report documenting the
18 CIU's interview of Mr. Garfinkel?
19     ATTORNEY SCHELLER:  As you know, I was not
20 participating in discovery in this case, so I
21 can't make any representation either way with
22 regard to what's been produced to date.  If there
23 isn't one in the production, I can commit to going
24 back and looking through the CIU file again.  But

Page 303

1  I do believe that our intention, and I believe
2  what we have done is produce all of the witness
3  interviews.
4      ATTORNEY CURRAN:  Right.  And that was my
5  understanding, which is why I'm asking the
6  question.
7      ATTORNEY SCHELLER:  Right.
8      ATTORNEY CURRAN:  I just want to make sure
9  there's not something I'm missing.
10     ATTORNEY SCHELLER:  What I can say is I don't
11 believe it would have been withheld for any reason
12 or on any basis.  If you're asking me to go back
13 and confirm one more time in the file, I'm happy
14 to do that.
15     ATTORNEY CURRAN:  Okay.  If you could do that,
16 that would be great.  We'll just follow up later.
17 BY ATTORNEY CURRAN:
18     Q.    Do you see there's a reference here, I
19 think it says in quotation marks "Garfield
20 horrors."
21     A.    Yes.
22     Q.    Do you know what that means?
23     A.    I don't.  And when I use quotation marks,
24 believe it or not, that actually means I'm quoting

Page 304

1  directly.  But I don't remember the context of
2  that statement.
3      Q.    Okay.  Do you see here where it says
4  "Fulton less forthcoming"?
5      A.    "Fulton less forthcoming," yes.
6      Q.    Do you know what that refers to?
7      A.    Yeah.  He -- My understanding was
8  Mr. Garfinkel said that Mr. Coleman was making his
9  admissions without much hesitation or angst.  He
10 was -- He was stating what he stated without being
11 uncomfortable or pushed or anything.  He just, he
12 was letting it all out.  Mr. Fulton was less
13 forthcoming, more guarded, more concerned about
14 the impact of what he was saying.  And I note the
15 underlying -- the next line in quotation marks.
16 And I may have been at the Garfinkel -- I'm now
17 wondering if I was there.  But he then says, even
18 though he was apprehensive or wary, no one crossed
19 the line in their dealings with him.
20     Q.    Okay.  And I was just trying to get your
21 general impressions if you had recalled.  But
22 again, you believe just based on your practice of
23 note taking that it's likely that you were looking
24 at some other writing to generate this?

Page 305

1      A.    You know what?  And here's -- I apologize
2  to not have better recollection.  I know -- My
3  recollection is that Mr. Garfinkel was in the
4  building for some case, for some reason, and
5  agreed to come up.  This was not an interview,
6  unlike many of the others, where we went out into
7  the field to find him.  He came and sat in the
8  office with Gina Savini and investigators.  Now, I
9  thought that I didn't participate in that and that
10 I learned about it from Gina.  Seeing these
11 quotations marks makes me doubt that that
12 recollection is completely accurate.  And it makes
13 me think I sat in this interview.
14     Q.    Okay.  You see here it says "Fulton wrote
15 threatening tone letter"?
16     A.    Yes.
17     Q.    Okay.  And again, that's information that
18 would have come presumably from
19 Mr. Garfinkel?
20     A.    Yes.
21     Q.    Do you recall seeing any other
22 information describing what was threatening about
23 the letter?
24     A.    I don't remember any details about that

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 306..309

Page 306

1  other than what's here on this note.
2      Q.   Okay.  Thank you, sir.  So page 4 is your
3  handwriting.  Page 5?
4      A.   Yes my handwriting.
5      Q.   Page 6?
6      A.   My notes of a meeting with Mr. Ainsworth.
7      Q.   Okay.
8      A.   My review of the videotape of the Neal
9  interview in North Carolina.
10     Q.   Okay.
11     A.   My handwriting.
12     Q.   Okay.
13     A.   My handwriting.  My copy of the CD had a
14 problem at the one hour, 16 minute mark
15 apparently.
16     Q.   Okay.  And you see here where it says
17 here "Gina leads to saying 'quickie'"?  Do you see
18 that?
19     A.   I do.
20     Q.   Okay.  So then was your impression from
21 watching the video that Gina sort of led him into
22 admitting that he had had some sort of quick
23 sexual encounter with the victim?
24     A.   Apparently so.

Page 307

1      Q.   Okay.  And then do you see here, "Had two
2  daughters by Theresa Harris"?
3      A.   I do.
4      Q.   And "Lived near Mikey"?
5      A.   I do.
6      Q.   Okay.  And I'm assuming that that
7  probably doesn't do much in the way of refreshing
8  your recollection about Ms. Harris other than to
9  just see it here in your notes?
10     A.   It doesn't refresh my recollection,
11 Mr. Curran.  It makes me -- Knowing Gina Savini
12 and the meticulous work she used to do, it makes
13 me believe that some effort must have been made to
14 try and figure out if we could find Ms. Harris.
15 But I'm not testifying that that happened.  It
16 makes me believe that that is likely.
17     Q.   Okay.  I appreciate that.
18     A.   My handwriting.
19     Q.   That's page 9, which is -- I should have
20 been saying this -- but CCSAO Supplemental 314.
21     A.   My handwriting.
22     Q.   Handwriting, okay.
23     A.   My handwriting.
24     Q.   Okay.

Page 308

1      A.   These -- That's my handwriting.
2           That is my handwriting of the -- I must
3  have been working from the video or audiotape of
4  our meeting with Mr. Fulton.  But that's certainly
5  my handwriting.
6      ATTORNEY CURRAN:  Okay.  Okay.  Thank you,
7  sir.  I appreciate that.
8           I think I'm done.  But if you could just
9  give me a couple of minutes just to look through
10 my notes and speak with Russell very briefly.
11     ATTORNEY HENRETTY:  While you guys are
12 looking, I do -- given the fact that we had so
13 many documents that were marked confidential, I
14 would like to mark the deposition confidential for
15 now.  Under the protective order, we can play
16 around with that later, but there's a bunch of
17 documents from us.  Or at least mark those
18 sections.  I don't know what you prefer.
19          So it's Exhibit 8, Exhibit 11, and the
20 last exhibit, there was another one there
21 somewhere.
22     ATTORNEY AINSWORTH:  I think under the terms,
23 we have 14 days after the receipt of the
24 transcript to mark it confidential.

Page 309

1      ATTORNEY HENRETTY:  That's fine.  I've run
2  into it the other way where if you don't do it at
3  the dep, you have -- you lose it.  So I just want
4  to make it on the record.  But I understand.
5      ATTORNEY AINSWORTH:  Yeah.  And I don't think
6  we can litigate it here.
7      ATTORNEY HENRETTY:  No, no, no.  I just wanted
8  to make sure we preserved it.
9           Okay.  So just a very short break.
10     THE VIDEOGRAPHER:  Off the record, then.
11 We're off the record at 6:16.
12          (Whereupon, a short break was
13           taken.)
14     THE VIDEOGRAPHER:  We're back on the record at
15 6:20.
16     ATTORNEY CURRAN:  Mr. Rotert, I'm going to
17 pass the baton.  I'm done with my questions.
18 Thank you, sir.
19     THE WITNESS:  Thank you, Mr. Curran.
20     ATTORNEY AINSWORTH:  And I don't have too much
21 for you, Mr. Rotert.  I just wanted to -- So I am
22 going to just jump around slightly because of
23 that, and so I'll try to pinpoint where I'm going.
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 310..313

Page 310

EXAMINATION

BY ATTORNEY AINSWORTH:

2     Q.   Many, many hours ago, you said -- you
mentioned that Derrell Fulton indicated that
Nevest Coleman had something to do with the --
with the murder. Do you recall talking about
that?

8     A.   You know, I don't -- I don't know if I
recall that testimony. I had thought that
Mr. Coleman brought Mr. Fulton's name into the
discussion.

12     Q.   All right.

13     A.   Okay. In any event.

14     Q.   In any event, Derrell Fulton had -- he
told you he had no firsthand knowledge about this
murder, right?

17     A.   When he met with me and you, he made that
claim or that assertion, yes.

19     Q.   All right. You never spoke with
Ms. Foxx, correct?

21         I'm sorry. With Ms. Foxx about this
case. My apologies.

23     A.   No. That's all right.

24         I don't believe that I did.

Page 311

1     Q.   Do you recall anything you said to the
decisionmakers up the chain that wasn't contained
in the memo that you provided?

4     A.   Nothing comes to mind.

5     Q.   For example, did you talk to either April
Perry or Eric Sussman about your impressions of
Clarence Neal? I mean specifically your
impressions of Clarence Neal's demeanor during his
interview.

10     A.   I don't recall -- I'm reasonably certain
I never had that conversation with April. I don't
recall ever having it with Eric.

13     Q.   Did you do anything to -- Strike that.

14         As far as you know, within the CIU, did
anyone do anything to investigate Clarence Neal
apart from interviewing him and reviewing the
forensic reports?

18     ATTORNEY SCHELLER: I'm going to object to the
question insofar as we're talking about
investigating Clarence Neal as a potential target
for prosecution as opposed to the work Mr. Rotert
has already described that he does with regard to
evaluating the actual innocence of the claimant
who petitions CIU for review.

Page 312

1     THE WITNESS: Mr. Ainsworth, I'm not aware of
anybody in CIU or our investigative group -- Well,
let me withdraw that.

4         When I came aboard, they knew a lot about
where Clarence lived, what his probation officer
said about him. He was having to be registered as
a sex offender. There was -- I was being told
information they clearly had spent some energies
in understanding a little more about him and so
forth, much of which must have predated my
arrival. So I don't know that I'm competent to
give you a clear answer to your question.

BY ATTORNEY AINSWORTH:

14     Q.   As far as you know, the only person that
the CIU interviewed in order to establish whether
or not Neal may have had something to do with this
murder was Clarence Neal; is that correct?

18     A.   As far as I know, that's correct.

19     Q.   And so you told us before that you didn't
investigate the background of the police officers
because no one provided you significant
evidentiary basis to do so, or something to that
effect. Do you remember that testimony?

24     A.   I do.

Page 313

1     Q.   All right. I wanted to show you what
we'll mark as the exhibit next.

3     ATTORNEY AINSWORTH: What are we on, Tracy?

4     THE COURT REPORTER: You're going to be on
Exhibit 25.

6         (Whereupon, Rotert Deposition
7          Exhibit No. 25 was marked for
8          identification.)

BY ATTORNEY AINSWORTH:

10     Q.   All right. Exhibit 25 is a document
Bates numbered EP Subpoena -- Coleman EP Subpoena
Response 5959 through 6092. And so this is the --
Do you recall the petition that Mr. Coleman filed
under 214-01 to vacate his sentence?

15     A.   I -- I hadn't recalled it until I had
seen this. I remember this gave me an opportunity
that I wasn't looking for to go and learn the
contours of 214-01.

19     Q.   And this was -- you see the file stamp
there of August 7, 2017?

21     A.   Yes, I do.

22     Q.   Okay. I just want to direct you to the
third -- or, sorry, the fourth page of this
Exhibit 25 where it talks about new evidence of

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 314..317

Page 314

1  misconduct, and it talks about how Bill Foley was
2  the detective who obtained a false confession from
3  Harold Richardson in the now notorious Englewood 4
4  case where all four men were exonerated when DNA
5  from a serial rapist murderer was discovered at
6  the crime scene, and that same DNA excluded all
7  four defendants, and they received Certificates of
8  Innocence.
9          Do you recall that, sir?  Do you recall
10 learning this information from reviewing this
11 filing?
12     A.   I recall that I reviewed this filing, so
13 I certainly would have read this paragraph.
14     Q.   And do you recall in that same filing
15 being alerted to the fact that the FBI had
16 interviewed a former assistant state's attorney,
17 Terence Johnson, who related that the suspects in
18 that case were told they could go home if they
19 cooperated by confessing to the crime and
20 implicating others.  They were told witnesses go
21 home, and as an exhibit to this, the Johnson 302
22 report was provided to you.
23         Would you have reviewed that 302, sir?
24     A.   I probably did.  And I have a

Page 315

1  recollection that Mr. Johnson's statements to the
2  FBI were a topic that came up in this and in other
3  contexts.
4      Q.   All right.  Well, just keeping on this
5  context, do you recall that Detective Boudreaux
6  was another detective who was also involved in the
7  Englewood 4 and implicated by Terence Johnson as
8  being a detective who had coached a witness to
9  make his testimony more consistent with the other
10 codefendants during the taking of the confessions?
11         ATTORNEY MEADOR:  Objection:  Form foundation.
12     THE WITNESS:  I recall reading this memorandum
13 or this motion that you filed.  And so while I
14 didn't recall it when I sat down here today,
15 seeing this, I know refreshes my recollection.
16 BY ATTORNEY AINSWORTH:
17     Q.   And in the -- And then as part of an
18 exhibit to the following was that chart that Nick
19 showed you that I also provided to you separately.
20 Do you see that there, sir?
21     A.   I see that there.
22     Q.   All right.  And also in Exhibit 2, the
23 petition, was a civil complaint filed by Harold
24 Hill relating how Detectives Boudreaux and others

Page 316

1  got three defendants, Harold Hill, Dan Young, and
2  Peter Williams, to provide interlocking
3  confessions to raping and killing the woman,
4  including impaling the woman in an abandoned
5  apartment on Garfield Boulevard until -- and one
6  of the individuals, Peter Williams, confessed to
7  murder despite the fact that he was in Cook County
8  Jail at the time of the murder.
9          Do you recall learning that information
10 in the course of this case?
11     A.   Your pleading refreshes my recollection
12 that I read your pleading and the allegations
13 you've just pointed out.
14     Q.   And then DNA -- And in the pleading, it
15 relates that DNA evidence later exonerated Harold
16 Hill and Dan Young, leading to their release from
17 prison.
18         Do you recall learning that information,
19 sir?
20     A.   Same answer.  I recall that I read this
21 pleading and that this material was in there.
22     Q.   All right.  So then Boudreaux also got
23 a -- coerced a confession from Wayne Washington
24 and was prominent in a prosecution that then led

Page 317

1  to Hood and Washington being convicted before
2  their murder convictions were overturned.
3          Do you recall that, sir?
4      A.   I recall -- I don't recall.  I see that
5  was in the pleading.  I recall reviewing it.
6      Q.   Then I'll stop the memory tour and ask
7  you, did you do anything to investigate whether
8  the detectives' background in coercing false
9  confessions in other cases might be relevant to
10 this case here?
11         ATTORNEY MEADOR:  Objection:  Form;
12 foundation.
13     THE WITNESS:  I have a two-part answer.
14 First, I considered what you represented to be the
15 circumstances of those cases to look at what was
16 asserted at the motion to suppress and in the
17 pleadings and the statements of your -- of the
18 clients, the defendants in this case, to see if
19 these cases appeared to have earmarks that were
20 provocative of a problem.
21         The second part of my answer is I
22 expressed to people on both sides of the aisle,
23 the state's attorney's office and the defense,
24 that it was not possible for me, without subpoena

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 122 of 612 PageID #:8780

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 318..321

Page 318

1  power or investigat- -- you know, without -- I
2  wasn't equipped to decide if there were pockets of
3  bad police detectives who needed to be rooted out.
4  And that issue had to be taken on and litigated in
5  an -- in an organized and comprehensive way. And
6  I talked to people about can we get a pattern and
7  practice hearing of some sort that will finally
8  hash this stuff out so that we get some kind of
9  determination. Because people like you, whom I
10  respected, were asserting that there were
11  problems. Other people whom I respected were
12  asserting that those claims were overblown, and it
13  was extremely difficult for me to navigate through
14  those waters. So all I could do was look at the
15  facts of the case and the allegations of the
16  clients or the defendants in front of me and make
17  a judgment about what I felt about that particular
18  confession.
19  BY ATTORNEY AINSWORTH:
20     Q.  All right, sir. So respecting your
21  answer, but did you do anything to investigate the
22  background of the police officers in this case
23  when you were conducting your review?
24     A.  Well, "investigate" is a stronger word

Page 319

1  than I might use. I looked at the material you
2  provided. I believe I looked at some of the
3  decisions that you referenced. I tried to use the
4  material that you provided to me to see if I could
5  learn things that were relevant to my -- my
6  inquiry.
7     Q.  And so apart from reviewing the materials
8  I provided to you, you didn't do anything else to
9  investigate the police officers' backgrounds; is
10  that correct?
11     ATTORNEY HENRETTY:  I'm going to object. That
12  mischaracterizes his answer.
13     THE WITNESS:  Well, I just wasn't equipped to
14  investigate police officers' backgrounds.
15  BY ATTORNEY AINSWORTH:
16     Q.  And I'm not trying to quibble with that.
17     A.  Yeah, I know.
18     Q.  I'm not trying to suggest --
19     A.  So the answer is I did not do anything
20  other than what I've already testified.
21     Q.  And what I understood you to testify to
22  was you reviewed the materials that I provided to
23  you, and you did not do anything else to
24  investigate the officers' backgrounds; is that

Page 320

1  correct?
2     ATTORNEY HENRETTY:  That's not what he
3  testified to. So objection.
4     THE WITNESS:  Well, I hope I've answered the
5  question to the best of my ability.
6  BY ATTORNEY AINSWORTH:
7     Q.  All right, sir. Well, what other
8  materials did you review apart from the materials
9  I provided to you?
10     A.  On which topic?
11     Q.  On the officers' backgrounds.
12     A.  It is -- Look. It's -- It is a correct
13  statement that some officers, and I would include
14  Officers Boudreaux and Halloran, were names that
15  occurred and arose in conversation about cases
16  other than this case. Okay? So I was not unaware
17  of allegations regarding those particular
18  officers. And I tried to express the statement
19  that I made earlier that this issue was not
20  something that CIU was equipped to resolve and
21  that others needed to take this bull by the horns
22  and do something about it instead of just saying
23  that this is a problem.
24     Q.  Okay. I'm going to now show you what

Page 321

1  we'll mark as Exhibit 26.
2        (Whereupon, Rotert Deposition
3        Exhibit No. 26 was marked for
4        identification.)
5  BY ATTORNEY AINSWORTH:
6     Q.  All right. This is the supplemental
7  police report. It's the 16 pager. This
8  particular one is Bates numbered City 16 -- 1821
9  through 1836. And I want to just direct your
10  attention to page No. 12 of this exhibit, and I
11  just -- I'm wondering whether you, in your -- the
12  course of your review, whether you noticed this,
13  Mark. So on page 12, this is a recitation of what
14  Nevest Coleman told the police during his
15  interrogation right before his actual confession.
16  And I'm going to read this portion to you, the top
17  paragraph on this page.
18        It says "The reporting detectives then
19  confronted Coleman with the fact that the family
20  of victim told the detectives that the victim
21  never returned home on that night." Did he now
22  want to tell the entire truth?
23        And then I'm going to pick up, "He then
24  stated that he returned to the area, and at that

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 123 of 612 PageID #:8781

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Pages 322..325

Page 322

1    time he saw the victim Bridgeman and Chip and Dap
2    talking to the victim in the alley behind his
3    house.  He then went on to say that he then sees
4    the victim and Chip and Dap go into his basement.
5    He then stated that after a short time, he went to
6    the basement door and observed the victim orally
7    copulating Chip, and she was also engaged with Dap
8    in anal intercourse.  He then went on to say that
9    he then became frightened and ran into his
10   apartment one floor above the crime scene where he
11   remained for the rest of the night."
12          Do you see that, sir?
13      A.  Yes.
14      Q.  So we've got Nevest Coleman saying he saw
15   the victim with the other two codefendants in the
16   alley, they went into his basement, he stood at
17   the basement door, which was apparently left open
18   in early April, while they had sex with the
19   victim, giving fellatio to one of the men and the
20   other having sex with her from behind until he got
21   scared and ran away.
22          Okay.  I'm going to now direct your
23   attention to page 14 of this exhibit.  This is
24   Derrell Fulton, what the police attribute to him

Page 323

1    right before he confessed to the murder.  And it
2    says that Fulton was confronted with, you know,
3    somebody else's account.  And I'm going to pick up
4    here.  "He then went on to say that on the date
5    and time of this incident, he was in the alley
6    behind 917 West 55th Street.  He then went on to
7    say he then observed Chip and Nevest and Antwinica
8    go into the basement at 917 West 55th Street.  He
9    then stated that he stayed in the alley for a
10   short time and that he went down into the
11   basement.  And while he was standing in the
12   basement doorway, he observed the victim orally
13   copulating Chip, and Nevest Coleman was having
14   vaginal intercourse with the victim.  He then went
15   on to say that Chip and Nevest Coleman turned
16   towards Fulton and saw that Fulton was standing in
17   the doorway.  Fulton then went on to say that he
18   panicked and ran from the scene and went home."
19          Do you see that, sir?
20      A.  I do.
21      Q.  So now we have Fulton saying that he was
22   in the alley, and he saw the other two
23   codefendants with the victim in the alley; that
24   they went into Nevest Coleman's basement.  While

Page 324

1    standing at the doorway of Nevest Coleman's
2    basement, which apparently was left open in early
3    April in full view of them having sex, in which
4    the victim was giving fellatio to one while having
5    sex from behind with the other, he then got scared
6    and ran home.  Which, would you agree with me,
7    pretty much matches up with the story attributed
8    to Coleman on page 12 of the report?
9           ATTORNEY GRILL:  Objection:  Mischaracterizes
10   the exhibit.
11      THE WITNESS:  Both statements identify the
12   same four people and the same location with
13   differences in whose conduct is which.  I would
14   agree with that.
15   BY ATTORNEY AINSWORTH:
16      Q.  And would you agree that when Coleman is
17   the one whose statement it is, he's the one
18   watching from the doorway and watching the other
19   two have sex with the victim and then getting
20   scared and running away, and when Fulton is the
21   speaker, he's the one who's watching from the
22   doorway, watching the other two have sex with the
23   victim before he gets scared and running away?
24      A.  If you're asking me is that what those

Page 325

1    statements in the police report reflect, yes.
2       Q.  Okay.  And did you in the course of your
3    review ever wonder why it was that both Derrell
4    Fulton and Nevest Coleman were giving false
5    stories to the police that do not -- you know,
6    that don't exculpate themselves but are identical
7    in the respects of watching the victim having sex
8    with the other two from an open basement door in
9    early April before getting scared and running away
10   home?
11          ATTORNEY GRILL:  Objection:  Form.
12      THE WITNESS:  Well, I don't know that I would
13   frame my analysis in the terms you just used.  I
14   looked at the statements that were made by each
15   defendant.  And I looked at the circumstances that
16   were reported by the police reports and the
17   transcripts of the motion to suppress to figure
18   out what I thought about those admissions.  Those
19   were things that were part of the mosaic of stuff
20   that you look at when you're looking at this kind
21   of case.
22          So did I look at that?  Did I consider
23   that those things say what they say?  I did.
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 326..329

Page 326

1  BY ATTORNEY AINSWORTH:
2      Q.   Was it suspicious to you that both
3  defendants supposedly gave both stories in which
4  they implicate the other two in having sex with
5  the victim in the exact same way and then -- and
6  then say that those are false stories?
7      A.   No, because there was clearly sexual
8  activity going on in that basement with that young
9  lady.  And in my experience both as a prosecutor
10 and as a defense lawyer, people will minimize
11 their own behavior when they're involved in a
12 crime.
13     Q.   But is -- Go ahead.
14     A.   The fact that each of them portrayed that
15 he wasn't the worst guy involved in the crime, and
16 that he was disgusted by what he was seeing, and
17 that he left the scene before the really nasty
18 stuff started was something that was relevant.
19 But did it make me think oh, my gosh, these guys
20 must be innocent?  It did not.
21     Q.   That's not my question, sir.  I'm not
22 trying to suggest this would exculpate the two
23 defendants.  What I'm asking you, sir, is was it
24 suspicious in your mind that both defendants were

Page 327

1  telling the same false story two days apart, you
2  know, one on one day tells the exact same false
3  story that the other one tells two days later?
4      A.   Well, what's --
5      ATTORNEY GRILL:  Objection:  Form;
6  mischaracterizes his testimony.  It's
7  argumentative also.
8      THE WITNESS:  And I'm not sure I understand
9  what the false testimony is.
10 BY ATTORNEY AINSWORTH:
11     Q.   No.  The false story is that both Nevest
12 Coleman and Derrell Fulton, according to the
13 police reports, then say, Oh, sorry, that story
14 was false.  That didn't happen.  Actually what
15 happened is we raped and killed this woman.
16     A.   So did I -- I took note of that.  Did it
17 raise suspicions with me because I had never heard
18 of a person giving an initially exculpatory story,
19 but then when confronted by other information,
20 confessing that he was really guilty?  I have seen
21 that happen elsewhere.
22     Q.   No.  What I'm saying, sir, is when two
23 people, two different people give the same exact
24 story on two separate days about the same crime --

Page 328

1      ATTORNEY GRILL:  Objection:  Form;
2  mischaracterizes his testimony.
3      THE WITNESS:  Well, it doesn't mischaracterize
4  my testimony.  It mischaracterizes
5  these police reports.  They didn't give the same
6  false story.
7      Fulton said he was with a young lady who
8  didn't agree with him that he was with her.  And
9  Mr. Coleman didn't give an alibi.  They didn't
10 give the same false story, but they ultimately
11 gave congruent statements about what happened in
12 that basement.
13 BY ATTORNEY AINSWORTH:
14     Q.   I just read to you, sir, the false
15 statements I'm referring to.  I'm not talking
16 about their alibis.  I'm talking about the items
17 that I directed your attention to.  And I'm not --
18 you know, I'm not sure why you're talking about
19 other stuff.  I'm talking about the two paragraphs
20 of this report that I directed your attention to
21 where --
22     A.   Why are those -- Why are those false
23 stories?
24     Q.   Because according to the police reports,

Page 329

1  both Nevest Coleman and Derrell Fulton said,
2  That's not what happened.  I just lied to you.
3  Now I'm going to tell you the truth.  The truth is
4  this is what happened.  I actually was in the
5  basement, and I was doing all these terrible
6  things.  But according to both the police reports
7  in both instances, they are telling these lies.
8      But that wasn't anything that stood out
9  to you?
10     A.   You know, I'm not -- I might be slow
11 today.  I'm not getting this at all.
12     These two each gave a statement about the
13 events in the basement that said -- placed
14 themselves at the events in the basement.  Each of
15 them portrayed himself as a marginal participant.
16 But each of them in their statements placed
17 himself in the basement.
18     Q.   Sorry.  What I'm -- What I'm saying is
19 that after they gave these false stories, like I
20 was going to show you page 15 here, then -- and
21 then it says -- then -- now Derrell Fulton decides
22 to come clean, and he tells the whole story.  And
23 so but you know what, Mark?  If this wasn't
24 something that stood out to you, then I think

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 125 of 612 PageID #:8783

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Pages 330..333

Page 330

1   that's all I needed.
2       A.   The -- Okay.  All right.
3       ATTORNEY GRILL:  Objection:  Form;
4   argumentative.
5   BY ATTORNEY AINSWORTH:
6       Q.   Did you ever defend a murder case as a
7   criminal defense attorney?
8       A.   It's a very good question.
9       No.  I never did.
10      Q.   And when you're talking about white
11  collar criminal defense, what was the majority of
12  your practice?  Representing corporations accused
13  of SEC violations, or what kind of stuff is it?
14      A.   I defended a woman charged in the -- what
15  is still the largest tax fraud prosecution in
16  American history.  I defended an insurance broker
17  accused of trying to defraud Peoria County out of
18  money.  I defended criminal defendants who had
19  banks that went under and who were accused of
20  conversion of bank assets.  I defended criminal
21  cases involving people who were allegedly
22  violating import laws.  So I -- I would say that
23  my career at Winston was oriented mostly toward
24  corporate representations, which is why I left.

Page 331

1   And when I was in private practice running my own
2   firm, I represented exclusively humans that were
3   in trouble.
4       Q.   Did you ever defend somebody against
5   Class X charges?
6       A.   Yes.  But it's only because the Attorney
7   General of Illinois overcharges like crazy and
8   charged Class X cases that had no business being
9   so charged.  So the answer is yes.
10      ATTORNEY MEADOR:  Move to mark that portion as
11  confidential of the dep.
12      THE WITNESS:  I don't mind if that's public.
13  I'm still mad about that.
14      But go ahead.
15  BY ATTORNEY AINSWORTH:
16      Q.   I guess what I'm saying is did you ever
17  defend a client against a rape charge?  Aggravated
18  criminal sexual assault to be specific.
19      A.   Not in a criminal context.
20      ATTORNEY AINSWORTH:  I don't have any further
21  questions for you, sir.
22      ATTORNEY HENRETTY:  I think we're way over
23  now, so I think we're done.
24      I think we'll reserve.  Madam Court

Page 332

1   Reporter, can we get a copy?  Or can we order -- I
2   don't know if anybody else is ordering.
3       THE WITNESS:  Oh, there's Mr. Grill.  I
4   haven't seen him all day.  Hello, Mr. Grill.
5       ATTORNEY GRILL:  How are you?
6       THE COURT REPORTER:  Let's go off the record,
7   shall we?
8       (Whereupon, a discussion was had
9       off the record.)
10      THE VIDEOGRAPHER:  We're going to go off the
11  record at 6:48.
12      (Off the record at 6:48 p.m. CST.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 333

1           IN THE UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4   DERRELL FULTON, AKA DARRYL   )
    FULTON,                      )
5           Plaintiff,           ) Case No. 17 CV 8696
        v.                       ) Hon. J. Pacold
6   CITY OF CHICAGO, et al.,     ) Mag. J. Harjani
            Defendants.          )
7   ---------------------------  )
    NEVEST COLEMAN,              )
8           Plaintiff,           ) Case No. 18 CV 998
        v.                       ) Hon. J. Pacold
9   CITY OF CHICAGO, et al.,     ) Mag. J. Harjani
            Defendants.          )
10
11      I, MARK ROTERT, being first duly sworn, on
12  oath say that I am the deponent in the aforesaid
13  deposition taken on March 19, 2021; that I have read
14  the foregoing transcript of my deposition,
15  consisting of pages 1 through 333 inclusive, and
16  affix my signature to same.
17
18  _____
                MARK ROTERT
19
20  Subscribed and sworn to
    before me this        day
21  of              , 2021
22
23  Notary Public
24

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Pages 334..337

Page 334

```
 1   STATE OF ILLINOIS      )
 2                          )  SS:
 3   COUNTY OF C O O K      )
 4        I, TRACY JONES, a Certified Shorthand
 5   Reporter within and for the County of Cook County
 6   and State of Illinois, do hereby certify that on
 7   March 19, 2021, there appeared before me via Zoom
 8   videoconference MARK ROTERT, in a cause now
 9   pending and undetermined in the United States
10   District Court for the Northern District of
11   Illinois, Eastern Division, wherein DERRELL
12   FULTON, et al., are the Plaintiffs, and CITY OF
13   CHICAGO, et al., are the Defendants.
14        I further certify that the said MARK ROTERT
15   was first duly sworn to testify the truth, the
16   whole truth and nothing but the truth in the cause
17   aforesaid; that the testimony then given by said
18   witness was reported stenographically
19   by me and afterwards reduced to typewriting by
20   Computer-Aided Transcription, and the foregoing is
21   a true and correct transcript of the testimony so
22   given by said witness as aforesaid.
23        I further certify that the signature to the
24   foregoing deposition was reserved by counsel for
```

Page 335

```
 1   the respective parties.
 2        I further certify that the taking of this
 3   deposition was pursuant to notice and that there
 4   were present at the deposition the attorneys
 5   hereinbefore mentioned.
 6        I further certify that I am not counsel for
 7   nor in any way related to the parties to this
 8   suit, nor am I in any way interested in the
 9   outcome thereof.
10        IN TESTIMONY WHEREOF:  I have hereunto set
11   my hand and affixed my notarial seal this 5th day
12   of April 2021.                               -
13
14
15
16        _____  _____
17        TRACY JONES, CSR, RPR, CLR
18        LIC. NO. 084-004553
19
20
21
22
23
24
```

Page 336

```
                    ERRATA SHEET
CASE NAME:        FULTON, et al. v.
                  CITY OF CHICAGO, et al.
CASE NUMBER:      17 CV 8696; 18 CV 998
WITNESS:          MARK ROTERT
REPORTER:         Tracy Jones, CSR, RPR, CLR
     I wish to make the following changes for the
following reasons:
PAGE    LINE
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
```

Page 337

```
PAGE    LINE
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
_____  _____
CHANGE:_____
               REASON:_____
     In accordance with Supreme Court Rule, the
above corrections are made to correct an error in
the reporting or transcription of my answer(s).
Signed:_____Date:_____
```

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Page 338

Page 338

```
                8260 Bromley Street
            Orland Park, Illinois 60462
                   312.535.2542
                      lit3c.com
April 5, 2021
COOK COUNTY STATE'S ATTORNEY'S OFFICE
JESSICA SCHELLER, ESQUIRE
500 Richard J. Daley Center
Chicago, Illinois 60602
IN RE: Fulton, et al. v. City of Chicago, et al.
COURT NUMBER: 17 CV 8696; 18 CV 998
DATE TAKEN: March 19, 2021
DEPONENT: MARK ROTERT
Dear Counsel:
Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause. Also enclosed are additional signature
pages, if applicable, and errata sheets.
Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature.  All changes or corrections must be
made on the errata sheets, not on the transcript
itself.  All errata sheets should be signed and
all signature pages need to be signed and
notarized.
After the deponent has completed the above, please
return all signature pages and errata sheets to me
at the above address, and I will handle
distribution to the respective parties.
If you have any questions, please call me at the
phone number below.
Sincerely,
Tracy Jones, CSR, RPR, CLR
Certified Shorthand Reporter
Cc: All counsel of record.
```

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: $50,000..22

**Exhibits**

**Exhibit 1** 4:10 30:20,22

**Exhibit 2** 4:11 39:4,11 315:22

**Exhibit 3** 4:11 73:19

**Exhibit 4** 4:12 83:15,18

**Exhibit 5** 4:12 90:3,5

**Exhibit 6** 4:13 93:19,21

**Exhibit 7** 4:13 98:17,19

**Exhibit 8** 4:14 112:12,16 184:24
185:15,24 186:13 187:11 188:23
190:16 191:17 192:23 193:4 208:12
256:14 308:19

**Exhibit 10** 4:15 154:5,9

**Exhibit 12** 4:16 199:8,12

**Exhibit 13** 4:16 202:14,16

**Exhibit 15** 4:17 218:24 219:2

**Exhibit 16** 4:18 250:24 251:3,8

**Exhibit 17** 4:18 258:9,11

**Exhibit 18** 4:19 259:19

**Exhibit 19** 4:19 261:10 262:4

**Exhibit 20** 4:20 262:14 263:11

**Exhibit 21** 4:20 268:4,6

**Exhibit 22** 4:21 278:11,15

**Exhibit 23** 4:21 296:10,14

**Exhibit 24** 4:22 300:15

**Exhibit 25** 4:22 313:5,7,10,24

**Exhibit 26** 4:23 321:1,3

**$**

**$50,000** 205:2

**0**

**084-004553** 5:4 335:18

**1**

**1** 30:20,22 134:17,22 210:3 219:8
220:6 281:8 333:15

**10** 26:20 72:17 134:9 136:13 154:5,9
200:3

**10:00** 100:24

**10:05** 5:6

**10:43** 30:5

**10:52** 30:9

**11** 13:19 139:16 157:22 180:23 181:3
185:2,4 186:8,19 188:16 191:11
192:23 193:2,3,11 208:13 241:3
256:15 263:13 308:19

**11265** 261:20

**11450** 263:2

**116-3** 82:18 89:21,24 92:17

**11:48** 72:19

**12** 13:18 138:12 199:5,8,12 321:10,13
324:8

**12:01** 72:23

**12:58** 112:5

**13** 14:23 88:20 139:15 202:14,16
297:8

**14** 88:20 159:21 209:20,21,23 210:2
308:23 322:23

**15** 142:13,18 200:3 218:24 219:2
263:19 329:20

**16** 49:3 94:12 250:24 251:3,8 306:14
321:7,8

**1628** 268:12

**1629** 268:13

**1630** 258:18

**1631** 258:18

**1632** 260:3

**1633** 260:3

**17** 5:12 201:7 202:20 205:1 208:24
211:21 212:9 258:9,11 333:5

**17th** 237:21

**18** 5:13 142:19 259:17,19 333:8

**180** 155:22

**180,000** 281:8

**1821** 321:8

**1836** 321:9

**19** 5:5 156:8 261:10 262:4 333:13
334:7

**1919** 39:5

**1929** 73:23

**1977** 14:13

**1987** 12:18 14:13

**1991** 13:10

**1994** 12:18 15:10 155:8 168:2 213:16
259:1,11,14 264:9 268:19

**1996** 260:8,23

**1998** 264:13,14,18 265:8

**1:00** 111:14

**1:13** 112:9

**1st** 16:8 21:10 197:2 209:11 212:9
217:22 218:17 232:23 237:22 268:19

**2**

**2** 39:4,11 90:16 101:14 127:8 301:10
315:22

**20** 149:18 157:20 200:3 262:14 263:11

**2004** 15:10,23

**2007** 16:1,4

**2013** 84:8

**2016** 90:16 94:12 139:16

**2017** 11:10 16:8,10,11 21:10 37:21
39:22 47:1,2 70:20 71:8,21 72:10
74:24 100:23 102:2 113:11 117:20
122:24 141:12 150:1 157:22 159:21
180:12 195:4 196:14 200:11 201:7
202:20 205:1 207:14 208:24 209:11
210:3 211:21 212:9 216:17 217:22
218:17 219:8 220:6 232:18 237:21,22
240:9 251:20 278:18 279:5 285:17
313:20

**2021** 5:5 333:13,21 334:7 335:12

**209** 251:9

**21** 268:4,6 285:2

**214-01** 313:14,18

**217** 251:10

**21st** 232:18

**22** 163:11 174:13 278:8,9,11,15

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 129 of 612 PageID #:8787

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: 23..accompanied

**23** 276:2 296:8,10,14

**23-page** 119:14

**24** 196:10 300:12,15

**24th** 260:8

**25** 313:5,7,10,24

**26** 321:1,3

**26th** 211:19

**27387** 29:24 31:4 32:19

**27388** 30:1 31:5

**27th** 40:1,4

**28th** 285:17

**29th** 278:18 279:5 280:21

**2:16** 152:11

**2:25** 152:15

**2nd** 13:13 15:22 259:1

---

**3**

**3** 45:11 73:16,19 86:3 87:2 113:11
251:19 301:12

**30** 152:3

**302** 314:21,23

**314** 307:20

**333** 333:15

**3482** 98:24

**3:06** 178:16

**3:20** 178:20

**3B1** 279:24 280:5

**3C** 5:4,16

**3rd** 122:24 141:12 180:12 195:3
280:21

---

**4**

**4** 83:15,18 100:23 128:19 279:21
301:12 306:2 314:3 315:7

**404(b)** 249:15

**4091** 265:1

**41st** 260:15,23

**43rd** 265:4

**45th** 264:3

**492** 203:5

**4:41** 235:4

**4:50** 235:8

---

**5**

**5** 90:3,5 130:24 306:3

**5/116-3** 91:6

**50** 39:24

**55th** 175:21 176:5,7,12 323:6,8

**5643** 112:13

**5765** 154:6

**5959** 313:12

**5:47** 284:20

**5:51** 284:24

**5th** 335:11

---

**6**

**6** 59:11 93:19,21 306:5

**6092** 313:12

**628** 268:12

**629** 268:12

**63** 181:13

**6734** 259:5,9

**676** 261:14

**677** 261:14

**6:16** 309:11

**6:20** 309:15

**6:48** 332:11,12

---

**7**

**7** 98:17,19 102:2 313:20

**725** 91:6

**730** 260:15,23

---

**8**

**8** 112:12,16 178:24 179:1 184:24
185:6,15,24 186:13 187:11 188:23
190:16 191:12,17 192:23 193:4,11
196:14 208:12 256:14 276:24 308:19

**8/16** 301:19

**84** 184:22

**85** 181:13 184:22

**8696** 5:12 333:5

---

**9**

**9** 84:8 133:23 134:9 151:24 152:1
153:22 154:2 200:10 296:19 297:8
307:19

**90** 11:7 26:16

**917** 323:6,8

**92** 13:10

**94** 270:11

**998** 5:13 333:8

---

**A**

**A-D-D-U-C-I** 23:4

**a.m.** 5:6 30:5 72:19 100:24

**abandoned** 264:24 316:4

**abducted** 264:3 299:17

**ability** 64:2 207:14 211:18 216:3
320:5

**aboard** 102:11 312:4

**absolute** 241:5

**absolutely** 32:4 133:12 140:16
214:15 223:2

**abused** 134:13

**accept** 90:18 124:6 170:20 174:21
232:14 277:22 295:12

**accepted** 16:11

**accepting** 34:17

**accommodating** 7:24 30:12

**accompanied** 158:14

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 130 of 612 PageID #:8788

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: accomplish..amend

**accomplish** 20:2 41:3,5

**account** 171:15,16 174:3,9 323:3

**accounting** 170:17

**accounts** 200:5

**accurate** 33:23 40:18 48:9 55:10 56:5 62:19 65:10 69:5,7 70:8,15,19 71:5,19 72:8 80:14 101:4,8 116:14 123:24 133:6 139:13 140:4 157:22 158:17,18 162:14 164:23 165:4,19 169:2 171:3 173:1 175:15 177:19 180:8,20 196:15 197:2 198:13 216:13 220:15,17 221:10 305:12

**accurately** 35:9 120:18 123:15

**accused** 247:18 330:12,17,19

**acknowledge** 164:2 178:1 185:14

**acknowledged** 176:18

**acquainted** 75:24

**act** 28:8 31:5 168:15

**acted** 244:24 245:13

**acting** 242:14 243:1,2

**action** 35:1 51:6 53:1,3

**actions** 192:11

**active** 82:3 168:2,16

**activity** 326:8

**actual** 27:20,24 32:21 47:19 55:22 56:15 57:7 62:15 64:11 66:12 69:16 83:8 123:22 180:1 184:5 188:18 234:18 238:21 239:3 272:13 311:23 321:15

**Adams** 156:9,10,15 157:10

**add** 12:13 25:7 58:18 59:10 63:11 68:7 88:19 178:3 191:9

**added** 179:16 182:12

**adding** 66:15

**addition** 63:5 66:17

**additional** 62:23 89:20 90:1 111:10 130:5 142:8 236:4

**address** 7:1 21:20 39:24 40:18 42:4, 17 43:16 87:20 88:20 102:15 178:13 190:18 223:18 259:4 260:14,23 261:20,24 263:1,7

**addressed** 46:5,6 60:3,6 78:16 153:22 168:22 169:3 220:1

**addresses** 49:4

**addressing** 22:14 171:19

**Adduci** 23:4

**admissions** 108:9 135:13,17 272:19 304:9 325:18

**admit** 276:15

**admittedly** 132:21

**admitting** 306:22

**adult** 266:19

**advance** 170:12

**advantage** 274:11 277:21

**advice** 26:3

**advise** 89:12 169:7 233:22 285:3

**advised** 19:24 82:8,24 83:7 84:19 104:9 129:19 155:5 176:8 203:21,22 218:2

**advises** 203:5

**advising** 196:24

**advocate** 196:4

**affect** 142:10 186:11 187:3 287:22

**affected** 168:17

**affidavit** 162:10

**affirmative** 45:7 162:3

**affix** 333:16

**affixed** 335:11

**afford** 27:13

**afield** 294:10

**aforesaid** 333:12 334:17,22

**afraid** 161:13

**African-american** 281:6

**afternoon** 246:3

**ages** 33:14

**aggravated** 103:21 331:17

**agree** 32:5 49:9 60:5,17 66:24 67:2,19 77:23 88:22 122:17 124:16,24 137:6 153:7 158:20 187:2 191:10 203:14 208:16 211:20 242:13 252:7 255:8 260:4 263:24 265:18 267:11 274:7 278:17 282:7 286:5 287:11 290:22 297:15 299:3,4,9 324:6,14,16 328:8

**agreeable** 299:13

**agreed** 16:4 31:24 32:1 49:10,12 91:5 153:1 256:12 305:5

**agreeing** 27:10 124:14 232:22

**agreement** 5:19 114:2 116:23 123:6

**agrees** 153:11

**ahead** 28:2 36:14 51:18 135:7 145:18 148:1 155:10 182:5 197:23 198:14 206:11 240:3 241:1 244:9 248:18 259:23 296:2 326:13 331:14

**aimed** 192:19 242:20

**Ainsworth** 6:1 11:21 26:21 28:24 29:5,9 97:21 104:13 111:24 114:7 115:19 125:8 126:3 127:2 135:22 141:18 153:9 161:14 202:22 218:21 224:1 237:9 240:21 249:24 250:11 251:19 295:24 296:4 306:6 308:22 309:5,20 310:2 312:1,13 313:3,9 315:16 318:19 319:15 320:6 321:5 324:15 326:1 327:10 328:13 330:5 331:15,20

**Ainsworth's** 22:21

**aisle** 37:7 317:22

**AKA** 333:4

**alerted** 314:15

**alibi** 85:9 156:12,16,20,23 157:2,3,7 160:20 161:10 162:2,4,11,21,23 328:9

**alibis** 328:16

**allegations** 122:11 246:16 249:4 252:6,16,19 316:12 318:15 320:17

**alleged** 135:13

**allegedly** 330:21

**alleging** 89:19

**alleles** 103:7 105:18 276:1

**alley** 322:2,16 323:5,9,22,23

**allocation** 207:15

**allowed** 58:15 86:6,19 137:8 292:3

**allowing** 49:6,8 205:14

**ally** 177:4

**alternative** 174:14

**ameliorate** 34:19

**amend** 53:10 143:19

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 131 of 612 PageID #:8789

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: American..assist

**American** 330:16

**ample** 286:6

**Amy** 6:7 235:12 242:9

**anal** 322:8

**analgized** 276:20

**analogous** 79:23 126:21 192:9

**analogy** 276:18

**analysis** 26:14 29:21 86:7 115:17 116:9,19 118:5 146:5 147:13 167:7 173:9 188:3 265:15 270:7 280:13,17 325:13

**analyst** 100:11

**analyzed** 110:2

**analyzing** 110:9

**Andrew** 6:9,24

**angle** 88:3 96:22

**angst** 304:9

**ankles** 175:1 294:2

**answering** 51:16 124:22

**answers** 158:18 159:2 160:13

**anticipate** 73:2 142:8 169:15

**anticipated** 136:7

**Antwinica** 85:10,18 102:8 106:8 129:8 144:3 145:4,5 282:11 286:12 287:14,21 288:14 294:17 295:2,10 297:4 323:7

**anxious** 150:17

**AP** 263:23

**apartment** 127:14 128:7 316:5 322:10

**apex** 231:6

**apologies** 84:1 310:22

**apologize** 70:13 119:18 131:2 163:21 178:22 217:18 249:13 305:1

**apparent** 148:21 291:15

**apparently** 103:3 121:13 133:9 182:8 233:4,5 306:15,24 322:17 324:2

**appeals** 15:4,6

**appearance** 7:1 208:23 217:22

**appearances** 196:9

**appeared** 126:18 127:5 132:2 136:11 142:22 198:3 201:6 202:21 317:19 334:7

**appearing** 6:2 7:22 8:2 196:23 201:23 202:2

**appears** 31:15 90:14,23 101:5 154:19 181:7 196:12 199:14 200:12 204:5 205:3 251:18 268:18 278:17 294:19

**appellate** 15:5

**appended** 179:14

**applicable** 49:22 118:13 231:9

**applicant** 74:10,11

**applicants** 75:6

**application** 57:1 58:6 66:9,21 67:2, 15 74:14 75:6,10,20

**applications** 117:11

**applied** 49:13 56:20,21 59:4 60:12 61:10 67:4,7 237:13

**applies** 77:15 288:21

**apply** 59:19 148:5 237:4,10 299:1

**applying** 237:4 239:4

**appointed** 91:20

**appointment** 16:11

**apprehensive** 304:18

**apprised** 85:21 92:20

**approaching** 297:2

**approval** 114:5,12

**approximately** 281:8

**April** 14:4,5 19:11 37:22 54:4,13 65:15 114:16 115:16 116:6,11 117:2, 24 118:5 183:10 193:22 194:10,24 209:1 227:15 238:12 311:5,11 322:18 324:3 325:9 335:12

**area** 12:19 16:18 79:12 85:3 104:19 131:11 132:10 134:17,22 143:2,6 161:17 247:13 265:5 321:24

**argue** 144:16

**arguing** 58:21

**argument** 59:5 269:2

**argumentative** 266:4 273:22 282:13, 14 292:12 327:7 330:4

**arose** 320:15

**arrest** 257:13,16 258:21 260:5,7,14, 23 261:17 262:20 268:18

**arrested** 108:8 258:24 260:19 268:22

**arrival** 312:11

**arrived** 13:24

**article** 198:20 199:13 200:10,13

**articulated** 25:13,15

**ASA** 85:22 90:21 96:16 101:7,17 113:6,24 115:17 134:14 137:5 138:3 139:24 140:5,14 243:2

**ASAS** 102:2

**asks** 26:6

**aspect** 96:24 224:20

**aspects** 170:22

**aspirations** 36:16

**assailant** 294:1

**assault** 103:22 130:14 142:15 143:16 144:2 145:3,4,6,10 174:12 274:17 282:10 295:15 331:18

**assaulted** 173:19

**assaults** 144:11 145:21 257:20 263:17 266:9,11 267:20,24 268:2

**assembled** 22:8 74:9

**assert** 55:22 69:16 216:16

**asserted** 138:22 167:11 179:12 317:16

**asserting** 45:8 123:22 136:9 186:21 318:10,12

**assertion** 50:23 57:13 85:20 129:24 146:15 290:15 310:18

**assertions** 36:5 103:10 128:12 250:3 299:12

**assess** 98:13 159:5

**assessed** 53:12

**assessing** 159:9

**assessment** 53:13 159:11

**assets** 330:20

**assigned** 22:1,24 51:20

**assist** 92:6

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 132 of 612 PageID #:8790

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: assistance..back

**assistance** 14:21 28:13

**assistant** 16:12 21:13 23:9,13,18 38:2 51:21 82:6 84:21 92:5 114:14 116:24 195:19 201:16,22 207:16 239:9 242:15 314:16

**assistants** 22:8 82:1

**assisted** 114:22

**associate** 99:7

**association** 5:15

**assume** 7:4 21:12 107:6 108:20 177:16 196:9,19,20 208:13

**assuming** 307:6

**assumption** 140:1

**assumptions** 35:5

**assure** 241:5

**assured** 138:3

**attache** 100:6

**attached** 100:4 151:10 179:6

**attempted** 135:15

**attempting** 130:11

**attention** 83:5 97:18 143:20 179:5 236:5 237:19 279:14,15 281:13 321:10 322:23 328:17,20

**attorney** 5:22 6:1,5,7,9,14,16,20,24 7:2,14 8:8 14:9,20 16:12 19:12 20:1,6 21:13 23:10,13 24:21 25:1,3,6,17 26:1 28:1,10,24 29:1,3,5,8,9,23 30:10 31:1 33:19,24 34:1,4,6,7,8,10,13,14, 16,22 36:12,19 38:5 39:13 42:23 43:6, 22 44:17,21,23 45:4,10,16 46:2,10,15 48:10,13,16,19,20,22 49:1,9,23 50:7, 9,10 51:10,14 52:4,14 53:15,16,22 54:2,5,10,16,21,22 56:22 57:3,4,11, 12,15,24 58:4,9,11,17,18,20 59:10 60:5,16,20,23 61:7,14,16,18 62:11,12 63:13,16,17 64:6 65:14,17,23 66:1,3, 4,7,13,24 67:20,22 68:1,7,9,11,15 70:4,10,11,12,14 72:15,24 73:7,8,21 75:8,12,14 77:4,9,14,16,17,19,22 78:5,7 79:6,13,17,19 80:8,9,20 81:1, 14,20 82:7 83:20 84:21,23 85:1,6 86:1,10,12,14,16,17,21 87:1,19 88:9, 11,13,18,23 89:2,4,10,11,18 90:7 91:20 93:23 95:11,13,15 96:8,17,19 98:21 104:13,20 111:14,24 112:10,18 114:7,10,11,24 115:3,5,19,21 116:1, 12 117:3,7,12,17 118:7,16,18,20

121:16,20 125:7,8,12,18,19 126:1,3, 12 127:1,2,6 130:7,9 132:16 133:3,8, 12,13,22 134:19 135:6,18,22,24 136:12 141:18 142:11 144:4 145:1,15 146:2 147:23 148:8,12 149:11 151:18, 21 152:1,2,16 153:7,9,10,12,17,19,20 154:4,11,23 155:2,9 156:1 158:5 159:13 161:9 163:12,15,17,19,22 167:3 172:2 178:12,21,24 179:1,2 180:24 181:5 182:3,14,21 183:2,11 184:11,16,19 187:4,5,6 193:24 194:1, 4,11 195:1,5,11,12,13,14 197:15,18, 19,20,22 198:11,18 199:5,10 200:14, 16,18,20,23 201:2,24 202:1,11,18,24 203:2,3 204:4,6,10,13,18,20,22,23 205:15,17 206:1,5,7,9 207:2,4,5,6,9 208:11 209:2,4,20 210:1 211:4,8,15 212:1,3,6,12,16,20,23,24 213:2,8,11 214:2,6,7,9,10,13,15,16,17,22,24 215:5,11,13,14 216:9 217:4,8,10,11, 14,17 218:4,5,8,9,14 219:4 220:22,23 221:3,13,14 222:3,4,14,15,16,20,22, 23 223:6,11,14,16,19,23 224:1,2,5,12, 15 225:13,18,20 226:15 227:5,8,9,10, 17,21 228:2,5,6,21 229:10,15,22 230:1,5,10,12,15,23,24 231:5,8,11,15, 18,20 232:6,7 233:15 234:6,8,22 235:9,14,18 236:3,8 237:8,9,11 238:18,19 239:1,6,7,9,10,16 240:1,4, 10,21,23 241:7,16 242:6,8,12,15,17, 23 243:9,11,12,19,24 244:1,2,4,5,6,9, 11 245:2,3,8,16,17 246:1,3,8,23 247:22 248:3,10,16,18,19,23 249:1,7, 10,12,14,18,20 250:14,18,22 251:5 252:9,12 254:10,16,24 255:1,15,20,24 256:5,6,16,18,22 257:8,12 258:5,6,7, 13 259:21 261:12 262:7,8,9,11,16 264:19,21 265:22 266:1,4,6,7 268:8 270:2,8 271:19 272:5,12,15,17 273:1, 21 274:4 275:14,16 276:8,14 277:5 278:7,13,21 279:2,4,8 280:8,15,16,19, 22,23 282:12,14 283:2,20,22 284:5,8, 11,15 285:1 287:24 288:6,15 289:6,9, 11,14,16,19 290:3,5,6,8,12,18,20 291:4,8,23 292:1,7,12,14 295:22,24 296:1,4,7,12,16,18 297:20,22 298:7, 10 299:5,7,8,10 300:11,17 302:15,19 303:4,7,8,10,15,17 308:6,11,22 309:1, 5,7,16,20 310:2 311:18 312:13 313:3, 9 314:16 315:11,16 317:11 318:19 319:11,15 320:2,6 321:5 324:9,15 325:11 326:1 327:5,10 328:1,13 330:3,5,7 331:6,10,15,20,22 332:5

**attorney's** 6:22 9:14,18 12:5,7,16,17, 20 13:6,23 14:6 16:3 17:21 18:4,7,13 21:1,9 24:19 28:22 31:13,21 32:19,23

37:20 38:7 42:8,24 43:5,7 46:11 57:13 59:14 60:1 64:17 65:9 71:2,14 76:14, 21 79:4 80:4,11 87:12 91:3 92:22 118:10 121:7 122:17 153:3,10 157:17 163:14 181:8 183:18 192:4 197:15 203:9 204:15 208:16 209:13 219:6 221:17 222:6 226:17 229:2,7 232:21 233:3 237:20,23 238:4,13 254:7 288:18 317:23

**attorneys** 9:1 20:1 23:19 139:17 160:3 218:16 335:4

**attribute** 37:8 275:4 322:24

**attributed** 33:17 103:11 128:15 324:7

**attributing** 131:22

**audiotape** 308:3

**August** 46:23 251:19 285:17 313:20

**AUSA** 14:2

**authored** 279:6

**authority** 255:18 256:2

**authorized** 60:14

**avoid** 18:9

**award** 226:13

**awarded** 226:3

**aware** 34:11 36:10 43:10 53:17 54:18 76:6,10,12,20 78:11 80:16,22 81:4,22 85:2,7,11,15,19 89:21 91:23 92:10,14, 19 94:24 98:8 103:14,23 104:2 106:7, 10,11,19 107:2,7,16,19,20 108:17 109:5,11 110:17 111:9 116:23 118:24 128:4 137:17,19,22 144:23 156:5 161:3 191:2 194:19 197:13,20 198:7, 19 199:15 201:5,9,14,21 209:10,15 211:1 213:9,22 216:20,22 217:2,20 218:1 229:7 234:15 236:11 237:19,22, 24 238:2 247:23 270:4 274:22 281:18, 24 282:1 283:23 287:16 302:17 312:1

**awareness** 26:9

**awful** 41:15

---

**B**
---

**back** 30:9 50:2 56:8 58:1,12 68:4 72:22 81:15 88:5 92:7 108:11 112:8 131:5,10 132:9 133:11 142:5 152:14 155:8 159:14 171:9 173:24 178:19,21 183:6 191:17 208:12 214:16,18 235:7 236:9 238:14 239:10,11,21 246:22

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 133 of 612 PageID #:8791

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: backdrop..broker

259:11 274:6 284:23 293:13,19 294:8 298:3,9,17,18 299:20 302:24 303:12 309:14

**backdrop** 135:17

**background** 312:20 317:8 318:22

**backgrounds** 319:9,14,24 320:11

**bad** 16:17 247:14,15 283:14 301:2,4 318:3

**ball** 215:23

**bank** 330:20

**banks** 330:19

**bar** 17:16 105:5

**Barber** 150:6

**baseball** 276:21,22

**based** 25:1 35:5 36:1,11 44:21 50:3 52:7 53:5 54:13 56:16 57:8,12 58:9 60:21 61:14 62:15 68:9 69:1,11,17 73:3 75:12 77:5,16 83:1 86:10 88:11 89:6,10 96:7 114:24 117:7 118:16 130:6 132:1 134:4 135:3 140:14 145:16 162:17,19 165:8 180:11 181:6 196:12 205:10 242:13 248:23 253:10, 20 257:1 285:13 289:18 290:15 304:22

**basement** 108:19 111:11 177:2,7,9, 11 294:17,21 295:8,9,11 299:18 322:4,6,16,17 323:8,11,12,24 324:2 325:8 326:8 328:12 329:5,13,14,17

**bases** 115:10 249:19

**basically** 89:24 272:1

**basis** 48:19 62:24 63:19 89:19 116:19 118:8 125:5,15 127:19 129:24 226:12 243:15,16 247:11,19 250:20 303:12 312:22

**Baskervilles** 150:16

**Bates** 32:13 39:5 98:23 251:9 261:13 278:22,24 313:11 321:8

**baton** 206:16 309:17

**bear** 30:13 39:9

**bed** 197:9

**beer** 106:16

**befriended** 16:3

**began** 26:9 38:14 148:17 294:18

**begin** 97:16 189:8

**beginning** 5:20 55:14 119:4 127:9 139:5 271:18 273:12

**begins** 128:19

**begs** 170:13

**begun** 44:24

**behalf** 5:23 6:2,5,7,9,15,16,21 8:1 43:6,12 177:17 202:22

**behavior** 147:22 245:7 326:11

**belief** 33:24 34:24 86:17 180:3 186:23 189:24

**beliefs** 32:6

**believed** 36:24 37:4 85:17 89:17,20 226:9 255:14

**believer** 205:18

**believing** 150:21

**bench** 22:22 105:5

**benefit** 158:21

**bias** 35:4

**big** 20:10 74:1 90:9 98:10 183:7 283:1

**bigger** 73:12

**bill** 277:1 314:1

**bills** 16:20

**birthday** 127:9

**bit** 8:24 12:4 31:17 47:16 55:14 113:17 116:3 119:3 152:18 155:4 163:24 164:1 167:21 169:5 236:11 252:24 274:6 294:9

**bite** 150:18

**bitter** 40:15

**Blackstone** 176:4,21 177:4 257:6 259:14 261:2 264:14 265:13 266:18

**blanche** 67:14

**bled** 129:4,13

**blessed** 186:19

**blood** 270:12

**blue** 276:20,22

**board** 26:5 264:10

**bodily** 129:2,11 282:20

**body** 130:15 132:4 174:4 294:8

**Bogira** 232:12

**bold** 30:17

**bond** 205:19 206:20

**bono** 26:23

**books** 78:24

**boon** 272:8

**boots** 294:2

**border** 176:3,9,16

**borders** 264:9

**bore** 271:11

**borne** 184:1,2

**bother** 81:9 199:21

**bottle** 40:21 111:11

**bottom** 31:17 32:9,13 102:5 105:23 191:18,24 240:18 276:4

**Boudreaux** 315:5,24 316:22 320:14

**boulevard** 175:18,21,23 316:5

**boutique** 16:6

**boyfriend** 150:3

**Brady** 28:13

**break** 8:20 30:6 72:16,20 111:15 112:6 116:3 132:20 133:10,14 152:4, 12 153:1 178:12,17 234:24 235:2,5 309:9,12

**breath** 200:8

**Brewer** 23:16

**Bridgeman** 85:10,18 102:9 106:9 129:8 144:3,10,12,18,22 145:5 164:21 166:24 168:21 176:20 225:3 282:11 285:19 286:12 287:14,21 288:14 294:18 295:2,10 297:4 322:1

**Bridgeman's** 269:13 270:1

**briefing** 45:23

**briefly** 11:4 41:21 252:24 284:18 294:21 300:6 301:14 308:10

**bring** 19:6 29:24 179:5

**bringing** 190:4,5

**broad** 21:23

**broker** 330:16

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 134 of 612 PageID #:8792

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: Brooklyn..characterization

**Brooklyn** 20:11

**brought** 51:1 65:7,21 83:4 97:17 104:18 126:8 132:9 243:22 273:7 279:13 281:13,18 292:20 310:10

**brutal** 173:15,17 177:11

**brutality** 144:17,21 174:1

**brutalized** 173:20

**Bruton** 108:10 272:20

**build** 33:21

**building** 202:9 264:24 305:4

**bulk** 271:23

**bull** 320:21

**bully** 282:15

**bunch** 308:16

**burden** 41:1 126:11 221:20 222:7,18

**business** 16:21,23 76:18 206:19 216:19 331:8

---

**C**

**calculated** 281:5

**California** 211:19

**Calimee** 127:13 128:7

**call** 44:6 100:24 101:3 102:2,11,12

**called** 7:11 12:22 16:6 119:10 134:15, 19 142:14 225:24 233:7

**calls** 101:16 242:18 244:2 291:5 297:21

**candidates** 19:16

**candor** 19:14

**cans** 106:16

**cap** 276:21

**capabilities** 185:11

**capable** 97:12 144:20

**capacity** 242:3,14

**capital** 23:8

**caps** 276:23

**caption** 42:16 66:12

**capture** 158:19

**car** 159:14

**cared** 220:3

**career** 12:6,11 37:5 330:23

**careful** 203:7 228:24

**carefully** 123:20 140:17,20

**Carolina** 148:18 306:9

**carte** 67:14

**case** 5:12 10:10 13:11,21 35:4 48:8, 12,14,18 49:14,15 50:12,13 51:3,4 52:9 53:6,8,11 57:2,6 59:1,6,20 60:10 61:10,11 64:5 65:24 66:9,19,23 67:4, 5,7,8,13 72:4 74:13 75:10,24 82:2,22 83:6,10 84:9 90:13,14,23 91:4,15 93:1,2 94:22 95:2 96:15,24 97:18 98:7,12 99:21 100:3,20 101:5 102:19 105:10,24 108:13,16 113:23 116:19 118:12 119:20 121:9 124:6,10 125:1 130:13 139:1,17 143:13 145:14 148:22 149:17 155:20 162:10 164:3, 10 170:23 171:8 176:18 181:20 186:11 187:3 190:11,20 191:5,13,14 192:13,15 195:18 196:13 198:2,6 201:7,9,17,19 205:3 206:24 207:21 209:2 213:16,20 214:5 215:10 216:12 224:17,24 225:5 228:15 242:22 243:6 247:3 248:7,21 250:11 252:3,14 253:15 270:16 272:23 274:17 278:3 280:14 281:17 287:17 289:2 293:15 302:20 305:4 310:22 314:4,18 316:10 317:10,18 318:15,22 320:16 325:21 330:6 333:5,8

**case-by-case** 29:20

**cases** 7:17 9:24 10:8 13:4 14:16,22, 24 17:7,15,23 18:16 24:20 25:5,12,14, 19,21 26:4,8 27:5,10 33:13 37:3,4 38:8 55:15 57:21 58:6 60:13 61:11 65:1 75:4 76:8 78:13 79:5 80:4,12,18 81:23 92:21 117:4,9,10,15 142:16 143:11,17 144:2 145:3,6,10,11 146:1 149:13 192:11 197:7 200:3 210:16 216:5 219:19,21 223:1 236:21 247:23 250:4 283:23 317:9,15,19 320:15 330:21 331:8

**catalog** 145:20

**catching** 228:10

**categories** 228:15

**Cathy** 23:7

**Caucasian** 281:6

**caused** 164:5 228:9

**cautious** 168:12

**caveat** 136:24

**CCSAO** 181:13 184:21 230:8 251:9 307:20

**CCSAO3447** 98:23

**CCSAO3451** 102:1

**CCSAO3495** 90:3

**CCSAO5622** 112:13

**CCSAO5762** 154:5

**CD** 306:13

**cease** 27:10

**center** 22:19 40:1,5

**central** 5:6 181:20

**certainty** 241:6

**certificate** 59:17 76:10,19 78:15 80:5 86:6 195:8 225:16 226:1,11,19,21 228:19 229:19 230:9 231:3 234:17,18 240:7,12

**certificates** 76:8,23 78:13 79:5 80:12,18 216:24 226:11 229:4,8 314:7

**Certified** 334:4

**certify** 334:6,14,23 335:2,6

**certifying** 25:8

**certitude** 213:5 241:2

**cervix** 294:5

**cetera** 78:3 230:22

**chain** 37:19 38:4 96:5 194:10,20,24 214:4 215:2,7 226:20 241:10,23 311:2

**challenge** 172:14

**chance** 32:5 112:19 186:10 286:10

**change** 40:17 123:2 182:1 185:17 186:2,12,14 187:14 188:1,24 189:3 190:13,14 191:7,9 203:10 212:13

**changed** 211:3

**changers** 142:3

**chapter** 213:18

**character** 207:13

**characterization** 211:5 212:2 295:20

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 135 of 612 PageID #:8793

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: characterize..Coleman

**characterize** 13:1 23:5,14 63:1 201:1

**characterized** 214:14

**characterizing** 214:10

**charge** 71:13 331:17

**charged** 259:1 330:14 331:8,9

**charges** 125:16 209:11 220:12 223:22 224:7 232:22 243:22 272:10, 22 331:5

**chart** 179:4,13 252:19 315:18

**charts** 293:14

**chase** 119:15 247:9

**chasing** 16:20

**cheater** 247:15

**checking** 185:5

**Chicago** 5:8,9 6:6 7:16 13:11,18 20:16 148:18 198:1 250:1 276:21 333:6,9 334:13

**chief** 15:4 38:1 65:8,15,21 67:23 201:16,22 207:17

**chiefs** 19:12

**children** 271:6,11

**Chip** 150:8,12 298:11 322:1,4,7 323:7,13,15

**chock** 99:8

**choices** 266:23

**chosen** 123:20

**Christy** 23:16

**CI** 191:18,24 240:17

**circulated** 26:11 44:15 181:12

**circumstance** 28:4 121:10 143:3 145:23 149:9 155:13

**circumstances** 10:2 53:6 59:5 63:9 72:4 113:23 122:16 130:18 132:2 138:19 143:22 144:15,24 150:23 159:16 174:6 194:15 213:21,23 245:11 291:7 317:15 325:15

**circumstantial** 159:10

**City** 5:8,9 6:6 7:16 29:24 258:18 260:3 261:14 268:12 321:8 333:6,9 334:12

**CIU** 25:13,14 48:17 50:22 52:12 55:16 59:8 62:14 64:15 68:21,23 69:24 70:2 71:13 79:24 119:20 126:6 138:10,20,

24 139:17 152:19 153:17 154:6,16 156:15 167:24 179:24 180:4 188:17 198:23 199:16 201:20 206:22 220:10 221:2,5,11 253:21 267:19 269:10,14, 22 270:10,13,14 271:10,17 282:2 285:16 302:24 311:14,24 312:2,15 320:20

**CIU's** 86:23 95:24 139:5 251:24 253:15 302:18

**civil** 76:14 80:13 229:21 236:21 315:23

**claim** 28:15 53:1 56:15 57:7 64:11 68:23,24 69:17 85:3 122:8 175:7 247:4 310:18

**claimant** 47:24 51:22 55:22 69:16 71:12 226:13 311:23

**claimed** 84:19 85:8 156:5,11 157:4

**claiming** 83:8 162:10

**claims** 27:20 28:12 32:20 47:18 50:14 61:4 62:15 69:13 75:7 85:23 89:14 91:12 97:9 110:10 134:11 135:3,16,20 136:2 137:11 138:24 180:1 188:18 200:15 226:6 269:16 318:12

**Clarence** 103:24 110:15 142:15 143:12,15 145:3,6,10,11 146:16,24 158:12 164:20 166:17 168:20 178:4 191:3 256:24 258:22 260:5 261:17 263:17 268:18 269:7,11,15,24 271:5, 11 274:9 275:1,21 277:19 280:2 281:1,16,20 283:12,17 285:16 287:12, 16 288:7,13,19 293:18 297:17 298:23 311:7,8,15,20 312:5,17

**clarification** 8:17 52:6 78:20 129:7 159:17 184:4 211:21 230:12 249:7

**clarifies** 179:17

**clarify** 8:3 50:16 70:18 77:13 114:10 126:2 192:22 239:2

**clarifying** 32:8

**clarity** 270:16

**Class** 331:5,8

**clause** 182:12

**clean** 170:4 329:22

**clear** 10:4 48:3,4 49:23 53:2 56:8,13 59:5 67:10 86:7 97:10 99:18 124:1 126:7 146:7 167:4,16,20 171:13 172:22 178:7 188:8 195:17 236:9,13, 20,23 237:1,4 238:21 253:20 264:12

276:6 280:10 285:10 289:22 312:12

**clerk's** 95:1,18 139:18

**click** 301:7

**client** 231:14 273:6 331:17

**client's** 290:16

**clients** 16:20,24 17:13 317:18 318:16

**Clinic** 26:22

**clippings** 106:8

**close** 287:10

**closest** 38:17

**clothed** 295:10

**clothes** 270:12

**clothing** 93:17 95:1,17 109:18 120:12 170:14 174:5 181:21

**CLR** 335:17

**clumsy** 30:14

**CLVS** 5:14

**coached** 315:8

**codefendant** 92:15

**codefendants** 10:9 315:10 322:15 323:23

**CODIS** 103:16

**coerced** 156:6 246:16 250:3 316:23

**coercing** 246:17 317:8

**coercion** 243:7 247:5

**coercive** 244:24 245:6,14,23

**coffee** 202:9

**COI** 76:12,16 80:2

**coincidental** 16:24

**Coleman** 5:9 6:2 9:20 10:8 11:11 61:13 75:19 81:5 82:15,22 83:8 85:17 92:15 97:9 107:3 109:12 110:14 123:8 125:16 127:13,24 128:5,10,14 131:5, 9,12,19 132:8,9,12,15 134:10,17,22 135:5 136:14 137:3,5,12 138:1 139:12 146:19 150:7 151:3 156:4 157:21 158:3 159:1,3 160:10,15,21 162:7,11, 21 167:5,10,15 170:21 176:15 197:16 198:8 200:21 202:23 205:1,6,12 209:12 210:4,17 211:3,7 212:11,22 215:4 216:23 217:23 218:16 219:19, 21 221:19 223:22 229:9,20 232:23

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: Coleman's..confidential

233:19,24 234:17 236:1 237:14,24 238:7,17 243:8,23 244:13 245:1,14 246:12 249:3,9 252:1 253:12,22 254:9 267:1,5,8 269:17,20 272:21 281:22 282:6,20,24 288:24 289:5 292:22 293:9 295:7 297:2 299:12 304:8 310:5,10 313:11,13 321:14,19 322:14 323:13,15 324:8,16 325:4 327:12 328:9 329:1 333:7

**Coleman's** 107:22 110:10 127:21 134:11,15 135:20 137:19 139:17 161:9,10,22 292:13 294:12 295:16 323:24 324:1

**collaborate** 44:5,8

**collar** 12:21 13:1 15:13 330:11

**colleagues** 16:2 18:8

**collected** 102:7 302:4

**column** 99:19 197:24 198:3 200:6

**combination** 26:20

**comfort** 111:18

**comfortable** 32:2 164:12 225:5 233:23

**command** 37:20 96:5 194:10,21,24 214:4 215:3,7 226:21 241:10,23

**comment** 83:11 165:24 193:8

**commented** 161:15 272:18

**commercial** 15:12

**commit** 35:4 126:10 178:10 265:19 267:16 302:23

**commitment** 33:20

**committed** 28:8 29:18 35:24 124:8, 17 143:21 257:2 267:20,23 268:1 282:10,17

**committing** 143:8 266:22

**commodities** 13:2

**common** 96:12 237:2 274:17 281:8

**commonly** 236:21

**communicated** 218:12

**communicating** 225:2

**communications** 26:17 97:20 218:15

**communities** 14:21

**companion** 247:4

**comparable** 144:8,16,17 299:21

**compare** 181:17

**compared** 144:2

**comparing** 145:2 185:1

**comparison** 106:13 144:11

**compelled** 177:17

**compelling** 162:23 178:7

**compensation** 226:7

**competent** 312:11

**competing** 19:16

**compilation** 302:8

**compilations** 192:14

**compiled** 152:20

**compiling** 115:14

**complained** 134:18

**complaint** 315:23

**complaints** 268:23

**complete** 103:6 145:24 221:16

**completed** 221:24 234:23 235:10

**completely** 198:3 305:12

**complicated** 41:6

**complicit** 266:24

**component** 56:15

**components** 113:15

**compound** 204:22 280:9

**comprehensive** 318:5

**computer** 45:16 133:10

**Computer-aided** 334:20

**concept** 21:19

**conceptual** 20:13

**concern** 63:4 92:24 158:14

**concerned** 27:18 63:6 73:5 186:16 304:13

**concerns** 64:1 131:20 250:17

**conclude** 119:16 120:10 167:7 170:19 205:12 220:11 239:12

**concluded** 116:21,22 119:17 123:21 125:2,4,14 128:20 131:4 203:9 213:19 221:17 243:14

**conclusion** 133:19 135:9 142:10 144:6 162:16,19 164:6,11,13 166:5,6, 20 167:6,17 168:20 169:1 170:23 171:5,10 175:2 180:2 190:10 222:1 238:5,11,12,15 239:22 240:6 242:18 244:3

**conclusions** 68:20 113:2 114:1,23 115:15 116:9,20 120:19 133:5 135:3 141:16,22 143:24 147:21 148:5 163:2 165:7 166:16 167:23 169:19 171:7 173:10 180:11,19 187:1 189:15 191:10,12 192:5 193:18,23 194:8 195:2 197:6,13 216:11 220:18 230:4 232:10 242:1 267:2 276:3 282:19

**conclusive** 56:2

**concrete** 107:17

**condition** 174:5 294:8

**conduct** 49:10 51:23 59:2 89:20 98:5 115:16 137:16 158:2 177:10 245:23 269:10,23 271:17 324:13

**conducted** 48:7,8 50:13 52:8 66:10 83:1 93:6 113:16 116:21 120:5,6 122:3,4 137:16 146:23 149:17 155:5 157:21 252:14 272:4

**conducting** 89:13 188:3 193:17 318:23

**conducts** 53:13 68:23

**confer** 235:1

**conference** 233:8,9

**confess** 234:1 272:9

**confessed** 282:23 316:6 323:1

**confessing** 314:19 327:20

**confession** 84:20 85:4 134:14 137:20 247:4,5,21 248:2 292:11,13 314:2 316:23 318:18 321:15

**confessions** 103:11 134:2 243:5 245:21,22 248:13 250:3 292:17 315:10 316:3 317:9

**confidence** 224:21

**confident** 32:4 53:18 110:6 115:23 129:24 141:15,21 142:6 189:23 202:7 264:11

**confidential** 223:7,10,17 308:13,14,

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 137 of 612 PageID #:8795

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: confines..corroborating

24 331:11

**confines** 36:8

**confirm** 208:14 303:13

**confronted** 321:19 323:2 327:19

**congruent** 182:24 183:3 328:11

**conjunction** 17:14

**connected** 166:17

**connection** 10:23 201:8 252:13 257:17

**conscious** 227:2

**consciously** 216:3

**consensual** 165:12 166:10 293:18 294:19 299:14

**consideration** 27:5 57:21 69:1 76:8, 23 78:13 79:4 80:5,12,17

**considerations** 168:7 170:8 207:12

**considered** 20:8 27:24 35:21 51:19 56:17 57:8 65:1,2 69:18 82:16 86:15, 19 87:9,10 105:22 110:8 115:9 143:21 146:5,8 170:1 226:17 227:1,19 230:16,20 231:1 247:10 266:3,10 317:14

**considers** 180:16

**consistent** 64:15 94:21 116:15 120:1 204:2 206:22 295:5 315:9

**consisting** 333:15

**consolidated** 61:12

**constitutes** 10:24

**constitutional** 28:15

**construct** 225:23

**construction** 161:19

**construe** 161:13

**consulting** 20:11 41:23 276:10

**contact** 283:18 285:18 290:23

**contained** 219:12 311:2

**contemplated** 49:8

**contemporaneous** 200:5

**contemporaneously** 104:9

**contestant** 242:7

**context** 49:7 59:22 87:11 125:10

146:20 164:10 195:19 245:9 250:5 254:21 283:1 304:1 315:5 331:19

**contexts** 315:3

**continue** 27:11 66:7 121:2,11 169:8 171:19 208:5,8 285:4

**continued** 16:7 27:14,15

**continues** 134:9 185:22

**continuum** 132:24 173:23

**contours** 313:18

**contribute** 113:5

**contributed** 109:13 276:5 280:3 281:2

**controversies** 128:17

**conversation** 54:13 83:11 110:21,23 111:6 169:16 173:7 209:5,7,9 230:2 240:6 296:23 311:11 320:15

**conversations** 195:7,9 210:14,19

**conversion** 330:20

**convey** 214:3

**conveyed** 85:16 204:2 214:12 230:20

**conveying** 230:14

**convicted** 18:18 26:17 28:6 55:5 56:4 103:18 108:15 181:22 188:21 220:12 238:8 317:1

**conviction** 16:13 17:23 20:2 21:15 27:19 28:21 29:12 31:14 32:19,21 33:8 35:11,18 36:6 39:21 41:11 44:2 45:21 47:18 50:12,21 51:6 52:24 55:11 56:18 57:10,22 61:24 62:17,24 65:7 66:6,10 70:16 71:7,13,15 72:9 75:5 76:17 80:6,19 81:4 84:8 85:16 91:1,5 110:9 126:20 138:19 172:2 193:17 200:15 208:5,9 220:21 223:2 233:15 237:6 239:5 241:9 242:3 244:15 245:12 253:17 269:5

**convictions** 21:21 22:20 33:20 65:3 81:5,23 96:1 125:6,10 146:14 192:16 195:24 203:12,23 215:19 218:2,6 239:13 249:2,11 250:16,20 251:24 253:5,11 254:15 255:9,14,19 256:10 257:18 317:2

**convincing** 48:3,4 53:2 56:8 124:2 126:7 167:4,16,20 171:13 178:8 236:10,13,20,23 237:2,5

**convincingly** 56:12

**convoluted** 187:8

**Cook** 6:8,21 28:22 32:22 52:13 70:5 91:2 316:7 334:5

**cooperated** 314:19

**cooperative** 159:3

**cop** 247:14,15

**copies** 42:12 278:2

**copulating** 322:7 323:13

**copy** 163:10 263:13 279:10 295:23 306:13 332:1

**corner** 251:12

**corporate** 330:24

**corporations** 15:14 330:12

**correct** 8:5,8 9:7,9 14:9 19:3 21:6 25:6 31:18 32:24 33:19 35:22 38:22 47:5,21 50:14 54:12 55:23,24 56:18, 19 69:20 70:23 72:1,2,13,14 73:17 74:24 78:22 81:6,18 83:16 88:4 90:13, 16,22 91:21 92:13 96:1 100:21 102:3 109:9 110:10,15,16 113:12 116:6 117:21 119:8,21,22 121:24 122:8,24 123:1 124:2,3 125:6,17 129:10 136:15,23 137:21 138:4 139:2 146:24 158:8 159:19 165:6,21 166:5 180:13, 24 181:1 184:8 187:16 191:14,15 196:19,20 200:11,22 204:3 205:2 206:3 207:1,22,23 208:2,18,19,21 211:24 212:11 220:21 221:1,2 224:8 231:23 232:24 236:13 240:13,14 242:4 244:21 246:13 251:1 253:2,3,6, 7,13,18,23,24 254:4 255:16 257:7 261:17 266:13 267:5,8,14 268:2,20 273:20 274:10 277:20 280:18 282:11 284:2 285:14,15,19,22 286:8 287:8,14 293:20 295:19 298:19 300:13 302:1 310:20 312:17,18 319:10 320:1,12 334:21

**Corrections** 26:12 42:13

**correctly** 27:6 35:7 52:16 55:8 62:20 69:3 70:6 71:3,17 72:6 73:13 74:22 91:7 120:16 122:19 131:21 134:24 137:9 143:10 151:18 154:24 162:12 165:14,24 175:15 216:2 220:13 221:8, 21,22 253:9

**corresponds** 91:13

**corroborated** 292:8,10

**corroborating** 292:16

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 138 of 612 PageID #:8796

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: corroborative..December

**corroborative** 91:15

**corrupted** 63:22

**corruption** 13:5

**counsel** 5:17,21 9:9,13 26:23 28:13
42:23 51:15 58:17 76:1 77:10 92:8,11
93:3 115:22 134:15 136:16 139:11,12
152:21 153:2,3 158:14 184:11 185:3
242:19 278:21 334:24 335:6

**counsel's** 26:3 43:14 46:17,18 57:17
61:1,20 68:12 75:16 78:9 88:15
118:22

**counted** 14:23

**County** 6:8,22 14:24 15:1 28:22
32:22 52:13 70:5 91:2 316:7 330:17
334:3,5

**couple** 10:16 11:8 16:2 19:12 22:13
27:4 55:21 87:20 117:20 137:5 149:7
155:4 181:9,16 187:12 193:10 197:4
235:14 284:7 308:9

**court** 5:3,10 6:11,18 7:7 9:4 24:24
25:10 45:24 59:21 60:14 66:16,19
67:2,5,13,16 73:17 83:16 86:7 87:4
112:1 132:19 133:24 134:3,5 136:10,
11 137:20 152:6 181:1 195:21,23
196:4,8,13,23,24 199:6 201:4,7,17
202:9 203:5,18,20,22 204:2 208:23
209:16,18,21 211:23 217:21,23
225:23 226:6,10 231:8 244:18 247:7
278:9 284:17 289:23 294:12 295:16,
23 296:5,8 299:1 300:13 313:4 331:24
332:6 333:1 334:10

**Court's** 66:13 86:3,13 87:2,17

**courts** 15:6 23:11

**covered** 118:13

**CPD** 100:20

**crafting** 133:1

**crashed** 133:10

**crazy** 331:7

**create** 38:21

**created** 20:24 43:2 225:22

**credibility** 159:6,9 291:3,11,14,18

**credited** 20:12

**crime** 18:21 55:6 82:12 93:8 120:7
124:17 126:10,17 132:5 144:8 149:6
159:15 173:14,18 174:6 178:10
205:11 266:23 267:16 273:11 287:10

292:9 293:2,5 314:6,19 322:10
326:12,15 327:24

**crimes** 12:23 144:20 176:8 238:8
265:20

**criminal** 10:10 12:21 15:4,5 17:13
28:8,12 33:22 35:11 41:19 50:14
53:18 54:19 64:23 100:20 103:21
121:15 142:15 145:21 168:14 179:23
185:23 186:1 194:16 201:17,22
206:17 207:17 246:18 266:17 290:20
330:7,11,18,20 331:18,19

**criminality** 168:16

**criteria** 18:10 26:14 55:21 57:7,19
69:1,12,13 226:9

**critical** 200:13

**criticize** 175:8

**cross** 267:13,16

**cross-referencing** 279:17

**crossed** 52:1 304:18

**crossing** 176:10,17

**CSR** 5:4 335:17

**CST** 332:12

**Cubs** 276:22

**curious** 148:20

**Curran** 5:22,23 11:21 72:24 84:23,24
95:11,12 96:6 114:24 130:7 132:16
135:24 144:4 145:15 152:2 163:12,17
178:24 197:18 198:11 200:23 201:24
204:4,10,18,22 206:7 212:23 214:6,
13,16 215:11 218:4,8 222:16 225:18
229:10 234:6 238:18 240:1 242:17
243:9,24 244:9 246:3,8 247:22
248:10,18 249:1,10,18,20 250:14,22
251:5 252:12 254:16 255:3,15,24
256:6,22 257:12 258:7,13 259:21
261:12 262:11,16 264:21 266:1,7
268:8 270:8 272:5 273:1 274:4,12
276:8 277:5 278:7,13,21 279:4,8
280:16,22,23 283:2,22 284:8,15 285:1
288:6 289:6,11,19 290:3,6,8,18 291:8
292:7,14 295:22 296:1,7,12,16,18
297:22 298:7,10 299:10 300:11,17
302:15 303:4,8,15,17 307:11 308:6
309:16,19

**current** 73:4 121:10 161:9 190:5

**custodial** 63:19 147:10 158:11

**cut** 119:14 247:9 298:5

**cute** 185:19

**cuttings** 110:18 111:2,6

**CV** 5:12,13 333:5,8

---

**D**

**D-E** 23:8

**DA's** 20:11

**Daley** 40:1,5

**damage** 226:13

**Dan** 49:2 265:4 316:1,16

**Dap** 322:1,4,7

**dare** 223:4

**darn** 276:4

**DARRYL** 333:4

**data** 74:12 99:9 270:17,20

**date** 141:5 218:2 232:14,15 260:7
279:2 287:10 301:17,20,22 302:22
323:4

**dated** 90:15 94:12 113:11 278:18
280:20,21 301:21

**dates** 196:7,8 238:1

**daughters** 307:2

**daunting** 213:17

**day** 15:10 18:19 26:19 40:7 78:6
170:12,14 183:9 209:16,18 219:14
327:2 332:4 333:20 335:11

**days** 14:20 108:11 111:1 157:11
169:9 176:3 196:14 285:6 308:23
327:1,3,24

**deal** 176:9 226:22

**dealing** 20:13

**dealings** 17:9 304:19

**dealt** 23:16 218:21

**death** 143:13 145:7 167:10 174:1,23
283:19

**debating** 41:23

**December** 197:2 209:11 210:3 212:9
217:22 218:17 219:8 220:6 232:23
237:22

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 139 of 612 PageID #:8797

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: decide..Dewald

**decide** 41:3 206:19 245:21 266:17 318:2

**decided** 17:4 177:10 241:17 272:3

**decides** 329:21

**deciding** 76:18 216:4

**decision** 16:14 59:16,23 60:1 65:20 70:3 86:23,24 87:11 114:19 172:12 195:10 203:21,22 210:15 211:6 212:10,21 213:10 215:3,8 216:6 223:21 224:7,11,22,23 225:9 230:7 253:22 254:3,8,13,14,19,22 256:4 281:20

**decisionmakers** 311:2

**decisionmaking** 86:20 213:4,6 222:11 255:18 256:1

**decisions** 35:5 36:1,10 194:18 240:13 255:23 288:23 319:3

**decisive** 166:1 275:22

**declared** 124:17 239:13

**declining** 26:3

**defend** 330:6 331:4,17

**defendant** 26:18 28:12 48:3 50:14,20 51:7,9 56:3 82:19 181:22 325:15

**Defendant's** 134:1

**defendants** 13:20 17:8 27:2 47:11 60:14 103:18 121:2 122:18 135:11,12, 14 180:7 190:12,21 208:17 212:11,19 220:11 242:22 250:2 253:1 255:6 293:2 314:7 316:1 317:18 318:16 326:3,23,24 330:18 333:6,9 334:13

**defendants'** 255:8

**defended** 330:14,16,18,20

**defender** 22:19 92:5

**defender's** 26:22

**defending** 37:3

**defense** 15:13,14 17:16 37:10 134:15 136:15 157:3,7 161:22 162:3,24 284:10 290:20 317:23 326:10 330:7, 11

**defer** 43:7 248:21

**definitive** 287:6

**defraud** 330:17

**degrees** 155:22

**delay** 9:1

**deliberate** 79:9

**deliberative** 25:9 44:19 45:1,6,20 48:20 58:8 68:8 77:5 78:4 86:22 87:7, 20 118:14 217:6 230:6,16 231:6 248:6

**delicate** 232:6

**delineate** 132:11

**delineates** 94:12

**delineating** 101:16

**delineation** 69:7 70:8,15,19 71:6,19 72:8 113:15

**demeanor** 311:8

**demonstrate** 126:19

**demonstrated** 143:7,16 166:23

**denial** 290:23

**denied** 128:15 137:3 151:5 267:7 285:17

**dense** 132:21

**deny** 102:13 267:10

**dep** 309:3 331:11

**Department** 13:12 26:12 42:12

**departments** 13:5

**depending** 49:15 54:6 72:3

**deponent** 333:12

**deposit** 174:24

**deposited** 103:8 281:21 282:20 294:7 298:23

**deposition** 5:7 8:11 9:17 10:15 11:2, 16 25:23 30:21 39:10 48:24 73:18 83:17 87:22 90:4 93:20 98:18 112:15 152:21 154:2,8 181:2 199:7 202:15 209:22 219:1 223:9 248:4 251:2 258:10 259:18 261:9 262:13 268:5 278:10 287:17 289:3 296:9 300:14 308:14 313:6 321:2 333:13,14 334:24 335:3,4

**depositions** 8:23

**deputy** 23:3

**derive** 130:12

**Derrell** 5:23 9:19 61:12 75:19 81:5 84:7 138:24 156:4,11,16 159:18 210:4 253:11 291:20 294:16 295:1 297:2

**describe** 13:8 27:6 192:15 205:10

**describing** 55:10 298:16 305:22

**designated** 64:10

**desirable** 37:1

**desire** 33:19 34:6,18

**desires** 34:12

**desk** 52:1 250:8

**detail** 105:18 300:19

**detailed** 167:21

**details** 305:24

**detective** 134:19 248:8 314:2 315:5, 6,8

**detectives** 131:5 132:10 235:20 244:24 245:13,24 246:17 247:24 249:5 250:21 252:7 270:6 315:24 318:3 321:18,20

**detectives'** 317:8

**determination** 59:8 79:11 94:19 108:12 120:24 132:1 189:18,19 190:9 208:4,7 210:20 221:11 230:7 239:15 318:9

**determinations** 117:15

**determine** 33:14 47:24 54:13 55:4 61:5 68:24 99:23 130:17 140:3 145:20 193:7 216:19 255:10 269:11,23

**determined** 113:22 121:12 162:22 177:22 180:8 191:2 195:22 221:5 222:6

**determining** 114:22 206:24

**detour** 173:22

**develop** 17:22 19:2 26:11 45:21 105:4 188:10 227:16 250:15

**developed** 21:22 39:20,22 40:12,20 44:20 45:7 78:2 168:1

**developing** 22:15 27:4

**development** 74:19 227:22

**developments** 105:13

**device** 13:12 177:21

**Dewald** 23:7

310:4,14 322:24 325:3 327:12 329:1, 21 333:4 334:11

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                      Index: died..draw

**died** 189:22

**difference** 56:11

**differences** 181:16 185:7 193:9,10 324:13

**differentiating** 122:7

**differs** 159:11

**difficult** 18:23 105:14 174:9 292:6 318:13

**difficulties** 106:14

**difficulty** 8:15

**digital** 184:13

**diligence** 98:11

**direct** 37:22,23 38:4 279:15 296:19 313:22 321:9 322:22

**directed** 146:7 328:17,20

**directing** 231:13

**direction** 29:14,15,19 73:14 241:18 274:14 290:16 298:8

**directives** 19:24 20:4 96:4,12

**directly** 48:22 65:8 97:15 218:22 304:1

**director** 16:12 21:14 114:15,19,21 237:6 239:5 241:8 242:3 244:15 245:11

**disagree** 58:22 60:17 67:1 77:23 78:5 88:22 239:21 243:20 248:10

**disagreed** 214:5 215:3

**disappointing** 225:6

**discern** 94:7

**Disciple** 176:10 177:6 257:3 259:10 260:24 262:1 263:8 266:21

**Disciples** 176:6

**disclosed** 258:20 261:7 268:11

**discoverable** 86:9

**discovered** 132:3 314:5

**discovery** 61:12 161:23 258:20 300:7 302:20

**discretion** 71:2 208:11

**discuss** 43:10 79:14 88:5 133:21 156:8 167:13 174:14 224:10

**discussed** 47:19 54:23 63:3 69:1,12, 14 71:24 72:13 123:10 160:9 164:9 192:8 198:1 231:2 238:9 255:23

**discusses** 138:24

**discussing** 48:23 65:24 87:5 94:8 96:16 117:4 132:9 280:11

**discussion** 30:2 50:3 66:17 97:22 99:23 118:9 134:3 147:15 149:13 152:8,18 167:22 170:5 171:19 173:3 175:12 192:18 213:23 284:21 310:11 332:8

**discussions** 102:6 118:12 146:12 193:21 194:5,23 196:6 204:7 205:5 208:24 224:6 229:17 232:8 238:3

**disgusted** 326:16

**dismiss** 59:16

**dismissal** 86:5

**dismissed** 272:11

**dispense** 8:14

**displayed** 147:16 185:1

**disposed** 192:11

**dispositive** 157:2 167:3

**dispute** 158:22

**disputed** 128:3,6

**disregard** 247:20

**disseminated** 44:15 47:4

**distinction** 188:8

**distinguished** 12:11 28:12

**distressed** 224:24

**District** 5:10,11 13:13 333:1,2 334:10

**dividing** 175:24

**division** 5:12 15:4 24:15 53:19 54:20 64:16,22,23 76:14 80:13 94:12 95:10 194:16 201:17,23 206:18 207:17 216:5 229:21 333:3 334:11

**divisions** 64:22

**DNA** 24:6 82:13 83:1,3 87:10 91:3,5, 21 92:16 93:1,5 96:21,22 98:8,14 99:16 102:6,18 103:4,5 104:2,10 105:17 106:7 107:7,16,21,22 108:17 109:9,13 110:1,12,18 120:5,11,13 121:22 122:2,8 123:9,12 124:7 130:5, 12,20 139:10 140:9,11,15 141:6,24

142:8 164:2,6,15 166:1,17 167:19 168:19 170:20 171:11,17,21 172:7 178:7 179:4,13,22 180:17 181:21 185:22,24 186:24 187:12 188:13 190:19 191:3 203:10 206:14 213:20 221:5,15,23 247:24 253:10 257:1 273:13,24 274:2,7 275:12,21,24 276:5,11,19 277:7,14 280:4 281:3 283:3,8 284:1 286:7 291:20 292:21 293:8 314:4,6 316:14,15

**document** 26:11 27:17 31:7 42:22 44:7 62:1 79:23 80:1 84:3,15 87:24 90:8 98:22 99:1,6,11 100:4,9 101:19 102:10,12,15 112:20 133:2 179:12 183:7 184:6,7,15 189:5 223:7 225:24 250:1,7 252:4 258:18,19 259:22 260:1,3 261:7 268:10 278:23 279:1 280:12 313:10

**documented** 109:3 151:17

**documenting** 139:4 302:17

**documents** 10:18 11:14 22:10,12 74:20 107:6 108:2,22 110:4 119:6 153:15 192:3,8 241:4 274:20 277:23 293:13 300:8 308:13,17

**dog** 150:15

**donors** 82:16

**door** 140:21 150:15,18 322:6,17 325:8

**doorstep** 148:16

**doorway** 323:12,17 324:1,18,22

**doubt** 236:16 305:11

**Doug** 6:16

**downstate** 14:22 15:1,3

**dozens** 42:11,12

**draft** 44:6,14 182:9 189:24

**drafted** 113:24 140:17 141:6,12 240:16

**drafting** 44:3,8 116:11 117:1 189:14 197:12

**drafts** 184:1,2 191:23

**dragged** 299:18

**drain** 169:8 285:5

**dramatic** 282:18

**draw** 143:24 147:21 162:16,19 164:5 166:4 169:1 276:2

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: drawing..evidence

**drawing** 169:19 227:3

**drawn** 120:11 141:23 165:17 173:10

**dressed** 299:15

**drew** 144:6 165:8 167:14

**drove** 264:22,24

**due** 98:11

**Duffy** 16:7

**duly** 7:11 333:11 334:15

**duplicate** 83:24 84:1

---

**E**

**e-mail** 163:17 219:7,9,12

**earlier** 11:24 71:24 72:13 102:18
117:18 124:1 140:8 154:18 158:12
165:24 179:3 180:15 181:6 187:17
193:3,8 208:15 235:21 236:11 292:19,
20 298:16 320:19

**early** 14:13 26:18 119:15 148:14
322:18 324:2 325:9

**earmark** 184:3

**earmarks** 317:19

**earnest** 33:19

**easier** 138:13

**East** 260:15,23

**Eastern** 5:11 333:3 334:11

**Eddie** 107:20 108:3,4 150:8,12 154:7,
17 272:8 273:4,14 294:17

**Edgar** 14:24

**edit** 185:21

**editing** 189:5

**educated** 222:12,13,17

**effect** 27:10 52:19 61:23 62:2,6,8
74:17 76:7 196:22 231:9 312:23

**effective** 70:20 71:7,20 72:10 196:4

**effort** 127:4 133:7,19 286:9 307:13

**efforts** 99:16 225:11

**ejaculated** 174:15

**elements** 226:2

**eligibility** 50:24

**eligible** 51:5 55:15 68:24

**else's** 216:6 300:22 323:3

**em** 38:10

**embedded** 184:14

**emotionally** 225:4

**emphasize** 28:17

**employed** 14:8,12

**employee** 23:23

**employment** 12:4

**enacted** 41:11

**encompassing** 25:22 46:4

**encounter** 17:6 165:12,13 166:10,11
306:23

**encountered** 17:1,10 177:1 283:13

**encounters** 168:13

**encourages** 163:5

**end** 16:16,17 55:2 81:9 88:4 116:24
127:12 146:17 156:22 163:5,11
167:24 177:15,22 183:9 189:5

**endeavor** 40:23

**endeavored** 38:21

**ended** 241:22 286:7 287:13

**ends** 163:10

**enduring** 235:11

**enemy** 176:23

**energies** 312:8

**energy** 41:24 83:5

**enforcement** 24:22 25:4 288:20

**engaged** 247:12 257:21 322:7

**engagement** 140:15

**engaging** 198:8

**Englewood** 314:3 315:7

**enormously** 24:5

**entered** 94:24

**entire** 39:8 86:22 257:22 266:19
321:22

**entirety** 25:23 32:10 94:6 99:1

**entitled** 45:2,4 48:5 68:20 124:15
132:7,13 133:24 134:1 138:10 140:10

149:14 163:2

**environment** 158:11

**EP** 313:11

**episodes** 266:17

**equipped** 318:2 319:13 320:20

**Eric** 13:22,24 14:3 17:1,5,7,9,10,15,17
19:6,10 38:1 194:11 195:1,17,24
196:1 197:24 198:5,19 199:12 201:6
202:7 204:11 209:1 211:22 218:20
219:8 238:10 311:6,12

**escape** 272:22

**escaped** 15:17

**escapes** 20:15

**essential** 22:4 57:6 134:11

**essentially** 12:24 14:23 17:2 21:23
74:21 126:24 139:4,9

**establish** 116:17 156:20 166:9
167:19 236:1 254:12,14 312:15

**established** 44:9 77:20 135:21
138:17 190:20 193:16 230:17

**estimate** 24:19 50:24

**estimation** 97:11 105:7 116:16 121:6

**et al** 5:8,9 333:6,9 334:12,13

**Ethics** 38:1 65:8,15,21 67:23

**evaluate** 64:11 105:23 179:24 188:18
244:13 269:16

**evaluated** 93:15 117:5 256:20

**evaluates** 70:2

**evaluating** 61:4 145:9 215:20 246:14
311:23

**evaluation** 113:21 159:14

**evening** 85:9 128:7

**event** 108:8 131:8 202:4 233:13
310:13,14

**events** 10:2 174:23 198:4 266:16
297:16 299:2 329:13,14

**everybody's** 158:16

**evidence** 23:17 24:6 29:13,19 53:2
55:4 56:2,16 57:8 63:21 69:18 82:14
87:10 91:4 93:10,11 94:13,18 95:8
98:14 99:17,20 104:3 107:23 108:13
110:8 119:7 120:14 121:4 122:8,11

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

123:7 124:6 126:8,18 127:5 130:5
135:21 136:11 139:18,21 140:9,23
141:15 145:17 167:4,16,19,20 171:17,
21 178:6,7 179:22 180:12 185:23,24
187:15 188:13,20 189:22 190:11,20
198:12 203:8,10 207:13 213:21 221:6,
16 223:3 236:1,16,23 237:2,3,23
238:6,16 244:22 248:1 249:16 250:19
252:15,18 253:11 272:10 273:8,19
277:17 282:5 283:23 292:16 293:2,4,
12 313:24 316:15

**evidentiary** 236:12 245:6 247:10
312:22

**evil** 37:14

**exact** 326:5 327:2,23

**exaggerated** 149:9

**exam** 72:24

**examination** 7:13 102:7 235:17
242:11 244:10 246:7 248:7 285:9
310:1

**examine** 45:5

**examined** 7:12

**examiner** 128:20

**exception** 275:20

**excited** 34:24

**exclude** 103:7 209:8 218:19 292:21

**excluded** 107:4,21,22 109:12 134:20
274:10,16 275:2 277:20 280:3 281:2,
23 293:9 314:6

**excluding** 110:14

**exclusions** 231:7

**exclusively** 331:2

**exculpate** 325:6 326:22

**exculpatory** 327:18

**excuse** 46:13,19 120:6 195:22

**executive** 119:11 120:9 208:14
241:15

**exemplar** 82:23

**exercise** 121:6 177:11

**exhaustively** 248:14

**exhibit** 29:24 30:16,20,22 31:4 39:4,
8,11,15 73:9,10,15,19 74:1,4 83:14,
15,18,21 90:2,3,5 93:19,21 98:17,19

100:4,7 112:12,16 151:19,22 153:22
154:2,5,9 163:21 175:5 178:13,23
179:16 180:23 181:3 184:24 185:2,4,
15,24 186:8,13,19 187:11 188:16,23
190:16 191:11,17 192:23 193:2,3,4
199:4,8,12 202:14,16 208:12,13
209:19,23 210:2 218:24 219:2 241:3
250:23,24 251:3,8,13 256:14,15
258:9,11 259:17,19 261:5,10 262:4,
12,14 263:11,13 268:4,6 278:1,11,15
279:24 280:5 296:6,10,14 299:6
300:15 308:19,20 313:2,5,7,10,24
314:21 315:18,22 321:1,3,10 322:23
324:10

**Exhibit3b1** 279:23

**exhibits** 10:19 11:20 73:4 153:1
181:12

**exist** 41:7 59:15,24

**existed** 77:7 78:16

**existence** 78:12 121:19,22

**existing** 21:1,4 27:15 254:15

**exiting** 295:11

**exonerated** 124:16 314:4 316:15

**expand** 36:3 67:14 166:12

**expansive** 243:13 292:23

**expect** 38:18

**expectation** 62:8

**expected** 186:9 281:1,4

**expecting** 66:20

**expediency's** 152:23

**expedite** 286:17 298:6

**expensive** 232:4

**experience** 8:23 36:21,23 37:2,3
136:6 170:11 176:16 225:1 242:13
283:6 326:9

**experienced** 37:12

**expertise** 130:8 175:7 285:14

**explain** 27:23 28:20 58:13 77:19
102:22 104:24 119:17 120:22 123:13,
17 124:11 126:14 131:17 148:9
161:11 163:4 166:15 170:7 174:17
182:7,10 213:13 225:15 286:6

**explained** 91:10 95:4 106:4

**explaining** 175:14 215:8

**explanation** 189:21 234:12 247:21
287:13,15

**explode** 77:24

**explore** 58:23

**explored** 45:22

**express** 190:21 205:21 273:2 320:18

**expressed** 131:20 317:22

**expressly** 47:10

**extensive** 257:13

**extent** 75:9 79:10 159:7 170:15
184:11 267:19 269:19 288:17 298:1

**external** 197:8,11

**extremely** 24:4 318:13

**extrinsic** 140:7

**eye** 215:23 246:14

**eyeglasses** 107:8,14

---

**F**

**fabric** 169:21

**fabricated** 84:20

**face** 51:3 134:17,23

**facilities** 94:13

**facility** 24:6

**fact** 29:17 41:9 43:16 56:17 57:9
69:19 84:12 85:11 86:21 95:4 103:11,
20 121:8 126:24 131:12,18 135:12
142:3 145:5,22 164:9 167:3 168:11
177:5 180:8 186:17 187:14 210:19
213:4,24 224:16 267:7 277:18 280:12,
17 282:10 285:21 287:6,20 292:6,20
308:12 314:15 316:7 321:19 326:14

**factfinding** 62:16

**factor** 156:24 168:6 172:19 173:13
175:13,17 176:17 228:15

**factored** 170:8,9

**factors** 36:11 146:4,8 170:23 171:23
172:23,24 173:2,4,5 197:11 226:16,24
227:18 228:17

**facts** 29:22 35:6 36:2,9,11 53:6 98:12
113:22 126:22 130:13,16,19 138:18
143:9 144:22 145:24 146:20 167:11

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 143 of 612 PageID #:8801

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: factual..form

172:6 177:5 191:3,4 237:18 318:15

**factual** 131:24

**factually** 28:4 200:7 243:18

**failure** 280:16

**fair** 8:10 9:6 10:6 19:7 28:11 31:11 32:7 35:17,22 40:22 43:23 47:7,9 52:7 54:6 75:3 87:17 88:9 94:9 95:7,13,16 102:17 107:12,15 113:9,14 127:7 130:3 134:2 140:1,22 141:14 146:8 148:9 158:10 163:7 170:2 171:18 184:10 193:14 195:11 210:13 215:15 227:10 228:22 254:20 259:2 275:5,6

**fairly** 65:1 67:10 86:7 109:2 147:11 148:14 189:21 287:6

**fairness** 35:3 124:21

**false** 29:14 248:2 314:2 317:8 325:4 326:6 327:1,2,9,11,14 328:6,10,14,22 329:19

**familiar** 8:11 140:12 236:17 265:5 277:6

**families** 217:22 218:13

**family** 47:11 134:16 149:19 225:2 321:19

**fashion** 63:22

**fast** 94:6 99:2 235:15

**faster** 202:13

**fault** 200:19

**FBI** 314:15 315:2

**feasible** 142:4 188:10

**feature** 181:20

**February** 15:22 90:15 259:1

**feel** 8:20 12:12,13 16:18 19:14,15 27:13 110:24 123:23 126:10 158:24 160:12 165:21 168:22 197:5,10

**feeling** 111:15

**feelings** 32:3 224:10 232:6

**fellatio** 322:19 324:4

**fellow** 23:23 232:16

**felony** 23:11 24:15 53:19 64:22 84:21 243:2

**felt** 18:24 19:5 20:6 37:7,23 38:3 48:5 51:23 54:14 63:10 85:4 124:18,19,23 171:14 172:16 177:17 180:18 187:14

189:20 222:17 225:9 230:21 318:17

**field** 38:12 305:7

**fight** 286:20

**figure** 22:5,16 147:12 148:14 252:21 307:14 325:17

**figuring** 275:23

**file** 134:5 140:6 157:17 198:23 199:17,20 200:1,9 302:24 303:13 313:19

**filed** 90:13,21 162:9 216:23 229:9,19 313:13 315:13,23

**files** 10:18 200:2

**filing** 314:11,12,14

**final** 70:3 79:10 95:23 100:2 114:5 182:9 183:20 186:20 189:18,19 193:3, 7 241:22 255:17 256:1

**finalize** 197:5

**finalized** 46:22 79:15 241:17

**finally** 318:7

**find** 16:21,24 18:15 50:23 57:1 59:21 88:2 98:13 124:9 179:18 188:2 206:12 238:7 243:16 244:22 245:12,21 250:19 264:17 270:10,13 273:7 281:16 284:11 305:7 307:14

**finding** 60:7 166:16 238:16,23 239:17 240:2 243:21 274:18 275:5,18

**findings** 52:15 96:3 108:24 110:5 164:15 276:19 281:19 293:6

**fine** 8:13 29:8,10 30:19 31:3 111:24 153:12,16 185:9 214:17 299:22 300:5 309:1

**fingernails** 106:12,15 274:9,16,19 275:3,13 276:12 277:7,10,15 280:1 281:4 283:4,9 284:2

**fingerprint** 111:10

**finish** 11:23 70:11

**finished** 70:13 230:24

**finite** 225:22

**firm** 15:16,18,22,24 16:5,6,15 331:2

**firms** 26:24

**firsthand** 310:15

**fit** 18:10 41:8 206:18

**five-minute** 133:10

**fix** 37:18

**flawed** 62:18 64:5

**flesh** 155:17

**flimsy** 150:15

**flipped** 155:20

**floor** 40:1,4 322:10

**Flora** 268:24

**fluids** 129:2,12

**flush** 146:4

**flushed** 129:3,13

**focus** 12:19 38:8 74:11 83:5 237:18 257:21 289:4

**focused** 12:24 15:5 22:14

**focusing** 288:3,7

**Foley** 219:8 233:6 314:1

**folks** 23:1 44:2

**follow** 61:3 78:8 88:21 190:23 193:15 204:9,12,16 215:9 233:1 303:16

**follow-up** 46:9

**follow-ups** 235:15 284:7

**followthrough** 155:19

**foot** 40:6

**foregoing** 333:14 334:20,24

**foreign** 294:4

**foremost** 253:16

**forensic** 23:15 83:3 94:11 169:6 271:17,24 273:19 285:3 292:16,24 293:1,4 311:17

**Forensic's** 95:10

**forget** 60:17

**forgot** 244:6,7

**form** 16:5 28:1 29:3 34:2,7,13 36:12 48:11 53:15 54:2,10,21 56:23 62:11 63:14,16 65:23 71:1 74:9,15 75:6,9, 10,20 76:3 80:20 84:23 95:12 96:7,17 104:13 114:7 115:1 116:12 121:16 125:7,18,19 126:3 127:1,2 130:7,9 132:17 135:6,22 141:18 144:4 145:16 147:23 148:12 155:9 182:21 183:10, 20 187:4 193:24 197:18,19 200:16,23

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: formally..gentleman

201:24 202:24 204:4,10,18,20 205:15 206:5 207:2 212:12,24 213:11 214:6,7 220:22 221:13 222:3 223:23 224:1,2, 13 225:18,20 229:11,22 234:6 236:3 237:8,9 238:18,20 239:6 240:1,23 243:9 245:3,18 246:24 250:18 252:9 254:10,24 255:1,21 256:16,18 257:8 258:5 262:7,8 264:19 265:22 266:5 270:3 271:19 272:16 273:21 275:14 276:14 280:9 282:12 283:20 291:4,23 299:7 315:11 317:11 325:11 327:5 328:1 330:3

**formally** 34:17

**format** 118:4 119:3 183:24

**formatted** 184:7

**formed** 148:6

**forms** 184:13

**formulating** 65:18 193:18

**forthcoming** 304:4,5,13

**forward** 20:22 117:2 126:8 223:18

**found** 37:9,11 45:24 64:4 82:12 105:19 107:18 108:18,19 111:11 165:18 168:13 174:21 181:21 200:2 274:8 275:3 281:7 291:1,21 293:17, 22,24 294:9 297:17 298:22

**foundation** 29:4 34:2 36:13 41:10 54:11 80:21 104:16 115:19 121:17 130:8 144:5 145:16 147:24 182:4 197:19,21 203:1 204:21 205:16 206:6 207:3,4 212:23 213:1 222:14,15,22 223:24 224:2 229:23 234:6 242:17 243:10,24 244:4 245:2,4,16,18 256:17 275:15 280:10 291:4,24 297:20 299:7 315:11 317:12

**fourth** 313:23

**Foxx** 33:24 200:14 255:17,23 256:7, 12,20 310:20,21

**Foxx's** 33:19 34:6

**fraction** 105:19

**frame** 46:24 325:13

**frankly** 87:21

**fraud** 13:2 236:22 330:15

**free** 8:20 12:13 165:21

**freezing** 45:17

**frequency** 111:7 281:4

**frequently** 157:4

**fresh** 36:5

**Friday** 111:19

**friend** 134:16

**friends** 149:19

**frightened** 322:9

**front** 66:14 138:13 184:24 197:3 233:7 269:20 277:1 318:16

**frustrating** 18:15

**fulfill** 33:11

**fulfilled** 188:17

**full** 99:8 137:2,23 139:15 152:3 161:6, 8 177:15 324:3

**full-blown** 286:13

**fully** 147:16

**Fulton** 5:8,23 6:17 9:19 10:7 11:11 61:13 75:19 81:5 82:15,22 83:8 84:7, 19 85:4,8,16 89:18,21 91:24 92:4,11, 16 97:8 103:7 107:21 110:9,14 123:8 125:16 139:11,16 146:19 150:7 151:3 156:4,11,16 157:6 159:18 160:3,14,16 167:5,10,15 170:21 176:14 197:16 198:8 200:21 201:7 202:20,23 205:1, 6,12 209:12 210:4,17 211:3,6 212:11, 22 215:4 216:23 217:23 218:16 219:19,21 221:19 222:22 229:9,20 232:23 233:19,24 234:17 236:2 237:13,24 238:7,16 243:8,22 244:14 245:1,15 246:12 249:3,8 252:1 253:11,22 254:8 269:17,21 272:1,22 281:22 282:6,19,23 288:24 289:5 292:22 293:8 294:16 295:1 297:2 304:4,5,12 305:14 308:4 310:4,14 322:24 323:2,16,17,21 324:20 325:4 327:12 328:7 329:1,21 333:4 334:12

**Fulton's** 85:22 89:14 90:13 91:11 138:24 190:6 291:20 310:10

**Fulton/coleman** 94:14 99:8 104:8 113:3 120:20 139:6 146:13 192:6 194:9 220:7 250:6

**function** 20:21 41:8

**functioned** 82:21

**functions** 22:4

**fundamentally** 62:18

**fussy** 183:14

**future** 186:10

## G

**gainsay** 185:16,20

**gambling** 13:14

**game** 142:3

**gang** 176:8 265:7,16,19 267:13,16,20

**gang's** 264:7 265:14 268:1

**gangs** 176:4 264:9

**Gangster** 176:6,10 177:6 257:3 259:10 260:24 262:1 263:7 266:20

**Garfield** 175:18 303:19 316:5

**Garfinkel** 6:8 84:22 134:14 137:6,14 138:3 150:1 242:9,14 301:24 302:7, 10,18 304:8,16 305:3,19

**garments** 294:1

**gather** 76:2 211:18 273:17

**gathered** 270:18

**gathering** 127:9

**gave** 131:5 136:20 138:19 155:13 213:18 234:11 250:20 313:16 326:3 328:11 329:12,19

**GD** 176:11 264:18 265:12

**GD's** 264:14

**gender** 280:6

**general** 14:20 24:16 25:19 29:11 49:5,11 59:2,13,20 66:17,20 67:15 117:14 118:18 302:3 304:21 331:7

**General's** 14:9

**generally** 12:15 14:12,14,16 25:5 26:4 46:7 47:14 48:11,13,15 49:24 57:21 60:11 66:2,4 67:8,24 80:4 87:21 117:9,10 118:5 136:17 147:9 226:14, 17 227:1 265:6 294:12,14 300:20

**generate** 16:23 304:24

**generated** 28:17 40:9 76:22 77:2

**generic** 66:21

**generous** 24:8

**genesis** 77:8

**gentleman** 233:9,10

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: gentlemen..Henretty

**gentlemen** 211:12

**geographic** 264:9 265:16

**geographically** 176:1

**Gina** 23:7 82:7 97:10 101:7,20 105:6 111:1 113:1 137:16 140:6,17 161:2, 15,16 183:5 210:21 211:10 223:21 224:6,16,18 270:6,15 271:9 273:2 277:13 287:1 305:8,10 306:17,21 307:11

**girl** 273:9 281:21

**girl's** 276:5

**give** 17:4 22:10 38:24 40:14 53:20 59:22 64:2 87:11 94:3 97:4 127:4 131:1 164:19,24 175:9 177:24 179:8 196:7 210:20 234:5 247:16 256:13 276:12 286:10 298:21 308:9 312:12 327:23 328:5,9,10

**giving** 198:15 217:5,8 322:19 324:4 325:4 327:18

**glasses** 107:10

**glitch** 30:12

**goal** 35:1

**goals** 35:14

**golf** 300:4

**good** 5:22 7:15 12:1 16:16 29:6 72:16 90:11 141:22 147:11 186:15 196:2 200:6 215:1 225:2 232:19 243:4 246:3,5 272:2 277:17 330:8

**gosh** 326:19

**govern** 272:20

**grabbed** 177:1

**gracious** 105:8

**grant** 70:4 180:6 190:11 221:6

**granted** 69:24 122:18 208:17 215:17 255:6

**granting** 94:24 125:11 171:12 234:16

**grappling** 224:3

**grasp** 264:8

**grass** 175:23

**great** 9:8 27:1 32:17 51:1 138:15 175:5 224:20 303:16

**Green** 160:19,20,23 161:10,21 162:4, 7,9,20

**Grill** 6:9 7:2 324:9 325:11 327:5 328:1 330:3 332:3,4,5

**Groundhog** 15:10

**group** 22:1,24 23:10 24:7,9 44:10 78:17 82:1 151:22 153:22 154:1 312:2

**groups** 281:7

**gruesome** 148:24

**guarded** 304:13

**guess** 19:5 20:8 41:15 42:10 50:18 107:9 132:18 165:23 198:5 217:15 222:11,12,13,17 223:4 225:24 266:14 292:3 331:16

**guidepost** 27:18

**guilt** 191:1 288:7,19 289:10,13

**guilty** 18:21 37:9,11 62:18 85:17 146:16 167:5,17 171:14 172:8 178:4 269:15 288:13 327:20

**guy** 97:3 234:11 247:18 266:18 326:15

**guys** 172:7 276:22 308:11 326:19

---

**H**

**hair** 109:6,13,18,21 111:5 113:20

**hairs** 110:1

**Hal** 6:7 23:20 84:21 129:20 169:16 242:9 277:13 301:23 302:7

**half** 73:3 267:22 276:24 284:9,12

**Halloran** 320:14

**hand** 8:16 27:17 168:15 274:8 275:3 276:11 280:1 281:4 283:4 335:11

**handed** 206:16 301:2

**handle** 13:4 18:20 96:4 229:3

**handled** 14:17 25:20 76:13 80:6,13, 18 229:20

**handling** 82:4 230:17

**hands** 234:13 286:2

**handwriting** 11:19 251:12,16 300:24 301:3 306:3,4,11,13 307:18,21,22,23 308:1,2,5

**handwritten** 244:19 271:21 300:8

**handy** 185:6 295:23

**Hanlon** 229:20 230:3,18 231:4,5

**happen** 54:14 81:21 82:23 171:20 260:22 261:24 263:6 264:6 265:7 295:22 327:14,21

**happened** 19:6 144:9,17 171:17 174:4 221:2 232:23 307:15 327:15 328:11 329:2,4

**happening** 104:19 152:6

**happy** 8:21 111:17 147:13 303:13

**hard** 24:12,13 183:5

**Harjani** 58:22 333:6,9

**Harjani's** 45:3 46:3,7 58:15

**Harold** 314:3 315:23 316:1,15

**Harris** 270:24 271:2,5 307:2,8,14

**Harvard** 20:14

**hash** 318:8

**he'll** 248:22

**head** 31:13 54:19 78:17 132:19

**header** 184:14

**heading** 30:17 33:7 39:23 101:15 133:4

**headings** 132:22

**hear** 9:2 63:15 81:10,11 136:8 217:15, 18 284:15

**heard** 210:10 217:14 327:17

**hearing** 134:12 135:15 136:21 137:12,13 138:7 162:6 201:12,15 204:24 211:22 218:17,18 318:7

**heavy** 223:1

**held** 37:24 124:10 208:7 209:9

**helpful** 23:24 184:12,18 187:19 200:4 267:3 276:19

**helping** 105:14 206:19

**helps** 184:15

**Henretty** 6:12,14 9:10,11,12 10:16 11:2,22 25:1 28:1 29:3 34:1,8,14 36:12 44:21 46:9,10 51:10 53:16 54:10 57:12 58:9 60:20 61:14 63:17 68:9 75:12 77:16 79:13 80:20 85:1 86:10 88:11 89:10 96:17 115:3,21 116:12 117:7 118:16 121:16 125:7,18 127:1 130:9 133:8,13 135:6 147:23 153:12,19 155:9 182:3 187:5 194:1

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 146 of 612 PageID #:8804

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: hereinbefore..inanimate

197:19 202:1 203:2 205:17 207:4,6
211:8 212:3,16 213:2,11 214:9 215:13
217:10 220:23 222:3,15,23 223:6,14
224:2,15 230:10 231:13,15 232:1,3,6
236:3 239:7 240:23 243:12 244:1,4
245:2,16 248:21,23 252:9 256:18
258:6 262:8 266:6 271:19 272:15
275:16 276:14 280:15 282:14 283:20
289:16 290:11,12 291:23 297:20
299:7 308:11 309:1,7 319:11 320:2
331:22

**hereinbefore** 335:5

**hereunto** 335:10

**hesitant** 194:13

**hesitation** 250:4 304:9

**highlight** 43:16

**highlighted** 193:11

**highlights** 12:10

**highly** 97:11 98:8 99:9 102:19,23

**hijacking** 259:2

**Hill** 219:7 315:24 316:1,16

**Hill's** 220:24

**hired** 21:5 31:13 205:20

**hiring** 31:22

**Hispanic** 281:6

**history** 257:14,16 330:16

**hit** 12:9,11 103:16 269:3

**hitting** 110:15

**Hold** 51:10,14

**home** 131:5 137:8 138:4 177:3,4,5,7
266:23 267:17 270:12 314:18,21
321:21 323:18 324:6 325:10

**homicide** 273:20

**Hon** 333:5,8

**honestly** 227:13

**honor** 49:20 87:17 203:6

**Hood** 317:1

**hope** 120:3 130:22 188:8 193:12
274:2 300:3 320:4

**hoped** 130:17

**hopeful** 136:9 273:24

**hopes** 273:3

**horns** 320:21

**horrors** 303:20

**Hound** 150:16

**hour** 73:2 196:10 284:12 306:14

**hours** 11:8 44:13 157:12 169:9
170:12 285:5 289:3 310:3

**house** 8:6 322:3

**human** 37:15,16 280:4 281:3

**humans** 331:2

**hunger** 111:22

**hypothesis** 299:16

**hypothetical** 29:2 182:22 292:2
297:21

---

**I**

**I-BOND** 205:7

**I-BONDS** 205:2,14

**idea** 18:4 20:7,13 21:18 147:11 189:9
239:11 250:12 267:12 277:6 293:17

**ideas** 110:2

**identical** 325:6

**identification** 30:23 39:12 73:20
83:19 90:6 93:22 98:20 112:17 154:3,
10 181:4 199:9 202:17 209:24 219:3
251:4 258:12 259:20 261:11 262:15
268:7 278:12 296:11 300:16 313:8
321:4

**identified** 55:21 82:2 99:17 103:4
109:4 123:12 124:7 148:16 160:20
280:4

**identifies** 179:8

**identify** 5:17 6:12 17:22 19:2 21:20
28:3 34:19 48:14 203:17 265:16
324:11

**IDOC** 18:19 42:14

**ILCS** 91:6

**Illinois** 5:4,11 14:8 41:12 93:8 94:11
108:23 147:9 331:7 333:2 334:1,6,11

**illusions** 31:24

**im-** 148:2

**imagine** 31:8,9

**impact** 179:22 185:14,16 304:14

**impacted** 282:18

**impaling** 316:4

**impeached** 210:7,10

**imperfect** 276:2

**implausibility** 298:22

**implausible** 173:21 293:17,22,24
297:17

**implicate** 273:4,14 326:4

**implicated** 118:12 248:8 263:17
315:7

**implicating** 314:20

**implied** 130:13

**imply** 255:11,12

**import** 330:22

**importance** 120:12 170:24 173:14

**important** 19:2 35:20 37:17 59:22
135:13 157:8 171:23 172:17

**imposed** 121:3

**impossible** 167:13 174:2 177:13

**impound** 95:1,18

**imprecise** 215:18 255:7

**impregnated** 271:14

**impress** 34:20

**impressed** 33:18

**impression** 98:10 148:13 149:5
185:20 306:20

**impressions** 96:15 148:2,6,10
304:21 311:6,8

**imprisonment** 226:7

**improper** 245:23 292:1

**improperly** 122:11

**improve** 123:19

**inability** 205:11

**inaccurate** 200:7

**inadvertently** 41:19

**inanimate** 294:4

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                              Index: inappropriate..intermediate

**inappropriate** 226:8 289:20

**inappropriately** 85:5

**incapable** 172:10

**incarcerated** 291:22

**incidences** 144:7

**incident** 119:5 263:22 323:5

**incline** 186:18

**inclined** 288:2

**include** 53:7,11 164:14 253:10 320:13

**included** 18:4 93:17 103:21 114:20 142:21 192:13 216:12 274:15

**includes** 230:18

**including** 54:19 118:14 157:11 178:6 200:15,21 316:4

**inclusive** 333:15

**incomplete** 29:2 182:22 297:21

**incorrect** 172:11 179:12 208:2,3

**incorrectly** 18:17 165:2,3 216:2

**increases** 132:7,14

**increasingly** 148:19

**inculpated** 29:16

**inculpatory** 137:4

**independent** 9:22 10:1 64:16

**indicating** 87:23 157:11 272:6

**indication** 69:5 145:11

**indications** 119:5

**indicative** 173:18 183:19

**individual** 6:10 7:3 23:20 66:22 103:8,20,24 108:4 111:12

**individual's** 290:23 291:1

**individually** 109:3

**individuals** 10:9 101:3 175:14 281:9 295:9 316:6

**indulge** 274:24

**ineffective** 28:13

**infallible** 172:10

**inference** 36:17 130:4 135:19 136:3 168:16 298:15

**inform** 89:8 275:8 280:17

**information** 33:3 76:2 105:23 110:8 121:14 129:15,18,21 140:2 141:15 142:9,21 155:6 157:15 161:20 162:17, 20 164:4 166:4 167:18 168:1 169:6, 14,18,20,21,24 172:17 179:4 187:15 188:11 199:20 200:1,6 204:1 211:13, 16,18,22 215:24 217:6 230:14,19 236:5 258:1 259:8 273:17 285:11 288:17 305:17,22 312:8 314:10 316:9, 18 327:19

**informative** 166:2

**informed** 195:22 269:19 280:13

**informing** 192:19

**initial** 52:8 68:23 74:12 96:14

**initially** 91:24 92:23 128:5 131:10 139:1 327:18

**initials** 263:23

**initiate** 216:17

**initiated** 273:3

**injuries** 129:4,14 130:6

**innocence** 27:21,24 32:21 47:19 55:22 56:16 57:7 59:17 62:15 64:11 69:16,17 76:9,11,19,24 78:14,15 79:5 80:5,13,18 83:9 86:6 123:22 180:1 188:19 190:20 191:1 195:8 216:24 225:16 226:1,19,22 228:19 229:4,8,19 230:9 231:3 234:17 236:1 238:21,23 239:3,18,24 240:8,12 311:23 314:8

**innocent** 48:1 55:5 64:4 71:12 123:8 125:3 162:8 170:22 172:4 205:13 216:1 220:11 238:7,17 239:14 273:8 282:6 326:20

**innocuous** 217:12

**input** 44:1 220:5

**inquire** 60:8,9,14 67:6,11,17

**inquired** 25:11

**inquiries** 102:19

**inquiring** 91:18

**inquiry** 24:24 48:17 49:10 59:2 67:9, 14 143:2 217:7 231:1 270:5 282:9 319:6

**inserted** 294:3

**inside** 194:20 266:18

**insisted** 138:1

**instances** 49:15 144:14 329:7

**instruct** 25:2 44:22 46:11,13 51:11 57:13 58:10 60:22 61:15 68:10 75:13 77:17 79:14 86:11 88:12 117:8 118:17 230:11 231:17 248:22,24 289:17 290:12,14

**instruction** 46:12 57:17 61:1,20 68:12 75:16 78:9 88:15 117:13 118:22 217:9 231:19

**instructions** 46:19

**insurance** 13:2 330:16

**integrity** 16:13 20:2 21:15 27:19 31:14 32:20 33:8 35:11,18 39:21 41:11 44:2 45:21 47:18 50:12 51:6 55:11 57:23 61:24 65:7 66:6,11 70:16 71:7 72:10 75:5 76:17 80:6,19 81:4 84:8 85:16 91:2,5 110:9 193:17 220:21 233:16 237:6 239:5 241:9 242:3 244:15 245:12 269:5

**intelligent** 24:4

**intelligibility** 158:15

**intend** 204:8 255:11

**intended** 46:4 47:10 74:9 116:17 118:3 146:13 255:13

**intending** 36:16

**intent** 118:9 133:1 158:23 226:4 254:12

**intention** 210:8 303:1

**interactions** 160:24 226:20

**interchanges** 238:10,12

**intercourse** 169:8 285:4 286:13 287:2,21 290:24 295:2 322:8 323:14

**interest** 65:3 108:14 149:19 206:19 225:3,15 274:18

**interested** 96:21,24 195:17,20 210:24 233:15 335:8

**interesting** 18:12 131:12,18

**interests** 92:6 124:20

**interject** 45:10 49:1 163:12

**interjection** 174:20

**interlocking** 316:2

**intermediate** 53:4

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 148 of 612 PageID #:8806

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: internal..Justine

**internal** 47:8 76:22 78:21,23 79:3
80:2

**interpose** 280:8

**interposed** 162:2

**interpreted** 254:19 288:12 289:12

**interrogation** 321:15

**interrupt** 44:18 81:7 206:11

**interrupting** 49:18 51:15

**interruption** 173:22

**interview** 19:8 131:4 137:16,17,18
146:24 147:5,17,18,22 148:4 150:7,24
154:13,17 156:9,14,18 157:21,24
158:2,7 160:1,6,10,18 161:5 232:12,
13,16 233:2 234:5 301:21,22,23
302:7,11,12,18 305:5,13 306:9 311:9

**interviewed** 19:15 159:6,18 285:16
312:15 314:16

**interviewing** 311:16

**interviews** 87:9 149:14,17,21 151:8,
9,14 155:4 156:3 198:9 303:3

**intimate** 286:1

**introduce** 235:21

**introduced** 120:13

**invades** 56:24 58:7 230:6

**invading** 87:7

**invaluable** 24:3

**invariably** 17:12

**invested** 225:5

**investigat-** 318:1

**investigate** 62:15 64:10 137:11
252:17 267:23 311:15 312:20 317:7
318:21,24 319:9,14,24

**investigated** 61:6 267:19

**investigates** 47:18 70:2

**investigating** 250:16 311:20

**investigation** 17:14 48:8 50:13
51:20,23 52:2,3 54:9 57:22 59:8 66:10
71:11 86:4 95:24 97:8,15 98:5 104:8
105:3 113:16 114:2,22 115:17 116:10,
21 120:20 122:1,3 125:4,14 128:2
131:14 132:1 133:6 138:10 139:5
146:23 165:8 171:8 192:9 193:18
230:3,14 233:19 249:11 250:21

269:11,23

**investigations** 173:10 249:9 252:15

**investigative** 62:16 151:13 152:19
153:5,18 154:6 271:15 312:2

**investigator** 242:16

**investigators** 270:7,15 305:8

**investigatory** 24:23 25:4 288:21

**involve** 16:23 144:14,20 145:7

**involved** 23:14 37:14 54:8 63:7,8,9,
22 92:16 93:3 97:5,8 104:7,24 105:2
116:9 139:12 144:13 149:20 174:12
175:14 194:16 213:10 240:12 247:24
253:21 254:2 315:6 326:11,15

**involvement** 104:22 105:16 108:5
151:6 273:20 292:9

**involves** 54:19 207:11

**involving** 13:4 61:12 247:3 330:21

**irrefutable** 282:16

**isolate** 105:19 275:18

**isolated** 103:4

**ISP** 93:12 94:19 95:2 100:21,24
101:16 110:4 120:7 278:23

**issue** 23:15 49:5 60:4,6 80:2 88:6
114:12 150:20 178:2,3,5 225:23 289:1
318:4 320:19

**issued** 42:4 116:20 142:7 196:14
232:10

**issues** 8:15 16:20 18:9 44:12 51:22
60:2 86:4 91:3 98:1 108:10 152:23
188:15 206:21 245:20 247:6 269:19
272:20

**issuing** 96:3

**item** 99:24 109:3

**itemization** 20:18 99:19

**items** 99:20 106:2,15,16 274:12
328:16

**iteration** 184:22

**iterations** 182:8 183:6

———————————————

**J**

**jail** 33:15 208:5,9 316:8

**Jakob** 78:16

**Jessica** 6:21 45:15 49:3 66:15 217:15
248:10 280:16 289:20 290:4 302:15

**Jim** 229:20 230:2,18 231:3,5

**job** 12:8 14:10,11 18:4 22:11 34:17
37:2 38:19 40:3 44:11 139:23 167:2
206:8,12 225:2 250:8 281:15

**Joe** 5:15 29:23 112:3 201:6 209:1

**Johnson** 6:12,16 23:21 129:20 156:9,
10,15 157:10 169:16 277:13 314:17,
21 315:7

**Johnson's** 315:1

**join** 34:8,14 53:16 63:17 85:1 115:3,
21 125:8 187:5 194:1 202:1 203:2
205:17 206:7 211:8 212:3,16 213:2
214:9 215:14 220:23 222:23 224:15
239:7 243:11,12 258:6 266:6 272:17
275:16 280:15 299:8

**joined** 12:17 38:2 62:2

**joint** 272:21

**joking** 42:17

**Jones** 5:3 334:4 335:17

**judge** 45:3 46:3,7 49:7 58:15,22 60:3,
6 88:3 121:3 135:16 136:2 197:4
208:7 226:3,10 243:16

**judge's** 25:21 45:11 49:3

**judgement** 143:3

**judgment** 51:4 225:11 318:17

**July** 16:8,9 21:10 139:16 149:24
268:19

**jump** 263:12 309:22

**jumping** 297:1

**juncture** 188:17

**June** 102:2

**juror** 63:8,21

**jury** 59:23 121:5,11,15 124:10 180:8
191:2 223:3

**justice** 33:22 41:20

**justify** 41:17

**Justine** 259:5,10

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

## K

**Kara** 24:1,3 101:7,17,20 105:13
129:16 169:16 277:12

**Kathleen** 92:12 219:7

**Katie** 220:24

**keeping** 315:4

**killed** 327:15

**killing** 282:23 316:3

**Kim** 255:17 256:7,12

**Kimberly** 156:9,10 160:19

**kind** 13:2 14:14,16 15:11 22:5 27:11
41:6,15,17 116:17 119:3 132:23
144:21 152:22 183:13 188:3 200:8
218:20 233:11,14 262:5,10 268:16,17
270:7,20 271:22 287:1 301:5 318:8
325:20 330:13

**kinds** 34:19 38:17 55:15 192:14,17

**Kirsten** 23:12

**Kling** 134:19,21 136:5

**knew** 76:16 78:15 93:2 95:4 106:14
128:16 148:23 185:9 189:18 190:4
198:5 202:10 212:17,18 213:14,19
267:4 281:20,22 312:4

**knowing** 177:7 267:7,10 307:11

**knowledge** 36:21 85:12 95:8 106:2,5
107:13 123:4 211:17 218:11 226:24
228:14 269:6,7 271:9 283:8,11 310:15

**knowledgeable** 23:22

**Kunzer** 6:7 242:8,9,12,23 243:19
244:5

## L

**lab** 95:5 100:11,21,24 101:16 120:7
186:10 196:24 278:2 279:5

**laboratory** 93:8 141:6 186:9 278:18

**laboring** 38:12

**laced** 294:2

**lack** 20:9 249:15 252:15,18

**lady** 326:9 328:7

**Laflin** 261:20 263:2

**lake** 40:6

**lane** 205:19

**language** 191:9 234:15,18 272:13
281:23

**large** 155:16

**largely** 134:20

**larger** 16:5 90:10

**largest** 330:15

**lasts** 225:7

**late** 44:18 46:23

**Latham** 150:2

**law** 20:14,15 24:22 25:3 26:24 35:6
36:1,8,11 42:13 231:10 236:13 288:20

**Lawrence** 264:3

**laws** 330:22

**lawsuit** 66:12 258:21 261:8

**lawsuits** 235:20

**lawyer** 23:21 26:6 37:11 50:20 113:19
149:3 196:2 232:2 326:10

**lawyers** 47:10 92:24

**layer** 68:7

**layperson** 26:13

**lead** 13:21 124:18 269:18

**leading** 316:16

**leads** 166:4 274:1 306:17

**learn** 82:21 96:22,23 98:12 130:14
313:17 319:5

**learned** 83:6 200:4 211:10 225:6
275:24 276:18 305:10

**learning** 82:18 224:24 314:10 316:9,
18

**learns** 136:1

**leave** 15:15 149:4

**leaving** 299:15

**led** 56:18 57:9 62:17 174:23 233:11
287:1 298:2 306:21 316:24

**left** 12:18 14:1 40:10 43:20 62:5 99:19
101:10 274:8 275:3 276:11 277:7
279:24 281:3 284:6 294:21 295:1
301:2 322:17 324:2 326:17 330:24

**legal** 28:5 238:22 242:18 244:2

**legally** 243:18

**legislature** 41:11 225:22

**legs** 22:22

**length** 108:7

**lengthy** 94:2 98:22 132:21

**letter** 84:2,7,10,12,14 85:12,13 89:18
91:1 92:2,4 94:2,11 190:6 271:21,22
272:2 305:15,23

**letterhead** 21:14 183:18,20 184:5,6,
13

**letting** 105:8 304:12

**level** 14:19 51:2 159:10 291:2

**levels** 105:20 144:9 277:2

**liberty** 214:21

**libraries** 42:13

**LIC** 335:18

**lied** 329:2

**lies** 329:7

**life** 176:16 266:17,19

**light** 171:17,20 221:16 248:1

**like-minded** 224:19

**likelihood** 123:11 144:13

**likewise** 71:1

**limit** 45:13 227:6

**limitation** 195:15

**limitations** 37:16 165:17

**limited** 105:21 106:4 276:2

**limits** 67:9

**lines** 272:8 286:4

**linked** 142:23 143:4

**liquor** 111:11

**Lisa** 6:5 7:16 29:5 88:18 214:14 223:7
252:21

**list** 20:18 38:7 192:11

**listed** 21:13 149:21 161:21 259:5
260:14 263:2

**listing** 99:18,19

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 150 of 612 PageID #:8808

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: lists..matters

**lists** 280:5

**litigate** 309:6

**litigated** 318:4

**litigation** 5:4,16 15:12 76:13,18 268:12

**live** 36:8 267:1

**lived** 143:2 177:8 267:5 307:4 312:5

**lives** 111:19 266:24

**living** 36:17 270:11

**located** 259:10

**location** 262:24 266:8,11 324:12

**loci** 283:13,18

**locution** 125:22

**logic** 170:17 172:13 190:23

**logical** 130:11 167:7 170:15

**logically** 167:12 170:10

**logistical** 152:23

**logistics** 98:1

**long** 11:5 12:10 15:24 25:18 78:6 99:4 112:14 128:13 175:22 283:8

**longer** 212:10

**longest** 38:16 225:8

**looked** 10:3,19,20 11:19,20,22 22:9 43:17,18 50:19,22 97:2 109:24 150:14 174:4 179:14 190:1 193:9 319:1,2 325:14,15

**loosely** 126:21

**lose** 309:3

**lost** 131:2 290:13 296:1

**lot** 10:2 19:16 21:22 22:18 23:16 24:13 26:19 41:15,22,23,24 50:17 53:20 97:19,21,24 105:6 110:21,22 142:2,5 149:16 158:22 171:9 189:7 207:12 210:23 220:4 234:12 270:16 312:4

**Lots** 276:22

**low** 280:6

**lower** 251:12

**lucky** 188:6

**luminaries** 203:18

**lunch** 111:21

**Lyle** 6:14

---

## M

**M-A-R-K** 7:21

**mad** 331:13

**Madam** 331:24

**made** 16:4 18:3 19:1 35:2,17,21 36:6, 10 37:13 43:20 48:3 50:14 51:19 59:23 60:1 76:20 84:13 85:19 87:12 91:23 98:9 108:9,12 113:3 115:15 116:5 117:5 128:12,15 135:13 136:3 137:11 156:4 174:20,24 180:11 193:1, 8 201:5,9,14,21 206:14 207:21 210:16,20 211:6 212:10 215:9 216:15 222:10 236:5 239:17,23 241:20 242:2 249:4 252:6 254:8,23 272:19 280:22 281:18 286:9 288:23 289:5 302:14 307:13 310:17 320:19 325:14

**Mag** 333:6,9

**Magats** 201:6 202:21 209:1

**Magazine** 233:13

**mail** 26:19

**main** 158:16 246:19

**maintain** 15:24 184:12

**maintained** 95:17 223:17

**major** 12:23 15:12,14 26:24

**majority** 27:1 51:1 247:2 330:11

**make** 16:14 37:16 42:20 49:17 53:23 56:11 70:22 72:1 74:12 90:9 94:19 107:10 116:18 118:10 130:11 141:16 143:9 145:24 146:12 151:17 153:15 158:17 167:12 172:12 182:1 188:24 189:3,20 190:13 191:6,9 194:18 214:11 216:7 222:11 223:14 226:6 253:16 265:15 270:7 289:22 301:5,7 302:21 303:8 309:4,8 315:9 318:16 326:19

**makes** 52:12 120:5 138:13 195:17 305:11,12 307:11,12,16

**making** 9:1 20:16 25:17 35:5 36:1 95:23 116:10 117:15 134:14 137:3 146:15 158:17 182:17 185:17 186:2,4, 14 224:22 225:11 241:11 266:15 304:8

**male** 281:3

**man** 132:3

**manage** 206:18

**managed** 76:13

**mandate** 21:24

**Manhattan** 20:11

**manner** 125:21 149:1 245:1,14

**March** 5:5 333:13 334:7

**marginal** 329:15

**mark** 5:7 7:10,20 51:10 98:17 111:4 172:5 182:5 185:19 198:14 199:4 213:13 227:17 234:10 246:3 258:9 259:17 263:10 278:14 296:5,13 306:14 308:14,17,24 313:2 321:1,13 329:23 331:10 333:11,18 334:8,14

**Mark's** 172:9

**marked** 30:22 31:4 39:11 73:19 83:18 90:5 93:21 98:19 112:16 154:3,9 181:3 199:8,11 202:14,16 209:23 218:23 219:2 223:9,12 251:3 256:14 258:11 259:19 261:10 262:14 263:13 268:6 278:11 296:10 300:15 308:13 313:7 321:3

**marking** 30:19 73:15 112:11 129:1 209:19

**marks** 32:4 303:19,23 304:15 305:11

**masthead** 115:11

**match** 181:22

**matches** 324:7

**material** 26:16 56:10 82:16 103:9 105:15 141:24 142:8 180:18 183:24 187:1,13,19 247:8 316:21 319:1,4

**materially** 142:9

**materials** 10:3 11:19,22 28:17 51:1 54:14 86:4,15 87:6 257:20 293:14 319:7,22 320:8

**matter** 5:8 9:17 10:23 18:14 49:6 63:10 64:1 71:1 76:13 86:21 92:1 94:15 96:5 99:8 113:4 120:20 122:13 186:4 189:19 197:1 202:20 203:14 206:16 207:11 208:10 210:24 250:6 268:20

**matters** 9:20 11:12 27:15 28:18 76:23 104:3,8 118:11 139:6 175:4 192:6 194:9 197:17 200:22 204:17 211:23

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 151 of 612 PageID #:8809

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: Matthews..money

220:7 233:20

**Matthews** 268:24 269:6

**mature** 37:6

**Meador** 6:5,24 7:14,16 25:3,17 26:1
28:10 29:8,10,23 30:10 31:1 34:4,10,
22 36:19 39:13 42:23 43:22 44:23
46:2,15 48:13,19,22 49:23 50:7,10
51:14 52:4 53:22 54:5,16,22 57:3,4,15
58:11 60:23 61:16,18 62:12 64:6
65:17 66:1,4 67:20 68:1,11,15 70:11,
14 72:15 73:7,8,21 75:14 77:9,19
78:5,7 79:17,19 80:9 81:1,14,20 83:20
85:6 86:14,17 87:15 88:13,23 89:2,11
90:7 93:23 95:13,15 96:8,19 98:21
104:20 111:14 112:10,18 114:10,11
115:5 116:1 117:12,17 118:18,20
121:20 125:12 126:1,12 127:6 133:3,
12,22 135:18 136:12 142:11 145:1
146:2 148:8 149:11 151:21 152:1,16
153:7,17,20 154:4,11,23 155:2 156:1
163:15,19,22 178:12,21 179:1,2
180:24 181:5 182:14 183:2 184:16,19
187:6 194:4 195:11,13,14 197:20,22
198:18 199:5,10 200:18,20 201:2
202:11,18 203:3 204:6,13,23 206:1,9
207:9 209:20 210:1 211:15 212:6,20
213:8 214:2,10,15,17,22 215:5 216:9
217:8,14,17 218:5,9,14 219:4 221:3,
14 222:4,20 223:11,16,19 224:5
225:13 226:15 227:8,10 228:5,21
229:15 230:1,12,23 231:5,11,18 232:7
234:8,22 235:9 255:1,3 315:11 317:11
331:10

**meaning** 137:24

**means** 12:12 35:17 37:15 56:1 62:23
64:21 102:16 161:23 303:22,24

**meant** 19:5 33:12 98:14,15 120:24
123:18 188:7 194:18 254:13 276:17

**mechanism** 34:18 226:5

**media** 197:14 198:9,17

**medical** 128:19

**meet** 38:13 57:6 105:5 221:20 222:7,
18 233:7

**meeting** 19:20 22:18,19,20,21 150:8,
12 306:6 308:4

**meetings** 19:22,23 82:1 104:23

**member** 176:22

**members** 23:6 47:11

**memo** 10:22 11:10,24 112:14 113:6,
7,9,11,14 114:1,6,13,16,20 116:4,11,
16,20 117:1,21,23 133:23 140:18
141:6,11,17,22 142:7 152:19 153:6
154:12,21 159:22 161:4 163:10 164:9,
14 167:22 173:9 178:23 179:14,15
181:8,16 182:8,17 183:9,16,17,24
188:23 189:8,14 190:15 191:6,12,19,
24 192:23,24 194:15 195:10 196:15
215:16 222:1 232:10,14 235:23
239:18,23 240:9,17,19 241:16,21,22
252:24 253:9 254:6,11,12 255:5
256:14,21 263:12 264:23 267:12
272:6 274:24 275:6 282:4 285:2
287:23 288:11,12 289:4,11 293:1,23
299:17 311:3

**memoranda** 184:13

**memorandum** 113:1 216:15 248:12
301:20 315:12

**memorized** 293:15

**memory** 74:22 150:13 183:1 225:7
317:6

**memos** 22:9 240:15 241:9,21

**men** 125:3 126:9 171:13 172:3 178:5
198:16 207:17 208:4 215:24 218:13
239:13 314:4 322:19

**mention** 267:12

**mentioned** 47:3 255:3 310:4 335:5

**mentioning** 175:20

**merged** 16:5

**merit** 171:11

**merited** 173:6

**merits** 180:6 190:11

**messed** 175:3 198:3

**Messrs** 6:11 110:14 202:21

**met** 19:11 34:15 44:10 123:23 126:11
128:14 139:17 226:9 310:17

**methodology** 17:22 19:2

**meticulous** 203:8 307:12

**Michael** 144:18 150:6

**middle** 132:22 137:24 203:4

**midst** 173:22

**midstream** 297:1

**Mikey** 107:10 129:7,8 144:9,12,18
164:20 168:1,10,21 176:20 177:1
265:21 293:18 298:2 307:4

**Mikey's** 127:9 129:3,12 170:22
268:20

**Miller** 160:19

**mince** 212:7

**mind** 11:15 244:8 245:6 291:7 311:4
326:24 331:12

**minds** 188:1

**mine** 15:19 216:8 251:17 296:2 301:9,
13

**minimize** 326:10

**minimum** 226:12

**minor** 280:4 281:3

**minute** 306:14

**minutes** 11:7 72:17 178:14 308:9

**misbehaved** 250:21

**mischaracterize** 328:3

**mischaracterizes** 207:6 212:14
214:8 215:11 255:21 299:6 319:12
324:9 327:6 328:2,4

**misconduct** 63:23 246:17 247:12
249:4 252:6 314:1

**missed** 66:15

**missing** 303:9

**mission** 55:3,11 64:15

**misstates** 145:17 198:12 257:8
272:13 287:24

**mistake** 179:15

**mistaken** 249:17

**mistakes** 19:1 37:13,17

**misunderstanding** 77:10

**misunderstood** 104:22

**mitigation** 162:5

**mix** 66:16

**MO** 143:15

**moment** 88:24 274:24

**moment's** 198:15

**money** 13:15 330:18

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 152 of 612 PageID #:8810

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Index: month..oath

**month** 8:1 227:14

**months** 22:13 26:19 27:4 117:21 268:20

**Moran** 6:11,18 7:2 45:10 46:6 49:1,2 58:18 59:10 60:5,16 66:13 86:21 87:14,19 88:18 89:6 235:14,18,19 236:8 237:11 239:1,16 240:10 241:7 242:6 244:6,11 245:8 246:1 249:14 250:18 254:10,24 257:8 262:7 272:12 279:2 284:5,11 287:24 291:4 299:8

**morning** 5:22 7:15 10:18 11:3,4 152:22 153:13 197:9

**MOS** 144:1

**mosaic** 325:19

**mother** 271:5

**motion** 90:12,24 91:9,15 134:10 135:4 136:21 137:12 138:7 243:17 247:8 290:7 315:13 317:16 325:17

**motives** 271:16

**mouth** 107:18 108:18 109:22 205:23

**move** 60:19 126:13 134:1 184:21 195:23 289:4 297:13 302:16 331:10

**moved** 73:12

**moving** 101:14 130:24 142:13 163:1 174:13 179:20 223:18

**Mr.-** 249:6

**multiple** 144:13,14 184:13 285:21

**murder** 14:22,24 29:16,17 85:9,18 123:9 124:8 128:8 144:3,12,22 145:4 148:22,24 151:6 156:12 162:9 165:13 166:11 167:2,6,11,17 170:13,22 173:15,17 174:16,24 222:24 257:2 268:20 269:13 270:1 282:11,17 284:1 288:14 295:15 310:6,16 312:17 316:7, 8 317:2 323:1 330:6

**murdered** 123:11 145:5 148:23 164:22 168:21 169:1 176:20 265:20 273:9

**murderer** 314:5

**muted** 45:15

---

**N**

---

**nail** 106:8

**named** 23:4,11,20

**names** 101:11 247:17 250:1 320:14

**Nancy** 23:4

**narcotics** 13:14

**nasty** 326:17

**Nation** 176:4

**natural** 155:18 190:19

**nature** 70:24 86:3,14 87:5 103:9 143:20 173:15 174:4 205:11 237:18

**navigate** 318:13

**Neal** 103:24 110:15 142:22 143:1,12, 15 144:7,19 145:3,7,10,11,21 146:16, 24 147:12 148:13 158:12 164:20 166:17,23 167:8 168:21,23 172:6 174:9,15,24 176:19 178:4 191:3 257:1,10,13 258:22 260:5,18 261:17 262:20 263:17,23 265:18 268:19 269:7,11,15,18,24 270:10,14 271:11, 14 274:9 275:1,21 276:4 277:20 280:2 281:2,16,20 282:17,20 283:17 285:17 287:12,16 288:13 293:18 297:17 298:23 299:17 306:8 311:7,15,20 312:16,17

**Neal's** 142:15 147:22 174:21 266:8 271:5 283:12 288:7,19 289:9,13 291:11,18 311:8

**necessarily** 59:18,19 60:12 86:9 124:18 135:9 167:12 169:1 182:24 185:8 190:22

**needed** 54:14 74:12 89:5 105:23 137:6 196:3 318:3 320:21 330:1

**needless** 287:11

**negative** 178:10

**neighborhood** 175:13 176:6 284:13

**neighbors** 149:20

**Neil** 282:10

**Nevest** 6:2 9:20 61:13 75:19 81:5 85:17 127:13 128:5 132:7,12,14 156:3 157:21 210:4 253:12 294:12 297:2 310:5 321:14 322:14 323:7,13,15,24 324:1 325:4 327:11 329:1 333:7

**newly** 20:24

**news** 225:7

**newspaper** 200:5

**nice** 15:20 40:4,8 74:2 246:5

**Nicholas** 5:22

**Nick** 84:24 95:12,14 96:6 115:2 132:16 152:2 244:6 246:5 249:8,17 284:5 315:18

**night** 321:21 322:11

**noise** 81:9

**noisy** 266:23

**nolle** 125:15 223:21 224:7 232:22

**nolle'd** 209:12 218:3,7

**nomenclature** 252:23

**normal** 196:22

**north** 176:5,11 306:9

**Northern** 5:11 333:2 334:10

**Northwestern** 26:22

**notarial** 335:11

**Notary** 333:23

**note** 8:22 39:22 156:21 157:8 304:14, 23 306:1 327:16

**noted** 144:22 145:8 148:3 157:6 179:11

**notes** 11:18 132:19 158:16,18 234:24 300:9,21 302:2,14 306:6 307:9 308:10

**notice** 335:3

**noticed** 321:12

**noting** 181:16

**notorious** 314:3

**November** 11:10,24 12:18 94:12 113:11 122:24 141:12 180:12 195:3 196:14 200:10 201:7 202:20 205:1 208:24 211:21 212:9 232:18 237:20 240:9 278:18 279:5 280:21

**nuances** 158:18

**number** 17:11 25:12 32:13 33:13 73:4 100:20,21 103:7 141:6 144:9 173:5 290:19

**numbered** 313:11 321:8

**numbers** 27:1

---

**O**

---

**oath** 40:2 333:12

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 153 of 612 PageID #:8811

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: obey..original

**obey** 290:16

**object** 24:21 28:1 29:1,3 34:1 36:12 44:19 48:10,16 54:10 61:7 63:13 66:8 75:8 77:4 79:6 80:8,20 84:23 86:2 95:12 96:7,17 104:13 114:7,24 116:12 117:3,13 118:7 121:16 125:7,18,19 126:3 127:2 130:7 132:17 135:6,22 141:18 144:4 145:15 147:23 148:12 155:9 195:5 197:18 198:11 200:23 202:24 206:5 211:4 212:1,12 213:11 214:6,7 222:3 223:23 224:12 225:18, 20 227:17,21 229:10,11 230:5 234:6 237:8,9 238:19 239:6 240:4,23 245:2, 3,16 248:3 250:18 252:9 254:10,24 255:20 256:18 257:8 262:7,8 270:2 271:19 272:12,15 276:14 282:12 289:16 311:18 319:11

**objected** 228:8 229:7 239:14

**objecting** 56:22,23 182:3 217:12 245:17,18 246:23 288:15

**objection** 5:24 6:3,6,8,10,15,17,23 7:6 9:3 25:16,18 29:6 34:7,13 44:19 45:9,19 53:15 54:2,21 57:11 59:9 60:15,21 61:14 62:11 63:16 65:14,23 68:8 75:12 77:14,17 79:9,13 88:1,10 89:9 115:4,19 118:16 127:1 146:10 182:21 187:4 193:24 200:16 201:24 204:4,10,18,20 205:15 207:2 212:23, 24 215:11 217:4 218:4 220:22 221:13 222:14,22 224:1 227:3,6 229:22 230:10 236:3 238:18 240:1,21 242:17 243:9 244:1 248:23 249:13 255:1 256:16 258:5 264:19 265:22 266:4 273:21 275:14 280:9,22 283:20 287:24 289:7 290:4 291:4,23 292:1,12 297:20 299:6 315:11 317:11 320:3 324:9 325:11 327:5 328:1 330:3

**objections** 9:1 43:1 46:17 49:19 58:5 68:9 214:12,24 215:14

**objective** 127:4

**objects** 93:17 99:17 173:20 293:7 294:4

**observed** 322:6 323:7,12

**observer** 203:24

**obstructionist** 49:20

**obtain** 44:1 130:23

**obtained** 85:5 92:8,11 103:6 130:5 139:11 155:6 157:15 164:2,7,16 169:13 208:6 211:17 248:2 258:2 277:19 314:2

**obvious** 149:3

**occasion** 127:14 260:17 287:2

**occasional** 17:9

**occasions** 10:17 17:11

**occupied** 266:21

**occur** 51:20

**occurred** 126:17 165:13 166:11 196:10 264:12 265:11,12 287:7 320:15

**occurrence** 261:20 263:1 281:5

**October** 84:8 260:8

**odds** 190:10

**offender** 312:7

**offenders** 144:13,14

**offense** 28:5 103:19 108:6 143:6 275:23

**offenses** 143:8,20

**offer** 153:4 287:22 288:12

**offered** 248:12 282:4 283:24 291:10, 13,14

**offering** 289:12

**office** 6:22 9:14,18 12:5,7,16,17,20 13:6,23 14:6,9 16:3 17:21 18:4,8,13 19:13 20:12 21:2,9 24:19 26:23 28:23 31:13,21 32:23 37:21 38:7 40:4,6,7 42:24 43:5,7 59:14 60:2 62:3 64:17 65:9 71:14 74:1 76:15,21 79:4 80:4,11 87:13 91:3 92:12,22 111:1 118:11 121:7 122:17 139:18 148:17 153:3,10 163:14 181:8 183:18 192:4 197:15 202:8 203:9 204:15 206:15 207:14 208:16 209:13 211:2 212:18 216:16 219:6 221:17 222:6 225:10 226:18,22 227:16 229:3,7 232:22 233:3,7 237:20,23 238:5,14 254:7 255:9,11, 12,13 266:2 288:18 305:8 317:23

**office's** 95:18 228:18

**officer** 13:17,19 38:1 63:7 65:8,16,21 67:24 312:5

**officer's** 247:20

**officers** 6:10 7:4 13:13,15,19 176:7 247:11 250:2,13 312:20 318:22 320:13,14,18

**officers'** 319:9,14,24 320:11

**official** 21:11 241:11

**Olson** 23:12

**omitting** 186:17

**once's** 244:19

**one's** 244:18 301:9

**ongoing** 104:4

**online** 133:11

**open** 111:16 188:15 322:17 324:2 325:8

**operation** 105:7

**operations** 13:15,16

**opinion** 49:4 87:14 205:22 206:22 214:3 241:3 243:6 250:15 253:9 256:9 276:12 288:19 291:17

**opinions** 205:21 248:12 249:19 256:13 282:4 287:22 288:12 289:12 291:10,14,15

**opportunities** 19:4

**opportunity** 35:1 39:7 74:3 181:17 244:12 286:6 313:16

**oppose** 59:17 226:18

**opposed** 63:4 145:23 150:23 240:8 311:21

**optical** 18:9

**optimism** 142:2

**optimistic** 188:5

**opus** 119:14

**orally** 322:6 323:12

**order** 44:6 45:3 46:4,7 58:15 94:24 146:15 188:1 223:9 225:24 226:3 236:22 253:4 308:15 312:15 332:1

**ordering** 332:2

**orders** 97:4 234:16

**ordinarily** 130:16

**organization** 22:21 23:6 282:1

**organizations** 26:21

**organized** 318:5

**oriented** 330:23

**origin** 85:12 130:2

**original** 50:2 228:7

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: other's..personnel

**other's** 286:2

**outcome** 120:14 195:18 335:9

**outlets** 198:10

**outset** 213:17

**outsider** 18:6,10

**outstanding** 180:17 186:24 187:12, 18 188:15

**overblown** 318:12

**overcharges** 331:7

**overlay** 267:24

**overlaying** 41:4

**overlook** 121:7

**overturned** 317:2

---

**P**

**p.m.** 112:5,9 152:11,15 178:16 235:4 332:12

**pace** 73:4

**Pacold** 333:5,8

**pager** 321:7

**pages** 39:9 87:20 89:1 142:14 184:21 190:7 301:7 333:15

**paid** 143:20

**panel** 275:20

**panels** 103:1,2

**panic** 149:1

**panicked** 323:18

**panties** 294:6 299:20

**pants** 173:24 286:2 293:19 298:2,13, 17

**paper** 87:18 198:24 199:1

**paragraph** 30:18 32:18 47:17 52:12 55:3 62:14 65:6 68:17 71:10 119:19, 23 120:10 123:5 127:8 128:19 131:3 134:8 136:4,16 137:3,24 138:23 139:16 141:5 156:22 167:24 169:4 170:19 175:12 177:16 179:21 181:19 184:23 220:10 314:13 321:17

**paragraphs** 32:11 132:8 136:18 193:10 328:19

**parallel** 74:18 190:10

**parameters** 27:12 48:24 77:21,24 106:3 227:2 248:4

**parents** 134:15

**parking** 175:22,24

**parroting** 138:1

**parse** 106:15

**parsing** 87:24

**part** 20:8 30:14 36:23 50:11 52:18 63:24 66:14 71:23 86:18 110:7 116:17 141:2 143:22 146:23 165:7 168:7 169:20 179:16 181:11 206:10,23 249:2 257:4 273:18 282:9 290:6 300:7 315:17 317:21 325:19

**part-time** 23:23

**partial** 274:8 275:2,12 277:18,24

**participant** 329:15

**participate** 33:2 147:2 150:1 193:21 194:19 213:3,5 232:11 305:9

**participated** 132:5 144:8 149:5 150:4 156:17 161:5 167:10 194:17

**participating** 302:20

**participation** 146:18 222:10

**particularity** 295:4

**particulars** 210:21

**parties** 335:1,7

**partner** 168:3

**party** 29:6 127:24 232:1

**pass** 111:21 235:12 242:7 309:17

**past** 39:20 43:18 135:11 192:16 207:19

**pat** 58:20 66:24 235:12,19 244:9 284:8

**Pat's** 7:1

**pattern** 318:6

**Patterson** 78:17

**paused** 200:18

**payment** 226:13

**pdf** 10:18

**pendency** 231:2 251:23

**pending** 5:10 334:9

**people** 9:5,19 12:24 13:14,17 15:21 18:16 19:18 22:1,3,20 23:1,5 29:21 37:9,14 38:12 54:7 65:2 86:8 97:2 116:22 121:11 126:9 148:15,17 149:7, 8,18 155:16 157:4 172:3 175:19 176:5,7 194:18 210:23 216:4 224:21 225:3,6,10,14 226:5 272:2 273:8 281:19 317:22 318:6,9,11 324:12 326:10 327:23 330:21

**Peoria** 330:17

**perceived** 64:23 168:11

**percent** 26:16,20

**perfect** 32:17 179:17

**performance** 63:20

**perils** 217:16

**period** 13:9 14:15 58:14 80:16 105:1 131:8 192:12 196:10 229:2 232:20 242:20

**periodically** 104:18 192:10

**permanent** 23:6

**permit** 121:1

**permitted** 24:24 105:10

**perpetrator** 257:1

**perpetrator's** 284:1

**Perry** 14:4,5 19:11 37:22 54:4 65:15 114:16 115:16 116:6,11 117:24 118:5 183:10 193:22 194:10 195:1 209:1 227:15 238:12 311:6

**Pershing** 265:4

**persist** 283:9

**person** 20:15 24:4 28:4,7,19 29:17 33:15 34:20 36:6 37:2 48:5 50:20 51:22 52:23 54:3 55:5 56:13 58:21 105:7 108:15 123:12 130:11 143:4,5,7 156:11 158:13,20 159:12,14 172:11 188:20 218:21 226:8 230:17 274:14, 15 282:21 312:14 327:18

**person's** 29:16 291:3

**personal** 35:14 133:5

**personally** 9:12 50:19 52:8 97:7,15 104:7 147:3 165:6 241:3

**personnel** 16:20 19:13 34:16

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 155 of 612 PageID #:8813

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: perspective..presenting

**perspective** 28:19 36:20 37:5 40:17 50:4 111:23 167:14 276:10

**persuade** 123:7 171:12 223:3

**pertains** 240:7

**Peter** 316:2,6

**petition** 226:19 228:19 230:8 231:3 240:7 313:13 315:23

**petitioner** 91:1,18

**petitions** 216:23 229:3,8,19 234:16 311:24

**philosophic** 41:16

**phone** 102:10

**phonetic** 78:16

**phrased** 50:8

**physical** 23:17 79:2 243:8

**physically** 134:13 174:2 177:12 286:1

**pick** 321:23 323:3

**picture** 143:22 283:1

**piece** 39:23 107:23 121:4 169:5 293:12

**pieces** 140:23 192:19

**pinpoint** 309:23

**pipe** 106:20,21,24 109:7,14

**place** 34:18 58:14 65:12 66:5 69:10 70:16,20 71:6,20 72:9 76:11 98:5 117:19 126:20 159:11 267:17 295:15 297:3 301:22

**placeholder** 254:22

**places** 14:24 15:1

**Plaintiff** 5:23 6:2,17 333:5,8

**plaintiff's** 5:20

**plaintiffs** 73:1 87:23 334:12

**plan** 21:19 98:4,7,10

**planning** 17:2

**platform** 20:8

**plausible** 157:18 174:3 177:14 267:14,15

**play** 300:4 308:15

**played** 222:10

**pleading** 316:11,12,14,21 317:5

**pleadings** 317:17

**pockets** 318:2

**point** 16:9 24:1 31:3 45:8,11 51:19,24 67:18 81:3 86:2 87:3 88:3 92:5,9,11, 14,23 93:15 94:23 97:19 103:14 113:16 123:3 128:1 129:16 130:10 131:13 133:6 141:16 143:1 144:11 146:12 161:14 164:21,22 167:9 176:2 189:4 194:14 203:6 212:17 216:20,22 217:1 229:1,6 250:9 253:4 254:7 260:13 266:15,20 279:10 286:11,15, 24 293:4,10 294:2 298:2,12

**pointed** 46:6 215:16 274:13 316:13

**points** 29:14,15,19 173:5 181:10

**police** 6:10 7:4 13:5,11,18,19 63:7 85:8 93:8 94:11 95:19 108:7,23 119:6 127:22 128:6,12,16 131:13,20,21 132:1,3,12 134:13 137:4,7 138:2 155:7,17 156:5 157:7 176:7 247:11,20 250:2,13 257:23 264:4 312:20 318:3, 22 319:9,14 321:7,14 322:24 325:1,5, 16 327:13 328:5,24 329:6

**Police's** 95:9

**polices** 45:5

**policies** 27:7,9 44:20 45:7,12,22 49:5,11 58:23,24 59:2,3,12,13,18,20, 24 60:8,11 61:23 62:5,7 66:3,5,18,21 67:12,17 76:7,22 77:2,7,12 78:1,12, 21,23 79:3,15 117:18 118:1,6 193:15

**policy** 22:9,15 39:21 40:19,24 42:3,19 43:2,4,8,9,11,13,19,21 44:3,7,9,14 45:2 46:21 47:4,16 48:23 51:8 52:18 56:21 57:2,20 58:6,13 65:19 66:9,18, 21 67:3,6 69:14 74:19,20 79:8,11,23 80:2 147:9

**polite** 119:14 159:3 160:16

**population** 281:7

**Porter** 121:3 136:2 197:4 208:7

**Porter's** 243:16

**portion** 87:15 223:9 279:16 321:16 331:10

**portray** 116:15

**portrayal** 145:24

**portrayed** 326:14 329:15

**posed** 67:21 177:23 291:16

**position** 17:3,18 18:11 19:8 20:3 21:11,17 35:14 36:22 48:2 86:18 88:7 102:15 211:2 235:23 240:19 248:16

**positive** 14:1,2 29:15

**possession** 260:19

**possibilities** 178:1

**possibility** 110:1 182:20,23 183:1 209:8 218:19

**possibly** 97:23 168:23 274:15

**post-conviction** 24:14 41:13

**posted** 74:21

**posture** 180:3

**potential** 52:21 93:12 94:14 153:4 217:5 311:20

**potentially** 273:19

**power** 121:6 318:1

**practice** 16:6 17:10,12 137:15 147:9 302:4 304:22 318:7 330:12 331:1

**practiced** 290:19

**precise** 187:19 232:15

**precisely** 50:15 157:19

**precision** 270:17

**predated** 102:11 312:10

**predicting** 124:21

**preemption** 193:1

**prefer** 111:16 308:18

**premise** 226:12

**preparation** 10:15 11:16

**prepare** 10:24 74:14 102:12

**prepared** 10:22 11:11 44:14 100:2,8, 10,18 101:20 113:2 140:14 151:13 277:22 302:6

**preponderance** 236:15

**presence** 130:19 150:5

**present** 8:4 50:20 127:23 129:2,12 130:18 135:14 139:21 157:24 158:5 159:24 160:3 162:23 178:6 201:11 203:24 210:6 246:10 276:1 335:4

**presented** 135:3,21 138:7 247:9

**presenting** 119:13

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: presents..pulled

**presents** 18:8

**preserve** 33:21

**preserved** 309:8

**preserving** 49:21

**press** 31:12 33:3 219:16,20 220:6

**pressure** 197:5,8,10,14

**pressured** 197:11

**presumption** 164:19 165:1

**pretty** 150:9 164:12 176:3 177:11 189:23 195:21 209:17 257:13 324:7

**previous** 196:11

**previously** 155:23 157:6 216:11 280:4

**primarily** 15:5,14 17:16 22:14 23:13 82:6 138:18

**primary** 161:2 170:24 173:13 257:21

**print** 42:11 198:22

**printed** 42:11 43:11 47:4

**printing** 184:5 191:23 199:16

**prior** 80:17 95:9,18 96:3 119:19 152:20 196:2 201:21 204:8 205:7 211:5 214:8 218:2,6,17 232:21 241:10 255:22

**priority** 34:21

**prison** 18:17 121:11 159:13 316:17

**prisoner** 271:22

**prisons** 18:19

**private** 17:10,12 26:23 134:19 137:15 331:1

**privilege** 24:23 25:4 44:21 46:11,12 57:13 68:8 77:6 78:4 79:9 87:7 231:4, 6 288:21 290:15

**privileged** 117:6 217:5

**privileges** 25:7 49:21 56:24 59:6,7 87:8 118:14 248:6

**pro** 26:23 91:19 105:11

**probability** 71:11 178:9

**probable** 243:21

**probation** 312:5

**problem** 60:16 143:7 146:10 205:13 280:10 292:19 306:14 317:20 320:23

**problems** 34:20 318:11

**procedure** 41:13 57:5 59:21 64:2,4 69:8 75:20 79:8,11 89:24 115:12,14 116:8,16,18

**procedures** 8:11 45:12 49:6,11,13, 24 58:14,24 59:3,4,12,13,19,24 60:9, 11 61:4,9,23 63:2 66:5,18 67:17 70:9, 16,20 71:6,20 72:9 76:7,22 77:3,7,8 78:1,12,22 79:3,15 105:4 117:14,19 118:1,6,19 193:16

**proceed** 91:19 207:14 221:18

**proceeding** 139:8 195:21

**proceedings** 56:18 57:9 119:8 128:1 133:24 134:4 138:18 162:3 202:19 210:3 225:4,15

**process** 20:22 25:10 27:11 41:2 44:20 45:1,6,21 48:17,20 58:8 62:17 63:18 64:1 68:8,23 77:5 78:4 79:9 86:20,22 87:7,21 92:17 118:14 135:10 189:5 213:4,6 217:7 225:16 227:23 230:7,16 231:6 248:6 271:24

**processes** 63:4,6,12

**prodigious** 211:19

**produce** 110:1 142:4 157:5 274:1 303:2

**produced** 82:13 163:13 181:8 183:9 260:2 302:22

**producers** 65:18

**product** 25:10 48:21 58:8 87:8 97:12 114:17 118:15 140:20 186:20 217:7 245:23 247:5

**production** 183:16 278:23 279:1 302:23

**professional** 97:11

**professor** 20:14

**profile** 274:7,8 275:2 277:18 280:4 281:3,5 283:13,17

**programs** 26:24

**progress** 189:6

**project** 74:18

**prominent** 21:21 316:24

**promise** 235:15

**promised** 40:3

**proof** 157:5 221:20 222:7,19 282:16

**properly** 61:9 207:16

**proposed** 79:8

**proposition** 29:12 124:5,23 170:20 213:17

**prosecute** 213:16 215:4 254:8,19,23

**prosecuted** 13:10 14:22 222:24 224:18 253:23 281:17 288:22

**prosecuting** 37:3

**prosecution** 13:18,20 14:21 28:22 103:10 179:23 185:23 186:1 206:17 211:12 212:19 216:17 254:13 283:24 311:21 316:24 330:15

**prosecutions** 12:21 13:1 32:22

**prosecutor** 13:21 14:19 17:7 18:15 37:10 63:8,21 243:3 326:9

**prosecutors** 29:14 157:10

**protection** 13:16

**protective** 223:8 308:15

**protocols** 27:5 38:22

**prove** 135:15 178:4 236:22,23 269:15 282:6

**proven** 157:3

**provide** 14:20 31:20 82:14 156:11,16 162:11 172:17 220:5 226:5 316:2

**provided** 9:13 38:7 43:4 89:22 121:14 132:12 154:14 167:15,18 219:6 245:6 249:24 250:5 252:3 257:16,19 259:8 278:2 311:3 312:21 314:22 315:19 319:2,4,8,22 320:9

**providing** 33:3 74:11 118:4 122:13 139:9

**provisions** 44:8

**provocative** 317:20

**psychological** 243:7

**public** 22:18 26:22 92:5 331:12 333:23

**public's** 33:21

**published** 62:4

**pull** 83:13 153:21 154:4 261:5 262:12 268:3

**pulled** 173:24 293:19 294:7 299:20

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

**pulling** 90:2 294:2 298:13

**pulls** 298:17

**punch/timecard** 157:11

**punched** 134:18

**purely** 300:3

**purported** 80:1 216:14 219:16

**purports** 252:5 258:21 260:4 279:5

**purpose** 116:10 131:11,18 138:16 163:4 231:7 273:16

**purposes** 215:20 232:21

**pursuant** 45:3 75:20 92:17 103:15 118:5 208:9 223:8 335:3

**pursue** 51:22 108:13 161:3,18 212:18 271:13

**pursued** 110:2

**purview** 207:13 208:20

**push** 238:14 239:21

**pushed** 239:10,11 304:11

**put** 33:15 35:1 41:21,24 42:13 73:1,6 74:17 117:19 132:22 160:17 172:9 173:4 185:9 191:17 197:10 198:22 210:23 225:10 231:12 249:16 275:7 279:2 298:3

**putting** 62:7 197:14 199:16

---

**Q**

**qualification** 137:1

**quarreled** 239:14

**question** 8:16 25:19 26:4 29:2,21 41:4 45:2 50:1,2,8 51:11 55:14 56:23 57:1 58:1,5 60:4,10 61:8 64:10 67:20, 22,24 68:1,3 69:23 70:11 75:9 76:19 77:5,6,9,10 79:7,10,18,20 81:13 89:7 104:14 114:8 115:6,24 118:8,19 124:22 126:4 132:17 135:23 141:19 146:11 163:3 168:19 170:13 179:18 180:7 182:11 187:8 190:9 191:1,17 195:6 198:11 206:17 209:6 212:13 213:7 214:16,17,18 216:1 218:10 224:3,13 225:19 227:18,22 228:4,8,11 229:12,13 230:6,13 240:5,24 242:20 246:24 248:24 249:14,21 254:20 255:21,24 256:1 259:9 261:23 269:22 270:3 275:11 276:9 282:2,22 283:14, 15 286:22 288:4,9,16 289:8,18,21 290:10 291:13 292:4 297:14 298:11, 21 303:6 311:19 312:12 320:5 326:21 330:8

**questioned** 108:6 132:10 149:7 256:24

**questioning** 46:8 255:4 284:10 292:20 298:1

**questionnaire** 74:10,20

**questions** 9:2 23:18 25:8 39:8 41:6, 16 43:14 45:11,14 49:17 66:8,20 67:15 73:3 87:23 128:9 131:24 146:6 149:10 159:1 160:13,17 171:20 177:16,17,21,23 178:1 181:6 207:15 227:2 235:10,13 242:8 244:7 291:6,16 309:17 331:21

**quibble** 319:16

**quick** 49:1 59:10 178:12 235:1 306:22

**quickie'** 306:17

**quickly** 12:3 163:8

**quotation** 32:3 303:19,23 304:15

**quotations** 305:11

**quote** 31:18 33:16,18 34:23

**quoting** 303:24

---

**R**

**R-O-T-E-R-T** 7:21

**raise** 8:16 58:4 123:10 291:2 327:17

**raised** 51:22 66:11

**raising** 91:3 131:19

**ran** 12:22 295:5 322:9,21 323:18 324:6

**Ranger** 177:4 257:6,11

**Rangers** 176:22

**ranked** 202:4

**ranking** 114:14

**ranks** 18:7

**rape** 257:2 288:13 331:17

**raped** 263:23 294:3 327:15

**rapes** 265:11

**raping** 316:3

**rapist** 314:5

**raw** 27:1

**reach** 188:19

**reached** 68:21

**reaching** 135:9

**react** 149:1,2

**reaction** 228:18

**reactions** 147:15 291:15

**read** 11:23 18:16 35:7 50:2,5 52:16 55:8 58:1,2 59:11 62:20 68:4,5 69:3 70:6 71:3,17 72:6 81:15,16 91:7 120:16 122:19 123:15 133:16 134:24 137:9 162:12 165:2,3,14 172:5 183:13 198:24 214:16,18,19 220:13 221:8,21, 22 228:11,12 254:6 255:8 271:23 279:12 290:1 295:20 297:8,9,10 314:13 316:12,20 321:16 328:14 333:13

**reader** 126:16 130:16 132:23 133:20 135:10,16,19 136:1 139:9 143:4 144:23 163:5 177:18 275:9

**readily** 185:6

**reading** 60:6 89:7 138:21 272:2 297:12 315:12

**reads** 56:6 67:1

**real** 49:1 59:10 176:9,17 235:1

**realize** 215:18

**realm** 206:2 245:20

**reask** 228:6 283:14

**reason** 12:23 19:6 89:8 124:9 132:13 142:20 158:16 163:20 187:21 197:9 245:12,22 254:17 288:16 291:9 303:11 305:4

**reasonable** 123:10 236:16

**reasoning** 86:19 91:10

**reasons** 16:16,17 51:5 83:2 85:22 89:13 116:4 119:20 158:11 160:8 172:16 212:21 226:2 256:24

**recall** 13:24 33:4,5 82:10 93:9,11 100:5,6 102:20 107:5 109:15,16,17,23 110:20 118:2 128:16 129:19 141:13 156:7 165:24 179:3 182:19 183:11,16 185:17 186:2,4,14,18 188:14 191:23 194:2 195:20 196:23 198:15 199:1 205:9 210:14 217:2,21,24 219:10

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 158 of 612 PageID #:8816

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: recalled..reluctantly

220:8 227:14 231:8 234:21 241:12 249:23 257:24 266:12 270:21 271:2, 12,14,16 272:6,18 285:7,10,12 286:2 287:3 294:11,12,15,22 295:3,4,11,17 302:2,11 305:21 310:6,9 311:1,10,12 313:13 314:9,12,14 315:5,12,14 316:9,18,20 317:3,4,5

**recalled** 304:21 313:15

**recanted** 287:19

**receipt** 68:22 308:23

**receive** 54:3 253:1

**received** 89:17 141:7,11 142:1 180:17 190:6 251:19 278:23 279:9 314:7

**receiving** 142:8 251:23

**recently** 23:10 128:10 161:9,12

**recitation** 127:4 321:13

**recognize** 39:17 74:6 84:3,5 112:22 185:3 251:15 300:21

**recognized** 11:18

**recollection** 9:23 10:1 75:1 84:16 108:1,21 109:2 111:12 128:9 130:1 155:23 156:19 160:23 182:16 184:2,9 187:20 199:18,22 203:16 209:7 210:9 211:9,14 215:7 218:20 251:22 269:9 271:6 302:5,13 305:2,3,12 307:8,10 315:1,15 316:11

**recommend** 52:23 53:1,5 55:6 71:13 167:2

**recommendation** 54:4 100:3 116:24 122:21,23 123:2 188:19 193:23 204:12 206:14 207:21 208:8,10 216:12 222:1 233:23 236:6 253:16 256:10,12

**recommendations** 18:3 20:17 35:2, 16,21 52:13 53:23 54:7,9 65:6,20 72:1 95:24 113:3 114:1,23 115:15 116:5 117:5 118:4,10 141:17 146:6 163:2 180:10,19 187:1 189:15 191:11,12 192:5 193:19 194:8 195:2,9 197:6,13 204:3,9,16 215:9 230:4 232:11 240:8 241:20 242:2

**recommended** 20:19 72:5

**recommending** 53:7,11 191:13 192:19

**recommends** 70:3

**reconsider** 58:16

**record** 6:13 7:19 30:3,4,9 39:5 40:2 41:2 50:5 58:2 59:12 60:21 68:5 72:18,22 73:1,6,22 81:16 89:3 98:23 103:21 112:2,4,8,12 133:16 145:17 147:14 152:9,10,14,18 160:6 178:15, 19 195:17 196:13 212:15 214:19 223:6 228:12 235:3,7 258:17 260:2 261:13 262:3 263:10 278:20 279:4 284:18,19,22,23 288:1 289:22 290:1 297:9 300:11 309:4,10,11,14 332:6,9, 11,12

**recorded** 5:14 13:17 147:5,7

**recording** 5:2 13:12,13 30:8 160:9

**records** 119:7 157:10

**recounted** 294:16

**recounting** 132:11 296:24

**recounts** 297:16

**recovered** 93:14 99:20

**rectify** 55:6

**reduced** 158:15 334:19

**refer** 129:8 140:7

**reference** 120:5 172:20 181:13 279:22 303:18

**referenced** 11:24 89:1 94:18 182:13 319:3

**references** 192:13

**referencing** 69:12 86:12 151:12 152:19 185:5 293:23

**referring** 102:6 328:15

**refers** 301:19 304:6

**reflect** 35:9 107:6 108:23 110:5 120:18 133:18 171:5,7 180:2 184:5 205:4 325:1

**reflected** 32:2,6 108:2 173:8 252:19

**reflecting** 192:4

**reflection** 97:13 138:6 141:22 220:17 221:2,10

**reflective** 91:9 94:17 133:5 184:6

**reflects** 99:13,15 113:14,21 180:3 219:7

**refresh** 251:22 271:6 307:10

**refreshes** 203:16 315:15 316:11

**refreshing** 210:9 307:7

**regard** 59:15 206:13 210:16 242:19 255:18 265:10 288:23 302:22 311:22

**regions** 265:16

**registered** 312:6

**reinvestigation** 86:23

**reject** 172:14

**rejoin** 111:20

**relate** 268:18

**related** 9:17,19 11:11 31:12,21 45:1 48:22 63:3 75:6 76:7,22 78:12 79:4 84:14 91:11,20 94:14 95:24 102:7 104:3 107:14,22 109:6,13 110:13 111:10 119:6 120:19 121:22 134:9 135:4 136:20 143:12 145:3,6,10,11 150:22 151:8 152:18 154:17 158:12 166:16 167:23 174:19 175:13 192:5 194:9 195:7,9 210:4 211:13 219:21 220:7 223:21 314:17 335:7

**relates** 48:17 117:10 154:6 175:18 230:13 249:10 316:15

**relating** 104:10 131:9 197:16 269:18 315:24

**relation** 151:14 160:9 198:4 200:14 293:7

**relations** 164:20

**relative** 143:1

**release** 31:12 33:3 316:16

**released** 52:24 205:2,6,14

**relevance** 48:21 224:13 275:12

**relevant** 26:14 59:21 99:21 143:3 146:21 186:17 191:2,4 199:19,24 200:7 228:18 265:20,23 275:10 280:17 282:2 317:9 319:5 326:18

**reliability** 35:3

**reliable** 35:22 64:3 273:17

**reliance** 169:23

**reliant** 272:1

**relied** 62:19 169:18

**relief** 48:6 69:23 70:4 71:1 89:23

**reluctantly** 287:5

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                         Index: rely..reviewed

**rely** 56:10 193:7

**remained** 322:11

**remaining** 275:21

**remains** 168:19

**remarkable** 144:19

**remedies** 52:22 72:5,12

**remedy** 52:14

**remember** 42:9 83:11 84:11 97:18 107:9 129:18 140:19 150:7,11 151:4 155:12,19 157:19 182:11 189:9 192:7 203:19 209:9 213:12 217:20 232:15 234:1,3 250:5 286:13,20 287:9 304:1 305:24 312:23 313:16

**remembered** 186:8

**remote** 8:23 217:16

**remotely** 5:20 6:4 8:3

**removes** 158:22

**rephrase** 57:3 95:14 115:23 125:13 187:8,10 219:15 224:4 228:3 232:9

**replaced** 174:7 294:5

**report** 37:22,23 38:4 151:10 154:7,13, 16 155:18 163:11 179:6,7 258:22 260:5,18 272:14 278:18 279:6,7,10, 12,16,18,21 280:20 302:6,17 314:22 321:7 324:8 325:1 328:20

**reported** 67:23 117:6 137:20 244:19 277:4 294:13 295:16,23 299:1 325:16 334:18

**reporter** 5:3 6:11,18 7:7 9:4 73:17 83:16 112:1 152:6 181:1 199:6 209:21 278:9 284:17 289:23 296:5,8 300:13 313:4 332:1,6 334:5

**reporters** 132:19

**reporting** 321:18

**reports** 119:7 151:13 152:20 153:5,6, 18 257:23 264:5 277:11 278:3 311:17 325:16 327:13 328:5,24 329:6

**reposed** 207:16

**represent** 5:18 7:3,16 84:6 91:20 92:6 94:10 181:15 184:12 186:12 188:22 219:5 231:22 232:17 235:19 242:9 258:18 261:6 268:10 279:20

**representation** 90:18 295:13 302:21

**representations** 330:24

**representative** 151:19

**represented** 9:9 17:8 76:1 94:22 317:14 331:2

**representing** 91:24 330:12

**represents** 26:21 232:1

**reputation** 35:3

**request** 83:2 91:19

**requested** 50:6 58:3 68:6 81:17 133:17 139:1 192:18 197:1 214:20 228:13 257:19 290:2

**requesting** 84:9

**require** 75:5,18 91:4 168:20 279:17

**required** 7:24 98:11 114:15

**requiring** 57:6

**reread** 289:21

**rescheduling** 7:24

**reserve** 331:24

**reserved** 334:24

**residence** 131:10 259:4 266:22

**resist** 169:24

**resistant** 283:3

**resolution** 121:9 197:16

**resolve** 320:20

**resolved** 38:17 76:12 216:1 247:7

**resource** 24:3,15

**resources** 207:15

**respect** 66:22 86:23 136:5 182:11 225:1 227:4 237:5,13,24 238:5 239:23

**respected** 216:7 225:12 318:10,11

**respecting** 318:20

**respective** 335:1

**respects** 105:16 159:4 224:20 325:7

**respond** 58:20 230:8

**response** 46:3 61:17 138:22 149:10 286:21 313:12

**responses** 177:24

**responsibilities** 21:16 33:7 47:20 208:21

**responsibility** 33:11 161:3 188:18 206:3

**responsible** 27:20 28:5 29:18 32:20 273:11 275:23

**responsive** 76:15

**rest** 136:9 256:4 322:11

**restate** 81:12

**rests** 70:4

**resubmission** 182:18

**result** 28:21 52:15 64:3 88:4 98:14 125:21 142:4 171:8 205:7

**resulted** 13:11 52:1,3 174:1

**resulting** 32:22 71:15

**results** 82:13 98:8 99:16 104:10 107:13 108:23 109:15 110:5 120:11, 13 123:10 124:9 141:7,10,24 164:2,6, 13,19,24 165:11 166:7,8 168:20 170:20 171:11 179:13 180:18 186:9, 10 187:13,18,23 188:6 191:3 197:1 203:11 206:14 257:1 274:13,21,22 275:12 276:11 277:3,4 292:21

**resumption** 111:18

**retained** 9:12

**retesting** 92:17

**retire** 16:19

**retrial** 53:12 203:21 205:19 206:2 209:14 221:18 222:8 237:17

**retried** 53:8 191:14 207:1,22 209:3 211:24 214:5 216:12

**retry** 59:16 86:5,24 195:10 211:6 212:10,22 215:10 225:9

**retrying** 209:2 211:2

**returned** 295:8 321:21,24

**returning** 295:9

**review** 10:22 18:8 24:20 25:14 27:10 48:7 50:11,23 51:2,3 52:9 55:15 57:6, 21 59:8 74:13 81:4,22 82:3,4,9,24 84:9,21 89:13 91:11 92:21 94:4 97:9 115:16 118:11 134:4 139:1 157:16 196:12 203:7,8 243:2,5,14 244:23 248:11 249:2 251:24 252:14 253:10 257:17 281:14 306:8 311:24 318:23 320:8 321:12 325:3

**reviewed** 11:9,15 25:13 52:2 75:4

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 160 of 612 PageID #:8818

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                                    Index: reviewer..seal

86:15 102:14 114:17 119:6,20 137:13 140:17,24 241:10 245:11 256:20 314:12,23 319:22

**reviewer** 119:13

**reviewing** 27:20 32:20 54:8 85:22 117:15 140:20 229:3 311:16 314:10 317:5 319:7

**rewarding** 16:22

**reworking** 20:24 21:4

**RFC1915** 39:5

**RFC1917** 64:8

**RFC1918** 68:17

**RFC1925** 73:23

**rhetorical** 177:20

**RIC** 203:5

**Richard** 136:5

**Richardson** 314:3

**ride** 131:5

**right-hand** 251:12

**rise** 138:19 164:19,24

**risk** 163:3 176:12,17

**rival** 176:4 265:19 267:13,16,20

**road** 177:22

**Robert** 219:8

**rock** 107:17 109:21

**role** 179:24 195:19 206:22,24 253:15 273:6

**room** 150:18 214:1 233:8,9

**rooted** 318:3

**rotated** 23:10

**Rotert** 5:7 7:10,15,20 8:7 9:8 12:2 16:7 26:2 30:11,21 37:19 39:6,10 42:24 46:16 50:11 51:18 57:5,16,19 60:24 61:3,19,22 67:11,21 68:11 73:3, 10,18,23 75:3,15,18 76:6 78:8 79:21 81:3 83:17,21 88:5,14 90:4,8 93:20,24 95:16 96:10 98:18 112:14,15 118:21 146:3 152:17 154:1,8,12 179:3 181:2 184:20 199:7 202:15 206:23 209:22 212:7 219:1 231:20 235:9,16 238:20 240:11 244:12 249:22 251:2,6 258:10, 14 259:18 261:9 262:6,13 268:5,9 278:10,15 279:9 282:3 288:17 296:9

298:5 299:5 300:14 309:16,21 311:21 313:6 321:2 333:11,18 334:8,14

**Rotert's** 43:3 240:6

**roughly** 91:14

**RPR** 335:17

**ruled** 67:3,6,16

**rules** 8:14

**ruling** 25:22 45:8 49:4,21 86:13 87:2, 16 231:9 243:16,17

**rulings** 86:3 87:17

**run** 17:24 105:3 269:18 309:1

**running** 13:14 16:21 105:7 324:20,23 325:9 331:1

**ruptured** 294:5

**Russell** 6:1 28:24 104:15 114:9 115:20 126:5 141:20 251:19 252:2 295:22 296:16 308:10

**Russell's** 73:14

**Ryan** 265:4

---

**S**

---

**S-A-V-I-N-I** 23:7

**safe** 217:13 254:5 265:11 267:17

**sake** 152:24

**sample** 103:5 279:24

**sanded** 183:8

**sat** 11:23 19:10 37:8,10 190:1 213:18 302:10 305:7,13 315:14

**satisfactory** 287:15

**satisfied** 226:2

**Savini** 23:7 82:7 85:22 89:8,12 90:21 91:13 96:16 97:11 101:7,11,17,20 102:3 105:6 113:1,6,24 137:16 139:24 140:14 161:2 210:21 211:10 223:21 224:7,11 240:17 270:6,15,19 271:9,21 272:3 273:2 305:8 307:11

**Savini's** 91:11

**sawed-off** 260:19

**scan** 99:5

**scared** 322:21 324:5,20,23 325:9

**scenario** 174:14 294:16 298:23

**scene** 93:14 99:21 159:15 173:14,18 174:6 314:6 322:10 323:18 326:17

**Scheller** 6:20,21 24:21 25:6 29:1 34:7,13 43:6 44:17 45:4,16 48:10,16, 20 49:9 50:9 53:15 54:2,21 56:22 57:11,24 58:4,17,20 60:5 61:7 62:11 63:13,16 65:14,23 66:3,7,24 67:22 68:7 70:10,12 75:8 77:4,14,22 79:6 80:8 86:1,12,16 87:1 88:9,23 89:4 117:3 118:7 125:19 133:9 148:12 153:10 182:21 184:11 187:4 193:24 195:5,12 200:16 202:24 204:20 205:15 206:5 207:2,5 211:4 212:1,12, 24 214:7,24 215:14 217:4,11 220:22 221:13 222:14,22 223:23 224:12 225:20 227:5,9,17,21 228:2,6 229:22 230:5,15,24 231:8,22,24 237:8 238:19 239:6 240:4 243:11 244:2 245:3,17 246:23 248:3,16,19 249:7,12 255:20 256:16 258:5 262:9 264:19 265:22 266:4 270:2 272:17 273:21 275:14 280:8,19 282:12 288:15 289:9,14 290:5 292:1,12 299:5 302:19 303:7,10 311:18

**scheme** 41:8

**school** 20:15

**science** 23:15 188:4 276:3,17

**scientific** 23:17 120:6 140:11 276:10

**scientifically** 142:23 166:22 187:22 188:10

**scientist** 23:22

**scientists** 169:7 285:3

**scope** 25:23 106:4

**screen** 39:23 73:12 175:4 181:23 278:5

**screening** 68:23

**scroll** 31:2,16 32:14 39:6 47:15 64:8 68:16 69:15 73:24 83:23 87:20 94:3 98:24 112:13 128:18 296:20 298:7,8

**scrolled** 39:20 43:18 94:6

**scrolling** 55:13 69:22 133:23 138:9 179:11

**scrutiny** 250:13

**sea** 22:22

**seal** 335:11

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: sec..slow

**sec** 83:13 330:13

**secondarily** 58:24

**seconds** 131:1 152:3 175:9 179:9

**section** 55:14 64:9 65:5 68:20 69:22 82:18 89:21 92:17 126:14,15 132:6, 11,14 133:24 138:10,16 140:10,13,18 149:13 163:1,4 179:7,20 215:16

**sections** 308:18

**seek** 82:20

**seeks** 57:1 58:5 75:9 79:7,10 118:8 195:6 240:5

**sees** 129:22 322:3

**self-defense** 51:8

**self-professed** 257:6

**semen** 102:7 103:3 165:18 166:17 168:13 169:8 170:10 285:4 287:13 290:24 291:21 298:24

**send** 114:12 241:9,17

**sending** 117:24 183:12

**senior** 19:13 34:16

**sense** 16:4 28:5 98:2 107:11

**sensitive** 41:9

**sent-** 161:6

**sentence** 64:14 71:16 131:11 141:4 161:8 164:1,18 168:18 169:6 181:19 182:12 185:13 188:17,23 189:1 190:8, 24 220:10 221:1,4 267:22 313:14

**sentences** 121:2 128:24 137:5 203:13 205:7

**sentencing** 162:6

**sentiment** 35:10 223:20 224:4

**separate** 327:24

**separately** 315:19

**September** 46:24 62:5 70:20 71:7,20 72:10 74:23 117:20 157:22 159:21

**sequence** 147:15 297:16 299:2

**sergeant** 13:12

**serial** 314:5

**serologist** 23:22

**serves** 74:22

**serving** 121:2

**set** 40:6 123:21 197:1 233:3 235:23 335:10

**setting** 204:16

**sex** 143:7,8 166:23 167:8 168:24 173:23 293:18 294:19 297:4 298:16 299:14 312:7 322:18,20 324:3,5,19,22 325:7 326:4

**sexual** 103:21 130:14 142:15 143:16 144:1,2,11 145:3,4,6,10,21 164:20 165:11,12 166:9,10 168:12 169:7 257:20 263:16 266:8 267:20,23 268:2 274:17 285:4,18 287:2 290:23 306:23 326:7 331:18

**sexually** 168:2,16

**share** 33:23 34:24 73:9 93:18 178:22 252:22 270:19

**shared** 11:21

**sharing** 24:8 30:13 175:4

**shatter** 31:23

**Shaunice** 150:5

**sheer** 144:17

**sheet** 257:22

**shoes** 298:14

**shop** 17:24

**short** 30:6 72:20 112:6 133:14 152:12 178:17 235:5 309:9,12 322:5 323:10

**Shorthand** 334:4

**shot** 17:4 51:8

**shotgun** 260:19

**show** 97:6 98:16 112:11 136:11 170:21 179:7 201:17 202:13 250:23 258:8 259:16 274:21 278:1 296:2 313:1 320:24 329:20

**showed** 79:24 276:17 277:23 315:19

**showing** 31:4 42:21 48:3,4 56:3 62:16 93:1 100:14 101:24 148:16 168:1 199:11 202:21 210:2 218:23 262:17 278:5

**shown** 149:9 220:2 247:11

**shows** 55:4 71:11 276:7

**shuffle** 290:13

**shut** 205:23

**sic** 290:17

**side** 23:15 105:17 150:14 280:6

**sides** 37:6 317:22

**sight** 163:6

**signature** 333:16 334:23

**signed** 268:23

**significance** 156:24 164:11 174:17 275:4,7

**significant** 14:15 42:18 98:9 102:19, 23 103:13 113:22 121:4,13 143:9 147:12 164:3,7,13,15 171:11 175:24 176:12 206:14 230:21,22 247:10 281:19 312:21

**significantly** 155:14

**signing** 18:13

**signs** 243:7

**silly** 163:3

**similar** 101:15 297:16

**similarly** 223:5

**simply** 29:12 228:20

**simultaneously** 27:16 105:3

**singular** 166:20

**sir** 234:20 246:9 251:11 252:20 258:8, 19 259:9 278:1 280:24 285:2 286:17 290:9 296:13,19 299:23 300:18 306:2 308:7 309:18 314:9,23 315:20 316:19 317:3 318:20 320:7 322:12 323:19 326:21,23 327:22 328:14 331:21

**sit** 93:9 97:4 98:1 182:15 188:12,14 208:8 215:6 222:5 232:13,16 233:16 234:11 235:22 266:16 285:12 293:3 294:11

**sitting** 104:23 159:12 302:12

**situation** 58:12 88:8 178:13 180:6

**situations** 55:7

**six-page** 279:7

**size** 276:24

**skeptical** 188:9

**slightly** 181:7 184:23 309:22

**slow** 105:15 329:10

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: slower..staying

**slower** 31:3

**slowly** 228:1 301:6

**small** 141:6 186:10

**smart** 205:21

**smiled** 22:11

**so-called** 176:23

**social** 300:3

**socks** 106:16 294:3

**solely** 71:1

**solid** 274:1,3

**solo** 16:1,5

**somebody's** 201:18

**someone's** 226:18

**sophisticated** 188:3

**sort** 16:18 19:4 20:12,21 22:3,17
28:14 82:22 93:17 176:1 190:19 252:5
254:21 282:15 285:18 306:21,22
318:7

**sorts** 16:16

**sought** 89:23 149:8 159:2 160:13

**sound** 40:16 196:15 197:2

**sounded** 150:16

**sounds** 12:1

**source** 86:3,15 87:5 129:14,17,18
213:9 277:17 285:11

**sources** 211:10

**south** 176:7 259:5,10 261:20 263:2
265:1

**space** 16:2

**speak** 11:5 37:7 51:4 85:14 117:8
153:2 233:16 269:6 270:5,16 308:10

**speaker** 324:21

**speaking** 19:17 101:16 207:19
271:10 289:7

**specialists** 176:8

**specific** 25:11,20 48:12,14 49:17
66:23 84:16 99:9,24 108:21 109:15
129:17,18 130:1 140:18 173:7 182:16
196:7 248:5 276:23 277:3 288:16
293:12 331:18

**specifically** 25:13,15 36:24 101:24
107:5 109:23 131:9 167:19 178:6
194:2,24 234:7 286:14 293:4 302:3
311:7

**specificity** 53:20 277:2

**specifics** 167:22

**speculation** 222:16 254:10 288:1
291:5 297:21

**spell** 7:18

**spending** 44:12

**spent** 22:13,18 27:4 40:7 165:16
269:12,24 312:8

**sperm** 174:9,21 294:6

**split** 108:1

**splitter** 113:20

**spoke** 11:3 17:17 101:12 128:5
176:14 270:23 310:19

**spoken** 150:5 190:18 196:1 230:19

**spread** 22:17

**squad** 159:14

**squarely** 60:3,6 88:20 245:20

**SS** 334:2

**St** 264:3

**staff** 19:12

**stain** 103:3,5,12,15,19,20 111:3
142:23 143:5 276:24 291:21

**stamp** 90:17 278:24 313:19

**stamped** 90:15 98:23 251:9 261:13
278:22

**stand** 11:15 25:15 45:19 60:15 88:10
121:9 203:17 235:22 255:14 284:17
289:23 290:3

**standard** 5:6 22:16 36:18 47:23 56:9
103:5 236:10,20 237:1,2,5,12 239:4

**standards** 63:2 123:21,23,24 236:12,
15 237:3

**standing** 59:9 323:11,16 324:1

**stands** 64:15 292:15

**start** 11:23 15:16,18 21:8 72:24
138:20 166:19 271:24

**started** 5:1 15:22 21:10 37:20 38:13
98:1 148:14 183:23,24 189:14,24

190:3 326:18

**starting** 20:12 32:18 282:15 299:14

**starts** 169:6

**state** 5:18 7:18 36:16 42:23 46:2
61:16 73:22 91:18 93:8 94:11 95:8,9,
19 108:23 124:4 162:7 241:5 334:1,6

**state's** 6:22 9:14,18 16:12 17:21 18:3,
7,13 19:11,24 20:1,6 21:1,9,13 23:9,
13,18 24:18 28:22 31:13,21 32:19,23
33:18,24 34:5,16 37:20 38:5,6 42:8,24
43:4,6 46:10 52:13 57:12 59:14 60:1
64:16 65:9 70:4 71:2,14 76:14,21
77:17 79:4 80:3,11 82:7 84:21 87:12
91:2 92:22 118:10 121:7 122:16
151:18 153:3,10 157:16 163:13 167:2
172:2 181:8 183:11,18 192:4 194:11
195:1 197:14,15 200:14 203:9 204:15
208:11,16 209:2,4,13 219:6 221:17
222:6 226:17 229:2,7 232:21 233:3,14
237:20,23 238:4,13 239:9 241:15
242:15 254:7 256:5 288:18 314:16
317:23

**stated** 158:23 171:10 187:2 304:10
321:24 322:5 323:9

**statement** 31:12,20 32:1 39:21 63:19
80:2 81:18 126:21 127:20,21 128:13
129:11 156:6 165:5 214:8,11 216:15
219:17,20 220:6 241:19 243:8 244:19,
20 294:13,15,19 295:5,13,16,21,23
296:20,24 299:1,13 304:2 320:13,18
324:17 329:12

**statements** 126:23 128:15 131:22
137:4 147:11 167:8 242:21 244:13,23
245:5,10 246:11,15 315:1 317:17
324:11 325:1,14 328:11,15 329:16

**states** 5:10 41:24 68:22 70:24 71:10
90:24 101:7 120:10 122:15 131:11
161:21 181:20 190:8 220:10 333:1
334:9

**stating** 275:1 304:10

**statistic** 281:12

**status** 82:9

**statute** 78:23 82:18,21 147:10

**statutory** 41:10 76:11 225:23 226:1,9

**stay** 266:18

**stayed** 15:3 323:9

**staying** 205:18

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: stead..suspicions

**stead** 201:23 202:3

**Stefanson** 24:1 101:7,12,17,20 102:3 105:13 129:20 169:16 277:12

**stenographically** 334:18

**step** 152:3

**steps** 55:6 71:14

**steroids** 150:17

**Stetler** 16:7

**Steve** 232:12

**stick** 269:3

**sticking** 286:1

**stipulation** 153:5 154:14

**stood** 92:5 322:16 329:8,24

**stop** 9:3 27:14 51:15 111:1,18 202:8 242:6 252:22 317:6

**stopped** 51:2 202:7

**stories** 132:12 197:14 325:5 326:3,6 328:23 329:19

**story** 92:7 172:8 177:14 190:3 233:11,14 324:7 327:1,3,11,13,18,24 328:6,10 329:22

**straight** 175:10

**Strawn** 15:8,9,15,18 119:12

**street** 175:21,23 176:5,7,12 261:20 323:6,8

**stressed** 34:18

**strictly** 28:18

**strike** 42:2 46:17 69:6,13 70:18 84:18 93:10 95:21 102:6 104:6 111:8 113:9 115:12 118:24 123:13 127:18 146:22 161:6 162:17 166:8 171:6,15 172:20 194:6 201:4 216:21 228:23 229:17 232:9 263:5 274:5 283:6 311:13

**strikes** 185:18 186:15

**stripped** 173:19

**strong** 20:7 164:19,24

**stronger** 318:24

**strongly** 18:24 124:19

**strove** 216:3

**struck** 199:19 213:16 294:9

**structure** 76:11

**struggle** 277:8

**student** 105:16

**studied** 10:20

**stuff** 95:5 142:5 183:14 188:5 220:4 276:6 318:8 325:19 326:18 328:19 330:13

**stylistic** 133:19 186:4

**subject** 9:16 18:14,24 49:6 78:4 110:20,22 131:14 217:6 231:4 288:20

**subjected** 173:24

**subjectively** 50:19

**subleasing** 16:2

**submit** 75:6,19 192:3

**submitted** 57:22 193:22 194:8 195:3

**submitting** 182:16 192:8

**subpoena** 313:11 317:24

**subscribe** 198:24

**Subscribed** 333:20

**subsection** 134:1

**subsequent** 201:3,5

**subsequently** 141:1

**substance** 84:13 137:17 150:23 151:1,2 163:9 219:11,13

**substances** 281:21 282:21

**substantial** 71:11 178:9 247:19

**substantive** 132:20

**substantively** 163:23

**substitute** 163:20,21

**subtlety** 228:11

**successfully** 135:20

**suddenly** 148:15

**sued** 235:20

**sufficient** 108:13 120:12 123:7 124:9 125:5,15 215:24 221:6 235:24 238:6 282:5

**sufficiently** 103:6 126:7

**suggest** 168:13 239:22 248:1 254:6 319:18 326:22

**suggested** 17:3 32:1 157:6 161:9 285:24

**suggestion** 64:24

**suggests** 188:20 212:13

**suit** 335:8

**suitable** 93:16 106:12

**suite** 40:8

**suited** 36:22

**summarize** 113:2 125:21 263:22 268:16

**summary** 119:4,11 120:9 126:14,15 142:14 208:14 252:5 264:23

**summer** 46:23

**summertime** 287:7,9

**supervisor** 38:18

**supplemental** 63:1,10 181:13 184:22 251:9 307:20 321:6

**support** 5:5,16 82:13 147:17 157:5 162:23 170:23 221:6 238:16 245:6 252:18

**supporting** 252:16

**suppose** 42:14

**supposedly** 326:3

**suppress** 134:2,10 135:4 136:21 137:12 138:7 243:17 247:8 317:16 325:17

**suppressed** 122:12

**suppression** 134:12 137:13

**Supreme** 132:18

**surmise** 273:16

**surmising** 186:20

**surprise** 264:17

**surprised** 84:15 134:21 192:12

**surrounded** 203:18

**suspect** 124:8 146:17 161:1,16

**suspected** 108:5 132:5

**suspects** 246:18 249:5,8 314:17

**suspicion** 132:7,14 291:2

**suspicions** 327:17

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 164 of 612 PageID #:8822

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: suspicious..ties

**suspicious** 326:2,24

**Sussman** 13:23 17:1,5 38:1 194:11 195:1,17 201:6 202:21 203:5,6 204:2, 8 209:1 211:22 218:20 219:8 238:11 241:14 311:6

**sustained** 53:2 65:4 130:6 136:3

**swab** 108:18

**swabbing** 106:12

**sweat** 111:4 277:1

**sweatshirt** 110:19,20 111:3,6

**swelling** 134:23

**swollen** 134:17

**sworn** 5:20 6:3 7:8,12 333:11,20 334:15

**system** 18:17 33:22 37:16 41:20

**systematically** 247:12

---

**T**

**table** 190:1

**tag** 105:8

**taking** 13:15 18:6 35:14 55:2 138:20 176:12 220:9 242:21 289:6 298:14 304:23 315:10 335:2

**talk** 10:7 11:1 12:3 41:14 136:13 137:14 145:12 148:18,22 155:16 163:9,23 170:3 173:12,15 174:16 223:11,12 233:18 237:16 252:23,24 263:16 311:5

**talked** 10:16 19:9 38:20 44:10 95:23 110:12 117:18 140:8 151:4 154:15 163:24 164:5,8,15 179:4 192:2,24 193:1 210:21,22 224:16 225:14 236:10 293:16 299:16 318:6

**talking** 9:6 44:13 65:19 78:21 101:24 111:2 121:21 153:16 165:16 198:17 199:13 219:14 239:2,19 249:15 277:12 310:6 311:19 322:2 328:15,16, 18,19 330:10

**talks** 49:5 102:5 215:16 313:24 314:1

**target** 311:20

**task** 105:14

**tax** 330:15

**Taylor** 103:8 108:3,4,14 110:14

150:8,12,19 154:7,17 272:8,19 273:4, 14 294:17

**Taylor's** 107:21 273:5,19

**team** 241:15

**tease** 113:18 145:22 275:18

**teased** 95:4 136:4

**technical** 30:12 99:22 152:23

**technology** 122:13 175:7

**tee** 173:2

**telling** 85:13 135:10 150:19 327:1 329:7

**tells** 227:12 327:2,3 329:22

**ten** 15:9 190:7

**tendency** 190:19

**tenure** 14:17 42:5 43:3 61:24 66:6 70:17 76:9,21 80:3,10,17 229:2 250:8

**Terence** 314:17 315:7

**term** 20:5 239:10 254:18

**termed** 15:17

**terminology** 161:11 255:7

**terms** 19:1 24:5 26:24 48:23 50:24 89:22 113:7 119:3 128:10 131:8 168:23 192:18 225:8 299:2 308:22 325:13

**terrible** 329:5

**territory** 176:11,21,24 257:3 259:11, 14 260:24 261:3 262:1 263:8 264:7, 14,15,18 265:7,13,14,19 266:18,21 267:13,16,21 268:1

**test** 120:13 123:9 141:7,10,24 164:2,6 168:20 172:13 186:24 187:13 188:6

**tested** 94:20 95:6 97:23 106:3 109:18,22 141:1 188:2 274:13 293:8

**testified** 7:12 80:11 102:18 120:2 134:16 158:12 186:23 187:11,17 248:14 253:21 256:23 280:13 319:20 320:3

**testify** 162:4,5 264:11 319:21 334:15

**testifying** 117:14 136:14 154:18 307:15

**testimony** 87:8 124:1 127:23 134:20 135:4 136:20 162:7 207:7 211:5 212:14 215:12 216:11 253:8 255:22

257:9 310:9 312:23 315:9 327:6,9 328:2,4 334:17,21 335:10

**testing** 82:11,20 83:1,3,4 90:1 91:4,6, 21 93:5,12,16 94:14 95:2 104:3,10,19 106:7,19,23 107:3,8,13,17 108:17 109:2 110:13,18 111:10 120:5,6,11 121:23 122:2 124:7 139:10 140:9,11, 13,15,24 180:17 221:15,23 271:17,24 273:3,13,17,24 274:2 275:21

**tests** 89:20 109:6,9 186:24 272:4

**text** 39:20 40:11 132:21 133:9 165:3 171:10 183:10 185:4

**theoretically** 177:12

**thereof** 252:16,18 335:9

**Theresa** 270:24 271:2,4 307:2

**thing** 11:23 13:3 18:23 20:10 40:3 50:22 82:10 87:3 88:18 150:2 159:10 189:24 200:8 272:4

**things** 10:4 12:12 22:7 26:10 27:14 37:5,12 38:17 41:9 50:23 53:5 86:9 87:10 93:17 98:2 103:17 105:6 108:10 122:13 130:21 131:23 148:3 151:2,8 158:22 160:24 166:21 170:16 172:1 190:4,5 192:17 200:4 205:21 219:22 228:17 237:17 248:14 267:11 277:13 293:17 298:6 299:15 302:16 319:5 325:19,23 329:6

**thinking** 17:3 18:1 41:22 78:19 171:16 172:9,13 173:8 185:19 213:13, 14 227:15

**thoroughness** 248:11

**thought** 24:5 34:21 37:12 70:12 105:10 114:17 132:3 143:5 150:2 157:7 161:18 166:13 168:10 172:11 173:6 177:18 187:23 189:18 198:16 203:20 224:21,23 234:12,14 255:12 256:20 272:3 273:13,16 275:8 281:19 305:9 310:9 325:18

**thoughts** 20:20 302:4

**threatening** 305:15,22

**three-minute** 111:18

**throw** 183:13

**thrust** 115:24

**tie** 103:19

**tied** 103:12,15,20 191:3 275:20

**ties** 293:2,5

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 165 of 612 PageID #:8823

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

Index: time..understood

**time** 5:5,6 8:4,19,24 12:6 13:8 14:15 22:18 24:8 37:23 38:2 41:12,24 46:24 52:19 58:14 62:3 72:16 73:5 74:21 80:16 82:3,5 87:22 92:20 93:3 97:19 105:1 116:14 121:15 122:4 128:4 131:8 138:21 139:10 141:11 142:7 143:1,6 147:8 155:5 156:12 159:12 162:6,8 164:22 165:13,16 166:2,11 167:1,9 188:15 189:13 190:5 192:12 194:7 198:2,10 203:7 204:24 210:23 221:24 226:4 227:6,9,13 229:1 232:20 233:6 234:13 242:21 247:3 256:8 269:12,24 270:1,11 283:19 284:6,16 287:10 289:6 295:21 300:1,2 303:13 316:8 322:1,5 323:5,10

**times** 11:1 19:22 54:18 187:12 197:4 247:14,18 285:22

**timing** 45:18 70:23

**tiny** 227:5

**tired** 15:2 16:19

**title** 21:12,14 37:24

**today** 5:5,15 7:23 9:9,17 10:15 24:24 84:10 120:2 130:1 141:13 154:18 179:3 182:15 186:23 187:11 188:12, 14 215:6 222:5 235:22 248:15 285:12 293:3 294:11 300:2 315:14 329:11

**told** 20:19 22:2 36:9 38:11 78:18 82:11 85:8 91:13,16 137:6,7 138:2 155:7 175:5 201:20 202:5 233:10,13 247:14 271:12 287:19 310:15 312:7, 19 314:18,20 321:14,20

**tone** 305:15

**top** 100:19 101:15 102:1 144:21 321:16

**topic** 46:5 49:16 66:16 83:4 86:3,13 87:2 133:20 174:19 226:21 315:2 320:10

**topics** 24:23

**topographically** 176:2

**tore** 294:1

**totaled** 149:18

**totality** 123:6 245:10

**totally** 289:19

**touch** 151:7 155:3

**touching** 169:5

**tour** 317:6

**town** 276:22

**track** 266:16 296:1

**Tracy** 5:3 73:15 81:15 151:23 209:20 278:7 289:21 300:11 313:3 334:4 335:17

**trailed** 218:9

**training** 119:13

**transcript** 66:14 67:1,10 155:18 202:19 205:4 207:18 210:3 212:2,4,15 298:4 308:24 333:14 334:21

**Transcription** 334:20

**transcripts** 134:7 325:17

**transfer** 95:1

**transferred** 95:9,19

**transpired** 201:15

**treated** 131:13

**treatment** 131:21

**trial** 13:20 14:19,20 23:11 24:15 53:19 64:22 119:7 120:14 121:3,5 122:18 124:15,20,24 125:11 126:19 127:5 134:6 136:14,23 156:23 157:9 162:3,5 171:12 180:6 189:22 190:12 203:11, 14 204:17 208:6,18 215:17 221:7 233:24 247:7 253:2 254:18,21 255:7 272:21

**trials** 121:15 122:5 124:10

**Tribune** 198:1,9

**tricked** 134:14

**tricky** 292:18

**trier** 56:17 57:9 69:18

**triggered** 194:15

**trouble** 331:3

**troubled** 18:23

**true** 56:11,20 110:11 160:15 167:8 172:6 206:23 241:19 257:14 334:21

**trust** 33:22

**truth** 321:22 329:3 334:15,16

**turn** 226:11

**turned** 157:8 323:15

**TV** 277:16

**tweaked** 183:7

**two-page** 258:17 260:2

**two-part** 317:13

**type** 249:16

**types** 45:14

**typewriting** 334:19

**typing** 280:6

**U**

**U.S.** 12:5,7,16,17,20 13:6,23 14:5 16:3

**ultimate** 59:22 87:11

**ultimately** 48:2 114:18 119:16 130:21 146:5 256:4 287:4 328:10

**unable** 213:6 221:20 222:7,18

**unaware** 320:16

**unchanged** 236:7

**uncomfortable** 304:11

**undercover** 13:16

**underinformed** 64:24

**underlying** 304:15

**undermine** 41:19

**underneath** 69:23 101:6

**underscore** 277:23

**understand** 9:16 12:4 14:14 18:2 20:6 26:13 33:6 34:5 59:24 96:9,11 105:15 115:6,23 122:2 126:16 128:1 132:23 133:20 143:11 146:3 160:19 170:15 172:21 179:21 187:7 212:8 225:21 226:4 233:12 248:16 249:21 257:10 259:7 276:16 289:14 309:4 327:8

**understandably** 148:20

**understanding** 10:8 20:23 21:3 29:22 37:13 54:24 58:11 68:2 80:15 83:12 87:4 92:2,3 93:7,13 96:12 102:24 105:21 106:3 108:11 122:6 127:17 155:14 156:10,13 172:21 186:22 229:24 231:24 240:11 243:1 253:8 256:3 257:5,15 271:4,20 303:5 304:7 312:9

**understood** 24:17 52:5 79:1 89:22 93:4 100:10 106:18 110:3 122:12 124:13 125:9 143:10 176:22 194:22

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021                                    Index: undertook..wanted

195:13 226:14 319:21

**undertook** 105:14

**underway** 97:22

**underwear** 82:12,17 102:8 103:1,2
110:13 123:12 142:24 165:18 166:18
168:14 170:4 174:7,10,15,22 175:1
276:5 286:7 287:14 291:1,22 298:24

**undetermined** 334:9

**undisputed** 127:13

**undo** 71:15 124:9

**undoubtedly** 99:12 257:23

**unfairly** 18:17

**unfinalized** 79:8

**unfortunate** 45:17

**uniformly** 237:10

**unique** 98:7

**unit** 12:22,23 16:13 20:2,24 21:1,4,15
22:8 24:2,14 25:20 26:5,9 27:19 31:14
32:20 33:8 35:2,11,17,18,21 38:13,22
39:21 41:7,12 44:2,16 45:22 47:18,20
50:12 51:6,21 55:11 57:23 61:24 65:7
66:6,11 70:17 71:7 72:10 75:5 77:13,
20 80:6,19 84:8 85:17 91:2,5 97:2
105:4 110:9 114:15 115:18 116:22
141:23 169:17 192:10 193:17 220:21
233:16 237:6 239:5 241:9 242:4 243:2
244:15 245:12 255:14 269:5

**unit's** 81:4,22

**United** 5:10 333:1 334:9

**University's** 20:14

**unjust** 226:8

**unkind** 151:2

**unlike** 305:6

**unpublished** 79:7

**unrelated** 281:8

**unusual** 148:15

**up-to-date** 104:18

**upset** 232:3

**urged** 250:12

**utilized** 47:24

---

**V**

**vacate** 71:15 125:5,10 172:2 195:23
203:23 313:14

**vacated** 52:24 192:16 203:12,13
215:20 239:13 253:5,12,17 255:9,19
256:11

**vacating** 205:7

**vagina** 129:3,13 294:4

**vaginal** 169:9 285:5 323:14

**valid** 250:17

**validity** 248:13

**variable** 277:2

**varying** 33:14

**vault** 169:9 285:5

**vehicle** 266:12

**vehicular** 259:2

**venture** 266:19

**ventured** 265:19

**verbal** 25:18

**verdict** 62:18 63:5

**versa** 176:13

**verse** 213:19

**version** 42:3 43:11 185:15 192:24
193:3,4,7

**versions** 183:17

**versus** 106:16 192:23

**vested** 65:3

**vestige** 119:12

**viability** 162:20

**vice** 176:13

**victim** 82:12 102:8 103:3 106:8
108:19 123:11 128:11,14 129:9 130:6
145:7 149:19 150:3 167:9 168:24
170:4 173:18,23 189:21 263:22
268:23 283:13,18 284:1 306:23
321:20 322:1,2,4,6,15,19 323:12,14,
23 324:4,19,23 325:7 326:5

**victim's** 107:8,18 109:18,22 110:13,
18 120:12 130:15 142:24 143:12
165:18 166:18 181:21 274:8 277:7,15

---

279:24 286:7 291:21 298:24

**victims** 145:12

**video** 5:7,14 147:5,7,14 148:7,11
306:21 308:3

**videoconference** 334:8

**videotape** 147:10 158:21 306:8

**view** 40:5 74:2 124:5 139:17 144:12
216:16 275:12,19 291:10 324:3

**viewed** 44:11 223:5 275:19

**viewing** 139:22

**views** 186:11

**violated** 299:18,19

**violating** 330:22

**violations** 28:14 330:13

**violent** 205:11 266:22 299:16

**violently** 294:3

**virgin** 168:11

**virtually** 93:13

**visited** 134:17

**vivid** 150:13

**vividly** 150:8,11

**vocabulary** 50:18 228:16

**voluntarily** 131:23

**voluntariness** 158:15

---

**W**

**W-A-L-D** 23:8

**waist** 294:6

**Wait** 149:2

**waiting** 196:24

**waived** 86:22 88:4 248:5

**waiver** 45:20 46:1 248:20 289:1

**waivers** 59:6

**waiving** 59:7

**walk** 228:1

**wanted** 8:3 16:19 17:24 20:1,21 41:3
45:23 47:11,13 56:9 95:5 96:22,23
97:1,4 126:16 130:15 135:14 136:8
143:9 144:23 145:12 163:8 166:12

DERRELL FULTON, et al., vs CITY OF CHICAGO, et al.
ROTERT, MARK on 03/19/2021

172:8 173:2 179:5 183:10 190:3,18,21 196:3 215:22 258:2 273:7,10 309:7,21 313:1

**warranted** 250:13

**wary** 148:20 304:18

**washing** 283:4

**Washington** 39:24 316:23 317:1

**waste** 87:22

**watch** 105:11 147:18

**watches** 277:16

**watching** 148:6,10 306:21 324:18,21, 22 325:7

**waters** 318:14

**Wayne** 316:23

**ways** 299:19

**wealth** 293:1

**wearing** 13:12 170:4,13 276:20,22,24

**website** 42:7,8

**weeks** 189:6,11

**weighed** 78:3

**weight** 223:1

**Wells** 265:1

**west** 39:24 265:3 323:6,8

**WHEREOF** 335:10

**white** 12:21 13:1 15:13 330:10

**Whiteside** 15:1

**wide** 175:22

**Williams** 150:6 316:2,6

**Willis** 5:15

**wine** 40:21

**Winston** 15:8,9,15,18 119:12 330:23

**wisdom** 225:22

**wishes** 272:2

**withdraw** 89:9 100:17 208:1 312:3

**withheld** 122:12 303:11

**withholding** 122:8

**witness's** 111:22 118:9 130:8 211:5 214:8 255:22

**witnesses** 126:18 155:6 161:22 213:20 314:20

**woman** 23:4,11,12 148:22 169:7 285:4 316:3,4 327:15 330:14

**woman's** 274:19 294:1

**women** 271:11,13

**wondered** 273:5

**Wonderful** 8:18 39:3

**wondering** 267:18 304:17 321:11

**wooden** 269:3

**word** 20:9 22:17 113:17 148:5,24 169:3 184:14 240:1 243:13,15 272:7 277:24 279:19 292:19 318:24

**words** 15:19 18:6 21:19 28:7 51:2 82:15 123:20 142:4 166:15 185:19 212:8 241:14 301:21

**wore** 107:10

**work** 9:18,23 13:22 14:2,5 15:5,7,11 18:8 21:24 22:3 24:2 25:10 27:15 33:21 35:10 39:1 41:18 48:20 58:8 85:3 87:8 97:2,6,12,14 105:11 114:17 118:15 157:10 172:14 180:4 185:1,7 186:20 189:6,7 190:7 200:14 213:14 217:7 237:5 239:4 241:8 244:14 247:16 250:6 271:15 307:12 311:21

**worked** 12:20 15:9 24:13 26:16 37:6 97:14 98:3 157:12 183:5

**working** 17:14 38:15 140:6 166:21 189:10 233:6 270:15 308:3

**works** 252:22

**worn** 174:8

**worry** 150:20 216:3 250:20

**worst** 326:15

**worth** 66:15 73:3 175:19

**wrapped** 17:13

**writing** 113:7 183:23 189:8 192:3 221:1 302:2,9,13 304:24

**written** 22:12 68:22 79:3 80:1 172:22 198:5 277:11

**wrong** 29:12,15,19 33:14 87:3,15 126:9 243:17 255:16 302:11

**wrongdoing** 247:18

**wrongful** 17:23 21:20 22:19 28:21

32:21 33:20 36:7 200:15

**wrongfully** 55:5 56:3 188:21

**wrote** 91:1 305:14

**Wu** 102:2 279:6

---

**Y**

**yardstick** 47:13

**Ye-** 194:12

**Yea** 301:18

**year** 91:14 139:23 192:16 227:14 232:24

**years** 10:3 14:18 15:2,10 149:6 200:3 290:20

**yesterday** 10:17 11:3,6

**Yongfei** 102:2 279:6

**Yorker** 233:12

**young** 316:1,16 326:8 328:7

**younger** 23:9

**Yup** 301:11

---

**Z**

**Zellner** 202:22 218:22 250:12

**Zellner's** 92:12

**zoom** 5:6 258:15 259:23 260:10 334:7

**Zorn** 198:1,5,20 199:12

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEVEST COLEMAN, | ) | |
| | ) | Case No. 18-CV-998 |
| *Plaintiff,* | ) | |
| | ) | Hon. Martha M. Pacold, |
| *v.* | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Hon. Sunil R. Harjani, |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |

| | | |
|---|---|---|
| DERRELL FULTON, | ) | |
| | ) | Case No. 17-CV-8696 |
| *Plaintiff,* | ) | |
| | ) | Hon. Martha M. Pacold, |
| *v.* | ) | District Judge |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Hon. Sunil R. Harjani, |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |

# EXHIBIT 26
# Neal Dep.
# (Filed Under Seal)

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if known, should include name if known, nickname; sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. and I.R. numbers if known, and state "In Custody."

# SUPPLEMENTARY REPORT
CHICAGO POLICE — FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

DATE OF ORIG. OCCURRENCE—TIME
DAY — MO. — YR.
11-12 Apr 94 | unk

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | I-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | 1 VERIFIED | 2 CORRECTED | 3. BEAT OF OCCUR. |
|---|---|---|---|---|---|
| HOMICIDE/1st DEGREE MURDER | 0110 | 917 West Garfield Blvd. | | | 712 |

| 5. VICTIM'S NAME AS SHOWN ON CASE REPORT | CORRECT XX YES 2 NO | IF NO, CORRECT ALL VICTIM INFOR-MATION IN BOXES 20 THROUGH 27. | 6. FIRE RELATED 1 YES XX NO | 7. BEAT ASSIGNED |
|---|---|---|---|---|
| BRIDGEMAN Antwinica | | | | 5113 |

| 8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED | LOCATION CODE | 9. NO. OF VICTIMS | 10. NO. OF OFFENDERS |
|---|---|---|---|
| Residence (basement) | 290 | 1 | 3 |

CIRCUM-STANCES
1 VERI-FIED
UPDATE TO
T = TAKEN; R = RECOVERED

| 12. OBJECT/WEAPON CODE NOS. | 13. FIREARM FEATURES CODE NO. | 14. POINT/ENTRY CODE NO. | 15. POINT/EXIT CODE NO. | 16. BURGLAR ALARM CODE NO. | 17. SAFE BURGLARY METHOD CODE NO. | 18. IF RESIDENCE WHERE WERE OCCUP. CODE NO. |
|---|---|---|---|---|---|---|

PROPERTY
1 VERIFIED dna
UPDATE TO

FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY T $ R $ | 2 JEWELRY T $ R $ | 3 FURS T $ R $ | 4 CLOTHING T $ R $ | 7 OFFICE EQUIPMENT T $ R $ | 8 TV, RADIO, STEREO T $ R $ |
|---|---|---|---|---|---|
| 9 HOUSEHOLD GOODS T $ R $ | 0 CONSUM. GOODS T $ R $ | (-) FIREARMS T $ R $ | & NARC./DANGEROUS DRUGS T $ R $ | 5 OTHER T $ R $ | 6 NONE T $ R $ |

VICTIMS UPDATE ONLY

| 20. NAME (LAST—FIRST—M.I.) | 21.-I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX—RACE—AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN-JURED YES NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | PERMANENT RETENTION FILE | | | | | | |
| 3. | | | | | | | |

OFFENDERS UPDATE ONLY

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX—RACE—AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. COLEMAN Nevest | 917 West Garfield Blvd. | M/1/25 | 5-11 | 210 | brn | blk | light |
| 2. FULTON Darryl | 5517 S. Sangamon | M/1/26 | 6-2 | 165 | brn | blk | medium |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | 1 OFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| 9633242 | 1050572 | 22 | OFF. 2 9333957 | 699341 | 22 | 2 | 610 |

| 33. OFF'S. VEHICLE | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE |
|---|---|---|---|---|---|---|---|
| USED DNA STOLEN | | | | | | | |

| 34. SERIAL NOS. OR IDENTIFICATION NOS. | XX DNA | 2 VERIFIED | 3 CORRECTED | LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE |
|---|---|---|---|---|

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) | REV. CODE | 51. METHOD CODE | 52. METHOD ASSIGNED | UNIT NO. | 53. STATUS |
|---|---|---|---|---|---|
| DNA | DNA | DNA | XX FIELD 1 SUMMARY | 610 | 0 PROGRESS | 1 SUSPENDED | 2 UNFOUNDED |

STATUS CONT'D.
3 CLSD. CLOSED | 4 CLRD. OPEN | 5 EXC. CLRD. CLOSED | 6 EXC. CLRD. OPEN | 7 CLSD. NON-CRIM.

| 54. IF CASE CLEARED, HOW CLEARED |
|---|
| X 1 ARREST PROSEC. | 2 DIRECTED TO JUV. CRT. | 3 COMPL. RFUSD. TO PROSECUTE | 4 COMMUNITY ADJUSTMENT | 5 OTHER EXCEPT. | XX ADULT JUV. |

65. FOR SUMMARY CASES ONLY — THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION. ℓ 1035 / 03

80. NARRATIVE

The narrative section of this report begins on page two...............

35. R.D. NO. Y-182495

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) | 91. DATE THIS REPORT SUBMITTED — DAY — MO. — YR. | TIME | 92. SUPERVISOR APPROVING (PRINT NAME) | STAR NO. |
|---|---|---|---|---|
| Normal | 9 June 94 | 2200 | Benoit | 2249 |

| 93. REPORTING OFFICER (PRINT NAME) | STAR NO. | 94. REPORTING OFFICER (PRINT NAME) | STAR NO. | SIGNATURE |
|---|---|---|---|---|
| Detective W. Foley | 20450 | Detective M. Clancy | 20395 | J. Senart |

SIGNATURE
W. Foley | M. Clancy

| 95. DATE APPROVED (DAY—MO.—YR.) | TIME |
|---|---|
| 10 Jun 94 | 0100 |

CPD-11,411-B (Rev. 8/85) | *MUST BE COMPLETED IN ALL CASES*

DEFS 201

Pls.' Exhibit 27

VICTIM:  BRIDGEMAN, Antwinica., F/1/20., DOB ████ 74., Address 852 W. 54th St., Ph# 268-4245., Single., Unemployed

IN CUSTODY:  #1 –  COLEMAN, Nevest., M/1/25., DOB ████ 69., Address 917 W. Garfield Blvd., Ph# 488-7926., Employed as a groundskeeper by the Chicago White Sox., Single., 5-11., 210lbs., Blk hair and brn. eyes., Light complected., SS# ████-6913. CB#9633242.,IR# 1050572.

#2 –  FULTON, Darryl., M/1/26., DOB ████ 67.,Also known as "DAP"., Address 5517 S. Sangamon St., No Phone., Unemployed., Single., 6-2, 165lbs., Blk hair., and brn. eyes., Medium complected., SS# ████-2719., CB# 9633957., IR# 699341

WANTED OFFENDER:  TAYLOR, Eddie., M/1/27., DOB ████ 66., LKA 4118 W. Potomac., 2nd Flr., Ph# 227-0213., 5-07., 190lbs., Heavy build., Medium complected., moustache., IR# 685117., SS# ████-7863., Ill. DLN # T460-2006-6211 **AKA "SHIP or "CHIP"**

GANG AFFILIATION:  The victim was a female Vice Lord who had recently changed gangs from the Gangster Disciples to Vice Lords.
The In- Custody subjects as well as the wanted offender are members of the Gangster Disciples.

ARRESTING OFFICERS:  Bt. 5113 – Dets. Foley #20450
          Clancy #20395
Bt. 5114 – Dets. Halloran #20453
          Boudreau #20435

PERMANENT RETENTION FILE

**DEFS 202**

DETECTIVE DIVISION
Victim, BRIDGEMAN, Antwinica

Y-182495

Bt. 5121 - Dets. O'Brien #20466
                Carroll #20346


Bt. 5124 - Dets. Moser #20465
                Graf #20480
Bt. 5126 - Det. Turner #20874

DATE,TIME,LOC.OF ARREST:

Arrestee #1- COLEMAN, 29 APR 94., (Friday)., 0200hrs., 5101 S. Wentworth St.

Arrestee #2- FULTON, 30 APR 94., (Saturday).,2350hrs., 5101 S. Wentworth St.

CHARGES,CT.DATE & BRANCH:

Both arrestees COLEMAN and FULTON were charged with Chap. 38-91a2 1st Degree Murder and Chap. 38-12-14a2 Agg. Criminal Sexual Assault., 2 MAY 94., Br. 66-4

INJURIES:

The victims body appeared to be in an advanced state of decomposition and mummification. The body appeared to have injuries to the head, face,chest and hands.  There was a piece of concrete wedged into her mouth and there were pieces of concrete in her hair and on her face. There was a length of what appeared to be 1/2" pipe protruding from her vagina. (See narrative portion of this report for a more detailed description of the victim).

TAKEN TO:

The victim was pronounced dead at the scene by M.E.I. T. Doe #63 at 2100hrs., The victims remains were then ordered to the morgue, Case # 560 APR 94.

WEAPON:

Hands and fists, pieces of concrete and iron pipe recovered from the scene and the victims body.

LOCATION:

This incident occurred and the victim was found in the basement of the bldg. located at 917 W. Garfield Blvd.

3

DEFS 203

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

DATE & TIME:            This incident occurred( 11-12 APR
                       94)., Monday-Tuesday.  The body
                       of the victim was not found and
                       reported until 28 APR 94.,
                       (Thursday) at 1947hrs.

WEATHER & LIGHTING:    Clear/Cool/Artificial

MANNER & MOTIVE:       The victim was sexually assaulted
                       and beaten with hands,feet and
                       iron pipes.  Inanimate objects
                       are then forced into the throat
                       and vagina causing the victim to
                       suffocate and sustain vaginal
                       trauma causing her death at the
                       hands of the offenders/Sexual
                       Gratification and Gang Violence.

IDENTIFIED BY:         The victim was identified at the
                       scene and at the morgue by her
                       mother Annette Bridgeman.,
                       F/1/35.,DOB ████ 58., 849 W.
                       54th St., Ph# 268-4245.

EVIDENCE:              Inv# - 1303153 Used condoms from
                       scene stairs and bsmt.
                       Inv# = 1303154 1 pair of broken
                       eyeglasses from scene.
                       Inv# - 1303155 Bottles and cans
                       from the scene.
                       Inv# - 1308245 2 plastic packets
                       from rear bldg. stairs, scene.
                       Inv# - 1309026   Set of photos.

REFERENCE:             M.E. Case # 560 APR 94.

NOTIFICATIONS:         A.S.A. Hal Garfinkel

PERSONNEL ASSIGNED:    DETECTIVE DIVISION
                       See Arresting Officers
                       Bt.5110 - Sgt. Benoit #2249
                       Bt. 5123 - Det. Golubiak #20451
                           5126 - Dets.Kelly #20229
                                      Harrison #20884
                       CRIME LAB
                       Bt. 9603 - Techs. Gurtowski#13319
                                        Stella #14488

                       DISTRICT PERSONNEL
                       Bt. 730 - Sgt. Gilmore #2032

4

**DEFS 204**

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

                          Bt. 709 - P.O. Tooles #16391
                          Bt. 712 - P.O. Mora #5583
                                    P.O. Paluck #8467
                                    (Paper Car)

                          Bt. 771 - P.O. Bresnahan #8238
                                    P.O. Small
                                    (Wagon for removal)
                          Bt. 776 - P.O.Hasenfang #15085
                                    P.O. Layman #15406
                                    (Scene protection)

WITNESSES:                BARBER, Michael., M/1/17., DOB
                          ████ 77., 5630 S. Peoria St.,
                          Ph# 846-8878., SS# ████-0802.,
                          Single., Student at the Englewood
                          H.S., Eye/Oral/Handwritten

                          CALIMEE, Francine., F/1/18., DOB
                          ████ 75., 923 W. 55th St., 1st
                          rear., No Phone., Single.,
                          Student at the Roberson High
                          School., Eye/Oral/Handwritten

                          WILLIAMS, Shaunice., F/1/16., DOB
                          ████ 78., 5640 S. Green St.,
                          Ph# 783-5826., Single., Student
                          at the Roberson H.S., Eye/Oral/
                          Handwritten

                          CALIMEE, Yvonne., F/1/37., DOB
                          ████ 57., 923 W. 55th St. 1st.
                          rear., No Phone., SS# ████-
                          5894., Single/Unemployed., Eye/
                          Oral.

                          CALIMEE, Larry., M/1/14., DOB
                          ████ 79., 923 W. 55th St., 1st
                          Rear., No Phone., Student at the
                          Englewood H.S..,Eye/Oral

STATEMENTS:               Court reported and Oral statement
                          by the In-Custody subject COLEMAN

                          Handwritten and Oral statement by
                          the In-Custody subject FULTON

                          Handwritten and Oral statements
                          by the witnesses BARBER, CALIMEE
                          and WILLIAMS



PERMANENT RETENTION FILE

DEFS 205

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

INTERVIEWED:                    BRIDGEMAN, Leola., F/1/66., 852
                                W. 54th Pl.,Ph#268-4245.,Grand-
                                mother of the victim could add
                                nothing to this investigation.


                                BRIDGEMAN, Annette., F/1/35., 849
                                W. 54th St., 2nd Flr., Ph# 268-
                                4245., Mother of the victim


                                LATHAM, Chester., M/1/28., DOB
                                ████ 65., 7507 S.Ingelside., PH
                                874-5970., Boyfriend of the
                                victim


                                CONLEY, Lori., F//1/32., 923 W.
                                Garfield Blvd., 2nd Rear., Ph#
                                783-1474.  At approx. the time of
                                incident she heard a F/1 scream-
                                ing in the east gangway at
                                approx. 0030hrs. The female was
                                saying "Get away or Go On" She
                                stated that she looked out but
                                saw nothing


                                COLEMAN, Lewis., M/1/56., 917 W.
                                55th St., 1st Flr., Father of the
                                In-Custody subject COLEMAN. Saw
                                nor heard nothing at the time of
                                this incident.


                                COLEMAN, Cecilia., F/B/51., 917
                                W. 55th St., 1st Flr.Mother of
                                COLEMAN., Saw nor heard nothing
                                at the time of this incident.
                                Smelled the odor on 27 and 28 APR
                                94 and told her son to get rid of
                                the odor, she thought it was a
                                dead animal in the bsmt.


                                JOHNSON, Kimberly., F/1/23., DOB
                                ████ 70., 3010 W. 62nd St., Ph#
                                737-6277., SS# ████-1195.,
                                Alibi witness for FULTON, Alibi
                                broken.


                                PALMER, Brenda., F/1/45., 909 W.
                                55th., 1st Flr.No Phone., Saw nor
                                heard nothing.

PERMANENT RETENTION FILE

6

DEFS 206

DETECTIVE DIVISION                                          Y-182495
Victim, BRIDGEMAN, Antwinica

                                        SILLER, Craig., M/1/34., 919 W.
                                        55th St., Ph# 723-2176., Saw nor
                                        heard nothing

**PERMANENT RETENTION FILE**            SILLER, Lynda., F/1/31., 919 W.
                                        55th St., Ph# 723-2176., Saw nor
                                        Heard nothing.

INVESTIGATION:                          The undersigned R/Ds assigned to
                                        this investigation by Sgt. Benoit
of this command.  The R/Ds then proceeded to the address of this
occurrence and observed it to be a brick bldg. containing two
stories and a basement.  The bldg. contained two apts. with both
front and rear entrances.  The rear entrances are enclosed by a
porch and access is gained to the rear doors from a common door
located at ground level.  Once inside this door there is a wooden
stairway leading both upstairs to the first and second floors
and/or down to the basement.  The stairway upstairs is to the
immediate south of the rear door and the stairs leading down is
immediately to the north of the rear door.

                                        The R/Ds were then directed to
                                        the beat officers, P.O.s Paluch
and Mora who then related the following to the R/Ds. They stated
that they had received an assignment of a "Foul Odor, Possible
Dead Body" at the above address.  The officers then went on to
say that they responded to the assignment and upon their arrival
were met by a Michael BARBER and Nevest COLEMAN who related that
they had found a dead female body in the basement of the bldg.
located at 917 W. Garfield Blvd. (It should be noted that
Garfield Blvd. is 55th St. at that address.)  The officers then
proceeded to the rear of the bldg. and went to the basement door
and attempted to gain entrance.  The officers then stated that
there was something on the other side of the door restricting the
opening of the door.  The officers then forced the door open and
observed the victim laying on the floor of the basement partially
clad and obviously dead.

                                        The Officers then went on to say
                                        that they then secured the scene
and made the proper notifications for the Medical Examiners
Office and the Violent Crimes detectives.  The R/Os then related
that the paramedics had responded and observed that the victim
was dead.  The officers then made arrangements and had COLEMAN
and BARBER transported into A/1 for interviews with members of
A/1 V.C.

                                        The R/Ds then proceeded to the
                                        rear of the bldg. and observed
the following, immediately to the north of the rear outer door

                                        7

**DEFS 207**

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

were seven (7) wooden steps leading down to the inner basement
wooden door.  The R/Ds then went through the door and entered
into a room approx. 30ft. wide and 12ft. deep.  It was observed
that to the north of this room was another room approx. 60ftdeep
by 30ft. wide.  The floor of both of these basement rooms was
concrete.  In the rear room where then victim was found the
concrete floor had been broken up in several locations, one of
the locations was immediately to the west of the victims body.
Also the R/Ds observed that there was a quantity of loose pipes
and a large amount of broken concrete and garbage and debris in
the room with the body.

                    The R/Ds then observed the body
                    in the following manner the
victim was laying on her back with her feet to the south and her
head to the north.  Her legs were spread wide apart there was a
larger pool of blood extending in a circle approx. 3ft in
diameter  centered on the trunk and vaginal area of the victim,
the blood was dried and deep red in color.  The upper clothing of
the victim had been pulled up around her neck and her lower
clothing was completely off her right leg and the clothing was
clumped around her left leg.  There was what appeared to be
chunks of concrete in the hair of the victim and a large chunk of
concrete wedged into the mouth of the victim.  There was a small
amount of blood dried on the mouth,nose and face of the victim.
The face and hands of the victim were extremely discolored, dark
red and her skin on the face and hands appeared to be in advance
stages of decomposition and mummification.  There was a large
amount of discoloration on the chest, abdomen and lower
extremities and there was skin slippage present on the entire
body of the victim.
It should also be noted that there were what looked like bruises
to the face and neck of the victim  Also the R/Ds observed what
appeared to be a piece of 1/2inch steel pipe protruding from the
victims vaginal area.

                    Immediately to the west of the
                    victim was a length of 1/2 inch
pipe.  Immediately to the north of the victim was a pink plastic
ponytail holder and pieces of concrete. To the west of the
victims body was a broken step ladder which was partially resting
on the right arm of the victim.  At the left shoulder(east side)
there was a pair of broken plastic eyeglasses.  The victims right
brown boot and one yellow sock were adjacent to the body directly
south of the victim.  Closer examination of her upper clothing
revealed the victim had been wearing a black hip length winter
cloth coat, black in color with pink and purple trim.  Under her
outer coat she was wearing a Bulls, red satin sports type jacket,
with ANTWINICA embroidered at the right breast.  gold
sweatshirt,white cotton bra, Bill Blass aqua colored jeans, blue
and white cotton panties, white thermal long underwear and yellow
sock and brown boot on her left foot. It should noted that there
were several of the victims teeth laying on the basement floor
next to the victims body.

PERMANENT RETENTION FILE

                              8

DEFS 208

DETECTIVE DIVISION                                          Y-182495
Victim, BRIDGEMAN, Antwinica

The contents of the victims pockets were then examined and they contained misc. make-up, condoms, cigarettes and a lighter, candy, matches and TOP cigarette papers. Two bottles were recovered from the immediate proximity to the victims body. Closer examination of the scene revealed a used condom and two empty beer cans from the room adjacent to the room where the victim was found. Another used condom was recovered from the wooden stairs leading to the basement from the outside. The scene was then processed and photographed by the Crime Lab.

The Medical Examiners Inv. T. Doe arrived on the scene and pronounced the victim dead at 2100hrs. The victims remains were then ordered to the morgue, case # 560 APR 94. The remains were then transported to the morgue by Bt. 771. The R/Ds had initiated a canvass of the area and during the course of that canvass the R/Ds located and interviewed BRIDGEMAN, Annette who related the following; she stated that her daughter had been at a party 11-12 APR 94 in the area and had not been seen since that date. The R/Ds then inquired as to the clothing description of that missing person and that clothing matched the clothing that the victim was found wearing when she was found in the bsmt. Arrangements were then made for the subject Annette BRIDGEMAN to view the remains of the victim in the wagon prior to the removal and at that time Annette BRIDGEMAN tentatively identified the victim as her daughter Antwinica BRIDGEMAN. The remains were the removed to the morgue and arrangements were then made for the victim to be viewed at the morgue. The R/Ds then proceeded to the morgue and at that time the family of the victim formally identified her as Antwinica BRIDGEMAN, the girl who had been missing since 11-12 APR 94.

Francine CALIMEE and Shaunice WILLIAMS were interviewed at the scene and they related that they were friends of the victim and that they last saw her at CALIMEEs house on the night of 11 APR 94 at a party. They then went on to say that the victim left the party and they never saw the victim again. The R/Ds then gave both of these subjects a description of the clothing that the body in the basement had on and they both stated that was the same type of clothing that the victim was wearing on the night that she left the party and disappeared.

Yvonne and Larry CALIMEE were interviewed and they verified that in fact there was a party at the CALIMEE on the night that the victim disappearred, 11 APR 94.

The R/Ds then had occasion to proceed to the morgue and while at the morgue the victims family members positively identified the victim as Antwinica BRIDGEMAN. While at the morgue the R/Ds had occasion to interview the boyfriend of the victim Chester

PERMANENT RETENTION FILE
DEFS 209

DETECTIVE DIVISION                     Y-182495
Victim, BRIDGEMAN, Antwinica

LATHAM who related the followimg in summary; He related that the
last time he saw the victim was on the day before the victims
birthday April 10, 994 and at that time he dropped her off at
approx. 2000hrs at her mothers house 852 W. 54th Pl. He then went
on to say that while he was with her he noticed that the victim
had a bruise (hickey) on her neck.  He then asked her how she got
the bruise and the victim stated that she had been assaulted
several days prior by a M/1 by the name of "Chip" or "Ship".   She
then told LATHAM that "CHIP" had tried to forcibly sexually
assault the victim but she had fought him off and ran away from
"Chip".   LATHAM then related that the victim had been a member of
the Gangster Disciples and had changed allegiances to the Vice
Lords.   LATHAM concluded this interview by stating that the
victim mentioned that "Chip" and "Dap" were Gangster Disciples
and they had been bothering her for changing gangs.

                  The R/Ds then proceeded to A/1
                  and at that time were informed
that Nevest COLEMAN and Michael BARBER, the individuals  that
found the victims body had been interviewed by members of A/1
V.C..  The following is a summary of those interviews.
COLEMAN related that he and his family had noticed a strange odor
coming from the basement.  On 28 APR 94 COLEMANS mother told
Nevest to check out the smell coming from the basement.  He then
related that he then met up with his friend Michael BARBER and
they attempted to get into the basement but the door was blocked.
He then went on to say that he and BARBER then went to the window
and saw the victim laying in the basmt.  He then added that he
then went and told his mother about the body and that she then
called the police.

                  The R/Ds then had occasion to ask
                  COLEMAN if he knew the victim
Antwinica BRIDGEMAN and at that time COLEMAN stated that in fact
he did know the victim and that he knew her for several years.
He then related that he had not seen her for sometime at least
several months.  The R/Ds then asked COLEMAN if he knew any
neighborhood by the nickname of "Chip" or "SHIP" and COLEMAN
stated that he knew a "Chip" and that "Chip" had just gotten out
of prison for what he thought was rape.  COLEMAN then took the
R/Ds to 5517 S. Sangamon and told the R/Ds that is where "Chip"
lived.  He then went on to say that "Chip" was M/1/late 20s-early
30s,  5-5 to 5-7., Heavy set with a scar on his face, left side
of head.On the way back to the COLEMAN house COLEMAN showed the
R/Ds the house where "Chip" lived, 5517 S. Sangamon St.  Both
COLEMAN and BARBER were then returned home.

                  Michael BARBER was then inter-
                  viewed and he related the
following; he stated that on 28 APR 94 he was approached by his
friend Nevest COLEMAN and COLEMAN asked him if he would help him
identify and correct an odor coming from the area of COLEMANs
basement.  He stated that they got a flashlight and tried to
enter the basement but the door was blocked from the inside.
They then looked through the window and saw the victims body on

PERMANENT RETENTION FILE

DEFS 210

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

the floor of the bsmt. He then stated that they then told
COLEMANs mother about the body and that she then called the
police.  He could add nothing further.

                    The R/Ds then had occasion to re-
                    interview both Francine CALIMEE
and Shaunice WILLIAMS and at that time both girls stated that
when they were first interviewed by the R/Ds then withheld
information regarding this investigation.  They then went on to
say that they were both afraid of the Gangster Disciples and that
the victim had left the party at CALIMEEs house with a GD, Nevest
COLEMAN on the night that she disappeared.  Francine CALIMEE then
went on to relate that she had a party at her house on the night
of 11 APR 94.  She then went on to say that at this party were
her friends Shaunice WILLIAMS, the victim  and Nevest COLEMAN.
She then added that at approx. 2300-2330hrs Shaunice WILLIAMS,
the victim BRIDGEMAN and Nevest COLEMAN left her house.  Shaunice
WILLIAMS then stated that her, the victim and Nevest COLEMAN then
walked to 56th and Green and at that time she left the company of
the victim BRIDGEMAN and Nevest COLEMAN.  WILLIAMS then went on
to say that she last saw the victim and COLEMAN walking W/B on
56th St.  She then added that she did not see the victim or
COLEMAN again and that she learned the next day that the victim
had disappeared.  She and CALIMEE then related that they were
extremely afraid for their safety and that is the reason that
they never told anyone that COLEMAN had left the party with the
victim.  They both were afraid that they would be the next
victims.

                    The R/Ds then went to the COLEMAN
                    and at that time told COLEMAN
that they had to re-interview him regarding this investigation.
At that time the R/Ds advised COLEMAN of his cons. rights, which
he stated that he understood and at that time COLEMAN was
transported into A/1 for further investigation.

                    The R/Ds then proceeded to 5517
                    S. Sangamon St. and interviewed
Duane and Dorothy DAVIS and they related that they were related
to "Chip" , they identified "Chip" as a Eddie Taylor M/1/in his
late 20's.  They further related that he had recently been
paroled from prison and that in the first weeks of Apr. 1994
TAYLOR had stayed at their house for several dates, they could
not remember the exact dates.  They went on to say that
TAYLOR was not living there anymore and they thought that he was
living on the westside of Chicago.

                    Francine CALIMEE and Shaunice
                    WILLIAMS were then transported
into A/1 where they were interviewed by the R/Ds and A.S.A.
Garfinkel  and they gave oral and handwritten statements to the
R/D and the State's Atty.

                    The R/Ds then had occasion to re-
                    interview COLEMAN and after again

11



PERMANENT RETENTION FILE
DEFS 211

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

advising him of his cons. rights, which he again stated that he understood. He then was confronted with the accounts of 11 APR 94 by CALIMEE and WILLIAMS and at that time COLEMAN stated that he had lied to the police and that in fact he had left the party at CALIMEEs house with the victim. He then stated that he left the party with the victim and WILLIAMS and that he and the victim walked WILLIAMS to the corner of 56th and Green St where they left WILLIAMS. He then went on to say that he then walked the victim to the corner of 55th and Green where he left her on the southside of the boulevard and observed the victim walking N/B across the blvd.. He then stated that he saw the victim walking towards her house. He then left and went to the liquor store.

The R/Ds then confronted COLEMAN with the fact that the family of the victim told the R/Ds that the victim never returned home on that night and at that time COLEMAN stated that he again was not truthful and he now wanted to tell the R/Ds then entire truth. He stated that after he left the party with WILLIAMS and CALIMEE he left them at 56th and Green St. and went to the liquor store at 55th St and Halsted. He then stated that he returned to the area and at that time he saw the victim BRIDGEMAN and "CHIP" and "DAP"talking to the victim in the alley behind his house. He then went on to say that he then sees the victim and "CHIP" and "DAP" go into his basement. He then stated that after a short time he went to the basement door and observed the victim orally copulating "CHIP" and she was also engaged with "DAP" in anal intercourse. He then went on to say that he then became frightened and ran into his apt. one floor above the crime scene where he remained for the rest of the night.

The R/Ds then notified A.S.A. Garfinkel of the Felony Review Unit who responded to the A/1 Violent Crimes. Garfinkel then arrived at A/1 and was then made aware of the status of this investigation. At that time A.S.A. Garfinkel and the R/Ds had occasion to interview COLEMAN. A.S.A. Garfinkel then introduced himself and explained to COLEMAN his function as a States Atty. and at that time informed COLEMAN of his cons. rights, which he stated that he understood. COLEMAN then went on to say that he wanted to tell the entire truth and at that time stated the following; He was at Francines house on 11 APR 94 and that he arrived there at approx. 1800-1900hrs. He then went on to say that he left the party at Francines house in the company of NICE (Shaunice WILLIAMS) and Mickey (The victim Antwinica BRIDGEMAN). He then went on to say that he and MIckey (Victim) then walked Nice home to the area of 56th and Green at which time Nice went home and he and Mickey then walked to the corner of 55th and Peoria and then to the liquor store at 55th and Halsted St. He then related that he went to the liquor store and Mickey (Victim) went home.

COLEMAN then stated that after he went to the liquor store he was walking around and again met up with Mickey (Victim). He then

PERMANENT RETENTION FILE

DEFS 212E

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

added that he met up with her at 55th and Peoria and that they
then walked back towards Francines house. On the way back to
Francines they meet up with "CHIP" (Eddie Taylor). He then went
on to say that the victim and "Chip" had a private conversation
out of his hearing range and that during the course of that
conversation "Dap" appeared on the scene and he also began to
talk to the victim and "Chip". COLEMAN then stated that he
thought that "Chip" and "Dap" were cousins or some sort of blood
relation. He then continued that "Dap" then approached COLEMAN
and asked where they could go to have sex with the victim and at
that time he suggested the basement of his house at 917 W.
Garfield Blvd.

          COLEMAN then went on to say that
          that the all, "Chip", "Dap"
himself and the victim then went into the basement. He then
stated that "Chip", "Dap" and the victim went into the back part
of the basement and that "Chip" and "Dap" were rubbing the victim
breasts and crotch area both inside and outside of her clothing
for a long time. He then went on to say that he then observed
the victim orally copulating "Chip" and he then saw "Dap" pull
down the victims pants and have anal intercourse with the victim
simultaneously COLEMAN then stated that while this was taking
place he was standing as a lookout to warn the others if someone
was to come into the bsmt. COLEMAN then related that this
activity lasted about ten minutes and at that time the victim
stated that she did not want to engage in any more sex and at
that point COLEMAN stated that he became very angry and left the
bsmt. He then went on to say that he remained outside in the
back yard for about 5 minutes and that he became increasingly
more angry and returned to the bsmt.where the victim and "Chip"
and "Dap" had remained while he was outside.

          COLEMAN then related that he then
          confronted the victim and began
to argue with her over her not performing any sexual acts on him
and that he then continued to get angrier and at that  point he
slapped the victim in the face twice. He then stated that at
that point "Dap" grabbed her and then "Chip" grabbed her and took
the victims pants and shoes off forcibly. He then stated that
they then asked him if he wanted "Some of this pussy" and COLEMAN
responded Yes. At that point COLEMAN stated that "Chip" got on
the victim face to face and started to have vaginal intercourse
with the victim while "Dap" was holding the victims mouth shut.
COLEMAN then stated that he was acting as a look-out  while they
were assaulting the victim. He then went on to say that "Dap"
then got on top of the victim and had vaginal intercourse with
the victim  while "Chip" held her mouth closed.

          COLEMAN then went on to say that
          "Dap" got off the victim and he
then held her mouth shut and "Chip" got back on the victim and
again sexually assaulted the victim. COLEMAN then went on to say
that at that point he told "Dap" take this piece of concrete and
put it in her mouth so that she will quit screaming.

13

PERMANENT RETENTION FILE
DEFS 213

DETECTIVE DIVISION                                          Y-182495
Victim, BRIDGEMAN, Antwinica

He then went on to say that the brick (concrete) was a medium
piece and that "Dap" did put the brick into the mouth of the
victim.  COLEMAN then stated that "Chip" then stated to the
victim "You want something long and Hard" and at that time he
picked up a piece of pipe that was laying on the floor and he
then inserted that pipe into her vagina.  COLEMAN then went on to
say that he was continuing to act as a look-out and he then
observed the victims body shaking and jerking, with her eyes open
and a lot of blood coming from her vaginal area.  He then stated
that he and "Chip" and "Dap" ran from the basement and he went to
his girlfriends at 56th and Sangamon St.  He then added that "Dap
and "Chip" ran from the scene together and that he did not know
where they went to after leaving the scene.  This statement was
then reduced to a handwritten statement. It should be noted that
during the course of this statement COLEMAN identified a photo
of Eddie TAYLOR as "Chip".


                    Darryl FULTON (DAP) was located
                    at his home and informed of the
nature of this investigation and agreed to assist in this
investigation and at that time he was informed of his cons.
rights which he stated that he understood. FULTON was then
transported into A/1 and upon arriving in A/1 he was again
advised of his cons. rights and at that time he was informed of
the status of this investigation.  FULTON then stated that at the
time of this incident he was not in the area and he did not have
anything to do whatsoever with this murder.  He then went on to
say that at the time of this incident he was with his girlfriend
Kimberly JOHNSON.

                    The R/Ds then had occasion to
                    locate and interview Kimberly
JOHNSON and at that time she stated that at the date and time of
this incident FULTON was not with her and that she did not know
anything about FULTONs whereabouts at the time of this incident.

                    FULTON was then confronted with
                    K. JOHNSONs account and at that
time stated that he had been un-truthful in his account of the
night of this incident.  He then went on to say that on the date
and time of this incident he was in the alley behind 917 W. 55th
St.  He then went on to say that he then observed "Chip" and
Nevest and Antwinica go into the bsmt. at 917 W. 55th St.  He
then stated that he stayed in the alley for a short time and that
he then went down into the basement and while he was standing in
the basement door way he observed the victim orally copulating
"Chip" and Nevest COLEMAN was having vaginal intercourse with the
victim.  He then went on to say that "Chip" and Nevest COLEMAN
turned towards FULTON and saw that FULTON was standing in the
doorway.  FULTON then went on to say that he then panicked and
ran from the scene and went home.



PERMANENT RETENTION FILE

**DEFS 214**

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

The R/Ds then had occasion to interview FULTON along with A.S.A. Garfinkel and at that time after being advised of his cons. rights he related basically the same set of facts as reported to the R/Ds in the above paragraph. FULTON was then advised of the content of COLEMANs statement and at that time FULTON requested to speak to A.S.A. Garfinkel alone.

This request was then granted and after that interview the R/Ds were then called back into the interview room and the following statement by FULTON was taken regarding this incident. He related that on the date and time of this incident he was in the alley between Sangamon and Peoria, on the south side of 55th St. He then stated that he met up with Nevest COLEMAN, Eddie TAYLOR "Chip", and Antwinica Bridgeman and that they all decided to go to the bsmt of Nevest COLEMAN to have sex. He stated that once in the bsmt. BRIDGEMAN began to orally copulate FULTON. FULTON while TAYLOR stood nearby watching. He then stated that while he was being copulating COLEMAN was having vaginal intercourse with the victim. FULTON then stated that TAYLOR wanted to have sexual relations with BRIDGEMAN and that the victim wanted to leave COLEMANs bsmt.

At that point TAYLOR and COLEMAN forced the victim to the ground. COLEMAN then forced the victim to orally copulate him and at the same time TAYLOR was having vaginal intercourse with the victim BRIDGEMAN. FULTON then stated that while this was going on he was acting as a look-out so that he could warn the others if someone came to investigate the screams of the victim. FULTON then went on to say that the victim continued to scream and at that point COLEMAN directed TAYLOR to insert a brick or piece of concrete in the mouth of the victim to silence her screams. FULTON then related that as the victim and TAYLOR and COLEMAN were laying on the floor he was again acting as a look-out. At that point he stated that TAYLOR got up off the ground picked up a piece of pipe laying next to the victim and told the victim" You want something long and hard, I'll give you something long and hard. At that point TAYLOR jammed the pipe into the vagina of the victim BRIDGEMAN.

FULTON then went on to say that as TAYLOR was inserting the pipe into the vagina of the victim he was again acting as a look-out. He definitely stated repeatedly that it was in fact TAYLOR who inserted the pipe into the victim and he definitely didn't insert the pipe into the vagina of the victim. FULTON then went on to say that after the pipe was in the victim he observed the victims body begin to shake and shiver. He then saw blood coming from the vaginal area of the victim and at that time he and COLEMAN left the bsmt. and they each respectively went home. It should be noted that during the course of these interviews FULTON identified a photograph of TAYLOR from a photo array as "Chip". A.S.A. Garfinkel then after conferring with his supervisor recommended that the two (2) In-Custody subjects be charged with First Degree Murder and Agg. Criminal Sexual Assault.



PERMANENT RETENTION FILE

DEFS 215

DETECTIVE DIVISION                                    Y-182495
Victim, BRIDGEMAN, Antwinica

                          As a result of the above stated
                          facts and the arrest and charging
of two of the offenders in this investigation the undersigned
R/Ds request that this case be considered CLEARED by ARREST and
remain OPEN pending the apprehension of the other wanted offender
in this case.


REPORT OF:                    Dets. William Foley #20450
                                    Michael Clancy #20395
                                    J. Halloran #20453
                                    K. Boudreau #20435
                                    J. O'Brien #20466
                                    G. Carroll#20346
                                    W. Moser #20465
                                    A. Graf #20480
                                    S. Turner #20874
                              Area #1 Violent Crimes Unit


PERMANENT RETENTION FILE


16

DEFS 216

Identify and describe all property or possible evidence recovered at the end of the Narrative in column form. Show exactly where found, when found, who found it and its description (include Property Inventory numbers). If property taken was scribed for Operation Identification, indicate I.D. number at end of Narrative. Offender's approximate description, if possible, should include name if known, nickname, sex, race code, age, height, weight, color eyes & hair, complexion, scars, marks, etc. If suspect is arrested, give name, sex, race code, age, C.B. or I.R. number, if known, and state "In Custody."

## SUPPLEMENTARY REPORT
### CHICAGO POLICE – FOR USE BY B.I.S. PERSONNEL ONLY

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

4. DATE OF ORIG. OCCURRENCE–TIME — 11-12 Apr 94 — unk

| 1. OFFENSE/CLASSIFICATION LAST PREVIOUS REPORT | 1-UCR OFF. CODE | 2. ADDRESS OF ORIG. INCIDENT/OFFENSE | 5. BEAT OF OCCUR. |
|---|---|---|---|
| HOMICIDE/1st DEGREE MURDER | 0110 | 917 West Garfield Blvd. | 712 |

5. VICTIM'S NAME AS SHOWN ON CASE REPORT — BRIDGEMAN  Antwinica

CORRECT: XX YES ☐ NO — IF NO, CORRECT ALL VICTIM INFORMATION IN BOXES 20 THROUGH 27. — 6. FIRE RELATED ☐ 1 YES ☒ NO — 7. BEAT ASSIGNED 5113

8. TYPE OF LOCATION OR PREMISE WHERE INCIDENT/OFFENSE OCCURRED — Residence  (basement) — LOCATION CODE 290 — 9. NO. OF VICTIMS 1 — 10. NO. OF OFFENDERS 3

| 19. | 12. OBJECT/WEAPON | 13. FIREARM FEATURES | 14. POINT/ENTRY | 15. POINT/EXIT | 16. BURGLAR ALARM | 17. SAFE BURGLARY METHOD | 18. IF RESIDENCE WHERE WERE OCCUP. |
|---|---|---|---|---|---|---|---|

DESCRIBE PROPERTY IN NARRATIVE — T = TAKEN;   R = RECOVERED — FILL IN THE FULL AMOUNT OF ONLY THOSE VALUES WHICH EITHER DIFFER FROM OR WERE NOT REPORTED ON THE ORIGINAL CASE REPORT OR THE LAST PREVIOUS SUPPLEMENTARY REPORT.

| 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 7 OFFICE EQUIPMENT | 8 TV, RADIO, STEREO |
|---|---|---|---|---|---|
| 9 HOUSEHOLD GOODS | 0 CONSUM. GOODS | (-) FIREARMS | & NARC/DANGEROUS DRUGS | 5 OTHER | 6 NONE |

| 20. NAME (LAST–FIRST–M.I.) | 21. I-UCR OFFENSE CODE | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. IN-JURED YES  NO | 27. VICTIM REL. CODE |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |

PERMANENT RETENTION FILE

| 28. OFFENDER'S NAME (OR DESCRIBE CLOTHING, ETC.) | 29. HOME ADDRESS | 30. SEX–RACE–AGE CODE | HEIGHT | WEIGHT | EYES | HAIR | COMPL. |
|---|---|---|---|---|---|---|---|
| 1. TAYLOR  Eddie  nmi | 4118 West Potomac | M/1/27 | 5'7" | 190 | Brn | Blk | Med |

| 31. C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | TOFFENDER IREL. CODE | C.B. NO. | I.R. NO., Y.D. NO. OR J.D.A. NO. | OFFENDER REL. CODE | 32. NO. ARRESTED | ARREST. UNIT NO. |
|---|---|---|---|---|---|---|---|
| OFF 9754193 | 0685117 | 24 | OFF. 2 | | | 1 | 610 |

33. OFF'S VEHICLE  YEAR  MAKE  BODY STYLE  COLOR  V.I.N.  ☐ USE DNA STOLEN  ISTATE LICENSE NO.  STATE

34. SERIAL NOS. OR IDENTIFICATION NOS.  XX DNA  ☐ 2 VERIFIED  ☐ 3 CORRECTED  LIST ALL CORRECTIONS & NEW OR ADDITIONAL NOS. OBTAINED IN NARRATIVE

| 50. OFFENSE/CLASS. THIS DATE (IF SAME ENTER DNA) DNA | REV. CODE | 51. METHOD CODF | 52. METHOD ASSIGNED XX FIELD ☐ 3 SUMMARY | UNIT NO. 610 | 53. STATUS ☐ 0 PROGRESS ☐ 1 SUSPENDED ☐ 2 UNFOUNDED |
|---|---|---|---|---|---|

STATUS CONT'D.
☒ CLRD. XX CLOSED — ☐ 4 CLRD. OPEN — ☐ 5 EXC. CLRD. CLOSED — ☐ 6 EXC. CLRD. OPEN — ☐ 7 CLSD. NON-CRIM.

54. IF CASE CLEARED, HOW CLEARED — XX ARREST & PROSECUT. — ☐ 2 DIRECTED TO JUV. CRT. — ☐ 3 COMPL. RFUSD. TO PROSECUTE — ☐ 4 COMMUNITY ADJUSTMENT — ☐ 5 OTHER EXCEPT. — XX ADULT ☐ JUV.

95. ☐ FOR SUMMARY CASES ONLY – THE ORIGINAL CASE REPORT IS SUBSTANTIALLY CORRECT, AND CONTACT WITH THE VICTIM HAS DISCLOSED NO ADDITIONAL PERTINENT INFORMATION.

80. NARRATIVE

. . . . . . . . . The narrative section of this report begins on page two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

35. R.D. NO. Y-182495

| 90. EXTRA COPIES REQUIRED (NO. & RECIPIENT) Normal | 91. DATE THIS REPORT SUBMITTED — DAY 10  MO. June  YR. 94  TIME 2100 | 92. SUPERVISOR APPROVING (PRINT NAME) STAR NO. Sgt Bontra 7108 |
|---|---|---|
| 93. REPORTING OFFICER (PRINT NAME) STAR NO. Detective W. Foley  20450 | 94. REPORTING OFFICER (PRINT NAME) STAR NO. Detective M. Clancy  20395 | SIGNATURE |
| SIGNATURE W. Foley 20450 | SIGNATURE M. Clancy 20395 | 95. DATE APPROVED (DAY–MO.–YR.) 10 JUN 94  TIME 2200 |

CPD-11.411-B (Rev. 9/85)  *MUST BE COMPLETED IN ALL CASES*

DEFS 221

Pls.' Exhibit 28

Detective Division
Victim, BRIDGEMAN, Antwinica                          Y-182495


VICTIM:                    BRIDGEMAN, Antwinica., F/1/20.,
                           DOB ████ 74., 852 W. 54th St.,
                           PH# 268-4245., Single.,
                           Unemployed.,

IN CUSTODY:                TAYLOR, Eddie., M/1/27., DOB
                           ████ 66., 4118 W. Potomac St.,
                           2nd Flr., No Phone., Single.,
                           Unemployed., IR# 068517., CB#
                           975493., 5-7., 90lbs., Blk hair
                           and Brn. eyes., Medium comp-
                           lected., Scar on left side of
                           face., Muscular build.

GANG AFFILIATION:          The victim was a Vice Lord who
                           had been a Gangster Disciple/The
                           offender is a Gangster Disciple.

ARRESTING OFFICERS:        Bt. 1121 - P.O. Nowlin #6800
                                      P.O. Nunon #5910

DATE,TIME,LOC.OF ARREST:   6 JUN 94 (Monday)., 0020hrs.,
                           12:20 A.M., In the Police
                           Station at 3151 W. Harrison St.

CHARGES,CT.DATE & BRANCH:  Chap. 38-91a2., 1st Degree
                           Murder., Chap. 38-2-4a2., Agg.
                           Criminal Sexual Assault.,
                           8 JUN 94., Br. 66-4

NOTIFICATIONS:             A.S.A. Fogarty, Felony Review
                           Unit.

PERSONNEL ASSIGNED:        Bt. 1121 - P.O.s Nowlin #6800
                                             Nunon #590
                           Bt. 5113 - Dets. Foley #20450
                                             Clancy #20395
                           Bt. 5115 - Dets. Argenbright20201
                                             Graf #20480
                           Bt. 5126 - Det. Rajkovich#20645

STATEMENTS:                Oral statement by the In-Custody
                           subject TAYLOR

2

DEFS 222

Detective Division
Victim, BRIDGEMAN, Antwinica                          Y-182495


# PERMANENT RETENTION FILE

REFERENCE:                    Stop Order #94-526

INVESTIGATION:                The undersigned R/Ds assigned to
                              this investigation by Sgt.
Griffin of this command.  The basic facts of this investigation
are as follows the above In-Custody TAYLOR subject was named as
one of the offenders in this murder.  On 5 MAY 94 the R/Ds
submitted a Stop-Order on Eddie TAYLOR IR# 0685117, Stop-Order #
94-526 through normal C.P.D. channels.  Additionally the R/Ds had
developed information that the wanted subject was hiding out on
the westside of Chicago. Subsequently, the R/Ds submitted the In-
Custody subject TAYLORs photo for publication in the C.P.D. Daily
Bulletin in which it appeared on 5 JUN 94.

                              On 6 JUN 94 at approx. 0020hrs
                              TAYLOR turned himself in to
officers from the 011th District, see arresting officers.  The
arresting officers were aware that TAYLOR was wanted by A/1 V.C.
with regard to this investigation.  TAYLOR was then booked into
the lock-up at the 011th District where he remained until 6JUN94
at 1000hrs when he was signed out of the lock-up and taken to A/1
by the R/Ds for further investigation.

                              Upon TAYLOR'S arrival at A/1 the
                              R/Ds had occasion to interview
TAYLOR and TAYLOR was informed of his cons. rights which he
stated that he understood.  TAYLOR then went on to say that he
did not have any knowledge regarding this investigation.  He then
went on to say that he was a member of the Gangster Disciples
street gang and that he was security worker for the G.D. street
gang while in the prison system  He then related that he did not
know the victim.  He then went on to say that he had heard about
this murder several days after the body was found.  TAYLOR then
related that he thought that on 11 APR 94  he was at his
girlfriends house Latoya DAVIS., 5247 S. Federal St., Apt. #507.,
No Phone.  The R/Ds then verified the residence  of DAVIS but
before being able to check TAYLORS alibi TAYLOR recanted that
alibi and stated that he did not remember where he was on the
date and time of this incident.

                              The R/Ds then had occasion to re-
                              interview TAYLOR and at that time
and at that time TAYLOR was made aware of Nevest COLEMANS
statement regarding this investigation.  At that time TAYLOR
related that he only knew COLEMAN casually and that he was not
particularly friendly with COLEMAN.  HE then went on to say that
his first story about being with his girlfriend was a lie and
that he did not remember where he was on 11 APR 94.  He again
repeated that he had no involvement in this murder.

DEFS 223

Detective Division
Victim, BRIDGEMAN, Antwinica                          Y-182495

PERMANENT RETENTION FILE

The R/Ds then had occasion to interview TAYLOR again and at that time the R/Ds informed TAYLOR of the statement of FULTON regarding this investigation and at that time TAYLOR related the following in summary; he stated that he had lied to the R/Ds in the previous statements and that he now wanted to tell the entire truth. He then related that on the date and time of this murder he was in the alley behind COLEMANS house in the late evening hours. He did see COLEMAN and "DAP" in the alley at that time. He went on to say that at that time there were several girls also in the alley but he did not know the victim so he did not know if she was one the girls out there that night. He then stated that he had never been in the bsmt. of COLEMANs house (The scene of this incident). He then went on to say that he did know COLEMAN, but only casually. He then went on to say he was very close friends with Darrel FULTON, AKA "Dap". He then went on to say that "Both COLEMAN and "DAP" are perverted mother-fuckers". When asked to explain that statement he declined to elaborate.

COLEMAN then went on to say that approx. a week after 1 APR 94 he was back in that alley playing basketball and noticed a bad smell coming from the area of COLEMANs house. He then went on to say that on the day after the arrests of COLEMAN and "Dap", possibly 1 or 2 MAY 94 he was again in the area of the scene of this incident and he heard from several people in the area that the police were looking for him in connection with this investigation and at that time he fled to the westside of the city and stayed there until the date of his arrest. The R/Ds then asked TAYLOR if he would take a polygraph examination and at that time TAYLOR stated that he wanted to take the polygraph. Arrangements were then made for TAYLOR to take a polygraph examination at 1121 S. State St.

This investigation was then turned over to Dets. Graf and Argenbright and at that time they had occasion to interview TAYLOR. Prior to that interview TAYLOR was then again advised of his cons. rights, which he stated that he understood. TAYLOR then repeated that he wanted to take the polygraph examination and that appointment was then confirmed by the R/Ds. Prior to that examination TAYLOR related that he had nothing to do with this murder and that he did not remember where he was on any day in April 1994. The polygraph examination was then conducted and in the opinion of Tech. J. Stout TAYLOR was untruthful in each and every response with regard to this investigation. TAYLOR was the n returned to A/1 for further investigation.

4

Detective Division
Victim, BRIDGEMAN, Antwinica                                    Y-182495


                        The R/Ds then notified A.S.A.
                        Fogarty of the Felony Review Unit
of the States Attys Office who then responded to A/1.  The R/Ds
and A.S.A. Fogarty attempted to re-interview TAYLOR and after
advising TAYLOR of his cons. rights TAYLOR would not respond to
any question from either Fogarty or the R/Ds.  A.S.A Fogarty then
conferred with his supervisor and then recommended that TAYLOR be
charged with 1st Degree Murder and Agg. Criminal Sexual Assault.
As a result of the above stated facts and the arrest and charging
of all of the offenders in this incident the R/Ds request that
this case be considered CLEARED by ARREST and CLOSED.



REPORT OF:                      Dets. William Foley #20450
                                      Michael Clancy #20395
                                      A. Graf #20480
                                      T. Argenbright #20201
                                      S. Rajkovich #20645
                                      W. Moser #20464
                                Area # 1 Violent Crimes Unit



                    PERMANENT RETENTION FILE



                                5

DEFS 225



# Transcript of Eddie Taylor

**Date:** March 9, 2020
**Case:** Coleman -v- City of Chicago, et al.; Fulton -v- Foley, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Pls.' Exhibit 29

Transcript of Eddie Taylor
Conducted on March 9, 2020

1 (1 to 4)

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4    -------------------------x
 5    NEVEST COLEMAN,          :
 6             Plaintiff, :
 7       v.       : Case No. 18-cv-00998
 8    CITY OF CHICAGO, et al., :
 9             Defendants. :
10    -------------------------:
11    DERRELL FULTON, a/k/a     :
12    DARRYL FULTON,           :
13       v.       : Case No. 17-cv-8696
14    CHICAGO POLICE OFFICER    :
15    WILLIAM FOLEY, et al.,    :
16             Defendants. :
17    -------------------------x
18        Videotaped Deposition of EDDIE TAYLOR
19             Chicago, Illinois
20           Monday, March 9, 2020
21             10:08 a.m.
22    Job No.: 294496
23    Pages: 1 - 390
24    Transcribed by: Robert Leifer, CET
```

**Page 2**

```
 1      Videotaped deposition of EDDIE TAYLOR, held at
 2    the offices of:
 3
 4
 5        LOEVY & LOEVY
 6        311 N. Aberdeen Street
 7        3rd Floor
 8        Chicago, Illinois 60607
 9        (312) 243-5900
10
11
12
13      Pursuant to notice before Ryan Grzelak, Notary
14    Public in and for the State of Illinois.
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1      A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF COLEMAN:
 3        RUSSELL AINSWORTH, ESQUIRE
 4        LOEVY & LOEVY
 5        311 North Aberdeen Street
 6        3rd Floor
 7        Chicago, Illinois 60607
 8        (312) 243-5900
 9
10    ON BEHALF OF PLAINTIFF FULTON:
11        NICHOLAS M. CURRAN, ESQUIRE
12        LAW OFFICES OF KATHLEEN T. ZELLNER, PC
13        1901 Butterfield Road
14        Suite 650
15        Downers Grove, Illinois 60515
16        (630) 955-1212
17
18    ON BEHALF OF DEFENDANT COOK COUNTY AND GARFINKEL:
19        DEREK KUHN, ESQUIRE
20        COOK COUNTY STATE'S ATTORNEY'S OFFICE
21        500 Richard J. Daley Center
22        Chicago, Illinois 60602
23        (312) 603-5527
24
```

**Page 4**

```
 1      A P P E A R A N C E S  C O N T I N U E D
 2    ON BEHALF OF INDIVIDUAL DEFENDANTS:
 3        ANDREW J. GRILL, ESQUIRE
 4        ROCK FUSCO & CONNELLY, LLC
 5        321 North Clark Street
 6        Suite 2200
 7        Chicago, Illinois 60654
 8        (312) 494-1000
 9
10    ON BEHALF OF DEFENDANT CITY OF CHICAGO:
11        LISA M. MEADOR, ESQUIRE
12        THE SOTOS LAW FIRM, PC
13        141 West Jackson Boulevard
14        Suite 1240A
15        Chicago, Illinois 60604
16        (312) 735-3300
17
18    ALSO PRESENT:
19        Barb Patel, Videographer
20        Shannon Bauer
21
22
23
24
```

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

5

C O N T E N T S

1
2  EXAMINATION OF EDDIE TAYLOR          PAGE
3    By Mr. Ainsworth            8
4    By Mr. Grill             60/378
5    By Ms. Meador              335
6    By Mr. Kuhn               355
7    By Mr. Curran            362/383
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

7

1        Planet Depos.  Sorry about that.
2            I am not authorized to administer an
3  oath.  I am not related to any party in this
4  action nor am I financially interested in the
5  outcome.  Counsel all present in the room and
6  everyone attending remotely will now state their
7  appearances and affiliations for the record,
8  please.
9            MR. AINSWORTH:  This is Russell Ainsworth
10 appearing on behalf of Nevest Coleman.
11           MR. GRILL:  Andrew Grill appearing on
12 behalf of the individual police officers.
13           MS. MEADOR:  Lisa Meador on behalf of the
14 City of Chicago.
15           MR. KUHN:  Derek Kuhn on behalf of
16 defendant Garfinkel and Cook County.
17           THE VIDEOGRAPHER:  Would the reporter
18 please swear in the witness.
19           THE REPORTER:  Please raise your right
20 hand.
21           Do you solemnly swear or affirm under the
22 penalties of perjury that the testimony you will
23 give will be the truth, the whole truth, and
24 nothing but the truth?

---

6

P R O C E E D I N G S

1
2            THE VIDEOGRAPHER:  Good morning.  We are
3  going on the video record at 10:07 a.m. on March
4  9, 2020.  Please note that the microphones are
5  sensitive and may pick up whispering, private
6  conversations, and cellular interference.
7            Please turn off all cell phones or place
8  them away from the microphones as they can
9  interfere with the deposition audio.  Audio and
10 video recording will continue taking place unless
11 all parties agree to go off record.
12           This is Media Unit 1 of the
13 video-recorded deposition of Eddie L. Taylor taken
14 by the counsel for plaintiff in the matter of
15 Darrell Fulton v. Chicago Police Officers William
16 Foley, et al., Case No. 17-cv-8696 and Nevest
17 Coleman v. City of Chicago, Case No. 18-cv-998
18 filed in the United States District Court for the
19 Northern District of Illinois Eastern Division.
20           This deposition is being held at Loevy &
21 Loevy located at 311 North Aberdeen in Chicago,
22 Illinois.  My name is Barb Patel from Veritext,
23 and I am the videographer.  The court reporter is
24 Ryan Grzelak from Veritext -- I'm sorry, from

---

8

1            THE WITNESS:  Yes.
2  Whereupon,
3            EDDIE TAYLOR
4  being first duly sworn or affirmed to testify to
5  the truth, the whole truth, and nothing but the
6  truth, was examined and testified as follows:
7     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8            NEVEST COLEMAN
9  BY MR. AINSWORTH:
10   Q  Sir, would you please state and spell
11 your name for the record.
12   A  Eddie Taylor, E-D-D-I-E T-A-Y-L-O-R.
13   Q  And, sir, have you ever given a
14 deposition before?
15   A  No, sir.
16   Q  I'm just going to go over some of the
17 rules here so we're on the same page.
18       Is that okay?
19   A  Uh-huh.
20   Q  The first thing I'm going to ask you to
21 do is to give an answer out loud with either a yes
22 or a no, if the question calls for it, rather than
23 relying on a shake of the head because the court
24 reporter can't record a shake of the head.

Transcript of Eddie Taylor
Conducted on March 9, 2020

9

1  A  Yes.
2  Q  And the next thing I'm going to ask you
3  to do is ask you to wait until the person who's
4  asking a question is done asking the question
5  before you start answering so that we're not
6  talking at the same time.
7  A  Yes.
8  Q  And I'll try and do the same to you and
9  that is wait until you're done with your answer
10 before I begin the next one, and then we're not
11 talking at the same time and making life difficult
12 for the court reporter.
13 A  Yes.
14    THE VIDEOGRAPHER:  Excuse me, Counsel.
15 Can we have the witness put the microphone on,
16 please?
17    MR. AINSWORTH:  Oh, sorry.
18    THE VIDEOGRAPHER:  There's a few of
19 those, yeah.
20 Q  There's a microphone there and --
21    THE VIDEOGRAPHER:  Thank you.
22    MR. AINSWORTH:  Can you --
23    THE VIDEOGRAPHER:  Yeah, I can --
24 Q  All right.  If you don't understand a

10

1  question, just let us know by asking us to
2  rephrase the question or re-ask the question or
3  just tell us you don't understand the question.
4  Okay?
5  A  Yes.
6  Q  If you need a break at any time, you're
7  entitled to a break.  Just answer any question
8  that's pending before you take a break.  Okay?
9  A  Okay.
10 Q  Are you on any medication or any -- do
11 you have any illness that would affect your
12 ability to testify truthfully and accurately here
13 today?
14 A  No.
15 Q  All right, sir.  What's your date of
16 birth?
17 A  7/25/66.
18 Q  And where do you live?
19 A  I stay at 5528 South Racine.
20 Q  And how long have you been living there?
21 A  A couple of years now.
22 Q  Where did you grow up?
23 A  South Side of Chicago.
24 Q  Where did you go to grammar school?

11

1  A  I went to Oliver Wendell Holmes.
2  Q  On 55th?
3  A  Yes.
4  Q  Okay.  And what grades did you go to
5  Holmes?
6  A  From the 4th to the 6th -- I think it was
7  4th -- excuse me, yes.
8  Q  And then where did you go after 6th
9  grade?
10 A  I went to John Hope.
11 Q  What grades did you attend there?
12 A  I graduated from the 5th to 6th to 8th --
13 6th to 8th grade.
14 Q  Okay.  And where did you go to high
15 school?
16 A  Tilden High School.
17 Q  And how far did you go in Tilden?
18 A  To 11th grade.
19 Q  And when you were attending Tilden, where
20 were you living?
21 A  I was staying at 5740 South Emerald.
22 Q  And who did you live with there?
23 A  My mother.
24 Q  Did you live with any siblings there?

12

1  A  Yeah.  And my four brothers and
2  sisters -- two brothers and two sisters, excuse
3  me.
4  Q  And who are the brothers and sisters you
5  were living with at 5740 South Emerald?
6  A  My brother Steven, my sister Brenda, my
7  other little brother Andre, and my baby sister
8  Clair.
9  Q  And so if you were born in '66, you left
10 school somewhere around '83, somewhere in there,
11 does that sound right?
12 A  Yeah.  Yes.
13 Q  After you left school, where did you live
14 in Chicago?
15 A  I moved out west.
16 Q  And why did you move out west?
17 A  My mom just wanted a different scenery.
18 Q  Okay.  And you moved with your mom?
19 A  Yes.
20 Q  And approximately where in the West Side
21 did you move to?
22 A  Monroe and Kilder, 4200.
23 Q  And for how long did you live out there
24 around Monroe and Kilder?

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

**Page 13**

1      A   About six, seven years.
2      Q   Where else did you live in the time
3  period from when you left Tilden until 1994 in
4  Chicago?  Any other addresses?
5      A   Yes.  My mom had moved on Potomac.  She
6  was staying on Potomac and Pulaski.
7      Q   So also on the West Side out there?
8      A   Yes.
9      Q   All right.  Is there anywhere else on the
10 South Side where you lived before 1994 after you
11 left Tilden?
12     A   Uh-huh.
13     Q   Is that a no?
14     A   No.
15     Q   You're all right.  Everyone does it at
16 some point in time where you --
17     A   I forgot about the head move.
18     Q   It's all right.
19         Do you know Darrell Fulton?
20     A   Yes.
21     Q   How do you know Darrell Fulton?
22     A   I grew up with him since we was about
23 four or five years old.
24     Q   Are you close with him?

---

**Page 14**

1      A   Yes, we was close.
2      Q   And were you close with his family?
3      A   Yes.
4      Q   How about Nevest Coleman?  Did you know
5  Nevest Coleman?
6      A   Yes, I knew him.
7      Q   How did you know Nevest Coleman?
8      A   He stayed right across the street from me
9  since he was a little boy.
10     Q   What's the age difference between you and
11 Darrell?
12     A   About -- I'm the oldest.  I'm the oldest.
13 About five, six years apart.  Something like that.
14 I don't really keep up with his -- I can't -- you
15 know what I'm saying?  All these years, it's
16 just -- excuse me.
17     Q   You're a few years older than Darrell --
18     A   Yes.
19     Q   -- is that fair to say?  All right.
20         What about Nevest Coleman?  Do you know
21 the age difference between you and Nevest Coleman?
22     A   No, not really.
23     Q   What was your relationship like with
24 Nevest Coleman when you were a kid?  Like were you

---

**Page 15**

1  close?
2      A   No.  He -- you know, his family was,
3  like, you know, strict about them hanging with
4  other kids in the neighborhood.
5      Q   What reputation did Nevest Coleman's
6  family have in the community at that time when you
7  were growing up?
8          MR. GRILL:  Objection.
9          MS. MEADOR:  Objection.  Foundation.
10     A   They was nice, good peoples.
11     Q   You mentioned they were strict.  What do
12 you mean by that?
13     A   They didn't want their kids playing with
14 other -- like socializing or mingling with other
15 kids in the neighborhood.  Like upper class,
16 middle class, and I was lower class.  Shit.
17     Q   Had you ever been to Nevest's home?
18     A   No, sir.
19     Q   When you were kids, did you socialize
20 with Nevest?
21     A   Only when I walked past his house did I
22 speak to him.  You know, his family and moms and
23 all of them be on the porch.  That was it.
24     Q   So as you were walking by, you would say

---

**Page 16**

1  hi to them?
2      A   Yes.
3      Q   And did you know any of Nevest's
4  siblings?
5      A   Yes.
6      Q   Did you know any of Nevest's siblings
7  more than you knew Nevest?
8      A   No, not really.  I just went to school
9  with him and know some of his older brothers and
10 sisters.  I think it was a higher grade than me.
11 I knew them, but I ain't never -- you know, never
12 really socialized or mingled with him.
13     Q   What about Darrell -- sorry.
14     A   Excuse me.  I was just going to say I
15 really knew who they were, you know, by being in
16 the neighborhood.
17     Q   You knew who they were because they lived
18 nearby?
19     A   Yes.
20     Q   All right.  When you were kids, did you
21 see Darrell and Nevest hanging out a lot?
22     A   Huh-uh.
23     Q   Is that a no?
24     A   No.

Transcript of Eddie Taylor
Conducted on March 9, 2020

5 (17 to 20)

---

17

1    Q   Can you describe what you observed about
2  Darrell and Nevest's relationship when you were
3  kids growing up?
4          MR. GRILL:  Objection to form.
5    A   Nevest just off to himself.  Always off
6  to himself, you know?  And Darrell was -- you
7  know, we all just -- we young.
8    Q   This is Nick Curran.  He represents
9  Darrell Fulton.
10        THE WITNESS:  Good morning.
11   Q   What about after high school?  Did
12 Darrell and Nevest hang out?
13   A   Not that I can recall, not really.
14   Q   And so after high school was there ever a
15 time when -- well, strike that.
16       After high school, did you observe Nevest
17 still doing the same thing, keeping to himself?
18   A   No --
19       MS. MEADOR:  Objection to form.
20       MR. GRILL:  Objection to form and
21 foundation.
22   A   Should I answer?
23   Q   Please.
24       MS. MEADOR:  Yes.

---

18

1    A   I had moved -- I had moved out west.  I
2  wasn't really hanging back at south like that to
3  really know what -- was they hanging together or
4  not, you know?
5    Q   Would you come back to the Englewood area
6  after you moved out west --
7    A   Yes.
8    Q   -- from time to time?
9        And when you came back to the Englewood
10 area, who would you come back to see?
11   A   My family, the Fultons and the Reeds
12 (phonetic) -- people that my mother, you know,
13 grew up with and I grew up with.  Their kids.  So
14 that's how me and Darrell got to meet.
15   Q   When you were living on the West Side,
16 you would come back to Englewood to see family.
17       Would you come to visit Nevest Coleman?
18   A   Huh-uh.
19   Q   Is that a no?
20   A   No, sir, no.
21   Q   And why not?
22   A   Because I really didn't know him like
23 that.  I knew him because he lived in the
24 neighborhood, but I didn't really know him like

---

19

1  that to really socialize or mingle with him, like,
2  you know?
3    Q   And when you were living out in the West
4  Side and you would come back to Englewood to visit
5  family, did you see Nevest and Darrell hanging out
6  together?
7    A   I just see Nevest hanging out with some
8  of my family members that he grew up with, you
9  know, socializing with.  For Darrell, you know,
10 he'd be in and out.
11   Q   Okay.  And who were the the family
12 members that you saw Nevest hanging out with?
13   A   It was -- they got nicknames.  You know
14 what I'm saying?  So the name Honey, Kank, Black.
15 A couple of more guys, they just stayed in my
16 building, Derek and Harrison, you used to see all
17 them all the time when I'd just be passing
18 through.
19   Q   And what did you see them doing when they
20 were hanging out with Nevest?
21   A   Sometimes they'll be in the front just
22 kicking it.  Sometimes they'll be in the back.
23 You know, and I keep it moving, because, you know,
24 I'm older.  That ain't my crowd.

---

20

1    Q   They were younger guys?
2    A   Yes.
3    Q   So the -- you just didn't -- you weren't
4  all that close with those guys.  Is that what
5  you're saying?
6    A   No.  Not that close at all.
7    Q   All right.  Did you ever see Nevest
8  Coleman smoking sherm sticks?
9    A   No.  I ain't really get the chance to
10 really know him like that.  I ain't know he smokes
11 sherm sticks, no.
12   Q   Do you know what a sherm stick is?
13   A   Yes.
14   Q   What's a sherm stick?
15   A   It's some type of form of PCP.
16   Q   Did you ever know Darrell Fulton to smoke
17 sherm sticks?
18   A   No.
19   Q   Was that something that you were into
20 back then?
21   A   No, sir.
22   Q   And, you know, we're here to talk about
23 the murder of Antwinica Bridgeman, also know as
24 Mikey.

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

6 (21 to 24)

21

1     Did he have anything to do with the
2 murder of Antwinica Bridgeman?
3     **A   No.**
4     Q   Did you know the victim who went by the
5 nickname Mikey?
6     **A   No.**
7     Q   Did you know Francine Calimee?
8     **A   Yes.**
9     Q   How did you know Francine?
10    **A   My little cousin's girlfriend, his baby**
11 **mama.**
12        MS. MEADOR: I'm sorry, can you read back
13 the answer.  It wasn't you.  He was flipping his
14 page.  I just couldn't hear you.
15        The court reporter will read it back.
16        (Pending answer read.)
17        MS. MEADOR: I'm sorry, sir.  Did you say
18 it was your brother's girlfriend?
19        THE WITNESS: No, my cousin's -- his
20 girlfriend.  It's his girlfriend.  What they say
21 is baby mama.  I'm sorry.
22        MS. MEADOR: Thank you so much.
23        THE WITNESS: I didn't mean to confuse
24 you all.

22

1        MS. MEADOR: No.  That's okay.  It was
2 still hard for me to hear.  It was your
3 cousin's -- she was your cousin's girlfriend.
4 They had a child together?
5        THE WITNESS: Yes.
6        MS. MEADOR: Thank you, sir.
7     Q   And what was your cousin's name?
8     **A   Lill Rob.**
9        MS. MEADOR: Lill Rock?
10        THE WITNESS: Lill Rob.
11        MS. MEADOR: Oh, Lill Rob.
12        THE WITNESS: Uh-huh.
13    Q   Were you close with Francine?
14    **A   No, huh-uh.  No.**
15    Q   Did she ever accuse you of acting
16 inappropriately towards her?
17    **A   No.**
18    Q   Did you ever act inappropriately towards
19 Francine?
20    **A   No.**
21    Q   Did you ever try and grab her?
22    **A   No.**
23    Q   Do you know Shaunice Williams?
24    **A   No.**

23

1     Q   Do you know a girl named Meacy
2 (phonetic)?
3     **A   No.**
4     Q   In 1994 did you learn that the police
5 were looking for you in regard to a murder?
6     **A   Yes.**
7     Q   How did you find that out?
8     **A   Because I came over to Darrell's aunty's**
9 **house to pick up my clothes to go to the**
10 **laundromat.  I came through the front not knowing**
11 **that all of the police cars and all that racket**
12 **was in the back of their house.  That's how I**
13 **found out.**
14    Q   And what did you do when you found that
15 out?
16    **A   I left because I ain't know it had**
17 **nothing to do with me.  I just left.**
18    Q   Did there come a time when you learned
19 that, you know, the police were looking for you in
20 particular?
21    **A   I found out later on that day on the news**
22 **because I was still fresh home from the**
23 **penitentiary.  Just came home.**
24    Q   Did that scare you?

24

1     **A   Yes.**
2     Q   All right.  And so is it fair to say at
3 that time you didn't really want to have contact
4 with the police?
5     **A   I didn't want to have no contact with**
6 **them.  I just came home, and I didn't know what**
7 **was going on.**
8     Q   Had you done anything at the time --
9 well, strike that.
10        And so did there come a time when you
11 turned yourself in to the police?
12    **A   Yes.**
13    Q   Tell us how that came about.  What led
14 you to turn yourself in?
15    **A   I turned myself in because I was out**
16 **west, and the officer that I had just gotten to**
17 **the penitentiary for, he knew me.  Plus this**
18 **bounty hunter, they stayed down the street from**
19 **me.  So they let me know to turn myself in that**
20 **day.  So I went ahead and turned myself in with**
21 **them.**
22    Q   Did they accompany you to the police
23 station?
24    **A   Yes.**

Transcript of Eddie Taylor
Conducted on March 9, 2020

7 (25 to 28)

25

1    Q   All right.  And why did you go to the
2  police station?
3    A   **Because I ain't do nothing.  I was**
4  **innocent.  I feel I shouldn't have to run and**
5  **hide.**
6    Q   Did you want to clear it up?
7       MS. MEADOR:  Objection to form.
8    A   **Yes.**
9    Q   Which police station did you go to?
10   A   **Harrison and Kedzie.**
11   Q   When you went to Harrison and Kedzie,
12 were you transported anywhere?
13   A   **Yes.**
14   Q   Where were you taken to?
15   A   **51st and Wentworth.**
16   Q   All right.  When you were brought to 51st
17 and Wentworth, what happened?
18   A   **They interrogated me.**
19   Q   All right.  Which part of 51st and
20 Wentworth did they bring you?
21   A   **Upstairs.**
22   Q   And did they put you in a room?
23   A   **Yes.**
24   Q   What kind of room did they put you in?

26

1  Can you describe it for us?
2    A   **It's blue with a table with the thing on**
3  **top, the handcuff thing.**
4    Q   All right.  So there's a table in the
5  room; is that right?
6    A   **Yes.**
7    Q   And you said the table had a thing on it.
8  Was it a ring on the table?
9    A   **It was a ring for handcuffs.**
10   Q   All right.  What was the ring made out
11 of?
12   A   **Steel.**
13   Q   And was there a chair in the room?
14   A   **Yes.**
15   Q   All right.  So can you describe for us
16 how you were positioned in that room?
17   A   **Like this.  Locked down with the thing**
18 **and me sitting in the chair.**
19   Q   All right.  So --
20   A   **Dogs on my left side.**
21   Q   You were sitting in a chair at the table,
22 and your left wrist was cuffed to the table?
23   A   **Yes.**
24   Q   Or your left wrist was cuffed to the ring

27

1  to the table?
2    A   **Yes.**
3    Q   And you said you were interrogated.  Were
4  you interrogated just a little, or were you
5  interrogated a lot?
6       MS. MEADOR:  Objection to form.
7    Q   Go ahead and tell us?
8    A   **Well, they tried to -- they didn't try**
9  **to -- they beat me.  Excuse me my French.  They**
10 **wanted a statement.**
11   Q   All right.  So let's walk through that.
12      How many detectives would interrogate you
13 at any one time?
14   A   **First two would come in.**
15   Q   So at first it was two detectives?
16   A   **Yes.**
17   Q   And how did those detectives treat you?
18   A   **First they were acting like detectives.**
19 **And then all of a sudden after about an hour, they**
20 **were mean.**
21   Q   When you said at first they were acting
22 like detectives, what do you mean?
23   A   **They came in, they showed me the pictures**
24 **of the young lady, and they had statements**

28

1  **already, like a yellow pad printed out telling me**
2  **that they know that I had something to do with**
3  **this and that they're going to get me a lawyer and**
4  **all that.  Later on she tried to get me to sign**
5  **some papers talking about how she's going to make**
6  **a deal with the judge.**
7    Q   All right.
8    A   **I wouldn't do it.**
9    Q   So let's go through this.
10      So when they showed you photos, what were
11 the photos of?
12   A   **Sick, man.  Sick.**
13   Q   Like gruesome crime scene photos?
14   A   **I don't like talking about it.**
15   Q   And were they telling you why they
16 believed you had something to do with this crime?
17   A   **They said they had statements.**
18   Q   Did they tell you who gave the
19 statements?
20   A   **Yes.**
21   Q   And who did they tell you gave statements
22 to them?
23   A   **They said Darrell Fulton and Nevest**
24 **Coleman.**

Transcript of Eddie Taylor
Conducted on March 9, 2020

8 (29 to 32)

---

29

1    Q   And did they tell you what Nevest and
2  Darrell said in those statements?
3    A   No.  They had never said.  They just said
4  they had statements.  They put them in my face.
5    Q   Did they show you the statements?
6    A   Yeah.  First they had a yellow pad with a
7  lot of -- somebody writing on it.  You know?  And
8  then they came back in with another
9  black-and-white, like, paper saying that it was
10 all right there.  Sign on and --
11   Q   All right.  You said that after about an
12 hour the two detectives were mean; is that right?
13       Is that a yes?
14   A   Yes.
15       MS. MEADOR:  I'm sorry, I missed your
16 question.
17   Q   After about an hour, the two detectives
18 were mean?
19       MS. MEADOR:  Mean?  Okay.  I'll object to
20 form.  You're leading the witness.
21       Go ahead.
22   A   Yes, they was.
23       MR. AINSWORTH:  That's what he said,
24 Lisa.

---

30

1        MS. MEADOR:  He didn't say mean.
2        MR. AINSWORTH:  He did earlier.  I
3  said --
4        MS. MEADOR:  Okay.  That's fine.  The
5  record is what the record is.  Just keep asking
6  your questions.
7        MR. AINSWORTH:  And I will say right now
8  that, when you read this transcript, please call
9  me up and say, I'm sorry, Russell, for falsely
10 accusing you of putting words in the witness's
11 mouth.
12       MS. MEADOR:  I won't, because you're
13 doing it always.
14       Go ahead.  Ask your questions, Counsel,
15 I'll make my objections.  Keep going.
16   Q   What do you mean by the detectives were
17 mean?
18   A   Can I be blunt?
19   Q   Yeah.
20   A   They beat my ass.
21   Q   How did they beat you?
22   A   With their fists.  Smacked me off the
23 side of my head, hit me in my face.
24   Q   Were you interrogated by different

---

31

1  detectives during the course of the day?
2    A   Yes.  The shift changed.
3    Q   And was it always two detectives who
4  would interrogate you?
5    A   No.  Three more came in after the shift
6  change.
7    Q   And did they always interrogate you with
8  at least two or three detectives, or was there
9  ever a time when it was just one?
10   A   At first it was two.  And then after
11 about that hour the other two came in.  And then
12 when the shift changed, three different ones came
13 in.  And that's when they weren't playing no games
14 with me.  They started just, you know, just
15 beating me.
16   Q   What were they saying when they would hit
17 you?
18   A   I was a nasty, perverted, freaky -- all
19 kind of crazy stuff.  I'm going to get life or the
20 death penalty.
21   Q   Were they telling you what would happen
22 if you -- you know, if you cooperated with them
23 and how they could make it easier to you?
24       MS. MEADOR:  Objection to form.

---

32

1    A   Yeah, they told me, yes.
2    Q   What did they tell you about how they
3  could help you if you cooperated?
4    A   They could talk to the judge and states.
5    Q   And what could they do by talking to the
6  judge and the states?
7    A   That's all they said, they could talk to
8  the judge, make a statement -- talking about
9  making a deal.
10   Q   And did they tell you they could try to
11 make a deal that would avoid you getting the death
12 penalty or life in prison?
13   A   No.  They just kept on --
14       MS. MEADOR:  Object again to leading.
15   A   No.
16   Q   Were any of the detectives nice to you
17 after that first hour or so?
18   A   When they first put me in the criminal --
19 I mean in the room -- they just handcuffed me.
20 That was it.  And then they came back in with the
21 photos and stuff.  That's the only niceness you're
22 going to get after that.
23   Q   Was there ever a time when there was just
24 one detective who was questioning you?

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

33

1      MR. GRILL:  Objection.  Asked and
2  answered.
3      MS. MEADOR:  Join.
4      **A   I can't recall, no.  No.**
5      Q   What did you tell the detectives when
6  they were accusing you of committing this crime?
7      **A   I told them that, when they showed me**
8  **those pictures, that my mother didn't raise me**
9  **like that.  I got sisters of my own.**
10     Q   Did you tell them whether or not you did
11 the crime?
12     **A   No.  I ain't tell them nothing.  I**
13 **wouldn't sign anything.**
14     Q   Did you tell them that you didn't commit
15 the crime?
16     **A   I told them I didn't do nothing,**
17 **anything.  I wasn't there.**
18     Q   And did they hit you in the face with an
19 open hand?
20     **A   Not with the hand, the fist.**
21     Q   Did it hurt when they hit you?
22     **A   Yes.**
23     Q   Did you ask for a lawyer?
24     **A   Yes.**

34

1      Q   What happened when you asked for a
2  lawyer?
3      **A   Nothing happened.  They brought just a**
4  **state's attorney or something.  She was a state's**
5  **attorney.**
6      Q   And how many times did you ask for a
7  lawyer?
8      **A   I asked about four times.**
9      Q   Did you ask those first two detectives
10 for a lawyer?
11     **A   No, because they was too busy**
12 **interrogating.**
13     Q   Was it when they did the shift change and
14 then three detectives came?  Is that when you
15 asked for the lawyer?
16     MR. GRILL:  Objection to form.
17     Q   Is that a yes?
18     **A   Yes.**
19     Q   How did you feel when the detectives were
20 striking you and telling you that you're a
21 perverted, nasty, freaky person?
22     **A   I felt bad because I didn't do nothing.**
23 **I turned myself in.  Proved my innocence.**
24     Q   Did you know anything about the murder

35

1  when you talked to the police?  When you talked
2  to -- when you were being interrogated, did you
3  know anything about the murder?
4      **A   Oh, no.**
5      Q   Did you have any information to provide
6  them?
7      **A   No, sir.**
8      Q   Did you tell them where you were on April
9  11th, the night that Mikey went missing?
10     **A   I don't recall.**
11     Q   Do you know where you were on April 11th,
12 the night that Mikey went missing?
13     **A   That was so long ago.  I don't really**
14 **know nothing about none of it.  That's why I was,**
15 **like -- I turned myself in, because I don't know**
16 **nothing.**
17     Q   Were you with your girlfriend Latoya the
18 night of the murder?
19     **A   No, I wasn't.**
20     MR. GRILL:  Objection.
21     MS. MEADOR:  Yeah, objection.  Leading
22 and form.  Witness said he wasn't there.
23     MR. AINSWORTH:  You can just say
24 objection.  You don't need to say what the witness

36

1  says.  Thank you.
2      MS. MEADOR:  I'm indicating my objection
3  for the record.
4      MR. AINSWORTH:  Knock it off.
5      MS. MEADOR:  I'm indicating my objection
6  for the record.
7      MR. AINSWORTH:  Yes.  Do so --
8      MS. MEADOR:  You can keep your leading
9  questions.  Go ahead.  Keep going, and I'll
10 continue to object.
11     MR. AINSWORTH:  That is fine.
12     MS. MEADOR:  Yes, it is.
13     MR. AINSWORTH:  Object in an appropriate
14 manner.  Do not comment on the witness's
15 testimony, or we'll stop this deposition.
16     MS. MEADOR:  Stop the deposition if you
17 want, Russell.  I can make my objections for the
18 record.  Continue asking your questions.
19     Q   I'm sorry, I can't remember your answer.
20     Were you with Latoya -- or do you know if
21 you were with Latoya on the night of April 11,
22 1994?
23     MS. MEADOR:  Objection.  Asked and
24 answered.

Transcript of Eddie Taylor
Conducted on March 9, 2020

10 (37 to 40)

37

1    A   I should have -- nine out of ten, I
2 should have been with her and my daughter.
3 Because that's when I came -- I first came home
4 and went to stay with her.  And I was there every
5 day and all night.
6    Q   And what makes you think that you were
7 with Latoya nine times out of ten or every night
8 that --
9    A   Because I've got a one-year-old daughter
10 I was glad to get home to.
11    Q   Did you tell the police that you were
12 lying about where you'd been on April 11th?
13    A   See, that question I really don't
14 understand because it's been so long ago.
15    Q   All right.  The detectives claim that you
16 told them at first that you were with Latoya and
17 then you said, Oh, I lied when I said I was with
18 Latoya.
19        Did that happen?
20        MS. MEADOR:  Objection to form.
21        MR. GRILL:  Objection to form.
22    A   Yes.
23    Q   And so tell us how that came to be?
24    A   When I got a chance to talk to my girl,

38

1 she told me that they had stopped her -- they
2 wanted her to came down -- she came down to 51st.
3 They wouldn't let her see me or nothing.  You know
4 what I'm saying?  She had a warrant out for my
5 arrest, and they told her if she say anything, you
6 know, they were going to lock her up.  Because I
7 was trying to get my parole papers to them and let
8 them know I just came home.
9    Q   Were you able to talk to Latoya while you
10 were in police custody?
11    A   When I got to the county.
12    Q   When you got to the county.  Okay.
13    A   Yes.
14    Q   But not while you were at 51st and
15 Wentworth?
16    A   No, not at 51st, no, sir.
17    Q   All right.  So while you were at 51st and
18 Wentworth, did you tell the police that you were
19 lying about being with Latoya?
20    A   No.  No, sir.
21    Q   While you were at 51st and Wentworth, did
22 you tell the police that the night of the murder
23 you were in the alley next to Nevest's home where
24 the victim was killed?

39

1    A   No.
2    Q   Did you tell the police that you saw
3 Darrell and Nevest together in the alley behind
4 Nevest's house the night that the victim was
5 killed?
6    A   No, sir.
7    Q   Did you tell the police that you saw some
8 girls with Darrell and Nevest in the alley behind
9 Nevest's home the night that the victim was
10 killed?
11    A   No.
12    Q   You said that there were -- they first
13 had a yellow pad with writing on it.
14    A   Yes.
15    Q   What did the detectives say to you about
16 the yellow pad?
17    A   That was the second shift when the lady
18 came in with the yellow pad.  Three detectives.
19 There was a lady that came in, the state's
20 attorney.  She had a yellow pad.  They had a white
21 one.  White paper with the black-and-white writing
22 on it.
23    Q   And when you say the black-and-white, did
24 that have preprinted lines on it and then

40

1 handwriting on it?
2    A   Yes.
3    Q   But the -- but first it was the yellow
4 pad?
5    A   No.  It was the white one first.
6    Q   Okay.  And who had the black-and-white
7 with the preprinted lines on it?
8    A   The two detectives.
9    Q   Was there handwriting on that
10 black-and-white paper with the preprinted lines on
11 it?
12    A   Yes.
13    Q   And did the detectives tell you what was
14 on the paper?
15    A   No, they didn't tell me what was on it.
16    Q   What did they say to you about the paper?
17    A   They just said they had statements that I
18 was the person -- you know, that I had something
19 to do with it and all like that.  And they had one
20 written up for me to sign.  I wasn't going to
21 sign.
22    Q   Did they tell you they had one written up
23 for you?
24    A   No.  I didn't seen -- I didn't write the

Transcript of Eddie Taylor
Conducted on March 9, 2020

41

1 note.
2    Q   Okay.  Did you see a confession that had
3 been written up for you?
4    **A   Yes.  That's -- they had it right there.**
5 **Everything that they said that I participated in,**
6 **they wanted me to sign it.  I wasn't going to sign**
7 **it.**
8    Q   And did it say I, Eddie Taylor, confess
9 or something to that affect?
10   **A   No.**
11       MS. MEADOR:  Objection to form.
12   Q   Were you able to read the paper?
13   **A   I wasn't trying to look at it like that.**
14   Q   All right.  Did they -- did they tell you
15 what they wanted you to sign?
16   **A   They wanted me to sign that statement,**
17 **that confession.**
18   Q   And did they tell you what they wanted
19 the confession to say?
20   **A   That I had something -- admitting guilt,**
21 **that I had something to do with whatever went on**
22 **with that case.**
23   Q   And then you said that a lady came in
24 with a yellow pad?

42

1        Is that a yes?
2    **A   Yes.**
3    Q   And did she also ask you to admit guilt?
4        MS. MEADOR:  Objection to form.
5    **A   She asked me to sign, yes.**
6    Q   And what did she want you to sign?
7    **A   The yellow pad.**
8    Q   Did you agree to sign?
9    **A   No.**
10   Q   Did you agree to confess?
11   **A   No.**
12   Q   And why didn't you agree to confess?
13   **A   Because I didn't do anything.**
14   Q   You said that you were hit by the police;
15 is that right?
16   **A   Yes.**
17   Q   Had you had experience with being hit
18 before?
19       MS. MEADOR:  Objection to form and
20 foundation.
21       MR. GRILL:  Join.
22   **A   Yes.**
23   Q   And so tell us, did your previous
24 experience being hit before help you at all when

43

1 the police were hitting you?
2        MR. GRILL:  Objection to form.
3        MS. MEADOR:  Objection to form and
4 foundation.
5    **A   Yes.**
6    Q   Tell us how your previous experiences
7 being hit helped you when the police were hitting
8 you.
9        MS. MEADOR:  Same objection.
10   **A   I don't know if I had to say certain**
11 **things, you know what I'm saying?  Because this is**
12 **my first time.  And this is so far behind me.  But**
13 **I want to --**
14   Q   You can tell the truth.
15   **A   When I was growing up going to Tilden --**
16 **you know, 55th was the borderline --**
17   Q   Yeah.
18   **A   -- you see what I'm saying?  And I had to**
19 **go -- I stayed on 57th.  I had to go to 47th to**
20 **get to Tilden.  And that was considered Motown.**
21 **That's when they were gang-banging real bad.  So**
22 **we had to go through there.  If they catch you,**
23 **there'd be like 10 or 12 of them, beat you up,**
24 **lump you up, black eye, probably a couple of**

44

1 **fractured ribs -- you know, gang-banging.  You**
2 **know what I'm saying?**
3        **So that's basically -- I'm trying to tell**
4 **you all my point is going through stuff like that**
5 **there in the hood -- you know, rough stuff -- and**
6 **then, you know, the situation that I was caught up**
7 **in, I just -- I couldn't -- I couldn't let myself**
8 **be railroaded like that when I know I didn't do**
9 **nothing.**
10   Q   All right.  So you previously --
11   **A   I just had to accept whatever I had**
12 **coming, you know?**
13   Q   So when you were growing up and going to
14 Tilden, there were times when 10 to 12 people
15 would jump you and beat you up?
16   **A   Sometimes more than that.**
17   Q   And this happened on a number of
18 occasions; is that right?
19   **A   Yes.**
20   Q   That made you pretty tough?
21   **A   Yeah, you can say that.  You know, I**
22 **ain't no bulletproof but --**
23   Q   You had to get tough?
24   **A   Yes.**

Transcript of Eddie Taylor
Conducted on March 9, 2020

12 (45 to 48)

45

1    MS. MEADOR: Objection. Form.
2    Q   All right. And so when the -- when it
3  was two police officers hitting you, you'd
4  experienced that kind of thing before, is that
5  fair to say?
6    A   Yes.
7    MR. GRILL: Objection to form and
8  foundation.
9    MS. MEADOR: Objection to form and
10 foundation.
11   Q   And so tell us how you felt when the
12 police officers were hitting you?
13   A   Man, I felt like nobody wanted to believe
14 me. It was the worst situation. And at the time
15 a lot of people was mad and -- about the case that
16 had happened, you know? And, you know, they was
17 full of rage. You feel what I'm saying? It
18 wasn't satisfactory. But I -- to me I can't sign
19 nothing that I've got nothing to do with, I wasn't
20 there. So --
21   Q   Were you thinking about the previous
22 times when you'd been jumped before when the
23 police were hitting you?
24   MR. GRILL: Objection to form.

46

1    MS. MEADOR: Objection to form. Leading.
2    A   Yes.
3    Q   And how did -- how did that thought
4  process affect you when you were in the police
5  station? How did thinking about the times when
6  you've been jumped on before affect you while you
7  were at the police station?
8    MR. GRILL: Same objection.
9    MS. MEADOR: Same objection.
10   A   Once again, feel bad and sad. Like a
11 lost child. Like no one was there to be there to
12 save me or nothing.
13   Q   Did you think you could withstand the
14 police officers hitting you?
15   MR. GRILL: Objection to form.
16   A   No.
17   Q   Eventually did the police accept that you
18 were not going to sign the confession?
19   MS. MEADOR: Objection. Form and
20 foundation.
21   A   Yes.
22   Q   And what happened after they stopped
23 trying to get you to sign the confession?
24   A   They said, Charge him with it, and locked

47

1  me up.
2    Q   What were you charged with?
3    A   Heinous first-degree murder.
4    Q   Did you go to court on those charges?
5    A   Yes.
6    Q   And what did you do when you went to
7  court?
8    A   Well, after the state, you know, they ran
9  through my background and everything, and then
10 they set -- they set a court date. So I asked the
11 judge could I address the court. And he said,
12 Yes, you may. And I asked him, Could I have a
13 speedy trial.
14   Q   And so you demanded a speedy trial?
15   A   Yes.
16   Q   Why did you demand a speedy trial?
17   A   To prove my innocence.
18   Q   Had you committed this murder?
19   A   No.
20   MR. GRILL: Objection. Asked and
21 answered.
22   MS. MEADOR: Join.
23   Q   And even though you demanded a speedy
24 trial, how long did you have to sit in the county

48

1  jail on these charges?
2    A   Before it was over with, the whole case?
3  Six months.
4    Q   And how did the criminal charges get
5  resolved?
6    A   Through DNA.
7    Q   Sorry, were the -- did you go to trial?
8  Did you plead? Were the charges dismissed?
9    A   No, I went to trial. I went to trial,
10 and the judge had people from the DNA, you know,
11 get right up there and get straight to it because
12 I came up missing three times. So he had to get
13 up there and get straight to it.
14       So they got up there and asked me, Did
15 anything have anything to do with Mr. Taylor
16 concerning this case? He said, No. He told me,
17 I'm sorry for the inconvenience.
18   Q   All right. So the charges were
19 dismissed?
20   A   Yes.
21   Q   And do you know who committed the murder?
22   A   No.
23   Q   Did there come a time when you smelled a
24 bad smell in the alley behind Nevest Coleman's

Transcript of Eddie Taylor
Conducted on March 9, 2020

49

1  house?
2  **A  Yes.**
3     Q  And during that time was Darrell Fulton
4  acting crazy or something like that?
5        MR. GRILL:  Objection to form.
6  **A  No.**
7     Q  Did you ever tell anyone that Darrell
8  Fulton was acting crazy during the time that you
9  smelled a bad smell in the back of the alley?
10  **A  Interrogation, they asked me all the same**
11  **questions.**
12     Q  And -- you mean at 51st and Wentworth?
13  **A  Yes.**
14     Q  Did you tell them that Darrell Fulton was
15  acting crazy at that time or anything like that?
16  **A  Not that I can recall.**
17     Q  And did you ever think that Darrell
18  Fulton was in hiding or something like that around
19  the time that you smelled a bad smell in the back
20  of the alley?
21  **A  I wouldn't consider he was hiding.  He**
22  **was always by his house, by his house.**
23     Q  And was that unnatural for him to be
24  doing in your experience?

50

1        MR. GRILL:  Objection to form.
2        MS. MEADOR:  Objection to form and
3  foundation.
4  **A  No.**
5     Q  All right.  Did you see Darrell or Nevest
6  when he went to court?
7  **A  Yes.**
8     Q  Do you talk with them a lot about why
9  they implicated you?
10  **A  No.**
11     Q  Why not?
12  **A  Because we get -- sometimes when I get to**
13  **court, they had been already out of there and**
14  **left.  I was in a different ward, so I couldn't**
15  **really get a chance to talk with them.**
16     Q  Any other reason why you didn't talk with
17  them a lot about why they implicated you?
18        MS. MEADOR:  Objection to form.
19        MR. GRILL:  Mischaracterizes his
20  testimony.
21  **A  No, I couldn't get a chance to really**
22  **talk to them.**
23     Q  Who was your lawyer during the criminal
24  case?

51

1     A  I forgot that lady's name.  I forgot her
2  name.
3     Q  Do you remember -- it was a woman?
4  **A  Yes.**
5     Q  Does Martha Fitzsimmons sound right?
6  **A  That's her.**
7     Q  All right.
8  **A  That's her.**
9     Q  Were there times when you did appear in
10  court with Darrell and Nevest?
11  **A  No.  I put in for a separate trial so I**
12  **wouldn't see them no more.**
13     Q  Did you -- did anyone tell you not to
14  talk to Darrell or Nevest about the case?
15        MR. GRILL:  Objection to form.  Form.
16  **A  No.**
17     Q  Did Martha give you any advice about
18  talking to Darrell or Nevest?
19  **A  No.**
20        MS. MEADOR:  Well, just to the extent
21  that the witness -- I would ask you to advise him
22  of his rights as to attorney-client privilege --
23        MR. AINSWORTH:  Well, sure.
24        MS. MEADOR:  And whether or not he's

52

1  willing to waive that privilege.
2     Q  You have a right to attorney-client
3  privilege with your lawyer, so conversations
4  between you and Martha are privileged.  You have
5  the right to waive that privilege, if you want.
6  So that means that you can talk about things that
7  you and Martha talked about, if you wish, or you
8  can assert the privilege.  That's up to you.
9        Do you understand that?
10  **A  Yes.**
11     Q  Okay.  While you were in --
12        MS. MEADOR:  I'm sorry, Russell, did he
13  answer your question?
14        MR. AINSWORTH:  I'm not sure, but it's
15  okay.
16        MS. MEADOR:  So are you withdrawing it?
17        MR. AINSWORTH:  I'm moving on.  Yes, I
18  withdraw the question.
19        MS. MEADOR:  Fine.  Just checking for the
20  record.  I don't want there to be like a blank
21  space.
22     Q  Did you ever see -- strike that.
23        While you were in the county, did you
24  ever have to have samples taken for DNA?

Transcript of Eddie Taylor
Conducted on March 9, 2020

14 (53 to 56)

53

1    A   Yes.
2    Q   All right.  And was that the cheek swab
3  and that kind of stuff?
4    A   Yes.
5    Q   Did you see Darrell and Nevest also
6  having to give a DNA sample?
7    A   Yes.
8    Q   Did they try to resist giving a DNA
9  sample in any way?
10   A   No.  They -- no.
11   Q   What did you observe them doing?
12   A   Scared.
13   Q   What made you think they were scared?
14   A   Just being in that county jail underneath
15  a case like that there and facing all them guys
16  and officers, you'll be scared too.
17   Q   Was it rough on you in county for this
18  case?
19   A   Yes.  They beat my motherfucking brains
20  in.
21   Q   Who beat you while you were in the
22  county?
23   A   Cook County sheriffs.
24   Q   Had you been in the county before?

54

1    A   Yes.
2    Q   And had Cook County sheriffs beat you up
3  in the other case that you were in on?
4    A   No.  They told me they were whooping me
5  because of the nature of the crime.
6    Q   And you mean the nature of the crime that
7  happened to Antwinica Bridgeman?
8    A   Yes.
9    Q   Did you feel like you were a target when
10  you were in Cook County jail on these charges?
11   A   Yes, I was.
12       MS. MEADOR:  Hold on.  Objection.  Form.
13  Leading.
14   Q   Why did you believe that you were a
15  target?
16   A   Because of the nature of the case.
17   Q   And what about the nature of the case?
18   A   The way it was -- it happened.  You know,
19  man, I --
20   Q   You mean like the brutal nature of the
21  crime?
22       MS. MEADOR:  Objection to form.
23   Q   Is that what you were referring to?
24   A   Yes.

55

1        MS. MEADOR:  Sorry, I apologize.  I
2  thought you were done.  Objection to form.
3  Leading.
4    Q   So tell us what did you mean when you
5  said the nature of the crime?
6    A   When I was coming through receiving, they
7  took my blood.  They just sit you at this table
8  for the -- do the -- where they're going to send
9  you to, on what division.  And they also read
10  your -- the charge.  You know what I'm saying?  So
11  when I -- they called my name up and I went to sit
12  down, I had a female.  See what I'm saying?
13       And then she opened up the file, and she
14  was reading.  She told me just like this here, she
15  backed up, You nasty, perverted, freaky
16  motherfucker.  She jumped up, ran over there,
17  showed them, talked to them.  Next thing you know
18  they cleared the Harvey bullpen, chained me up and
19  down, and they beat me down.
20   Q   And the Harvey bullpen is the bullpen
21  that people --
22   A   The last one.
23   Q   All right.  When you appeared in court
24  for the first time on this case, you weren't

56

1  bleeding; is that right?
2    A   Yes, I was.  I had black eyes.
3    Q   And was that from the beating you
4  received in the Harvey bullpen?
5    A   It was the beating on top of that one.
6  From the first police on 51st until I got to the
7  county.
8    Q   And so did the beating that you received
9  in the Harvey bullpen, did that happen before you
10  appeared in court for the first time, or was that
11  after?
12   A   That was before I went to court.
13   Q   So it was right when you got to county?
14   A   Uh-huh.
15   Q   Is that a yes?
16   A   Yes.
17   Q   You met with me before this deposition;
18  is that right?
19   A   Yes.
20   Q   And what did I ask you to do here?
21   A   Yes/no.
22   Q   And --
23   A   I'm just playing.  I'm just playing.
24  Y'all got to excuse me.

Transcript of Eddie Taylor
Conducted on March 9, 2020

15 (57 to 60)

57

1    Q   You're good.  Did I ask you to tell the
2  truth?
3    A   Yes.
4    Q   All right, sir.  I don't have any further
5  questions for you.  But --
6        MR. AINSWORTH:  Let's take a quick break
7  at this point.
8        THE VIDEOGRAPHER:  We are going off the
9  video record at 11:04 a.m., and this is the end of
10 Video Media 1.
11       (A recess was taken.)
12       THE VIDEOGRAPHER:  We are back on video
13 record at 11:20 a.m., and this is the beginning of
14 Video Media 2.
15 BY MR. AINSWORTH:
16   Q   Mr. Taylor, when you were at 51st and
17 Wentworth being interrogated about Mikey's murder,
18 did you give a polygraph?
19   A   Yes.  They came and got me from the
20 county.
21   Q   All right.  And you gave a polygraph test
22 at some point, right?
23   A   Yes.
24   Q   Can you describe how that polygraph went?

58

1    A   He asked me a lot of questions concerning
2  the case which I couldn't answer because I wasn't
3  there.
4    Q   All right.  Before you gave the polygraph
5  exam, was the guy who was going to give the
6  polygraph, was he interrogating you?
7    A   No, sir.
8    Q   Was he asking you about the case?
9    A   Yes.
10   Q   And was he asking you about whether you
11 were involved in the case or committed the murder?
12   A   Yes.
13   Q   And what was his tone like when he was
14 questioning you about the murder before you gave
15 the polygraph exam?
16       MS. MEADOR:  Objection to form.
17   A   Probably just asking me just -- words
18 concerning the case.
19   Q   Gotcha.  And what kind of -- what was his
20 tone like?  What was his -- the volume of his
21 voice, what --
22   A   No.  He was professional.
23   Q   All right.  And you gave a -- and then
24 you took the polygraph test; is that right?

59

1    A   Yes.
2    Q   And then were you interrogated after you
3  gave the polygraph test?
4    A   No.  It had -- excuse me?  Say that
5  again.
6    Q   Were you interrogated after you gave the
7  polygraph test?
8    A   No.
9    Q   And you think you got the polygraph exam
10 while you were at county; is that right?
11   A   I didn't get them.
12   Q   You got it -- was it while you were at
13 51st and Wentworth that you gave the polygraph
14 exam or that they came to get you to --
15   A   They came to get me and took me
16 downtown --
17   Q   All right.
18   A   -- to the old police station.
19   Q   And then after the polygraph test, were
20 you then returned to 51st and Wentworth?
21       MS. MEADOR:  Objection.
22   A   No, back to county.
23   Q   Back to county?
24   A   Yes.

60

1    Q   So do you think they came to get you from
2  county to bring you to get -- to take the
3  polygraph test?
4    A   Yes.
5    Q   That's your memory?
6    A   Yes.
7        MR. AINSWORTH:  I don't have any further
8  questions.
9        MR. GRILL:  Nick?
10       MR. CURRAN:  Maybe just follow-up after
11 you guys.
12       MR. GRILL:  Okay.
13       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
14       CITY OF CHICAGO POLICE OFFICERS, ET AL.
15 BY MR. GRILL:
16   Q   All right.  Mr. Taylor, I introduced
17 myself to you before, but just to remind you, my
18 name is Andrew Grill.  I'm one of the attorneys
19 that represents the police officers that
20 Mr. Coleman and Mr. Fulton are suing in this case.
21 All right?
22   A   Yes.
23   Q   Okay.  Your nickname back at least in
24 1994 was either Chip or Ship, correct?

Transcript of Eddie Taylor
Conducted on March 9, 2020

61

1    A    Yes.
2    Q    Did you go by both those names or one
3 versus the other?
4    A    Chip.
5    Q    Did you have any other nicknames that you
6 used at the time?
7    A    Not out south; only out west.
8    Q    What nicknames did you use out west?
9    A    Ice-T (phonetic).
10    Q    Ice-T?
11    A    Yes.
12    Q    Any other nicknames between -- other than
13 Chip and Ice-T?
14    A    No, that's it.
15    Q    Okay.  Did you ever use your brother's
16 name with the police like when you got arrested in
17 the past?
18    A    No, sir.
19    Q    Any other aliases?
20    A    No, sir.
21    Q    Did you ever use the name Steven?
22    A    My brother?
23    Q    Uh-huh.
24    A    I can't recall.

62

1    Q    It's possible?
2    A    Possible.
3    Q    Okay.  What did the nickname Chip mean?
4    A    Like a lot of chips.  That's what my mama
5 named me.
6    Q    I'm sorry?
7    A    It means -- just because I liked -- when
8 I was growing up, she said I like to eat a lot of
9 chips.
10    Q    Like potato chips?
11    A    Yes.
12    Q    Okay.  And so your mom gave you the
13 nickname Chip?
14    A    Yes.
15    Q    Okay.  Now, I want to go back to when --
16 so start, I want to go back to when you found out
17 the police were looking for you.
18        Do you recall Russell asking you some
19 questions about that?
20    A    Yes.
21    Q    Yeah.  And those questions that Russell
22 asked you, did Russell go over those questions
23 with you before the deposition today?  Were those
24 some of the questions that he wanted you to give

63

1 yes or no answers to?
2        MR. AINSWORTH:  Object to the form of the
3 question.
4    A    No.
5    Q    No?
6    A    No.
7    Q    Okay.  Did you talk with Russell before
8 today's deposition about how it was that you first
9 found out that the police were looking for you in
10 regards to the murder and rape of Antwinica
11 Bridgeman?
12    A    I found out on the TV.
13    Q    My question was did you talk to Russell
14 about that, about how you found out before today's
15 deposition?
16    A    Russell?
17    Q    The guy sitting right here that was
18 asking you the questions.
19    A    Oh, no.  He just explained to me about
20 how people were going to ask questions --
21    Q    Okay.
22    A    -- and tell the truth.
23    Q    Okay.  Did you tell him anything about
24 what you knew about -- or what you remembered

64

1 about your arrest back in 1994 for this murder?
2    A    He didn't really ask me questions like
3 that, you know --
4    Q    Well, what kind of questions did he ask
5 you?
6    A    The questions was containing about
7 peoples being in the room and, you know, the
8 cameras and all that.
9    Q    I'm not following you.
10    A    Okay.  He asked me was -- you know, about
11 a lot of stuff concerning Nevest and Fulton, you
12 know, how did I know him and stuff like that.
13    Q    Okay.  And was this a conversation you
14 had with Russell on the phone, or was it in person
15 like face to face?
16    A    In person.
17    Q    Okay.  Where did that conversation take
18 place?
19    A    When he came and visited me.
20    Q    Where did he come visit you at?
21    A    At my house.
22    Q    In the house at the address you gave us
23 before down at 5528 South Racine?
24    A    Yes.

Transcript of Eddie Taylor
Conducted on March 9, 2020

17 (65 to 68)

65

1    Q    Okay.  Who do you live there with again?
2    A    With my wife.
3    Q    Was she there when Russell and you spoke?
4    A    Yeah.  But I excused her.
5    Q    Was Russell with anybody, or was it just
6 him?
7    A    Just him.
8    Q    And when you're talking about cameras and
9 lights, what do you mean?
10   A    About -- I was asking him how -- you
11 know, I've never been to a deposition, would he be
12 able to walk me through it --
13   Q    Okay.
14   A    -- as far as what I'm -- because really
15 I'm confused -- I'm thinking about this whole
16 thing again.  It's, you know, the fire -- like
17 throwing gas on a fire again.  It's behind me.
18   Q    Right.
19   A    You know what I'm saying?  So I'm going
20 to be truthful, tell the truthful.  I'm going to
21 do what I got to do and tell the truth, you know?
22   Q    Yeah.  And you told the truth to the
23 police when you talked to them, right?
24   A    Yes.

66

1         MR. AINSWORTH:  Objection to form.
2    Q    And you were telling the -- you
3 remembered some investigators from the state's
4 attorney's office coming out and speaking with you
5 back in 2017 about this case, right?
6    A    Yeah, 2017.
7    Q    You told the truth to them too?
8         MR. AINSWORTH:  Objection.  Form.
9    Q    Right?
10   A    Yes.
11   Q    And you're telling the truth today,
12 right?
13   A    Yes.
14   Q    Okay.  So when you met with Russell, how
15 long ago was it when you met with him?
16   A    Yesterday.
17   Q    Just yesterday?
18   A    Yes.
19   Q    Did you ever meet him before then?
20   A    No.
21   Q    Did you ever talk to him before then?
22   A    No.
23   Q    Did you ever talk to anybody, any
24 lawyers, about this case between 2017 and

67

1 yesterday other than Russell?
2    A    No.
3    Q    Okay.  How did Russell get ahold of you?
4    A    Through Darrell Fulton.
5    Q    Okay.  And --
6         MR. AINSWORTH:  Objection to foundation.
7    Q    -- explain how Russell got ahold of you
8 through Darrell Fulton.  What do you mean by that?
9    A    I got a call.
10   Q    From?
11   A    From Darrell.
12   Q    Okay.  How long ago?
13   A    About a month or two.  He was telling me
14 about a deposition, that I had to go to do a
15 deposition.
16   Q    That you had to go to a deposition?  This
17 was something that Darrell was telling you?
18   A    No.  He was just saying about the
19 deposition.
20   Q    Darrell was telling you this?
21   A    Yes.
22   Q    Okay.  And this was on a phone call?
23   A    Yes.
24   Q    How often do you talk to Darrell

68

1 generally since he's gotten out of jail?
2    A    Every blue moon.
3    Q    What does that mean?
4    A    I can barely catch him.
5    Q    Okay.  But he has your phone number?
6    A    Yes.
7    Q    Did you give him your phone number?
8    A    Yes.
9    Q    Yeah?  When did you give Darrell your
10 phone number?
11   A    Oh, it's been a minute.  It's been a
12 minute.
13   Q    Well, let me put it this way:  Did you
14 give Darrell your phone number after he got out of
15 jail for this murder?
16   A    After I got out of jail?
17   Q    No, after Darrell got out of jail.
18   A    Yes.  We got contact through our peoples.
19   Q    What peoples are those?
20   A    His family, Darrell's family.
21   Q    Any specific family?
22   A    Yeah.  His cousin Ricky Harris.
23   Q    Okay.  How do you know Ricky?
24   A    He raised both of us.

Transcript of Eddie Taylor
Conducted on March 9, 2020

18 (69 to 72)

---

69

1    Q   What do you mean by that?
2    A   He's older than both of us.
3    Q   You said raised, I thought.  Did I
4  mishear you?
5    A   Yeah.  Like we call him uncle.  He's
6  family.
7    Q   Okay.  How old is he, if you know?
8    A   68 or 60.
9    Q   So like an older guy?
10   A   Yes.
11   Q   Much older -- like a lot older than you?
12   A   Yes.
13   Q   Does Ricky have any nicknames or anything
14  that you're aware of?
15   A   Ricky.
16   Q   Just Ricky?
17   A   Yes.
18   Q   Where did Ricky live?
19   A   He stayed -- at the time -- he used to
20  stay on 56th and Emerald.
21   Q   Back in '94?
22   A   No, not in '94.  The house got burnt
23  down.
24   Q   I wasn't clear.  Where did Ricky stay

---

70

1  back in 1994 when he was raising you guys?
2    A   I think he moved -- he moved on 56 and
3  Woods.  56 and Woods.
4    Q   Okay.  And was Ricky a GD?
5    A   Yes.
6    Q   Okay.  Did he have a rank in the GDs?
7    A   No.
8    Q   Okay.  Darrell is a GD, right?
9    A   Yes.
10   Q   So is Nevest?
11   A   Yes.
12   Q   And so are you?
13   A   Yes.
14   Q   And specifically you were GDs back in
15  1994 before this murder happened, right?
16   A   Yes.
17   Q   What rank did you hold in the Gangster
18  Disciples then?
19   A   None.
20       MR. AINSWORTH:  Objection to form and
21  foundation.
22   Q   What rank --
23   A   No rank.  I was a soldier.
24   Q   What does that mean?

---

71

1    A   Like an outstanding member, a follower.
2    Q   I'm sorry what?
3    A   A follower.
4    Q   A follower.  Sorry.  I have some hearing
5  loss -- I'm not even joking -- from playing music.
6  So I'm sorry if I ask you to repeat yourself.
7  It's not you, it's me.
8       Okay.  So you were a soldier, a follower.
9  When did you join the GDs?
10   A   1978.
11   Q   1978?  How did you get in?  Were you
12  jumped in?  Did you get blessed in?  How did you
13  get in?
14   A   Just neighborhood -- you know, certain
15  sides.  And, you know, whatever side you lived on,
16  that's how they try to play you -- that's what you
17  was.
18   Q   Certain sides of Garfield specifically,
19  right?
20   A   Uh-huh, yes.
21   Q   Okay.  It was on the south side of
22  Garfield, GDs, at that time, right?
23   A   Uh-huh.
24   Q   You've got to say yes or no.

---

72

1    A   Yes.
2    Q   North side was P Stones, right?
3    A   Yes.
4    Q   Any other gangs on the north side?
5    A   Yes.
6    Q   And I'm talking about in the area right
7  around, you know, where this murder happened.
8    A   Oh, yes.  Plenty of them.
9    Q   Who else is on the north side?
10   A   You had -- you had the Black P Stones,
11  you had the -- you had the Black P Stones, you had
12  the Vice Lords -- you got everything over there.
13  Everything.  Every gang you can name all through
14  the neighborhood.
15   Q   And on your side, GDs and --
16   A   On both sides.  On both sides.
17   Q   Okay.  P Stones stand on your side of the
18  boulevard?  Yeah?  You've got to say yes.
19   A   Yes, yes.  I'm sorry.
20   Q   Okay.  All right.  But you testified
21  earlier today that crossing Garfield, if you were
22  a GD and you crossed over north of Garfield, you'd
23  be at risk of maybe getting one of those beatings
24  that you described by 10 or 12 people, right?

---

73

1    A    Yes.
2    Q    Maybe even killed, right?
3    A    Yes.
4    Q    Same thing could happen to a P Stone that
5 came south across Garfield into GD -- onto the GD
6 side, correct?
7    A    Yeah.  If you got caught in the wrong
8 territory.
9    Q    Something real bad up to and including
10 getting killed could happen to you, right?
11       MR. AINSWORTH: Objection to form.
12    Q    Based on your knowledge --
13    A    Yes.
14    Q    -- and experience in that neighborhood --
15    A    Yes.
16    Q    -- as a soldier in the Gangster
17 Disciples --
18    A    Yes.
19    Q    -- since 1978, right?
20    A    Yes.
21    Q    So as of 1994, you had been a GD for
22 about 16 years; that would be about, correct?
23    A    Yes.
24    Q    Okay.  When did Nevest join the GDs?

74

1    A    I really --
2       MR. AINSWORTH: Objection.  Foundation.
3    Q    If you know.
4    A    -- can't tell you that -- no, I can't
5 tell you.
6    Q    Well, you testified earlier that you'd
7 known him since you were kids, right --
8    A    Yes.
9    Q    -- since you were little?
10    A    Yes.
11    Q    So based on your experience with him,
12 when do you believe that he joined -- became a GD?
13       MR. AINSWORTH: Objection.  Foundation.
14       MR. CURRAN:  Calls for speculation.
15    Q    Based on your experience.
16    A    As long as he'd been staying on that
17 side, you know, I think he just became what his
18 family became.
19       Do you see what I'm saying?
20    Q    No, I don't.
21    A    Okay.  He became one of the outstanding
22 members of what his family was.  Just like me.
23    Q    I don't understand.
24    A    The majority of your family, whatever

75

1 they was and whatever they was about, that's what
2 you was going to be about.  You going to be
3 treated like opposition too.
4    Q    So the majority of your family were GDs?
5    A    Yes.
6    Q    And the majority of Nevest's family were
7 GDs?
8       MR. CURRAN:  Objection to foundation.
9    A    I don't know.  I can't tell you that, no.
10 I don't know.
11    Q    Okay.  What about Darrell, when did he
12 join the GDs, to your knowledge?
13       MR. CURRAN:  Objection.  Foundation.
14    A    I can't tell you that either.
15    Q    Okay.  But he was a GD as well, right?
16    A    Yes.
17    Q    Do you know what rank he held in the
18 gang?
19    A    He had no rank.
20    Q    What about Nevest?  Do you know what rank
21 he held?
22    A    He ain't got no rank either.
23    Q    Were they both soldiers like you?
24    A    Yep.

76

1    Q    Okay.
2    A    Yes.
3    Q    Yes.  Okay.  So Fulton, to your
4 knowledge, got your phone number from Ricky?
5    A    Yes.
6    Q    After you got out of jail?
7    A    Yes.
8    Q    Do you know how long after Darrell got
9 out of jail that Ricky gave him your phone number?
10       MR. AINSWORTH: Objection.  Foundation.
11    A    I can't really recall.
12    Q    Did Ricky tell you, hey, I gave Darrell
13 your phone number?
14    A    Yes.
15    Q    Okay.  How did Ricky tell you that?  Like
16 face to face?  A phone call?
17    A    He pulled up on me face to face, and we
18 talked.
19    Q    Ever talk to Nevest on the phone since he
20 got out of jail?
21    A    No, sir.  No, sir.
22    Q    Ever get any correspondence or
23 communications of any sort from Nevest?
24    A    No, sir.

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

**77**

1    Q   Do you have like a Facebook page?
2    **A   No.**
3    Q   Do you know what that is?
4    **A   I don't have it.**
5    Q   Okay.  You've got a -- I saw your phone.
6   You have a smart phone, right?
7    **A   Yeah.  But I don't have no page.**
8    Q   Okay.
9    **A   I'm a dinosaur.**
10    Q   Okay.  You gotten any text messages,
11   anything like that, from Darrell since he's gotten
12   out of jail on that phone?
13    **A   Yeah.**
14    Q   Okay.  What about --
15    **A   Not on this phone, my other one.  It's a**
16   **new phone.**
17    Q   Okay.  What's the phone number for that
18   phone?
19    **A   I don't even know it.  I just got it.**
20    Q   We're talking about the phone that you
21   get text messages on from Darrell.  What's that
22   phone number?
23    **A   Oh, it's 312-937-6958.**
24    Q   Who's the carrier?  Is it like Verizon?

**78**

1   Is it T-Mobile?
2    **A   Metro PC --**
3    Q   PCS?  Okay.  How long have you had that
4   phone?
5    **A   For like about two to three years.**
6    Q   All right.  And where is that phone right
7   now?
8    **A   It's at home.**
9    Q   Okay.  How many other phones do you have
10   besides the one at home that we're talking about
11   and the one that you have with you right now?
12    **A   That's it.  Just these two.**
13    Q   Just those two phones?
14    **A   Yes.**
15    Q   Okay.  What's the phone number and
16   carrier for the phone that you have with you
17   today?
18    **A   I don't know it by heart.  I just got it.**
19   **Still stuck in the box.  Just bought it.**
20    Q   Okay.  Maybe so we can keep moving
21   forward, we can figure out how to figure out what
22   that phone number is at the end of the deposition.
23   Okay?
24    **A   Yes.**

**79**

1    Q   Okay.  Do you know who the carrier is,
2   though, like that you get the phone bill from for
3   that phone?
4    **A   Metro PCS.**
5    Q   Also Metro PCS?  Is there any reason why
6   you have two phones?
7    **A   Yeah.  The other one won't charge up.**
8    Q   Okay.  So it's like an older phone?
9    **A   Yes.**
10    Q   Okay.  When was the last time you got a
11   text message from Darrell Fulton on that other
12   phone that's at home?
13    **A   About -- about a month or two.**
14    Q   A month or two ago?
15    **A   Yeah.**
16    Q   Okay.  I'm just going to ask you we're
17   probably going to need to see those text
18   messages --
19    **A   Yes.**
20    Q   -- so don't erase them, don't do anything
21   with that phone.  Okay?  Fair enough?
22    **A   Fair.**
23    Q   Okay.  Do you ever get any emails from
24   Darrell?

**80**

1    **A   No.  I don't get the --**
2    Q   You know what an email is, right?
3    **A   Yeah.  But I ain't got none of that.**
4    Q   Okay.  And you have no social media
5   accounts?  No Facebook?  No Instagram?  Nothing?
6    **A   Nothing.**
7    Q   Okay.  So after Ricky gave you -- gave
8   Darrell your phone number, think back to when
9   Darrell got out.
10        How long after Darrell got out of jail on
11   this -- was released on this case was it that
12   Darrell first reached out to you on that phone.
13   Did you get a call or text from him?
14        MR. CURRAN:  Objection to foundation.
15    **A   I got a call.**
16    Q   From Darrell?
17    **A   When I first -- when he first reached out**
18   **to me?**
19    Q   Yeah, uh-huh?
20    **A   My cousin called him.**
21    Q   That's not my question.  Sorry if it
22   wasn't clear.
23    **A   Okay.**
24    Q   The question is when did Darrell first

Transcript of Eddie Taylor
Conducted on March 9, 2020

81

1 reach out to you on the phone?
2    A  It was about two months after he came
3 home.  It was about two months after he came home.
4    Q  And although you said once in a blue moon
5 you talked to Darrell on the phone, how many
6 calls -- I mean, how often -- okay?  If you can
7 quantify it for me -- since Darrell has gotten out
8 of jail do you talk to Darrell on the phone?
9        MR. AINSWORTH:  Object to the form of the
10 question.
11   A  About six, seven times.
12   Q  Total or a month?
13   A  No, not in a month.  I'll say -- yeah,
14 about -- yeah, about six, seven times.
15   Q  Okay.  Total or a month?
16   A  I'll say within a month.
17   Q  Okay.  So you talked to him six or seven
18 times per month since he has gotten out?
19   A  Yes.
20       MR. CURRAN:  Objection.  Misstates his
21 testimony.
22   Q  And since he's been released, how many
23 times have you seen Darrell in person?
24   A  I've seen him, like, twice.

82

1    Q  Let's talk about the first time.  When
2 was that that you saw him?
3    A  The first time he came to see me at my
4 brother's house.
5    Q  Which brother?
6    A  5401 South Woods.  Andre.
7    Q  At Andre's.  Okay.  And how long after
8 Darrell had been released was this encounter at
9 Andre's house that you had?
10   A  It was, like, about three months.  It
11 was, like, about three months after he touched
12 down.
13   Q  Who was there other than you and Darrell
14 and Andre?
15   A  Just me and my brother.
16   Q  And Darrell?
17   A  Yes.
18   Q  Okay.  What did you guys do?  What was
19 the reason for everybody getting together there
20 that day?
21       MR. CURRAN:  Objection to form.
22   A  We were just talking.  I was glad to see
23 him, you know?  And I hate that we all had -- went
24 through this.  You know?  That was it.  That's

83

1 all.  He was just telling me about some good jobs
2 where they was hiring.  You know, stuff like that.
3    Q  Okay.  How did you know to -- why were
4 you there -- I'll withdraw the question.
5        Why did you go to Andre's house that day?
6    A  That's where I was staying then.
7    Q  That's where you were staying?
8    A  Yes.
9    Q  Okay.  And did you know Darrell was
10 coming over that day?
11   A  Yeah.
12   Q  How did you find out?
13   A  Through my cousin.
14   Q  Okay.  Which cousin is that?
15   A  Ricky Harris.
16   Q  Ricky.  Okay.  Did Ricky call you and
17 tell you Darrell was coming over?
18   A  Yes.
19   Q  Okay.  Did you know from Ricky why
20 Darrell wanted to -- was coming by that day?
21   A  Yes.
22   Q  What was that?  What was the reason that
23 he told you?
24   A  Because, you know, when I first got

84

1 arrested, I was upset.  I was mad, you know, about
2 the statement part.  You know, so I just put it in
3 God's hands and just told him I'll talk to him.
4 You know, they've been gone 26 years.  You know, I
5 was hurt; but, you know, I had to make amends to
6 that.  You know what I'm saying?  We talked.
7 That's all.
8        MR. GRILL:  Can you read my question
9 back, please?
10       (The Reporter read the record as follows:
11 What was that?  What was the reason that he told
12 you?)
13   Q  Mr. Taylor, when you were over at Andre's
14 house on that day, how long did you all -- you,
15 Andre, and Darrell -- how long were you guys
16 together for that day?
17   A  About a half an hour.
18   Q  All right.  And at that time that you met
19 with Darrell, did you know whether he was -- had
20 filed a lawsuit regarding this case that he had
21 been released on?
22   A  No.
23   Q  Okay.  When did you first find out that
24 Darrell filed a lawsuit?

Transcript of Eddie Taylor
Conducted on March 9, 2020

22 (85 to 88)

85

1    A  I found out through family members, his
2  family members.
3    Q  Whose family members?
4    A  Darrell's.
5    Q  Okay.  When did you find out in relation
6  to that meeting that day three months after
7  Darrell got out of jail?
8        MR. AINSWORTH:  Object to the form of the
9  question.
10       MR. CURRAN:  Join.
11   Q  Do you understand the question?
12   A  Say that one more time.
13   Q  Yeah.  So when you think about -- back to
14  that day when you had this meeting at Andre's
15  house --
16   A  Oh, I found out like about a year later.
17  Almost like a year later.
18   Q  Okay.  And which family members did you
19  find out about?
20   A  Through his -- from his nephews and
21  cousins.
22   Q  Do you know which ones?
23   A  Yeah.  It was Kank.
24   Q  How do you spell that?

86

1    A  K-A-N-K.  That's how I spell it.
2    Q  Kank.  Okay.  Fair enough.  Who else?
3    A  And Lill Rob.  Lill Rob, his other
4  cousin, and his brother Clenzo.
5    Q  What do you know about the lawsuit?  For
6  example -- go ahead, if you understand the
7  question.
8    A  What I'm understanding is they will be
9  compensated for -- I don't know.  Like I said,
10  it's been so long, I don't --
11   Q  It's been so long since what?
12   A  Since this case popped back up, and it
13  just all took me by surprise.  You feel what I'm
14  saying?
15   Q  Right.  So you found out that Darrell is
16  going to be compensated or you think that he will
17  be?
18       MR. CURRAN:  Objection.  Misstates his
19  testimony.
20   Q  What do you mean by that?  You used the
21  word compensated.  What do you mean by that?
22   A  Yeah, compensated means -- I mean, I'm
23  thinking about all the time they've been locked
24  up, you know what I'm saying?  I'm thinking the

87

1  state is going to, you know, at least try to help
2  the guys out with something, you know?
3    Q  Yeah.
4    A  Being wrongfully convicted.
5    Q  What do you think Darrell should be
6  compensated?  Like how much?
7    A  I can't say that.
8    Q  Did Darrell ever tell you?
9    A  No.
10   Q  Do you think he's going to be compensated
11  a little bit or a lot?
12       MR. CURRAN:  Objection.
13       MR. AINSWORTH:  Objection.  Assumes facts
14  not in evidence.
15       MR. CURRAN:  Object to the form.
16   A  I really don't know how much is involved
17  because don't nobody talk to me.  I stay away from
18  everybody.  So I can't sit up here and tell you no
19  story.
20   Q  When you say you stay away from
21  everybody, what do you mean by that?
22   A  Because I still stay in the whole
23  neighborhood.
24   Q  You don't stay away from Darrell,

88

1  correct?
2    A  Yes, I do.  He stays away from me too.
3  It's just, you know, like I said, the past.  You
4  know what I'm saying?  And once I see people, I
5  just start thinking and just --
6    Q  What about people in the old
7  neighborhood -- it sounds like you've got some
8  concerns about some people in the old
9  neighborhood.
10   A  The old neighborhood, it's -- it's a new
11  neighborhood now.  It's old and new.  You feel me?
12  A lot of people moved around.  A lot of new people
13  moved in.
14   Q  So what are you trying to stay away from?
15   A  I just really stay away from all, you
16  know, just nonsense, period.  You know what I'm
17  saying?
18   Q  Sure.  If it's new people in the
19  neighborhood -- do people in the old neighborhood,
20  these new people, in particular, do they talk
21  about this murder?
22   A  No.
23   Q  Okay.  So is there anything about this
24  murder that gives you any concerns about -- from

Transcript of Eddie Taylor
Conducted on March 9, 2020

89

1  anybody in the neighborhood?
2      MR. CURRAN:  Objection to form.
3      **A  No, sir.**
4      Q  None?  Okay.  Tell me about the second
5  meeting that you had with Darrell, face-to-face
6  meeting.
7      **A  The second meeting?**
8      Q  You said there were two.  Tell me about
9  the second one.
10     **A  Oh, when he came to my house.  I just**
11 **spoke to him.  He let me know he was going to do**
12 **laundry and then headed back home and asked me did**
13 **I have a job yet.**
14     Q  Okay.  So the second meeting -- how long
15 after the first meeting did the second meeting
16 happen?
17     **A  He came about another four months later.**
18     Q  That's the only other time you've seen
19 him face to face?
20     **A  Yes.**
21     Q  And he came to your house to do laundry
22 or --
23     **A  No.  He just came from the laundromat.**
24     Q  Got it.  Sorry.  Okay.

90

1      Where is the laundromat in relation to
2  the house that you were living at?  Or is this
3  at -- you were living at 5528 South Racine?
4      **A  Yes.**
5      Q  That's the address he came to?
6      **A  Yes.**
7      Q  Okay.  Where's the laundromat?
8      MR. CURRAN:  Objection to foundation.
9      **A  He said somewhere -- I don't know -- I**
10 **think he said 60-something and Ashland.**
11     Q  He told you the address of the
12 laundromat?
13     **A  No.  He told me that -- he told me the**
14 **street, like 51st or 61st and Ashland -- like 69th**
15 **and Ashland, I think.  He said that's where the**
16 **laundromat was.  He was at somewhere over there.**
17     Q  Okay.  So he was like 14 blocks away at a
18 laundromat?
19     **A  Uh-huh.**
20     MR. CURRAN:  Objection to foundation.
21     Q  Well, 69th street would be about
22 14 blocks south of 55th Street, right?
23     **A  Yes.**
24     Q  Okay.  Maybe (inaudible) Racine, right?

91

1      **A  Yes.**
2      Q  Yeah.  Okay.  Did you know that Darrell
3  was coming by that day?
4      **A  Yeah, he called me.**
5      Q  Okay.
6      **A  He called me.**
7      Q  And what did he say?
8      **A  Just what are you doing?  I said, I ain't**
9  **doing nothing.  I'm in the house.  He said, Well,**
10 **I'm going to slide by and holler at you for a**
11 **minute.**
12     Q  Okay.
13     **A  He asked me how my -- the first thing**
14 **that kept coming out of his mouth was, You get a**
15 **job?  You get a job?**
16     Q  Uh-huh.  Darrell with anybody?
17     **A  I really can't tell you that.  As far as**
18 **my relationship?**
19     Q  No, no, no.  I'm sorry.  That wasn't
20 clear.  When he came to visit you this day --
21     **A  Oh, no, sir.  No, sir.**
22     Q  -- after the -- he was at the laundromat.
23 He was by himself?
24     **A  He was by himself.**

92

1      Q  Okay.  How long was he at your house for?
2      **A  About a good six, seven minutes.**
3      Q  Okay.  And you guys talk about anything
4  else other than what you just said?
5      **A  No.  I was glad to see each other.  That's**
6  **all.  You know, like little kids again.  That's**
7  **all.**
8      Q  Got it.  All right.  So when did you
9  first find out that -- or strike that.
10     So Darrell was the one who called you and
11 told you about today's deposition.  That's how you
12 first found out about it, right?
13     MR. CURRAN:  Objection.  Misstates his
14 testimony.
15     **A  Yeah.  Darrell called me and said the**
16 **lawyer wanted to talk to me, but I had to give him**
17 **my permission.**
18     Q  That he had to give --
19     **A  No, me.**
20     Q  Okay.  And how long ago was this call
21 from Darrell to tell you about today's deposition.
22     MR. AINSWORTH:  Objection.  Asked and
23 answered.
24     **A  That was about almost two months.**

Transcript of Eddie Taylor
Conducted on March 9, 2020

93

1    Q   Two months ago?  Okay.
2        Darrell send you any text messages about
3    today's deposition?
4    A   No, sir.
5    Q   Okay.  What did Darrell tell you about
6    today's deposition, like what it was more?
7        MR. AINSWORTH:  Object to the form of the
8    question.
9    A   He just asked me -- he told me that they
10   were going to ask me some questions.
11   Q   About?
12   A   About the case.
13   Q   Any types of questions?
14   A   No.  He didn't get into details.
15   Q   Okay.  When you say you didn't have
16   anything to do with the case, with the murder,
17   right?
18   A   Yes.
19   Q   Okay.  So what did -- did Darrell say
20   anything to you, then, about what today's
21   deposition was going to be about if you didn't
22   have anything to do with the murder?
23       MR. AINSWORTH:  Objection.  Asked and
24   answered.

94

1    A   No, sir.  He just told me that lawyer
2    wanted to talk to me about a deposition.  I was
3    asking him questions.  He didn't ask --
4    Q   What kind of questions were you asking
5    him?
6    A   I'm, like, What they want to talk about?
7    Why they calling me?
8    Q   Okay.
9    A   I'm through with the case.
10   Q   Uh-huh.  Did Darrell answer your
11   questions about -- that you were asking him?
12   A   No, sir.
13   Q   Why not, if you know?  Do you know why
14   Darrell wouldn't answer those questions?
15       MR. CURRAN:  Objection.
16   Q   If you know.
17       MR. CURRAN:  Foundation.  Calls for
18   speculation.
19   A   I think because attorney or someone
20   present, you know?  And he didn't want to get into
21   details, you know?
22   Q   Okay.  So you think there was an attorney
23   on the other end of the phone sitting with Darrell
24   when he called you?

95

1        MR. CURRAN:  Objection.
2        MR. AINSWORTH:  Objection to foundation.
3        MR. CURRAN:  Foundation.
4    A   I can't say that either.
5    Q   Okay.
6        MR. CURRAN:  Misstates his testimony.
7    Q   All right.  So how long was that call
8    with Darrell when he was telling you about today's
9    deposition?
10       MR. AINSWORTH:  Object to the form of the
11   question.
12       MR. CURRAN:  Join.
13   A   About -- he stayed on the phone with me a
14   good two minutes.
15   Q   Okay.  And did he tell you the name of
16   the attorney that was going to contact you?
17   A   No.  He just said his attorney.
18   Q   Okay.  And then how long after that call
19   with Darrell did you get a call from an attorney
20   about this case?
21   A   I don't know if it was a couple of days,
22   three days later, or something like that.
23   Q   And it was Russell who called or it was
24   somebody else?

96

1    A   It was him.
2    Q   Okay.  And how many times -- you only
3    talked to Russell on the phone that one time?
4    A   Yes.
5    Q   Okay.  And then otherwise came and met
6    with him -- or he came to you and met with you,
7    right?
8    A   Yeah.  I was trying to call him again to
9    find out the stuff about it, but he wasn't saying
10   nothing to me either.  He was just saying you'll
11   see when you get there, you know, when I talked to
12   him.
13   Q   Okay.  When you met with Russell, did you
14   have any questions for him as to, like, why you
15   were -- why your deposition was being sought in
16   this case?
17   A   Yes.
18   Q   What did you ask him?
19   A   I asked him -- I asked him -- I said,
20   I've got to really be here?  You know what I'm
21   saying?
22   Q   Uh-huh.
23   A   You know, and he was, like, No.  Really,
24   you know -- because I ain't got no attorney.  You

Transcript of Eddie Taylor
Conducted on March 9, 2020

25 (97 to 100)

97

1  know what I'm saying?  I just -- I just want to
2  get this behind me.
3      Q   What do you want to get behind you?
4      A   All this and get back on with my life.
5  People keep popping up, you know what I'm saying?
6      Q   What people keep popping up?
7      A   I'm talking about from the last time.
8  They scared me to death.
9      Q   Who is they?
10     A   The people that came to my brother's
11 house before they came home.  And I'm, like -- I'm
12 working a job, doing everything, getting off
13 parole.  I'm wondering what's going on.
14     Q   You're talking about back at the time in
15 1994?
16     A   No.
17     Q   Oh.
18     A   Right before they came home.
19     Q   They being Darrell and Nevest?
20     A   Yes.
21     Q   Okay.  So what people are you talking
22 about?
23     A   Well, it was some -- the states, I think.
24     Q   People in the state's attorney's office?

98

1      A   Yes.
2      Q   Got it.  Okay.  Anybody else other than
3  those people from the state's attorney's office
4  pop up, to use your words?
5      A   No.  No, sir.
6      Q   Okay.  All right.  Those people from the
7  state's attorney's office that came and talked to
8  you, they met with you at your house?
9      A   At my brother's house.
10     Q   Your brother's house.  Excuse me.
11         How long did you meet with them for?
12     A   About an hour and a half.
13     Q   All right.  And they told you who they
14 were when they came and talked with you?
15     A   Yes.
16     Q   Okay.
17     A   The investigator or something.
18     Q   And when they showed up, your brother
19 basically called you and told you that they were
20 there, right?
21     A   Yeah, my nephew.
22     Q   Yeah, your nephew.  Okay.
23         And then you came and met with them,
24 right?

99

1      A   Yes.
2      Q   And then they showed you their
3  identification about who they were and why they
4  were there to talk with you?  Yes?
5      A   Yes.
6      Q   Okay.  They didn't yell at you, right?
7      A   No.
8      Q   They didn't threaten you?
9      A   No.
10     Q   They didn't beat you?
11     A   No.
12     Q   All right.  In all respects, you would
13 say that they treated you with respect when they
14 were interviewing you?
15     A   Yes.
16     Q   And they just basically asked you
17 questions, and you gave them answers, right?
18     A   Yes.
19     Q   Did you see them taking notes while they
20 were talking to you?
21     A   Yes.
22     Q   Okay.  Okay.  So let's just switch here
23 for a second.
24         When you found out that the police were

100

1  looking for you for this murder -- so back in
2  1994, okay?  -- your testimony in response to
3  Mr. Ainsworth's questions were that, if I can
4  remember this right, if I wrote this down right,
5  that you were at Darrell's aunt's house when you
6  found out the police were looking for you.
7          Did I get that right?
8      A   Yeah.  I just got off the bus.
9      Q   Okay.
10     A   Just got off the bus coming from the
11 projects from Robert Taylor's.
12     Q   Robert Taylor Homes?
13     A   And when you catch 55th straight down,
14 you can get off right up there and walk straight
15 to the building.  It's right there on 55th, right
16 across from the bus stop.
17     Q   Who were you -- do you remember if you
18 were visiting somebody specific over at the Robert
19 Taylor Homes earlier that day?
20     A   That was my -- I spent the night there.
21 Me and my girl and my baby.
22     Q   With Latoya?
23     A   Yes.
24     Q   Okay.  Do you know what time it was that

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

101

1 you got -- what time of day it was that you got to
2 Darrell's aunt's house?
3     A    It was earlier.  It was earlier around
4 what?  School was going -- around about 8.
5 Almost -- 8, yeah, something like that.
6     Q    8 in the morning?
7     A    Yes.
8     Q    So it was like a school day?
9     A    Yeah, it was a school day because I seen
10 the kids going to school.
11    Q    And you're sure about that?
12    A    Yes.
13         MR. CURRAN:  Objection to form.
14    A    Yes.
15    Q    All right.  I guess what I'm asking is
16 that something, when you're thinking about --
17 thinking back to something you can still remember,
18 you can visualize that in your head?  Yes?
19    A    Yes.
20    Q    Okay.  And you said that there was police
21 activity in the back?
22    A    Yes.  Only reason I found that out is
23 because Darrell's aunty's -- Darrell's cousin came
24 upstairs -- he went to Tilden high school, he left

---

102

1 his ID.
2     Q    Okay.
3     A    I had clothes up to his mother's house.
4 I was getting my clothes and putting them in the
5 bag --
6     Q    Right.
7     A    -- so I could go to the laundromat --
8     Q    Okay.
9     A    -- because I had just came home.  I was
10 sleeping from here to there, you know?  I was
11 going from house to house.  I ain't going to lie
12 to you.
13         So when I went to get my clothes, he
14 knocked on the back door, she opened the door up.
15 He came in.  He said, Man.  I'm like -- I looked
16 out too.  I said, Man, all them police out there.
17 I don't know what was going on.  She didn't know
18 what was going on.  You know what I'm saying?  At
19 the time they had took them already.  You know
20 what I'm saying?  He didn't even know there was no
21 news trucks back there.
22         So when he came up to see if he got his
23 ID, we looked down, and I was like, Man, he -- the
24 first thing that came out of his mouth was, Man,

---

103

1 they got a picture of you.  They're looking for
2 you.  I'm, like, What?  You know what I'm saying.
3 So what I do -- I'm like, Looking for me for what?
4 And then that's when he told me the whole story.
5 You know what I'm saying?  He told me about --
6 because he was down there where that happened.
7 You know what I'm saying?
8         And he's, like, They found somebody over
9 there.  And I was, like, What?  So I was, like --
10 you know what I'm saying?  I'm delirious.  I'm
11 feeling I'm going crazy --
12    Q    Yeah.
13    A    -- you know what I'm saying?  Because
14 I'm, like, What?  They're looking for me.  So, you
15 know, I was headed out west that day anyhow --
16    Q    Okay.
17    A    -- to make amends with my moms.
18    Q    So you keep saying he was telling you,
19 who's the he that's telling you this?
20    A    It's Darrell's little cousin.
21    Q    What's his name?
22    A    They call him Black.  His real name --
23 what's that boy's real name?  I can't remember his
24 real name.  We call him Black.  That's his name,

---

104

1 street name.
2     Q    Is he older than you or younger than you?
3     A    No.  He's younger than me.
4     Q    How much younger than you?
5     A    He about -- like about 34, 35.
6     Q    He was in high school?
7     A    He was in high school.  He's old now.
8 This has been years ago.
9     Q    No, I'm talking about now.
10    A    That's what I'm talking about.  He was in
11 high school, and he was going to Tilden.
12    Q    Got it.  What's the address of Darrell's
13 aunt's house that you were at when you -- when
14 this whole thing was going down that we're talking
15 about?
16    A    I don't even know that address.
17    Q    Okay.  You know where Darrell lived then,
18 right?
19    A    Yes.
20    Q    Okay.  So --
21    A    I don't even know his address.  I know he
22 stayed in --
23    Q    So how far from Darrell's house, then,
24 was his aunt's house?

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

105

1    **A   Walk out the alley; his mama's house was**
2  **right there.**
3    Q   Was it on 55th Street, or was it on --
4    **A   It was on Sangamon.  You can say 56th**
5  **and Sangamon.  55th between Peoria and Garfield.**
6    Q   Okay.
7    **A   It's right around the corner.**
8    Q   Okay.  So really close.
9    **A   Yeah.**
10   Q   And you could see police activity?
11   **A   From the top porch to the -- out there**
12 **outside.**
13   Q   And where was the police activity?
14   **A   It was just all in the alley.  You**
15 **know --**
16   Q   Okay.  Like -- sorry, I didn't mean to
17 cut you off.  Were you done with your answer?
18   **A   Yes.**
19   Q   If you could describe the type of police
20 activity that you saw.
21   **A   I just seen police cars out there and**
22 **police standing out.  You know, I looked out for a**
23 **second on the back, and I left.  I left back out**
24 **through the front --**

106

1    Q   Okay.
2    **A   -- the way I came.**
3    Q   And so Black comes in and tells you
4  they're looking for you?
5    **A   Yeah.  Once he seen I was there.  He said**
6  **they're riding around with my picture looking for**
7  **me, Eddie, Chip.  That's the name he said.  I was,**
8  **like, You're lying?  He was like, Cuz, I'm telling**
9  **you, man.  They've got your picture man riding**
10 **around.  I said, What?**
11   Q   Did he tell you how he found that out?
12   **A   Yeah.  They drove up on him.  Asked him**
13 **how they seen me.  But he didn't know I was there.**
14 **You know what I'm saying?  He had just went to**
15 **school, and I had just came through the front off**
16 **the bus on 55th.**
17   Q   Not even knowing that anybody was looking
18 for you?
19   **A   No.  I didn't know.  Because I wasn't**
20 **around there.  I didn't get around there until I**
21 **got -- that morning.**
22   Q   What's Fulton's aunt's name whose house
23 you were in?
24   **A   Say that again?**

107

1    Q   What's Darrell's aunt's name?
2    **A   Linda, Linda Fulton.**
3    Q   Linda.  Okay.  And did Black tell you,
4  although he was telling you that the police had a
5  picture of you --
6    **A   He told me --**
7    Q   -- did he tell you what the police wanted
8  to talk to you about?
9    **A   Yes.  He said that they locked Dap and**
10 **Nevest up and they found the girl in Nevest's**
11 **mama's basement.**
12   Q   Anything else?
13   **A   That's it.**
14   Q   Okay.  What did he say -- like, when they
15 say they found a girl in Nevest's basement, what
16 did you understand --
17   **A   They said she was deceased.**
18   Q   He said that she was dead?
19   **A   Yes.**
20   Q   Okay.  Did he say who it was?
21   **A   No.  No.  No, he didn't say who it was.**
22   Q   Okay.  So you find this out at about 8:00
23 in the morning, right?
24   **A   Yes.**

108

1    Q   And you're saying it's about 8:00 in the
2  morning because of when you saw kids going to
3  school?
4    **A   Yes.**
5    Q   Okay.  And where did you go to school at
6  the time?
7    **A   At the time I wasn't in school.  I went**
8  **to Tilden.**
9    Q   Okay.  But you weren't in school at the
10 time?
11   **A   No, I wasn't in school.**
12   Q   Like you had dropped out?
13   **A   Yeah.  I was about 26, 27 back then.**
14   Q   Okay.  You didn't go to school like for
15 anything at the time?
16   **A   Uh-huh.**
17   Q   Did you have a job?
18   **A   Uh-huh.  Hustling.**
19   Q   Hustling?  What does that mean?  I have
20 an idea, but you've got to explain it for the
21 record, so --
22   **A   Okay.**
23   Q   -- sorry about the tediousness of the --
24   **A   I can be blunt?**

Transcript of Eddie Taylor
Conducted on March 9, 2020

28 (109 to 112)

109

1    Q   Yeah, for sure.
2    A   Selling drugs.
3    Q   Okay.  And you'd been arrested prior to
4  this murder having happened for selling drugs in
5  the past, right?
6    A   Excuse me?  Please say that --
7    Q   You had been arrested for selling drugs
8  in the past, correct?
9    A   Yes.
10   Q   Okay.  And what kind of drugs did you
11 sell then?
12   A   Cocaine.
13   Q   Anything else?
14   A   Weed.
15   Q   Anything else?
16   A   Heroin.
17   Q   Anything else?
18   A   That's it.
19   Q   PCP?
20   A   No, huh-uh.
21   Q   Why?  Why the reaction to PCP?
22   A   Because I see how -- how people out there
23 are crazy.  That stuff -- how people is crazy.
24   Q   Can you explain that to me?

110

1    A   When they smoke it, it seems like they
2  just lose their minds.
3    Q   Okay.  You've seen people smoke PCP?
4    A   Yes.
5    Q   Would that be also like a sherm stick
6  like Russell asked you about before?
7    A   Yes.
8    Q   Okay.  So that's like a cigarette --
9  maybe even a marijuana cigarette laced with PCP?
10   A   Yes.
11   Q   And you've seen people consume that?
12   A   Yes.
13   Q   And you've seen the effects that that has
14 on people?
15   A   Yes.  We'd be walking down the street.
16 They can just do it out in the day on the streets.
17   Q   Does it make people that wouldn't
18 otherwise act crazy act totally crazy?
19       MR. CURRAN:  Objection to form.
20   A   Yes.  The people that's messing with it.
21   Q   Okay.  So I've never seen anybody under
22 the influence of something like that.
23       Could you do your best to explain, based
24 on your experience -- like just paint a picture

111

1  for me like how somebody might be acting when
2  they're on PCP or having smoked a sherm stick, for
3  example?
4    A   When we be coming down the streets, I
5  stayed -- it was in the air real bad.  You can see
6  them just out there just smoking in gang ways and
7  all that.  You know what I'm saying?  You can know
8  what it is because you can smell it.
9    Q   What does it smell like?
10   A   To me like dead bodies.
11   Q   Sherm sticks smell like dead bodies?
12   A   Smell like a lot of chemicals and -- it
13 just stanks.  Especially when they put something
14 on it.
15   Q   What do you mean like put something on
16 it?  Like what?
17   A   Whatever they're doing to that stuff.
18 Whatever their doing -- excuse me my French, but I
19 don't know what they're doing to it, but they have
20 people just going crazy.  I've seen people where
21 they took off all their clothes in the grocery
22 stores, and we had to get them up out of there.
23 Stuff like that.
24   Q   Have you seen anybody get violent?

112

1    A   Yeah.
2    Q   When they're on drugs like that?
3    A   Yeah.  But they was getting violent when
4  the police try to -- what you call that?  Detain
5  them.  Because they're out there streaking.  They
6  ain't got no clothes on.  I don't know if that
7  stuff just messed them up mentally.
8    Q   Okay.  You said it smells like a dead
9  body.
10   A   It stinks.
11   Q   Have you ever smelled a dead body in your
12 life?
13   A   Yep.
14   Q   How many times?
15   A   Just once.
16   Q   When?
17   A   I was standing on 52nd and Union.  This
18 old lady passed in her house, and nobody know --
19 haven't seen her in like weeks or months.  And the
20 smell just took over the whole block.  And then
21 when they found out she was in there, they brung
22 trucks and everybody out there in the suits and
23 special spray and these cans and stuff.  You know
24 what I'm saying?  We watched them bring her body

Transcript of Eddie Taylor
Conducted on March 9, 2020

113

1  out.  It was decomposed.
2    Q    Okay.  And that was presumably before --
3    A    I was younger then.
4    Q    Yeah.
5    A    I was younger.
6    Q    Before 1994.
7    A    Yeah.  This was in the 70s.
8    Q    Okay.  That smell in the alley behind --
9  that was Coleman's house, was it similar?  Same
10  type of smell?
11      MS. MEADOR:  Is that a yes?
12    A    Yes.  Yes.  Yes.
13    Q    You smelled that, and did you think that
14  that was the smell of a dead body when you smelled
15  that smell behind his house?
16    A    When I smelt stuff, there was a lot of
17  garbage out there too that was stanking too.  It
18  was hot that day.
19    Q    It was hot in April?
20    A    Yes.
21    Q    Okay.  Well, putting aside the smell of
22  the garbage, could you smell like a smell similar
23  to the body that you had smelled in the late 70s?
24    A    Yes.

114

1    Q    Okay.  Did you tell anybody, like, hey,
2  that smells like a dead body coming from Nevest's
3  house?
4      MR. AINSWORTH:  Object to the form of the
5  question.
6    A    I didn't know where the smell was coming
7  from, but I smelt a smell, and I blurted out -- I
8  said, Man, you all smell that?
9    Q    How long before the body was discovered
10  did you make this statement?
11    A    I don't even know --
12      MR. AINSWORTH:  Objection to foundation.
13    A    I don't even know nobody was deceased or
14  nothing like that there --
15    Q    No, I got that.
16    A    You know, by me just coming around and
17  saying, What's up, y'all?  Let's play some ball or
18  whatever.  You know, you all smell that?  I'm not
19  fitting to play right here.
20    Q    Uh-huh.  So you were in the alley, maybe
21  people wanting to play basketball back there, and
22  you noticed the smell, right?
23    A    Yes.
24    Q    Do you remember who was there when you --

115

1    A    It was a whole lot of --
2    Q    Was Nevest or Darrell there?
3    A    Nevest walked up last with a case of
4  Budweiser in his hand coming from work.  Darrell
5  was coming out of his mama's house, and it was a
6  lot of them just already out there from the
7  neighborhood, little guys.  You know what I'm
8  saying.
9    Q    Okay.
10    A    They're younger than me.  So you have to
11  excuse me if I can't remember their names.
12    Q    That's fine.  Do you remember --
13    A    You know, there was at least about nine
14  of us out there.
15    Q    Okay.  Was this, like, right behind
16  Darrell's -- or Nevest's house?
17    A    No, not right behind his house.  It's
18  like -- like a couple of -- how can I put this?
19    Q    Down the alley a little bit?
20    A    Yeah, a little bit down.
21    Q    Okay.
22    A    Where we had a light -- it's a light
23  pole.  They built a basketball rim.
24    Q    Right.  So when everybody was together

116

1  and you see Nevest's got a bunch of beer with him,
2  you made a statement at that point about a smell
3  like a dead body?
4    A    Yes.  Yes.
5    Q    And do you remember exactly what you
6  said?
7    A    Nobody said nothing.
8    Q    No, do you remember exactly what you
9  said?
10    A    Do I remember --
11    Q    Exactly what you said, the comment you
12  made about the dead body to everybody or the
13  smell, I should say, to everybody.  Do you
14  remember what the comment was exactly that you
15  made?
16    A    No.  I -- I just -- that day I remember I
17  said, Do you all smell that?
18    Q    Okay.
19    A    And everybody was looking around, they're
20  smoking squares and all that.  You know what I'm
21  saying?
22    Q    What did they say?
23    A    They ain't say nothing.
24    Q    Okay.

Transcript of Eddie Taylor
Conducted on March 9, 2020

117

1    A    I don't know.
2    Q    Did you all play basketball then?
3    A    No, I didn't play.
4    Q    Okay.  Was everybody else out there to
5  play basketball, to your knowledge?
6    A    Yeah, they was out there.
7    Q    What were you doing back there, then?
8    A    Huh?
9    Q    What were you doing back there, then?
10    A    I came back there to play ball.  He
11  called me.
12    Q    That's what I was -- I thought you had
13  said no, you weren't playing basketball.
14    A    No, I didn't play.  I didn't play.
15    Q    Okay.
16    A    I didn't play ball.
17    Q    Okay.  So after -- let's go back to the
18  time when, like, Black was telling you, hey, the
19  police -- the police activity, they've got your
20  picture and are looking for you.
21    A    Yes.
22    Q    So you find this out from Black.  What do
23  you do?
24    A    I leave.  I ain't do nothing.

118

1    Q    Right.
2    A    What they looking for me for?
3    Q    Okay.  You had no idea if the police --
4  or did you know if the police wanted to talk to
5  you as if, like, you were a suspect like they
6  thought that you were involved or --
7    A    Yeah.  That's what I thought, that they
8  thought I was a suspect and involved.
9    Q    Okay.
10    A    So I didn't want no problem with no
11  police, man.  I just came home.
12    Q    Why did you think that, based on what
13  Black was telling you, that you thought that the
14  police would have thought that you were a suspect
15  or involved?
16    A    Because if they ran my background, they
17  knew I just came home for a murder.  So,
18  therefore, you think they ain't going to be
19  looking for me?
20    Q    Okay.  You knew you didn't have anything
21  to do with it.
22    A    Exactly.
23    Q    Okay.
24    A    That's why I turned myself in.

119

1    Q    Okay.  So -- yeah, and you didn't turn
2  yourself in for, like, six weeks.
3    A    I still turned myself in.  I've got a
4  conscience.
5    Q    But you agree?  But you agree with me,
6  right, you didn't turn yourself in --
7    A    I don't remember no six weeks.  I don't
8  know about that.
9    Q    Okay.  So I'm going to represent to you
10  you turned yourself in around June 5th, June 6th
11  of '94.  Okay?  Fair?  And whereas the other
12  lawyers are not objecting because they know that's
13  the date too.  Okay?
14    A    Well, I can't remember.
15    Q    So -- that's fine.  So -- and the murder
16  occurred on April 11th.  So we kind of do the
17  math, five, six weeks later, right?  Where did you
18  go?
19    A    I went out west.
20    Q    To the west side?
21    A    Uh-huh.
22    Q    Do you remember specifically where?
23    A    Building torn down.  4400 Kilborne.
24    Q    Okay.  Who was there?

120

1    A    Jackson.  My homey Perry and his girl.  I
2  was at they house.
3    Q    You were at their house?
4    A    Yes.
5    Q    What are their names?
6    A    Perry.
7    Q    Perry what?
8    A    I don't know their real names.  They --
9  I've been gone.  Just gone home again off a
10  30-year bid.  I know everybody moved.  You know
11  what I'm saying?  I don't really know them like
12  that, you know what I'm saying?  I just, you know,
13  met some peoples.
14    Q    Right.  So I'm -- you know, we got to
15  kind of dive in to some of the details here and
16  figure out, like, where -- where you went, like
17  what you can remember --
18    A    I don't remember.  I went in the house,
19  and I watched the news.  That's the first thing I
20  did.  Because I'm still -- how did you say?
21  Programmed.  I've got to watch the news.
22  Addicted.
23    Q    You talking about back in 1994 or today?
24    A    '94, the question you asked me.

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

**121**

1    Q   Okay.  Okay.  Good.  That's what I was
2   asking.  I just wanted to make sure that we're on
3   the same page.  Okay.
4        So you go out to, like, 4400 West
5   Kilborne?
6    A   Yes.
7    Q   Okay.  What neighborhood is that?
8    A   K Town.
9    Q   What does that mean?
10   A   A block where it's all Ks.  Kilborne,
11  Komont, Kolin (phonetic) -- you know what I'm
12  saying?  Keep going.
13   Q   Got it.  Yeah.  Is this GD territory?
14   A   It's everything over there.
15   Q   It's everything?
16   A   Everything.
17   Q   Okay.  Perry was this guy's name?
18   A   Yeah, Perry.
19   Q   That was a nickname or his real name?
20   A   That's his real name.
21   Q   Do you know his last name?  Is Perry
22  still alive?
23   A   I don't know.  I ain't been out west.  I
24  told you I just came home.

**122**

1    Q   I'm just asking if you know.
2        And it sounded like Perry lived with
3   somebody else, his girlfriend?
4    A   Yeah.  He stayed with his girl -- his
5   wife, as a matter of fact.  They was married.
6    Q   What's her name?
7    A   Patricia.
8    Q   Do you know if Patricia has a last name
9   that you know of?  Okay.
10       And why did you specifically go to their
11  house?  Like, so you find out that the police are
12  looking for you, and so you leave and go to 4400
13  West Kilborne.  Why that specific address?
14   A   Because I went to their house because
15  they was my friends.  You know, and at that time,
16  when I first came home and I went to my mom's
17  house, me and her -- I ain't go to high school.
18  We was beefing.  That's why I went south.  You
19  know what I'm saying?  I went south.  I didn't
20  go -- I went south because me and my moms was
21  beefing because I was locked up.
22   Q   You and your mom were beefing?
23   A   Yeah.
24   Q   Okay.  So what were you and your mom

**123**

1   beefing about?  Well, let me ask you this:
2   Explain what that means.  Like --
3    A   Me being an oldest and not setting a good
4   pace for my younger brothers and sisters.  Keep
5   getting locked up.
6    Q   Your mama is mad.  Your mama is not happy
7   with you?
8    A   Yes.
9    Q   That's what you mean?  I figured.  Again,
10  I've just got to make it clear for the record, so
11  thanks for entertaining me on that.
12       Okay.  So Perry and Patricia, I presume,
13  were not your only two friends in the world.
14   A   I had more because I ain't want to go
15  around a lot people.  You know, I was feeling --
16  you know what I'm saying?  -- like I'm about to go
17  crazy by me being caught up in this situation.
18  You know what I'm saying?  And people -- you know
19  what I'm saying?  -- put me in that -- you know,
20  because I ain't never been in nothing like that
21  before.
22   Q   Okay.  At the time Black told you the
23  police had your picture and wanted to talk to you,
24  did he tell you anything else?

**124**

1    A   No.
2    Q   Okay.  Had anybody told you -- anybody
3   from any source that you learned at that time
4   before you left, you know, that your house -- you
5   know, down the street from --
6    A   Linda's house.
7    Q   -- where the police activity was -- yeah,
8   from Linda's house.  Had you learned from any
9   source whatsoever at that point what specifically
10  anybody thought you had -- your involvement was?
11   A   Man, this is -- I'm trying to think.  No,
12  I didn't really talk to nobody.  But could I
13  rephrase something?
14   Q   Sure.
15   A   I went to Darrell's mom's house and asked
16  her what they locked him up for.
17   Q   Okay.
18   A   And, you know, me and her not seeing eye
19  to eye.  You know what I'm saying?  Because by me
20  just coming home, she feel I got him in trouble.
21  You follow me now?
22   Q   You mean just coming home from jail?
23   A   Yes.
24   Q   Okay.

Transcript of Eddie Taylor
Conducted on March 9, 2020

32 (125 to 128)

125

1    A    And we was hanging out.  She feeling, Oh,
2  he's fitting to get in some trouble.  Like I'm the
3  bad guy.
4    Q    Okay.
5    A    So she felt that way, like I just came
6  home and got him in some trouble.
7    Q    Okay.  Darrell's mom's name is?
8    A    Dorthy Fulton.
9    Q    Uh-huh.  And where did she live then?
10   A    Right there on 56th and Sangamon.
11   Q    Right.  So when did you -- in relation to
12 when you had this --
13   A    Just --
14   Q    Hang on.  Let me just ask the question
15 and then you can answer so that we're not talking
16 over each other.
17        After Black -- or in relation to when
18 Black came to Linda's house, when was this
19 conversation with Dorthy?
20   A    That's why I said I wanted to rephrase.
21   Q    Yeah, that's fine.  Just tell me when it
22 was.
23   A    I waited until the police left and went
24 over there and knocked on the door.  And I asked

126

1  her what happened.
2    Q    Okay.  So you waited --
3    A    I had to remember.  You know what I'm
4  saying?  It's been --
5    Q    That's cool.  I just want to make sure I
6  got this right.
7        So Black comes over, tells you this, and
8  you just sit tight until the police -- all the
9  police activity goes away?
10   A    Yeah, because I ain't trying to go back
11 to jail.  I just got out.
12   Q    Okay.  Well, and it's fair to say that,
13 other than them having your picture, I guess, and
14 looking for you, you had no other idea for sure
15 what the police wanted to talk to you about,
16 right?
17   A    No.
18   Q    Okay.  Correct?  I'm right?
19   A    No.  Black said, when he came upstairs,
20 that the police got definite evidence -- you know
21 what I'm saying?  -- and he had my picture -- they
22 found the girl down in his mom's basement.  You
23 feel what I'm saying?
24   Q    Yeah.

127

1    A    That's what he said.  You dig?  Because
2  he was out there -- must have been when all the
3  activity was going on when they brought the girl
4  out or something.  You feel what I'm saying?
5        So I waited until they left and went and
6  hollered at her, talked to her.
7    Q    Right.  Yeah.  So --
8    A    I'm --
9    Q    Go ahead.  Are you done?
10   A    Yeah.  I went and hollered and talked to
11 her, and that's when she thought I got Darrell in
12 some trouble by me just coming home.  Because when
13 we both was growing up, I was always, you know,
14 getting him in trouble.
15   Q    Okay.
16   A    You know what I'm saying?
17   Q    Sure.  What type of trouble would you get
18 Darrell in?
19   A    Like what?  Going to the car wash and try
20 to hustle when we're not supposed to leave the
21 front porch.
22   Q    Is that like -- when you say hustle, is
23 that selling drugs?
24   A    No, no, no.

128

1    Q    Okay.
2    A    Go try to drive some cars out on 55th at
3  the gas station.  She ain't like us to do that.
4    Q    Okay.  What other type of trouble would
5  you get Darrell in other than washing cars to make
6  money?
7    A    Sneaking out the house when we're
8  supposed to be studying, and we're out there
9  playing football -- stuff like that -- in the
10 park.
11   Q    Did you ever get arrested with Darrell?
12   A    No, never.
13   Q    Okay.  So you're telling me that, from
14 your point of view, it seemed to you that Dorthy
15 thought that you had gotten Darrell into trouble
16 for a murder based on you getting him into trouble
17 in the past for hustling and washing cars and
18 sneaking out and not doing your homework?
19        That's the -- do I got that right?
20        MR. AINSWORTH:  Objection to form.
21        Foundation.
22   A    Yes.
23   Q    Okay.  Anything else --
24   A    No.

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

129

1  Q  -- that -- okay.
2      So police activity dies down.  Are you,
3  like, looking out the window to see if they're
4  gone?  Is that how you know it died down or --
5  **A  Yes.**
6  Q  Okay.  So all police leave.  What time is
7  it, do you think, when the activity dies down?
8  **A  About 9.**
9  Q  At night?
10 **A  No.  About 9 -- well, all the kids was in**
11 **school.**
12 Q  So like an hour later?
13 **A  Yes.**
14 Q  Okay.  And then you walk over to Dorthy's
15 house?
16 **A  Yes.**
17 Q  You're by yourself?
18 **A  Yes.**
19 Q  Where's Black, if you know?  Where did
20 Black go?
21 **A  Black went to school.**
22 Q  Okay.  So after he told you what he told
23 you, he took off and went to school?
24 **A  Yes.**

---

130

1  Q  Okay.  Where did Black go to school?
2  **A  Tilden.**
3  Q  Okay.  And you go to Dorthy's house, you
4  knock on the door?
5  **A  Yeah.  I knocked on the door, and then**
6  **she came to the door and I asked her what**
7  **happened.  And she just started screaming and**
8  **hollering at me.**
9  Q  What did she say?
10 **A  Talking about, You got my son in trouble.**
11 **I told him not to be around you and this and that**
12 **and the other.**
13    **And I'm, like, What?**
14 Q  Okay.  Tell me what you -- more
15 specifically what you remember Dorthy saying?
16 **A  That was it.**
17 Q  Okay.
18 **A  She just said I got her son in trouble.**
19 **And I told her, I'm not trying to hear that.  And**
20 **I walked off.**
21 Q  Did she tell you why she thought you had
22 gotten Darrell in trouble?
23 **A  No.  She was talking about every time I**
24 **come around him I get him in trouble or us in**

---

131

1  **trouble.**
2  Q  Do you think that's true?
3  **A  Hell no.  No.**
4  Q  Okay.  And you had been released from
5  prison how long before this?
6  **A  I think I got out April 2nd or 4th --**
7  **something like that.**
8  Q  It's like two weeks before.
9      MR. CURRAN:  Objection to form.
10 Q  So this murder happened on April -- or
11 excuse me, this -- the body was found at the end
12 of April, and you were released at the beginning
13 of April?
14 **A  Yes.**
15 Q  Okay.  So a few weeks before, fair?
16     MR. AINSWORTH:  Object to the form of the
17 question.
18     MR. GRILL:  All right.  The transcript
19 will speak for itself.
20 Q  All right.  So -- and you were locked up
21 in prison for what type of crime?
22 **A  I was locked up for heroin.**
23 Q  Okay.  Anything else?
24 **A  Yeah, cocaine and pills.**

---

132

1  Q  Okay.  All right.  So what did -- did
2  Dorthy tell you what Darrell had been arrested
3  for, what her son had been arrested for?
4  **A  No.  She didn't say none of that.**
5  Q  Did you find out any --
6  **A  She was just crying and screaming and**
7  **hollering.**
8  Q  Okay.
9  **A  That's it.  That's all.  She didn't say**
10 **nothing about what the police found or whatever**
11 **was happening in the house or none of that.  She**
12 **didn't bring up none of that.  She just kept**
13 **screaming at me that I got him in trouble.  And**
14 **I'm looking at her like she's crazy.**
15 Q  What did you say to her?
16 **A  What did I say to her?**
17 Q  Yeah.
18 **A  It's a damn lie.  I didn't get nobody in**
19 **trouble.  I don't know what you all talking about.**
20 Q  Okay.  What happened next?
21 **A  I left.**
22 Q  Where did you go?
23 **A  West.**
24 Q  Why did you want to go talk to Dorthy

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

133

1  after the police activity died down?
2      MR. AINSWORTH:  Object to the form of the
3  question.
4      A  Because she's like a mother to me.  She
5  raised me too, you know?  It's just that I don't
6  know why she would think something like that, man.
7      Q  Where was Darrell living at the time?
8      A  With his mom.
9      Q  Did you ask her any questions about where
10 Darrell was the night before?
11     A  No.  I ain't ask her no questions.  It's
12 what happened.  And she just got to screaming and
13 hollering, upset -- Get out of my porch and all
14 this.  I'm -- I just left.
15     Q  And so when you asked Dorthy what
16 happened, other than her screaming and hollering,
17 what did she say about what happened?
18     MR. CURRAN:  Objection.  Asked and
19 answered.
20     A  She didn't say.  She just said, You got
21 my son in trouble.
22     Q  That's it?
23     A  That's it.  I wish you wouldn't came
24 around here and all that.

134

1      Q  Did she say got my son in trouble for
2  something specific?
3      A  No, sir.
4      Q  Just got him in trouble?
5      A  Yes.
6      Q  Okay.  So what happened -- how long was
7  this conversation with Dorthy?
8      A  It wasn't long.  Trust me, real short the
9  way she was cussing at me.
10     Q  Did she ever invite you into the house --
11     A  No.
12     Q  -- or were you outside on the porch the
13 whole time?
14     A  No.
15     Q  Outside?
16     A  Yes.
17     Q  She was, like, maybe in her doorway?
18     A  In the doorway.
19     Q  Okay.  Was she with anybody?
20     A  She was with her husband, Dwane.
21     Q  Okay.
22     A  He passed away now since I've been gone.
23     Q  Okay.  What happened next, then?  This
24 conversation is over.  Where do you go, or what do

135

1  you do next?
2      A  I went west.
3      Q  Right away?
4      A  Yes.
5      Q  Like did you stop anywhere?  Did you go
6  from Dorthy's house to 4400 West Kilborne?
7      A  Yeah, I went straight there.
8      Q  How did you get there?
9      A  Caught the L on the bus.
10     Q  Okay.  All right.  So K Town, that would
11 be outside the neighborhood, right, that Dorthy's
12 house, for example, was in, right?  It's not the
13 same neighborhood?
14     A  No.  It's Englewood.  Dorthy stayed in
15 Englewood.
16     Q  Right.  And 4400 West Kilborne is on the
17 West Side.
18     A  West Side.
19     Q  And as you describe it, K Town, right?
20     A  Uh-huh.
21     Q  Yes?
22     A  Yes.
23     Q  Okay.  So when you got over to K Town,
24 did you tell Perry and Patricia that you were

136

1  coming, or did you just show up?
2      A  I just showed up.
3      Q  Did you have any clothes with you?
4      A  Yes.
5      Q  A backpack or something?
6      A  No, I had a bag.
7      Q  What kind of bag?
8      A  A plastic bag, a plastic store bag with
9  my clothes in it.
10     Q  Just grabbed some stuff and hightailed it
11 out of there?
12     A  I went and got my stuff that I had
13 upstairs that I had bought when I came home from
14 the penitentiary.  And I changed, and I had to
15 wash it because I had no more change of clothes.
16     Q  Okay.  So did you have this bag with you
17 when you were talking with Dorthy?
18     A  Yes.
19     Q  All right.  And when you got over to
20 Perry and Patricia's house, what was their
21 demeanor when you showed up?  How did they react
22 to you being there?
23     A  They really didn't know nothing about the
24 case.  You know what I'm saying?

Transcript of Eddie Taylor
Conducted on March 9, 2020

35 (137 to 140)

137

1    Q   Did they know anything about the case?
2    A   They didn't know nothing.  I didn't say
3  nothing.
4    Q   Okay.  What did you tell them you were
5  there for?
6    A   You know what I'm saying?  Because I'm
7  still in my mind, like, What happened?  You know
8  what I'm saying?  I'm discombobulated.  That's the
9  best word I can find.
10   Q   Well, you don't know what happened,
11 right?
12   A   Exactly.
13   Q   Yeah.  So what are you so concerned
14 about?  If you don't know what happened, what are
15 you so concerned about?
16       MR. AINSWORTH:  Object to the form.
17   A   Because my name got put in something --
18 my name got put in something that I ain't have
19 nothing to do with.
20   Q   Well, how do you know that your name got
21 put into anything?
22       MR. CURRAN:  Objection.  Asked and
23 answered.
24   A   Because they was looking for me and they

138

1  had my picture.
2    Q   Well, that's it.  Do you know if your
3  name was described or mentioned as, like, somebody
4  who was responsible or just that they had your
5  picture and wanted to talk to you?
6        MR. CURRAN:  Objection.  Asked and
7  answered.
8    A   They had my picture, they wanted to talk
9  to me, and I also saw it on the news.
10   Q   What did you see on the news?
11   A   They had Darrell Fulton and -- they had
12 Darrell Fulton and Nevest Coleman on the news with
13 another face up there saying the other suspect was
14 still at large, armed and dangerous.
15   Q   Okay.  Did it have your name?
16   A   Which I knew -- huh?
17   Q   Was it you?
18   A   No.  It was -- I just -- come on, man.  I
19 put two and two together.
20   Q   I need you to do that for me.
21       MR. AINSWORTH:  Objection.
22   A   All right.  I'm thinking, well, somebody
23 said something and lied on me or something, which
24 it is true.  We're now now, right?

139

1    Q   Okay.  So you saw this news program over
2  at Perry and Patricia's house?
3    A   Yes.
4    Q   Okay.  Were they there with you when you
5  saw this?
6    A   Yes.  They weren't paying no attention to
7  the news.
8    Q   How do you know that?
9    A   Because they was in the room with each
10 other.
11   Q   Okay.  Did you ever tell them or talk to
12 them about why you were there?
13   A   No.  No, sir.
14   Q   Okay.  So you were there for maybe five
15 weeks, maybe more --
16   A   No.
17   Q   -- and you didn't talk to them?
18   A   No, I was moving around and around.
19   Q   Okay.  So -- okay.  How long are you at
20 Perry and Patricia's for, then?
21   A   Probably about a day or two.
22   Q   Where did you go next?
23   A   Couple of more -- I know where I went,
24 them hype cribs.

140

1    Q   What's that?
2    A   Where people be getting high at.
3    Q   Okay.  Were you getting high?
4    A   No, I wasn't getting high.
5    Q   Why would you go to a hype crib?
6    A   I was selling drugs.
7    Q   So you were still just now selling drugs
8  on the West Side?
9    A   Yes.
10   Q   Okay.  Were you staying at the hype crib?
11   A   I didn't have nowhere else to go.
12   Q   Okay.  Where was the hype crib at?
13   A   On Kilborne.
14   Q   And?
15   A   4400.
16   Q   So it was like right by Perry and
17 Patricia's house?
18   A   Yes.
19   Q   Okay.  Why didn't you just keep staying
20 at Perry and Patricia's?
21   A   They're married.  They got -- they need
22 their privacy.  You know, I respect that.
23   Q   How long were you at the hype crib for?
24   A   In and out.  In and out.

141

1    Q   Okay.  Did you stay anywhere else other
2  than the hype crib and Perry and Patricia's before
3  you turned yourself in?
4    A   I thought I went and seen a couple of
5  more females, you know.  You know, how you all put
6  it, on the run, you know what I'm saying?  So I'm
7  here and I'm there, you know?
8    Q   Okay.  While you were on the run?
9    A   If you want to say that.
10   Q   Those are the words you used.
11   A   Yes.  I'm trying to -- you told me clear
12 it up.  So that's it.
13   Q   Okay.
14   A   You know?
15   Q   So what led to the change of heart to
16 turn yourself in?
17   A   Because I talked to my moms.  And she
18 said, If you ain't got nothing to do with it, turn
19 yourself in.  Put it in God's hands.  That's what
20 I did.
21   Q   Why did you need your mom to tell you
22 that?
23       MR. AINSWORTH:  Object to the form of the
24 question.

142

1       MR. CURRAN:  Join.  Argumentative.
2    A   I was going to do it myself, but I still
3  wanted to talk to my mother.
4    Q   I'm sorry, I couldn't hear you over --
5    A   I said I was going to do it myself in the
6  beginning, but I still wanted to talk to my
7  mother.
8    Q   Okay.  How many times did you try to talk
9  to your mom, then, in the five or six weeks that
10 you're on the run?
11   A   I only talked to her once when I was
12 getting ready to turn myself in.
13   Q   Okay.  Did you talk to Eddie Fulton or
14 Coleman's family members in those five or six
15 weeks that you were on the run on the West Side in
16 K Town?
17   A   No.
18   Q   Okay.  You followed the case on the news,
19 yeah?
20   A   Yes.
21   Q   What do you remember about those news
22 broadcasts over those five or six weeks that you
23 were following?
24   A   I didn't watch it every day --

143

1    Q   That's fine.  What do you remember?
2    A   As long as I -- when I first saw it, I
3  knew what I needed to do then.  You know what I'm
4  saying?  I had to give myself some time to think
5  about me just coming home before I turned myself
6  in.
7    Q   What did you have to think about?
8    A   Man, that case was crazy.  I just came
9  home.  You understand what I'm saying?  I just
10 came home from the penitentiary.  You dig?  And
11 then, when you come home from the penitentiary,
12 they're looking for you for another murder, man?
13   Q   What did you have to think about, though?
14   A   What did I have to think about?
15   Q   Yeah.
16   A   My freedom, my kids, my mama.
17   Q   Did you think that you were going to get
18 locked up for this murder?
19   A   Yeah.  I mean, I got to prove myself
20 again?  I have to prove myself innocent.  I have
21 to do what I have to do.  I ain't want to be on
22 the run forever and I knew I didn't did anything.
23   Q   Right.
24   A   You know?  That's what I did.  I turned

144

1  myself in.  It don't matter, six months, seven
2  months -- I turned myself in.  Get it over with.
3    Q   Okay.  When you turned yourself in, you
4  told the police that you had an alibi, right?
5    A   No.  I ain't tell them nothing like that.
6    Q   No?
7    A   No.
8    Q   What did you tell them?
9    A   They asked me where was I that day.  I
10 told them that day I just left my girl's house.
11   Q   You know what an alibi is, right?
12   A   Yes.
13   Q   What is it?
14   A   Like a lie put together.  To me.
15   Q   I'm sorry, what?
16   A   An alibi is like when a person -- when a
17 person give a statement, give a statement.
18   Q   What kind of statement?
19   A   About where were they, what were they
20 doing.  You know what I'm saying?
21   Q   Yeah.
22   A   Stuff like that.
23   Q   Like a place maybe somebody would be that
24 would make you innocent like you couldn't have

Transcript of Eddie Taylor
Conducted on March 9, 2020

145

1  done the crime, right?
2      **A   Yeah, you could say that.**
3      Q   Okay.  So you didn't tell the police that
4  you had an alibi when you first went in?
5      **A   I can't recall, but I know they asked me**
6  **questions.**
7      Q   Okay.  Do you know where you were on the
8  night the murder happened -- well, let me ask you
9  this: Do you know -- did you know then when the
10 murder happened?  When you were talking to the
11 police, did you know like what night the police
12 thought that the murder occurred?
13     **A   I didn't follow up on none of the cases,**
14 **that stuff, until I got inside the county jail to**
15 **go to the library and to get my discovery.**
16     Q   Yeah.  That's not my question.
17         My question is did you learn, when you
18 were talking to the police -- did you know from
19 any source when they believed -- the police
20 believed the murder had happened?
21     **A   No.**
22         MR. AINSWORTH: Objection.
23         MR. CURRAN: Objection.  Form and
24 foundation.

146

1          MR. AINSWORTH: Argumentative.  Compound.
2      Q   You said before that, when you turned
3  yourself in, there was a police officer or
4  something living down the street from you?
5      **A   Yes.**
6      Q   That you turned yourself in to?
7      **A   Uh-huh.  That I talked to.**
8      Q   Oh, okay.  My apologies, but did they
9  accompany you when they turned yourself in?  Did
10 they go with you?
11     **A   Officer Noland went with me.**
12     Q   Officer Noland?
13     **A   Yeah.  Harrison and Kedzie.**
14     Q   N-O-L-A-N-D?
15     **A   Noland.**
16     Q   Okay.  How do you know this guy again?
17 Or is this the guy --
18     **A   He sent me to my first trip to the**
19 **penitentiary.**
20     Q   Okay.
21     **A   And he's the neighborhood cop that knows**
22 **everybody and everything you do.**
23     Q   And where did Officer Noland live then?
24     **A   I ain't know where he lived, but he**

147

1      patrolled our area.
2      Q   Which area is that?  In Englewood or
3  in --
4      **A   No.  Out west.**
5      Q   In K Town?
6      **A   Yes.**
7      Q   Okay.  And you knew him from the
8  penitentiary?
9      **A   No.**
10         MR. CURRAN: Objection.
11     **A   He sent me to the penitentiary.**
12     Q   He sent you to the penitentiary.  Sorry.
13         And so you called him?
14     **A   No.  He seen me on the streets and pulled**
15 **up on me and told me, Man, you know they got an**
16 **APB out for your arrest?  I said, For what?  He**
17 **said, I knew you was home already.  When I come**
18 **home from the joint, he said he seen someone home**
19 **and that's how he knew I was home.**
20     Q   Uh-huh.
21     **A   And he'd been seeing me.**
22     Q   Yeah.
23     **A   You know what I'm saying?  And he finally**
24 **hollered at me.**

148

1      Q   And when he asked you this, the APB that
2  he was referring to was for this murder that you
3  had left Englewood for?
4          MR. AINSWORTH: Objection to form.
5          MR. CURRAN: Objection.  Foundation.
6      **A   He didn't know that I was in Englewood.**
7      Q   Right.  But that's the APB that you
8  believe that you understood him to be talking
9  about, right?
10     **A   Yes.  Yes.**
11     Q   Okay.  So -- and you said, For what to
12 him?
13     **A   Uh-huh.**
14     Q   But you knew what it was for?
15         MR. CURRAN: Objection.  Argumentative.
16     **A   Basically, yes.**
17     Q   Okay.  So what did -- what happened next
18 after this conversation with Officer Noland --
19     **A   I turned myself in with him.**
20     Q   But he -- so I guess the thing that I'm
21 kind of confused about -- and I'm sorry if I'm a
22 little slow on the uptake here, but did Officer
23 Noland go with you when you turned yourself in?
24     **A   Yes.  He took me.**

Transcript of Eddie Taylor
Conducted on March 9, 2020

149

1    Q   Okay.  Anybody else go with --
2    A   No.
3    Q   Okay.  Did he like put you in the car and
4  bring you in or --
5    A   Yes.
6    Q   Right then and there?
7    A   Yes.
8    Q   Okay.  All right.  So in relation to when
9  you ran into Officer Noland, when was that
10 conversation with your mom?
11   A   Like about -- I would say the next day.
12 It was the next day.  I talked to my mom before I
13 talked to Officer Noland.
14   Q   That's what I thought.  Okay.
15       So you talked to your mom, and the next
16 day you see Officer Noland?
17   A   Yeah.  I see Officer Noland the next day.
18   Q   Okay.  So that worked out pretty well.
19 Like, you talked to your mom, and you were going
20 to turn yourself in, but then you run into Officer
21 Noland?
22   A   Yes.
23       MR. CURRAN:  Objection to form.
24   Q   Right?

150

1    A   Yes.
2    Q   Okay.  Okay.  Why did -- after you talked
3  to your mom, why didn't you just go right to the
4  police station and turn yourself in?
5    A   You know, being scared in a situation
6  like that, it ain't going to be too pretty.  Like
7  it was -- like it wasn't too pretty when I did
8  turn myself in.
9    Q   Do you know where were you at the time
10 that the murder happened?
11       MR. CURRAN:  Objection.  Foundation.
12   A   I can't recall.
13   Q   When you think back to when you were
14 interrogated by the police back in 1994 in June,
15 do you recall, thinking back to that, thinking,
16 Oh, yeah, I know where I was.  I couldn't have
17 done this murder?
18   A   Nine out of ten, I was with my baby mama.
19   Q   I know nine out of ten.  I'm talking
20 about, like -- because you testified -- when you
21 think back to that time now when you were being
22 interrogated by the police, when you think back to
23 that, do you recall knowing that you had an alibi
24 at the time?

151

1    A   No.
2    Q   You don't remember?
3    A   Because I didn't know I had a case.
4    Q   What do you mean?
5    A   I didn't thought I had no alibi.  I
6  didn't know my name was going to get drug into
7  this.
8    Q   Yeah, I know.  But you believed that your
9  name had gotten drug into it as soon as you saw
10 the police activity outside and talked to Black,
11 right?
12   A   Yeah.
13   Q   Okay.  So now we're, like, weeks later.
14 We're in June.  Okay?
15       So do you recall during that
16 interrogation with the police thinking, yeah, I
17 have an alibi.  I can --
18   A   No.  I ain't tell them I had no alibi.
19 They asked me where I was -- you know what I'm
20 saying? -- and where have I been.  I told them,
21 I've been with my baby mama.
22   Q   Okay.
23   A   Then they asked me about Darrell Fulton
24 and Nevest Coleman, do I know them.  And I told

152

1  them yeah.
2    Q   And when you -- did you -- so you did
3  tell the police that you were with your -- with
4  Latoya?
5    A   Yes.
6    Q   Okay.  And then at some point you walked
7  that back, right?
8    A   Yeah.
9        MR. AINSWORTH:  Object to the form of the
10 question.
11   A   I didn't know that -- I didn't know that
12 they was going to -- hold on.  Would you say that
13 again?  Because you're confusing me, man.  Please?
14   Q   Say what again?
15   A   What you just said.
16       MR. AINSWORTH:  The question.  Repeat the
17 question.
18       MR. GRILL:  I don't remember which part
19 because we were kind of talking at the same time,
20 so go ahead.
21       (Pending question read.)
22   Q   Did you understand the question?
23   A   Yeah.  But I'm still confused on it too.
24   Q   Okay.  So at some point --

Transcript of Eddie Taylor
Conducted on March 9, 2020

153

1      MR. AINSWORTH:  Are we back on?
2    Q   So after telling the police that you were
3  with Latoya, at some point you walked that back?
4      MR. CURRAN:  Objection.
5    Q   Do you know what I mean by that?
6    **A   No.  Okay.  Since you walked me back,**
7  **when they asked me where I was, I didn't know a**
8  **person was deceased or nothing like that.  The**
9  **only thing I knew is they found somebody.  I**
10 **didn't know the day they got killed or nothing**
11 **like that, so I can't answer that question.  You**
12 **know what I'm saying?  Or answer the question**
13 **about -- you know what I'm saying?  -- the**
14 **statement and all that.  I know that I told them.**
15 **You dig?  I ain't write no statement.  They asked**
16 **me a question, and I answered verbally.**
17   Q   Okay.  Well, you knew somebody was
18 deceased, though?
19   **A   Yeah.**
20   Q   You knew that?
21   **A   Yeah, I knew -- well, you know what I'm**
22 **saying?  From them telling me and finding out --**
23 **through my sources on the streets.**
24   Q   Well, you knew somebody was deceased the

154

1  day you saw the police activity.  Black told you,
2  right?
3    **A   Yeah.  But what does that have to do with**
4  **me?**
5    Q   Well --
6    **A   That's just like somebody put your name**
7  **in it.**
8    Q   I see what you're saying.  Okay.
9        But you knew that the police were there
10 to talk to you about the body that was found in
11 Nevest's basement, right?
12   **A   Yeah.**
13   Q   Okay.
14      MR. GRILL:  We got just a couple of
15 minutes left on the video?
16      All right.  Let's -- we'll go off, then.
17      THE VIDEOGRAPHER:  Okay.
18      MR. GRILL:  Yeah.
19      THE VIDEOGRAPHER:  We are going off the
20 video record at 12:39 p.m., and this is the end of
21 Video Media 2.
22      (A recess was taken.)
23      THE VIDEOGRAPHER:  We are back on the
24 video record at 12:55 p.m., and this is the

155

1  beginning of Video Media 3.
2  BY MR. GRILL:
3    Q   All right.  Mr. Taylor, after -- or
4  during the break, did you have any conversations
5  with any -- with either Mr. Ainsworth or
6  Mr. Curran while we were on break?
7    **A   No.**
8    Q   Okay.  All right.  So kind of jumping
9  right back in here.
10       I want to go back to when you were out in
11 K Town and you were seeing these TV reports.
12 Although you said you were following it, you were
13 seeing reports from time to time on the television
14 about the murder, right?
15   **A   Yes.**
16   Q   Okay.  And in those reports they were
17 mentioning Nevest Coleman and Darrell Fulton as
18 two people that had been arrested, correct?
19   **A   Yes.**
20   Q   And they were talking about the details
21 or at least that a woman had been murdered, right?
22   **A   Yes.**
23   Q   Do you remember what those reports had
24 said about how the woman had died?

156

1    **A   No.  They ain't get too into graphic**
2  **details or nothing.**
3    Q   Okay.  Well, what -- do you remember
4  anything or --
5    **A   Yeah.  When I seen it on the news, they**
6  **said that they found a lady in the basement of**
7  **Coleman's mother's apartment somewhere -- in the**
8  **basement.**
9    Q   Okay.  Did those reports, though -- do
10 you recall those reports saying how she died?
11   **A   No.**
12   Q   How she was killed?
13   **A   No.**
14   Q   Okay.  And you said that those reports
15 were talking about a third suspect that was still
16 at large, right?
17   **A   Yes.**
18   Q   I think you said they were saying this
19 person is armed and dangerous; is that right?
20   **A   Yes.**
21   Q   Did they put a picture up on those news
22 reports, if you recall, of who this third suspect
23 was?
24   **A   No, I didn't see it.  I didn't see the**

157

1  picture.
2      Q   Okay.  Meaning there was no picture that
3  was on the broadcast that you had seen?
4      **A   They had three pictures up.  One without**
5  **a face.**
6      Q   Okay.  Like a question mark or --
7      **A   Yes.**
8      Q   -- a black box or something --
9      **A   Yes, a black box.**
10     Q   Okay.  Did they say a name?
11     **A   No.**
12         MR. AINSWORTH:  Objection.  Asked and
13  answered.
14     Q   Did they give a description on those
15  reports on who this third suspect might be, a
16  physical description?
17     **A   No.**
18     Q   So from watching those reports, it would
19  be fair to say that you didn't know if it was you
20  that they -- who this third unidentified person
21  might be?
22     **A   Yes.**
23     Q   Okay.  In -- and we'll talk about this
24  more in a minute, but just for -- just to kind of

158

1  set the scene here for the next couple of
2  questions, at some point during the criminal
3  investigation you became aware that Darrell and
4  Nevest had both given statements that
5  identified -- that named you as being involved --
6      **A   Yes.**
7      Q   -- in this murder.  Okay.  Right?
8      **A   Yes.**
9      Q   Okay.  And you became aware of that while
10  you were at the police station?
11     **A   Yes.**
12     Q   Okay.  So let's jump up to that first
13  meeting that you had at Andre's house with Darrell
14  right after -- a few months after he got out of
15  jail.
16         Do you know the meeting I'm talking
17  about?
18     **A   Uh-huh.**
19     Q   Yes?
20     **A   Yes.**
21     Q   Okay.  And you said, I believe before,
22  that that meeting was about a half-hour long?
23     **A   Yes.**
24     Q   And it was just the three of you that

159

1  were there, right?
2      **A   Yes.**
3      Q   All right.  Had you talked -- before that
4  meeting, had you talked to Darrell at all while he
5  was in incarcerated?
6      **A   No.**
7      Q   I'm talking about in prison, not at
8  county jail.  While he was in prison.
9      **A   No, sir.**
10     Q   Okay.  So this is the first time in
11  20-something years that you'd seen him?
12     **A   Yes.**
13     Q   Did you ask him why he put you in it?
14         MR. CURRAN:  Objection.  Asked and
15  answered.  Form.
16     **A   Yes.**
17     Q   Do you know what I mean, right?
18     **A   Yes.**
19     Q   What do you think I mean?
20         MR. AINSWORTH:  Object to the form of the
21  question.
22     **A   Why did he use my name in his statement.**
23     Q   Right.  So --
24     **A   And he said he couldn't take the beating**

160

1  **no more.**
2      Q   Okay.
3      **A   That's why they did what they did, the**
4  **statement.**
5      Q   That's why he put your name in it, yes?
6      **A   Yes.**
7      Q   What kind of beating did Darrell tell you
8  he received from the police?
9          MR. AINSWORTH:  Objection to form.
10         MR. CURRAN:  Assumes facts not in
11  evidence.
12     Q   What did Darrell tell you about -- if
13  anything, about the beating that he said -- told
14  you was responsible for him naming you as
15  participating in that rape and murder?
16         MR. CURRAN:  Objection.
17     **A   I just kept asking him, Why did you use**
18  **my name.  And he was, like, I couldn't -- I**
19  **couldn't take the beatings no more.  That's all he**
20  **kept saying.**
21     Q   And you kept --
22     **A   And he was coerced -- and he was coerced**
23  **into signing a statement.**
24     Q   So you kept asking him --

Transcript of Eddie Taylor
Conducted on March 9, 2020

161

1     A   Yes.
2     Q   -- like you had to ask him over and over
3   again?
4     A   Yes.
5         MR. AINSWORTH:  Object to the form of the
6   question.
7     Q   How many times do you think you asked him
8   in this half-hour conversation why he had put
9   you -- why he named you in that statement?
10    A   I asked him about three times.
11    Q   Okay.  And the first time you asked him,
12  what answer did he give you?
13    A   He said he couldn't take the beatings no
14  more --
15    Q   Okay.
16    A   -- and don't believe that he snitched on
17  me and all that.
18    Q   Okay.
19    A   And I'm like, Man, well, how my name just
20  pop up like that, you know what I'm saying?  Ain't
21  no just -- you know what I'm saying?
22    Q   Okay.  And the second time?
23    A   And he was like -- that's when he hit me
24  with the coerced.  He said coerced.  He was

162

1   coerced.
2     Q   Coerced into naming you?
3     A   Yes.
4     Q   So you asked him a second time why?
5     A   I asked him three times.
6     Q   Why did you feel like you had to ask him
7   a second time, not the third time.  Why did you
8   have to ask the second time?
9     A   Because I wanted to know something.
10  Because, if I didn't commit no crime, why did my
11  name pop up in these people's database and they
12  have pictures of me, looking for me for a crime
13  talking about how I had something to do with it.
14    Q   Okay.  So you asked him this.  What did
15  he says the second time?
16    A   He was like he was coerced.  He kept
17  saying the same thing, he was coerced and he
18  didn't trick on it.
19    Q   Was that not a satisfactory answer to
20  you?
21        MR. CURRAN:  Objection to form.
22    A   Yes.  It's -- yes.
23    Q   Yes, it was not satisfactory?
24    A   I can say it was satisfactory.

163

1     Q   Why did you ask him a third time, then?
2     A   Because it just made me ask him.  I just
3   wanted to ask.  I looked him dead in his eyes and
4   asked.
5     Q   Asked him what?
6     A   Why did my name come up.
7     Q   What did he say the third time?
8     A   He said the same thing, I was coerced,
9   man.  I couldn't take the beatings no more, cuz.
10  I ain't no snitch.  I ain't snitched on you.
11    Q   Did you believe him?
12    A   All this time gone past now, I'd say yes.
13    Q   You'd say yes what?
14    A   That I believe him, that he said he was
15  coerced.
16    Q   After he said it the first time, did you
17  not believe him?
18    A   No.
19    Q   Why not?
20    A   Because I was still furious and upset.
21  You know, but I just prayed about the situation.
22  That's all.
23    Q   When did you pray about the situation?
24    A   The first time I got locked up.  The

164

1   first time.
2     Q   So back in 1994?
3     A   Yeah.
4     Q   Okay.  But we're in, like, the late 2000s
5   now, right?  Or 2018.
6     A   Yeah.
7     Q   Sorry.  So the second time you asked him
8   did you believe his answer that time?
9     A   Not really.
10    Q   Why not?
11    A   Because I still wanted to say more, but I
12  just said, forgive and get on now.  You know?
13  It's all behind us.
14    Q   What do you want to say more of?
15    A   Give more to the -- we beat it.  You
16  know, more into talking about that, but I feel I
17  ain't -- you know, since he just got through doing
18  all that time, you know, let's let bygones be
19  bygones.
20    Q   Third time he said it did you believe him
21  that time, then?
22    A   Yeah.
23    Q   So he said the police coerced him and
24  beat him?

Transcript of Eddie Taylor
Conducted on March 9, 2020

165

1    A   Yes.
2    Q   How did he tell you that they coerced
3   him?
4        MR. CURRAN:  Objection.  Asked and
5   answered.
6        MR. GRILL:  I'll rephrase the question.
7    Q   What did he tell you the police did to
8   him specifically to coerce him?
9        MR. CURRAN:  Objection.  Asked and
10  answered.
11   A   He just said that he couldn't take the
12  beatings no more.
13   Q   Okay.  And did he tell you, then, that he
14  then gave them your name?
15   A   No.  He didn't really say he gave them
16  the name, but when he said statement and
17  coerced -- you know what I'm saying?  -- somebody
18  had to give something up, you know?
19   Q   So he gave you up?
20       MR. CURRAN:  Objection to the form.
21  Argumentative.
22   Q   Right?  I mean, that -- your name was in
23  it?
24   A   Yes.

166

1        MR. CURRAN:  Objection.  Assumes facts
2   not in evidence.
3    Q   Right?
4    A   He used my name, yes.
5    Q   Darrell used your name?
6        MR. CURRAN:  Objection.  Foundation.
7    Q   Were you angry with him in this first
8   meeting with Darrell?
9    A   Yeah.  I was a little heated, but I -- I
10  maintained.
11   Q   What helped you maintain?
12   A   Being upset ain't going to -- ain't going
13  to really give me no satisfactory or nothing.
14   Q   What do you do for a living now?
15   A   I do off-and-on jobs.
16   Q   What kind of jobs are those?
17   A   Maintenance, drywall -- I do all kind of
18  house --
19   Q   Do you work for somebody, or do you work
20  for yourself?
21   A   No.  I work with people -- time to time,
22  job to jobs, house to house -- whenever they need
23  some help on the house.
24   Q   Is it like a company that you work for?

167

1    A   No.  Just -- you know, just neighborhood
2   stuff.
3    Q   Okay.  Do you collect any type of public
4   aid or assistance?
5    A   Yes.
6    Q   Okay.  What type?
7    A   Public aid.
8    Q   Okay.  Which type?  Like, there's a bunch
9   of different types.
10   A   Stamps.
11   Q   Okay.  Food stamps?
12   A   Yes.
13   Q   What else?
14   A   That's it.
15   Q   Okay.  How long have you been on that
16  for?
17   A   Since I came home.  I'm off and on
18  because I had jobs off and on.  So when you get a
19  job, you've got to go get that canceled.
20   Q   Okay.  Did Darrell tell you any details
21  in that conversation with -- at Andre's house what
22  the police -- what type of beating the police, you
23  know, I guess, perpetrated on him?
24       MR. CURRAN:  Objection.  Asked and

168

1   answered.
2    A   No.
3    Q   You didn't say anything about it?
4    A   No.
5        MR. CURRAN:  Objection.  Asked and
6   answered.
7    Q   Did you ask him?
8    A   No.
9    Q   Were you curious to know how bad of a
10  beating he got that led him to name you as --
11       MR. CURRAN:  Objection.  Assumes facts
12  not in evidence.
13   Q   -- somebody who was involved in this?
14   A   No.
15   Q   No?
16   A   Say the question again?  Because I'm
17  spacing out with this --
18   Q   Do you need a break?  We can take a long
19  break if you're getting tired.
20   A   No I'm -- come with the question again.
21   Q   I've got a lot of questions left --
22   A   All right.
23   Q   -- so do you need a break?
24   A   No, I'm okay.

Transcript of Eddie Taylor
Conducted on March 9, 2020

43 (169 to 172)

169

1    Q   You're good?

**2    A   Yes.**

3    Q   Okay.  So my question --

4        MR. AINSWORTH:  Can you read the question

5    back?

6        (The Reporter read the record as follows:

7    Were you curious to know how bad of a beating he

8    got that led him to name you as somebody who was

9    involved in this?)

10       MR. GRILL:  I'll just ask the question

11   again.  You ready?

12       MR. CURRAN:  And I could interject.

13   Mr. Taylor, if you could just pause for a second

14   so I could state an objection, if I have one,

15   before your answer.  That would be helpful.

16       THE WITNESS:  Yes.

17       MR. CURRAN:  Thank you, sir.

18   Q   Okay.  So I think what I asked you was

19   were you interested in knowing what type of

20   beating or how severe of a beating Darrell

21   received that caused him to name you to give a

22   statement against you?

**23   A   No.**

24       MR. CURRAN:  Objection to form.

170

1        Go ahead.

**2    A   No.  We didn't really get into details**

**3    like that.  He just said the little short**

**4    statement he said, and that was it.  And then we**

**5    just, you know, conversated about being free.**

**6    That's all.**

7    Q   Okay.  Were you interested in knowing the

8    details of that?

**9    A   About as -- by me being through all that**

**10   pain and suffering already, I just said -- I just**

**11   left it behind, you know?  I'm not really trying**

**12   to dig up no old past.  None of that.  I'm just**

**13   glad I beat that case, man, because it was bogus.**

14   Q   You would agree that having been named

15   back in 1994 in the statements that Darrell and

16   Nevest gave as a third suspect, that that was,

17   since then, a pretty stressful thing for you

18   personally that happened.

19       Would that be fair?

**20   A   Yes.**

21       MR. CURRAN:  Objection to the form of the

22   question.

23   Q   It caused you a lot of anxiety over the

24   years, correct?

171

**1    A   Yes.**

2    Q   As you've described, people have, at

3    different times, popped up on you and wanted to

4    talk to you about this, correct?

**5    A   Yes.**

6    Q   And this isn't something that you enjoy

7    talking about, correct?

**8    A   I do not enjoy, no.**

9    Q   It's something -- to use your words, it's

10   something you want to leave behind you, right?

**11   A   Yes.**

12   Q   Okay.  Would -- and in your case, you

13   testified today that you were beaten by the police

14   as well in relation to this criminal

15   investigation, right?

**16   A   Yes.**

17   Q   And you described today that you were

18   beaten repeatedly, correct?

**19   A   Yes.**

20       MR. AINSWORTH:  Object to the form of the

21   question.

22   Q   With closed fists, correct?

**23   A   Yes.**

24   Q   While your left hand was handcuffed to a

172

1    table in an interrogation room at the police

2    headquarters, right?

**3    A   Yes.**

4    Q   And that was in relation, according to

5    your testimony, to the detectives' desire to get

6    you to confess to having been involved in raping

7    and killing Antwinica Bridgeman, right?

**8    A   Yes.**

9    Q   And how many times did they punch you?

**10   A   Repeatedly.**

11   Q   Like two times?  Ten times?  Fifty times?

12   If you can ballpark it for me.

**13   A   They whipped my butt.**

14   Q   Describe it for me, please.

**15   A   They just -- like, they just took their**

**16   anger out on me.  You know?**

17   Q   Okay.  How many times did they hit you in

18   the face?  Let's just start with that.

**19   A   I can't tell you.  I was just trying to**

**20   cover up.**

21   Q   How do you mean?  Describe what you were

22   doing to cover up?

**23   A   Like this.**

24   Q   Okay.  So what parts of your head were

Transcript of Eddie Taylor
Conducted on March 9, 2020

44 (173 to 176)

173

1  their fists actually coming in contact with?
2  **A  The right hand and left in the back of my**
3  **head, my neck, ribs --**
4  Q  Cheeks?
5  **A  Yes.**
6  Q  What about the front of your face?
7  **A  They got that too.**
8  Q  How did they get there if you were
9  covering up?  How did they get there?
10  **A  They pulled me away.**
11  Q  Okay.  Punched you.  Gave you two black
12  eyes?
13  **A  Yeah.**
14  Q  Were you bleeding?
15  **A  I wasn't bleeding, but I was like split,**
16  **lips split.**
17  Q  Okay.  But you got hit hard enough to
18  give you two black eyes?
19  **A  Yep.**
20  Q  Okay.  Knock any teeth out?
21  **A  No, no teeth.**
22  Q  So you think you were punched with closed
23  fists more than ten times?
24  **A  But this one is loose.**

174

1  Q  Still?
2  **A  Yeah.**
3  Q  From that?
4  **A  Yes.**
5  Q  Okay.  And did they kick you?
6  **A  No.**
7  Q  Okay.  And so just punches?
8  **A  Yes.**
9  Q  In your face only and your head?
10  **A  All over my upper body.**
11  Q  Okay.  So let's move down -- okay.  So
12  where else in your body did they punch you?
13  **A  In my face, my head, my neck, my ribs --**
14  **whenever they can up top.**
15  Q  Okay.  And how long did this beating go
16  on for?
17  **A  I couldn't even tell you.  I'm just glad**
18  **it's over with.**
19  Q  Well, think back -- I mean, this is
20  something -- had you ever been beaten by the
21  police before like this?
22  **A  No.**
23  Q  Okay.  So this is something that
24  definitely, I would think, stands out in your

175

1  memory?
2  MR. AINSWORTH:  Object to the form of the
3  question.
4  Q  Like you would remember this, right?
5  MR. CURRAN:  Objection.  Argumentative.
6  **A  Yeah.**
7  Q  Do you remember it real -- like, is it
8  pretty clear in your memory, getting beaten like
9  you've described by the police?
10  MR. AINSWORTH:  Objection to the form of
11  the question.
12  **A  It's a whooping you had never had before**
13  **with a case like that.  Trust me.**
14  Q  You're never going to forget it, right?
15  MR. CURRAN:  Objection.  Argumentative.
16  **A  No.**
17  Q  Okay.  So how long did the beating go on
18  for?
19  MR. AINSWORTH:  Objection.  Asked and
20  answered.
21  MR. CURRAN:  Join.
22  **A  I really can't give you no time.  When a**
23  **person is whooping you and taking their**
24  **frustration out on you and you're handcuffed,**

176

1  **there's nothing you can do but accept it.**
2  Q  Was it for five minutes?
3  **A  I really can't tell you.**
4  Q  Did it -- did the beating -- was it all
5  delivered at one time, or did it -- was it
6  delivered over multiple --
7  **A  No.  It was shift changing.**
8  Q  Okay.  How many police officers,
9  detectives -- you know, people that you thought
10  were police officers were --
11  **A  It was two of them --**
12  Q  -- hang on -- were involved in hitting
13  you?
14  MR. AINSWORTH:  Objection.  Foundation.
15  **A  I'd say five.**
16  Q  Okay.  And all five of them physically
17  punched you at one time or another?
18  **A  Yes.**
19  Q  Okay.
20  **A  Not all at one time.**
21  Q  No, no.  I didn't think so, but like
22  total five different police officers punched you?
23  **A  Yes.**
24  Q  Okay.  What -- did you recognize any of

Transcript of Eddie Taylor
Conducted on March 9, 2020

45 (177 to 180)

---

177

1 these police officers?
2    A  No.  And I don't want to see them again
3 neither.
4    Q  Okay.  Would you recognize them today?
5    A  Man, it's been so long.
6    Q  I'm presuming you're thinking -- you're
7 thinking about it.  Oh, you were waiting for me to
8 ask another question?
9    A  Yes.
10    Q  Sorry.
11       MR. GRILL:  Can you read the question
12 back?
13    Q  I thought you were thinking about the
14 question.
15       (The Reporter read the record as follows:
16 Would you recognize them today?)
17    Q  That was the question.
18    A  No, I wouldn't.
19    Q  Okay.  Of these five officers, were they
20 men or women or a combination of them?
21    A  All men.
22    Q  White guys or black guys?
23    A  White guys.
24    Q  Can you describe -- offer any

---

178

1 descriptions of any of them?  Well, let me ask you
2 this -- I'll withdraw the question.
3       Of these five people, do you recall
4 whether one of them was, like, taking the lead in
5 beating you, or was it kind of equally spread
6 across all five or something?
7    A  Equal -- it was equally spread every time
8 they came in at different times.
9    Q  Okay.  And how -- the most number of
10 officers that were beating you that were in the
11 room at the same time was one number?
12    A  Not at the same time.  At the county,
13 yeah, it was 13 of them --
14    Q  No.  That's sheriff's department.  I'm
15 talking about Chicago police officers beating you
16 when you're handcuffed to the table by your --
17    A  You had the first two that came, and then
18 on second shift, you had the other three.
19    Q  Okay.
20    A  And then the lady came in there with a
21 yellow tablet, told me she was the state's
22 attorney.
23    Q  A female state's attorney came to talk to
24 you with a yellow pad of paper, yes?

---

179

1    A  Yes.
2    Q  How do you know she was a state's
3 attorney?
4    A  She said she was the state's attorney.
5    Q  Do you remember her name?
6    A  Huh-uh.
7    Q  Okay.
8       MS. MEADOR:  Is that a no?
9    Q  That's a no?
10    A  No.
11    Q  Okay.  So back to the beating.  The two
12 police officers that came in and beat you the
13 first time before the shift change, what did these
14 guys look like?
15       MR. CURRAN:  Objection to foundation.
16    A  I really can't recall.  It's been so
17 long.
18    Q  What were they dressed in?
19       MR. CURRAN:  Objection.  Foundation.
20    A  They didn't have on uniforms.
21    Q  Okay.
22    A  They were like undercovers or something.
23    Q  Why do you say that?
24    A  Because they had on regular clothes.

---

180

1    Q  Okay.  What else do you remember about
2 how they looked -- or how they were dressed?
3    A  That's about it.
4    Q  Was -- what color hair did they have?
5       MR. CURRAN:  Objection.  Foundation.
6    Q  Either one of them.
7    A  I really couldn't tell you.  I can't --
8 because it's been so long.
9    Q  Did they have facial hair, either of
10 them?
11       MR. CURRAN:  Objection.  Foundation.
12    A  I can't recall.
13    Q  Did either of them wear glasses?
14       MR. CURRAN:  Same objection.
15    A  I still can't recall.
16    Q  Did they have gray hair, either of them?
17       MR. CURRAN:  Same objection.
18       MR. GRILL:  I'll just give you a
19 continuing objection; although, I don't understand
20 what the foundation problem is but --
21       MR. CURRAN:  He hasn't testified that he
22 remembers their description.
23       MR. GRILL:  Well, he does recall some
24 things, but we'll see.  So you can have a

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

181

1 continuing objection.
2      MR. CURRAN: Well, you can continue to
3 beat the dead horse, if you'd like. I appreciate
4 your offer to allow me to have a standing
5 objection.
6      MR. GRILL: I take -- I'm sure that was
7 an accident that you used that particular
8 language, right?
9      MR. CURRAN: No, it's not. Keep going.
10      MR. GRILL: Okay. Are you suggesting --
11      MR. CURRAN: Do we need to have the
12 witness step out?
13      MR. GRILL: Yeah. Let's have the witness
14 step out for a second.
15   Q   Would you just step out in the hallway,
16 please?
17      THE REPORTER: Would you like to go off
18 record?
19      MR. GRILL: No, we'll stay on record.
20      THE REPORTER: Okay.
21      MR. GRILL: So I had asked you that I
22 presume that was a mistake that you said that; but
23 I really got to believe, Nick, that, putting
24 whatever you believe -- whenever your objections

182

1 were proper or not aside, that you are not at all
2 drawing any comparison between a valid deposition
3 to a rape and -- or excuse me, to the brutal
4 beating that he's described --
5      MR. CURRAN: Andrew, that's -- obviously
6 that's not --
7      MR. GRILL: You just said -- you just
8 said, You can beat a dead horse, and in light of
9 the --
10      MR. CURRAN: I'm talking about the
11 question that you're asking.
12      MR. GRILL: Nick, the language, though.
13 The choice of language --
14      MR. CURRAN: Andrew, get off it.
15      MR. GRILL: No, no, no, no.
16      MR. CURRAN: No, get off it.
17      MR. GRILL: I asked you to clarify it,
18 and you --
19      MR. CURRAN: Andrew, don't go down this
20 road. You know that's not what I meant.
21      MR. GRILL: Nick, I gave you an
22 opportunity to clarify.
23      MR. CURRAN: You know that's not what I
24 meant, Andrew.

183

1      MR. GRILL: Well, then why did you tell
2 me no, that was not an accidental choice of words?
3      MR. CURRAN: Because the witness has told
4 you he doesn't remember what any of these
5 detectives look like --
6      MR. GRILL: I get that. Nick, that's
7 not --
8      MR. CURRAN: -- and so now you're just
9 asking him (inaudible) questions about their
10 appearance.
11      MR. GRILL: Nick, that's not --
12      MR. CURRAN: It's a waste of time.
13      MR. GRILL: That's not --
14      MR. CURRAN: That was the point of my
15 objection.
16      MR. GRILL: Okay. Are you done?
17      MR. CURRAN: Yeah. Are you done?
18      MR. GRILL: Okay. That's not my point.
19 My qualm with you right now is your particular
20 choice of language. And I actually do take
21 offense to that.
22      MR. CURRAN: That's fine. That's fine.
23 What are you going to do about it?
24      MR. GRILL: So I'm giving you the

184

1 chance --
2      MR. CURRAN: What are you going to do
3 about it?
4      MR. GRILL: What are you daring me to go
5 outside, Nick?
6      MR. CURRAN: No. What are you going to
7 do about it?
8      MR. GRILL: I'm asking you to --
9      MR. CURRAN: Are you going to file a
10 motion?
11      MR. GRILL: I'm asking you as a
12 professional to apologize to say that was a
13 mistake in choice of language.
14      MR. CURRAN: Who am I apologizing to?
15      MR. GRILL: Me.
16      MR. CURRAN: I'm not going to apologize
17 to you, Andrew. Go ahead. Continue to ask your
18 questions.
19      MR. GRILL: Wow. That's really, really
20 low, Nick. And I --
21      MR. CURRAN: That's fine.
22      MR. GRILL: That's really low.
23      MR. CURRAN: That's fine.
24      MR. GRILL: We'll have the witness come

Transcript of Eddie Taylor
Conducted on March 9, 2020

185

1  back in.  I'm really surprised.  That says quite a
2  bit about you, Nick.
3       MR. CURRAN:  That's fine.
4       MR. GRILL:  For the record, I would never
5  do that to you.
6       MR. CURRAN:  That's fine.
7  BY MR. GRILL:
8       Q   All right, sir.  These first two officers
9  that came in, do you -- can you tell me if you
10  recall what approximate age either of them may
11  have been?
12       MR. AINSWORTH:  Same objection.
13       A   Excuse me?  I --
14       Q   What approximate age you think they may
15  have been.
16       A   It was younger guys.
17       Q   Younger guys?  What about them made you
18  think that they were younger?
19       A   Well, they was older, but they looked
20  younger to me when I was younger.
21       Q   Okay.
22       A   They looked like older guys to me, but
23  they was young.  You know that middle -- I'd say
24  30s and 40s.

186

1       Q   Okay.  How long did they beat you for,
2  those two guys?
3       A   Till they tried to get me to sign their
4  statement.
5       Q   Oh, so they -- these guys had a
6  statement -- strike that question.
7       Did you present you with a statement?
8       A   Yes.
9       Q   A written statement?
10       A   Yes.
11       Q   Okay.  Had you talked to them at all at
12  that point about what you recalled you were doing,
13  or had you given a statement to them?
14       A   No.  They was asking me questions and
15  showing me the pictures of the girl.
16       Q   Okay.  And was this a statement that they
17  wrote out in front of you?
18       A   No.  They didn't write it in front of me.
19       Q   Okay.  They just presented you with a
20  statement?
21       A   Yes.
22       Q   Did you look at it?
23       A   They wouldn't let me look at it long
24  enough.

187

1       Q   Tell me what you mean by that.
2       A   When they put it down and I wouldn't
3  sign, that's when one of them slapped me upside
4  the head because I wouldn't sign.
5       Q   Okay.  So they were asking you to sign
6  it?
7       A   Yes.
8       Q   And how many pages was the statement, or
9  was it just one page?
10       A   No.  It was more than one page.
11       Q   Was it front and back?
12       A   I can't tell you if it was front and
13  back.
14       Q   Was there writing on both sides of the
15  pages?  No?
16       A   I couldn't see.  They didn't really open
17  it up.  They just had it folded like that.
18       Q   Okay.  Did you make any markings of any
19  sort on that statement?
20       A   No, sir.
21       Q   Okay.  And you never read it?
22       A   No, sir.
23       Q   Did anybody read it to you?
24       A   No, sir.

188

1       Q   Do you know what was in the statement?
2       A   No, sir.
3       Q   So how do you know it was a statement?
4       A   Because they tried to get me to sign it.
5       Q   Well, how do you know it was a
6  statement -- how do you know what it was that you
7  were signing?
8       A   I wouldn't start signing nothing without
9  a lawyer present.
10       Q   Okay.  Well, how do you know that it was
11  a statement that they were asking you to sign?  If
12  you didn't read --
13       A   They said -- they said themselves that
14  Coleman that -- they said that Coleman and Fulton
15  signed this statement on me.  They made
16  statements.
17       Q   I got that part.  I'm talking about the
18  piece of paper or papers that they put in front of
19  you that they wanted you to sign.
20       A   It must have been -- they faxed -- or
21  what they said on paper to put me in it and wanted
22  me to sign it and agree upon it.  So I wasn't
23  going to sign it.
24       Q   Got it.  How did you know that the piece

Transcript of Eddie Taylor
Conducted on March 9, 2020

189

1 of paper that they wanted you to sign was a
2 statement?
3    **A    Because I know law.**
4    Q    What do you mean by that?
5    **A    Well, I ain't going to sign nothing.  I**
6 **know I got the right to remain silent.**
7    Q    My question still is how did you know it
8 was a statement?  If you didn't read it, they
9 wouldn't let you read it --
10    **A    They told me it was a statement.**
11    Q    Oh.  What did they tell you about it?
12    **A    They didn't tell me nothing about it.**
13 **They said Nevest -- they said Nevest and**
14 **Coleman --**
15    Q    Gave a statement --
16    **A    -- gave us a statement.**
17    Q    Got that.
18    **A    You know what I'm saying?  And then they**
19 **was trying to get me to sign.**
20    Q    Still talking about how you knew the
21 piece of paper, though, was a statement?
22    **A    It had to be something.  They weren't**
23 **going to let me free.**
24    Q    Was it their -- did they tell you it was,

190

1 like, their statement that they put in front of
2 you?
3    **A    No.  They said it was Darrell and**
4 **Coleman's.**
5    Q    So what they're showing you as a
6 statement was Darrell -- was to your knowledge --
7 or you believed it was either Darrell or Nevest's
8 statement?
9    **A    To tell you the truth, whatever they had**
10 **in front of me -- and they said they had**
11 **statements.  They wanted me to sign that and agree**
12 **to it.  I wasn't going to do it.**
13    Q    Okay.  So did you see any -- this was
14 handwriting, this statement?
15    **A    Yes.**
16    Q    Okay.
17    **A    It wasn't handwritten.  It was, like,**
18 **printed up.**
19    Q    Oh, okay.  And they wanted you to sign
20 it?
21    **A    Yes.**
22    Q    Did they tell you why they wanted you to
23 sign it?
24    **A    No.  But I knew why they wanted me to**

191

1 **sign it.**
2    Q    And you knew that they wanted you to sign
3 it?
4    **A    They tried to get me to sign it.**
5    Q    Okay.  How did they try to get you to
6 sign it?
7    **A    They whooped my ass.**
8    Q    Okay.  Were they telling you to sign it?
9    **A    Yeah, I wasn't signing nothing.**
10    Q    Did they say -- what were they saying to
11 you that made you believe that?
12    **A    They kept putting the pictures --**
13    Q    Okay.
14    **A    -- and all that stuff in front of me.**
15    Q    What kind of pictures?
16    **A    The pictures of the deceased person.**
17    Q    What did the pictures look like?
18    A    Gruesome.
19    Q    Why?
20    **A    Why?**
21    Q    Yeah, what was gruesome about them?
22    **A    It's the way they showed the girl**
23 **being -- looking like that.**
24    Q    What did she look like?  Tell me what the

192

1 pictures looked like.
2    **A    She was -- it was ugly, man.  I don't**
3 **want to talk about that.**
4    Q    Well, I need you to talk -- and if you
5 need a break to kind of collect your thoughts, you
6 can, but I need you to tell me what the pictures
7 looked like.
8    **A    Something you ain't want to see.**
9    Q    Oh, I've seen them, if we're talking
10 about the same pictures, but I want to know the
11 pictures that they showed you; so I'd ask you to
12 describe them for me.
13    **A    All right, man.  They showed me the**
14 **pictures.  It was like a girl was laying down**
15 **somewhere --**
16    Q    Okay.  Somewhere where?
17    **A    -- and her clothes and stuff was halfway**
18 **off.**
19    MR. CURRAN:  Objection.  Foundation.
20    **A    And that's -- it was gruesome.**
21    Q    Where did it appear this body was laying?
22    MR. CURRAN:  Objection.  Form.
23    **A    Where it appears on that picture.**
24 **Wherever they took it at.**

Transcript of Eddie Taylor
Conducted on March 9, 2020

49 (193 to 196)

193

1    Q   Okay.  What perspective -- how many
2  pictures did they show you, if you can remember
3  how many?
4    A   They showed me two of them.
5    Q   Two of them.  Okay.  From what
6  perspective were the pictures taken?  Was it of
7  the victim's face?  Was it of the whole body?  Was
8  it something else?
9    A   No.  It was of the whole body.
10   Q   Okay.  Okay.  And what did they ask you
11 about these pictures?  Did they say anything to
12 you about these pictures?
13   A   Yeah, they was upset.
14   Q   How do you know they were upset?
15   A   Because they whooped my ass and tried to
16 make me sign that paper.
17   Q   Okay.  So the paper was the typed --
18 something that was typed up, right?
19   A   Yes.
20   Q   Okay.  By like a typewriter or something
21 or a computer?
22   A   It looked typed up to me.
23   Q   Okay.  Do you remember how many -- and
24 you don't remember how many pages it was?

194

1    A   No, sir.
2    Q   Okay.  Did they say that it was your
3  statement that they wanted you to sign, or was it
4  somebody else's statement?
5    A   No, they didn't say that.
6    Q   Okay.  So this is all going on with these
7  first two guys that came in, right?
8    A   Yes.
9    Q   How long do you think that you were with
10 these two guys?
11   A   Until they got tired of knocking me
12 around and trying to get me to sign the statement.
13   Q   Did you get the black eyes from this
14 beating with these two guys, or was it a different
15 beating?
16      MR. CURRAN:  Objection.  Foundation.
17   A   I got whooped from both parties.
18   Q   Okay.
19   A   Transfer to transfer from 51st to the
20 county jail.
21   Q   So I'm talking about the black eyes.
22      So you said the police whooped you to a
23 degree and that gave you two black eyes, right?
24   A   Yes.

195

1    Q   And I'm talking about not at the jail,
2  I'm talking about while you were at headquarters
3  getting interrogated.
4    A   Yes.
5    Q   Right?
6    A   Yes.
7    Q   So was it the beating from these first
8  two guys that gave you the black eyes, or was
9  it --
10   A   The first two.
11   Q   The first two guys came in and whooped
12 you bad enough to give you two black eyes, right?
13 Correct?
14   A   Yes.
15   Q   Okay.  Did you call out for help during
16 this beating?
17   A   Yeah, yeah.  I was screaming.  Trying to
18 cover up too.
19   Q   Okay.  How loud were you screaming?
20   A   From my lungs, the top of my lungs.
21   Q   As loud as you could scream?
22   A   Yeah.  They had me in that room.
23   Q   Okay.  And you were bleeding from your
24 mouth -- or you split your lip?

196

1    A   Yeah.  They split my lip.
2    Q   Were you bleeding from anywhere else?
3    A   No.
4    Q   When did the beating end?
5    A   When they got tired.
6    Q   How do you know --
7    A   I can't give you no certain time.  You
8  know what I'm saying?  I'm just glad it was over
9  with.
10   Q   How do you know they got tired?
11   A   Shit, they got done whooping on me.  They
12 must have been tired.
13   Q   Okay.
14   A   They saw I wasn't going to break and sign
15 that statement.
16   Q   Okay.  All right.  So these two
17 officers -- you won't sign the statement, they get
18 tired, they leave.
19      Are you alone in the room, then, at that
20 point?
21   A   Yeah.  Shift change.  They came back in
22 there again, three more.
23   Q   And you're still handcuffed by your left
24 hand, right?

Transcript of Eddie Taylor
Conducted on March 9, 2020

50 (197 to 200)

197

1    A   Yes, I am.
2    Q   Okay.  And how long are you alone in the
3  room until the next, I guess, three officers come
4  in?
5    A   Whatever time their shift changed.  They
6  came in there when the shift changed with
7  different officers.
8    Q   How do you know it was a shift change?
9    A   Because I seen different peoples when I
10  was leaving.  It wasn't the same people when we
11  come through past the desk.
12    Q   Yeah.  But I'm thinking like a shift
13  change is something specific.
14        Like, how do you know it was a shift
15  change?  Or do you know?
16        MR. AINSWORTH:  Object on the form.
17    A   It was shift changing.
18    Q   Why do you say that?
19    A   Because I seen different officers
20  coming -- looking all up at the door and stuff and
21  trying to see who I am too.  They was coming and
22  going.
23    Q   Are you saying this because this is --
24  you've had -- you have enough experience with the

198

1  police to know that this is a shift change, or are
2  you guessing?
3        MR. CURRAN:  Objection.
4        MR. AINSWORTH:  Object to the form of the
5  question.
6    A   Shift change.  I was there long enough.
7    Q   Okay.  You were there that day long
8  enough?
9    A   Yeah.
10    Q   Okay.  Have you ever been in a police
11  headquarters in an interrogation room in that
12  building before this incident?
13    A   Say that again?
14    Q   So you're at police headquarters, right?
15    A   Yeah.
16    Q   At 51st and Wentworth, right?
17    A   Uh-huh.
18    Q   And you're in an interrogation room in
19  the building, right?
20    A   Uh-huh.
21    Q   At a table --
22        MS. MEADOR:  Say yes or no.
23    Q   Yes?  Yes or no?
24    A   Yes.

199

1    Q   Thanks.  And you're handcuffed with your
2  left hand to a table in this interrogation room,
3  right?
4    A   Yes.
5    Q   Had you ever been in any of the
6  interrogation rooms at 51st and Wentworth prior to
7  this incident that we're talking about?
8    A   No, sir.
9    Q   First time that you were ever there?
10    A   Yes, sir.  The first time I was there for
11  that case.
12    Q   I know.  I'm not talking about for this
13  case.
14    A   Well, I've been through 51st and
15  Wentworth all my life since I was a shorty, when
16  I'm 17.
17    Q   Okay.  How many times do you think you've
18  been -- prior to this case, how many times do you
19  think you've been in 51st and Wentworth all your
20  life?
21    A   About three times.
22    Q   Okay.  So you knew what it looked like on
23  the inside, right?
24    A   No.  They ain't taking me -- you go to

200

1  somewhere different when you're a juvenile --
2    Q   Okay.
3    A   -- and that's when I was going through
4  that.  You go to the first floor, you don't go on
5  the second floor.
6    Q   Okay.  You've been interrogated, though,
7  even as a juvenile at 51st and Wentworth for a
8  crime?
9    A   No.
10    Q   Never?
11    A   No.
12    Q   Just been in the lockup there?
13    A   Yes.
14    Q   No other part of the building?
15    A   No other part of the building.  Just
16  lockup.
17    Q   Okay.  You ever been in an interrogation
18  room in any other police station in Chicago --
19    A   No, sir.
20    Q   -- prior to this incident?
21    A   No, sir.
22    Q   Okay.  All right.  So how long are you
23  alone in the room for before the next three
24  officers come in?

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

201

1    A   I really can't recall that time because I
2   was just trying to get somebody to believe me and
3   get me up out of here.  That's all.  That's all.
4    Q   Okay.
5    A   And still wondering in my mind how is
6   somebody going to use my name in something like
7   this.  That's all that was running through my
8   mind.
9    Q   And it was -- these first two officers
10  that -- before the shift change -- sorry, I want
11  to circle back real quick.
12       These first two officers that you spoke
13  with that beat you in the way that you've
14  described, you told them that -- during that that
15  you were at Latoya's?
16       MR. CURRAN:  Objection.  Mischaracterizes
17  his testimony.
18    A   When they asked me where I was, I told
19  them -- they asked me where I've been, do I got an
20  alibi.  I told them, I'm so discombobulated the
21  only thing I'm thinking about is telling -- yeah,
22  I know to tell them the truth, with my girl, and I
23  left.
24    Q   Yeah.  So you did tell them that you were

202

1   at Latoya's?
2        MR. CURRAN:  Objection.  Mischaracterizes
3   his testimony.
4    A   Yes.  I was -- man.
5    Q   All right.  Did you tell them -- did you
6   tell -- do you recall whether the police asked you
7   any questions about what your position in the
8   Gangster Disciples was?
9    A   Yeah.  They asked me that.
10   Q   What did you tell them?
11    A   I told them I ain't got no position.
12   Q   You told them what you told me today,
13  that you were like a --
14    A   Yes.
15   Q   -- soldier or a security guy?
16    A   No, not security guy, foot soldier.
17       MR. CURRAN:  Objection.  Misstates his
18  testimony.
19   Q   Foot soldier?  What's a security worker
20  do for the GDs?
21       MR. AINSWORTH:  Objection.  Foundation.
22    A   Security.
23   Q   Okay.  Tell me?
24    A   That's what they do.

203

1    Q   Like draw me a picture with your words.
2   Like what does that entail?
3        MR. AINSWORTH:  Same objection.
4    Q   In your experience.
5    A   You've got to be in the penitentiary to
6   really experience that.
7    Q   Okay.
8    A   You know what I'm saying?
9    Q   I don't, so --
10    A   Okay.  That's what I'm saying.  You've
11  got to be in the penitentiary to really experience
12  that, what security really means.  It's really the
13  backbone of the organization.  People with
14  positions of authority that have that power.  I
15  ain't that kind of --
16   Q   A security worker is a person with a
17  position of authority or power in prison?
18    A   Yeah.  On the streets.
19   Q   Okay.  What kind of security does a
20  security worker for the GDs provide?
21       MR. CURRAN:  Objection.  Form.
22  Foundation.
23    A   Well, in the penitentiary, that's when
24  you really get deep into it.  You'll see they'll

204

1   let you know to watch each other's backs.  You
2   know, stick together.  That's what security is,
3   you know?  And, you know, when you get in the
4   showers and stuff like that so nobody want to do
5   no sneak attack on the other side and get
6   involved, you know --
7    Q   That makes sense.
8    A   You know, you've got to watch yourself in
9   there.
10   Q   Making sure your fellow gang members are,
11  I guess, relatively safe --
12    A   Yes.
13   Q   -- from being attacked, right?
14    A   Yes.
15   Q   How does that translate as a security
16  worker out on the street?
17       MR. CURRAN:  Objection.
18   Q   What's the difference?  So you've got
19  security workers in jail, and then you said
20  there's ambassador security workers on the street.
21    A   Yeah.  But I didn't get too deep into it
22  on the streets.  Once I'm free, F you.
23   Q   Yeah.
24    A   Excuse my French.

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

52 (205 to 208)

205

1    Q   That's okay.  I've heard a lot worse.
2    **A   You know what I'm saying?  I'm serious.**
3 **I'm going about my life.  I ain't in that no more.**
4    Q   Right.  I just want you to tell me, like,
5 what it is --
6    **A   No, I don't mean to say it like that.**
7 **I'm saying as far as -- you know, when you go**
8 **inside the penitentiary, you're going to get in**
9 **line.  You know what I'm saying?  Whatever you is.**
10 **And whatever you ain't, you ain't going to -- so**
11 **whatever they tell you to do up there, you're**
12 **going to have to get in compliance.**
13    Q   Okay.  So what does security work around
14 the street do that's different than what a
15 security worker in prison might do?
16        MR. CURRAN:  Objection.  Foundation.
17    **A   Like I said, once I'm free -- once I'm**
18 **free out the penitentiary, I don't care what they**
19 **do on the streets --**
20    Q   Okay.
21    **A   -- the organization, the mob -- whatever.**
22 **I'm free.**
23    Q   Based on your experience, though, what
24 would you expect a security worker to be

206

1 responsible for out on the street?
2        MR. CURRAN:  Objection.  Calls for
3 speculation.
4    **A   I can't say that.**
5        MR. CURRAN:  Foundation.
6    **A   No.**
7    Q   Why not?
8    **A   Because I ain't really experience that on**
9 **the streets, only in the joint.**
10    Q   Okay.  Would there be repercussions for
11 you if you told me what the --
12    **A   No.  I'll tell you anyhow, but I don't**
13 **know.  I ain't experienced on the streets for**
14 **security.**
15    Q   I'm not talking --
16    **A   Now, want to know --**
17    Q   Sorry, go ahead.
18    **A   Now, if you want to know what security**
19 **really is, it's called securing yourself.**
20    Q   Securing what?
21    **A   Securing yourself.**
22    Q   Securing yourself.  Got it.
23    **A   That's what I was doing.**
24    Q   Right.  Right.  So -- and it seems like,

207

1 you know, in light of what you're telling me, that
2 you didn't work as a security worker on the street
3 for the gangs --
4    **A   No.**
5    Q   -- but my question is is, based on your
6 experience, you know, of a couple of decades in
7 the GDs at that time -- or almost two decades in
8 the GDs as of 1994, what would you expect a
9 security worker's responsibilities to be on the
10 street?  Although you weren't one, based on your
11 experience, what did you expect a security worker
12 on the street to be responsible for?
13        MR. CURRAN:  Objection.  Form.
14 Objection.  Form.  Foundation.  Calls for
15 speculation.
16        Go ahead.
17        Also asked and answered.
18    **A   Answer?**
19    Q   Yeah.
20    **A   To me on the streets, it's like they've**
21 **got a little circle of security for people -- you**
22 **know, for the neighborhoods.  Like if somebody**
23 **snatched somebody's mom's purse or broke into**
24 **someone's house, steal their car or something like**

208

1 **that, they're going to holler at the guys and let**
2 **them know, Man, your son, your nephew, we got a**
3 **witness.  They went and stole this and broke in**
4 **here.  That's what security do.**
5    Q   Okay.  So they would get --
6    **A   On the streets.  On my --**
7    Q   So security workers would actually kind
8 of be plugged into, like, what kind of crimes are
9 being committed in the neighborhood and who might
10 be doing them?
11        MR. CURRAN:  Objection.  Calls for
12 speculation.  Foundation.
13    **A   It all depends.**
14    Q   But that's within the realm of
15 possibility?
16    **A   Back then?**
17        MR. CURRAN:  Objection.  Calls for
18 speculation.
19    Q   Yeah.  You agree with me back then?
20    **A   Back then.**
21        MR. CURRAN:  Same objection.
22    Q   Okay.  When did you tell the police
23 during the first two guys -- so we're before the
24 shift change -- when did you tell the police,

Transcript of Eddie Taylor
Conducted on March 9, 2020

53 (209 to 212)

209

1  those two guys, that you -- or did you tell them
2  that you had heard at any point about this murder
3  having happened?
4       MR. CURRAN:  Objection to the form of the
5  question.
6       MR. AINSWORTH:  Join.
7    Q   No?  You've got to say yes or no.
8    A   **No.**
9    Q   Did they ask you a question like that
10 like when did you find out about this?
11   A   **No.**
12   Q   Okay.  So did you -- during that first --
13 those first two officers, did you say anything to
14 them about, you know, even what you knew about the
15 circumstances surrounding the murder?  I mean,
16 what I'm talking specifically about is did you
17 tell them, like, you found out about it from,
18 like, Black, that you were down the street, you
19 didn't know anything --
20   A   **No.**
21   Q   Did you talk about the murder at all, not
22 that you were involved in it but, like, anything
23 that you might have known about it?  Did you tell
24 them anything?

210

1    A   **No.**
2    Q   Nothing?
3    A   **Nothing.**
4    Q   Did you give them any -- say you just
5  basically got beaten and they wanted you to sign
6  something?
7    A   **Yes.**
8    Q   That's it?
9    A   **That's it.**
10   Q   Okay.  So how long after they leave?  Are
11 you in there for an hour, two hours, less than
12 that before the next guys -- the next group of
13 three guys come in?
14   A   **No.  It wasn't that long.**
15   Q   How long do you think it was?
16   A   **I'd say about 30 or 25 minutes.**
17   Q   So pretty quick?
18   A   **Yes.**
19   Q   Okay.  You're bleeding -- and I said this
20 before, you're bleeding from your mouth, but
21 you're not the bleeding anywhere else, though, at
22 least to your knowledge?  Yeah?
23   A   **Yes.  I wasn't bleeding nowhere else, no.**
24   Q   Okay.  And you've got two black eyes?

211

1    A   **Yes.**
2    Q   Okay.  What do these next three officers
3  that come in look like?
4    A   **They was white.**
5    Q   Okay.  What else about them?  How are
6  they dressed?
7       MR. CURRAN:  Objection.  Foundation.
8    A   **Regular clothes.**
9    Q   Okay.  Like jeans?
10   A   **No.  Just like home style.**
11   Q   What does that mean?
12   A   **Like they was casual.  They was dressed**
13 **casual.**
14   Q   Like jeans?  Like I'm dressed right now?
15   A   **I couldn't tell if they had on jeans or**
16 **not.**
17   Q   Why.
18   A   **Because when they came in, they was just,**
19 **like, casual, you know?  Like --**
20   Q   Could you see their pants?
21   A   **I wasn't trying to see their pants.  I'm**
22 **trying to make sure I wouldn't get whooped no**
23 **more.**
24   Q   Okay.  When the first two guys left, did

212

1  they take the statements that they brought in that
2  they wanted you to sign with them, or did they
3  leave them in the room with you?
4    A   **No.  They took them out.**
5    Q   Okay.  So you didn't have anything to
6  review or anything -- Okay.
7       So these three guys, so they're dressed
8  casual.  Did they tell you who they were?
9    A   **No.**
10   Q   Did they tell you whether they were even
11 police officers?
12   A   **Yeah.  They had to be.  They was up in**
13 **there smacking me upside my head.**
14   Q   Well, I'm talking about the three guys
15 now, sorry.  I didn't make that clear.  I'm
16 talking about after the shift change.  So now the
17 second group of guys come in.  This is three
18 dudes.
19       Did any of these three guys identify
20 themselves to you as police officers?
21   A   **No.**
22   Q   You assumed they were why?
23   A   **Because I'm in the police station.**
24   Q   Okay.  Well, there's -- you said somebody

Transcript of Eddie Taylor
Conducted on March 9, 2020

54 (213 to 216)

213

1 came in later on that was a female state's
2 attorney, right?
3    **A**   **Yeah, the lady came in.**
4    Q   Do you understand state's attorneys to be
5 police officers, or do you believe that they're
6 something different?
7    **A**   **State's attorneys -- say that again?**
8    Q   Do you believe a state's attorney is a
9 police officer, or do you believe a state's
10 attorney is something different than a police
11 officer?
12    **A**   **No. State's attorney is something**
13 **different.**
14    Q   Okay. So based on that, what about these
15 three guys made you think that they were police
16 officers other than the fact that they were in the
17 police station?
18    **A**   **The way they was treating me.**
19    Q   Which was what?
20    **A**   **Brutal.**
21    Q   Okay. Did they ask you any questions
22 about the murder?
23    **A**   **No. They wanted me to sign their**
24 **statement.**

214

1    Q   Okay. So did they bring a statement with
2 them?
3    **A**   **Yeah, they did it.**
4    Q   Okay. What -- was it the same statement
5 as before, or was it different?
6    **A**   **I don't know if it was the same one or**
7 **not.**
8    Q   What did this one look like?
9    **A**   **But it was still black and white on paper**
10 **with black writing on it.**
11    Q   Okay. Was this one typed up too that the
12 second group of guys had?
13    **A**   **I don't know whether it was typed or it**
14 **was printed. Like some type of machine or**
15 **something. I don't know.**
16    Q   Okay. How thick was it? Was it a couple
17 of pages? Was it a lot of pages? If you
18 remember.
19    **A**   **It wasn't that thick. It was similar to**
20 **something like this but take some of that off.**
21    Q   Okay. Maybe like that?
22    **A**   **Yeah, it wasn't that thick.**
23    Q   15 pages, maybe, something like that?
24     You didn't count them, right, but they

215

1 didn't let you see it?
2    **A**   **No.**
3    Q   Okay. And these same guys wanted you to
4 sign this one too?
5    **A**   **Yes.**
6    Q   These three guys?
7    **A**   **Yes.**
8    Q   Okay. What were they telling you that
9 made you think that they wanted you to sign it?
10 What were they doing?
11    **A**   **They just kept screaming to me about how**
12 **I'm going to be gone a long time, I'm facing the**
13 **death penalty, and all this old stuff. You know**
14 **what I'm saying? I kept screaming and hollering**
15 **telling them that my mama didn't raise me like**
16 **that, you know, and they were showing me them**
17 **pictures again.**
18    Q   Okay. Is anybody talking about the
19 murder with these three guys? Are they talking
20 about this murder or anything about it?
21    **A**   **No.**
22    Q   They're just asking you to sign it?
23    **A**   **Yeah, that's it. After they got**
24 **through -- they was talking crazy to me. That's**

216

1 what I'm saying. At the same time they're trying
2 to get me to sign it.
3    Q   Okay. So when you say they're talking
4 crazy to you, tell me -- like, flush that out for
5 me. What do you mean by that?
6    **A**   **Calling me all names.**
7    Q   Like what types of names?
8    **A**   **Like nasty and crazy motherfucker and all**
9 **this.**
10    Q   Okay.
11    **A**   **You know what I'm saying? Just -- man,**
12 **just like I was a low-down scum of the earth.**
13    Q   Okay.
14    **A**   **You know?**
15    Q   Like how?
16    **A**   **They was calling me all kind of names --**
17 **perverted, freaky motherfucker too.**
18    Q   Okay.
19    **A**   **And I was trying not to use those words.**
20 **Y'all got to excuse my French.**
21    Q   Did you tell these guys that you were
22 with Latoya too?
23     MR. CURRAN: Objection. Misstates his
24 testimony --

Transcript of Eddie Taylor
Conducted on March 9, 2020

55 (217 to 220)

217

1    A    No, they didn't get a chance to ask me
2 none of that --
3        MR. CURRAN:  Eddie, I apologize, sir.
4        THE WITNESS:  I'm sorry.  I'm sorry.
5        MR. CURRAN:  Just try to remember, if I
6 voice an objection to pause.  Okay?  Just so the
7 record is clear.
8        I'm going to object.  Mischaracterizes
9 his testimony.
10       Go ahead.
11   Q   Did you tell these three officers your
12 alibi --
13   A   No, sir.
14   Q   -- that you were with Latoya?
15   A   No, sir.  They didn't ask me that.
16   Q   Okay.  Did these detectives tell you
17 anything about any evidence that they had against
18 you, these three guys, any evidence they had, you
19 know, at that point that made them think that you
20 might have been involved with this rape and
21 murder?
22   A   They ain't give me no type of advice or
23 nothing.  No type of -- nothing but read me my
24 rights.

218

1    Q   So they read you your rights?
2    A   Yeah.  After they beat me down.
3    Q   Okay.  Did the first guys -- the first
4 two guys read you your rights too?
5    A   Yes.
6    Q   Okay.  And they did that when?
7    A   When I got to the station.
8    Q   Okay.
9    A   Downstairs.
10   Q   Okay.  Did you ask for a lawyer at that
11 point?
12   A   No.  Because I was turning myself in.  I
13 didn't have no money for that.
14   Q   Okay.  When did you first ask for a
15 lawyer?
16   A   I asked for a lawyer in the room with
17 them.
18   Q   The first two guys or the second --
19   A   The first two guys.
20   Q   Okay.  So these three guys -- after the
21 shift change, it's your testimony that they didn't
22 ask you any questions about the murder and they
23 were just beating you and wanting you to sign this
24 confession?  That's it?

219

1    A   That's it.
2    Q   And you said nothing -- you didn't even
3 tell them that you had an alibi?
4    A   All that I told them was I didn't do
5 nothing like that.
6    Q   That's it?  That's the only thing you
7 said to them?
8    A   And that my mother raised me better than
9 that.
10   Q   Okay.  Did they -- and they didn't talk
11 to you about any of the evidence that they had --
12   A   No.
13   Q   -- against you?  Like the statements?
14   A   Yeah, they told me about the statements.
15   Q   Oh, they did?
16   A   Oh, yes, they did.
17   Q   Okay.  What did they say -- these three
18 guys -- we're talking about the three guys, right?
19   A   No.  The three guys didn't say nothing.
20 They just tried to get me to sign the statement.
21   Q   Okay.  So that's what I'm asking about,
22 just so we're clear.
23       So the three guys that came in after the
24 shift change, did they say anything to you about

220

1 these statements that Nevest and Darrell had given
2 that implicated you?
3    A   No.
4    Q   Okay.  You're sure?  Okay.  Yes?
5    A   Yes.
6    Q   Okay.  All right.  So it sounds to me --
7 and tell me if I'm wrong, if I mischaracterize
8 this -- it seems to me that these three guys just
9 basically came in and, based on your testimony,
10 beat you some more and demanded that you sign this
11 statement.
12   A   Yes.
13   Q   Is that right?
14   A   Yes.
15   Q   Okay.  How long did these three guys beat
16 you for?
17   A   I couldn't tell you.  I couldn't tell
18 you.  I'm just glad it's over with.
19   Q   Okay.  So describe -- I need you to tell
20 me in as much details as you can recall.  I'll
21 give you the floor.  Okay?
22       Tell me everything you remember about how
23 they beat you, these three guys.
24   A   I balled up.

Transcript of Eddie Taylor
Conducted on March 9, 2020

221

1　Q　Okay.  So keep going.  You've got as much
2　time as you need to explain it.
3　**A　I balled up.  They didn't say nothing to**
4　**me about no statement or none of that there.  They**
5　**just wanted me to sign this statement.  And by me**
6　**telling them, no, I didn't do it and me crying and**
7　**everything, they didn't give about none of that.**
8　**They just wanted me to sign this statement.  You**
9　**know what I'm saying?**
10　　**And by me just turning myself in, you**
11　**know, it's made it look worse on me; so, you know,**
12　**I ain't got no lame scent on me.  You know what**
13　**I'm saying?**
14　Q　No, I don't.  Explain that, please.
15　**A　All right.  Well, they beat my ass.  They**
16　**beat my ass.**
17　Q　Okay.
18　**A　You know what I'm saying?  And I can't**
19　**describe to you how many minutes, how long it**
20　**took.  I was glad it was over with.**
21　Q　Okay.
22　**A　That's it.**
23　Q　And when they walked -- these three guys
24　after the shift change walked in, did they get

222

1　right to beating you right when they walked in, or
2　did they talk to you a little bit before they
3　started beating you?
4　**A　They just came straight in and asked me**
5　**to sign their statement.**
6　Q　Okay.
7　**A　And was calling me all out my names**
8　**throwing them pictures down in my face.**
9　Q　Oh, so they showed you the pictures
10　too --
11　**A　Yes, they did.**
12　Q　-- just like the first two guys?
13　**A　Yes.**
14　Q　Same two pictures that they showed you?
15　**A　Yes.**
16　Q　Okay.  And did they tell you who the
17　picture was of like who the victim was in the
18　picture, the dead person?
19　**A　No.  They ain't tell me who the person**
20　**was.**
21　Q　Did any of these police officers, whether
22　the first two or the three after the shift change,
23　tell you the name of the victim?
24　**A　No.**

223

1　Q　Never?
2　**A　Never.**
3　Q　Do you know who that person's name is
4　now?
5　**A　Yeah, through the discoveries and the**
6　**reports, yeah.**
7　Q　Okay.  What discoveries and reports are
8　you talking about?
9　**A　When I had mine when I was fighting this**
10　**case.**
11　Q　Okay.  And do you remember the name of
12　the victim sitting here today?
13　**A　Remember the victim sitting here today?**
14　Q　Do you remember her name from those
15　reports from the discovery that you just talked
16　about?
17　**A　To tell you the truth, I didn't know I**
18　**was trying to remember her name.**
19　Q　I'm not -- that's not my question.
20　　My question is sitting here today, do you
21　remember her name?
22　**A　No, not really.  I hear it when they read**
23　**it on the paper because I didn't know the girl.**
24　Q　Yeah.  What do you remember from that

224

1　paper is the victim's name?
2　**A　I don't know her name, man, by heart.**
3　**I'm serious.  I don't know the girl's name by**
4　**heart.  You know?  I only had my mind focused on**
5　**it -- on them law papers when I was in the**
6　**situation that I was in.  As far as all that,**
7　**that's behind me.  I ain't trying to rekindle the**
8　**fire.**
9　Q　When these three officers were beating
10　you, the guys that came in after the shift change,
11　did they tell you what it was that they wanted you
12　to sign?
13　**A　No.**
14　Q　They just wanted you to sign some papers?
15　**A　Yes.**
16　Q　Okay.  Where -- were these guys punching
17　you with closed fists also?
18　**A　Yes.**
19　Q　All three of them?
20　**A　Yes.**
21　Q　Were they doing it at the same time, or
22　were they taking turns?
23　**A　Yes.**
24　Q　All at the same time?

Transcript of Eddie Taylor
Conducted on March 9, 2020

225

1    A   Yes, sir.
2    Q   Where -- let's start with your head.
3        Where on your head were they hitting you?
4    A   They hit me all over my body when I
5 covered up.
6    Q   Okay.
7    A   I'm handcuffed, so they taking care of
8 their business on me. I'm screaming and
9 hollering, and they're doing what they got to do.
10   Q   Okay.
11   A   You know what I'm saying? Because I
12 ain't signing nothing.
13   Q   Okay. But you didn't know what they
14 wanted you to sign?
15       MR. CURRAN: Objection to form.
16   Q   Right? You did not know what it was that
17 they wanted you to sign?
18   A   No, I didn't know, no.
19   Q   Okay. And were they also hitting -- in
20 addition to hitting you in the head and face, were
21 they hitting you in the sides of your body as
22 well?
23   A   Yes.
24   Q   What about your legs?

226

1    A   No.
2    Q   Just -- so in your torso, back, and your
3 head and face, right?
4    A   Yes.
5    Q   Okay. How many times do you think you
6 got hit by closed fists by these guys?
7    A   I can't --
8    Q   And I'm talking about the three guys that
9 came in after the shift change.
10   A   They whooped my ass. That's all I knew.
11 I can't give you no -- really no detail how many
12 minutes they was beating me.
13   Q   So they beat you for minutes?
14   A   I don't know. I said I can't give you no
15 details about how many minutes that they was
16 beating me.
17   Q   But it was a while?
18   A   But I'm glad it was over with.
19   Q   So what injuries did you have after the
20 second beating, to your recollection, that were
21 different than what you sustained in the first
22 beating? Because the first beating got the black
23 eyes and the fat lip.
24   A   Uh-huh. And black eyes on the top of

227

1 black eyes. I was purple, yellow, and blue.
2    Q   Okay.
3    A   Yes. I was bruised all over my body.
4    Q   So you got beaten pretty badly?
5    A   Yes. And that wasn't nothing until I got
6 to the county.
7    Q   Okay. And there you got some sheriff's
8 deputies, right?
9    A   I know some, they kept --
10   Q   Well, the guys that beat you at the
11 county, were they the same guys that -- any of the
12 same guys --
13   A   No, sir.
14   Q   -- that beat you at the 51st and
15 Wentworth?
16   A   No, sir.
17   Q   Okay. All right. How long after this
18 beating -- these beatings that you described was
19 it that you first went to court in this case?
20   A   Say that again?
21   Q   So you get beaten at 51st and Wentworth,
22 you don't sign -- you don't confess, you don't
23 sign --
24   A   Yes.

228

1    Q   -- whatever it was that they wanted you
2 to sign.
3        So you go to county jail after that,
4 right?
5    A   Yes.
6    Q   How long are you there before you go to
7 court the first time where you actually appear in
8 court? Was it a day? Was it a week?
9    A   A week continuous, I think.
10   Q   A week or so later?
11   A   Yeah.
12   Q   Okay. And did you get a lawyer appointed
13 to you?
14   A   Yeah. Like the second time.
15   Q   Right.
16   A   I got a PD, a public defender.
17   Q   Do you remember that public defender's
18 name?
19       MR. CURRAN: Objection. Asked and
20 answered.
21   A   I'd remember it if I hear it.
22   Q   Okay. And you didn't tell the judge that
23 you got beaten, right?
24   A   No, I didn't tell her.

Transcript of Eddie Taylor
Conducted on March 9, 2020

58 (229 to 232)

229

1    Q   And you didn't tell your public defender
2 you got beaten?
3        MR. CURRAN:  Objection.
4    **A   No, I didn't tell her.**
5        MR. CURRAN:  Sir, you should -- just to
6 remind you again, if anybody asks you about any of
7 your conversations with your court-appointed
8 attorney, you do not have to answer those.  It's
9 your choice whether or not to waive the privilege.
10       Go ahead.
11   Q   So -- and you understood that you were
12 being beaten because these police were trying to
13 get you to confess to a rape and a murder that you
14 were sure you had no involvement in, right?
15   **A   Yes.**
16       MR. CURRAN:  Objection to form.
17   Q   And you understood at the time that you
18 were actually in custody because of those beliefs
19 that the police had about you, right?
20   **A   Yes.**
21   Q   Okay.  And you understood that a rape
22 charge or a murder charge, you would agree those
23 are probably the most serious criminal charges
24 that can be leveled against a person in this

230

1 country, correct?
2    **A   Yes.**
3    Q   Okay.  And you understood that, at the
4 time that you were found guilty of that, you were
5 looking at the prospect of spending a very
6 significant amount of time in prison, right?
7    **A   Yes.**
8    Q   And that wasn't a place that you wanted
9 to spend the rest of your life, right?  Correct?
10   **A   No.**
11   Q   And being aware of all that, why did you
12 not mention to the judge, for starters, I just was
13 beaten by two different groups of police officers
14 at 51st and Wentworth a week ago that wanted me to
15 confess to something I didn't do?
16   **A   Because when I went in there, the first
17 thing that was on my mind was thinking about
18 not -- I'm not guilty.**
19   Q   Okay.
20   **A   That's why I addressed the court to the
21 judge -- I'm going to do it the right way.  I've
22 got to.  I'm in their hands.  Custody.  Addressed
23 the judge -- I addressed the court.  He said, Yes,
24 you may.**

231

1    Q   Okay.
2    **A   I said, I would like to have a speedy
3 trial.  And he said, You're sober?  You understand
4 the seriousness of this case?  I said, Yes.
5 That's why I'll take a DNA test, anything.**
6    Q   Sure.  Yeah.  And did the judge comment
7 on, like, your black eyes or anything like that?
8    **A   No, he didn't say nothing.**
9    Q   Did he say, like, Mr. Taylor, what
10 happened to your face?
11   **A   No.  He didn't say nothing.**
12   Q   Nothing?
13   **A   Nothing.**
14   Q   Okay.  And did you think that the --
15 well, strike that.
16       You didn't tell your -- as you already
17 said, you didn't tell your attorney.  Was there
18 any reason why you didn't tell your attorney that
19 you had been beaten.
20   **A   Because he knew.**
21   Q   How do you know that?
22       MS. MEADOR:  What did you say?
23       THE WITNESS:  Excuse me, she knew.
24       MS. MEADOR:  Okay.  Thank you.  I'm

232

1 sorry.  I just didn't hear what you said.  My
2 apologies.
3        MR. GRILL:  Okay.
4    Q   So how do you know she knew?
5        MR. CURRAN:  Objection.
6    **A   She came to see me on my visit --**
7        MR. CURRAN:  Eddie, hold on, hold on,
8 hold on.
9        THE WITNESS:  I'm sorry.
10       MR. CURRAN:  He's asking you questions
11 that are privileged by attorney-client
12 confidentiality.
13       MR. GRILL:  This one is not.
14       MR. CURRAN:  Okay?  It's your decision
15 whether or not to waive that privilege.  And I
16 just want to remind you of that.  Okay?
17       MR. GRILL:  This one is not.
18       MR. AINSWORTH:  It is.
19       MR. CURRAN:  It is.
20   Q   And if you don't want to answer, then
21 maybe we can certify the question and maybe we'll
22 come back on another day.
23       MR. AINSWORTH:  No, no.  That's not how
24 it works.

Transcript of Eddie Taylor
Conducted on March 9, 2020

233

1    MR. CURRAN:  Yeah, you -- Eddie, don't
2  listen to any of his legal advice or whatever it
3  is he's trying to tell you.
4    MS. MEADOR:  He's not giving legal
5  advice.  He's just --
6    MR. CURRAN:  Ask the question.  Go ahead.
7  Ask the question.
8    MS. MEADOR:  Yeah, let's just move on.
9    MR. GRILL:  Let's just move on.  Okay.
10   Q  So how do you know that your attorney
11 knew?
12    MR. CURRAN:  Objection.
13   Q  You can answer.
14    MR. CURRAN:  Calls for -- once again, it
15 calls for information that's protected by
16 attorney-client confidentiality.
17    Mr. Taylor, the decision is up to you
18 whether or not to waive that privilege.
19    MS. MEADOR:  Are you going to ask him
20 that?  He's already waived the privilege.  It's
21 already been waived.
22    MR. CURRAN:  I disagree.  I disagree.
23    MS. MEADOR:  He's already answered it.
24    MR. CURRAN:  I disagree.

234

1    MS. MEADOR:  So the door is open.  Okay.
2  Okay.
3    MR. CURRAN:  I thought you just said that
4  the question didn't call for attorney-client
5  privilege.  Now you're saying that --
6    MS. MEADOR:  Well, you're -- to the
7  extent that it does.  I mean, this is his mindset.
8  It's not asking what he told his attorney, it's
9  his mindset.
10    MR. CURRAN:  Should we terminate the
11 deposition and call Judge Harjani and ask him the
12 propriety of your asking questions that are clearly
13 covered by attorney-client confidentiality?
14    MR. GRILL:  In my question, to be --
15    MR. CURRAN:  Because I'm willing to do
16 that.
17    MS. MEADOR:  This is --
18    MR. GRILL:  This is ridiculous.
19    MS. MEADOR:  Let's move forward.  For
20 sure.
21   Q  So the question is how do you know that
22 your attorney knew?
23    MR. CURRAN:  Same objection.  Calls for
24 attorney-client confidentiality.

235

1    MR. GRILL:  We've heard it.
2   Q  So go ahead.
3    MR. AINSWORTH:  Agreed.
4    MR. CURRAN:  And you know what?  Before
5  you -- let's go ahead and terminate -- or stop the
6  deposition for a moment.
7    Mr. Taylor, if you can go ahead and step
8  out.
9    THE REPORTER:  Do you want to go off
10 record or --
11    MR. CURRAN:  No.  We can stay on record.
12    THE REPORTER:  Okay.
13    MR. CURRAN:  So, Andrew, if you want to
14 continue asking these questions, I'm going to
15 suggest that we call the judge and we have him
16 resolve it.
17    MR. GRILL:  Well, we don't know what his
18 answer is going to be and whether he's going to
19 assert it, Nick.  And you've advised him, like,
20 ten ways --
21    MR. CURRAN:  Yeah, but he's not --
22    MR. GRILL:  -- so I think he's well
23 advised and capable of waiving it.
24    MR. CURRAN:  He's not.  He's not --

236

1    MR. GRILL:  You're totally coaching him.
2    MR. CURRAN:  He's not represented by
3  counsel.
4    MS. MEADOR:  Russell is the one who
5  opened the door to these questions.
6    MR. CURRAN:  He's not represented -- if
7  he asked him a single question, that doesn't open
8  the door to the entirety of his --
9    MS. MEADOR:  Yes.  I just think it's
10 ironic that you think it's okay for your questions
11 you can invade the privilege for what you want him
12 to say.  But it's inappropriate for us.  Give me a
13 break.
14    MR. GRILL:  You can't control him like
15 that.
16    MS. MEADOR:  He's been advised -- don't
17 waive your finger at me.  He has been advised of
18 his rights, and he has --
19    MR. CURRAN:  Hey, I've proposed a very
20 simple solution.
21    MS. MEADOR:  Hold on, I'm not done.
22 We're on the record, Nick.
23    MR. CURRAN:  Okay.  Go ahead.
24    MS. MEADOR:  He has been advised of what

Transcript of Eddie Taylor
Conducted on March 9, 2020

237

1  his rights are, and he continues to waive them
2  despite your jumping up and down and trying to
3  coach him otherwise. Let's just move forward with
4  the deposition. It's long enough already. Go.
5       MR. AINSWORTH: Lisa, you make
6  accusations, and then you say let's go, let's go;
7  and it doesn't work that way.
8       MS. MEADOR: I'm not making accusations.
9       MR. AINSWORTH: You just did.
10      MS. MEADOR: I'm stating my position for
11  the record. That's it. Stating my position for
12  the record.
13      MR. AINSWORTH: So, Lisa, you just said
14  that we opened the door in some way, and I
15  withdrew the question after you made an objection.
16  So --
17      MS. MEADOR: Because you knew where it
18  would take you. You knew exactly where it would
19  take you. Right here. Right here.
20      MR. CURRAN: Oh, you're in Russell's
21  mind? You're in his mind?
22      MR. AINSWORTH: So, I'm sorry, you
23  mean -- hang on, Lisa. You just said that I
24  opened the door. I withdrew the question, and now

238

1  you're saying that -- so, I mean, don't just say
2  stuff. Have a point. Okay?
3       MS. MEADOR: I beg your pardon, Russell,
4  why don't you pump the brakes a little bit.
5       MR. AINSWORTH: No, I'm --
6       MS. MEADOR: You know what? Your level
7  of inappropriateness right now is really too much.
8       MR. CURRAN: Okay. So --
9       MS. MEADOR: So take a step back --
10      MR. CURRAN: Hold on.
11      MS. MEADOR: -- before you say something
12  that you regret really before I do, all right.
13      MR. CURRAN: Time out.
14      MS. MEADOR: All right? This isn't --
15  doesn't have to go down this road.
16      MR. CURRAN: Time out.
17      MR. AINSWORTH: You take care of you,
18  I'll take care of me.
19      MS. MEADOR: You're doing a great job.
20      MR. AINSWORTH: Thank you.
21      MR. CURRAN: If I may propose, I proposed
22  a very simple solution. Let's call the judge and
23  ask him about the propriety of asking an
24  unrepresented client --

239

1       MR. GRILL: No. I'm going to -- if he
2  wants to -- if he wants to -- he's been advised.
3  He's very well familiar with the criminal justice
4  system. He knows his rights.
5       MR. CURRAN: You think he's an attorney?
6  You think he's an attorney.
7       MR. GRILL: He's capable. He's capable.
8       MR. CURRAN: That's shameful.
9       MR. GRILL: He's absolutely capable of --
10      MR. CURRAN: That's shameful.
11      MR. GRILL: That's not what I said, Nick.
12      MR. CURRAN: That's shameful.
13      MR. GRILL: He's more than capable of
14  understanding whether he wants to answer the
15  question or not.
16      MR. CURRAN: That's shameful. First you
17  say you're not asking a question where the
18  privilege is applicable, and then you do and now
19  it's --
20      MR. GRILL: Nick, Nick, Nick, that
21  question I asked is absolutely -- absolutely
22  capable of being answered without touching it, if
23  this is even protected --
24      MR. CURRAN: How on earth --

240

1       MR. GRILL: I'm asking for his opinion --
2  I'm asking for how it is that he knows. I don't
3  know what the answer to that is. How is it --
4       MR. CURRAN: How would his attorney know
5  unless he told him?
6       MR. GRILL: I don't know, Nick. That's
7  up to him.
8       MR. CURRAN: Exactly. Exactly.
9       MS. MEADOR: But he's already testified
10  that he didn't tell his attorney.
11      MR. GRILL: You know what, Nick? You
12  know what, Nick?
13      MR. CURRAN: You know what? We're going
14  to stop the deposition. We're going to call the
15  judge.
16      MR. GRILL: No. I'm not calling the
17  judge.
18      MR. CURRAN: We are.
19      MR. GRILL: No. I'm continuing with the
20  deposition.
21      MR. AINSWORTH: Let's take a --
22      MR. CURRAN: I'm calling the judge.
23      MR. GRILL: No, Nick.
24      MR. AINSWORTH: -- so we can discuss.

Transcript of Eddie Taylor
Conducted on March 9, 2020

61 (241 to 244)

241

1     MR. GRILL: No, Nick. I think that's
2 a -- I don't think that's appropriate. If you
3 think about what his testimony is, you will
4 realize that there is a very obvious answer that
5 he could give here that doesn't impinge on any --
6     MR. CURRAN: Then why don't you say what
7 it is?
8     MR. GRILL: Because I would prefer that
9 you don't coach him through it, Nick, because
10 that's what you're doing. And he's sitting right
11 outside.
12     MR. CURRAN: When have I coached? When
13 have I coached? Give a single example of when I
14 have coached during this entire deposition.
15     MR. GRILL: This whole -- just now, Nick.
16     MS. MEADOR: All right. Let's just --
17     MR. CURRAN: You're disagreeing that he
18 has a right to attorney-client -- he has an
19 attorney-client privilege?
20     MS. MEADOR: This witness is --
21     MR. GRILL: One of the ways that he can
22 answer this question is simply to say, I had
23 visible injuries. I talked to you about it.
24     MR. CURRAN: Sure.

242

1     MR. GRILL: Okay? How does that --
2     MR. CURRAN: But you know -- but you
3 know -- you know that your question could
4 potentially invade on attorney-client privileged
5 information.
6     MR. GRILL: I don't know what his answer
7 is going to be, and you've advised him ten ways
8 till Sunday, Nick --
9     MR. CURRAN: You can tell him -- you can
10 tell him I'm not looking for any of your
11 conversations with your attorney.
12     MS. MEADOR: Because if he chooses to
13 waive the privilege, that's his right to do so.
14     MR. KUHN: Why is he not capable of
15 making that choice on his own?
16     MR. CURRAN: Well, let's see. He's not
17 represented by counsel --
18     MS. MEADOR: He already has. But he
19 already has.
20     MR. KUHN: And he's been advised of his
21 rights.
22     MR. CURRAN: Okay. That's fine.
23     MR. KUHN: And he's capable of making his
24 own decision.

243

1     MR. CURRAN: Okay. That's fine. That's
2 fine.
3     MS. MEADOR: Great. Let's just bring him
4 in here. Let's go.
5     MR. GRILL: If you want to call the judge
6 and, like, have Harjani be, like, you know what,
7 Mr. Taylor, it's your privilege to waive --
8     MR. CURRAN: Sure.
9     MR. GRILL: -- because that's about all
10 that Harjani can say. Okay?
11     MR. CURRAN: And I bet the judge would
12 say you should seek legal counsel before doing so
13 rather than having somebody who's directly opposed
14 to you pressuring you into doing it waiving the
15 privilege.
16     MR. GRILL: Oh, God. Okay.
17     MS. MEADOR: Nobody is pressuring --
18     MR. GRILL: Nobody is pressuring.
19     MS. MEADOR: You're pressuring him to
20 take it.
21     MR. GRILL: You're totally pressuring him
22 to take it.
23     MS. MEADOR: Because you know what
24 happens.

244

1     MR. CURRAN: What I'm trying to do is
2 protect somebody who may not know the full extent
3 of their rights.
4     MS. MEADOR: I'm sorry, I didn't want to
5 get him if you were --
6     MR. CURRAN: I know that doesn't really
7 matter to you, but it does matter --
8     MR. GRILL: Well, then maybe you're the
9 one that should have conversations with him
10 instead of Russell since he relates to your end of
11 things more than anything else.
12     MR. CURRAN: I have no idea what that
13 means.
14 BY MR. GRILL:
15   Q   Ready? I think everybody has calmed
16 down. I'm sorry about the delay.
17     All right, sir. Did you tell anybody in
18 your family that you were beaten by the police?
19   **A   My mother.**
20   Q   Yeah? What's your mother's name again?
21   **A   Mary Taylor.**
22   Q   Where is she at?
23   **A   She passed away.**
24   Q   Did you tell anybody else?

Transcript of Eddie Taylor
Conducted on March 9, 2020

62 (245 to 248)

---

245

1     A    My sisters.
2     Q    They're still alive?
3     A    Yes.
4     Q    Okay.  Did you ask your attorney to file
5  any motions on your behalf or to tell the court
6  any -- strike that question.
7          Did you ask your attorney to tell the
8  court that you were beaten?
9          MR. CURRAN:  Objection.
10    A    No.
11         MR. CURRAN:  Same objections.
12         Hold on.  Calls for attorney-client
13 privileged information.  You have the choice
14 whether or not to waive the privilege.  Okay?
15         THE WITNESS:  Yes.
16         MR. CURRAN:  Go ahead.
17    Q    You did not?
18    A    No.
19    Q    Did you think it was important for the
20 court to find out that -- about how the police had
21 treated you during your time at 51st and
22 Wentworth?
23    A    At the time I felt they didn't care.
24    Q    Who's they?

---

246

1     A    The whole system.
2     Q    Okay.  Would that include the judge?
3     A    Yeah.  I felt I had to get on top of my
4  business for this law work.
5     Q    I'm sorry, I didn't hear that last part.
6     A    Back on studying the law library and
7  trying to educate myself.
8     Q    Were you studying the law library at
9  county jail?
10    A    Yes.
11    Q    What were you specifically studying
12 there?
13    A    Just reading up -- looking up a lot of
14 cases.
15    Q    What types of cases?  For what?
16    A    All kinds.  Just sometimes just go down
17 there and just reading.  See if I can learn a lot
18 of stuff on --
19    Q    What were you trying -- what was the
20 reason, though, that you were studying in the law
21 library?  What was inspiring you to do that?
22    A    Being innocent, free.  I mean, for a
23 crime that I did not commit.
24    Q    Okay.  So --

---

247

1     A    And I didn't have a paid lawyer.
2     Q    Okay.  Well, you had a public defender,
3  right?
4     A    Yes.
5     Q    Yeah.  And what types of things do you
6  recall searching for in the law library?
7     A    I was just reading a lot of cases.
8     Q    Well, there's --
9     A    I already had my motion in.
10    Q    Okay.  What motion was that?
11    A    I had my motion in for a speedy trial.
12    Q    Right.  Okay.  Did you have any other
13 motions, to your knowledge, that were in?
14    A    No, sir.
15    Q    Okay.  So, you know, lots of different
16 things that you could possibly read about in the
17 law library.
18         What specific things were you trying to
19 find?
20    A    I'm just reading basically a lot of cases
21 from all over, in the hood -- I was running across
22 a lot of cases, all kinds of shootings and stuff
23 like that, robberies --
24    Q    Yeah, about what, though?

---

248

1     A    -- drug cases --
2     Q    About what?  What were you trying to
3  find?
4     A    Just reading.  Just basically reading.
5     Q    Okay.
6     A    But I couldn't put another motion in
7  because it already was set for trial.
8     Q    So the types of cases that you were
9  looking for, were you hoping to use them or find
10 something that would help you to get out of jail?
11    A    Yes.  If I could have.  But I couldn't
12 find nothing, so the motion was already set for
13 trial.
14    Q    The speedy trial?
15    A    Yes.
16    Q    Did your attorney explain to you -- you
17 don't have to tell me what she said, but did she
18 explain to you how a speedy trial works?
19         MR. AINSWORTH:  Objection.  Calls for
20 communications between you and your counsel.  You
21 have the right to reserve that privilege or waive
22 that privilege.
23         THE WITNESS:  Yeah, I'll waive.
24    A    I'll waive.

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

---

249

1    Q   Okay.  Well, tell me?
2    **A   Say that one more time.  Because I'm**
3    **telling you, this -- all this coming at me like**
4    **this, and I'm --**
5    Q   Did your lawyer tell you how a speedy
6    trial works?
7    **A   No.**
8    Q   Okay.  So why did you not tell your
9    lawyer that you were beaten in police custody?
10       MR. CURRAN:  Same objection.
11       MR. GRILL:  He already answered he did
12   not.
13   Q   So why did you not?
14       MR. CURRAN:  Sir, you have the right
15   whether or not to --
16       MR. GRILL:  No.  You don't on this, and
17   we will call the judge on this one.  He needs to
18   answer it.
19       MR. CURRAN:  It's not a blanket answer.
20       Sir, you can choose to answer the
21   question or not.  Okay?  It's up to you.
22   **A   Because at the time when I had -- I felt**
23   **it was a smack in the face when they gave me a**
24   **female public defender.  So, therefore, I -- she**

---

250

1    **really didn't have nothing to talk to me about,**
2    **and I didn't really have nothing to talk to her**
3    **about.**
4    Q   Well, why would that matter if she's a
5    public defender?  Why is that a smack in the face?
6    **A   Because she likely held a grudge against**
7    **me when I first came through with that case just**
8    **like everybody else.  Everybody was judging me.**
9    Q   Okay.  You've got to -- this is news to
10   me.  So please explain to me, like, what about her
11   made you feel that way, that she didn't -- you
12   know, that she held a grudge against you?
13   **A   I just didn't say nothing to her about**
14   **it.  I was just waiting to go to trial.**
15   Q   Okay.  Did she say something to you that
16   made you feel that way about her?
17   **A   No.**
18   Q   Did she do something that --
19   **A   I just didn't want to say nothing --**
20   **nothing, period.**
21   Q   Okay.  Was it because she --
22   **A   Because I didn't know if it was going to**
23   **piss her off or not because --**
24   Q   Okay.  Did -- was it because she was a

---

251

1    woman?  Is that what the problem was for you, or
2    was it something else?
3    **A   It was like a smack in the face, like I**
4    **said, by me coming in fresh with a face like that**
5    **there with a female -- you know what I'm**
6    **saying? -- and I've got a woman representing me,**
7    **and she's reading the facts and all that.  You**
8    **know what I'm saying?  You know she looked at me**
9    **crazy.**
10   Q   Did you think that a woman would not be
11   able to do a good job defending you simply --
12   **A   I didn't say that.**
13   Q   Okay.  That's what I'm trying to figure
14   out like really what you mean by that.
15       So what was it that made you -- what did
16   she do that made you feel like this was -- like
17   getting appointed a woman public defender was a
18   smack in the face to you?
19   **A   That was just a figure of speech, the way**
20   **I felt at that time.**
21   Q   Okay.  So if that's your figure of
22   speech, you've got to explain to me what that --
23   translate that for me.
24   **A   I felt like the only thing I want to talk**

---

252

1    to her about was the case.
2    Q   Okay.  Did you?
3    **A   Yeah.  When it came to the end.**
4    Q   Okay.  End of what?
5    **A   It was almost time to go to trial.**
6    Q   Okay.  Did you ask, when you were at --
7    after coming out of 51st and Wentworth and what
8    you said happened there happened, did you ask to
9    see a doctor?  No?
10   **A   No.**
11   Q   Why not?
12   **A   They weren't going to let me see no**
13   **doctor.**
14   Q   That's not my question.  Did you ask to
15   see one?
16   **A   No.**
17       MR. AINSWORTH:  No, no.  Your question
18   was why not, and he explained it to you, so --
19       MR. GRILL:  Well, my question is what it
20   is.
21   Q   So why didn't you ask to see a doctor?
22   **A   Because I was afraid.**
23   Q   Of what?
24   **A   They had already beat my ass.**

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

64 (253 to 256)

253

1    Q   You were afraid the doctors were going to
2  beat your ass?
3    A   No.  I was afraid -- they whooped me
4  already, I'd rather say nothing to them.
5    Q   I gotcha.  So you were afraid that, if
6  you asked for a doctor, they'd beat you again,
7  right?
8    A   Yes.
9    Q   Okay.  What about when you got to Cook
10 County jail, did they give you an examination of
11 any sort when they processed you to enter the
12 facility, I guess?
13   A   No.
14   Q   No?
15   A   I got processed -- and they got to me to
16 process me in the county, that's when all hell
17 took loose -- got loose.
18   Q   You're talking about the beating that you
19 got?
20   A   Yes.
21   Q   Right.  I'm talking about, like, when
22 you, you know, went through the intake procedure
23 at CC -- at Cook County jail.
24       You've been through that before, right --

254

1    A   Yes.
2    Q   -- this wasn't the first time, right?
3    A   Yes.
4    Q   It was a process, right, that you have to
5  go through before they admit you in?
6    A   Uh-huh.
7    Q   Right?
8    A   Yes.
9    Q   And part of that, you know, involves
10 checking you out physically, right, making sure --
11 seeing whether you have any injuries --
12   A   No, they don't do that.  They don't care
13 if you come in there with injuries or not.
14   Q   They didn't do that then?
15   A   No, they don't do that.
16   Q   Okay.  Did you go through any procedures
17 or intake protocol like that when you went into
18 Cook County jail for this crime?
19   A   No.
20   Q   Nothing?  They just put you in the jail?
21   A   They just put me -- once they prosecuted
22 me, they found out -- once they prosecuted, they
23 took my picture, they took me in the cell -- they
24 did their thing in the holding cell.

255

1    Q   Okay.
2    A   That's where they beat me.
3    Q   That's where they beat you.
4        How long had you been in Cook County jail
5  by the time the deputies there beat you up?
6    A   About an hour.
7    Q   Did you have a celly at the time?
8    A   No.
9    Q   Did you ever have one there at the time
10 that you were being held?
11   A   Yes.
12   Q   What was your celly's name?
13   A   I don't know that dude's name.
14   Q   Did you have more than one?
15   A   Yeah, I had more than one.
16   Q   Do you remember any of their names?
17   A   I can't remember none of them studs.
18   Q   Okay.
19   A   I was just glad to get out of there.
20   Q   Anybody come visit you while you were
21 sitting at Cook County jail on this case before
22 you got released?
23   A   Yes.
24   Q   Who came and visited you?

256

1    A   My sister.
2    Q   Yeah?
3    A   And my baby sister, Clair Taylor.
4    Q   Anybody from the Fulton family come and
5  see you?
6    A   No.
7    Q   Anybody from the Coleman family come and
8  see you?
9    A   No.
10   Q   Okay.  So the police beat you quite a
11 bit, it sounds like, at 51st and Wentworth, right?
12 Correct?
13   A   Yes.
14   Q   And you didn't buckle?  You didn't
15 confess, right?
16   A   No.
17   Q   And you -- is it fair to say that,
18 because you endured a beating like that, you know,
19 for -- you know, for as long as you say it went on
20 for and to the degree that you said that it, you
21 know, occurred at, that that is some evidence that
22 demonstrates that you truly were not involved in
23 this because you didn't buckle.
24       Is that fair?

Transcript of Eddie Taylor
Conducted on March 9, 2020

65 (257 to 260)

257

1    A   Yes.
2        MR. CURRAN:  Objection to form.
3    Q   Is that fair?
4        MR. AINSWORTH:  Objection to form.
5    A   It ain't saying that I buckled.  It's
6 just that I wasn't going to sign and agree to
7 nothing because I didn't have nothing to do with
8 it.
9    Q   Right.  Even after enduring all that,
10 right?
11   A   Yeah.  I wasn't signing nothing.
12   Q   So when you talked to Fulton when you got
13 out, didn't you want to know what type of beating
14 he took --
15       MR. CURRAN:  Objection.
16   Q   -- that caused him to name you?
17       MR. CURRAN:  Objection.  Asked and
18 answered.
19       MR. AINSWORTH:  Join.
20   A   I really didn't care no more.  I was
21 home.  You know?  I put all that behind me.  You
22 know, I really didn't ask no questions.  I'm glad
23 he got out and --
24   Q   Well, you didn't believe him the first

258

1 time?
2    A   No, because I was younger and I had just
3 gotten to jail --
4    Q   No, no, no.  I'm talking about when you
5 met him after he got out in -- you're talking to
6 him in 2018 --
7    A   Oh, yeah.
8    Q   -- okay?  -- and it's you and Andre,
9 right?
10   A   Yeah.
11   Q   Okay.  So you get -- it's in 2018; it's
12 you, Andre, and Darrell; and you told me earlier
13 today that the first time -- you asked him three
14 times --
15   A   Yes.
16   Q   -- to tell me about it.  And the first
17 time he gave you an answer and he just said that
18 the police beat him and they coerced him --
19   A   Yes.
20   Q   -- and that wasn't good enough.  You
21 didn't believe him.  Then you asked him a second
22 time.  Then you asked him a third time.
23   A   And he said he couldn't take it no more.
24   Q   Right.  So you didn't press -- you didn't

259

1 want to press Darrell about, Tell me the details
2 of how the police beat you, Darrell, that caused
3 them --
4    A   No, I didn't go into details --
5        MR. CURRAN:  Hold on.
6        THE WITNESS:  Oh, I'm sorry.
7        MR. CURRAN:  Objection.  It's been asked
8 and answered several times.
9        Go ahead.
10       MR. AINSWORTH:  Join.
11   Q   But in your own experience, like, you
12 didn't -- according to you, you took quite a
13 beating.  You didn't buckle.  You didn't want to
14 know why Darrell did?
15       MR. AINSWORTH:  Objection.
16 Argumentative.
17       MR. CURRAN:  It's also been asked and
18 answered.
19       MR. GRILL:  At a certain point it gets
20 harassing, Andrew.
21   A   I really didn't care no more.
22       MR. GRILL:  I'm going to put that on like
23 a recorder and hit one of those buttons when you
24 say that.  It's classic.

260

1        MR. AINSWORTH:  You're saying that I --
2 so you're saying --
3        MR. GRILL:  You like to -- you like to
4 accuse people of harassing witnesses.  That's all.
5        MR. AINSWORTH:  No.  At the certain point
6 it gets harassing when you ask him the same
7 question over and over.
8        MR. GRILL:  Yeah, I know.  I'm just
9 saying I've heard you say it.
10       MR. AINSWORTH:  Well, you've heard me say
11 it to you?
12       MR. GRILL:  No.  I've heard you just say
13 it.
14       MR. AINSWORTH:  I see.
15       MR. GRILL:  It's kind of Ainsworthism, if
16 you ask me.
17       MR. AINSWORTH:  Yeah.
18       MR. GRILL:  Yeah.
19   Q   Okay.  So earlier today I asked you some
20 questions about when those people from the state's
21 attorney's office came to see you in 2017.
22       MR. GRILL:  Oh, apparently we have five
23 minutes left on the video.  I'm going to move to a
24 different topic, so --

Transcript of Eddie Taylor
Conducted on March 9, 2020

66 (261 to 264)

261

1     THE VIDEOGRAPHER:  So we are going off
2  the video record at 2:19 p.m., and this is the end
3  of Video Media No. 3.
4        (A recess was taken.)
5     THE VIDEOGRAPHER:  We are back on the
6  video record at 2:33 p.m., and this is the
7  beginning of Video Media 4.
8  BY MR. AINSWORTH:
9     Q   All right.  We are moving towards the
10 conclusion, if you wanted to know.  Okay?  So I'll
11 try to get through this next part quick, and then
12 I should be almost done.
13       All right.  So just for clarity's sake,
14 did you testify earlier that you had recently been
15 released from custody?
16    A   Yes.
17    Q   Okay.  When did you get out before today?
18 Like when were you released?
19    A   I was released 2013, January 26th.
20    Q   Okay.  And what facility were you in then
21 when you were released?
22    A   Mount Sterling.
23    Q   Mount Sterling?
24    A   Yes.

262

1     Q   Okay.  And what were you in custody for?
2  What were you serving time for?  What type of
3  crime?
4     A   Possession of drugs.
5     Q   Okay.  And what type of sentence -- was
6  that six years?  How long was it?
7     A   No.  They gave me -- I copped out for
8  30 years.
9     Q   30.  Okay.  How much time did you
10 actually serve on that?
11    A   15.
12    Q   Okay.  When were you arrested on that
13 case?  Do you recall what year at least?
14    A   '98.
15    Q   Okay.  What type of drugs were you caught
16 with?
17    A   Heroin and cocaine.
18    Q   How much?
19    A   500 grams.
20    Q   Of each?
21    A   250 of each.
22    Q   Okay.  So you got a distribution charge
23 with that?  Yes?
24    A   Yes.

263

1     Q   Okay.  Did you go to trial, or did you
2  plead guilty with that?
3     A   Plead guilty.
4     Q   Were you guilty?
5     A   Yes.
6     Q   Okay.  And any of the officers -- do you
7  know the names of -- today any of the officers
8  that were involved in the investigation of
9  Antwinica Bridgeman of her murder?  Do you know
10 the names of any of those officers today?
11    A   No.  No, sir.
12    Q   Okay.  I presume none of the officers
13 were -- or at least you don't believe that any of
14 the officers that investigated that murder were
15 part of the drug charge from '98 that you pled
16 guilty to, correct?
17    A   No, they wasn't.
18    Q   Okay.  Did the police interrogate you at
19 51st and Wentworth for that 1998 heroin and
20 cocaine charge?
21    A   No.
22    Q   Where -- what part of the city were you
23 arrested in for that one?
24    A   They interrogated me -- they didn't

264

1  interrogate me.  They locked me up and took me --
2  what's that?  Bowling Brook or something?  I was
3  on the borderline.
4     Q   Okay.
5     A   And it's '98.  It was the year of the
6  broken (inaudible).
7     Q   Okay.
8     A   I don't know what's that -- that's what
9  he took me to.  I mean the sheriff's.
10    Q   Sheriff's department?
11    A   Yeah.
12    Q   Okay.  Well, let me get this straight.
13       Did the sheriff's department arrest you
14 for that?
15    A   Not the sheriff's, I mean the state
16 troopers.
17    Q   Got it.
18    A   And CPD.
19    Q   Got it, got it, got it.  Okay.
20       Did they, I guess, catch you in the act;
21 or was it like a search warrant that got you?
22    A   No, speed.
23    Q   Car?  You had it in the car?
24    A   Yes.

Transcript of Eddie Taylor
Conducted on March 9, 2020

67 (265 to 268)

265

1    Q   Okay.  Police beat you up in that case,
2  in that investigation?
3    **A   No, sir.**
4    Q   No?
5    **A   No.**
6    Q   Okay.  Did you have a lawyer representing
7  you in that one?
8    **A   No.**
9    Q   You just pled guilty without a lawyer?
10   **A   No.  I had a public defender.  They gave**
11 **me a public defender.**
12   Q   All right.  That's a lawyer, right?  You
13 understand that to be a lawyer?
14   **A   All right.**
15   Q   Okay.  Was it a male or a female public
16 defender that you got in that case?
17   **A   I had a male.**
18   Q   Okay.  Do you remember his name?
19   **A   No, I do not remember his name.**
20   Q   Okay.  At any point in the time that you
21 were in IDOC for this drug case, at any point
22 before you got released in 2013 on that, were you
23 ever in the same facility as Nevest Coleman or
24 Darrell Fulton?

266

1    **A   No.**
2    Q   Okay.  Did you ever communicate with
3  either of them in any way while you were in
4  custody --
5    **A   No, sir.**
6    Q   -- at a certain time on that drug charge?
7    **A   No, sir.**
8    Q   Okay.  Did you ever get any letters,
9  phone calls --
10   **A   No.**
11   Q   -- correspondence of any sort from them,
12 either of them, while you were in custody?
13   **A   No.**
14   Q   Anybody from either of their families
15 come visit you while you were imprisoned for the
16 drug charge?
17   **A   No.**
18   Q   Are you still a member of the Gangster
19 Disciples today?
20   **A   No.  I'm retired.**
21   Q   How do you retire from the GDs?
22   **A   Just quit.**
23   Q   Do you have to tell somebody?
24   **A   Huh?**

267

1    Q   Do you have to tell somebody?
2    **A   You ain't got to tell nobody nothing.**
3    Q   Okay.  You just decide that you're done?
4    **A   It ain't no more gang activities going**
5  **out there as it is, but they're just buck wild.**
6    Q   Yeah.  What do you mean by that, buck
7  wild?
8    **A   It's the new generation.  After that a**
9  **new generation and another generation.  Shorties**
10 **out there, you can't tell them nothing.**
11   Q   Like they don't listen to older guys like
12 you?
13   **A   Yeah, exactly.**
14   Q   Okay.  Did you know who -- back in 1994
15 time period, you knew the P Stones were, like,
16 right across the -- right across Garfield, right?
17   **A   Yes.**
18   Q   Just like a block north, basically, of
19 where you were, right?
20   **A   Yes.**
21   Q   Did you know any of those P Stones that
22 were across the boulevard?  Did you know, like --
23 if you recognize them, you knew their names,
24 maybe?

268

1    **A   Yeah, I went to school with some of them.**
2    Q   Yeah?  Do you remember the names of any
3  of the ones that you went to school with?
4    **A   Yeah, I remember.  Never forget them.**
5    Q   Tell me their names, the ones that you
6  can recall?
7    **A   Okay.  14 Karat Jeff, Eddie, Squangy, and**
8  **G-Pop.**
9    Q   Any others?
10   **A   Huh?**
11   Q   Any others?
12   **A   No, the rest of them I ain't messing with**
13 **them.**
14   Q   Okay.
15   **A   Okay.  Huh-uh.**
16   Q   And you knew their names because you went
17 to school with them?
18   **A   Yes.**
19   Q   Okay.  Did you know who -- you know, if
20 there were -- well, let me ask it this way:  GDs
21 had like -- as you testified, you know, he had
22 soldiers like you down at the bottom, and there
23 were guys up at the top, right, and there were
24 some people in between with different titles,

Transcript of Eddie Taylor
Conducted on March 9, 2020

68 (269 to 272)

269
1 correct?
2    A  Correct.
3    Q  Okay.  So it's kind of like a hierarchy,
4 right, within the gang?
5    A  Yes.
6    Q  The guy at the top makes the rules-ish,
7 and then people have less and less authority as
8 you get down -- all the way down to a street-level
9 guy like you who really had to take orders from
10 everybody else, right?
11   A  Yes.  I was around them.
12   Q  Yeah.  Okay.  So to your knowledge, was
13 it the same in the P Stones across the boulevard?
14 They had a hierarchy of guys at the top and guys
15 at the bottom?
16   A  Yes.
17   Q  And some guys in between?
18   A  Yes.
19   Q  All right.  Would you know some of these
20 P Stones on sight if they crossed over?  Like
21 you'd know what they looked like?
22   A  Oh, yeah.
23   Q  Okay.  What about ranking members of the
24 P Stones?  Would it be something that you would --

270
1 you would know who they were?
2    A  Yes.
3    Q  Yeah.  Like generals across the street in
4 P Stones, you would know them likely on sight?
5       MR. AINSWORTH:  Objection.  Foundation.
6       MR. CURRAN:  Join.
7       MR. AINSWORTH:  Calls for speculation.
8    A  Yes.
9    Q  Why would you know who they were on
10 sight?
11   A  I grew in school -- I grew with them in
12 that neighborhood.
13   Q  Okay.  Would it be -- in light of the
14 territorial, you know, violations that could
15 occur, would it be kind of expected or -- that you
16 would know who some of these high-ranking guys
17 were from across Garfield that were P Stones
18 ranking gang members?
19   A  Yeah, I knew them but not knew them like
20 that for what their business is.
21   Q  Totally.  What I'm wondering more about
22 is, if you saw them on sight, you'd be, like,
23 that's a P Stone, that's such and such.
24       MR. CURRAN:  Objection to foundation.

271
1       Go ahead.
2    A  Yeah.  The persons that I grew up with,
3 yes, in grammar school and high school.
4    Q  Okay.  Would those guys that you grew up
5 with, by virtue of them being P Stones despite the
6 fact that you grew up with them, would they still
7 be in danger of getting hurt if they came across
8 the boulevard into GD territory?
9       MR. AINSWORTH:  Objection.  Calls for
10 speculation.
11      MR. CURRAN:  Join.
12   A  We all took our own chances going across
13 each side.  So that's on you.  Repercussions and
14 consequences on you.
15   Q  So it was possible?
16   A  Yes.
17   Q  Okay.  Maybe not something that you would
18 carry out if you knew them, but somebody else
19 might?
20   A  Yeah, you could say that, yes.
21   Q  Were there girls in the gangs?  For
22 example, in the GDs, were there female GD members?
23   A  Not around where we at.
24   Q  Why not?

272
1       MR. AINSWORTH:  Objection to foundation.
2    Q  To your knowledge.  Just in the
3 experience.
4    A  I didn't really see nothing until I go to
5 the projects.  That's it.
6    Q  Like throughout the trailer homes?
7    A  Yes.
8    Q  Okay.  Based on your experience, though,
9 around, you know, where you grew up on, around
10 55th street in Englewood, based on your
11 experience, were you ever -- did you ever become
12 aware of a reason why women were not GD members,
13 at least in that area where the GDs were?
14   A  No.  I really wasn't all into all of
15 that.
16   Q  Okay.
17   A  You know?
18   Q  Cool.  Did women have some -- in your
19 experience back in the 1994 time period, did women
20 have some -- I don't want to say immunity; but,
21 like, was it safer for a woman to go back and
22 forth across 55th Street to the P Stone side to
23 the GD side without, you know, the same fear that
24 you might have of getting hurt?

Transcript of Eddie Taylor
Conducted on March 9, 2020

69 (273 to 276)

273

1       MR. AINSWORTH: Objection. Foundation
2 and form.
3    Q  Do you understand my question?
4    A  Say it one more time?
5    Q  Yeah.  So, like, would it be -- you know,
6 you had testified earlier today that, as a GD, if
7 you went north of Garfield in the P Stone
8 territory, you know, you would be, like, I could
9 probably get hurt or killed by a P Stone.
10 Would -- just by virtue of you being, you know, a
11 GD.
12       So did women, you know -- were they
13 generally to your knowledge subject to the same
14 type of retaliation for crossing -- you know,
15 going from -- the girl lived on north of Garfield
16 and came down in the GD territory, would it be
17 safe for her to do that --
18    A  Yeah.
19    Q  -- or would it -- it would be safer for
20 her to do that than a guy living north of Garfield
21 coming --
22    A  Yes.
23    Q  Okay.  Why would it be safer for a woman
24 to cross 55th Street from one side or the other?

274

1    A  Because she's a female.
2       MR. AINSWORTH: Objection. Foundation.
3    Q  Based on your experience.
4    A  And everybody likes to see new females go
5 inside and come across.  You know?  They do
6 both -- don't just do one side, they go from both
7 sides.  You know?
8    Q  Gotcha.  Okay.  So in 2017, as I started
9 asking you before the break, you testified earlier
10 that you recall that some investigators from the
11 Cook County state's attorney's office came and
12 spoke with you about this case, right?
13    A  Yes.
14    Q  Okay.  When did you first -- or how did
15 you find out the state's -- these people from the
16 state's attorney's office wanted to speak with
17 you?  You got a call from your nephew, right?
18    A  My nephew.
19    Q  Okay.  And you didn't know that -- before
20 then that they were looking to talk to you,
21 correct?
22    A  No.
23    Q  And your nephew called you, and you go to
24 his house, and these two investigators are there,

275

1 right?
2    A  Yeah.
3    Q  And I think you testified earlier that
4 they identified themselves and told you who they
5 were, correct?
6    A  Yes.
7    Q  And they showed you their credentials,
8 correct?
9    A  Yes.
10    Q  Okay.  And you understood very clearly
11 that these were people from the Cook County
12 state's attorney's office, right?
13    A  Yes.
14    Q  And you understood at the time that you
15 were speaking with them that they worked with the
16 prosecutor's office, same office that prosecuted
17 you for crimes in the past, correct?
18    A  Correct.
19    Q  Okay.  So -- and you didn't think that
20 these people, like, were your lawyers or anything
21 like that that were representing you, right?
22    A  No.
23    Q  All right.  And you testified earlier
24 that your conversations with them were

276

1 relatively -- were amicable, that they didn't make
2 any threats.  They weren't mean to you or anything
3 like that, correct?
4    A  Right.
5    Q  All right.
6    A  Yes.
7    Q  And was your nephew present for this
8 conversation with these two investigators?
9    A  No.
10    Q  It was just you, these two
11 investigators -- anybody else?
12    A  And my other brother Andre.
13    Q  Andre was there.  Okay.
14       And where exactly did you all talk?
15    A  In the back patio.
16    Q  Back patio.  Of which house?
17    A  Of my brother's.
18    Q  Address?
19    A  5401 South Woods.
20    Q  54 --
21    A  01 South Woods.
22    Q  -- 01 South Woods.  Okay.  Got it.
23       And which brother was this again?
24    A  Andre.

Transcript of Eddie Taylor
Conducted on March 9, 2020

70 (277 to 280)

277

1    Q   Andre.  Sorry, you said that.  Okay.  Got
2  it.
3        Anybody else?  Just the four of you or --
4  you, Andre, and these two investigators?  Anybody
5  else there?
6    A   There was -- there was more than two.
7    Q   There was more than two investigators?
8    A   Yeah.
9    Q   Who else was there?
10   A   There was a lady there too.
11   Q   Okay.  So two guys and a woman?
12   A   Yes.
13   Q   Okay.  All right.  So when you get there,
14 what did they tell you they wanted to talk to you
15 about?
16   A   About the release of Coleman and Fulton.
17   Q   Okay.  Did you know that they had been
18 released at this time?
19   A   No.  I don't think they had been released
20 yet.
21   Q   Did you know that they were going to be
22 released?
23   A   Yeah.  I found out through the news.
24   Q   Okay.  Did you find out from any other

278

1  source?
2    A   No.
3    Q   Like Ricky reached out to you and told
4  you that they might be getting out?
5    A   After.  He -- after the fact.  After the
6  peoples came.  He came and told me too.
7    Q   Did you -- who's he?  Ricky?
8    A   Ricky.
9    Q   Okay.  Did you know, at least, you know,
10 from 2013 after you got released on the drug
11 charge, once you were out, did you know from any
12 source that Fulton and Coleman were trying to get
13 out of jail?
14   A   Not in my prior knowledge.
15   Q   You didn't know that?
16   A   No.
17   Q   Okay.
18   A   I went on about my life.
19   Q   Pardon me?
20   A   I went on about my life.
21   Q   Okay.  Did you -- you know, at that time
22 in 2017, did you live near -- I'll ask it this
23 way.  Withdraw the question.
24       Between 2013 and 2017, when you had this

279

1  meeting with the investigators from the state's
2  attorney's office, did you ever live near any
3  Fulton family members between 2013 and 2017?
4    A   I stayed in the area, but they stayed
5  farther away like in the 60s and 70s.
6    Q   Okay.
7    A   I stayed at 55th.
8    Q   Okay.
9    A   I mean 54th.
10   Q   So in those, like, four years, did you
11 ever see any Fulton family members?
12   A   I ain't come around none of them.
13   Q   Okay.
14   A   None of them.
15   Q   All right.
16   A   You know what I'm saying?  Because I was
17 upset.  I wasn't going around nobody.
18   Q   Okay.  You were still upset about having
19 been named at all in it?
20   A   Yes.
21   Q   You were upset at the Fultons generally?
22 Because, Eddie, I mean, Darrell is in jail; so,
23 you know, he was the one that -- one of the two
24 guys whose statements your name appeared in.

280

1        Why, then, were you upset at the Fultons
2  more broadly, I guess?
3    A   I wasn't really upset at the whole
4  family.  I was upset at the mom and him.  You know
5  what I'm saying?  Because she acted like she --
6  you're supposed to be a mother.  And I come to you
7  and ask you -- you know what I'm saying?  You
8  raised me.  And you looked at me like -- you know
9  what I'm saying?  You're looking down on me, you
10 know?  And I asked you a certain question, and
11 you -- she snapped on me, so --
12   Q   What questions did you ask her?
13   A   I asked her what happened.
14   Q   Are you talking about the day that you
15 were on the porch?
16   A   Yes.
17   Q   Like before you went to K Town?
18   A   Yes.
19   Q   Okay.  Other than that incident, had you
20 not talked to her since that day in 1994?
21   A   No.
22   Q   So you were still angry at her all the
23 way in 2017?
24   A   Eventually I'll get over it.  Yeah,

Transcript of Eddie Taylor
Conducted on March 9, 2020

281
1  eventually I'll get --
2    Q   All right.
3    A   Yes.
4    Q   And it's true that, as you testified
5  before, that you've known Darrell since you were a
6  kid, basically, right?
7    A   Yes.
8    Q   Did you guys call yourselves cousins?  Is
9  that a way that you referred to each other?
10   A   Yes.
11   Q   But you guys weren't blood related,
12 right?
13   A   No.
14   Q   Okay.  That was just a word that you guys
15 used --
16   A   Streets.
17   Q   -- to explain quickly, like, that you
18 guys were really close?
19   A   Yes.
20   Q   Like friends, right?
21   A   Yes.
22   Q   And that -- and you testified earlier
23 today too that you'd known Coleman since you guys
24 were kids but that you guys didn't hang out.

282
1    A   No, we didn't hang out.
2    Q   Okay.  But that's right, though, what I'm
3  saying?
4    A   Yes.
5    Q   You'd see him, though, in the
6  neighborhood?
7    A   Yeah, I'd see him.
8    Q   You knew who he was?  You saw him walking
9  down the street, you'd be like, That's Nevest
10 Coleman, right?
11   A   Yeah.  Stayed right across the street
12 from him.
13   Q   Yeah.  He didn't have a nickname, did he?
14   A   Nevest.
15   Q   Just Nevest, right.
16       Did you know anybody with the nickname of
17 Kat, K-A-T?  That's a name that comes up.  I'm
18 trying to figure out who she is.
19   A   Yeah.  My little cousin who got killed.
20 Kat.
21   Q   Okay.  Kat.
22   A   That's the one you're talking about,
23 right?
24   Q   I don't know.

283
1    A   Yeah.
2    Q   How old was she?
3    A   She was around, like -- Kat was young.
4  About 20-something -- 22, 23.
5    Q   When did she get killed?  What year?
6    A   What year was that when I came home from
7  the joint?  It had to be a year before I came.  I
8  think it was '93.
9    Q   Okay.
10   A   Yep.  I think it was before I came home.
11   Q   She was killed in '93?
12   A   I think so before I came home.
13   Q   Before you came home from jail --
14   A   Yes.
15   Q   -- back in 1994.  Okay.
16       If you mind me asking, how was she
17 killed?
18   A   From what I heard, her boyfriend had
19 stabbed her up in the alley.  You know?  He was
20 fighting on drugs.
21   Q   Sorry.  Did he get arrested for it?
22   A   Yeah, they got him.
23   Q   They got him?
24   A   Yes.

284
1    Q   All right.  55th and Halsted is how far
2  west of where you were living in 1994?
3    A   '94?
4    Q   Yeah.  Halsted is what?  800?
5    A   Yeah, I was staying in Robert Taylor's
6  with my girl when I came home in '94.
7    Q   Okay.
8    A   Just for that little period of time.
9    Q   Just for that little period of time?
10   A   Yes.
11   Q   So relative to where Nevest lived or
12 Darrell, I should say -- or where Darrell lived,
13 how far away was 55th and Halsted?
14   A   They all were in -- I'm on State Street,
15 they're all the way on Peoria.
16   Q   Yeah.
17   A   That's a long way.  That's almost a mile.
18   Q   Okay.  Did you ever hang out with Darrell
19 around 55th and Halsted?
20   A   Yeah, when we were younger.
21   Q   Yeah?  What was over there?
22   A   I told you the car wash.  We hustled
23 right there.
24   Q   If you said that, that's where it

Transcript of Eddie Taylor
Conducted on March 9, 2020

72 (285 to 288)

---

285

1  was, I missed that earlier; so I'm sorry for that.
2  Okay.
3          So the car wash that you guys would go
4  hustle at, wash cars, and whatnot --
5      A  Yes.
6      Q  -- that was over at 55th and Halsted?
7      A  Yes.
8      Q  Okay.  When you got out -- so in '93, I
9  guess-ish, right --
10     A  '94.
11     Q  Early '94?  What month did you get
12  released?
13     A  April.
14     Q  April.  That's right.  April.
15         Did you notice that Nevest and Darrell
16  were hanging out too when you came back?  Do you
17  have a recollection of that?
18     A  When I came around, they all just be out
19  there.  You know, the whole family and friends.
20  You know what I'm saying?  So I really didn't know
21  who was hanging with who like that because I was
22  staying out west at the time when I got locked up.
23  I wasn't hanging out south.
24     Q  Uh-huh.

---

286

1      A  You see what I'm saying?
2      Q  Yeah.  Well, did you see --
3      A  I saw them all hanging together, you
4  know.
5      Q  Nevest and Darrell and other people --
6      A  Yes.
7      Q  -- together?
8      A  Yes.
9      Q  But you would see Nevest and Darrell
10  together?
11     A  No.  I ain't never seen them just
12  together --
13     Q  Okay.
14     A  -- by themselves.
15     Q  Okay.  But it was always with a larger
16  group of people?
17     A  Yes.
18     Q  Okay.  How often did you see them
19  together, at least in a larger group of people,
20  after you got released and before you got picked
21  up on that Bridgeman murder?
22     A  I didn't see Nevest much, but I seen
23  Darrell.  You know, because I come down --
24  sometimes I come from the projects.  I'll walk all

---

287

1      the way to Peoria where they stayed, and I'd look
2      for him, just Darrell.  And he didn't be around,
3      so I'd head west and gone.
4      Q  Okay.  Over the Robert Taylor homes?
5      A  Yes.
6      Q  Yeah.  Okay.  So the investigators that,
7      you know, interviewed you in 2017 made a report,
8      you know, about -- they took notes and wrote a
9      report about what you told them in that interview
10  that you did with them.
11     A  Yes.
12     Q  And one of the things that they wrote
13  down was that, after you got out and you were back
14  in the neighborhood-ish -- back in April, I guess,
15  1994 -- that they said that you told them that
16  Darrell had become friends with Nevest Coleman and
17  that they were spending a considerable amount of
18  time together.  That's what they wrote the down.
19         So do you recall telling the
20  investigators that?
21     A  No.  No.
22     Q  Okay.  All right.  When you would see
23  Darrell and Nevest together, whether I guess in
24  these groups of people that you said that you'd

---

288

1      see them with, was it always the same group of
2      people?
3      A  Yes.
4      Q  Could you name -- how big was this group,
5      and can you name anybody else other than Darrell
6      and Nevest?
7      A  No.  It was the majority of Darrell's
8      family.  You know, he's got the biggest family
9      over there.
10     Q  Fultons, Griffins -- those folks?
11     A  Yes.
12     Q  Okay.  Do you remember like who these
13  people were?
14     A  Yeah.  I know every last one of them.
15     Q  Okay.  So this group of people that you'd
16  see Darrell and Nevest together with, most often
17  who was in this group of people?
18     A  Like I said, the majority of Fulton's
19  cousins.
20     Q  Okay.  Could you tell me the names of the
21  people that you'd see him with?
22     A  Yeah.  Black, Honey, Kank, Harrison, his
23  brother Derek -- who else?  Yeah, that's about it.
24  A couple more of them.  I can't remember their

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

73 (289 to 292)

289

1 names.
2     Q   So basically it would be Nevest and a
3 bunch of -- Darrell and a bunch of Darrell's
4 family?
5     A   Yes.
6     Q   That's the group that you'd see --
7     A   Yes.
8     Q   -- together?  Okay.
9         And I think you testified earlier that
10 one of the places this group would be -- that
11 you'd see them in would be in the alley maybe
12 playing basketball in the back; is that right?
13     A   Yes.
14     Q   Okay.  And this is the alley behind
15 Nevest's home kind of down the alley from where
16 Darrell lived, right?
17     A   Yes.
18     Q   Okay.  How often did you see him back in
19 the alley?
20         MR. AINSWORTH:  Objection.
21     Q   Yeah, in the month or so that you were
22 out, how often would you see them in the alley?
23     A   It was warm.  You know, every blue moon
24 I'd come through there, I'd catch them all out

290

1 there.
2     Q   Okay.
3     A   Wasn't like every day, every day.  I
4 ain't hanging with them like that.
5     Q   Right.  But it wasn't an unusual sight
6 for you to see them all back there?
7         MR. CURRAN:  Objection.
8         MR. AINSWORTH:  Objection to the form of
9 the question and foundation.
10         MR. CURRAN:  Join.
11     Q   You would be walking through the alley,
12 and you would see Nevest and Darrell and the other
13 Fulton family members together in the alley, and
14 it wasn't an unusual sight.  Although you didn't
15 see them every day or once in a blue moon, but it
16 wasn't -- when you walked through, it was not an
17 unusual sight for you to see them all in the alley
18 together?
19         MR. AINSWORTH:  Objection to form and
20 foundation.
21         MR. CURRAN:  Same.  Join.
22     A   When I seen them, I just see them.  I
23 didn't speculate or judge nobody.  You know what
24 I'm saying?  I just seen them.  And they out

291

1 there -- they're doing what they do.
2     Q   And one of the times that you saw them
3 back there, I think you testified earlier, you saw
4 Nevest come up with a case of beer; is that right?
5     A   Yes.
6     Q   What kind of beer was it?
7     A   Budweiser.
8     Q   Okay.  Why do you remember -- do you
9 specifically remember that?
10     A   I remember that.  He had the whole case
11 on him.
12     Q   Okay.  Is that a beer that you recall
13 that Nevest typically drank?
14     A   I don't know if he drank it or not.  I
15 just seen him with the case.  I never drunk with
16 him or --
17     Q   Yeah.
18     A   -- spent time with it like that.
19     Q   Sure.  Okay.  Did you ever hang out with
20 this group of people too?
21     A   Yeah.  Well, I -- Nevest and I -- with
22 Nevest and Darrell, yes.
23     Q   Okay.
24     A   That's my family.

292

1     Q   Right.  Okay.  Would you ever see anybody
2 in this group of people smoking sherm sticks --
3     A   No.
4     Q   -- the ones that we talked about earlier
5 today?
6     A   No.
7     Q   Never?
8     A   Never.
9     Q   What about just, like, people smoking
10 weed?
11     A   Yeah.
12     Q   Okay.  That wasn't an unusual thing?
13     A   No.  It was unusual.  They smoking pot,
14 they doing something else uncivilized.
15     Q   Okay.  Would you see Nevest smoking pot?
16     A   No.  I ain't never seen him smoke
17 nothing.
18     Q   Would you see Darrell smoking pot?
19     A   No.
20     Q   Do you know if Darrell ever smoked pot?
21     A   No.  I didn't know that either, no, sir.
22     Q   All right.  So going back to, like, what
23 the investigators said you told them, they said
24 that you told them that at that time -- so from

Transcript of Eddie Taylor
Conducted on March 9, 2020

74 (293 to 296)

293

1 the time that you got out up to the time where the
2 police picked you up from the Bridgeman murder,
3 that you saw Darrell Fulton and Nevest Coleman
4 spending considerable time in the alley behind
5 Nevest Coleman's residence.
6     Did you tell them that?
7     A  No.
8     MR. CURRAN: Objection. Asked and
9 answered. Well, I apologize.
10     Go ahead.
11     Q  No, you didn't tell them that?
12     A  No.
13     Q  Okay. They also said that -- they
14 reported that you told them that this group that
15 Darrell and Nevest would be seen -- that you'd see
16 them drinking beer and smoking sherms, which you
17 told them to be cannabis cigarettes that had PCP
18 in them.
19     Did you tell the investigators anything
20 like that?
21     A  No.
22     Q  Okay. You already testified today,
23 though, that you know what sherm sticks are.
24     A  Yes.

294

1     Q  And you've testified about the effects,
2 in your experience, of those types of -- that type
3 of drug --
4     A  Watching other peoples.
5     Q  -- has on people. It makes them crazy,
6 right?
7     A  Yeah.
8     Q  You never -- you ever been inside
9 Coleman's house?
10     A  No, sir.
11     Q  You knew where they lived, though, right?
12     A  Yes.
13     Q  You've never been inside it, though?
14     A  No.
15     Q  You ever looked inside through a window
16 or anything like that?
17     A  No.
18     Q  Do you remember the investigators asking
19 you if -- giving you some names and asking you if
20 you knew who certain people were by name? Do you
21 remember them asking you questions like that?
22     A  No. They -- they were just basically --
23 you know, they were just basically concerned about
24 the -- about Nevest and Darrell.

295

1     Q  Do you remember if the investigators
2 asked you if you knew Francine Calimee?
3     A  I told them yes.
4     Q  Yeah. So you do remember them asking
5 about her?
6     A  You said they remember --
7     Q  Yeah, do you remember the investigators
8 asking you --
9     A  Oh, yeah. You said certain names.
10     Q  Yeah.
11     A  You mean specific names? You just said
12 certain names.
13     Q  Sorry. I was asking generally just as a
14 starter question if you remember if the
15 investigators listed some names to you and asked
16 you generally if you knew some people.
17     It sounds like you do remember them
18 asking you questions like that.
19     A  I remember them asking me questions, but
20 a lot of them I really couldn't answer because it
21 was -- you know what I'm saying? It was a long
22 time ago.
23     Q  Well, it was 2017.
24     A  You know what I'm saying? It's still a

296

1 long time.
2     Q  Okay. So you remember that they asked
3 you if you knew Francine Calimee, right?
4     A  Yes.
5     Q  And you told them that you did, right?
6     A  Yes.
7     Q  And you knew her from the neighborhood,
8 right?
9     A  Yes.
10     Q  Okay. And did you ever date Francine or
11 anything like that?
12     A  No.
13     Q  Okay. Did you ever go to parties with
14 her or see her at parties?
15     A  No.
16     Q  Okay. How did you know her exactly?
17     MR. AINSWORTH: Objection. Asked and
18 answered.
19     A  Through my little cousin Lill Robert.
20 That's his baby mama.
21     Q  That's right. Baby mama. Okay.
22     And they asked you if -- you remember
23 them asking you if you knew a person that went by
24 the nickname of Hobo?

Transcript of Eddie Taylor
Conducted on March 9, 2020

297

1    A  No.
2    Q  Do you remember that they asked you that?
3    A  I can't remember no name about no Hobo.
4    Q  No.  The question is do you remember the
5  investigators from the state's attorney's office
6  asking you.
7    A  No.
8    Q  Do you know a person by the name of Hobo?
9    A  No.
10   Q  Okay.  Do you remember them asking you if
11 you knew somebody with the nickname HB?
12   A  No.
13   Q  No, you don't remember; or, no, you don't
14 remember if they asked you that?
15   A  They didn't -- I don't know if they asked
16 me no question like that, no.
17   Q  Okay.  Do you remember if they asked you
18 if you know a person named Clarence Neal?
19   A  No.
20   Q  You don't remember them asking you that?
21   A  No.
22   Q  What about a guy named Antwone Powell?
23 Do you remember if they asked you if you know that
24 person?

298

1    A  No.
2    Q  Do you know that person?
3    A  No.
4    Q  Okay.  Do you know -- strike that.
5       Do you know a person named Clarence Neal?
6    A  No.
7    Q  Have you ever heard that name anywhere?
8    A  No.
9    Q  So it is -- as you testified earlier
10 today, shortly before the body was discovered, you
11 did notice a smell in the alley while you were
12 playing basketball in the alley, right?
13   A  They tried to get me to play basketball.
14 I didn't play.
15   Q  Okay.  But, anyway, people were playing
16 basketball.  You were in the alley, you noticed a
17 smell, right?
18   A  Yes.
19   Q  Okay.  And at the time that you noticed a
20 smell in the alley shortly before the body was
21 discovered, when was the first time before that
22 that you'd seen Darrell, if you remember?
23   A  Say that again?
24   Q  So at the point when you were in the

299

1  alley, people want to play basketball, you noticed
2  a smell -- okay?  So before that when was the last
3  time that you saw Darrell, if you remember?
4    A  I saw Darrell -- I saw Darrell right --
5  where I didn't see him -- because that's when I
6  came over that morning -- I don't know if it was a
7  couple of days later or what.  I don't know.  But
8  next time I seen him, we was in the county jail.
9    Q  Okay.  So you hadn't seen him for a bit?
10   A  Yeah.
11   Q  Okay.  Did you know if he had left the
12 neighborhood at all or if he just -- or what?
13   A  No.  He ain't leave the neighborhood.
14   Q  Okay.  But you hadn't seen him in a
15 while?
16   A  No.  I ain't seen him.
17   Q  Okay.  Do you recall, you know, between
18 the time you got out in beginning of April '94-ish
19 until the time you got picked up, do you recall
20 seeing Darrell at any point during that time
21 period?
22   A  When I got out?
23   Q  Yeah.  Like beginning of April 1994, and
24 then you get picked up in June, you know, of '94.

300

1  In that time period, did you ever see --
2    A  I seen him when I first came home.
3    Q  So beginning of June?
4    A  No.
5    Q  Or beginning of April.  Excuse me.
6    A  Yes.
7    Q  Okay.  So you saw him at the beginning of
8  April, and then you didn't see him again until you
9  got to county?
10   A  Yes.
11   Q  Okay.  Did you ever see Darrell during
12 the time that you saw him behaving in any way that
13 to you was unusual?
14   A  No.
15   Q  Okay.  The investigators from the CIU
16 said that, when you saw Darrell in that time
17 period, that you described him as acting crazy but
18 that Mr. Fulton would not tell you why he was
19 acting in such a manner.
20      Did you tell the CIU investigators that?
21   A  Yes.
22   Q  Okay.  Why did you tell the CIU
23 investigators that?
24   A  Because him and his girl, she was driving

Transcript of Eddie Taylor
Conducted on March 9, 2020

76 (301 to 304)

---

301

1 him crazy. He was always into it with her.
2 Kimberly.
3    Q   Okay. So they report that you -- that
4 Darrell would not tell you why he was acting
5 crazy, but it sounds like you know why now.
6 Because of this girl? I guess so like where are
7 you getting that from now? Like how do you know
8 that it was over a girl? I'll withdraw the
9 question.
10       How do you know that Darrell was acting
11 crazy over a girl back then?
12    A   Because when I first came home, we went
13 to see his girl, and they was always arguing.
14    Q   Okay.
15    A   Because they was fitting to get married.
16    Q   Okay.
17    A   And they was arguing about the wedding
18 and how they're going to set it up.
19    Q   Okay. Do you remember his girl's name?
20    A   Kimberly. I went to school with her too.
21    Q   Okay. Where was she living at the time,
22 if you know?
23    A   She stayed on 57 Aberdeen.
24    Q   Did you tell -- what did you tell the --

---

302

1 if you recall -- the investigators from the
2 state's attorney's office in 2017 about -- or did
3 you tell them that you went alone to the police
4 station at 51st and Wentworth where you
5 surrendered? Did you tell them that?
6    A   I didn't even go there. I drove there.
7    Q   You drove there?
8    A   No. I got drove from Harrison and Kedzie
9 to --
10    Q   Okay.
11    A   From one police station to the other.
12    Q   Yeah. Did -- when you -- Noland, right?
13    A   Noland.
14    Q   When he picked you up, did he, like, walk
15 you in to 51st and Wentworth; or did he, like,
16 drop you off?
17    A   Yes, he did.
18    Q   He did?
19    A   Yes.
20    Q   Okay.
21    A   Took me straight to a white shirt.
22    Q   Got it. To a sergeant?
23    A   Yes.
24    Q   All right. Okay. Couple of times today

---

303

1 you've used the word perverted to describe at
2 least what you saw in those photographs.
3       The CIU reports that you told them that
4 the detectives that arrested you allowed you to
5 view photographs of the crime scene. That's
6 right? That's true, correct?
7       MR. AINSWORTH: Objection. Form and
8 compound.
9    A   Say it one more time.
10    Q   So the detectives, when you were being
11 interrogated at 51st and Wentworth, they showed
12 you pictures of the crime scene, correct?
13    A   Yes. Of the girl.
14    Q   And the CIU investigators report that you
15 told them that, upon viewing those photographs,
16 you said something to the effect that Coleman and
17 Fulton were, quote, perverted for doing that to
18 the woman.
19       Did you say anything like that to the CIU
20 investigators, the state's attorney's
21 investigators?
22       MR. AINSWORTH: Objection. Form.
23 Compound.
24       MR. CURRAN: Join.

---

304

1    A   I can't recall.
2    Q   Is it possible you said something like
3 that?
4       MR. AINSWORTH: Objection. Calls for
5 speculation.
6       MR. CURRAN: Join.
7    A   If I did, I was upset.
8    Q   Okay.
9    A   Because I was in a situation that I ain't
10 got nothing to do with.
11    Q   Okay. Were they accusing you of being
12 involved, the state's attorney's investigators?
13    A   Yeah. He was getting down on me like --
14 you know what I'm saying? He was rough. He was
15 rough.
16    Q   During your interrogations at 51st and
17 Wentworth, did you ever tell any of the police
18 officers -- although you can't remember what they
19 looked like or who they were, did you ever tell
20 any of those five guys that you thought Coleman
21 and Fulton were, quote, perverted motherfuckers?
22       Do you recall using that language back in
23 1994?
24    A   Yes.

---

Transcript of Eddie Taylor
Conducted on March 9, 2020

305

1    Q   You said that?
2    A   Yes.
3    Q   You said Coleman and Fulton are perverted
4  motherfuckers?
5    A   I said it because I was upset and the
6  situation they had gotten me in.
7    Q   Okay.
8    A   Out of anger.
9    Q   So you used that language back in 1994,
10 and then you used it again in 2017, calling it
11 perverted when you talked to the state's
12 attorney's office investigators; is that right?
13      MR. AINSWORTH: Objection. Form and
14 compound.
15      MR. CURRAN: Join.
16    A   Yes.
17    Q   Okay. With the report, you're
18 specifically saying also that they were perverted
19 for doing that to the woman.
20      Why did you say that they were perverted
21 for doing that to the woman --
22      MR. AINSWORTH: Objection and --
23    Q   To the state's attorney's investigators.
24      MR. AINSWORTH: No. That's not what

306

1  it's -- you're misrepresenting what the document
2  states, and I think it's a --
3      MR. GRILL: I'll read the whole sentence.
4  This is what it says.
5      MR. AINSWORTH: Yes.
6    Q   The detectives -- this is what they
7  report you telling them. Okay? The state's
8  attorney's investigators in their report, this is
9  what they document in part.
10      This is one of the things they said you
11 told to them: The detectives also -- that you
12 told them that the detectives allowed,
13 Mr. Taylor -- you -- to view photographs of the
14 crime scene.
15      And upon viewing these photos, you said
16 that -- you told the detectives something to the
17 effect of Coleman and Fulton were perverted for
18 doing that to the woman.
19    A   I said it like this: I said, If they did
20 that to that woman on that picture -- you dig what
21 I'm saying? -- that's perverted, freaky
22 motherfuckers. I said that.
23    Q   Okay.
24    A   Because that's an ugly situation when

307

1  they're putting something like that in your face
2  and you're innocent and you've got to go through
3  all these trials and tribulations. You know what
4  I'm saying? I'm just -- you know, I'm bugged up.
5    Q   Did you think that Fulton and Coleman had
6  done that, what was depicted in those photographs,
7  to Antwinica Bridgeman?
8      MR. AINSWORTH: Objection. Foundation.
9      MR. CURRAN: Join.
10    A   At the time I didn't know what was going
11 on. I just wanted to prove myself innocent.
12 That's why I put in for a speedy trial, and I put
13 in for a service trial.
14    Q   Right. So let's talk about 2017, then.
15    A   All right.
16    Q   When you talked to the state's attorney's
17 investigators in 2017 and said something to the
18 effect to them that Coleman and Fulton were
19 perverted for doing that to the woman, did you
20 think at the time that you made statement that
21 Fulton and Coleman did that to the woman -- to
22 that woman?
23    A   At the time I thought it because I didn't
24 have nothing to do with it and I'm looking at a

308

1  picture of a crime that they're trying to put on
2  me. You serious, man? I'm serious. Man, I won't
3  take no fall for nothing like that. Nobody.
4    Q   So -- okay. The investigators -- do you
5  recall that the investigators, when they
6  interviewed you in 2017, the investigators from
7  the state's attorney's office, talking to them
8  about the polygraph examination that you sat for
9  as part of the criminal investigation back in
10 1994?
11    A   Yes.
12    Q   Do you remember sitting for that
13 polygraph examination?
14    A   Yes.
15    Q   And I think you testified earlier today
16 that you were brought from county to the old
17 headquarters to do that there, right?
18    A   Yes.
19    Q   Had you ever sat for a polygraph before
20 that time?
21    A   No.
22    Q   Okay. That was your first one?
23    A   First one.
24    Q   You never sit for one subsequent to then?

Transcript of Eddie Taylor
Conducted on March 9, 2020

78 (309 to 312)

309

1 Afterwards?
2    A  Never.  Never.
3    Q  That's the only one you've ever done in
4 your life?
5    A  In my life.
6    Q  And which -- do you remember who it was
7 that brought you down to do the polygraph?
8    A  Only thing I remember is gold badges.
9    Q  Gold badges?
10   A  Yes.
11   Q  What does that mean to you?
12   A  They had gold badges on.  Maybe it's the
13 U.S. Marshals or something.
14   Q  Did you recognize this person that
15 brought you down to the polygraph?
16   A  No.
17   Q  Was it one of the guys that beat you?
18   A  No.
19   Q  Okay.  And when you gave the polygraph,
20 you were in a room by yourself with just the
21 polygraph examiner, correct?
22   A  Yes.
23   Q  The officer, whoever it was that brought
24 you down to the polygraph, was not in the room

310

1 with you when you --
2    A  No.
3    Q  -- took the polygraph test, right?
4    A  Yes.
5    Q  Okay.  And the examiner that gave you --
6 you know, administered the polygraph exam to you,
7 do you remember what he looked like?
8    A  He was an older cat.
9    Q  Okay.
10   A  I know that much.  He was an older cat.
11 Tall.
12   Q  How was he dressed?
13   A  He had on like a doctor suit thing.  I
14 remember that.
15   Q  A what?
16   A  A white thing.
17   Q  Oh, like a doctor's suit?  Is that what
18 you said?
19   A  Yeah, like a white -- like a --
20   Q  Like a lab coat?
21   A  Yeah.
22   Q  Okay.
23      THE REPORTER:  I'm sorry, I missed that.
24      THE WITNESS:  Oh, I'm sorry.  It was a

311

1 lab coat.  A white lab coat.
2       THE REPORTER:  Thank you.
3    Q  And did -- how long do you think you were
4 with this examiner for?  Was it like a couple of
5 minutes, or was it longer than that?
6    A  No.  It was longer than that.  Longer
7 than that.  Almost about an hour.
8    Q  About an hour?
9    A  About an hour.
10   Q  And how do you remember this examiner
11 treating you?
12   A  He was professional.
13   Q  He wasn't yelling at you or anything like
14 that?
15   A  No, sir.
16   Q  And he didn't beat you, right?
17   A  No, sir.
18   Q  Never laid a hand on you other than maybe
19 to put the probes and whatnot on you, right?
20   A  That's it, yes.
21   Q  Okay.  Did he accuse you of doing
22 anything, like --
23   A  No.
24   Q  Okay.  Did he -- other than asking you

312

1 some questions during the examination, after the
2 examination was over, did he continue asking you
3 questions about --
4    A  No.
5    Q  -- did you do it?
6    A  No.
7    Q  Nothing like that?
8    A  No.
9    Q  Okay.  And did he tell you the results of
10 the polygraph exam after it was over?
11   A  No.
12   Q  Okay.  Did you ever learn what those
13 results were?
14   A  Yes.
15   Q  What did you learn what the results were?
16   A  When I came -- when peoples came to see
17 me and tell me that --
18   Q  The people from the state's attorney's
19 office?
20   A  Yes.
21   Q  So you didn't learn what the results of
22 your polygraph exam were until 2017?
23   A  No.  I was just -- I just found out in
24 2017 what it was about.

Transcript of Eddie Taylor
Conducted on March 9, 2020

313

1    Q   Okay.  And what did you find out that
2  those results were?
3    A   They said I failed it.
4    Q   Okay.  And you don't recall the
5  individual that administered that test to you
6  telling you that you -- it indicated that you were
7  being deceptive in your answers?
8    A   No.  Only thing he did was just ask me
9  questions.  That was it.
10   Q   Okay.  How did you feel when you were
11  taking the polygraph test?  If you remember.  If
12  you think back to, like --
13   A   My first time scared about the whole
14  situation, the whole ordeal, you know?  Just
15  scared.
16   Q   Yeah.  You remember, like, when you were
17  taking the polygraph exam, that's how you felt?
18   A   Yeah.  The same way.  Because I don't
19  even know what's going to happen to me after I
20  take this.  I don't know.
21   Q   Right.  Did they explain to you or was it
22  explained to you at some point prior to the
23  examine being -- the polygraph examine being
24  administered to you, like, what the purpose of it

314

1  was?
2    A   No.  Not really.  Just the guy was
3  talking about how they brung me here.  And he was,
4  like, Okay.  They stepped out.  And he started
5  hooking them things up.
6    Q   Okay.  Did he tell you what the exam was
7  supposed to test for?
8    A   Oh, I knew what it was for.
9    Q   What did you know it was --
10   A   He didn't tell me nothing.  It was just a
11  lie detector test.
12   Q   Okay.  So you knew that's what it was
13  for?
14   A   Yes.
15   Q   It was going to try to determine if you
16  were telling the truth or not, right?
17   A   Yes.
18   Q   And so, since you were innocent, this was
19  like an opportunity for you to prove that, right?
20   A   Yes.
21   Q   In your mind, right?  Correct?
22   A   Yes.
23   Q   Okay.  So then why were you so nervous
24  about it?

315

1    A   Nervous and scared.
2    Q   Okay.  So --
3    A   Just about the whole ordeal, being caught
4  up in a situation like that.
5    Q   Right.  But this is --
6    A   You know, it's traumatizing.
7    Q   Right.  But this is like a chance that
8  you had to get a test result, right, at least in
9  your mind, yeah?
10   MR. CURRAN:  Objection.  Argumentative.
11  Form.
12   Q   At least in your mind that could clear
13  you, right?
14   MR. CURRAN:  Same objection.
15   Q   It was a lie detector test, right?
16   A   I was just taking the test to prove that
17  I didn't have nothing to do with none of that.
18   Q   Do you remember what questions you were
19  asked?
20   A   Crazy questions.
21   Q   What do you mean?  What about them was
22  crazy that you recall?
23   A   I try not to restore them in my memory
24  bank.

316

1    Q   Do you remember being asked if you
2  were -- questions asking if you were involved in
3  the killing?
4    A   I mean, asking me questions about the
5  case and other stuff -- you know, like simple
6  stuff.  What day it is.  Stuff like that.  I don't
7  know.
8    Q   Okay.  You didn't tell the polygraph
9  examiner that the police had beaten you up at 51st
10  and Wentworth, did you?
11   A   No.
12   Q   Why not?
13   A   He ain't no judge or no police.  He can't
14  do nothing for me.
15   Q   Well --
16   A   But test me.  What his job is to do for
17  what he gets paid.
18   Q   Well, he was treating you pretty nicely,
19  right?
20   A   Yes.
21   Q   You described him as being professional?
22   A   Yes.
23   Q   Okay.  And you had had recently this
24  experience where you were beaten consecutively by

Transcript of Eddie Taylor
Conducted on March 9, 2020

80 (317 to 320)

317

1 two different groups of police officers while they
2 were apparently getting you -- trying to get you
3 to confess to this crime, right?
4     A  Yes.
5     Q  Okay.  And you testified already that you
6 didn't tell the judge that that had happened and
7 you didn't tell your attorney that that had
8 happened.  And here's another opportunity for you
9 to tell somebody, and you didn't.
10     So I'm just wondering why you didn't tell
11 the polygraph examiner.
12     A  Because he didn't ask me did I get beat.
13     MR. AINSWORTH: Objection.  Form.
14 Compound.
15     Q  Would you only tell somebody that you
16 would have been beaten by the police if they had
17 asked you?
18     A  I made a call, told my family, my mama.
19     Q  Okay.  What did they, to your knowledge,
20 do with that information?  To your knowledge, what
21 did your family or your mom do with that
22 information?
23     A  She was upset by it.  She didn't do
24 nothing.  She didn't have no money to give me no

318

1 lawyer.  I had to fight that on my own.
2     Q  Well, you didn't have to pay for your
3 public defender, right?
4     A  No.
5     Q  And your public defender is a lawyer,
6 right?
7     A  To our term, penitentiary delivered.
8     Q  I didn't catch that.
9     A  Penitentiary delivered.  That's what we
10 call it in the county, a public defender.
11     Q  Oh, PD, penitentiary delivered.  Got it.
12 Okay.
13     So basically you didn't have any
14 confidence that the public defender would be able
15 to defend you?
16     So did you ask --
17     MS. MEADOR: Is that correct?
18     Q  Is that correct?
19     A  Yes.
20     Q  Okay.  Did you ask the judge to represent
21 yourself?
22     A  No.
23     Q  If you had that little confidence in the
24 public defender --

319

1     A  No.
2     Q  Why not?
3     A  Because he told me I had to have somebody
4 to represent me.
5     Q  So did you make that request or not?
6     A  No.  I did not make that statement to go
7 pro se.
8     Q  Right.  Okay.  So you know the term.
9     So why did you not ask the judge, Your
10 Honor, I will represent myself pro se because I do
11 not trust this attorney -- female attorney
12 can represent me effectively?
13     A  It's because I ain't really have the law
14 skills to really represent myself, so --
15     Q  Well, you didn't feel like your attorney
16 did either?
17     A  Well, I had to ride it out.
18     Q  Okay.
19     MR. CURRAN: Objection.  Argumentative.
20     Q  All right.  At any point did you see
21 Nevest and Darrell giving DNA samples while they
22 were at Cook County jail?
23     A  No.  They took us all in separate rooms.
24     Q  All right.  Did you ever -- okay.  Did

320

1 you see Nevest and Darrell at Cook County jail
2 while you were there?
3     A  One time, yes.
4     Q  Tell me about that time.
5     A  That's when they was in the barbershop.
6     Q  In the barbershop in the jail?
7     A  In Division 1.
8     Q  Okay.  Tell me what happened that day.
9     A  I just asked him, Man, how did my name
10 get in this?  That's all.  And neither one of them
11 acted like they could answer no questions.  I just
12 walked off.
13     Q  So you saw both of them together?
14     A  Yes.
15     Q  Were you all in the same tier, same wing?
16     A  Same division.
17     Q  Same division?  Which was Division 1?
18     A  Barbershop day.
19     Q  Okay.  And do you know where their
20 cell -- were they in the same cell, if you know?
21     A  I don't know.  I was in the back of the
22 jail.
23     Q  Do you know where their cells were?
24     A  Yeah.  They was in PC.

Transcript of Eddie Taylor
Conducted on March 9, 2020

81 (321 to 324)

321

1    Q   Okay.  Protective custody?  Okay.
2        Do you know why they were in PC?
3    A   They tried to get me to go up there.  I
4  told them I wasn't going.
5    Q   Darrell and Nevest wanted you to come
6  to --
7    A   No.  They didn't want me.  The officers
8  tried to put me in that to help for my protection.
9  I told them, I ain't got nothing to hide.  I'm
10 going in population.
11   Q   Is that because of the type of charge
12 that you were facing?
13   A   Yes.
14   Q   Okay.  So when you saw Darrell and Nevest
15 in the barbershop in Division 1, how long had you
16 been in custody at that point at Cook County jail?
17   A   I was with them like about -- like almost
18 two weeks I was there.
19   Q   Okay.  And when you saw them, how long --
20 you asked them, it sounds like -- you went right
21 up to and confronted them with, Why did you name
22 me?
23   A   That's what I wanted to know, why my name
24 was in this.  That's all I asked.

322

1    Q   And what exactly do you remember that
2  they said to you?
3    A   They said they don't know how my name got
4  in, and I was, like, Yeah right.  And I just
5  walked off.
6    Q   They said -- you recall them saying they
7  did not know how your name got in there?  That's
8  what they said?
9    A   Yes.
10   Q   You're 100 percent sure that's what they
11 said?
12   A   Yes.
13   Q   Like -- okay.  The CIU investigators
14 report that you told them that -- I was just going
15 to quote.  I'm trying to find the right spot
16 here -- Eddie Taylor stated that he saw Nevest
17 Coleman and Darrell Fulton attempting to resist
18 giving samples -- and the samples they're talking
19 about are DNA samples -- while you guys were at
20 Cook County jail.
21       Is that true?  Did you tell them that?
22   A   They wasn't resisting.  They was scared.
23 They was scared.  You know what I'm saying?  They
24 acted like they was real scared.

323

1    Q   Explain what you mean by that.
2    A   I -- to me they was -- it was like they
3  was resisting like they just didn't -- they didn't
4  know where they was going.  To me I looked like I
5  knew where I was going, but they told me where I
6  was going.
7    Q   All right.  So when you say that you
8  thought Darrell and Nevest were resisting, how
9  were they resisting?
10   A   Like they were scared like they're
11 fitting to get whooped or something.
12   Q   Okay.  So it sounds to me like you
13 remember some incident at Cook County jail where
14 you knew Nevest and Darrell had to give DNA
15 samples; is that right?
16   A   I thought I had to give them up.  I knew
17 they -- that's why they took us all down into the
18 hospital for.
19   Q   Okay.  So you went down to the hospital
20 with them, and you had to give a DNA sample, and
21 they did too?
22   A   No.  They had three different peoples
23 coming to get us.  They had two on me, two on
24 Darrell, and two on Nevest.

324

1    Q   Yes.  My question is, to your
2  recollection, did all three of you, though, go
3  down to the hospital at the same time to give DNA
4  samples?
5    A   Yes.
6    Q   Got it.  Okay.  And you saw Nevest and
7  Darrell down there or no?  In the hospital.
8    A   Yes.  I saw them down there.  We all --
9  they was waiting on me with the other two
10 officers --
11   Q   Got it.
12   A   -- and they put me in the front, took me
13 in the front --
14   Q   Got it.
15   A   -- and they was behind me bringing them.
16   Q   Nevest and Darrell were behind you?
17   A   Yes.
18   Q   All right.  And you gave your DNA sample?
19   A   Yes.
20   Q   And did you see Nevest and Darrell, then,
21 each go and --
22   A   No.  I left out first.  I didn't know if
23 they was still there or not.
24   Q   So when you say that they looked scared,

Transcript of Eddie Taylor
Conducted on March 9, 2020

325

1  just describe what you mean, like what you saw on
2  them or how they behaved that led you to --
3      A  Just scared, shaking, you know?
4      Q  Okay.  And the CIU investigators report
5  on this topic that Mr. Taylor demonstrated for the
6  reporting investigators and the ASAs by jerking
7  his legs and arms about in the same manner which
8  he saw Mr. Coleman and Mr. Fulton doing when the
9  DNA samples were being collected.
10         Did you demonstrate that to them?
11     A  Yes.
12     Q  What -- tell me in your own words, then,
13  what exactly it was that you were demonstrating to
14  the state's attorney's investigators.
15     A  He asked me -- I told him how we was
16  walking.  We would be shackled down.
17     Q  Right.
18     A  And then they was -- like, had to
19  force-walk them.  You feel what I'm saying?
20     Q  Uh-huh.
21     A  And I don't know -- I was just ready to
22  get it over with.  I guess -- I don't know what
23  was going on in their mind, if they'd been set up
24  or a what, I don't know; but I knew they were

326

1  scared.  You know, and I was too, and I wanted to
2  go ahead and get it over with it.  Let's get it.
3      Q  But you were -- you did, you know,
4  demonstrate some jerking --
5      A  Yes.
6      Q  -- or leg or arm movement to the
7  investigators --
8      A  Yes.
9      Q  -- as a way of demonstrating how you
10  thought Darrell and Nevest were resisting giving
11  these DNA samples; is that correct?
12         MR. CURRAN:  Objection.  Mischaracterizes
13  his testimony.
14     A  No.  It's -- I just said they was scared.
15  They was, like, shaking.
16     Q  Okay.  So you were -- that was them --
17  you demonstrated physically when they were doing
18  because they were scared?
19     A  Yes.
20     Q  Okay.  Who do you believe killed
21  Antwinica Bridgeman sitting here today?  Do you
22  have an idea, or do you have a theory on it?
23     A  I ain't trying that now.  I'm just glad
24  my name is out of that mess.

327

1      Q  Right.  I know.  So --
2      A  I got my life back.  I don't try to dwell
3  on it, think about it -- none of that.  I didn't
4  want to come here, if you want to know the truth.
5      Q  Yeah.  You're not the first to not want
6  to come in for one of these, but I appreciate you
7  coming.  I know you've been here a while, so thank
8  you.
9         But the question still stands.  Do you
10  have an idea or do you have a thought or a belief
11  about who killed Antwinica Bridgeman today?
12     A  No, sir.
13     Q  The CIU investigators -- the state's
14  attorney's investigators said this:  The reporting
15  investigators then specifically asked Eddie Taylor
16  if he knew who murdered Antwinica Bridgeman.  And
17  in response you stated that you believed Darrell
18  Fulton and Nevest Coleman had done so.
19         Did you say anything like that to the
20  investigators?
21     A  No.
22     Q  Okay.  So with the time that you gave
23  this interview to the state's attorney's
24  investigators, Nevest and Darrell had not been

328

1  released yet from prison, correct?
2      A  Yes.
3      Q  All right.  And you had no idea at the
4  time that you gave this interview whether they
5  were actually going to get out of jail, correct?
6      A  I didn't know if they were going to get
7  out or not.
8      Q  Right.  And in 2018, though, when you saw
9  Darrell face to face --
10     A  I saw it on the news.
11     Q  No, no, no.  In 2018, you know, you knew
12  he was out, you were there meeting with him face
13  to face, right?
14     A  No.  He was there to meet me.
15     Q  Right.  But you guys were all meeting
16  together, right?
17     A  Right.
18     Q  Okay.  And at that time --
19     A  Not all of us guys, just me and Darrell.
20     Q  And it was at that time you knew that he
21  had a lawsuit and was going to be compensated for
22  it, correct?
23         MR. AINSWORTH:  Objection.
24         MR. CURRAN:  Form.

Transcript of Eddie Taylor
Conducted on March 9, 2020

329

1      A   No.
2      Q   Well, that's what you testified to
3  earlier today, right?
4          MR. AINSWORTH: Objection.
5          MR. CURRAN: Mischaracterizes his
6  testimony.
7      A   No, I didn't say that, no.
8          MR. GRILL: Can we take just a quick
9  break? I think I may be done. I just want to go
10 over a couple of notes with my colleagues, and
11 then, if I am done, I can pass it off.
12         THE VIDEOGRAPHER: Okay. We are going
13 off the video record at 3:34 p.m., and this is the
14 end of Video Media 4.
15         (A recess was taken.)
16         THE VIDEOGRAPHER: We are back on video
17 record at 3:47 p.m., and this is the beginning of
18 Video Media 5.
19 BY MR. GRILL:
20     Q   All right. I am almost done. Just a few
21 more questions.
22         Mr. Taylor, when you were at 51st and
23 Wentworth back in '94 and the interrogations were
24 concluded or you were being interrogated down

330

1  there but before you were transferred over to Cook
2  County jail, do you remember if anybody took any
3  photographs of you while you were down there?
4      A   No. They waited till they took my
5  picture first, and then they got them.
6      Q   I'm not following you.
7      A   You know how you're supposed to go --
8  when you go through processing, right?
9      Q   Where? At the county?
10     A   At the county.
11     Q   Okay. Yep.
12     A   So they should have them pictures.
13     Q   So you remember having your picture taken
14 at processing at county jail?
15     A   Yes.
16     Q   Okay. And how long was that, when this
17 picture was taken, do you recall it being after
18 you left 51st and Wentworth? So like the same
19 night?
20     A   No. I didn't get there in the nighttime.
21 I got there in the afternoon.
22     Q   Okay. But, like, within a day?
23     A   Yes.
24     Q   Okay. So I need you to help me clear

331

1  something up.
2          So you've told us today that you -- you
3  didn't tell the judge about the beating by the
4  police and you didn't tell your public defender
5  about the beating by the police. You told your
6  family. The CIU investigators do not report that
7  you told them either that you were beaten by the
8  police.
9      A   Because they weren't --
10     Q   Did you tell them that you were?
11     A   No, I didn't.
12     Q   Okay. Why did you not tell the CIU
13 investigators that the police beat you?
14     A   Because they were too concerned about
15 asking me about Dap and Nevest. Questions.
16     Q   Sorry, they were too concerned about Dap
17 and Nevest?
18     A   Yes.
19     Q   Okay. Did you think it was important for
20 them to know that the police had beaten you?
21     A   No. Because, once again, it was behind
22 me. I didn't really want to answer none of them
23 questions anyhow. You know what I'm saying?
24     Q   Well, earlier today you testified that

332

1  you felt or believed that the CIU -- the state's
2  attorney's investigators in 2017 were coming at
3  you in a way that made you believe that they
4  thought that you were still involved in the
5  murder; is that right?
6      A   Yes, he did.
7      Q   Okay. Did you think -- in that mindset,
8  if that's what you believe that the state's
9  attorney's investigators thought about you, did
10 you think it was important to let them know that
11 the police had tried to get you to confess to this
12 murder that you were saying you were not involved
13 in by beating you?
14     A   No.
15     Q   Why did you not think --
16     A   No, I did not give them none of that
17 information because I ain't have an attorney
18 present, and I didn't know what really was going
19 on until he started talking about certain stuff.
20 And I answered them questions for him.
21     Q   Why do you think it was important to have
22 an attorney with you if you were going to tell
23 them that the police beat you?
24     A   Because I didn't know why they was there.

Transcript of Eddie Taylor
Conducted on March 9, 2020

333

1  You see what I'm saying?  And when he told me the
2  state's attorney's office, I was -- I'm like, Here
3  we go -- what the?  You know what I'm saying?
4  I'm --
5      Q   So -- sorry.  Were you done?  I didn't
6  mean to cut you off.
7      A   Yes.
8      Q   Okay.  So other than your family or you
9  telling your mother at least who passed away,
10 today is the first time, then, that you've told
11 anybody that you were beaten by the police, is
12 that fair?
13     A   Say that again?
14     Q   Other than telling your mother --
15     A   And my sister.
16     Q   -- and your sister, today is the first
17 time that you've told anybody that you were beaten
18 by the police?
19         MR. AINSWORTH:  Objection to the form of
20 the question.
21     A   No.
22     Q   Okay.  What other times have you told
23 people that you were beaten by the police in this
24 investigation?

334

1      A   To you.  Today.
2      Q   Yeah, that's what I'm saying.
3      A   Yeah, that's what I'm --
4      Q   Okay.  Yeah, we're talking about the same
5  thing.
6          Why do you think it's important today to
7  tell me about this beating that you endured at
8  51st and Wentworth back in 1994?
9          MR. AINSWORTH:  Object to the form of the
10 question.
11         MR. CURRAN:  Join.
12     A   You asked me the question -- you asked me
13 questions about the whole case.  They didn't.
14 They was just going off of certain details.  You
15 see what I'm saying?  That's the difference.  You
16 know, so that's why I answered your questions --
17     Q   Okay.
18     A   You know?
19     Q   All right.  I'm done for now.  Thanks for
20 your time.  Some of the other attorneys may have
21 some more questions for you, but I think the
22 lion's share of this is out of the way at this
23 point.  So thanks a lot.
24         MR. GRILL:  I'll pass the ball.

335

1        EXAMINATION BY COUNSEL FOR THE DEFENDANT
2                  CITY OF CHICAGO
3  BY MS. MEADOR:
4      Q   Okay.  Mr. Taylor, I just have a few
5  follow-up questions for you.
6          You were asked some questions about when
7  you turned yourself in to the police station.  Do
8  you recall talking about that?
9      A   Ma'am, you said?
10     Q   When you turned yourself in to the police
11 station, do you recall talking about that for
12 this --
13     A   For this case?
14     Q   Yes.
15     A   Only with the officers?
16     Q   Right.  I mean, you remember talking
17 about that earlier today here?
18     A   Oh, yes.
19     Q   Okay.  All right.  I just kind of wanted
20 to orient you to the questions I was going to be
21 asking about.  Okay?
22     A   All right.
23     Q   And you said that you had spoken with an
24 Officer Noland, correct?

336

1      A   Yes.
2      Q   Okay.  And where did you see him?
3      A   On Jackson and Kilborne.
4      Q   Okay.  And was he in a police vehicle?
5      A   Yes.
6      Q   And when you spoke with him, did -- you
7  said that he told you that there was a notice out
8  that you were wanted to go in and talk with the
9  police, correct?
10     A   Yes.
11     Q   Okay.  And did you tell him that you had
12 already planned on going in and talking to the
13 police about it?
14     A   No.  I told him -- yes.  I told him that
15 I -- I seen it on the news, and I'm turning myself
16 in.  I didn't do nothing.  And he said it was the
17 right thing to do.  So I asked him would he take
18 me.
19     Q   Okay.  So you asked him if he would take
20 you?
21     A   Yes.
22     Q   Okay.  And did he bring you right to the
23 station?
24     A   Yes.

Transcript of Eddie Taylor
Conducted on March 9, 2020

337

1    Q   And that's the 11th District?
2    A   That's Harrison and Kedzie?  I know the
3  district by heart out west.
4    Q   Okay.  Did he drop you off at the door,
5  or did he -- did the two of you park the vehicle
6  and you walked in together?
7    A   He parked in the back and walked me in
8  handcuffed.
9    Q   Okay.  At what point did he handcuff you?
10   A   There was probably (inaudible) --
11   Q   No, no, no.
12   A   -- before I got in the car.
13   Q   Before you got in the car?
14   A   Uh-huh.
15   Q   Okay.  Is that a yes?
16   A   Yes.
17   Q   Okay.
18   A   I'm sorry.
19   Q   Did Officer Noland advise you of your
20 rights?
21   A   No, ma'am.
22   Q   Okay.  When you were walked to the front
23 desk -- strike that.
24       Were you walked to the front desk at the

338

1  station?
2    A   Oh, excuse me.  Yes, he did remind me of
3  my rights.
4    Q   He did read you your rights?
5    A   Yes, he did.
6    Q   Okay.  When he walked you into the
7  station, where did he take you?
8    A   In a little side room for, like, about
9  ten minutes.  And then they came and got me and
10 took me in the back.
11   Q   Did he leave you in there by yourself?
12   A   Yes.
13   Q   Okay.  Did he close the door?
14   A   No.  He ain't close the door.
15   Q   Okay.  Let me ask you this: Maybe this
16 is a better question.  Was it a room with a door,
17 or was it just some seating in the hallway?
18   A   No.  It was a room.  I sit down at this
19 table, and they had a typewriter right there.  And
20 handcuffed again to the table.
21   Q   Okay.  And you were in there for about
22 ten minutes, you said?
23   A   Yes.
24   Q   Okay.  And then what happened?

339

1    A   Him and the white shirt came and got me
2  and they took me to the back booking area.
3    Q   Do you remember who that white shirt was?
4    A   No, ma'am.
5    Q   Okay.  Can you describe Officer Noland
6  for me?
7    A   Dark-skinned, tall, low haircut, about
8  6'7".
9    Q   Was he African American?
10   A   Yes.
11   Q   And about how old was he?
12   A   Older than me.  I was going on 32 at the
13 time.  He was about 50 -- or up to 50.  A lot
14 older than that.
15   Q   And did he talk to you at all about the
16 process that was going to happen?
17   A   No, ma'am.
18   Q   And then Officer Noland and the white
19 shirt went with you where?  Where did they take
20 you?
21   A   To the back lockup, and the turnkey took
22 me to my cell.
23   Q   Okay.  Were you processed at all while
24 you were back there?

340

1    A   Yes.
2    Q   Okay.  How so?  What happened?
3    A   I wasn't processed.  They just hold me.
4    Q   Fine.
5    A   They just hold me and transferred me.
6    Q   Okay.  That's --
7    A   Transferred me to 51st.
8    Q   Okay.  That's just what I'm trying to
9  figure out, if you were -- you weren't
10 fingerprinted?
11   A   No.
12   Q   You weren't photographed?
13   A   Huh-uh.
14   Q   Is that a no?
15   A   No.
16   Q   Okay.  And how long were you in holding
17 before you were taken to 51st and Wentworth?
18   A   About an hour.
19   Q   And do you know who came and got you and
20 took you to the area?
21   A   Yeah.  They came and got all the inmates,
22 the police did.  You know, everybody that was back
23 there, you know.
24   Q   Okay.  So was it a group transport?

Transcript of Eddie Taylor
Conducted on March 9, 2020

341

1  A  Yes.
2  Q  Okay.  You weren't taken individually?
3  A  No.
4  Q  Do you know how many other individuals
5  went at the same time you did?
6  A  About three or four.
7  Q  And then, when you were brought to 51st
8  and Wentworth, where did you go?
9  A  Where did I go into 51st and Wentworth?
10  Q  Yes, sir.
11  A  Upstairs to the second floor.
12  Q  Did you go by yourself, or were the other
13  individuals taken as well that were transported --
14  A  No.  They went somewhere else.
15  Q  Do you know who it was that took you up
16  to the interview room?
17  A  The -- some more officers came and got me
18  at the holding cell and took me upstairs.
19  Q  Oh, okay.  So when -- just so I make sure
20  I understand this correctly, so when you got to
21  51st and Wentworth, did you go into a holding cell
22  there?
23  A  No.  They took me straight upstairs.
24  That's what I'm going to say.  They took me

342

1  straight upstairs.  It's been so long.  They took
2  me straight upstairs.  And that's when the
3  officers came in.
4  Q  Okay.  So that's what I'm trying to
5  figure out.
6  When you went -- when you got there, you
7  were with three or four other individuals who were
8  brought to the area, right?
9  A  Yes.
10  Q  Okay.  You were the only one brought
11  upstairs to the detective's area, correct?
12  A  Yes.
13  Q  Okay.  And do you know who took you
14  upstairs?
15  A  There was two officers.
16  Q  Okay.  Was it one of the officers who had
17  transported you?
18  A  No.  No, ma'am.  It was two different.
19  Q  They were different officers?
20  A  Yes.
21  Q  Okay.  Do you remember what they were
22  wearing?
23  A  They was wearing, like, regular clothes.
24  Q  Okay.  They were not uniformed officers?

343

1  A  No, ma'am.
2  Q  Okay.  Were they wearing suits?
3  A  You could say they was casual.
4  Q  Casual?
5  A  Yes.
6  Q  Well, to me casual isn't wearing a suit,
7  so I'm trying to understand what you mean by
8  casual or regular clothes.
9  A  They were dressed like homicides.
10  Homicide suits, you might say, yeah.
11  Q  Were they wearing suits, or were they
12  wearing, like, khaki pants or --
13  A  No.  They weren't wearing no uniforms.
14  They was wearing pants.  You know, regular pants
15  and stuff.  I couldn't tell if they was blue jeans
16  or not, you know what I'm saying?  Because I
17  was -- at the time I'm bugging up, why, you know,
18  I'm turning myself in and got to go through all
19  this.
20  Q  Okay.  Okay.
21  A  And then it's been so long, you know?
22  Q  Okay.  And then you also said something
23  about there being a bounty hunter.
24  A  Yes.

344

1  Q  Can you explain to me what you meant by
2  that?
3  A  Yes.  It's this guy, Mr. D -- his name is
4  Mr. Davis.  He works for the county jail.  He
5  stayed in the 44 -- 4500 on Monroe.  I used to see
6  him all the time.
7  Q  He was with the sheriff's office?
8  A  Yes.  He was a bounty hunter from the
9  county jail.
10  Q  Okay.
11  A  He's the bounty hunter from the county
12  jail.
13  Q  And did you see him at the time where you
14  immediately --
15  A  I seen him --
16  Q  Hold on.  Hold on.
17  A  Okay.  I'm sorry.  I'm sorry.
18  Q  No, that's okay.  Let me just get my
19  question out so it's easier for the court
20  reporter.
21  A  Yes, ma'am.
22  Q  Did you see him at the time period prior
23  to your turning yourself in to the police for this
24  crime?

Transcript of Eddie Taylor
Conducted on March 9, 2020

87 (345 to 348)

345

1    A   Yes.  I seen him, but I never discussed
2  the matter with him.
3    Q   That was my next question.
4    A   Okay.
5    Q   Okay.  All right.  You had said something
6  about there was an officer who was --
7    A   His son.
8    Q   -- patrolling the area and then a bounty
9  hunter, so I didn't know if you also had
10 conversations with the bounty hunter, that you
11 call him, about this case.
12       But for clarification, you did not; is
13 that correct?  You never spoke with him?
14   A   No.
15   Q   Okay.  Were you -- did you have a concern
16 at the time that this individual who you call a
17 bounty hunter from the jail -- were you concerned
18 that he would see you and take you in?
19   A   Yes.
20   Q   Okay.  I just -- I'm trying to figure out
21 why you raised that he was in the area, why you
22 mentioned it.
23   A   He was in the area -- they just
24 through -- the block where I be on, all of them be

346

1  there.  It's a hot block.
2    Q   Okay.
3    A   You know what I'm saying?  They're always
4  looking for somebody around there.  Jackson and
5  Kilborne.
6    Q   So this Mr. Davis, did he live at 45th
7  and Monroe, or was that his patrol area?
8    A   No.  That's where he stayed.
9    Q   Okay.  That's where he lived?
10   A   Yes.  He was just riding over there
11 looking for somebody.
12   Q   Thank you for clarifying.
13   A   Yes, ma'am.
14   Q   When you met with Mr. Ainsworth, did he
15 provide you with any documents to review?
16   A   No, ma'am.
17   Q   Do you remember when you were telling us
18 that Darrell Fulton called you and told you that
19 his attorney wanted to speak to you?
20       Do you remember talking about that?
21   A   Yes.
22   Q   Okay.  And then you testified -- and
23 please correct me if I'm wrong.  Then you
24 testified that two or three days later you

347

1  received a call from Mr. Ainsworth, correct?
2    A   Yes.
3    Q   Okay.  And did Mr. Ainsworth tell you
4  that he was Darrell's attorney?
5    A   Yes.
6    Q   Okay.  Did you ever speak with anyone
7  other than Mr. Ainsworth who represented either
8  Mr. Coleman or Mr. Fulton?
9    A   No.  That's it.
10   Q   Okay.  As you sit here today, is it your
11 understanding that Mr. Ainsworth represents
12 Darrell Fulton?
13   A   Yes.
14   Q   Okay.  Did Darrell ever tell you that he
15 expected to get money as a result of his lawsuit?
16   A   No, ma'am.
17       MR. AINSWORTH:  Objection.  Asked and
18 answered.
19       MR. CURRAN:  Join.
20   Q   Did Darrell --
21       MS. MEADOR:  I thought it was a different
22 question that he was asked previously, so to the
23 extent that it was already asked, my apologies.
24 It's been a long day.

348

1    Q   Did Darrell ever tell you that he would
2  provide you with any compensation, money, or any
3  other means as a result of winning his lawsuit?
4    A   No, ma'am.
5    Q   Did anyone ever tell you that they would
6  give you money compensation if -- as a result of
7  your testimony here today?
8    A   No, ma'am.
9    Q   So there was some questioning -- some
10 questions that you answered regarding things that
11 you would see in the alley behind Darrell's
12 residence and Nevest's residence.
13       Do you remember talking about that?
14   A   Garbage.
15   Q   In that alley behind their houses?
16   A   Garbage.
17   Q   Garbage?  No I mean like things that you
18 would see people doing.
19       Do you remember talking about that?  So
20 correct me if I'm wrong.  Okay?  I thought that
21 you had talked earlier about people being in the
22 alley, smoking pot, using drugs, and doing some
23 other things.  Do you remember talking about that
24 earlier today?

Transcript of Eddie Taylor
Conducted on March 9, 2020

88 (349 to 352)

349

1    A    Yes.
2    Q    Okay.  So you had made a comment about,
3  like, other bad things that were going on in that
4  alley, and I just wanted to understand what you
5  meant by that.
6    A    Bad things?
7    Q    Yes.  I apologize, I can't recall -- I
8  didn't write down your exact words, but it was
9  something along the lines of there were some bad
10 things going on back there.
11   A    A smell.  Not bad things.  It was my
12 first time really back there.  You know, just
13 coming home, so I just didn't like the smell.
14 Play no ball -- something smelled bad there.  You
15 know what I'm saying?  I'm fresh home from the
16 penitentiary smelling cow dooky.  You know what
17 I'm saying?
18   Q    So it was my understanding that your
19 testimony was more related to illegal activity
20 going on in that alleyway.
21       Is that not what your recollection is as
22 to the activity going on back there?
23   A    Yes.
24       MR. AINSWORTH:  Object to the form of the

350

1  question.
2        MR. CURRAN:  Join.
3    Q    Okay.  So explain to me what it was that
4  you saw back then right after you got released
5  from jail.
6        MR. AINSWORTH:  Objection.  Foundation.
7        MR. CURRAN:  Also asked and answered.
8    A    Only thing I really saw was that's where
9  everybody just go back there, you know, and play
10 their little ball, drink their little beer, and
11 smoke their little weed.  And whatever else they
12 do, that's their business.  I ain't sticking
13 around a lot like that.  It wasn't really my
14 crowd.
15   Q    Okay.  I apologize if you were asked this
16 already, but how long after you were at 51st and
17 Wentworth at the area was it until you had the
18 polygraph examination?
19   A    I was in the county for a minute then.  I
20 got prosecuted -- they took me to the county --
21 took all that, processed me in.  I was there for
22 like about two to three months before I even did
23 that polygraph.  I'd say about two months.
24   Q    Okay.  Did you ever hear of an

351

1  organization called 21st Century Vote?
2    A    Yes.
3    Q    Okay.  Were you part of 21st Century
4  Vote?
5    A    No, ma'am.
6    Q    Do you know anyone who was?
7    A    No, not really.
8    Q    Do you know what it was?
9    A    Yeah, some type of -- it was an
10 organization within an organization.
11   Q    What do you mean by that?
12       MR. AINSWORTH:  I'll object to foundation
13 and to form.
14       Go ahead.
15   A    Just that -- can I just break it down?
16   Q    Yeah, please.
17   A    All right.  An organization within an
18 organization is a group of individuals that get
19 together and try to come up with something else to
20 try to make other people a part of -- a part of
21 the first organization.  Just like they called
22 themselves 21st Century Vote.  I didn't know
23 nothing about it until I came home from the joint.
24   Q    Which time?

352

1    A    '94.
2    Q    Okay.  And what did you learn about it?
3    A    It wasn't right.
4    Q    Why?
5    A    Because, man, I seen a lot of stuff and
6  heard a lot of stuff.  You know, in the joint you
7  hear a lot of stuff first.  It wasn't right.
8  That's it, that's all.
9    Q    What do you mean by it wasn't right?
10   A    The guys that was running it, I didn't
11 mess with none of them, period.  I didn't go
12 around them like that because I knew they wasn't
13 right.
14   Q    Okay.  Do you know who the guys were that
15 were running it?
16   A    Yeah, they're all locked up now.  Every
17 last one of them.  The RICO way.
18   Q    So you're familiar with the RICO way?
19   A    Yes, ma'am.
20   Q    Okay.  And do you -- can you tell me who
21 you recall being involved in it?
22   A    Yeah.  All the people that they have.  It
23 was just -- they got the two main guys -- Shorty G
24 and Pops.

Transcript of Eddie Taylor
Conducted on March 9, 2020

89 (353 to 356)

353

1    Q   Who's Shorty G and Pops?  Do you know
2  their names?
3    A   No.  I don't know their real names.  That
4  was just their street names.
5    Q   Okay.  Do you know if Larry Hoover
6  (phonetic) was involved in 21st Century Vote?
7    A   No, ma'am.  He was incarcerated.
8    Q   Okay.  Do you know if Darrell Fulton was
9  involved in 21st Century Vote?
10   A   No, ma'am.
11   Q   Do you know if Nevest Coleman was
12 involved in 21st Century Vote?
13   A   No, ma'am.
14   Q   Was 21st Century Vote an organization
15 established by the GDs?
16   A   Yes.
17   Q   Okay.  How do you know that?
18   A   Because the guys that were running it,
19 Shorty G and Pops.
20   Q   Okay.  And do you know what the
21 organization was set up for, to do?
22   A   No.  I didn't really get into details
23 because I didn't really want to be a part of it,
24 you know?  It was on the South Side, I was out

354

1  west.  You know?  And they give out a lot of
2  orders.  I ain't following them.  I kept it
3  moving.  They walk forward, I'm walking backwards.
4    Q   All right.  Anything in particular that
5  you can tell me about --
6    A   Yeah.
7    Q   Hold on.
8    A   I'm sorry.
9    Q   No, that's okay.  Anything in particular
10 that you can tell me about that caused you a
11 concern that you didn't want to be involved in
12 this organization?
13   A   Yeah.  Because the individual that was
14 running it, he was trying to fit some shoes that
15 he couldn't fit.  And a lot of things he was doing
16 weren't righteous, to my eyesight unjust.
17   Q   Okay.  Tell me what you mean by that?
18 Like what kinds of things was he doing?
19   A   Just wasn't loyal, wasn't faithful.  Just
20 out for self and tried to use individuals to
21 his -- for his own personal gang.
22   Q   And this is an organization that you
23 heard about while you were incarcerated?
24   A   Incarcerated.

355

1    Q   Before 1994, correct?
2    A   Yes.
3    Q   Okay.  Do you know what kind of activity
4  that was being promoted by 21st Century Vote?
5    A   No.  I never really participated in none
6  of the activities.
7    Q   Okay.  Okay.  Those are all the questions
8  I have.  Those are all the questions I have,
9  Mr. Taylor.  Thank you.
10   A   Thank you.
11   EXAMINATION BY COUNSEL FOR THE DEFENDANT
12        COOK COUNTY AND GARFINKEL
13 BY MR. KUHN:
14   Q   I've got a few questions for you.
15       So just as a reminder, my name is Derek
16 Kuhn.  I represent Harold Garfinkel and Cook
17 County in this lawsuit.  You already testified
18 that you spoke with some people in 2017 from the
19 Cook County state's attorney's office.
20       Do you remember giving that testimony
21 today?
22   A   I just remember a few questions that they
23 asked me.
24   Q   Right.  Because today we've talked about

356

1  your interactions with people from the Cook
2  state's attorney's office in 2017, right?
3    A   Yes.
4    Q   And you testified that you said the truth
5  when you talked to them, right?
6    A   Yes.
7    Q   Is there anything that, in the last
8  two-plus years, since that meeting with them, that
9  you later realized was incorrect?
10   A   Not really.  Because I would look at it
11 as it's behind me.  You know, why have they
12 started writing me into stuff?  You feel what I'm
13 saying?  All this.
14   Q   I'm not sure I understand the answer.
15       My only question is was there ever
16 anything after you talked to the CIU people that
17 you ever thought, oh, I messed up that answer and
18 I'd like to change it for some reason?
19   A   No.  No.
20   Q   And then you also talked to a female
21 assistant state's attorney in 1994, right?
22   A   Yes.  '94?  You say --
23   Q   So other than the people you talked to in
24 and one female assistant state's attorney,

Transcript of Eddie Taylor
Conducted on March 9, 2020

90 (357 to 360)

357

1  are there any other assistant state's attorneys
2  that you remember talking to about the Bridgeman
3  homicide at any other time?
4  **A   No.  Just the ones that came to see me in**
5  **2017.**
6      Q   Have you ever heard the name Harold
7  Garfinkel?
8  **A   I can't -- no.  No.**
9      Q   Did Darrell Fulton ever talk to you about
10 a Harold Garfinkel?
11 **A   No.**
12     Q   Did he ever talk to you about an
13 assistant state's attorney that he dealt with?
14 **A   No.**
15     Q   So the day you were interrogated, the
16 female assistant state's attorney asked you if you
17 would like to give a statement, right?
18 **A   Yes.**
19     Q   When during that day is the first time
20 you saw a female assistant state's attorney?
21 **A   Where, at 51st?**
22     Q   Yes.
23 **A   The same day them three officers came in**
24 **upstairs.  I told them I was going to sign --**

358

1  **trick them and stop them from beating on me.  And**
2  **they came back with that lady.**
3      Q   So --
4  **A   You know what I'm saying?  And she said**
5  **she was going -- if I sign this statement, she was**
6  **going to talk to the judge for me and try to work**
7  **me a deal out.**
8      Q   So just let me break it down a little
9  bit.
10         So you see the two guys, right?  Then
11 there's a shift change, then you see the three
12 guys --
13 **A   Three guys.**
14     Q   -- then they leave, right, before you see
15 the state -- assistant state's attorney?
16 **A   Yes.**
17     Q   And then the assistant state's attorney
18 shows up, right?  Is that a yes?
19 **A   Yes.**
20     Q   Is she alone at that point?
21 **A   Yes.**
22     Q   When you saw her did you say, Hey, I've
23 been beaten by the police?
24 **A   No.  I ain't say nothing.  I'm scared to**

359

1  **say anything.**
2      Q   You told her that you didn't want to make
3  a statement?  Did you say that to her?
4  **A   Yeah.  I told her I wasn't signing**
5  **nothing.**
6      Q   Well, did she -- well, did she advise you
7  of your rights?  Did she say that she was an
8  attorney and not your attorney and a prosecutor?
9  **A   No.  She didn't advise me of my rights,**
10 **no.**
11     Q   Did she ask you if you would like to give
12 a statement?
13 **A   She asked me would I sign that paper.**
14     Q   Did she give you the option to give a
15 court reported or a handwritten statement?
16 **A   She asked me to do that too.**
17     Q   So she said, there's two options here.
18 You can do a court reported or a handwritten,
19 right?
20 **A   Yes.**
21     Q   And what did you say to that?
22 **A   I'm not signing nothing.**
23     Q   All right.  And did she have something in
24 her hands when you first saw her?

360

1  **A   Yeah.  She had a yellow pad in her hand.**
2  **One of those.  Exactly.  Just like that.**
3      Q   Do you have any idea what words are on
4  the -- I'm sorry, so was there writing on the pad?
5  **A   Yes, there was.**
6      Q   Was it handwritten writing?
7  **A   Yes, it was handwritten writing.**
8      Q   Did you ever read any of the words on the
9  pad?
10 **A   No, I didn't.**
11     MR. AINSWORTH:  Objection.  Asked and
12 answered.
13     Q   Was the assistant state's attorney
14 threatening you?
15 **A   No.**
16     Q   Did she yell at you?
17 **A   No.**
18     Q   Was she professional?
19 **A   Yes.**
20     Q   Were you bleeding at the time that she
21 was there?
22 **A   Sorry?**
23     Q   Were you bleeding?
24 **A   Yeah.  I had my lip busted and my black**

Transcript of Eddie Taylor
Conducted on March 9, 2020

361

1  eyes and them lumps.
2     Q   And you never explained that that was
3  because you had been beaten by the police?
4     A   She seen it.
5     Q   But she didn't ask you about it, right?
6     A   No.
7     Q   Did you overhear any conversations
8  between the assistant state's attorney and anybody
9  else in the police station?
10    A   No.
11    Q   Was there ever anybody else in the room
12 with you and the assistant state's attorney?
13    A   Yes.
14    Q   So --
15    A   The first time when she walked in and
16 three walked out.
17    Q   Right.  So you talked --
18    A   That was the only time.
19    Q   You talked to her alone, right?
20    A   Yes.  They stepped out; she stepped in.
21    Q   And then she asked you if you wanted to
22 give a statement, and you said no.
23    A   Yes.
24    Q   Then what happened?

362

1     A   I still didn't give no statement.  She
2  just kept on talking about the -- she could talk
3  to the judge and all that.  You know what I'm
4  saying?  Try to get me a deal and all that.
5     Q   Eventually you didn't give a statement,
6  and she left, right?
7     A   Yes.
8     Q   Did you ever see that assistant state's
9  attorney again?
10    A   No, sir.
11    Q   That's all the questions I have for you,
12 sir.
13        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
14              DARREL FULTON
15 BY MR. CURRAN:
16    Q   Good afternoon, sir.  My name is Nicholas
17 Curran.  I represent -- I'm one of the attorneys
18 that represents Darrell Fulton.  I have just a few
19 follow-up questions for you.
20        When you spoke with an attorney on the
21 phone that you believed to be Darrell Fulton's
22 attorney, what did you discuss with him?
23    A   He just told me about the deposition.
24    Q   Okay.  And is it fair to say that was

363

1  about scheduling a deposition?
2     A   Yes.
3     Q   Okay.  I will represent to you that I was
4  the person who called you to speak with you.
5     A   Okay.
6     Q   Do you have any reason -- I know you
7  believed it might have been Mr. Ainsworth, but do
8  you have any reason to dispute that it was me that
9  contacted you about arranging the deposition?
10    A   No.  I -- like I said, I -- my mind is
11 just -- you know what I'm saying?  I'm still
12 discombobulated because I feel -- you know what
13 I'm saying?  Yeah.
14    Q   Sure.  But just to clarify, it was the
15 person who spoke to you on the phone -- the
16 attorney who spoke with you on the phone and said
17 he represents Darrell Fulton, correct?
18    A   Yes.
19    Q   Okay.  You were asked some questions
20 earlier about the decision to turn yourself in
21 relation to Antwinica Bridgeman's murder, correct?
22    A   Yes.
23    Q   Okay.  Is it fair to say that you were
24 nervous about doing that?

364

1     A   Yes.
2     Q   And was one of the reasons you were
3  nervous is because you were concerned about being
4  wrongfully accused of being involved in her
5  murder?
6        MS. MEADOR:  Objection.  Leading.
7        MR. GRILL:  Objection.  Form.
8     Q   Go ahead, sir.
9     A   Yes.
10    Q   And, in fact, that's exactly what ended
11 up happening, correct?
12    A   Yes.
13        MR. GRILL:  Objection.  Form.
14 Foundation.  Assumes facts not in evidence.
15        MS. MEADOR:  Join.
16    Q   Were you concerned about how police would
17 treat you in the event that you turned yourself
18 in?
19        MR. GRILL:  Form.
20    A   Yes.
21    Q   Okay.  And why were you concerned about
22 how police would treat you in the event that you
23 turned yourself in?
24    A   It was -- somebody got killed, you know?

Transcript of Eddie Taylor
Conducted on March 9, 2020

92 (365 to 368)

365

1 **I ain't never killed nobody.  You know what I'm**
2 **saying?  That's a lot to wear on a person.  You**
3 **know?  Especially when it comes to a female.  I**
4 **ain't no want to be with none of that.**
5    Q   Okay.  You were asked a bunch of
6 questions about how you felt towards Darrell
7 Fulton and the statements he allegedly made about
8 you.
9    **A   Yes.**
10    Q   Do you recall those?
11    **A   Yes.**
12    Q   Okay.  This is obvious, but you were not
13 present when Darrell Fulton was interrogated; is
14 that correct?
15    **A   No.**
16    Q   You have no idea what it is police said
17 to him?
18    **A   No.**
19       MR. GRILL: Objection.  Mischaracterizes
20 his testimony.
21    Q   Okay.  And Darrell Fulton never told you
22 exactly what it was they did to coerce him; is
23 that correct?
24       MR. GRILL: Objection.  Form.

366

1    **A   Excuse --**
2       MR. GRILL: Hang on.  Objection.  Form.
3 Mischaracterizes his testimony.
4    Q   Go ahead.
5    **A   Would you please rephrase that again for**
6 **me?**
7    Q   Sure.  Did Darrell Fulton ever tell you
8 specifically what it was the police officers did
9 to coerce him into giving a statement?
10    **A   No.**
11    Q   Was it your understanding that Darrell
12 Fulton gave a statement implicating you in the
13 death of Antwinica Bridgeman?
14       MR. GRILL: Objection to foundation.
15    **A   Yes.**
16    Q   Okay.  And where did that information
17 come from?
18    **A   The police.**
19    Q   And I'm going to apologize in advance for
20 using this language as well, but so did you have
21 any reason before your arrest in June of 1994 to
22 believe that Darrell Fulton was a perverted
23 motherfucker?
24    **A   No.**

367

1    Q   Okay.  Did you have the opinion before
2 your arrest in June of 1994 that Darrell Fulton
3 was a perverted motherfucker?
4    **A   Say that one more time.**
5    Q   Sure.  Did you have the opinion before
6 your arrest in June of 1994 that Darrell Fulton
7 was a perverted motherfucker?
8    **A   No.**
9    Q   If police -- if the detectives attributed
10 a statement to you that you told them Darrell was
11 a perverted motherfucker, would that be true or
12 false?
13       MS. MEADOR: Objection.  Form.
14 Foundation.
15    **A   When I seen the pictures, from out of**
16 **anger, I'm like, If they did this and got me in**
17 **this, they say perverted motherfuckers.  I'm not**
18 **fitting to lie.  You see what I'm saying?  Because**
19 **I didn't know what to think at the time.**
20    Q   So is it fair to say that you believed
21 whoever committed the murder of Antwinica
22 Bridgeman was a perverted motherfucker?
23    **A   Yes.**
24    Q   And that was based in part on the photos

368

1 that were shown to you?
2    **A   Yes.**
3    Q   You had mentioned earlier that you grew
4 up with some individuals you knew to be P Stones?
5    **A   Yes.**
6    Q   And I think there were some questions
7 asked of you as to whether or not you would
8 recognize a P Stone as a P Stone if they came
9 south of Garfield.
10       Do you remember those questions?
11    **A   Yes.**
12    Q   Okay.  Is it fair to say that, if one of
13 those individuals was a P Stone with whom you grew
14 up, you would, of course, recognize them?  Is that
15 fair?
16    **A   Yes.**
17    Q   Okay.  Would you -- would there be
18 something about another P Stone's appearance to
19 where you would recognize them as a P Stone if
20 they came south of Garfield?
21    **A   Yes.  Everybody had their colors.  Red --**
22 **red and black or black and blue.**
23    Q   Okay.  What if they were not wearing any
24 colors?

Transcript of Eddie Taylor
Conducted on March 9, 2020

369

1    A   Back then, if they was gang banging, they
2   going to dress -- the other individuals that's out
3   there, they're going to confront you if you ain't
4   got your colors on.  That's your ride.
5    Q   Okay.  My question, though, is, if
6   somebody was not wearing colors, would you know
7   them -- would there be something else about their
8   appearance that would lead you to believe they
9   were P Stone?
10   A   Yeah.  Back then I was ignorant.  I was
11  young.  Now that I'm older, I can see it was
12  ignorant.  Your question is -- yes.
13   Q   I'm sorry, I don't quite follow.  What do
14  you mean by that?
15   A   One more time because I'm -- I'm just
16  frustrated.
17   Q   No, that's okay.  That's okay.  I'll
18  re-ask it.
19   A   Know about what I'm saying?
20   Q   So what I'm asking is if, for example, a
21  P Stone who came across the boulevard was not
22  wearing P Stone colors -- do you know what I mean
23  by that? --
24   A   Yes.

370

1    Q   -- would there be something else about
2   their appearance that would lead you to believe
3   that they were a P Stone?
4    A   It all depends on whatever they saw you
5   coming across from.  If you came across that
6   boulevard or you just came from -- you came from
7   up south.  If you came from southwest, yeah; if
8   you came there south going towards that -- I mean
9   southwest, yes.
10   Q   Okay.  I take it you didn't know all the
11  P Stones; is that correct?
12   A   No, I didn't know them all.
13   Q   When you were administered the polygraph
14  examination, were you concerned at all that you
15  would be subjected to further beatings depending
16  on how the polygraph went?
17       MS. MEADOR:  Objection.  Form.
18   A   I have my guards up every day.  It ain't
19  when just the polygraph test.  I was just thinking
20  about my life in general.  You know, when I go
21  back to the -- to the county.
22   Q   When you say your guard was up, can you
23  be more specific as to what --
24   A   To watch my ass while I was in there

371

1   because I knew what kind of case that I had.  And
2   you never know when a person will try to do
3   something to you.  So you can't -- you've got to
4   keep your back against the wall.
5    Q   Can you explain what you mean by a case
6   like that or like this?
7    A   Yes.  With the case that they charged me
8   with.
9    Q   And what about the case that they charged
10  you with would make you want to have your guard
11  up?
12   A   The murder.
13   Q   Is it because it was a violent murder
14  involving a female?
15   A   Yes.  Yes.  Yes.
16   Q   Okay.  This time that you saw Nevest and
17  Darrell in the Division 1 barbershop --
18   A   Yes.
19   Q   -- do you remember how many other people
20  were present at that time?
21   A   Yes.  The whole barbershop was full.
22   Q   Can you give me just sort of a rough
23  estimate of how many people would have been in
24  there?

372

1    A   It was like about 13 or 14 people in
2   there.
3    Q   And how long was your interaction with
4   them?
5    A   Wasn't even two minutes.
6    Q   Was it your understanding that they were
7   in protective custody at that time?
8    A   Yes.
9    Q   How is it you knew that they were in
10  protective custody?
11   A   From other inmates that walk the
12  galleries, that work the galleries.  They knew my
13  rappies (phonetic).
14   Q   And can you just testify what you mean by
15  your rappies?
16   A   Yeah.  We was on the same case.  That's
17  what they call rappies.
18   Q   Okay.  So they were your codefendants in
19  the --
20   A   Yes.
21   Q   -- case with which you were charged?
22   A   Yes.
23   Q   Okay.  And so somebody at some point told
24  you that Darrell Fulton was in protective custody?

Transcript of Eddie Taylor
Conducted on March 9, 2020

94 (373 to 376)

373

1    A   Yes.
2    Q   And somebody at some point told you that
3 Nevest Coleman was in protective custody?
4    A   Yes.
5    Q   Do you remember who that individual or
6 those individuals were that told you that?
7    A   No.  I was seeing guys that I knew from
8 the streets.  You know what I'm saying?  But I
9 never really knew them like that; but, you know,
10 we was tight because we always cooled past each
11 other in the street, what's up, and we bump heads
12 in the county.
13       You know, he was working on the gallery.
14 They follow the story on the news, and nobody
15 missing nothing; so they knew.  Especially when I
16 turned myself in.
17   Q   Back in 1994, if -- strike that.
18       What did -- to your knowledge, what did
19 it mean for a jail inmate in 1994 to be in
20 protective custody?
21   A   For his safety.
22   Q   Okay.  And how is extra safety for those
23 inmates provided, to your knowledge, based on your
24 experience?

374

1        MS. MEADOR:  I'm going to object to
2 foundation.
3        MR. CURRAN:  Sure.
4    Q   Were they separated from the rest of the
5 population?
6    A   Yes.
7    Q   Did they have different clothing than the
8 other inmates?
9    A   No.
10   Q   They didn't?  Okay.  Were there ever
11 situations in which, to your knowledge, inmates in
12 protective custody interacted with inmates in the
13 general population?
14   A   No.
15       MS. MEADOR:  Other than the incident he's
16 already testified to?
17       MR. CURRAN:  If you have an objection, go
18 ahead.
19       MS. MEADOR:  That's why I'm asking you.
20 I don't know if --
21       MR. CURRAN:  Yeah, it's not a proper
22 objection.
23       MS. MEADOR:  Okay.  Then I --
24       MR. CURRAN:  If you object to the form,

375

1 that's fine.
2        MS. MEADOR:  I'm going to object to the
3 form, and it --
4        MR. GRILL:  Mischaracterizes.
5        MS. MEADOR:  -- mischaracterizes his
6 testimony.
7        MR. CURRAN:  It didn't characterize his
8 testimony.  I asked him a question.
9        MS. MEADOR:  I was just asking -- really
10 just asking you to clarify, so --
11       MR. CURRAN:  Sure.
12   Q   So my question, which I think was pretty
13 clear, is to your knowledge were inmates in
14 protective custody allowed to interact with
15 inmates in the general population?
16   A   No.
17   Q   Okay.  And you were in general population
18 the whole time you were at Cook County jail in
19 relation to Antwinica Bridgeman; is that correct?
20   A   Yes.
21   Q   Okay.  You said that somebody named Ricky
22 Harris -- that's your cousin; is that correct?
23   A   Yes.
24   Q   You view him as somebody who raised you;

376

1 is that correct?
2    A   Yes.
3    Q   And he was somebody who also, you
4 believe, raised Darrell Fulton?
5    A   Uh-huh, yes.
6    Q   Okay.  When you used the term raised you
7 in that context, can you explain what you mean by
8 that?
9    A   Like an older big brother.  I'm the
10 oldest in my family.  He was like an older brother
11 to me.  I ain't got no bigger brother to look up
12 to.  Same with Darrell.  He's the oldest in his
13 family.  He ain't got no older brother to look up
14 to.
15       So, you know, he was a good guy in the
16 neighborhood --
17   Q   Okay.
18   A   -- to try and show us to do the right
19 thing.
20   Q   Sure.  And did he provide for you
21 financially at all?
22   A   No.
23   Q   And how often during this period of time
24 were you kind of identifying him as somebody who

Transcript of Eddie Taylor
Conducted on March 9, 2020

95 (377 to 380)

377

1 was raising you? How often would you interact
2 with him?
3    A   He stayed right down the street from me
4 on Emerald. I stayed on 57th, he stayed on 56th;
5 so I'd see him every day.
6    Q   You saw him every day?
7    A   Yeah.
8    Q   Okay. Kind of in what context would you
9 see him? Would it be while you were just outside
10 in the neighborhood or --
11    A   In the neighborhood. Teaching us how to
12 play basketball and stuff like that, you know. A
13 lot of stuff -- you know, football -- all types of
14 activities.
15    Q   Sir, apart from this case, to your
16 knowledge, have you ever been accused of
17 committing a sexual assault?
18    A   No, sir.
19    Q   Okay. I don't have anything else. Thank
20 you for your time, sir.
21        MR. AINSWORTH: I don't have any
22 questions for you, sir.
23        MR. GRILL: I've got a couple of other
24 ones.

378

1        EXAMINATION BY COUNSEL FOR THE DEFENDANT
2        CITY OF CHICAGO POLICE OFFICERS, ET AL.
3 BY MR. GRILL:
4    Q   Did you -- I know -- it looks like you've
5 got a big scar.
6    A   Yes.
7    Q   What's that from?
8    A   I got cut with a straight razor.
9    Q   In prison or somewhere else?
10    A   On the streets. Out west.
11    Q   In -- by K Town or somewhere over there?
12    A   Yeah, in K Town.
13    Q   What year did that happen?
14    A   '85.
15    Q   Did you ever go by the nickname Scarface?
16    A   Yes.
17    Q   Okay. That's another nickname other than
18 Chip or Ship?
19    A   Yeah.
20    Q   You forgot that one?
21    A   But I wasn't letting them use that on the
22 streets. Only in the joint.
23    Q   Okay. But it was a nickname, then?
24    A   Yeah, only certain people knew. You

379

1 know?
2    Q   Sure. Did somebody get arrested for
3 that, or was that --
4    A   No, the guy, he -- yes, he got arrested.
5 He got arrested. But I ain't press -- I ain't
6 really, you know, follow through with it.
7    Q   What was the dispute over? Or why did
8 you do it, I guess, if you know?
9    A   It was about me and my girl and my child.
10 And her oldest sister was trying to dictate the
11 pace of us raising our child. You know what I'm
12 saying? And she was trying to tell him I ain't no
13 good and this and that and the other. And I was
14 working at the time. How I ain't no good?
15        And we got into it. She put her hands on
16 me. I put my hands back on her. She go tell her
17 boyfriend. He catch me off guard, hit me on the
18 shoulder. I turned around, and he hit me across
19 the face with a straight razor. So I tried to
20 fight the man. He hit me again right here with
21 the straight razor. Put my whole arm up. So
22 we're fighting again. I still don't feel it just
23 feel like he's scratching me. Throw a jab at him.
24 He hit me right here two times, opened my arms up.

380

1        So that's when I -- you know what I'm
2 saying? I'm, like, man, something ain't right.
3 And I just -- my blooded was drilling, and I
4 stopped. It just started pouring. You know what
5 I'm saying? The whole hole. Big family fight.
6    Q   You said you put your hands on her. Did
7 you --
8    A   Yeah, I pushed her. She slapped me, and
9 I pushed her down. When I was trying to pick my
10 baby up, my child.
11    Q   Have you ever been arrested for any type
12 of domestic-battery-related incident?
13    A   Yeah. When I was, like, around about 17.
14 They locked me up for a battery, me and her, for
15 fighting. They locked us both up.
16    Q   Because you were fighting with your girl?
17    A   Yes.
18    Q   Did you hurt her in that?
19    A   No, no, no.
20    Q   Okay.
21    A   No, no, no.
22    Q   When you were in prison at Cook County
23 jail, you were being asked some questions by
24 Mr. Curran a minute ago about interactions between

Transcript of Eddie Taylor
Conducted on March 9, 2020

96 (381 to 384)

381

1 general population and guys in protective custody.
2 And your testimony was is that they don't interact
3 except -- my question is is what it sounded to me
4 like, whenever everybody gets their hair cut, for
5 example, there is some -- those two populations
6 will be in the same place together and can
7 interact, correct?
8   A   Yes.
9   Q   Because you were able to talk with Fulton
10 and Coleman --
11   A   Yes.
12   Q   -- at the barbershop?
13   A   Yes.
14   Q   On that one occasion?
15   A   Yes.
16   Q   Where you confronted them about why they
17 put you in this whole thing, right?
18   A   Yes.
19   Q   Okay.  Would you agree with me that
20 somebody -- a guy, an adult man -- who rapes a
21 two- or three-year-old child would be perverted?
22       MR. AINSWORTH:  Object to the form of the
23 question.
24   A   Yes.

382

1   Q   Did you know that Darrell pled guilty and
2 was sentenced to four years in prison for doing
3 that?
4       MR. CURRAN:  Objection.
5   A   No, I didn't know.
6       MR. CURRAN:  Misstates the record.
7 Assumes facts not in evidence.
8   Q   Okay.  Did you know that Darrell Fulton
9 pled guilty and was given a four-year IDOC
10 sentence for raping a two- to three-year-old
11 child?
12       MR. CURRAN:  Objection.  Misstates the
13 record.  Get your facts straight before you ask
14 questions in a deposition where you present them
15 as true.
16   Q   That's news to you?  You never heard that
17 before?
18   A   Yes, I heard it before, but I didn't
19 believe it because I never questioned no one about
20 it.  I'd just hear street talk.
21   Q   What did you hear?
22   A   What you told me.
23   Q   That he assaulted -- sexually assaulted a
24 child?

383

1   A   Yes.
2   Q   Did you ever talk to Darrell about that?
3   A   No, sir.
4   Q   When did you first find out about that,
5 if you can think back?  Did you know about that --
6   A   I just came home from the joint again.
7   Q   In '94?
8   A   '94 I just came home from the joint, and
9 I just came home right before that, and I just
10 came home right before that.  It seemed like I
11 just had bad luck back to back to back to back to
12 back.  See what I'm saying?  That's why --
13   Q   So you were out -- in 1994, when you were
14 out, you were aware that Darrell had been to
15 prison for that?
16       MR. CURRAN:  Objection to the form of the
17 question.
18   A   Yes.
19   Q   Okay.  I've got nothing else.  Thank you.
20       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
21           DARREL FULTON
22 BY MR. CURRAN:
23   Q   Mr. Taylor, I've got a few follow-ups on
24 that.

384

1       Did you know that the reason in this case
2 that Mr. Grill is referring to that police
3 suspected this young child had been abused was
4 because the child tested positive for chlamydia?
5 Did you know that?
6   A   No, I ain't know that much.
7       MS. MEADOR:  Objection.
8       MR. KUHN:  Objection.
9       MS. MEADOR:  I'm going to object as to
10 the characterization of what the state of mind of
11 the police was.
12       MR. CURRAN:  Sure.  That's fine.
13   Q   Did you know that, sir?
14   A   No.
15   Q   Okay.  And did you know that Darrell
16 Fulton took a blood test or rather -- strike that.
17       Did you know that Darrell Fulton took a
18 test to see whether or not he had chlamydia?
19   A   No.
20   Q   Okay.  And did you know he tested
21 negative for chlamydia?
22   A   Oh, wow.
23   Q   Yeah.  And did you know exactly what --
24       MR. CURRAN:  Andrew, the commentary is

Transcript of Eddie Taylor
Conducted on March 9, 2020

385

1 inappropriate.
2      MR. GRILL: I'm sorry, could you hear
3 that? I didn't know that I was talking that loud.
4 I'm sorry.
5      MR. CURRAN: Yeah.
6    Q  Based on your experience with police, is
7 it hard to believe that somebody could be
8 wrongfully accused of doing something they haven't
9 done?
10      MS. MEADOR: Objection. Form.
11 Foundation.
12  A  Yes.
13    Q  Is that hard for you to believe?
14      MS. MEADOR: Same objections.
15      MR. GRILL: Same objections.
16  A  Yes.
17    Q  Is it hard for you to believe?
18  A  Yeah.
19    Q  Okay. You were wrongfully accused of
20 being involved in the murder of Antwinica
21 Bridgeman; is that correct?
22  A  Yes.
23      MR. GRILL: Objection. Form and
24 foundation.

386

1      MS. MEADOR: Join.
2      MR. KUHN: Join.
3    Q  Are you able to tell me definitively when
4 it was you learned that Darrell Fulton had been
5 convicted of attempt indecent liberties with a
6 child?
7  A  You've got to say that question again. I
8 can't --
9    Q  Sure. This conviction that we've been
10 discussing here --
11  A  Yes.
12    Q  -- do you know when it was you learned
13 that Darrell had been convicted of that?
14      MR. GRILL: Asked and answered.
15  A  No, I didn't know he was convicted of it.
16    Q  Okay. Do you know anything about that
17 case --
18  A  No.
19    Q  -- other than what you heard on the
20 streets?
21  A  That's it.
22    Q  Okay. Did the police ask you at all
23 about that when you were being interrogated by
24 them with regard to Antwinica Bridgeman?

387

1  A  No, sir.
2    Q  Okay. If they attribute a statement to
3 you that you told them Darrell Fulton was a
4 perverted motherfucker, did that have anything to
5 do with your knowledge of this prior case
6 involving him and a child?
7  A  No.
8      MS. MEADOR: Objection as to form.
9      MR. CURRAN: Okay. No further questions.
10      MR. AINSWORTH: I don't have any
11 questions.
12      Sir, your deposition is concluded, but we
13 have one last thing to ask you, and that's that
14 your deposition -- all the questions that you've
15 been asked and all the answers that you give are
16 being recorded. And they're going to be
17 transcribed onto paper. And you have the right
18 now to trust that the transcription will be
19 accurate, or you can ask to reserve the right to
20 read the transcript before it becomes final.
21      It doesn't matter to us. Many people
22 trust that it's going to be recorded accurately,
23 but it's up to you. You have that right. And you
24 just have to tell us what you'd like to do.

388

1      THE WITNESS: I would like to read it
2 first.
3      MR. AINSWORTH: All right. We'll reserve
4 signature. Or signature reserved.
5      THE VIDEOGRAPHER: Thank you. This
6 concluding today's deposition. The time is now
7 4:44 p.m., and we are going off the video record
8 at the end of Video Media 5.
9      (Off the record at 4:44 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

389

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2        I, Ryan Grzelak, the officer before whom the
3    foregoing deposition was taken, do hereby certify
4    that said proceedings were electronically recorded
5    by me; and that I am neither counsel for, related
6    to, nor employed by any of the parties to this
7    case and have no interest, financial or otherwise,
8    in its outcome. Review was requested.
9        IN WITNESS WHEREOF, I have hereunto set my hand
10   and affixed my notarial seal this 9th day of
11   March, 2020.
12
13
14
15
16
17   _____
18   Ryan Grzelak, Notary Public
19   for the State of Illinois
20
21
22
23
24

390

1        CERTIFICATE OF TRANSCRIBER
2        I, Robert Leifer, do hereby certify that the
3    foregoing transcript is a true and correct record
4    of the recorded proceedings; that said proceedings
5    were transcribed to the best of my ability from
6    the audio recording and supporting information;
7    and that I am neither counsel for, related to, nor
8    employed by any of the parties to this case and
9    have no interest, financial or otherwise, in its
10   outcome.
11
12
13
14
15   _____
16   Robert Leifer
17   AAERT Certified Electronic Transcriber No. CET-970
18   April 2, 2020
19
20
21
22
23
24

Transcript of Eddie Taylor
Conducted on March 9, 2020

99

| A |
|---|

**aaert**
390:17
**aberdeen**
2:6, 3:5, 6:21,
301:23
**ability**
10:12, 390:5
**able**
38:9, 41:12,
65:12, 251:11,
318:14, 381:9,
386:3
**absolutely**
239:9, 239:21
**abused**
384:3
**accept**
44:11, 46:17,
176:1
**accident**
181:7
**accidental**
183:2
**accompany**
24:22, 146:9
**according**
172:4, 259:12
**accounts**
80:5
**accurate**
387:19
**accurately**
10:12, 387:22
**accusations**
237:6, 237:8
**accuse**
22:15, 260:4,
311:21
**accused**
364:4, 377:16,
385:8, 385:19
**accusing**
30:10, 33:6,
304:11
**across**
14:8, 73:5,

100:16, 178:6,
247:21, 267:16,
267:22, 269:13,
270:3, 270:17,
271:7, 271:12,
272:22, 274:5,
282:11, 369:21,
370:5, 379:18
**act**
22:18, 110:18,
264:20
**acted**
280:5, 320:11,
322:24
**acting**
22:15, 27:18,
27:21, 49:4,
49:8, 49:15,
111:1, 300:17,
300:19, 301:4,
301:10
**action**
7:4
**activities**
267:4, 355:6,
377:14
**activity**
101:21, 105:10,
105:13, 105:20,
117:19, 124:7,
126:9, 127:3,
129:2, 129:7,
133:1, 151:10,
154:1, 349:19,
349:22, 355:3
**actually**
173:1, 183:20,
208:7, 228:7,
229:18, 262:10,
328:5
**addicted**
120:22
**addition**
225:20
**address**
47:11, 64:22,
90:5, 90:11,
104:12, 104:16,

104:21, 122:13,
276:18
**addressed**
230:20, 230:22,
230:23
**addresses**
13:4
**administer**
7:2
**administered**
310:6, 313:5,
313:24, 370:13
**admit**
42:3, 254:5
**admitting**
41:20
**adult**
381:20
**advance**
366:19
**advice**
51:17, 217:22,
233:2, 233:5
**advise**
51:21, 337:19,
359:6, 359:9
**advised**
235:19, 235:23,
236:16, 236:17,
236:24, 239:2,
242:7, 242:20
**affect**
10:11, 41:9,
46:4, 46:6
**affiliations**
7:7
**affirm**
7:21
**affirmed**
8:4
**affixed**
389:10
**afraid**
252:22, 253:1,
253:3, 253:5
**african**
339:9
**after**
11:8, 12:13,

13:10, 17:11,
17:14, 17:16,
18:6, 27:19,
29:11, 29:17,
31:5, 31:10,
32:17, 32:22,
46:22, 47:8,
56:11, 59:2,
59:6, 59:19,
60:10, 68:14,
68:16, 68:17,
76:6, 76:8,
80:7, 80:10,
81:2, 81:3,
82:7, 82:11,
85:6, 89:15,
91:22, 95:18,
117:17, 125:17,
129:22, 133:1,
148:18, 150:2,
153:2, 155:3,
158:14, 163:16,
210:10, 212:16,
215:23, 218:2,
218:20, 219:23,
221:24, 222:22,
224:10, 226:9,
226:19, 227:17,
228:3, 237:15,
252:7, 257:9,
258:5, 267:8,
278:5, 278:10,
286:20, 287:13,
312:1, 312:10,
313:19, 330:17,
350:4, 350:16,
356:16
**afternoon**
330:21, 362:16
**afterwards**
309:1
**again**
32:14, 46:10,
59:5, 65:1,
65:16, 65:17,
92:6, 96:8,
106:24, 120:9,
123:9, 143:20,

Transcript of Eddie Taylor
Conducted on March 9, 2020

100

146:16, 152:13,
152:14, 161:3,
168:16, 168:20,
169:11, 177:2,
196:22, 198:13,
213:7, 215:17,
227:20, 229:6,
233:14, 244:20,
253:6, 276:23,
298:23, 300:8,
305:10, 331:21,
333:13, 338:20,
362:9, 366:5,
379:20, 379:22,
383:6, 386:7
**against**
169:22, 217:17,
219:13, 229:24,
250:6, 250:12,
371:4
**age**
14:10, 14:21,
185:10, 185:14
**ago**
35:13, 37:14,
66:15, 67:12,
79:14, 92:20,
93:1, 104:8,
230:14, 295:22,
380:24
**agree**
6:11, 42:8,
42:10, 42:12,
119:5, 170:14,
188:22, 190:11,
208:19, 229:22,
257:6, 381:19
**agreed**
235:3
**ahead**
24:20, 27:7,
29:21, 30:14,
36:9, 86:6,
127:9, 152:20,
170:1, 184:17,
206:17, 207:16,
217:10, 229:10,
233:6, 235:2,

235:5, 235:7,
236:23, 245:16,
259:9, 271:1,
293:10, 326:2,
351:14, 364:8,
366:4, 374:18
**ahold**
67:3, 67:7
**aid**
167:4, 167:7
**ain't**
16:11, 19:24,
20:9, 20:10,
23:16, 25:3,
33:12, 44:22,
75:22, 80:3,
91:8, 96:24,
102:11, 112:6,
116:23, 117:24,
118:18, 121:23,
122:17, 123:14,
123:20, 126:10,
128:3, 133:11,
137:18, 141:18,
143:21, 144:5,
146:24, 150:6,
151:18, 153:15,
156:1, 161:20,
163:10, 164:17,
166:12, 189:5,
192:8, 199:24,
202:11, 203:15,
205:3, 205:10,
206:8, 206:13,
217:22, 221:12,
222:19, 224:7,
225:12, 257:5,
267:2, 267:4,
268:12, 279:12,
286:11, 290:4,
292:16, 299:13,
299:16, 304:9,
316:13, 319:13,
321:9, 326:23,
332:17, 338:14,
350:12, 354:2,
358:24, 365:1,
365:4, 369:3,

370:18, 376:11,
376:13, 379:5,
379:12, 379:14,
380:2, 384:6
**ainsworth's**
100:3
**ainsworthism**
260:15
**air**
111:5
**al**
1:8, 1:15,
6:16, 60:14,
378:2
**aliases**
61:19
**alibi**
144:4, 144:11,
144:16, 145:4,
150:23, 151:5,
151:17, 151:18,
201:20, 217:12,
219:3
**alive**
121:22, 245:2
**allegedly**
365:7
**alley**
38:23, 39:3,
39:8, 48:24,
49:9, 49:20,
105:1, 105:14,
113:8, 114:20,
115:19, 283:19,
289:11, 289:14,
289:15, 289:19,
289:22, 290:11,
290:13, 290:17,
293:4, 298:11,
298:12, 298:16,
298:20, 299:1,
348:11, 348:15,
348:22, 349:4
**alleyway**
349:20
**allow**
181:4
**allowed**
303:4, 306:12,

375:14
**almost**
85:17, 92:24,
101:5, 207:7,
252:5, 261:12,
284:17, 311:7,
321:17, 329:20
**alone**
196:19, 197:2,
200:23, 302:3,
358:20, 361:19
**along**
349:9
**already**
28:1, 50:13,
102:19, 115:6,
147:17, 170:10,
231:16, 233:20,
233:21, 233:23,
237:4, 240:9,
242:18, 242:19,
247:9, 248:7,
248:12, 249:11,
252:24, 253:4,
293:22, 317:5,
336:12, 347:23,
350:16, 355:17,
374:16
**also**
4:18, 13:7,
20:23, 42:3,
53:5, 55:9,
79:5, 110:5,
138:9, 207:17,
224:17, 225:19,
259:17, 293:13,
305:18, 306:11,
306:12, 343:22,
345:9, 350:7,
356:20, 376:3
**although**
81:4, 107:4,
155:12, 180:19,
207:10, 290:14,
304:18
**always**
17:5, 30:13,
31:3, 31:7,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    101

49:22, 127:13,
286:15, 288:1,
301:1, 301:13,
346:3, 373:10
**ambassador**
204:20
**amends**
84:5, 103:17
**american**
339:9
**amicable**
276:1
**amount**
230:6, 287:17
**andre**
12:7, 82:6,
82:14, 84:15,
258:8, 258:12,
276:12, 276:13,
276:24, 277:1,
277:4
**andre's**
82:7, 82:9,
83:5, 84:13,
85:14, 158:13,
167:21
**andrew**
4:3, 7:11,
60:18, 182:5,
182:14, 182:19,
182:24, 184:17,
235:13, 259:20,
384:24
**anger**
172:16, 305:8,
367:16
**angry**
166:7, 280:22
**another**
29:8, 89:17,
138:13, 143:12,
176:17, 177:8,
232:22, 248:6,
267:9, 317:8,
368:18, 378:17
**answer**
8:21, 9:9,
10:7, 17:22,

21:13, 21:16,
36:19, 52:13,
58:2, 94:10,
94:14, 105:17,
125:15, 153:11,
153:12, 161:12,
162:19, 164:8,
169:15, 207:18,
229:8, 232:20,
233:13, 235:18,
239:14, 240:3,
241:4, 241:22,
242:6, 249:18,
249:19, 249:20,
258:17, 295:20,
320:11, 331:22,
356:14, 356:17
**answered**
33:2, 36:24,
47:21, 92:23,
93:24, 133:19,
137:23, 138:7,
153:16, 157:13,
159:15, 165:5,
165:10, 168:1,
168:6, 175:20,
207:17, 228:20,
233:23, 239:22,
249:11, 257:18,
259:8, 259:18,
293:9, 296:18,
332:20, 334:16,
347:18, 348:10,
350:7, 360:12,
386:14
**answering**
9:5
**answers**
63:1, 99:17,
313:7, 387:15
**antwinica**
20:23, 21:2,
54:7, 63:10,
172:7, 263:9,
307:7, 326:21,
327:11, 327:16,
363:21, 366:13,
367:21, 375:19,

385:20, 386:24
**antwone**
297:22
**anxiety**
170:23
**anybody**
65:5, 66:23,
89:1, 91:16,
98:2, 106:17,
110:21, 111:24,
114:1, 124:2,
124:10, 134:19,
149:1, 187:23,
215:18, 229:6,
244:17, 244:24,
255:20, 256:4,
256:7, 266:14,
276:11, 277:3,
277:4, 282:16,
288:5, 292:1,
330:2, 333:11,
333:17, 361:8,
361:11
**anyhow**
103:15, 206:12,
331:23
**anyone**
49:7, 51:13,
347:6, 348:5,
351:6
**anything**
21:1, 24:8,
33:13, 33:17,
34:24, 35:3,
38:5, 42:13,
48:15, 49:15,
63:23, 69:13,
77:11, 79:20,
88:23, 92:3,
93:16, 93:20,
93:22, 107:12,
108:15, 109:13,
109:15, 109:17,
118:20, 123:24,
128:23, 131:23,
137:1, 137:21,
143:22, 156:4,
160:13, 168:3,

193:11, 209:13,
209:19, 209:22,
209:24, 212:5,
212:6, 215:20,
217:17, 219:24,
231:5, 231:7,
244:11, 275:20,
276:2, 293:19,
294:16, 296:11,
303:19, 311:13,
311:22, 327:19,
354:4, 354:9,
356:7, 356:16,
359:1, 377:19,
386:16, 387:4
**anyway**
298:15
**anywhere**
13:9, 25:12,
135:5, 141:1,
196:2, 210:21,
298:7
**apart**
14:13, 377:15
**apartment**
156:7
**apb**
147:16, 148:1,
148:7
**apologies**
146:8, 232:2,
347:23
**apologize**
55:1, 184:12,
184:16, 217:3,
293:9, 349:7,
350:15, 366:19
**apologizing**
184:14
**apparently**
260:22, 317:2
**appear**
51:9, 192:21,
228:7
**appearance**
183:10, 368:18,
369:8, 370:2
**appearances**
7:7

Transcript of Eddie Taylor
Conducted on March 9, 2020

102

**appeared**
55:23, 56:10,
279:24
**appearing**
7:10, 7:11
**appears**
192:23
**applicable**
239:18
**appointed**
228:12, 251:17
**appreciate**
181:3, 327:6
**appropriate**
36:13, 241:2
**approximate**
185:10, 185:14
**approximately**
12:20
**april**
35:8, 35:11,
36:21, 37:12,
113:19, 119:16,
131:6, 131:10,
131:12, 131:13,
285:13, 285:14,
287:14, 299:18,
299:23, 300:5,
300:8, 390:18
**area**
18:5, 18:10,
72:6, 147:1,
147:2, 272:13,
279:4, 339:2,
340:20, 342:8,
342:11, 345:8,
345:21, 345:23,
346:7, 350:17
**arguing**
301:13, 301:17
**argumentative**
142:1, 146:1,
148:15, 165:21,
175:5, 175:15,
259:16, 315:10,
319:19
**arm**
326:6, 379:21

**armed**
138:14, 156:19
**arms**
325:7, 379:24
**around**
12:10, 12:24,
49:18, 72:7,
88:12, 101:3,
101:4, 105:7,
106:6, 106:10,
106:20, 114:16,
116:19, 119:10,
123:15, 130:11,
130:24, 133:24,
139:18, 194:12,
205:13, 269:11,
271:23, 272:9,
279:12, 279:17,
283:3, 284:19,
285:18, 287:2,
346:4, 350:13,
352:12, 379:18,
380:13
**arranging**
363:9
**arrest**
38:5, 64:1,
147:16, 264:13,
366:21, 367:2,
367:6
**arrested**
61:16, 84:1,
109:3, 109:7,
128:11, 132:2,
132:3, 155:18,
262:12, 263:23,
283:21, 303:4,
379:2, 379:4,
379:5, 380:11
**asas**
325:6
**ashland**
90:10, 90:14,
90:15
**aside**
113:21, 182:1
**ask**
8:20, 9:2, 9:3,

30:14, 33:23,
34:6, 34:9,
42:3, 51:21,
56:20, 57:1,
63:20, 64:2,
64:4, 71:6,
79:16, 93:10,
94:3, 96:18,
123:1, 125:14,
133:9, 133:11,
145:8, 159:13,
161:2, 162:6,
162:8, 163:1,
163:2, 163:3,
168:7, 169:10,
177:8, 178:1,
184:17, 192:11,
193:10, 209:9,
213:21, 217:1,
217:15, 218:10,
218:14, 218:22,
233:6, 233:7,
233:19, 234:11,
238:23, 245:4,
245:7, 252:6,
252:8, 252:14,
252:21, 257:22,
260:6, 260:16,
268:20, 278:22,
280:7, 280:12,
313:8, 317:12,
318:16, 318:20,
319:9, 338:15,
359:11, 361:5,
382:13, 386:22,
387:13, 387:19
**asking**
9:4, 10:1,
30:5, 36:18,
58:8, 58:10,
58:17, 62:18,
63:18, 65:10,
94:3, 94:4,
94:11, 101:15,
121:2, 122:1,
160:17, 160:24,
182:11, 183:9,
184:8, 184:11,

186:14, 187:5,
188:11, 215:22,
219:21, 232:10,
234:8, 234:12,
235:14, 238:23,
239:17, 240:1,
240:2, 274:9,
283:16, 294:18,
294:19, 294:21,
295:4, 295:8,
295:13, 295:18,
295:19, 296:23,
297:6, 297:10,
297:20, 311:24,
312:2, 316:2,
316:4, 331:15,
335:21, 369:20,
374:19, 375:9,
375:10
**asks**
229:6
**ass**
30:20, 191:7,
193:15, 221:15,
221:16, 226:10,
252:24, 253:2,
370:24
**assault**
377:17
**assaulted**
382:23
**assert**
52:8, 235:19
**assistance**
167:4
**assistant**
356:21, 356:24,
357:1, 357:13,
357:16, 357:20,
358:15, 358:17,
360:13, 361:8,
361:12, 362:8
**assumed**
212:22
**assumes**
87:13, 160:10,
166:1, 168:11,
364:14, 382:7

Transcript of Eddie Taylor
Conducted on March 9, 2020

103

attack
204:5
attacked
204:13
attempt
386:5
attempting
322:17
attend
11:11
attending
7:6, 11:19
attention
139:6
attorney
34:4, 34:5,
39:20, 94:19,
94:22, 95:16,
95:17, 95:19,
96:24, 178:22,
178:23, 179:3,
179:4, 213:2,
213:8, 213:10,
213:12, 229:8,
231:17, 231:18,
233:10, 234:8,
234:22, 239:5,
239:6, 240:4,
240:10, 242:11,
245:4, 245:7,
248:16, 317:7,
319:11, 319:15,
332:17, 332:22,
346:19, 347:4,
356:21, 356:24,
357:13, 357:16,
357:20, 358:15,
358:17, 359:8,
360:13, 361:8,
361:12, 362:9,
362:20, 362:22,
363:16
attorney's
3:20, 66:4,
97:24, 98:3,
98:7, 260:21,
274:11, 274:16,
275:12, 279:2,

297:5, 302:2,
303:20, 304:12,
305:12, 305:23,
306:8, 307:16,
308:7, 312:18,
325:14, 327:14,
327:23, 332:2,
332:9, 333:2,
355:19, 356:2
attorney-client
51:22, 52:2,
232:11, 233:16,
234:4, 234:13,
234:24, 241:18,
241:19, 242:4,
245:12
attorneys
60:18, 213:4,
213:7, 334:20,
357:1, 362:17
attribute
387:2
attributed
367:9
audio
6:9, 390:6
aunt's
100:5, 101:2,
104:13, 104:24,
106:22, 107:1
aunty's
23:8, 101:23
authority
203:14, 203:17,
269:7
authorized
7:2
avoid
32:11
aware
69:14, 158:3,
158:9, 230:11,
272:12, 383:14
away
6:8, 87:17,
87:20, 87:24,
88:2, 88:14,
88:15, 90:17,

126:9, 134:22,
135:3, 173:10,
244:23, 279:5,
284:13, 333:9

**B**

baby
12:7, 21:10,
21:21, 100:21,
150:18, 151:21,
256:3, 296:20,
296:21, 380:10
backbone
203:13
backed
55:15
background
47:9, 118:16
backpack
136:5
backs
204:1
backwards
354:3
bad
34:22, 43:21,
46:10, 48:24,
49:9, 49:19,
73:9, 111:5,
125:3, 168:9,
169:7, 195:12,
349:3, 349:6,
349:9, 349:11,
349:14, 383:11
badges
309:8, 309:9,
309:12
badly
227:4
bag
102:5, 136:6,
136:7, 136:8,
136:16
ball
114:17, 117:10,
117:16, 334:24,
349:14, 350:10
balled
220:24, 221:3

ballpark
172:12
banging
369:1
bank
315:24
barb
4:19, 6:22
barbershop
320:5, 320:6,
320:18, 321:15,
371:17, 371:21,
381:12
barely
68:4
based
73:12, 74:11,
74:15, 110:23,
118:12, 128:16,
205:23, 207:5,
207:10, 213:14,
220:9, 272:8,
272:10, 274:3,
367:24, 373:23,
385:6
basement
107:11, 107:15,
126:22, 154:11,
156:6, 156:8
basically
44:3, 98:19,
99:16, 148:16,
210:5, 220:9,
247:20, 248:4,
267:18, 281:6,
289:2, 294:22,
294:23, 318:13
basketball
114:21, 115:23,
117:2, 117:5,
117:13, 289:12,
298:12, 298:13,
298:16, 299:1,
377:12
battery
380:14
bauer
4:20

Transcript of Eddie Taylor
Conducted on March 9, 2020

104

**beat**
27:9, 30:20,
30:21, 43:23,
44:15, 53:19,
53:21, 54:2,
55:19, 99:10,
164:15, 164:24,
170:13, 179:12,
181:3, 182:8,
186:1, 201:13,
218:2, 220:10,
220:15, 220:23,
221:15, 221:16,
226:13, 227:10,
227:14, 252:24,
253:2, 253:6,
255:2, 255:3,
255:5, 256:10,
258:18, 259:2,
265:1, 309:17,
311:16, 317:12,
331:13, 332:23
**beaten**
171:13, 171:18,
174:20, 175:8,
210:5, 227:4,
227:21, 228:23,
229:2, 229:12,
230:13, 231:19,
244:18, 245:8,
249:9, 316:9,
316:24, 317:16,
331:7, 331:20,
333:11, 333:17,
333:23, 358:23,
361:3
**beating**
31:15, 56:3,
56:5, 56:8,
159:24, 160:7,
160:13, 167:22,
168:10, 169:7,
169:20, 174:15,
175:17, 176:4,
178:5, 178:10,
178:15, 179:11,
182:4, 194:14,
194:15, 195:7,

195:16, 196:4,
218:23, 222:1,
222:3, 224:9,
226:12, 226:16,
226:20, 226:22,
227:18, 253:18,
256:18, 257:13,
259:13, 331:3,
331:5, 332:13,
334:7, 358:1
**beatings**
72:23, 160:19,
161:13, 163:9,
165:12, 227:18,
370:15
**became**
74:12, 74:17,
74:18, 74:21,
158:3, 158:9
**become**
272:11, 287:16
**becomes**
387:20
**beefing**
122:18, 122:21,
122:22, 123:1
**been**
10:20, 15:17,
37:2, 37:12,
37:14, 41:3,
45:22, 46:6,
50:13, 53:24,
65:11, 68:11,
73:21, 74:16,
81:22, 82:8,
84:4, 84:21,
86:10, 86:11,
86:23, 104:8,
109:3, 109:7,
120:9, 121:23,
123:20, 126:4,
127:2, 131:4,
132:2, 132:3,
134:22, 147:21,
151:20, 151:21,
155:18, 155:21,
167:15, 170:14,
172:6, 174:20,

177:5, 179:16,
180:8, 185:11,
185:15, 188:20,
196:12, 198:10,
199:5, 199:14,
199:18, 199:19,
200:6, 200:12,
200:17, 201:19,
217:20, 231:19,
233:21, 236:16,
236:17, 236:24,
239:2, 242:20,
253:24, 255:4,
259:7, 259:17,
261:14, 277:17,
277:19, 279:19,
294:8, 294:13,
317:16, 321:16,
325:23, 327:7,
327:24, 342:1,
343:21, 347:24,
358:23, 361:3,
363:7, 371:23,
377:16, 380:11,
383:14, 384:3,
386:4, 386:9,
386:13, 387:15
**beer**
116:1, 291:4,
291:6, 291:12,
293:16, 350:10
**before**
2:13, 8:14,
9:5, 9:10, 10:8,
13:10, 42:18,
42:24, 45:4,
45:22, 46:6,
48:2, 53:24,
56:9, 56:12,
56:17, 58:4,
58:14, 60:17,
62:23, 63:7,
63:14, 64:23,
66:19, 66:21,
70:15, 97:11,
97:18, 110:6,
113:2, 113:6,
114:9, 123:21,

124:4, 131:5,
131:8, 131:15,
133:10, 141:2,
143:5, 146:2,
149:12, 158:21,
159:3, 169:15,
174:21, 175:12,
179:13, 198:12,
200:23, 201:10,
208:23, 210:12,
210:20, 214:5,
222:2, 228:6,
235:4, 238:11,
238:12, 243:12,
253:24, 254:5,
255:21, 261:17,
265:22, 274:9,
274:19, 280:17,
281:5, 283:7,
283:10, 283:12,
283:13, 286:20,
298:10, 298:20,
298:21, 299:2,
308:19, 330:1,
337:12, 337:13,
340:17, 350:22,
355:1, 358:14,
366:21, 367:1,
367:5, 382:13,
382:17, 382:18,
383:9, 383:10,
387:20, 389:2
**beg**
238:3
**begin**
9:10
**beginning**
57:13, 131:12,
142:6, 155:1,
261:7, 299:18,
299:23, 300:3,
300:5, 300:7,
329:17
**behalf**
3:2, 3:10,
3:18, 4:2, 4:10,
7:10, 7:12,
7:13, 7:15,

Transcript of Eddie Taylor
Conducted on March 9, 2020

105

**behaved**
325:2
**behaving**
300:12
**behind**
39:3, 39:8,
43:12, 48:24,
65:17, 97:2,
97:3, 113:8,
113:15, 115:15,
115:17, 164:13,
170:11, 171:10,
224:7, 257:21,
289:14, 293:4,
324:15, 324:16,
331:21, 348:11,
348:15, 356:11
**being**
6:20, 8:4,
16:15, 35:2,
38:19, 42:17,
42:24, 43:7,
53:14, 57:17,
64:7, 87:4,
96:15, 97:19,
123:3, 123:17,
136:22, 150:5,
150:21, 158:5,
166:12, 170:5,
170:9, 191:23,
204:13, 208:9,
229:12, 230:11,
239:22, 246:22,
255:10, 271:5,
273:10, 303:10,
304:11, 313:7,
313:23, 315:3,
316:1, 316:21,
325:9, 329:24,
330:17, 343:23,
348:21, 352:21,
355:4, 364:3,
364:4, 380:23,
385:20, 386:23,
387:16
**belief**
327:10

245:5

**beliefs**
229:18
**believe**
45:13, 54:14,
74:12, 148:8,
158:21, 161:16,
163:11, 163:14,
163:17, 164:8,
164:20, 181:23,
181:24, 191:11,
201:2, 213:5,
213:8, 213:9,
257:24, 258:21,
263:13, 326:20,
332:3, 332:8,
366:22, 369:8,
370:2, 376:4,
382:19, 385:7,
385:13, 385:17
**believed**
28:16, 145:19,
145:20, 151:8,
190:7, 327:17,
332:1, 362:21,
363:7, 367:20
**besides**
78:10
**best**
110:23, 137:9,
390:5
**bet**
243:11
**better**
219:8, 338:16
**between**
14:10, 14:21,
52:4, 61:12,
66:24, 105:5,
182:2, 248:20,
268:24, 269:17,
278:24, 279:3,
299:17, 361:8,
380:24
**bid**
120:10
**big**
288:4, 376:9,
378:5, 380:5

**bigger**
376:11
**biggest**
288:8
**bill**
79:2
**birth**
10:16
**bit**
87:11, 115:19,
115:20, 185:2,
222:2, 238:4,
256:11, 299:9,
358:9
**black**
19:14, 43:24,
56:2, 72:10,
72:11, 103:22,
103:24, 106:3,
107:3, 117:18,
117:22, 118:13,
123:22, 125:17,
125:18, 126:7,
126:19, 129:19,
129:20, 129:21,
130:1, 151:10,
154:1, 157:8,
157:9, 173:11,
173:18, 177:22,
194:13, 194:21,
194:23, 195:8,
195:12, 209:18,
210:24, 214:9,
214:10, 226:22,
226:24, 227:1,
231:7, 288:22,
360:24, 368:22
**black-and-white**
29:9, 39:21,
39:23, 40:6,
40:10
**blank**
52:20
**blanket**
249:19
**bleeding**
56:1, 173:14,
173:15, 195:23,

196:2, 210:19,
210:20, 210:21,
210:23, 360:20,
360:23
**blessed**
71:12
**block**
112:20, 121:10,
267:18, 345:24,
346:1
**blocks**
90:17, 90:22
**blood**
55:7, 281:11,
384:16
**blooded**
380:3
**blue**
26:2, 68:2,
81:4, 227:1,
289:23, 290:15,
343:15, 368:22
**blunt**
30:18, 108:24
**blurted**
114:7
**bodies**
111:10, 111:11
**body**
112:9, 112:11,
112:24, 113:14,
113:23, 114:2,
114:9, 116:3,
116:12, 131:11,
154:10, 174:10,
174:12, 192:21,
193:7, 193:9,
225:4, 225:21,
227:3, 298:10,
298:20
**bogus**
170:13
**booking**
339:2
**borderline**
43:16, 264:3
**born**
12:9

Transcript of Eddie Taylor
Conducted on March 9, 2020

106

**both**
61:2, 68:24,
69:2, 72:16,
75:23, 127:13,
158:4, 187:14,
194:17, 274:6,
320:13, 380:15
**bottom**
268:22, 269:15
**bought**
78:19, 136:13
**boulevard**
4:13, 72:18,
267:22, 269:13,
271:8, 369:21,
370:6
**bounty**
24:18, 343:23,
344:8, 344:11,
345:8, 345:10,
345:17
**bowling**
264:2
**box**
78:19, 157:8,
157:9
**boy**
14:9
**boy's**
103:23
**boyfriend**
283:18, 379:17
**brains**
53:19
**brakes**
238:4
**break**
10:6, 10:7,
10:8, 57:6,
155:4, 155:6,
168:18, 168:19,
168:23, 192:5,
196:14, 236:13,
274:9, 329:9,
351:15, 358:8
**brenda**
12:6
**bridgeman**
20:23, 21:2,

54:7, 63:11,
172:7, 263:9,
286:21, 293:2,
307:7, 326:21,
327:11, 327:16,
357:2, 366:13,
367:22, 375:19,
385:21, 386:24
**bridgeman's**
363:21
**bring**
25:20, 60:2,
112:24, 132:12,
149:4, 214:1,
243:3, 336:22
**bringing**
324:15
**broadcast**
157:3
**broadcasts**
142:22
**broadly**
280:2
**broke**
207:23, 208:3
**broken**
264:6
**brook**
264:2
**brother**
12:6, 12:7,
61:22, 82:5,
82:15, 86:4,
98:18, 276:12,
276:23, 288:23,
376:9, 376:10,
376:11, 376:13
**brother's**
21:18, 61:15,
82:4, 97:10,
98:9, 98:10,
276:17
**brothers**
12:1, 12:2,
12:4, 16:9,
123:4
**brought**
25:16, 34:3,

127:3, 212:1,
308:16, 309:7,
309:15, 309:23,
341:7, 342:8,
342:10
**bruised**
227:3
**brung**
112:21, 314:3
**brutal**
54:20, 182:3,
213:20
**buck**
267:5, 267:6
**buckle**
256:14, 256:23,
259:13
**buckled**
257:5
**budweiser**
115:4, 291:7
**bugged**
307:4
**bugging**
343:17
**building**
19:16, 100:15,
119:23, 198:12,
198:19, 200:14,
200:15
**built**
115:23
**bulletproof**
44:22
**bullpen**
55:18, 55:20,
56:4, 56:9
**bump**
373:11
**bunch**
116:1, 167:8,
289:3, 365:5
**burnt**
69:22
**bus**
100:8, 100:10,
100:16, 106:16,
135:9

**business**
225:8, 246:4,
270:20, 350:12
**busted**
360:24
**busy**
34:11
**butt**
172:13
**butterfield**
3:13
**buttons**
259:23
**bygones**
164:18, 164:19

**C**

**calimee**
21:7, 295:2,
296:3
**call**
30:8, 67:9,
67:22, 69:5,
76:16, 80:13,
80:15, 83:16,
92:20, 95:7,
95:18, 95:19,
96:8, 103:22,
103:24, 112:4,
195:15, 234:4,
234:11, 235:15,
238:22, 240:14,
243:5, 249:17,
274:17, 281:8,
317:18, 318:10,
345:11, 345:16,
347:1, 372:17
**called**
55:11, 80:20,
91:4, 91:6,
92:10, 92:15,
94:24, 95:23,
98:19, 117:11,
147:13, 206:19,
274:23, 346:18,
351:1, 351:21,
363:4
**calling**
94:7, 216:6,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                107

216:16, 222:7,
240:16, 240:22,
305:10
**calls**
8:22, 74:14,
81:6, 94:17,
206:2, 207:14,
208:11, 208:17,
233:14, 233:15,
234:23, 245:12,
248:19, 266:9,
270:7, 271:9,
304:4
**calmed**
244:15
**cameras**
64:8, 65:8
**can**
6:8, 9:15,
9:22, 9:23,
17:1, 17:13,
21:12, 26:1,
26:15, 30:18,
35:23, 36:8,
36:17, 43:14,
44:21, 49:16,
52:6, 52:8,
57:24, 68:4,
72:13, 78:20,
78:21, 81:6,
84:8, 100:3,
100:14, 101:17,
101:18, 105:4,
108:24, 109:24,
110:16, 111:5,
111:7, 111:8,
115:18, 120:17,
125:15, 137:9,
151:17, 162:24,
168:18, 169:4,
172:12, 174:14,
176:1, 177:11,
177:24, 180:24,
181:2, 182:8,
185:9, 192:6,
193:2, 220:20,
229:24, 232:21,
233:13, 235:7,

235:11, 236:11,
240:24, 241:21,
242:9, 243:10,
246:17, 249:20,
268:6, 288:5,
319:12, 329:8,
329:11, 339:5,
344:1, 351:15,
352:20, 354:5,
354:10, 359:18,
369:11, 370:22,
371:5, 371:22,
372:14, 376:7,
381:6, 383:5,
387:19
**can't**
8:24, 14:14,
33:4, 36:19,
45:18, 61:24,
74:4, 75:9,
75:14, 76:11,
87:7, 87:18,
91:17, 95:4,
103:23, 115:11,
119:14, 145:5,
150:12, 153:11,
172:19, 175:22,
176:3, 179:16,
180:7, 180:12,
180:15, 187:12,
196:7, 201:1,
206:4, 221:18,
226:7, 226:11,
226:14, 236:14,
255:17, 267:10,
288:24, 297:3,
304:1, 304:18,
316:13, 349:7,
357:8, 371:3,
386:8
**canceled**
167:19
**cannabis**
293:17
**cans**
112:23
**capable**
235:23, 239:7,

239:9, 239:13,
239:22, 242:14,
242:23
**car**
127:19, 149:3,
207:24, 264:23,
284:22, 285:3,
337:12, 337:13
**care**
205:18, 225:7,
238:17, 238:18,
245:23, 254:12,
257:20, 259:21
**carrier**
77:24, 78:16,
79:1
**carry**
271:18
**cars**
23:11, 105:21,
128:2, 128:5,
128:17, 285:4
**case**
1:7, 1:13,
6:16, 6:17,
41:22, 45:15,
48:2, 48:16,
50:24, 51:14,
53:15, 53:18,
54:3, 54:16,
54:17, 55:24,
58:2, 58:8,
58:11, 58:18,
60:20, 66:5,
66:24, 80:11,
84:20, 86:12,
93:12, 93:16,
94:9, 95:20,
96:16, 115:3,
136:24, 137:1,
142:18, 143:8,
151:3, 170:13,
171:12, 175:13,
199:11, 199:13,
199:18, 223:10,
227:19, 231:4,
250:7, 252:1,
255:21, 262:13,

265:1, 265:16,
265:21, 274:12,
291:4, 291:10,
291:15, 316:5,
334:13, 335:13,
345:11, 371:1,
371:5, 371:7,
371:9, 372:16,
372:21, 377:15,
384:1, 386:17,
387:5, 389:7,
390:8
**cases**
145:13, 246:14,
246:15, 247:7,
247:20, 247:22,
248:1, 248:8
**casual**
211:12, 211:13,
211:19, 212:8,
343:3, 343:4,
343:6, 343:8
**cat**
310:8, 310:10
**catch**
43:22, 68:4,
100:13, 264:20,
289:24, 318:8,
379:17
**caught**
44:6, 73:7,
123:17, 135:9,
262:15, 315:3
**caused**
169:21, 170:23,
257:16, 259:2,
354:10
**cc**
253:23
**cell**
6:7, 254:23,
254:24, 320:20,
339:22, 341:18,
341:21
**cells**
320:23
**cellular**
6:6

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    108

| | | | |
|---|---|---|---|
| **celly**<br>255:7<br>**celly's**<br>255:12<br>**center**<br>3:21<br>**century**<br>351:1, 351:3,<br>351:22, 353:6,<br>353:9, 353:12,<br>353:14, 355:4<br>**certain**<br>43:10, 71:14,<br>71:18, 196:7,<br>259:19, 260:5,<br>266:6, 280:10,<br>294:20, 295:9,<br>295:12, 332:19,<br>334:14, 378:24<br>**certificate**<br>389:1, 390:1<br>**certified**<br>390:17<br>**certify**<br>232:21, 389:3,<br>390:2<br>**cet**<br>1:24, 390:17<br>**chained**<br>55:18<br>**chair**<br>26:13, 26:18,<br>26:21<br>**chance**<br>20:9, 37:24,<br>50:15, 50:21,<br>184:1, 217:1,<br>315:7<br>**chances**<br>271:12<br>**change**<br>31:6, 34:13,<br>136:15, 141:15,<br>179:13, 196:21,<br>197:8, 197:13,<br>197:15, 198:1,<br>198:6, 201:10,<br>208:24, 212:16, | 218:21, 219:24,<br>221:24, 222:22,<br>224:10, 226:9,<br>356:18, 358:11<br>**changed**<br>31:2, 31:12,<br>136:14, 197:5,<br>197:6<br>**changing**<br>176:7, 197:17<br>**characterization**<br>384:10<br>**characterize**<br>375:7<br>**charge**<br>46:24, 55:10,<br>79:7, 229:22,<br>262:22, 263:15,<br>263:20, 266:6,<br>266:16, 278:11,<br>321:11<br>**charged**<br>47:2, 371:7,<br>371:9, 372:21<br>**charges**<br>47:4, 48:1,<br>48:4, 48:8,<br>48:18, 54:10,<br>229:23<br>**checking**<br>52:19, 254:10<br>**cheek**<br>53:2<br>**cheeks**<br>173:4<br>**chemicals**<br>111:12<br>**chicago**<br>1:8, 1:14,<br>1:19, 2:8, 3:7,<br>3:22, 4:7, 4:10,<br>4:15, 6:15,<br>6:17, 6:21,<br>7:14, 10:23,<br>12:14, 13:4,<br>60:14, 178:15,<br>200:18, 335:2,<br>378:2 | **child**<br>22:4, 46:11,<br>379:9, 379:11,<br>380:10, 381:21,<br>382:11, 382:24,<br>384:3, 384:4,<br>386:6, 387:6<br>**chip**<br>60:24, 61:4,<br>61:13, 62:3,<br>62:13, 106:7,<br>378:18<br>**chips**<br>62:4, 62:9,<br>62:10<br>**chlamydia**<br>384:4, 384:18,<br>384:21<br>**choice**<br>182:13, 183:2,<br>183:20, 184:13,<br>229:9, 242:15,<br>245:13<br>**choose**<br>249:20<br>**chooses**<br>242:12<br>**cigarette**<br>110:8, 110:9<br>**cigarettes**<br>293:17<br>**circle**<br>201:11, 207:21<br>**circumstances**<br>209:15<br>**city**<br>1:8, 4:10,<br>6:17, 7:14,<br>60:14, 263:22,<br>335:2, 378:2<br>**ciu**<br>300:15, 300:20,<br>300:22, 303:3,<br>303:14, 303:19,<br>322:13, 325:4,<br>327:13, 331:6,<br>331:12, 332:1,<br>356:16 | **claim**<br>37:15<br>**clair**<br>12:8, 256:3<br>**clarence**<br>297:18, 298:5<br>**clarification**<br>345:12<br>**clarify**<br>182:17, 182:22,<br>363:14, 375:10<br>**clarifying**<br>346:12<br>**clarity's**<br>261:13<br>**clark**<br>4:5<br>**class**<br>15:15, 15:16<br>**classic**<br>259:24<br>**clear**<br>25:6, 69:24,<br>80:22, 91:20,<br>123:10, 141:11,<br>175:8, 212:15,<br>217:7, 219:22,<br>315:12, 330:24,<br>375:13<br>**cleared**<br>55:18<br>**clearly**<br>234:12, 275:10<br>**clenzo**<br>86:4<br>**client**<br>238:24<br>**close**<br>13:24, 14:1,<br>14:2, 15:1,<br>20:4, 20:6,<br>22:13, 105:8,<br>281:18, 338:13,<br>338:14<br>**closed**<br>171:22, 173:22,<br>224:17, 226:6<br>**clothes**<br>23:9, 102:3, |

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    109

102:4, 102:13,
111:21, 112:6,
136:3, 136:9,
136:15, 179:24,
192:17, 211:8,
342:23, 343:8
**clothing**
374:7
**coach**
237:3, 241:9
**coached**
241:12, 241:13,
241:14
**coaching**
236:1
**coat**
310:20, 311:1
**cocaine**
109:12, 131:24,
262:17, 263:20
**codefendants**
372:18
**coerce**
165:8, 365:22,
366:9
**coerced**
160:22, 161:24,
162:1, 162:2,
162:16, 162:17,
163:8, 163:15,
164:23, 165:2,
165:17, 258:18
**coleman**
1:5, 3:2, 6:17,
7:10, 8:8, 14:4,
14:5, 14:7,
14:20, 14:21,
14:24, 18:17,
20:8, 28:24,
60:20, 138:12,
151:24, 155:17,
188:14, 189:14,
256:7, 265:23,
277:16, 278:12,
281:23, 282:10,
287:16, 293:3,
303:16, 304:20,
305:3, 306:17,

307:5, 307:18,
307:21, 322:17,
325:8, 327:18,
347:8, 353:11,
373:3, 381:10
**coleman's**
15:5, 48:24,
113:9, 142:14,
156:7, 190:4,
293:5, 294:9
**colleagues**
329:10
**collect**
167:3, 192:5
**collected**
325:9
**color**
180:4
**colors**
368:21, 368:24,
369:4, 369:6,
369:22
**combination**
177:20
**come**
18:5, 18:10,
18:16, 18:17,
19:4, 23:18,
24:10, 27:14,
48:23, 64:20,
130:24, 138:18,
143:11, 147:17,
163:6, 168:20,
184:24, 197:3,
197:11, 200:24,
210:13, 211:3,
212:17, 232:22,
254:13, 255:20,
256:4, 256:7,
266:15, 274:5,
279:12, 280:6,
286:23, 286:24,
289:24, 291:4,
321:5, 327:4,
327:6, 351:19,
366:17
**comes**
106:3, 126:7,

282:17, 365:3
**coming**
44:12, 55:6,
66:4, 83:10,
83:17, 83:20,
91:3, 91:14,
100:10, 111:4,
114:2, 114:6,
114:16, 115:4,
115:5, 124:20,
124:22, 127:12,
136:1, 143:5,
173:1, 197:20,
197:21, 249:3,
251:4, 252:7,
273:21, 323:23,
327:7, 332:2,
349:13, 370:5
**comment**
36:14, 116:11,
116:14, 231:6,
349:2
**commentary**
384:24
**commit**
33:14, 162:10,
246:23
**committed**
47:18, 48:21,
58:11, 208:9,
367:21
**committing**
33:6, 377:17
**communicate**
266:2
**communications**
76:23, 248:20
**community**
15:6
**company**
166:24
**comparison**
182:2
**compensated**
86:9, 86:16,
86:21, 86:22,
87:6, 87:10,
328:21

**compensation**
348:2, 348:6
**compliance**
205:12
**compound**
146:1, 303:8,
303:23, 305:14,
317:14
**computer**
193:21
**concern**
345:15, 354:11
**concerned**
137:13, 137:15,
294:23, 331:14,
331:16, 345:17,
364:3, 364:16,
364:21, 370:14
**concerning**
48:16, 58:1,
58:18, 64:11
**concerns**
88:8, 88:24
**concluded**
329:24, 387:12
**concluding**
388:6
**conclusion**
261:10
**confess**
41:8, 42:10,
42:12, 172:6,
227:22, 229:13,
230:15, 256:15,
317:3, 332:11
**confession**
41:2, 41:17,
41:19, 46:18,
46:23, 218:24
**confidence**
318:14, 318:23
**confidentiality**
232:12, 233:16,
234:13, 234:24
**confront**
369:3
**confronted**
321:21, 381:16

Transcript of Eddie Taylor
Conducted on March 9, 2020

110

confuse
21:23
confused
65:15, 148:21,
152:23
confusing
152:13
connelly
4:4
conscience
119:4
consecutively
316:24
consequences
271:14
consider
49:21
considerable
287:17, 293:4
considered
43:20
consume
110:11
contact
24:3, 24:5,
68:18, 95:16,
173:1
contacted
363:9
containing
64:6
context
376:7, 377:8
continue
6:10, 36:10,
36:18, 181:2,
184:17, 235:14,
312:2
continues
237:1
continuing
180:19, 181:1,
240:19
continuous
228:9
control
236:14
conversated
170:5

conversation
64:13, 64:17,
125:19, 134:7,
134:24, 148:18,
149:10, 161:8,
167:21, 276:8
conversations
6:6, 52:3,
155:4, 229:7,
242:11, 244:9,
275:24, 345:10,
361:7
convicted
87:4, 386:5,
386:13, 386:15
conviction
386:9
cook
3:18, 3:20,
7:16, 53:23,
54:2, 54:10,
253:9, 253:23,
254:18, 255:4,
255:21, 274:11,
275:11, 319:22,
320:1, 321:16,
322:20, 323:13,
330:1, 355:12,
355:16, 355:19,
356:1, 375:18,
380:22
cool
126:5, 272:18
cooled
373:10
cooperated
31:22, 32:3
cop
146:21
copped
262:7
corner
105:7
correct
60:24, 73:6,
73:22, 88:1,
109:8, 126:18,
155:18, 170:24,

171:4, 171:7,
171:18, 171:22,
195:13, 230:1,
230:9, 256:12,
263:16, 269:1,
269:2, 274:21,
275:5, 275:8,
275:17, 275:18,
276:3, 303:6,
303:12, 309:21,
314:21, 318:17,
318:18, 326:11,
328:1, 328:5,
328:22, 335:24,
336:9, 342:11,
345:13, 346:23,
347:1, 348:20,
355:1, 363:17,
363:21, 364:11,
365:14, 365:23,
370:11, 375:19,
375:22, 376:1,
381:7, 385:21,
390:3
correctly
341:20
correspondence
76:22, 266:11
could
31:23, 32:3,
32:4, 32:5,
32:7, 32:10,
46:13, 47:11,
47:12, 73:4,
73:10, 102:7,
105:10, 105:19,
110:23, 113:22,
124:12, 145:2,
169:12, 169:13,
169:14, 195:21,
211:20, 241:5,
242:3, 247:16,
248:11, 270:14,
271:20, 273:8,
288:4, 288:20,
315:12, 320:11,
343:3, 362:2,
385:2, 385:7

couldn't
21:14, 44:7,
50:14, 50:21,
58:2, 142:4,
144:24, 150:16,
159:24, 160:18,
160:19, 161:13,
163:9, 165:11,
174:17, 180:7,
187:16, 211:15,
220:17, 248:6,
248:11, 258:23,
295:20, 343:15,
354:15
counsel
6:14, 7:5, 8:7,
9:14, 30:14,
60:13, 236:3,
242:17, 243:12,
248:20, 335:1,
355:11, 362:13,
378:1, 383:20,
389:5, 390:7
count
214:24
country
230:1
county
3:18, 3:20,
7:16, 38:11,
38:12, 47:24,
52:23, 53:14,
53:17, 53:22,
53:23, 53:24,
54:2, 54:10,
56:7, 56:13,
57:20, 59:10,
59:22, 59:23,
60:2, 145:14,
159:8, 178:12,
194:20, 227:6,
227:11, 228:3,
246:9, 253:10,
253:16, 253:23,
254:18, 255:4,
255:21, 274:11,
275:11, 299:8,
300:9, 308:16,

Transcript of Eddie Taylor
Conducted on March 9, 2020

111

318:10, 319:22,
320:1, 321:16,
322:20, 323:13,
330:2, 330:9,
330:10, 330:14,
344:4, 344:9,
344:11, 350:19,
350:20, 355:12,
355:17, 355:19,
356:1, 370:21,
373:12, 375:18,
380:22
**couple**
10:21, 19:15,
43:24, 95:21,
115:18, 139:23,
141:4, 154:14,
158:1, 207:6,
214:16, 288:24,
299:7, 302:24,
311:4, 329:10,
377:23
**course**
31:1, 368:14
**court**
1:1, 6:18,
6:23, 8:23,
9:12, 21:15,
47:4, 47:7,
47:10, 47:11,
50:6, 50:13,
51:10, 55:23,
56:10, 56:12,
227:19, 228:7,
228:8, 230:20,
230:23, 245:5,
245:8, 245:20,
344:19, 359:15,
359:18, 389:1
**court-appointed**
229:7
**cousin**
68:22, 80:20,
83:13, 83:14,
86:4, 101:23,
103:20, 282:19,
296:19, 375:22
**cousin's**
21:10, 21:19,

22:3, 22:7
**cousins**
85:21, 281:8,
288:19
**cover**
172:20, 172:22,
195:18
**covered**
225:5, 234:13
**covering**
173:9
**cow**
349:16
**cpd**
264:18
**crazy**
31:19, 49:4,
49:8, 49:15,
103:11, 109:23,
110:18, 111:20,
123:17, 132:14,
143:8, 215:24,
216:4, 216:8,
251:9, 294:5,
300:17, 301:1,
301:5, 301:11,
315:20, 315:22
**credentials**
275:7
**crib**
140:5, 140:10,
140:12, 140:23,
141:2
**cribs**
139:24
**crime**
28:13, 28:16,
33:6, 33:11,
33:15, 54:5,
54:6, 54:21,
55:5, 131:21,
145:1, 162:10,
162:12, 200:8,
246:23, 254:18,
262:3, 303:5,
303:12, 306:14,
308:1, 317:3,
344:24

**crimes**
208:8, 275:17
**criminal**
32:18, 48:4,
50:23, 158:2,
171:14, 229:23,
239:3, 308:9
**cross**
273:24
**crossed**
72:22, 269:20
**crossing**
72:21, 273:14
**crowd**
19:24, 350:14
**crying**
132:6, 221:6
**cuffed**
26:22, 26:24
**curious**
168:9, 169:7
**cussing**
134:9
**custody**
38:10, 229:18,
230:22, 249:9,
261:15, 262:1,
266:4, 266:12,
321:1, 321:16,
372:7, 372:10,
372:24, 373:3,
373:20, 374:12,
375:14, 381:1
**cut**
105:17, 333:6,
378:8, 381:4
**cuz**
106:8, 163:9
**cv**
1:7, 1:13,
6:16, 6:17

---
**D**

**daley**
3:21
**damn**
132:18
**danger**
271:7

**dangerous**
138:14, 156:19
**dap**
107:9, 331:15,
331:16
**daring**
184:4
**dark-skinned**
339:7
**darrel**
362:14, 383:21
**darrell's**
23:8, 68:20,
85:4, 100:5,
101:2, 101:23,
103:20, 104:12,
104:23, 107:1,
115:16, 124:15,
125:7, 288:7,
289:3, 347:4,
348:11
**darryl**
1:12
**database**
162:11
**date**
10:15, 47:10,
119:13, 296:10
**daughter**
37:2, 37:9
**davis**
344:4, 346:6
**day**
23:21, 24:20,
31:1, 37:5,
82:20, 83:5,
83:10, 83:20,
84:14, 84:16,
85:6, 85:14,
91:3, 91:20,
100:19, 101:1,
101:8, 101:9,
103:15, 110:16,
113:18, 116:16,
139:21, 142:24,
144:9, 144:10,
149:11, 149:12,
149:16, 149:17,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    112

153:10, 154:1,
198:7, 228:8,
232:22, 280:14,
280:20, 290:3,
290:15, 316:6,
320:8, 320:18,
330:22, 347:24,
357:15, 357:19,
357:23, 370:18,
377:5, 377:6,
389:10
**days**
95:21, 95:22,
299:7, 346:24
**dead**
107:18, 111:10,
111:11, 112:8,
112:11, 113:14,
114:2, 116:3,
116:12, 163:3,
181:3, 182:8,
222:18
**deal**
28:6, 32:9,
32:11, 358:7,
362:4
**dealt**
357:13
**death**
31:20, 32:11,
97:8, 215:13,
366:13
**decades**
207:6, 207:7
**deceased**
107:17, 114:13,
153:8, 153:18,
153:24, 191:16
**deceptive**
313:7
**decide**
267:3
**decision**
232:14, 233:17,
242:24, 363:20
**decomposed**
113:1
**deep**
203:24, 204:21

**defend**
318:15
**defendant**
3:18, 4:10,
7:16, 335:1,
355:11, 378:1
**defendants**
1:9, 1:16, 4:2,
60:13
**defender**
228:16, 229:1,
247:2, 249:24,
250:5, 251:17,
265:10, 265:11,
265:16, 318:3,
318:5, 318:10,
318:14, 318:24,
331:4
**defender's**
228:17
**defending**
251:11
**definite**
126:20
**definitely**
174:24
**definitively**
386:3
**degree**
194:23, 256:20
**delay**
244:16
**delirious**
103:10
**delivered**
176:5, 176:6,
318:7, 318:9,
318:11
**demand**
47:16
**demanded**
47:14, 47:23,
220:10
**demeanor**
136:21
**demonstrate**
325:10, 326:4
**demonstrated**
325:5, 326:17

**demonstrates**
256:22
**demonstrating**
325:13, 326:9
**department**
178:14, 264:10,
264:13
**depending**
370:15
**depends**
208:13, 370:4
**depicted**
307:6
**depos**
7:1
**deposition**
1:18, 2:1, 6:9,
6:13, 6:20,
8:14, 36:15,
36:16, 56:17,
62:23, 63:8,
63:15, 65:11,
67:14, 67:15,
67:16, 67:19,
78:22, 92:11,
92:21, 93:3,
93:6, 93:21,
94:2, 95:9,
96:15, 182:2,
234:11, 235:6,
237:4, 240:14,
240:20, 241:14,
362:23, 363:1,
363:9, 382:14,
387:12, 387:14,
388:6, 389:3
**deputies**
227:8, 255:5
**derek**
3:19, 7:15,
19:16, 288:23,
355:15
**derrell**
1:11
**describe**
17:1, 26:1,
26:15, 57:24,
105:19, 135:19,

172:14, 172:21,
177:24, 192:12,
220:19, 221:19,
303:1, 325:1,
339:5
**described**
72:24, 138:3,
171:2, 171:17,
175:9, 182:4,
201:14, 227:18,
300:17, 316:21
**description**
157:14, 157:16,
180:22
**descriptions**
178:1
**desire**
172:5
**desk**
197:11, 337:23,
337:24
**despite**
237:2, 271:5
**detail**
226:11
**details**
93:14, 94:21,
120:15, 155:20,
156:2, 167:20,
170:2, 170:8,
220:20, 226:15,
259:1, 259:4,
334:14, 353:22
**detain**
112:4
**detective**
32:24
**detective's**
342:11
**detectives**
27:12, 27:15,
27:17, 27:18,
27:22, 29:12,
29:17, 30:16,
31:1, 31:3,
31:8, 32:16,
33:5, 34:9,
34:14, 34:19,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    113

37:15, 39:15,
39:18, 40:8,
40:13, 172:5,
176:9, 183:5,
217:16, 303:4,
303:10, 306:6,
306:11, 306:12,
306:16, 367:9
**detector**
314:11, 315:15
**determine**
314:15
**dictate**
379:10
**died**
129:4, 133:1,
155:24, 156:10
**dies**
129:2, 129:7
**difference**
14:10, 14:21,
204:18, 334:15
**different**
12:17, 30:24,
31:12, 50:14,
167:9, 171:3,
176:22, 178:8,
194:14, 197:7,
197:9, 197:19,
200:1, 205:14,
213:6, 213:10,
213:13, 214:5,
226:21, 230:13,
247:15, 260:24,
268:24, 317:1,
323:22, 342:18,
342:19, 347:21,
374:7
**difficult**
9:11
**dig**
127:1, 143:10,
153:15, 170:12,
306:20
**dinosaur**
77:9
**directly**
243:13

**disagree**
233:22, 233:24
**disagreeing**
241:17
**disciples**
70:18, 73:17,
202:8, 266:19
**discombobulated**
137:8, 201:20,
363:12
**discovered**
114:9, 298:10,
298:21
**discoveries**
223:5, 223:7
**discovery**
145:15, 223:15
**discuss**
240:24, 362:22
**discussed**
345:1
**discussing**
386:10
**dismissed**
48:8, 48:19
**dispute**
363:8, 379:7
**distribution**
262:22
**district**
1:1, 1:2, 6:18,
6:19, 337:1,
337:3
**dive**
120:15
**division**
1:3, 6:19,
55:9, 320:7,
320:16, 320:17,
321:15, 371:17
**dna**
48:6, 48:10,
52:24, 53:6,
53:8, 231:5,
319:21, 322:19,
323:14, 323:20,
324:3, 324:18,
325:9, 326:11

**doctor**
252:9, 252:13,
252:21, 253:6,
310:13
**doctor's**
310:17
**doctors**
253:1
**document**
306:1, 306:9
**documents**
346:15
**does**
12:11, 13:15,
51:5, 68:3,
69:13, 70:24,
108:19, 110:17,
111:9, 121:9,
154:3, 180:23,
203:2, 203:19,
204:15, 205:13,
211:11, 234:7,
242:1, 244:7,
309:11
**doesn't**
183:4, 236:7,
237:7, 238:15,
241:5, 244:6,
387:21
**dogs**
26:20
**doing**
17:17, 19:19,
30:13, 49:24,
53:11, 91:8,
91:9, 97:12,
111:17, 111:18,
111:19, 117:7,
117:9, 128:18,
144:20, 164:17,
172:22, 186:12,
206:23, 208:10,
215:10, 224:21,
225:9, 238:19,
241:10, 243:12,
243:14, 291:1,
292:14, 303:17,
305:19, 305:21,

306:18, 307:19,
311:21, 325:8,
326:17, 348:18,
348:22, 354:15,
354:18, 363:24,
382:2, 385:8
**domestic-battery-
-related**
380:12
**done**
9:4, 9:9, 24:8,
55:2, 105:17,
127:9, 145:1,
150:17, 183:16,
183:17, 196:11,
236:21, 261:12,
267:3, 307:6,
309:3, 327:18,
329:9, 329:11,
329:20, 333:5,
334:19, 385:9
**dooky**
349:16
**door**
102:14, 125:24,
130:4, 130:5,
130:6, 197:20,
234:1, 236:5,
236:8, 237:14,
237:24, 337:4,
338:13, 338:14,
338:16
**doorway**
134:17, 134:18
**dorthy**
125:8, 125:19,
128:14, 130:15,
132:2, 132:24,
133:15, 134:7,
135:14, 136:17
**dorthy's**
129:14, 130:3,
135:6, 135:11
**down**
24:18, 26:17,
38:2, 55:12,
55:19, 64:23,
69:23, 82:12,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    114

100:4, 100:13,
102:23, 103:6,
104:14, 110:15,
111:4, 115:19,
115:20, 119:23,
124:5, 126:22,
129:2, 129:4,
129:7, 133:1,
146:4, 174:11,
182:19, 187:2,
192:14, 209:18,
218:2, 222:8,
237:2, 238:15,
244:16, 246:16,
268:22, 269:8,
273:16, 280:9,
282:9, 286:23,
287:13, 287:18,
289:15, 304:13,
309:7, 309:15,
309:24, 323:17,
323:19, 324:3,
324:7, 324:8,
325:16, 329:24,
330:3, 338:18,
349:8, 351:15,
358:8, 377:3,
380:9

**downers**
3:15

**downstairs**
218:9

**downtown**
59:16

**drank**
291:13, 291:14

**draw**
203:1

**drawing**
182:2

**dress**
369:2

**dressed**
179:18, 180:2,
211:6, 211:12,
211:14, 212:7,
310:12, 343:9

**drilling**
380:3

**drink**
350:10

**drinking**
293:16

**drive**
128:2

**driving**
300:24

**drop**
302:16, 337:4

**dropped**
108:12

**drove**
106:12, 302:6,
302:7, 302:8

**drug**
151:6, 151:9,
248:1, 263:15,
265:21, 266:6,
266:16, 278:10,
294:3

**drugs**
109:2, 109:4,
109:7, 109:10,
112:2, 127:23,
140:6, 140:7,
262:4, 262:15,
283:20, 348:22

**drunk**
291:15

**drywall**
166:17

**dude's**
255:13

**dudes**
212:18

**duly**
8:4

**during**
31:1, 49:3,
49:8, 50:23,
151:15, 155:4,
158:2, 195:15,
201:14, 208:23,
209:12, 241:14,
245:21, 299:20,
300:11, 304:16,
312:1, 357:19,

376:23

**dwane**
134:20

**dwell**
327:2

**E**

**e-d-d-i-e**
8:12

**each**
92:5, 125:16,
139:9, 204:1,
262:20, 262:21,
271:13, 281:9,
324:21, 373:10

**earlier**
30:2, 72:21,
74:6, 100:19,
101:3, 258:12,
260:19, 261:14,
273:6, 274:9,
275:3, 275:23,
281:22, 285:1,
289:9, 291:3,
292:4, 298:9,
308:15, 329:3,
331:24, 335:17,
348:21, 348:24,
363:20, 368:3

**early**
285:11

**earth**
216:12, 239:24

**easier**
31:23, 344:19

**eastern**
1:3, 6:19

**eat**
62:8

**eddie**
1:18, 2:1, 5:2,
6:13, 8:3, 8:12,
41:8, 106:7,
142:13, 217:3,
232:7, 233:1,
268:7, 279:22,
322:16, 327:15

**educate**
246:7

**effect**
303:16, 306:17,
307:18

**effectively**
319:12

**effects**
110:13, 294:1

**either**
8:21, 60:24,
75:14, 75:22,
95:4, 96:10,
155:5, 180:6,
180:9, 180:13,
180:16, 185:10,
190:7, 266:3,
266:12, 266:14,
292:21, 319:16,
331:7, 347:7

**electronic**
390:17

**electronically**
389:4

**else**
13:2, 13:9,
72:9, 86:2,
92:4, 95:24,
98:2, 107:12,
109:13, 109:15,
109:17, 117:4,
122:3, 123:24,
128:23, 131:23,
140:11, 141:1,
149:1, 167:13,
174:12, 180:1,
193:8, 196:2,
210:21, 210:23,
211:5, 244:11,
244:24, 250:8,
251:2, 269:10,
271:18, 276:11,
277:3, 277:5,
277:9, 288:5,
288:23, 292:14,
341:14, 350:11,
351:19, 361:9,
361:11, 369:7,
370:1, 377:19,
378:9, 383:19

else's
194:4
email
80:2
emails
79:23
emerald
11:21, 12:5,
69:20, 377:4
employed
389:6, 390:8
encounter
82:8
end
57:9, 78:22,
94:23, 131:11,
154:20, 196:4,
244:10, 252:3,
252:4, 261:2,
329:14, 388:8
ended
364:10
endured
256:18, 334:7
enduring
257:9
englewood
18:5, 18:9,
18:16, 19:4,
135:14, 135:15,
147:2, 148:3,
148:6, 272:10
enjoy
171:6, 171:8
enough
79:21, 86:2,
173:17, 186:24,
195:12, 197:24,
198:6, 198:8,
237:4, 258:20
entail
203:2
enter
253:11
entertaining
123:11
entire
241:14

entirety
236:8
entitled
10:7
equal
178:7
equally
178:5, 178:7
erase
79:20
especially
111:13, 365:3,
373:15
esquire
3:3, 3:11,
3:19, 4:3, 4:11
established
353:15
estimate
371:23
et
1:8, 1:15,
6:16, 60:14,
378:2
even
47:23, 71:5,
73:2, 77:19,
102:20, 104:16,
104:21, 106:17,
110:9, 114:11,
114:13, 174:17,
200:7, 209:14,
212:10, 219:2,
239:23, 257:9,
302:6, 313:19,
350:22, 372:5
event
364:17, 364:22
eventually
46:17, 280:24,
281:1, 362:5
ever
8:13, 15:17,
17:14, 20:7,
20:16, 22:15,
22:18, 22:21,
31:9, 32:23,
49:7, 49:17,

52:22, 52:24,
61:15, 61:21,
66:19, 66:21,
66:23, 76:19,
76:22, 79:23,
87:8, 112:11,
128:11, 134:10,
139:11, 174:20,
198:10, 199:5,
199:9, 200:17,
255:9, 265:23,
266:2, 266:8,
272:11, 279:2,
279:11, 284:18,
291:19, 292:1,
292:20, 294:8,
294:15, 296:10,
296:13, 298:7,
300:1, 300:11,
304:17, 304:19,
308:19, 309:3,
312:12, 319:24,
347:6, 347:14,
348:1, 348:5,
350:24, 356:15,
356:17, 357:6,
357:9, 357:12,
360:8, 361:11,
362:8, 366:7,
374:10, 377:16,
378:15, 380:11,
383:2
every
37:4, 37:7,
68:2, 72:13,
130:23, 142:24,
178:7, 288:14,
289:23, 290:3,
290:15, 352:16,
370:18, 377:5,
377:6
everybody
82:19, 87:18,
87:21, 112:22,
115:24, 116:12,
116:13, 116:19,
117:4, 120:10,
146:22, 244:15,

250:8, 269:10,
274:4, 340:22,
350:9, 368:21,
381:4
everyone
7:6, 13:15
everything
41:5, 47:9,
72:12, 72:13,
97:12, 121:14,
121:15, 121:16,
146:22, 220:22,
221:7
evidence
87:14, 126:20,
160:11, 166:2,
168:12, 217:17,
217:18, 219:11,
256:21, 364:14,
382:7
exact
349:8
exactly
116:5, 116:8,
116:11, 116:14,
118:22, 137:12,
237:18, 240:8,
267:13, 276:14,
296:16, 322:1,
325:13, 360:2,
364:10, 365:22,
384:23
exam
58:5, 58:15,
59:9, 59:14,
310:6, 312:10,
312:22, 313:17,
314:6
examination
5:2, 8:7,
60:13, 253:10,
308:8, 308:13,
312:1, 312:2,
335:1, 350:18,
355:11, 362:13,
370:14, 378:1,
383:20
examine
313:23

Transcript of Eddie Taylor
Conducted on March 9, 2020

116

examined
8:6
examiner
309:21, 310:5,
311:4, 311:10,
316:9, 317:11
example
86:6, 111:3,
135:12, 241:13,
271:22, 369:20,
381:5
except
381:3
excuse
9:14, 11:7,
12:2, 14:16,
16:14, 27:9,
56:24, 59:4,
98:10, 109:6,
111:18, 115:11,
131:11, 182:3,
185:13, 204:24,
216:20, 231:23,
300:5, 338:2,
366:1
excused
65:4
expect
205:24, 207:8,
207:11
expected
270:15, 347:15
experience
42:17, 42:24,
49:24, 73:14,
74:11, 74:15,
110:24, 197:24,
203:4, 203:6,
203:11, 205:23,
206:8, 207:6,
207:11, 259:11,
272:3, 272:8,
272:11, 272:19,
274:3, 294:2,
316:24, 373:24,
385:6
experienced
45:4, 206:13

experiences
43:6
explain
67:7, 108:20,
109:24, 110:23,
123:2, 221:2,
221:14, 248:16,
248:18, 250:10,
251:22, 281:17,
313:21, 323:1,
344:1, 350:3,
371:5, 376:7
explained
63:19, 252:18,
313:22, 361:2
extent
51:20, 234:7,
244:2, 347:23
extra
373:22
eye
43:24, 124:18,
124:19
eyes
56:2, 163:3,
173:12, 173:18,
194:13, 194:21,
194:23, 195:8,
195:12, 210:24,
226:23, 226:24,
227:1, 231:7,
361:1
eyesight
354:16

**F**

face
29:4, 30:23,
33:18, 64:15,
76:16, 76:17,
89:19, 138:13,
157:5, 172:18,
173:6, 174:9,
174:13, 193:7,
222:8, 225:20,
226:3, 231:10,
249:23, 250:5,
251:3, 251:4,

251:18, 307:1,
328:9, 328:12,
328:13, 379:19
face-to-face
89:5
facebook
77:1, 80:5
facial
180:9
facility
253:12, 261:20,
265:23
facing
53:15, 215:12,
321:12
fact
122:5, 213:16,
271:6, 278:5,
364:10
facts
87:13, 160:10,
166:1, 168:11,
251:7, 364:14,
382:7, 382:13
failed
313:3
fair
14:19, 24:2,
45:5, 79:21,
79:22, 86:2,
119:11, 126:12,
131:15, 157:19,
170:19, 256:17,
256:24, 257:3,
333:12, 362:24,
363:23, 367:20,
368:12, 368:15
faithful
354:19
fall
308:3
false
367:12
falsely
30:9
familiar
239:3, 352:18
families
266:14

family
14:2, 15:2,
15:6, 15:22,
18:11, 18:16,
19:5, 19:8,
19:11, 68:20,
68:21, 69:6,
74:18, 74:22,
74:24, 75:4,
75:6, 85:1,
85:2, 85:3,
85:18, 142:14,
244:18, 256:4,
256:7, 279:3,
279:11, 280:4,
285:19, 288:8,
289:4, 290:13,
291:24, 317:18,
317:21, 331:6,
333:8, 376:10,
376:13, 380:5
far
11:17, 43:12,
65:14, 91:17,
104:23, 205:7,
224:6, 284:1,
284:13
farther
279:5
fat
226:23
faxed
188:20
fear
272:23
feel
25:4, 34:19,
45:17, 46:10,
54:9, 86:13,
88:11, 124:20,
126:23, 127:4,
162:6, 164:16,
250:11, 250:16,
251:16, 313:10,
319:15, 325:19,
356:12, 363:12,
379:22, 379:23
feeling
103:11, 123:15,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    117

125:1
**fellow**
204:10
**felt**
34:22, 45:11,
45:13, 125:5,
245:23, 246:3,
249:22, 251:20,
251:24, 313:17,
332:1, 365:6
**female**
55:12, 178:23,
213:1, 249:24,
251:5, 265:15,
271:22, 274:1,
319:11, 356:20,
356:24, 357:16,
357:20, 365:3,
371:14
**females**
141:5, 274:4
**few**
9:18, 14:17,
131:15, 158:14,
329:20, 335:4,
355:14, 355:22,
362:18, 383:23
**fifty**
172:11
**fight**
318:1, 379:20,
380:5
**fighting**
223:9, 283:20,
379:22, 380:15,
380:16
**figure**
78:21, 120:16,
251:13, 251:19,
251:21, 282:18,
340:9, 342:5,
345:20
**figured**
123:9
**file**
55:13, 184:9,
245:4
**filed**
6:18, 84:20,

84:24
**final**
387:20
**finally**
147:23
**financial**
389:7, 390:9
**financially**
7:4, 376:21
**find**
23:7, 83:12,
84:23, 85:5,
85:19, 92:9,
96:9, 107:22,
117:22, 122:11,
132:5, 137:9,
209:10, 245:20,
247:19, 248:3,
248:9, 248:12,
274:15, 277:24,
313:1, 322:15,
383:4
**finding**
153:22
**fine**
30:4, 36:11,
52:19, 115:12,
119:15, 125:21,
143:1, 183:22,
184:21, 184:23,
185:3, 185:6,
242:22, 243:1,
243:2, 340:4,
375:1, 384:12
**finger**
236:17
**fingerprinted**
340:10
**fire**
65:16, 65:17,
224:8
**firm**
4:12
**first**
8:4, 8:20,
27:14, 27:15,
27:18, 27:21,
29:6, 31:10,

32:17, 32:18,
34:9, 37:3,
37:16, 39:12,
40:3, 40:5,
43:12, 55:24,
56:6, 56:10,
63:8, 80:12,
80:17, 80:24,
82:1, 82:3,
83:24, 84:23,
89:15, 91:13,
92:9, 92:12,
102:24, 120:19,
122:16, 143:2,
145:4, 146:18,
158:12, 159:10,
161:11, 163:16,
163:24, 164:1,
166:7, 178:17,
179:13, 185:8,
194:7, 195:7,
195:10, 195:11,
199:9, 199:10,
200:4, 201:9,
201:12, 208:23,
209:12, 209:13,
211:24, 218:3,
218:14, 218:18,
218:19, 222:12,
222:22, 226:21,
226:22, 227:19,
228:7, 230:16,
239:16, 250:7,
254:2, 257:24,
258:13, 258:16,
274:14, 298:21,
300:2, 301:12,
308:22, 308:23,
313:13, 324:22,
327:5, 330:5,
333:10, 333:16,
349:12, 351:21,
352:7, 357:19,
359:24, 361:15,
383:4, 388:2
**first-degree**
47:3
**fist**
33:20

**fists**
30:22, 171:22,
173:1, 173:23,
224:17, 226:6
**fit**
354:14, 354:15
**fitting**
114:19, 125:2,
301:15, 323:11,
367:18
**fitzsimmons**
51:5
**five**
13:23, 14:13,
119:17, 139:14,
142:9, 142:14,
142:22, 176:2,
176:15, 176:16,
176:22, 177:19,
178:3, 178:6,
260:22, 304:20
**flipping**
21:13
**floor**
2:7, 3:6,
200:4, 200:5,
220:21, 341:11
**flush**
216:4
**focused**
224:4
**folded**
187:17
**foley**
1:15, 6:16
**folks**
288:10
**follow**
124:21, 145:13,
369:13, 373:14,
379:6
**follow-up**
60:10, 335:5,
362:19
**follow-ups**
383:23
**followed**
142:18

Transcript of Eddie Taylor
Conducted on March 9, 2020                                       118

follower
71:1, 71:3,
71:4, 71:8
following
64:9, 142:23,
155:12, 330:6,
354:2
follows
8:6, 84:10,
169:6, 177:15
food
167:11
foot
202:16, 202:19
football
128:9, 377:13
force-walk
325:19
foregoing
389:3, 390:3
forever
143:22
forget
175:14, 268:4
forgive
164:12
forgot
13:17, 51:1,
378:20
forth
272:22
forward
78:21, 234:19,
237:3, 354:3
found
23:13, 23:14,
23:21, 62:16,
63:9, 63:12,
63:14, 85:1,
85:16, 86:15,
92:12, 99:24,
100:6, 101:22,
103:8, 106:11,
107:10, 107:15,
112:21, 126:22,
131:11, 132:10,
153:9, 154:10,
156:6, 209:17,

230:4, 254:22,
277:23, 312:23
foundation
15:9, 17:21,
42:20, 43:4,
45:8, 45:10,
46:20, 50:3,
67:6, 70:21,
74:2, 74:13,
75:8, 75:13,
76:10, 80:14,
90:8, 90:20,
94:17, 95:2,
95:3, 114:12,
128:21, 145:24,
148:5, 150:11,
166:6, 176:14,
179:15, 179:19,
180:5, 180:11,
180:20, 192:19,
194:16, 202:21,
203:22, 205:16,
206:5, 207:14,
208:12, 211:7,
270:5, 270:24,
272:1, 273:1,
274:2, 290:9,
290:20, 307:8,
350:6, 351:12,
364:14, 366:14,
367:14, 374:2,
385:11, 385:24
four
12:1, 13:23,
34:8, 89:17,
277:3, 279:10,
341:6, 342:7,
382:2
four-year
382:9
fractured
44:1
francine
21:7, 21:9,
22:13, 22:19,
295:2, 296:3,
296:10
freaky
31:18, 34:21,

55:15, 216:17,
306:21
free
170:5, 189:23,
204:22, 205:17,
205:18, 205:22,
246:22
freedom
143:16
french
27:9, 111:18,
204:24, 216:20
fresh
23:22, 251:4,
349:15
friends
122:15, 123:13,
281:20, 285:19,
287:16
front
19:21, 23:10,
105:24, 106:15,
127:21, 173:6,
186:17, 186:18,
187:11, 187:12,
188:18, 190:1,
190:10, 191:14,
324:12, 324:13,
337:22, 337:24
frustrated
369:16
frustration
175:24
full
45:17, 244:2,
371:21
fulton
1:11, 1:12,
3:10, 6:15,
13:19, 13:21,
17:9, 20:16,
28:23, 49:3,
49:8, 49:14,
49:18, 60:20,
64:11, 67:4,
67:8, 76:3,
79:11, 107:2,
125:8, 138:11,

138:12, 142:13,
151:23, 155:17,
188:14, 256:4,
257:12, 265:24,
277:16, 278:12,
279:3, 279:11,
290:13, 293:3,
300:18, 303:17,
304:21, 305:3,
306:17, 307:5,
307:18, 307:21,
322:17, 325:8,
327:18, 346:18,
347:8, 347:12,
353:8, 357:9,
362:14, 362:18,
363:17, 365:7,
365:13, 365:21,
366:7, 366:12,
366:22, 367:2,
367:6, 372:24,
376:4, 381:9,
382:8, 383:21,
384:16, 384:17,
386:4, 387:3
fulton's
106:12, 288:18,
362:21
fultons
18:11, 279:21,
280:1, 288:10
furious
163:20
further
57:4, 60:7,
370:15, 387:9
fusco
4:4

——————— G ———————

g-pop
268:8
galleries
372:12
gallery
373:13
games
31:13

Transcript of Eddie Taylor
Conducted on March 9, 2020

119

**gang**
72:13, 75:18,
111:6, 204:10,
267:4, 269:4,
270:18, 354:21,
369:1
**gang-banging**
43:21, 44:1
**gangs**
72:4, 207:3,
271:21
**gangster**
70:17, 73:16,
202:8, 266:18
**garbage**
113:17, 113:22,
348:14, 348:16,
348:17
**garfield**
71:18, 71:22,
72:21, 72:22,
73:5, 105:5,
267:16, 270:17,
273:7, 273:15,
273:20, 368:9,
368:20
**garfinkel**
3:18, 7:16,
355:12, 355:16,
357:7, 357:10
**gas**
65:17, 128:3
**gave**
28:18, 28:21,
57:21, 58:4,
58:14, 58:23,
59:3, 59:6,
59:13, 62:12,
64:22, 76:9,
76:12, 80:7,
99:17, 165:14,
165:15, 165:19,
170:16, 173:11,
182:21, 189:15,
189:16, 194:23,
195:8, 249:23,
258:17, 262:7,
265:10, 309:19,

310:5, 324:18,
327:22, 328:4,
366:12
**gd**
70:4, 70:8,
72:22, 73:5,
73:21, 74:12,
75:15, 121:13,
271:8, 271:22,
272:12, 272:23,
273:6, 273:11,
273:16
**gds**
70:6, 70:14,
71:9, 71:22,
72:15, 73:24,
75:4, 75:7,
75:12, 202:20,
203:20, 207:7,
207:8, 266:21,
268:20, 271:22,
272:13, 353:15
**general**
370:20, 374:13,
375:15, 375:17,
381:1
**generally**
68:1, 273:13,
279:21, 295:13,
295:16
**generals**
270:3
**generation**
267:8, 267:9
**gets**
259:19, 260:6,
316:17, 381:4
**getting**
32:11, 72:23,
73:10, 82:19,
97:12, 102:4,
112:3, 123:5,
127:14, 128:16,
140:2, 140:3,
140:4, 142:12,
168:19, 175:8,
195:3, 251:17,
271:7, 272:24,

278:4, 301:7,
304:13, 317:2
**girl**
23:1, 37:24,
100:21, 107:10,
107:15, 120:1,
122:4, 126:22,
127:3, 186:15,
191:22, 192:14,
201:22, 223:23,
273:15, 284:6,
300:24, 301:6,
301:8, 301:11,
301:13, 303:13,
379:9, 380:16
**girl's**
144:10, 224:3,
301:19
**girlfriend**
21:10, 21:18,
21:20, 22:3,
35:17, 122:3
**girls**
39:8, 271:21
**give**
7:23, 8:21,
51:17, 53:6,
57:18, 58:5,
62:24, 68:7,
68:9, 68:14,
92:16, 92:18,
143:4, 144:17,
157:14, 161:12,
164:15, 165:18,
166:13, 169:21,
173:18, 175:22,
180:18, 195:12,
196:7, 210:4,
217:22, 220:21,
221:7, 226:11,
226:14, 236:12,
241:5, 241:13,
253:10, 317:24,
323:14, 323:16,
323:20, 324:3,
332:16, 348:6,
354:1, 357:17,
359:11, 359:14,

361:22, 362:1,
362:5, 371:22,
387:15
**given**
8:13, 158:4,
186:13, 220:1,
382:9
**gives**
88:24
**giving**
53:8, 183:24,
233:4, 294:19,
319:21, 322:18,
326:10, 355:20,
366:9
**glad**
37:10, 82:22,
92:5, 170:13,
174:17, 196:8,
220:18, 221:20,
226:18, 255:19,
257:22, 326:23
**glasses**
180:13
**god**
243:16
**god's**
84:3, 141:19
**goes**
126:9
**gold**
309:8, 309:9,
309:12
**gone**
84:4, 120:9,
129:4, 134:22,
163:12, 215:12,
287:3
**good**
6:2, 15:10,
17:10, 57:1,
83:1, 92:2,
95:14, 121:1,
123:3, 169:1,
251:11, 258:20,
362:16, 376:15,
379:13, 379:14
**gotcha**
58:19, 253:5,

Transcript of Eddie Taylor
Conducted on March 9, 2020

120

274:8
**gotten**
24:16, 68:1,
77:10, 77:11,
81:7, 81:18,
128:15, 130:22,
151:9, 258:3,
305:6
**grab**
22:21
**grabbed**
136:10
**grade**
11:9, 11:13,
11:18, 16:10
**grades**
11:4, 11:11
**graduated**
11:12
**grammar**
10:24, 271:3
**grams**
262:19
**graphic**
156:1
**gray**
180:16
**great**
238:19, 243:3
**grew**
13:22, 18:13,
19:8, 270:11,
271:2, 271:4,
271:6, 272:9,
368:3, 368:13
**griffins**
288:10
**grocery**
111:21
**group**
210:12, 212:17,
214:12, 286:16,
286:19, 288:1,
288:4, 288:15,
288:17, 289:6,
289:10, 291:20,
292:2, 293:14,
340:24, 351:18

**groups**
230:13, 287:24,
317:1
**grove**
3:15
**grow**
10:22
**growing**
15:7, 17:3,
43:15, 44:13,
62:8, 127:13
**grudge**
250:6, 250:12
**gruesome**
28:13, 191:18,
191:21, 192:20
**grzelak**
2:13, 6:24,
389:2, 389:18
**guard**
370:22, 371:10,
379:17
**guards**
370:18
**guess**
101:15, 126:13,
148:20, 167:23,
197:3, 204:11,
253:12, 264:20,
280:2, 287:14,
287:23, 301:6,
325:22, 379:8
**guess-ish**
285:9
**guessing**
198:2
**guilt**
41:20, 42:3
**guilty**
230:4, 230:18,
263:2, 263:3,
263:4, 263:16,
265:9, 382:1,
382:9
**guy**
58:5, 63:17,
69:9, 125:3,
146:16, 146:17,

202:15, 202:16,
269:6, 269:9,
273:20, 297:22,
314:2, 344:3,
376:15, 379:4,
381:20
**guy's**
121:17
**guys**
19:15, 20:1,
20:4, 53:15,
60:11, 70:1,
82:18, 84:15,
87:2, 92:3,
115:7, 177:22,
177:23, 179:14,
185:16, 185:17,
185:22, 186:2,
186:5, 194:7,
194:10, 194:14,
195:8, 195:11,
208:1, 208:23,
209:1, 210:12,
210:13, 211:24,
212:7, 212:14,
212:17, 212:19,
213:15, 214:12,
215:3, 215:6,
215:19, 216:21,
217:18, 218:3,
218:4, 218:18,
218:19, 218:20,
219:18, 219:19,
219:23, 220:8,
220:15, 220:23,
221:23, 222:12,
224:10, 224:16,
226:6, 226:8,
227:10, 227:11,
227:12, 267:11,
268:23, 269:14,
269:17, 270:16,
271:4, 277:11,
279:24, 281:8,
281:11, 281:14,
281:18, 281:23,
281:24, 285:3,
304:20, 309:17,

322:19, 328:15,
328:19, 352:10,
352:14, 352:23,
353:18, 358:10,
358:12, 358:13,
373:7, 381:1

---

**H**

**hadn't**
299:9, 299:14
**hair**
180:4, 180:9,
180:16, 381:4
**haircut**
339:7
**half**
84:17, 98:12
**half-hour**
158:22, 161:8
**halfway**
192:17
**hallway**
181:15, 338:17
**halsted**
284:1, 284:4,
284:13, 284:19,
285:6
**hand**
7:20, 33:19,
33:20, 115:4,
171:24, 173:2,
196:24, 199:2,
311:18, 360:1,
389:9
**handcuff**
26:3, 337:9
**handcuffed**
32:19, 171:24,
175:24, 178:16,
196:23, 199:1,
225:7, 337:8,
338:20
**handcuffs**
26:9
**hands**
84:3, 141:19,
230:22, 359:24,
379:15, 379:16,

Transcript of Eddie Taylor
Conducted on March 9, 2020

121

380:6
**handwriting**
40:1, 40:9,
190:14
**handwritten**
190:17, 359:15,
359:18, 360:6,
360:7
**hang**
17:12, 125:14,
176:12, 237:23,
281:24, 282:1,
284:18, 291:19,
366:2
**hanging**
15:3, 16:21,
18:2, 18:3,
19:5, 19:7,
19:12, 19:20,
125:1, 285:16,
285:21, 285:23,
286:3, 290:4
**happen**
31:21, 37:19,
56:9, 73:4,
73:10, 89:16,
313:19, 339:16,
378:13
**happened**
25:17, 34:1,
34:3, 44:17,
45:16, 46:22,
54:7, 54:18,
70:15, 72:7,
103:6, 109:4,
126:1, 130:7,
131:10, 132:20,
133:12, 133:16,
133:17, 134:6,
134:23, 137:7,
137:10, 137:14,
145:8, 145:10,
145:20, 148:17,
150:10, 170:18,
209:3, 231:10,
252:8, 280:13,
317:6, 317:8,
320:8, 338:24,

340:2, 361:24
**happening**
132:11, 364:11
**happens**
243:24
**happy**
123:6
**harassing**
259:20, 260:4,
260:6
**hard**
22:2, 173:17,
385:7, 385:13,
385:17
**harjani**
234:11, 243:6,
243:10
**harold**
355:16, 357:6,
357:10
**harris**
68:22, 83:15,
375:22
**harrison**
19:16, 25:10,
25:11, 146:13,
288:22, 302:8,
337:2
**harvey**
55:18, 55:20,
56:4, 56:9
**has**
68:5, 81:7,
81:18, 104:8,
110:13, 122:8,
183:3, 236:17,
236:18, 236:24,
241:18, 242:18,
242:19, 244:15,
294:5
**hasn't**
180:21
**hate**
82:23
**haven't**
112:19, 385:8
**having**
53:6, 109:4,

111:2, 126:13,
170:14, 172:6,
209:3, 243:13,
279:18, 330:13
**hb**
297:11
**he'd**
19:10, 74:16,
147:21
**he's**
51:24, 68:1,
69:2, 69:5,
77:11, 81:22,
87:10, 103:8,
104:3, 104:7,
125:2, 146:21,
182:4, 232:10,
233:3, 233:4,
233:5, 233:20,
233:23, 235:18,
235:21, 235:22,
235:24, 236:2,
236:6, 236:16,
239:2, 239:3,
239:5, 239:6,
239:7, 239:9,
239:13, 240:9,
241:10, 242:16,
242:20, 242:23,
288:8, 344:11,
374:15, 376:12,
379:23
**head**
8:23, 8:24,
13:17, 30:23,
101:18, 172:24,
173:3, 174:9,
174:13, 187:4,
212:13, 225:2,
225:3, 225:20,
226:3, 287:3
**headed**
89:12, 103:15
**headquarters**
172:2, 195:2,
198:11, 198:14,
308:17
**heads**
373:11

**hear**
21:14, 22:2,
130:19, 142:4,
223:22, 228:21,
232:1, 246:5,
350:24, 352:7,
382:20, 382:21,
385:2
**heard**
205:1, 209:2,
235:1, 260:9,
260:10, 260:12,
283:18, 298:7,
352:6, 354:23,
357:6, 382:16,
382:18, 386:19
**hearing**
71:4
**heart**
78:18, 141:15,
224:2, 224:4,
337:3
**heated**
166:9
**heinous**
47:3
**held**
2:1, 6:20,
75:17, 75:21,
250:6, 250:12,
255:10
**hell**
131:3, 253:16
**help**
32:3, 42:24,
87:1, 166:23,
195:15, 248:10,
321:8, 330:24
**helped**
43:7, 166:11
**helpful**
169:15
**her**
22:16, 22:21,
37:2, 37:4,
38:1, 38:2,
38:3, 38:4,
38:5, 38:6,

51:1, 51:6,
51:8, 65:4,
112:18, 112:19,
112:24, 122:6,
122:17, 124:16,
124:18, 126:1,
127:6, 127:11,
130:6, 130:18,
130:19, 132:3,
132:14, 132:15,
132:16, 133:9,
133:11, 133:16,
134:17, 134:20,
142:11, 179:5,
192:17, 223:14,
223:18, 223:21,
224:2, 228:24,
229:4, 250:2,
250:10, 250:13,
250:16, 250:23,
252:1, 263:9,
273:17, 273:20,
280:12, 280:13,
280:20, 280:22,
283:18, 283:19,
295:5, 296:7,
296:14, 296:16,
301:1, 301:20,
358:22, 359:2,
359:3, 359:4,
359:24, 360:1,
361:19, 364:4,
379:10, 379:15,
379:16, 380:6,
380:8, 380:9,
380:14, 380:18

**here**
8:17, 10:12,
20:22, 55:14,
56:20, 63:17,
87:18, 96:20,
99:22, 102:10,
114:19, 120:15,
133:24, 141:7,
148:22, 155:9,
158:1, 201:3,
208:4, 223:12,
223:13, 223:20,

237:19, 241:5,
243:4, 314:3,
322:16, 326:21,
327:4, 327:7,
333:2, 335:17,
347:10, 348:7,
359:17, 379:20,
379:24, 386:10

**here's**
317:8

**hereby**
389:3, 390:2

**hereunto**
389:9

**heroin**
109:16, 131:22,
262:17, 263:19

**hey**
76:12, 114:1,
117:18, 236:19,
358:22

**hi**
16:1

**hide**
25:5, 321:9

**hiding**
49:18, 49:21

**hierarchy**
269:3, 269:14

**high**
11:14, 11:16,
17:11, 17:14,
17:16, 101:24,
104:6, 104:7,
104:11, 122:17,
140:2, 140:3,
140:4, 271:3

**high-ranking**
270:16

**higher**
16:10

**hightailed**
136:10

**himself**
17:5, 17:6,
17:17, 91:23,
91:24

**hiring**
83:2

**hit**
30:23, 31:16,
33:18, 33:21,
42:14, 42:17,
42:24, 43:7,
161:23, 172:17,
173:17, 225:4,
226:6, 259:23,
379:17, 379:18,
379:20, 379:24

**hitting**
43:1, 43:7,
45:3, 45:12,
45:23, 46:14,
176:12, 225:3,
225:19, 225:20,
225:21

**hobo**
296:24, 297:3,
297:8

**hold**
54:12, 70:17,
152:12, 232:7,
232:8, 236:21,
238:10, 245:12,
259:5, 340:3,
340:5, 344:16,
354:7

**holding**
254:24, 340:16,
341:18, 341:21

**hole**
380:5

**holler**
91:10, 208:1

**hollered**
127:6, 127:10,
147:24

**hollering**
130:8, 132:7,
133:13, 133:16,
215:14, 225:9

**holmes**
11:1, 11:5

**home**
15:17, 23:22,
23:23, 24:6,
37:3, 37:10,

38:8, 38:23,
39:9, 78:8,
78:10, 79:12,
81:3, 89:12,
97:11, 97:18,
102:9, 118:11,
118:17, 120:9,
121:24, 122:16,
124:20, 124:22,
125:6, 127:12,
136:13, 143:5,
143:9, 143:10,
143:11, 147:17,
147:18, 147:19,
167:17, 211:10,
257:21, 283:6,
283:10, 283:12,
283:13, 284:6,
289:15, 300:2,
301:12, 349:13,
349:15, 351:23,
383:6, 383:8,
383:9, 383:10

**homes**
100:12, 100:19,
272:6, 287:4

**homework**
128:18

**homey**
120:1

**homicide**
343:10, 357:3

**homicides**
343:9

**honey**
19:14, 288:22

**honor**
319:10

**hood**
44:5, 247:21

**hooking**
314:5

**hoover**
353:5

**hope**
11:10

**hoping**
248:9

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    123

horse
181:3, 182:8
hospital
323:18, 323:19,
324:3, 324:7
hot
113:18, 113:19,
346:1
hour
27:19, 29:12,
29:17, 31:11,
32:17, 84:17,
98:12, 129:12,
210:11, 255:6,
311:7, 311:8,
311:9, 340:18
hours
210:11
house
15:21, 23:9,
23:12, 39:4,
49:1, 49:22,
64:21, 64:22,
69:22, 82:4,
82:9, 83:5,
84:14, 85:15,
89:10, 89:21,
90:2, 91:9,
92:1, 97:11,
98:8, 98:9,
98:10, 100:5,
101:2, 102:3,
102:11, 104:13,
104:23, 104:24,
105:1, 106:22,
112:18, 113:9,
113:15, 114:3,
115:5, 115:16,
115:17, 120:2,
120:3, 120:18,
122:11, 122:14,
122:17, 124:4,
124:6, 124:8,
124:15, 125:18,
128:7, 129:15,
130:3, 132:11,
134:10, 135:6,
135:12, 136:20,

139:2, 140:17,
144:10, 158:13,
166:18, 166:22,
166:23, 167:21,
207:24, 274:24,
276:16, 294:9
houses
348:15
huh
117:8, 138:16,
266:24, 268:10
huh-uh
16:22, 18:18,
22:14, 109:20,
179:6, 268:15,
340:13
hunter
24:18, 343:23,
344:8, 344:11,
345:9, 345:10,
345:17
hurt
33:21, 84:5,
271:7, 272:24,
273:9, 380:18
husband
134:20
hustle
127:20, 127:22,
285:4
hustled
284:22
hustling
108:18, 108:19,
128:17
hype
139:24, 140:5,
140:10, 140:12,
140:23, 141:2

               I

i'll
9:8, 29:19,
30:15, 36:9,
81:13, 81:16,
83:4, 84:3,
165:6, 169:10,
178:2, 180:18,

206:12, 220:20,
231:5, 238:18,
248:23, 248:24,
261:10, 278:22,
280:24, 281:1,
286:24, 301:8,
306:3, 334:24,
351:12, 369:17
i've
37:9, 45:19,
65:11, 81:24,
96:20, 110:21,
111:20, 119:3,
120:9, 120:21,
123:10, 134:22,
151:21, 168:21,
192:9, 199:14,
201:19, 205:1,
230:21, 236:19,
251:6, 260:9,
260:12, 355:14,
358:22, 377:23,
383:19, 383:23
ice-t
61:9, 61:10,
61:13
id
102:1, 102:23
idea
108:20, 118:3,
126:14, 244:12,
326:22, 327:10,
328:3, 360:3,
365:16
identification
99:3
identified
158:5, 275:4
identify
212:19
identifying
376:24
idoc
265:21, 382:9
ignorant
369:10, 369:12
illegal
349:19

illinois
1:2, 1:19, 2:8,
2:14, 3:7, 3:15,
3:22, 4:7, 4:15,
6:19, 6:22,
389:19
illness
10:11
immediately
344:14
immunity
272:20
impinge
241:5
implicated
50:9, 50:17,
220:2
implicating
366:12
important
245:19, 331:19,
332:10, 332:21,
334:6
imprisoned
266:15
inappropriate
236:12, 385:1
inappropriately
22:16, 22:18
inappropriateness
238:7
incarcerated
159:5, 353:7,
354:23, 354:24
incident
198:12, 199:7,
200:20, 280:19,
323:13, 374:15,
380:12
include
246:2
including
73:9
inconvenience
48:17
incorrect
356:9
indecent
386:5

Transcript of Eddie Taylor
Conducted on March 9, 2020
124

| | | | |
|---|---|---|---|
| **indicated** 313:6 | **instagram** 80:5 | **interrogations** 304:16, 329:23 | 295:7, 295:15, 297:5, 300:15, |
| **indicating** 36:2, 36:5 | **instead** 244:10 | **interview** 287:9, 327:23, | 300:20, 300:23, 302:1, 303:14, |
| **individual** 4:2, 7:12, | **intake** 253:22, 254:17 | 328:4, 341:16 | 303:20, 303:21, 304:12, 305:12, |
| 313:5, 345:16, | **interact** 375:14, 377:1, | **interviewed** 287:7, 308:6 | 305:23, 306:8, 307:17, 308:4, |
| 354:13, 373:5 | 381:2, 381:7 | **interviewing** 99:14 | 308:5, 308:6, 322:13, 325:4, |
| **individually** 341:2 | **interacted** 374:12 | **into** 20:19, 73:5, | 325:6, 325:14, 326:7, 327:13, |
| **individuals** 341:4, 341:13, | **interaction** 372:3 | 93:14, 94:20, 128:15, 128:16, | 327:14, 327:15, 327:20, 327:24, |
| 342:7, 351:18, 354:20, 368:4, | **interactions** 356:1, 380:24 | 134:10, 137:21, 149:9, 149:20, | 331:6, 331:13, 332:2, 332:9 |
| 368:13, 369:2, 373:6 | **interest** 389:7, 390:9 | 151:6, 151:9, 156:1, 160:23, | **invite** 134:10 |
| **influence** 110:22 | **interested** 7:4, 169:19, | 162:2, 164:16, 170:2, 203:24, | **involved** 58:11, 87:16, |
| **information** 35:5, 233:15, | 170:7 | 204:21, 207:23, 208:8, 243:14, | 118:6, 118:8, 118:15, 158:5, |
| 242:5, 245:13, 317:20, 317:22, | **interfere** 6:9 | 254:17, 259:4, 271:8, 272:14, | 168:13, 169:9, 172:6, 176:12, |
| 332:17, 366:16, 390:6 | **interference** 6:6 | 301:1, 323:17, 338:6, 341:9, | 204:6, 209:22, 217:20, 256:22, |
| **injuries** 226:19, 241:23, | **interject** 169:12 | 341:21, 353:22, 356:12, 366:9, | 263:8, 304:12, 316:2, 332:4, |
| 254:11, 254:13 | **interrogate** 27:12, 31:4, | 379:15 | 332:12, 352:21, 353:6, 353:9, |
| **inmate** 373:19 | 31:7, 263:18, 264:1 | **introduced** 60:16 | 353:12, 354:11, 364:4, 385:20 |
| **inmates** 340:21, 372:11, | **interrogated** 25:18, 27:3, | **invade** 236:11, 242:4 | **involvement** 124:10, 229:14 |
| 373:23, 374:8, 374:11, 374:12, | 27:4, 27:5, 30:24, 35:2, | **investigated** 263:14 | **involves** 254:9 |
| 375:13, 375:15 | 57:17, 59:2, 59:6, 150:14, | **investigation** 158:3, 171:15, | **involving** 371:14, 387:6 |
| **innocence** 34:23, 47:17 | 150:22, 195:3, 200:6, 263:24, | 263:8, 265:2, 308:9, 333:24 | **ironic** 236:10 |
| **innocent** 25:4, 143:20, | 303:11, 329:24, 357:15, 365:13, | **investigator** 98:17 | **ish** 299:18 |
| 144:24, 246:22, 307:2, 307:11, | 386:23 | **investigators** 66:3, 274:10, | **isn't** 171:6, 238:14, |
| 314:18 | **interrogating** 34:12, 58:6 | 274:24, 276:8, 276:11, 277:4, | 343:6 |
| **inside** 145:14, 199:23, | **interrogation** 49:10, 151:16, | 277:7, 279:1, 287:6, 287:20, | **it's** 13:18, 14:15, |
| 205:8, 274:5, 294:8, 294:13, | 172:1, 198:11, 198:18, 199:2, | 292:23, 293:19, 294:18, 295:1, | 20:15, 21:20, |
| 294:15 | 199:6, 200:17 | | |
| **inspiring** 246:21 | | | |

26:2, 37:14,
52:14, 62:1,
65:16, 65:17,
68:11, 71:7,
77:15, 77:23,
78:8, 79:8,
86:10, 86:11,
88:3, 88:10,
88:11, 88:18,
100:15, 103:20,
105:7, 108:1,
115:17, 115:22,
121:10, 121:14,
121:15, 126:4,
126:12, 131:8,
132:18, 133:5,
133:11, 135:12,
135:14, 162:22,
164:13, 171:9,
174:18, 175:12,
177:5, 179:16,
180:8, 181:9,
183:12, 191:22,
203:12, 206:19,
207:20, 218:21,
220:18, 221:11,
229:8, 232:14,
233:20, 234:8,
236:9, 236:10,
236:12, 237:4,
239:19, 243:7,
249:19, 249:21,
257:5, 258:8,
258:11, 259:7,
259:17, 259:24,
260:15, 264:5,
267:8, 269:3,
281:4, 295:24,
306:1, 306:2,
309:12, 315:6,
319:13, 326:14,
334:6, 342:1,
343:21, 344:3,
344:19, 346:1,
347:24, 356:11,
374:21, 387:22,
387:23
**its**
389:8, 390:9

**itself**
131:19

**J**

**jab**
379:23
**jackson**
4:13, 120:1,
336:3, 346:4
**jail**
48:1, 53:14,
54:10, 68:1,
68:15, 68:16,
68:17, 76:6,
76:9, 76:20,
77:12, 80:10,
81:8, 85:7,
124:22, 126:11,
145:14, 158:15,
159:8, 194:20,
195:1, 204:19,
228:3, 246:9,
248:10, 253:10,
253:23, 254:18,
254:20, 255:4,
255:21, 258:3,
278:13, 279:22,
283:13, 299:8,
319:22, 320:1,
320:6, 320:22,
321:16, 322:20,
323:13, 328:5,
330:2, 330:14,
344:4, 344:9,
344:12, 345:17,
350:5, 373:19,
375:18, 380:23
**january**
261:19
**jeans**
211:9, 211:14,
211:15, 343:15
**jeff**
268:7
**jerking**
325:6, 326:4
**job**
1:22, 89:13,

91:15, 97:12,
108:17, 166:22,
167:19, 238:19,
251:11, 316:16
**jobs**
83:1, 166:15,
166:16, 166:22,
167:18
**john**
11:10
**join**
33:3, 42:21,
47:22, 71:9,
73:24, 75:12,
85:10, 95:12,
142:1, 175:21,
209:6, 257:19,
259:10, 270:6,
271:11, 290:10,
290:21, 303:24,
304:6, 305:15,
307:9, 334:11,
347:19, 350:2,
364:15, 386:1,
386:2
**joined**
74:12
**joint**
147:18, 206:9,
283:7, 351:23,
352:6, 378:22,
383:6, 383:8
**joking**
71:5
**judge**
28:6, 32:4,
32:6, 32:8,
47:11, 48:10,
228:22, 230:12,
230:21, 230:23,
231:6, 234:11,
235:15, 238:22,
240:15, 240:17,
240:22, 243:5,
243:11, 246:2,
249:17, 290:23,
316:13, 317:6,
318:20, 319:9,

331:3, 358:6,
362:3
**judging**
250:8
**jump**
44:15, 158:12
**jumped**
45:22, 46:6,
55:16, 71:12
**jumping**
155:8, 237:2
**june**
119:10, 150:14,
151:14, 299:24,
300:3, 366:21,
367:2, 367:6
**justice**
239:3
**juvenile**
200:1, 200:7

**K**

**k-a-n-k**
86:1
**k-a-t**
282:17
**kank**
19:14, 85:23,
86:2, 288:22
**karat**
268:7
**kat**
282:17, 282:20,
282:21, 283:3
**kathleen**
3:12
**kedzie**
25:10, 25:11,
146:13, 302:8,
337:2
**keep**
14:14, 19:23,
30:5, 30:15,
36:8, 36:9,
78:20, 97:5,
97:6, 103:18,
121:12, 123:4,
140:19, 181:9,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    126

221:1, 371:4
**keeping**
17:17
**kept**
32:13, 91:14,
132:12, 160:17,
160:20, 160:21,
160:24, 162:16,
191:12, 215:11,
215:14, 227:9,
354:2, 362:2
**khaki**
343:12
**kick**
174:5
**kicking**
19:22
**kid**
14:24, 281:6
**kids**
15:4, 15:13,
15:15, 15:19,
16:20, 17:3,
18:13, 74:7,
92:6, 101:10,
108:2, 129:10,
143:16, 281:24
**kilborne**
119:23, 121:5,
121:10, 122:13,
135:6, 135:16,
140:13, 336:3,
346:5
**kilder**
12:22, 12:24
**killed**
38:24, 39:5,
39:10, 73:2,
73:10, 153:10,
156:12, 273:9,
282:19, 283:5,
283:11, 283:17,
326:20, 327:11,
364:24, 365:1
**killing**
172:7, 316:3
**kimberly**
301:2, 301:20

**kind**
25:24, 31:19,
45:4, 53:3,
58:19, 64:4,
94:4, 109:10,
119:16, 120:15,
136:7, 144:18,
148:21, 152:19,
155:8, 157:24,
160:7, 166:16,
166:17, 178:5,
191:15, 192:5,
203:15, 203:19,
208:7, 208:8,
216:16, 260:15,
269:3, 270:15,
289:15, 291:6,
335:19, 355:3,
371:1, 376:24,
377:8
**kinds**
246:16, 247:22,
354:18
**knew**
14:6, 16:7,
16:11, 16:15,
16:17, 18:23,
24:17, 63:24,
118:17, 118:20,
138:16, 143:3,
143:22, 147:7,
147:17, 147:19,
148:14, 153:9,
153:17, 153:20,
153:21, 153:24,
154:9, 189:20,
190:24, 191:2,
199:22, 209:14,
226:10, 231:20,
231:23, 232:4,
233:11, 234:22,
237:17, 237:18,
267:15, 267:23,
268:16, 270:19,
271:18, 282:8,
294:11, 294:20,
295:2, 295:16,
296:3, 296:7,

296:23, 297:11,
314:8, 314:12,
323:5, 323:14,
323:16, 325:24,
327:16, 328:11,
328:20, 352:12,
368:4, 371:1,
372:9, 372:12,
373:7, 373:9,
373:15, 378:24
**knock**
36:4, 130:4,
173:20
**knocked**
102:14, 125:24,
130:5
**knocking**
194:11
**knowing**
23:10, 106:17,
150:23, 169:19,
170:7
**knowledge**
73:12, 75:12,
76:4, 117:5,
190:6, 210:22,
247:13, 269:12,
272:2, 273:13,
278:14, 317:19,
317:20, 373:18,
373:23, 374:11,
375:13, 377:16,
387:5
**known**
74:7, 209:23,
281:5, 281:23
**knows**
146:21, 239:4,
240:2
**kolin**
121:11
**komont**
121:11
**ks**
121:10
**kuhn**
3:19, 5:6,
7:15, 242:14,

242:20, 242:23,
355:13, 355:16,
384:8, 386:2
_____
                **L**
_____
**lab**
310:10, 311:1
**laced**
110:9
**lady**
27:24, 39:17,
39:19, 41:23,
112:18, 156:6,
178:20, 213:3,
277:10, 358:2
**lady's**
51:1
**laid**
311:18
**lame**
221:12
**language**
181:8, 182:12,
182:13, 183:20,
184:13, 304:22,
305:9, 366:20
**large**
138:14, 156:16
**larger**
286:15, 286:19
**larry**
353:5
**last**
55:22, 79:10,
97:7, 115:3,
121:21, 122:8,
246:5, 288:14,
299:2, 352:17,
356:7, 387:13
**late**
113:23, 164:4
**later**
23:21, 28:4,
85:16, 85:17,
89:17, 95:22,
119:17, 129:12,
151:13, 213:1,
228:10, 299:7,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    127

346:24, 356:9
**latoya**
35:17, 36:20,
36:21, 37:7,
37:16, 37:18,
38:9, 38:19,
100:22, 152:4,
153:3, 216:22,
217:14
**latoya's**
201:15, 202:1
**laundromat**
23:10, 89:23,
90:1, 90:7,
90:12, 90:16,
90:18, 91:22,
102:7
**laundry**
89:12, 89:21
**law**
3:12, 4:12,
189:3, 224:5,
246:4, 246:6,
246:8, 246:20,
247:6, 247:17,
319:13
**lawsuit**
84:20, 84:24,
86:5, 328:21,
347:15, 348:3,
355:17
**lawyer**
28:3, 33:23,
34:2, 34:7,
34:10, 34:15,
50:23, 52:3,
92:16, 94:1,
188:9, 218:10,
218:15, 218:16,
228:12, 247:1,
249:5, 249:9,
265:6, 265:9,
265:12, 265:13,
318:1, 318:5
**lawyers**
66:24, 119:12,
275:20
**laying**
192:14, 192:21

**lead**
178:4, 369:8,
370:2
**leading**
29:20, 32:14,
35:21, 36:8,
46:1, 54:13,
55:3, 364:6
**learn**
23:4, 145:17,
246:17, 312:12,
312:15, 312:21,
352:2
**learned**
23:18, 124:3,
124:8, 386:4,
386:12
**least**
31:8, 60:23,
87:1, 115:13,
155:21, 210:22,
262:13, 263:13,
272:13, 278:9,
286:19, 303:2,
315:8, 315:12,
333:9
**leave**
117:24, 122:12,
127:20, 129:6,
171:10, 196:18,
210:10, 212:3,
299:13, 338:11,
358:14
**leaving**
197:10
**led**
24:13, 141:15,
168:10, 169:8,
325:2
**left**
12:9, 12:13,
13:3, 13:11,
23:16, 23:17,
26:20, 26:22,
26:24, 50:14,
101:24, 105:23,
124:4, 125:23,
127:5, 132:21,

133:14, 144:10,
148:3, 154:15,
168:21, 170:11,
171:24, 173:2,
196:23, 199:2,
201:23, 211:24,
260:23, 299:11,
324:22, 330:18,
362:6
**leg**
326:6
**legal**
233:2, 233:4,
243:12
**legs**
225:24, 325:7
**leifer**
1:24, 390:2,
390:16
**less**
210:11, 269:7
**let**
10:1, 24:19,
38:3, 38:7,
44:7, 68:13,
89:11, 123:1,
125:14, 145:8,
164:18, 178:1,
186:23, 189:9,
189:23, 204:1,
208:1, 215:1,
252:12, 264:12,
268:20, 332:10,
338:15, 344:18,
358:8
**let's**
27:11, 28:9,
57:6, 82:1,
99:22, 114:17,
117:17, 154:16,
158:12, 164:18,
172:18, 174:11,
181:13, 225:2,
233:8, 233:9,
234:19, 235:5,
237:3, 237:6,
238:22, 240:21,
241:16, 242:16,

243:3, 243:4,
307:14, 326:2
**letters**
266:8
**letting**
378:21
**level**
238:6
**leveled**
229:24
**liberties**
386:5
**library**
145:15, 246:6,
246:8, 246:21,
247:6, 247:17
**lie**
102:11, 132:18,
144:14, 314:11,
315:15, 367:18
**lied**
37:17, 138:23
**life**
9:11, 31:19,
32:12, 97:4,
112:12, 199:15,
199:20, 205:3,
230:9, 278:18,
278:20, 309:4,
309:5, 327:2,
370:20
**light**
115:22, 182:8,
207:1, 270:13
**lights**
65:9
**liked**
62:7
**likely**
250:6, 270:4
**likes**
274:4
**lill**
22:8, 22:9,
22:10, 22:11,
86:3, 296:19
**linda**
107:2, 107:3

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    128

linda's
124:6, 124:8,
125:18
line
205:9
lines
39:24, 40:7,
40:10, 349:9
lion's
334:22
lip
195:24, 196:1,
226:23, 360:24
lips
173:16
lisa
4:11, 7:13,
29:24, 237:5,
237:13, 237:23
listed
295:15
listen
233:2, 267:11
little
12:7, 14:9,
21:10, 27:4,
74:9, 87:11,
92:6, 103:20,
115:7, 115:19,
115:20, 148:22,
166:9, 170:3,
207:21, 222:2,
238:4, 282:19,
284:8, 284:9,
296:19, 318:23,
338:8, 350:10,
350:11, 358:8
live
10:18, 11:22,
11:24, 12:13,
12:23, 13:2,
65:1, 69:18,
125:9, 146:23,
278:22, 279:2,
346:6
lived
13:10, 16:17,
18:23, 71:15,

104:17, 122:2,
146:24, 273:15,
284:11, 284:12,
289:16, 294:11,
346:9
living
10:20, 11:20,
12:5, 18:15,
19:3, 90:2,
90:3, 133:7,
146:4, 166:14,
273:20, 284:2,
301:21
llc
4:4
located
6:21
lock
38:6
locked
26:17, 46:24,
86:23, 107:9,
122:21, 123:5,
124:16, 131:20,
131:22, 143:18,
163:24, 264:1,
285:22, 352:16,
380:14, 380:15
lockup
200:12, 200:16,
339:21
loevy
2:5, 3:4, 6:20,
6:21
long
10:20, 12:23,
35:13, 37:14,
47:24, 66:15,
67:12, 74:16,
76:8, 78:3,
80:10, 82:7,
84:14, 84:15,
86:10, 86:11,
89:14, 92:1,
92:20, 95:7,
95:18, 98:11,
114:9, 131:5,
134:6, 134:8,

139:19, 140:23,
143:2, 158:22,
167:15, 168:18,
174:15, 175:17,
177:5, 179:17,
180:8, 186:1,
186:23, 194:9,
197:2, 198:6,
198:7, 200:22,
210:10, 210:14,
210:15, 215:12,
220:15, 221:19,
227:17, 228:6,
237:4, 255:4,
256:19, 262:6,
284:17, 295:21,
296:1, 311:3,
321:15, 321:19,
330:16, 340:16,
342:1, 343:21,
347:24, 350:16,
372:3
longer
311:5, 311:6
look
41:13, 179:14,
183:5, 186:22,
186:23, 191:17,
191:24, 211:3,
214:8, 221:11,
287:1, 356:10,
376:11, 376:13
looked
102:15, 102:23,
105:22, 163:3,
180:2, 185:19,
185:22, 192:1,
192:7, 193:22,
199:22, 251:8,
269:21, 280:8,
294:15, 304:19,
310:7, 323:4,
324:24
looking
23:5, 23:19,
62:17, 63:9,
100:1, 100:6,
103:1, 103:3,

103:14, 106:4,
106:6, 106:17,
116:19, 117:20,
118:2, 118:19,
122:12, 126:14,
129:3, 132:14,
137:24, 143:12,
162:12, 191:23,
197:20, 230:5,
242:10, 246:13,
248:9, 274:20,
280:9, 307:24,
346:4, 346:11
looks
378:4
loose
173:24, 253:17
lords
72:12
lose
110:2
loss
71:5
lost
46:11
lot
16:21, 27:5,
29:7, 45:15,
50:8, 50:17,
58:1, 62:4,
62:8, 64:11,
69:11, 87:11,
88:12, 111:12,
113:16, 115:1,
115:6, 123:15,
168:21, 170:23,
205:1, 214:17,
246:13, 246:17,
247:7, 247:20,
247:22, 295:20,
334:23, 339:13,
350:13, 352:5,
352:6, 352:7,
354:1, 354:15,
365:2, 377:13
lots
247:15
loud
8:21, 195:19,

195:21, 385:3
**low**
184:20, 184:22, 339:7
**low-down**
216:12
**lower**
15:16
**loyal**
354:19
**luck**
383:11
**lump**
43:24
**lumps**
361:1
**lungs**
195:20
**lying**
37:12, 38:19, 106:8

**M**

**ma'am**
335:9, 337:21, 339:4, 339:17, 342:18, 343:1, 344:21, 346:13, 346:16, 347:16, 348:4, 348:8, 351:5, 352:19, 353:7, 353:10, 353:13
**machine**
214:14
**mad**
45:15, 84:1, 123:6
**made**
26:10, 44:20, 53:13, 116:2, 116:12, 116:15, 163:2, 185:17, 188:15, 191:11, 213:15, 215:9, 217:19, 221:11, 237:15, 250:11, 250:16, 251:15,

251:16, 287:7, 307:20, 317:18, 332:3, 349:2, 365:7
**main**
352:23
**maintain**
166:11
**maintained**
166:10
**maintenance**
166:17
**majority**
74:24, 75:4, 75:6, 288:7, 288:18
**make**
28:5, 30:15, 31:23, 32:8, 32:11, 36:17, 84:5, 103:17, 110:17, 114:10, 121:2, 123:10, 126:5, 128:5, 144:24, 187:18, 193:16, 211:22, 212:15, 237:5, 276:1, 319:5, 319:6, 341:19, 351:20, 359:2, 371:10
**makes**
37:6, 204:7, 269:6, 294:5
**making**
9:11, 32:9, 204:10, 237:8, 242:15, 242:23, 254:10
**male**
265:15, 265:17
**mama**
21:11, 21:21, 62:4, 123:6, 143:16, 150:18, 151:21, 215:15, 296:20, 296:21, 317:18

**mama's**
105:1, 107:11, 115:5
**man**
28:12, 45:13, 54:19, 102:15, 102:16, 102:23, 102:24, 106:9, 114:8, 118:11, 124:11, 133:6, 138:18, 143:8, 143:12, 147:15, 152:13, 161:19, 163:9, 170:13, 177:5, 192:2, 192:13, 202:4, 208:2, 216:11, 224:2, 308:2, 320:9, 352:5, 379:20, 380:2, 381:20
**manner**
36:14, 300:19, 325:7
**many**
27:12, 34:6, 78:9, 81:5, 81:22, 96:2, 112:14, 142:8, 161:7, 172:9, 172:17, 176:8, 187:8, 193:1, 193:3, 193:23, 193:24, 199:17, 199:18, 221:19, 226:5, 226:11, 226:15, 341:4, 371:19, 371:23, 387:21
**march**
1:20, 6:3, 389:11
**marijuana**
110:9
**mark**
157:6
**markings**
187:18

**married**
122:5, 140:21, 301:15
**marshals**
309:13
**martha**
51:5, 51:17, 52:4, 52:7
**mary**
244:21
**math**
119:17
**matter**
6:14, 122:5, 144:1, 244:7, 250:4, 345:2, 387:21
**may**
6:5, 47:12, 185:10, 185:14, 230:24, 238:21, 244:2, 329:9, 334:20
**maybe**
60:10, 72:23, 73:2, 78:20, 90:24, 110:9, 114:20, 134:17, 139:14, 139:15, 144:23, 214:21, 214:23, 232:21, 244:8, 267:24, 271:17, 289:11, 309:12, 311:18, 338:15
**meacy**
23:1
**mean**
15:12, 21:23, 27:20, 27:22, 29:12, 29:18, 29:19, 30:1, 30:16, 30:17, 32:19, 49:12, 54:6, 54:20, 55:4, 62:3, 65:9, 67:8, 68:3, 69:1,

Transcript of Eddie Taylor
Conducted on March 9, 2020

130

70:24, 81:6,
86:20, 86:21,
86:22, 87:21,
105:16, 108:19,
111:15, 121:9,
123:9, 124:22,
143:19, 151:4,
153:5, 159:17,
159:19, 165:22,
172:21, 174:19,
187:1, 189:4,
205:6, 209:15,
211:11, 216:5,
234:7, 237:23,
238:1, 246:22,
251:14, 264:9,
264:15, 267:6,
276:2, 279:9,
279:22, 295:11,
309:11, 315:21,
316:4, 323:1,
325:1, 333:6,
335:16, 343:7,
348:17, 351:11,
352:9, 354:17,
369:14, 369:22,
370:8, 371:5,
372:14, 373:19,
376:7
**meaning**
157:2
**means**
52:6, 62:7,
86:22, 123:2,
203:12, 244:13,
348:3
**meant**
182:20, 182:24,
344:1, 349:5
**media**
6:12, 57:10,
57:14, 80:4,
154:21, 155:1,
261:3, 261:7,
329:14, 329:18,
388:8
**medication**
10:10

**meet**
18:14, 66:19,
98:11, 328:14
**meeting**
85:6, 85:14,
89:5, 89:6,
89:7, 89:14,
89:15, 158:13,
158:16, 158:22,
159:4, 166:8,
279:1, 328:12,
328:15, 356:8
**member**
71:1, 266:18
**members**
19:8, 19:12,
74:22, 85:1,
85:2, 85:3,
85:18, 142:14,
204:10, 269:23,
270:18, 271:22,
272:12, 279:3,
279:11, 290:13
**memory**
60:5, 175:1,
175:8, 315:23
**men**
177:20, 177:21
**mentally**
112:7
**mention**
230:12
**mentioned**
15:11, 138:3,
345:22, 368:3
**mentioning**
155:17
**mess**
326:24, 352:11
**message**
79:11
**messages**
77:10, 77:21,
79:18, 93:2
**messed**
112:7, 356:17
**messing**
110:20, 268:12

**met**
56:17, 66:14,
66:15, 84:18,
96:5, 96:6,
96:13, 98:8,
98:23, 120:13,
258:5, 346:14
**metro**
78:2, 79:4,
79:5
**microphone**
9:15, 9:20
**microphones**
6:4, 6:8
**middle**
15:16, 185:23
**might**
111:1, 157:15,
157:21, 205:15,
208:9, 209:23,
217:20, 271:19,
272:24, 278:4,
343:10, 363:7
**mikey**
20:24, 21:5,
35:9, 35:12
**mikey's**
57:17
**mile**
284:17
**mind**
137:7, 201:5,
201:8, 224:4,
230:17, 237:21,
283:16, 314:21,
315:9, 315:12,
325:23, 363:10,
384:10
**minds**
110:2
**mindset**
234:7, 234:9,
332:7
**mine**
223:9
**mingle**
19:1
**mingled**
16:12

**mingling**
15:14
**minute**
68:11, 68:12,
91:11, 157:24,
350:19, 380:24
**minutes**
92:2, 95:14,
154:15, 176:2,
210:16, 221:19,
226:12, 226:13,
226:15, 260:23,
311:5, 338:9,
338:22, 372:5
**mischaracterize**
220:7
**mischaracterizes**
50:19, 201:16,
202:2, 217:8,
326:12, 329:5,
365:19, 366:3,
375:4, 375:5
**mishear**
69:4
**misrepresenting**
306:1
**missed**
29:15, 285:1,
310:23
**missing**
35:9, 35:12,
48:12, 373:15
**misstates**
81:20, 86:18,
92:13, 95:6,
202:17, 216:23,
382:6, 382:12
**mistake**
181:22, 184:13
**mob**
205:21
**mom**
12:17, 12:18,
13:5, 62:12,
122:22, 122:24,
133:8, 141:21,
142:9, 149:10,
149:12, 149:15,

Transcript of Eddie Taylor
Conducted on March 9, 2020

131

149:19, 150:3,
280:4, 317:21
**mom's**
122:16, 124:15,
125:7, 126:22,
207:23
**moment**
235:6
**moms**
15:22, 103:17,
122:20, 141:17
**monday**
1:20
**money**
128:6, 218:13,
317:24, 347:15,
348:2, 348:6
**monroe**
12:22, 12:24,
344:5, 346:7
**month**
67:13, 79:13,
79:14, 81:12,
81:13, 81:15,
81:16, 81:18,
285:11, 289:21
**months**
48:3, 81:2,
81:3, 82:10,
82:11, 85:6,
89:17, 92:24,
93:1, 112:19,
144:1, 144:2,
158:14, 350:22,
350:23
**moon**
68:2, 81:4,
289:23, 290:15
**more**
16:7, 19:15,
31:5, 44:16,
51:12, 85:12,
93:6, 123:14,
130:14, 136:15,
139:15, 139:23,
141:5, 157:24,
160:1, 160:19,
161:14, 163:9,

164:11, 164:14,
164:15, 164:16,
165:12, 173:23,
187:10, 196:22,
205:3, 211:23,
220:10, 239:13,
244:11, 249:2,
255:14, 255:15,
257:20, 258:23,
259:21, 267:4,
270:21, 273:4,
277:6, 277:7,
280:2, 288:24,
303:9, 329:21,
334:21, 341:17,
349:19, 367:4,
369:15, 370:23
**morning**
6:2, 17:10,
101:6, 106:21,
107:23, 108:2,
299:6
**most**
178:9, 229:23,
288:16
**mother**
11:23, 18:12,
33:8, 133:4,
142:3, 142:7,
219:8, 244:19,
280:6, 333:9,
333:14
**mother's**
102:3, 156:7,
244:20
**motherfucker**
55:16, 216:8,
216:17, 366:23,
367:3, 367:7,
367:11, 367:22,
387:4
**motherfuckers**
304:21, 305:4,
306:22, 367:17
**motherfucking**
53:19
**motion**
184:10, 247:9,

247:10, 247:11,
248:6, 248:12
**motions**
245:5, 247:13
**motown**
43:20
**mount**
261:22, 261:23
**mouth**
30:11, 91:14,
102:24, 195:24,
210:20
**move**
12:16, 12:21,
13:17, 174:11,
233:8, 233:9,
234:19, 237:3,
260:23
**moved**
12:15, 12:18,
13:5, 18:1,
18:6, 70:2,
88:12, 88:13,
120:10
**movement**
326:6
**moving**
19:23, 52:17,
78:20, 139:18,
261:9, 354:3
**much**
21:22, 69:11,
87:6, 87:16,
104:4, 220:20,
221:1, 238:7,
262:9, 262:18,
286:22, 310:10,
384:6
**multiple**
176:6
**murder**
20:23, 21:2,
23:5, 34:24,
35:3, 35:18,
38:22, 47:3,
47:18, 48:21,
57:17, 58:11,
58:14, 63:10,

64:1, 68:15,
70:15, 72:7,
88:21, 88:24,
93:16, 93:22,
100:1, 109:4,
118:17, 119:15,
128:16, 131:10,
143:12, 143:18,
145:8, 145:10,
145:12, 145:20,
148:2, 150:10,
150:17, 155:14,
158:7, 160:15,
209:2, 209:15,
209:21, 213:22,
215:19, 215:20,
217:21, 218:22,
229:13, 229:22,
263:9, 263:14,
286:21, 293:2,
332:5, 332:12,
363:21, 364:5,
367:21, 371:12,
371:13, 385:20
**murdered**
155:21, 327:16
**music**
71:5
**must**
127:2, 188:20,
196:12
**myself**
24:15, 24:19,
24:20, 34:23,
35:15, 44:7,
60:17, 118:24,
119:3, 142:2,
142:5, 142:12,
143:4, 143:5,
143:19, 143:20,
144:1, 144:2,
148:19, 150:8,
218:12, 221:10,
246:7, 307:11,
319:10, 319:14,
336:15, 343:18,
373:16

**N**

**n-o-l-a-n-d**
146:14

name
6:22, 8:11,
19:14, 22:7,
51:1, 51:2,
55:11, 60:18,
61:16, 61:21,
72:13, 95:15,
103:21, 103:22,
103:23, 103:24,
104:1, 106:7,
106:22, 107:1,
121:17, 121:19,
121:20, 121:21,
122:6, 122:8,
125:7, 137:17,
137:18, 137:20,
138:3, 138:15,
151:6, 151:9,
154:6, 157:10,
159:22, 160:5,
160:18, 161:19,
162:11, 163:6,
165:14, 165:16,
165:22, 166:4,
166:5, 168:10,
169:8, 169:21,
179:5, 201:6,
222:23, 223:3,
223:11, 223:14,
223:18, 223:21,
224:1, 224:2,
224:3, 228:18,
244:20, 255:12,
255:13, 257:16,
265:18, 265:19,
279:24, 282:17,
288:4, 288:5,
294:20, 297:3,
297:8, 298:7,
301:19, 320:9,
321:21, 321:23,
322:3, 322:7,
326:24, 344:3,
355:15, 357:6,
362:16
named
23:1, 62:5,
158:5, 161:9,

170:14, 279:19,
297:18, 297:22,
298:5, 375:21
names
61:2, 115:11,
120:5, 120:8,
216:6, 216:7,
216:16, 222:7,
255:16, 263:7,
263:10, 267:23,
268:2, 268:5,
268:16, 288:20,
289:1, 294:19,
295:9, 295:11,
295:12, 295:15,
353:2, 353:3,
353:4
naming
160:14, 162:2
nasty
31:18, 34:21,
55:15, 216:8
nature
54:5, 54:6,
54:16, 54:17,
54:20, 55:5
nd
112:17
neal
297:18, 298:5
near
278:22, 279:2
nearby
16:18
neck
173:3, 174:13
need
10:6, 35:24,
79:17, 138:20,
140:21, 141:21,
166:22, 168:18,
168:23, 181:11,
192:4, 192:5,
192:6, 220:19,
221:2, 330:24
needed
143:3
needs
249:17

negative
384:21
neighborhood
15:4, 15:15,
16:16, 18:24,
71:14, 72:14,
73:14, 87:23,
88:7, 88:9,
88:10, 88:11,
88:19, 89:1,
115:7, 121:7,
135:11, 135:13,
146:21, 167:1,
208:9, 270:12,
282:6, 296:7,
299:12, 299:13,
376:16, 377:10,
377:11
neighborhood-ish
287:14
neighborhoods
207:22
neither
177:3, 320:10,
389:5, 390:7
nephew
98:21, 98:22,
208:2, 274:17,
274:18, 274:23,
276:7
nephews
85:20
nervous
314:23, 315:1,
363:24, 364:3
never
16:11, 29:3,
65:11, 110:21,
123:20, 128:12,
175:12, 175:14,
185:4, 187:21,
200:10, 223:1,
223:2, 268:4,
286:11, 291:15,
292:7, 292:8,
292:16, 294:8,
294:13, 308:24,
309:2, 311:18,

345:1, 345:13,
355:5, 361:2,
365:1, 365:21,
371:2, 373:9,
382:16, 382:19
nevest
1:5, 6:16,
7:10, 8:8, 14:4,
14:5, 14:7,
14:20, 14:21,
14:24, 15:5,
15:20, 16:7,
16:21, 17:5,
17:12, 17:16,
18:17, 19:5,
19:7, 19:12,
19:20, 20:7,
28:23, 29:1,
39:3, 39:8,
48:24, 50:5,
51:10, 51:14,
51:18, 53:5,
64:11, 70:10,
73:24, 75:20,
76:19, 76:23,
97:19, 107:10,
115:2, 115:3,
138:12, 151:24,
155:17, 158:4,
170:16, 189:13,
220:1, 265:23,
282:9, 282:14,
282:15, 284:11,
285:15, 286:5,
286:9, 286:22,
287:16, 287:23,
288:6, 288:16,
289:2, 290:12,
291:4, 291:13,
291:21, 291:22,
292:15, 293:3,
293:5, 293:15,
294:24, 319:21,
320:1, 321:5,
321:14, 322:16,
323:8, 323:14,
323:24, 324:6,
324:16, 324:20,

326:10, 327:18,
327:24, 331:15,
331:17, 353:11,
371:16, 373:3
**nevest's**
15:17, 16:3,
16:6, 17:2,
38:23, 39:4,
39:9, 75:6,
107:10, 107:15,
114:2, 115:16,
116:1, 154:11,
190:7, 289:15,
348:12
**new**
77:16, 88:10,
88:11, 88:12,
88:18, 88:20,
267:8, 267:9,
274:4
**news**
23:21, 102:21,
120:19, 120:21,
138:9, 138:10,
138:12, 139:1,
139:7, 142:18,
142:21, 156:5,
156:21, 250:9,
277:23, 328:10,
336:15, 373:14,
382:16
**next**
9:2, 9:10,
38:23, 55:17,
132:20, 134:23,
135:1, 139:22,
148:17, 149:11,
149:12, 149:15,
149:17, 158:1,
197:3, 200:23,
210:12, 211:2,
261:11, 299:8,
345:3
**nice**
15:10, 32:16
**nicely**
316:18
**niceness**
32:21

**nicholas**
3:11, 362:16
**nick**
17:8, 60:9,
181:23, 182:12,
182:21, 183:6,
183:11, 184:5,
184:20, 185:2,
235:19, 236:22,
239:11, 239:20,
240:6, 240:11,
240:12, 240:23,
241:1, 241:9,
241:15, 242:8
**nickname**
21:5, 60:23,
62:3, 62:13,
121:19, 282:13,
282:16, 296:24,
297:11, 378:15,
378:17, 378:23
**nicknames**
19:13, 61:5,
61:8, 61:12,
69:13
**night**
35:9, 35:12,
35:18, 36:21,
37:5, 37:7,
38:22, 39:4,
39:9, 100:20,
129:9, 133:10,
145:8, 145:11,
330:19
**nighttime**
330:20
**nine**
37:1, 37:7,
115:13, 150:18,
150:19
**nobody**
45:13, 87:17,
112:18, 114:13,
116:7, 124:12,
132:18, 204:4,
243:17, 243:18,
267:2, 279:17,
290:23, 308:3,

365:1, 373:14
**noland**
146:11, 146:12,
146:15, 146:23,
148:18, 148:23,
149:9, 149:13,
149:16, 149:17,
149:21, 302:12,
302:13, 335:24,
337:19, 339:5,
339:18
**none**
35:14, 70:19,
80:3, 89:4,
132:4, 132:11,
132:12, 145:13,
170:12, 217:2,
221:4, 221:7,
255:17, 263:12,
279:12, 279:14,
315:17, 327:3,
331:22, 332:16,
352:11, 355:5,
365:4
**nonsense**
88:16
**nor**
7:4, 389:6,
390:7
**north**
3:5, 4:5, 6:21,
72:2, 72:4,
72:9, 72:22,
267:18, 273:7,
273:15, 273:20
**northern**
1:2, 6:19
**notarial**
389:10
**notary**
2:13, 389:1,
389:18
**note**
6:4, 41:1
**notes**
99:11, 287:8,
329:10
**nothing**
7:24, 8:5,

23:17, 25:3,
33:12, 33:16,
34:3, 34:22,
35:14, 35:16,
38:3, 44:9,
45:19, 46:12,
80:5, 80:6,
91:9, 96:10,
114:14, 116:7,
116:23, 117:24,
123:20, 132:10,
136:23, 137:2,
137:3, 137:19,
141:18, 144:5,
153:8, 153:10,
156:2, 166:13,
176:1, 188:8,
189:5, 189:12,
191:9, 210:2,
210:3, 217:23,
219:2, 219:5,
219:19, 221:3,
225:12, 227:5,
231:8, 231:11,
231:12, 231:13,
248:12, 250:1,
250:2, 250:13,
250:19, 250:20,
253:4, 254:20,
257:7, 257:11,
267:2, 267:10,
272:4, 292:17,
304:10, 307:24,
308:3, 312:7,
314:10, 315:17,
316:14, 317:24,
321:9, 336:16,
351:23, 358:24,
359:5, 359:22,
373:15, 383:19
**notice**
2:13, 285:15,
298:11, 336:7
**noticed**
114:22, 298:16,
298:19, 299:1
**now**
7:6, 10:21,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                          134

30:7, 62:15,
78:7, 78:11,
88:11, 104:7,
104:9, 124:21,
134:22, 138:24,
140:7, 150:21,
151:13, 163:12,
164:5, 164:12,
166:14, 183:8,
183:19, 206:16,
206:18, 211:14,
212:15, 212:16,
223:4, 234:5,
237:24, 238:7,
239:18, 241:15,
301:5, 301:7,
326:23, 334:19,
352:16, 369:11,
387:18, 388:6
**nowhere**
140:11, 210:23
**number**
44:17, 68:5,
68:7, 68:10,
68:14, 76:4,
76:9, 76:13,
77:17, 77:22,
78:15, 78:22,
80:8, 178:9,
178:11

--- O ---

**oath**
7:3
**object**
29:19, 32:14,
36:10, 36:13,
63:2, 81:9,
85:8, 87:15,
93:7, 95:10,
114:4, 131:16,
133:2, 137:16,
141:23, 152:9,
159:20, 161:5,
171:20, 175:2,
197:16, 198:4,
217:8, 334:9,
349:24, 351:12,

374:1, 374:24,
375:2, 381:22,
384:9
**objecting**
119:12
**objections**
30:15, 36:17,
181:24, 245:11,
385:14, 385:15
**observe**
17:16, 53:11
**observed**
17:1
**obvious**
241:4, 365:12
**obviously**
182:5
**occasion**
381:14
**occasions**
44:18
**occur**
270:15
**occurred**
119:16, 145:12,
256:21
**off**
6:7, 6:11,
17:5, 30:22,
36:4, 57:8,
97:12, 100:8,
100:10, 100:14,
105:17, 106:15,
111:21, 120:9,
129:23, 130:20,
154:16, 154:19,
167:17, 167:18,
181:17, 182:14,
182:16, 192:18,
214:20, 235:9,
250:23, 261:1,
302:16, 320:12,
322:5, 329:11,
329:13, 333:6,
334:14, 337:4,
379:17, 388:7,
388:9
**off-and-on**
166:15

**offense**
183:21
**offer**
177:24, 181:4
**office**
3:20, 66:4,
97:24, 98:3,
98:7, 260:21,
274:11, 274:16,
275:12, 275:16,
279:2, 297:5,
302:2, 305:12,
308:7, 312:19,
333:2, 344:7,
355:19, 356:2
**officer**
1:14, 24:16,
146:3, 146:11,
146:12, 146:23,
148:18, 148:22,
149:9, 149:13,
149:16, 149:17,
149:20, 213:9,
213:11, 309:23,
335:24, 337:19,
339:5, 339:18,
345:6, 389:2
**officers**
6:15, 7:12,
45:3, 45:12,
46:14, 53:16,
60:14, 60:19,
176:8, 176:10,
176:22, 177:1,
177:19, 178:10,
178:15, 179:12,
185:8, 196:17,
197:3, 197:7,
197:19, 200:24,
201:9, 201:12,
209:13, 211:2,
212:11, 212:20,
213:5, 213:16,
217:11, 222:21,
224:9, 230:13,
263:6, 263:7,
263:10, 263:12,
263:14, 304:18,

317:1, 321:7,
324:10, 335:15,
341:17, 342:3,
342:15, 342:16,
342:19, 342:24,
357:23, 366:8,
378:2
**offices**
2:2, 3:12
**often**
67:24, 81:6,
286:18, 288:16,
289:18, 289:22,
376:23, 377:1
**oh**
9:17, 22:11,
35:4, 37:17,
63:19, 68:11,
72:8, 77:23,
85:16, 89:10,
91:21, 97:17,
125:1, 146:8,
150:16, 177:7,
186:5, 189:11,
190:19, 192:9,
219:15, 219:16,
222:9, 237:20,
243:16, 258:7,
259:6, 260:22,
269:22, 295:9,
310:17, 310:24,
314:8, 318:11,
335:18, 338:2,
341:19, 356:17,
384:22
**old**
13:23, 59:18,
69:7, 88:6,
88:8, 88:10,
88:11, 88:19,
104:7, 112:18,
170:12, 215:13,
283:2, 308:16,
339:11
**older**
14:17, 16:9,
19:24, 69:2,
69:9, 69:11,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    135

79:8, 104:2,
185:19, 185:22,
267:11, 310:8,
310:10, 339:12,
339:14, 369:11,
376:9, 376:10,
376:13
**oldest**
14:12, 123:3,
376:10, 376:12,
379:10
**oliver**
11:1
**once**
46:10, 81:4,
88:4, 106:5,
112:15, 142:11,
204:22, 205:17,
233:14, 254:21,
254:22, 278:11,
290:15, 331:21
**one**
9:10, 27:13,
31:9, 32:24,
39:21, 40:5,
40:19, 40:22,
46:11, 55:22,
56:5, 60:18,
61:2, 72:23,
74:21, 77:15,
78:10, 78:11,
79:7, 85:12,
89:9, 92:10,
96:3, 157:4,
169:14, 173:24,
176:5, 176:17,
176:20, 178:4,
178:11, 180:6,
187:3, 187:9,
187:10, 207:10,
214:6, 214:8,
214:11, 215:4,
232:13, 232:17,
236:4, 241:21,
244:9, 249:2,
249:17, 252:15,
255:9, 255:14,
255:15, 259:23,

263:23, 265:7,
273:4, 273:24,
274:6, 279:23,
282:22, 287:12,
288:14, 289:10,
291:2, 302:11,
303:9, 306:10,
308:22, 308:23,
308:24, 309:3,
309:17, 320:3,
320:10, 327:6,
342:10, 342:16,
352:17, 356:24,
360:2, 362:17,
364:2, 367:4,
368:12, 369:15,
378:20, 381:14,
382:19, 387:13
**one-year-old**
37:9
**ones**
31:12, 85:22,
268:3, 268:5,
292:4, 357:4,
377:24
**only**
15:21, 32:21,
61:7, 89:18,
96:2, 101:22,
123:13, 142:11,
153:9, 174:9,
201:21, 206:9,
219:6, 224:4,
251:24, 309:3,
309:8, 313:8,
317:15, 335:15,
342:10, 350:8,
356:15, 361:18,
378:22, 378:24
**onto**
73:5, 387:17
**open**
33:19, 187:16,
234:1, 236:7
**opened**
55:13, 102:14,
236:5, 237:14,
237:24, 379:24

**opinion**
240:1, 367:1,
367:5
**opportunity**
182:22, 314:19,
317:8
**opposed**
243:13
**opposition**
75:3
**option**
359:14
**options**
359:17
**ordeal**
313:14, 315:3
**orders**
269:9, 354:2
**organization**
203:13, 205:21,
351:1, 351:10,
351:17, 351:18,
351:21, 353:14,
353:21, 354:12,
354:22
**orient**
335:20
**other**
12:7, 13:4,
15:4, 15:14,
31:11, 50:16,
54:3, 61:3,
61:5, 61:12,
61:19, 67:1,
72:4, 77:15,
78:9, 79:7,
79:11, 82:13,
86:3, 89:18,
92:4, 92:5,
94:23, 98:2,
119:11, 125:16,
126:13, 126:14,
128:4, 128:5,
130:12, 133:16,
138:13, 139:10,
141:1, 178:18,
200:14, 200:15,
200:18, 204:5,

213:16, 247:12,
273:24, 276:12,
277:24, 280:19,
281:9, 286:5,
288:5, 290:12,
294:4, 302:11,
311:18, 311:24,
316:5, 324:9,
333:8, 333:14,
333:22, 334:20,
341:4, 341:12,
342:7, 347:7,
348:3, 348:23,
349:3, 351:20,
356:23, 357:1,
357:3, 369:2,
371:19, 372:11,
373:11, 374:8,
374:15, 377:23,
378:17, 379:13,
386:19
**other's**
204:1
**others**
268:9, 268:11
**otherwise**
96:5, 110:18,
237:3, 389:7,
390:9
**our**
68:18, 147:1,
271:12, 318:7,
379:11
**outcome**
7:5, 389:8,
390:10
**outside**
105:12, 134:12,
134:15, 135:11,
151:10, 184:5,
241:11, 377:9
**outstanding**
71:1, 74:21
**over**
8:16, 23:8,
48:2, 55:16,
62:22, 72:12,
72:22, 83:10,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    136

83:17, 84:13,
90:16, 100:18,
103:8, 112:20,
121:14, 125:16,
125:24, 126:7,
129:14, 134:24,
135:23, 136:19,
139:1, 142:4,
142:22, 144:2,
161:2, 170:23,
174:10, 174:18,
176:6, 196:8,
220:18, 221:20,
225:4, 226:18,
227:3, 247:21,
260:7, 269:20,
280:24, 284:21,
285:6, 287:4,
288:9, 299:6,
301:8, 301:11,
312:2, 312:10,
325:22, 326:2,
329:10, 330:1,
346:10, 378:11,
379:7
**overhear**
361:7
**own**
33:9, 242:15,
242:24, 259:11,
271:12, 318:1,
325:12, 354:21

**P**

**pace**
123:4, 379:11
**pad**
28:1, 29:6,
39:13, 39:16,
39:18, 39:20,
40:4, 41:24,
42:7, 178:24,
360:1, 360:4,
360:9
**page**
5:2, 8:17,
21:14, 77:1,
77:7, 121:3,

187:9, 187:10
**pages**
1:23, 187:8,
187:15, 193:24,
214:17, 214:23
**paid**
247:1, 316:17
**pain**
170:10
**paint**
110:24
**pants**
211:20, 211:21,
343:12, 343:14
**paper**
29:9, 39:21,
40:10, 40:14,
40:16, 41:12,
178:24, 188:18,
188:21, 189:1,
189:21, 193:16,
193:17, 214:9,
223:23, 224:1,
359:13, 387:17
**papers**
28:5, 38:7,
188:18, 224:5,
224:14
**pardon**
238:3, 278:19
**park**
128:10, 337:5
**parked**
337:7
**parole**
38:7, 97:13
**part**
25:19, 84:2,
152:18, 188:17,
200:14, 200:15,
246:5, 254:9,
261:11, 263:15,
263:22, 306:9,
308:9, 351:3,
351:20, 353:23,
367:24
**participated**
41:5, 355:5

**participating**
160:15
**particular**
23:20, 88:20,
181:7, 183:19,
354:4, 354:9
**parties**
6:11, 194:17,
296:13, 296:14,
389:6, 390:8
**parts**
172:24
**party**
7:3
**pass**
329:11, 334:24
**passed**
112:18, 134:22,
244:23, 333:9
**passing**
19:17
**past**
15:21, 61:17,
88:3, 109:5,
109:8, 128:17,
163:12, 170:12,
197:11, 275:17,
373:10
**patel**
4:19, 6:22
**patio**
276:15, 276:16
**patricia**
122:7, 122:8,
123:12, 135:24
**patricia's**
136:20, 139:2,
139:20, 140:17,
140:20, 141:2
**patrol**
346:7
**patrolled**
147:1
**patrolling**
345:8
**pause**
169:13, 217:6
**pay**
318:2

**paying**
139:6
**pc**
3:12, 4:12,
78:2, 320:24,
321:2
**pcp**
20:15, 109:19,
109:21, 110:3,
110:9, 111:2,
293:17
**pcs**
78:3, 79:4,
79:5
**pd**
228:16, 318:11
**penalties**
7:22
**penalty**
31:20, 32:12,
215:13
**pending**
10:8, 21:16,
152:21
**penitentiary**
23:23, 24:17,
136:14, 143:10,
143:11, 146:19,
147:8, 147:11,
147:12, 203:5,
203:11, 203:23,
205:8, 205:18,
318:7, 318:9,
318:11, 349:16
**people**
18:12, 44:14,
45:15, 48:10,
55:21, 63:20,
72:24, 88:4,
88:6, 88:8,
88:12, 88:18,
88:19, 88:20,
97:5, 97:6,
97:10, 97:21,
97:24, 98:3,
98:6, 109:22,
109:23, 110:3,
110:11, 110:14,

110:17, 110:20,
111:20, 114:21,
123:15, 123:18,
140:2, 155:18,
166:21, 171:2,
176:9, 178:3,
197:10, 203:13,
207:21, 260:4,
260:20, 268:24,
269:7, 274:15,
275:11, 275:20,
286:5, 286:16,
286:19, 287:24,
288:2, 288:13,
288:15, 288:17,
288:21, 291:20,
292:2, 292:9,
294:5, 294:20,
295:16, 298:15,
299:1, 312:18,
333:23, 348:18,
348:21, 351:20,
352:22, 355:18,
356:1, 356:16,
356:23, 371:19,
371:23, 372:1,
378:24, 387:21
**people's**
162:11
**peoples**
15:10, 64:7,
68:18, 68:19,
120:13, 197:9,
278:6, 294:4,
312:16, 323:22
**peoria**
105:5, 284:15,
287:1
**per**
81:18
**percent**
322:10
**period**
13:3, 88:16,
250:20, 267:15,
272:19, 284:8,
284:9, 299:21,
300:1, 300:17,

344:22, 352:11,
376:23
**perjury**
7:22
**permission**
92:17
**perpetrated**
167:23
**perry**
120:1, 120:6,
120:7, 121:17,
121:18, 121:21,
122:2, 123:12,
135:24, 136:20,
139:2, 139:20,
140:16, 140:20,
141:2
**person**
9:3, 34:21,
40:18, 64:14,
64:16, 81:23,
144:16, 144:17,
153:8, 156:19,
157:20, 175:23,
191:16, 203:16,
222:18, 222:19,
229:24, 296:23,
297:8, 297:18,
297:24, 298:2,
298:5, 309:14,
363:4, 363:15,
365:2, 371:2
**person's**
223:3
**personal**
354:21
**personally**
170:18
**persons**
271:2
**perspective**
193:1, 193:6
**perverted**
31:18, 34:21,
55:15, 216:17,
303:1, 303:17,
304:21, 305:3,
305:11, 305:18,

305:20, 306:17,
306:21, 307:19,
366:22, 367:3,
367:7, 367:11,
367:17, 367:22,
381:21, 387:4
**phone**
64:14, 67:22,
68:5, 68:7,
68:10, 68:14,
76:4, 76:9,
76:13, 76:16,
76:19, 77:5,
77:6, 77:12,
77:15, 77:16,
77:17, 77:18,
77:20, 77:22,
78:4, 78:6,
78:15, 78:16,
78:22, 79:2,
79:3, 79:8,
79:12, 79:21,
80:8, 80:12,
81:1, 81:5,
81:8, 94:23,
95:13, 96:3,
266:9, 362:21,
363:15, 363:16
**phones**
6:7, 78:9,
78:13, 79:6
**phonetic**
18:12, 23:2,
61:9, 121:11,
353:6, 372:13
**photographed**
340:12
**photographs**
303:2, 303:5,
303:15, 306:13,
307:6, 330:3
**photos**
28:10, 28:11,
28:13, 32:21,
306:15, 367:24
**physical**
157:16
**physically**
176:16, 254:10,

326:17
**pick**
6:5, 23:9,
380:9
**picked**
286:20, 293:2,
299:19, 299:24,
302:14
**picture**
103:1, 106:6,
106:9, 107:5,
110:24, 117:20,
123:23, 126:13,
126:21, 138:1,
138:5, 138:8,
156:21, 157:1,
157:2, 192:23,
203:1, 222:17,
222:18, 254:23,
306:20, 308:1,
330:5, 330:13,
330:17
**pictures**
27:23, 33:8,
157:4, 162:12,
186:15, 191:12,
191:15, 191:16,
191:17, 192:1,
192:6, 192:10,
192:11, 192:14,
193:2, 193:6,
193:11, 193:12,
215:17, 222:8,
222:9, 222:14,
303:12, 330:12,
367:15
**piece**
188:18, 188:24,
189:21
**pills**
131:24
**piss**
250:23
**place**
6:7, 6:10,
64:18, 144:23,
230:8, 381:6
**places**
289:10

plaintiff
1:6, 3:2, 3:10,
6:14, 8:7,
362:13, 383:20
planet
7:1
planned
336:12
plastic
136:8
play
71:16, 114:17,
114:19, 114:21,
117:2, 117:3,
117:5, 117:10,
117:14, 117:16,
298:13, 298:14,
299:1, 349:14,
350:9, 377:12
playing
15:13, 31:13,
56:23, 71:5,
117:13, 128:9,
289:12, 298:12,
298:15
plead
48:8, 263:2,
263:3
please
6:4, 6:7, 7:8,
7:18, 7:19,
8:10, 9:16,
17:23, 30:8,
84:9, 109:6,
152:13, 172:14,
181:16, 221:14,
250:10, 346:23,
351:16, 366:5
pled
263:15, 265:9,
382:1, 382:9
plenty
72:8
plugged
208:8
plus
24:17
point
13:16, 44:4,

57:7, 57:22,
116:2, 124:9,
128:14, 152:6,
152:24, 153:3,
158:2, 183:14,
183:18, 186:12,
196:20, 209:2,
217:19, 218:11,
238:2, 259:19,
260:5, 265:20,
265:21, 298:24,
299:20, 313:22,
319:20, 321:16,
334:23, 337:9,
358:20, 372:23,
373:2
pole
115:23
polygraph
57:18, 57:21,
57:24, 58:4,
58:6, 58:15,
58:24, 59:3,
59:7, 59:9,
59:13, 59:19,
60:3, 308:8,
308:13, 308:19,
309:7, 309:15,
309:19, 309:21,
309:24, 310:3,
310:6, 312:10,
312:22, 313:11,
313:17, 313:23,
316:8, 317:11,
350:18, 350:23,
370:13, 370:16,
370:19
pop
98:4, 161:20,
162:11
popped
86:12, 171:3
popping
97:5, 97:6
pops
352:24, 353:1,
353:19
population
321:10, 374:5,

374:13, 375:15,
375:17, 381:1
populations
381:5
porch
15:23, 105:11,
127:21, 133:13,
134:12, 280:15
position
202:7, 202:11,
203:17, 237:10,
237:11
positioned
26:16
positions
203:14
positive
384:4
possession
262:4
possibility
208:15
possible
62:1, 62:2,
271:15, 304:2
possibly
247:16
pot
292:13, 292:15,
292:18, 292:20,
348:22
potato
62:10
potentially
242:4
potomac
13:5, 13:6
pouring
380:4
powell
297:22
power
203:14, 203:17
pray
163:23
prayed
163:21
prefer
241:8

preprinted
39:24, 40:7,
40:10
present
4:18, 7:5,
94:20, 186:7,
188:9, 276:7,
332:18, 365:13,
371:20, 382:14
presented
186:19
press
258:24, 259:1,
379:5
pressuring
243:14, 243:17,
243:18, 243:19,
243:21
presumably
113:2
presume
123:12, 181:22,
263:12
presuming
177:6
pretty
44:20, 149:18,
150:6, 150:7,
170:17, 175:8,
210:17, 227:4,
316:18, 375:12
previous
42:23, 43:6,
45:21
previously
44:10, 347:22
printed
28:1, 190:18,
214:14
prior
109:3, 199:6,
199:18, 200:20,
278:14, 313:22,
344:22, 387:5
prison
32:12, 131:5,
131:21, 159:7,
159:8, 203:17,

205:15, 230:6,
328:1, 378:9,
380:22, 382:2,
383:15
**privacy**
140:22
**private**
6:5
**privilege**
51:22, 52:1,
52:3, 52:5,
52:8, 229:9,
232:15, 233:18,
233:20, 234:5,
236:11, 239:18,
241:19, 242:13,
243:7, 243:15,
245:14, 248:21,
248:22
**privileged**
52:4, 232:11,
242:4, 245:13
**pro**
319:7, 319:10
**probably**
43:24, 58:17,
79:17, 139:21,
229:23, 273:9,
337:10
**probes**
311:19
**problem**
118:10, 180:20,
251:1
**procedure**
253:22
**procedures**
254:16
**proceedings**
389:4, 390:4
**process**
46:4, 253:16,
254:4, 339:16
**processed**
253:11, 253:15,
339:23, 340:3,
350:21
**processing**
330:8, 330:14

**professional**
58:22, 184:12,
311:12, 316:21,
360:18
**program**
139:1
**programmed**
120:21
**projects**
100:11, 272:5,
286:24
**promoted**
355:4
**proper**
182:1, 374:21
**propose**
238:21
**proposed**
236:19, 238:21
**propriety**
234:12, 238:23
**prosecuted**
254:21, 254:22,
275:16, 350:20
**prosecutor**
359:8
**prosecutor's**
275:16
**prospect**
230:5
**protect**
244:2
**protected**
233:15, 239:23
**protection**
321:8
**protective**
321:1, 372:7,
372:10, 372:24,
373:3, 373:20,
374:12, 375:14,
381:1
**protocol**
254:17
**prove**
47:17, 143:19,
143:20, 307:11,
314:19, 315:16

**proved**
34:23
**provide**
35:5, 203:20,
346:15, 348:2,
376:20
**provided**
373:23
**public**
2:14, 167:3,
167:7, 228:16,
228:17, 229:1,
247:2, 249:24,
250:5, 251:17,
265:10, 265:11,
265:15, 318:3,
318:5, 318:10,
318:14, 318:24,
331:4, 389:1,
389:18
**pulaski**
13:6
**pulled**
76:17, 147:14,
173:10
**pump**
238:4
**punch**
172:9, 174:12
**punched**
173:11, 173:22,
176:17, 176:22
**punches**
174:7
**punching**
224:16
**purple**
227:1
**purpose**
313:24
**purse**
207:23
**pursuant**
2:13
**pushed**
380:8, 380:9
**put**
9:15, 25:22,

25:24, 29:4,
32:18, 51:11,
68:13, 84:2,
111:13, 111:15,
115:18, 123:19,
137:17, 137:18,
137:21, 138:19,
141:5, 141:19,
144:14, 149:3,
154:6, 156:21,
159:13, 160:5,
161:8, 187:2,
188:18, 188:21,
190:1, 248:6,
254:20, 254:21,
257:21, 259:22,
307:12, 308:1,
311:19, 321:8,
324:12, 379:15,
379:16, 379:21,
380:6, 381:17
**putting**
30:10, 102:4,
113:21, 181:23,
191:12, 307:1

## Q

**qualm**
183:19
**quantify**
81:7
**questioned**
382:19
**questioning**
32:24, 58:14,
348:9
**questions**
30:6, 30:14,
36:9, 36:18,
49:11, 57:5,
58:1, 60:8,
62:19, 62:21,
62:22, 62:24,
63:18, 63:20,
64:2, 64:4,
64:6, 93:10,
93:13, 94:3,
94:4, 94:11,

94:14, 96:14,
99:17, 100:3,
133:9, 133:11,
145:6, 158:2,
168:21, 183:9,
184:18, 186:14,
202:7, 213:21,
218:22, 232:10,
234:12, 235:14,
236:5, 236:10,
257:22, 260:20,
280:12, 294:21,
295:18, 295:19,
312:1, 312:3,
313:9, 315:18,
315:20, 316:2,
316:4, 320:11,
329:21, 331:15,
331:23, 332:20,
334:13, 334:16,
334:21, 335:5,
335:6, 335:20,
348:10, 355:7,
355:8, 355:14,
355:22, 362:11,
362:19, 363:19,
365:6, 368:6,
368:10, 377:22,
380:23, 382:14,
387:9, 387:11,
387:14

**quick**
57:6, 201:11,
210:17, 261:11,
329:8

**quickly**
281:17

**quit**
266:22

**quite**
185:1, 256:10,
259:12, 369:13

**quote**
303:17, 304:21,
322:15

**R**

**racine**
10:19, 64:23,

90:3, 90:24

**racket**
23:11

**rage**
45:17

**railroaded**
44:8

**raise**
7:19, 33:8,
215:15

**raised**
68:24, 69:3,
133:5, 219:8,
280:8, 345:21,
375:24, 376:4,
376:6

**raising**
70:1, 377:1,
379:11

**ran**
47:8, 55:16,
118:16, 149:9

**rank**
70:6, 70:17,
70:22, 70:23,
75:17, 75:19,
75:20, 75:22

**ranking**
269:23, 270:18

**rape**
63:10, 160:15,
182:3, 217:20,
229:13, 229:21

**rapes**
381:20

**raping**
172:6, 382:10

**rappies**
372:13, 372:15,
372:17

**rather**
8:22, 243:13,
253:4, 384:16

**razor**
378:8, 379:19,
379:21

**re-ask**
10:2, 369:18

**reach**
81:1

**reached**
80:12, 80:17,
278:3

**react**
136:21

**reaction**
109:21

**read**
21:12, 21:15,
21:16, 30:8,
41:12, 55:9,
84:8, 84:10,
152:21, 169:4,
169:6, 177:11,
177:15, 187:21,
187:23, 188:12,
189:8, 189:9,
217:23, 218:1,
218:4, 223:22,
247:16, 306:3,
338:4, 360:8,
387:20, 388:1

**reading**
55:14, 246:13,
246:17, 247:7,
247:20, 248:4,
251:7

**ready**
142:12, 169:11,
244:15, 325:21

**real**
43:21, 73:9,
103:22, 103:23,
103:24, 111:5,
120:8, 121:19,
121:20, 134:8,
175:7, 201:11,
322:24, 353:3

**realize**
241:4

**realized**
356:9

**really**
14:14, 14:22,
16:8, 16:12,
16:15, 17:13,

18:2, 18:3,
18:22, 18:24,
19:1, 20:9,
20:10, 24:3,
35:13, 37:13,
50:15, 50:21,
64:2, 65:14,
74:1, 76:11,
87:16, 88:15,
91:17, 96:20,
96:23, 105:8,
120:11, 124:12,
136:23, 164:9,
165:15, 166:13,
170:2, 170:11,
175:22, 176:3,
179:16, 180:7,
181:23, 184:19,
184:22, 185:1,
187:16, 201:1,
203:6, 203:11,
203:12, 203:24,
206:8, 206:19,
223:22, 226:11,
238:7, 238:12,
244:6, 250:1,
250:2, 251:14,
257:20, 257:22,
259:21, 269:9,
272:4, 272:14,
280:3, 281:18,
285:20, 295:20,
314:2, 319:13,
319:14, 331:22,
332:18, 349:12,
350:8, 350:13,
351:7, 353:22,
353:23, 355:5,
356:10, 373:9,
375:9, 379:6

**realm**
208:14

**reason**
50:16, 79:5,
82:19, 83:22,
84:11, 101:22,
231:18, 246:20,
272:12, 356:18,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                   141

363:6, 363:8,
366:21, 384:1
**reasons**
364:2
**recall**
17:13, 33:4,
35:10, 49:16,
61:24, 62:18,
76:11, 145:5,
150:12, 150:15,
150:23, 151:15,
156:10, 156:22,
178:3, 179:16,
180:12, 180:15,
180:23, 185:10,
201:1, 202:6,
220:20, 247:6,
262:13, 268:6,
274:10, 287:19,
291:12, 299:17,
299:19, 302:1,
304:1, 304:22,
308:5, 313:4,
315:22, 322:6,
330:17, 335:8,
335:11, 349:7,
352:21, 365:10
**recalled**
186:12
**received**
56:4, 56:8,
160:8, 169:21,
347:1
**receiving**
55:6
**recently**
261:14, 316:23
**recess**
57:11, 154:22,
261:4, 329:15
**recognize**
176:24, 177:4,
177:16, 267:23,
309:14, 368:8,
368:14, 368:19
**recollection**
226:20, 285:17,
324:2, 349:21

**record**
6:3, 6:11, 7:7,
8:11, 8:24,
30:5, 36:3,
36:6, 36:18,
52:20, 57:9,
57:13, 84:10,
108:21, 123:10,
154:20, 154:24,
169:6, 177:15,
181:18, 181:19,
185:4, 217:7,
235:10, 235:11,
236:22, 237:11,
237:12, 261:2,
261:6, 329:13,
329:17, 382:6,
382:13, 388:7,
388:9, 390:3
**recorded**
387:16, 387:22,
389:4, 390:4
**recorder**
259:23
**recording**
6:10, 390:6
**red**
368:21, 368:22
**reeds**
18:11
**referred**
281:9
**referring**
54:23, 148:2,
384:2
**regard**
23:5, 386:24
**regarding**
84:20, 348:10
**regards**
63:10
**regret**
238:12
**regular**
179:24, 211:8,
342:23, 343:8,
343:14
**rekindle**
224:7

**related**
7:3, 281:11,
349:19, 389:5,
390:7
**relates**
244:10
**relation**
85:5, 90:1,
125:11, 125:17,
149:8, 171:14,
172:4, 363:21,
375:19
**relationship**
14:23, 17:2,
91:18
**relative**
284:11
**relatively**
204:11, 276:1
**release**
277:16
**released**
80:11, 81:22,
82:8, 84:21,
131:4, 131:12,
255:22, 261:15,
261:18, 261:19,
261:21, 265:22,
277:18, 277:19,
277:22, 278:10,
285:12, 286:20,
328:1, 350:4
**relying**
8:23
**remain**
189:6
**remembered**
63:24, 66:3
**remembers**
180:22
**remind**
60:17, 229:6,
232:16, 338:2
**reminder**
355:15
**remotely**
7:6
**repeat**
71:6, 152:16

**repeatedly**
171:18, 172:10
**repercussions**
206:10, 271:13
**rephrase**
10:2, 124:13,
125:20, 165:6,
366:5
**report**
287:7, 287:9,
301:3, 303:14,
305:17, 306:7,
306:8, 322:14,
325:4, 331:6
**reported**
293:14, 359:15,
359:18
**reporter**
6:23, 7:17,
7:19, 8:24,
9:12, 21:15,
84:10, 169:6,
177:15, 181:17,
181:20, 235:9,
235:12, 310:23,
311:2, 344:20,
389:1
**reporting**
325:6, 327:14
**reports**
155:11, 155:13,
155:16, 155:23,
156:9, 156:10,
156:14, 156:22,
157:15, 157:18,
223:6, 223:7,
223:15, 303:3
**represent**
119:9, 318:20,
319:4, 319:10,
319:12, 319:14,
355:16, 362:17,
363:3
**represented**
236:2, 236:6,
242:17, 347:7
**representing**
251:6, 265:6,

**represents**
17:8, 60:19,
347:11, 362:18,
363:17
**reputation**
15:5
**request**
319:5
**requested**
389:8
**reserve**
248:21, 387:19,
388:3
**reserved**
388:4
**residence**
293:5, 348:12
**resist**
53:8, 322:17
**resisting**
322:22, 323:3,
323:8, 323:9,
326:10
**resolve**
235:16
**resolved**
48:5
**respect**
99:13, 140:22
**respects**
99:12
**response**
100:2, 327:17
**responsibilities**
207:9
**responsible**
138:4, 160:14,
206:1, 207:12
**rest**
230:9, 268:12,
374:4
**restore**
315:23
**result**
315:8, 347:15,
348:3, 348:6
**results**
312:9, 312:13,

312:15, 312:21,
313:2
**retaliation**
273:14
**retire**
266:21
**retired**
266:20
**returned**
59:20
**review**
212:6, 346:15,
389:8
**ribs**
44:1, 173:3,
174:13
**richard**
3:21
**ricky**
68:22, 68:23,
69:13, 69:15,
69:16, 69:18,
69:24, 70:4,
76:4, 76:9,
76:12, 76:15,
80:7, 83:15,
83:16, 83:19,
278:3, 278:7,
278:8, 375:21
**rico**
352:17, 352:18
**ride**
319:17, 369:4
**ridiculous**
234:18
**riding**
106:6, 106:9,
346:10
**righteous**
354:16
**rights**
51:22, 217:24,
218:1, 218:4,
236:18, 237:1,
239:4, 242:21,
244:3, 337:20,
338:3, 338:4,
359:7, 359:9

**rim**
115:23
**ring**
26:8, 26:9,
26:10, 26:24
**risk**
72:23
**road**
3:13, 182:20,
238:15
**rob**
22:8, 22:10,
22:11, 86:3
**robberies**
247:23
**robert**
1:24, 100:11,
100:12, 100:18,
284:5, 287:4,
296:19, 390:2,
390:16
**rock**
4:4, 22:9
**room**
7:5, 25:22,
25:24, 26:5,
26:13, 26:16,
32:19, 64:7,
139:9, 172:1,
178:11, 195:22,
196:19, 197:3,
198:11, 198:18,
199:2, 200:18,
200:23, 212:3,
218:16, 309:20,
309:24, 338:8,
338:16, 338:18,
341:16, 361:11
**rooms**
199:6, 319:23
**rough**
44:5, 53:17,
304:14, 304:15,
371:22
**rules**
8:17
**rules-ish**
269:6

**run**
25:4, 141:6,
141:8, 142:10,
142:15, 143:22,
149:20
**running**
201:7, 247:21,
352:10, 352:15,
353:18, 354:14
**russell**
3:3, 7:9, 30:9,
36:17, 52:12,
62:18, 62:21,
62:22, 63:7,
63:13, 63:16,
64:14, 65:3,
65:5, 66:14,
67:1, 67:3,
67:7, 95:23,
96:3, 96:13,
110:6, 236:4,
238:3, 244:10
**russell's**
237:20
**ryan**
2:13, 6:24,
389:2, 389:18

S

**sad**
46:10
**safe**
204:11, 273:17
**safer**
272:21, 273:19,
273:23
**safety**
373:21, 373:22
**sake**
261:13
**same**
8:17, 9:6, 9:8,
9:11, 17:17,
43:9, 46:8,
46:9, 49:10,
73:4, 113:9,
121:3, 135:13,
152:19, 162:17,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                     143

163:8, 178:11,
178:12, 180:14,
180:17, 185:12,
192:10, 197:10,
203:3, 208:21,
214:4, 214:6,
215:3, 216:1,
222:14, 224:21,
224:24, 227:11,
227:12, 234:23,
245:11, 249:10,
260:6, 265:23,
269:13, 272:23,
273:13, 275:16,
288:1, 290:21,
313:18, 315:14,
320:15, 320:16,
320:17, 320:20,
324:3, 325:7,
330:18, 334:4,
341:5, 357:23,
372:16, 376:12,
381:6, 385:14,
385:15
**sample**
53:6, 53:9,
323:20, 324:18
**samples**
52:24, 319:21,
322:18, 322:19,
323:15, 324:4,
325:9, 326:11
**sangamon**
105:4, 105:5,
125:10
**sat**
308:8, 308:19
**satisfactory**
45:18, 162:19,
162:23, 162:24,
166:13
**save**
46:12
**saw**
19:12, 39:2,
39:7, 77:5,
82:2, 105:20,
108:2, 138:9,

139:1, 139:5,
143:2, 151:9,
154:1, 196:14,
270:22, 282:8,
286:3, 291:2,
291:3, 293:3,
299:3, 299:4,
300:7, 300:12,
300:16, 303:2,
320:13, 321:14,
321:19, 322:16,
324:6, 324:8,
325:1, 325:8,
328:8, 328:10,
350:4, 350:8,
357:20, 358:22,
359:24, 370:4,
371:16, 377:6
**says**
36:1, 162:15,
185:1, 306:4
**scar**
378:5
**scare**
23:24
**scared**
53:12, 53:13,
53:16, 97:8,
150:5, 313:13,
313:15, 315:1,
322:22, 322:23,
322:24, 323:10,
324:24, 325:3,
326:1, 326:14,
326:18, 358:24
**scarface**
378:15
**scene**
28:13, 158:1,
303:5, 303:12,
306:14
**scenery**
12:17
**scent**
221:12
**scheduling**
363:1
**school**
10:24, 11:15,

11:16, 12:10,
12:13, 16:8,
17:11, 17:14,
17:16, 101:4,
101:8, 101:9,
101:10, 101:24,
104:6, 104:7,
104:11, 106:15,
108:3, 108:5,
108:7, 108:9,
108:11, 108:14,
122:17, 129:11,
129:21, 129:23,
130:1, 268:1,
268:3, 268:17,
270:11, 271:3,
301:20
**scratching**
379:23
**scream**
195:21
**screaming**
130:7, 132:6,
132:13, 133:12,
133:16, 195:17,
195:19, 215:11,
215:14, 225:8
**scum**
216:12
**se**
319:7, 319:10
**seal**
389:10
**search**
264:21
**searching**
247:6
**seating**
338:17
**second**
39:17, 89:4,
89:7, 89:9,
89:14, 89:15,
99:23, 105:23,
161:22, 162:4,
162:7, 162:8,
162:15, 164:7,
169:13, 178:18,

181:14, 200:5,
212:17, 214:12,
218:18, 226:20,
228:14, 258:21,
341:11
**securing**
206:19, 206:20,
206:21, 206:22
**security**
202:15, 202:16,
202:19, 202:22,
203:12, 203:16,
203:19, 203:20,
204:2, 204:15,
204:19, 204:20,
205:13, 205:15,
205:24, 206:14,
206:18, 207:2,
207:9, 207:11,
207:21, 208:4,
208:7
**seeing**
124:18, 147:21,
155:11, 155:13,
254:11, 299:20,
373:7
**seek**
243:12
**seemed**
128:14, 383:10
**seems**
110:1, 206:24,
220:8
**seen**
40:24, 81:23,
81:24, 89:18,
101:9, 105:21,
106:5, 106:13,
110:3, 110:11,
110:13, 110:21,
111:20, 111:24,
112:19, 141:4,
147:14, 147:18,
156:5, 157:3,
159:11, 192:9,
197:9, 197:19,
286:11, 286:22,
290:22, 290:24,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    144

291:15, 292:16,
293:15, 298:22,
299:8, 299:9,
299:14, 299:16,
300:2, 336:15,
344:15, 345:1,
352:5, 361:4,
367:15
**self**
354:20
**sell**
109:11
**selling**
109:2, 109:4,
109:7, 127:23,
140:6, 140:7
**send**
55:8, 93:2
**sense**
204:7
**sensitive**
6:5
**sent**
146:18, 147:11,
147:12
**sentence**
262:5, 306:3,
382:10
**sentenced**
382:2
**separate**
51:11, 319:23
**separated**
374:4
**sergeant**
302:22
**serious**
205:2, 224:3,
229:23, 308:2
**seriousness**
231:4
**serve**
262:10
**service**
307:13
**serving**
262:2
**set**
47:10, 158:1,

248:7, 248:12,
301:18, 325:23,
353:21, 389:9
**setting**
123:3
**seven**
13:1, 81:11,
81:14, 81:17,
92:2, 144:1
**several**
259:8
**severe**
169:20
**sexual**
377:17
**sexually**
382:23
**shackled**
325:16
**shake**
8:23, 8:24
**shaking**
325:3, 326:15
**shameful**
239:8, 239:10,
239:12, 239:16
**shannon**
4:20
**share**
334:22
**shaunice**
22:23
**she's**
28:5, 132:14,
133:4, 250:4,
251:7, 274:1
**sheriff's**
178:14, 227:7,
264:9, 264:10,
264:13, 264:15,
344:7
**sheriffs**
53:23, 54:2
**sherm**
20:8, 20:11,
20:12, 20:14,
20:17, 110:5,
111:2, 111:11,

292:2, 293:23
**sherms**
293:16
**shift**
31:2, 31:5,
31:12, 34:13,
39:17, 176:7,
178:18, 179:13,
196:21, 197:5,
197:6, 197:8,
197:12, 197:14,
197:17, 198:1,
198:6, 201:10,
208:24, 212:16,
218:21, 219:24,
221:24, 222:22,
224:10, 226:9,
358:11
**ship**
60:24, 378:18
**shirt**
302:21, 339:1,
339:3, 339:19
**shit**
15:16, 196:11
**shoes**
354:14
**shootings**
247:22
**short**
134:8, 170:3
**shorties**
267:9
**shortly**
298:10, 298:20
**shorty**
199:15, 352:23,
353:1, 353:19
**should**
17:22, 37:1,
37:2, 87:5,
116:13, 229:5,
234:10, 243:12,
244:9, 261:12,
284:12, 330:12
**shoulder**
379:18
**shouldn't**
25:4

**show**
29:5, 136:1,
193:2, 376:18
**showed**
27:23, 28:10,
33:7, 55:17,
98:18, 99:2,
136:2, 136:21,
191:22, 192:11,
192:13, 193:4,
222:9, 222:14,
275:7, 303:11
**showers**
204:4
**showing**
186:15, 190:5,
215:16
**shown**
368:1
**shows**
358:18
**siblings**
11:24, 16:4,
16:6
**sick**
28:12
**side**
10:23, 12:20,
13:7, 13:10,
18:15, 19:4,
26:20, 30:23,
71:15, 71:21,
72:2, 72:4,
72:9, 72:15,
72:17, 73:6,
74:17, 119:20,
135:17, 135:18,
140:8, 142:15,
204:5, 271:13,
272:22, 272:23,
273:24, 274:6,
338:8, 353:24
**sides**
71:15, 71:18,
72:16, 187:14,
225:21, 274:7
**sight**
269:20, 270:4,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    145

270:10, 270:22,
290:5, 290:14,
290:17
**sign**
28:4, 29:10,
33:13, 40:20,
40:21, 41:6,
41:15, 41:16,
42:5, 42:6,
42:8, 45:18,
46:18, 46:23,
186:3, 187:3,
187:4, 187:5,
188:4, 188:11,
188:19, 188:22,
188:23, 189:1,
189:5, 189:19,
190:11, 190:19,
190:23, 191:1,
191:2, 191:4,
191:6, 191:8,
193:16, 194:3,
194:12, 196:14,
196:17, 210:5,
212:2, 213:23,
215:4, 215:9,
215:22, 216:2,
218:23, 219:20,
220:10, 221:5,
221:8, 222:5,
224:12, 224:14,
225:14, 225:17,
227:22, 227:23,
228:2, 257:6,
357:24, 358:5,
359:13
**signature**
388:4
**signature-ibxzh**
390:14
**signature-oepnq**
389:15
**signed**
188:15
**significant**
230:6
**signing**
160:23, 188:7,

188:8, 191:9,
225:12, 257:11,
359:4, 359:22
**silent**
189:6
**similar**
113:9, 113:22,
214:19
**simple**
236:20, 238:22,
316:5
**simply**
241:22, 251:11
**since**
13:22, 14:9,
68:1, 73:19,
74:7, 74:9,
76:19, 77:11,
81:7, 81:18,
81:22, 86:11,
86:12, 134:22,
153:6, 164:17,
167:17, 170:17,
199:15, 244:10,
280:20, 281:5,
281:23, 314:18,
356:8
**single**
236:7, 241:13
**sir**
8:10, 8:13,
8:15, 10:15,
15:18, 18:20,
20:21, 21:17,
22:6, 35:7,
38:16, 38:20,
39:6, 57:4,
58:7, 61:18,
61:20, 76:21,
76:24, 89:3,
91:21, 93:4,
94:1, 94:12,
98:5, 134:3,
139:13, 159:9,
169:17, 185:8,
187:20, 187:22,
187:24, 188:2,
194:1, 199:8,

199:10, 200:19,
200:21, 217:3,
217:13, 217:15,
225:1, 227:13,
227:16, 229:5,
244:17, 247:14,
249:14, 249:20,
263:11, 265:3,
266:5, 266:7,
292:21, 294:10,
311:15, 311:17,
327:12, 341:10,
362:10, 362:12,
362:16, 364:8,
377:15, 377:18,
377:20, 377:22,
383:3, 384:13,
387:1, 387:12
**sister**
12:6, 12:7,
256:1, 256:3,
333:15, 333:16,
379:10
**sisters**
12:2, 12:4,
16:10, 33:9,
123:4, 245:1
**sit**
47:24, 55:7,
55:11, 87:18,
126:8, 308:24,
338:18, 347:10
**sitting**
26:18, 26:21,
63:17, 94:23,
223:12, 223:13,
223:20, 241:10,
255:21, 308:12,
326:21
**situation**
44:6, 45:14,
123:17, 150:5,
163:21, 163:23,
224:6, 304:9,
305:6, 306:24,
313:14, 315:4
**situations**
374:11

**six**
13:1, 14:13,
48:3, 81:11,
81:14, 81:17,
92:2, 119:2,
119:7, 119:17,
142:9, 142:14,
142:22, 144:1,
262:6
**skills**
319:14
**slapped**
187:3, 380:8
**sleeping**
102:10
**slide**
91:10
**slow**
148:22
**smack**
249:23, 250:5,
251:3, 251:18
**smacked**
30:22
**smacking**
212:13
**smart**
77:6
**smell**
48:24, 49:9,
49:19, 111:8,
111:9, 111:11,
111:12, 112:20,
113:8, 113:10,
113:14, 113:15,
113:21, 113:22,
114:6, 114:7,
114:8, 114:18,
114:22, 116:2,
116:13, 116:17,
298:11, 298:17,
298:20, 299:2,
349:11, 349:13
**smelled**
48:23, 49:9,
49:19, 112:11,
113:13, 113:14,
113:23, 349:14

Transcript of Eddie Taylor
Conducted on March 9, 2020

146

smelling
349:16
smells
112:8, 114:2
smelt
113:16, 114:7
smoke
20:16, 110:1,
110:3, 292:16,
350:11
smoked
111:2, 292:20
smokes
20:10
smoking
20:8, 111:6,
116:20, 292:2,
292:9, 292:13,
292:15, 292:18,
293:16, 348:22
snapped
280:11
snatched
207:23
sneak
204:5
sneaking
128:7, 128:18
snitch
163:10
snitched
161:16, 163:10
sober
231:3
social
80:4
socialize
15:19, 19:1
socialized
16:12
socializing
15:14, 19:9
soldier
70:23, 71:8,
73:16, 202:15,
202:16, 202:19
soldiers
75:23, 268:22

solemnly
7:21
solution
236:20, 238:22
some
8:16, 13:16,
16:9, 19:7,
20:15, 28:5,
39:7, 57:22,
62:18, 62:24,
66:3, 71:4,
83:1, 88:7,
88:8, 93:10,
97:23, 114:17,
120:13, 120:15,
125:2, 125:6,
127:12, 128:2,
136:10, 143:4,
152:6, 152:24,
153:3, 158:2,
166:23, 180:23,
214:14, 214:20,
220:10, 224:14,
227:7, 227:9,
237:14, 256:21,
260:19, 268:1,
268:24, 269:17,
269:19, 270:16,
272:18, 272:20,
274:10, 294:19,
295:15, 295:16,
312:1, 313:22,
323:13, 326:4,
334:20, 334:21,
335:6, 338:17,
341:17, 348:9,
348:22, 349:9,
351:9, 354:14,
355:18, 356:18,
363:19, 368:4,
368:6, 372:23,
373:2, 380:23,
381:5
somebody
29:7, 95:24,
100:18, 103:8,
111:1, 122:3,
138:3, 138:22,

144:23, 153:9,
153:17, 153:24,
154:6, 165:17,
166:19, 168:13,
169:8, 194:4,
201:2, 201:6,
207:22, 212:24,
243:13, 244:2,
266:23, 267:1,
271:18, 297:11,
317:9, 317:15,
319:3, 346:4,
346:11, 364:24,
369:6, 372:23,
373:2, 375:21,
375:24, 376:3,
376:24, 379:2,
381:20, 385:7
somebody's
207:23
someone
94:19, 147:18
someone's
207:24
something
14:13, 20:19,
28:2, 28:16,
34:4, 40:18,
41:9, 41:20,
41:21, 49:4,
49:18, 67:17,
73:9, 87:2,
90:10, 95:22,
98:17, 101:5,
101:16, 101:17,
110:22, 111:13,
111:15, 124:13,
127:4, 131:7,
133:6, 134:2,
136:5, 137:17,
137:18, 138:23,
146:4, 157:8,
159:11, 162:9,
162:13, 165:18,
171:6, 171:9,
171:10, 174:20,
174:23, 178:6,
179:22, 189:22,

192:8, 193:8,
193:18, 193:20,
197:13, 201:6,
207:24, 210:6,
213:6, 213:10,
213:12, 214:15,
214:20, 214:23,
230:15, 238:11,
248:10, 250:15,
250:18, 251:2,
264:2, 269:24,
271:17, 283:4,
292:14, 303:16,
304:2, 306:16,
307:1, 307:17,
309:13, 323:11,
331:1, 343:22,
345:5, 349:9,
349:14, 351:19,
359:23, 368:18,
369:7, 370:1,
371:3, 380:2,
385:8
sometimes
19:21, 19:22,
44:16, 50:12,
246:16, 286:24
somewhere
12:10, 90:9,
90:16, 156:7,
192:15, 192:16,
200:1, 341:14,
378:9, 378:11
son
130:10, 130:18,
132:3, 133:21,
134:1, 208:2,
345:7
soon
151:9
sorry
6:24, 7:1,
9:17, 16:13,
21:12, 21:17,
21:21, 29:15,
30:9, 36:19,
48:7, 48:17,
52:12, 55:1,

Transcript of Eddie Taylor
Conducted on March 9, 2020

147

62:6, 71:2,
71:4, 71:6,
72:19, 80:21,
89:24, 91:19,
105:16, 108:23,
142:4, 144:15,
147:12, 148:21,
164:7, 177:10,
201:10, 206:17,
212:15, 217:4,
232:1, 232:9,
237:22, 244:4,
244:16, 246:5,
259:6, 277:1,
283:21, 285:1,
295:13, 310:23,
310:24, 331:16,
333:5, 337:18,
344:17, 354:8,
360:4, 360:22,
369:13, 385:2,
385:4
**sort**
76:23, 187:19,
253:11, 266:11,
371:22
**sotos**
4:12
**sought**
96:15
**sound**
12:11, 51:5
**sounded**
122:2, 381:3
**sounds**
88:7, 220:6,
256:11, 295:17,
301:5, 321:20,
323:12
**source**
124:3, 124:9,
145:19, 278:1,
278:12
**sources**
153:23
**south**
10:19, 10:23,
11:21, 12:5,

13:10, 18:2,
61:7, 64:23,
71:21, 73:5,
82:6, 90:3,
90:22, 122:18,
122:19, 122:20,
276:19, 276:21,
276:22, 285:23,
353:24, 368:9,
368:20, 370:7,
370:8
**southwest**
370:7, 370:9
**space**
52:21
**spacing**
168:17
**speak**
15:22, 131:19,
274:16, 346:19,
347:6, 363:4
**speaking**
66:4, 275:15
**special**
112:23
**specific**
68:21, 100:18,
122:13, 134:2,
197:13, 247:18,
295:11, 370:23
**specifically**
70:14, 71:18,
119:22, 122:10,
124:9, 130:15,
165:8, 209:16,
246:11, 291:9,
305:18, 327:15,
366:8
**speculate**
290:23
**speculation**
74:14, 94:18,
206:3, 207:15,
208:12, 208:18,
270:7, 271:10,
304:5
**speech**
251:19, 251:22

**speed**
264:22
**speedy**
47:13, 47:14,
47:16, 47:23,
231:2, 247:11,
248:14, 248:18,
249:5, 307:12
**spell**
8:10, 85:24,
86:1
**spend**
230:9
**spending**
230:5, 287:17,
293:4
**spent**
100:20, 291:18
**split**
173:15, 173:16,
195:24, 196:1
**spoke**
65:3, 89:11,
201:12, 274:12,
336:6, 345:13,
355:18, 362:20,
363:15, 363:16
**spoken**
335:23
**spot**
322:15
**spray**
112:23
**spread**
178:5, 178:7
**squangy**
268:7
**squares**
116:20
**st**
25:15, 25:16,
25:19, 38:2,
38:14, 38:16,
38:17, 38:21,
49:12, 56:6,
57:16, 59:13,
59:20, 90:14,
194:19, 198:16,

199:6, 199:14,
199:19, 200:7,
227:14, 227:21,
230:14, 245:21,
252:7, 256:11,
263:19, 302:4,
302:15, 303:11,
304:16, 316:9,
329:22, 330:18,
334:8, 340:7,
340:17, 341:7,
341:9, 341:21,
350:16, 351:1,
351:3, 351:22,
353:6, 353:9,
353:12, 353:14,
355:4, 357:21
**stabbed**
283:19
**stamps**
167:10, 167:11
**stand**
72:17
**standing**
105:22, 112:17,
181:4
**stands**
174:24, 327:9
**stanking**
113:17
**stanks**
111:13
**start**
9:5, 62:16,
88:5, 172:18,
188:8, 225:2
**started**
31:14, 130:7,
222:3, 274:8,
314:4, 332:19,
356:12, 380:4
**starter**
295:14
**starters**
230:12
**state**
2:14, 7:6,
8:10, 47:8,

Transcript of Eddie Taylor
Conducted on March 9, 2020                    148

87:1, 169:14,
264:15, 284:14,
358:15, 384:10,
389:19
**state's**
3:20, 34:4,
39:19, 66:3,
97:24, 98:3,
98:7, 178:21,
178:23, 179:2,
179:4, 213:1,
213:4, 213:7,
213:8, 213:9,
213:12, 260:20,
274:11, 274:15,
274:16, 275:12,
279:1, 297:5,
302:2, 303:20,
304:12, 305:11,
305:23, 306:7,
307:16, 308:7,
312:18, 325:14,
327:13, 327:23,
332:1, 332:8,
333:2, 355:19,
356:2, 356:21,
356:24, 357:1,
357:13, 357:16,
357:20, 358:15,
358:17, 360:13,
361:8, 361:12,
362:8
**stated**
322:16, 327:17
**statement**
27:10, 32:8,
41:16, 84:2,
114:10, 116:2,
144:17, 144:18,
153:14, 153:15,
159:22, 160:4,
160:23, 161:9,
165:16, 169:22,
170:4, 186:4,
186:6, 186:7,
186:9, 186:13,
186:16, 186:20,
187:8, 187:19,

188:1, 188:3,
188:6, 188:11,
188:15, 189:2,
189:8, 189:10,
189:15, 189:16,
189:21, 190:1,
190:6, 190:8,
190:14, 194:3,
194:4, 194:12,
196:15, 196:17,
213:24, 214:1,
214:4, 219:20,
220:11, 221:4,
221:5, 221:8,
222:5, 307:20,
319:6, 357:17,
358:5, 359:3,
359:12, 359:15,
361:22, 362:1,
362:5, 366:9,
366:12, 367:10,
387:2
**statements**
27:24, 28:17,
28:19, 28:21,
29:2, 29:4,
29:5, 40:17,
158:4, 170:15,
188:16, 190:11,
212:1, 219:13,
219:14, 220:1,
279:24, 365:7
**states**
1:1, 6:18,
32:4, 32:6,
97:23, 306:2
**stating**
237:10, 237:11
**station**
24:23, 25:2,
25:9, 46:5,
46:7, 59:18,
128:3, 150:4,
158:10, 200:18,
212:23, 213:17,
218:7, 302:4,
302:11, 335:7,
335:11, 336:23,

338:1, 338:7,
361:9
**stay**
10:19, 37:4,
69:20, 69:24,
87:17, 87:20,
87:22, 87:24,
88:14, 88:15,
141:1, 181:19,
235:11
**stayed**
14:8, 19:15,
24:18, 43:19,
69:19, 95:13,
104:22, 111:5,
122:4, 135:14,
279:4, 279:7,
282:11, 287:1,
301:23, 344:5,
346:8, 377:3,
377:4
**staying**
11:21, 13:6,
74:16, 83:6,
83:7, 140:10,
140:19, 284:5,
285:22
**stays**
88:2
**steal**
207:24
**steel**
26:12
**step**
181:12, 181:14,
181:15, 235:7,
238:9
**stepped**
314:4, 361:20
**sterling**
261:22, 261:23
**steven**
12:6, 61:21
**stick**
20:12, 20:14,
110:5, 111:2,
204:2
**sticking**
350:12

**sticks**
20:8, 20:11,
20:17, 111:11,
292:2, 293:23
**still**
17:17, 22:2,
23:22, 78:19,
87:22, 101:17,
119:3, 120:20,
121:22, 137:7,
138:14, 140:7,
142:2, 142:6,
152:23, 156:15,
163:20, 164:11,
174:1, 180:15,
189:7, 189:20,
196:23, 201:5,
214:9, 245:2,
266:18, 271:6,
279:18, 280:22,
295:24, 324:23,
327:9, 332:4,
362:1, 363:11,
379:22
**stinks**
112:10
**stole**
208:3
**stone**
73:4, 270:23,
272:22, 273:7,
273:9, 368:8,
368:13, 368:19,
369:9, 369:21,
369:22, 370:3
**stone's**
368:18
**stones**
72:2, 72:10,
72:11, 72:17,
267:15, 267:21,
269:13, 269:20,
269:24, 270:4,
270:17, 271:5,
368:4, 370:11
**stop**
36:15, 36:16,
100:16, 135:5,

235:5, 240:14,
358:1
**stopped**
38:1, 46:22,
380:4
**store**
136:8
**stores**
111:22
**story**
87:19, 103:4,
373:14
**straight**
48:11, 48:13,
100:13, 100:14,
135:7, 222:4,
264:12, 302:21,
341:23, 342:1,
342:2, 378:8,
379:19, 379:21,
382:13
**streaking**
112:5
**street**
2:6, 3:5, 4:5,
14:8, 24:18,
90:14, 90:21,
90:22, 104:1,
105:3, 110:15,
124:5, 146:4,
204:16, 204:20,
205:14, 206:1,
207:2, 207:10,
207:12, 209:18,
270:3, 272:10,
272:22, 273:24,
282:9, 282:11,
284:14, 353:4,
373:11, 377:3,
382:20
**street-level**
269:8
**streets**
110:16, 111:4,
147:14, 153:23,
203:18, 204:22,
205:19, 206:9,
206:13, 207:20,

208:6, 281:16,
373:8, 378:10,
378:22, 386:20
**stressful**
170:17
**strict**
15:3, 15:11
**strike**
17:15, 24:9,
52:22, 92:9,
186:6, 231:15,
245:6, 298:4,
337:23, 373:17,
384:16
**striking**
34:20
**stuck**
78:19
**studs**
255:17
**studying**
128:8, 246:6,
246:8, 246:11,
246:20
**stuff**
31:19, 32:21,
44:4, 44:5,
53:3, 64:11,
64:12, 83:2,
96:9, 109:23,
111:17, 111:23,
112:7, 112:23,
113:16, 128:9,
136:10, 136:12,
144:22, 145:14,
167:2, 191:14,
192:17, 197:20,
204:4, 215:13,
238:2, 246:18,
247:22, 316:5,
316:6, 332:19,
343:15, 352:5,
352:6, 352:7,
356:12, 377:12,
377:13
**style**
211:10
**subject**
273:13

**subjected**
370:15
**subsequent**
308:24
**such**
270:23, 300:19
**sudden**
27:19
**suffering**
170:10
**suggest**
235:15
**suggesting**
181:10
**suing**
60:20
**suit**
310:13, 310:17,
343:6
**suite**
3:14, 4:6, 4:14
**suits**
112:22, 343:2,
343:10, 343:11
**sunday**
242:8
**supporting**
390:6
**supposed**
127:20, 128:8,
280:6, 314:7,
330:7
**sure**
51:23, 52:14,
88:18, 101:11,
109:1, 121:2,
124:14, 126:5,
126:14, 127:17,
181:6, 204:10,
211:22, 220:4,
229:14, 231:6,
234:20, 241:24,
243:8, 254:10,
291:19, 322:10,
341:19, 356:14,
363:14, 366:7,
367:5, 374:3,
375:11, 376:20,

379:2, 384:12,
386:9
**surprise**
86:13
**surprised**
185:1
**surrendered**
302:5
**surrounding**
209:15
**suspect**
118:5, 118:8,
118:14, 138:13,
156:15, 156:22,
157:15, 170:16
**suspected**
384:3
**sustained**
226:21
**swab**
53:2
**swear**
7:18, 7:21
**switch**
99:22
**sworn**
8:4
**system**
239:4, 246:1

**T**

**t-a-y-l-o-r**
8:12
**t-mobile**
78:1
**table**
26:2, 26:4,
26:7, 26:8,
26:21, 26:22,
27:1, 55:7,
172:1, 178:16,
198:21, 199:2,
338:19, 338:20
**tablet**
178:21
**take**
10:8, 57:6,
60:2, 64:17,

159:24, 160:19,
161:13, 163:9,
165:11, 168:18,
181:6, 183:20,
212:1, 214:20,
231:5, 237:18,
237:19, 238:9,
238:17, 238:18,
240:21, 243:20,
243:22, 258:23,
269:9, 308:3,
313:20, 329:8,
336:17, 336:19,
338:7, 339:19,
345:18, 370:10

**taken**
6:13, 25:14,
52:24, 57:11,
154:22, 193:6,
261:4, 329:15,
330:13, 330:17,
340:17, 341:2,
341:13, 389:3

**taking**
6:10, 99:19,
175:23, 178:4,
199:24, 224:22,
225:7, 313:11,
313:17, 315:16

**talk**
20:22, 32:4,
32:7, 37:24,
38:9, 50:8,
50:15, 50:16,
50:22, 51:14,
52:6, 63:7,
63:13, 66:21,
66:23, 67:24,
76:19, 81:8,
82:1, 84:3,
87:17, 88:20,
92:3, 92:16,
94:2, 94:6,
99:4, 107:8,
118:4, 123:23,
124:12, 126:15,
132:24, 138:5,
138:8, 139:11,

139:17, 142:3,
142:6, 142:8,
142:13, 154:10,
157:23, 171:4,
178:23, 192:3,
192:4, 209:21,
219:10, 222:2,
250:1, 250:2,
251:24, 274:20,
276:14, 277:14,
307:14, 336:8,
339:15, 357:9,
357:12, 358:6,
362:2, 381:9,
382:20, 383:2

**talked**
35:1, 52:7,
55:17, 65:23,
76:18, 81:5,
81:17, 84:6,
96:3, 96:11,
98:7, 98:14,
127:6, 127:10,
141:17, 142:11,
146:7, 149:12,
149:13, 149:15,
149:19, 150:2,
151:10, 159:3,
159:4, 186:11,
223:15, 241:23,
257:12, 280:20,
292:4, 305:11,
307:16, 348:21,
355:24, 356:5,
356:16, 356:20,
356:23, 361:17,
361:19

**talking**
9:6, 9:11,
28:5, 28:14,
32:5, 32:8,
51:18, 65:8,
72:6, 77:20,
78:10, 82:22,
97:7, 97:14,
97:21, 99:20,
104:9, 104:10,
104:14, 120:23,

125:15, 130:10,
130:23, 132:19,
136:17, 145:10,
145:18, 148:8,
150:19, 152:19,
155:20, 156:15,
158:16, 159:7,
162:13, 164:16,
171:7, 178:15,
182:10, 188:17,
189:20, 192:9,
194:21, 195:1,
195:2, 199:7,
199:12, 206:15,
209:16, 212:14,
212:16, 215:18,
215:19, 215:24,
216:3, 219:18,
223:8, 226:8,
253:18, 253:21,
258:4, 258:5,
280:14, 282:22,
308:7, 314:3,
322:18, 332:19,
334:4, 335:8,
335:11, 335:16,
336:12, 346:20,
348:13, 348:19,
348:23, 357:2,
362:2, 385:3

**tall**
310:11, 339:7

**target**
54:9, 54:15

**taylor**
1:18, 2:1, 5:2,
6:13, 8:3, 8:12,
41:8, 48:15,
57:16, 60:16,
84:13, 100:12,
100:19, 155:3,
169:13, 231:9,
233:17, 235:7,
243:7, 244:21,
256:3, 287:4,
306:13, 322:16,
325:5, 327:15,
329:22, 335:4,

355:9, 383:23

**taylor's**
100:11, 284:5

**teaching**
377:11

**tediousness**
108:23

**teeth**
173:20, 173:21

**television**
155:13

**telling**
28:1, 28:15,
31:21, 34:20,
66:2, 66:11,
67:13, 67:17,
67:20, 83:1,
95:8, 103:18,
103:19, 106:8,
107:4, 117:18,
118:13, 128:13,
153:2, 153:22,
191:8, 201:21,
207:1, 215:8,
215:15, 221:6,
249:3, 287:19,
306:7, 313:6,
314:16, 333:9,
333:14, 346:17

**tells**
106:3, 126:7

**ten**
37:1, 37:7,
150:18, 150:19,
172:11, 173:23,
235:20, 242:7,
338:9, 338:22

**term**
318:7, 319:8,
376:6

**terminate**
234:10, 235:5

**territorial**
270:14

**territory**
73:8, 121:13,
271:8, 273:8,
273:16

Transcript of Eddie Taylor
Conducted on March 9, 2020                    151

**test**
57:21, 58:24,
59:3, 59:7,
59:19, 60:3,
231:5, 310:3,
313:5, 313:11,
314:7, 314:11,
315:8, 315:15,
315:16, 316:16,
370:19, 384:16,
384:18
**tested**
384:4, 384:20
**testified**
8:6, 72:20,
74:6, 150:20,
171:13, 180:21,
240:9, 268:21,
273:6, 274:9,
275:3, 275:23,
281:4, 281:22,
289:9, 291:3,
293:22, 294:1,
298:9, 308:15,
317:5, 329:2,
331:24, 346:22,
346:24, 355:17,
356:4, 374:16
**testify**
8:4, 10:12,
261:14, 372:14
**testimony**
7:22, 36:15,
50:20, 81:21,
86:19, 92:14,
95:6, 100:2,
172:5, 201:17,
202:3, 202:18,
216:24, 217:9,
218:21, 220:9,
241:3, 326:13,
329:6, 348:7,
349:19, 355:20,
365:20, 366:3,
375:6, 375:8,
381:2
**text**
77:10, 77:21,

79:11, 79:17,
80:13, 93:2
**th**
11:2, 11:18,
35:9, 35:11,
37:12, 43:16,
43:19, 69:20,
90:14, 90:21,
90:22, 100:13,
100:15, 105:3,
105:4, 105:5,
106:16, 119:16,
125:10, 128:2,
261:19, 272:10,
272:22, 273:24,
279:7, 279:9,
284:1, 284:13,
284:19, 285:6,
337:1, 346:6,
377:4
**than**
8:22, 14:17,
16:7, 16:10,
44:16, 61:12,
67:1, 69:2,
69:11, 82:13,
92:4, 98:2,
104:2, 104:3,
104:4, 115:10,
126:13, 128:5,
133:16, 141:2,
173:23, 187:10,
205:14, 210:11,
213:10, 213:16,
219:8, 226:21,
239:13, 243:13,
244:11, 255:14,
255:15, 273:20,
277:6, 277:7,
280:19, 288:5,
311:5, 311:6,
311:7, 311:18,
311:24, 333:8,
333:14, 339:12,
339:14, 347:7,
356:23, 374:7,
374:15, 378:17,
386:19

**thank**
9:21, 21:22,
22:6, 36:1,
169:17, 231:24,
238:20, 311:2,
327:7, 346:12,
355:9, 355:10,
377:19, 383:19,
388:5
**thanks**
123:11, 199:1,
334:19, 334:23
**their**
7:6, 15:13,
18:13, 23:12,
30:22, 99:2,
110:2, 111:18,
111:21, 115:11,
120:3, 120:5,
120:8, 122:10,
122:14, 136:20,
140:22, 172:15,
173:1, 175:23,
180:22, 183:9,
186:3, 189:24,
190:1, 197:5,
207:24, 211:20,
211:21, 213:23,
222:5, 225:8,
230:22, 244:3,
254:24, 255:16,
266:14, 267:23,
268:5, 268:16,
270:20, 275:7,
288:24, 306:8,
320:19, 320:23,
325:23, 348:15,
350:10, 350:11,
350:12, 353:2,
353:3, 353:4,
368:21, 369:7,
370:2, 381:4
**themselves**
188:13, 212:20,
275:4, 286:14,
351:22
**theory**
326:22

**there'd**
43:23
**there's**
9:18, 9:20,
26:4, 167:8,
176:1, 204:20,
212:24, 247:8,
358:11, 359:17
**therefore**
118:18, 249:24
**these**
14:15, 48:1,
54:10, 78:12,
88:20, 112:23,
155:11, 162:11,
177:1, 177:19,
178:3, 179:13,
183:4, 185:8,
186:5, 193:11,
193:12, 194:6,
194:10, 194:14,
195:7, 196:16,
201:9, 201:12,
211:2, 212:7,
212:19, 213:14,
215:3, 215:6,
215:19, 216:21,
217:11, 217:16,
217:18, 218:20,
219:17, 220:1,
220:8, 220:15,
220:23, 221:23,
222:21, 224:9,
224:16, 226:6,
227:18, 229:12,
235:14, 236:5,
269:19, 270:16,
274:15, 274:24,
275:11, 275:20,
276:8, 276:10,
277:4, 287:24,
288:12, 306:15,
307:3, 326:11,
327:6
**they'd**
253:6, 325:23
**they'll**
19:21, 19:22,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    152

203:24
**they're**
28:3, 55:8,
103:1, 103:14,
106:4, 106:6,
111:2, 111:17,
111:19, 112:2,
112:5, 115:10,
116:19, 129:3,
140:21, 143:12,
190:5, 208:1,
212:7, 213:5,
215:22, 216:1,
216:3, 225:9,
245:2, 267:5,
284:15, 291:1,
301:18, 307:1,
308:1, 322:18,
323:10, 346:3,
352:16, 369:3,
387:16
**they've**
84:4, 86:23,
106:9, 117:19,
207:20
**thick**
214:16, 214:19,
214:22
**thing**
8:20, 9:2,
17:17, 26:2,
26:3, 26:7,
26:17, 45:4,
55:17, 65:16,
73:4, 91:13,
102:24, 104:14,
120:19, 148:20,
153:9, 162:17,
163:8, 170:17,
201:21, 219:6,
230:17, 251:24,
254:24, 292:12,
309:8, 310:13,
310:16, 313:8,
334:5, 336:17,
350:8, 376:19,
381:17, 387:13
**things**
43:11, 52:6,

180:24, 244:11,
247:5, 247:16,
247:18, 287:12,
306:10, 314:5,
348:10, 348:17,
348:23, 349:3,
349:6, 349:10,
349:11, 354:15,
354:18
**think**
11:6, 16:10,
37:6, 46:13,
49:17, 53:13,
59:9, 60:1,
70:2, 74:17,
80:8, 85:13,
86:16, 87:5,
87:10, 90:10,
90:15, 94:19,
94:22, 97:23,
113:13, 118:12,
118:18, 124:11,
129:7, 131:2,
131:6, 133:6,
143:4, 143:7,
143:13, 143:14,
143:17, 150:13,
150:21, 150:22,
156:18, 159:19,
161:7, 169:18,
173:22, 174:19,
174:24, 176:21,
185:14, 185:18,
194:9, 199:17,
199:19, 210:15,
213:15, 215:9,
217:19, 226:5,
228:9, 231:14,
235:22, 236:9,
236:10, 239:5,
239:6, 241:1,
241:2, 241:3,
244:15, 245:19,
251:10, 275:3,
275:19, 277:19,
283:8, 283:10,
283:12, 289:9,
291:3, 306:2,

307:5, 307:20,
308:15, 311:3,
313:12, 327:3,
329:9, 331:19,
332:7, 332:10,
332:15, 332:21,
334:6, 334:21,
367:19, 368:6,
375:12, 383:5
**thinking**
45:21, 46:5,
65:15, 86:23,
86:24, 88:5,
101:16, 101:17,
138:22, 150:15,
151:16, 177:6,
177:7, 177:13,
197:12, 201:21,
230:17, 370:19
**third**
156:15, 156:22,
157:15, 157:20,
162:7, 163:1,
163:7, 164:20,
170:16, 258:22
**those**
9:19, 20:4,
27:17, 29:2,
33:8, 34:9,
47:4, 61:2,
62:21, 62:22,
62:23, 68:19,
72:23, 78:13,
79:17, 94:14,
98:3, 98:6,
141:10, 142:14,
142:21, 142:22,
155:16, 155:23,
156:9, 156:10,
156:14, 156:21,
157:14, 157:18,
166:16, 186:2,
209:1, 209:13,
216:19, 223:14,
229:8, 229:18,
229:22, 259:23,
260:20, 263:10,
267:21, 271:4,

279:10, 288:10,
294:2, 303:2,
303:15, 304:20,
307:6, 312:12,
313:2, 355:7,
355:8, 360:2,
365:10, 368:10,
368:13, 373:6,
373:22, 381:5
**though**
47:23, 79:2,
143:13, 153:18,
156:9, 182:12,
189:21, 200:6,
205:23, 210:21,
246:20, 247:24,
272:8, 282:2,
282:5, 293:23,
294:11, 294:13,
324:2, 328:8,
369:5
**thought**
46:3, 55:2,
69:3, 117:12,
118:6, 118:7,
118:8, 118:13,
118:14, 124:10,
127:11, 128:15,
130:21, 141:4,
145:12, 149:14,
151:5, 176:9,
177:13, 234:3,
304:20, 307:23,
323:8, 323:16,
326:10, 327:10,
332:4, 332:9,
347:21, 348:20,
356:17
**thoughts**
192:5
**threaten**
99:8
**threatening**
360:14
**threats**
276:2
**three**
31:5, 31:8,

31:12, 34:14,
39:18, 48:12,
78:5, 82:10,
82:11, 85:6,
95:22, 157:4,
158:24, 161:10,
162:5, 178:18,
196:22, 197:3,
199:21, 200:23,
210:13, 211:2,
212:7, 212:14,
212:17, 212:19,
213:15, 215:6,
215:19, 217:11,
217:18, 218:20,
219:17, 219:18,
219:19, 219:23,
220:8, 220:15,
220:23, 221:23,
222:22, 224:9,
224:19, 226:8,
258:13, 323:22,
324:2, 341:6,
342:7, 346:24,
350:22, 357:23,
358:11, 358:13,
361:16

**three-year-old**
381:21, 382:10

**through**
19:18, 23:10,
27:11, 28:9,
43:22, 44:4,
47:9, 48:6,
55:6, 65:12,
67:4, 67:8,
68:18, 72:13,
82:24, 83:13,
85:1, 85:20,
94:9, 105:24,
106:15, 153:23,
164:17, 170:9,
197:11, 199:14,
200:3, 201:7,
215:24, 223:5,
241:9, 250:7,
253:22, 253:24,
254:5, 254:16,

261:11, 277:23,
289:24, 290:11,
290:16, 294:15,
296:19, 307:2,
330:8, 343:18,
345:24, 379:6

**throughout**
272:6

**throw**
379:23

**throwing**
65:17, 222:8

**tier**
320:15

**tight**
126:8, 373:10

**tilden**
11:16, 11:17,
11:19, 13:3,
13:11, 43:15,
43:20, 44:14,
101:24, 104:11,
108:8, 130:2

**till**
186:3, 242:8,
330:4

**times**
34:6, 34:8,
37:7, 44:14,
45:22, 46:5,
48:12, 51:9,
81:11, 81:14,
81:18, 81:23,
96:2, 112:14,
142:8, 161:7,
161:10, 162:5,
171:3, 172:9,
172:11, 172:17,
173:23, 178:8,
199:17, 199:18,
199:21, 226:5,
258:14, 259:8,
291:2, 302:24,
333:22, 379:24

**tired**
168:19, 194:11,
196:5, 196:10,
196:12, 196:18

**titles**
268:24

**today**
10:13, 62:23,
66:11, 72:21,
78:17, 120:23,
171:13, 171:17,
177:4, 177:16,
202:12, 223:12,
223:13, 223:20,
258:13, 260:19,
261:17, 263:7,
263:10, 266:19,
273:6, 281:23,
292:5, 293:22,
298:10, 302:24,
308:15, 326:21,
327:11, 329:3,
331:2, 331:24,
333:10, 333:16,
334:1, 334:6,
335:17, 347:10,
348:7, 348:24,
355:21, 355:24

**today's**
63:8, 63:14,
92:11, 92:21,
93:3, 93:6,
93:20, 95:8,
388:6

**together**
18:3, 19:6,
22:4, 39:3,
82:19, 84:16,
115:24, 138:19,
144:14, 204:2,
286:3, 286:7,
286:10, 286:12,
286:19, 287:18,
287:23, 288:16,
289:8, 290:13,
290:18, 320:13,
328:16, 337:6,
351:19, 381:6

**told**
32:1, 33:7,
33:16, 37:16,
38:1, 38:5,

48:16, 54:4,
55:14, 65:22,
66:7, 83:23,
84:3, 84:11,
90:11, 90:13,
92:11, 93:9,
94:1, 98:13,
98:19, 103:4,
103:5, 107:6,
121:24, 123:22,
124:2, 129:22,
130:11, 130:19,
141:11, 144:4,
144:10, 147:15,
151:20, 151:24,
153:14, 154:1,
160:13, 178:21,
183:3, 189:10,
201:14, 201:18,
201:20, 202:11,
202:12, 206:11,
219:4, 219:14,
234:8, 240:5,
258:12, 275:4,
278:3, 278:6,
284:22, 287:9,
287:15, 292:23,
292:24, 293:14,
293:17, 295:3,
296:5, 303:3,
303:15, 306:11,
306:12, 306:16,
317:18, 319:3,
321:4, 321:9,
322:14, 323:5,
325:15, 331:2,
331:5, 331:7,
333:1, 333:10,
333:17, 333:22,
336:7, 336:14,
346:18, 357:24,
359:2, 359:4,
362:23, 365:21,
367:10, 372:23,
373:2, 373:6,
382:22, 387:3

**tone**
58:13, 58:20

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    154

| | | | |
|---|---|---|---|
| **too** 34:11, 53:16, 66:7, 75:3, 88:2, 102:16, 113:17, 119:13, 133:5, 150:6, 150:7, 152:23, 156:1, 173:7, 195:18, 197:21, 204:21, 214:11, 215:4, 216:17, 216:22, 218:4, 222:10, 238:7, 277:10, 278:6, 281:23, 285:16, 291:20, 301:20, 323:21, 326:1, 331:14, 331:16, 359:16 **took** 55:7, 58:24, 59:15, 86:13, 102:19, 111:21, 112:20, 129:23, 148:24, 172:15, 192:24, 212:4, 221:20, 253:17, 254:23, 257:14, 259:12, 264:1, 264:9, 271:12, 287:8, 302:21, 310:3, 319:23, 323:17, 324:12, 330:2, 330:4, 338:10, 339:2, 339:21, 340:20, 341:15, 341:18, 341:23, 341:24, 342:1, 342:13, 350:20, 350:21, 384:16, 384:17 **top** 26:3, 56:5, 105:11, 174:14, 195:20, 226:24, 246:3, 268:23, 269:6, 269:14 **topic** 260:24, 325:5 | **torn** 119:23 **torso** 226:2 **total** 81:12, 81:15, 176:22 **totally** 110:18, 236:1, 243:21, 270:21 **touched** 82:11 **touching** 239:22 **tough** 44:20, 44:23 **towards** 22:16, 22:18, 261:9, 365:6, 370:8 **town** 121:8, 135:10, 135:19, 135:23, 142:16, 147:5, 155:11, 280:17, 378:11, 378:12 **trailer** 272:6 **transcribed** 1:24, 387:17, 390:5 **transcriber** 390:1, 390:17 **transcript** 30:8, 131:18, 387:20, 390:3 **transcription** 387:18 **transfer** 194:19 **transferred** 330:1, 340:5, 340:7 **translate** 204:15, 251:23 **transport** 340:24 **transported** 25:12, 341:13, | **342**:17 **traumatizing** 315:6 **treat** 27:17, 364:17, 364:22 **treated** 75:3, 99:13, 245:21 **treating** 213:18, 311:11, 316:18 **trial** 47:13, 47:14, 47:16, 47:24, 48:7, 48:9, 51:11, 231:3, 247:11, 248:7, 248:13, 248:14, 248:18, 249:6, 250:14, 252:5, 263:1, 307:12, 307:13 **trials** 307:3 **tribulations** 307:3 **trick** 162:18, 358:1 **tried** 27:8, 28:4, 186:3, 188:4, 191:4, 193:15, 219:20, 298:13, 321:3, 321:8, 332:11, 354:20, 379:19 **trip** 146:18 **troopers** 264:16 **trouble** 124:20, 125:2, 125:6, 127:12, 127:14, 127:17, 128:4, 128:15, 128:16, 130:10, 130:18, 130:22, | **130**:24, 131:1, 132:13, 132:19, 133:21, 134:1, 134:4 **trucks** 102:21, 112:22 **true** 131:2, 138:24, 281:4, 303:6, 322:21, 367:11, 382:15, 390:3 **truly** 256:22 **trust** 134:8, 175:13, 319:11, 387:18, 387:22 **truth** 7:23, 7:24, 8:5, 8:6, 43:14, 57:2, 63:22, 65:21, 65:22, 66:7, 66:11, 190:9, 201:22, 223:17, 314:16, 327:4, 356:4 **truthful** 65:20 **truthfully** 10:12 **try** 9:8, 22:21, 27:8, 32:10, 53:8, 71:16, 87:1, 112:4, 127:19, 128:2, 142:8, 191:5, 217:5, 261:11, 314:15, 315:23, 327:2, 351:19, 351:20, 358:6, 362:4, 371:2, 376:18 **trying** 38:7, 41:13, 44:3, 46:23, 88:14, 96:8, 124:11, 126:10, |

Transcript of Eddie Taylor
Conducted on March 9, 2020                                              155

130:19, 141:11,
170:11, 172:19,
189:19, 194:12,
195:17, 197:21,
201:2, 211:21,
211:22, 216:1,
216:19, 223:18,
224:7, 229:12,
233:3, 237:2,
244:1, 246:7,
246:19, 247:18,
248:2, 251:13,
278:12, 282:18,
308:1, 317:2,
322:15, 326:23,
340:8, 342:4,
343:7, 345:20,
354:14, 379:10,
379:12, 380:9

**turn**
6:7, 24:14,
24:19, 119:1,
119:6, 141:16,
141:18, 142:12,
149:20, 150:4,
150:8, 363:20

**turned**
24:11, 24:15,
24:20, 34:23,
35:15, 118:24,
119:3, 119:10,
141:3, 143:5,
143:24, 144:2,
144:3, 146:2,
146:6, 146:9,
148:19, 148:23,
335:7, 335:10,
364:17, 364:23,
373:16, 379:18

**turning**
218:12, 221:10,
336:15, 343:18,
344:23

**turnkey**
339:21

**turns**
224:22

**tv**
63:12, 155:11

**twice**
81:24

**two**
12:2, 27:14,
27:15, 29:12,
29:17, 31:3,
31:8, 31:10,
31:11, 34:9,
40:8, 45:3,
67:13, 78:5,
78:12, 78:13,
79:6, 79:13,
79:14, 81:2,
81:3, 89:8,
92:24, 93:1,
95:14, 123:13,
131:8, 138:19,
139:21, 155:18,
172:11, 173:11,
173:18, 176:11,
178:17, 179:11,
185:8, 186:2,
193:4, 193:5,
194:7, 194:10,
194:14, 194:23,
195:8, 195:10,
195:11, 195:12,
196:16, 201:9,
201:12, 207:7,
208:23, 209:1,
209:13, 210:11,
210:24, 211:24,
218:4, 218:18,
218:19, 222:12,
222:14, 222:22,
230:13, 274:24,
276:8, 276:10,
277:4, 277:6,
277:7, 277:11,
279:23, 317:1,
321:18, 323:23,
323:24, 324:9,
337:5, 342:15,
342:18, 346:24,
350:22, 350:23,
352:23, 358:10,
359:17, 372:5,
379:24, 381:5,

381:21, 382:10

**two-plus**
356:8

**type**
20:15, 105:19,
113:10, 127:17,
128:4, 131:21,
167:3, 167:6,
167:8, 167:22,
169:19, 214:14,
217:22, 217:23,
257:13, 262:2,
262:5, 262:15,
273:14, 294:2,
321:11, 351:9,
380:11

**typed**
193:17, 193:18,
193:22, 214:11,
214:13

**types**
93:13, 167:9,
216:7, 246:15,
247:5, 248:8,
294:2, 377:13

**typewriter**
193:20, 338:19

**typically**
291:13

---

### U

**ugly**
192:2, 306:24

**uh-huh**
8:19, 13:12,
22:12, 56:14,
61:23, 71:20,
71:23, 80:19,
90:19, 91:16,
94:10, 96:22,
108:16, 108:18,
114:20, 119:21,
125:9, 135:20,
146:7, 147:20,
148:13, 158:18,
198:17, 198:20,
226:24, 254:6,
285:24, 325:20,

337:14, 376:5

**uncivilized**
292:14

**uncle**
69:5

**under**
7:21, 110:21

**undercovers**
179:22

**underneath**
53:14

**understand**
9:24, 10:3,
37:14, 52:9,
74:23, 85:11,
86:6, 107:16,
143:9, 152:22,
180:19, 213:4,
231:3, 265:13,
273:3, 341:20,
343:7, 349:4,
356:14

**understanding**
86:8, 239:14,
347:11, 349:18,
366:11, 372:6

**understood**
148:8, 229:11,
229:17, 229:21,
230:3, 275:10,
275:14

**unidentified**
157:20

**uniformed**
342:24

**uniforms**
179:20, 343:13

**union**
112:17

**unit**
6:12

**united**
1:1, 6:18

**unjust**
354:16

**unless**
6:10, 240:5

**unnatural**
49:23

Transcript of Eddie Taylor
Conducted on March 9, 2020

156

**unrepresented**
238:24
**until**
9:3, 9:9, 13:3,
56:6, 106:20,
125:23, 126:8,
127:5, 145:14,
194:11, 197:3,
227:5, 272:4,
299:19, 300:8,
312:22, 332:19,
350:17, 351:23
**unusual**
290:5, 290:14,
290:17, 292:12,
292:13, 300:13
**upon**
188:22, 303:15,
306:15
**upper**
15:15, 174:10
**upset**
84:1, 133:13,
163:20, 166:12,
193:13, 193:14,
279:17, 279:18,
279:21, 280:1,
280:3, 280:4,
304:7, 305:5,
317:23
**upside**
187:3, 212:13
**upstairs**
25:21, 101:24,
126:19, 136:13,
341:11, 341:18,
341:23, 342:1,
342:2, 342:11,
342:14, 357:24
**uptake**
148:22
**use**
61:8, 61:15,
61:21, 98:4,
159:22, 160:17,
171:9, 201:6,
216:19, 248:9,
354:20, 378:21

**used**
19:16, 61:6,
69:19, 86:20,
141:10, 166:4,
166:5, 181:7,
281:15, 303:1,
305:9, 305:10,
344:5, 376:6
**using**
304:22, 348:22,
366:20

---
**V**
---

**valid**
182:2
**vehicle**
336:4, 337:5
**verbally**
153:16
**veritext**
6:22, 6:24
**verizon**
77:24
**versus**
61:3
**very**
230:5, 236:19,
238:22, 239:3,
241:4, 275:10
**vice**
72:12
**victim**
21:4, 38:24,
39:4, 39:9,
222:17, 222:23,
223:12, 223:13
**victim's**
193:7, 224:1
**video**
6:3, 6:10,
57:9, 57:10,
57:12, 57:14,
154:15, 154:20,
154:21, 154:24,
155:1, 260:23,
261:2, 261:3,
261:6, 261:7,
329:13, 329:14,

329:16, 329:18,
388:7, 388:8
**video-recorded**
6:13
**videographer**
4:19, 6:2,
6:23, 7:17,
9:14, 9:18,
9:21, 9:23,
57:8, 57:12,
154:17, 154:19,
154:23, 261:1,
261:5, 329:12,
329:16, 388:5
**videotaped**
1:18, 2:1
**view**
128:14, 303:5,
306:13, 375:24
**viewing**
303:15, 306:15
**violations**
270:14
**violent**
111:24, 112:3,
371:13
**virtue**
271:5, 273:10
**visible**
241:23
**visit**
18:17, 19:4,
64:20, 91:20,
232:6, 255:20,
266:15
**visited**
64:19, 255:24
**visiting**
100:18
**visualize**
101:18
**voice**
58:21, 217:6
**volume**
58:20
**vote**
351:1, 351:4,
351:22, 353:6,

353:9, 353:12,
353:14, 355:4

---
**W**
---

**wait**
9:3, 9:9
**waited**
125:23, 126:2,
127:5, 330:4
**waiting**
177:7, 250:14,
324:9
**waive**
52:1, 52:5,
229:9, 232:15,
233:18, 236:17,
237:1, 242:13,
243:7, 245:14,
248:21, 248:23,
248:24
**waived**
233:20, 233:21
**waiving**
235:23, 243:14
**walk**
27:11, 65:12,
100:14, 105:1,
129:14, 286:24,
302:14, 354:3,
372:11
**walked**
15:21, 115:3,
130:20, 152:6,
153:3, 153:6,
221:23, 221:24,
222:1, 290:16,
320:12, 322:5,
337:6, 337:7,
337:22, 337:24,
338:6, 361:15,
361:16
**walking**
15:24, 110:15,
282:8, 290:11,
325:16, 354:3
**wall**
371:4
**want**
15:13, 24:3,

24:5, 25:6,
36:17, 42:6,
43:13, 52:5,
52:20, 62:15,
62:16, 94:6,
94:20, 97:1,
97:3, 118:10,
123:14, 126:5,
132:24, 141:9,
143:21, 155:10,
164:14, 171:10,
177:2, 192:3,
192:8, 192:10,
201:10, 204:4,
205:4, 206:16,
206:18, 232:16,
232:20, 235:9,
235:13, 236:11,
243:5, 244:4,
250:19, 251:24,
257:13, 259:1,
259:13, 272:20,
299:1, 321:7,
327:4, 327:5,
329:9, 331:22,
353:23, 354:11,
359:2, 365:4,
371:10
**wanted**
12:17, 27:10,
38:2, 41:6,
41:15, 41:16,
41:18, 45:13,
62:24, 83:20,
92:16, 94:2,
107:7, 118:4,
121:2, 123:23,
125:20, 126:15,
138:5, 138:8,
142:3, 142:6,
162:9, 163:3,
164:11, 171:3,
188:19, 188:21,
189:1, 190:11,
190:19, 190:22,
190:24, 191:2,
194:3, 210:5,
212:2, 213:23,

215:3, 215:9,
221:5, 221:8,
224:11, 224:14,
225:14, 225:17,
228:1, 230:8,
230:14, 261:10,
274:16, 277:14,
307:11, 321:5,
321:23, 326:1,
335:19, 336:8,
346:19, 349:4,
361:21
**wanting**
114:21, 218:23
**wants**
239:2, 239:14
**ward**
50:14
**warm**
289:23
**warrant**
38:4, 264:21
**wash**
127:19, 136:15,
284:22, 285:3,
285:4
**washing**
128:5, 128:17
**wasn't**
18:2, 21:13,
33:17, 35:19,
35:22, 40:20,
41:6, 41:13,
45:18, 45:19,
58:2, 69:24,
80:22, 91:19,
96:9, 106:19,
108:7, 108:11,
134:8, 140:4,
150:7, 173:15,
188:22, 190:12,
190:17, 191:9,
196:14, 197:10,
210:14, 210:23,
211:21, 214:19,
214:22, 227:5,
230:8, 254:2,
257:6, 257:11,

258:20, 263:17,
272:14, 279:17,
280:3, 285:23,
290:3, 290:5,
290:14, 290:16,
292:12, 311:13,
321:4, 322:22,
340:3, 350:13,
352:3, 352:7,
352:9, 352:12,
354:19, 359:4,
372:5, 378:21
**waste**
183:12
**watch**
120:21, 142:24,
204:1, 204:8,
370:24
**watched**
112:24, 120:19
**watching**
157:18, 294:4
**way**
53:9, 54:18,
68:13, 106:2,
125:5, 134:9,
191:22, 201:13,
213:18, 230:21,
237:7, 237:14,
250:11, 250:16,
251:19, 266:3,
268:20, 269:8,
278:23, 280:23,
281:9, 284:15,
284:17, 287:1,
300:12, 313:18,
326:9, 332:3,
334:22, 352:17,
352:18
**ways**
111:6, 235:20,
241:21, 242:7
**we'd**
110:15
**we'll**
36:15, 154:16,
157:23, 180:24,
181:19, 184:24,

232:21, 388:3
**we're**
8:17, 9:5,
9:10, 20:22,
77:20, 78:10,
79:16, 104:14,
121:2, 125:15,
127:20, 128:7,
128:8, 138:24,
151:13, 151:14,
164:4, 192:9,
199:7, 208:23,
219:18, 219:22,
236:22, 240:13,
240:14, 334:4,
379:22
**we've**
235:1, 355:24,
386:9
**wear**
180:13, 365:2
**wearing**
342:22, 342:23,
343:2, 343:6,
343:11, 343:12,
343:13, 343:14,
368:23, 369:6,
369:22
**wedding**
301:17
**weed**
109:14, 292:10,
350:11
**week**
228:8, 228:9,
228:10, 230:14
**weeks**
112:19, 119:2,
119:7, 119:17,
131:8, 131:15,
139:15, 142:9,
142:15, 142:22,
151:13, 321:18
**well**
17:15, 24:9,
27:8, 47:8,
51:20, 51:23,
64:4, 68:13,

Transcript of Eddie Taylor
Conducted on March 9, 2020                              158

74:6, 75:15,
90:21, 91:9,
97:23, 113:21,
119:14, 123:1,
126:12, 129:10,
137:10, 137:20,
138:2, 138:22,
145:8, 149:18,
153:17, 153:21,
153:24, 154:5,
156:3, 161:19,
171:14, 174:19,
178:1, 180:23,
181:2, 183:1,
185:19, 188:5,
188:10, 189:5,
192:4, 199:14,
203:23, 212:14,
212:24, 221:15,
225:22, 227:10,
231:15, 234:6,
235:17, 235:22,
239:3, 242:16,
244:8, 247:2,
247:8, 249:1,
250:4, 252:19,
257:24, 260:10,
264:12, 268:20,
286:2, 291:21,
293:9, 295:23,
316:15, 316:18,
318:2, 319:15,
319:17, 329:2,
331:24, 341:13,
343:6, 359:6,
366:20
**wendell**
11:1
**went**
11:1, 11:10,
16:8, 21:4,
24:20, 25:11,
35:9, 35:12,
37:4, 41:21,
47:6, 48:9,
50:6, 55:11,
56:12, 57:24,
82:23, 101:24,

102:13, 106:14,
108:7, 119:19,
120:16, 120:18,
122:14, 122:16,
122:18, 122:19,
122:20, 124:15,
125:23, 127:5,
127:10, 129:21,
129:23, 135:2,
135:7, 136:12,
139:23, 141:4,
145:4, 146:11,
208:3, 227:19,
230:16, 253:22,
254:17, 256:19,
268:1, 268:3,
268:16, 273:7,
278:18, 278:20,
280:17, 296:23,
301:12, 301:20,
302:3, 321:20,
323:19, 339:19,
341:5, 341:14,
342:6, 370:16
**wentworth**
25:15, 25:17,
25:20, 38:15,
38:18, 38:21,
49:12, 57:17,
59:13, 59:20,
198:16, 199:6,
199:15, 199:19,
200:7, 227:15,
227:21, 230:14,
245:22, 252:7,
256:11, 263:19,
302:4, 302:15,
303:11, 304:17,
316:10, 329:23,
330:18, 334:8,
340:17, 341:8,
341:9, 341:21,
350:17
**weren't**
20:3, 31:13,
55:24, 108:9,
117:13, 139:6,
189:22, 207:10,

252:12, 276:2,
281:11, 331:9,
340:9, 340:12,
341:2, 343:13,
354:16
**west**
4:13, 12:15,
12:16, 12:20,
13:7, 18:1,
18:6, 18:15,
19:3, 24:16,
61:7, 61:8,
103:15, 119:19,
119:20, 121:4,
121:23, 122:13,
132:23, 135:2,
135:6, 135:16,
135:17, 135:18,
140:8, 142:15,
147:4, 284:2,
285:22, 287:3,
337:3, 354:1,
378:10
**what's**
10:15, 14:10,
20:14, 77:17,
77:21, 78:15,
97:13, 103:21,
103:23, 104:12,
106:22, 107:1,
114:17, 122:6,
140:1, 202:19,
204:18, 244:20,
264:2, 264:8,
313:19, 373:11,
378:7
**whatever**
41:21, 44:11,
71:15, 74:24,
75:1, 111:17,
111:18, 114:18,
132:10, 181:24,
190:9, 197:5,
205:9, 205:10,
205:11, 205:21,
228:1, 233:2,
350:11, 370:4
**whatnot**
285:4, 311:19

**whatsoever**
124:9
**whenever**
166:22, 174:14,
181:24, 381:4
**where's**
90:7, 129:19
**whereas**
119:11
**whereof**
389:9
**whereupon**
8:2
**wherever**
192:24
**whether**
33:10, 51:24,
58:10, 84:19,
178:4, 202:6,
212:10, 214:13,
222:21, 229:9,
232:15, 233:18,
235:18, 239:14,
245:14, 249:15,
254:11, 287:23,
328:4, 368:7,
384:18
**which**
25:9, 25:19,
58:2, 82:5,
83:14, 85:18,
85:22, 138:16,
138:23, 147:2,
152:18, 167:8,
213:19, 276:16,
276:23, 293:16,
309:6, 320:17,
325:7, 351:24,
372:21, 374:11,
375:12
**while**
38:9, 38:14,
38:17, 38:21,
46:6, 52:11,
52:23, 53:21,
59:10, 59:12,
99:19, 141:8,
155:6, 158:9,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                    159

159:4, 159:8,
171:24, 195:2,
226:17, 255:20,
266:3, 266:12,
266:15, 298:11,
299:15, 317:1,
319:21, 320:2,
322:19, 327:7,
330:3, 339:23,
354:23, 370:24,
377:9
**whipped**
172:13
**whispering**
6:5
**white**
39:20, 39:21,
40:5, 177:22,
177:23, 211:4,
214:9, 302:21,
310:16, 310:19,
311:1, 339:1,
339:3, 339:18
**who**
11:22, 12:4,
16:15, 16:17,
18:10, 19:11,
21:4, 28:18,
28:21, 31:3,
32:24, 40:6,
48:21, 50:23,
53:21, 58:5,
65:1, 72:9,
79:1, 82:13,
86:2, 92:10,
95:23, 97:9,
98:13, 99:3,
100:17, 107:20,
107:21, 114:24,
119:24, 138:4,
156:22, 157:15,
157:20, 168:13,
169:8, 184:14,
197:21, 208:9,
212:8, 222:16,
222:17, 222:19,
223:3, 236:4,
244:2, 255:24,

267:14, 268:19,
269:9, 270:1,
270:9, 270:16,
275:4, 277:9,
282:8, 282:18,
282:19, 285:21,
288:12, 288:17,
288:23, 294:20,
304:19, 309:6,
326:20, 327:11,
327:16, 333:9,
339:3, 340:19,
341:15, 342:7,
342:13, 342:16,
345:6, 345:16,
347:7, 351:6,
352:14, 352:20,
363:4, 363:15,
363:16, 369:21,
373:5, 375:24,
376:3, 376:24,
381:20
**who's**
9:3, 77:24,
103:19, 243:13,
245:24, 278:7,
353:1
**whoever**
309:23, 367:21
**whole**
7:23, 8:5,
48:2, 65:15,
87:22, 103:4,
104:14, 112:20,
115:1, 134:13,
193:7, 193:9,
241:15, 246:1,
280:3, 285:19,
291:10, 306:3,
313:13, 313:14,
315:3, 334:13,
371:21, 375:18,
379:21, 380:5,
381:17
**whom**
368:13, 389:2
**whooped**
191:7, 193:15,

194:17, 194:22,
195:11, 211:22,
226:10, 253:3,
323:11
**whooping**
54:4, 175:12,
175:23, 196:11
**whose**
85:3, 106:22,
279:24
**wife**
65:2, 122:5
**wild**
267:5, 267:7
**will**
6:10, 7:6,
7:22, 7:23,
21:15, 30:7,
86:8, 86:16,
131:19, 241:3,
249:17, 319:10,
363:3, 371:2,
381:6, 387:18
**william**
1:15, 6:15
**williams**
22:23
**willing**
52:1, 234:15
**window**
129:3, 294:15
**wing**
320:15
**winning**
348:3
**wish**
52:7, 133:23
**withdraw**
52:18, 83:4,
178:2, 278:23,
301:8
**withdrawing**
52:16
**withdrew**
237:15, 237:24
**within**
81:16, 208:14,
269:4, 330:22,

351:10, 351:17
**without**
157:4, 188:8,
239:22, 265:9,
272:23
**withstand**
46:13
**witness**
7:18, 8:1,
9:15, 17:10,
21:19, 21:23,
22:5, 22:10,
22:12, 29:20,
35:22, 35:24,
51:21, 169:16,
181:12, 181:13,
183:3, 184:24,
208:3, 217:4,
231:23, 232:9,
241:20, 245:15,
248:23, 259:6,
310:24, 388:1,
389:9
**witness's**
30:10, 36:14
**witnesses**
260:4
**woman**
51:3, 155:21,
155:24, 251:1,
251:6, 251:10,
251:17, 272:21,
273:23, 277:11,
303:18, 305:19,
305:21, 306:18,
306:20, 307:19,
307:21, 307:22
**women**
177:20, 272:12,
272:18, 272:19,
273:12
**won't**
30:12, 79:7,
196:17, 308:2
**wondering**
97:13, 201:5,
270:21, 317:10
**woods**
70:3, 82:6,

Transcript of Eddie Taylor
Conducted on March 9, 2020                                          160

276:19, 276:21,
276:22
**word**
86:21, 137:9,
281:14, 303:1
**words**
30:10, 58:17,
98:4, 141:10,
171:9, 183:2,
203:1, 216:19,
325:12, 349:8,
360:3, 360:8
**work**
115:4, 166:19,
166:21, 166:24,
205:13, 207:2,
237:7, 246:4,
358:6, 372:12
**worked**
149:18, 275:15
**worker**
202:19, 203:16,
203:20, 204:16,
205:15, 205:24,
207:2, 207:11
**worker's**
207:9
**workers**
204:19, 204:20,
208:7
**working**
97:12, 373:13,
379:14
**works**
232:24, 248:18,
249:6, 344:4
**world**
123:13
**worse**
205:1, 221:11
**worst**
45:14
**wouldn't**
28:8, 33:13,
38:3, 49:21,
51:12, 94:14,
110:17, 133:23,
177:18, 186:23,

187:2, 187:4,
188:8, 189:9,
211:22
**wow**
184:19, 384:22
**wrist**
26:22, 26:24
**write**
40:24, 153:15,
186:18, 349:8
**writing**
29:7, 39:13,
39:21, 187:14,
214:10, 356:12,
360:4, 360:6,
360:7
**written**
40:20, 40:22,
41:3, 186:9
**wrong**
73:7, 220:7,
346:23, 348:20
**wrongfully**
87:4, 364:4,
385:8, 385:19
**wrote**
100:4, 186:17,
287:8, 287:12,
287:18

---
                Y
---
**y'all**
56:24, 114:17,
216:20
**year**
85:16, 85:17,
120:10, 262:13,
264:5, 283:5,
283:6, 283:7,
378:13
**years**
10:21, 13:1,
13:23, 14:13,
14:15, 14:17,
73:22, 78:5,
84:4, 104:8,
159:11, 170:24,
262:6, 262:8,

279:10, 356:8,
382:2
**yell**
99:6, 360:16
**yelling**
311:13
**yellow**
28:1, 29:6,
39:13, 39:16,
39:18, 39:20,
40:3, 41:24,
42:7, 178:21,
178:24, 227:1,
360:1
**yep**
75:24, 112:13,
173:19, 283:10,
330:11
**yesterday**
66:16, 66:17,
67:1
**yet**
89:13, 277:20,
328:1
**you'd**
37:12, 45:3,
45:22, 72:22,
74:6, 109:3,
159:11, 163:13,
181:3, 269:21,
270:22, 281:23,
282:5, 282:9,
287:24, 288:15,
288:21, 289:6,
289:11, 293:15,
298:22, 387:24
**you'll**
53:16, 96:10,
203:24
**you're**
9:9, 10:6,
13:15, 14:17,
20:5, 29:20,
30:12, 32:21,
34:20, 57:1,
65:8, 66:11,
69:14, 97:14,
101:11, 101:16,

106:8, 108:1,
128:13, 129:17,
142:10, 152:13,
154:8, 168:19,
169:1, 175:14,
175:24, 177:6,
178:16, 182:11,
183:8, 196:23,
198:14, 198:18,
199:1, 200:1,
205:8, 205:11,
207:1, 210:19,
210:20, 210:21,
220:4, 231:3,
234:5, 234:6,
236:1, 237:20,
237:21, 238:1,
238:19, 239:17,
241:10, 241:17,
243:19, 243:21,
244:8, 253:18,
258:5, 260:1,
260:2, 267:3,
280:6, 280:9,
282:22, 305:17,
306:1, 307:2,
322:10, 327:5,
330:7, 352:18
**you've**
46:6, 71:24,
72:18, 77:5,
88:7, 89:18,
108:20, 110:3,
110:11, 110:13,
167:19, 171:2,
175:9, 197:24,
199:17, 199:19,
200:6, 201:13,
203:5, 203:10,
204:8, 204:18,
209:7, 210:24,
221:1, 235:19,
242:7, 250:9,
251:22, 253:24,
260:10, 281:5,
294:1, 294:13,
303:1, 307:2,
309:3, 327:7,

331:2, 333:10,
333:17, 371:3,
378:4, 386:7,
387:14
**young**
17:7, 27:24,
185:23, 283:3,
369:11, 384:3
**younger**
20:1, 104:2,
104:3, 104:4,
113:3, 113:5,
115:10, 123:4,
185:16, 185:17,
185:18, 185:20,
258:2, 284:20
**yourself**
24:11, 24:14,
71:6, 119:2,
119:6, 119:10,
129:17, 141:3,
141:16, 141:19,
144:3, 146:3,
146:6, 146:9,
148:23, 149:20,
150:4, 166:20,
204:8, 206:19,
206:21, 206:22,
309:20, 318:21,
335:7, 335:10,
338:11, 341:12,
344:23, 363:20,
364:17, 364:23
**yourselves**
281:8

**Z**

**zellner**
3:12

**0**

**00**
107:22, 108:1
**00998**
1:7
**01**
276:21, 276:22
**04**
57:9

**07**
6:3
**08**
1:21

**1**

**10**
1:21, 6:3,
43:23, 44:14,
72:24
**100**
322:10
**1000**
4:8
**11**
11:18, 35:9,
35:11, 36:21,
37:12, 57:9,
57:13, 119:16,
337:1
**12**
43:23, 44:14,
72:24, 154:20,
154:24
**1212**
3:16
**1240**
4:14
**13**
178:13, 372:1
**14**
90:17, 90:22,
268:7, 372:1
**141**
4:13
**15**
214:23, 262:11
**16**
73:22
**17**
1:13, 6:16,
199:16, 380:13
**18**
1:7, 6:17
**19**
261:2
**1901**
3:13

**1978**
71:10, 71:11,
73:19
**1994**
13:3, 13:10,
23:4, 36:22,
60:24, 64:1,
70:1, 70:15,
73:21, 97:15,
100:2, 113:6,
120:23, 150:14,
164:2, 170:15,
207:8, 267:14,
272:19, 280:20,
283:15, 284:2,
287:15, 299:23,
304:23, 305:9,
308:10, 334:8,
355:1, 356:21,
366:21, 367:2,
367:6, 373:17,
373:19, 383:13
**1998**
263:19

**2**

**2**
261:2, 261:6
**20**
57:13, 159:11,
283:4
**2000**
164:4
**2013**
261:19, 265:22,
278:10, 278:24,
279:3
**2017**
66:5, 66:6,
66:24, 260:21,
274:8, 278:22,
278:24, 279:3,
280:23, 287:7,
295:23, 302:2,
305:10, 307:14,
307:17, 308:6,
312:22, 312:24,
332:2, 355:18,

**1978** (continued column)

**1978**

**1994**

**1998**

**2018**
164:5, 258:6,
258:11, 328:8,
328:11
**2020**
1:20, 6:4,
389:11, 390:18
**21**
351:1, 351:3,
351:22, 353:6,
353:9, 353:12,
353:14, 355:4
**22**
283:4
**2200**
4:6
**23**
283:4
**243**
2:9, 3:8
**25**
10:17, 210:16
**250**
262:21
**26**
84:4, 108:13,
261:19
**27**
108:13
**294496**
1:22
**2nd**
131:6

**3**

**3**
329:13, 329:17
**30**
120:10, 185:24,
210:16, 262:8,
262:9
**311**
2:6, 3:5, 6:21
**312**
2:9, 3:8, 3:23,
4:8, 4:16, 77:23

356:2, 356:24,
357:5
**2018**

**32**
339:12
**321**
4:5
**33**
261:6
**3300**
4:16
**335**
5:5
**34**
104:5, 329:13
**35**
104:5
**355**
5:6
**362**
5:7
**378**
5:4
**383**
5:7
**39**
154:20
**390**
1:23
**3rd**
2:7, 3:6

**4**

**4**
388:7, 388:9
**40**
185:24
**4200**
12:22
**44**
344:5, 388:7,
388:9
**4400**
119:23, 121:4,
122:12, 135:6,
135:16, 140:15
**45**
346:6
**4500**
344:5
**47**
43:19, 329:17

**494**
4:8
**4th**
11:6, 11:7,
131:6

**5**

**50**
339:13
**500**
3:21, 262:19
**51**
25:15, 25:16,
25:19, 38:2,
38:14, 38:16,
38:17, 38:21,
49:12, 56:6,
57:16, 59:13,
59:20, 90:14,
194:19, 198:16,
199:6, 199:14,
199:19, 200:7,
227:14, 227:21,
230:14, 245:21,
252:7, 256:11,
263:19, 302:4,
302:15, 303:11,
304:16, 316:9,
329:22, 330:18,
334:8, 340:7,
340:17, 341:7,
341:9, 341:21,
350:16, 357:21
**52**
112:17
**54**
276:20, 279:9
**5401**
82:6, 276:19
**55**
11:2, 43:16,
90:22, 100:13,
100:15, 105:3,
105:5, 106:16,
128:2, 154:24,
272:10, 272:22,
273:24, 279:7,
284:1, 284:13,

284:19, 285:6
**5527**
3:23
**5528**
10:19, 64:23,
90:3
**56**
69:20, 70:2,
70:3, 105:4,
125:10, 377:4
**57**
43:19, 301:23,
377:4
**5740**
11:21, 12:5
**5900**
2:9, 3:8
**5th**
11:12, 119:10

**6**

**6'7**
339:8
**60**
5:4, 69:8,
90:10, 279:5
**603**
3:23
**60515**
3:15
**60602**
3:22
**60604**
4:15
**60607**
2:8, 3:7
**60654**
4:7
**61**
90:14
**630**
3:16
**650**
3:14
**66**
10:17, 12:9
**68**
69:8

**69**
90:14, 90:21
**6958**
77:23
**6th**
11:6, 11:8,
11:12, 11:13,
119:10

**7**

**70**
113:7, 113:23,
279:5
**735**
4:16

**8**

**8**
107:22, 108:1
**800**
284:4
**83**
12:10
**85**
378:14
**8696**
1:13, 6:16
**8th**
11:12, 11:13

**9**

**93**
283:8, 283:11,
285:8
**937**
77:23
**94**
69:21, 69:22,
119:11, 120:24,
284:3, 284:6,
285:10, 285:11,
299:18, 299:24,
329:23, 352:1,
356:22, 383:7,
383:8
**955**
3:16
**970**
390:17

**98**
262:14, 263:15,
264:5
**998**
6:17
**9th**
389:10

1

RE: INVESTIGATION (ANTWINICA BRIDGEMAN)

S T A T E M E N T

of

NEVEST COLEMAN,

taken in an interview room, 2nd floor, Area 1

Headquarters, 5101 South Wentworth Avenue,

Chicago, Cook County, Illinois, on  Friday, April

29, 1994, at 9:57 a.m.

PRESENT:        MR. HAL GARFINKEL
                Assistant State's Attorney

                Detective MIKE CLANCY,
                Star No. 20395
                Area 1  Violent Crimes

Reported By:    Joseph A. Szybist C.S.R.
                Illinois State License No. 84-1752

Book No.        9404-29

                ----------------------------

        MR. GARFINKEL:  Let the record reflect

that we are in an interview room at Area 1 Violent

Crimes.  Today's date is April 29, 1994.  The time

is 9:57 a.m.

        Present in the room with me, Assistant

State's Attorney Hal Garfinkel, are Detective Mike



Plaintiff 002660

Pls.' Exhibit 30

Clancy, the court reporter, and Nevest Coleman.

We are here to take the statement of Nevest Coleman concerning the investigation of the fatal beating of Antwinica Bridgeman, which occurred on April 11, 1994, at approximately 11:55 in the evening at 917 West Garfield.

EXAMINATION

BY MR. GARFINKEL

Q. Nevest, I talked to you earlier and explained that I am an Assistant State's Attorney, a lawyer and prosecutor, and not your lawyer; is that correct?

A. Yes.

Q. And before we spoke, I advised you of your constitutional rights, is that correct?

A. Yes.

Q. I am going to read you your rights again.

Do you understand that you have a right to remain silent?

A. Yes.

Q. Do you understand that anything you say can be used against you in a court of law?

A. Yes.

*ASA Hal Garfinkel*

*Nevest Coleman*

*Det. Mike Clancy 20395*

Plaintiff 002661

Q.   Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned?

A.   Yes.

Q.   Do you understand if you cannot afford to hire a lawyer, and you want one, a lawyer will be appointed by the Court to represent you before any questioning?

A.   Yes.

Q.   Understanding these rights, do you wish to talk to us now?

A.   Yes.

Q.   What is your name, please?

A.   Nevest Coleman.

Q.   How old are you?

A.   25.

Q.   Where are you currently living at at this time?

A.   917 West Garfield.

Q.   What's your date of birth?

A.   ███-69.

Q.   Do you have a name that they call you on the street?

A.   No.

*ASA Hal Garfinkel*

*Nevest Coleman*

*Det. Mike Clancy 20395*

Q.    Nevest, I would like to direct your
attention to, if I could, to April 11 at
approximately 6 o'clock in the evening.

Do you remember where you were?

A.    Yes, I do.

Q.    Where were you?

A.    Over a friend's named Francine,
Francine's house.

Q.    Do you remember what time you arrived at
Francine's house at?

A.    About 6 o'clock.

Q.    Did you arrive with anybody?

A.    No.

Q.    What was your purpose for going to
Francine's house?

A.    Just to visit.

Q.    How long were you at Francine's house
for?

A.    About 9, 9:30.

Q.    So about 3, 3 and a half hours you were
there?

A.    Yes.

Q.    At some time that evening did you leave
Francine's house?

*ASA Hal Garfinkel*

*Nevest Coleman*

*Det. Mike Clancy #20395*

Plaintiff 002663

A.   Yes.

Q.   About what time?

A.   9:30.

Q.   And who if anyone did you leave the house with?

A.   I left the house with Nice and Mikey.

Q.   Does Nice also go by the name of Shaunice Williams?

A.   Yes.

Q.   Who is Mikey known as?  Is she also known as Antwinica Bridgeman?

A.   Yes.

Q.   Okay. Approximately what time in the evening did you leave Francine's house the 3 of you?

A.   9:30.

Q.   Okay.  After you left ~~the~~ Francine's house, where did you go if anywhere else?

A.   We had walked Nice's home, Shaunice.

Q.   What's Nice's address?

A.   56th and Green.

Q.   Did Mikey accompany you at that time?

A.   Yes, ~~he~~ did.

Q.   Okay.  After you walked Shaunice

*ASA Hal Garfinkel*

*Newest Coleman*
*Det. M. Clancy 20395 #*

Williams home, where if anywhere did you go after that?

A.    I went to the liquor store.

Q.    Who did you go to the liquor store with?

A.    Myself but I had walked with Mikey to watch her go home.

Q.    Where did you walk Mikey when she went home?

A.    55th and Peoria.

Q.    The two of you left the corner of 55th and Peoria and you went to the liquor store?

A.    Yes.

Q.    Where is the liquor store located?

A.    55th and Halsted.

Q.    Where did Mikey go if you know?

A.    She supposedly went home.

Q.    Okay.  Did you in fact purchase beer?

A.    Yes.

Q.    Do you remember what the name of the liquor store was that you purchased the beer from?

A.    Ram's Liquors.

Q.    At some time that evening did you meet up with Antwinica or Mikey again?

A.    Yes.

ASA Hal Garfinkel
Nevest Coleman
Det. Mike Clancy #20395

Q.    How long after you had dropped her off did you meet up with her again?

A.    15 minutes.

Q.    Was she accompanied by anybody?

A.    No, she was by herself.

Q.    After the two of -- where in fact did you meet her?

A.    I met her on 55th and Peoria by the alley.

Q.    After you met up with her at the corner on 55th and Peoria near the alley, where if anywhere did you go?

A.    Francine's house.

Q.    Was what was the purpose of going back to Francine's house?

A.    To drink some beer.

Q.    Did you in fact start walking towards Francine's house?

A.    Yes.

Q.    At some point did you meet up with any individual?

A.    Yes.

Q.    Who did you meet up with?

A.    Chip.

*ASA Hal Garfinkel*

*Nevest Coleman*
*Det. Mike Clancy #20395*

Plaintiff 002666

Q.   And did you know Chip by another name?

A.   No, I don't.

Q.   Did you have a conversation with Chip at that particular time?

A.   No, I didn't.

Q.   Did Chip say anything to you at all?

A.   No, he just called Mikey by her name.

Q.   Did Chip have a conversation with Mikey at that point?

A.   Yes.

Q.   What if anything did Chip say to Mikey and Mikey say to Chip?

A.   I don't know because I had walked by the garbage cans.

Q.   How far away were you from them?

A.   About 5 feet.

Q.   What happened as you walked to the garbage cans?

A.   Then I stood there and then Dap came.

Q.   Who is Dap?

A.   Dap is Chip's cousin.

Q.   Did you have a conversation with Dap at this time?

A.   Not at that point, no.

*ASA Hal Bayinkel*
*Nevest Coleman*
*Det. Mike Clancy #20395*

Q.    Did Dap have a conversation with Mikey and Chip?

A.    Yes.

Q.    Were you able to ~~here~~ *hear HMD NGC mc.* what they were -- they were talking about?

A.    No.

Q.    What did you do next?  What happened next?

A.    Dap had called me.  He called me, Nevest, come here.

Q.    After Dap called you, did you respond?

A.    Yes.

Q.    What if anything did you say?

A.    I walked towards him.

Q.    Who was present at this point?

A.    Just me and Dap.

Q.    Where was Chip?

A.    Chip was still talking to Mikey.

Q.    How far was Chip and Mikey from the two of you?

A.    About 3 feet.

Q.    What if anything was said at this point?

A.    Dap had asked me do I know anyplace where I can go so she could suck our dicks.

*ASA Hal Garfinkel*
*Nevest Coleman*
*Det. Mike Clancy #20395*

Q.   Did you understand that to mean that Dap was asking you if you had a place to go where you could have sex with Mikey?

A.   Yes.

Q.   Did you in fact respond to his question?

A.   Yes, I did.

Q.   Where did you suggest that you go?

A.   917 West Garfield in the basement.

Q.   Who lives at that residence?

A.   My mom and me.

Q.   Did you all go over to that residence?

A.   Yes.

Q.   Okay.  What happened after you arrived at 917 West Garfield?

A.   Down to the basement, in the back part of the basement.

Q.   Was anybody present in the basement when you arrived?

A.   No.

Q.   What happened immediately after you arrived in the basement of 917 West Garfield?

A.   Chip, Mikey and Dap was in the back, I was in the back.  They was rubbing all over her tits and grabbing her pussy on the inside and the

*ASA Hal Bayfuld*

*Nevest Coleman*
*Det. Mike Clancy #20395*

outside of her clothing.

Q.   Where were you at this time?

A.   I was standing there.

Q.   About how far away?

A.   About 2, 3 feet away.

Q.   How long were Dap and Chip rubbing on the outside and inside of her clothing?

A.   About 5, 10 minutes.

Q.   What happened after that?

A.   Chip pulled his dick out and she started sucking his dick.  Dap pulled down her pants and Dap started fucking her from behind.

Q.   What were you doing?

A.   Standing there looking out so nobody would come down there.

Q.   How long did this go on for?

A.   5, 10 minutes.

Q.   What happened after 10 minutes?

A.   She had stopped and said, I don't want to do this no more.  I had got upset and I had left.

Q.   Why did you get upset?

A.   Because I wanted her to do me too.

Q.   What do you mean by that?

ASA Hal Sanford
Nevest Coleman
Det. Mike Clancy

A.    Suck my dick and give me some pussy too.

Q.    Where did you go after you got upset?

A.    I went outside and I took a piss.  Then I stood there and I started drinking my beer.

Q.    How long were you out there for?

A.    About 5 minutes.

Q.    Where was Chip, Dap and Mikey at this point?

A.    They was still down in the basement.

Q.    After you drank your beer, what happened next?

A.    I went down in the basement.  I met them coming out.

Q.    You returned back to 917 West Garfield?

A.    Yes.

Q.    At this point did you see Dap, Chip and Mikey?

A.    Yes, I did.

Q.    Where did you see them?

A.    They was coming out of the door.  I was going in.

Q.    What happened at this point?

A.    I came in and I closed the door and I told her, I said, you can suck his dick, you can

*ASA Hal Sayon*

*Nevest Coleman*
*Det. Mike Clancy #20395*

give him some pussy but you can't give me none.

Q. Did anything unusual happen?

A. Yes.

Q. What happened?

A. I smacked her twice.

Q. Who?

A. Mikey.

Q. In what part of her body?

A. In the face.

Q. With what part of your body?

A. My hand.

Q. Was it an open fist, closed fist?

A. Open fist.

Q. Okay. After you struck her 2 times in the face, what happened text?

A. Dap grabbed her -- Dap grabbed her from the mouth and they asked, do you want some of this pussy? I said, yes.

Q. What was Chip doing at this point?

A. Pulling her pants down and taking her shoes off.

Q. What were you doing there at this point?

A. Looking out and making sure nobody come downstairs.

_ASA Hd Sul_

_Nevest Coleman_
_Det. Mike Clancy #20395_

Q.   After they asked you whether or not you wanted any pussy, what did you say?

A.   I said, yes.

Q.   What happened then?

A.   Chip got on top of her first.  Chip started fucking her first.

Q.   What was Dap doing?

A.   Holding her mouth.

Q.   What if anything were you doing?

A.   I was standing there looking out making sure nobody come down the stairs.

Q.   What happened next?

A.   She started mumbling Dap, Chip, get off.  Dap got on her and Chip held her mouth.

Q.   When you say mumbling, was she yelling?

A.   She was mumbling, umh, a mumble.

Q.   Loud or soft voice?

A.   Loud.

Q.   What were you doing at this point?  What was your purpose for being there?

A.   Standing there looking out.

Q.   What happened next?

A.   Then Dap got off of her.  Dap covered her mouth.  She was yelling and Chip got back on

*ASA Hal Burr*

*Nevest Coleman*
*Det. Mike Clancy #20395*

Plaintiff 002673

top of her.   Chip ~~has~~ _was Hms Ngc me_ fucking her.   I told Dap, I
said, take this piece of a brick and put it inside
her mouth.

Q.   Can you estimate how big the brick was?

A.   I can't but it wasn't a big brick.   It
was about medium size.

Q.   You directed Dap to take the medium size
brick and place it in her mouth?

A.   Yes.

Q.   Did Dap do that?

A.   Yes.

Q.   What were you doing?

A.   I was standing there.

Q.   What happened next?

A.   Then Chip had asked her you want
something long and hard?   I am going to give you
something long and hard.   Chip picked the pipe up
and I thought he was going to hit her with the
pipe and I turned around.

Q.   As you glanced back what if anything did
you see?

A.   Chip shoved the pipe up in her.

Q.   When you say Chip shoved the pipe up in
her, what portion of her body did he shove the

_ASA Hal Sm_
_Nevest Coleman_
_Det. mike Clancy #20395_

pipe into?

A.   Her pussy.

Q.   At this point what were you doing?

A.   I was standing there looking out making sure nobody would come down.

Q.   Did you have an opportunity to observe Mikey at this point?

A.   Yes.

Q.   Did you notice anything unusual about her?

A.   She was shaking.  She was just shaking with her eyes open.

Q.   Did you notice anything unusual about the legs of her body?

A.   Blood.

Q.   How much blood did you see?

A.   A lot of blood.

Q.   Where was the blood coming from?

A.   Out of her pussy.

Q.   What happened next?

A.   We all stood there.  We opened the door and we ran out.  I closed the door and we ran out.  I ran towards my girlfriend's house 56th and Sangamon.

*Nevest Coleman*
*Det. Mike Clancy #20395*

Plaintiff 002675

Q.   Where did Chip go if you know?

A.   Chip and Dap, they went together somewhere.

Q.   Okay.  At some point subsequent to running out of the house, did you have a conversation with Mike Garber (phonetic)?

A.   No.

Q.   Have you had anything to eat today?

A.   Yes.

Q.   What were you given to eat today?

A.   A bacon and egg cheese biscuit, 2 of them, hash browns and orange juice.

Q.   Did you have an opportunity to use the bathroom today?

A.   Yes, I did.

Q.   Can you read and write English?

A.   Yes.

Q.   Okay. I talked to you alone today, is that correct?

A.   Yes.

Q.   How have you been treated by the police?

A.   Very well.

Q.   How have I treated you?

A.   Very well.

*ASA Hal Bm*

*Nevest Coleman*

*Det. Mike Clancy #20395*

Plaintiff 002676

Q.   Has anybody made any promises or threats
to you in order for you to give this statement
today?

A.   No.

Q.   Are you under the influence of drugs or
alcohol at this time?

A.   No, I am not.

Q.   Nevest, the court reporter will now type
up the statement.  You will be allowed to read
over the statement and make any additions or
corrections that you wish.

A.   Okay.

MR. GARFINKEL: This will conclude the
statement of Nevest Coleman, which is in Area 1
Violent Crimes Detective Division.

The time is now 10:04 in the morning
hours.

This will conclude the court reported
statement of Nevest Coleman.

x *Nevest Coleman*

WITNESSES TO SIGNATURE:

ASA _ASA Hal Garfinkl_

Det. _Mike Clancy #20395_

Det. _____

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT-CRIMINAL DIVISION**

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | |
| Respondent, | ) | |
| v. | ) | No. 94 CR 1443301 |
| **NEVEST COLEMAN,** | ) | Honorable LeRoy Martin, Jr., Judge |
| Defendant-Petitioner, | ) | |

## AFFIDAVIT OF NEVEST COLEMAN

1. My name is Nevest Coleman. I am over 18 years old and competent to give this statement.

2. In 1994, I was arrested and charged with the rape and murder of Antwinica Bridgeman.

3. I was coerced into giving a false confession to these crimes.

4. I graduated high school in 1987.

5. Since high school, I was continuously employed up until my arrest in 1994.

6. At the time of my arrest, I had two children, aged 2 years and 3 months old.

7. I did not plan, participate in, or know about the rape or murder of Antwinica Bridgeman in any way whatsoever. I am innocent of these crimes.

8. Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I, Nevest Coleman, certify that the statements set forth in this instrument are true and correct:

_Nevest Coleman_
Nevest Coleman

Dated: 1-18-2018

LAUREN STANCZAK LEBATA
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 20, 2019

_Lauren J. Lebata_

Signed and sworn before me on: 1/18/2018

Plaintiff 000039
EXHIBIT

Pls.' Exhibit 31

## CIRCUIT COURT OF COOK COUNTY ILLINOIS
## CRIMINAL DIVISION

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | Case No. 94 CR 1334402 |
| Respondent, | ) | |
| | ) | Chief Judge LeRoy K. Martin, |
| v. | ) | Judge Presiding |
| | ) | |
| DARRYL FULTON, a.k.a | ) | |
| DERRELL FULTON, | ) | |
| | ) | |
| Defendant/Petitioner. | ) | |

## AGREED ORDER

Petitioner Darryl Fulton, a.k.a. Derrell Fulton, has petitioned this Court for a Certificate of Innocence pursuant to 735 ILCS 5/2-702, and the Parties have submitted this Agreed Order and jointly requested that the Court enter this Order. In reviewing Mr. Fulton's Petition, this Court has considered the trial, appellate, and post-conviction records, including Mr. Fulton's petition to vacate his conviction pursuant to 735 ILCS 5/2-1401 filed in the Circuit Court on August 24, 2017, and the State's Motion to Vacate Convictions granted on November 17, 2017.

Having considered all of the above, the Court finds that Darryl Fulton, a.k.a. Derrell Fulton, has satisfied his burden under 735 ILCS 5/2-702 and is entitled to a Certificate of Innocence. Wherefore, Mr. Fulton's Petition for a Certificate of Innocence is **GRANTED**.

In so ruling, this Court recognizes that 735 ILCS 5/2-702 does not require any findings of potential misconduct by any particular individual or entity related to the granting of a Certificate of Innocence. In granting this Certificate, this Court makes no findings of misconduct, nor was it asked to make such findings. Thus, this Order and the Petitioner's Certificate of Innocence are not intended to provide evidentiary support for any claim that the Cook County State's Attorney's

Plaintiff 000001

Office or any of its Assistant State's Attorneys engaged in misconduct with respect to Petitioner's conviction. The Court, however, expresses no opinion about whether this Order or the resulting Certificate of Innocence should be admissible in another proceeding for a separate purpose. Pursuant to 735 ILCS 5/2-702(j), this Court's decision to grant Petitioner a Certificate of Innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a *res judicata* effect on any other proceedings.

ENTERED:

Date:

> FILED
> JUDGE LEROY K. MARTIN - 1844
> MAR 09 2018
> DOROTHY BROWN
> CLERK OF THE CIRCUIT COURT
> OF COOK COUNTY, IL

Judge LeRoy K. Martin, Jr.

2659882.2

Plaintiff 000002

**CIRCUIT COURT OF COOK COUNTY ILLINOIS**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | Case No. 94 CR 1443301 |
| Respondent, | ) | |
| | ) | Chief Judge LeRoy K. Martin, |
| v. | ) | Judge Presiding |
| | ) | |
| NEVEST COLEMAN, | ) | |
| | ) | |
| Petitioner. | ) | |

---

## AGREED ORDER

---

Petitioner Nevest Coleman has petitioned this Court for a Certificate of Innocence pursuant to 735 ILCS 5/2-702, and the Parties have submitted this Agreed Order and jointly requested that the Court enter this Order.  In reviewing Mr. Coleman's Petition, this Court has considered the trial, appellate, and post-conviction records, including the Mr. Coleman's post-conviction petition filed in the Circuit Court on August 7, 2017, and the State's Motion to Vacate Conviction filed in the Circuit Court on November 17, 2017.

Having considered all of the above, the Court finds that Nevest Coleman has satisfied his burden under 735 ILCS 5/2-702 and is entitled to a Certificate of Innocence.  Wherefore, Mr. Coleman's Petition for a Certificate of Innocence is **GRANTED**.

In so ruling, this Court recognizes that 735 ILCS 5/2-702 does not require any findings of potential misconduct by any particular individual or entity related to the granting of a Certificate of Innocence.  In granting this Certificate, this Court makes no findings of misconduct, nor was it asked to make such findings.  Thus, this Order and the Petitioner's Certificate of Innocence are not intended to provide evidentiary support for any claim that the Cook County State's Attorney's Office or any of its Assistant State's Attorneys engaged in misconduct with respect to Petitioner's

Plaintiff 000003

conviction. The Court, however, expresses no opinion about whether this Order or the resulting Certificate of Innocence should be admissible in another proceeding for a separate purpose. Pursuant to 735 ILCS 5/2-702(j), this Court's decision to grant Petitioner a Certificate of Innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a *res judicata* effect on any other proceedings.

ENTERED:

Date: _____

Judge LeRoy K. Martin, Jr.

2659882.2

Plaintiff 000004

# ILLINOIS STATE POLICE
### Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)



**Bruce Rauner**
*Governor*

November 29, 2017
**LABORATORY REPORT**

Leo P. Schmitz
*Director*

WILLIAM R. FOLEY
CHICAGO PD UNIT 610
DETECTIVE DIVISION, AREA 1
5101 SOUTH WENTWORTH
CHICAGO, IL 60609

Laboratory Case #C97-004891
RD #Y0182495
SUPPLEMENTAL REPORT

OFFENSES    Murder/Sexual Assault
SUSPECTS    Darryl Fulton/Nevest Coleman/Eddie Taylor
VICTIM      Antwinica Bridgeman

The following evidence was received by the Forensic Science Center at Chicago on June 9, 2016:
**Inventory# 1742284**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1A1 | Blood standard from Darryl Fulton |
| 1B1 | Blood standard from Eddie Taylor |
| 1C1 | Blood standard from Nevest Coleman |

The following evidence was received by the Forensic Science Center at Chicago on July 6, 2016:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 5K1 | Cutting from underwear (semen indicated) |

The following evidence was received by the Forensic Science Center at Chicago on May 26, 2017:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 14 | Buccal standard from Chester Latham |

**RESULTS**

The following information pertains to Combined DNA Index System (CODIS) association #64.

Due to the size of the stain in Exhibit 5K1, DNA extraction was performed in three tubes (Extractions A, B, and C).

DNA from Exhibits 1A1, 1B1, and 1C1 was previously amplified and profiled at the 24 loci contained within the PowerPlex® Fusion PCR amplification kit.

Fulton7278

Pls.' Exhibit 34

CHICAGO PD UNIT 610
Laboratory Case #C97-004891                    -2-          COPY    November 29, 2017

**RESULTS** (continued)
DNA from Exhibits 5K1 and 14 was amplified and profiled at the 24 loci contained within the
PowerPlex® Fusion PCR amplification kit.

The DNA results from Exhibit 5K1 were compared to the human male DNA profiles previously identified
in Exhibits 1A1, 1B1, and 1C1, and the human female DNA profile previously identified in Exhibit 2H
(Head hair standard from Antwinica Bridgeman).

The human male DNA profile previously identified in Exhibit 3B1 (Swabbing from left hand nail
clippings) and the minor human DNA types previously identified in Exhibits 7A (Swabbing from pipe)
and 12A (Swabbing from rock) were compared to the human male DNA profile identified in Exhibit 14.

The major human female DNA profiles previously identified in Exhibits 3B1, 7A, and 12A were
compared to the human female DNA profile previously identified in Exhibit 2H (Head hair standard from
Antwinica Bridgeman).

A human female DNA profile was identified in the non-sperm fraction of Exhibit 5K1 (Extraction A) at
the Amelogenin, D3S1358, D1S1656, D2S441, D16S539, D18S51, D2S1338, TH01, vWA, D21S11,
D8S1179, D12S391, and D19S433 loci. Antwinica Bridgeman cannot be excluded from having
contributed to this DNA profile at the Amelogenin, D3S1358, D1S1656, D2S441, D16S539, D18S51,
TH01, vWA, D21S11, D8S1179, D12S391, and D19S433 loci. The expected frequency of occurrence for
this profile was calculated for the African American, Caucasian, and Hispanic population groups and was
found to be no more common than approximately 1 in 4.9 trillion unrelated individuals.

The non-sperm fractions of Exhibit 5K1 (Extractions B and C) were not profiled.

A mixture of human DNA profiles was identified in the sperm fraction of Exhibit 5K1 (Extraction B) at
the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, D16S539, D18S51, D2S1338,
CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, D8S1179, D12S391, D19S433, and FGA
loci. Assuming this is a mixture of the human female DNA profile identified in the non-sperm fraction of
Exhibit 5K1 and one other individual, a human male DNA profile was identified. This DNA profile has
been searched against the DNA Index. The search detected an association to laboratory cases
C98-48970/RD#C670319, Exhibit 1B1(Vaginal swabs), C01-35693/RD#G489333, Exhibit 1B1 (Vaginal
swabs), and C98-47159/RD#C416086, Exhibit 1B1 (Vaginal swabs).

The human male DNA profile identified in laboratory case C01-35693/RD#G48933, Exhibit 1B1 (Vaginal
swabs) matches the human male DNA profile identified in laboratory case C01-35693/RD#G48933,
Exhibit 2 (Buccal swab standard from Clarence Neal).

Clarence Neal cannot be excluded from having contributed to the human male DNA profile identified in
the sperm fraction of Exhibit 5K1 (Extraction B) at the Amelogenin, D3S1358, D1S1656, D2S441,
D10S1248, D13S317,  D16S539, D18S51, D2S1338, CSF1PO, TH01, vWA, D21S11, D7S820, D5S818,
D8S1179, D12S391, D19S433, and FGA loci. The expected frequency of occurrence for this profile was
calculated for the African American, Caucasian, and Hispanic population groups and was found to be no
more common than approximately 1 in 1.7 septillion unrelated individuals.

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 380 of 612 PageID #:9038

**COPY**

**RESULTS** (continued)

Darryl Fulton, Nevest Coleman, Eddie Taylor, and Chester Latham can be excluded from having contributed to the human male DNA profile identified in the sperm fraction of Exhibit 5K1 (Extraction B)

A mixture of human DNA profiles was identified in the sperm fraction of Exhibit 5K1 (Extraction A) at the Amelogenin, D3S1358, D16S539, D18S51, TH01, vWA, D8S1179, and D12S391 loci which was interpreted as a mixture of two people. Assuming this is a mixture of the human female DNA profile identified in the non-sperm fraction of Exhibit 5K1 and one other individual, a human male DNA profile was identified from which Clarence Neal cannot be excluded. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 7.1 million unrelated individuals.

Darryl Fulton, Nevest Coleman, Eddie Taylor, and Chester Latham can be excluded from having contributed to the human male DNA profile identified in the sperm fraction of Exhibit 5K1 (Extraction A)

A mixture of human DNA profiles was identified in the sperm fraction of Exhibit 5K1 (Extraction C) at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D16S539, D18S51, TH01, vWA, D21S11, D8S1179, D12S391, D19S433, and FGA loci which was interpreted as a mixture of two people. Assuming this is a mixture of the human female DNA profile identified in the non-sperm fraction of Exhibit 5K1 and one other individual, a human male DNA profile was identified at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D16S539, D18S51, TH01, vWA, D8S1179, D12S391, D19S433, and FGA loci from which Clarence Neal cannot be excluded. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 700 trillion unrelated individuals.

Darryl Fulton, Nevest Coleman, Eddie Taylor, and Chester Latham can be excluded from having contributed to the human male DNA profile identified in the sperm fraction of Exhibit 5K1 (Extraction C)

A mixture of human DNA profiles was identified in the mixed fraction of Exhibit 5K1 (Extraction A) at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D16S539, D18S51, TH01, vWA, D21S11, D8S1179, D12S391, D19S433, and FGA loci which was interpreted as a mixture of two people. Assuming this is a mixture of the human female DNA profile identified in the non-sperm fraction of Exhibit 5K1 and one other individual, a human male DNA profile was identified at the Amelogenin, D3S1358, D1S1656, D16S539, D18S51, TH01, vWA, D8S1179, and D12S391 loci from which Clarence Neal cannot be excluded. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 240 million unrelated individuals.

Darryl Fulton, Nevest Coleman, Eddie Taylor, and Chester Latham can be excluded from having contributed to the human male DNA profile identified in the mixed fraction of Exhibit 5K1 (Extraction A).

Fulton7280

CHICAGO PD UNIT 610
Laboratory Case #C97-004891      -4-      COPY      November 29, 2017

**RESULTS** (continued)

A mixture of human DNA profiles was identified in the mixed fraction of Exhibit 5K1 (Extraction B) at the Amelogenin, D3S1358, D1S1656, D2S441, D16S539, D18S51, D2S1338, TH01, vWA, D21S11, D8S1179, D12S391, D19S433, and FGA loci which was interpreted as a mixture of two people. Assuming this is a mixture of the human female DNA profile identified in the non-sperm fraction of Exhibit 5K1 and one other individual, a human male DNA profile was identified at the Amelogenin, D3S1358, D1S1656, D16S539, D18S51, TH01, vWA, D8S1179, D12S391, and D19S433 loci from which Clarence Neal cannot be excluded. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 5.3 billion unrelated individuals.

Darryl Fulton, Nevest Coleman, Eddie Taylor, and Chester Latham can be excluded from having contributed to the human male DNA profile identified in the mixed fraction of Exhibit 5K1 (Extraction B).

A mixture of human DNA profiles was identified in the mixed fraction of Exhibit 5K1 (Extraction C) at the Amelogenin, D3S1358, D1S1656, D16S539, D18S51, TH01, vWA, D21S11, D8S1179, D12S391, and D19S433 loci which was interpreted as a mixture of two people. Assuming this is a mixture of the human female DNA profile identified in the non-sperm fraction of Exhibit 5K1 and one other individual, a human male DNA profile was identified at the Amelogenin, D3S1358, D16S539, D18S51, TH01, vWA, D8S1179, and D12S391 loci from which Clarence Neal cannot be excluded. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 290 million unrelated individuals.

Darryl Fulton, Nevest Coleman, Eddie Taylor, and Chester Latham can be excluded from having contributed to the human male DNA profile identified in the mixed fraction of Exhibit 5K1 (Extraction C).

Clarence Neal cannot be excluded from having contributed to the minor human male DNA profile previously identified in Exhibit 3B1 at the Amelogenin, D3S1358, D16S539, D18S51, TH01, and D8S1179 loci. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 180 thousand unrelated individuals. Chester Latham can be excluded from having contributed to this minor DNA profile.

Clarence Neal cannot be excluded from having contributed to the minor human DNA type previously identified in Exhibit 7A at the FGA locus. The expected frequency of occurrence for this DNA type was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 3 unrelated individuals. Chester Latham can be excluded from contributed to this minor DNA type.

Clarence Neal and Chester Latham cannot be excluded from having contributed to the minor human DNA type previously identified in Exhibit 12A at the D3S1358 locus. The expected frequency of occurrence for this DNA type was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 85% unrelated individuals.

Fulton7281

CHICAGO PD UNIT 610
Laboratory Case #C97-004891     -5-     November 29, 2017



**RESULTS** (continued)

Antwinica Bridgeman cannot be excluded from having contributed to the major human female DNA profile previously identified in Exhibit 3B1 at the Amelogenin, D3S1358, D16S539, D18S51, TH01 and D8S1179 loci. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 2.6 million unrelated individuals.

Antwinica Bridgeman cannot be excluded from having contributed to the major human female DNA profile previously identified in Exhibit 7A at the Amelogenin, D3S1358, D1S1656, D2S441, D16S539, D18S51, TH01, vWA, D21S11, D7S820, D8S1179, D12S391, and D19S433 loci. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 30 trillion unrelated individuals.

Antwinica Bridgeman cannot be excluded from having contributed to the major human female DNA profile previously identified in Exhibit 12A at the Amelogenin, D3S1358, D1S1656, D2S441, D16S539, D18S51, TH01, vWA, D21S11, D8S1179, D12S391 and D19S433 loci. The expected frequency of occurrence for this profile was calculated for the African American, Caucasian, and Hispanic population groups and was found to be no more common than approximately 1 in 20 trillion unrelated individuals.

The human male DNA profile identified in the sperm fraction of Exhibit 5K1 (Extraction B) and the human male DNA profiles previously identified in Exhibits 1A1, 1B1, and 1C1 have been included in the DNA Index and will continue to be compared to other DNA Index profiles. You will be notified if a probative association is detected.

**REQUESTS**

For results of previous biological examinations, please refer to my prior laboratory report, the laboratory reports by Forensic Scientists Michelle Moody, Megan E. Neff, Wendy C. Gruhl, Lisa E. Kell, Brian Schoon, and Francesca Antonaci from the Forensic Science Center at Chicago, the laboratory reports by Chicago Police Department Criminal Laboratory Division dated November 26, 1994 and December 2, 1994, and the laboratory report by LabCorp dated March 13, 1997.

If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**

Samples from Exhibits 1A1, 1B1, 1C1, and 14 have been retained at the Forensic Science Center at Chicago for Y-STR DNA analysis and, if analyzed, will be the subject of a separate report.

The evidence from this case will be returned to the the submitting agencies.

CHICAGO PD UNIT 610
Laboratory Case #C97-004891                    -6-                    November 29, 2017

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by
ANSI-ASQ National Accreditation Board (ANAB).  Refer to certificate #AT-1697 and associated Scope of
Accreditation.

Respectfully submitted,

COPY

Yongfei Wu
Forensic Scientist

cc: CHICAGO PD UNIT 606-DNA
    COOK CO SA FORENSIC SCIENCE UNIT
    WILLIAM FOLEY 0-CHICAGO PD UNIT 606
    ASA Gina Savini - Room 11B34-COOK CO SA

## ILLINOIS STATE POLICE
### Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

Bruce Rauner
*Governor*

Leo P. Schmitz
*Director*

July 18, 2017
**LABORATORY REPORT**

WILLIAM R. FOLEY
CHICAGO PD UNIT 610
DETECTIVE DIVISION, AREA 1
5101 SOUTH WENTWORTH
CHICAGO, IL 60609

Laboratory Case #C97-004891
RD #Y0182495

OFFENSE     Murder
SUSPECTS    Darryl Fulton/Nevest Coleman/Eddie Taylor
VICTIM      Antwinica Bridgeman

The following evidence was received by the Forensic Science Center at Chicago on June 9, 2016:
**Inventory# 1742284**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1A1 | Blood standard: Darryl Fulton |
| 1B1 | Blood standard: Eddie Taylor |
| 1C1 | Blood standard: Nevest Coleman |

The following evidence was received by the Forensic Science Center at Chicago on July 6, 2016:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 3A1 | Swabbing from right hand nail clippings |
| 3B1 | Swabbing from left hand nail clippings |

The following evidence was received by the Forensic Science Center at Chicago on July 25, 2016:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 6A1 | Swabbing from plastic fingernail |

The following evidence was received by the Forensic Science Center at Chicago on September 13, 2016:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 7A | Swabbing from pipe (no semen indicated) |
| 11A | Swabbing from eyeglasses |
| 12A | Swabbing from rock (no semen indicated) |

Fulton7038

CHICAGO PD UNIT 610
Laboratory Case #C97-004891                    -2-                           July 18, 2017

## RESULTS

Quantitative PCR indicates there is insufficient human DNA in Exhibits 6A1 and 11A for autosomal STR or Y-STR analysis. Exhibits 6A1 and 11A were not profiled.

DNA from Exhibits 1A1, 1B1, 1C1, 3A1, 3B1, 7A, and 12A was amplified and profiled at the 24 loci contained within the PowerPlex® Fusion PCR amplification kit.

A mixture of human DNA profiles was identified in Exhibit 3A1 at the Amelogenin, D3S1358, D16S539, D18S51, TH01, vWA, D8S1179, and D12S391 loci which was interpreted as a mixture of at least two people. This mixture is not suitable for comparisons or entry into the DNA Index.

A mixture of human DNA profiles was identified in Exhibit 3B1 at the Amelogenin, D3S1358, D1S1656, D16S539, D18S51, TH01, vWA, D8S1179, D12S391, and D19S433 loci which was interpreted as a mixture of two people.

A major human female DNA profile was identified in Exhibit 3B1 at the Amelogenin, D3S1358, D16S539, D18S51, TH01, and D8S1179 loci.

A minor human male DNA profile was identified in Exhibit 3B1 at the Amelogenin, D3S1358, D16S539, D18S51, TH01, and D8S1179 loci from which Darryl Fulton, Eddie Taylor, and Nevest Coleman can be excluded.

A mixture of human DNA profiles was identified in Exhibit 7A at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, Penta E, D16S539, D18S51, D2S1338, CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, TPOX, D8S1179, D12S391, D19S433, FGA, and D22S1045 loci which was interpreted as a mixture of two people.

A major human female DNA profile was identified in Exhibit 7A at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, D16S539, D18S51, TH01, vWA, D21S11, D7S820, D8S1179, D12S391, D19S433, and FGA loci.

A minor human DNA type was identified in Exhibit 7A at the FGA locus from which Nevest Coleman cannot be excluded. Approximately 1 in 3 Black, 1 in 3 White, or 1 in 4 Hispanic unrelated individuals cannot be excluded from having contributed to this DNA type.

Darryl Fulton and Eddie Taylor can be excluded from having contributed to the minor human DNA type identified in Exhibit 7A.

A mixture of human DNA profiles was identified in Exhibit 12A at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, D16S539, D18S51, D2S1338, Penta D, TH01, vWA, D21S11, D7S820, D5S818, D8S1179, D12S391, D19S433, and FGA loci which was interpreted as a mixture of two people.

A major human female DNA profile was identified in Exhibit 12A at the Amelogenin, D3S1358, D1S1656, D2S441, D16S539, D18S51, TH01, vWA, D21S11, D8S1179, D12S391, and D19S433 loci.

[c] COPY

DF 114

CHICAGO PD UNIT 610
Laboratory Case #C97-004891                    -3-                    July 18, 2017

**RESULTS** (continued)
A minor human DNA type was identified in Exhibit 12A at the D3S1358 locus from which Eddie Taylor cannot be excluded. Approximately 64 percent Black, 50 percent White, or 86 percent Hispanic unrelated individuals cannot be excluded from having contributed to this DNA type.

Darryl Fulton and Nevest Coleman can be excluded from having contributed to the minor human DNA type identified in Exhibit 7A.

**REQUESTS**
Upon submission of additional standards, further analysis can be conducted to resolve the source of the open profiles and types identified.

For results of previous biological examinations, please refer to the laboratory reports by Forensic Scientist Michelle Moody from the Forensic Science Center at Chicago, the laboratory reports by Criminalists Robert E. Berk and Pamela Fish from the Chicago Police Department, and the laboratory report by LabCorp dated March 13, 1997

Please note that additional items were received but not examined at this time.

If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**
Please note that Exhibits 3A1, 3B1, 6A1, 7A, 11A, and 12A were consumed in DNA analysis.

Extracted DNA remains from Exhibits 6A1, 7A, and 11A for additional testing.

The evidence from this case will be returned to the submitting agencies.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by ANSI-ASQ National Accreditation Board (ANAB). Refer to certificate #AT-1697 and associated Scope of Accreditation.

Respectfully submitted,

COPY

Yongfei Wu
Forensic Scientist

cc: CHICAGO PD UNIT 606-DNA
    WILLIAM FOLEY 0-CHICAGO PD UNIT 606
    ASA Gina Savini - Room 12C42-COOK CO SA

JA-115

Fulton7040

## ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

Bruce Rauner
*Governor*

September 25, 2017
**LABORATORY REPORT**

Leo P. Schmitz
*Director*

WILLIAM R. FOLEY
CHICAGO PD UNIT 610
DETECTIVE DIVISION, AREA 1
5101 SOUTH WENTWORTH
CHICAGO, IL 60609

Laboratory Case #C97-004891
RD #Y0182495

OFFENSES   Murder/Sexual Assault
SUSPECTS   Darryl Fulton/Nevest Coleman/Eddie Taylor
VICTIM     Antwinica Bridgeman

The following evidence was received by the Forensic Science Center at Chicago on June 9, 2016:
**Inventory# 1373534**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 2E1 | Hair from pipe |
| 2E2 | Hair from pipe |
| 2E3 | Hair from pipe |
| 2E4 | Hair from pipe |
| 2E5 | Hair from pipe |
| 2E6 | Hair from pipe |
| 2E7 | Hair from pipe |
| 2E8 | Hair from pipe |

**RESULTS**
DNA from Exhibits 2E2, 2E3, 2E5, 2E6, 2E7, and 2E8 was amplified and profiled at the 24 loci contained within the PowerPlex® Fusion PCR amplification kit.

Results of this DNA analysis were compared to the human DNA profiles previously identified in Exhibit 1A1 (Blood standard: Darryl Fulton), 1B1 (Blood standard: Eddie Taylor), 1C1 (Blood standard: Nevest Coleman) and 14 (Buccal standard: Chester Latham - Elimination Standard). For results of this previous DNA analysis, please refer to the prior laboratory reports by Forensic Scientist Yongfei Wu from the Forensic Science Center at Chicago.

Quantitative PCR indicates there is insufficient human DNA in Exhibits 2E1 and 2E4 for autosomal STR or Y-STR analysis. Exhibits 2E1 and 2E4 were not profiled.

q4/x



Fulton7561

Pls.' Exhibit 36

CHICAGO PD UNIT 610
Laboratory Case #C97-004891                     -2-                     September 25, 2017

**RESULTS** (continued)

A human female DNA profile was identified in Exhibit 2E2 at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, D16S539, D18S51, D2S1338, CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, D8S1179, D12S391, D19S433, and FGA loci.

Darryl Fulton, Eddie Taylor, Nevest Coleman, and Chester Latham can be excluded from having contributed to the human female DNA profile identified in Exhibit 2E2.

A human female DNA profile was identified in Exhibit 2E3. Darryl Fulton, Eddie Taylor, Nevest Coleman, and Chester Latham can be excluded from having contributed to this human female DNA profile.

A mixture of human DNA profiles was identified in Exhibit 2E5 at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, Penta E, D16S539, D18S51, D2S1338, CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, TPOX, D8S1179, D12S391, D19S433, FGA, and D22S1045 loci which was interpreted as a mixture of two people.

A human female DNA profile was identified in Exhibit 2E5. Darryl Fulton, Eddie Taylor, Nevest Coleman, and Chester Latham can be excluded from having contributed to this human female DNA profile.

A low level human DNA type was also identified in Exhibit 2E5 at the FGA locus. Darryl Fulton, Eddie Taylor, and Chester Latham can be excluded from having contributed to this low level human DNA type.

Nevest Coleman cannot be excluded from having contributed to the low level human DNA type identified in Exhibit 2E5. Approximately 1 in 5 Black, 1 in 7 White, or 1 in 4 Hispanic unrelated individuals cannot be excluded from having contributed to this low level DNA type.

A human female DNA profile was identified in Exhibit 2E6 at the Amelogenin, D3S1358, D16S539, D18S51, TH01, vWA, D8S1179, and D19S433 loci. Darryl Fulton, Eddie Taylor, Nevest Coleman, and Chester Latham can be excluded from having contributed to this human female DNA profile.

A human female DNA profile was identified in Exhibit 2E7 at the Amelogenin, D3S1358, D1S1656, D2S441, D10S1248, D13S317, Penta E, D16S539, D18S51, D2S1338, CSF1PO, Penta D, TH01, vWA, D21S11, D7S820, D5S818, D8S1179, D12S391, D19S433, and FGA loci. Darryl Fulton, Eddie Taylor, Nevest Coleman, and Chester Latham can be excluded from having contributed to this human female DNA profile.

A human female DNA profile was identified in Exhibit 2E8. Darryl Fulton, Eddie Taylor, Nevest Coleman, and Chester Latham can be excluded from having contributed to this human female DNA profile.

94B

Fulton7562

CHICAGO PD UNIT 610
Laboratory Case #C97-004891                 -3-                    September 25, 2017

**REQUESTS**
For results of previous biological examinations, please refer to the laboratory reports by Forensic
Scientists Yongfei Wu, Francesca Antonaci, and Michelle Moody from the Forensic Science Center at
Chicago; the laboratory report issued by LabCorp, dated March 13, 1997; and the laboratory report issued
by Supervising Criminalist Pamela Fish from the Chicago Police Department Crime Laboratory Division,
dated December 2, 1994.

If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**
The evidence will be returned to your agency.

Please note that Exhibits 2E1, 2E2, 2E3, 2E4, 2E5, 2E6, 2E7, and 2E8 were consumed in DNA analysis.
Extracted DNA remains from Exhibits 2E1, 2E2, 2E3, 2E4, 2E5, 2E7, and 2E8 for additional testing.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by
ANSI-ASQ National Accreditation Board (ANAB). Refer to certificate #AT-1697 and associated Scope of
Accreditation.

Respectfully submitted,

COPY

Brian Schoon
Forensic Scientist III

cc:  CHICAGO PD UNIT 606-DNA
     WILLIAM FOLEY 0-CHICAGO PD UNIT 606
     ASA Gina Savini - Room 12C42-COOK CO SA

ILLINOIS STATE POLICE
Division of Forensic Services
Forensic Science Center at Chicago
1941 West Roosevelt Road
Chicago, Illinois 60608-1229
(312) 433-8000 (Voice) * 1-(800) 255-3323 (TDD)

Bruce Rauner
*Governor*

December 14, 2017
**LABORATORY REPORT**

Leo P. Schmitz
*Director*

WILLIAM R. FOLEY
CHICAGO PD UNIT 610
DETECTIVE DIVISION, AREA 1
5101 SOUTH WENTWORTH
CHICAGO IL 60609

Laboratory Case #C97-004891
RD #Y0182495

OFFENSES: Murder/Sexual Assault
SUSPECTS: Darryl Fulton/Nevest Coleman/Eddie Taylor
VICTIM: Antwinica Bridgeman

The following evidence was received by the Forensic Science Center at Chicago on June 9, 2016:
**Inventory# 1742284**

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1A1A | Extracted DNA from blood standard of Darryl Fulton |
| 1B1A | Extracted DNA from blood standard of Eddie Taylor |
| 1C1A | Extracted DNA from blood standard of Nevest Coleman |

The following evidence was received by the Forensic Science Center at Chicago on July 6, 2016:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 5B2A | Extracted DNA from cutting from sweatshirt |
| 5B9A | Extracted DNA from cutting from sweatshirt |

The following evidence was received by the Forensic Science Center at Chicago on May 26, 2017:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 14A | Extracted DNA from buccal standard of Chester Latham |

**RESULTS**
DNA from Exhibits 1A1A, 1B1A, 1C1A, 14A, the non-sperm fraction of Exhibit 5B2A (cuttings B and C), and the non-sperm fraction of Exhibit 5B9A (cutting A) was amplified and profiled at the 23 loci contained within the PowerPlex® Y23 PCR amplification kit.

Results of this analysis were compared to the human Y-STR DNA haplotype identified in laboratory case C01-35693/RD# G489333, Exhibit 2 (buccal standard from Clarence Neal).

Fulton7118

Pls.' Exhibit 37

CHICAGO PD UNIT 610
Laboratory Case #C97-004891       -2-       December 14, 2017

**RESULTS** (continued)

Extraneous DNA was detected in a negative amplification control as well as a reagent blank associated with Exhibits 1A1A and 1C1A. This extraneous DNA does not affect the interpretation of the exhibits from this case.

A mixture of human Y-STR DNA haplotypes was identified in the non-sperm fraction of Exhibit 5B2A (cutting B) at 10 of 23 loci which was interpreted as a mixture of three males. Interpretation of potential contributing haplotypes was based on results identified only at the DYS481 and DYS393 loci. At the remaining loci, all potential haplotypes may not be present. Darryl Fulton, Nevest Coleman, Chester Latham and Clarence Neal cannot be excluded as having contributed to this mixture of Y-STR haplotypes. This mixture of Y-STR haplotypes was searched against a pooled known database consisting of unrelated African American, Caucasian, and Hispanic males. This mixture of Y-STR haplotypes would be expected to occur in approximately 1 in 2 unrelated males at the DYS481 and DYS393 loci based on a 95% upper confidence limit. Eddie Taylor can be excluded as having contributed to this mixture of Y-STR haplotypes.

A mixture of human Y-STR DNA haplotypes was identified in the non-sperm fraction of Exhibit 5B2A (cutting C) at 9 of 23 loci which was interpreted as a mixture of five males. Interpretation of potential contributing haplotypes was based on results identified only at the DYS576 locus. At the remaining loci, all potential haplotypes may not be present. Darryl Fulton, Eddie Taylor, Nevest Coleman, Chester Latham and Clarence Neal cannot be excluded as having contributed to this mixture of Y-STR haplotypes. All potential contributing haplotypes were searched against a known database and with a 95% upper confidence limit, would be expected to occur in approximately 94% of unrelated African American males, 96% of unrelated Caucasian males and 94% of unrelated Hispanic males based on a database of 1636 African Americans, 1841 Caucasians and 1246 Hispanics at the DYS576 locus.

A mixture of human Y-STR DNA haplotypes was identified in the non-sperm fraction of Exhibit 5B9A (cutting A) at 13 of 23 loci which was interpreted as a mixture of three males. Interpretation of potential contributing haplotypes was based on results identified only at the DYS576, DYS570 and DYS458 loci. At the remaining loci, all potential haplotypes may not be present. Chester Latham and Clarence Neal cannot be excluded as having contributed to this mixture of Y-STR haplotypes. This mixture of Y-STR haplotypes was searched against a pooled known database consisting of unrelated African American, Caucasian, and Hispanic males. This mixture of Y-STR haplotypes would be expected to occur in approximately 1 in 4 unrelated males at the DYS576, DYS570 and DYS458 loci based on a 95% upper confidence limit. Darryl Fulton, Eddie Taylor and Nevest Coleman can be excluded as having contributed to this mixture of Y-STR haplotypes.

The Y-STR DNA haplotypes identified in Exhibits 1A1A, 1B1A and 1C1A have been included in the DNA Index.

**REQUESTS**

For results of previous biological examinations, please refer to the laboratory reports by Forensic Scientists Michelle Moody, Yongfei Wu, Wendy C. Gruhl, Francesca Antonaci, Lisa E. Kell, Megan Neff and Brian Schoon from the Forensic Science Center at Chicago; the laboratory reports from the Chicago Police Department Crime Laboratory Division dated November 26, 1994 and December 2, 1994; and to the laboratory report issued by LabCorp, dated March 13, 1997.

CHICAGO PD UNIT 610
Laboratory Case #C97-004891       -3-       December 14, 2017

**REQUESTS** (continued)
If you have any questions regarding this report, please feel free to contact me.

**EVIDENCE DISPOSITION**
Please note that the non-sperm fraction of Exhibit 5B2A (cutting B), the non-sperm fraction of Exhibit 5B2A (cutting C) and the non-sperm fraction of Exhibit 5B9A (cutting A) were consumed in Y-STR DNA analysis.

DNA evidence from this case will be returned to the Chicago Police Department Evidence and Recovered Property Section.

Any analysis conducted is accredited under the laboratory's ISO/IEC 17025 accreditation issued by ANSI-ASQ National Accreditation Board (ANAB). Refer to certificate #AT-1697 and associated Scope of Accreditation.

Respectfully submitted,

Greg A. DiDomenic
Forensic Scientist III

cc: CHICAGO PD UNIT 606-DNA
    ASA Gina Savini, Room 11B34-COOK CO SA
    WILLIAM FOLEY 0-CHICAGO PD UNIT 606

**Order**                                                    **(2/24/05) CCG N002**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

People of the State of Illinois
                    Respondent

v.                                              No.  93 CR 135 2601

Robert Bouto, Petitioner

### ORDER

Now Comes this Honorable Court, on motion by Petitioner for a Certificate of Innocence, this Court being duly advised, and after hearing the evidence presented and reviewing the record on this case, this Court hereby Orders:

Petitioner, Robert Bouto, has met his burden to prove that he was convicted of one or more felonies and served his sentence, his judgment of conviction was vacated; his claim is timely and he is innocent of the offenses charged; and he did not by his own conduct bring about his conviction. The records of arrest shall be expunged from the records of the Chicago Police Department and the records of the clerk of circuit court and Department of the State Police shall be sealed until further order of the Court. Petitioner Robert Bouto's name shall be obliterated from circuit court clerk for this case only, by the

**Atty. No.:** 44407

**Name:** The Exoneration Project              **ENTERED:**

**Atty. for:** Bouto

**Address:** 311 N. Aberdeen 3rd Floor

**City/State/Zip:** Chicago, IL 60607

**Telephone:** 312-789-4968

**ENTERED**
JUDGE LEROY K. MARTIN - 1844
MAR 27 2019
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

**Dated:** _____

_____
**Judge**                              **Judge's No.**

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Copy Distribution - White: 1. ORIGINAL - COURT FILE  Canary: 2. COPY  Pink: 3. COPY

Pls.' Exhibit 38

STATE OF ILLINOIS     )
                            ) SS.
COUNTY OF COOK      )

### IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT-CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| v. | ) | 93 CR 13526 |
| | ) | Presiding Judge |
| ROBERT BOUTO. | ) | LeRoy K. Martin, Jr. |
| | ) | |

**FILED 2018 OCT 24 PM 2: 5"** *(file stamp)*

### NOTICE OF FILING

To:    Russell Ainsworth
        The Exoneration Project
        311 N. Aberdeen, Ste. 2E
        Chicago, IL 60601
        russell@exonerationproject.org

      YOU ARE HEREBY NOTIFIED that on October 24, 2018, the undersigned filed with the Clerk of the Circuit Court at The Leighton Criminal Courthouse the attached People's Objection the Petition for Certificate of Certificate of Innocence, a copy of which is hereby served to you.

                                    KIMBERLY FOXX
                                      State's Attorney of Cook County
                By:    */s/ Sara Dixon Spivy*
                                      Sara Dixon Spivy
                                      Assistant State's Attorney
                                      Civil Actions Bureau
                                      500 Richard J. Daley Center
                                        (312) 603-3278
                                        sara.spivy@cookcountyil.gov

### PROOF OF SERVICE

      I, Sara Dixon Spivy, Assistant State's Attorney, hereby certify that I tendered via electronic mail a copy of the above notice together with the document referenced therein to Attorney Russell Ainsworth on October 24, 2018 at or before 5:00 p.m.
                                      */s/ Sara Dixon Spivy*
                                      Sara Dixon Spivy

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| v. | ) | 93 CR 13526 |
| | ) | Presiding Judge |
| ROBERT BOUTO. | ) | LeRoy K. Martin, Jr. |
| | ) | |

THE PEOPLE'S OBJECTION TO
PETITION FOR A CERTIFICATE OF INNOCENCE

    NOW COME the People of the State of Illinois, by their Attorney, KIMBERLY M. FOXX, State's Attorney of Cook County, Illinois and through her Assistant Sara Dixon Spivy, and respectfully seek leave to intervene to request that this Honorable Court deny Robert Bouto's Petition for a Certificate of Innocence.   In support thereof, the People state as follows:

### Introduction

    The petition filed by Robert Bouto ("Petitioner") invites this Court to distort an Illinois statute so as to provide a financial windfall to a man who participated in the gruesome and violent murder of a young student as high school let out for the day. The Petitioner bears a statutory burden of proving that he is actually innocent of the murder, but will not be able to overcome it. The Petitioner proceeds on the flawed premise that because his conviction was vacated for reasons collateral to the question of guilt that he is entitled to be found "innocent".   That proposition, however, is at odds with the plain language of the statute, the intent of the legislation, and the case law.

### Overview of Issue Presented

    On July 18, 2018, Robert Bouto filed a Petition for a Certificate of Innocence (COI). A jury found Petitioner guilty on August 1, 1996 for the murder of Salvador Ruvalcaba and was sentenced to 45 years in the Illinois Department of Corrections.   On April 30, 2018, Petitioner's conviction was vacated pursuant to 735 ILCS 5/2-1401 due to questions concerning the investigation of the case.   Petitioner had served his entire sentence and the case was dismissed.

Petitioner now seeks to obtain a certificate of innocence despite the fact that eye-witnesses to the murder continue to identify him as the shooter. Petitioner's argument for a COI relies mostly on allegations of misconduct by Chicago Police Officer Guevara, and not on evidence proving him actually innocent of the murder.

<div align="center">Relevant Facts</div>

Fifteen year old Salvador Ruvalcaba was gunned down outside of his high school shortly after school let out. Petitioner was picked up by police almost immediately and identified by eye-witnesses at an on-scene show-up. Most notably, Carl Richmond, who knew Bouto, identified him as the shooter. Petitioner was later placed in line-ups and was again identified.

Petitioner alleges that Chicago Police Detective Guevara tainted the eye-witness identifications through coercive tactics including manipulating the line-ups.

<div align="center">Petitioner is not eligible for a certificate of innocence.</div>

<div align="center">A. Petitioner is Not Actually Innocent.</div>

As this Court is aware, the Illinois legislature enacted a statute that allows innocent individuals who were wrongfully convicted to obtain a Certificate of Innocence ("COI"). A COI allows those wrongfully convicted an opportunity to request compensation for their injury from the Illinois Court of Claims.

The intent of the statute is clear from its language. The statute, 735 ILCS 5/2-702, does not contemplate that a COI should issue because misconduct by a police officer requires a new trial. Rather, the plain language and intent of the legislature makes clear that a COI should issue *only* where the petitioner can meet the burden of showing that he is ***actually innocent***. This intent appears throughout the provisions of the statute. Subsection (b) provides that a person is not eligible for a COI unless he or she can show that he or she was imprisoned for a crime "which he or she did not commit...." The question for this Court then is whether the petitioner performed criminal acts not whether a proceeding is fair. COIs do not issue solely because of government misconduct before or during trial— and other remedies exist to address such circumstances.

Section 2-702 provides two bases for a petitioner to be eligible for a COI. First, a COI will issue if the person was convicted under an unconstitutional statute. Subsections (c)(2) and (d). That is not the situation we have here. The second basis for granting a COI requires a showing that the petitioner "was ***innocent*** of all offenses for which he or she was

<div align="center">2</div>

incarcerated." 735 ILCS 5/2-702 (b) (emphasis added). Illinois courts historically and consistently hold that the word "innocent" is to be given its common understanding. It means that a person simply played no role at all in the offense. It does not mean that a person escaped re-prosecution after reversal of conviction. As the First District Appellate Court has noted, "the plain language of Section 2-702 shows the legislature's intent to distinguish between a finding of not guilty at retrial and actual innocence of the charged offense." *People v. Fields,* 959 N.E.2d 1162, 2011 IL App (1st) 100169, 2011 Ill. App. LEXIS 1066, 355 Ill. Dec. 429.

For this reason, 735 ILCS 5/2-702 (g) imposes the burden of proof on the petitioner, not on the State. Subsection (g)(3) requires a petitioner to show by a preponderance of evidence that he is "innocent of the offense charged." This requires more than a mere showing of weakness in the prosecution's case, and a petitioner cannot shift this burden by relying only on the absence of evidence in the State's case. Thus, in *Rudy v. People,* 2013 IL App (1st) 113449, 984 N.E.2d 540, 2013 Ill. App. LEXIS 35, 368 Ill. Dec. 594, 2013 WL 313192, 14, the court held that a petitioner must prove by a preponderance of the evidence that he is "actually innocent," as opposed to the circumstances in which the State presented insufficient evidence to convict. The statute could not be clearer in assigning this burden, and it directs this Court not to entertain further proceedings on a COI petition unless and until the petitioner shows that he is "likely to succeed at trial in proving that [he] is innocent of the offenses charged..." 735 ILCS 5/2-702 (d).

None of this is new or controversial. As the court noted in *People v. Dumas,* 2013 IL App (2d) 120561, 988 N.E.2d 713, 2013 Ill. App. LEXIS 226, 370 Ill. Dec. 515, 2013 WL 1500589, this understanding of the term "innocent" comports with the interpretation of a similar federal statute, under which the court "must consider whether the petitioner is truly innocent-that is, whether he committed the acts charged and, if so, whether those acts constituted a criminal offense— but the court makes that determination independent of the outcome of the trial or appeal, taking into account not only whether the petitioner was innocent but also whether he may be deemed responsible for his own prosecution." *Id.* quoting *Betts v. United States,* 10 F.3d 1278, 1283, 1993 U.S. App. LEXIS 31125. The *Betts* court further interpreted this to mean that "before the petitioner can be said to have caused or brought

3

about his prosecution * * * he must have acted or failed to act in such a way as to mislead the authorities into thinking he had committed an offense." *Betts* at 1285. This is because the statute "compensates only the truly innocent, making it 'necessary to separate from the group of persons whose convictions have been reversed, those few who are in fact innocent of any offense whatever.'" *United States v. Racing Services, Inc.*, 580 F.3d 710, 712 (8th Cir. 2009) (quoting *Betts,* 10 F.3d at 1284).

<div align="center">B. Petitioner Does Not Show a Likelihood of Success at Trial</div>

Bearing these principles in mind, it quickly becomes apparent that Petitioner cannot meet his burden of proving himself actually innocent. Predictably, the Petitioner's pleadings devote a great deal of energy to denunciations of the police, and particularly Detective Guevara. That discussion is largely irrelevant, however, because the COI statute requires this Court to focus on the conduct of the petitioner, not the police. Again, remedies exist for those victimized by police misconduct, but it demeans the meaning of the word "innocent" if a COI issues to a person solely on the basis that his conviction entailed misconduct by the police.

Eye-witness Carl Richmond has not wavered in his identification of Petitioner as the person who murdered fifteen-year-old Salvador Ruvalcaba. He had known Petitioner from the neighborhood as they were both gang members and had previous run-ins. Richmond's identification of the Plaintiff as a murderer, an identification that holds to this day, has nothing to do with police misconduct, and instead has everything to do with Petitioner's inability to prove his actual innocence.

The Petitioner has not shown that he likely will meet his burden at a trial of proving that he factually is innocent of any guilt for this horrible crime. For this reason he is not entitled to a Certificate of Innocence. To grant him a COI would require the Court to ignore the plain text of the applicable statute and depart from the stated wishes of the legislature that passed the statute.

WHEREFORE, the People of the State of Illinois respectfully request that this Honorable Court deny Petitioner's request for a Certificate of Innocence.

<div align="center">4</div>

Respectfully submitted,
KIMBERLY M. FOXX
State's Attorney of Cook County

By:     */s/ Sara Dixon Spivy*
        Assistant State's Attorney
        500 Richard J. Daley Center
        Chicago, IL 60602
        312-603-3278
        sara.spivy@cookcountyil.gov

FILED

MAR 31 1995

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,       )
                                       )
                Plaintiff,             )
                                       )    No. 94-CR-13344
            v.                         )    Honorable,
                                       )    Christy Berkos,
NEVEST COLEMAN,                        )    Judge Presiding.
                                       )
                Defendant.             )

## MOTION TO SUPPRESS STATEMENT

The Defendant, **NEVEST COLEMAN**, by and through his attorney, **RICHARD S. KLING**,

moves this Honorable Court to suppress as evidence any and all oral or written communications,

confessions, statements, or admissions, whether inculpatory or exculpatory, made by Nevest Coleman

relating to his arrest in the above titled cause; in support of which Nevest Coleman states as follows:

1.      Nevest Coleman is charged with First-degree Murder in 94-CR-13344.

2.      On April 28, 1994, at approximately 9:00 p.m., Nevest Coleman voluntarily went to

the Chicago Police Department with certain officers to answer some questions regarding the incident in

the above indictment.

3.      Certain detectives returned Nevest Coleman to his home on April 28, 1994, at

approximately 10:30 p.m.

4.      Approximately two hours later, certain detectives of the Chicago Police Department

returned to the Coleman residence and requested that Nevest Coleman return to the station to answer a

few more questions.

5.      These detectives of the Chicago Police Department assured Nevest Coleman and

Nevest Coleman's family that the officers simply wanted to ask Nevest Coleman a few more questions

and Nevest Coleman would return to his home that night.

6.      At the police station, Nevest Coleman was taken to an interrogation room and

Pls.' Exhibit 40

questioned for several hours by an officer of the Chicago Police Department, during which time

Nevest Coleman repeatedly denied involvement and knowledge in the offense about which he was

being questioned.

7.      Nevest Coleman was then locked alone in an interrogation room for approximately two

hours.

8.      An officer, whose name Nevest Coleman does not know, coerced and threatened

Nevest Coleman, both by mental coercion and threats of physical force if Nevest Coleman refused to

speak to the officer.

a)      A certain officer promised Nevest Coleman he would be allowed to go home if

he said exactly what the officer told him to say.

b)      When Nevest Coleman refused to make a statement, he was consequently hit

in the face by an investigating officer.

9.      Nevest Coleman's father, his brother Louis Coleman, and John Earl saw Nevest

Coleman after he gave a statement and will testify that Nevest Coleman's face was abnormally

swollen.

10.     The investigating officers told Nevest Coleman that he was not the person they

wanted, and if Nevest Coleman made a statement, he would be released.

11.     In addition, an Assistant State's Attorney, Hal Garfinkel, told Nevest Coleman that if

he said certain statements, Mr. Garfinkel would act as his attorney and represent Nevest Coleman. Mr.

Garfinkel further promised Nevest Coleman that he would provide protection and relocation for Nevest

Coleman and his girlfriend and baby.

12.     Consequently, Nevest Coleman gave a statement to Detective Mike Clancy and

Assistant State's Attorney Garfinkel at 9:57 A.M. on April 29, 1994, where Nevest Coleman was

promised that if he signed the statement he would be allowed to go home.

2

PD 01066

13.    This signed statement was obtained as the direct result of knowing false misrepresentation of fact and in violation of Nevest Coleman's Constitutional Rights under the Fourth and Fifth Amendments of the Constitution as guaranteed to him by the Fourteenth Amendment.

14.    Nevest Coleman was held in custody without probable cause, and subsequently interrogated for approximately nine hours.

15.    The treatment of Nevest Coleman, whether or not technically characterized as an arrest, was in important respects indistinguishable from a traditional arrest, and must be based on probable cause to comply with the Fourth Amendment. Dunaway v. New York, 442 U.S. 200, 214-15 (1979). The custodial interrogation of Nevest Coleman on less then probable cause was an illegal seizure. Id.; Brown v. Illinois, 422 U.S. 590, 602 (1975).

16.    Nevest Coleman was subjected to custodial interrogation for nine hours, during which period he was not given Miranda warnings as required by Miranda v. Arizona, 384 U.S. 436 (1966). "A person is in custody for purposes of Miranda if that person is either formally arrested or has suffered a 'restraint on freedom of movement' of the degree associated with a formal arrest." U.S. v. Burns, 37 F.3d 276, 280 (7th Cir. 1994).

17.    Under the Fifth Amendment, a detainee subject to custodial interrogation has the right to counsel. See Miranda v. Arizona, 384 U.S. 436 (1966). Nevest Coleman invoked his right to counsel when he agreed to have A.S.A. Garfinkel act as his attorney. However, this right could not be and was not honored.

18.    Any and all confessions, statements or admissions of Nevest Coleman, made at the time of and/or after his arrest, were, therefore elicited in violation of his Constitutional Rights under the Fifth Amendment of the Constitution of the United States. Miranda v. Arizona, 384 U.S. 436 (1966).

19.    Due to the mental, emotional, and psychological state of Nevest Coleman, and a direct

3

result of the false promises made by the law enforcement officer, Nevest Coleman was unable to appreciate and understand the full meaning of his <u>Miranda</u> rights when finally given, and that any relinquishment of such rights was therefore not a free and rational choice of the accused, and was not made voluntarily, knowingly and intelligently. <u>Miranda v. Arizona</u>, 384 U.S. 436, 448 (1966); <u>People v. Prim</u>, 53 Ill.2d 62, 70 (1972).

20.     Any alleged statements thus obtained were elicited in violation of both the United States Constitution and the Illinois Constitution and should be barred from use at trial.

WHEREFORE, Nevest Coleman respectfully requests this Honorable Court to quash the arrest and suppress as evidence any and all, communications, confessions, statements, or admissions, whether inculpatory or exculpatory, written or oral, made by Nevest Coleman.

Respectfully submitted,

Richard S. Kling
Attorney for Nevest Coleman

Richard S. Kling
Attorney No. 21077
565 West Adams, Suite 600
Chicago, Illinois  60661
(312) 906-5050

Debra Gassman
George Livas
Legal Interns

4

STATEMENT OF

Michael Barber

Page 1 of 3

TAKEN April 29, 1994 AT 7:45 P.M

AT Area 1 Violent Crimes

PRESENT ASA Hal Garfinkel

Det Graff #20480

This statement taken regarding the Fatal Beating

of Antwinica Bridgeman which occured on April 11, 1994

at 917 W Garfield at 11:55 P.M

I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement.

After advising Michael Barber that Hal Garfinkel is an Assistant States Attorney, a lawyer, a prosecutor, and not his lawyer, Michael Barber agreed to give the following Handwritten Statement which is in summary and not word for word

Michael Barber states that he is 17 years old and Currently a Junior at Englewood High School. Michael States that he has been a good friend of Nevest Coleman for about five years as they live in the same neighborhood. Michael States that he can both read and write English and has demonstrated this ability by reading the first few lines of this Handwritten Statement aloud to A.S.A Hal Garfinkel Michael States that on April 28, 1994 at 5:30 P.M at the residence of Nevest Coleman that he had a Conversation exclusively with Nevest Coleman out in front of Nevest Coleman's residence, Michael Barber States that Nevest Coleman told Michael Barber that, "There is a real Bad smell Coming from

Det. A. Graff #20480

ASA Hal Garfinkel

Michael Barber

**DEFS 321**

Pls.' Exhibit 41

the basement of my house and I t_ it that it may be a body." Michael Barker states that Nevest Coleman asked Michael Barker if Michael Barker would help Nevest Coleman locate a flashlight in order to determine if there was, in fact a body located in Nevest Coleman's residence. Michael Barker states that he, along with Nevest Coleman, went to 923 W Garfield and borrowed a flashlight from a neighbor of Nevest Coleman

Furthermore, Michael and Nevest, before securing the flashlight, had tried to open the basement door located at 917 W Garfield in order to see if a body was there, however they were unsuccessful. Therefore, Michael Barker and Nevest Coleman secured the flashlight and went to the East Window of the basement of 917 W Garfield and Michael Barker turned on the flashlight and was able to observe through the basement window a body laying on its back. At this point, Michael Barker told Nevest Coleman that a body was laying on the floor and Michael Barker states that Nevest Coleman "stated, "Oh, My God, there is a body"

Furthermore, Michael states that he, along with Nevest Coleman went around the front of Nevest Coleman's house and told Nevest Coleman's mother about the body the two boys had discovered. Michael states that he has been treated well by both the Area I Violent Crimes Detectives as well as A.S.A. Hal Garfield. Additionally Michael states that he has not been harmed in any manner or threatened in any way in exchange for this handwritten Statement. Michael was provided an Orange Juice and Sausage biscuit and permitted to Use the Washroom. Michael may make any additions or corrections to this Handwritten Statement and may do so by Asking ASA Hal Garfield and may do so now. Additionally, Michael

Det A. Graf # 20480

DEFS 322

States that he has not been Promised any thing in exchange for the information Provided in this Handwritten Statement.

Mibul Barber

ASA Hal/Garfinkel ————————→ Det. A. Graf #20480

Page 3 of 3



# Transcript of Harold Mark Garfinkel

**Date:** December 3, 2019
**Case:** Coleman -v- City of Chicago, et al.; Fulton -v- Foley, ey al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Pls.' Exhibit 42

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3            EASTERN  DIVISION
 4   ----------------------------x
 5   NEVEST COLEMAN,              :
 6            Plaintiff,          :
 7      v.                        :  Case No. 18-cv-00998
 8   CITY OF CHICAGO, et al.,     :
 9            Defendants.         :
10   ------------------------     :
11   DERRELL FULTON, a/k/a        :
12   DARRYL FULTON,               :
13      v.                        :  Case No. 17-cv-8696
14   CHICAGO POLICE OFFICER       :
15   WILLIAM FOLEY, et al.,       :
16            Defendants.         :
17   ----------------------------x
18   Videotaped Deposition of HAROLD MARK GARFINKEL
19            Chicago, Illinois
20         Tuesday, December 3, 2019
21            10:18 a.m.
22   Job No.:  270734
23   Pages:  1 - 359
24   Reported by:  Paula M. Quetsch, CSR, RPR
```

**Page 2**

```
 1       Videotaped deposition of HAROLD MARK GARFINKEL,
 2   held at the location of:
 3
 4          PLANET DEPOS
 5          180 North LaSalle Street
 6          Suite 3700
 7          Chicago, Illinois 60601
 8          (888) 433-3767
 9
10
11
12       Pursuant to notice before Paula M. Quetsch, a
13   Certified Shorthand Reporter, Registered
14   Professional Reporter, and a Notary Public in and
15   for the State of Illinois.
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1       A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF COLEMAN:
 3       RUSSELL AINSWORTH, ESQUIRE
 4       LOEVY & LOEVY
 5       311 North Aberdeen Street
 6       3rd Floor
 7       Chicago, Illinois 60607
 8       (312) 243-5900
 9
10   ON BEHALF OF PLAINTIFF FULTON:
11       NICHOLAS M. CURRAN, ESQUIRE
12       LAW OFFICES OF KATHLEEN T. ZELLNER, PC
13       1901 Butterfield Road
14       Suite 650
15       Downers Grove, Illinois 60515
16       (630) 955-1212
17
18   ON BEHALF OF DEFENDANT COOK COUNTY AND DEPONENT:
19       DEREK KUHN, ESQUIRE
20       RYAN GILLESPIE, ESQUIRE
21       COOK COUNTY STATE'S ATTORNEY'S OFFICE
22       500 Richard J. Daley Center
23       Chicago, Illinois 60602
24       (312) 603-5527
```

**Page 4**

```
 1       A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF INDIVIDUAL DEFENDANTS:
 3       PATRICK R. MORAN, ESQUIRE
 4       ROCK FUSCO & CONNELLY, LLC
 5       321 North Clark Street
 6       Suite 2200
 7       Chicago, Illinois 60654
 8       (312) 494-1000
 9
10   ON BEHALF OF DEFENDANT CITY OF CHICAGO:
11       LISA M. MEADOR, ESQUIRE
12       THE SOTOS LAW FIRM, PC
13       141 West Jackson Boulevard
14       Suite 1240A
15       Chicago, Illinois 60604
16       (312) 735-3300
17
18   ALSO PRESENT:
19       RICK KOSBERG, Videographer
20
21
22
23
24
```

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

5

C O N T E N T S

1
2 EXAMINATION OF HAROLD MARK GARFINKEL     PAGE

3    By Mr. Ainsworth       8
4    By Mr. Curran       312
5    By Mr. Ainsworth       355
6
7       E X H I B I T S
8     (Attached to transcript.)
9

10 GARFINKEL DEPOSITION EXHIBITS       PAGE
11
12 Exhibit 1   Sup Report       85
13 Exhibit 2   Michael Barber Handwritten     95
14     Statement
15 Exhibit 3   Shaunice Williams Handwritten    100
16     Statement
17 Exhibit 4   Francine Calimee Handwritten    105
18     Statement
19 Exhibit 5   General Offense Case Report    112
20 Exhibit 6   Coleman Criminal History    121
21 Exhibit 7   Brick Photograph      127
22 Exhibit 8   Statement of Nevest Coleman    153
23 Exhibit 9   Felony Review Jacket for     182
24     Nevest Coleman

6

1 Exhibit 10 Arrest Report for Nevest     190
2     Coleman
3 Exhibit 11 Derrell Fulton Handwritten    218
4     Statement
5 Exhibit 12 Detective Foley's Trial     245
6     Testimony
7 Exhibit 13 Motion to Suppress Testimony    265
8 Exhibit 14 Felony Review Jacket     272
9 Exhibit 15 Blog Post       298
10 Exhibit 16 General Progress Reports    305
11 Exhibit 17 Coleman Form 101      308
12 Exhibit 18 Fulton Form 101      308
13
14
15
16
17
18
19
20
21
22
23
24

7

P R O C E E D I N G S

1
2      THE VIDEOGRAPHER: This is the video
3 deposition of Hal Garfinkel, taken by Loevy & Loevy
4 in the matter of Nevest Coleman v. The City of
5 Chicago, et al., Docket No. 18-cv-00998, and
6 Fulton v. Chicago, et al. 17-cv-8696 held at
7 Planet Depos, Amata Law Center, 180 North LaSalle,
8 Suite 3700, Chicago, Illinois.
9      Today is December 3rd, 2019. The time is
10 10:18. The court reporter is Paula Quetsch of
11 Planet Depos. The videographer is Rick Kosberg.
12      Counsel can now introduce themselves, and the
13 court reporter is free to administer the oath.
14      MR. AINSWORTH: This is Russell Ainsworth
15 appearing on behalf of Nevest Coleman.
16      MR. CURRAN: Nicholas Curran on behalf of
17 Plaintiff Fulton.
18      MR. KUHN: Assistant State's Attorney
19 Derek Kuhn on behalf of the deponent as well as
20 Cook County.
21      MR. GILLESPIE: Assistant State's Attorney
22 Ryan Gillespie on behalf of the deponent as well
23 as Cook County.
24      MR. MORAN: Pat Moran on behalf of the

8

1 individual officer defendants in both cases.
2      MS. MEADOR: Lisa Meador on behalf of the
3 City of Chicago.
4      (Witness sworn.)
5      HAROLD MARK GARFINKEL,
6 having been duly sworn, testified as follows:
7   EXAMINATION BY COUNSEL FOR PLAINTIFF COLEMAN
8 BY MR. AINSWORTH:
9    Q   Would you please state and spell your name
10 for the record.
11    **A   Harold Mark Garfinkel, G-a-r-f-i-n-k-e-l.**
12    Q   And, sir, have you ever been deposed before?
13    **A   One time.**
14    Q   And when was that?
15    **A   At least 10 years ago involving an**
16 **administrative agency review of some kind in a**
17 **civil matter.**
18    Q   And were you a witness in that case?
19    **A   I was.**
20    Q   And do you know why you were being deposed?
21    **A   You know, it happened so many years ago.**
22 **It was involving some type of charitable trust in**
23 **Chicago, and I was called as a witness.**
24    Q   Do you know who called you as a witness?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

3 (9 to 12)

---

**9**

1    A  I think the Attorney General's Office.
2    Q  Were there any allegations of impropriety
3  in the creation of the charitable trust?
4    A  There were allegations but I don't think
5  it ever rose to the level of a verdict.  I don't
6  believe it went to trial.
7    Q  And were you one of the attorneys who
8  created the charitable trust?
9    A  No.
10    Q  And do you know what your role was as a
11  witness in that case?
12    A  I think it was to speak on behalf of a
13  rabbi, Rabbi First.
14    Q  And in what manner would you speak on
15  behalf of the rabbi?
16    A  I believe it was just his -- his reputation
17  in the community.
18    Q  Was the rabbi being accused of wrongdoing?
19    A  There was an allegation of that, but,
20  again, I don't believe it went to verdict.
21    Q  You've taken depositions; is that correct?
22    A  You know, I haven't.  I'm a criminal lawyer.
23    Q  So just want to go over the ground rules
24  here so --

**10**

1    A  Sure.
2    Q  -- we're all on the same page.
3      The first thing I'm going to ask you to do
4  is to give your answers out loud with a yes or a
5  no if the question calls for it as you've been
6  doing thus far.  Okay?
7    A  No worries.  Yeah, of course.
8    Q  And the next thing I'm going to ask you to
9  do is to wait until I'm done with my question even
10  if it's a long one before you begin your answer so
11  we're not talking at the same time.
12    A  Fair enough.
13    Q  I'll try and do the same to you and just
14  wait until you're done with your answer before I
15  begin my next question so we're not getting hit by
16  the court reporter.
17    A  Okay.  That's fair.
18    Q  If you don't understand my question, please
19  ask me to rephrase the question, reask the question
20  or in some way indicate to me that you do not
21  understand my question.
22    A  Okay.
23    Q  The flip side of that is if you answer my
24  question, I'll assume that you understood my

**11**

1  question as I've posed it.  Fair?
2    A  Okay.
3    Q  If you need a break at any time, just let
4  us know.  All that we ask is that you answer any
5  question that's pending before we break.
6    A  Sure.
7    Q  Are you on any medication or do you have
8  any medical condition that would affect your
9  ability to testify truthfully and accurately here
10  today?
11    A  No.
12    Q  All right.  So where did you go to high
13  school?
14    A  New Trier West.
15    Q  And where did you go to college?
16    A  I went to two colleges.  I went to
17  University of Kansas and Hebrew University in Israel.
18    Q  And when did you graduate high school?
19    A  1981.
20    Q  And when did you attend the University of
21  Kansas?
22    A  Starting from '82 through -- well, it
23  would have been '81 through '84, and then Hebrew
24  University '84 to '85.

**12**

1    Q  Did you receive a degree or certificate
2  from University of Kansas?
3    A  I did.
4    Q  What degree or certificate did you receive?
5    A  A BA in psychology.
6    Q  And when did you receive that degree?
7    A  '85.
8    Q  And did you go to Hebrew -- and what was
9  your purpose for going to Hebrew University?
10    A  Before I went to law school I was -- I
11  went to -- I was in a Ph.D. program, and the
12  research that I was interested in, they were doing
13  a lot of that research at Hebrew University.  So I
14  thought I would do my senior year in college
15  there, and I got involved in a lab, and that lab
16  work was also something which I applied at
17  University of Kansas doctorate program which I did
18  not complete, but the research was similar.
19    Q  And did you attend graduate school at
20  University of Kansas?
21    A  I did for a little under a year.
22    Q  And then what degree -- or what was your
23  study there?
24    A  Developmental psychology.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

4 (13 to 16)

---

13

1    Q  And what is developmental psychology?
2    A  It's a theory of psychology that looks to
3  cognitive thought as to how thought can affect
4  behavior.
5    Q  Was there -- and what were you studying in
6  the lab?
7    A  I was doing shaping and modeling procedures
8  involving tachistoscope readings on the frontal
9  lobe of the brain.  But, again, I only did it for
10  about a year, a little under a year, and it wasn't
11  for me.
12    Q  Was it studying brain imaging?
13    A  No, not imaging.  Studying shaping
14  procedures and how you can shape -- not to get too
15  scientific with you, but we focused on certain
16  images to the nasal retina of the eye, and that
17  would affect imaging -- not imaging but
18  perceptions with the brain, and then you could
19  shape those perceptions based on what we call a
20  masking element.
21    But, again, it was many years ago, and I
22  didn't stick with it.  I didn't stick with it.
23    Q  And so when did you attend graduate school?
24    A  That was -- that would have been in -- that

---

14

1  would have been in '86.  I did about nine months
2  in the program.
3    Q  You attended John Marshall; is that right?
4    A  I did.
5    Q  Did you attend any other law school?
6    A  No.
7    Q  When did you attend John Marshall?
8    A  From 1987 through 1989.
9    Q  And what did you do from 1986 to 1987?
10    A  Well, I was in -- I was in graduate school
11  at University of Kansas.  I started my program
12  there.  I finished that and then I went to Israel
13  for a couple months before I started law school in
14  '87.  So at the end of '86 after I finished my
15  program -- not finished, after I left graduate
16  work, I then went to Israel and started law
17  school, that would have been the fall of '87.
18    Q  While you were in law school, did you have
19  any outside employment?
20    A  Yeah, I did.
21    Q  What outside employment did you have?
22    A  I worked for various law firms, you know,
23  clerking.  I don't remember what all those
24  positions were, but I worked for loads of solo

---

15

1  practitioners from '87 through '89.
2    Q  Did you ever clerk for the Cook County
3  State's Attorney's Office?
4    A  I did, as a 711 in '89.
5    Q  Did you ever clerk for the Cook County
6  Public Defender's Office?
7    A  No.
8    Q  Did you clerk for any other governmental
9  agency other than the Cook County State's
10  Attorney's Office?
11    A  No.
12    Q  Was it just your last semester of law
13  school that you were clerking at Cook County
14  State's Attorney's Office?
15    A  I think so.  I think so.  But certainly
16  not more than a year.  It would have probably been
17  a semester.
18    Q  Did you clerk for the Cook County State's
19  Attorney's Office during the summer?
20    A  I don't think so.  I don't think so.
21    Q  What did you do for the Cook County
22  State's Attorney's Office when you were clerking
23  as a law student?
24    A  I worked in a felony trial room, and I did

---

16

1  research and writing, and they let me do a couple
2  711-type motions.
3    Q  Where was the felony trial room?
4    A  Who was the judge?
5    Q  Where, which building?
6    A  26th Street.
7    Q  Do you remember the judge?
8    A  Well, again, I worked for many judges.  I
9  worked for Judge Hague for a while; I worked for
10  Judge Himmel a little bit, maybe Judge Schreier.
11    Q  When you say you worked for the judge --
12    A  I worked for the State's Attorney who was
13  assigned to those rooms and I would -- they would,
14  you know, kind of just shuttle me around.  If this
15  prosecutor in this courtroom needed work done, I
16  would write a motion, and I would find myself in
17  that courtroom, if that makes any sense.
18    Q  When you graduated John Marshall, did you
19  have -- were you employed?
20    A  Was I employed?  Yeah.  I was -- I was
21  driving a forklift truck for Peer Bearing when I
22  graduated.  I had been doing that for that last
23  semester.
24    Q  Did you have any other employment when you

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

17

1  graduated law school?
2    A  Paid employment?  Paid?
3    Q  Paid.
4    A  It was with the State's Attorney's Office,
5  I believe, unpaid.  Paid I believe it was just
6  Peer Bearing -- oh, and I was also working -- I
7  was waiting tables at TGI Fridays in Glenview that
8  last year.
9    Q  And so when you say you were working for
10 the Cook County State's Attorney's Office in an
11 unpaid position, was that your 711 position?
12   A  Yeah -- yes.
13   Q  When did that end?
14   A  Well, what happened was it continued once
15 I became a lawyer.  There were a group of us who
16 were waiting to be sworn in.  We were all -- most
17 of us were 711s, most were unpaid, some may have
18 been paid.  That group of unpaid 711s had been
19 offered a position.  It was unpaid and then once
20 we got sworn in, we kind of matriculated to
21 becoming prosecutors.  So kind of that last year,
22 that last semester, if that makes sense.
23   Q  An when did you sit for the bar exam?
24   A  That would have been October of '89.

18

1    Q  How many times did you sit for the bar exam?
2    A  Once.
3    Q  And when did you become an attorney?
4    A  I would have got my results, I guess -- I
5  think I sat in July of '89.  I would have got my
6  results in October.  So I guess, you know, October
7  '89 or '90 when I took the multistate exam, I think.
8    Q  How many times did you take the multistate
9  exam?
10   A  Once.
11   Q  When did you start with the Cook County
12 State's Attorney's Office in a paid position?
13   A  That last -- when I was sitting -- it
14 would have been '89 after I got sworn in.  That's
15 when I started getting paid.
16   Q  So it wasn't January of 1990?
17   A  Well, then it was a lawyer.  But, again,
18 it was that -- kind of that gray period where I
19 graduated law school, and we were paid like a
20 clerk's salary.  We were lawyers but we weren't
21 licensed.  We all waited for our bar results, and
22 then we got our offers, and then we went in
23 January '90, I guess.
24     It was a long time ago.  I don't remember --

19

1  there was that small period of time where we were
2  lawyers, not licensed.  We weren't State's
3  attorneys, but we were getting paid as unlicensed
4  lawyers, and then January we all went in as
5  lawyers, if that makes sense.
6    Q  And so for how many years did you work for
7  the Cook County State's Attorney's Office?
8    A  I worked for one year from '90 to '91, and
9  then I left and I went to Israel for a year, and then
10 I came back to the office for another four years.
11   Q  All right.  So in that first year that you
12 worked at the Cook County State's Attorney's
13 Office, where were you assigned?
14   A  All the different misdemeanor courtrooms --
15 I'm sorry.  I started out in the appellate division.
16 Appellate, traffic, and some misdemeanor courtrooms.
17   Q  And why did you leave the Cook County
18 State's Attorney's Office in '91?
19   A  The Intifada broke out in Israel, and I'm
20 an EMT, a medic, so I went out there just to
21 volunteer during a time of war.  I was there for
22 about -- I think I was there 11 months during the
23 First Intifada, and then I came back and rejoined
24 the office in '92.

20

1    Q  And so what did you do in Israel while you
2  were in Israel that year, that 11 months?
3    A  Just worked in different hospitals.
4    Q  When did you become an EMT?
5    A  I did it in Kansas, and I work as an EMT
6  now in our community.  So I was licensed twice.  I
7  was licensed first, it would have been -- I think
8  my first licensure was in Kansas in '82, and then
9  I got licensed in Illinois, where I currently
10 work, six years ago.
11   Q  When you say "our community," what are you
12 referring to?
13   A  The Orthodox Jewish community in Rogers Park
14 has our own EMS system we've established.  It's
15 called Hatzalah.  It's a Hebrew word for "to save."
16 So we have our own rigs; we're all on duty; we all
17 have equipment, and we drive around and we answer
18 calls in Rogers Park, Evanston, Peterson Park,
19 Skokie, and we have our own EMS system, an
20 internal system that integrates with the Chicago
21 Fire Department.
22   Q  And for how long have you been doing that?
23   A  Six years.
24   Q  And how -- how much time do you spend

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

6 (21 to 24)

21

1 doing that work?
2    A We're on 24/7. We carry radios with us.
3 When I leave -- when I leave my office downtown, I
4 work through the night depending what the call
5 volume is. So we're on all the time. There's
6 34 of us.
7    Q Do you work every night?
8    A I do. I mean, if there's a call. I mean,
9 I'm on. I can't say there's a call every night,
10 but, you know, I have a radio.
11    Q How often do you get a call?
12    A It all depends.
13    Q How about in the past week?
14    A I think the last call I took -- I think, I
15 don't remember -- took a call three or four days
16 ago, I think, around there.
17    Q And when was the last call before that?
18    A I don't know. I take -- I average about
19 eight, nine calls a month. It all depends. I
20 mean, I could look -- I could get you those
21 numbers. We keep very particular notes on that,
22 but I don't -- can't remember right now when the
23 last call was.
24    Q All right. When you returned to the

22

1 office of the Cook County State's Attorney in
2 1992, where were you assigned?
3    A Initially child support court, child
4 support court in the public interest bureau, and
5 it took me about a year to get back to the
6 criminal side.
7    Q And did you remain in the child support
8 unit until you got back to the criminal side?
9    A Yes.
10    Q And was that in 1993 that you made it back
11 to the criminal side?
12    A Probably. Either the end of '92 or the
13 beginning of '93.
14    Q And when you were -- when you made it back
15 to the criminal side, what was your assignment?
16    A I think, again, I went to the misdemeanor
17 courtrooms, and then I ultimately was assigned to
18 felony review.
19    Q And when did you get assigned to felony
20 review?
21    A I don't know. I got married in '94. I
22 was already in review in '94. Either the end of
23 '93 or the beginning of '94 is when I went to
24 felony review.

23

1    Q And how long did you remain in felony review?
2    A I think I was in review for -- I think --
3 I don't remember -- either 12 or 14 months was the
4 stint in those days on review.
5    Q And what was your next assignment after
6 felony review?
7    A Preliminary hearings. And I left the
8 office in preliminary hearings.
9    Q And what were your duties in preliminary
10 hearings?
11    A Well, there are -- in those days there
12 were several branch courts that conducted
13 preliminary hearings, I mean, Branch 44, Branch 48,
14 I think 50 had a preliminary court, 42, and you
15 would just conduct preliminary hearings, and there
16 was also the Branch 66 homicide sex preliminary
17 hearing grand jury indictment call. So I covered
18 all those duties while I was an Assistant State's
19 Attorney in preliminary hearings.
20    Q In your interrogatory responses you told
21 us that --
22    A In what?
23    Q In your interrogatory responses --
24    A Yeah.

24

1    Q -- you told us you worked in felony review
2 from approximately May of 1993 to July of 1994.
3    A Oh, is that what I said?
4    Q Does that sound about right?
5    A Okay. Could have been, yeah.
6    Q Do you have any reason to doubt that?
7    A No. If I -- no, I don't.
8    Q And so when did you leave the Cook County
9 State's Attorney's Office?
10    A December of '95.
11    Q So were you in preliminary hearings for
12 about a year and a half?
13    A Whatever that would have been, yeah.
14    Q Why did you leave the Cook County State's
15 Attorney's Office?
16    A I wanted to be a solo practitioner. I
17 wanted to do criminal defense, and it seemed like
18 a good time to leave.
19    Q Okay. Why did you want to do criminal
20 defense?
21    A Well, I wasn't going to be a civil lawyer.
22 I was trained as a prosecutor, and I wanted to
23 work for myself. So the natural segue would be to
24 stay in the area that I was trained in, which is

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

7 (25 to 28)

---

25

1 criminal law. I wasn't going to be a prosecutor
2 anymore, so then by default it would have been
3 criminal defense.
4     I didn't want to do civil work; I wanted
5 to stay, you know, in the arena substantively of
6 criminal law, so all that's remaining is criminal
7 defense.
8     Q  Why did you want to work for yourself?
9     A  You know, I'm an Orthodox Jew. It can be
10 sometimes complicated to be employed and for them
11 to understand that, you know, there's rules of
12 Sabbath and rules of holidays, and it just -- it's
13 complicated. So if you can kind of control your
14 own destiny, so to speak, workwise it just made
15 more sense to work for yourself.
16     Q  So if you would --
17     A  Sure.
18     Q  -- would you trace your career as an
19 attorney from December 1995 onward for us.
20     A  Sure. I went on my own in December 1995.
21 I do Federal and State criminal defense, and
22 currently I'm a criminal defense attorney
23 practicing in the area of Federal and State
24 criminal defense, sole practitioner.

---

26

1     Q  Were you a sole practitioner the entire time?
2     A  Yes. Yes.
3     Q  Did you ever have an affiliation with
4 Ms. Edelson?
5     A  For a very short time.
6     Q  When was that?
7     A  Wow, I think maybe year and a half ago. I
8 think we were partners maybe a month, two months.
9 It just -- it just didn't work out.
10     Q  Who is Ms. Edelson?
11     A  Her name is Zisl Edelson. She is a
12 corporate lawyer, and she was interested in doing
13 civil rights work, and she knew that I -- she
14 didn't have any real litigation skills. She's
15 also in our community. She approached me and she
16 knew that I did have litigation skills and asked
17 if I'd be interested.
18     Q  Interested in what?
19     A  Just maybe partnering up with her and seeing
20 if we could get some cases together doing civil
21 rights work. Substantively I didn't really -- I
22 hadn't studied the area, but I was interested in
23 the area just, you know, but personalitywise we
24 just were not a fit.

---

27

1     Q  And why were you not a fit?
2     A  She's strong; I'm strong. I had never
3 really worked with anybody or -- you know, since
4 the days of the office, and it just -- it wasn't a
5 good partnership.
6     Q  And so that partnership lasted for a
7 couple months?
8     A  At the most. At the most.
9     Q  You have a website, is that right, for
10 your law firm?
11     A  I do, sir.
12     Q  And have you employed -- have you ever
13 employed an attorney?
14     A  Some of my appellate work that I do now I
15 will contract out to other lawyers. I have in
16 the past.
17     Q  Have you ever had an attorney or your
18 payroll?
19     A  No, no.
20     Q  Who creates the content for your website?
21     A  Who creates the content? Well, the initial
22 content came from FindLaw, their writers, which I
23 had retained many, many years ago. It was then --
24 I then changed hosts many years ago, as well, to

---

28

1 OVC, Greg Wildman's company. So it's a blend.
2 It's content that's both -- that was originally
3 from FindLaw, and then Greg and his writers have
4 added their content to it.
5     MR. MORAN:  Sorry, can you just clarify,
6 is it Fine or Find?
7     THE WITNESS:  Find, F-i-n-d-L-a-w.
8     Q  And for the blog posts, who creates the
9 content for the blog posts?
10     A  Their writers.
11     Q  Whose writers?
12     A  It would be OVC's writers.
13     Q  And so do you pay them to create blog
14 posts for your website?
15     A  I pay OVC, yes, I do.
16     Q  And then you -- you ask them to post that
17 content on your website?
18     A  Yes, sir.
19     Q  Have -- and you read your blog posts; right?
20     A  Periodically. I don't -- I don't keep up
21 as much as I probably should, but in the past I
22 have. If there's an article that piques my
23 interest, I'll read it.
24     Q  Have you ever asked a posting to be taken

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

29

1  down because you disagree with it?
2      **A  No, I've not.**
3      Q  Do you tell them what kind of content you
4  would like to be posted on your website?
5      **A  No.**
6      Q  And OVC has been doing it for the last
7  several years; is that right?
8      **A  Many years.  Many years.**
9      Q  Are you married?
10     **A  I am.**
11     Q  For how long have you been married?
12     **A  25 years.**
13     Q  Have you ever been divorced?
14     **A  No.**
15     Q  How many kids do you have?
16     **A  Four.**
17     Q  Do you have any family members in law
18  enforcement?
19     **A  No.**
20     Q  When you joined felony review, were you
21  provided with any training?
22     **A  They gave us some training when we started.**
23     Q  What did that training consist of?
24     **A  How to fill out the felony review jacket.**

30

1  **They explained to us our role, what we were there**
2  **to do.  They explained to us the manner of**
3  **Mirandizing targets.  Just a general schematic of**
4  **the different areas, the regions, and then the**
5  **district stations that fell under those areas, if**
6  **that makes sense.**
7      Q  Approximately how long was that training?
8      **A  I think -- I don't remember going 20-plus**
9  **years, 25 years ago.  I think about a month maybe.**
10  **But we were -- you know, we jumped in pretty**
11  **quickly.  But maybe a month.**
12     Q  And was the month of going to classes and
13  being trained, or was it on-the-job training?
14     **A  It was a little of both, I think.**
15     Q  But the month that you're referring to,
16  what was that?
17     **A  Yeah, we went right on-the-job training,**
18  **but then kind of concomitant to that we would have**
19  **our supervisors sit us down, and, again, we got**
20  **kind of a roundtable forum, questions we had**
21  **regarding cases, and then additional instruction**
22  **based on that discussion we had on the case.  But**
23  **it was quite informal; it was loose.**
24     Q  And were you trained on how to obtain

31

1  statements?
2      MR. MORAN:  Object to form.
3      MR. AINSWORTH:  Let me change that question.
4      MR. KUHN:  Join.
5      Q  Were you trained on how to memorialize
6  statements?
7      **A  Yes.**
8      Q  And what training were you provided in how
9  to memorialize statements?
10     **A  Well, there's three types of statements**
11  **that you secure while on felony review.**
12         **There's an oral statement.  So that was**
13  **just kind of like, you know, if a target just**
14  **gives you an oral statement, then you would just**
15  **reduce to writing on that felony review jacket in**
16  **the narrative what that target said to you.**
17         **We learned very general rules about a**
18  **handwritten statement, how you would execute or**
19  **document a handwritten statement.**
20         **And then there was a court reported**
21  **statement and how we would do that.**
22     Q  And how were you trained to document a
23  handwritten statement?
24     **A  You would speak with the individual in the**

32

1  **room, and you would ask an individual, "Would you**
2  **like to give an oral statement, a handwritten, or**
3  **court reported?"**
4         **We would -- I would then go over what each**
5  **manner of those statements were, and if the client**
6  **said he wanted a handwritten statement, I would**
7  **then write up the statement based on what the**
8  **target told me.**
9         **I would then sit next to that statement --**
10  **I would sit next to the target with the statement;**
11  **I would have the statement -- read a paragraph or**
12  **two of that statement to verify that he read and**
13  **understood English, and then I would go through**
14  **the entire statement with the target making any**
15  **additions, corrections, or modifications that it**
16  **needed, and then each page was signed.**
17         **And if there was a page that had kind of**
18  **lines to the bottom, that would be X'd out to make**
19  **sure that that page could not be, you know, added --**
20  **any information be added on in the future.  That's**
21  **how you would do it.**
22     Q  Were you trained to leave the room in
23  order to prepare the handwritten statement outside
24  the presence of the target?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

---

33

1    A  Not always.  There were times -- I don't
2  remember but I know -- I can't say conclusively
3  that every handwritten statement I generated was
4  done in the presence or out of the presence.  I
5  think it was a little of both probably.
6    Q  Well, were you trained that you were supposed
7  to leave the room to prepare the handwritten
8  statement?
9    A  I don't remember that, no.
10   Q  Were you told why you didn't have the
11 target just read the entire statement rather than
12 just a paragraph or two?
13   A  I didn't say that.  What I said was I
14 initially would have him read the first two --
15 first paragraph or two to make sure that he could
16 read, and then I would read alongside him, that
17 target, but he also could read along with me.
18 Nothing would preclude him from reading the entire
19 statement with me if he so chose.
20   Q  Were you told why you were supposed to
21 have them read a paragraph or two out loud as
22 opposed to having them read the entire statement?
23   A  No, sir.  No.
24   Q  Was there a reason why you didn't allow

34

1  the target to read the entire statement out loud?
2    A  He could have if he wanted to.  I just felt
3  that one or two paragraphs would be representative
4  of his or her ability to not only read a statement
5  but show fluency and competency in reading and
6  understanding the English language and negotiating,
7  if you will, those paragraphs -- not negotiating,
8  maybe navigating.  And I felt two paragraphs was
9  enough, but if he or she wanted to read the entire
10 statement, they could.  I never, ever precluded
11 any individual from reading the entire statement
12 if he or she felt it was necessary.
13   Q  Were you trained on what information
14 should be included in the handwritten statement?
15   A  Yes.
16   Q  What were you trained on that topic?
17   A  I was trained that it was very important
18 in the first paragraph to let the target know that
19 I was not his lawyer, that I was a prosecutor, and
20 I was working with -- with the police, so to
21 speak, but that I was not his lawyer.
22      It was also important that -- of course,
23 to include in the body of the statement the facts,
24 the substantive facts.  It was important to state

35

1  in the document that the target could read and
2  understand the English language.  It was important
3  to document that that skill was demonstrated to
4  me.  It was important to document that the target
5  was given an opportunity to eat or drink anything
6  he or she wished or -- or use the bathroom and to
7  make any additions, corrections, or modifications
8  that the target felt necessary.
9      That was typically what they -- what our
10 supervisors wanted us to include, but I'm sure
11 there were other metrics, also, that I'm just not
12 remembering right now.  It's been so long.
13   Q  Were you trained to include some personal
14 facts about the suspect so that it was clear that
15 the statement came from the suspect or the target?
16   A  I don't know if we were trained on that.
17 I oftentimes included some personal demographics,
18 but I don't think it was a rule enforced in felony
19 review.  But I'm sure that oftentimes, if not every
20 time included some fact or facts demonstrating the
21 unique characteristics of that target.
22   Q  And were you trained to document the
23 condition of the suspect or target at the time
24 that they gave the statement?

36

1    A  I believe we would take a Polaroid picture.
2  I believe we did.  I don't know if we always did.
3  I think we did in your case just to memorialize or
4  to, you know, have a picture to show the condition
5  of the individual.
6    Q  And would you document in the statement
7  how the person was treated during their time in
8  custody?
9    A  Yes.  I believe so.  I believe so.
10   Q  And how would you document how the person
11 was treated while they were in custody?
12   A  I think I would document -- I would ask the
13 individual how he or she was treated during their
14 contact with law enforcement, as well as how they
15 were treated with regards to my contact, and I think
16 I would document that in some -- some language.
17   Q  And would you document -- and what was your
18 purpose in documenting how the person was treated?
19      MR. KUHN:  Objection; foundation, form.
20      Go ahead.
21   A  My purpose was if they were at a later
22 time to make any allegation of either abuse, or
23 duress, or coercion, that this would be a way to
24 kind of prophylactically address that and say,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

10 (37 to 40)

**37**

1  "Well, here is a statement in which, you know,
2  it's documented that you were treated fairly,"
3  kind of just anticipating that.
4      Q  So you're trying to avoid a later
5  allegation that there was some undue coercion
6  going on?
7      A  I just wanted to address that because I
8  think it's an important thing to document.
9      Q  And so would you document both facts that
10 suggested that there might be coercion, as well as
11 facts that suggest that there was not coercion?
12     A  I don't ever remember a target that I
13 interviewed in which he or she ever said to me
14 directly, "I've been coerced."  That never happened
15 in my tenure in felony review.  Had that happened,
16 I would have terminated the oral statement; I
17 would have terminated the written or court reported
18 statement, and then I would have directly gone to
19 my chain in command to say that, "I've got a
20 target who is making an allegation of coercion; I
21 do not feel comfortable going forward documenting
22 any of the three types of statements."  That never
23 happened.
24     Q  I'm asking a little different thing.  If

**38**

1  you had a suspect who told you that he was fed,
2  you would document what the person was fed; correct?
3      A  Yes.
4      Q  All right.  And that would help to show
5  that the person wasn't, you know, being coerced
6  because they were being provided access to food as
7  one aspect of it; right?
8      A  No.  I just document -- if they ate
9  something, I wanted that to be documented.  I
10 didn't draw any conclusions what that inference
11 would be.
12     Q  Why did you want to document if they ate
13 something?
14     A  Because I -- it's important that targets
15 be given -- given food or drink.  It's an
16 important fact.
17     Q  Is it also important that targets be allowed
18 to sleep?
19     A  If they're tired or if they ask to sleep,
20 absolutely.
21     Q  All right.  And so would you document in
22 your statements whether the targets were given
23 access to sleep?
24     A  Your client never told me that he was tired

**39**

1  or needed to sleep at the area when I interviewed
2  him.  Had he said to me, "Mr. Garfinkel, I'm
3  tired; I need sleep; I've been deprived sleep,"
4  that would have been documented, and the statement
5  would have been terminated.  It didn't happen.
6      Q  Do you remember my question?
7      A  Yeah.
8         MR. KUHN:  Could we take a break at the
9  next question?
10        MR. AINSWORTH:  Can you answer my question?
11        THE WITNESS:  Could you repeat your
12 question?
13        MR. AINSWORTH:  Sure.  Could you read it
14 back, please?
15     (The Reporter read the question as
16 follows: "All right.  And so would you document
17 in your statements whether the targets were given
18 access to sleep?")
19     A  (Continuing.)  Unless they said to me they
20 weren't given access to sleep, I would not have
21 documented it.
22     Q  Did you -- would you ask targets whether
23 they were tired?
24     A  Yes.

**40**

1      Q  All right.  So that was something you would
2  affirmatively ask?
3      A  Yes.
4      Q  And why would you ask if suspects were
5  tired or targets were tired?
6      A  Because if they were tired, then that
7  might affect their ability to provide an accurate
8  statement.
9      Q  And so then you would document the response
10 that the target provided to your question if they
11 were tired; right?
12     A  Yes.
13     Q  And you would document that because that
14 would demonstrate that they weren't tired at the
15 time that they spoke to you; right?
16     A  Possibly, yes.
17     Q  Did you say possibly?
18     A  Yes.
19     Q  Well, but you agree with me you would
20 document the response to the question if the
21 target was tired when you asked it; right?
22        MR. KUHN:  Form objection.
23        Go ahead.
24     A  Correct.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

41

1  Q  Were you trained -- or you told us that
2  you were trained on what role you were to play and
3  what you were there to do as a felony review
4  Assistant State's Attorney.  What were you trained
5  in that manner?
6      MS. MEADOR:  Objection as to form.
7      MR. MORAN:  Join.
8      MR. KUHN:  Join.
9   A  If a police -- when the police department
10 would bring an individual in that they wanted
11 charges approved for, it was our job to approve
12 those charges.
13     Q  So your job was to approve the charges
14 that the police department was seeking; right?
15     MR. KUHN:  Objection; form,
16 mischaracterizes the testimony.
17  A  I think a more accurate way of saying it
18 is we worked hand in hand with the police department.
19 They would conduct their investigations, and they
20 would seek charges.  Ultimately, of course, Cook
21 County State's Attorney's Office approves those
22 charges, but I think we worked in tandem with them
23 to arrive at that decision.
24     But sometimes police officers left it --

42

1  they would say, "Here's a case, if you feel it
2  should be approved, approve."  And sometimes they
3  would say, "We believe we have enough evidence to
4  approve it.  What is your thought?"  And we would
5  approve it, reject it, or CI it.
6      Q  When you worked in felony review, did you
7  trust the police officers that you worked with?
8   A  Always.
9      Q  When you had a suspect who is willing to
10 make an inculpatory statement to you, would you
11 ask questions to determine what the motive for the
12 crime was?
13     MS. MEADOR:  Objection; form.
14     MR. KUHN:  Join.
15  A  Not -- I can't say it was a hard and fast
16 rule that I always examine motive.  If it came out
17 in a statement and the substantive facts, I may or
18 may not document what that motive was, but it was
19 not always a condition precedent to my -- to
20 approving or rejecting charges.
21     Q  What was the purpose for memorializing an
22 inculpatory statement from a target?
23     MR. MORAN:  Object to form.
24  A  From an evidentiary perspective, it's an

43

1  attractive piece of evidence to have as a
2  prosecutor.
3      Q  It would really help the case -- a truthful
4  inculpatory statement is very powerful evidence of
5  guilt in a subsequent prosecution; right?
6   A  I think that's a fair statement.
7      Q  And if you also have the motive from the
8  suspect, that would assist in the prosecution;
9  right?
10  A  Motive is always a helpful tool.
11     Q  Is there any reason why you wouldn't ask a
12 suspect who is freely confessing what their motive
13 was in committing a crime?
14     MR. KUHN:  Objection; form, incomplete
15 hypothetical.
16     You can answer if you understand the
17 question.
18  A  I may or may not.  Again, you know, it all
19 just kind of depended on the day and the case.
20 But, again, there were, I'm sure times that I
21 would conduct an interview and I would not ask
22 about motive, and I'm sure there were times that
23 targets would, you know, provide me with that
24 motive and it might be documented.

44

1  Q  Is there a single reason you can think of
2  that you would not ask a suspect who is freely and
3  voluntarily confessing why they committed the crime?
4   A  You know, our role in felony review is not
5  to be a trial lawyer; our role in felony review is
6  to review charges.  So I might be cautious; I
7  might be cautious in documenting that motive as if
8  that motive is documented and it later turned out
9  to be not truthful or partially truthful.  It could
10 potentially box that trial lawyer who is litigating
11 the case to be kind of fixed with that motive.
12 And, again, our role there was not to be a trial
13 lawyer.
14     Q  So you would include things or not include
15 things in a suspect's statement in order to make
16 it better for the prosecution?
17     MR. MORAN:  Objection; form, misstates the
18 testimony.
19     MR. KUHN:  Join.
20  A  That's not what I said.
21     Q  Let me -- let me just kind of delve into
22 that a bit.
23  A  Sure.
24     Q  I thought that you said that you would

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

12 (45 to 48)

---

45

1 sometimes not include motive because that might make
2 it harder for a prosecutor later on down the line.
3    **A  I might not include motive --**
4       MR. MORAN:  Hold on.
5       Objection; that misstates his testimony.
6       MR. KUHN:  Join.
7    **A  (Continuing.)  I might not include motive**
8  **if the target or suspect did not include motive in**
9  **his facts; then I might not.  If that target**
10 **freely provided to me his motive, I may or may not**
11 **document it.  I may or may not.  It was not a hard**
12 **rule that I lived by.**
13   Q  Okay.  So why wouldn't you document the
14 motive provided to you by a target as to why he or
15 she committed a crime?
16      MR. KUHN:  Objection to form; incomplete
17 hypothetical.
18   **A  Because that motive might be consistent**
19 **with the evidence.  It might be consistent.  And**
20 **then if they're including it in their statement,**
21 **then I would document it.  But if they didn't**
22 **provide me with a motive, I may or may not inquire**
23 **about that.**
24   Q  So now you're saying if they provide you a

---

46

1 document, you would always document --
2    **A  If they provide me a document?**
3       MR. MORAN:  Objection.
4       MR. AINSWORTH:  I'm sorry; I got it wrong.
5  I'm withdrawing the question.
6    Q  So you're saying if the target provided
7  you with a motive, you would always document it?
8    **A  I didn't say that.**
9    Q  No?
10   **A  I said I may or may not.**
11   Q  Okay.  And I'm -- and you've told me that
12 one reason why you may not include the motive is
13 because it might make it harder for the trial
14 prosecutor down the line; is that correct?
15   **A  I said or it may not be a truthful motive,**
16 **and I didn't want to corner or I didn't want to**
17 **limit the prosecutor's theory to a statement I'm**
18 **taking when I don't have an expansive view of the**
19 **case or the evidence.**
20   Q  So you didn't want to hurt a potential
21 prosecution by documenting what the suspect was
22 telling you was the motive for the crime?
23      MR. MORAN:  Objection; form.
24      MR. KUHN:  Join.

---

47

1    **A  Or hurt a suspect if he provided me an**
2  **untruthful motive.**
3    Q  And so you were trying -- you were trying
4  to help the suspect by not documenting what the
5  suspect told you?  Is that what you're saying?
6    **A  A prosecutor represents the people of the**
7  **State of Illinois.  A suspect or target also falls**
8  **into that class of the people of the State of**
9  **Illinois.  I only wanted to document truthful**
10 **statements in either oral, written, or court**
11 **reported form.**
12      **If -- and I don't have a specific case**
13 **that comes to my mind, but if I felt that a target**
14 **or suspect was providing an untruthful motive, I**
15 **might not -- I might not document that just based**
16 **on the cautiousness that I wanted to make sure**
17 **that I documented truthful and accurate facts.**
18   Q  If a suspect had previously provided a
19 false alibi, would you document the fact that the
20 suspect provided a false alibi prior to making an
21 inculpatory and free and voluntary confession?
22   **A  I would not document that false alibi in a**
23 **handwritten statement.**
24   Q  What I mean by that, would you document

---

48

1 the fact that the suspect is now admitting that
2 they had previously provided a false alibi, but
3 that false alibi was, in fact, false?
4    **A  No, because felony review's job is not to**
5  **do that.  That would -- that would be really -- if**
6  **I could be so bold as to say I believe that would**
7  **have been the duty of the detective in a cleared**
8  **close report to document all of the consistent or**
9  **inconsistent statements.  Our job was just to**
10 **document that final statement.  If indeed we**
11 **believed it was truthful and credible, then we**
12 **would document that.**
13   Q  What is a cleared close report?
14   **A  You know what a cleared close report is.**
15   Q  Do you know what a cleared close report is?
16   **A  I do.**
17   Q  What is a cleared close report?
18   **A  Cleared close report is that final report**
19 **that a detective makes indicating review has come**
20 **on scene and that they've then either approved or**
21 **rejected charges.  That's the final report that's**
22 **made by the -- by one or several of the lead**
23 **detectives on any felony case.**
24      MR. KUHN:  Counsel, we're going to take a

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

13 (49 to 52)

49

1  quick break before the next question; I'm sorry.
2        MR. AINSWORTH:  Sure.
3        THE VIDEOGRAPHER:  Off the record, 11:04.
4        (Recess taken, 11:04 a.m. to 11:10 a.m.)
5        THE VIDEOGRAPHER:  Back on the record, 11:10.
6  BY MR. AINSWORTH:
7     Q  Were you trained that you had discretion
8  to interview whichever witnesses or targets you
9  wanted to once you were at an area determining
10 whether to approve charges?
11    A  No.
12    Q  Who determined which witnesses or targets
13 you would interview?
14    A  I suppose it was the detective who was
15 assigned to the case would provide -- but there
16 were times when I would interview a witness that a
17 name would come up, and I might supply that
18 detective with that name.  So I guess actually
19 there probably were times that, in the course of an
20 interview, a name was discovered that had not been
21 previously learned and then I would -- would have
22 provided it and then that individual may have been
23 brought in.
24    Q  When you actually went out to an area to

50

1  conduct your duties as a felony review Assistant
2  State's Attorney, would you meet with the
3  investigating detectives to learn about the case?
4     A  Of course.
5     Q  And as part of that conversation with the
6  detectives, would you determine which witnesses
7  were at the area and available to be interviewed?
8     A  Yes.
9     Q  And did you have discretion as to -- as far
10 as the individuals who were present at the area,
11 the witnesses and the targets, did you have
12 discretion as to which of those you could interview?
13    A  I suppose.
14    Q  When you say "suppose" -- you "suppose,"
15 what do you mean?
16    A  I don't -- I don't remember this; I didn't
17 take notes but I can't imagine there would have
18 been a case that detectives brought a witness to
19 the area that I unilaterally said, "I don't want
20 to interview them."  I would have tried to conduct
21 an as exhaustive and complete evaluation as
22 possible.
23        So that would have meant I would have
24 interviewed everybody that was there, and then if

51

1  additional names came up in the interview, I would
2  request that the detectives get those individuals.
3  I'm sure that happened.
4     Q  If there are, say, four targets in an
5  investigation, and all four are present at the
6  area, would you want to talk to all four of the
7  targets in order to determine what each one of
8  them was saying about their own and the other's
9  culpability?
10    A  Yes.
11    Q  For murders did you have to consult with a
12 supervisor before approving charges?
13    A  Always.
14    Q  For murders did you have to consult with a
15 supervisor before obtaining a handwritten or court
16 reported statement?
17    A  Yes.
18    Q  What was your purpose for contacting the
19 supervisor before obtaining a handwritten or court
20 reported statement?
21    A  Well, all cases are important and the Cook
22 County State's Attorney's Office treats all cases
23 with equal importance, but, of course, the
24 consequences of a murder case, you know, there's a

52

1  dead person versus a theft case.
2        So the rule was when it came to cases other
3  than murder cases and I think sex cases, you could
4  procure a statement oral, handwritten, or court
5  reported without the need for supervisor approval.
6  But when it came to murders and maybe sex cases --
7  murders for sure because of the gravity of the
8  case, that had to be run by supervisors to let
9  them know that this is what the investigation was,
10 and we would be taking either handwritten, court
11 reported, or oral statement.
12    Q  When you were trained how to fill out the
13 felony review folder, how were you trained to fill
14 it out?
15    A  Accurately and as -- just accurately.
16    Q  Were you trained to fill out the felony
17 review folder while you were at the area, for a
18 murder case, I should say?
19    A  I don't think that was a rule that it had
20 to be out of the area.  It just had to be done --
21    Q  And so --
22    A  Before you left your shift on that murder,
23 that felony review jacket was done.  Where it was
24 done didn't matter.

53

1   Q  Would you -- would you start filling out
2   the felony review folder or jacket while you were
3   at the area, or would you do it after you left the
4   area?
5       A  It varied.
6       MR. KUHN:  Objection; form, incomplete
7   hypothetical.
8       A  (Continuing.)  It varied.
9       Q  What did it vary -- what caused it to vary?
10      A  Nothing specific.  Just there was no fixed
11  rule as to where you had to complete your jacket.
12      Q  Where would you take notes if you wanted
13  to take notes?
14      MR. KUHN:  Objection to form.
15      A  I didn't take notes.  I just filled out
16  that jacket.
17      Q  Why didn't you take notes?
18      A  I didn't need to take notes.  I don't
19  think any of -- I can't speak for everybody.  I
20  never took notes.
21      Q  Why didn't you need to take notes?
22      A  I would listen carefully to what the
23  target said.  I had the jacket right there to
24  document the narrative if it was an oral statement.

54

1   The handwritten statement I would listen carefully
2   to the conversation; I would document it, and I
3   would go through with the suspect that statement
4   and inquire if this was an accurate documentation
5   of what he or she said, and that would equally
6   apply to the court reported.
7       So I was able to document any one of those
8   three statements and then have that target agree
9   or disagree as to whether or not it was accurate,
10  so no need to take notes.
11      Q  Were you trained in how to obtain an
12  inculpatory statement from a suspect who had not
13  yet confessed?
14      MS. MEADOR:  Objection to form.
15      MR. MORAN:  Join.
16      MR. KUHN:  Join.
17      MR. AINSWORTH:  Let me withdraw the
18  question and change it.
19      Q  Were you trained in how to elicit an
20  inculpatory statement from somebody who had not
21  yet implicated themselves in a crime?
22      MR. MORAN:  Objection.
23      MR. KUHN:  Join.
24      A  We were just trained to ask individuals

55

1   what had happened, ask open-ended questions, and
2   then in the event that we had additional information
3   either by way of a cotarget or cosuspect or any
4   other form, we oftentimes would confront that
5   individual with the hopes that that would kind of
6   encourage or promote that individual to give a
7   truthful statement.  If it happened to be
8   incriminating, it would be incriminating; if it
9   was exculpatory, it was exculpatory.
10      Q  What were you trained to do in terms of
11  confronting the target with information?
12      A  If we were provided extrinsic evidence
13  which was inconsistent with what the individual or
14  target told us, we would then show or relate to
15  that target what that inconsistent evidence was,
16  and then we'd wait to see what that target did.
17      Q  What do you mean by "extrinsic evidence"?
18      A  Well, let's just say hypothetically -- and,
19  again, we're going back many, many years ago -- if
20  we had extrinsic testimonial evidence or evidence
21  that would lead to testimonial evidence, let's say
22  that a third party would say X, and the target is
23  saying Y, we would confront that target with the
24  interrogation -- not interrogation -- the interview

56

1   of why and say, "Well, someone else is telling us
2   something different; is your position still the
3   same," and we would wait to see what that individual
4   would to.
5       Q  So you would confront the -- or you might
6   confront the target with statements provided by
7   third parties?
8       A  Or documentary evidence on a forgery case,
9   for example.
10      Q  Like confront them with their own signature
11  on a document?
12      A  Maybe, maybe, maybe.
13      Q  You're aware that false confessions can
14  occur; right?
15      A  I am aware of that.
16      Q  Have you filed motions to suppress?
17      A  Based on false statements?
18      Q  Yeah.
19      A  I have.
20      Q  And as a criminal defense attorney, you
21  have to have a basis to make such a filing; right?
22      A  That's correct.
23      Q  And then how often have you filed motions
24  to suppress?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

15 (57 to 60)

57

1    A  Based on what theory, a Fourth Amendment
2  theory, a Sixth Amendment, Fifth Amendment?  What
3  theory?
4    Q  To suppress an inculpatory statement.
5    A  Sixth Amendment, okay, motion to suppress
6  a statement only, not evidence, a statement?
7    Q  Correct.
8    A  Multiple times.
9    Q  When you say "multiple," like what do you
10  mean?  Hundreds?
11    A  I wouldn't say hundreds.  I wouldn't say
12  hundreds.  I'd say in my career -- I'm guessing --
13  I'm guessing I probably filed 25 motions to
14  suppress statements.  Suppressing evidence,
15  hundreds.  Statements alone, probably 25 to 50 in
16  my career probably.
17    Q  Have you been successful in any of those?
18    A  On suppressing statements?
19    Q  Yeah.
20    A  I was on one in front of Judge Egan,
21  People v. José Huerta, but then he reversed
22  himself.  He reversed himself.  That was the only
23  motion to suppress statement I was successful on I
24  think.  Maybe there were other ones, but that one

58

1  just stands out in my head.
2    Q  In your career in felony review, did you
3  ever obtain an inculpatory statement from a
4  suspect who up to that point had not inculpated
5  himself in a crime as far as you knew?
6    MS. MEADOR:  Object to the form.
7    A  I'm not sure if I understand the question.
8    Q  Sure.  I appreciate you telling me that.
9    So in the situation where you're
10  interviewing somebody who is a target but has not
11  made an inculpatory statement --
12    A  Not, okay.
13    Q  -- and then you speak to the person, and
14  now, lo and behold, they are now inculpating
15  themselves?
16    A  Yes.
17    Q  Has that happened?
18    A  Yes, it has.
19    Q  On how many occasions has that happened
20  while you were in felony review?
21    A  I can't remember.  I couldn't begin to
22  give you a number.  I just can't.
23    Q  Was that one of the purposes of you going
24  to the area was to elicit inculpatory statements

59

1  from targets?
2    MR. KUHN:  Objection; foundation.
3    MR. MORAN:  Misstates the testimony.
4    MR. KUHN:  Join.
5    A  My purpose in going to the area or to a
6  district station was to evaluate evidence and
7  then, based on the evaluation, make a
8  determination if that case should be approved,
9  rejected, or CI'd.  That was my role.
10    Q  What did you do to prepare for this
11  deposition?
12    A  I met with Mr. Kuhn several times.  I read
13  the handwritten statement I created in Fulton.  I
14  read the court reported statement I take in Nevest
15  Coleman.  I think I read Mike -- I think I read
16  Mike Barber's statement.  I don't remember it.  I
17  think Shaunice Williams, I think she gave a
18  handwritten statement; I read that.  And I may
19  have read the felony review jacket and then the
20  trial testimony and then both motions to suppress.
21  There were motions to suppress on both your guys'
22  clients, so I read that, too.
23    Q  Did you review the felony review jacket
24  for both Coleman and Fulton?

60

1    A  I think I did.  I think I did.
2    Q  And when you say the motions to suppress
3  and the trial testimony, do you mean your own?
4    A  Yes.
5    Q  Did you review the transcript of any
6  person other than you?
7    A  Well, I read the -- reviewed Nevest Coleman's
8  court reported.  That's a transcript.
9    Q  Fair.
10    A  Besides that, no.
11    Q  When did you meet with Mr. Kuhn to prepare
12  for this?
13    A  We met two or three times over the course
14  of the last 6 to 10 months at his offices downtown
15  Chicago.
16    Q  When was the last time that you met?
17    A  Within the last two weeks.
18    Q  Who was present for that meeting?
19    A  Mr. Kuhn and myself.
20    Q  And for how long did you meet?
21    A  About an hour.
22    Q  And when was the last time before that
23  that you met?
24    A  Maybe -- maybe two months before then, a

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

16 (61 to 64)

61

1 month or two months maybe.
2    Q  And how long was that meeting?
3    A  About -- again, about an hour.
4    Q  And who was present for that meeting?
5    A  Me and Mr. Kuhn.
6    Q  And did you meet with him prior to that?
7    A  We met, I think one other time.  I think
8  his supervisor -- I don't know his name; I just
9  can't remember right now -- kind of popped his
10 head in, and we had a quick conversation, too.
11   Q  And how long did you -- how long did that
12 meeting last?
13   A  Again, about an hour.
14   Q  When you met with a target in felony review,
15 did you understand that you wanted to determine if
16 the statement that was being given to you was a
17 truthful statement?
18   A  Always.
19   Q  And so did you understand that one of the
20 ways in which you determined if the statement was
21 truthful or not was to listen to the information
22 being provided to you and see if you could
23 corroborate that information by facts that were
24 not publicly available?

62

1    A  When you say "not publicly available,"
2  well, those facts were not given to me by the
3  detective at the area?
4    Q  No, I mean not publicly available, meaning
5  hadn't been released in a newspaper report or --
6    A  Sure.  Sure.  I would --
7       MS. MEADOR:  Hold on.
8       MR. MORAN:  Hold on.  I'm going to object
9  to the form of the question.
10      MS. MEADOR:  I'm going to object to the
11 form of the question and foundation.
12      MR. KUHN:  Join.
13   A  (Continuing.)  Anytime a felony review
14 assistant has extrinsic corroborative facts of a
15 given statement, that's always important to
16 evaluate the truthfulness of that statement.
17   Q  And so you would not want to taint that
18 truth seeking process by, for example, telling the
19 suspect the caliber of the gun that was used in
20 the crime before the suspect provided that
21 information to you; is it fair to say?
22      MR. KUHN:  Objection; form, incomplete
23 hypothetical.
24      You can answer if you understand the

63

1  question.
2    A  I can't say that in my tenure at felony
3  review that I didn't interview a target of a gun
4  case and disclose the caliber prior to an
5  inculpatory or exculpatory statement.  I can't say
6  that but I typically would ask open-ended
7  questions hoping to gain -- to get -- to collect
8  facts that had not been previously disclosed by me
9  to that target.
10   Q  And I guess that's what I'm getting at.
11 Did you know that you weren't supposed to feed
12 information to a target?
13   A  Yes, of course.
14   Q  All right.  And so you wanted to be sure
15 that the information being provided to you by that
16 target was coming from them and not them parroting
17 information that you had provided to the --
18   A  Always.
19   Q  -- target?
20   A  Always.
21   Q  How did you learn that Mr. Coleman and
22 Mr. Fulton were being released from prison?
23      MR. KUHN:  Objection; foundation.
24   A  I don't remember if somebody from the

64

1  State's Attorney's Office called me or if I read
2  about it in the -- in the papers and the internet.
3  I don't remember which -- how I found that out.
4    Q  Did anyone from the Conviction Integrity
5  Unit ever interview you?
6    A  Yes.
7    Q  When did they interview you?
8    A  I think shortly before the release of
9  either Fulton or Coleman.
10   Q  And who was it that interviewed you?
11   A  Gina Savini interviewed me.
12   Q  Was this in person or over the phone?
13   A  Both.
14   Q  So tell me about the phone interview --
15 well, which came first?
16   A  For sure the phone interview.  And she
17 said -- she asked me if I would come and discuss
18 my involvement in the Coleman/Fulton case, to
19 which I said sure.  And I also received a phone
20 call -- received a telephone call from, I think
21 her boss then, a guy named Mark.
22   Q  Mark Rotor?
23   A  I think, yeah.
24   Q  Did you know Gina?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

---

65

1   A   Yeah, we were in review together.  Her
2   husband and I were on the same team.
3   Q   And who is her husband?
4   A   Greg Vaci.
5   Q   I'm sorry; could you say --
6   A   Greg Vaci.
7   Q   How is that last name spelled?
8   A   I think it's V-a-c-i.
9   Q   And so Gina was part of felony review at
10  the same time that you were in felony review; is
11  that fair to say?
12  A   Yes.
13  Q   Were you -- and can you describe what you
14  mean by a felony review team?
15  A   Sure.  Review is comprised of two teams
16  that work each day 12-hour shifts, morning shift,
17  evening shift.  I think there were six to nine
18  assistants that covered the day shift, six to
19  nine assistants that covered the night shift.  I
20  think there were a total of six teams.  That goes
21  365, 365 days a year.
22  Q   And the teams would be assigned to different
23  physical locations?
24  A   Exactly, exactly.

---

66

1   Q   Where were the physical locations?
2   A   There was north side, south side, west
3   side, and then kind of, for lack of a better word --
4   it was still south but we considered that more of
5   a central area.  That would have been Area 1 at
6   51st and Wentworth.
7   Q   And when you were assigned to south, where
8   would that location be?
9   A   Area 2, which is now called Area South,
10  111th Street.
11  Q   So if you were working Area -- or if you
12  were working south, you would report to Area 2?
13  A   You could do 26th Street, you know, in the
14  building, and if a call came out, you might find
15  yourself at Area 2, or you might find yourself at
16  one of the south district stations like the
17  5th District, or the 2nd District, or whatever.
18  You wouldn't necessarily report solely to the area
19  but you might.
20  Q   Sorry; what I mean is, when you would
21  start work, if you were assigned to the south,
22  where would you go?
23  A   It varied.  Sometimes we would just go
24  right to the area.  Sometimes we would just go to

---

67

1   26th Street and then just wait for a call to come
2   in, and then we'd go to the area.  No hard and
3   fast rule how that worked.
4   Q   When you -- you would meet with your team
5   when you first started work; is that right?
6   A   If it wasn't a formal meet, but we'd all
7   just go down there, and some people would go up
8   north if they were working north and just -- they
9   might just split.  Otherwise, you might just have
10  a couple guys hang out at 26th Street, or you
11  might just go to the area and wait to see what
12  happens there.
13  Q   So you had an office at 26th and Cal; is
14  that right?
15  A   We did.  We did.
16  Q   And Assistant State's Attorney from which
17  geographic location would cover Area 1 at 51st and
18  Wentworth?
19  A   Which State's Attorney?  You -- the team
20  would be broken down into the different respective
21  geographical areas, and there might be one or
22  two people covering Area 1 and a couple handling
23  south and north.  There was no rhyme or reason to
24  the assignment.

---

68

1   Q   When you were assigned to felony review
2   for a particular day, would you know whether you
3   were going to be assigned to south --
4   A   Yes.
5   Q   -- or to north?
6   A   Yes, yes.
7   Q   And so, I guess if it's -- I'm trying to
8   figure out if there's a south, a north, and a
9   west, who would -- who would be covering 51st and
10  Wentworth?
11  A   That's why I said to you -- there was for
12  sure the south, the north guys, and the west guys,
13  and then there were -- and then there were the guys
14  who were covering Area 1.  Could they have been
15  south-side guys?  It's possible.  It's possible
16  the south side included Area 2 and Area 1.  I
17  don't remember how they parsed Area 1 relative to
18  Area 2.
19  Q   And was Gina on a different team when you
20  were back in felony review?
21  A   Gina and I were not on the same team.
22  Q   So Gina asked you if you would be willing
23  to come in and discuss; you said you would.  Did
24  you have any other conversation with Gina in that

---

69

1 telephone conversation?
2    A In that -- I think we spoke several times
3 on the phone, and I believe both conversations
4 were just kind of -- the purpose of it was just to
5 kind of logistically set up the face-to-face
6 meeting. I believe that was what it was.
7    Q Did you have any discussion with Gina
8 Savini on the phone about the facts of this case?
9    A I don't believe so.
10    Q How many times did you speak to Mark on
11 the phone?
12    A I think once.
13    Q And what conversation did you have with
14 Mark on that phone call?
15    A Also just about setting up the logistics
16 to have a face-to-face with either Mark and Gina,
17 or Gina alone, or Gina and her partner, some other
18 woman whose name escapes me; I apologize.
19    Q So when you say logistics, do you just
20 mean coordinating schedules or something else?
21    A Exactly, exactly.
22    Q How many times did you have an in-person
23 meeting with people from the Conviction Integrity
24 Unit?

71

1    A With regards to both I told -- I would have
2 given as best I could the general timeline involving
3 the procurement of Coleman's court reported
4 statement and then a follow-up handwritten on
5 Fulton. I would have given, as best I could, the
6 timeline of that, how that worked.
7    But I don't -- you know -- and she -- and
8 she may have shown me a copy of the court reported
9 statement. She may have. And she may have shown
10 me a copy of the handwritten on Fulton. I don't
11 remember if she showed me those statements or not.
12    Q What did Gina or her partner say to you
13 during that in-person interview?
14    A She just asked me to provide as much of a
15 personal recollection I could of my contact with
16 Nevis Coleman and Derrell Fulton. That was about it.
17    Q How long did the interview last?
18    A Also about an hour.
19    Q Did they ask you any questions that
20 surprised you?
21    A No.
22    Q Did they tell you that there's -- that
23 there were DNA results that were casting some
24 doubts on the convictions?

70

1    A Once.
2    Q And do you know when that was?
3    A I don't. I was trying to think about that
4 now. I don't remember.
5    Q And who did you meet with?
6    A Gina. I don't know if Mark was there or
7 not. Maybe -- he may have been there. And then
8 Gina had a partner; I just don't remember her
9 name. A woman.
10    Q And what conversation did you have with
11 Gina and her partner and possibly Mark?
12    A It wasn't Mark; I can say that. It would
13 have been Gina and her partner. Just some of the
14 substantive facts about the investigation involving
15 Coleman/Fulton.
16    Q What substantive facts did you talk to her
17 about?
18    A Facts and circumstances surrounding the
19 taking of the court reported statement on Coleman,
20 facts and circumstances surrounding the taking of
21 the handwritten statement of Fulton.
22    Q I understand you talked about facts.
23 Which facts did you discuss? Tell me what you
24 told her.

72

1    A I think she told me that there was an
2 additional sample that had been recovered from the
3 victim's garments that -- that had a DNA profile
4 other than -- I think she said other than Fulton
5 or Coleman.
6    Q Did she tell you that the DNA profile was
7 linked to a person who had been accused of several
8 rapes?
9    A She might have. I don't remember. She
10 might have said that.
11    Q How did you feel about Nevest Coleman and
12 Derrell Fulton being released from prison?
13    MR. KUHN: Objection to the form;
14 compound.
15    A I don't really have a feeling about it.
16    Q You don't care one way or the other
17 whether their convictions were vacated or not; is
18 that true?
19    MR. KUHN: Objection; argumentative.
20    A I don't really have an opinion.
21    Q Do you have an opinion as to whether
22 Derrell Fulton or Nevest Coleman are guilty?
23    A Based on my conversations with both Coleman
24 and Fulton and the fact that they were so --

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

73

1   certainly -- based on my contacts with both of
2   those individuals and the fact that they gave me
3   incriminating statements, and based on the fact
4   they told me that they were treated well by law
5   enforcement, and based on the fact that I didn't
6   see anything which would contradict that, then the
7   fact that they were convicted was consistent with
8   the evidence I had.  The fact that they were later
9   exculpated, I haven't really formed an opinion as
10  to that.
11      Q   When you worked felony review, would you
12  work a particular shift?
13      A   We worked either the morning shift or the
14  evening shift based on just the kind of calendar
15  schedule and how it worked out.
16      Q   And what was the time of the morning shift
17  and the evening shift?
18      A   I think -- I think it formally started at
19  6:00 a.m. and formally went to 6:00 p.m. unless
20  you picked up a case that potentially could kind
21  of matriculate beyond your shift.  That could
22  happen.  You could go beyond your time.
23          You'd usually arrive half an hour before.
24  So if it was a morning shift, you typically would

74

1   arrive 5:30 or close to, and that evening shift
2   you might get there 5:30 p.m. for a 6:00 p.m.
3   shift and then work through the night.
4       Q   And would you remain on one shift for a
5   period of time and then switch, or how would
6   it work?
7       A   Right.  I think you did a month of days,
8   then a month of nights.  I think you went a month
9   at a time.  I'm almost sure you did.
10      Q   And would it change with the calendar
11  month, or how was that calculated?
12      A   It wasn't based on the calendar month.  It
13  was just based on, you know, if you worked days,
14  you did days for a month.  You did that for month
15  and then you'd go to nights.  But the initial
16  assignment, I don't know if that was based on a
17  month.  Then you were just given another day
18  shift, and it would consecutively -- successfully
19  follow.
20      Q   Would you have some time off before you
21  switched from the morning shift to the evening
22  shift?
23      A   You worked three days on and had three days
24  off for your specific shift, and that would go for

75

1   a month's time, and then you would have, I believe
2   no time off and then start your next shift, then
3   work three days on, have three days off, if that
4   was clear.
5       Q   So you would have three days off, and then
6   you would start your next shift when you were
7   transitioning to a new -- a new schedule?
8       A   Yes.
9       Q   Which shift were you working on
10  April 29th, 1994?
11      A   That was my first contact in the
12  investigation, right?
13      Q   That's correct.
14      A   I would have worked the morning shift.
15      Q   And so what time did you arrive that day
16  for work?
17      A   Sure.  I would assume I would have gotten
18  on -- I tried to be as punctual as possible.  I
19  probably would have arrived somewhere at 5:30 p.m.
20  to start a 6:00 a.m. shift.  I probably would have
21  gone to 26th Street or met at a restaurant.  We
22  all met at restaurants oftentimes just to kind of
23  get ready.
24      Q   Did you have any kids then?

76

1       A   I got married out of review.  No.
2       Q   And so -- and you would have -- do you
3   recall where you reported for work that day?
4       A   No.  I have no idea.
5       Q   So you don't know if it was 26th Street or
6   a restaurant or an area?
7       A   That's fair.  I don't know.
8       Q   When you fill out your felony review
9   jacket, at the top there's a time.  What does that
10  time refer to on the first page?
11      A   I don't remember.  I don't remember
12  honestly, no.
13      Q   Do you recall anything you did the morning
14  of April 29th, 1994, before learning about the
15  murder of Antwinica Bridgeman?
16      A   No.
17      Q   What is your first recollection of learning
18  about this case, the murder of Antwinica Bridgeman?
19      A   When I would have gotten the dispatch
20  call, wherever I was, to report to Area 1, that
21  would have been my first contact.
22      Q   So you had a pager?
23      A   Yeah, we had pagers.
24      Q   So cell phones?

77

1    A  No.  But it's funny; we got cell phones.
2 I remember that became the new -- the new wave.  I
3 got my first cell phone while in felony review.
4    Q  All right.  So you might have had a cell
5 phone at this time?
6    A  I didn't.  I think it was a pager.
7    Q  How do you know you didn't have a cell
8 phone at this time?
9    A  I didn't get a cell phone until the very,
10 very end of felony review.  I just remember
11 that fact.
12    Q  And so what were you told about this case
13 from dispatch?
14    A  Just report to Area 1, there's a murder
15 investigation.  That's all I would have been told.
16    Q  And you didn't know anything more than the
17 fact that there was a murder at Area 1; correct?
18    A  The murder wasn't at Area 1, that there
19 was a murder investigation being conducted at
20 Area 1.
21    Q  Fair.  I appreciate the clarification.
22 But that's all you knew; right?
23    A  Right.
24    Q  And so then what would you have done -- or

78

1 strike that.
2       What did you do after receiving that
3 dispatch call?
4    A  Went to Area 1.
5    Q  How did you get there?
6    A  I would have driven a felony review car.
7    Q  And where did you have to go to get a
8 felony review car?
9    A  In the parking lot of 26th Street we kept
10 our cars.
11    Q  Did you take the felony review car home?
12    A  On that date or other days?
13    Q  On that date.
14    A  Take it home?
15    Q  Yeah.
16    A  You weren't allowed to go home.
17    Q  Sometimes people get a car, a work car
18 that they can bring home.  Did you have a work car
19 that you could bring home?
20    A  The felony review car was not allowed to
21 be brought to your home.  It had to stay either at
22 a district station, and area station, or 26th Street,
23 or a restaurant, you know, involving felony review
24 business.  Those were the only places those cars

79

1 were taken.
2    Q  So you had to pick up a car in order to
3 get to Area 1; right?
4    A  I did.
5    Q  And where did you pick up the car for
6 this day?
7    A  I don't know.  Probably would have been
8 26th Street parking lot.
9    Q  And how far would it take -- how long
10 would it take you to get from 26th and Cal to
11 Area 1 at 6:00 a.m.
12    A  15 minutes.
13    Q  Do you recall what time it was when you
14 arrived at Area 1 on this case?
15    A  Sometime before 9:00.  Probably 7:00 or
16 8:00.  Maybe 8:00 or something maybe.
17    Q  Did you work on any cases before working
18 on this case?
19    A  I don't remember.
20    Q  So you arrived at Area 1, and what did
21 you do?
22    A  I would have gone upstairs to the detective
23 division, and I would have met with the -- the
24 head detective or one of the -- one of the

80

1 detectives working the case.  I think that was
2 Mike Clancy.  I think his name is Mike.  Detective
3 Clancy.
4    Q  It is Mike.  But that's who you recall
5 meeting with?
6    A  Yeah.
7    Q  Have you worked with Mike Clancy since?
8       MR. MORAN:  Object to form.
9    A  Since when?
10    Q  Since April 29, 1994.
11    A  Did I have other cases with Clancy while I
12 was a State's Attorney or as a defense attorney?
13    Q  Both.
14    A  I mean, I'm sure Clancy's name's been on
15 paper.  I've been practicing 25-plus years.  I'm
16 sure Clancy's name was on paper subsequent to the
17 Nevest Coleman investigation, and I'm sure Coleman
18 wasn't my last case as a felony review assistant,
19 and I went to preliminary hearing court, so I'm
20 certain Clancy's name was on paper that I worked
21 on as a prosecutor, though I don't have direct
22 recollection, personal recollection of it.
23    Q  Have you worked with Mike Clancy's son?
24    A  A detective or a lawyer?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

81

1  Q  Lawyer.
2  A  I know a couple Clancys.  I didn't know
3  that was -- it might -- maybe.  I don't think so.
4  I certainly wouldn't have worked with because I'm
5  a private lawyer, I work for myself.  So the answer
6  to that actually would be no.
7  Q  I mean where you're representing codefendants
8  in the same case or something like that.
9     MS. MEADOR:  Object to foundation.
10    MR. MORAN:  Objection.
11    MR. KUHN:  Join.
12  A  We've never worked as codefendants.
13  Q  All right.  So you met with one of the
14 detectives, Mike Clancy.  Where did you meet with
15 Mike Clancy?
16  A  It would have been the second -- second
17 floor of Area 1, a big room.
18  Q  You mean the detectives area?
19  A  Yeah.
20  Q  The open area?
21  A  Yeah.
22  Q  Not in an office?
23  A  No.  We would have met in an open room.
24  Q  And what did you say to Mike Clancy at

82

1  that time, and what did he say to you?
2  A  I said, "I'm here from felony review.  I
3  understand there's a murder investigation going on,"
4  and I think he communicated to me at that point
5  that he had already interviewed Nevest Coleman and
6  that Nevest Coleman had provided an incriminating
7  statement regarding his involvement in the -- is
8  it Bridgeman, is that her name? -- Ms. Bridgeman's
9  death.
10  Q  Did you know Mike Clancy before
11 April 29, 1994?
12  A  Only in a professional manner.  I had other
13 cases with him.
14  Q  So you had had other cases with him?
15  A  For sure, for sure.
16  Q  Do you recall any of the cases that you
17 had worked with Mike Clancy before then?
18  A  I don't.
19  Q  Had you worked cases before with Bill Foley?
20  A  Sure.
21  Q  Do you recall any of those cases?
22  A  I don't.
23  Q  Had you worked cases with Kenny Boudreau?
24  A  Of course.

83

1  Q  Why do you say "of course"?
2  A  Because he's part of the team there.  He
3  was there.
4  Q  Do you recall any of those cases?
5  A  I don't.
6  Q  Had you worked cases with Jack Halloran?
7  A  Jack Halloran, yes.
8  Q  Do you recall any of those cases?
9  A  I don't.
10  Q  Had you worked any cases with Al Graf?
11  A  Al Graf, yes, many cases.
12  Q  And do you recall any of those cases?
13  A  I don't.
14  Q  How about Jim O'Brien?  Had you worked
15 cases with him before?
16  A  Sure.
17  Q  Do you recall any of those cases?
18  A  No.
19  Q  How about Bill Moser?  Had you worked
20 cases with him?
21  A  Yes.
22  Q  And do you recall any of those cases?
23  A  I don't.
24  Q  How about Stan Turner?  Do you recall

84

1  working with him?
2  A  That name doesn't pop out, but it's quite
3  possible I did work with him.  I don't remember
4  Mr. Turner personally.
5  Q  Did you review any police reports in
6  preparation for this deposition?
7  A  I don't believe I did.  I might have but I
8  don't -- I don't remember.
9  Q  When you worked felony review, would you
10 obtain the cleared close sup?
11  A  No.  It wasn't generated at that point.
12  Q  Would you review the cleared close sup
13 before you had to testify at a motion to suppress?
14  A  Yes, of course.
15  Q  Would you review -- do you recall reviewing
16 the cleared close sup in this case before you
17 testified at either of the motions to suppress?
18  A  I know when the State's Attorney is
19 handling cases, list of cases probably they had a
20 cleared close report there.  Did they show it to
21 me or did I review it?  I might have at the motions
22 to suppress or the trial, but I don't have personal
23 knowledge today -- remember reviewing it prior to my
24 trial testimony or prior to my motions to suppress.

85

1  I don't remember reviewing it.
2      MR. AINSWORTH:  Let's mark this as
3  Exhibit 1, please.
4      (Garfinkel Deposition Exhibit 1 marked for
5  identification and attached to the transcript.)
6      Q  All right.  Sir, I'm showing you what's
7  been marked as Exhibit 1, which is the cleared
8  close sup report in this case.  It's a long one,
9  so you're welcome to read it if you'd like, but
10  I'm going to turn -- direct your attention to
11  page 12 of the report.
12      A  Sure.
13      Q  You see there's a middle paragraph that
14  starts with --
15      A  "The R/Ds then notified"?
16      Q  Before that, the one above that.
17      A  Yes, sir.
18      Q  So it says that they confronted Coleman
19  with the fact that the family of the victim told
20  the detectives that the victim never returned home
21  on that night, and at that time Coleman stated
22  that he again was not truthful, and he now wanted
23  to tell the detectives the entire truth.
24      He stated after he left the party with

86

1  Williams and Calimee, he left them at 56th and
2  Green Street and went to the liquor store at
3  55th and Halsted.  He then stated he returned to
4  the area, and at that time he saw the victim
5  Bridgeman and Chip and Dap talking to the victim
6  in the alley behind his house.
7      He then went on to say that he then sees
8  the victim and Chip and Dap go into his basement.
9  He then stated that after a short time he went to
10  the basement door to observe the victim orally
11  copulating Chip, and she was also engaged with Dap
12  in anal intercourse.  He then went on to say that
13  he became frightened and ran to his apartment one
14  floor above the crime scene where he remained for
15  the rest of the night.
16      And then do you see the next paragraph, sir?
17      A  Yes.
18      Q  It says, "The detectives then notified
19  Assistant State's Attorney Garfinkel of the felony
20  review unit, who responded to the Area 1 violent
21  crimes.  Garfinkel then arrived at Area 1 and was
22  then made aware of the status of this investigation.
23  At that time ASA Garfinkel and the detectives had
24  occasion to interview Coleman.  ASA Garfinkel then

87

1  introduced himself and explained to Coleman his
2  function as a State's Attorney, and at that time
3  he informed Coleman of his constitutional rights,
4  which he stated he had understood.  Coleman then
5  went on to say that he wanted to tell the entire
6  truth and at that time stated the following."
7      Do you see that, sir?
8      A  Yes, sir.
9      Q  All right.  So do you see that, according
10  to the sup report, at the time that you arrived at
11  the area, Mr. Coleman was saying that he was a
12  witness to a crime that was committed by two other
13  people -- or potential crime -- and that he
14  didn't -- and at least according to the report, he
15  didn't have any involvement in it; is that right?
16      MR. MORAN:  Form -- hold on.
17      MR. KUHN:  Objection; form, foundation,
18  speculation.
19      MR. MORAN:  Join.
20      A  Do you have a question for me?
21      Q  Yes, sir.  Just do you see that, according
22  to this report, at the time that you arrived at
23  Area 1 violent crimes, Nevest Coleman's story was
24  that he was a witness to two other people having

88

1  sex with the victim, and then he left and went home?
2      A  Again, I would not --
3      MR. KUHN:  Objection; speculation.
4      A  (Continuing.)  I didn't --
5      MR. KUHN:  You can answer.
6      A  (Continuing.)  I didn't have this report
7  present when I interviewed Coleman, and the facts
8  of the court reported -- facts of the court
9  reported statement are consistent with what
10  Coleman told me.
11      Q  I'm asking you something different.
12      A  Okay.
13      Q  Mr. Garfinkel, I'm asking you, sir,
14  according to this report, do you understand that
15  the report is indicating that at the time that you
16  arrived at Area 1 violent crimes, Nevest Coleman
17  is saying that he was a witness to two other
18  people having sex with the victim and that he then
19  left and ran home?
20      A  Well, this is --
21      MR. MORAN:  Hold on.  Hold on.  I'm going
22  to object to foundation and speculation.
23      MR. KUHN:  Join.
24      And, Hal, if you could just give us a

Case: 1:17-cv-08696 Document #: 339-4 Filed: 08/05/21 Page 430 of 612 PageID #:9088

second --
THE WITNESS: Sure.
MR. KUHN: -- to object before you start answering?
**A Well, this is what Foley --**
Q And Clancy?
**A -- and Clancy documented that Coleman said to me regarding his presence on the scene, but the court reported that I took on my interview of Coleman has Coleman acting as a lookout and acting in an accountable fashion, which under the statute is criminal -- criminal liability.**
MR. MORAN: I'm going to object to -- I didn't get it out; he answered beforehand -- but the question, foundation, speculation as to who and what wrote the report.
MR. KUHN: Join.
Q So you want to talk about what happened later during the court reported statement, and I understand that and we're going to get to that, sir.
**A Yes, sir.**
Q Okay. I'm just saying -- for the purposes of this question, I'm just asking you to -- I've read to you portions of Exhibit 1, and I just want

to see if you agree or disagree that according to this report at the time that you arrived at Area 1 violent crimes, Nevest Coleman had not yet inculpated him in the murder -- inculpated himself in the murder of Antwinica Bridgeman --
MR. MORAN: Objection.
Q -- is that correct?
MR. MORAN: Objection.
**A When I got --**
MS. MEADOR: Hold on.
MR. KUHN: Objection; form, foundation, speculation.
MS. MEADOR: I'll join and add that the document speaks for itself.
**A The document does speak for itself, but I would just say that when I got to Area 1, Detective Clancy told me that Nevest Coleman had implicated himself in the murder of Ms. Bridgeman.**
**And, again, this document hadn't been created yet, so I can't speak to what's documented here and clearly what Clancy told me. Clancy told me that Coleman was implicating himself in the murder. I'm going to leave it at that.**
Q Right. But I'm asking you to look at the

document and tell me, is the document erroneous, I guess is my next question, sir.
MR. MORAN: Objection --
Q Is it --
MR. MORAN: Sorry.
Q Is the document an inaccurate representation of the facts, the portion that I just read to you?
MR. MORAN: Object to foundation; speculation.
MS. MEADOR: Join.
MR. KUHN: Join and I'll add form.
**A Can I have a minute?**
Q Sure.
**A I'm not going to call this document erroneous. I'm just going to tell you that when I got to the area, Clancy told me that Coleman had implicated himself in this murder, and then I went in and interviewed Coleman, and Coleman told me about his involvement in the case, and the interview I had with Coleman that was taken before the court reported statement is consistent with what he told me at the court reported statement.**
Q All right. Did Nevest Coleman tell you when you met with him that he wanted to tell the

entire truth?
**A Nevest Coleman never told me anything other than what was consistent in the court reported statement. I don't know if I asked him, "Is what you're telling me the truth," but I -- but he didn't tell me that he wasn't telling me the truth.**
Q Listen to my question, sir.
**A Yeah.**
Q Did Nevest Coleman tell you that he wanted to tell the entire truth?
**A I don't remember him saying that, but I can't say he didn't say it.**
Q So you're saying that Mike Clancy -- when you met with him at Area 1 when you first arrived, Mike Clancy didn't say that Nevest Coleman was only placing himself as a witness; he was saying that Nevest Coleman had implicated himself?
**A I don't remember -- I don't remember what Mike Clancy told me originally. I'm sorry; I just don't remember. I just know that he said to me that Coleman was implicating himself and that, "You should go in and interview him and see for yourself whether he is incriminating himself or exculpating himself," and then I went on to**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

93

1 interview Coleman, and my interview with Coleman
2 was consistent with my court reported statement of
3 Coleman.
4    Q  Well, what else did Mike Clancy tell you
5 when you first met with him apart from the fact
6 that Nevest had made an inculpatory statement?
7    A  That's all I remember.
8    Q  Did he tell you about any other witnesses
9 who were at the area?
10    A  Well, I think he told me that -- I don't
11 remember what names of individuals he told me were
12 witnesses at the area.  I don't remember that.
13    Q  Did he tell you there were witnesses at
14 the area?
15    A  I don't remember.  It was some years ago.
16    Q  Did Mike Clancy tell you about the condition
17 of the victim?
18    A  Other than that she was dead?
19    Q  Yes.
20    A  Well, I know there had been -- she had
21 been -- a brick had been placed in her mouth, and
22 I know a pipe had been placed into her anal
23 cavity.  I know that.  Other than that I don't
24 think he said anything to me about her condition.

94

1    Q  And did you learn --
2    A  Not anal cavity, vaginal cavity.  I meant
3 vaginal; I said anal cavity.
4    Q  Did you learn that information from
5 Mike Clancy?
6    A  I don't remember.  I learned it from one of
7 the detectives.  It may have been Clancy.  But I
8 learned it that night.
9    Q  Which other detectives did you speak to?
10    A  I don't remember.
11    Q  All right.  Sir, what was the next thing
12 you did after you spoke to the -- to Detective
13 Mike Clancy?
14    A  I think I went right in and spoke with
15 Coleman.
16    Q  That's your recollection?
17    A  Yes, sir.
18    Q  Did you speak to Michael Barber first?
19    A  I don't remember.  I don't remember
20 honestly.  There would be a time in Barber's
21 handwritten statement when it was taken.  If you
22 compare that time versus the time of Coleman's
23 court reported, that might give you some answers
24 to that.

95

1       MR. AINSWORTH:  Let's mark this as Exhibit 2.
2       (Garfinkel Deposition Exhibit 2 marked for
3 identification and attached to the transcript.)
4    Q  I'm showing you what we've marked as
5 Exhibit 2, which is Michael Barber's handwritten
6 statement.  Is this your handwriting on here, sir?
7    A  It is, sir.
8    Q  So this is a -- and what does the 7:45 a.m.
9 at the top refer to?
10    A  That might mean that's the time that I
11 executed this document that you've indicated is
12 Exhibit 2, or it could mean the time that I
13 actually met with Barber.  I don't think it's
14 100 percent instructive.
15       My instincts are, if I had to guess -- and
16 this is only a guess -- 7:45 represents the time
17 that I -- I executed this document, which means I
18 would have met with Barber sometime before 7:45 a.m.
19    Q  And when you say "execute," you mean start
20 writing it?
21    A  Yes.
22    Q  Is that correct?
23    A  Yes, sir.
24    Q  As opposed to the signing of it?

96

1    A  That's right, yes.
2    Q  Is there a reason why you spoke to
3 Michael Barber?
4    A  He would have been there, and he would
5 have been an occurrence or fact witness that the
6 police wanted me to speak to.
7    Q  At the time that you spoke to Michael Barber,
8 you knew that Nevest Coleman was the target; right?
9    A  Sure.
10    Q  And so if Michael Barber had information
11 about Nevest Coleman saying anything inculpatory,
12 you would have wanted to know that information
13 from Michael Barber; right?
14    A  You're saying if Coleman would have made a
15 third-party admission to Barber --
16    Q  Yeah.
17    A  -- and Barber had possession of that, I'd
18 want to know that.
19    Q  Yeah.  And you would have asked him for
20 all statements that Nevest Coleman made to him
21 about the crime; correct?
22    A  I think I would have done that, yes.
23    Q  And so when you spoke to Michael Barber on
24 the morning of April 29th, 1994, if you take a

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

97

1 look at the second page of Exhibit 2, you see at
2 the bottom of the second paragraph where it says,
3 "And Michael Barber turned on the flashlight and
4 was able to observe through the basement window a
5 body laying on its back. At this point Michael
6 Barber told Nevest Coleman that a body was laying
7 on the floor, and Michael Barber states that
8 Nevest Coleman stated, 'Oh, my God. There is a
9 body.'"
10     Do you see that?
11   **A  I do.**
12   Q  And that's what Michael Barber told you
13 Nevest Coleman said at the time that the body was
14 discovered; right?
15   **A  Yes.**
16   Q  And that then Michael Barber told you that
17 he and Nevest Coleman told Nevest Coleman's mother
18 about the body; right?
19   **A  Okay. Right.**
20   Q  And did Michael Barber tell you anything
21 about -- well, did he tell you anything that's not
22 contained in Exhibit 2?
23   **A  I have no personal recollection of ever**
24 **meeting Michael Barber other than this document**

98

1 **which kind of documents my contact with Barber.**
2   Q  Do you recall what Michael Barber looks like?
3   **A  No.**
4   Q  Do you recall how old he was?
5   **A  The statement says he was 17 years old.**
6 **I'm relying on that statement solely for his age.**
7   Q  Do you know if Michael Barber spent the
8 night at Area 1?
9   **A  I have no idea.**
10   Q  Did you care if a 17-year-old kid spent
11 the night at Area 1?
12     MS. MEADOR: Objection; form, argumentative.
13     MR. KUHN: Join.
14   **A  Not unless Barber or some detective told me**
15 **that there was any abuse that had been**
16 **communicated by Barber or anybody on behalf of**
17 **Barber that had been committed at the area, no.**
18   Q  Did you take any steps to find out if
19 there had been any -- any abuse towards Michael
20 Barber?
21   **A  My pattern and practice would have been**
22 **that when I interview any witness, I think I would**
23 **have asked them how they had been treated by**
24 **myself and any detectives or investigators involved.**

99

1   Q  You would have also wanted to know from
2 Michael Barber if Nevest Coleman had a
3 relationship with the victim; is that right?
4   **A  I would have wanted to know from**
5 **Michael Barber if he knows about a relationship,**
6 **or if Coleman told Barber about a relationship?**
7   Q  Either one.
8   **A  It's relevant. I'd want to know.**
9     MR. MORAN: Object as speculation.
10     MS. MEADOR: Join.
11     MR. KUHN: Join.
12   Q  You knew that this was a sexual assault;
13 right?
14   **A  Yes.**
15   Q  And so you wanted to know if Nevest Coleman
16 had a romantic relationship with the victim;
17 correct?
18     MR. MORAN: Objection; foundation,
19 speculation.
20     MR. KUHN: Join.
21   **A  That would be an important fact.**
22   Q  You also met with Shaunice Williams; correct?
23   **A  I don't have personal knowledge of that**
24 **contact, but I know there's a handwritten statement**

100

1 **that I created regarding my conversation with her.**
2     MR. AINSWORTH: Let's mark this as
3 Exhibit 3, please.
4     (Garfinkel Deposition Exhibit 3 marked for
5 identification and attached to the transcript.)
6   Q  All right. Showing you what we've marked
7 as Exhibit 3, which is Shaunice Williams' statement,
8 is this your handwriting on this document, sir?
9   **A  It is.**
10   Q  What time was this statement taken?
11   **A  The time is not mentioned in there.**
12   Q  Do you know why that is?
13   **A  I have no -- no knowledge why that wasn't**
14 **included.**
15   Q  Shaunice Williams was 16 years old; right?
16   **A  I have no idea.**
17   Q  Well --
18   **A  Did I write that?**
19   Q  The second paragraph on the first page.
20   **A  Oh, yeah, 16 years old.**
21   Q  And at the top of the first page you're
22 supposed to write the time on the form; right?
23   **A  You are, yeah.**
24   Q  Do you know if Shaunice Williams spent all

---

**101**

1  night at the police station?

2  **A  I have no idea.  I have no personal knowledge**

3  **of that fact.**

4  Q  And Shaunice -- do you have any recollection

5  of your conversation with Shaunice Williams?

6  **A  Other than the handwritten statement that**

7  **you've identified as Exhibit 3, I have no personal**

8  **recollection of any contact with Shaunice Williams.**

9  Q  Did Shaunice Williams tell you anything

10  that's not contained in Exhibit 3?

11  **A  I can't remember.  Nothing -- I don't**

12  **think anything relevant.  I think all the relevant**

13  **conversation would have been documented.**

14  Q  Is there anything that would refresh your

15  recollection of your conversation with Shaunice

16  Williams apart from Exhibit 3?

17  **A  It's quite possible a cleared close report**

18  **or some report generated by the police department**

19  **would give a more exhaustive documentation of my**

20  **contact with Ms. Williams.**

21  Q  And what about your interview with Michael

22  Barber?  Would anything refresh your recollection

23  of your conversation?

24  **A  Maybe the same thing.**

---

**102**

1  Q  And how about your conversation with

2  Francine Calimee?  Do you recall that conversation?

3  **A  It's 25 years ago.  Other than that --**

4  **either a cleared close report, sup report, a GPR,**

5  **or a handwritten statement, I have no**

6  **recollection.**

7  Q  If Shaunice told you anything about there

8  being a romantic relationship between Nevest

9  Coleman and the victim, you would have documented

10  that fact; right?

11  MR. KUHN:  Objection; foundation,

12  speculation.

13  **A  It's an important fact.  I think I would**

14  **have included it.**

15  Q  And Shaunice was telling you that she was

16  with Nevest and the victim on the night the victim

17  died; correct?

18  **A  Other than the facts contained in the**

19  **Williams handwritten statement I don't remember**

20  **anything this woman said to me or what she**

21  **looks like.**

22  Q  According to your handwritten statement --

23  **A  Yeah.  I have to read it.**

24  Q  Shaunice --

---

**103**

1  **A  Oh, I'm sorry.**

2  Q  Shaunice Williams told you that she was

3  with Nevest Coleman and the victim the night that

4  the victim died; is that right?

5  **A  Yes.**

6  Q  And so you would have asked Shaunice if

7  she knew about any romantic relationship between

8  Nevest Coleman and the victim; correct?

9  MR. MORAN:  Objection, foundation,

10  speculation.

11  MR. KUHN:  Join.

12  **A  I have no idea.**

13  Q  Is there any reason why you wouldn't ask

14  Shaunice if there was any romantic relationship

15  between Nevest and the victim?

16  MR. MORAN:  Objection; foundation,

17  speculation.

18  MR. KUHN:  Incomplete hypothetical.

19  MS. MEADOR:  Join.

20  **A  I -- I can't speak to whether or not I**

21  **would have asked that question.**

22  Q  Let me put it this way.  You would have

23  asked Shaunice if in her presence Nevest and the

24  victim were touching each other in a sexually

---

**104**

1  suggestive manner or doing any -- or kissing or

2  doing anything that would suggest that they were

3  going to have sexual relations that night?

4  MR. MORAN:  Objection; foundation,

5  speculation, and form.

6  MS. MEADOR:  Join.

7  MR. KUHN:  Join.

8  **A  In a consensual way?**

9  Q  Yes.

10  MR. MORAN:  Same objections.

11  **A  That might have come up, but I --**

12  MS. MEADOR:  Join.

13  **A  -- can't remember whether or not I asked**

14  **or not.**

15  Q  You would -- you would want to know that

16  information; correct?

17  MR. MORAN:  Objection; foundation,

18  speculation.

19  MR. KUHN:  Join.

20  MS. MEADOR:  Join.

21  **A  It's an important fact.**

22  MR. AINSWORTH:  And let me show you what

23  we'll mark as Exhibit 4.

24  MR. KUHN:  Can we take a break at the next

105
1  question? I'm sorry to interrupt.
2        MR. AINSWORTH:  Sure.
3        MR. MORAN:  Are we taking one now?
4        MR. KUHN:  Yeah, that's great if we can
5  take it now.
6        THE VIDEOGRAPHER:  Off the record, 12:17.
7        (Recess taken, 12:17 p.m. to 12:30 p.m.)
8        THE VIDEOGRAPHER:  Back on the record, 12:30.
9        (Garfinkel Deposition Exhibit 4 marked for
10  identification and attached to the transcript.)
11  BY MR. AINSWORTH:
12      Q  Showing you what we've marked as Exhibit 4,
13  this is a handwritten statement taken from
14  Francine Calimee.  Sir, is this your handwriting
15  on this document?
16      A  It is.
17      Q  And this statement was taken at 10:25 a.m.?
18      A  Yes.
19      Q  So you talked to Francine sometime before
20  10:25 a.m.?
21      A  Yes.
22      Q  And Jim O'Brien was the witness for the
23  statement; correct?
24      A  Yes.

106
1        Q  Jim O'Brien was still at the area as of
2  10:25 a.m.; correct?
3        MR. MORAN:  Objection -- hold on.
4  Objection to foundation.
5        Go ahead.
6      A  He signed the statement, so he would have
7  been there.
8      Q  All right.  I didn't think that was going
9  to be a contentious point of --
10      A  No, no, I'm saying he signed it, yeah.  So
11  I guess so.
12      Q  It says at the top, "This statement taken
13  regarding the fatal beating of Antwinica Bridgeman."
14  Do you see that?
15      A  I do, sir.
16      Q  Why did you say it was "taken regarding
17  the fatal beating"?
18      A  Well, she had a pipe put inside her vagina
19  and a brick in her mouth that killed her.  Isn't
20  that a fatal beating?
21      Q  I'm just asking you why you --
22      A  I thought those words would accurately
23  describe two objects in a person's body.  Cause of
24  death would have been affixation or blunt trauma.

107
1        Sounds like a fatal beating to me.
2      Q  On April 29th, 1994, did you learn the
3  cause of death for Antwinica Bridgeman?
4      A  No.
5      Q  It says, "which occurred on April 11, 1994,
6  at 917 West Garfield at 11:55 p.m."  Do you see that?
7      A  I do, sir.
8      Q  Where did you get the 11:55 p.m. time?
9      A  That would have either been communicated
10  to me by a detective, or there may have been a
11  general offense case -- there may have been an
12  R/D report that was generated.  I would not have
13  just capriciously written that time.  I got it
14  from some -- some source.
15      Q  Did you review police reports before you
16  spoke to Nevest Coleman?
17      A  Whatever reports would have been generated
18  at that time, if they were reports generated, I
19  would have read them.  Of course, if they weren't
20  generated yet, I would not have read them.
21      Q  What documents -- sorry -- what reports do
22  you recall reviewing before you spoke to Nevest
23  Coleman?
24      A  I don't have any personal recollection of

108
1  reviewing any reports, but if a report would have
2  been generated prior to the review, I would have
3  asked a detective or an officer for that report if
4  it existed.
5      Q  Turning back to Exhibit 4, did Francine
6  Calimee tell you anything on April 29th, 1994,
7  that's not contained in this document?
8      A  I have no personal recollection of any
9  review of Francine Calimee other than what's
10  documented in the report.  It's possible she told
11  me some other facts, but I have no personal
12  recollection of those facts.
13      Q  Is there anything that would refresh your
14  recollection as to what Francine Calimee told you?
15      A  Other than the handwritten statement or
16  some report documenting that conversation, the
17  answer would be no.
18      Q  And you've read Exhibit 4; correct?
19      A  Right now or some previous time?
20      Q  Within the last few months?
21      A  I don't think I read the whole thing.  I
22  think I knew that it existed, but I -- I don't
23  remember carefully reviewing it.
24      Q  Well, let's take a look at the second page

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

28 (109 to 112)

109

1  of Exhibit 4.  Do you see where it says,
2  "Furthermore, Francine" --
3      **A  Yes.**
4      Q  -- "always remembered seeing Antwinica
5  wearing her glasses.  Additionally, on the evening
6  of April 11, 1994, Francine remembers seeing
7  Antwinica Bridgeman leave her house wearing
8  turquoise pants, brown boots, a red Bulls starter
9  jacket with her name Antwinica embroidered on the
10  outside of her coat.  Additionally, Francine
11  remembers seeing Antwinica leave her home wearing
12  a black ski coat with pink and purple design on
13  the outside of the coat."
14      **A  Okay.**
15      Q  Do you see that?
16      **A  I do, sir.**
17      Q  And that's what Francine told you on
18  April 29th, 1994; correct?
19      **A  She signed it, so that would have come**
20  **from her, yes.**
21      Q  And it was important for your investigation
22  to determine whether Francine -- what Francine was
23  wearing the night of April 11th, 1994; correct?
24      MR. MORAN:  Hold on.  Objection; form

110

1  foundation, speculation, misstates his testimony.
2      MR. KUHN:  Join.
3      MS. MEADOR:  Join.
4      **A  Okay.  But you said what Francine was**
5  **wearing.  I think you meant to say what Bridgeman**
6  **was wearing.**
7      Q  You're absolutely -- if I screwed that up,
8  thank you.
9      It was important to your investigation to
10  document what Antwinica Bridgeman was wearing the
11  night of April 11th, 1994; correct?
12      MR. KUHN:  Objection; form.
13      MS. MEADOR:  Objection --
14      MR. MORAN:  Hold on.
15      MS. MEADOR:  Hold on.
16      MR. MORAN:  Hold on.  Form, foundation,
17  speculation.
18      MS. MEADOR:  Join.
19      MR. KUHN:  Join.
20      **A  I don't have any personal knowledge as to**
21  **the importance or relevance of what the victim was**
22  **wearing.  I just know that it's included in here.**
23  **It may or may not have any kind of significance.**
24  **I can't comment on it.  I just don't remember.**

111

1      Q  Well, you wanted to establish a time of
2  death for Antwinica Bridgeman; right?
3      **A  I wanted to generate a statement that was**
4  **accurate and a truthful representation of what the**
5  **individual witness and/or target might have told**
6  **me, and those are the facts I included.**
7      Q  You also wanted to know when the victim
8  died; right?
9      MR. MORAN:  Objection; misstates his
10  testimony.
11      MR. KUHN:  Join.
12      **A  I can't remember whether or not that was a**
13  **point of interest for me to know when I interviewed**
14  **any of the witnesses.  I can't remember or don't**
15  **remember.**
16      Q  Well, for example, the victim's body
17  wasn't found until April 28th, some 15 days after
18  April 11th when she was last seen; correct?
19      **A  I don't know that.  I don't know when -- I**
20  **don't remember any of the facts of this case other**
21  **than what's included in these reports I'm reading**
22  **now.  I have no personal memory of any of the**
23  **facts of this case.**
24      MR. AINSWORTH:  Let's mark this as

112

1  Exhibit 5, please.
2      (Garfinkel Deposition Exhibit 5 marked for
3  identification and attached to the transcript.)
4      Q  Showing you what we've marked as Exhibit 5,
5  this is a general offense case report.  Do you see
6  in the upper right-hand corner there's, "Date
7  arrived, April 28th, 1994, at 7:47 p.m."?  Where
8  the R/D number --
9      **A  Of course.  The day the R/Os arrived.**
10      Q  Yeah.
11      **A  Yes, sir.**
12      Q  Okay.  That indicates that the body was
13  discovered on April 28th, 1994; right?
14      MR. KUHN:  Objection; foundation,
15  speculation.
16      **A  The date arrived and the underlined time**
17  **is just when the officers arrived.  I don't know**
18  **if that's when the body was discovered.  I just**
19  **know when I'm looking at this now, "Officers**
20  **arrived on April 28th, 1994, at 1947."  There's**
21  **nothing in this box right here that says there was**
22  **anything about a body.**
23      Q  Right.  Okay.  So then if you look at the --
24      **A  Narrative --**

113

1  Q -- narrative of it.

2  A Okay. The narrative indicates that a body
3  was recovered at or near the time the officers
4  responded.

5  Q On April 28th; right?

6  A Absolutely.

7  Q Okay.

8  A Absolutely.

9  Q And so if you're trying to determine when
10 the victim was killed, it would be helpful to know
11 whether she was wearing the same clothes that she
12 was last seen in on April 11th, 1994, or if she
13 was wearing different clothes suggesting that she
14 was killed on some date after April 11th, 1994;
15 would you agree with that?

16    MR. MORAN: Object to speculation.

17    MR. KUHN: Join.

18    MS. MEADOR: Join.

19  A That's not a consideration I -- I take
20 into account when taking a statement of a witness,
21 or specifically Francine Calimee. That wasn't
22 something I took into account.

23  Q Sorry; leaving aside Francine Calimee or
24 any particular witness, just in general it's

114

1  helpful to -- well, let me -- let me take it
2  this way.

3  A Yeah.

4  Q If Fran- -- if the victim was wearing
5  clothes different from those she was wearing the
6  night of April 11th, 1994, and Nevest was saying
7  that he killed her that night, it might cause a
8  question in your mind as to why Francine -- or why
9  Antwinica was wearing different clothes if she was
10 killed the same night she was seen leaving the
11 party in a -- you know, in the turquoise clothes
12 and the Bulls starter jacket?

13    MR. MORAN: Objection.

14    MR. KUHN: Objection; form, foundation,
15 speculation, incomplete hypothetical.

16    MS. MEADOR: Join.

17  A That would certainly be a fact that I
18 would certainly pay attention to.

19  Q Yeah. You just -- you would want to know?

20  A I would want to know, sure.

21  Q And if you'd like to, you're welcome to
22 review either Exhibits 2, 3, or 4 to see if the
23 substance in those reports refreshes your
24 recollection as to your conversations with any of

115

1  those witnesses. And, you all --

2     MR. MORAN: Are you asking him to do
3  that now?

4     MR. AINSWORTH: I'm not asking him. I'm
5  just saying that he has that opportunity.

6     THE WITNESS: Well, why don't you pose a
7  question to me, and if it's a question that
8  requires me to refresh my memory, I'll certainly
9  tell you.

10  Q Do you recall anything else that either
11 Francine Calimee, or Shaunice Williams, or Michael
12 Barber told you on April 29th, 1994?

13  A No personal memory of any conversations
14 with any of the witnesses incorporated in
15 Exhibits 2 through 4 other than the facts
16 contained within Exhibits 2 through 4.

17  Q And did you ever speak with any of those
18 witnesses after April 29th, 1994?

19  A No, I wouldn't have.

20  Q When you went in to speak to Nevest Coleman,
21 what did you know about the crime?

22  A That there was a young woman in a basement
23 at the Garfield address and that there were -- and
24 that she was dead, and that there were several

116

1  objects in her body, inserted in her body, and
2  that Nevest Coleman had implicated himself in that
3  crime.

4  Q Before I switch gears to Nevest Coleman, I
5  had one more question on Exhibit 4, which was
6  Francine Calimee. She was the host of the
7  get-together that was attended by the victim and
8  Nevest Coleman and Shaunice Williams. Do you
9  recall that?

10  A I don't recall that.

11  Q All right. So if you look at her statement,
12 Exhibit 4, you see on the first page about three-
13 quarters of the way down, "Francine states that on
14 the evening hours of April 11th, 1994, she had a
15 small party at her home which included, among others,
16 both Antwinica Bridgeman and Nevest Coleman.
17 Additionally, Francine states that Shaunice
18 Williams also attended her party."

19  A I see that.

20  Q So --

21  A It sounds like she hosted it.

22  Q You -- you would have wanted to know if
23 Shaunice -- strike that.

24     You would have wanted to know if Francine

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

117

1 Calimee had witnessed any romantic behavior going
2 on at her home between the victim and Nevest
3 Coleman the night that the victim died; right?
4 **A Right.**
5 MR. MORAN: Objection; speculation and
6 foundation.
7 MR. KUHN: And asked and answered.
8 MS. MEADOR: Join.
9 **A (Continuing.) Obviously of a consensual**
10 **nature.**
11 Q Yeah.
12 **A That would have been an important fact.**
13 Q So then going back to Nevest Coleman, did
14 you want to know why Nevest Coleman left the
15 victim's body in his basement?
16 **A No.**
17 Q Why didn't you want to know why Nevest
18 Coleman left the victim's body in the basement of
19 his own home to be discovered at some point?
20 MS. MEADOR: Objection; form.
21 MR. KUHN: Join.
22 **A He didn't bring up that fact. That wasn't**
23 **a fact that any of the investigators had raised to**
24 **me, and I was just there to get a truthful**

118

1 **statement from Nevest Coleman about his involvement**
2 **in a crime. And that was my -- that was the extent**
3 **of my involvement.**
4 Q So you didn't want to know why Nevest Coleman
5 left the victim's body in the basement of his own
6 home?
7 **A I didn't say --**
8 MS. MEADOR: Objection; mischaracterizes
9 the witness' testimony.
10 MR. KUHN: Join.
11 **A (Continuing.) I didn't say I didn't want**
12 **to know. It just didn't -- it didn't come up in**
13 **the course of conversation between investigators**
14 **and myself, between Coleman and myself, or any of the**
15 **witnesses and myself. And, therefore, it didn't**
16 **need to be examined at that point.**
17 **My role was to evaluate evidence, speak to**
18 **witnesses, try to procure an -- an honest and**
19 **truthful accounting of their understanding,**
20 **involvement in the case and that was it.**
21 Q Was there anything preventing you from
22 asking Nevest Coleman why he left the victim's
23 body in the basement of his own home?
24 **A Nothing.**

119

1 Q How long was your conversation with Nevest
2 Coleman when you spoke to him the first time?
3 **A I'm guessing anywhere between 15 to**
4 **45 minutes.**
5 Q Who was present for that conversation?
6 **A Initially when I spoke to him?**
7 Q Yes.
8 **A Probably myself and Mike Clancy. Probably.**
9 **I don't have any real personal knowledge to who**
10 **was present for that first contact, but that's**
11 **probably who it would have been.**
12 Q What did you first say to Nevest Coleman
13 when you met him?
14 **A I would have gone in and introduced myself**
15 **and said that I was an Assistant State's Attorney,**
16 **I was a lawyer working with the Cook County**
17 **State's Attorney's Office, and that I was not his**
18 **lawyer. I needed to make sure that he understood**
19 **my relationship, and I would have explained to him**
20 **what my role and function was in the investigation.**
21 **And I would have, of course, asked him what, if any,**
22 **knowledge he had about it. "It" being the**
23 **investigation.**
24 Q What would you have said about your role

120

1 and function in the investigation?
2 **A I would have told --**
3 Q Sorry; strike that.
4 What did you tell him about your role and
5 function in the investigation?
6 MR. KUHN: Objection; form.
7 **A I don't have any personal recollection of**
8 **what I did tell him. What I would have told him,**
9 **as I tell every target or suspect in an**
10 **investigation when I was assigned to the felony**
11 **review unit, that my job was to assist the police**
12 **in evaluating evidence and then coming to a**
13 **decision either on my own or through a supervisor**
14 **if that evidence rises to the level of approving a**
15 **charge, rejecting a charge, or continuing the**
16 **investigation. I told that to every suspect in**
17 **a case.**
18 Q What did Nevest Coleman look like?
19 **A He was an African-American gentleman of --**
20 **I think he was a bit stocky, I think about**
21 **five-eight, I think, well-groomed. He was**
22 **oriented, he was reasonably dressed and had a**
23 **reasonable affect, appeared normal in every sense.**
24 MR. AINSWORTH: Let's mark this as

121

1  Exhibit 6, please.
2      (Garfinkel Deposition Exhibit 6 marked for
3  identification and attached to the transcript.)
4      Q  Showing you what's been marked as Exhibit 6,
5  this is a rap sheet for Nevest Coleman.  It's
6  dated at the bottom, "Issued on Inquiry, April 28,
7  1994."  Do you see that, sir?
8      A  I do, sir.
9      MS. MEADOR:  I'm just going to object as
10 to the characterization of the document.
11     Go ahead.
12     Q  It's a criminal history report issued by
13 the Chicago Police Identification section.  Do you
14 see that, sir?
15     A  I do.  We called it a B of I, but it's an
16 identification of criminal history.
17     Q  All right.  Do you recall having read this
18 document before you met with Nevest Coleman?
19     A  I can't remember if I did or not.
20     Q  If this document, Exhibit 6, was in the
21 file, the police file, would you have examined it
22 before you met with Nevest Coleman?
23     A  Not necessarily.
24     Q  Why wouldn't you want to -- why wouldn't

122

1  you review the criminal history report for a
2  target you were going to speak to?
3      A  I'm not sure how criminal -- a prior
4  criminal history is relevant as to the credibility
5  and honesty of the statement that he's giving me
6  at that date and time.  You know, I may review it
7  at a later time.  I may but it isn't a hard and
8  fast rule that it's a condition precedent to
9  interviewing somebody.
10     Q  For a murder case, that has to be approved
11 by a felony review assistant in order for the
12 charges to be approved; right?
13     A  Approved by a supervisor, Assistant
14 State's Attorney, right.
15     Q  So in order to get charges for somebody,
16 the police have to reach out to felony review and
17 have a felony review Assistant State's Attorney
18 review the case to get charges imposed on that
19 person; right?
20     MR. KUHN:  Objection; incomplete
21 hypothetical.
22     A  Cook County State's Attorney's Office
23 felony review unit is designed and its purpose is
24 to either approve, reject, or tell investigators

123

1  to continue their investigation.  That's what we do.
2      Q  I understand that's the purpose of the
3  unit.  I'm saying that if I'm a Chicago police
4  detective, and I want to get murder charges
5  approved, the only way I can get murder charges
6  approved on a suspect is to go through felony
7  review --
8      A  Yes.
9      Q  -- is that right?
10     A  Yes.
11     Q  Okay.  Was Nevest Coleman handcuffed when
12 you first met him?
13     A  I don't remember.
14     Q  Where was Nevest Coleman when you first
15 met him?
16     A  He would have been in an interview room on
17 the second floor of Area 1.
18     Q  Do you recall which room he was in?
19     A  No.
20     Q  Do you recall what was in that room?
21     A  There would have been -- there would have
22 been a bench; there would have been a concrete
23 wall, set of walls, of course, and then there
24 would have been a place to clasp a handcuff on if

124

1  he indeed were handcuffed, and then there would be
2  a couple chairs, and there may or may not have
3  been a table.
4      Q  So the bench, concrete walls, and the ring
5  on the wall, those were in every interview room at
6  Area 1; right?
7      MS. MEADOR:  Objection; foundation.
8      MR. KUHN:  Join.
9      A  I can't say what was in every area room --
10 not area -- interview room.  I can speak to the --
11 that would be a typical description of a room, but
12 I can't say with conclusivity that every room
13 contained those fixtures.  I can't.
14     Q  The room that you met Nevest in the first
15 time had a bench, a -- concrete walls, and a ring
16 on the wall; right?
17     A  For sure.  I don't know about the table.
18     Q  You don't know about the table, and you're
19 not sure how many chairs were there; is it fair
20 to say?
21     A  That's very fair.
22     Q  All right.  What -- after you introduced
23 yourself to Nevest Coleman, what did Nevest Coleman
24 say in response?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

125

1     **A  I don't remember what he said in response**
2  **to my initially identifying who I was.**
3     Q  What conversation did you have between
4  yourself, Mike Clancy, and Nevest Coleman?
5        MR. MORAN:  Objection; form.
6     **A  Well, there wasn't -- when I first went in**
7  **there and identified myself to Coleman, I would**
8  **have identified who I was, what my role was, and**
9  **then there wouldn't -- there would not have been a**
10 **conversation between myself, Coleman, and Clancy.**
11 **I would have then immediately Mirandized Coleman.**
12    Q  All right.  And so you -- you then
13 Mirandized Coleman?
14    **A  Yes.**
15    Q  And what did he say in response to your
16 Mirandizing him?
17    **A  I went through each and every right with**
18 **him and asked him if he understood those rights,**
19 **and after he gave me his answer, I then asked if**
20 **he would waive those rights and if he would speak**
21 **to me about his understanding of this investigation.**
22    Q  And what did he say?
23    **A  He said he understood each and every**
24 **right, and then he would have spoken about the**

126

1  **facts and circumstances surrounding the death of**
2  **Bridgeman.**
3     Q  So tell me everything that you said to
4  Nevest Coleman, and everything that he said to
5  you, and everything that Mike Clancy said during
6  that meeting.
7     **A  During that interview?  I don't remember**
8  **anything Clancy would have said.  I don't remember**
9  **anything in that room other than the facts contained**
10 **within the court reported between Coleman and**
11 **myself that was taken at a later time that day.  I**
12 **don't remember anything specific that Coleman and**
13 **I spoke about other than the fact that that**
14 **conversation -- that first conversation was**
15 **consistent with the court reported statement he**
16 **gave at a later time.**
17    Q  Did Nevest Coleman provide you with any
18 facts during that first conversation that are not
19 contained in his court reported statement?
20    **A  Not facts that would have exculpated his**
21 **guilt.**
22    Q  Were there any facts that would have tended
23 to inculpate his guilt that were not included in
24 his court reported statement?

127

1     A  It's possible.
2     Q  Well, do you recall any facts that Nevest
3  Coleman told you during that interview, that first
4  interview of Nevest Coleman that are not contained
5  in his court reported statement?
6     **A  I don't remember.**
7     Q  Nevest told you about a brick being placed
8  in the victim's mouth; correct?
9     **A  Yes.**
10    Q  And did -- you understood what he meant by
11 a brick?
12       MS. MEADOR:  Objection; form.
13       MR. MORAN:  Speculation.
14       MR. KUHN:  Join.
15    **A  I know what a brick is.**
16    Q  Okay.
17    **A  I think it was a general consensus as to**
18 **what he was talking about.**
19       MR. AINSWORTH:  All right.  So let's mark
20 this as Exhibit 7, please.
21       (Garfinkel Deposition Exhibit 7 marked for
22 identification and attached to the transcript.)
23    Q  All right.  Exhibit 7, this is a picture
24 of -- would you call this a brick?

128

1        MS. MEADOR:  I'm going to object as to the
2  characterization of the exhibit and foundation.
3        MR. MORAN:  And I'm going to object to the
4  exhibit to the extent it's not an accurate
5  reflection of the object that was used.
6        MS. MEADOR:  Join.
7        MR. AINSWORTH:  Counsel, like these just
8  speaking objections have got to stop.  I'm just
9  saying it now.  I mean, you're making -- like
10 these are not objections you would make at trial.
11 Just knock it off.
12       MR. MORAN:  No, this is a document that
13 would never get into a trial, but you know it's
14 not a speaking objection, too, so why don't you
15 just move on.
16       MR. AINSWORTH:  I do -- it is a speaking
17 objection.
18       MR. MORAN:  No, it isn't.
19       MR. AINSWORTH:  Pat, I'm -- I have a
20 transcript of it.  It is the definition of a
21 speaking objection.
22       MR. MORAN:  You'll have the transcript.
23 Move on.  I'm not going -- this isn't a debate.
24 It's not a speaking objection.  Every single

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

129

1 objection I've made has been a legal basis. This
2 is something that is not related to this case.
3 Why don't you just go ahead.
4      MR. AINSWORTH: So that's -- then the
5 objection is relevance, you know --
6      MR. MORAN: Relevance is not my objection.
7      MR. AINSWORTH: -- 401, 402. Well, so
8 then -- right. So then that's where we're getting
9 into the problem.
10      MR. MORAN: No. The problem is what you
11 want to use, and I understand what you're trying
12 to do.
13      MR. AINSWORTH: So, Pat, here's the thing.
14 I'm just saying now, here's my attempt, I'm asking
15 you politely, please stop with the speaking
16 objections. We'll continue the deposition, but if
17 we have to come around to this, then we'll have to
18 deal with it, and if we have to call the Judge,
19 we'll call the Judge.
20      MR. MORAN: You do what you think you need
21 to do.
22      MR. AINSWORTH: Fair.
23      MR. MORAN: And I will do the same.
24   **A I don't know what is depicted in Exhibit 7.**

130

1 **It could be a piece of cheese; it could be -- I**
2 **don't know what it is.**
3      Q I'm not asking you for what it is.
4   **A You asked me if it was a brick. I don't**
5 **know if it's a brick.**
6      Q Does it look like a brick?
7   **A Does it look like a brick to you?**
8      Q It does. Does it look like a brick to
9 you, sir?
10   **A It looks like a brick.**
11      Q All right. In common parlance a brick is
12 a rectangular object made of baked clay or some
13 other building material?
14      MR. KUHN: Objection; foundation.
15      MR. MORAN: Foundation and speculation.
16      MS. MEADOR: Join.
17   **A You could have a section of this brick,**
18 **and it would be loosely described as a brick. It**
19 **doesn't have to be a rectangular complete object.**
20 **A brick can be -- you know, a section of a brick**
21 **is commonly referred to as a brick.**
22      Q All right. So a brick that starts out as
23 a triangular piece of brick might have a piece
24 broken off of it, and that might still be a brick;

131

1 is that what you're saying?
2      MR. MORAN: Objection.
3      MS. MEADOR: Objection; form.
4   **A It's a piece of a brick.**
5      Q Piece of a brick. Okay. But a brick
6 starts out as being a rectangular object. Can we
7 agree on that?
8   **A We can.**
9      MS. MEADOR: Objection; form.
10      Q What was Nevest Coleman's demeanor like
11 when you met with him, that first conversation?
12   **A He was -- he was thoughtful; he was**
13 **measured; he was calm; he was matter of fact; he --**
14 **he was rather emotionless.**
15      Q Did you ask Nevest Coleman how long he'd
16 been at the station?
17   **A I don't remember. I don't -- I might have**
18 **but I don't have -- I don't remember.**
19      Q Did you investigate through any means to
20 find out how long Nevest Coleman had been at the
21 station?
22   **A That is not an uncommon question that I**
23 **would have asked in any investigation, but I don't**
24 **have personal recollection if I asked Clancy or**

132

1 **any of his colleagues how long Coleman had been in**
2 **prior to my arriving at Area 1.**
3      Q Did you find out from Nevest if he had had
4 the opportunity to sleep the night prior to your
5 talking to him?
6   **A During --**
7      MS. MEADOR: Objection; form.
8   **A (Continuing.) Coleman on his own never**
9 **unilaterally told me that he was deprived of**
10 **sleep. There was nothing about his behavior which**
11 **indicated to me that he was sleep deprived.**
12      **No one on behalf of Coleman or anybody in**
13 **the investigation ever communicated to me**
14 **including witnesses or investigators and Coleman**
15 **himself that he was deprived sleep. That never**
16 **was raised in this case.**
17      Q Now I've forgotten my last question. Let
18 me ask this question.
19      Did you determine by asking Nevest Coleman
20 whether he'd been able to sleep the night prior to
21 you speaking to him on the morning of April 29th,
22 1994?
23   **A I don't remember.**
24      Q Is that something you would have wanted

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

34 (133 to 136)

133

1 to know?
2      MR. KUHN:  Objection; speculation.
3      **A  If -- if a target or suspect appeared**
4 **sleep deprived or in any way lethargic, or if it**
5 **had been communicated to me through witnesses**
6 **and/or investigators at the area or station that**
7 **this individual was sleep deprived or lethargic,**
8 **then it might come up.**
9      Q  Did you ask Nevest Coleman if he was tired?
10     **A  I don't have any personal recollection of**
11 **asking him that.**
12     Q  Earlier today you told me that you would
13 ask targets if they were tired and document that
14 fact when you took statements from them.  Do you
15 recall that from earlier this morning?
16     **A  No, I don't.**
17     Q  All right.  Are you getting tired?
18     **A  No, I'm good.**
19     Q  All right.  You're good.  Well, you
20 understand that if at any time you get tired
21 during this --
22     **A  Thanks.**
23     Q  -- deposition, you have the right to take
24 a break; right?  You understand that?

134

1      **A  I do understand that.**
2      Q  All right.  So you don't recall if you
3 asked Nevest Coleman if he was tired; right?
4      **A  I don't.**
5      Q  Did you -- and you weren't concerned at
6 all with how long Nevest had been in custody; right?
7      MR. MORAN:  Objection.
8      MR. KUHN:  Objection; misstates the
9 testimony, form.
10     MS. MEADOR:  Join.
11     **A  I wouldn't say I wasn't concerned, but**
12 **unless it was raised to me by investigators or**
13 **witnesses or the suspect himself, that he had been**
14 **in custody for a -- for a -- an extended period of**
15 **time, it wouldn't normally come up.**
16     Q  So if you knew that the target was in
17 custody for over 36 hours, then you would want to
18 explore with the suspect their level of fatigue
19 and document that fact?
20     **A  Not necessarily.**
21     Q  All right.  So if you knew that somebody
22 was in custody for over 36 hours, you wouldn't
23 necessarily want to explore if they were tired?
24     **A  I think it would depend on a case-by-case**

135

1 **basis of how that suspect presented and whether**
2 **there was any other additional facts learned from**
3 **other -- learned by me from other individuals**
4 **about his level of consciousness or level of**
5 **fatigue.**
6      Q  I'm writing that down for later.  All right.
7      So what questions did you ask Nevest Coleman
8 to elicit a statement from him?
9      MS. MEADOR:  Objection; form.
10     MR. MORAN:  Objection; form, misstates his
11 testimony.
12     MR. KUHN:  Join.
13     **A  Other than the questions that I asked him**
14 **in the court reported statement, I don't have any**
15 **personal recollection of any specific questions I**
16 **would have asked him.  But I know I would have --**
17 **I would have asked him if he understood each and**
18 **every one of the Miranda rights I gave him.  I**
19 **know I would have asked him what happened, and I**
20 **know I would have asked him at the end how he was**
21 **treated by myself and how he was treated by police**
22 **officers and detectives assigned to the**
23 **investigation.  Those questions I know I would**
24 **have asked him.**

136

1      Q  Did you offer Nevest a phone call?
2      **A  No.**
3      Q  Why not?
4      **A  That's not our job.**
5      Q  Well, even if it's not your job, why
6 didn't you offer him a phone call?
7      **A  Because I'm --**
8      MS. MEADOR:  Objection; asked and
9 answered.
10     MR. KUHN:  Objection.
11     **A  I don't have that authority.  It's not my**
12 **phone.  It's the police officer's phone, City of**
13 **Chicago's phone.**
14     Q  Okay.  You're a State's Attorney,
15 Assistant State's Attorney at the time; right?
16     **A  I was.**
17     Q  You represent the People of the State of
18 Illinois; right?
19     **A  That's true.**
20     Q  Including Nevest Coleman; right?
21     **A  That's true.**
22     Q  Did you make any effort to get Nevest
23 Coleman access to a telephone?
24     **A  He didn't --**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

35 (137 to 140)

137

1     MR. KUHN: Objection; asked and answered.
2     **A (Continuing.) He didn't ask to use the**
3 **phone.**
4     Q I understand that, sir. Did you offer him
5 a phone call?
6     MR. MORAN: Objection; asked and answered.
7     **A I don't remember personally offering him. I**
8 **can say with a fair amount of confidence that I never**
9 **asked people if they wanted to make phone calls.**
10    Q Why didn't you ever ask targets if they
11 wanted to make a phone call?
12    MR. KUHN: Objection; asked and answered.
13    **A When we were trained, that was not one of**
14 **the duties that we were instructed to extend to**
15 **suspects or targets.**
16    Q Nobody during your training told you that
17 you were not allowed to help targets make a phone
18 call; right?
19    **A Nobody told me that I -- it never came up**
20 **in my training that our function was to ask**
21 **targets if they wanted to make phone calls. I'll**
22 **leave it at that.**
23    Q I'm asking the reverse.
24    **A I know you are.**

138

1     Q So that's the question I want answered is,
2 nobody told you during your training --
3     **A That I couldn't?**
4     Q -- that you weren't allowed to help a
5 suspect get a phone call; right?
6     **A No but --**
7     MR. KUHN: Wait until counsel is done
8 asking --
9     THE WITNESS: Sure. Sure.
10    MR. KUHN: -- a question before you start
11 answering --
12    THE WITNESS: I'm sorry.
13    MR. KUHN: -- just for the court
14 reporter's sake. Thank you.
15    **A (Continuing.) Nobody told me during my**
16 **training that I couldn't ask that.**
17    Q Is there anything that would refresh your
18 recollection about your conversation with Nevest
19 Coleman during that first 15- to 45-minute
20 conversation?
21    **A The only thing I can possibly think of is**
22 **either some supplemental police report, a GPR report,**
23 **or cleared close report.**
24    Q Well, you have the -- Exhibit 1 --

139

1     **A I do.**
2     Q -- in front of you. Page 12, it discusses
3 your arrival. You're welcome to take a look at
4 that and see if that refreshes your recollection
5 of your conversation with Nevest Coleman during
6 that first interview.
7     **A I don't have a personal recollection of my**
8 **first conversation with Coleman, so I can't say**
9 **that this accurately refreshes my memory as to**
10 **what that conversation would have been.**
11    Q I'm just curious as to whether reading
12 Exhibit 1 refreshes your recollection as to your
13 conversation or not.
14    **A No --**
15    MS. MEADOR: Objection; form.
16    **A -- it doesn't.**
17    Q Okay. Can you tell us what led to your
18 conversation with Nevest Coleman ending?
19    **A What led to my conversation -- which**
20 **conversation?**
21    Q The first conversation you had with Nevest
22 Coleman.
23    **A Sure. Coleman would have incriminated**
24 **himself in the murder. I then would have asked**

140

1 **Coleman how he wanted to document that. He would**
2 **have told me, and I would have gone out and called**
3 **my supervisor to give the supervisor kind of the**
4 **lay of the land, where we were at, and what type**
5 **of statement Coleman wanted to have document my**
6 **conversation with him.**
7     Q Which supervisor did you call?
8     **A I think it was Johnny Muldoon. I think**
9 **it was.**
10    Q Would there be any documentation of who
11 you called?
12    **A Sure. The felony review jacket would have**
13 **had it on it, I think. Other than that, unless my**
14 **supervisor came out to the scene -- and I don't**
15 **believe the supervisor came out -- the only**
16 **possible document that would corroborate would be**
17 **the felony review jacket.**
18    Q How long was your conversation with
19 John Muldoon?
20    **A I don't remember how long it would have**
21 **been, but just long enough to communicate where we**
22 **were in the investigation, the -- what had been --**
23 **where we were at, the type of statement he wanted**
24 **documented, and how I felt taking the statement, I**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

36 (141 to 144)

141

1  guess. Supervisors normally ask, "How do you feel
2  about, you know, handling this?"
3      Q  Back in '93/'94, the Cook County State's
4  Attorney's Office treated your felony review
5  jackets as work product; is that right?
6      MS. MEADOR: Objection; form, foundation,
7  calls for speculation.
8      MR. KUHN: Join.
9      A  I think that's People v. Moras that
10 addressed that issue.
11     Q  You knew when you were creating the felony
12 review jackets in this case for Mr. Coleman and
13 Mr. Fulton that that would not be tendered to the
14 criminal defendants; correct?
15     MR. KUHN: Objection; speculation.
16     A  I don't think I ever -- I don't think I
17 ever thought about it at the time.
18     Q  Well, you knew that the -- regardless what
19 you thought about whether they would be tendered
20 to the defense, you knew that the Cook County
21 State's Attorney's Office wouldn't tender them to
22 the defense; right?
23     MR. KUHN: Objection; speculation.
24     A  I didn't know that.

142

1      Q  In the '90s did you ever receive felony
2  review jackets in discovery?
3      A  As a defense lawyer?
4      Q  Yeah.
5      A  I never requested any.
6      Q  Why didn't you request any?
7      A  If there was a court reported statement, I
8  have the actual court reported statement to look
9  at to analyze it. If it's a handwritten statement,
10 I'd have the handwritten statement. If it was an
11 oral statement -- if it was an oral statement, I'd
12 want it.
13     Q  You'd want the -- anything that was
14 written by the people who took the confession of
15 your client to see if there's any inconsistencies
16 between their notes and the statement; right?
17     MR. KUHN: Speculation, incomplete
18 hypothetical.
19     Go ahead.
20     A  I wouldn't describe the jacket as notes.
21 I would describe the jacket as just containing
22 those demographics, indication of time of arrival,
23 and what type of statement was given and what time
24 we left the area.

143

1      I didn't find the jacket overly, overly
2  helpful. It wasn't not helpful; it was just kind
3  of neutral. It was a statement that I'd be
4  interested whether it was court reported or
5  written. If it was a case involving an oral
6  statement, then the felony review jacket becomes
7  important. As a defense lawyer I look at it.
8      Q  The -- the felony review jacket contains a
9  summary of the statements; right?
10     A  Summary of both the oral, written, and
11 handwritten --
12     Q  Yeah.
13     A  -- incorporated. A summary.
14     Q  Is one of the reasons why you didn't request
15 felony review jackets because you were aware under
16 the case law that it was not something that you
17 could obtain in discovery?
18     A  That's not an accurate reading of the law.
19 I believe the Moras decision came out in the '90s,
20 which then -- which left open whether or not you
21 could get access to that felony review jacket.
22     So, you know, it wasn't clear -- and in
23 truth, the State's Attorney's Office was -- was
24 providing it at some point in the '90s. We were

144

1  getting it. We were getting it.
2      Q  What conversation did you have with your
3  supervisor after Nevest Coleman's statement -- or
4  after that initial conversation with Nevest Coleman?
5      A  I would have told my supervisor that I
6  believed I had a credible, honest, and truthful
7  statement from a suspect who was implicating
8  himself. I would have told Muldoon, if that was my
9  supervisor, that I explained the three manners of
10 which we could document it, and that Coleman would
11 have told me that the court reported way was the
12 way he wanted to go, and that I felt comfortable,
13 you know, conducting that court reported interview.
14     Q  What did your supervisor say to you?
15     A  "Go get 'em, Hal." Go take it.
16     Q  Do you recall that as a quote?
17     A  He would have said, "Take the statement."
18     Q  All right. Do you recall anything that
19 was said between you and your supervisor?
20     A  No.
21     Q  So you just -- what you just testified to
22 under oath is just what you're --
23     A  "Go get 'em"? That was just kind of a --
24 he would have said -- he would have said -- I know

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

145

1  in every time it was a murder statement that was --
2  that was the -- those were the metrics that were
3  touched, and then the last statement was, "Do you
4  feel comfortable taking this," and I would have
5  said yes.
6      Q  Was it a man or a woman you spoke to?
7      A  My supervisor?
8      Q  Yeah.
9      A  I think -- I think it was Johnny Muldoon,
10 I think.  I think.
11     Q  A man?
12     A  I believe.  It's 25 years ago.  I think he
13 was my supervisor -- I know he was one of the
14 supervisors.
15     Q  And so everything you testified to about
16 you telling the supervisor that it was a credible,
17 honest, and truthful statement and that, that was --
18     A  I did that every time.
19     Q  That's not what you necessarily said;
20 that's just what you're speculating you may have
21 said?
22     A  That was -- that was -- that was how I
23 operated on a -- on a murder statement.  I did
24 that on every case.

146

1      Q  What was the next thing you did after you
2  called your supervisor?
3      A  I would have communicated with the detective
4  that I communicated with my supervisor and that
5  we'd be taking a court reported statement of
6  Nevest Coleman, and that there would be a court
7  reporter contacted by our office, and that that
8  court reporter would be there shortly to take that
9  statement.
10     Q  Would you call your office to request a
11 court reporter?
12     A  I don't remember if I did or dispatch did it.
13     Q  Sorry; did you call dispatch to ask that a
14 court reporter --
15     A  I don't remember who did it.  I don't
16 remember who did it.
17     Q  You testified previously that you would
18 call dispatch to ask for a court reporter to
19 arrive?
20     A  I don't know that.
21     Q  Does that sound right?
22     A  That was -- I think I -- I think in those
23 days that was the procedure; you called dispatch,
24 let them know that you needed the court reporter.

147

1  I don't believe I called the court reporter
2  directly.  I don't think I would have done that.
3      Q  What did you do after you told the
4  detective that a court reported statement would be
5  taken and that a court reporter would be arriving
6  for that purpose?
7      A  I might have gone to the bathroom and had
8  a drink, a pop or some water, just relaxed, you
9  know, and then maybe just ran the thought -- ran
10 the case in my head.  And then I would have spoken
11 with Coleman alone just to verify that -- that the
12 statement that he was giving me was an honest,
13 truthful statement and that he had not in any way
14 been abused or was the victim of coercion.  I
15 would have done that for sure.
16     Q  For how long did you speak to Nevest Coleman?
17     A  Which conversation?
18     Q  That initial one.
19     A  You asked me that.  I think my --
20     Q  Sorry, sorry, sorry.
21     A  That's all right.
22     Q  I got it wrong.  How long did the
23 conversation last when you spoke to Nevest Coleman
24 alone?

148

1      A  Prior to court reported?
2      Q  Yes.
3      A  I don't have a specific amount time, but
4  it would have been enough time to cover those
5  questions.  How was he treated, was he allowed to
6  use the bathroom, was he fed, were there any
7  medical issues, I would have asked him that.  That
8  could probably be covered in 5 to 10 minutes.
9      Q  Who was the overall supervisor of felony
10 review while you were there?
11     MR. KUHN:  Objection; speculation.
12     A  Well, that -- it rotated but at that time
13 it was -- it was -- it's now Judge Charles Burns.
14 Chuck Burns was the supervisor at that time.
15     Q  And --
16     A  The supervisor.
17     Q  Right.  And sometimes Chuck Burns would
18 assign people research projects, right, felony
19 review people?
20     MR. KUHN:  Objection; foundation,
21 speculation.
22     MS. MEADOR:  Join.
23     A  I don't have any knowledge of that.
24     Q  You never got assigned research assignments;

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

38 (149 to 152)

149

1  correct?
2      A  From Chuck?
3      Q  Yeah.
4      A  I worked for Chuck when I was a 711 student,
5  so I'm running it through my head.  I don't believe
6  when I was on review he ever gave me a direct
7  assignment.  Gary Howard was also -- now retired
8  Judge Howard was also the first supervisor of
9  review while I was -- while my tenure was there.
10 So I think it might have been Burns.
11     Q  Did that ever happen where you would go
12 out to an area to take a statement and -- from a
13 target and you didn't approve charges while you
14 were in felony review?
15     A  On any related charge?  Like on a sex
16 case, theft case, forgery, or just murder?  Were
17 you asking about murder?
18     Q  On any charge where you didn't charge at
19 least something.
20     A  What --
21        MS. MEADOR:  I'm going to object as to form.
22        MR. KUHN:  Join.
23     A  (Continuing.)  Are you asking did I ever go
24 out to an area or a district station and reject a

150

1  CI case?
2      Q  No.  What I'm asking is, did you ever go
3  out to an area and take a statement, you know,
4  where -- where the detectives were asking you to --
5  to memorialize a statement from a suspect?
6      A  What kind of statement?  A court reported,
7  a handwritten, an oral?
8      Q  Any one of those three and not approve
9  charges.
10     A  On any kind of charge?
11     Q  Yes.
12     A  Was the statement an incriminating statement?
13     Q  Yes.
14     A  No.  No.  If they gave an incriminating
15 statement and I made the determination that it was
16 a truthful, honest statement and that they were
17 not a victim of duress, abuse, or any type of
18 coercion, I char-- I evaluated that evidence and
19 then I would approve.
20     Q  Every single statement that you took as a
21 felony review Assistant State's Attorney was
22 credible, honest, and truthful; right?
23        MR. KUHN:  Objection; speculation,
24 foundation.

151

1      A  What kind of statement?  Incriminating or
2  exculpatory?
3      Q  Every inculpatory statement that you
4  memorialized as a felony review Assistant State's
5  Attorney was in your mind credible, honest, and
6  truthful; correct?
7      A  In my mind or I wouldn't charge.
8      Q  That's right?
9      A  Yes.
10     Q  And every single statement that you took
11 from a target that was inculpatory was not the
12 product of duress; right?
13        MR. KUHN:  Objection; foundation,
14 speculation.
15     A  In my opinion.
16     Q  Correct?
17     A  In my opinion.
18     Q  All right.  So in -- after you spoke to --
19 what conversation did you have with Nevest Coleman
20 when you spoke to him alone?  What did you say to
21 him; what did he say to you?
22     A  I don't remember personal knowledge of
23 what that conversation was specific, but what I
24 would have covered is, "Is what you're telling me

152

1  the truth; have you been provided bathroom if you
2  needed it; were you fed if you were hungry, or
3  were you in any way a victim of abuse, coercion,
4  or are you under duress at all?"  I wanted to
5  know that.
6      Q  And what did Nevest say to you?
7      A  He would have said no.
8      Q  Well, do you recall what he said to you?
9      A  No, I don't.  But I can promise you this,
10 if I took that statement, he said, "Hal, I'm
11 fine," or I wouldn't have taken it.
12     Q  What happened after you spoke to Nevest
13 Coleman alone?
14     A  I don't -- I don't know if the court
15 reporter was there or on his or her way.  I think
16 it was Joe Szybist who was working the homicide,
17 but I would have waited, you know, just chilled by
18 myself or maybe called a partner, you know, see
19 what was going on, what the city was like that
20 night.  In other words, just waited or collected
21 my thoughts or something.
22     Q  Would you have made an outline of the
23 questions you were going to ask Nevest?
24     A  No.

153

1    Q  Why not?
2    A  I just had a good ability to remember
3  facts and organize facts and ask good questions.
4    Q  And what was the next thing you did after
5  you waited and maybe called a friend?
6    A  The court reporter would come; we would
7  have -- I would have let the court reporter know
8  that there's a suspect who wants to give a
9  statement, and then we would talk about the
10  logistics as to where that statement would take
11  place.
12        The court reporter would set up, and I
13  would wait for him or her to tell me they're ready
14  to go, and I would have gotten -- I would have
15  told the detective or detectives assigned, "We're
16  ready to go; let's do it."
17      MR. AINSWORTH: Let's mark this as
18  Exhibit 8.  I handed you one too many.  Oh, got it.
19      (Garfinkel Deposition Exhibit 8 marked for
20  identification and attached to the transcript.)
21    Q  All right.  Showing you what we've marked
22  as Exhibit 8, it's the statement of Nevest Coleman
23  that was taken beginning at 9:57 a.m.; is that right?
24    A  Yes, sir.

154

1    Q  So who witnessed that statement?
2    A  Me, Detective Clancy, and then the court
3  reporter, Joe Szybist.
4    Q  All right.  And was there anything said
5  during this conversation in the presence of the
6  court reporter that was not recorded by the court
7  reporter?
8    A  I don't believe so.
9    Q  All right.  And so you provided Nevest
10  with his Miranda rights; correct?
11    A  I Mirandized him, yeah.
12    Q  And you asked him about his birth date on
13  page 3?
14    A  That's true.
15    Q  And on page 4 you asked him about being at
16  Francine's house?
17    A  Yep.
18    Q  And that he said he left at 9:00 or 9:30?
19    A  Okay.  Yes.
20    Q  Did you wonder how it was that he left at
21  9:00 or 9:30 if Shaunice was saying she didn't get
22  there until 10:30?
23      MR. KUHN: Objection; speculation.
24    A  I don't remember if I wondered.

155

1    Q  Did you -- do you remember that Shaunice
2  and Francine were saying that Nevest left around
3  11:00 or 11:30?
4    A  I don't remember them tell me anything
5  other than what they -- what's documented in those
6  two handwritten statements of those two women --
7  girls.
8    Q  So if witnesses were telling you that
9  Nevest was at the house until 11:00 or 11:30 --
10    A  Which witnesses?
11    Q  Shaunice and Francine?
12    A  Right.
13    Q  -- and Nevest was saying he left at 9:00 or
14  9:30, is that one of the things that you would
15  want to confront him with, you know, a statement
16  from a third party?
17    A  No.
18    Q  Why not?
19    A  There's an ancillary -- that would be an
20  ancillary fact which wouldn't vitiate the
21  incriminating nature of the statement in general
22  that he's acting as a lookout while this girl is
23  getting killed.
24    Q  Didn't you want to know why it was he was

156

1  saying this happened at 9:00, 9:30 when you had a
2  time of death -- on the statements you're
3  reporting 11:55 p.m. as the time of death?
4    A  I didn't have -- I didn't have a
5  postmortem time of death.  I didn't have any
6  medical -- medical examiner or any doctor telling
7  me time of death.
8    Q  Right.  But then why were you putting
9  11:55 p.m. as the -- as the time that the fatal
10  beating occurred?
11      MR. KUHN: Objection; speculation --
12    A  I don't have --
13      MR. KUHN: -- asked and answered.
14      Just let us object.
15      THE WITNESS: Sorry.
16    A  (Continuing.)  I don't remember why I
17  put that.
18    Q  Then on page 5 Nevest says he left the
19  house at about 9:30; right?  And he left with Nice
20  and Mikey; right?
21    A  Yes.
22    Q  And then on page 6 Nevest says he goes to
23  the liquor store and watched Mikey go home; right?
24  And then at the bottom of page 6 Nevest talks about

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

40 (157 to 160)

157

1 meeting up with Mikey again; right?
2 **A He doesn't say she goes home. He says she**
3 **supposedly goes home.**
4 Q It says walked her -- watched her go home.
5 **A "Where did Mikey go, if you know?**
6 "Answer: She supposedly went home."
7 Q I'm just saying, what's --
8 **A I'm just reading the statement, sir.**
9 Q Right. At the top of the page, it says he
10 watched her go home, and then it says he doesn't --
11 supposedly went home; right?
12 **A Right.**
13 Q And then the next page says he met up with
14 her 15 minutes later. Do you see that?
15 **A Yeah. I can read it. Do you have a**
16 **question for me?**
17 Q That's all the question, just that --
18 **A Yeah. I can see it.**
19 Q All right. And then at the bottom of the
20 page it says he met up with Chip. Do you see that?
21 **A I see everything on this document, sir. I**
22 **can see everything here.**
23 Q I just want to make sure we're on the
24 same page.

158

1 MS. MEADOR: I'm going to object, Counsel.
2 I don't really understand the argumentative nature
3 of the attitude that you're giving to this
4 witness. I think it's inappropriate.
5 MR. AINSWORTH: I don't know what the --
6 what your objection is. It's --
7 MS. MEADOR: My objection is to your
8 attitude, as I've stated on the record. I think
9 it's inappropriate. Do you want to take a break?
10 MR. AINSWORTH: Lisa, I don't need it. I
11 just don't need it.
12 MS. MEADOR: Nor does this witness. This
13 witness is here --
14 MR. AINSWORTH: This witness is saying --
15 MS. MEADOR: -- and answering your
16 questions, and you are being absolutely
17 inappropriate to him.
18 MR. AINSWORTH: You're wrong. The witness
19 is telling me he can see everything.
20 Q I'm just simply asking you to follow along
21 with me. Do you understand that, sir?
22 **A Is that a question? Are you asking me to**
23 **follow along with you?**
24 Q I said --

159

1 MR. KUHN: Hal, just answer the question.
2 Q -- sir, do you see where --
3 THE COURT REPORTER: Okay. I can only
4 take one at a time.
5 **A I see Exhibit 8 and I see -- I'm able to**
6 **read all of page 7, sir.**
7 Q Do you see the bottom part of page 7 where
8 it says "Chip"?
9 **A I see "Chip."**
10 Q Okay. And so Nevest referred to a person
11 as Chip; right?
12 **A Yes.**
13 Q And then next page where it says at the
14 top, "Did you know Chip by another name," and it
15 says, "No, I don't," do you see that?
16 **A Again, I can read the entire exhibit, sir.**
17 MR. KUHN: Hal.
18 THE WITNESS: I can read it.
19 Q I'm just trying to find -- make sure we're
20 at the same place so there's no confusion in the
21 record about me talking about one particular part
22 of Exhibit 8 --
23 **A I see page 8. I see page 8.**
24 MR. KUHN: Counsel, let's take a break.

160

1 THE WITNESS: No, I'm fine.
2 MR. AINSWORTH: He's good.
3 Q And so, sir, Nevest never called Chip by
4 the name -- by the name Ship; correct?
5 **A I don't know what he -- I don't know what**
6 **Nevest called Chip by. I just know what I have in**
7 **this document here that he's referring to him as**
8 **Chip.**
9 Q Right. And you have no recollection of
10 Nevest calling Chip by the name Ship --
11 MR. MORAN: Object to foundation.
12 Q -- is that right?
13 MR. KUHN: Join.
14 **A No. No.**
15 Q Did Nevest ever tell you that the victim
16 was changing clothes?
17 **A Other than what I have documented in the**
18 **court reported between Coleman and I, I don't have**
19 **a personal recollection of the conversation other**
20 **than when I first went in and introduced myself,**
21 **Mirandized him, and the following conversation**
22 **which I would have asked him how he felt, how he**
23 **was treated.**
24 Q If Nevest told you that the victim had

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

41 (161 to 164)

161

1 changed clothes, you would have included that fact
2 in his -- you would have elicited that fact from
3 his court reported statement; correct?
4    A I don't know --
5     MR. KUHN: Objection; speculation.
6    A (Continuing.) I don't know. I might
7 have. I might not have.
8    Q Why wouldn't you elicit the fact that the
9 victim had changed clothes if Nevest had told you
10 that the victim had changed clothes?
11     MR. MORAN: Objection; speculation.
12     MS. MEADOR: Objection to form.
13     MR. KUHN: Join.
14     MR. MORAN: Foundation, form.
15    A You know, I'd have to look at the
16 investigation in totality at that time and then
17 make the determination whether or not that would
18 have been a relevant fact. Sitting here 25 years
19 later, I can't say what I would have done about a
20 change of clothing without -- you know, because
21 it's -- memories fade. Right? Memories fade.
22     So I don't remember -- can't say now
23 specifically if, during the court reported
24 statement, I would have examined him on the change

162

1 of clothing.
2    Q Well, if he had told you that the victim
3 had changed clothes or was going to change clothes,
4 that's something that you would have wanted to
5 talk to Nevest about during the court reported
6 statement; correct?
7    A Going to change clothes --
8     MR. KUHN: Object to speculation,
9 foundation.
10     Go ahead.
11    A (Continuing.) Going to change clothes when?
12    Q That night.
13    A When that night?
14    Q Before he met up with her again.
15    A I can't answer that question. I just
16 can't answer that question.
17    Q Why can't you answer it?
18    A Because I would need to really consider
19 and ponder all the facts of the case available to
20 me at that time and then make a determination if
21 it would have been important. But 25 years later
22 I really can't say what relevance her change of
23 clothes would have had. It might have been
24 something I might have followed up with during the

163

1 court reported but maybe not.
2    Q Well, why did you ask Francine Calimee to
3 describe what the victim was wearing when she left
4 Francine's house the night of April 11th, 1994?
5    A I don't --
6     MS. MEADOR: Objection; form, foundation,
7 assumes facts not in evidence.
8     MR. KUHN: Speculation and join.
9     MR. MORAN: Join.
10    A (Continuing.) I don't remember.
11    Q Well, would you agree with me that, because
12 you documented in Francine's statement what the
13 victim was wearing the night of April 11th, 1994,
14 that you at least had some interest in what the
15 victim was wearing the night that she was killed?
16    A What do you mean by "some interest"?
17    Q I mean that it was a fact that you thought
18 was relevant to your inquiry.
19    A So was her age. I mean, it's a fact. How
20 much weight I'm going to apply towards that fact,
21 I don't remember how much weight, if any, I gave it.
22    Q So you documented the color of Mikey's [sic]
23 pants that she was wearing at Francine's house;
24 right? If you'd like to look at Exhibit 4, you're

164

1 welcome to, page 2. The turquoise pants?
2    A Yes, I documented that.
3    Q The color of her boots; right?
4    A Yes.
5    Q The fact that she was wearing boots and
6 not shoes?
7    A Yes.
8    Q The fact that she was wearing a red Bulls
9 starter jacket; right?
10    A Right.
11    Q And that the red Bulls starter jacket had
12 her name, Antwinica, embroidered on the outside of
13 the coat; right?
14    A Is that a question?
15    Q Yes, sir. Do you see that you document --
16    A I see those -- I documented those facts, yes.
17    Q And you documented that Francine [sic] was
18 wearing a black ski coat with a pink and purple
19 design on the outside of the coat?
20    A Yes, I documented that. I documented
21 that, sir.
22    Q And did you have access to crime scene
23 photos when you talked to Mike Clancy when you
24 arrived at the area?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

42 (165 to 168)

165

1    A  No.  Those ET photos would have been --
2 would have just been, you know, created that
3 night.  I didn't look at them.
4    Q  Why didn't you look at them?
5    A  I'm not sure they were available to me.
6    Q  If they were available, you would have
7 looked at them?
8       MR. KUHN:  Objection; speculation.
9    A  Not necessarily but maybe.  But not
10 necessarily.
11   Q  Why did you document Francine's description
12 of the victim's clothing down to the pink and
13 purple design on the outside of her black ski coat?
14   A  I don't remember.
15   Q  I would suggest to you, sir, that -- did
16 it have anything to do with the fact that the
17 victim had been missing since April 11th, 1994,
18 and you were trying to triangulate and corroborate
19 the fact that she was actually killed the night
20 of -- that she was last seen at the party?
21      MR. KUHN:  Objection; form.
22      MS. MEADOR:  Objection; form.
23   A  I don't remember the relevance of her
24 clothing description.

166

1    Q  When you create your felony review jacket
2 and you summarize the victim's statement, do you
3 reproduce everything that the victim -- did I say
4 victim?
5    A  Yeah.  I don't summarize victims' statements.
6    Q  Let me -- well, you might if they're
7 living but let's -- let me start over.
8       When you create your felony review jacket
9 and you summarize a target statement, do you
10 include everything that the target told you during
11 your interview with that person?
12   A  No.
13   Q  Do you just include the most salient
14 details of what they told you?
15   A  And maybe some unsalient details.  There's
16 no rhyme or reason.  Just enough just to get a
17 general flavor of the statement.
18   Q  Did Nevest tell you that the victim had
19 changed clothes between the time that he left
20 Francine's home with Mikey and the time that he
21 met up with her about 15 minutes later?
22   A  I don't remember.
23   Q  All right.  If you'd take a look back at
24 Exhibit 8.

167

1       Before Nevest Coleman gave this court
2 reported statement that we've marked as Exhibit 8,
3 did you rehearse with him any of the questions
4 that you were going to ask or the answers that he
5 was going to give?
6       MR. KUHN:  Objection to form.
7    A  I would have gone over with him the -- the
8 format of the court reported statement and questions
9 that I would be asking.
10   Q  At what point in time would you have done
11 that with him?
12   A  At some point prior to the actual taking
13 of the court reported statement.
14   Q  And would that have been with the court
15 reporter in the room, or would that have been at
16 some point before the court reporter got there?
17   A  Some point before.
18   Q  And who was present for that conversation
19 with Nevest Coleman?
20   A  It would have been me and Coleman.
21   Q  Alone?
22   A  Not necessarily.  At some point it might
23 have been alone, but detectives sort of had free
24 access.  They may have come in and out, but I

168

1 don't have personal memory as to -- we always went
2 over with the suspects what the format was, what
3 you're calling a rehearsal, and that would have
4 been done in this case as it was done in every case.
5    Q  And so can you describe --
6    A  So -- I'm sorry.
7    Q  Go ahead.
8    A  Just so there would be no surprises and
9 that everything was being asked was something that
10 had been gone over and that they were expecting
11 and that would increase the probability of a
12 truthful response from a suspect.
13   Q  And so what did you rehearse with
14 Mr. Coleman?
15      MR. KUHN:  Objection to form.
16   A  I would --
17      MR. MORAN:  And that misstates his
18 testimony.
19      MR. KUHN:  Join.
20   A  I would have gone over -- I would have let
21 him know that we are -- I was going to re-Mirandize
22 him; I would have told him that I was going to ask
23 him what he remembers of the incident and that I
24 would be asking a number of open-ended questions

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

43 (169 to 172)

---

169

1 and that he was free to testify in a truthful and
2 an honest manner about his involvement, and he did
3 it and he told me how he acted as a lookout for
4 the murder of this girl.
5     MR. KUHN:  Russell, I think it's lunchtime.
6 I'm going to call it will unless you have not much
7 left, but I imagine you have plenty left.
8     MR. AINSWORTH:  I do.
9     MR. KUHN:  All right.  20 minutes,
10 something like that?
11    MR. AINSWORTH:  Whatever the witness needs.
12    MR. MORAN:  20 minutes is enough.
13    MR. KUHN:  Say half hour?
14    THE WITNESS:  Sure.
15    MR. KUHN:  Let's call it a half hour.
16    THE VIDEOGRAPHER:  Off the record, 1:44.
17    (Recess taken, 1:44 p.m. to 2:23 p.m.)
18    THE VIDEOGRAPHER:  Back on the record, 2:23.
19 BY MR. AINSWORTH:
20    Q  And forgive me, sir, but the -- in the
21 session where you talked with Nevest Coleman about
22 what questions you were going to ask during his
23 court reported statement, what questions did you
24 tell him that you were going to ask him apart from

---

170

1 the Miranda warnings?
2    A  Just general open-ended questions about
3 what had happened, but I don't have any real
4 specific recollection as to what that conversation
5 entailed.
6    Q  Was Nevest Coleman in the same room each
7 time you spoke to him?
8    A  Other than when we took the court reported
9 statement, that would have been in the general
10 detectives -- that common area.
11   Q  Like in the open area?
12   A  Yes.
13   Q  So not only was Mike Clancy present for the
14 court reported statement, but any other detective
15 involving investigation could have been walking
16 around; is that right?
17   A  Not during the court reported statement.
18 It would have been -- it wouldn't have been in
19 that general common area.  It would have been in a
20 large room than the initial interview room that I
21 met Coleman in.  It was -- it would have been in a
22 larger room, but not the same -- not the room that
23 the general common area was.
24       There had to be a bigger room.  We for

---

171

1 sure we didn't take the court reported statement
2 in that first initial room for sure, and for sure
3 we didn't take the court reported statement in
4 that general room where the detectives -- that
5 open area.  It would have had to have been a
6 larger room where we took that statement for sure.
7    Q  Were you speaking quickly when you took
8 your court reporter interview with Nevest Coleman?
9      MR. KUHN:  Object to speculation.
10     MR. AINSWORTH:  Go ahead.
11   A  Oh, no.
12     THE COURT REPORTER:  "No" or "I don't know"?
13   A  (Continuing.)  No.  No, I did not speak in
14 a quick manner.
15   Q  You were trying to make the questions
16 understandable for Mr. Coleman; is that right?
17   A  Yes.
18   Q  Was he speaking in a quick manner?
19   A  Nothing stands out in my memory about the
20 manner of his speech.
21   Q  In your court reported statement of Nevest
22 Coleman, you never had to ask him to repeat himself
23 because you didn't understand what he was saying
24 because he was speaking so quickly; is that right?

---

172

1    A  In the court reported statement I never
2 asked him to repeat any of his answers.
3    Q  And you believe that Nevest Coleman was
4 truthful in everything that he told you; is that
5 right?
6    A  It's my belief, yes.
7    Q  And what did you do after he concluded
8 giving his court reported statement?
9    A  He would have executed signatures on each
10 page.  We would have gone -- that's not -- what we
11 have done is this.  After the statement was done,
12 he and I would have reviewed that statement in its
13 entirety.  After we got through each page, we all
14 would have put our signatures, my signature,
15 Coleman's signature, and Clancy's signature.  And
16 we would have gone through the entire statement,
17 put on countersignatures.  We would have included
18 the statement, the reading of it, signatures of
19 it, and I would have taken his picture.
20   Q  Let me pause you there.  Before you
21 reviewed the statement, it had to have been typed
22 up; right?
23   A  Yes.
24   Q  All right.  And that was done by the court

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

44 (173 to 176)

173

1 reporter; correct?
2 **A   Yes.**
3   Q   It was done by the court reporter at the
4 area; right?
5 **A   Absolutely.**
6   Q   And some time would need to be used to
7 allow the court reporter to do that; correct?
8 **A   Yes.**
9   Q   In your testimony, for example, at
10 Mr. Coleman's trial, you testified about going --
11 starting your review of the statement at about
12 11:40 a.m.  Do you recall that testimony?
13   MS. MEADOR:  I'm going to object as to form.
14 **A   I would need to have my memory refreshed**
15 **as to what time.**
16   Q   Let me read your -- let me read this
17 portion of your testimony to you.  This is page X23,
18 also Bates numbered PLAINTIFF 001987, lines 3 to 7.
19   "Question:  I'd like to direct your
20 attention to approximately 11:40 that morning.
21 Was the court reported statement, in fact, typed up?
22   "Answer:  It was."
23   And, oh, and also in your motion to
24 suppress testimony for Mr. Coleman's case we have

174

1 similar testimony where you testify at page H11 of
2 Coleman's motion to suppress, which is also Bates
3 numbered PLAINTIFF 000478, and you're asked the
4 question at line 13:
5   "Question:  Now, sir, directing your
6 attention to approximately 11:40 a.m., did you
7 have an opportunity to review the statement with
8 the defendant?
9   "Answer:  I did."
10   Does that refresh your recollection as to
11 the time you reviewed the statement with Mr. Coleman?
12 **A   Yes.**
13   MR. MORAN:  Objection; form, foundation.
14   MR. KUHN:  Join.
15   Q   What time did you review the statement
16 with Mr. Coleman?
17 **A   Well, that indicates that it would have**
18 **been at or near the time of 11:40.**
19   Q   Do you know where that 11:40 -- like how
20 you're able to remember that time in your -- or
21 how Mr. Sexton would know to -- to establish the
22 time of 11:40 at your motion to suppress testimony
23 and your trial testimony?
24   MR. MORAN:  Objection to form.

175

1   MR. KUHN:  Objection; speculation, form.
2   MS. MEADOR:  Join.
3 **A   I can't speak on behalf of Mr. Sexton as**
4 **to how he identified that time nor do I have any**
5 **personal recollection that I -- that I first**
6 **reviewed with Mr. Coleman the court reported**
7 **statement at 11:40.  I just don't have any**
8 **personal memory of that.**
9   Q   Is there anywhere where that time would be
10 documented?
11 **A   Not that I can think of.**
12   Q   I'll represent to you that the photograph
13 that was taken of Mr. Coleman and that was signed
14 was signed -- was -- the time that was placed on
15 it was 12:05 p.m.
16 **A   Okay.**
17   Q   Does that indicate to you anything about
18 when you might have started reviewing Mr. Coleman's
19 statement?
20 **A   No.  It just means I would have taken a**
21 **picture at or near the time of 12:05.  It doesn't**
22 **instruct me specifically when I started the review**
23 **or concluded the review.**
24   Q   While you were waiting for the court

176

1 reporter to arrive, what did you do?
2 **A   I don't have any personal knowledge as to**
3 **what -- I don't have a personal memory as to what**
4 **I did, but I more than likely would have just**
5 **waited for the court reporter to come.**
6   Q   And talked with the detectives about the
7 investigation?
8 **A   I don't remember.**
9   Q   After you signed Mr. Coleman's court
10 reported statement, what did you do?
11 **A   After I signed what page of Mr. Coleman's**
12 **court reported statement?**
13   Q   Sorry.  After you signed the last page of
14 Mr. Coleman's court reported statement.
15 **A   I don't have any personal memory what I**
16 **did, but I at some point would have left the area**
17 **and let the dispatch know that I was available to**
18 **take other calls that came in.**
19   Q   What time did you leave the area?
20 **A   I don't remember.**
21   Q   So Nevest Coleman implicated Dap and Chip
22 in the murder; right?
23 **A   Yes.**
24   Q   And did you want to speak to Dap or Chip?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

45 (177 to 180)

---

177

1    A  I don't believe Dap or Chip were at the
2  area at that time.
3    Q  Did anyone tell you that Dap was at the
4  area when you were taking Nevest Coleman's court
5  reported statement?
6    A  I don't remember any conversation at the
7  time I took Coleman's statement that Dap or Chip
8  were at the area.  But they may have told me.  I
9  just don't have a personal memory of it.  I don't
10  have a personal memory of it.
11    Q  If Dap was at the area at the time that
12  you were at the area after taking Nevest Coleman's
13  court reported statement, would you have wanted to
14  speak to him and interview him to find out what he
15  knew about this crime?
16    MR. MORAN:  Object; speculation.
17    MR. KUHN:  Join.
18    A  If the police department would have
19  contacted felony review and asked me to review or
20  go over evidence of this or any other murder, then
21  once that assignment takes place, then I would do
22  it.  But until a formal assignment has been made
23  to me from a supervisor -- from a dispatcher that
24  there's a case that's to be reviewed, I would not

---

178

1  interview anybody else.
2    Q  I thought you were assigned to review
3  this case.
4    A  I was with regards to Nevest Coleman.
5    Q  Okay.  So in regards to Nevest Coleman,
6  wouldn't you want to speak to his codefendant to
7  find out what his -- you know, or his
8  coperpetrator to find out what his coperpetrator
9  had to say?
10    A  I don't know if there was a coperpetrator
11  at the area at the time at which I took Coleman's
12  statement.  I don't remember that.
13    Q  Sorry; let me clarify my question.  If you
14  knew that there was a coperpetrator at the area at
15  the time you took Nevest Coleman's statement,
16  would you have wanted to interview him?
17    MR. KUHN:  Objection; speculation,
18  incomplete hypothetical.
19    Go ahead.
20    A  Only if, again, the police department
21  contacted felony review and asked me to interview
22  that individual to make a determination to approve,
23  reject, or CI a case.  That's how the protocol went.
24    Q  I thought this morning you told me that

---

179

1  you wanted to interview all targets that were at
2  the area if there was more than one target.
3    A  Yes.  But there's a procedure for that,
4  and I never said when we first spoke that that
5  procedure did not include me being formally
6  assigned to interview an individual, a target or a
7  suspect, and any collateral evidence to that.
8    In felony review you would never, ever
9  interview a target or suspect of a murder case
10  until there's been a formal assignment.  The way
11  that formal assignment reviews -- occurs is a
12  police department calls up felony review, they
13  speak to a dispatcher, and the dispatcher says,
14  "Oh, we would like you now to review this case."
15    This case did not involve me -- I don't
16  remember me going from Nevest Coleman to Fulton
17  without a formal assignment from my dispatcher to
18  do that.  I don't believe that was the case.
19    Q  So Nevest Coleman --
20    A  Simply put, I think I left the area after
21  I took the statement of Coleman and then returned
22  back to the area at some later point to interview
23  Fulton.
24    Q  Well, before you left you approved murder

---

180

1  charges against Nevest Coleman; right?
2    A  Of course.
3    Q  And then Nevest Coleman would be taken to,
4  you know, Cook County jail, and he would be brought
5  before a judge for a bond hearing; right?
6    A  Yes.
7    Q  So did you talk to the detectives about
8  charging Dap?
9    A  I don't -- I don't -- you're assuming I
10  knew that Dap was in the area at that time.  I
11  don't remember -- I don't have any personal
12  knowledge that when I interviewed Coleman Dap or
13  Chip or anybody else who was considered a target
14  by the police department was at the area at that
15  time.  I don't have personal knowledge of that
16  fact.  You're assuming that fact to be true.  I
17  don't know that fact to be true.
18    Q  Did you document in Nevest Coleman's
19  statement whether he had been offered the ability
20  to make a phone call?
21    A  I did not ask that question.
22    Q  Why not?
23    A  The question --
24    MR. KUHN:  Objection; asked and answered.

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

46 (181 to 184)

181

1     MS. MEADOR:  Objection; asked and answered.
2     **A (Continuing.)  You have asked that**
3  **question quite a bit.  That's not our function.**
4  **We were never trained to ask a target or a suspect**
5  **or a witness if they would like to make a phone**
6  **call.  I never did --**
7     Q  Sorry; my question is a little bit
8  different.  And, you know, everyone can object if
9  they want to, but my question is, did you document
10 in the statement by saying, "Mr. Coleman, I
11 understand you have not been able -- you have not
12 been -- you've not made a phone call to a family
13 member or to anyone during your time in custody"?
14    **A  There's nothing in the court reported**
15 **statement reflecting any conversations between**
16 **Coleman and myself about making or not making a**
17 **phone call.**
18    Q  And so why didn't you document in the
19 court reported statement that Nevest Coleman
20 hadn't made a phone call to any family member?
21    MR. KUHN:  Objection; foundation,
22 speculation.
23    **A  Because there was no conversation between**
24 **me and Coleman about the existence or nonexistence**

182

1  of a phone call because we aren't trained to ask
2  those questions about phone calls.  And, therefore,
3  I -- it wasn't a relevant topic in the interview.
4     MR. AINSWORTH:  Let's mark this as Exhibit 9.
5     (Garfinkel Deposition Exhibit 9 marked for
6  identification and attached to the transcript.)
7     Q  Showing you what we've marked as Exhibit 9,
8  is this your felony review jacket for Nevest Coleman?
9     **A  It is.**
10    Q  Okay.  All right.  In the top left corner
11 you have "Screen Felony" marked?
12    **A  Yes.**
13    Q  What does that refer to?
14    **A  Screen for a felony, to evaluate the**
15 **evidence to approve we had a felony.**
16    Q  We've got a start time as 0615.  What does
17 that refer to?
18    **A  That probably documents the time that I**
19 **hit the area.  Probably.**
20    Q  When you say "hit the area," you mean
21 arrive at the area?
22    **A  Arrive -- excuse me -- arrive at the area.**
23    Q  And then finish time we have 1415.  What
24 does that refer to?

183

1     **A  That's military time for 2:15 p.m.  That's**
2  **probably -- probably when I finished the felony**
3  **review jacket.**
4     Q  And do you know where you were when you
5  filled out this felony review jacket?
6     **A  I don't remember.  It would have either**
7  **been on the 14th floor of 26th Street, or it would**
8  **have been at the area.**
9     Q  What does Action No. 75 refer to?
10    **A  I believe that's -- I believe that was the**
11 **75th call that was requested to be reviewed for a**
12 **felony during the month of April 1994.**
13    Q  In your group or is that for all of felony
14 review?
15    **A  I don't remember.  I just don't remember**
16 **so many years ago.**
17    Q  Under "Charges/Actions," you've got a
18 number of charges on the left-hand side.  Then you
19 have notifications of ASA Bigane and ASA Bosky?
20    **A  Okay.**
21    Q  Why are those people listed there?
22    **A  Well, I must have contacted John Muldoon**
23 **for Fulton, and ASA -- that would have been Jane**
24 **Bigane; she was a supervisor, and that would have**

184

1  been Chuck Bosky; he was a supervisor -- well,
2  hold on.  Those were additional trial supervisors
3  in felony review that I just reached out to maybe
4  in addition to Muldoon, or those may have been the
5  only supervisors I spoke to excluding Muldoon.  I
6  don't remember.
7     Q  Why would you include the names of those
8  two Assistant State's Attorneys but not Muldoon's
9  name if you talked to Muldoon?
10    **A  I wouldn't have.  I wouldn't.  I was**
11 **pretty particular.**
12    Q  So this suggests that you talked to
13 ASA Bigane and ASA Bosky?
14    **A  I believe.  I believe.**
15    Q  Does looking at Exhibit 9 refresh your
16 recollection of your conversation with your
17 supervisor or supervisors?
18    **A  No, not at all.  It just indicates that I**
19 **documented that I contacted them.  It doesn't**
20 **refresh the content of that conversation.**
21    Q  All right.  And then we've got "Statement"
22 for Defendant No. 1, which is Nevest Coleman;
23 right?
24    **A  Where are you?**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

185

1    Q  Under "Charges and Actions" we now have a
2  new heading, "Statement."
3    **A  Yes, yes.**
4    Q  Okay.
5    **A  Uh-huh.**
6    Q  And type is court reported; correct?
7    **A  Yeah, that's when the court reporter started.**
8    Q  9:57 but close enough; right?
9    **A  Right.**
10   Q  You don't include the court reporter's
11 name --
12   **A  No.**
13   Q  -- correct?  Is there a reason for that?
14   **A  No.**
15   Q  Then you have witnesses as yourself and
16 Detective Clancy, and then we have a statement
17 summary?
18   **A  Yes.**
19   Q  And so this is a summary of the statement?
20   **A  Of course.**
21   Q  And so could you read this to us, sir?
22   **A  Do you want me to read the statement**
23 **summary?**
24   Q  Yes, please.

186

1    **A  "Defendant advised of our -- advised of**
2  **the warnings.  Offender and two male blacks known**
3  **only as Ship and Dap" -- probably was Chip; I put**
4  **Ship -- "raped Victim 1 in vagina and anus.**
5  **Offender 1 directed Dap to place concrete in her**
6  **mouth while Ship placed a pole inside the vagina,**
7  **causing bleeding.  Victim 1 -- Victim 1 booty**
8  **found at Offender 1 residence at 917 West Garfield."**
9    Q  Is that body perhaps?
10   **A  Yeah, it's body.**
11   Q  All right.  Sir, so twice you put, in
12 quotes, "Ship."  Do you see that, sir?
13   **A  Yes.**
14   Q  Do you remember there being a discrepancy
15 in the investigation between whether Chip's name
16 was Chip or Ship?
17       MS. MEADOR:  Objection; form, foundation.
18       MR. KUHN:  Join.
19   **A  I don't remember whether or not that was**
20 **an ongoing debate of whether it was Chip or Ship.**
21 **I don't remember that.**
22   Q  In any event, after the court reported
23 statement in which Nevest Coleman called him Chip,
24 you called him Ship in this summary; is that

187

1  right?
2    **A  Wasn't there a correction made regarding**
3  **Chip or Ship in the court reported?**
4    Q  You're looking at Exhibit 8; correct?
5    **A  Yeah.**
6    Q  Remember, we talked about you had read all
7  of page 8, and it references Chip at the bottom of
8  page 7 and then the top of page 8, and then the
9  top of page 9, and then all throughout the rest of
10 the statement?
11   **A  Yes, Chip is referenced in the court**
12 **reported, and Ship is referenced in the felony**
13 **review jacket.**
14   Q  And the felony review jacket came after
15 the court reported statement; right?
16   **A  Absolutely.**
17   Q  And after the court reported statement was
18 reviewed and signed; right?
19   **A  Yes.**
20   Q  And in your statement summary you said
21 that Dap was directed to place concrete in the
22 victim's mouth; right?
23   **A  That -- that's I believe what Coleman**
24 **told me.**

188

1    Q  Well, in his statement he never says
2  concrete; right?
3    **A  Does he say -- does he say brick?**
4    Q  He does, sir.
5    **A  So concrete and brick would have been**
6  **synonyms.**
7        THE COURT REPORTER:  Would have been what?
8    Q  Synonyms?
9    **A  You know, one would have referenced --**
10 **they're not truly synonyms, but it would have been**
11 **a concrete brick, and I just was maybe sloppy in**
12 **the narrative when I didn't write brick, concrete.**
13   Q  So you think that concrete and brick are
14 the same thing?
15   **A  I think that when I said concrete in the**
16 **narrative section, that was to reference some**
17 **concrete-type object, which could also be**
18 **considered a brick.**
19   Q  Did you know from your review of the
20 police reports that it was a piece of concrete
21 that was in the victim's mouth and not a brick?
22   **A  I never said that I reviewed any police**
23 **reports.**
24       MR. KUHN:  Objection; misstates testimony

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

189

1  regarding the difference between concrete and brick.
2      Q  I'm not asking you, sir, if you reviewed
3  police reports.  I'm asking, do you recall seeing
4  in any police reports a reference to the fact that
5  concrete was in the victim's mouth as opposed to a
6  brick?
7      MR. MORAN:  Objection; foundation.
8      MR. KUHN:  Join.
9      **A  It's quite possible that the brick that**
10 **was referenced in the police reports were made out**
11 **of concrete.  I just called it concrete.  It was**
12 **just -- it was just kind of a general term that**
13 **could be used interchangeably concrete and/or brick.**
14     Q  You have arresting officers as Paluck and
15 Mora.  Where did you get those names from?
16     **A  I also have investigators as Boudreau and**
17 **O'Brien.  There were -- there were a lot of people**
18 **out that night.  There were loads of officers**
19 **involved.  I guess I'd have to look at the arrest**
20 **report.**
21     Q  I'm asking, where did you get the names of
22 the arresting officers?
23     **A  It's quite possible that I -- that I did**
24 **review an arrest report subsequent to Coleman**

190

1  **being charged, and the arresting officer may have**
2  **been Paluck.  Take a look at a CB police report**
3  **and you'll probably see Paluck's name there even**
4  **though Clancy did the open and close.**
5      MR. AINSWORTH:  Let's mark this as
6  Exhibit 10, please.
7      (Garfinkel Deposition Exhibit 10 marked
8  for identification and attached to the transcript.)
9      Q  All right.  Here is an arrest report for
10 Nevest Coleman; right?
11     **A  Right.**
12     Q  I don't see -- I see the arresting officers
13 as being Foley, Clancy, Halloran, Boudreau, O'Brien,
14 Carroll, Moser, and Graf.
15     **A  That's right.**
16     Q  Incidentally, did Nevest Coleman tell you
17 that he worked for the White Sox?
18     **A  He did not tell me that, no.**
19     Q  It didn't come up?
20     **A  He may have told me.  I don't have personal**
21 **knowledge of that, and I learned that fact**
22 **afterwards.**
23     Q  When you say "afterwards," what do you --
24 what are you referring to?

191

1      **A  Either the Sun Times or Tribune did a**
2  **whole article about how Coleman worked for the**
3  **White Sox and that he was a gang member in 21st**
4  **Century -- I don't remember what the name of the**
5  **group was, but I think that also referenced the**
6  **fact that he was a groundskeeper and also a named**
7  **gang member in that article.**
8      Q  At the time that you were at the area, you
9  didn't know anything about Nevest being part -- a
10 member of a gang; is that right?  I'm not asking
11 you if it's on the arrest report; I'm asking if
12 you knew this fact when you were at the area.
13     **A  Well, I would have taken a picture of him,**
14 **and it's quite possible that that picture had a**
15 **tattoo, so then I might have learned that fact**
16 **then if he had any tats on his body.  If there's**
17 **nothing in the court reported statement that he**
18 **reveals himself as a gang member or me asking him**
19 **that, that doesn't mean that I didn't take a**
20 **picture of him and that I would have seen a tattoo**
21 **establishing that there's a GD.**
22     Q  All right.  You have listed as investigators
23 Boudreau and O'Brien.  Why did you list Boudreau
24 on O'Brien as the investigators?

192

1      **A  That was interchangeable -- that's just --**
2  **the felony review jacket calls them investigators.**
3  **If you'll see, they don't use the word "detective,"**
4  **but what I did to the right of it is identify**
5  **titles, Detective Boudreau, Detective O'Brien.**
6      Q  And you also have Clancy and Graf and
7  Moser if you flip ahead two pages to page 908 at
8  the bottom, just to be fair.
9      **A  Fair to who?**
10     Q  To you.  I'm not trying to --
11     **A  No, no.  Arresting officers, then I put**
12 **Detective Clancy as being the arresting officer.**
13 **Paluck must have been a gang guy or something.**
14 **I'm guessing Paluck probably brought him into**
15 **the area.**
16     Q  So do you know why you chose these
17 five detectives, Boudreau, O'Brien, Clancy, Graf,
18 and Moser as opposed to any other five who were
19 working the case?
20     **A  They might -- you know, there were lots of**
21 **people.  It was -- you know, it was a big case;**
22 **there were lots of people there that night -- that**
23 **day.  I just remember seeing those figures that**
24 **played a significant role.**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

49 (193 to 196)

193

1    Q  All right.  Then below that we have
2  evidence investigation --
3    **A  Just to be fair, if you look at the notes**
4  **section, I wrote, "Dr. Congan performed postmortem**
5  **M.E. 560 April '94.  Suffocation as a result of a**
6  **triangular piece of concrete jutted in mouth near**
7  **windpipe."  So that was a term that was used**
8  **throughout the investigation, concrete.**
9    Q  Right.  Not brick; correct?
10    **A  No.  We -- there was also -- I mean, we --**
11  **but we used the term brick, too.**
12    Q  Who is "we"?
13    **A  Well, the detectives.  They would have**
14  **just referenced it concrete or concrete brick.**
15    Q  Well, all right.  The medical examiner
16  referred to it as a triangular piece of concrete;
17  right?
18    **A  Yeah.  But if you look at the incident on**
19  **page 1 of Exhibit 9, weapon type, we put "Cylinder,**
20  **brick, metal pipe."  So you see that that term is**
21  **used interchangeably, concrete and brick.**
22    Q  Who is "we"?
23    **A  Well, I mean, let's say me.**
24    Q  Yeah, it was you who wrote this; right?

194

1    **A  I wrote that, sir.**
2    Q  All right.  Exhibit 9 is your handwriting?
3    **A  Yes.**
4    Q  Correct?
5    **A  It is, yes.**
6    Q  All right.  So you were calling it a
7  brick, and the medical examiner was calling it a
8  triangular piece of concrete; correct?
9        MS. MEADOR:  Objection; mischaracterizes
10  the witness' testimony.
11        MR. MORAN:  Join.
12        MR. KUHN:  Join.
13    **A  Wait a minute.**
14    Q  Are you looking for where it says "piece
15  of brick," sir?
16    **A  No, I'm not.  I'm looking for something else.**
17    Q  What are you looking for, sir?
18    **A  I'll tell you.**
19    Q  Well, I'm asking.
20        MR. KUHN:  I don't think there was a
21  question pending.
22        MR. AINSWORTH:  No, there is a question
23  pending.  It's, "What are you looking for?"
24    **A  I'm trying to see where your client**

195

1  referenced it.
2    Q  That's where it says piece of brick.  It's
3  at the top of page 15, I think.  Yeah, top of
4  page 15, sir.
5    **A  Right.  So your -- so your client uses the**
6  **word brick in the court reported statement, and I**
7  **use the word brick in the felony review narrative.**
8  **So both your client and I use the word brick, and**
9  **the word concrete is also used.**
10    Q  By the medical examiner; right?
11    **A  I don't know -- I don't know if he's the**
12  **only person who used it.**
13    Q  All right.  In any event, sir --
14    **A  Yeah.**
15    Q  -- you have listed as evidence, physical
16  evidence a used condom and a broken pair of
17  glasses; right?  Turning back to Exhibit 9.
18    **A  That's -- that's three pieces of physical**
19  **evidence, yes.**
20    Q  Did you ask Nevest Coleman if anyone used
21  a condom during the commission of the crime?
22    **A  I don't have personal knowledge as to**
23  **whether I asked him that question, but it's not in**
24  **the court reported statement clearly.**

196

1    Q  You would have wanted to know if there's
2  any item of physical evidence that might link
3  Nevest Coleman to the crime; right?
4        MR. KUHN:  Objection; incomplete
5  hypothetical, speculation.
6    **A  I just asked him to provide a statement**
7  **regarding what information he had, and then he**
8  **admitted to acting as a lookout while he watched a**
9  **girl get murdered.**
10    Q  This will go easier if you answer my
11  question, sir.  My question is, did -- you wanted
12  to --
13        MS. MEADOR:  Counsel, that's unnecessary.
14        MR. AINSWORTH:  Well, I mean --
15        MS. MEADOR:  Again --
16        THE WITNESS:  No, go, go.
17        MR. AINSWORTH:  -- this is an attorney
18  here, and he knows what the questions are.
19        MS. MEADOR:  He doesn't need to be
20  harassed in that nature.
21        MR. AINSWORTH:  Apparently he needs
22  additional direction.
23        THE WITNESS:  I don't need any direction
24  but I'm not being harassed.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

50 (197 to 200)

197

1    MR. KUHN:  Wait until there's a question.
2    Q  All right.  So you wanted to know if
3  there's any piece of physical evidence that might
4  corroborate Nevest Coleman's statement inculpating
5  himself; right?
6    A  I didn't say I wanted to know that.  I was
7  just provided -- whatever evidence they had, I was
8  provided.  I didn't say I wanted to know that.
9    Q  I'm not suggesting you are.  I said -- I'm
10  suggesting to you that it seems to me that if I'm
11  getting a confession from a suspect, I would want
12  to know if there are pieces of physical evidence
13  that I could test to link that person to this
14  crime --
15    A  I'm not an investigator --
16    MR. KUHN:  Wait until the question is done
17  and let me object.
18    THE WITNESS:  I apologize.
19    Q  -- to aid in the prosecution of that person.
20    MR. KUHN:  Objection; foundation,
21  speculation, incomplete hypothetical.
22    If you understand the question --
23    THE WITNESS:  I do.
24    MR. KUHN:  -- you can go ahead and answer.

198

1    A  You're couching that question as if I'm an
2  investigator.  I'm not there an as investigator.
3  I'm there as a lawyer taking a statement.  So when
4  you say you would want to know if there's any
5  incriminating or any intrinsic or demonstrative
6  evidence, I wasn't there to look for evidence; I
7  was there to take a statement from somebody who is
8  admitting to a crime.
9    Q  And confront him with evidence if need be;
10  right?
11    MR. KUHN:  Objection; mischaracterizes
12  testimony, foundation, speculation.
13    A  If that evidence was presented to me by
14  police officers acting as investigators or Coleman
15  telling me that he was aware of any physical
16  evidence, maybe he was going to provide that to
17  me.  But, again, I don't have a personal
18  recollection of ever speaking to Coleman about
19  physical evidence other than what's included in
20  the court reported statement.
21    Q  You provided a summary of the incident;
22  correct?
23    A  I provided a summary of the incident?
24    MR. MORAN:  Are we back on Exhibit 9?

199

1    MR. AINSWORTH:  We are.
2    A  The felony review -- the felony review
3  jacket?
4    Q  Yeah.
5    A  Yes.
6    Q  All right.  And in that incident summary
7  you note that Dab is currently in custody at
8  Area 1 but he's not been charged.  Do you see
9  that, sir?
10    A  I don't see that.  Where are you
11  referring to?
12    Q  The incident.
13    MR. MORAN:  How about the page number?
14    A  Okay.
15    Q  So middle of that paragraph.  "Dab is
16  currently in custody at Area 1 but has not been
17  charged."
18    A  I don't see that.  Where is that?  Page 1?
19    Q  Page 1, five lines down.
20    A  Five lines down?
21    Q  Underneath the word "party."
22    A  Dap and Ship is currently in custody room
23  but has not been -- but has not been charged.
24  Okay.  Which meant I would not have had any

200

1  contact with him at that point.
2    Q  Why does that mean you would not have had
3  any contact with him at that point?  You had
4  contact with Nevest before he was charged; right?
5    MR. MORAN:  Object to form.
6    MR. KUHN:  Join.
7    MR. MORAN:  Foundation.
8    A  I think in my trial testimony or in motion
9  to suppress testimony I document -- I think I
10  testified what time I arrived at the area and made
11  contact with Fulton.  I think I do.  Do you
12  know that?
13    MR. KUHN:  Let counsel ask the questions.
14    Q  So there's nothing -- you knew that Dap
15  was at the area the morning of April 29th, 1994;
16  correct?
17    A  It's documented in the jacket, yes.
18    Q  Yeah.  Documented by you; correct?
19    A  I authored the jacket.
20    Q  All right.  In your incident summary --
21  well, where did you get the information for the
22  incident summary?
23    A  That would have come from the detective
24  regarding the status of any other individuals.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

51 (201 to 204)

201

1    Q  Well, where did the other information for
2  the incident come from?
3    A  Like what?  Like the facts?
4    Q  Yeah.
5    A  Well, that would have come from Nevest
6  Coleman when he incriminated himself.
7    Q  All right.  So it says, "On above date,
8  time, and location, Victim 1, Witness 1, and
9  Offender 1 left home of Witness 2 after spending
10 three hours at Witness 2's residence partying.
11 Victim 1 and offender walked Witness 1 to her
12 residence, and Victim 1 and offender went to
13 purchase beer at 55th and Halsted.  Offender 1 went
14 to purchase beer while Victim 1 went to her home
15 to change her clothes.  Victim 1 and offender
16 decided to return to Witness 1's residence to party
17 again when they met two of offender's friends Dap
18 and Ship."  Again, Ship is spelled like the boat.
19    Do you see that, sir?
20    A  I do see that.
21    Q  All right.  So Nevest told you that the
22 victim changed her clothes; right?
23    MS. MEADOR:  Objection; mischaracterizes
24 the evidence.

202

1    MR. KUHN:  Join.
2    A  That fact is included in the incident, but I
3  don't know -- I don't know the source of that fact.
4    Q  I thought you said that Nevest Coleman was
5  the person who told you that.
6    A  I said he was one of the people who gave
7  me some of the facts, but I didn't say he was the
8  only individual or the only source of facts in here.
9    Q  Who -- who else -- well, let me just ask
10 you this.  Who told you that the victim went to
11 her home to change her clothes and then decided to
12 return to Witness 1's residence?
13    MR. KUHN:  Objection; foundation,
14 speculation.
15    A  I -- I don't remember.  I don't remember.
16    Q  Is there anyone else who you spoke to
17 while you were at the area on April 29th, 1994,
18 who could have told you that information other
19 than Nevest Coleman?
20    MR. MORAN:  Object to speculation.
21    MR. KUHN:  Join.
22    A  I'd have to speculate on it.  I wouldn't
23 feel comfortable doing that because I don't have
24 any personal knowledge.

203

1    Q  All right.  And then we have Dap -- sorry,
2  still in the incident, sir; we're not done with
3  that -- Exhibit 9, page 1, "Dap, Ship, Offender 1,
4  and Victim 1 returned to offender residence where
5  Offender 1 directed Dap to place a piece of
6  concrete in her mouth while Dap and Ship both
7  performed both vaginal and anal intercourse on
8  Victim 1."  Do you see where it says "concrete," sir?
9    A  I do see it.
10    Q  Did Nevest Coleman say the word concrete
11 to you?
12    MR. KUHN:  Object to foundation, speculation.
13    A  I don't remember who used the word
14 concrete.  I might have just used -- kind of like
15 poetic license and used the word concrete.
16    Q  Well, what made you think it was concrete?
17    MR. KUHN:  Objection; foundation,
18 speculation.
19    A  Well, if --
20    Q  I mean, let me -- let me withdraw that
21 question.
22    A  Sure.
23    Q  If Nevest is calling it a brick or a piece
24 of a brick, what would make you think that it was

204

1  concrete, then?
2    MR. MORAN:  Objection; speculation.
3    A  That might have just been --
4    MS. MEADOR:  Object to form.
5    Go ahead.
6    A  (Continuing.)  That might have just been my
7  inference.  Again, that might have just been me
8  assuming that to be a fact when it hadn't been
9  confirmed.
10    Q  Have you ever worked with bricks?  You
11 look like a handy -- handy person.
12    A  I don't work with -- I don't really work
13 with bricks a lot.
14    Q  Well, you have worked with them before?
15    A  Bricks?
16    Q  Yeah.
17    A  You know that I've worked with bricks before?
18    Q  Yeah.
19    A  When have I worked with bricks before?
20    Q  I'm asking you the questions, sir.  Can
21 you tell us --
22    A  Have I worked with --
23    Q  -- the circumstances in which you've
24 worked with bricks?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

52 (205 to 208)

---

205

1    A  I don't think I have worked with bricks.
2    Q  Then why did you say that you don't think
3  you've worked with bricks a lot?
4    A  I don't think I've worked with bricks
5  at all.
6    Q  My question is, why did you say you don't
7  think you've worked with bricks a lot?
8       MR. KUHN:  Objection; argumentative.
9       MR. MORAN:  Objection; argumentative.
10    A  That was probably me just saying that when
11  I don't work with them a lot, I meant, I guess
12  like -- like it's quite possible that maybe I had
13  a brick in my back yard, and I threw it in the
14  garbage can.  Maybe when I said a lot, I consider
15  that a little bit, having access to bricks, but
16  I've never worked in a formal job with bricks.
17  I've never worked with bricks.
18    Q  So when I said have you worked with
19  bricks, you thought maybe you might have discarded
20  a brick, and that would be construed as working
21  with bricks?
22    A  Well, when you said the word "worked," you
23  didn't say were you employed having access to
24  bricks.  Working with bricks would be also if I'm

---

206

1  cleaning up the house, and there may be a brick
2  there.  I'll be very clear, I've never been
3  employed as a -- as a contractor or as a manual
4  laborer involved with bricks.
5    Q  Do you have a brick home?
6    A  Do I have a brick home?  Do you have a
7  brick home?
8    Q  I'm asking you, sir.  Do you have a
9  brick home?
10    A  I do have a brick home.
11      MR. MORAN:  So that counts as working with
12  bricks?  Okay.
13    A  (Continuing.)  Yeah, I have a brick home,
14  Russ.
15      MS. MEADOR:  I think we're in a rabbit
16  hole, here.
17      THE WITNESS:  No.
18    Q  All right.  And then continuing the
19  incident it says, "Ship takes a metal pipe and
20  inserts pipe in vagina of Victim 1."  Do you see
21  that, sir?
22    A  I do.
23    Q  Okay.  And at the time Nevest Coleman was
24  25 years old; right?

---

207

1    A  I don't know what his age was, but I'm
2  sure I could look at his date of birth and I could
3  calculate it.
4    Q  At the top of your jacket it's March 18th,
5  '69, is his birthday.
6    A  Okay.  25.
7    Q  25.  And then you have in the last part of
8  the incident, "All three boys leave scene and body
9  discarded on April" -- discovered; sorry -- "on
10  April 28, '94, in basement where rape occurred.
11  Residence of rape is offender's residence,
12  917 West Garfield."
13    A  Right.
14    Q  Do you see that, sir?
15    A  I do.
16    Q  You wrote that, sir?
17    A  I authored this, yes.
18    Q  Yes.  Why did you say "all three boys"?
19      MR. KUHN:  Objection; speculation;
20  foundation.
21    A  That was just a descriptive noun used to
22  refer to the three young men.
23    Q  And how was it descriptive, sir?
24    A  Well --

---

208

1      MR. KUHN:  Objection; argumentative.
2    A  -- they -- they weren't girls; they were
3  boys.  But they were young men.
4    Q  He's 25.  He was full- -- he was fully
5  employed as a groundskeeper for two years and been
6  fully employed for seven years since graduating
7  high school.
8      MR. KUHN:  Objection; argumentative.
9    A  I didn't --
10      MR. MORAN:  Hold on.  There's no question
11  pending yet.
12      THE WITNESS:  Sure.
13    Q  Why -- why did you call him a boy?
14      MS. MEADOR:  Objection; asked and answered.
15      MR. KUHN:  Objection; asked and answered.
16    A  Well, I wasn't going to call him a girl,
17  was I?
18    Q  Is it because he's black?  Is that why you
19  called him a boy?
20      MS. MEADOR:  Whoa.  Objection --
21    A  Not at all.
22      MS. MEADOR:  -- argumentative.
23    A  (Continuing.)  Not at all.
24      MR. CURRAN:  It's a fair question.  How is

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

53 (209 to 212)

---

209

1  it argumentative?
2      MS. MEADOR:  I'm making my objection,
3  Counsel.
4      A  (Continuing.)  Not at all.
5      (Simultaneous speaking.)
6      THE COURT REPORTER:  I didn't hear that
7  and it's not on the record.
8      Q  Let me -- let me go on to the second page
9  of Exhibit 9.
10     A  Sure.
11     Q  There's three additional pieces of
12 evidence, sir.  Did you ask Nevest Coleman if he
13 handled any of those pieces of evidence?
14     A  Say again?
15     Q  Did you ask Nevest Coleman if he handled
16 any of those pieces of evidence?
17     A  The first three pieces on the first page?
18     Q  Sorry, the second page.  There are three
19 pieces of evidence listed there.
20     A  I never asked him -- I don't remember
21 whether or not I asked him if he handled it.
22     Q  Did you want to know if he had handled any
23 of those three pieces of investigation [sic] to
24 aid his future prosecution?

---

210

1      A  I wasn't -- I was not acting as an
2  investigator.  I was there as a lawyer having been
3  informed by the Chicago Police Department that
4  there was an individual on the premises, in the
5  station, in the area who wanted to give an
6  incriminating statement about his role in the
7  murder of a woman.  My job wasn't to investigate
8  and help buttress any physical evidence in the case.
9      So the answer is no.  That's what police
10 officers do or trial lawyers, but I wasn't acting
11 as a trial lawyer here.
12     Q  In your felony review jacket, you refer to
13 sending witnesses to the grand jury.
14     A  Where is that?
15     Q  If you look on this last page of Exhibit 9,
16 "Witness 2 set to go to grand jury.  Witness 3 set
17 to grand jury."
18     A  Uh-huh.
19     Q  What does that refer to?
20     A  I'm looking.  Well, with regards to
21 Witness 3, that's Michael Barber.  And when it
22 says "W3," which is witness, "set to grand jury,"
23 in Cook County we have something called a grand
24 jury, and what a grand jury does is it either can

---

211

1  be used to -- as a function of a trial -- trier of
2  fact to charge, or people bring witnesses there to
3  lock them into statements.  That's what a grand
4  jury does.
5      So that was a reference to making sure
6  that Mr. Barber -- not making sure -- documenting
7  that Barber was to go to the grand jury to provide
8  a statement.
9      Q  Why did you want Michael Barber to go to
10 the grand jury?
11     A  I didn't --
12     MR. KUHN:  Objection; misstates evidence.
13     A  (Continuing.)  I didn't want Michael Barber
14 to go to the grand jury.  I documented the fact
15 that he was going to the grand jury.  That's very
16 different.
17     Q  Whose decision was it to send him to the
18 grand jury?
19     MR. KUHN:  Objection; speculation.
20     A  I don't know.
21     Q  How did you learn that he was going to the
22 grand jury?
23     A  That would have been communicated to me by
24 law enforcement.

---

212

1      Q  So are you saying that it was the police
2  officers' decision to send him to grand -- the
3  grand jury?
4      A  I don't remember whose decision it was.
5      Q  Well, in other cases that you've had where
6  witnesses have gone to the grand jury, is that a
7  function of the prosecutor's office or the law
8  enforcement's office?
9      A  What kind of cases?
10     Q  Murder.
11     A  You know, it's been so many years since
12 I've been in felony review, I don't remember who
13 has the authority to make the decision whether or
14 not to lock a witness into the grand jury.
15     Q  Why wasn't Shaunice Williams set to go to
16 the grand jury?
17     MR. KUHN:  Objection; foundation,
18 speculation.
19     Q  If you look back on page 3 of Exhibit 9,
20 there's no indication that she's set to go to the
21 grand jury.  Does that mean that she's not going
22 to go to the grand jury?
23     A  But there's no indication that she wasn't
24 go to the grand jury.  It was just --

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

54 (213 to 216)

---

213

1 right?  There's no reference at all.
2     Q  That is true.  So I guess my question is,
3 sir, why did you indicate that Francine and
4 Michael Barber were set to go to grand jury but
5 not Shaunice Williams?
6     **A  Because perhaps Williams didn't go to the**
7 **grand jury, and those other two witnesses did go.**
8     Q  So if you finished with this case at 1415 on
9 April 29th, when would be the next time that you
10 would start work?
11       MR. MORAN:  Objection; foundation.  That
12 misstates his prior testimony.
13     **A  I would have been working days, so that**
14 **would have been a 6:00-to-6:00 shift.  So then I**
15 **would have -- I would have concluded my day shift**
16 **at 6:00 p.m., and I would have gone to work the**
17 **next morning, assuming that that was either Day 1 or**
18 **Day 2 of my three-day cycle.**
19     Q  Okay.  So if you were working on April 30th,
20 you would have been working the 6:00-a.m.-to-
21 6:00-p.m. shift; is that right?
22     **A  Say again?**
23     Q  If you were working on April 30th -- like
24 because if it was Day 3 on April 29th, then you'd

---

214

1 be off on April 30th; right?
2     **A  Right.**
3     Q  And so assuming that you were working on
4 April 30th, you would have been working the
5 6:00-a.m.-to-6:00-p.m. shift; correct?  What are you
6 looking for, sir?  Maybe I can help you out.
7     **A  Do you have Fulton's handwritten statement?**
8     Q  I do.
9     **A  Why don't you give it to me.**
10     Q  Why do you want it?
11     **A  Well, because that will tell me what time**
12 **I went and met with him, and depending on whether**
13 **that was a morning -- I think I went in the**
14 **evening.  So for some -- some reason with regards**
15 **to Fulton I stayed -- I either went back --**
16     Q  Well, you know, we'll get there, sir.
17     **A  Yeah.**
18     Q  What I'm trying to find out --
19     **A  I worked that -- with regards to Coleman I**
20 **worked days.**
21     Q  Right.
22     **A  I worked days.**
23     Q  And so then if you were working on the
24 30th, you would have been scheduled to work

---

215

1 starting at 6:00 a.m.; can we agree on that?
2     **A  Yes.**
3     Q  All right.  And so after the conclusion of
4 your felony review jacket for Coleman, did you
5 have any other involvement in the Antwinica
6 Bridgeman homicide investigation on April 29th?
7     **A  It's been a long time.  I think -- I think**
8 **I closed up my involvement after I took the**
9 **statement of Coleman and then reinitiated with**
10 **Fulton.**
11     Q  Do you recall anything else you did after
12 you finished with the felony review jacket for
13 Coleman on the 29th?
14     **A  What I did relevant -- relative to that**
15 **investigation?**
16     Q  Or anything that you did while you were
17 still on the clock.
18     **A  You're asking me what I did 25 years ago**
19 **in a four-hour window --**
20     Q  Precisely.
21     **A  -- from 2:15?**
22     Q  Yes.
23     **A  No idea.  That's a good question, though.**
24 I just don't remember.  It's a very good question.

---

216

1     Q  So then you went home, and presumably you
2 got some sleep that night; right?
3     **A  I don't know what or where I went.  It's**
4 **25 years ago.**
5     Q  Right.  But like at some point before you
6 started work again the next morning, you slept; is
7 that a fair statement?
8       MR. MORAN:  Objection; foundation.
9       MR. KUHN:  Foundation.
10     **A  I can't say I slept.  I mean, you know.**
11     Q  You may not have slept?
12     **A  I might not have, no.**
13     Q  You wouldn't have been up all night with a
14 baby; right?
15     **A  I didn't have a baby at that point.**
16     Q  Right.  And do you recall being sick or
17 something preventing you from sleeping that night?
18       MR. KUHN:  Objection; foundation,
19 speculation.
20     **A  You're asking if I had a cold 25 years**
21 **ago --**
22     Q  Or --
23     **A  -- is that what you're asking me?**
24     Q  Or some other kind of ailment that might

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

55 (217 to 220)

217

1  have --
2      A  I don't remember.
3      Q  -- impacted your sleep.
4      A  I don't remember.  That's a very good
5  question.  I don't remember if I had a cold.
6      Q  So then on the -- on the 30th you would
7  have gone to work at 6:00 a.m.; is that right?
8      A  If -- if it was a normal three-day on-off
9  schedule and I'm working days, I'm going on at
10  6:00 a.m.  Day 3 or Day 2.
11      Q  And sometimes you have to work past 6:00 p.m.
12  even -- you know, even if you start at 6:00 a.m.,
13  sometimes you've got to work past 6:00 p.m.  That
14  happened a lot; right?
15      A  It did.
16      Q  And that would be if you were still on a
17  case and you had to finish -- see the case
18  through; right?
19      A  Or if you picked up a new case right at
20  that witching hour, you'd bleed over into the next
21  shift.
22      Q  So when you get a call at 5:30, it's like
23  huh, but you do your job, and you do what you need
24  to do; right?

218

1      A  I don't remember grunting when doing my job.
2      Q  Fair.  And I apologize but that would --
3  that's how I would feel.  You may feel differently.
4      But you wouldn't stay late past 6:00 unless
5  you were already working on a -- on a new case or
6  a case that you've been assigned prior to 6:00?
7      A  Yes.
8      Q  And you would remain until that case was
9  finished, and then you would go home?
10      A  Absolutely.
11      Q  All right.  Do you know when you were
12  called to the area for Derrell Fulton?
13      A  I don't know.  But some -- I don't know
14  why, doesn't make any sense.  Something is leading
15  me to believe I arrived in the evening.
16      Q  Well, it might have been your review of
17  the documents because -- let's take a little
18  look-see at Exhibit 11.
19      (Garfinkel Deposition Exhibit 11 marked
20  for identification and attached to the transcript.)
21      Q  All right.  Showing you what we've marked
22  as Exhibit 11 and I'll -- I can read to you from
23  your trial testimony at the Fulton trial.  This is
24  page 07, which is also Bates-numbered

219

1  PLAINTIFF 004300, line 17.
2      "Question:  I would like to direct your
3  attention to the following date, April 30th, 1994.
4  Were you in Area 1 violent crimes at approximately
5  9:30?
6      "Answer:  I believe so.  9:30."
7      And then the Court asks, "A.m. or p.m.,"
8  and Mr. Sanford, who is putting you on, says, "P.m.
9  Thank you, Judge," and then you say, "9:30, yes."
10      MR. MORAN:  I'll object to --
11      Q  Does --
12      MR. MORAN:  -- foundation.  Sorry.
13      Q  Sir, does that refresh your recollection
14  that you arrived at Area 1 --
15      A  Yes.
16      Q  -- on April 30th at 9:30 p.m. --
17      A  Yes.
18      MR. MORAN:  Object to foundation.
19      Q  -- approximately?
20      MR. KUHN:  Join.
21      MS. MEADOR:  Join.
22      Q  All right.  So can you tell us why you
23  were the same felony review person assigned to
24  Derrell Fulton's case as Nevest Coleman's case?

220

1      MR. KUHN:  Objection; foundation,
2  speculation.
3      A  The only thing I can possibly think of is
4  just in terms of continuity of taking the
5  statements.  Since I had already been involved in
6  Coleman, somehow I was on Fulton, and I can't
7  remember how that assignment went.  I really
8  can't.  I have no idea.
9      Q  Because typically it would just go to
10  whoever is on duty; right?
11      MR. KUHN:  Objection; foundation,
12  speculation.
13      A  I'm not going to speak to typically.  That
14  would go to, you know, felony review's protocol
15  and that's way above my pay grade.
16      Q  Fair enough.  In your experience, you
17  would pick up calls based on whoever needed
18  assistance.  You wouldn't get calls specifically
19  to go to a case that you had worked on before;
20  right?
21      A  No.  There were a couple exceptions when
22  the officer asked me to handle a case, and even
23  though I wasn't on that specific unit or that
24  team, I went on it.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

221

1    Q  Because -- that would be if you had a
2  particular expertise in the area?
3    **A  I wouldn't say expertise but just -- just**
4  **they -- they -- somehow they just called me to**
5  **handle it.**
6    Q  And that would be a case that was bearing
7  a different jurisdiction, not a case you had
8  worked on before; right?
9    **A  I just don't -- I mean, typically speaking**
10 **I took it when I'm called like every other**
11 **assistant.  The only time you would maybe find**
12 **yourself working on another case is if you had**
13 **some connection with the -- you know, you took a --**
14 **here was a codefendant.  I made reference**
15 **obviously to Fulton in the narrative, so somehow I**
16 **was assigned that.  Whether it was random or**
17 **whether it was specific, I don't remember the**
18 **details and circumstances surrounding that**
19 **assignment.  I just don't.  I just don't.**
20      **I can tell you this; I didn't stay at the**
21 **area the entire time between Coleman and Fulton.**
22 **I know I didn't.**
23   Q  Were you at home when they called you to
24 come to Area 1 to take Fulton's statement?

222

1    **A  Oh, I don't remember.  I don't remember.**
2    Q  Did you tell the detectives, "If Fulton is
3  ready to confess, call me"?
4    **A  Absolutely not.  Absolutely not.**
5    Q  Because when you arrived at Area 1 at
6  approximately 9:30, the detectives told you that
7  Derrell Fulton wasn't ready to confess; right?
8    **A  I don't remember what they told me.**
9    Q  Okay.  You don't remember what they told
10 you.  Well, when you arrived -- let's take it in
11 steps.
12      And forgive me; I don't know if I've asked
13 this question.  Do you know what time you started
14 work on April 30th?
15   **A  You asked that question.  I don't remember.**
16   Q  All right.  Do you know where you were
17 when you received the call regarding Derrell Fulton?
18   **A  I don't remember.**
19   Q  When you received the call regarding
20 Derrell Fulton, did you know it was regarding the
21 murder you'd worked on the day before, or did you
22 just get told it was a murder out of Area 1?
23   **A  It would have been the latter.  Once I**
24 **arrived at the area, then I would have either seen**

223

1  **the same detectives or a new group of detectives**
2  **and said, "Oh, by the way, we now have the**
3  **cosuspect in custody, or he's in custody and now**
4  **this is your case."  But nobody requested me.**
5    Q  How do you know that nobody requested you?
6    **A  Because that was never -- that was just --**
7  **I know I -- that was just not the protocol.**
8    Q  So it would be a breach of protocol for
9  the detectives to ask for you specifically; correct?
10     MR. KUHN:  Objection; foundation --
11     MR. MORAN:  Objection.
12     MR. KUHN:  -- speculation.
13   **A  I don't have the basis of knowledge to say**
14 **it would be a breach of protocol because I don't**
15 **know -- I never saw any written protocols as to**
16 **what -- how assignments take place.**
17     **Anecdotally, it wasn't done, but I can't**
18 **go so far as to say that it's a breach of**
19 **protocol.  I didn't draft what that protocol was.**
20   Q  So -- and you don't know where you were
21 when you received this call from dispatch?
22     MR. KUHN:  Asked and answered.
23   **A  I don't know.**
24   Q  Do you know if you were already in Area 1

224

1  when you received the call from dispatch regarding
2  this case?
3    **A  I told you this a moment ago that I'm**
4  **confident I did not stay at the area from the**
5  **conclusion of Coleman's statement at 2:15.**
6    Q  And I wasn't suggesting you were.  I'm
7  just saying, do you recall if you were at the area
8  for another matter at the time you received the
9  call from dispatch about Derrell Fulton?
10   **A  I don't know where I was when Fulton's**
11 **call -- when the call came in to interview Fulton,**
12 **but I know I wasn't at the area.**
13   Q  All right.  What were you told when you
14 arrived at the area?
15   **A  I don't remember what I was told other**
16 **than I would have been told that there was**
17 **somebody in custody who they wanted an evaluation**
18 **of the evidence with regards to the Bridgeman**
19 **murder and to review that case for either approving,**
20 **rejecting, or CI, continuing investigation.**
21 **That's all I would have been told.**
22   Q  Well, when you arrived at the area, did
23 you talk to a detective?
24   **A  Yes.**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

57 (225 to 228)

225

1  Q  Do you know which detective it was?
2  A  Would have been Foley.
3  Q  Did Detective Foley give you an update in
4  what had happened in the investigation since you
5  had left the area the day before?
6  A  I don't -- I can't remember that.
7  Q  Any reason why he wouldn't give you an
8  update?
9  A  He -- he would have done everything he
10 could to bring me up to speed as to what the tempo
11 of the investigation was.  That's reasonable.  But
12 I don't have personal knowledge of that.
13 Q  And that's what you would want -- what you
14 would have wanted to know, like, "Where are we at
15 now on this case"; right?
16 A  I would want to know that.
17 Q  You would want to know what Derrell Fulton
18 was saying about his involvement in the crime?
19 A  I would want to know if he made any
20 statements, sure.
21 Q  Did you bring anything with you when you
22 went to the area -- to Area 1 on April 30th at
23 about 9:30 p.m.?
24 A  I would have brought the felony review

226

1  jackets, you know, a bag that -- we had like a
2  briefcase or something.
3  Q  What was in the briefcase?
4  A  I had four pencils and I would have had a
5  notebook, like just -- you know, just -- I might
6  have had -- I mean, I don't know.
7  Q  Polaroid?
8  A  I would have had to have a camera with me,
9  right, a camera.
10 Q  What else?
11 A  That would have been it.  That would have
12 been it.
13 Q  Would you have anything from the previous
14 day's assignment?
15 A  No, because we turn those jackets in to
16 review.  There's a -- there's a desk.
17 Q  What's in the jacket when you turn it in?
18 A  The insert, the innards of this felony
19 review.  There's a hard -- you'd break it apart
20 and you would put the hard jacket in one section,
21 like one file folder, and the innards would go
22 into another thing.
23 Q  And what are "the innards"?
24 A  Like what you're looking at right now, the

227

1  inside of a jacket.
2  Q  You mean Exhibit 9?
3  A  Yes.
4  Q  And would the statements be contained in
5  the jacket?
6  A  What statements?
7  Q  Statements from Shaunice Williams, Michael
8  Barber, Francine Calimee, and Nevest Coleman.
9  A  Handwritten statements, I believe.  I
10 don't know.  They may have stayed with the
11 detective.  I didn't make copies.  The originals
12 probably stayed with the detectives.  I don't
13 believe I took the handwrittens back.  I just took
14 that felony review jacket back and disassembled
15 it.  But for the hard jacket -- the hard jacket,
16 that middle folder section, and the innards would
17 go into another section.
18 Q  Just for the record, could you please
19 point to Exhibit 9 which are the hard parts of the
20 jacket and which are the innards?
21 A  Right.  9 is the innards but there's a
22 fold- -- there's a manila folder that goes over it.
23 Q  That you write on; correct?
24 A  That's what?

228

1  Q  You write on the outside of the folder?
2  A  Right.
3  Q  And what do you put on the outside of the
4  folder?
5  A  I don't think anything.  I think it was
6  just an out -- like a manila folder that was a
7  hard folder like one of those legal folders, and
8  when you would open it up, you'd have the innards,
9  what we have in Exhibit 9, and that's the file.
10 It's kind of like -- it's like a protective casing.
11 Q  All right, sir.  So you met with Detective
12 Foley, and what did Detective Foley with regards --
13 what did Detective Foley tell you with regard to
14 Mr. Fulton?
15 A  I don't remember the personal
16 conversations -- I don't have personal knowledge
17 as to what the conversation would be other than
18 Fulton was in custody.
19 Q  All right.  Did you know before you spoke
20 to Mr. Fulton what his current version of his
21 story was?
22    MR. MORAN:  Object to foundation.
23    MR. KUHN:  Join.
24    MS. MEADOR:  Object to form and foundation.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

58 (229 to 232)

---

229

1    **A  I don't remember.**

2    Q  Any reason why you wouldn't have wanted to

3  know what Derrell Fulton was saying about his role

4  in the crime?

5    MR. KUHN:  Objection; form.

6    MR. MORAN:  Objection; argumentative.

7    **A  I didn't say I didn't want to know.  I**

8  **don't remember, though, if I asked or if it was**

9  **told to me.  I would have asked, "Is he speaking?"**

10    Q  And "What's he saying"; right?

11    **A  I think that's what a smart lawyer would do.**

12    Q  Did you talk to Detective Foley about

13  anything other than Mr. Fulton?

14    **A  Like what?**

15    Q  Any evidence that had been tested by the

16  lab, any -- anything about Nevest Coleman's lawyer

17  or his dad?

18    **A  That's really what an investigator would**

19  **do.  I was there just as a felony review assistant**

20  **to take statements.  That's the only thing I ever**

21  **did.  Didn't ask about evidence really; didn't ask**

22  **about what evidence was tested.**

23    Q  Didn't try and get confessions from suspects?

24    **A  I tried -- I tried to memorialize statements**

---

230

1  **if I had a willing individual who wanted to speak**

2  **about their involvement or knowledge of the crime.**

3  **That's all I really did.**

4    Q  Well, police officers investigate by

5  trying to get statements from suspects about their

6  participation in a crime; right?

7    MR. MORAN:  Object to form; foundation.

8    MR. KUHN:  Join.

9    Q  Police detectives investigate by trying to

10  elicit confessions from suspects; right?

11    MR. MORAN:  Objection; form and foundation.

12    Go ahead.

13    **A  I mean, that's one thing police officers**

14  **do is they try to -- they interview and try to**

15  **extract statements, yes.**

16    Q  And that's an investigatory tool; right?

17    MR. KUHN:  Objection; foundation,

18  speculation.

19    **A  I know that's something that police**

20  **officers do.**

21    Q  To investigate; right?

22    MR. KUHN:  Objection; foundation.

23    **A  What do you mean by "investigate"?  you**

24    Q  I don't know.  Whatever you might -- you

---

231

1  meant when you've been using it throughout this

2  deposition.

3    MR. MORAN:  Objection; misstates his

4  testimony.

5    MR. KUHN:  Join.

6    **A  Again, a good felony review Assistant**

7  **State's Attorney goes out and interviews witnesses**

8  **regarding any information they may have, and if**

9  **it's considered -- if that State's Attorney**

10  **considers it to be important, relevant, honest,**

11  **and trustworthy, we then ask that individual if**

12  **they want to document it.  That's what we do.**

13    Q  That would be a great question if I asked

14  you what you did.

15    **A  Right.**

16    Q  That's not what I asked you.  So I'm

17  asking you that a police officer who interrogates

18  a -- strike that.

19    Q  A police officer who interviews a suspect

20  to try to elicit a confession, they're conducting --

21  that's part of their investigation; right?

22    MR. KUHN:  Objection; foundation,

23  speculation.

24    **A  Police officers interview suspects.**

---

232

1    Q  As part of their investigation; correct?

2    **A  As part of their duties.**

3    Q  To investigate.  Why are you fighting me

4  on "investigate"?

5    **A  I'm not fighting you.**

6    Q  All right.  So give me a yes/no answer.

7  Do -- is it part of a police officer's

8  investigation to interview suspects to try to

9  elicit a confession?

10    MR. MORAN:  Objection; foundation, form --

11    MR. KUHN:  Join.

12    MR. MORAN:  -- speculation.

13    **A  It's part of their duties.**

14    Q  I mean, so you are fighting me; right?

15    **A  I would never fight you.**

16    MR. KUHN:  Argumentative.

17    **A  (Continuing.) I'm not fighting you.**

18    Q  Okay.  So I asked for a yes or no answer.

19    **A  I'm not here to --**

20    MR. KUHN:  There's no question pending.

21    Q  So I asked for a yes/no answer, so give me

22  a yes/no answer.  Part of the --

23    MR. KUHN:  Asked and answered; objection.

24    Q  -- police officer's investigation is to

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

59 (233 to 236)

233

1 interview suspects to try to elicit a confession?
2     MR. MORAN: Objection.
3     MR. KUHN: Objection; asked and answered.
4     Go ahead.
5     MS. MEADOR: I'm going to object as to
6 form. The witness can answer the way --
7     A No, not to get --
8     MS. MEADOR: -- he feels appropriate.
9     A (Continuing.) No.
10     Q Okay. And so part of your duties as a
11 felony review State's Attorney is to interview
12 suspects to see if they'll give you a confession;
13 right?
14     MR. KUHN: Objection.
15     A No, that's not true.
16     MR. KUHN: Objection.
17     A (Continuing.) That's not true.
18     Q Can you tell us anything that happened
19 while you were at Area 1 after 9:30 -- or from
20 9:30 p.m. until you spoke to Mr. Fulton?
21     A I have no personal recollection other than
22 I know I do have a personal recollection that I
23 arrived at the area. I remember that.
24     Q What do you remember --

234

1     A I mean, I know I drove there. I know I
2 drove there. What happened substantively? Other
3 than what's in that handwritten statement, I don't
4 remember any contact I would have had with Fulton.
5     Q So you have a memory of arriving at Area 1
6 from somewhere else to conduct your felony review
7 of Derrell Fulton's case?
8     A I remember meeting him in an interview
9 room. I remember that happening.
10     Q Well, can we go back to my last question?
11     A Yes, yes.
12     Q You remember -- you have an actual memory
13 of arriving at Area 1 to conduct your felony
14 review duties with regards to Derrell Fulton's case?
15     A Yes, I do.
16     Q So you were not at Area 1 at the time that
17 you received the dispatch for Derrell Fulton's case?
18     A I don't know where I was when I got the
19 assignment. I do remember at some point arriving,
20 but it's -- I'm not going to speculate where I was
21 when the assignment came in because just -- it's
22 been too many years.
23     Q All right. But you recall arriving from
24 somewhere else in your car at Area 1?

235

1     A I don't know that. I don't know that. I
2 don't know that fact. I don't know that fact.
3     Q All right. I'm going -- do you recall what
4 time it was that you met with the Derrell Fulton
5 for the first time on April 30th?
6     A This? It would have been in the evening.
7     Q All right. Do you recall what time in the
8 evening?
9     MS. MEADOR: Counsel, when you have a
10 natural break, I just want to take a restroom
11 break if that's okay.
12     THE WITNESS: She wants to take a break.
13 Are we breaking or not? I'm sorry.
14     MS. MEADOR: I said when he has a natural
15 break.
16     THE WITNESS: Oh, okay.
17     I'm sorry. Do I know -- please read what
18 you want to read.
19     Q Sure. Do you recall what time it was in
20 the evening that you first met with Derrell Fulton
21 on April 30th?
22     A Sometime after 8:00 p.m. and it would have
23 been before 12:35 a.m. Sometime in that window.
24     Q At Mr. Fulton's trial you were asked the

236

1 following question -- I just want to see if this
2 refreshes your recollection. This is at
3 pages 08 and 09 starting at line 23 of 08.
4     "When you met the defendant at approximately
5 10:00 p.m., was there a detective there, also?
6     "Answer: There was.
7     "Do you recall the detective's name?
8     "I believe it was Detective Foley."
9     Does 10:00 p.m. sound about right?
10     MR. MORAN: Object to foundation.
11     A When I arrived?
12     Q When you first --
13     MR. MORAN: Hold on.
14     Q -- talked to Mr. Foley -- Fulton.
15     MR. MORAN: Object to foundation.
16     Go ahead.
17     A I don't think I would have intentionally
18 misled a judge, or a prosecutor, or defense
19 lawyer, so if I said I arrived at 10:00, that
20 would be my guess.
21     MR. AINSWORTH: Let's take a break here.
22     THE VIDEOGRAPHER: Off the record, 3:39.
23     (Recess taken, 3:39 p.m. to 3:58 p.m.)
24     THE VIDEOGRAPHER: Back on the record, 3:58.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

237

1  BY MR. AINSWORTH:
2     Q  So when you first met with Mr. Fulton at
3  about 10:00 p.m., what was your intent in going to
4  see him?
5     **A  Just to determine whether or not he wanted**
6  **to provide a statement to me about his knowledge**
7  **and/or involvement in the Bridgeman murder.**
8     Q  Did you have an idea as to whether or not
9  he had provided an inculpatory statement in the
10 Bridgeman murder at that point when you first
11 spoke to him?
12    **A  I don't remember.**
13    Q  Had you talked with Detective Foley or any
14 other Chicago police detective about a plan of
15 attack for speaking to Mr. Fulton?
16       MR. MORAN:  Object to form.
17    **A  I don't remember.**
18    Q  Had you done that on other occasions,
19 discuss with the detective about what tactics you
20 might use to try to get a statement from a suspect?
21       MR. KUHN:  Foundation --
22       MR. MORAN:  Object to form.
23       MR. KUHN:  -- form, misstates evidence.
24    **A  No.**

238

1     Q  Do you have any independent recollection
2  of speaking to Derrell Fulton?
3     **A  I don't.  I don't.**
4     Q  Do you remember what he looks like?
5     **A  What he looked like when I met with him?**
6     Q  Yeah.
7     **A  An African-American young man, thin, not**
8  **overly thin but, you know, nice build.**
9     Q  About 26 years old when you met him?
10    **A  That's what his age was, 26, right.**
11    Q  Where was he -- where was Mr. Fulton when
12 you first met him?
13    **A  Would have been in an interview room in**
14 **Area 1.**
15    Q  Do you know which one it was?
16    **A  No, sir.**
17    Q  Do you know if it was the same room that
18 Nevest Coleman was in?
19    **A  I don't remember.**
20    Q  Do you remember anything about what you
21 said to him or what he said to you when you first
22 met him?
23    **A  Nothing.**
24    Q  Do you remember anything about using any

239

1  tactics to get him to provide a confession?
2        MR. MORAN:  Object to form, foundation.
3        MR. KUHN:  Join.
4     **A  I've never used any tactics when I meet**
5  **with a -- when I met with the a suspect or target**
6  **regarding a statement.**
7     Q  Have you ever left the room to go get a
8  piece of evidence to then confront the witness
9  with in hopes of getting the witness to stop
10 providing a denial and start providing an
11 inculpatory statement?
12    **A  I let Fulton --**
13       MS. MEADOR:  Object to form.
14       MR. KUHN:  Join.
15    **A  (Continuing.) I let Fulton know that**
16 **Coleman had provided a court reported statement in**
17 **his case, and I did show him the existence of that**
18 **court reported statement, but I don't -- I don't**
19 **believe he read it.  I don't think I let him read it.**
20       MR. AINSWORTH:  Would you read back my
21 question, please.
22       (Pending question read.)
23    **A  (Continuing.) No.**
24    Q  When you -- you agree that you left

240

1  Derrell Fulton's interview room to get Nevest
2  Coleman's statement; right?
3     **A  Yes.**
4     Q  The time that you left Derrell Fulton's
5  interview room, Derrell Fulton was denying having
6  anything to do with Antwinica Bridgeman's murder;
7  correct?
8     **A  I don't remember whether or not he --**
9  **whether or not he -- I don't remember if he had --**
10 **if he had full denial at that point.  I just don't**
11 **remember.**
12    Q  Well, let's see if the detective's cleared
13 close sup report refreshes your recollection.
14    **A  Okay.**
15       MR. AINSWORTH:  Shoot, I've forgotten what
16 exhibit --
17       MR. CURRAN:  No. 1.
18       MR. AINSWORTH:  No. 1?
19    Q  All right.  If you'd turn to page 15 of
20 Exhibit 1.
21    **A  Yes.**
22    Q  All right.  We've got the top paragraph
23 there.  "The reporting detectives then had
24 occasion to interview Fulton, along with

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

241

1 ASA Garfinkel." And that's you, right, sir?
2   A I'm the ASA Garfinkel.
3   Q Okay. "And at that time, after being
4 advised of his constitutional rights, he related
5 basically the same set of facts as reported to the
6 reporting detectives in the above paragraph."
7     Let's just go back a paragraph to see what
8 it was that, according to Detectives Foley and
9 Clancy, Fulton was saying to you at that time. So
10 this is the bottom paragraph of page 14.
11     "Fulton was then confronted with K. Johnson's
12 account and at that time stated that he had been
13 untruthful of his account of the night of this
14 incident. He then went on to state that on the
15 date and time of this incident he was in the alley
16 behind 917 West 55th Street. He then went on to
17 state that he then observed Chip and Nevest and
18 Antwinica go into the basement at 917 West 55th
19 Street. He then stated he stayed in the alley for
20 a short time and that he then went down into the
21 basement, and while he was standing in the
22 basement doorway, he observed the victim orally
23 copulating Chip and Nevest Coleman having vaginal
24 intercourse with the victim. He then went on to

242

1 say that Chip and Nevest Coleman turned towards
2 Fulton and saw that Fulton was standing in the
3 doorway. Fulton then went on to say that he then
4 panicked and ran from the scene and went home."
5     Do you see that, sir?
6   A Yes.
7     MR. MORAN: I'm going to object before you
8 start the question to the extent that this has
9 been referred to as a closed report. I don't
10 believe that's accurate if you look at the last page.
11     MR. AINSWORTH: Cleared open, yes, because
12 Taylor is not -- oh, okay.
13   Q So, sir, does reading that paragraph, the
14 bottom paragraph of page 14 refresh your recollection
15 that when you first talked to Derrell Fulton
16 before you got Nevest Coleman's statement that
17 Derrell Fulton was saying he simply witnessed
18 Nevest Coleman and Eddie Taylor having sex with
19 the victim and then got scared and ran off?
20     MR. MORAN: Objection.
21   A Well, I don't think Eddie Taylor's name is
22 mentioned.
23   Q Well -- sorry -- Nevest Coleman and Chip.
24     MR. MORAN: Object to foundation.

243

1     MR. KUHN: Join.
2   A Again, this cleared close report was not
3 prepared when I was at the Area certainly, so I
4 can't speak to the contents of this statement as
5 refreshing my memory as to what was said then if I
6 don't have a personal memory of what occurred at
7 the area with regards to my initial contact with
8 Fulton.
9   Q That's what I'm asking you, sir. Does it
10 refresh your recollection?
11     MR. KUHN: Asked and answered.
12   A Of a conversation I had with Fulton, no,
13 it does not.
14   Q All right.
15   A Does not.
16   Q So you can't say whether this report,
17 Exhibit 1, is accurate or not with regard to your
18 interaction with Derrell Fulton; correct?
19     MR. MORAN: Objection; foundation.
20     MR. KUHN: Join.
21   A What I'm saying is since I don't remember --
22 remember my initial conversation with Fulton, I
23 can't say whether this document prepared by, it
24 looks like Detective Foley, refreshes that

244

1 conversation if I don't know what that
2 conversation was.
3   Q Now I'm not asking you -- see, my
4 questions do change even though they seem like
5 they're redundant and the same. But this question
6 is whether -- is that -- I'm asking, can you say
7 that this report on the bottom paragraph of page 14
8 and the top paragraph on page 15 is inaccurate?
9     MR. KUHN: Foundation, speculation.
10   A In order for me to say -- comment on
11 whether it's accurate or inaccurate would require
12 me to have personal knowledge of the facts that
13 occurred before this was created, and I can't say
14 that because I don't have personal knowledge of
15 what Detective Foley or what Fulton said to me
16 when I initially met them in order to compare
17 or contrast with this report. That's the best I
18 can do.
19   Q Right. You -- you've got no basis to say
20 that the bottom paragraph of page 14 and the top
21 paragraph of page 15 are incorrect; right?
22     MR. KUHN: Objection.
23   A I have no basis to say --
24     MR. KUHN: Join.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

62 (245 to 248)

245

1    A -- that these paragraphs refresh the
2 conversation I had with Fulton when I first met
3 him at the area. That's what I'm saying.
4    Q When -- when you showed Nevest Coleman's
5 statement to Derrell Fulton, did Derrell Fulton say,
6 "Yeah, 36 hours ago the detective showed me that"?
7    A Say what?
8    Q When you showed Derrell Fulton Nevest
9 Coleman's statement, did Derrell Fulton say,
10 "Yeah, the detective showed me that 36 hours ago"?
11    A I don't remember Fulton saying anything to
12 me after I showed Fulton Coleman's statement. I
13 don't remember a personal conversation.
14    Q Are you aware that Detective Foley made --
15 showed Nevest Coleman's statement to Derrell Fulton
16 on the morning of April 29th?
17    A I don't have any personal memory as to that.
18    MR. AINSWORTH: Let me show you what we'll
19 mark as Exhibit 12.
20    (Garfinkel Deposition Exhibit 12 marked
21 for identification and attached to the transcript.)
22    Q Exhibit 12 is Detective Foley's trial
23 testimony from May 7th of 1997, and I'm going to
24 ask you to turn to page U83 of Exhibit 12. And

246

1 you'll see starting at line 2 -- and this is
2 Bill Foley's testimony just so we're all clear.
3    A Okay. What line?
4    Q So line 2 references Detective Foley
5 arriving at Area 1 and then interacting with
6 Mr. Fulton and then talking to -- at line 10 talking
7 to Mr. Fulton at approximately 7:30 a.m. Do you
8 see that?
9    A I do.
10    Q And he was with Detective Clancy at the
11 time; do you see that?
12    A Yes.
13    Q And then just so we're clear on the date,
14 if you look at the next page, page U84, at line 17
15 Mr. Sexton asks Detective Foley, "Could you please
16 read the rights to be read to Mr. Fulton back on
17 April 29th, 1994, in the morning hours?" Do you
18 see that, sir?
19    A I do.
20    Q Okay. And then moving on through the
21 Miranda rights that are given on pages U84 and
22 U85, if you go to page U86, then at line 2, "Did
23 he" -- meaning Fulton -- "agree to talk to you
24 about this murder?"

247

1    Detective Foley answers, "He did.
2    "Did he ask you to explain any of the
3 terms at all?"
4    The answer is, "No, sir.
5    "Question: Did you have any difficulty in
6 comprehending what he was saying?
7    "Answer: No, sir.
8    "Question: Did you then inform him of
9 anything?
10    "Answer: Yes, sir.
11    "Question: What is that?
12    "Answer: The contents of Mr. Coleman's
13 statement."
14    Do you see that, sir?
15    A I do see it.
16    Q All right. Why did you show Derrell
17 Fulton --
18    A Why did what?
19    Q Why did you show Derrell Fulton Nevest
20 Coleman's statement?
21    A Because I wanted Fulton to know that
22 Coleman had implicated Fulton in the murder.
23    Q Was there anything that suggested that
24 Fulton didn't already know that Nevest Coleman had

248

1 implicated him in the murder?
2    A I wasn't aware of --
3    MS. MEADOR: Objection; calls for
4 speculation.
5    MR. KUHN: Join.
6    You can answer.
7    A (Continuing.) I wasn't aware of the fact
8 that Foley had shown Fulton Coleman's statement
9 prior to my arrival at the area.
10    Q Did you tell Detective Foley that you were
11 going to go get Nevest Coleman's statement and
12 show it to Derrell Fulton?
13    A I don't remember.
14    Q Where did you get Nevest Coleman's
15 statement from?
16    A Well, the statement had been generated on --
17 sometime prior to my interaction with Fulton, and
18 that would have been in the area. Detectives would
19 have had a copy of it. It was already generated.
20    Q All right. But where in the area did you
21 get it from?
22    A Oh, I don't remember.
23    Q Did you go from Derrell Fulton's interview
24 room to the sergeant's office and start pulling

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

63 (249 to 252)

249

1  out files from Area 1?
2  **A  I just told you I don't remember.**
3  Q  Was that something you would do when you're
4  at an area?  Would you go into the police
5  department's files and just help yourself to
6  anything you wanted?
7  **A  Absolutely not.  I never did that.**
8  Q  So how did you get access to Nevest Coleman's
9  statement to show it to Derrell Fulton?
10  MR. KUHN:  Objection; asked and answered.
11  THE WITNESS:  Exactly.
12  MR. KUHN:  Speculation.
13  Go ahead and answer.
14  **A  I don't know how that statement got in my**
15  **hand.  I can only -- I can assume that a detective**
16  **gave me a copy.  I certainly wasn't driving around**
17  **the City of Chicago with Nevest Coleman's statement.**
18  **I didn't have my own copy of Nevest Coleman's**
19  **statement.  It was provided to me by somebody, more**
20  **than likely somebody from the Chicago Police**
21  **Department.**
22  Q  And the reason that you wanted to show
23  Nevest -- strike that.  The reason you wanted to
24  show Derrell Fulton Nevest Coleman's statement was

250

1  to confront him in the hopes that he would provide
2  a truthful inculpatory statement; is that right?
3  **A  The reason I showed Fulton Coleman's court**
4  **reported statement, although he didn't read it,**
5  **was to provide Fulton an opportunity to give a**
6  **truthful statement --**
7  Q  Okay.  Because you thought --
8  **A  -- whatever that statement was.**
9  Q  Because you thought up until that point
10  Derrell Fulton was not providing you with truthful
11  statements; right?
12  **A  I hadn't formed an opinion as to whether**
13  **or not Fulton was providing an accurate or**
14  **inaccurate statement, and I just wanted Fulton to**
15  **know that Coleman had implicated him, and then**
16  **wherever the case would go is where it would go.  I**
17  **wanted him to be truthful, honest, and transparent.**
18  Q  Would you agree with me that according to
19  Exhibit 1, Detective Foley and Detective Clancy's
20  report, Derrell Fulton didn't inculpate himself
21  until you arrived at the scene?
22  MR. KUHN:  Objection; foundation,
23  speculation.
24  You can answer, if you know.

251

1  **A  I don't know.**
2  Q  Well, let's take a look at pages 14 and 15.
3  **A  Okay.**
4  Q  Remember the question is whether
5  Detectives Foley and Clancy's report states that,
6  up until you arrived at the scene, Derrell Fulton
7  had not inculpated himself in the crime.
8  So if you'd look at the top of page 15 again.
9  **A  Well, on page 14, prior to my arrival, Foley**
10  **documents that, when Fulton was confronted with**
11  **K. Johnson's account, he admits for the first time**
12  **that he was not being truthful.**
13  Q  Right.
14  **A  So that's before I got there.**
15  Q  Right.  But if you'll read that paragraph,
16  he says he wasn't being truthful, and then he
17  provides an account that makes him a witness and --
18  **A  Well, he now has admitted that he provided**
19  **a false statement to -- to investigators.  So he**
20  **admitted to lying before I arrived.  Right?**
21  Q  Mr. Garfinkel, you know, you can do the
22  lawyer thing --
23  **A  I'm not doing the lawyer thing.  I'm just**
24  **saying that, prior to my arrival, he tells law**

252

1  **enforcement officers that he was not being**
2  **truthful.**
3  Q  Does that implicate him in the murder?
4  Does anything on page 14 implicate Mr. Fulton in
5  the murder?
6  **A  Nothing on page 14 from Fulton's mouth**
7  **incriminates him in the murder.**
8  Q  And according to Foley and Clancy's report,
9  on page 15, "The detectives then had occasion to
10  interview Fulton along with ASA Garfinkel, and at
11  that time after being advised of his
12  constitutional rights, he related basically the
13  same set of facts as reported to the reporting
14  detectives in the above paragraph.
15  "Fulton was then advised of the content of
16  Coleman's statement, and at that time Fulton
17  requested to speak with ASA Garfinkel alone.  This
18  request was then granted, and after that interview
19  the detectives were then called back into the
20  interview room, and the following statement by
21  Fulton was taken regarding this incident."
22  Do you see that, sir?
23  **A  I do see it.**
24  Q  Have you ever been alone with a suspect or

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

64 (253 to 256)

253

1    a target when that target first provides an
2    inculpatory statement to a murder?
3        MR. MORAN:  Object to form.
4        Go ahead.
5        MR. KUHN:  Join.
6    **A  Absolutely.  Absolutely.**
7    Q  So you have, by yourself without a police
8    officer present, obtained confessions from
9    suspects where, up to that point, they had not
10   confessed to a murder?
11   **A  Of course.**
12       MR. KUHN:  Form.
13   **A  (Continuing.)  Of course.**
14   Q  You say "of course"?
15   **A  Yes.  That's not unusual or uncommon.**
16   Q  How many times did that happen in your
17   career, sir?
18   **A  I can't give you a number.**
19   Q  More than five times?
20   **A  I can't give you a number.**
21   Q  What tactic -- what tactics would you use
22   to get these confessions from people when you were
23   alone with them?
24       MR. KUHN:  Objection --

254

1        MR. MORAN:  Objection to form --
2        MR. KUHN:  -- misstates testimony.
3        MR. MORAN:  -- foundation, argumentative.
4        MR. KUHN:  Join.
5    **A  The only thing I did in this case was let**
6    **Mr. Fulton know that Mr. Coleman had implicated**
7    **him in a murder.**
8    Q  So hang on.  You previously testified at
9    Derrell Fulton's trial -- and this is page 010,
10   also Bates numbered PLAINTIFF 004303 -- that your
11   initial conversation with Mr. Fulton -- well,
12   here's the question and answer, line 16.
13       "Were you, the defendant, and Detective
14   Foley present?
15       "Answer:  In the interview room, yes.
16       "Question:  Approximately how long was
17   this initial conversation with the defendant?
18       "Answer:  I believe it to be between
19   15 and 20 minutes."
20       And then just for context, "Question:
21   After you had this conversation with the
22   defendant, did you go anyplace?
23       "Answer:  I had gone out of the room to
24   secure a statement I had taken the previous evening."

255

1        And so does that refresh your recollection
2    that that first interview took about 15 to
3    20 minutes?
4    **A  Sure.  But I want to say something.  I**
5    **have no personal knowledge that when Fulton**
6    **provided me with a confession that I was alone**
7    **with him.  I understand the report says that Foley**
8    **wasn't in the room, but I have no personal**
9    **knowledge to that fact.**
10   Q  Okay.  So let me just take it one step at
11   a time.
12       So first -- so Mr. Fulton was at the area
13   from at least 7:30 in the morning on April 29th until
14   you spoke to him at around 10:00 p.m. in the evening
15   on April 30th.  And so we're looking at a period
16   of -- 36 hours would be 7:30 in the evening, so
17   38 would be 9:30 -- around, you know, pushing
18   close to 40 hours at the area; fair?
19       MR. KUHN:  Objection; foundation,
20   speculation.
21   Q  Fair?
22   **A  If those times that you're stating are**
23   **correct, then it's about that period of time.**
24   Q  And you have no reason to doubt Detective

256

1    Foley's testimony that he first spoke with Derrell
2    Foley [sic] at 7:30 in the morning on April 29th;
3    correct?
4    **A  Who is Derrick Foley?  You said Derrick**
5    **Foley.**
6    Q  You're right.  My apologies.
7    **A  I'm just trying to understand your --**
8    Q  Yeah.  You have no reason to doubt that --
9    to doubt Detective Foley's testimony that he first
10   spoke to Derrell Fulton at about 7:30 in the
11   morning on April 29th; correct?
12       MR. KUHN:  Foundation, speculation.
13   **A  I don't have any personal knowledge when**
14   **they met.  I have no reason to think that he's**
15   **lying when he testified, but I have no personal**
16   **knowledge that I can independently verify when**
17   **Foley and Fulton met for the first time.**
18   Q  Well, you do know from your own report,
19   the felony review jacket, that Derrell Fulton was
20   in custody on the morning of April 29th; right?
21   **A  I did notate that in the summary.**
22   Q  All right.  So you have at least some
23   corroboration for Detective Foley's testimony;
24   right?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

65 (257 to 260)

257

1      A  Yes.
2      Q  Okay.  So after approximately 40 hours of
3  custody, you speak to Derrell Fulton for 15 or
4  20 minutes, and then he provides you with an
5  inculpatory statement when detectives weren't able
6  to get a confession from him for 38 1/2 hours?
7      A  I don't know what --
8         MR. KUHN:  Object to form, argumentative.
9      A  (Continuing.)  I don't know --
10        MR. MORAN:  Hal, you've got to wait.
11        THE WITNESS:  Sure.  I'm sorry.  I
12  apologize.
13        MR. KUHN:  Go ahead.
14     A  (Continuing.)  I don't know if detectives --
15  I don't know what, if anything, detectives did
16  with respect to Fulton prior to my arrival.
17     Q  Well, we know unless Detective Foley was
18  lying at trial, he said that at about 7:30 in the
19  morning on April 29th he confronted Derrell Fulton
20  with Nevest Coleman's statement; right?
21     A  But I don't know if --
22        MR. MORAN:  Objection.
23        THE WITNESS:  I'm sorry.
24        MR. MORAN:  Objection.  That is not what

258

1  he said.
2      A  I don't know --
3         MR. KUHN:  Misstates -- join.
4      A  (Continuing.)  I don't know what contact,
5  if any, or the amount of time detectives had with
6  Fulton prior to my arrival.  I don't know that.
7         So when you're suggesting that for
8  38 hours Fulton was exposed to interviews and
9  interrogations by police officers and they were
10  unable to secure a confession and then I came in
11  and in 15 minutes was able to get it, you're
12  assuming a fact that we don't know to be true
13  regarding what contact, if any, investigators and
14  officers had with Fulton prior to my arrival.
15     Q  You'd been a lawyer for how long when you
16  were in felony review?  Three years?
17     A  I had been a lawyer four years.
18     Q  Four years, sorry.
19     A  Four years.
20     Q  Do you think that you were better at
21  obtaining confessions after four years as a lawyer
22  than the detectives who had over 20 years'
23  experience as police officers?
24        MR. KUHN:  Objection; foundation,

259

1  speculation, form.
2         You can answer if you know.
3         MR. MORAN:  And argumentative.
4      A  I never said I was good at obtaining any --
5  all I've ever done as a felony review assistant
6  was to ask and inquire of suspects if they want to
7  provide a truthful accounting of their involvement
8  in a -- in a given investigation.
9         And, again, I want to say this --
10        MR. KUHN:  Wait until there's a
11  question, Hal.
12     Q  What do you want to say, sir?
13     A  I'm good.
14     Q  I'd like to know what you want to say.
15     A  I'm good.  I'm good.
16     Q  I understand you're good.  I'm asking you
17  a question.
18     A  Ask me a question.
19     Q  I am.
20     A  What is --
21     Q  What is it --
22        THE COURT REPORTER:  All right.  One at
23  a time.
24     Q  What is it that you wanted to say?

260

1      A  Nothing.
2      Q  You wanted to say nothing?  That is your
3  truthful response under oath?
4      A  Yes.
5         MR. KUHN:  Argumentative.
6      Q  You understand you're under oath?
7      A  I do.
8      Q  Okay.  And so when you were saying, "What
9  I'd like to say," you're now saying you wanted to
10  say nothing?
11     A  Nothing.
12        MR. KUHN:  Objection; argumentative.
13     Q  I just wanted to be sure.
14     A  Good.
15     Q  Yeah.
16     A  Okay.
17     Q  All right.  At page 022 of your trial
18  testimony at Mr. Fulton's trial -- this is page
19  PLAINTIFF 004315 -- you are asked the question at
20  line 5:
21        "Did the defendant say anything concerning
22  Detective Foley after you showed him the
23  statement?
24        "Answer: He wanted to speak with me alone.

261

1  I asked, 'Is it possible the detectives could
2  leave the room.'
3      "Question:  Did anyone, in fact, leave
4  the room?
5      "Answer:  Detective Foley left the room.
6  It was myself and the defendant.
7      "Question:  When it was just you and the
8  defendant, did you have a conversation with the
9  defendant concerning the murder of Antwinica
10 Bridgeman?
11     "Answer:  I did.
12     "Question:  Could you tell the ladies and
13 gentlemen of the jury approximately how long that
14 conversation was?
15     "Answer:  I believe it to be somewhere
16 between 35 and 45 minutes."
17     Does that refresh your recollection --
18     **A  It does.**
19     Q  -- that you had -- were alone with
20 Mr. Fulton when he provided an inculpatory
21 statement?
22     **A  Yes.**
23     Q  All right.  Sir, at Fulton's motion to
24 suppress hearing you were asked the following

262

1  questions, and did you give the following answers?
2  This is page A88 - A, as in "apple" -- of
3  PLAINTIFF 004823, line 3.
4      "Question:  Was he there for your
5  conversation when you confronted the defendant
6  with, in fact, Mr. Nevest Coleman's statement?
7      "Answer:  He was there initially and
8  then left.
9      "Question:  Did you ask him to leave?
10     "No.
11     "Question:  Did the defendant ask him to
12 leave?
13     "Answer:  No."
14     Were you asked those questions, and did
15 you give those answers, sir?
16     **A  Well, I don't have a copy of the**
17 **transcript.  I'm trusting that you are honestly**
18 **reading that.**
19     MR. MORAN:  We'll object to foundation.
20     MR. KUHN:  Join.
21     **A  (Continuing.)  Those questions were asked**
22 **and those answers were given.**
23     Q  Why did you testify at your motion to
24 suppress that neither you nor the defendant asked

263

1  Detective Foley to leave the room after you
2  confronted Fulton with Nevest Coleman's statement?
3      MS. MEADOR:  Objection; foundation.
4      MR. KUHN:  Speculation.
5      **A  I -- I don't remember whether or not I was**
6  **alone with -- at this point, as I'm testifying**
7  **today, I do not remember whether or not I was**
8  **alone with Fulton the entire time that Fulton**
9  **provided his incriminating statement.  I don't --**
10 **I don't have personal knowledge as to that.  I**
11 **know what you just read to me on the transcript.**
12     Q  I'm going to ask you and see if this
13 refreshes your recollection.  This is from your
14 trial testimony at page 023, which is also Bates
15 numbered PLAINTIFF 004316, line 3.
16     "Question:  After that approximately
17 45-minute period, did anyone come into the room?
18     "Answer:  Detective Foley, who I had asked
19 to leave, came back into the room.  It was myself,
20 Detective Foley, and Mr. Fulton were in the room.
21     "Question:  When Detective Foley came back
22 into the room, did the defendant" -- strike that.
23     "When Detective Foley came into the room,
24 did the defendant repeat what he had told you in

264

1  Detective Foley's presence?
2      "Answer:  Yes."
3      Does that refresh your recollection that
4  you were alone with Mr. Fulton for the entire
5  45-minute period where you were discussing
6  Antwinica Bridgeman's murder with Mr. Fulton?
7      **A  No, it doesn't because it's quite possible**
8  **Foley may have come in intermittently during that**
9  **30- to 45-minute period.**
10     Q  Regardless whether he was -- whether
11 Detective Foley was not in the room at all or he
12 came in intermittently, why did you testify that
13 you didn't ask him to leave the room when you then
14 testified at trial in front of a jury that you did
15 ask him to leave the room?
16     MR. KUHN:  Objection; form.
17     MR. MORAN:  Object to form.
18     **A  I'm not clear on the question.**
19     Q  Sure.  In your trial testimony you testified
20 that Mr. Fulton supposedly asked you if he could
21 be alone with you, and then you asked Detective
22 Foley if it was possible that he could leave so
23 you could be alone with Mr. Fulton?
24     **A  That's the trial testimony.  Okay.**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

67 (265 to 268)

265

1    Q  But at the motion to suppress testimony,
2  you were asked if you -- if you asked Detective
3  Foley to leave or if the defendant asked Detective
4  Foley to leave, and you said no to both of those
5  questions.
6    **A  I'd have to see the motion to suppress**
7  **testimony.**
8        MR. KUHN:  Foundation, speculation.
9        MR. AINSWORTH:  Here I'll show you what
10  we'll mark as Exhibit 13.
11      (Garfinkel Deposition Exhibit 13 marked
12  for identification and attached to the transcript.)
13    Q  And if you'd turn to page 88 -- A88.  So
14  it's the very last page of this transcript, line --
15  the part I read you starts at line 3, ends at
16  line 10.
17    **A  With regards to the cleared -- the cleared**
18  **open report, Foley documents that Fulton requested**
19  **to speak with me alone.  In the motion to suppress**
20  **testimony my testimony is consistent.**
21        **In the trial testimony you're indicating**
22  **that I said that I requested Foley to leave -- or**
23  **who requested Foley to leave in the trial**
24  **testimony?  Who requested Foley to leave?**

266

1    Q  You did, according to your testimony.
2    **A  In the trial?**
3    Q  Yeah, at trial.
4    **A  What does it say about the defendant**
5  **requesting Foley to leave during the trial**
6  **testimony?**
7        MR. KUHN:  Just let Russell ask the
8  questions.  Listen to the questions and
9  answer them.
10    Q  It says that Detective -- that Detective
11  Foley asked if he could be alone with you, and
12  then you asked if it was possible if Detective
13  Foley could leave.
14    **A  But, yeah, in my trial testimony I was**
15  **never asked --**
16        MR. KUHN:  There's no question pending.
17        MR. MORAN:  I'm sorry, Russell, could you
18  say that again?  I might have misunderstood what
19  you were saying.  Can you repeat your question?
20    Q  As you sit here now, sir, do you have any
21  explanation for why you testified that way at
22  the -- at the motion to suppress hearing --
23        MR. KUHN:  Objection; form.
24    Q  -- from lines 3 through 10 on page 88?

267

1    **A  My testimony at the motion to suppress and**
2  **the cleared close report are consistent that**
3  **Fulton requested we speak alone.  With regards to**
4  **the trial testimony, the question was never asked**
5  **or the question was never asked did Fulton ask**
6  **Foley to leave the room.**
7        **So, therefore, with regards to the trial**
8  **testimony, it's not clear from the trial testimony**
9  **whether or not Fulton also asked Foley to leave.**
10    Q  And in your motion to suppress testimony
11  you said that Fulton did not ask Foley to leave;
12  right?
13        MR. MORAN:  Objection; argumentative.
14        MR. KUHN:  Join.
15    Q  Right?
16        MR. KUHN:  Asked and answered.
17    Q  Do you want me to read it to you again?
18    **A  No, you -- you read it to me.**
19    Q  Okay.  So you agree that you testified at
20  the motion to suppress hearing that Fulton did not
21  ask Foley to leave; right?
22        MR. KUHN:  Argumentative, asked and
23  answered.
24    **A  I did testify to that at the motion to**

268

1  **suppress.**
2    Q  So in preparation for the motion to
3  suppress hearing, you reviewed the cleared open
4  report, right, that we marked as Exhibit 1?
5    **A  I don't have a personal memory of**
6  **reviewing that, but I would have met with the**
7  **State's Attorney to prep my testimony.**
8    Q  You testified earlier today that you
9  reviewed it in preparation for the motion to
10  suppress hearings; right?
11        MR. MORAN:  Objection.
12    **A  I don't remember saying that, that I**
13  **reviewed the open report prior to a motion to**
14  **suppress.  I don't remember saying that.**
15    Q  Okay.  Well, we have a transcript.
16    **A  Okay.**
17    Q  Did you ever say that the information in
18  Exhibit 1 was inaccurate in any way?
19        MR. KUHN:  Objection; form.
20    **A  I don't know.  Was I ever asked the**
21  **question if -- if the cleared open report was**
22  **inaccurate?  Was that question ever propounded --**
23  **ever directed to me?  In the motion to suppress --**
24    Q  I'm asking you a different question.  I'm

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

68 (269 to 272)

269

1  not asking you like, you know, was there a
2  transcript question/answer that would impeach you.
3  I'm just saying, you know, in preparation for your
4  testimony --
5     **A  Which testimony?**
6     Q  Either at the motion to suppress or trial,
7  when you reviewed the cleared open report, did you
8  review it and say, "Oh, my goodness, there's an
9  error in here; they've got me getting Nevest
10 Coleman's confession when he had already confessed
11 before I got there"?
12    **A  I don't believe --**
13    MS. MEADOR: Objection -- hold on.
14    Objection; mischaracterizes the witness'
15 testimony.
16    **A  (Continuing.)  I don't think in the trial**
17 **testimony or either motions to suppress testimony**
18 **a prosecutor or any lawyer ever asked me my**
19 **opinion as to whether or not Foley's opened clear**
20 **report was accurate or inaccurate.  The question**
21 **was never asked of me.**
22    Q  I agree with you and I'm not asking what
23 happened at trial.  I'm saying before trial, in
24 preparation for trial or preparation for the

270

1  motion to suppress, did you say, "Hey, Brian, you
2  know, we've got an issue because this report that
3  was generated by Clancy and Foley has got some
4  inaccuracies in it, and we need to, you know, try
5  and figure this out"?
6     MS. MEADOR: Objection; assumes facts not
7  in evidence.
8     MR. MORAN: Join.
9     MR. KUHN: Join.  Foundation, speculation,
10 asked and answered.
11    **A  I don't have a personal memory of being**
12 **prepared for either motions to suppress or the**
13 **trial testimony before I testified and then**
14 **whether or not that question ever even arose.  I**
15 **have no personal memory of that.  What -- I just**
16 **don't remember it.  It's 20-plus years.**
17    Q  You knew Brian Sexton; right?
18    **A  I know Brian Sexton.**
19    Q  You know him.  Did you know him back
20 in 1994?
21    **A  Sure.**
22    Q  How did you know him?
23    **A  He was an Assistant State's Attorney; I**
24 **was also a State's Attorney, so we knew each other.**

271

1     Q  Did you know all of the Assistant State's
2  Attorneys?
3     **A  Every single one of them?**
4     Q  Yes.
5     **A  No.**
6     Q  How did you know Brian Sexton?
7     **A  Brian would occasionally act as a trial**
8  **supervisor while I was on review and, you know,**
9  **you just -- you meet people.**
10    Q  Did you work with him thereafter, after
11 April of 1994?
12    **A  Say again?**
13    Q  Did you work with Brian Sexton after
14 April of 1994?
15    **A  Work with him while I was on review, was**
16 **he -- were we co-review --**
17    Q  Sorry; it was a bad question.  Did you
18 ever work in the same unit as Brian Sexton?
19    **A  The only time I -- Sexton and I -- our**
20 **time overlapped was when he acted as a trial super**
21 **and I was in review.  He was older and he was**
22 **ahead of me in the office.**
23    MR. AINSWORTH: Let's mark this as
24 Exhibit 15, please.

272

1     THE COURT REPORTER: 14?
2     MR. AINSWORTH: Oh, 14, I'm sorry.  I got
3  ahead of myself.
4     (Garfinkel Deposition Exhibit 14 marked
5  for identification and attached to the transcript.)
6     Q  Showing you what we've marked as Exhibit 14,
7  you see at the top it's dated May 1st, 1994?
8     **A  Yes.**
9     Q  Is that the day that you began this felony
10 review jacket?
11    **A  What's that?**
12    Q  Is that the day you began this felony
13 review jacket?
14    **A  Yes.**
15    Q  The time -- start time and end time is cut
16 off on this copy, unfortunately.  What's the
17 number under Action Number?
18    **A  Looks like it's 77.**
19    Q  Okay.  We've got "Notifications:  ASA Brian
20 Sexton."  Do you see that?
21    **A  I do.**
22    Q  So who did you notify about Derrell
23 Fulton's case?
24    **A  Well, according to the innards of the**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

---

273

1  felony review jacket, I notified Brian Sexton, but
2  that's not to say I didn't speak to anybody else.
3      Q  If you notified somebody else, would you
4  have listed their name on your felony review
5  jacket?
6      A  I -- I should have but that doesn't mean
7  that I didn't speak with another supervisor and
8  had not documented that conversation.
9      Q  Were the -- were you in the habit of
10 omitting information from your report, sir?
11     A  Not intentionally, no.
12     Q  Well, were you known for submitting sloppy
13 reports with information missing from them.
14        (Simultaneous objections.)
15     A  I don't think I have that reputation.
16     Q  Okay.  And that's because you -- you tried
17 to do a competent job and include the information
18 that you're supposed to include; right?
19     A  Tried to be as thorough and as exhaustive
20 as possible, yeah.
21     Q  All right.  Under "Statement" for
22 Defendant No. 1 you provide a statement summary;
23 right?
24     A  I do.

---

274

1      Q  And after the defendant is advised of his
2  rights, it says, "Offender admitted to Assistant
3  State's Attorney that he, along with Nevest
4  Coleman and Eddie Taylor (not in custody) took
5  Victim 1 back to 917 West Garfield and repeatedly
6  raped Victim 1.  Offender placed a brick in
7  Victim 1's mouth while unknown male placed a metal
8  pipe in victim's vagina.  See handwritten
9  statement for details."  Do you see that, sir?
10     A  I do.
11     Q  Why did you say "an unknown male placed a
12 metal pipe in the victim's vagina"?
13     A  Well, I'd have to look at Fulton's
14 handwritten statement to see who he identifies as
15 inserting the metal pipe.
16        MR. AINSWORTH:  Let me grab that for you.
17        THE WITNESS:  That's Exhibit 11.
18        MR. AINSWORTH:  Thank you, sir.
19     Q  So the question that's pending to you,
20 sir, is, why did you write "unknown male placed a
21 metal pipe into the victim's vagina"?
22     A  I don't think I ever had contact with
23 Eddie Taylor at that point.
24     Q  So you didn't know his name?

---

275

1      A  Well, Fulton gives me the name Eddie Taylor
2  in the handwritten statement.
3      Q  Sure does.
4      A  But I had no way to verify who Eddie
5  Taylor was.  It wasn't corroborated and I just
6  used -- just used "unknown male."
7      Q  So why did you say in the same statement
8  summary that he, meaning Derrell Fulton, "along
9  with Nevest Coleman and Eddie Taylor (not in
10 custody) took Victim 1 back to 917 West Garfield
11 and repeatedly raped Victim 1"?
12        And just to put a final point on it, why
13 were you okay saying that Eddie Taylor repeatedly
14 raped Victim 1 but called him -- called him an
15 unknown male who placed a metal pipe in the
16 victim's vagina?
17        MR. KUHN:  Objection; misstates the
18 evidence, speculation.
19     A  In Fulton's statement to me in the
20 narrative section, I have Fulton telling me that
21 there's an Offender 1 -- that "Coleman directed
22 Offender 1 to place a brick in Victim's 1 mouth
23 while Taylor inserted a metal pipe in victim's
24 vagina."

---

276

1      Q  Where are you going with this?
2      A  Well, I'm just letting you know I'm
3  reading the narrative of that.  I can't -- I don't
4  remember specifically why I refer to -- why I
5  reference an unknown male in the narrative
6  section.  I do not remember why that was used.
7      Q  When you first talked to Derrell Fulton at
8  about 10:00 p.m. on April 30th, he wasn't even
9  under arrest; is that correct?
10     A  That's not my decision to make who is
11 under arrest or not.
12     Q  I didn't suggest it was.  I'm just saying
13 when you talked to Derrell Fulton --
14     A  He was in custody.  He was in custody.
15     Q  Well, you list the date and time of his
16 arrest as being April 30th, 1994, at 2350 hours;
17 right?
18     A  I indicate in the first narrative in
19 Nevest Coleman's -- in the innards of Nevest
20 Coleman's jacket that Fulton was already in
21 custody.  He was in custody when I went out on the
22 date of the interview with Coleman.  So he was in
23 custody.
24     Q  I understand that and I appreciate that

---

277

1  distinction. I'm just trying to alert you to the
2  fact that, according to you, Derrell Fulton was
3  arrested on April 30th, 1994, at 2350 hours. Is
4  that correct or is that -- or is that in error?
5      **A  Do you have a copy of Derrell Fulton's**
6  **arrest report? It will give a time when he's**
7  **arrested. Let's look at that. Maybe that's**
8  **consistent.**
9      Q  I'm sure it is but I guess the question
10 for you is, so you just write down whatever the
11 police department says --
12     MR. KUHN: Objection; misstates testimony
13 of the narrative.
14     **A  What time?**
15     Q  2350.
16     **A  So does the arrest report for Derrell**
17 **Fulton say 2350?**
18     Q  Yes.
19     MR. MORAN: Objection.
20 **A  Just like my --**
21     MR. KUHN: Join.
22 **A  -- narrative -- or excuse me -- just like**
23 **the innards of my felony review jacket that's**
24 **consistent with what the police wrote. Right?**

278

1      Q  And in your statement summary you called
2  it a brick that was placed in Victim 1's mouth;
3  correct?
4      **A  I'm just looking. One second, please.**
5      Q  It's about 10 lines down from the bottom
6  of page 2. It says, "Coleman directed Eddie Taylor
7  to insert a brick," and -- sorry -- that's page 2 of
8  Exhibit 11.
9      **A  In the handwritten statement. I'm looking**
10 **for how I described the object.**
11     Q  I just read it to you. It's 10 lines down
12 from the bottom where it says, "Coleman directed
13 Eddie Taylor to insert a brick." It's the last
14 paragraph, second line from the top of the last
15 paragraph on page 2.
16     **A  10 lines from the top?**
17     Q  10 lines from the bottom, sir. So the bottom
18 paragraph, second line down from the bottom --
19     **A  "Insert a brick." It's "brick."**
20     Q  Yeah.
21     **A  Right. A brick is used. That's why I**
22 **described it as a brick.**
23     Q  Did you ask Derrell Fulton to describe the
24 brick?

279

1      A  I don't remember.
2      Q  Can we just agree that a brick was not
3  used to suffocate Antwinica Bridgeman?
4      MR. KUHN: Objection; argumentative,
5  misstates testimony, calls for speculation.
6      MS. MEADOR: I'll object to foundation.
7      **A  I don't know what object was used to**
8  **suffocate. I don't know.**
9      Q  So you've never seen the crime scene photos?
10     **A  Why would I see the crime scene photos?**
11     Q  I didn't ask you why you would.
12     **A  No --**
13     Q  I just -- I'm asking you --
14     **A  -- no, no.**
15     Q  Did you --
16     **A  I wasn't the trial lawyer on the case and**
17 **I wasn't acting -- I wasn't investigating the case.**
18 **I was there to take an interview of Derrell Fulton.**
19 **There would be no reason for me to look at any**
20 **pictures because I wasn't trying the case.**
21     Q  So you don't know that it wasn't a brick
22 that was used to suffocate Antwinica Bridgeman?
23     MR. KUHN: Objection; argumentative,
24 misstates testimony, calls for speculation --

280

1      MR. MORAN: Foundation.
2      MR. KUHN: -- foundation.
3      **A  I've never seen a crime scene photo in**
4  **this case.**
5      Q  Did you ask Derrell Fulton why he left
6  Antwinica Bridgeman's body in Nevest Coleman's
7  basement?
8      **A  I don't remember any independent**
9  **conversation I had with Fulton regarding the**
10 **substantive facts of the case other than that**
11 **which is documented in the handwritten statement.**
12     Q  Is there a reason why you don't remember
13 your conversation with Derrell Fulton?
14     **A  Well -- well, it happened 25 years ago,**
15 **and I've had hundreds and hundreds of cases,**
16 **hundreds of cases in my career as a defense**
17 **lawyer, as well as a prosecutor, and it's a lot of**
18 **material.**
19     Q  Can you tell us one other case where you
20 obtained a confession to a murder all by yourself?
21     MR. KUHN: Objection; misstates testimony.
22     **A  I can't give you the name off the top of**
23 **my head right now.**
24     Q  Give us any -- any details about it. Tell

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

281

1  us and take as much time as you need.
2  **A  I can't remember.**
3  Q  Can you give us one detail about it?
4  **A  I can't.  I can't.**
5  Q  So is there another case where you have
6  obtained a confession to a murder all by yourself
7  apart from Derrell Fulton?
8      MR. KUHN:  Objection; asked and answered,
9  argumentative.
10  **A  I'm sure.**
11  Q  How many statements in murder cases did
12  you take as a felony review assistant -- sorry --
13  let me clarify.
14      How many inculpatory statements did you
15  take from a target in a murder case where they
16  implicated themselves in a murder?
17      MR. KUHN:  Object to form.
18      MR. MORAN:  Object to form and asked and
19  answered.
20  **A  I don't remember.  I didn't keep those**
21  **statistics.**
22  Q  About 50?
23  **A  Again, I didn't keep statistics.**
24  Q  I didn't say you keep statistics.  I'm

282

1  asking for your best estimate.  Does about 50 sound
2  right or actually less, fewer?
3  **A  I don't know.  I really -- I cannot -- as**
4  **I sit here now under oath, I cannot give you any**
5  **specificity of the number of -- now, is that**
6  **including oral, handwritten, and court reported**
7  **statements?  I can't give you the number.**
8  Q  Oral, handwritten, and court reported, is
9  that about 30 murders -- murder confessions?
10  **A  I don't know how many I had.**
11  Q  Did you have more than 100?
12  **A  No.**
13  Q  How many murder confessions did you take
14  in cases where the victim was impaled and
15  abandoned for her body to rot?
16      MR. KUHN:  Objection; argumentative.
17  **A  I don't know.**
18  Q  Was there another case other than the
19  Antwinica Bridgeman case where the victim was
20  impaled and her body left to rot?
21      MR. KUHN:  Objection; argumentative.
22  **A  Impaled from her mouth or other part of**
23  **her body?  Impaled is a general term.**
24  Q  Yeah, I'll say impaled as a general term

283

1  in any fashion.
2  **A  I don't remember.**
3      MR. KUHN:  Object to form.
4  Q  Were there any other cases where the
5  victim was impaled to death that you worked on at
6  felony review?
7      MR. MORAN:  Object to form.
8  **A  I don't remember.**
9  Q  And just to fix the objection, were there
10  any other cases where the victim was impaled and
11  later died in a case that you worked on in felony
12  review?
13  **A  And later died?**
14  Q  And died and it became a murder.
15  **A  As a result of the impalement?**
16  Q  Not necessarily as a result of the
17  impalement but injuries inflicted in conjunction
18  with the impaling.
19  **A  I don't remember.**
20  Q  There are inconsistencies between Derrell
21  Fulton's statement and Nevest Coleman's statement;
22  would you agree with me on that?
23  **A  Yes.**
24  Q  You told Brian Sexton that you believed

284

1  that Derrell Fulton's statement was truthful and
2  voluntary; correct?
3      MR. KUHN:  Objection; form, foundation.
4  **A  I don't remember a conversation I had with**
5  **Brian Sexton where I told him the truthfulness of**
6  **Fulton's statement.  I don't remember when I spoke**
7  **to Sexton about that.  I know I met with Sexton; I**
8  **know I met with Jimmy Sanford.  I don't have**
9  **personal knowledge as to opining on the truthfulness**
10  **of their statements.**
11  Q  When you talked to felony review -- your
12  felony review supervisor --
13  **A  Which supervisor?**
14  Q  When you talked to whichever felony review
15  supervisor you called after you obtained Derrell
16  Fulton's consent to get a handwritten statement,
17  what did you tell that supervisor?
18  **A  I don't remember that conversation.  It**
19  **was more than 25 years ago.**
20  Q  Was it similar or different from your
21  conversation with the felony review supervisor
22  that you had in regard to Nevest Coleman's case?
23      MR. KUHN:  Objection; foundation,
24  speculation.

285

1    A  If I don't remember the conversation, I
2  wouldn't be able to compare or contrast it with a
3  conversation I had with a supervisor in Coleman's
4  case.
5    Q  Did you believe that Derrell Fulton's
6  confession to you was truthful?
7    A  Absolutely.
8    Q  And you believed that Nevest Coleman's
9  confession to you was truthful; right?
10   A  Not all -- every detail around who
11 orchestrated what, but I believed that -- I
12 believed their statements to me.
13   Q  And you believed them to be truthful
14 because they contained crime scene facts that are
15 consistent with what you know the crime scene to --
16 to be that give it an air of reliability; is that
17 fair to say?
18     MR. MORAN:  Objection; foundation.
19     MR. KUHN:  Form.
20   A  The manner in which they spoke to me and
21 the manner in which they behaved when they spoke
22 to me led me to believe that they were being
23 truthful and honest.
24   Q  What was Derrell Fulton's demeanor like?

286

1    A  He was --
2      MS. MEADOR:  Objection; asked and answered.
3      MR. KUHN:  Join.
4    A  (Continuing.)  I don't have a clear memory
5  of how he behaved in the interview room, but I --
6  what I do remember, what I do remember is that he
7  was -- he was remorseful, he was -- he was honest,
8  and he was cooperative.
9    Q  So you don't remember a single thing that
10 Derrell Fulton said or a single thing that you
11 said to Derrell Fulton, but you remember that he
12 was remorseful and honest; is that what you're
13 saying?
14   A  Well --
15     MS. MEADOR:  Objection; argumentative.
16     MR. KUHN:  Join.
17   A  (Continuing.)  I just remember there being
18 nothing uneventful of my interactions with both
19 Coleman and Fulton -- nothing eventful.  They both
20 came in and admitted their participation in this
21 murder.
22   Q  Well, just a minute ago you were telling
23 us that it was because of Derrell Fulton's
24 demeanor and the way he confessed that led you to

287

1  believe that he was being truthful.  Do you -- do
2  you remember that?
3    A  I do.
4    Q  Okay.  So what was it about Derrell
5  Fulton's demeanor that leads you to believe that
6  he was being truthful when he confessed?
7    A  I don't remember him yelling or in any way
8  being anything other than an individual who wanted
9  to come clean about his involvement in this murder.
10   Q  What -- have you ever had a suspect or a
11 target provide you a statement and based on their
12 demeanor you could tell that that person was lying?
13   A  Lying about -- when they would give an
14 exculpatory statement and that they were lying
15 about that?
16   Q  Lying about whatever it was in their
17 statement.
18   A  I don't remember really -- in truth, I
19 don't really remember much of my work in felony
20 review in terms of specific cases and the way
21 suspects or targets behaved with me or towards me.
22 It's been too many years.
23   Q  I'm going to the read you two portions of
24 Exhibit 1, so if you want to grab it and have it

288

1  with you to read along, and I'm going to ask you
2  to compare them and see if they sound similar
3  to you.
4      MS. MEADOR:  I'm sorry; I missed -- can
5  you read back just that last part?
6      MR. AINSWORTH:  "I'm going to ask you if
7  they sound similar to you."
8      MS. MEADOR:  Thank you.  I appreciate it.
9    Q  So starting at page 12 of Exhibit 1.
10     MR. CURRAN:  Bates stamp 12 or page 12?
11     MR. AINSWORTH:  Page 12.
12   Q  All right.  The middle paragraph, it says,
13 "The reporting detectives then confronted Coleman
14 with the fact that the family" --
15   A  Page 12 of the cleared close report?
16 Page 12 the second paragraph starts with, "The RDs
17 then confronted."
18   Q  Yeah, you're in the same place.  That's
19 what I was reading.  "The reporting detectives" --
20 I'm translating RDs to reporting detectives.
21   A  Go on.
22   Q  -- "then confronted Coleman with the fact
23 that the family of the victim told the detectives
24 that the victim never returned home on that night,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

73 (289 to 292)

289

1 and at that time Coleman stated that he again was
2 not truthful and he now wanted to tell the
3 detectives the entire truth.
4      "He stated that after he left the party
5 with Williams and Calimee, he left them at 56th and
6 Green Street and went to the liquor store at 55th
7 and Halsted. He then stated that he returned to
8 the area, and at that time he saw the Victim
9 Bridgeman and Chip and Dap talking to the victim
10 in the alley behind his house. He then went on to
11 say that he then sees the victim and Chip and Dap
12 go into his basement.
13      "He then stated after a short time he went
14 to the basement door and observed the victim
15 orally copulating Chip, and she was also engaged
16 with Dap in anal intercourse. He then went on to
17 say that he then became frightened and ran into
18 his apartment one floor above the crime scene
19 where he remained for the rest of the night?"
20      Do you see that, sir?
21   A  I do see that.
22   Q  So we have -- this is Nevest Coleman
23 saying that he is confronted with evidence by the
24 detectives, and then he wants to come clean, and

290

1 he says he saw Fulton and Taylor with the victim
2 in the basement, and he watched from the open
3 basement door. He watched them have -- both men
4 have sex with the victim, and then he got scared,
5 and he ran away.
6      All right. Now I want to asked you about
7 page 14 of Exhibit 1.
8      MR. MORAN: Is this all part of one
9 question?
10      MR. AINSWORTH: It is.
11      MR. MORAN: Let me just get one objection
12 out of the way to form.
13      MR. AINSWORTH: That's fine.
14   Q  All right. The last paragraph on page 14
15 reads, "Fulton was then confronted with K. Johnson's
16 account and at that time stated he had been
17 untruthful in his account of the night of this
18 incident. He then went on to say that, on the date
19 and time of this incident, he was in the alley
20 behind 917 West 55th Street.
21      "He then went on to say that he then observed
22 Chip and Nevest and Antwinica go into the basement
23 at 917 West 55th Street. He then stated that he
24 stayed in the alley for a short time and that he

291

1 then went down into the basement, and while he was
2 standing in the basement doorway, he observed the
3 victim orally copulating Chip, and Nevest Coleman
4 was having vaginal intercourse with the victim.
5      He then went on to say that Chip and Nevest
6 Coleman turned toward Fulton and saw that Fulton
7 was standing in the doorway. Fulton then went on
8 to say that he then panicked and ran from the
9 scene and went home?"
10      Okay. So we now have Derrell Fulton being
11 confronted with evidence saying he wants to come
12 clean and that he saw Coleman and Taylor in the
13 alley with the victim and that --
14   A  Well, at this point Fulton hasn't been
15 confronted with anything yet.
16   Q  Well, he was confronted with K. Johnson's
17 account.
18   A  Yes.
19   Q  Yes. And he sees Fulton and Taylor --
20 sorry -- he sees Coleman and Taylor in the alley,
21 and he goes to the doorway of the basement, and
22 from the open doorway of the basement he sees both
23 Coleman and Taylor having sex with the victim, he
24 got scared, and he ran home.

292

1      Do you see similarities in the fake
2 stories that both Coleman and Fulton give to the
3 detectives?
4      MR. KUHN: Object to form.
5      MR. MORAN: Object to form, foundation.
6      Go ahead.
7      MS. MEADOR: Join.
8   A  I think the report speaks for itself,
9 and -- and I suppose you could make arguments
10 either way, you know.
11   Q  You don't see these two versions of events
12 as being suspiciously similar?
13      MR. KUHN: Objection; argumentative, form,
14 foundation.
15      Go ahead.
16   A  I don't see anything suspicious, for a
17 characterization of suspicious. There's nothing
18 that's suspicious. It's not unusual in cases for
19 codefendants to point their fingers at the other
20 person and for a codefendant to incriminate or
21 inculpate himself with respect to acting as a
22 lookout and then another codefendant also
23 inculpating himself acting as a lookout and then
24 pointing fingers at each other. Codefendants do

293

1 that all the time.
2    Q  Right.  But neither of these events -- you
3 know, both defendants admitted that this was a
4 made-up story, that this doesn't happen -- right? --
5 that they didn't actually witness the other from
6 the doorway having sex with the victim and then
7 ran away scared and went home; right?
8       MR. KUHN:  Objection; argumentative.
9    Q  Right?
10      MR. KUHN:  Form.
11   A  We know what -- again, the report speaks
12 for itself.  I'm not here to comment on what a
13 detective drafted and form an opinion as to that,
14 as to the truthfulness or untruthfulness of it.
15      I wasn't present.  This report hadn't been
16 created when I interviewed Fulton or Coleman, and
17 I wasn't consulted on the crafting or drafting of
18 this document.
19   Q  None of those are my question, sir.  I
20 mean, like, you know, just to steer it back to my
21 question, my question is, sir --
22   A  I don't see --
23   Q  -- don't you think --
24   A  Go ahead.

294

1    Q  Can you think of a reason why both Fulton
2 and Coleman would implicate the other in, you know,
3 having sex with the victim with a fake story that
4 both included each of them standing in an open
5 doorway in April and watching the other have
6 sex with the victim and a murder and then getting
7 scared and running home?
8    A  I wouldn't --
9       MS. MEADOR:  Objection.
10      MR. MORAN:  Hold on a second.
11      Objection; foundation and form.
12      MR. KUHN:  Join.
13      MS. MEADOR:  Join.
14   A  (Continuing.)  I would not begin to opine
15 why your clients would say what they say and then
16 turn an about-face the other way.  You would -- it
17 would require me to really stand in the shoes of
18 both of these individuals, and I can't possibly do
19 that.  So I really am not in a position to give an
20 opinion.  I'm just not.
21   Q  As a criminal defense attorney, does -- do
22 those two scenarios in this Exhibit 1 strike you
23 as odd --
24      MR. KUHN:  Objection; form.

295

1    Q  -- that two different people would be
2 providing the same fake story?
3       MS. MEADOR:  Objection; form.
4       MR. MORAN:  Objection; form, foundation,
5 misstates the testimony -- the record.
6    A  Not really, no.
7    Q  All right.  So you've reviewed Exhibit 11,
8 correct, Derrell Fulton's statement?
9    A  I have.
10   Q  Does reviewing Derrell Fulton's statement
11 refresh your recollection of any of the events that
12 are described therein or any of the statements
13 that he made to you?
14      MS. MEADOR:  Objection; foundation.
15   A  Again, I remember speaking to him at the
16 end of our -- at the end of our encounter as to
17 how he had been treated, and this refreshes that
18 conversation I had with him about that he was
19 treated fine.
20      This document refreshes my recollection of
21 certainly going in and identifying myself to
22 Derrell Fulton and letting him know that I wasn't
23 his lawyer, that I was a prosecutor, and I didn't
24 work on his behalf or for him.

296

1       So to the extent that this document refreshes
2 my memory to those aspects of the conversations,
3 it does.
4    Q  All right.  So your memory is refreshed with
5 regard to telling Derrell Fulton that you were a
6 lawyer but not his lawyer --
7    A  Right.
8    Q  -- and a prosecutor and introducing
9 yourself and determining that he was treated fine
10 by the police.  And that's the extent of your
11 memory of your interaction with Derrell Fulton; is
12 that what you're saying?
13   A  Pretty much.
14   Q  Well, is there any hedging there?
15   A  I don't think so.  I think that's pretty
16 accurate.
17   Q  Is it accurate or is it pretty accurate?
18 I want to be real clear here because you've been
19 precise with language.
20   A  I think it's accurate.
21   Q  All right.  Having reviewed Exhibit 1 --
22 and I'm going to ask you, sir, to review the
23 portion of Exhibit 1 that I haven't yet read to
24 you but just read it to yourself.

297

1    A  Sure.
2    Q  This is page -- the remainder of page 15 of
3  Exhibit 1 and just let us know if that refreshes your
4  recollection as to any other of your interactions
5  with --
6    A  The entire page 15?
7    Q  Please, just to yourself.
8    A  There's nothing in page 15 that refreshes
9  my memory of the conversation I had with Fulton
10  regarding substantive facts of this case.
11    Q  Is there anything on page 15 that refreshes
12  your recollection as to anything about your
13  interactions with Derrell Fulton?
14    A  Nothing.
15    MR. AINSWORTH:  All right.  Let's go off
16  the record.
17    THE VIDEOGRAPHER:  Off the record, 5:16.
18    (Recess taken, 5:16 p.m. to 5:28 p.m.)
19    THE VIDEOGRAPHER:  Back on the record, 5:28.
20  BY MR. AINSWORTH:
21    Q  Do you believe that confessions are
22  frequently obtained under circumstances that --
23  under circumstances in which a defendant is all
24  but forced to confess?

298

1    MR. KUHN:  Objection; form, foundation,
2  speculation.
3    MS. MEADOR:  Join.
4    A  No.
5    MR. AINSWORTH:  Let's mark this as
6  Exhibit 15, please.
7    (Garfinkel Deposition Exhibit 15 marked
8  for identification and attached to the transcript.)
9    Q  Showing you what we've marked as Exhibit 15,
10  is this a blog post from your website, sir?
11    A  Yes.
12    Q  And do you see it's titled "Common Causes
13  of Wrongful Convictions"?
14    A  Yes.
15    Q  And do you see on the first page it says,
16  "The system is far from perfect, and every year
17  hundreds if not thousands of individuals are found
18  guilty of crimes they did not commit"?
19    Do you see that?
20    A  Yes.
21    Q  Do you agree that hundreds if not thousands
22  of individuals are found guilty of crimes they did
23  not commit every year?
24    MR. KUHN:  Objection; foundation,

299

1  speculation.
2    A  This is content that is posted on my
3  website in order to -- to generate SEO traffic.  I
4  didn't author this.  It wasn't presented to me for
5  review before it was posted on my website, and I
6  didn't read this blog before it was posted on my
7  website.
8    Q  Okay.  My question, sir, is just, do you
9  believe that hundreds if not thousands of
10  individuals are found guilty of crimes they did
11  not commit every year?
12    MR. KUHN:  Form and foundation.
13    A  I think there are individuals -- I mean,
14  I'm not going to stand by the statement of hundreds
15  if not thousands are convicted of crimes every
16  year they didn't commit.  I don't have personal
17  knowledge as to hundreds or thousands.
18    Q  So you post these blogs on your website to
19  profit off them; correct?
20    MR. KUHN:  Objection; misstates the
21  testimony.
22    A  I -- I post these blogs on my website to
23  generate traffic and allow anybody who is
24  interested in my services to read articles that

300

1  they might find interesting but not necessarily to
2  profit.
3    Q  Well, it's for a business purpose; right?
4    A  It is for a business purpose.
5    Q  And the business purpose is to drive traffic
6  to your website; right?
7    A  That's correct.
8    Q  So you get more clients; right?
9    A  Yes.
10    Q  And presumably more clients means more
11  profit; correct?
12    A  Presumably.
13    Q  So -- and you post the blog site -- post
14  the blog entries to drive traffic to increase
15  profit; correct?
16    MR. KUHN:  Objection; misstates evidence.
17    Q  What am I missing here?
18    A  Those articles are posted on my website.
19  Again, I -- it is intended to drive traffic, and
20  it is -- it is intended to get my name out on
21  social media to advance what it is that I do for a
22  living.
23    Q  And they're posted there because you pay
24  somebody to post them?  You're paying somebody to

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

---

301

1  write the content that appears on your website;
2  correct?
3      MR. MORAN:  Asked and answered.
4      MR. KUHN:  Join.
5   **A  I'm posting a service that -- I retain a**
6  **service to post articles that will increase my**
7  **traffic regardless as to whether I believe each**
8  **and every fact contained within that article.**
9   Q  Right.  You just want to generate revenue;
10 right?
11     MR. MORAN:  Objection; argumentative.
12     MR. KUHN:  Join.
13  **A  No, that's not true.**
14  Q  Then why are you posting blog entries on
15 your website that you might not agree with?
16  **A  Because there's another --**
17     MR. KUHN:  Objection; misstates the
18 testimony.
19  **A  (Continuing.)  There's a wide variety of**
20 **opinions as to the existence or nonexistence of**
21 **wrongful convictions, and these are interesting**
22 **articles that I want to expose the public to so**
23 **that they can read them and then form an opinion**
24 **based on those articles as to whether or not they**

---

302

1  **might even want to speak to me.**
2   Q  So do you believe that one wrongful
3  conviction is too many?
4   **A  Yes.**
5   Q  Do you agree with the statement
6  incriminating statements, full confessions or
7  guilty pleas are not always reliable; they are
8  frequently obtained under questionable
9  circumstances in which a defendant is all but
10 forced to confess?
11     MR. KUHN:  Objection to form.
12  **A  I'm not sure I'd agree to that stem of the**
13 **statement that they are all but forced to confess.**
14  Q  All but forced to confess?
15  **A  Right, all but forced, I'm not sure I'd**
16 **agree to that.**
17  Q  Are there criminal defendants that you've
18 represented that you believe were coerced to confess?
19  **A  Yes.**
20  Q  And you filed motions to suppress on their
21 behalf; right?
22  **A  Yes.**
23  Q  And was that as a result of misconduct by
24 police officers?

---

303

1      MR. MORAN:  Objection; foundation, form.
2      MR. KUHN:  Join.
3   **A  Let me think about those cases that I**
4  **filed motions to suppress.**
5      **Most of the statements that I filed motion**
6  **to suppress statements went to either classic**
7  **Fourth Amendment violations, a warrant and seizure**
8  **and then the fruit from that seizer, or a Sixth**
9  **Amendment argument there was not a proper**
10 **Mirandizing of the client.**
11     **I don't believe I've ever filed a motion**
12 **on behalf of a client in which I alleged police**
13 **misconduct in the form of coercion, duress, any**
14 **kind of physical or mental duress.  I can almost**
15 **say I've never done that.**
16  Q  Have you ever accused an Assistant State's
17 Attorney of misconduct in a case you were
18 litigating as a criminal defense attorney?
19  **A  On the record?  Off the record?  What do**
20 **you mean?  What context?**
21  Q  In a motion to suppress or some other means.
22  **A  Accuse a State's Attorney?**
23  Q  Yeah.
24  **A  On a motion to suppress?**

---

304

1   Q  Yes.
2   **A  On a Fourth Amendment motion to suppress?**
3   Q  On any motion to suppress.
4   **A  Do you understand the differences between**
5  **a motion to suppress on a Fourth, Fifth, or**
6  **Sixth amendment?**
7   Q  Yes, sir.
8   **A  All right.  So on a Fourth Amendment motion**
9  **to suppression, that goes to the misconduct of --**
10 **that goes to whether or not the officer has ever**
11 **made a -- so we're analyzing the behavior of the**
12 **officer, so there would be no reason to challenge**
13 **a State's Attorney's conduct.**
14     **With regards to a Fifth Amendment, no, or**
15 **a Sixth Amendment, no, because the State's Attorney**
16 **doesn't play a role in that -- in the facts that**
17 **would go to a motion to suppress.  Other than**
18 **going specifically like to a Brady violation, I've**
19 **never -- I've never -- I've never questioned a**
20 **State's Attorney on any case I've ever litigated**
21 **in 25 years, as hard as this may be for you to**
22 **believe, that the State violated a discovery rule**
23 **ever, ever.  Never in 25 years.**
24  Q  Do you believe that law enforcement

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

77 (305 to 308)

305

1  officials are skilled at their jobs; they have the
2  ability to lie and manipulate facts to coax people
3  into admitting guilt?
4      MR. KUHN: Objection; form.
5      MS. MEADOR: Objection; form, foundation,
6  calls for speculation.
7      A  Maybe in some cases.  Maybe in some cases.
8      Q  What do you mean "in some cases"?
9      A  Listen, if you have a target or a defendant
10 who is of diminished capacity, an officer could
11 exercise his intellect to persuade or to
12 manipulate a suspect into giving a statement.
13 That does exist.
14     Q  Do you think that wrongful convictions are
15 a major problem in the United States?
16     MR. KUHN: Objection; form.
17     A  Anytime there's a wrongful conviction
18 it's -- it's problematic and a reflection of our
19 criminal justice system, absolutely.  Absolutely.
20     MR. AINSWORTH: I want to mark this as
21 Exhibit 16.
22     (Garfinkel Deposition Exhibit 16 marked
23 for identification and attached to the transcript.)
24     Q  All right.  Showing you what we've marked

306

1  as Exhibit 16, this is a group exhibit of a number
2  of GPRs that are all taken from this case.
3      MR. AINSWORTH:  And, Counsel, we've used
4  this same exhibit with other witnesses.
5      Q  I'm going to ask you to take a look
6  through Exhibit 16 and tell me if you recognize
7  having seen any of these GPRs back in 1994 and
8  whether any of these GPRs refresh your recollection
9  as to any of the interactions with any of the
10 witnesses about whom you've testified here today,
11 such as Shaunice Williams, Francine Calimee,
12 Nevest Coleman, Michael Barber, or Derrell Fulton
13 or your interactions with the detectives who were
14 investigating the Antwinica Bridgeman homicide.
15     A  I never reviewed any GPRs in connection
16 with the Nevest Coleman or Derrell Fulton
17 investigations.
18     Q  How do you know that?
19     A  Well, I just don't have any personal
20 memory of ever reviewing any.
21     Q  Have you had the opportunity to review all
22 of Exhibit 16?
23     A  Well, I mean, they're all GPRs.  I don't
24 have any personal memory of ever reviewing any

307

1  GPRs in connection with this case.  My only
2  involvement -- well, certainly at the time I was
3  at the scene -- strike that -- at the area those
4  GPRs would not have been created yet.
5      Q  Why do you say that they wouldn't have
6  been created yet?  Certain of them not yet?
7      A  Certain of them.
8      Q  All right.
9      A  With regards to pretrial testimony in
10 terms of motions to suppress and trial testimony,
11 I don't have any personal recollection of ever
12 reviewing any GPRs prior to my testimony at
13 motions to suppress or the trial.
14     Q  Please make sure you review each and every
15 page --
16     A  I am.
17     Q  -- of Exhibit 16.
18     A  Well, they're all GPRs.  I don't have memory
19 of reviewing any GPR prior to any trial testimony
20 or motion to suppress testimony.
21     Q  Have you had the opportunity to review
22 each and every page of Exhibit 16?
23     A  I have.
24     Q  Does it refresh your recollection as to

308

1  any of the topics we've discussed here today?
2      A  It doesn't.
3      Q  Did you know anything about Derrell Fulton's
4  criminal history at the time you spoke to him?
5      A  No.
6      MR. AINSWORTH:  Let's mark this as
7  Exhibit 17, please.
8      (Garfinkel Deposition Exhibit 17 marked
9  for identification and attached to the transcript.)
10     Q  Did you play any role in creating this
11 document?
12     A  This 101?
13     Q  Yeah.
14     A  No, none.
15     Q  Why do you say that?
16     A  That's not the way I write, and I did not
17 create this document.
18     MR. AINSWORTH:  And let's mark this as
19 Exhibit 18.
20     (Garfinkel Deposition Exhibit 18 marked
21 for identification and attached to the transcript.)
22     Q  Showing you what we've marked as Exhibit 18,
23 did you play a role in creating any portion of
24 this document, Exhibit 18?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

78 (309 to 312)

309

1    A  No.

2    Q  How do you know?

3    A  By the way -- this document looks like it

4  was typed by a pretty poor typer, and the

5  language, the syntax.

6    Q  Have you completed 101s before?

7    A  I don't believe so.

8    Q  Have you ever received a credible claim of

9  misconduct against a police officer in your career

10  either as an Assistant State's Attorney or as a

11  criminal defense attorney?

12      MR. KUHN:  Objection; speculation.

13    A  What do you mean by "a credible claim"?

14    Q  Like a claim by someone and you deem the

15  claim to be credible.

16    A  I deem to be credible?

17    Q  Yeah.

18    A  No.

19    Q  Have you received claims from either

20  clients or -- either clients while you were a

21  criminal defense attorney or from suspects while

22  you were Assistant State's Attorney that a police

23  officer abused them?

24      MS. MEADOR:  Objection as to form.

310

1      MR. KUHN:  Join.

2    A  With -- with regards to clients telling me

3  about whether an officer abused them, I think those

4  would be privileged communications.

5    Q  I agree.  And so I'll limit to situations

6  where you've made a public filing regarding those

7  allegations.

8    A  I don't think a public filing would waive

9  an attorney-client privilege.  Only -- only the

10  client can waive that.

11    Q  Once you put it into a public filing, then

12  it's public.  So only the content that was in the

13  public file, sir.

14    A  But the client and only the client gets to

15  waive privilege, so I disagree with you.  So I'm

16  not going to communicate anything in this deposition

17  regarding what a client told me even if there was

18  a public filing because I can't waive the

19  privilege; only my client can.

20      MR. KUHN:  Hal, just listen to the

21  question he asks.

22      THE WITNESS:  I heard the question.  I

23  heard the question.  I heard the question.

24    Q  So for clients where it came under an

311

1  attorney-client privileged communication, I'm not

2  asking for the communication that was made to you

3  by the client, only what you filed in court.

4    A  I don't believe I made a filing.  What do

5  you mean "a filing"?  Like a motion, like a motion

6  to suppress?

7    Q  Yes.

8    A  On police misconduct?

9    Q  And I'm going broad.  So any other kind of --

10  but, yes, for police misconduct, any kind of filing.

11      MS. MEADOR:  Objection as to form then.

12    A  I don't -- I don't believe I have.

13      MR. AINSWORTH:  Derrick, can we have the

14  same stipulation with regard to punitive damages

15  discovery we've done with Detective Boudreau and

16  other defendants in this case -- other defendants

17  in this case?

18      MR. KUHN:  We agree to the same terms that

19  we put on the record with Mr. Moran.

20      MR. AINSWORTH:  Then I will -- I'll pass

21  the witness to -- to Nick.  I may have a few

22  questions, but this will speed things along, and I

23  doubt that I will.

24 ///

312

1      EXAMINATION BY COUNSEL FOR PLAINTIFF FULTON

2  BY MR. CURRAN:

3    Q  Sir, when is the last time you spoke with

4  Brian Sexton?

5    A  Might seen him in one of the

6  courthouses in the last month and just said hi.

7    Q  Have you ever discussed this lawsuit with

8  Brian Sexton?

9    A  ESPN had called wanting to interview me

10  several times, and I think I spoke with Brian just

11  about that fact, that I had rejected their offers

12  to give an interview.

13    Q  And do you recall approximately when you

14  would have had that conversation with Brian Sexton?

15    A  Last six months.

16    Q  And did you reach out to him regarding

17  ESPN's requests?

18    A  No.

19    Q  Did he reach out to you?

20    A  I think -- I think we just saw each other.

21    Q  And what was, to the best of your memory,

22  the substance of that conversation you had with him?

23    A  He just said to me that he had been

24  contacted by ESPN regarding the suit, and then he

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

79 (313 to 316)

313

1 asked me if I had, and I said I had. I think he
2 asked me if I had given a statement, and I told
3 him that I didn't, and I think he told me that he
4 did. And that was the extent of it.
5    Q When you say you told him that you didn't
6 give a statement, you mean you did not speak with
7 ESPN about the lawsuit?
8    A Yeah, yeah.
9    Q Did you discuss the substance of the
10 lawsuit at all --
11    A No.
12    Q -- with Mr. Sexton?
13    A Never.
14    Q Please just let me finish my question --
15    A Sure.
16    Q -- before you answer it.
17    A Sure.
18    Q Thank you, sir.
19      Did you discuss Derrell Fulton at all with
20 Brian Sexton during that conversation?
21    A No.
22    Q Did you ever express any opinion to him
23 concerning the decision by the Conviction
24 Integrity Unit to vacate Mr. Fulton's conviction?

314

1    A No.
2      MR. MORAN: Object to foundation.
3      MR. KUHN: Join.
4    A (Continuing.) No.
5    Q Have you ever had any other conversations
6 with Mr. Sexton regarding this lawsuit?
7    A No. There may be several conversations,
8 two at the most or three, very limited all about
9 the -- all about the ESPN interview and my
10 decision -- just kind of like, "Hey, did you speak
11 with ESPN?" I said, "No, never did."
12    Q So just for clarification, are you saying
13 that you spoke with him on multiple occasions
14 about the ESPN story?
15    A Maybe two, maybe two. I want to be precise.
16    Q And, again, did he broach that with you or
17 did you on any of those occasions raise the issue
18 with him?
19    A It was raised to me by him, but, again,
20 just in passing.
21    Q Did he relate to you what it is he told ESPN?
22    A No.
23    Q Did you read the article?
24    A The ESPN article?

315

1    Q Yes.
2    A I might have. I might have.
3    Q Have you ever heard a police detective use
4 the term "ghetto lottery"?
5    A Say what?
6    Q Have you ever heard a police detective use
7 the term "ghetto lottery"?
8    A Never.
9    Q When you were in felony review, did you
10 ever hear a detective during the course of his
11 duties as a police officer use the word "nigger"?
12    A No.
13    Q Have you ever in any situation heard a
14 police officer use the word "nigger"?
15    A Never.
16    Q When you arrived at the area on April 30th,
17 was it your intention to elicit an inculpatory
18 statement from Derrell Fulton?
19      MR. KUHN: Objection; asked and answered.
20    A No.
21    Q Did you intend to approve charges against
22 Mr. Fulton regardless of the information he
23 provided to you?
24      MR. KUHN: Objection; misstates testimony.

316

1    A No.
2      MR. CURRAN: I believe that's an improper
3 objection. I didn't characterize his testimony.
4      Could you please repeat my question?
5      MR. KUHN: We can talk about the propriety
6 of my objection if you want to.
7      MR. CURRAN: I'm -- what I'm saying is I'm
8 not going to allow you --
9      MR. KUHN: If you want to debate it, let's
10 debate it.
11      MR. CURRAN: Hold on.
12      Could you please repeat my question first?
13      (The Reporter read the question as
14 follows: Did you intend to approve charges
15 against Mr. Fulton regardless of the information
16 he provided to you?)
17      MR. CURRAN: Now explain to me, Derek, if
18 you believe your objection was proper, how was I
19 characterizing testimony?
20      MR. KUHN: So this goes to your seven hours?
21      MR. CURRAN: Yes.
22      MR. MORAN: Guys, come on. Let's just
23 move on. This is ridiculous.
24      MR. CURRAN: I don't allow people --

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

80 (317 to 320)

317

1     MR. MORAN:  I need to be somewhere.
2     MR. CURRAN:  I don't allow people to just
3  reflectively object with a string of meritless
4  objections and obstruct the process of taking a
5  deposition.  That's just not the way I do things.
6  So if I have to involve the Judge, I will.  Okay?
7  BY MR. CURRAN:
8     Q  Now, my question to you, sir, is, did you
9  intend on approving charges against Mr. Fulton
10 regardless of the information he provided to you?
11    MR. KUHN:  Same objections.
12    A  No.  I think I said no already to you.
13    Q  Okay.  Hypothetically, if Mr. Fulton had
14 invoked his right to remain silent when you
15 attempted to speak with him on April 30th, would
16 you have contacted your supervisor about approving
17 first degree murder charges against him?
18    MR. KUHN:  Objection --
19    MR. KUHN:  Incomplete hypothetical and
20 asked and answered.
21    A  I don't remember what -- I don't remember
22 what the evidence was separate and apart from the
23 Fulton's statement.  I mean, if I would have had --
24 I would have had a codefendant implicating Fulton,

318

1  Fulton asserts his Fifth.  I think under James I
2  would have -- I would have had a conversation with
3  my supervisor about -- about approving charges.  I
4  would have had a conversation.  I'm not saying I
5  would have requested an approval, but I think I
6  would have discussed it with him.
7     Q  And what would that conversation have
8  entailed?
9     MR. MORAN:  Objection; speculation.
10    MR. KUHN:  Join.
11    A  The belief that Coleman had given a
12 credible authentic statement implicating Fulton.
13 I don't remember whether there were other people
14 who had implicated -- I just don't remember right
15 now whether there were other people implicating
16 Fulton, but if there were other people implicating
17 Fulton, if there were, and Coleman implicates
18 Fulton, that evidence, that would be attractive
19 evidence to at least broach a conversation, maybe
20 not -- maybe not try and persuade.
21    Q  If you could clarify for me, did you wield
22 the authority to the approve charges, murder charges
23 on your own, or did you have to have a supervisor's
24 approval before you approved charges?

319

1     A  The latter.  The latter.
2     MS. MEADOR:  Objection as to form.
3     THE WITNESS:  Sorry.
4     A  (Continuing.)  The latter.
5     Q  And I take it the supervisor's decision to
6  let you approve charges was based on the
7  information that you provided to them.
8     A  Yes.
9     Q  In 1994 you were experienced in the field
10 of -- in the field of criminal law; correct?
11    MS. MEADOR:  Objection; form.
12    A  What does that mean?
13    Q  Sure.
14    A  What kind of question is that?
15    Q  That was the only area in which you
16 practiced; is that fair?
17    A  I was a prosecutor.  I just got out of
18 school in '90; I spent a year in Israel, so it was
19 three years.  As a lawyer yeah, I had only done
20 criminal law.
21    Q  Okay.  And would you agree with me that,
22 from the perspective of the prosecution, a
23 confession from a defendant is a powerful piece of
24 evidence insofar as meeting your burden of proof

320

1  at trial?
2     MR. MORAN:  Objection; asked and answered.
3     A  Statements are very -- are very probative
4  and very -- very much looked upon in favor.
5     Q  And not just a statement but a confession;
6  correct?
7     A  Sure.  Sure.
8     Q  And back in 1994 you were -- you were
9  aware that Nevest Coleman's court reported
10 statement could not be used against Derrell Fulton
11 at Fulton's trial unless Coleman testified at
12 Fulton's trial; is that true?
13    A  Well, that's Bruton, of course.
14    Q  So you obviously knew that back in 1994?
15    A  It's the Sixth Amendment right to
16 confront, right?
17    Q  Sure.  But just so the record is clear,
18 you were aware of that --
19    A  I knew the Bruton rule.  I knew the Bruton
20 rule.
21    Q  And what is your understanding of what the
22 Bruton rule is?
23    A  A nontestifying codef- -- a nontestifying
24 codefendant's statement cannot be used against him

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

81 (321 to 324)

---

321

1  unless he confronts it in court subject to
2  cross-examination.  That's what Bruton says.
3     Q  So you would have been aware at the time
4  you spoke with Mr. Fulton that you -- or rather
5  the prosecution would not be able to use
6  Mr. Coleman's court reported statement against
7  Mr. Fulton unless Mr. Coleman testified at
8  Mr. Fulton's trial; correct?
9     A  Yes.
10    Q  And so obtaining an inculpatory statement
11 from Mr. Fulton was critical to prosecuting him
12 for the victim's murder; is that fair?
13       MR. MORAN:  Objection; form.
14       MS. MEADOR:  Objection; form --
15    A  Was what?
16       MS. MEADOR:  -- calls for speculation.
17       MR. KUHN:  Join.
18    Q  It was -- obtaining an inculpatory statement
19 from Mr. Fulton was critical to prosecuting him
20 for the victim's murder; is that fair?
21    A  I wasn't there --
22       MS. MEADOR:  Same objection.
23    A  (Continuing.)  I was not there to make the
24 decision whether to prosecute Fulton.  I'm there

---

322

1  to interview Fulton to determine whether or not he
2  had any information relative to how this woman died.
3        I didn't make critical decisions about
4  whether or not he should or shouldn't be
5  prosecuted.  My decision was to approve charges,
6  and once he gave an incriminating statement, then
7  I went up my chain and said, "I think we have
8  enough to approve charges."  Then it's out of my
9  hands and goes to the felony trial division.
10    Q  If you approve charges in felony review,
11 isn't your expectation normally that that is a
12 precursor to prosecuting the defendant for that
13 charge?
14    A  I don't have --
15       MR. KUHN:  Form and foundation,
16 speculation.
17       Go ahead.
18    A  (Continuing.)  As a felony review assistant,
19 we don't go into an investigation with expectations,
20 none.  That calculus doesn't even enter my mind.
21    Q  So you're saying that at the time you take
22 a statement from a defendant or a suspect, we'll
23 say --
24    A  What kind of -- what kind of statement?

---

323

1     Q  Sir, allow me to finish my question, please.
2     A  Then be clear with your statement.
3     Q  Allow me to finish my question, please, sir.
4     A  Be clear with it then.
5     Q  Sir, you don't get to make the rules here.
6  Allow me to finish my question.
7     A  Be clear then.
8     Q  Sir, when you --
9        MR. KUHN:  Wait until there's a question
10 pending until you say anything.
11    Q  When you take a statement, for example,
12 from a suspect or target, as you've labeled them
13 or described them here during your deposition here
14 today, I believe you testified earlier that part
15 of what you're doing is memorializing the statement
16 in such a way that it might not harm the prosecutor
17 further on down the road in the prosecution of
18 that defendant.  Is that not fair?
19       MR. MORAN:  Objection.
20    A  I never said that at all.
21    Q  Let's talk about --
22       MR. KUHN:  Join.
23    Q  Let's talk about when you testified
24 earlier about why you may or may not include

---

324

1  motive in a defendant's handwritten statement.  Do
2  you remember those questions being asked of you?
3     A  I do.
4     Q  And do you remember testifying that you
5  might not include information about motive in a
6  statement because it might box the prosecutor in --
7     A  Yes.
8     Q  -- later on?
9     A  Yes.
10    Q  So that you would agree then would be an
11 example of how, during your role as a felony review
12 prosecutor, you would execute your responsibilities
13 with an eye towards the defendant being prosecuted
14 at trial?
15       MR. KUHN:  Objection; misstates testimony.
16    A  Not necessarily towards trial but in a
17 trial posture.
18    Q  What do you mean by that?
19    A  Well, I mean, when a felony review assistant
20 takes a statement, whether it's inculpatory or
21 exculpatory, all we are looking for is a statement
22 which is either corroborated extrinsically by
23 either testimonial or demonstrative evidence, or
24 if it's a statement which isn't corroborated but

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

82 (325 to 328)

---

325

1  the assistant believes that what is being said is
2  truthful, then we take statements, and then we
3  let -- we -- we hand it off to our supervisor.
4      In the case of murder, okay, the police are
5  looking for an approval, based on my assessment of
6  this statement, they're seeking charges, and I
7  would agree and concur in charges being filed and
8  that's it.
9      Q  Would you agree with me that you have
10 testified here today pretty adamantly that you
11 don't investigate when you are in felony review?
12     A  I don't.
13     Q  It was not your role to investigate
14 Ms. Bridgeman's murder; is that correct?
15     A  Absolutely.
16     Q  Do you recall testifying at the hearing on
17 Derrell Fulton's motion to suppress his statement
18 that when you spoke with Mr. Fulton, you told him
19 that you had been assigned to investigate the
20 homicide?
21     MR. MORAN:  Objection; foundation.
22     MR. KUHN:  Join.
23     A  I might have used that word, but when I
24 used that word "investigate," it wasn't with the

---

326

1  understanding of how it's being used today that I was
2  acting as an investigator.  That was just a verb.
3      Q  How did you mean it just as a verb?
4      A  Investigating meant that I would be
5  conducting an interview of Mr. Fulton.
6      Q  What is an interview?  How would you
7  define the term in this context?
8      A  Asking questions of a suspect or target
9  and getting answers or not getting answers.
10     Q  So when Mr. Fulton denied any involvement
11 in the offense, how come you did not just accept
12 his denials and then carry on?
13     A  Well, I had -- I had a court reported
14 statement of Nevest Coleman which I believed to be
15 true, and I wanted to give Mr. Fulton every
16 opportunity to give as honest and truthful a
17 statement as possible, and I felt by showing
18 him -- not letting him read but just having him
19 see that there was a codefendant who had
20 implicated him, that might affect the statement he
21 was going to give me.
22     Q  Do you know how Mr. Fulton just seeing the
23 court reported statement without having an
24 opportunity to read its content would affect his

---

327

1  decision whether or not to give you, in your
2  words, a truthful statement?
3      MR. KUHN:  Objection; speculation.
4      A  That would really -- that question, to
5  answer that would require me to step into the
6  shoes of Mr. Fulton and cognitively understand the
7  machinations of what he was thinking about, and,
8  of course, I can't do that.
9      Q  Well, but you were trying to do that,
10 weren't you, when you were confronting him or
11 showing him Mr. Coleman's statement?  I mean, you
12 had a reason for doing that; correct?
13     A  Yes, but it wasn't to step into the shoes
14 of Mr. Fulton; it was to say, "Listen there's a
15 codefendant out there" -- or let's call him a
16 cosuspect -- "out there who has implicated you.
17 Is there anything you want to say about this
18 case," to which he said -- he then gave the
19 statement that he ultimately gave.
20     Q  Would you agree that investigation
21 involves eliciting information about a crime that
22 was not up to that point known?
23     MR. KUHN:  Objection; foundation,
24 speculation.

---

328

1      You can answer, if you know.
2      A  I don't know.  I never thought about that.
3      Q  When you say you were not acting as an
4  investigator in this case, what do you mean by that?
5      A  Well, I wasn't reviewing crime scene photos;
6  I wasn't going out to the crime scene and looking
7  at the crime scene; I wasn't -- often times in law
8  enforcement they use polygraph instruments to
9  calibrate the testimony or to calibrate the
10 statements given in the station.  I wasn't part of
11 any of that.
12     Any -- whatever you think about what a police
13 officer does in the course of an investigation, a
14 felony review assistant doesn't do any of that,
15 any of that.
16     Q  So what you're saying, then, is a felony
17 review assistant does not participate in breaking
18 a suspect?
19     MR. MORAN:  Objection; form.
20     MS. MEADOR:  Objection; form.
21     MR. KUHN:  Argumentative.
22     A  I don't know what the word "breaking" is.
23 What is breaking?
24     Q  Sure.  Getting a suspect to go from denying

---

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

83 (329 to 332)

329

1 involvement in the offense to admit involvement in
2 the offense.
3    **A   I never -- in all of my tenure in felony**
4 **review I never broke a suspect or in any way**
5 **influenced or persuaded a suspect to provide a**
6 **statement other than the one he or she wanted to**
7 **give.  I was just there to listen to what they had**
8 **to say and then document it.**
9    Q  So is it your testimony that Derrell Fulton
10 wanted to give you the handwritten statement that
11 he eventually signed?
12    **A   That question, again, would require me to**
13 **step into the shoes of Derrell Fulton and be able**
14 **to really assess what he wanted or didn't want to**
15 **do, and that's kind of a silly question.  I**
16 **couldn't answer that.**
17    Q  Yeah, I agree, especially when you just
18 testified right before that that you never took a
19 statement from someone other than the statement
20 that they wanted to give.
21    MR. KUHN:  Objection; argumentative.
22    Q  You kind of did that previously, didn't you?
23    MR. MORAN:  Objection; argumentative.
24    **A   The statement they were willing to give.**

330

1    Q  Okay.
2    **A   I never coerced a statement out of**
3 **anybody.**
4    Q  So you would agree with me that in order
5 to know the statement that they're willing to
6 give, you would have to step into their shoes;
7 right?
8    **A   No --**
9    MR. KUHN:  Objection; argumentative.
10    **A   (Continuing.) No, by the manner in which**
11 **they provide the statement and the ease with which**
12 **they gave over that statement can lead to a**
13 **reasonable belief that this is something that they**
14 **wanted to do.**
15    Q  What gave you a reasonable belief that
16 Derrell Fulton wanted to provide a statement
17 admitting to his involvement in the murder of
18 Antwinica Bridgeman?
19    **A   I don't have -- when I asked him how he**
20 **had been treated by the police and how I had**
21 **treated him, and he almost reflectively said, "I**
22 **was treated fine by you and fine by the police,"**
23 **and when I told him from the onset of our contact**
24 **that I was not his lawyer, that I was a lawyer**

331

1 **working for the police, and the fact that he**
2 **readily provided a statement after letting him**
3 **know that Coleman had implicated him led me to**
4 **reasonably believe that there wasn't much**
5 **dissonance or fight -- I don't know if I like the**
6 **word fight -- or any kind of real obstruction to**
7 **him telling me that he was involved.**
8    Q  So is it fair to say, then, you didn't think
9 he resisted enough to be innocent of the crime?
10    MR. MORAN:  Objection; misstates his
11 testimony.
12    MR. KUHN:  And to form.
13    **A   It's not an issue of resist at all.  He --**
14 **he fully cooperated in my interview of him, and**
15 **that cooperation led me to believe that this was**
16 **something that he desired to do and that there was**
17 **no -- there was no cajoling or any type of**
18 **intimidation by me to him to provide that statement.**
19    Q  As an experienced criminal defense
20 attorney and former prosecutor, you understand
21 that, in order for a criminal defendant's
22 statement to be admissible, the statement must
23 have been given voluntarily; is that correct?
24    **A   Voluntarily and intelligently, yes.**

332

1    Q  And you're familiar with the concept that
2 if a suspect's will is overborne, any suspect --
3 statement the suspect gives as a result is
4 inadmissible?
5    **A   That would be -- that would violate Miranda.**
6    Q  Sure.  Would you agree with me that part
7 of your job in felony review was to ensure that
8 any statement given by a suspect was given
9 voluntarily?
10    **A   Absolutely.**
11    Q  Do you agree that the duration of an
12 interrogation is a factor courts consider in
13 determining whether a statement was given
14 voluntarily?
15    **A   Dickerson says that.  That's the law.**
16    Q  Sure.  So is it true, then, that as an
17 Assistant State's Attorney in felony review,
18 knowing how long a suspect has been interrogated
19 would be part of assessing whether the suspect is
20 giving a statement voluntarily?
21    MR. KUHN:  Objection; incomplete
22 hypothetical.
23    **A   Absolutely.**
24    Q  Okay.  And, similarly, you would want to

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

84 (333 to 336)

333

1  know how long a suspect has been at the station --
2  station as part of that assessment; is that true?
3      MS. MEADOR:  Objection; incomplete
4  hypothetical.
5      MR. KUHN:  Join.
6      MR. CURRAN:  Go ahead, sir.
7   **A  I might want to know.**
8   Q  And why might you want to know that?
9      MR. KUHN:  Objection; form, incomplete
10 hypothetical.
11  **A  The length of time can under certain**
12 **circumstances be relevant in determining whether**
13 **or not a statement is given voluntarily.**
14  Q  And what are those circumstances?
15     MR. KUHN:  Objection; form.
16  **A  Just the amount of time that -- that a**
17 **person is detained, but then there are many, many**
18 **other metrics, including whether or not they've**
19 **been given the right to use a bathroom, whether**
20 **they've been provided food, whether they can drink**
21 **anything, and whether they have been denied sleep**
22 **if they have requested to sleep.**
23  Q  But you would agree with me that length of
24 detention would be a factor?

334

1   **A  Can be a factor.  Not is a factor, can.**
2   Q  When you arrived at the area on April 30th
3  to take Derrell Fulton's statement, did you ask
4  any of the detectives at the area for how long he
5  had been in custody?
6   **A  I don't remember if I did or didn't.**
7   Q  Sir, if you can go to Exhibit 13, I just
8  want to see if this refreshes your recollection.
9  If you look at Page A68 --
10  **A  It's 13?**
11  Q  It is your testimony during the motion to
12 suppress statements that have been filed by
13 Derrell Fulton?
14  **A  Do I have 13?  I've got 12.  What makes**
15 **you think I have 13?**
16  Q  Well, there was an Exhibit 13.  I have no
17 reason to believe that you no longer have it.
18  **A  This is 12; this is 2; this is 11.**
19     MR. AINSWORTH:  May I see 12, sir?
20     THE WITNESS:  Okay.  3, 6, 4, 10.
21     MR. KUHN:  That might be it.
22     THE WITNESS:  13, got it.
23  Q  Okay.  Sir, if you could turn to page A68,
24 which is also Bates-stamped PLAINTIFF --

335

1   **A  I got it.**
2   Q  -- 4803.  Starting on line 17:
3      "Question:  So when you speak of two or
4  three conversations, what time was your first
5  conversation?
6      "Answer:  Approximately 10:00.
7      "Question:  And how long had Mr. Fulton
8  been in custody before that?
9      "Answer:  I had not asked.  I was not
10 concerned with it."
11     Do you see that?
12  **A  I do see that.**
13  Q  As you sit here today, can you explain to
14 me why you were not concerned with how long
15 Mr. Fulton had been in custody before he spoke
16 with you?
17  **A  Fulton had -- Fulton had not communicated**
18 **to me in any -- when -- my memory of my conversation**
19 **with Fulton is based on the handwritten statement**
20 **of -- and that's -- and really that limits what I**
21 **remember going back 25 years.**
22      **And I asked Fulton how he had been treated**
23 **by myself and by the detectives, by all law**
24 **enforcement.  He said fine.  So I had no reason to**

336

1  **believe that he had been exposed to any extended**
2  **detention, as he didn't communicate that to me at**
3  **any time during my contact with him, and,**
4  **therefore, that's what I meant when I said I**
5  **wasn't concerned with that.  I wasn't concerned**
6  **that he had been a victim of any extended duration.**
7   Q  Today there's been reference to, I believe
8  Derrell Fulton asking that he have the opportunity
9  to speak with you alone.  Do you recall that?
10  **A  I do.**
11  Q  Okay.  Do you remember asking him why he
12 wanted to speak with you alone?
13  **A  I don't remember.**
14  Q  Would you have asked him why he wanted to
15 speak with you alone?
16  **A  I don't remember.**
17  Q  Would that have given you any pause where
18 a target asks to speak with you outside the
19 presence of a police officer?
20  **A  No, because I do it in every case.**
21 **Whether they ask me or I ask them, I demand that I**
22 **speak with that suspect alone to verify outside of**
23 **the presence of law enforcement that there has**
24 **been nothing of a coercive or a duress-like**

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

85 (337 to 340)

337

1  environment.  So whether they ask to be alone or
2  whether I initiate it, we get to the same
3  destination.
4      Q  I understand that, sir, but my question
5  is, would it give you any pause where a defendant
6  or a suspect or target asks you --
7          MR. MORAN:  Objection.
8      Q  -- to speak alone outside the presence of
9  a law enforcement officer?
10     A  No, it's not uncommon --
11         MR. MORAN:  Objection; asked and answered.
12     A  (Continuing.)  It's not uncommon.
13     Q  For what kinds of reasons would they want
14 to speak with you -- have they explained -- strike
15 that.  Let me back up.
16        In those situations have they ever explained
17 to you why they wanted to speak with you outside
18 the presence of a law enforcement officer?
19     A  I don't remember, Counsel.  I don't remember.
20     Q  Okay.  And you don't have any memory of
21 ever asking any of those suspects or targets,
22 "Hey, why did you ask the officer to leave the
23 room?"
24     A  No memory.

338

1      Q  Okay.  You agree that Derrell Fulton
2  initially denied any involvement in the offense?
3          MR. KUHN:  Objection; misstates testimony.
4      Q  That's why I'm asking you, do you agree
5  with that?
6      A  Yes.
7      Q  Did you document anywhere that Derrell
8  Fulton initially denied any involvement in the
9  offense?
10     A  No.
11     Q  Why not?
12     A  Again, the documentation that would take
13 place -- that takes place is the handwritten
14 statement, which, of course, would not include an
15 initial denial, and then the felony review jacket
16 doesn't really have a section that allows you to
17 document an initial denial and then a subsequent
18 incriminating statement.
19     Q  So just to be clear, your testimony is
20 that there's not room on the felony review jacket
21 to document a suspect or target denying involvement
22 in the offense?
23         MR. KUHN:  Objection.  That misstates the
24 testimony.

339

1      A  I never said anything about room.  I'm not
2  sure what the word "room" means.
3      Q  Sir, I'm just asking you the question.  Is
4  it -- is it because there's no -- there's not a
5  section on here that says, "Did the defendant
6  initially deny" --
7      A  Well, that's different --
8      Q  -- "involvement in the offense?"
9      A  That's different than what you said
10 about room.
11     Q  Okay.  Here's my question.  Let me
12 backtrack, cut through this.
13     A  Sure.  Sure.
14     Q  Why don't you document it anywhere?
15         MR. KUHN:  Form.
16     A  There is not a section on the actual innards
17 of the felony review file to document that.  It's --
18 we weren't trained to include an initial denial in
19 a handwritten statement and it just -- I never did
20 it.  Never did it.
21     Q  Can you think of any other reason?
22     A  No.
23     Q  To be clear -- because I know you were
24 asked some questions about this earlier, but I

340

1  have to reiterate some things for my questions to
2  make sense.
3      A  Sure.  Sure.
4      Q  Would there have been any reason for you
5  to keep a copy of Nevest Coleman's court reported
6  statement in your personal possession when you
7  left the area on April 29th?
8      A  Only if those court reported statements
9  had to be turned into felony review, and that's
10 what I don't remember.  I don't remember if I kept
11 the statements there or if they went to felony
12 review.  I just don't remember.  That was -- that
13 was the one issue.  Is that clear?
14     Q  Do you recall how it is in the case of a
15 court reported statement you would actually receive
16 the court reported statement?
17     A  Yeah, it's -- court reporter is right
18 there, and he -- and he prints it up.  And they
19 connect it to a printer, and then it's generated,
20 and then the statement is gone through with the
21 suspect, and then copies are made.
22     Q  Okay.  And the suspect would sign each
23 page of the court reported statement; is that
24 correct?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

86 (341 to 344)

341

1    A  Well, you saw Coleman's statement.
2    Q  Sure.
3    A  There's a signature on each page.
4    Q  Sure, sir, but I have to ask questions to
5  get to --
6    A  Yeah, yeah, yeah --
7    Q  -- my next question.
8    A  -- of course, of course.
9    Q  Okay.  And you would sign it; correct?
10   A  Yes.
11   Q  And a detective would sign it?
12   A  Well, yeah.
13   Q  Okay.  And so there would be an original
14  with original statements; correct?
15   A  Yes.
16   Q  Where did that original go?
17   A  I don't know.  I don't remember.  I don't
18  know if I physically brought it over to the
19  14th floor and handed it off or if it remained
20  with the detectives.  I don't remember who it was
21  handed off to.  I know I didn't keep it.
22   Q  When you say "the 14th floor," are you
23  talking about the 14th floor at 26th --
24   A  Yeah, that's where felony review is.

342

1    Q  -- Street?
2    A  Yes.
3    Q  Okay.  So would there have been any reason
4  for you to leave the area with Mr. Coleman's
5  statement and keep it in your possession for a day
6  or two after it was obtained?
7    A  No.  But I need to say this.  Clancy
8  documented in that report that I retrieved it --
9  retrieved it from a briefcase.  I don't remember
10  testifying -- I might have and if I did, please
11  correct me.  I don't remember testifying at either
12  the trial or the motions that I retrieved a
13  statement from a briefcase.  If I did, then
14  you'll -- you'll impeach me on that now.
15     I don't think I ever did.  I don't think I
16  ever removed it from a briefcase.  I didn't have a
17  briefcase.  I had like a book bag where I kept my
18  felony review jackets.  I didn't have money for a
19  briefcase in those days.
20   Q  Was your memory of the events of
21  April 29th through May 1st fresher when you
22  testified to them during the pretrial motions and
23  then at Mr. Coleman's and Mr. Fulton's trials?
24     MR. KUHN:  Objection --

343

1    A  Yes.
2      MR. KUHN:  -- to form.
3    Q  If you could again go back to that
4  Exhibit 13.
5    A  Yeah.
6    Q  And if you look at A57.
7    A  Yep.
8    Q  Starting at line 22:
9      "Question:  And after that conversation
10  with Mr. Fulton, did you confront him with
11  anything at that point?
12     "Answer:  I did.  I stepped out of the
13  room, and I went to my briefcase, and I went back
14  into the interview room, and I told Mr. Fulton I
15  had a court reported statement that I had contacted
16  with Mr. Nevest Coleman."
17     Do you see that?
18   A  I do.  All I can say is when I used the
19  word "briefcase" here, that would have been a book
20  bag that I had with the felony jackets, and it's
21  quite possible when I made reference and testified
22  to that -- remember, there were multiple copies of
23  that court reported statement that were generated.
24  So I might have gotten -- there may have been --

344

1  I'm sure there was a copy that the detectives had
2  after Coleman completed it, and I probably
3  retrieved it from one of them.
4      I can say unequivocally I never left and
5  traveled for two days with a -- with a court
6  reported statement in my bag --
7    Q  So when --
8    A  -- without a doubt.
9    Q  So when you testified here -- you agree
10  with me this seems to indicate that you went and
11  retrieved the statement from your briefcase?
12   A  Yeah, but I didn't say that that briefcase
13  left the area.  Right?  There's nothing in that
14  statement saying that that briefcase that I
15  retrieved the statement from ever left the area.
16   Q  Based on your experience in felony review,
17  do you have any knowledge of a briefcase being
18  kept --
19   A  No.
20   Q  -- at the area?
21   A  I don't ever remember using -- it was --
22  it was a book bag.  It was a book bag.
23   Q  You've testified, I think here today that
24  words -- precision with your words is important?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

87 (345 to 348)

345

1    A  I don't remember saying today that precision
2 with words are important.  I think we all agree as
3 lawyers that you want to be as accurate as possible.
4    Q  Okay.  So were you trying to be as accurate
5 as possible when you testified under oath during
6 this pretrial motion to suppress?
7    A  I tried to be as truthful and honest as I
8 could be.
9    Q  You've had an opportunity to review
10 documents prior to your deposition here today?
11    A  Sure.
12    Q  Do you have any reason to believe that
13 there are any documents out there that you could
14 review that would refresh your recollection beyond
15 what you testified to here today?
16    A  No.  There are none.
17    Q  Based on any of the documents that you
18 reviewed, do you have any reason to believe that
19 narcotics had anything to do with your decision to
20 approve charges?
21    MR. MORAN:  Objection; foundation.
22    MS. MEADOR:  Join.
23    MR. KUHN:  Join.
24    A  Narcotics?

346

1    Q  Yes, that's my question.
2    A  That -- are you suggesting that -- that
3 one or both the suspects somehow had narcotics in
4 them and that that's how -- that's how they gave
5 the statement?
6    Q  Correct -- or no, that's why the murder
7 was perpetrated.  Do you have any information
8 like that?
9    A  No, I don't.  I don't.  I don't.
10    Q  Do you have any opinions as to when there
11 was first probable cause to arrest Nevest Coleman?
12    MR. MORAN:  Object to foundation.
13    MR. KUHN:  Join.
14    A  That's not a decision I even --
15    Q  Sir, listen to my question.
16    A  Yeah.
17    Q  Do you have any opinions as to when there
18 was first probable cause to arrest Nevest Coleman?
19    MR. MORAN:  Object to foundation.
20    MR. KUHN:  Same objection.
21    A  No, I have no opinion on that.
22    Q  Thank you.
23    Do you have any opinions as to when there
24 was first probable cause to arrest Derrell Fulton?

347

1    MR. MORAN:  Same objection.
2    MR. KUHN:  Join.
3    A  No.
4    Q  I believe that you testified that you
5 carried a Polaroid camera with you when you worked
6 in felony review.
7    A  We all did, yeah.
8    Q  And was it procedure to take a Polaroid
9 photo of a suspect or target who gives a
10 confession after the confession is given?
11    A  Yes.
12    Q  Was there a standard procedure as to how
13 many photographs you would take?
14    A  I don't think so.
15    Q  Did you have a practice of taking a
16 certain number of photographs?
17    A  Like my own unique practice?
18    Q  Sure.
19    A  No.
20    Q  Do you have any memory of taking more than
21 one photograph of Derrell Fulton?
22    A  I have no memory of taking any picture of
23 Fulton.  I know I did.
24    Q  Do you have any reason to believe that you

348

1 would have taken more than one photo of Derrell
2 Fulton?
3    A  I have no personal knowledge of taking a
4 photo of Fulton.
5    Q  Certainly, sir.  My question is a little
6 bit different.
7    A  Yeah.
8    Q  I want to know if you have any reason to
9 believe that you took more than one.  I mean, is
10 that -- for example -- for example --
11    A  Yeah.
12    Q  -- do you have any memory of ever having
13 taken more than one photo of any suspect from whom
14 you obtained a confession while you were in felony
15 review?
16    A  No.
17    Q  Did you ever take photographs of suspects
18 who -- from whom you obtained a statement with
19 their shirts off?
20    A  I don't remember.
21    Q  Are you -- do you consider yourself to be
22 friends with Gina Savini?
23    A  No.
24    Q  Have you ever spent time with her socially?

349

1    A  I don't think so.
2    Q  What about her husband, Greg?
3    A  Only when we were on review we'd be like,
4  you know, at a breakfast or dinner professionally.
5  I never socialized.  I didn't socialize with
6  really anybody much in the office.
7    Q  Was there a reason for that?
8      MS. MEADOR:  Objection; form.
9    A  It's my background.  It's, you know, kind
10 of who I was.
11   Q  Have you ever had any informal
12 conversations with Gina Savini about this case?
13   A  Informal conversations?
14   Q  Sure.
15   A  No, no.
16   Q  You said that you spoke with her that one
17 time; is that correct?
18   A  May have been twice on the phone and once
19 face to face.
20   Q  Where did that face-to-face meeting take
21 place?
22   A  26th Street.
23   Q  And where in 26th Street?
24   A  Oh, I don't know.  One of the -- one of

350

1  the floors.  Maybe it was the library.  I think.
2  I don't remember.  May have been the library.
3    Q  And did you have an understanding of why
4  it was she wanted to speak to you?
5    A  Well, yeah.
6    Q  What was your understanding?
7    A  She was in the wrongful conviction unit,
8  and she wanted to know what I remembered about the
9  Coleman/Fulton investigation.
10   Q  Do you recall whether or not you expressed
11 any opinions as to Derrell Fulton's guilt during
12 that conversation?
13   A  I don't remember.
14   Q  Same question as to Nevest Coleman.
15   A  I don't remember.
16   Q  Do you recall for sure that there was at
17 least one other person present when you spoke with
18 Ms. Savini?
19   A  Absolutely.
20   Q  And forgive me, I know you were asked
21 these questions but I want to clarify.
22   A  That's all right.
23   Q  Do you recall how many other people were
24 present?

351

1    A  There was for sure a female who was her
2  partner that was there -- I shouldn't say partner.
3  It was a woman there.  And I think Mark -- I think
4  he -- I think he may have popped his head in and
5  out but maybe not.  Maybe I just met him in passing.
6    Q  So is it fair to say, then, that you
7  remember for sure one other person being present
8  throughout the entirety of your conversation with
9  Ms. Savini?
10   A  In addition to Savini?
11   Q  Yes.
12   A  There was another woman there.
13   Q  And she was there the entire time you
14 spoke with Ms. Savini?
15   A  I can't say she was there the entire time.
16   Q  Do you have any memory of her leaving
17 during the course of your conversation with
18 Ms. Savini?
19   A  I don't.
20   Q  And there may have been one other male --
21 may or may not have been one other male who was
22 present at times during your conversation?
23   A  Briefly just introducing himself.
24   Q  Did Ms. Savini, to your recollection, take

352

1  any notes during her conversations with you?
2    A  I don't believe she did.  I don't believe
3  she did.
4    Q  To your recollection, was your conversation
5  with her audio recorded?
6    A  No.
7    Q  Was the other woman who was with Ms. Savini
8  taking any notes while you spoke with her?
9    A  I don't remember.
10   Q  Have you received any emails from anyone
11 other than perhaps your attorney concerning this
12 lawsuit?
13   A  Any emails?
14   Q  Correct.
15   A  No.
16   Q  Have you received any text messages
17 regarding this lawsuit?
18   A  Text messages?
19   Q  Correct.
20   A  No.
21   Q  Do you have any memory of Derrell Fulton
22 sending you a letter?
23   A  I do.
24   Q  Did you keep a copy of that letter?

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

353

1    A  I did not.

2    Q  Do you remember what was in the letter?

3    A  I don't.  It was so many years ago.

4    Q  That was going to be my next question.  Do
5  you remember approximately -- this is not anything
6  I'm going to hold you to.

7    A  I understand.

8    Q  Do you remember approximately how long ago
9  you would have received that letter?

10    A  It was when I was officing at 111.  For
11  sure 10 years, if not more.

12    Q  And do you remember anything about the
13  gist of what was in that letter?

14    MR. MORAN:  Object to form.

15    Go ahead.

16    A  I don't remember.  I don't remember.

17    Q  And was it only one letter that you have
18  memory of having received from Derrell Fulton?

19    A  Yes.  Yes.

20    Q  And is it your recollection that you, in
21  fact, read the letter?

22    A  I did read it.

23    Q  Is there a reason the fact that he sent a
24  letter to you stands out in your memory?

354

1    MR. MORAN:  Object to form.

2    A  It's not oftentimes you get a letter from
3  a previous defendant in a case.  I think I can
4  count on one hand how many times it ever happened
5  before.  So that -- that was a bit jarring, got my
6  attention.

7    Q  Did you keep that letter for a period of
8  time after you received it?

9    A  For a period of time?  Maybe a week or so.
10  And, again, don't hold me to it.  I know at some
11  point I threw it away.

12    Q  Did you have a reason for throwing it away?

13    A  Nothing that stands out.

14    Q  You agree with me that when you were in
15  felony review you were not allowed to make false
16  promises of leniency to suspects?

17    A  Never.  No, couldn't do it.

18    Q  And do you know why you were not allowed
19  to do that?

20    MR. KUHN:  Objection; speculation,
21  foundation.

22    A  False promises --

23    MR. CURRAN:  That's why I asked him if
24  he knows.

355

1    A  (Continuing.)  False promises of leniency?

2    Q  Yes.

3    A  Doesn't violate -- doesn't violate Miranda
4  to do it but it just wasn't done.  I just didn't --
5  I didn't -- ethically I wouldn't feel comfortable
6  doing that.

7    First of all, I wouldn't have the authority.
8  I was a felony review assistant.  I would not have
9  felt comfortable to give a false promise of
10  leniency in exchange for a statement.

11    Q  Are you aware of any case precedent that
12  prohibits false promises of leniency?

13    A  I don't think there is.  I was running
14  that in my head right now.

15    MR. CURRAN:  Okay.  I don't have
16  anything else.

17    MR. KUHN:  How much time do we have left?

18    THE VIDEOGRAPHER:  6:51 elapsed.

19    EXAMINATION BY COUNSEL FOR PLAINTIFF COLEMAN

20  BY MR. AINSWORTH:

21    Q  Why did you not want to speak to ESPN?

22    A  It's not -- I'm not -- I'm not a -- I'm
23  more modest.  I just try to keep a low profile.
24  I'm not going to say I haven't had cases in the

356

1  press.  I've had lots of cases in the press, big
2  cases.  I'm not a press whore.  I just don't like
3  talking to the press unless I think it's something
4  which will help my client.

5    Q  Do you think it helps your client to talk
6  about your client who is accused of cutting the
7  unborn child from the victim's mother's stomach
8  and is seeking to reduce the publicity in her case
9  to talk about her case in the media?

10    MS. MEADOR:  Objection; form.

11    MR. KUHN:  Join, argumentative.

12    A  There's been an onslaught of that case in
13  terms of the press and the powers that be, and at
14  this point I had to make a calculated decision as
15  to whether or not I thought I could help my client
16  by infusing the press a different narrative, what
17  I believe to be a truthful narrative of his
18  innocence.  It was a calculated decision to go
19  public on that case.  It's not something I do on a
20  regular basis.

21    Q  Have you socialized with any of the police
22  officer defendants in this case?

23    A  I never socialize with people from the
24  office or law enforcement.

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

357

1    Q  When you first met Nevest Coleman, were
2  you friendly to him?
3    **A  Yes, friendly professional -- professionally.**
4    Q  Were copies made of both Nevest Coleman's
5  statement and Derrell Fulton's statement while you
6  were in the area?
7    **A  Yes.**
8    Q  Is there a reason why you said earlier in
9  this deposition that you didn't make copies?
10    MR. MORAN:  Objection.
11    **A  I don't think I ever said that I didn't**
12  **make copies.  There would have been copies.  The**
13  **original -- I don't know where the original goes --**
14  **and there would be several other copies made.**
15    **But let me be clear, I did not keep any**
16  **copies ever.  I didn't have my own personal file**
17  **of court reported or handwritten statements.**
18    Q  And, sir, is there a reason why you didn't
19  ask Nevest Coleman in his court reported statement
20  about the victim changing her clothes?
21    MR. KUHN:  Speculation.
22    **A  I don't remember why I didn't.**
23    MR. AINSWORTH:  I don't have any further
24  questions.

358

1    MR. MORAN:  Nothing over here.
2    MS. MEADOR:  No questions.
3    MR. KUHN:  No questions.
4    You have the right to review a transcript
5  for typographical errors --
6    THE WITNESS:  Right now?
7    MR. KUHN:  No -- or you can waive
8  signature.
9    THE WITNESS:  I'll waive signature.
10    MR. KUHN:  All right.  We'll waive.
11    (Off the record at 6:40 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

359

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3    I, Paula M. Quetsch, Certified Shorthand
4  Reporter No. 084-003733, CSR, RPR, and a Notary
5  Public in and for the County of Kane, State of
6  Illinois, the officer before whom the foregoing
7  deposition was taken, do hereby certify that the
8  foregoing transcript is a true and correct record
9  of the testimony given; that said testimony was
10  taken by me stenographically and thereafter reduced
11  to typewriting under my direction; that reading and
12  signing was not requested; and that I am neither
13  counsel for, related to, nor employed by any of
14  the parties to this case and have no interest,
15  financial or otherwise, in its outcome.
16    IN WITNESS WHEREOF, I have hereunto set my
17  hand and affixed my notarial seal this 15th day of
18  December, 2019.
19
20  My commission expires:  October 16, 2021
21
22  _____
23  Notary Public in and for the
24  State of Illinois

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

91

**A**

**abandoned**
282:15
**aberdeen**
3:5
**ability**
11:9, 34:4,
40:7, 153:2,
180:19, 305:2
**able**
54:7, 97:4,
132:20, 159:5,
174:20, 181:11,
257:5, 258:11,
285:2, 321:5,
329:13
**about-face**
294:16
**above**
85:16, 86:14,
201:7, 220:15,
241:6, 252:14,
289:18
**absolutely**
38:20, 110:7,
113:6, 113:8,
158:16, 173:5,
187:16, 218:10,
222:4, 249:7,
253:6, 285:7,
305:19, 325:15,
332:10, 332:23,
350:19
**abuse**
36:22, 98:15,
98:19, 150:17,
152:3
**abused**
147:14, 309:23,
310:3
**accept**
326:11
**access**
38:6, 38:23,
39:18, 39:20,
136:23, 143:21,
164:22, 167:24,

205:15, 205:23,
249:8
**according**
87:9, 87:14,
87:21, 88:14,
90:1, 102:22,
241:8, 250:18,
252:8, 266:1,
272:24, 277:2
**account**
113:20, 113:22,
241:12, 241:13,
251:11, 251:17,
290:16, 290:17,
291:17
**accountable**
89:11
**accounting**
118:19, 259:7
**accurate**
40:7, 41:17,
47:17, 54:4,
54:9, 111:4,
128:4, 143:18,
242:10, 243:17,
244:11, 250:13,
269:20, 296:16,
296:17, 296:20,
345:3, 345:4
**accurately**
11:9, 52:15,
106:22, 139:9
**accuse**
303:22
**accused**
9:18, 72:7,
303:16, 356:6
**act**
271:7
**acted**
169:3, 271:20
**acting**
89:10, 155:22,
196:8, 198:14,
210:1, 210:10,
279:17, 292:21,
292:23, 326:2,
328:3

**action**
183:9, 272:17
**actions**
183:17, 185:1
**actual**
142:8, 167:12,
234:12, 339:16
**actually**
49:18, 49:24,
81:6, 95:13,
165:19, 282:2,
293:5, 340:15
**adamantly**
325:10
**add**
90:13, 91:11
**added**
28:4, 32:19,
32:20
**addition**
184:4, 351:10
**additional**
30:21, 51:1,
55:2, 72:2,
135:2, 184:2,
196:22, 209:11
**additionally**
109:5, 109:10,
116:17
**additions**
32:15, 35:7
**address**
36:24, 37:7,
115:23
**addressed**
141:10
**administer**
7:13
**administrative**
8:16
**admissible**
331:22
**admission**
96:15
**admit**
329:1
**admits**
251:11

**admitted**
196:8, 251:18,
251:20, 274:2,
286:20, 293:3
**admitting**
48:1, 198:8,
305:3, 330:17
**advance**
300:21
**advised**
186:1, 241:4,
252:11, 252:15,
274:1
**affect**
11:8, 13:3,
13:17, 40:7,
120:23, 326:20,
326:24
**affiliation**
26:3
**affirmatively**
40:2
**affixation**
106:24
**affixed**
359:17
**african-american**
120:19, 238:7
**after**
14:14, 14:15,
18:14, 23:5,
53:3, 78:2,
85:24, 86:9,
94:12, 111:17,
113:14, 115:18,
124:22, 125:19,
144:3, 144:4,
146:1, 147:3,
151:18, 152:12,
153:4, 172:7,
172:11, 172:13,
176:9, 176:11,
176:13, 177:12,
179:20, 186:22,
187:14, 187:17,
201:9, 215:3,
215:8, 215:11,
233:19, 235:22,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

92

241:3, 245:12,
252:11, 252:18,
254:21, 257:2,
258:21, 260:22,
263:1, 263:16,
271:10, 271:13,
274:1, 284:15,
289:4, 289:13,
331:2, 342:6,
343:9, 344:2,
347:10, 354:8

**afterwards**
190:22, 190:23

**again**
9:20, 13:9,
13:21, 16:8,
18:17, 22:16,
30:19, 43:18,
43:20, 44:12,
55:19, 61:3,
61:13, 85:22,
88:2, 90:19,
157:1, 159:16,
162:14, 178:20,
196:15, 198:17,
201:17, 201:18,
204:7, 209:14,
213:22, 216:6,
231:6, 243:2,
251:8, 259:9,
266:18, 267:17,
271:12, 281:23,
289:1, 293:11,
295:15, 300:19,
314:16, 314:19,
329:12, 338:12,
343:3, 354:10

**against**
180:1, 309:9,
315:21, 316:15,
317:9, 317:17,
320:10, 320:24,
321:6

**age**
98:6, 163:19,
207:1, 238:10

**agency**
8:16, 15:9

**ago**
8:15, 8:21,
13:21, 18:24,
20:10, 21:16,
26:7, 27:23,
27:24, 30:9,
55:19, 93:15,
102:3, 145:12,
183:16, 215:18,
216:4, 216:21,
224:3, 245:6,
245:10, 280:14,
284:19, 286:22,
353:3, 353:8

**agree**
40:19, 54:8,
90:1, 113:15,
131:7, 163:11,
215:1, 239:24,
246:23, 250:18,
267:19, 269:22,
279:2, 283:22,
298:21, 301:15,
302:5, 302:12,
302:16, 310:5,
311:18, 319:21,
324:10, 325:7,
325:9, 327:20,
329:17, 330:4,
332:6, 332:11,
333:23, 338:1,
338:4, 344:9,
345:2, 354:14

**ahead**
36:20, 40:23,
106:5, 121:11,
129:3, 142:19,
162:10, 168:7,
171:10, 178:19,
192:7, 197:24,
204:5, 230:12,
233:4, 236:16,
249:13, 253:4,
257:13, 271:22,
272:3, 292:6,
292:15, 293:24,
322:17, 333:6,
353:15

**aid**
197:19, 209:24

**ailment**
216:24

**ainsworth**
3:3, 5:3, 5:5,
7:14, 8:8, 31:3,
39:10, 39:13,
46:4, 49:2,
49:6, 54:17,
85:2, 95:1,
100:2, 104:22,
105:2, 105:11,
111:24, 115:4,
120:24, 127:19,
128:7, 128:16,
128:19, 129:4,
129:7, 129:13,
129:22, 153:17,
158:5, 158:10,
158:14, 158:18,
160:2, 169:8,
169:11, 169:19,
171:10, 182:4,
190:5, 194:22,
196:14, 196:17,
196:21, 199:1,
236:21, 237:1,
239:20, 240:15,
240:18, 242:11,
245:18, 265:9,
271:23, 272:2,
274:16, 274:18,
288:6, 288:11,
290:10, 290:13,
297:15, 297:20,
298:5, 305:20,
306:3, 308:6,
308:18, 311:13,
311:20, 334:19,
355:20, 357:23

**air**
285:16

**al**
1:8, 1:15, 7:5,
7:6, 83:10,
83:11

**alert**
277:1

**alibi**
47:19, 47:20,
47:22, 48:2,
48:3

**allegation**
9:19, 36:22,
37:5, 37:20

**allegations**
9:2, 9:4, 310:7

**alleged**
303:12

**alley**
86:6, 241:15,
241:19, 289:10,
290:19, 290:24,
291:13, 291:20

**allow**
33:24, 173:7,
299:23, 316:8,
316:24, 317:2,
323:1, 323:3,
323:6

**allowed**
38:17, 78:16,
78:20, 137:17,
138:4, 148:5,
354:15, 354:18

**allows**
338:16

**almost**
74:9, 303:14,
330:21

**alone**
57:15, 69:17,
147:11, 147:24,
151:20, 152:13,
167:21, 167:23,
252:17, 252:24,
253:23, 255:6,
260:24, 261:19,
263:6, 263:8,
264:4, 264:21,
264:23, 265:19,
266:11, 267:3,
336:9, 336:12,
336:15, 336:22,
337:1, 337:8

**along**
33:17, 158:20,

158:23, 240:24,
252:10, 274:3,
275:8, 288:1,
311:22
**alongside**
33:16
**already**
22:22, 82:5,
218:5, 220:5,
223:24, 247:24,
248:19, 269:10,
276:20, 317:12
**also**
4:18, 12:16,
17:6, 23:16,
26:15, 33:17,
34:22, 35:11,
38:17, 43:7,
47:7, 64:19,
69:15, 71:18,
86:11, 99:1,
99:22, 111:7,
116:18, 149:7,
149:8, 173:18,
173:23, 174:2,
188:17, 189:16,
191:5, 191:6,
192:6, 193:10,
195:9, 205:24,
218:24, 236:5,
254:10, 263:14,
267:9, 270:24,
289:15, 292:22,
334:24
**although**
250:4
**always**
33:1, 36:2,
42:8, 42:16,
42:19, 43:10,
46:1, 46:7,
51:13, 61:18,
62:15, 63:18,
63:20, 109:4,
168:1, 302:7
**amata**
7:7
**amendment**
57:1, 57:2,

57:5, 303:7,
303:9, 304:2,
304:6, 304:8,
304:14, 304:15,
320:15
**among**
116:15
**amount**
137:8, 148:3,
258:5, 333:16
**anal**
86:12, 93:22,
94:2, 94:3,
203:7, 289:16
**analyze**
142:9
**analyzing**
304:11
**ancillary**
155:19, 155:20
**anecdotally**
223:17
**another**
19:10, 74:17,
159:14, 221:12,
224:8, 226:22,
227:17, 273:7,
281:5, 282:18,
292:22, 301:16,
351:12
**answer**
10:10, 10:14,
10:23, 11:4,
20:17, 39:10,
43:16, 62:24,
81:5, 88:5,
108:17, 125:19,
157:6, 159:1,
162:15, 162:16,
162:17, 173:22,
174:9, 196:10,
197:24, 210:9,
219:6, 232:6,
232:18, 232:21,
232:22, 233:6,
236:6, 247:4,
247:7, 247:10,
247:12, 248:6,

249:13, 250:24,
254:12, 254:15,
254:18, 254:23,
259:2, 260:24,
261:5, 261:11,
261:15, 262:7,
262:13, 263:18,
264:2, 266:9,
269:2, 313:16,
327:5, 328:1,
329:16, 335:6,
335:9, 343:12
**answered**
89:14, 117:7,
136:9, 137:1,
137:6, 137:12,
138:1, 156:13,
180:24, 181:1,
208:14, 208:15,
223:22, 232:23,
233:3, 243:11,
249:10, 267:16,
267:23, 270:10,
281:8, 281:19,
286:2, 301:3,
315:19, 317:20,
320:2, 337:11
**answering**
89:4, 138:11,
158:15
**answers**
10:4, 94:23,
167:4, 172:2,
247:1, 262:1,
262:15, 262:22,
326:9
**anticipating**
37:3
**antwinica**
76:15, 76:18,
90:5, 106:13,
107:3, 109:4,
109:7, 109:9,
109:11, 110:10,
111:2, 114:9,
116:16, 164:12,
215:5, 240:6,
241:18, 261:9,

264:6, 279:3,
279:22, 280:6,
282:19, 290:22,
306:14, 330:18
**anus**
186:4
**anybody**
27:3, 98:16,
132:12, 178:1,
180:13, 273:2,
299:23, 330:3,
349:6
**anymore**
25:2
**anyone**
64:4, 177:3,
181:13, 195:20,
202:16, 261:3,
263:17, 352:10
**anyplace**
254:22
**anything**
35:5, 73:6,
76:13, 77:16,
92:2, 93:24,
96:11, 97:20,
97:21, 101:9,
101:12, 101:14,
101:22, 102:7,
102:20, 104:2,
108:6, 108:13,
112:22, 115:10,
118:21, 126:8,
126:9, 126:12,
138:17, 142:13,
144:18, 154:4,
155:4, 165:16,
175:17, 191:9,
215:11, 215:16,
225:21, 226:13,
228:5, 229:13,
229:16, 233:18,
238:20, 238:24,
240:6, 245:11,
247:9, 247:23,
249:6, 252:4,
257:15, 260:21,
287:8, 291:15,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

94

292:16, 297:11,
297:12, 308:3,
310:16, 323:10,
327:17, 333:21,
339:1, 343:11,
345:19, 353:5,
353:12, 355:16
**anytime**
62:13, 305:17
**anywhere**
119:3, 175:9,
338:7, 339:14
**apart**
93:5, 101:16,
169:24, 226:19,
281:7, 317:22
**apartment**
86:13, 289:18
**apologies**
256:6
**apologize**
69:18, 197:18,
218:2, 257:12
**apparently**
196:21
**appeared**
120:23, 133:3
**appearing**
7:15
**appears**
301:1
**appellate**
19:15, 19:16,
27:14
**apple**
262:2
**applied**
12:16
**apply**
54:6, 163:20
**appreciate**
58:8, 77:21,
276:24, 288:8
**approached**
26:15
**appropriate**
233:8
**approval**
52:5, 318:5,

318:24, 325:5
**approve**
41:11, 41:13,
42:2, 42:4,
42:5, 49:10,
122:24, 149:13,
150:8, 150:19,
178:22, 182:15,
315:21, 316:14,
318:22, 319:6,
322:5, 322:8,
322:10, 345:20
**approved**
41:11, 42:2,
48:20, 59:8,
122:10, 122:12,
122:13, 123:5,
123:6, 179:24,
318:24
**approves**
41:21
**approving**
42:20, 51:12,
120:14, 224:19,
317:9, 317:16,
318:3
**approximately**
24:2, 30:7,
173:20, 174:6,
219:4, 219:19,
222:6, 236:4,
246:7, 254:16,
257:2, 261:13,
263:16, 312:13,
335:6, 353:5,
353:8
**april**
75:10, 76:14,
80:10, 82:11,
96:24, 107:2,
107:5, 108:6,
109:6, 109:18,
109:23, 110:11,
111:17, 111:18,
112:7, 112:13,
112:20, 113:5,
113:12, 113:14,
114:6, 115:12,

115:18, 116:14,
121:6, 132:21,
163:4, 163:13,
165:17, 183:12,
193:5, 200:15,
202:17, 207:9,
207:10, 213:9,
213:19, 213:23,
213:24, 214:1,
214:4, 215:6,
219:3, 219:16,
222:14, 225:22,
235:5, 235:21,
245:16, 246:17,
255:13, 255:15,
256:2, 256:11,
256:20, 257:19,
271:11, 271:14,
276:8, 276:16,
277:3, 294:5,
315:16, 317:15,
334:2, 340:7,
342:21
**areas**
30:4, 30:5,
67:21
**aren't**
182:1
**arena**
25:5
**argument**
303:9
**argumentative**
72:19, 98:12,
158:2, 205:8,
205:9, 208:1,
208:8, 208:22,
209:1, 229:6,
232:16, 254:3,
257:8, 259:3,
260:5, 260:12,
267:13, 267:22,
279:4, 279:23,
281:9, 282:16,
282:21, 286:15,
292:13, 293:8,
301:11, 328:21,
329:21, 329:23,

330:9, 356:11
**arguments**
292:9
**arose**
270:14
**around**
16:14, 20:17,
21:16, 129:17,
155:2, 170:16,
249:16, 255:14,
255:17, 285:10
**arrest**
6:1, 189:19,
189:24, 190:9,
191:11, 276:9,
276:11, 276:16,
277:6, 277:16,
346:11, 346:18,
346:24
**arrested**
277:3, 277:7
**arresting**
189:14, 189:22,
190:1, 190:12,
192:11, 192:12
**arrival**
139:3, 142:22,
248:9, 251:9,
251:24, 257:16,
258:6, 258:14
**arrive**
41:23, 73:23,
74:1, 75:15,
146:19, 176:1,
182:21, 182:22
**arrived**
75:19, 79:14,
79:20, 86:21,
87:10, 87:22,
88:16, 90:2,
92:14, 112:7,
112:9, 112:16,
112:17, 112:20,
164:24, 200:10,
218:15, 219:14,
222:5, 222:10,
222:24, 224:14,
224:22, 233:23,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

95

236:11, 236:19,
250:21, 251:6,
251:20, 315:16,
334:2
**arriving**
132:2, 147:5,
234:5, 234:13,
234:19, 234:23,
246:5
**article**
28:22, 191:2,
191:7, 301:8,
314:23, 314:24
**articles**
299:24, 300:18,
301:6, 301:22,
301:24
**asa**
86:23, 86:24,
183:19, 183:23,
184:13, 241:1,
241:2, 252:10,
252:17, 272:19
**aside**
113:23
**asking**
37:24, 88:11,
88:13, 89:23,
90:24, 106:21,
115:2, 115:4,
118:22, 129:14,
130:3, 132:19,
133:11, 137:23,
138:8, 149:17,
149:23, 150:2,
150:4, 158:20,
158:22, 167:9,
168:24, 189:2,
189:3, 189:21,
191:10, 191:11,
191:18, 194:19,
204:20, 206:8,
215:18, 216:20,
216:23, 231:17,
243:9, 244:3,
244:6, 259:16,
268:24, 269:1,
269:22, 279:13,

282:1, 311:2,
326:8, 336:8,
336:11, 337:21,
338:4, 339:3
**asks**
219:7, 246:15,
310:21, 336:18,
337:6
**aspect**
38:7
**aspects**
296:2
**assault**
99:12
**asserts**
318:1
**assess**
329:14
**assessing**
332:19
**assessment**
325:5, 333:2
**assign**
148:18
**assigned**
16:13, 19:13,
22:2, 22:17,
22:19, 49:15,
65:22, 66:7,
66:21, 68:1,
68:3, 120:10,
135:22, 148:24,
153:15, 178:2,
179:6, 218:6,
219:23, 221:16,
325:19
**assignment**
22:15, 23:5,
67:24, 74:16,
149:7, 177:21,
177:22, 179:10,
179:11, 179:17,
220:7, 221:19,
226:14, 234:19,
234:21
**assignments**
148:24, 223:16
**assist**
43:8, 120:11

**assistance**
220:18
**assistant**
7:18, 7:21,
23:18, 41:4,
50:1, 62:14,
67:16, 80:18,
86:19, 119:15,
122:11, 122:13,
122:17, 136:15,
150:21, 151:4,
184:8, 221:11,
229:19, 231:6,
259:5, 270:23,
271:1, 274:2,
281:12, 303:16,
309:10, 309:22,
322:18, 324:19,
325:1, 328:14,
328:17, 332:17,
355:8
**assistants**
65:18, 65:19
**assume**
10:24, 75:17,
249:15
**assumes**
163:7, 270:6
**assuming**
180:9, 180:16,
204:8, 213:17,
214:3, 258:12
**ate**
38:8, 38:12
**attached**
5:8, 85:5,
95:3, 100:5,
105:10, 112:3,
121:3, 127:22,
153:20, 182:6,
190:8, 218:20,
245:21, 265:12,
272:5, 298:8,
305:23, 308:9,
308:21
**attack**
237:15
**attempt**
129:14

**attempted**
317:15
**attend**
11:20, 12:19,
13:23, 14:5,
14:7
**attended**
14:3, 116:7,
116:18
**attention**
85:10, 114:18,
173:20, 174:6,
219:3, 354:6
**attitude**
158:3, 158:8
**attorney**
7:18, 7:21,
9:1, 16:12,
18:3, 22:1,
23:19, 25:19,
25:22, 27:13,
27:17, 41:4,
50:2, 56:20,
67:16, 67:19,
80:12, 84:18,
86:19, 87:2,
119:15, 122:14,
122:17, 136:14,
136:15, 150:21,
151:5, 196:17,
231:7, 231:9,
233:11, 268:7,
270:23, 270:24,
274:3, 294:21,
303:17, 303:18,
303:22, 304:15,
304:20, 309:10,
309:11, 309:21,
309:22, 331:20,
332:17, 352:11
**attorney's**
3:21, 15:3,
15:10, 15:14,
15:19, 15:22,
17:4, 17:10,
18:12, 19:7,
19:12, 19:18,
24:9, 24:15,

41:21, 51:22,
64:1, 119:17,
122:22, 141:4,
141:21, 143:23,
304:13
**attorney-client**
310:9, 311:1
**attorneys**
9:7, 19:3,
184:8, 271:2
**attractive**
43:1, 318:18
**audio**
352:5
**authentic**
318:12
**author**
299:4
**authored**
200:19, 207:17
**authority**
136:11, 212:13,
318:22, 355:7
**available**
50:7, 61:24,
62:1, 62:4,
162:19, 165:5,
165:6, 176:17
**average**
21:18
**avoid**
37:4
**aware**
56:13, 56:15,
86:22, 143:15,
198:15, 245:14,
248:2, 248:7,
320:9, 320:18,
321:3, 355:11
**away**
290:5, 293:7,
354:11, 354:12

**B**

**ba**
12:5
**baby**
216:14, 216:15

**back**
19:10, 19:23,
22:5, 22:8,
22:10, 22:14,
39:14, 49:5,
55:19, 68:20,
97:5, 105:8,
108:5, 117:13,
141:3, 166:23,
169:18, 179:22,
195:17, 198:24,
205:13, 212:19,
214:15, 227:13,
227:14, 234:10,
236:24, 239:20,
241:7, 246:16,
252:19, 263:19,
263:21, 270:19,
274:5, 275:10,
288:5, 293:20,
297:19, 306:7,
320:8, 320:14,
335:21, 337:15,
343:3, 343:13
**background**
349:9
**backtrack**
339:12
**bad**
271:17
**bag**
226:1, 342:17,
343:20, 344:6,
344:22
**baked**
130:12
**bar**
17:23, 18:1,
18:21
**barber**
5:13, 94:18,
95:13, 95:18,
96:3, 96:7,
96:10, 96:13,
96:15, 96:17,
96:23, 97:3,
97:6, 97:7,
97:12, 97:16,

97:20, 97:24,
98:1, 98:2,
98:7, 98:14,
98:16, 98:17,
98:20, 99:2,
99:5, 99:6,
101:22, 115:12,
210:21, 211:6,
211:7, 211:9,
211:13, 213:4,
227:8, 306:12
**barber's**
59:16, 94:20,
95:5
**based**
13:19, 30:22,
32:7, 47:15,
56:17, 57:1,
59:7, 72:23,
73:1, 73:3,
73:5, 73:14,
74:12, 74:13,
74:16, 220:17,
287:11, 301:24,
319:6, 325:5,
335:19, 344:16,
345:17
**basement**
86:8, 86:10,
97:4, 115:22,
117:15, 117:18,
118:5, 118:23,
207:10, 241:18,
241:21, 241:22,
280:7, 289:12,
289:14, 290:2,
290:3, 290:22,
291:1, 291:2,
291:21, 291:22
**basically**
241:5, 252:12
**basis**
56:21, 129:1,
135:1, 223:13,
244:19, 244:23,
356:20
**bates**
173:18, 174:2,

254:10, 263:14,
288:10
**bates-numbered**
218:24
**bates-stamped**
334:24
**bathroom**
35:6, 147:7,
148:6, 152:1,
333:19
**bearing**
16:21, 17:6,
221:6
**beating**
106:13, 106:17,
106:20, 107:1,
156:10
**became**
17:15, 77:2,
86:13, 283:14,
289:17
**because**
29:1, 37:7,
38:6, 38:14,
40:6, 40:13,
45:1, 45:18,
46:13, 48:4,
52:7, 81:4,
83:2, 136:7,
143:15, 161:20,
162:18, 163:11,
171:23, 171:24,
181:23, 182:1,
202:23, 208:18,
213:6, 213:24,
214:11, 218:17,
220:9, 221:1,
222:5, 223:6,
223:14, 226:15,
234:21, 242:11,
244:14, 247:21,
250:7, 250:9,
264:7, 270:2,
273:16, 279:20,
285:14, 286:23,
296:18, 300:23,
301:16, 304:15,
310:18, 324:6,

336:20, 339:4,
339:23
**become**
18:3, 20:4
**becomes**
143:6
**becoming**
17:21
**beer**
201:13, 201:14
**before**
2:12, 8:12,
10:10, 10:14,
11:5, 12:10,
14:13, 21:17,
49:1, 51:12,
51:15, 51:19,
52:22, 60:22,
60:24, 62:20,
64:8, 73:23,
74:20, 76:14,
79:15, 79:17,
82:10, 82:17,
82:19, 83:15,
84:13, 84:16,
85:16, 89:3,
91:20, 95:18,
105:19, 107:15,
107:22, 116:4,
121:18, 121:22,
138:10, 162:14,
167:1, 167:16,
167:17, 172:20,
179:24, 180:5,
200:4, 204:14,
204:17, 204:19,
216:5, 220:19,
221:8, 222:21,
225:5, 228:19,
235:23, 242:7,
242:16, 244:13,
251:14, 251:20,
269:11, 269:23,
270:13, 299:5,
299:6, 309:6,
313:16, 318:24,
329:18, 335:8,
335:15, 354:5,

359:6
**beforehand**
89:14
**began**
272:9, 272:12
**begin**
10:10, 10:15,
58:21, 294:14
**beginning**
22:13, 22:23,
153:23
**behalf**
3:2, 3:10,
3:18, 4:2, 4:10,
7:15, 7:16,
7:19, 7:22,
7:24, 8:2, 9:12,
9:15, 98:16,
132:12, 175:3,
295:24, 302:21,
303:12
**behaved**
285:21, 286:5,
287:21
**behavior**
13:4, 117:1,
132:10, 304:11
**behind**
86:6, 241:16,
289:10, 290:20
**behold**
58:14
**being**
8:20, 9:18,
30:13, 38:5,
38:6, 61:16,
61:22, 63:15,
63:22, 72:12,
77:19, 102:8,
119:22, 127:7,
131:6, 154:15,
158:16, 168:9,
179:5, 186:14,
190:1, 190:13,
191:9, 192:12,
196:24, 216:16,
241:3, 251:12,
251:16, 252:1,

252:11, 270:11,
276:16, 285:22,
286:17, 287:1,
287:6, 287:8,
291:10, 292:12,
324:2, 324:13,
325:1, 325:7,
326:1, 344:17,
351:7
**belief**
172:6, 318:11,
330:13, 330:15
**believe**
9:6, 9:16,
9:20, 17:5,
36:1, 36:2,
36:9, 42:3,
48:6, 69:3,
69:6, 69:9,
75:1, 84:7,
140:15, 143:19,
145:12, 147:1,
149:5, 154:8,
172:3, 177:1,
179:18, 183:10,
184:14, 187:23,
218:15, 219:6,
227:9, 227:13,
236:8, 239:19,
242:10, 254:18,
261:15, 269:12,
285:5, 285:22,
287:1, 287:5,
297:21, 299:9,
301:7, 302:2,
302:18, 303:11,
304:22, 304:24,
309:7, 311:4,
311:12, 316:2,
316:18, 323:14,
331:4, 331:15,
334:17, 336:1,
336:7, 345:12,
345:18, 347:4,
347:24, 348:9,
352:2, 356:17
**believed**
48:11, 144:6,

283:24, 285:8,
285:11, 285:12,
285:13, 326:14
**believes**
325:1
**below**
193:1
**bench**
123:22, 124:4,
124:15
**besides**
60:10
**best**
71:2, 71:5,
244:17, 282:1,
312:21
**better**
44:16, 66:3,
258:20
**between**
102:8, 103:7,
103:15, 117:2,
118:13, 118:14,
119:3, 125:3,
125:10, 126:10,
142:16, 144:19,
160:18, 166:19,
181:15, 181:23,
186:15, 189:1,
221:21, 254:18,
261:16, 283:20,
304:4
**beyond**
73:21, 73:22,
345:14
**big**
81:17, 192:21,
356:1
**bigane**
183:19, 183:24,
184:13
**bigger**
170:24
**bill**
82:19, 83:19,
246:2
**birth**
154:12, 207:2

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

98

**birthday**
207:5
**bit**
16:10, 44:22,
120:20, 181:3,
181:7, 205:15,
348:6, 354:5
**black**
109:12, 164:18,
165:13, 208:18
**blacks**
186:2
**bleed**
217:20
**bleeding**
186:7
**blend**
28:1
**blog**
6:9, 28:8,
28:9, 28:13,
28:19, 298:10,
299:6, 300:13,
300:14, 301:14
**blogs**
299:18, 299:22
**blunt**
106:24
**boat**
201:18
**body**
34:23, 97:5,
97:6, 97:9,
97:13, 97:18,
106:23, 111:16,
112:12, 112:18,
112:22, 113:2,
116:1, 117:15,
117:18, 118:5,
118:23, 186:9,
186:10, 191:16,
207:8, 280:6,
282:15, 282:20,
282:23
**bold**
48:6
**bond**
180:5

**book**
342:17, 343:19,
344:22
**boots**
109:8, 164:3,
164:5
**booty**
186:7
**bosky**
183:19, 184:1,
184:13
**boss**
64:21
**both**
8:1, 28:2,
30:14, 33:5,
37:9, 59:20,
59:21, 59:24,
64:13, 69:3,
71:1, 72:23,
73:1, 80:13,
116:16, 143:10,
195:8, 203:6,
203:7, 265:4,
286:18, 286:19,
290:3, 291:22,
292:2, 293:3,
294:1, 294:4,
294:18, 346:3,
357:4
**bottom**
32:18, 97:2,
121:6, 156:24,
157:19, 159:7,
187:7, 192:8,
241:10, 242:14,
244:7, 244:20,
278:5, 278:12,
278:17, 278:18
**boudreau**
82:23, 189:16,
190:13, 191:23,
192:5, 192:17,
311:15
**boulevard**
4:13
**box**
44:10, 112:21,

324:6
**boy**
208:13, 208:19
**boys**
207:8, 207:18,
208:3
**brady**
304:18
**brain**
13:9, 13:12,
13:18
**branch**
23:12, 23:13,
23:16
**breach**
223:8, 223:14,
223:18
**break**
11:3, 11:5,
39:8, 49:1,
104:24, 133:24,
158:9, 159:24,
226:19, 235:10,
235:11, 235:12,
235:15, 236:21
**breakfast**
349:4
**breaking**
235:13, 328:17,
328:22, 328:23
**brian**
270:1, 270:17,
270:18, 271:6,
271:7, 271:13,
271:18, 272:19,
273:1, 283:24,
284:5, 312:4,
312:8, 312:10,
312:14, 313:20
**brick**
5:21, 93:21,
106:19, 127:7,
127:11, 127:15,
127:24, 130:4,
130:5, 130:6,
130:7, 130:8,
130:10, 130:11,
130:17, 130:18,

130:20, 130:21,
130:22, 130:23,
130:24, 131:4,
131:5, 188:3,
188:5, 188:11,
188:12, 188:13,
188:18, 188:21,
189:1, 189:6,
189:9, 189:13,
193:9, 193:11,
193:14, 193:20,
193:21, 194:7,
194:15, 195:2,
195:6, 195:7,
195:8, 203:23,
203:24, 205:13,
205:20, 206:1,
206:5, 206:6,
206:7, 206:9,
206:10, 206:13,
274:6, 275:22,
278:2, 278:7,
278:13, 278:19,
278:21, 278:22,
278:24, 279:2,
279:21
**bricks**
204:10, 204:13,
204:15, 204:17,
204:19, 204:24,
205:1, 205:3,
205:4, 205:7,
205:15, 205:16,
205:17, 205:19,
205:21, 205:24,
206:4, 206:12
**bridgeman**
76:15, 76:18,
82:8, 86:5,
90:5, 90:18,
106:13, 107:3,
109:7, 110:5,
110:10, 111:2,
116:16, 126:2,
215:6, 224:18,
237:7, 237:10,
261:10, 279:3,
279:22, 282:19,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

99

289:9, 306:14,
330:18
**bridgeman's**
82:8, 240:6,
264:6, 280:6,
325:14
**briefcase**
226:2, 226:3,
342:9, 342:13,
342:16, 342:17,
342:19, 343:13,
343:19, 344:11,
344:12, 344:14,
344:17
**briefly**
351:23
**bring**
41:10, 78:18,
78:19, 117:22,
211:2, 225:10,
225:21
**broach**
314:16, 318:19
**broad**
311:9
**broke**
19:19, 329:4
**broken**
67:20, 130:24,
195:16
**brought**
49:23, 50:18,
78:21, 180:4,
192:14, 225:24,
341:18
**brown**
109:8
**bruton**
320:13, 320:19,
320:22, 321:2
**build**
238:8
**building**
16:5, 66:14,
130:13
**bulls**
109:8, 114:12,
164:8, 164:11

**burden**
319:24
**bureau**
22:4
**burns**
148:13, 148:14,
148:17, 149:10
**business**
78:24, 300:3,
300:4, 300:5
**butterfield**
3:13
**buttress**
210:8

---
C
---

**cajoling**
331:17
**cal**
67:13, 79:10
**calculate**
207:3
**calculated**
74:11, 356:14,
356:18
**calculus**
322:20
**calendar**
73:14, 74:10,
74:12
**caliber**
62:19, 63:4
**calibrate**
328:9
**calimee**
5:17, 86:1,
102:2, 105:14,
108:6, 108:9,
108:14, 113:21,
113:23, 115:11,
116:6, 117:1,
163:2, 227:8,
289:5, 306:11
**call**
13:19, 21:4,
21:8, 21:9,
21:11, 21:14,
21:15, 21:17,

21:23, 23:17,
64:20, 66:14,
67:1, 69:14,
76:20, 78:3,
91:14, 127:24,
129:18, 129:19,
136:1, 136:6,
137:5, 137:11,
137:18, 138:5,
140:7, 146:10,
146:13, 146:18,
169:6, 169:15,
180:20, 181:6,
181:12, 181:17,
181:20, 182:1,
183:11, 208:13,
208:16, 217:22,
222:3, 222:17,
222:19, 223:21,
224:1, 224:9,
224:11, 327:15
**called**
8:23, 8:24,
20:15, 64:1,
66:9, 121:15,
140:2, 140:11,
146:2, 146:23,
147:1, 152:18,
153:5, 160:3,
160:6, 186:23,
186:24, 189:11,
208:19, 210:23,
218:12, 221:4,
221:10, 221:23,
252:19, 275:14,
278:1, 284:15,
312:9
**calling**
160:10, 168:3,
194:6, 194:7,
203:23
**calls**
10:5, 20:18,
21:19, 137:9,
137:21, 141:7,
176:18, 179:12,
182:2, 192:2,
220:17, 220:18,

248:3, 279:5,
279:24, 305:6,
321:16
**calm**
131:13
**came**
19:10, 19:23,
27:22, 35:15,
42:16, 51:1,
52:2, 52:6,
64:15, 66:14,
137:19, 140:14,
140:15, 143:19,
176:18, 187:14,
224:11, 234:21,
258:10, 263:19,
263:21, 263:23,
264:12, 286:20,
310:24
**camera**
226:8, 226:9,
347:5
**can't**
21:9, 21:22,
33:2, 42:15,
50:17, 53:19,
58:21, 58:22,
61:9, 63:2,
63:5, 90:20,
92:12, 101:11,
103:20, 104:13,
110:24, 111:12,
111:14, 121:19,
124:9, 124:12,
124:13, 139:8,
161:19, 161:22,
162:15, 162:16,
162:17, 162:22,
175:3, 216:10,
220:6, 220:8,
223:17, 225:6,
243:4, 243:16,
243:23, 244:13,
253:18, 253:20,
276:3, 280:22,
281:2, 281:4,
282:7, 294:18,
310:18, 327:8,

351:15
**cannot**
282:3, 282:4,
320:24
**capacity**
305:10
**capriciously**
107:13
**car**
78:6, 78:8,
78:11, 78:17,
78:18, 78:20,
79:2, 79:5,
234:24
**care**
72:16, 98:10
**career**
25:18, 57:12,
57:16, 58:2,
253:17, 280:16,
309:9
**carefully**
53:22, 54:1,
108:23
**carried**
347:5
**carroll**
190:14
**carry**
21:2, 326:12
**cars**
78:10, 78:24
**case"**
225:15
**case-by-case**
134:24
**cases**
8:1, 26:20,
30:21, 51:21,
51:22, 52:2,
52:3, 52:6,
79:17, 80:11,
82:13, 82:14,
82:16, 82:19,
82:21, 82:23,
83:4, 83:6,
83:8, 83:10,
83:11, 83:12,

83:15, 83:17,
83:20, 83:22,
84:19, 212:5,
212:9, 280:15,
280:16, 281:11,
282:14, 283:4,
283:10, 287:20,
292:18, 303:3,
305:7, 305:8,
355:24, 356:1,
356:2
**casing**
228:10
**casting**
71:23
**cause**
106:23, 107:3,
114:7, 346:11,
346:18, 346:24
**caused**
53:9
**causes**
298:12
**causing**
186:7
**cautious**
44:6, 44:7
**cautiousness**
47:16
**cavity**
93:23, 94:2,
94:3
**cb**
190:2
**cell**
76:24, 77:1,
77:3, 77:4,
77:7, 77:9
**center**
3:22, 7:7
**central**
66:5
**century**
191:4
**certain**
13:15, 80:20,
307:6, 307:7,
333:11, 347:16

**certainly**
15:15, 73:1,
81:4, 114:17,
114:18, 115:8,
243:3, 249:16,
295:21, 307:2,
348:5
**certificate**
12:1, 12:4,
359:1
**certified**
2:13, 359:3
**certify**
359:7
**chain**
37:19, 322:7
**chairs**
124:2, 124:19
**challenge**
304:12
**change**
31:3, 54:18,
74:10, 161:20,
161:24, 162:3,
162:7, 162:11,
162:22, 201:15,
202:11, 244:4
**changed**
27:24, 161:1,
161:9, 161:10,
162:3, 166:19,
201:22
**changing**
160:16, 357:20
**char**
150:18
**characteristics**
35:21
**characterization**
121:10, 128:2,
292:17
**characterize**
316:3
**characterizing**
316:19
**charge**
120:15, 149:15,
149:18, 150:10,

151:7, 211:2,
322:13
**charged**
190:1, 199:8,
199:17, 199:23,
200:4
**charges**
41:11, 41:12,
41:13, 41:20,
41:22, 42:20,
44:6, 48:21,
49:10, 51:12,
122:12, 122:15,
122:18, 123:4,
123:5, 149:13,
150:9, 180:1,
183:17, 183:18,
185:1, 315:21,
316:14, 317:9,
317:17, 318:3,
318:22, 318:24,
319:6, 322:5,
322:8, 322:10,
325:6, 325:7,
345:20
**charging**
180:8
**charitable**
8:22, 9:3, 9:8
**charles**
148:13
**cheese**
130:1
**chicago**
1:8, 1:14,
1:19, 2:7, 3:7,
3:23, 4:7, 4:10,
4:15, 7:5, 7:6,
7:8, 8:3, 8:23,
20:20, 60:15,
121:13, 123:3,
210:3, 237:14,
249:17, 249:20
**chicago's**
136:13
**child**
22:3, 22:7,
356:7

**chilled**
152:17
**chip**
86:5, 86:8,
86:11, 157:20,
159:8, 159:9,
159:11, 159:14,
160:3, 160:6,
160:8, 160:10,
176:21, 176:24,
177:1, 177:7,
180:13, 186:3,
186:16, 186:20,
186:23, 187:3,
187:7, 187:11,
241:17, 241:23,
242:1, 242:23,
289:9, 289:11,
289:15, 290:22,
291:3, 291:5
**chip's**
186:15
**chose**
33:19, 192:16
**chuck**
148:14, 148:17,
149:2, 149:4,
184:1
**ci**
42:5, 150:1,
178:23, 224:20
**ci'd**
59:9
**circumstances**
70:18, 70:20,
126:1, 204:23,
221:18, 297:22,
297:23, 302:9,
333:12, 333:14
**city**
1:8, 4:10, 7:4,
8:3, 136:12,
152:19, 249:17
**civil**
8:17, 24:21,
25:4, 26:13,
26:20
**claim**
309:8, 309:13,

309:14, 309:15
**claims**
309:19
**clancy**
80:2, 80:3,
80:7, 80:11,
81:14, 81:15,
81:24, 82:10,
82:17, 89:6,
89:7, 90:17,
90:21, 91:16,
92:13, 92:15,
92:19, 93:4,
93:16, 94:5,
94:7, 94:13,
119:8, 125:4,
125:10, 126:5,
126:8, 131:24,
154:2, 164:23,
170:13, 185:16,
190:4, 190:13,
192:6, 192:12,
192:17, 241:9,
246:10, 270:3,
342:7
**clancy's**
80:14, 80:16,
80:20, 80:23,
172:15, 250:19,
251:5, 252:8
**clancys**
81:2
**clarification**
77:21, 314:12
**clarify**
28:5, 178:13,
281:13, 318:21,
350:21
**clark**
4:5
**clasp**
123:24
**class**
47:8
**classes**
30:12
**classic**
303:6

**clay**
130:12
**clean**
287:9, 289:24,
291:12
**cleaning**
206:1
**clear**
35:14, 75:4,
143:22, 206:2,
246:2, 246:13,
264:18, 267:8,
269:19, 286:4,
296:18, 320:17,
323:2, 323:4,
323:7, 338:19,
339:23, 340:13,
357:15
**cleared**
48:7, 48:13,
48:14, 48:15,
48:17, 48:18,
84:10, 84:12,
84:16, 84:20,
85:7, 101:17,
102:4, 138:23,
240:12, 242:11,
243:2, 265:17,
267:2, 268:3,
268:21, 269:7,
288:15
**clearly**
90:21, 195:24
**clerk**
15:2, 15:5,
15:8, 15:18
**clerk's**
18:20
**clerking**
14:23, 15:13,
15:22
**client**
32:5, 38:24,
142:15, 194:24,
195:5, 195:8,
303:10, 303:12,
310:10, 310:14,
310:17, 310:19,

**clay**
311:3, 356:4,
356:5, 356:6,
356:15
**clients**
59:22, 294:15,
300:8, 300:10,
309:20, 310:2,
310:24
**clock**
215:17
**close**
48:8, 48:13,
48:14, 48:15,
48:17, 48:18,
74:1, 84:10,
84:12, 84:16,
84:20, 85:8,
101:17, 102:4,
138:23, 185:8,
190:4, 240:13,
243:2, 255:18,
267:2, 288:15
**closed**
215:8, 242:9
**clothes**
113:11, 113:13,
114:5, 114:9,
114:11, 160:16,
161:1, 161:9,
161:10, 162:3,
162:7, 162:11,
162:23, 166:19,
201:15, 201:22,
202:11, 357:20
**clothing**
161:20, 162:1,
165:12, 165:24
**co-review**
271:16
**coat**
109:10, 109:12,
109:13, 164:13,
164:18, 164:19,
165:13
**coax**
305:2
**codef**
320:23

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

102

codefendant
178:6, 221:14,
292:20, 292:22,
317:24, 326:19,
327:15
codefendant's
320:24
codefendants
81:7, 81:12,
292:19, 292:24
coerced
37:14, 38:5,
302:18, 330:2
coercion
36:23, 37:5,
37:10, 37:11,
37:20, 147:14,
150:18, 152:3,
303:13
coercive
336:24
cognitive
13:3
cognitively
327:6
cold
216:20, 217:5
coleman's
60:7, 71:3,
87:23, 94:22,
97:17, 131:10,
144:3, 172:15,
173:10, 173:24,
174:2, 175:18,
176:9, 176:11,
176:14, 177:4,
177:7, 177:12,
178:11, 178:15,
180:18, 197:4,
219:24, 224:5,
229:16, 240:2,
242:16, 245:4,
245:9, 245:12,
245:15, 247:12,
247:20, 248:8,
248:11, 248:14,
249:8, 249:17,
249:18, 249:24,

250:3, 252:16,
257:20, 262:6,
263:2, 269:10,
276:19, 276:20,
280:6, 283:21,
284:22, 285:3,
285:8, 320:9,
321:6, 327:11,
340:5, 341:1,
342:4, 342:23,
357:4
collateral
179:7
colleagues
132:1
collect
63:7
collected
152:20
college
11:15, 12:14
colleges
11:16
color
163:22, 164:3
come
48:19, 49:17,
64:17, 67:1,
68:23, 104:11,
109:19, 118:12,
129:17, 133:8,
134:15, 153:6,
167:24, 176:5,
190:19, 200:23,
201:2, 201:5,
221:24, 263:17,
264:8, 287:9,
289:24, 291:11,
316:22, 326:11
comes
47:13
comfortable
37:21, 144:12,
145:4, 202:23,
355:5, 355:9
coming
63:16, 120:12
command
37:19

comment
110:24, 244:10,
293:12
commission
195:21, 359:20
commit
298:18, 298:23,
299:11, 299:16
committed
44:3, 45:15,
87:12, 98:17
committing
43:13
common
130:11, 170:10,
170:19, 170:23,
298:12
commonly
130:21
communicate
140:21, 310:16,
336:2
communicated
82:4, 98:16,
107:9, 132:13,
133:5, 146:3,
146:4, 211:23,
335:17
communication
311:1, 311:2
communications
310:4
community
9:17, 20:6,
20:11, 20:13,
26:15
company
28:1
compare
94:22, 244:16,
285:2, 288:2
competency
34:5
competent
273:17
complete
12:18, 50:21,
53:11, 130:19

completed
309:6, 344:2
complicated
25:10, 25:13
compound
72:14
comprehending
247:6
comprised
65:15
concept
332:1
concerned
134:5, 134:11,
335:10, 335:14,
336:5
concerning
260:21, 261:9,
313:23, 352:11
concluded
172:7, 175:23,
213:15
conclusion
215:3, 224:5
conclusions
38:10
conclusively
33:2
conclusivity
124:12
concomitant
30:18
concrete
123:22, 124:4,
124:15, 186:5,
187:21, 188:2,
188:5, 188:11,
188:12, 188:13,
188:15, 188:20,
189:1, 189:5,
189:11, 189:13,
193:6, 193:8,
193:14, 193:16,
193:21, 194:8,
195:9, 203:6,
203:8, 203:10,
203:14, 203:15,
203:16, 204:1

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                    103

| | | | |
|---|---|---|---|
| concrete-type | 297:21, 302:6 | consequences | contacting |
| 188:17 | confidence | 51:24 | 51:18 |
| concur | 137:8 | consider | contacts |
| 325:7 | confident | 162:18, 205:14, | 73:1 |
| condition | 224:4 | 332:12, 348:21 | contained |
| 11:8, 35:23, | confirmed | consideration | 97:22, 101:10, |
| 36:4, 42:19, | 204:9 | 113:19 | 102:18, 108:7, |
| 93:16, 93:24, | confront | considered | 115:16, 124:13, |
| 122:8 | 55:4, 55:23, | 66:4, 180:13, | 126:9, 126:19, |
| condom | 56:5, 56:6, | 188:18, 231:9 | 127:4, 227:4, |
| 195:16, 195:21 | 56:10, 155:15, | considers | 285:14, 301:8 |
| conduct | 198:9, 239:8, | 231:10 | containing |
| 23:15, 41:19, | 250:1, 320:16, | consist | 142:21 |
| 43:21, 50:1, | 343:10 | 29:23 | contains |
| 50:20, 234:6, | confronted | consistent | 143:8 |
| 234:13, 304:13 | 85:18, 241:11, | 45:18, 45:19, | content |
| conducted | 251:10, 257:19, | 48:8, 73:7, | 27:20, 27:21, |
| 23:12, 77:19 | 262:5, 263:2, | 88:9, 91:21, | 27:22, 28:2, |
| conducting | 288:13, 288:17, | 92:3, 93:2, | 28:4, 28:9, |
| 144:13, 231:20, | 288:22, 289:23, | 126:15, 265:20, | 28:17, 29:3, |
| 326:5 | 290:15, 291:11, | 267:2, 277:8, | 184:20, 252:15, |
| confess | 291:15, 291:16 | 277:24, 285:15 | 299:2, 301:1, |
| 222:3, 222:7, | confronting | constitutional | 310:12, 326:24 |
| 297:24, 302:10, | 55:11, 327:10 | 87:3, 241:4, | contentious |
| 302:13, 302:14, | confronts | 252:12 | 106:9 |
| 302:18 | 321:1 | construed | contents |
| confessed | confusion | 205:20 | 243:4, 247:12 |
| 54:13, 253:10, | 159:20 | consult | context |
| 269:10, 286:24, | congan | 51:11, 51:14 | 254:20, 303:20, |
| 287:6 | 193:4 | consulted | 326:7 |
| confessing | conjunction | 293:17 | continue |
| 43:12, 44:3 | 283:17 | contact | 123:1, 129:16 |
| confession | connect | 36:14, 36:15, | continued |
| 47:21, 142:14, | 340:19 | 71:15, 75:11, | 17:14 |
| 197:11, 231:20, | connection | 76:21, 98:1, | continuing |
| 232:9, 233:1, | 221:13, 306:15, | 99:24, 101:8, | 39:19, 45:7, |
| 233:12, 239:1, | 307:1 | 101:20, 119:10, | 53:8, 62:13, |
| 255:6, 257:6, | connelly | 200:1, 200:3, | 88:4, 88:6, |
| 258:10, 269:10, | 4:4 | 200:4, 200:11, | 117:9, 118:11, |
| 280:20, 281:6, | consciousness | 234:4, 243:7, | 120:15, 132:8, |
| 285:6, 285:9, | 135:4 | 258:4, 258:13, | 137:2, 138:15, |
| 319:23, 320:5, | consecutively | 274:22, 330:23, | 149:23, 156:16, |
| 347:10, 348:14 | 74:18 | 336:3 | 161:6, 162:11, |
| confessions | consensual | contacted | 163:10, 171:13, |
| 56:13, 229:23, | 104:8, 117:9 | 146:7, 177:19, | 181:2, 204:6, |
| 230:10, 253:8, | consensus | 178:21, 183:22, | 206:13, 206:18, |
| 253:22, 258:21, | 127:17 | 184:19, 312:24, | 208:23, 209:4, |
| 282:9, 282:13, | consent | 317:16, 343:15 | 211:13, 224:20, |
| | 284:16 | | |

232:17, 233:9,
233:17, 239:15,
239:23, 248:7,
253:13, 257:9,
257:14, 258:4,
262:21, 269:16,
286:4, 286:17,
294:14, 301:19,
314:4, 319:4,
321:23, 322:18,
330:10, 337:12,
355:1
**continuity**
220:4
**contract**
27:15
**contractor**
206:3
**contradict**
73:6
**contrast**
244:17, 285:2
**control**
25:13
**conversation**
50:5, 54:2,
61:10, 68:24,
69:1, 69:13,
70:10, 100:1,
101:5, 101:13,
101:15, 101:23,
102:1, 102:2,
108:16, 118:13,
119:1, 119:5,
125:3, 125:10,
126:14, 126:18,
131:11, 138:18,
138:20, 139:5,
139:8, 139:10,
139:13, 139:18,
139:19, 139:20,
139:21, 140:6,
140:18, 144:2,
144:4, 147:17,
147:23, 151:19,
151:23, 154:5,
160:19, 160:21,
167:18, 170:4,

177:6, 181:23,
184:16, 184:20,
228:17, 243:12,
243:22, 244:1,
244:2, 245:2,
245:13, 254:11,
254:17, 254:21,
261:8, 261:14,
262:5, 273:8,
280:9, 280:13,
284:4, 284:18,
284:21, 285:1,
285:3, 295:18,
297:9, 312:14,
312:22, 313:20,
318:2, 318:4,
318:7, 318:19,
335:5, 335:18,
343:9, 350:12,
351:8, 351:17,
351:22, 352:4
**conversations**
69:3, 72:23,
114:24, 115:13,
181:15, 228:16,
296:2, 314:5,
314:7, 335:4,
349:12, 349:13,
352:1
**convicted**
73:7, 299:15
**conviction**
64:4, 69:23,
302:3, 305:17,
313:23, 313:24,
350:7
**convictions**
71:24, 72:17,
298:13, 301:21,
305:14
**cook**
3:18, 3:21,
7:20, 7:23,
15:2, 15:5,
15:9, 15:13,
15:18, 15:21,
17:10, 18:11,
19:7, 19:12,

19:17, 22:1,
24:8, 24:14,
41:20, 51:21,
119:16, 122:22,
141:3, 141:20,
180:4, 210:23
**cooperated**
331:14
**cooperation**
331:15
**cooperative**
286:8
**coordinating**
69:20
**coperpetrator**
178:8, 178:10,
178:14
**copies**
227:11, 340:21,
343:22, 357:4,
357:9, 357:12,
357:14, 357:16
**copulating**
86:11, 241:23,
289:15, 291:3
**copy**
71:8, 71:10,
248:19, 249:16,
249:18, 262:16,
272:16, 277:5,
340:5, 344:1,
352:24
**corner**
46:16, 112:6,
182:10
**corporate**
26:12
**correct**
9:21, 38:2,
40:24, 46:14,
56:22, 57:7,
75:13, 77:17,
90:7, 95:22,
96:21, 99:17,
99:22, 102:17,
103:8, 104:16,
105:23, 106:2,
108:18, 109:18,

109:23, 110:11,
111:18, 127:8,
141:14, 149:1,
151:6, 151:16,
154:10, 160:4,
161:3, 162:6,
173:1, 173:7,
185:6, 185:13,
187:4, 193:9,
194:4, 194:8,
198:22, 200:16,
200:18, 214:5,
223:9, 227:23,
232:1, 240:7,
243:18, 255:23,
256:3, 256:11,
276:9, 277:4,
278:3, 284:2,
295:8, 299:19,
300:7, 300:11,
300:15, 301:2,
319:10, 320:6,
321:8, 325:14,
327:12, 331:23,
340:24, 341:9,
341:14, 342:11,
346:6, 349:17,
352:14, 352:19,
359:8
**correction**
187:2
**corrections**
32:15, 35:7
**corroborate**
61:23, 140:16,
165:18, 197:4
**corroborated**
275:5, 324:22,
324:24
**corroboration**
256:23
**corroborative**
62:14
**cosuspect**
55:3, 223:3,
327:16
**cotarget**
55:3

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

105

**couching**
198:1
**could**
13:18, 21:20,
24:5, 26:20,
32:19, 33:15,
33:17, 34:2,
34:10, 35:1,
39:8, 39:11,
39:13, 44:9,
48:6, 50:12,
52:3, 61:22,
65:5, 66:13,
68:14, 71:2,
71:5, 71:15,
73:20, 73:21,
73:22, 78:19,
88:24, 95:12,
130:1, 130:17,
143:17, 143:21,
144:10, 148:8,
170:15, 185:21,
188:17, 189:13,
197:13, 202:18,
207:2, 225:10,
227:18, 246:15,
261:1, 261:12,
264:20, 264:22,
264:23, 266:11,
266:13, 266:17,
287:12, 292:9,
305:10, 316:4,
316:12, 318:21,
320:10, 334:23,
343:3, 345:8,
345:13, 356:15
**couldn't**
58:21, 138:3,
138:16, 329:16,
354:17
**counsel**
7:12, 8:7,
48:24, 128:7,
138:7, 158:1,
159:24, 196:13,
200:13, 209:3,
235:9, 306:3,
312:1, 337:19,

355:19, 359:13
**count**
354:4
**countersignatures**
172:17
**counts**
206:11
**county**
3:18, 3:21,
7:20, 7:23,
15:2, 15:5,
15:9, 15:13,
15:18, 15:21,
17:10, 18:11,
19:7, 19:12,
19:17, 22:1,
24:8, 24:14,
41:21, 51:22,
119:16, 122:22,
141:3, 141:20,
180:4, 210:23,
359:5
**couple**
14:13, 16:1,
27:7, 67:10,
67:22, 81:2,
124:2, 220:21
**course**
10:7, 34:22,
41:20, 49:19,
50:4, 51:23,
60:13, 63:13,
82:24, 83:1,
84:14, 107:19,
112:9, 118:13,
119:21, 123:23,
180:2, 185:20,
253:11, 253:13,
253:14, 315:10,
320:13, 327:8,
328:13, 338:14,
341:8, 351:17
**courthouses**
312:6
**courtroom**
16:15, 16:17
**courtrooms**
19:14, 19:16,

22:17
**courts**
23:12, 332:12
**cover**
67:17, 148:4
**covered**
23:17, 65:18,
65:19, 148:8,
151:24
**covering**
67:22, 68:9,
68:14
**crafting**
293:17
**create**
28:13, 166:1,
166:8, 308:17
**created**
9:8, 59:13,
90:20, 100:1,
165:2, 244:13,
293:16, 307:4,
307:6
**creates**
27:20, 27:21,
28:8
**creating**
141:11, 308:10,
308:23
**creation**
9:3
**credibility**
122:4
**credible**
48:11, 144:6,
145:16, 150:22,
151:5, 309:8,
309:13, 309:15,
309:16, 318:12
**crime**
42:12, 43:13,
44:3, 45:15,
46:22, 54:21,
58:5, 62:20,
86:14, 87:12,
87:13, 96:21,
115:21, 116:3,
118:2, 164:22,

177:15, 195:21,
196:3, 197:14,
198:8, 225:18,
229:4, 230:2,
230:6, 251:7,
279:9, 279:10,
280:3, 285:14,
285:15, 289:18,
327:21, 328:5,
328:6, 328:7,
331:9
**crimes**
86:21, 87:23,
88:16, 90:3,
219:4, 298:18,
298:22, 299:10,
299:15
**criminal**
5:20, 9:22,
22:6, 22:8,
22:11, 22:15,
24:17, 24:19,
25:1, 25:3,
25:6, 25:21,
25:22, 25:24,
56:20, 89:12,
121:12, 121:16,
122:1, 123:3,
122:4, 141:14,
294:21, 302:17,
303:18, 305:19,
308:4, 309:11,
309:21, 319:10,
319:20, 331:19,
331:21
**critical**
321:11, 321:19,
322:3
**cross-examination**
321:2
**csr**
1:24, 359:4
**culpability**
51:9
**curious**
139:11
**curran**
3:11, 5:4,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

106

7:16, 208:24,
240:17, 288:10,
312:2, 316:2,
316:7, 316:11,
316:17, 316:21,
316:24, 317:2,
317:7, 333:6,
354:23, 355:15
**current**
228:20
**currently**
20:9, 25:22,
199:7, 199:16,
199:22
**custody**
36:8, 36:11,
134:6, 134:14,
134:17, 134:22,
181:13, 199:7,
199:16, 199:22,
223:3, 224:17,
228:18, 256:20,
257:3, 274:4,
275:10, 276:14,
276:21, 276:23,
334:5, 335:8,
335:15
**cut**
272:15, 339:12
**cutting**
356:6
**cv**
1:7, 1:13, 7:5,
7:6
**cycle**
213:18
**cylinder**
193:19

**D**

**dab**
199:7, 199:15
**dad**
229:17
**daley**
3:22
**damages**
311:14

**dap**
86:5, 86:8,
86:11, 176:21,
176:24, 177:1,
177:3, 177:7,
177:11, 180:8,
180:10, 180:12,
186:3, 186:5,
187:21, 199:22,
200:14, 201:17,
203:1, 203:3,
203:5, 203:6,
289:9, 289:11,
289:16
**darryl**
1:12
**date**
78:12, 78:13,
112:6, 112:16,
113:14, 122:6,
154:12, 201:7,
207:2, 219:3,
241:15, 246:13,
276:15, 276:22,
290:18
**dated**
121:6, 272:7
**day**
43:19, 65:16,
65:18, 68:2,
74:17, 75:15,
76:3, 79:6,
112:9, 126:11,
192:23, 213:15,
213:17, 213:18,
213:24, 217:10,
222:21, 225:5,
272:9, 272:12,
342:5, 359:17
**day's**
226:14
**days**
21:15, 23:4,
23:11, 27:4,
65:21, 74:7,
74:13, 74:14,
74:23, 75:3,
75:5, 78:12,

111:17, 146:23,
213:13, 214:20,
214:22, 217:9,
342:19, 344:5
**dead**
52:1, 93:18,
115:24
**deal**
129:18
**death**
82:9, 106:24,
107:3, 111:2,
126:1, 156:2,
156:3, 156:5,
156:7, 283:5
**debate**
128:23, 186:20,
316:9, 316:10
**december**
1:20, 7:9,
24:10, 25:19,
25:20, 359:18
**decided**
201:16, 202:11
**decision**
41:23, 120:13,
143:19, 211:17,
212:2, 212:4,
212:13, 276:10,
313:23, 314:10,
319:5, 321:24,
322:5, 327:1,
345:19, 346:14,
356:14, 356:18
**decisions**
322:3
**deem**
309:14, 309:16
**default**
25:2
**defendant**
3:18, 4:10,
174:8, 184:22,
186:1, 236:4,
254:13, 254:17,
254:22, 260:21,
261:6, 261:8,
261:9, 262:5,

262:11, 262:24,
263:22, 263:24,
265:3, 266:4,
273:22, 274:1,
297:23, 302:9,
305:9, 319:23,
322:12, 322:22,
323:18, 324:13,
337:5, 339:5,
354:3
**defendant's**
324:1, 331:21
**defendants**
1:9, 1:16, 4:2,
8:1, 141:14,
293:3, 302:17,
311:16, 356:22
**defender's**
15:6
**defense**
24:17, 24:20,
25:3, 25:7,
25:21, 25:22,
25:24, 56:20,
80:12, 141:20,
141:22, 142:3,
143:7, 236:18,
280:16, 294:21,
303:18, 309:11,
309:21, 331:19
**define**
326:7
**definition**
128:20
**degree**
12:1, 12:4,
12:6, 12:22,
317:17
**delve**
44:21
**demand**
336:21
**demeanor**
131:10, 285:24,
286:24, 287:5,
287:12
**demographics**
35:17, 142:22

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

107

demonstrate
40:14
demonstrated
35:3
demonstrating
35:20
demonstrative
198:5, 324:23
denial
239:10, 240:10,
338:15, 338:17,
339:18
denials
326:12
denied
326:10, 333:21,
338:2, 338:8
deny
339:6
denying
240:5, 328:24,
338:21
department
20:21, 41:9,
41:14, 41:18,
101:18, 177:18,
178:20, 179:12,
180:14, 210:3,
249:21, 277:11
department's
249:5
depend
134:24
depended
43:19
depending
21:4, 214:12
depends
21:12, 21:19
depicted
129:24
deponent
3:18, 7:19,
7:22
depos
2:4, 7:7, 7:11
deposed
8:12, 8:20

deposition
1:18, 2:1,
5:10, 7:3,
59:11, 84:6,
85:4, 95:2,
100:4, 105:9,
112:2, 121:2,
127:21, 129:16,
133:23, 153:19,
182:5, 190:7,
218:19, 231:2,
245:20, 265:11,
272:4, 298:7,
305:22, 308:8,
308:20, 310:16,
317:5, 323:13,
345:10, 357:9,
359:7
depositions
9:21
deprived
39:3, 132:9,
132:11, 132:15,
133:4, 133:7
derek
3:19, 7:19,
316:17
derrell
1:11, 6:3,
71:16, 72:12,
72:22, 218:12,
219:24, 222:7,
222:17, 222:20,
224:9, 225:17,
229:3, 234:7,
234:14, 234:17,
235:4, 235:20,
238:2, 240:1,
240:4, 240:5,
242:15, 242:17,
243:18, 245:5,
245:8, 245:9,
245:15, 247:16,
247:19, 248:12,
248:23, 249:9,
249:24, 250:10,
250:20, 251:6,
254:9, 256:1,

256:10, 256:19,
257:3, 257:19,
272:22, 275:8,
276:7, 276:13,
277:2, 277:5,
277:16, 278:23,
279:18, 280:5,
280:13, 281:7,
283:20, 284:1,
284:15, 285:5,
285:24, 286:10,
286:11, 286:23,
287:4, 291:10,
295:8, 295:10,
295:22, 296:5,
296:11, 297:13,
306:12, 306:16,
308:3, 313:19,
315:18, 320:10,
325:17, 329:9,
329:13, 330:16,
334:3, 334:13,
336:8, 338:1,
338:7, 346:24,
347:21, 348:1,
350:11, 352:21,
353:18, 357:5
derrick
256:4, 311:13
describe
65:13, 106:23,
142:20, 142:21,
163:3, 168:5,
278:23
described
130:18, 278:10,
278:22, 295:12,
323:13
description
124:1, 165:11,
165:24
descriptive
207:21, 207:23
design
109:12, 164:19,
165:13
designed
122:23

desired
331:16
desk
226:16
destination
337:3
destiny
25:14
detail
281:3, 285:10
details
166:14, 166:15,
221:18, 274:9,
280:24
detained
333:17
detective
6:5, 48:7,
48:19, 49:14,
49:18, 62:3,
79:22, 79:24,
80:2, 80:24,
90:17, 94:12,
98:14, 107:10,
108:3, 123:4,
146:3, 147:4,
153:15, 154:2,
170:14, 185:16,
192:3, 192:5,
192:12, 200:23,
224:23, 225:1,
225:3, 227:11,
228:11, 228:12,
228:13, 229:12,
236:5, 236:8,
237:13, 237:14,
237:19, 243:24,
244:15, 245:6,
245:10, 245:14,
245:22, 246:4,
246:10, 246:15,
247:1, 248:10,
249:15, 250:19,
254:13, 255:24,
256:9, 256:23,
257:17, 260:22,
261:5, 263:1,
263:18, 263:20,

263:21, 263:23,
264:1, 264:11,
264:21, 265:2,
265:3, 266:10,
266:12, 293:13,
311:15, 315:3,
315:6, 315:10,
341:11
**detective's**
236:7, 240:12
**detectives**
48:23, 50:3,
50:6, 50:18,
51:2, 80:1,
81:14, 81:18,
85:20, 85:23,
86:18, 86:23,
94:7, 94:9,
98:24, 135:22,
150:4, 153:15,
167:23, 170:10,
171:4, 176:6,
180:7, 192:17,
193:13, 222:2,
222:6, 223:1,
223:9, 227:12,
230:9, 240:23,
241:6, 241:8,
248:18, 251:5,
252:9, 252:14,
252:19, 257:5,
257:14, 257:15,
258:5, 258:22,
261:1, 288:13,
288:19, 288:20,
288:23, 289:3,
289:24, 292:3,
306:13, 334:4,
335:23, 341:20,
344:1
**detention**
333:24, 336:2
**determination**
59:8, 150:15,
161:17, 162:20,
178:22
**determine**
42:11, 50:6,

51:7, 61:15,
109:22, 113:9,
132:19, 237:5,
322:1
**determined**
49:12, 61:20
**determining**
49:9, 296:9,
332:13, 333:12
**developmental**
12:24, 13:1
**dickerson**
332:15
**died**
102:17, 103:4,
111:8, 117:3,
283:11, 283:13,
283:14, 322:2
**difference**
189:1
**differences**
304:4
**different**
19:14, 20:3,
30:4, 37:24,
56:2, 65:22,
67:20, 68:19,
88:11, 113:13,
114:5, 114:9,
181:8, 211:16,
221:7, 268:24,
284:20, 295:1,
339:7, 339:9,
348:6, 356:16
**differently**
218:3
**difficulty**
247:5
**diminished**
305:10
**dinner**
349:4
**direct**
80:21, 85:10,
149:6, 173:19,
219:2
**directed**
186:5, 187:21,

203:5, 268:23,
275:21, 278:6,
278:12
**directing**
174:5
**direction**
196:22, 196:23,
359:11
**directly**
37:14, 37:18,
147:2
**disagree**
29:1, 54:9,
90:1, 310:15
**disassembled**
227:14
**discarded**
205:19, 207:9
**disclose**
63:4
**disclosed**
63:8
**discovered**
49:20, 97:14,
112:13, 112:18,
117:19, 207:9
**discovery**
142:2, 143:17,
304:22, 311:15
**discrepancy**
186:14
**discretion**
49:7, 50:9,
50:12
**discuss**
64:17, 68:23,
70:23, 237:19,
313:9, 313:19
**discussed**
308:1, 312:7,
318:6
**discusses**
139:2
**discussing**
264:5
**discussion**
30:22, 69:7
**dispatch**
76:19, 77:13,

78:3, 146:12,
146:13, 146:18,
146:23, 176:17,
223:21, 224:1,
224:9, 234:17
**dispatcher**
177:23, 179:13,
179:17
**dissonance**
331:5
**distinction**
277:1
**district**
1:1, 1:2, 30:5,
59:6, 66:16,
66:17, 78:22,
149:24
**division**
1:3, 19:15,
79:23, 322:9
**divorced**
29:13
**dna**
71:23, 72:3,
72:6
**docket**
7:5
**doctor**
156:6
**doctorate**
12:17
**document**
31:19, 31:22,
35:1, 35:3,
35:4, 35:22,
36:6, 36:10,
36:12, 36:16,
36:17, 37:8,
37:9, 38:2,
38:8, 38:12,
38:21, 39:16,
40:9, 40:13,
40:20, 42:18,
45:11, 45:13,
45:21, 46:1,
46:2, 46:7,
47:9, 47:15,
47:19, 47:22,

47:24, 48:8,
48:10, 48:12,
53:24, 54:2,
54:7, 56:11,
90:14, 90:15,
90:19, 91:1,
91:6, 91:14,
95:11, 95:17,
97:24, 100:8,
105:15, 108:7,
110:10, 121:10,
121:18, 121:20,
128:12, 133:13,
134:19, 140:1,
140:5, 140:16,
144:10, 157:21,
160:7, 164:15,
165:11, 180:18,
181:9, 181:18,
200:9, 231:12,
243:23, 293:18,
295:20, 296:1,
308:11, 308:17,
308:24, 309:3,
329:8, 338:7,
338:17, 338:21,
339:14, 339:17

**documentary**
56:8

**documentation**
54:4, 101:19,
140:10, 338:12

**documented**
37:2, 38:9,
39:4, 39:21,
43:24, 44:8,
47:17, 89:7,
90:20, 101:13,
102:9, 108:10,
140:24, 155:5,
160:17, 163:12,
163:22, 164:2,
164:16, 164:17,
164:20, 175:10,
184:19, 200:17,
200:18, 211:14,
273:8, 280:11,
342:8

**documenting**
36:18, 37:21,
44:7, 46:21,
47:4, 108:16,
211:6

**documents**
98:1, 107:21,
182:18, 218:17,
251:10, 265:18,
345:10, 345:13,
345:17

**doing**
10:6, 12:12,
13:7, 16:22,
20:22, 21:1,
26:12, 26:20,
29:6, 104:1,
104:2, 202:23,
218:1, 251:23,
323:15, 327:12,
355:6

**done**
10:9, 10:14,
16:15, 33:4,
52:20, 52:23,
52:24, 77:24,
96:22, 138:7,
147:2, 147:15,
161:19, 167:10,
168:4, 172:11,
172:24, 173:3,
197:16, 203:2,
223:17, 225:9,
237:18, 259:5,
303:15, 311:15,
319:19, 355:4

**door**
86:10, 289:14,
290:3

**doorway**
241:22, 242:3,
291:2, 291:7,
291:21, 291:22,
293:6, 294:5

**doubt**
24:6, 255:24,
256:8, 256:9,
311:23, 344:8

**doubts**
71:24

**down**
29:1, 30:19,
45:2, 46:14,
67:7, 67:20,
116:13, 135:6,
165:12, 199:19,
199:20, 241:20,
277:10, 278:5,
278:11, 278:18,
291:1, 323:17

**downers**
3:15

**downtown**
21:3, 60:14

**dr**
193:4

**draft**
223:19

**drafted**
293:13

**drafting**
293:17

**draw**
38:10

**dressed**
120:22

**drink**
35:5, 38:15,
147:8, 333:20

**drive**
20:17, 300:5,
300:14, 300:19

**driven**
78:6

**driving**
16:21, 249:16

**drove**
234:1, 234:2

**ds**
85:15

**duly**
8:6

**duration**
332:11, 336:6

**duress**
36:23, 150:17,

151:12, 152:4,
303:13, 303:14

**duress-like**
336:24

**during**
15:19, 19:21,
19:22, 36:7,
36:13, 71:13,
89:19, 126:5,
126:7, 126:18,
127:3, 132:6,
133:21, 137:16,
138:2, 138:15,
138:19, 139:5,
154:5, 161:23,
162:5, 162:24,
166:10, 169:22,
170:17, 181:13,
183:12, 195:21,
264:8, 266:5,
313:20, 315:10,
323:13, 324:11,
334:11, 336:3,
342:22, 345:5,
350:11, 351:17,
351:22, 352:1

**duties**
23:9, 23:18,
50:1, 137:14,
232:2, 232:13,
233:10, 234:14,
315:11

**duty**
20:16, 48:7,
220:10

_____

|         **E**         |

**each**
32:4, 32:16,
51:7, 65:16,
103:24, 125:17,
125:23, 135:17,
170:6, 172:9,
172:13, 270:24,
292:24, 294:4,
301:7, 307:14,
307:22, 312:20,
340:22, 341:3

earlier
133:12, 133:15,
268:8, 323:14,
323:24, 339:24,
357:8
ease
330:11
easier
196:10
eastern
1:3
eat
35:5
eddie
242:18, 242:21,
274:4, 274:23,
275:1, 275:4,
275:9, 275:13,
278:6, 278:13
edelson
26:4, 26:10,
26:11
effort
136:22
egan
57:20
eight
21:19
either
22:12, 22:22,
23:3, 36:22,
47:10, 48:20,
52:10, 55:3,
64:9, 69:16,
73:13, 78:21,
84:17, 99:7,
102:4, 107:9,
114:22, 115:10,
120:13, 122:24,
138:22, 183:6,
191:1, 210:24,
213:17, 214:15,
222:24, 224:19,
269:6, 269:17,
270:12, 292:10,
303:6, 309:10,
309:19, 309:20,
324:22, 324:23,

342:11
elapsed
355:18
element
13:20
elicit
54:19, 58:24,
135:8, 161:8,
230:10, 231:20,
232:9, 233:1,
315:17
elicited
161:2
eliciting
327:21
else
56:1, 69:20,
93:4, 115:10,
178:1, 180:13,
194:16, 202:9,
202:16, 215:11,
226:10, 234:6,
234:24, 273:2,
273:3, 355:16
em
144:15, 144:23
emails
352:10, 352:13
embroidered
109:9, 164:12
emotionless
131:14
employed
16:19, 16:20,
25:10, 27:12,
27:13, 205:23,
206:3, 208:5,
208:6, 359:13
employment
14:19, 14:21,
16:24, 17:2
ems
20:14, 20:19
emt
19:20, 20:4,
20:5
encounter
295:16

encourage
55:6
end
14:14, 17:13,
22:12, 22:22,
77:10, 135:20,
272:15, 295:16
ending
139:18
ends
265:15
enforced
35:18
enforcement
29:18, 36:14,
73:5, 211:24,
252:1, 304:24,
328:8, 335:24,
336:23, 337:9,
337:18, 356:24
enforcement's
212:8
engaged
86:11, 289:15
english
32:13, 34:6,
35:2
enough
10:12, 34:9,
42:3, 140:21,
148:4, 166:16,
169:12, 185:8,
220:16, 322:8,
331:9
ensure
332:7
entailed
170:5, 318:8
enter
322:20
entire
26:1, 32:14,
33:11, 33:18,
33:22, 34:1,
34:9, 34:11,
85:23, 87:5,
92:1, 92:10,
159:16, 172:16,

221:21, 263:8,
264:4, 289:3,
297:6, 351:13,
351:15
entirety
172:13, 351:8
entries
300:14, 301:14
environment
337:1
equal
51:23
equally
54:5
equipment
20:17
erroneous
91:1, 91:15
error
269:9, 277:4
errors
358:5
escapes
69:18
especially
329:17
espn
312:9, 312:24,
313:7, 314:9,
314:11, 314:14,
314:21, 314:24,
355:21
espn's
312:17
esquire
3:3, 3:11,
3:19, 3:20, 4:3,
4:11
establish
111:1, 174:21
established
20:14
establishing
191:21
estimate
282:1
et
1:8, 1:15, 7:5,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

111

7:6, 165:1
**ethically**
355:5
**evaluate**
59:6, 62:16,
118:17, 182:14
**evaluated**
150:18
**evaluating**
120:12
**evaluation**
50:21, 59:7,
224:17
**evanston**
20:18
**even**
10:9, 136:5,
190:3, 217:12,
220:22, 244:4,
270:14, 276:8,
302:1, 310:17,
322:20, 346:14
**evening**
65:17, 73:14,
73:17, 74:1,
74:21, 109:5,
116:14, 214:14,
218:15, 235:6,
235:8, 235:20,
254:24, 255:14,
255:16
**event**
55:2, 186:22,
195:13
**eventful**
286:19
**events**
292:11, 293:2,
295:11, 342:20
**eventually**
329:11
**ever**
8:12, 9:5,
15:2, 15:5,
26:3, 27:12,
27:17, 28:24,
29:13, 34:10,
37:12, 37:13,

58:3, 64:5,
97:23, 115:17,
132:13, 137:10,
141:16, 141:17,
142:1, 149:6,
149:11, 149:23,
150:2, 160:15,
179:8, 198:18,
204:10, 229:20,
239:7, 252:24,
259:5, 268:17,
268:20, 268:22,
268:23, 269:18,
270:14, 271:18,
274:22, 287:10,
303:11, 303:16,
304:10, 304:20,
304:23, 306:20,
306:24, 307:11,
309:8, 312:7,
313:22, 314:5,
315:3, 315:6,
315:10, 315:13,
337:16, 337:21,
342:15, 342:16,
344:15, 344:21,
348:12, 348:17,
348:24, 349:11,
354:4, 357:11,
357:16
**every**
21:7, 21:9,
33:3, 35:19,
120:9, 120:16,
120:23, 124:5,
124:9, 124:12,
125:17, 125:23,
128:24, 135:18,
145:1, 145:18,
145:24, 150:20,
151:3, 151:10,
168:4, 221:10,
271:3, 285:10,
298:16, 298:23,
299:11, 299:15,
301:8, 307:14,
307:22, 326:15,
336:20

**everybody**
50:24, 53:19
**everyone**
181:8
**everything**
126:3, 126:4,
126:5, 145:15,
157:21, 157:22,
158:19, 166:3,
166:10, 168:9,
172:4, 225:9
**evidence**
42:3, 43:1,
43:4, 45:19,
46:19, 55:12,
55:15, 55:17,
55:20, 55:21,
56:8, 57:6,
57:14, 59:6,
73:8, 118:17,
120:12, 120:14,
150:18, 163:7,
177:20, 179:7,
182:15, 193:2,
195:15, 195:16,
195:19, 196:2,
197:3, 197:7,
197:12, 198:6,
198:9, 198:13,
198:16, 198:19,
201:24, 209:12,
209:13, 209:16,
209:19, 210:8,
211:12, 224:18,
229:15, 229:21,
229:22, 237:23,
239:8, 270:7,
275:18, 289:23,
291:11, 300:16,
317:22, 318:18,
318:19, 319:24,
324:23
**evidentiary**
42:24
**exactly**
65:24, 69:21,
249:11
**exam**
17:23, 18:1,

18:7, 18:9
**examination**
5:2, 8:7,
312:1, 355:19
**examine**
42:16
**examined**
118:16, 121:21,
161:24
**examiner**
156:6, 193:15,
194:7, 195:10
**example**
56:9, 62:18,
111:16, 173:9,
323:11, 324:11,
348:10
**exceptions**
220:21
**exchange**
355:10
**excluding**
184:5
**exculpated**
73:9, 126:20
**exculpating**
92:24
**exculpatory**
55:9, 63:5,
151:2, 287:14,
324:21
**excuse**
182:22, 277:22
**execute**
31:18, 95:19,
324:12
**executed**
95:11, 95:17,
172:9
**exercise**
305:11
**exhaustive**
50:21, 101:19,
273:19
**exhibits**
5:10, 114:22,
115:15, 115:16
**exist**
305:13

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

112

**existed**
108:4, 108:22
**existence**
181:24, 239:17,
301:20
**expansive**
46:18
**expectation**
322:11
**expectations**
322:19
**expecting**
168:10
**experience**
220:16, 258:23,
344:16
**experienced**
319:9, 331:19
**expertise**
221:2, 221:3
**expires**
359:20
**explain**
247:2, 316:17,
335:13
**explained**
30:1, 30:2,
87:1, 119:19,
144:9, 337:14,
337:16
**explanation**
266:21
**explore**
134:18, 134:23
**expose**
301:22
**exposed**
258:8, 336:1
**express**
313:22
**expressed**
350:10
**extend**
137:14
**extended**
134:14, 336:1,
336:6
**extent**
118:2, 128:4,

242:8, 296:1,
296:10, 313:4
**extract**
230:15
**extrinsic**
55:12, 55:17,
55:20, 62:14
**extrinsically**
324:22
**eye**
13:16, 324:13

**F**

**f-i-n-d-l-a-w**
28:7
**face**
349:19
**face-to-face**
69:5, 69:16,
349:20
**fact**
35:20, 38:16,
47:19, 48:1,
48:3, 72:24,
73:2, 73:3,
73:5, 73:7,
73:8, 77:11,
77:17, 85:19,
93:5, 96:5,
99:21, 101:3,
102:10, 102:13,
104:21, 114:17,
117:12, 117:22,
117:23, 126:13,
131:13, 133:14,
134:19, 155:20,
161:1, 161:2,
161:8, 161:18,
163:17, 163:19,
163:20, 164:5,
164:8, 165:16,
165:19, 173:21,
180:16, 180:17,
189:4, 190:21,
191:6, 191:12,
191:15, 202:2,
202:3, 204:8,
211:2, 211:14,

235:2, 248:7,
255:9, 258:12,
261:3, 262:6,
277:2, 288:14,
288:22, 301:8,
312:11, 331:1,
353:21, 353:23
**factor**
332:12, 333:24,
334:1
**facts**
34:23, 34:24,
35:14, 35:20,
37:9, 37:11,
42:17, 45:9,
47:17, 61:23,
62:2, 62:14,
63:8, 69:8,
70:14, 70:16,
70:18, 70:20,
70:22, 70:23,
88:7, 88:8,
91:7, 102:18,
108:11, 108:12,
111:6, 111:20,
111:23, 115:15,
126:1, 126:9,
126:18, 126:20,
126:22, 127:2,
135:2, 153:3,
162:19, 163:7,
164:16, 201:3,
202:7, 202:8,
241:5, 244:12,
252:13, 270:6,
280:10, 285:14,
297:10, 304:16,
305:2
**fade**
161:21
**fair**
10:12, 10:17,
11:1, 43:6,
60:9, 62:21,
65:11, 76:7,
77:21, 124:19,
124:21, 129:22,
137:8, 192:8,

192:9, 193:3,
208:24, 216:7,
218:2, 220:16,
255:18, 255:21,
285:17, 319:16,
321:12, 321:20,
323:18, 331:8,
351:6
**fairly**
37:2
**fake**
292:1, 294:3,
295:2
**fall**
14:17
**falls**
47:7
**false**
47:19, 47:20,
47:22, 48:2,
48:3, 56:13,
56:17, 251:19,
354:15, 354:22,
355:1, 355:9,
355:12
**familiar**
332:1
**family**
29:17, 85:19,
181:12, 181:20,
288:14, 288:23
**far**
10:6, 50:9,
58:5, 79:9,
223:18, 298:16
**fashion**
89:11, 283:1
**fast**
42:15, 67:3,
122:8
**fatal**
106:13, 106:17,
106:20, 107:1,
156:9
**fatigue**
134:18, 135:5
**favor**
320:4

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

113

| | | | |
|---|---|---|---|
| **fed** 38:1, 38:2, 148:6, 152:2 | 339:17, 357:16 **filed** 56:16, 56:23, 57:13, 302:20, 303:4, 303:5, 303:11, 311:3, 325:7, 334:12 | 323:3, 323:6 **finished** 14:12, 14:14, 14:15, 183:2, 213:8, 215:12, 218:9 | **fit** 26:24, 27:1 **five** 192:17, 192:18, 199:19, 199:20, 253:19 |
| **federal** 25:21, 25:23 **feed** 63:11 | **files** 249:1, 249:5 | **fire** 20:21 **firm** 4:12, 27:10 | **five-eight** 120:21 **fix** 283:9 |
| **feel** 37:21, 42:1, 72:11, 141:1, 145:4, 202:23, 218:3, 355:5 | **filing** 56:21, 310:6, 310:8, 310:11, 310:18, 311:4, 311:5, 311:10 | **firms** 14:22 **first** 9:13, 10:3, 19:11, 19:23, 20:7, 20:8, | **fixed** 44:11, 53:10 **fixtures** 124:13 **flashlight** 97:3 |
| **feeling** 72:15 **feels** 233:8 | **fill** 29:24, 52:12, 52:13, 52:16, 76:8 | 33:14, 33:15, 34:18, 64:15, 67:5, 75:11, 76:10, 76:17, | **flavor** 166:17 **flip** 10:23, 192:7 |
| **fell** 30:5 **felt** 34:2, 34:8, 34:12, 35:8, 47:13, 140:24, 144:12, 160:22, 326:17, 355:9 | **filled** 53:15, 183:5 **filling** 53:1 **final** 48:10, 48:18, 48:21, 275:12 | 76:21, 77:3, 92:14, 93:5, 94:18, 100:19, 100:21, 116:12, 119:2, 119:10, 119:12, 123:12, 123:14, 124:14, | **floor** 3:6, 81:17, 86:14, 97:7, 123:17, 183:7, 289:18, 341:19, 341:22, 341:23 **floors** 350:1 |
| **female** 351:1 **few** 108:20, 311:21 | **financial** 359:15 **find** 16:16, 28:6, 28:7, 66:14, | 125:6, 126:14, 126:18, 127:3, 131:11, 138:19, 139:6, 139:8, 139:21, 149:8, | **fluency** 34:5 **focused** 13:15 **fold** 227:22 |
| **fewer** 282:2 **field** 319:9, 319:10 **fifth** 57:2, 304:5, 304:14, 318:1 | 66:15, 98:18, 131:20, 132:3, 143:1, 159:19, 177:14, 178:7, 178:8, 214:18, 221:11, 300:1 | 160:20, 171:2, 175:5, 179:4, 209:17, 235:5, 235:20, 236:12, 237:2, 237:10, 238:12, 238:21, | **folder** 52:13, 52:17, 53:2, 226:21, 227:16, 227:22, 228:1, 228:4, 228:6, 228:7 |
| **fight** 232:15, 331:5, 331:6 **fighting** 232:3, 232:5, 232:14, 232:17 | **findlaw** 27:22, 28:3 **fine** 28:6, 152:11, 160:1, 290:13, 295:19, 296:9, | 242:15, 245:2, 251:11, 253:1, 255:2, 255:12, 256:1, 256:9, 256:17, 276:7, | **folders** 228:7 **foley** 1:15, 82:19, 89:5, 190:13, |
| **figure** 68:8, 270:5 **figures** 192:23 **file** 121:21, 226:21, 228:9, 310:13, | 330:22, 335:24 **fingers** 292:19, 292:24 **finish** 182:23, 217:17, 313:14, 323:1, | 276:18, 298:15, 316:12, 317:17, 335:4, 346:11, 346:18, 346:24, 355:7, 357:1 | 225:2, 225:3, 228:12, 228:13, 229:12, 236:8, |

236:14, 237:13,
241:8, 243:24,
244:15, 245:14,
246:4, 246:15,
247:1, 248:8,
248:10, 250:19,
251:5, 251:9,
252:8, 254:14,
255:7, 256:2,
256:4, 256:5,
256:17, 257:17,
260:22, 261:5,
263:1, 263:18,
263:20, 263:21,
263:23, 264:8,
264:11, 264:22,
265:3, 265:4,
265:18, 265:22,
265:23, 265:24,
266:5, 266:11,
266:13, 267:6,
267:9, 267:11,
267:21, 270:3
**foley's**
6:5, 245:22,
246:2, 256:1,
256:9, 256:23,
264:1, 269:19
**follow**
74:19, 158:20,
158:23
**follow-up**
71:4
**followed**
162:24
**following**
87:6, 160:21,
219:3, 236:1,
252:20, 261:24,
262:1
**follows**
8:6, 39:16,
316:14
**food**
38:6, 38:15,
333:20
**forced**
297:24, 302:10,

302:13, 302:14,
302:15
**foregoing**
359:6, 359:8
**forgery**
56:8, 149:16
**forgive**
169:20, 222:12,
350:20
**forgotten**
132:17, 240:15
**forklift**
16:21
**formal**
67:6, 177:22,
179:10, 179:11,
179:17, 205:16
**formally**
73:18, 73:19,
179:5
**format**
167:8, 168:2
**formed**
73:9, 250:12
**former**
331:20
**forum**
30:20
**forward**
37:21
**found**
64:3, 111:17,
186:8, 298:17,
298:22, 299:10
**four**
19:10, 21:15,
29:16, 51:4,
51:5, 51:6,
226:4, 258:17,
258:18, 258:19,
258:21
**four-hour**
215:19
**fourth**
57:1, 303:7,
304:2, 304:5,
304:8
**fran**
114:4

**francine**
5:17, 102:2,
105:14, 105:19,
108:5, 108:9,
108:14, 109:2,
109:6, 109:10,
109:17, 109:22,
110:4, 113:21,
113:23, 114:8,
115:11, 116:6,
116:13, 116:17,
116:24, 155:2,
155:11, 163:2,
164:17, 213:3,
227:8, 306:11
**francine's**
154:16, 163:4,
163:12, 163:23,
165:11, 166:20
**free**
7:13, 47:21,
167:23, 169:1
**freely**
43:12, 44:2,
45:10
**frequently**
297:22, 302:8
**fresher**
342:21
**fridays**
17:7
**friend**
153:5
**friendly**
357:2, 357:3
**friends**
201:17, 348:22
**frightened**
86:13, 289:17
**front**
57:20, 139:2,
264:14
**frontal**
13:8
**fruit**
303:8
**full**
208:4, 240:10,

302:6
**fully**
208:4, 208:6,
331:14
**fulton's**
214:7, 219:24,
221:24, 224:10,
234:7, 234:14,
234:17, 235:24,
240:1, 240:4,
248:23, 252:6,
254:9, 260:18,
261:23, 272:23,
274:13, 275:19,
277:5, 283:21,
284:1, 284:6,
284:16, 285:5,
285:24, 286:23,
287:5, 295:8,
295:10, 308:3,
313:24, 317:23,
320:11, 320:12,
321:8, 325:17,
334:3, 342:23,
350:11, 357:5
**function**
87:2, 119:20,
120:1, 120:5,
137:20, 181:3,
211:1, 212:7
**funny**
77:1
**further**
323:17, 357:23
**furthermore**
109:2
**fusco**
4:4
**future**
32:20, 209:24

| G |
| --- |

**g-a-r-f-i-n-k-e-l**
8:11
**gain**
63:7
**gang**
191:3, 191:7,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

115

191:10, 191:18,
192:13
**garbage**
205:14
**garfield**
107:6, 115:23,
186:8, 207:12,
274:5, 275:10
**garfinkel**
1:18, 2:1, 5:2,
5:10, 7:3, 8:5,
8:11, 39:2,
85:4, 86:19,
86:21, 86:23,
86:24, 88:13,
95:2, 100:4,
105:9, 112:2,
121:2, 127:21,
153:19, 182:5,
190:7, 218:19,
241:1, 241:2,
245:20, 251:21,
252:10, 252:17,
265:11, 272:4,
298:7, 305:22,
308:8, 308:20
**garments**
72:3
**gary**
149:7
**gave**
29:22, 35:24,
59:17, 73:2,
125:19, 126:16,
135:18, 149:6,
150:14, 163:21,
167:1, 202:6,
249:16, 322:6,
327:18, 327:19,
330:12, 330:15,
346:4
**gd**
191:21
**gears**
116:4
**general**
5:19, 6:10,
30:3, 31:17,

71:2, 107:11,
112:5, 113:24,
127:17, 155:21,
166:17, 170:2,
170:9, 170:19,
170:23, 171:4,
189:12, 282:23,
282:24
**general's**
9:1
**generate**
111:3, 299:3,
299:23, 301:9
**generated**
33:3, 84:11,
101:18, 107:12,
107:17, 107:18,
107:20, 108:2,
248:16, 248:19,
270:3, 340:19,
343:23
**gentleman**
120:19
**gentlemen**
261:13
**geographic**
67:17
**geographical**
67:21
**get-together**
116:7
**getting**
10:15, 18:15,
19:3, 63:10,
129:8, 133:17,
144:1, 155:23,
197:11, 239:9,
269:9, 294:6,
326:9, 328:24
**ghetto**
315:4, 315:7
**gillespie**
3:20, 7:21,
7:22
**gina**
64:11, 64:24,
65:9, 68:19,
68:21, 68:22,

68:24, 69:7,
69:16, 69:17,
70:6, 70:8,
70:11, 70:13,
71:12, 348:22,
349:12
**girl**
155:22, 169:4,
196:9, 208:16
**girls**
155:7, 208:2
**gist**
353:13
**give**
10:4, 32:2,
55:6, 58:22,
88:24, 94:23,
101:19, 140:3,
153:8, 167:5,
210:5, 214:9,
225:3, 225:7,
232:6, 232:21,
233:12, 250:5,
253:18, 253:20,
262:1, 262:15,
277:6, 280:22,
280:24, 281:3,
282:4, 282:7,
285:16, 287:13,
292:2, 294:19,
312:12, 313:6,
326:15, 326:16,
326:21, 327:1,
329:7, 329:10,
329:20, 329:24,
330:6, 337:5,
355:9
**given**
35:5, 38:15,
38:22, 39:17,
39:20, 61:16,
62:2, 62:15,
71:2, 71:5,
74:17, 142:23,
246:21, 259:8,
262:22, 313:2,
318:11, 328:10,
331:23, 332:8,

332:13, 333:13,
333:19, 336:17,
347:10, 359:9
**gives**
31:14, 275:1,
332:3, 347:9
**giving**
122:5, 147:12,
158:3, 172:8,
305:12, 332:20
**glasses**
109:5, 195:17
**glenview**
17:7
**go**
9:23, 11:12,
11:15, 12:8,
32:4, 32:13,
36:20, 40:23,
54:3, 66:22,
66:23, 66:24,
67:2, 67:7,
67:11, 73:22,
74:15, 74:24,
78:7, 78:16,
86:8, 92:22,
106:5, 121:11,
123:6, 129:3,
142:19, 144:12,
144:15, 144:23,
149:11, 149:23,
150:2, 153:14,
153:16, 156:23,
157:4, 157:5,
157:10, 162:10,
168:7, 171:10,
177:20, 178:19,
196:10, 196:16,
197:24, 204:5,
209:8, 210:16,
211:7, 211:9,
211:14, 212:15,
212:20, 212:22,
212:24, 213:4,
213:6, 213:7,
218:9, 220:9,
220:14, 220:19,
223:18, 226:21,

227:17, 230:12,
233:4, 234:10,
236:16, 239:7,
241:7, 241:18,
246:22, 248:11,
248:23, 249:4,
249:13, 250:16,
253:4, 254:22,
257:13, 288:21,
289:12, 290:22,
292:6, 292:15,
293:24, 297:15,
304:17, 322:17,
322:19, 328:24,
333:6, 334:7,
341:16, 343:3,
353:15, 356:18
**god**
97:8
**goes**
65:20, 156:22,
157:2, 157:3,
227:22, 231:7,
291:21, 304:9,
304:10, 316:20,
322:9, 357:13
**going**
10:3, 10:8,
12:9, 24:21,
25:1, 30:8,
30:12, 37:6,
37:21, 48:24,
55:19, 58:23,
59:5, 62:8,
62:10, 68:3,
82:3, 85:10,
88:21, 89:13,
89:20, 90:23,
91:14, 91:15,
104:3, 106:8,
117:1, 117:13,
121:9, 122:2,
128:1, 128:3,
128:23, 149:21,
152:19, 152:23,
158:1, 162:3,
162:7, 162:11,
163:20, 167:4,

167:5, 168:21,
168:22, 169:6,
169:22, 169:24,
173:10, 173:13,
179:16, 198:16,
208:16, 211:15,
211:21, 212:21,
217:9, 220:13,
233:5, 234:20,
235:3, 237:3,
242:7, 245:23,
248:11, 263:12,
276:1, 287:23,
288:1, 288:6,
295:21, 296:22,
299:14, 304:18,
306:5, 310:16,
311:9, 316:8,
326:21, 328:6,
335:21, 353:4,
353:6, 355:24
**gone**
37:18, 75:21,
79:22, 119:14,
140:2, 147:7,
167:7, 168:10,
168:20, 172:10,
172:16, 212:6,
213:16, 217:7,
254:23, 340:20
**good**
24:18, 27:5,
133:18, 133:19,
153:2, 153:3,
160:2, 215:23,
215:24, 217:4,
231:6, 259:4,
259:13, 259:15,
259:16, 260:14
**goodness**
269:8
**gotten**
75:17, 76:19,
153:14, 343:24
**governmental**
15:8
**gpr**
102:4, 138:22,

307:19
**gprs**
306:2, 306:7,
306:8, 306:15,
306:23, 307:1,
307:4, 307:12,
307:18
**grab**
274:16, 287:24
**grade**
220:15
**graduate**
11:18, 12:19,
13:23, 14:10,
14:15
**graduated**
16:18, 16:22,
17:1, 18:19
**graduating**
208:6
**graf**
83:10, 83:11,
190:14, 192:6,
192:17
**grand**
23:17, 210:13,
210:16, 210:17,
210:22, 210:23,
210:24, 211:3,
211:7, 211:10,
211:14, 211:15,
211:18, 211:22,
212:2, 212:3,
212:6, 212:14,
212:16, 212:21,
212:22, 212:24,
213:4, 213:7
**granted**
252:18
**gravity**
52:7
**gray**
18:18
**great**
105:4, 231:13
**green**
86:2, 289:6
**greg**
28:1, 28:3,

65:4, 65:6,
349:2
**ground**
9:23
**groundskeeper**
191:6, 208:5
**group**
17:15, 17:18,
183:13, 191:5,
223:1, 306:1
**grove**
3:15
**grunting**
218:1
**guess**
18:4, 18:6,
18:23, 49:18,
63:10, 68:7,
91:2, 95:15,
95:16, 106:11,
141:1, 189:19,
205:11, 213:2,
236:20, 277:9
**guessing**
57:12, 57:13,
119:3, 192:14
**guilt**
43:5, 126:21,
126:23, 305:3,
350:11
**guilty**
72:22, 298:18,
298:22, 299:10,
302:7
**gun**
62:19, 63:3
**guy**
64:21, 192:13
**guys**
59:21, 67:10,
68:12, 68:13,
68:15, 316:22

**H**

**habit**
273:9
**hague**
16:9

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

117

**hal**
7:3, 88:24,
144:15, 152:10,
159:1, 159:17,
257:10, 259:11,
310:20
**half**
24:12, 26:7,
73:23, 169:13,
169:15
**halloran**
83:6, 83:7,
190:13
**halsted**
86:3, 201:13,
289:7
**hand**
41:18, 249:15,
325:3, 354:4,
359:17
**handcuff**
123:24
**handcuffed**
123:11, 124:1
**handed**
153:18, 341:19,
341:21
**handle**
220:22, 221:5
**handled**
209:13, 209:15,
209:21, 209:22
**handling**
67:22, 84:19,
141:2
**hands**
322:9
**handwriting**
95:6, 100:8,
105:14, 194:2
**handwritten**
5:13, 5:15,
5:17, 6:3,
31:18, 31:19,
31:23, 32:2,
32:6, 32:23,
33:3, 33:7,
34:14, 47:23,

51:15, 51:19,
52:4, 52:10,
54:1, 59:13,
59:18, 70:21,
71:4, 71:10,
94:21, 95:5,
99:24, 101:6,
102:5, 102:19,
102:22, 105:13,
108:15, 142:9,
142:10, 143:11,
150:7, 155:6,
214:7, 227:9,
234:3, 274:8,
274:14, 275:2,
278:9, 280:11,
282:6, 282:8,
284:16, 324:1,
329:10, 335:19,
338:13, 339:19,
357:17
**handwrittens**
227:13
**handy**
204:11
**hang**
67:10, 254:8
**happen**
39:5, 73:22,
149:11, 253:16,
293:4
**happened**
8:21, 17:14,
37:14, 37:15,
37:23, 51:3,
55:1, 55:7,
58:17, 58:19,
89:18, 135:19,
152:12, 156:1,
170:3, 217:14,
225:4, 233:18,
234:2, 269:23,
280:14, 354:4
**happening**
234:9
**happens**
67:12
**harassed**
196:20, 196:24

**hard**
42:15, 45:11,
67:2, 122:7,
226:19, 226:20,
227:15, 227:19,
228:7, 304:21
**harder**
45:2, 46:13
**harm**
323:16
**harold**
1:18, 2:1, 5:2,
8:5, 8:11
**hatzalah**
20:15
**head**
58:1, 61:10,
79:24, 147:10,
149:5, 280:23,
351:4, 355:14
**heading**
185:2
**hear**
209:6, 315:10
**heard**
310:22, 310:23,
315:3, 315:6,
315:13
**hearing**
23:17, 80:19,
180:5, 261:24,
266:22, 267:20,
268:3, 325:16
**hearings**
23:7, 23:8,
23:10, 23:13,
23:15, 23:19,
24:11, 268:10
**hebrew**
11:17, 11:23,
12:8, 12:9,
12:13, 20:15
**hedging**
296:14
**held**
2:2, 7:6
**help**
38:4, 43:3,

47:4, 137:17,
138:4, 210:8,
214:6, 249:5,
356:4, 356:15
**helpful**
43:10, 113:10,
114:1, 143:2
**helps**
356:5
**here**
9:24, 11:9,
37:1, 82:2,
90:21, 95:6,
110:22, 112:21,
157:22, 158:13,
160:7, 161:18,
190:9, 196:18,
202:8, 206:16,
210:11, 221:14,
232:19, 236:21,
265:9, 266:20,
269:9, 282:4,
293:12, 296:18,
300:17, 306:10,
308:1, 323:5,
323:13, 325:10,
335:13, 339:5,
343:19, 344:9,
344:23, 345:10,
345:15, 358:1
**here's**
42:1, 129:13,
129:14, 254:12,
339:11
**hereby**
359:7
**hereunto**
359:16
**hey**
270:1, 314:10,
337:22
**hi**
312:6
**high**
11:12, 11:18,
208:7
**himmel**
16:10

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                                    118

**himself**
57:22, 58:5,
87:1, 90:4,
90:18, 90:22,
91:17, 92:16,
92:17, 92:21,
92:23, 92:24,
116:2, 132:15,
134:13, 139:24,
144:8, 171:22,
191:18, 197:5,
201:6, 250:20,
251:7, 292:21,
292:23, 351:23
**history**
5:20, 121:12,
121:16, 122:1,
122:4, 308:4
**hit**
10:15, 182:19,
182:20
**hold**
45:4, 62:7,
62:8, 87:16,
88:21, 90:10,
106:3, 109:24,
110:14, 110:15,
110:16, 184:2,
208:10, 236:13,
269:13, 294:10,
316:11, 353:6,
354:10
**hole**
206:16
**holidays**
25:12
**home**
78:11, 78:14,
78:16, 78:18,
78:19, 78:21,
85:20, 88:1,
88:19, 109:11,
116:15, 117:2,
117:19, 118:6,
118:23, 156:23,
157:2, 157:3,
157:4, 157:6,
157:10, 157:11,

166:20, 201:9,
201:14, 202:11,
206:5, 206:6,
206:7, 206:9,
206:10, 206:13,
216:1, 218:9,
221:23, 242:4,
288:24, 291:9,
291:24, 293:7,
294:7
**homicide**
23:16, 152:16,
215:6, 306:14,
325:20
**honest**
118:18, 144:6,
145:17, 147:12,
150:16, 150:22,
151:5, 169:2,
231:10, 250:17,
285:23, 286:7,
286:12, 326:16,
345:7
**honestly**
76:12, 94:20,
262:17
**honesty**
122:5
**hopes**
55:5, 239:9,
250:1
**hoping**
63:7
**hospitals**
20:3
**host**
116:6
**hosted**
116:21
**hosts**
27:24
**hour**
60:21, 61:3,
61:13, 65:16,
71:18, 73:23,
169:13, 169:15,
217:20
**hours**
116:14, 134:17,

134:22, 201:10,
245:6, 245:10,
246:17, 255:16,
255:18, 257:2,
257:6, 258:8,
276:16, 277:3,
316:20
**house**
86:6, 109:7,
154:16, 155:9,
156:19, 163:4,
163:23, 206:1,
289:10
**howard**
149:7, 149:8
**huerta**
57:21
**huh**
217:23
**hundreds**
57:10, 57:11,
57:12, 57:15,
280:15, 280:16,
298:17, 298:21,
299:9, 299:14,
299:17
**hungry**
152:2
**hurt**
46:20, 47:1
**husband**
65:2, 65:3,
349:2
**hypothetical**
43:15, 45:17,
53:7, 62:23,
103:18, 114:15,
122:21, 142:18,
178:18, 196:5,
197:21, 317:19,
332:22, 333:4,
333:10
**hypothetically**
55:18, 317:13

---
            **I**
**idea**
76:4, 98:9,

100:16, 101:2,
103:12, 215:23,
220:8, 237:8
**identification**
85:5, 95:3,
100:5, 105:10,
112:3, 121:3,
121:13, 121:16,
127:22, 153:20,
182:6, 190:8,
218:20, 245:21,
265:12, 272:5,
298:8, 305:23,
308:9, 308:21
**identified**
101:7, 125:7,
125:8, 175:4
**identifies**
274:14
**identify**
192:4
**identifying**
125:2, 295:21
**illinois**
1:2, 1:19, 2:7,
2:15, 3:7, 3:15,
3:23, 4:7, 4:15,
7:8, 20:9, 47:7,
47:9, 136:18,
359:6, 359:24
**images**
13:16
**imagine**
50:17, 169:7
**imaging**
13:12, 13:13,
13:17
**immediately**
125:11
**impacted**
217:3
**impaled**
282:14, 282:20,
282:22, 282:23,
282:24, 283:5,
283:10
**impalement**
283:15, 283:17

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

119

impaling
283:18
impeach
269:2, 342:14
implicate
252:3, 252:4,
294:2
implicated
54:21, 90:18,
91:17, 92:17,
116:2, 176:21,
247:22, 248:1,
250:15, 254:6,
281:16, 318:14,
326:20, 327:16,
331:3
implicates
318:17
implicating
90:22, 92:21,
144:7, 317:24,
318:12, 318:15,
318:16
importance
51:23, 110:21
important
34:17, 34:22,
34:24, 35:2,
35:4, 37:8,
38:14, 38:16,
38:17, 51:21,
62:15, 99:21,
102:13, 104:21,
109:21, 110:9,
117:12, 143:7,
162:21, 231:10,
344:24, 345:2
imposed
122:18
improper
316:2
impropriety
9:2
in-person
69:22, 71:13
inaccuracies
270:4
inaccurate
91:6, 244:8,

244:11, 250:14,
268:18, 268:22,
269:20
inadmissible
332:4
inappropriate
158:4, 158:9,
158:17
incident
168:23, 193:18,
198:21, 198:23,
199:6, 199:12,
200:20, 200:22,
201:2, 202:2,
203:2, 206:19,
207:8, 241:14,
241:15, 252:21,
290:18, 290:19
incidentally
190:16
include
34:23, 35:10,
35:13, 44:14,
45:1, 45:3,
45:7, 45:8,
46:12, 166:10,
166:13, 179:5,
184:7, 185:10,
273:17, 273:18,
323:24, 324:5,
338:14, 339:18
included
34:14, 35:17,
35:20, 68:16,
100:14, 102:14,
110:22, 111:6,
111:21, 116:15,
126:23, 161:1,
172:17, 198:19,
202:2, 294:4
including
45:20, 132:14,
136:20, 282:6,
333:18
incomplete
43:14, 45:16,
53:6, 62:22,
103:18, 114:15,

122:20, 142:17,
178:18, 196:4,
197:21, 317:19,
332:21, 333:3,
333:9
inconsistencies
142:15, 283:20
inconsistent
48:9, 55:13,
55:15
incorporated
115:14, 143:13
incorrect
244:21
increase
168:11, 300:14,
301:6
incriminate
292:20
incriminated
139:23, 201:6
incriminates
252:7
incriminating
55:8, 73:3,
82:6, 92:23,
150:12, 150:14,
151:1, 155:21,
198:5, 210:6,
263:9, 302:6,
322:6, 338:18
inculpate
126:23, 250:20,
292:21
inculpated
58:4, 90:4,
251:7
inculpating
58:14, 197:4,
292:23
inculpatory
42:10, 42:22,
43:4, 47:21,
54:12, 54:20,
57:4, 58:3,
58:11, 58:24,
63:5, 93:6,
96:11, 151:3,

151:11, 237:9,
239:11, 250:2,
253:2, 257:5,
261:20, 281:14,
315:17, 321:10,
321:18, 324:20
indeed
48:10, 124:1
independent
238:1, 280:8
independently
256:16
indicate
10:20, 175:17,
213:3, 276:18,
344:10
indicated
95:11, 132:11
indicates
112:12, 113:2,
174:17, 184:18
indicating
48:19, 88:15,
265:21
indication
142:22, 212:20,
212:23
indictment
23:17
individual
4:2, 8:1,
31:24, 32:1,
34:11, 36:5,
36:13, 41:10,
49:22, 55:5,
55:6, 55:13,
56:3, 111:5,
133:7, 178:22,
179:6, 202:8,
210:4, 230:1,
231:11, 287:8
individuals
50:10, 51:2,
54:24, 73:2,
93:11, 135:3,
200:24, 294:18,
298:17, 298:22,
299:10, 299:13

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019          120

**inference**
38:10, 204:7
**inflicted**
283:17
**influenced**
329:5
**inform**
247:8
**informal**
30:23, 349:11,
349:13
**information**
32:20, 34:13,
55:2, 55:11,
61:21, 61:23,
62:21, 63:12,
63:15, 63:17,
94:4, 96:10,
96:12, 104:16,
196:7, 200:21,
201:1, 202:18,
231:8, 268:17,
273:10, 273:13,
273:17, 315:22,
316:15, 317:10,
319:7, 322:2,
324:5, 327:21,
346:7
**informed**
87:3, 210:3
**infusing**
356:16
**initial**
27:21, 74:15,
144:4, 147:18,
170:20, 171:2,
243:7, 243:22,
254:11, 254:17,
338:15, 338:17,
339:18
**initially**
22:3, 33:14,
119:6, 125:2,
244:16, 262:7,
338:2, 338:8,
339:6
**initiate**
337:2

**injuries**
283:17
**innards**
226:18, 226:21,
226:23, 227:16,
227:20, 227:21,
228:8, 272:24,
276:19, 277:23,
339:16
**innocence**
356:18
**innocent**
331:9
**inquire**
45:22, 54:4,
259:6
**inquiry**
121:6, 163:18
**insert**
226:18, 278:7,
278:13, 278:19
**inserted**
116:1, 275:23
**inserting**
274:15
**inserts**
206:20
**inside**
106:18, 186:6,
227:1
**insofar**
319:24
**instincts**
95:15
**instruct**
175:22
**instructed**
137:14
**instruction**
30:21
**instructive**
95:14
**instruments**
328:8
**integrates**
20:20
**integrity**
64:4, 69:23,

313:24
**intellect**
305:11
**intelligently**
331:24
**intend**
315:21, 316:14,
317:9
**intended**
300:19, 300:20
**intent**
237:3
**intention**
315:17
**intentionally**
236:17, 273:11
**interacting**
246:5
**interaction**
243:18, 248:17,
296:11
**interactions**
286:18, 297:4,
297:13, 306:9,
306:13
**interchangeable**
192:1
**interchangeably**
189:13, 193:21
**intercourse**
86:12, 203:7,
241:24, 289:16,
291:4
**interest**
22:4, 28:23,
111:13, 163:14,
163:16, 359:14
**interested**
12:12, 26:12,
26:17, 26:18,
26:22, 143:4,
299:24
**interesting**
300:1, 301:21
**intermittently**
264:8, 264:12
**internal**
20:20

**internet**
64:2
**interrogated**
332:18
**interrogates**
231:17
**interrogation**
55:24, 332:12
**interrogations**
258:9
**interrogatory**
23:20, 23:23
**interrupt**
105:1
**interview**
43:21, 49:8,
49:13, 49:16,
49:20, 50:12,
50:20, 51:1,
55:24, 63:3,
64:5, 64:7,
64:14, 64:16,
71:13, 71:17,
86:24, 89:9,
91:19, 92:22,
93:1, 98:22,
101:21, 123:16,
124:5, 124:10,
126:7, 127:3,
127:4, 139:6,
144:13, 166:11,
170:20, 171:8,
177:14, 178:1,
178:16, 178:21,
179:1, 179:6,
179:9, 179:22,
182:3, 224:11,
230:14, 231:24,
232:8, 233:1,
233:11, 234:8,
238:13, 240:1,
240:5, 240:24,
248:23, 252:10,
252:18, 252:20,
254:15, 255:2,
276:22, 279:18,
286:5, 312:9,
312:12, 314:9,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

121

322:1, 326:5,
326:6, 331:14,
343:14
**interviewed**
37:13, 39:1,
50:7, 50:24,
64:10, 64:11,
82:5, 88:7,
91:18, 111:13,
180:12, 293:16
**interviewing**
58:10, 122:9
**interviews**
231:7, 231:19,
258:8
**intifada**
19:19, 19:23
**intimidation**
331:18
**intrinsic**
198:5
**introduce**
7:12
**introduced**
87:1, 119:14,
124:22, 160:20
**introducing**
296:8, 351:23
**investigate**
131:19, 210:7,
230:4, 230:9,
230:21, 230:23,
232:3, 232:4,
325:11, 325:13,
325:19, 325:24
**investigating**
50:3, 279:17,
306:14, 326:4
**investigation**
51:5, 52:9,
70:14, 75:12,
77:15, 77:19,
80:17, 82:3,
86:22, 109:21,
110:9, 119:20,
119:23, 120:1,
120:5, 120:10,
120:16, 123:1,

125:21, 131:23,
132:13, 135:23,
140:22, 161:16,
170:15, 176:7,
186:15, 193:2,
193:8, 209:23,
215:6, 215:15,
224:20, 225:4,
225:11, 231:21,
232:1, 232:8,
232:24, 259:8,
322:19, 327:20,
328:13, 350:9
**investigations**
41:19, 306:17
**investigator**
197:15, 198:2,
210:2, 229:18,
326:2, 328:4
**investigators**
98:24, 117:23,
118:13, 122:24,
132:14, 133:6,
134:12, 189:16,
191:22, 191:24,
192:2, 198:14,
251:19, 258:13
**investigatory**
230:16
**invoked**
317:14
**involve**
179:15, 317:6
**involved**
12:15, 98:24,
189:19, 206:4,
220:5, 331:7
**involvement**
64:18, 82:7,
87:15, 91:19,
118:1, 118:3,
118:20, 169:2,
215:5, 215:8,
225:18, 230:2,
237:7, 259:7,
287:9, 307:2,
326:10, 329:1,
330:17, 338:2,

338:8, 338:21,
339:8
**involves**
327:21
**involving**
8:15, 8:22,
13:8, 70:14,
71:2, 78:23,
143:5, 170:15
**israel**
11:17, 14:12,
14:16, 19:9,
19:19, 20:1,
20:2, 319:18
**issue**
141:10, 270:2,
314:17, 331:13,
340:13
**issued**
121:6, 121:12
**issues**
148:7
**item**
196:2
**itself**
90:14, 90:15,
292:8, 293:12

---

**J**

**jack**
83:6, 83:7
**jacket**
5:23, 6:8,
29:24, 31:15,
52:23, 53:2,
53:11, 53:16,
53:23, 59:19,
59:23, 76:9,
109:9, 114:12,
140:12, 140:17,
142:20, 142:21,
143:1, 143:6,
143:8, 143:21,
164:9, 164:11,
166:1, 166:8,
182:8, 183:3,
183:5, 187:13,
187:14, 192:2,

199:3, 200:17,
200:19, 207:4,
210:12, 215:4,
215:12, 226:17,
226:20, 227:1,
227:5, 227:14,
227:15, 227:20,
256:19, 272:10,
272:13, 273:1,
273:5, 276:20,
277:23, 338:15,
338:20
**jackets**
141:5, 141:12,
142:2, 143:15,
226:1, 226:15,
342:18, 343:20
**jackson**
4:13
**jail**
180:4
**james**
318:1
**jane**
183:23
**january**
18:16, 18:23,
19:4
**jarring**
354:5
**jew**
25:9
**jewish**
20:13
**jim**
83:14, 105:22,
106:1
**jimmy**
284:8
**job**
1:22, 41:11,
41:13, 48:4,
48:9, 120:11,
136:4, 136:5,
205:16, 210:7,
217:23, 218:1,
273:17, 332:7
**jobs**
305:1

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

122

**joe**
152:16, 154:3
**john**
14:3, 14:7,
16:18, 140:19,
183:22
**johnny**
140:8, 145:9
**johnson's**
241:11, 251:11,
290:15, 291:16
**joined**
29:20
**josé**
57:21
**judge**
16:4, 16:7,
16:9, 16:10,
16:11, 57:20,
129:18, 129:19,
148:13, 149:8,
180:5, 219:9,
236:18, 317:6
**judges**
16:8
**july**
18:5, 24:2
**jumped**
30:10
**jurisdiction**
221:7
**jury**
23:17, 210:13,
210:16, 210:17,
210:22, 210:24,
211:4, 211:7,
211:10, 211:14,
211:15, 211:18,
211:22, 212:3,
212:6, 212:14,
212:16, 212:21,
212:22, 212:24,
213:4, 213:7,
261:13, 264:14
**justice**
305:19
**jutted**
193:6

---
**K**
---
**kane**
359:5
**kansas**
11:17, 11:21,
12:2, 12:17,
12:20, 14:11,
20:5, 20:8
**kathleen**
3:12
**keep**
21:21, 28:20,
281:20, 281:23,
281:24, 340:5,
341:21, 342:5,
352:24, 354:7,
355:23, 357:15
**kenny**
82:23
**kept**
78:9, 340:10,
342:17, 344:18
**kid**
98:10
**kids**
29:15, 75:24
**killed**
106:19, 113:10,
113:14, 114:7,
114:10, 155:23,
163:15, 165:19
**kind**
8:16, 16:14,
17:20, 17:21,
18:18, 25:13,
29:3, 30:18,
30:20, 31:13,
32:17, 36:24,
37:3, 43:19,
44:11, 44:21,
55:5, 61:9,
66:3, 69:4,
69:5, 73:14,
73:20, 75:22,
98:1, 110:23,
140:3, 143:2,
144:23, 150:6,

150:10, 151:1,
189:12, 203:14,
212:9, 216:24,
228:10, 303:14,
311:9, 311:10,
314:10, 319:14,
322:24, 329:15,
329:22, 331:6,
349:9
**kinds**
337:13
**kissing**
104:1
**knew**
26:13, 26:16,
58:5, 77:22,
96:8, 99:12,
103:7, 108:22,
134:16, 134:21,
141:11, 141:18,
141:20, 177:15,
178:14, 180:10,
191:12, 200:14,
270:17, 270:24,
320:14, 320:19
**knock**
128:11
**knowing**
332:18
**knowledge**
84:23, 99:23,
100:13, 101:2,
110:20, 119:9,
119:22, 148:23,
151:22, 176:2,
180:12, 180:15,
190:21, 195:22,
202:24, 223:13,
225:12, 228:16,
230:2, 237:6,
244:12, 244:14,
255:5, 255:9,
256:13, 256:16,
263:10, 284:9,
299:17, 344:17,
348:3
**known**
186:2, 273:12,

327:22
**knows**
99:5, 196:18,
354:24
**kosberg**
4:19, 7:11

---
**L**
---
**lab**
12:15, 13:6,
229:16
**labeled**
323:12
**laborer**
206:4
**lack**
66:3
**ladies**
261:12
**land**
140:4
**language**
34:6, 35:2,
36:16, 296:19,
309:5
**large**
170:20
**larger**
170:22, 171:6
**lasalle**
2:5, 7:7
**last**
15:12, 16:22,
17:8, 17:21,
17:22, 18:13,
21:14, 21:17,
21:23, 29:6,
60:14, 60:16,
60:17, 60:22,
61:12, 65:7,
71:17, 80:18,
108:20, 111:18,
113:12, 132:17,
145:3, 147:23,
165:20, 176:13,
207:7, 210:15,
234:10, 242:10,
265:14, 278:13,

278:14, 288:5,
290:14, 312:3,
312:6, 312:15
**lasted**
27:6
**late**
218:4
**later**
36:21, 37:4,
44:8, 45:2,
73:8, 89:19,
122:7, 126:11,
126:16, 135:6,
157:14, 161:19,
162:21, 166:21,
179:22, 283:11,
283:13, 324:8
**latter**
222:23, 319:1,
319:4
**law**
3:12, 4:12,
7:7, 12:10,
14:5, 14:13,
14:16, 14:18,
14:22, 15:12,
15:23, 17:1,
18:19, 25:1,
25:6, 27:10,
29:17, 36:14,
73:4, 143:16,
143:18, 211:24,
212:7, 251:24,
304:24, 319:10,
319:20, 328:7,
332:15, 335:23,
336:23, 337:9,
337:18, 356:24
**lawsuit**
312:7, 313:7,
313:10, 314:6,
352:12, 352:17
**lawyer**
9:22, 17:15,
18:17, 24:21,
26:12, 34:19,
34:21, 44:5,
44:10, 44:13,

80:24, 81:1,
81:5, 119:16,
119:18, 142:3,
143:7, 198:3,
210:2, 210:11,
229:11, 229:16,
236:19, 251:22,
251:23, 258:15,
258:17, 258:21,
269:18, 279:16,
280:17, 295:23,
296:6, 319:19,
330:24
**lawyers**
18:20, 19:2,
19:4, 19:5,
27:15, 210:10,
345:3
**lay**
140:4
**laying**
97:5, 97:6
**lead**
48:2, 55:21,
330:12
**leading**
218:14
**leads**
287:5
**learn**
50:3, 63:21,
94:1, 94:4,
107:2, 211:21
**learned**
31:17, 49:21,
94:6, 94:8,
135:2, 135:3,
190:21, 191:15
**learning**
76:14, 76:17
**least**
8:15, 87:14,
149:19, 163:14,
255:13, 256:22,
318:19, 350:17
**leave**
19:17, 21:3,
24:8, 24:14,

24:18, 32:22,
33:7, 90:23,
109:7, 109:11,
137:22, 176:19,
207:8, 261:2,
261:3, 262:9,
262:12, 263:1,
263:19, 264:13,
264:15, 264:22,
265:3, 265:4,
265:22, 265:23,
265:24, 266:5,
266:13, 267:6,
267:9, 267:11,
267:21, 337:22,
342:4
**leaving**
113:23, 114:10,
351:16
**led**
139:17, 139:19,
285:22, 286:24,
331:3, 331:15
**left**
14:15, 19:9,
23:7, 41:24,
52:22, 53:3,
85:24, 86:1,
88:1, 88:19,
117:14, 117:18,
118:5, 118:22,
142:24, 143:20,
154:18, 154:20,
155:2, 155:13,
156:18, 156:19,
163:3, 166:19,
169:7, 176:16,
179:20, 179:24,
182:10, 201:9,
225:5, 239:7,
239:24, 240:4,
261:5, 262:8,
280:5, 282:20,
289:4, 289:5,
340:7, 344:4,
344:13, 344:15,
355:17
**left-hand**
183:18

**legal**
129:1, 228:7
**length**
333:11, 333:23
**leniency**
354:16, 355:1,
355:10, 355:12
**less**
282:2
**let's**
55:18, 55:21,
85:2, 95:1,
100:2, 108:24,
111:24, 120:24,
127:19, 153:16,
153:17, 159:24,
166:7, 169:15,
182:4, 190:5,
193:23, 218:17,
222:10, 236:21,
240:12, 241:7,
251:2, 271:23,
277:7, 297:15,
298:5, 308:6,
308:18, 316:9,
316:22, 323:21,
323:23, 327:15
**lethargic**
133:4, 133:7
**letter**
352:22, 352:24,
353:2, 353:9,
353:13, 353:17,
353:21, 353:24,
354:2, 354:7
**letting**
276:2, 295:22,
326:18, 331:2
**level**
9:5, 120:14,
134:18, 135:4
**liability**
89:12
**library**
350:1, 350:2
**license**
203:15
**licensed**
18:21, 19:2,

20:6, 20:7, 20:9
**licensure**
20:8
**lie**
305:2
**likely**
176:4, 249:20
**limit**
46:17, 310:5
**limited**
314:8
**limits**
335:20
**line**
45:2, 46:14,
174:4, 219:1,
236:3, 246:1,
246:3, 246:4,
246:6, 246:14,
246:22, 254:12,
260:20, 262:3,
263:15, 265:14,
265:15, 265:16,
278:14, 278:18,
335:2, 343:8
**lines**
32:18, 173:18,
199:19, 199:20,
266:24, 278:5,
278:11, 278:16,
278:17
**link**
196:2, 197:13
**linked**
72:7
**liquor**
86:2, 156:23,
289:6
**lisa**
4:11, 8:2,
158:10
**list**
84:19, 191:23,
276:15
**listed**
183:21, 191:22,
195:15, 209:19,
273:4

**listen**
53:22, 54:1,
61:21, 92:7,
266:8, 305:9,
310:20, 327:14,
329:7, 346:15
**litigated**
304:20
**litigating**
44:10, 303:18
**litigation**
26:14, 26:16
**little**
12:21, 13:10,
16:10, 30:14,
33:5, 37:24,
181:7, 205:15,
218:17, 348:5
**lived**
45:12
**living**
166:7, 300:22
**llc**
4:4
**lo**
58:14
**loads**
14:24, 189:18
**lobe**
13:9
**location**
2:2, 66:8,
67:17, 201:8
**locations**
65:23, 66:1
**lock**
211:3, 212:14
**loevy**
3:4, 7:3
**logistically**
69:5
**logistics**
69:15, 69:19,
153:10
**long**
10:10, 18:24,
20:22, 23:1,
29:11, 30:7,

35:12, 60:20,
61:2, 61:11,
71:17, 79:9,
85:8, 119:1,
131:15, 131:20,
132:1, 134:6,
140:18, 140:20,
140:21, 147:16,
147:22, 215:7,
254:16, 258:15,
261:13, 332:18,
333:1, 334:4,
335:7, 335:14,
353:8
**longer**
334:17
**look**
21:20, 90:24,
97:1, 108:24,
112:23, 116:11,
120:18, 130:6,
130:7, 130:8,
139:3, 142:8,
143:7, 161:15,
163:24, 165:3,
165:4, 166:23,
189:19, 190:2,
193:3, 193:18,
198:6, 204:11,
207:2, 210:15,
212:19, 242:10,
246:14, 251:2,
251:8, 274:13,
277:7, 279:19,
306:5, 334:9,
343:6
**look-see**
218:18
**looked**
165:7, 238:5,
320:4
**looking**
112:19, 184:15,
187:4, 194:14,
194:16, 194:17,
194:23, 210:20,
214:6, 226:24,
255:15, 278:4,

278:9, 324:21,
325:5, 328:6
**lookout**
89:10, 155:22,
169:3, 196:8,
292:22, 292:23
**looks**
13:2, 98:2,
102:21, 130:10,
238:4, 243:24,
272:18, 309:3
**loose**
30:23
**loosely**
130:18
**lot**
12:13, 78:9,
79:8, 189:17,
204:13, 205:3,
205:7, 205:11,
205:14, 217:14,
280:17
**lots**
192:20, 192:22,
356:1
**lottery**
315:4, 315:7
**loud**
10:4, 33:21,
34:1
**low**
355:23
**lunchtime**
169:5
**lying**
251:20, 256:15,
257:18, 287:12,
287:13, 287:14,
287:16

---
**M**
---
**machinations**
327:7
**made**
22:10, 22:14,
25:14, 48:22,
58:11, 86:22,
93:6, 96:14,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

125

96:20, 129:1,
130:12, 150:15,
152:22, 177:22,
181:12, 181:20,
187:2, 189:10,
200:10, 203:16,
221:14, 225:19,
245:14, 295:13,
304:11, 310:6,
311:2, 311:4,
340:21, 343:21,
357:4, 357:14
**made-up**
293:4
**major**
305:15
**make**
32:18, 33:15,
35:7, 36:22,
42:10, 44:15,
45:1, 46:13,
47:16, 56:21,
59:7, 119:18,
128:10, 136:22,
137:9, 137:11,
137:17, 137:21,
157:23, 159:19,
161:17, 162:20,
171:15, 178:22,
180:20, 181:5,
203:24, 212:13,
218:14, 227:11,
276:10, 292:9,
307:14, 321:23,
322:3, 323:5,
340:2, 354:15,
356:14, 357:9,
357:12
**makes**
16:17, 17:22,
19:5, 30:6,
48:19, 251:17,
334:14
**making**
32:14, 37:20,
47:20, 128:9,
181:16, 209:2,
211:5, 211:6

**male**
186:2, 274:7,
274:11, 274:20,
275:6, 275:15,
276:5, 351:20,
351:21
**man**
145:6, 145:11,
238:7
**manila**
227:22, 228:6
**manipulate**
305:2, 305:12
**manner**
9:14, 30:2,
32:5, 41:5,
82:12, 104:1,
169:2, 171:14,
171:18, 171:20,
285:20, 285:21,
330:10
**manners**
144:9
**manual**
206:3
**many**
8:21, 13:21,
16:8, 18:1,
18:8, 19:6,
27:23, 27:24,
29:8, 29:15,
55:19, 58:19,
69:10, 69:22,
83:11, 124:19,
153:18, 183:16,
212:11, 234:22,
253:16, 281:11,
281:14, 282:10,
282:13, 287:22,
302:3, 333:17,
347:13, 350:23,
353:3, 354:4
**march**
207:4
**mark**
1:18, 2:1, 5:2,
8:5, 8:11,
64:21, 64:22,

69:10, 69:14,
69:16, 70:6,
70:11, 70:12,
85:2, 95:1,
100:2, 104:23,
111:24, 120:24,
127:19, 153:17,
182:4, 190:5,
245:19, 265:10,
271:23, 298:5,
305:20, 308:6,
308:18, 351:3
**marked**
85:4, 85:7,
95:2, 95:4,
100:4, 100:6,
105:9, 105:12,
112:2, 112:4,
121:2, 121:4,
127:21, 153:19,
153:21, 167:2,
182:5, 182:7,
182:11, 190:7,
218:19, 218:21,
245:20, 265:11,
268:4, 272:4,
272:6, 298:7,
298:9, 305:22,
305:24, 308:8,
308:20, 308:22
**married**
22:21, 29:9,
29:11, 76:1
**marshall**
14:3, 14:7,
16:18
**masking**
13:20
**material**
130:13, 280:18
**matriculate**
73:21
**matriculated**
17:20
**matter**
7:4, 8:17,
52:24, 131:13,
224:8

**maybe**
16:10, 26:7,
26:8, 26:19,
30:9, 30:11,
34:8, 52:6,
56:12, 57:24,
60:24, 61:1,
70:7, 79:16,
81:3, 101:24,
147:9, 152:18,
153:5, 163:1,
165:9, 166:15,
184:3, 188:11,
198:16, 205:12,
205:14, 205:19,
214:6, 221:11,
277:7, 305:7,
314:15, 318:19,
318:20, 350:1,
351:5, 354:9
**mean**
21:8, 21:20,
23:13, 47:24,
50:15, 55:17,
57:10, 60:3,
62:4, 65:14,
66:20, 69:20,
80:14, 81:7,
81:18, 95:10,
95:12, 95:19,
128:9, 163:16,
163:17, 163:19,
182:20, 191:19,
193:10, 193:23,
196:14, 200:2,
203:20, 212:21,
216:10, 221:9,
226:6, 227:2,
230:13, 230:23,
232:14, 234:1,
273:6, 293:20,
299:13, 303:20,
305:8, 306:23,
309:13, 311:5,
313:6, 317:23,
319:12, 324:18,
324:19, 326:3,
327:11, 328:4,

348:9
**meaning**
62:4, 246:23,
275:8
**means**
95:17, 131:19,
175:20, 300:10,
303:21, 339:2
**meant**
50:23, 94:2,
110:5, 127:10,
199:24, 205:11,
231:1, 326:4,
336:4
**measured**
131:13
**media**
300:21, 356:9
**medic**
19:20
**medical**
11:8, 148:7,
156:6, 193:15,
194:7, 195:10
**medication**
11:7
**meet**
50:2, 60:11,
60:20, 61:6,
67:4, 67:6,
70:5, 81:14,
239:4, 271:9
**meeting**
60:18, 61:2,
61:4, 61:12,
69:6, 69:23,
80:5, 97:24,
126:6, 157:1,
234:8, 319:24,
349:20
**member**
181:13, 181:20,
191:3, 191:7,
191:10, 191:18
**members**
29:17
**memorialize**
31:5, 31:9,

36:3, 150:5,
229:24
**memorialized**
151:4
**memorializing**
42:21, 323:15
**memories**
161:21
**memory**
111:22, 115:8,
115:13, 139:9,
168:1, 171:19,
173:14, 175:8,
176:3, 176:15,
177:9, 177:10,
234:5, 234:12,
243:5, 243:6,
245:17, 268:5,
270:11, 270:15,
286:4, 296:2,
296:4, 296:11,
297:9, 306:20,
306:24, 307:18,
312:21, 335:18,
337:20, 337:24,
342:20, 347:20,
347:22, 348:12,
351:16, 352:21,
353:18, 353:24
**men**
207:22, 208:3,
290:3
**mental**
303:14
**mentioned**
100:11, 242:22
**meritless**
317:3
**messages**
352:16, 352:18
**met**
59:12, 60:13,
60:16, 60:23,
61:7, 61:14,
75:21, 75:22,
79:23, 81:13,
81:23, 91:24,
92:14, 93:5,

95:13, 95:18,
99:22, 119:13,
121:18, 121:22,
123:12, 123:15,
124:14, 131:11,
157:13, 157:20,
162:14, 166:21,
170:21, 201:17,
214:12, 228:11,
235:4, 235:20,
236:4, 237:2,
238:5, 238:9,
238:12, 238:22,
239:5, 244:16,
245:2, 256:14,
256:17, 268:6,
284:7, 284:8,
351:5, 357:1
**metal**
193:20, 206:19,
274:7, 274:12,
274:15, 274:21,
275:15, 275:23
**metrics**
35:11, 145:2,
333:18
**michael**
5:13, 94:18,
95:5, 96:3,
96:7, 96:10,
96:13, 96:23,
97:3, 97:5,
97:7, 97:12,
97:16, 97:20,
97:24, 98:2,
98:7, 98:19,
99:2, 99:5,
101:21, 115:11,
210:21, 211:9,
211:13, 213:4,
227:7, 306:12
**middle**
85:13, 199:15,
227:16, 288:12
**might**
37:10, 40:7,
43:24, 44:6,
44:7, 45:1,

45:3, 45:7,
45:9, 45:18,
45:19, 46:13,
47:15, 49:17,
56:5, 66:14,
66:15, 66:19,
67:9, 67:11,
67:21, 72:9,
72:10, 74:2,
77:4, 81:3,
84:7, 84:21,
94:23, 95:10,
104:11, 111:5,
114:7, 130:23,
130:24, 131:17,
133:8, 147:1,
149:10, 161:6,
161:7, 162:23,
162:24, 166:6,
167:22, 175:18,
191:15, 192:20,
196:2, 197:3,
203:14, 204:3,
204:6, 204:7,
205:19, 216:12,
216:24, 218:16,
226:5, 230:24,
237:20, 266:18,
300:1, 301:15,
302:1, 312:5,
315:2, 323:16,
324:5, 324:6,
325:23, 326:20,
333:7, 333:8,
334:21, 342:10,
343:24
**mike**
59:15, 59:16,
80:2, 80:4,
80:7, 80:23,
81:14, 81:15,
81:24, 82:10,
82:17, 92:13,
92:15, 92:19,
93:4, 93:16,
94:5, 94:13,
119:8, 125:4,
126:5, 164:23,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

127

170:13
**mikey**
156:20, 156:23,
157:1, 157:5,
166:20
**mikey's**
163:22
**military**
183:1
**mind**
47:13, 114:8,
151:11, 151:7,
322:20
**minute**
91:12, 138:19,
194:13, 263:17,
264:5, 264:9,
286:22
**minutes**
79:12, 119:4,
148:8, 157:14,
166:21, 169:9,
169:12, 254:19,
255:3, 257:4,
258:11, 261:16
**miranda**
135:18, 154:10,
170:1, 246:21,
332:5, 355:3
**mirandized**
125:11, 125:13,
154:11, 160:21
**mirandizing**
30:3, 125:16,
303:10
**mischaracterizes**
41:16, 118:8,
194:9, 198:11,
201:23, 269:14
**misconduct**
302:23, 303:13,
303:17, 304:9,
309:9, 311:8,
311:10
**misdemeanor**
19:14, 19:16,
22:16
**misled**
236:18

**missed**
288:4
**missing**
165:17, 273:13,
300:17
**misstates**
44:17, 45:5,
59:3, 110:1,
111:9, 134:8,
135:10, 168:17,
188:24, 211:12,
213:12, 231:3,
237:23, 254:2,
258:3, 275:17,
277:12, 279:5,
279:24, 280:21,
295:5, 299:20,
300:16, 301:17,
315:24, 324:15,
331:10, 338:3,
338:23
**misunderstood**
266:18
**modeling**
13:7
**modest**
355:23
**modifications**
32:15, 35:7
**moment**
224:3
**money**
342:18
**month**
21:19, 26:8,
30:9, 30:11,
30:12, 30:15,
61:1, 74:7,
74:8, 74:11,
74:12, 74:14,
74:17, 183:12,
312:6
**month's**
75:1
**months**
14:1, 14:13,
19:22, 20:2,
23:3, 26:8,

27:7, 60:14,
60:24, 61:1,
108:20, 312:15
**mora**
189:15
**moras**
141:9, 143:19
**more**
15:16, 25:15,
41:17, 66:4,
77:16, 101:19,
116:5, 176:4,
179:2, 249:19,
253:19, 282:11,
284:19, 300:8,
300:10, 347:20,
348:1, 348:9,
348:13, 353:11,
355:23
**morning**
65:16, 73:13,
73:16, 73:24,
74:21, 75:14,
76:13, 96:24,
132:21, 133:15,
173:20, 178:24,
200:15, 213:17,
214:13, 216:6,
245:16, 246:17,
255:13, 256:2,
256:11, 256:20,
257:19
**moser**
83:19, 190:14,
192:7, 192:18
**most**
17:16, 17:17,
27:8, 166:13,
303:5, 314:8
**mother**
97:17
**mother's**
356:7
**motion**
6:7, 16:16,
57:5, 57:23,
84:13, 173:23,
174:2, 174:22,

200:8, 261:23,
262:23, 265:1,
265:6, 265:19,
266:22, 267:1,
267:10, 267:20,
267:24, 268:2,
268:9, 268:13,
268:23, 269:6,
270:1, 303:5,
303:11, 303:21,
303:24, 304:2,
304:3, 304:5,
304:8, 304:17,
307:20, 311:5,
325:17, 334:11,
345:6
**motions**
16:2, 56:16,
56:23, 57:13,
59:20, 59:21,
60:2, 84:17,
84:21, 84:24,
269:17, 270:12,
302:20, 303:4,
307:10, 307:13,
342:12, 342:22
**motive**
42:11, 42:16,
42:18, 43:7,
43:10, 43:12,
43:22, 43:24,
44:7, 44:8,
44:11, 45:1,
45:3, 45:7,
45:8, 45:10,
45:14, 45:18,
45:22, 46:7,
46:12, 46:15,
46:22, 47:2,
47:14, 324:1,
324:5
**mouth**
93:21, 106:19,
127:8, 186:6,
187:22, 188:21,
189:5, 193:6,
203:6, 252:6,
274:7, 275:22,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

128

278:2, 282:22
**move**
128:15, 128:23,
316:23
**moving**
246:20
**much**
20:24, 28:21,
71:14, 163:20,
163:21, 169:6,
281:1, 287:19,
296:13, 320:4,
331:4, 349:6,
355:17
**muldoon**
140:8, 140:19,
144:8, 145:9,
183:22, 184:4,
184:5, 184:9
**muldoon's**
184:8
**multiple**
57:8, 57:9,
314:13, 343:22
**multistate**
18:7, 18:8
**murder**
51:24, 52:3,
52:18, 52:22,
76:15, 76:18,
77:14, 77:17,
77:18, 77:19,
82:3, 90:4,
90:5, 90:18,
90:23, 91:17,
122:10, 123:4,
123:5, 139:24,
145:1, 145:23,
149:16, 149:17,
169:4, 176:22,
177:20, 179:9,
179:24, 210:7,
212:10, 222:21,
222:22, 224:19,
237:7, 237:10,
240:6, 246:24,
247:22, 248:1,
252:3, 252:5,

252:7, 253:2,
253:10, 254:7,
261:9, 264:6,
280:20, 281:6,
281:11, 281:15,
281:16, 282:9,
282:13, 283:14,
286:21, 287:9,
294:6, 317:17,
318:22, 321:12,
321:20, 325:4,
325:14, 330:17,
346:6
**murdered**
196:9
**murders**
51:11, 51:14,
52:6, 52:7,
282:9
**must**
183:22, 192:13,
331:22
**myself**
16:16, 24:23,
60:19, 81:5,
98:24, 118:14,
118:15, 119:8,
119:14, 125:7,
125:10, 126:11,
135:21, 152:18,
160:20, 181:16,
261:6, 263:19,
272:3, 295:21,
335:23

---

## N

**name**
8:9, 26:11,
49:17, 49:18,
49:20, 61:8,
65:7, 69:18,
70:9, 80:2,
80:16, 80:20,
82:8, 84:2,
109:9, 159:14,
160:4, 160:10,
164:12, 184:9,
185:11, 186:15,

190:3, 191:4,
236:7, 242:21,
273:4, 274:24,
275:1, 280:22,
300:20
**name's**
80:14
**named**
64:21, 191:6
**names**
51:1, 93:11,
184:7, 189:15,
189:21
**narcotics**
345:23, 345:24,
346:3
**narrative**
31:16, 53:24,
112:24, 113:1,
113:2, 188:12,
188:16, 195:7,
221:15, 275:20,
276:3, 276:5,
276:18, 277:13,
277:22, 356:16,
356:17
**nasal**
13:16
**natural**
24:23, 235:10,
235:14
**nature**
117:10, 155:21,
158:2, 196:20
**navigating**
34:8
**near**
113:3, 174:18,
175:21, 193:6
**necessarily**
66:18, 121:23,
134:20, 134:23,
145:19, 165:9,
165:10, 167:22,
283:16, 300:1,
324:16
**necessary**
34:12, 35:8

**need**
11:3, 39:3,
52:5, 53:18,
53:21, 54:10,
118:16, 129:20,
158:10, 158:11,
162:18, 173:6,
173:14, 196:19,
196:23, 198:9,
217:23, 270:4,
281:1, 317:1,
342:7
**needed**
16:15, 32:16,
39:1, 119:18,
146:24, 152:2,
220:17
**needs**
169:11, 196:21
**negotiating**
34:6, 34:7
**neither**
262:24, 293:2,
359:12
**neutral**
143:3
**never**
27:2, 34:10,
37:14, 37:22,
38:24, 53:20,
81:12, 85:20,
92:2, 128:13,
132:8, 132:15,
137:8, 137:19,
142:5, 148:24,
160:3, 171:22,
172:1, 179:4,
179:8, 181:4,
181:6, 188:1,
188:22, 205:16,
205:17, 206:2,
209:20, 223:6,
223:15, 232:15,
239:4, 249:7,
259:4, 266:15,
267:4, 267:5,
269:21, 279:9,
280:3, 288:24,

303:15, 304:19,
304:23, 306:15,
313:13, 314:11,
315:8, 315:15,
323:20, 328:2,
329:3, 329:4,
329:18, 330:2,
339:1, 339:19,
339:20, 344:4,
349:5, 354:17,
356:23
**nevis**
71:16
**new**
11:14, 75:7,
77:2, 185:2,
217:19, 218:5,
223:1
**newspaper**
62:5
**next**
10:8, 10:15,
23:5, 32:9,
32:10, 39:9,
49:1, 75:2,
75:6, 86:16,
91:2, 94:11,
104:24, 146:1,
153:4, 157:13,
159:13, 213:9,
213:17, 216:6,
217:20, 246:14,
341:7, 353:4
**nice**
156:19, 238:8
**nicholas**
3:11, 7:16
**nick**
311:21
**nigger**
315:11, 315:14
**night**
21:4, 21:7,
21:9, 65:19,
74:3, 85:21,
86:15, 94:8,
98:8, 98:11,
101:1, 102:16,

103:3, 104:3,
109:23, 110:11,
114:6, 114:7,
114:10, 117:3,
132:4, 132:20,
152:20, 162:12,
162:13, 163:4,
163:13, 163:15,
165:3, 165:19,
189:18, 192:22,
216:2, 216:13,
216:17, 241:13,
288:24, 289:19,
290:17
**nights**
74:8, 74:15
**nine**
14:1, 21:19,
65:17, 65:19
**nobody**
137:16, 137:19,
138:2, 138:15,
223:4, 223:5
**none**
293:19, 308:14,
322:20, 345:16
**nonexistence**
181:24, 301:20
**nontestifying**
320:23
**normal**
120:23, 217:8
**normally**
134:15, 141:1,
322:11
**north**
2:5, 3:5, 4:5,
7:7, 66:2, 67:8,
67:23, 68:5,
68:8, 68:12
**northern**
1:2
**notarial**
359:17
**notary**
2:14, 359:1,
359:4, 359:23
**notate**
256:21

**note**
199:7
**notebook**
226:5
**notes**
21:21, 50:17,
53:12, 53:13,
53:15, 53:17,
53:18, 53:20,
53:21, 54:10,
142:16, 142:20,
193:3, 352:1,
352:8
**nothing**
33:18, 53:10,
101:11, 112:21,
118:24, 132:10,
171:19, 181:14,
191:17, 200:14,
238:23, 252:6,
260:1, 260:2,
260:10, 260:11,
286:18, 286:19,
292:17, 297:8,
297:14, 336:24,
344:13, 354:13,
358:1
**notice**
2:12
**notifications**
183:19, 272:19
**notified**
85:15, 86:18,
273:1, 273:3
**notify**
272:22
**noun**
207:21
**number**
58:22, 112:8,
168:24, 183:18,
199:13, 253:18,
253:20, 272:17,
282:5, 282:7,
306:1, 347:16
**numbered**
173:18, 174:3,
254:10, 263:15

**numbers**
21:21

---
**O**
---

**o'brien**
83:14, 105:22,
106:1, 189:17,
190:13, 191:23,
191:24, 192:5,
192:17
**oath**
7:13, 144:22,
260:3, 260:6,
282:4, 345:5
**object**
31:2, 42:23,
58:6, 62:8,
62:10, 80:8,
81:9, 88:22,
89:3, 89:13,
91:8, 99:9,
113:16, 121:9,
128:1, 128:3,
128:5, 130:12,
130:19, 131:6,
149:21, 156:14,
158:1, 160:11,
162:8, 171:9,
173:13, 177:16,
181:8, 188:17,
197:17, 200:5,
202:20, 203:12,
204:4, 219:10,
219:18, 228:22,
228:24, 230:7,
233:5, 236:10,
236:15, 237:16,
237:22, 239:2,
239:13, 242:7,
242:24, 253:3,
257:8, 262:19,
264:17, 278:10,
279:6, 279:7,
281:17, 281:18,
283:3, 283:7,
292:4, 292:5,
314:2, 317:3,
346:12, 346:19,

353:14, 354:1
**objections**
104:10, 128:8,
128:10, 129:16,
273:14, 317:4,
317:11
**objects**
106:23, 116:1
**observe**
86:10, 97:4
**observed**
241:17, 241:22,
289:14, 290:21,
291:2
**obstruct**
317:4
**obstruction**
331:6
**obtain**
30:24, 54:11,
58:3, 84:10,
143:17
**obtained**
253:8, 280:20,
281:6, 284:15,
297:22, 302:8,
342:6, 348:14,
348:18
**obtaining**
51:15, 51:19,
258:21, 259:4,
321:10, 321:18
**obviously**
117:9, 221:15,
320:14
**occasion**
86:24, 240:24,
252:9
**occasionally**
271:7
**occasions**
58:19, 237:18,
314:13, 314:17
**occur**
56:14
**occurred**
107:5, 156:10,
207:10, 243:6,

244:13
**occurrence**
96:5
**occurs**
179:11
**october**
17:24, 18:6,
359:20
**odd**
294:23
**offender**
186:2, 186:5,
186:8, 201:9,
201:11, 201:12,
201:13, 201:15,
203:3, 203:4,
203:5, 274:2,
274:6, 275:21,
275:22
**offender's**
201:17, 207:11
**offense**
5:19, 107:11,
112:5, 326:11,
329:1, 329:2,
338:2, 338:9,
338:22, 339:8
**offer**
136:1, 136:6,
137:4
**offered**
17:19, 180:19
**offering**
137:7
**offers**
18:22, 312:11
**office**
3:21, 9:1,
15:3, 15:6,
15:10, 15:14,
15:19, 15:22,
17:4, 17:10,
18:12, 19:7,
19:10, 19:13,
19:18, 19:24,
21:3, 22:1,
23:8, 24:9,
24:15, 27:4,

41:21, 51:22,
64:1, 67:13,
81:22, 119:17,
122:22, 141:4,
141:21, 143:23,
146:7, 146:10,
212:7, 212:8,
248:24, 271:22,
349:6, 356:24
**officer**
1:14, 8:1,
108:3, 190:1,
192:12, 220:22,
231:17, 231:19,
253:8, 304:10,
304:12, 305:10,
309:9, 309:23,
310:3, 315:11,
315:14, 328:13,
336:19, 337:9,
337:18, 337:22,
356:22, 359:6
**officer's**
136:12, 232:7,
232:24
**officers**
41:24, 42:7,
112:17, 112:19,
113:3, 135:22,
189:14, 189:18,
189:22, 190:12,
192:11, 198:14,
210:10, 212:2,
230:4, 230:13,
230:20, 231:24,
252:1, 258:9,
258:14, 258:23,
302:24
**offices**
3:12, 60:14
**officials**
305:1
**officing**
353:10
**often**
21:11, 56:23,
328:7
**oftentimes**
35:17, 35:19,

55:4, 75:22,
354:2
**oh**
17:6, 24:3,
97:8, 100:20,
103:1, 153:18,
171:11, 173:23,
179:14, 222:1,
223:2, 235:16,
242:12, 248:22,
269:8, 272:2,
349:24
**okay**
10:6, 10:17,
10:22, 11:2,
24:5, 24:19,
45:13, 46:11,
57:5, 58:12,
88:12, 89:22,
97:19, 109:14,
110:4, 112:12,
112:23, 113:2,
113:7, 123:11,
127:16, 131:5,
136:14, 139:17,
154:19, 159:3,
159:10, 175:16,
178:5, 182:10,
183:20, 185:4,
199:14, 199:24,
206:12, 206:23,
207:6, 213:19,
222:9, 232:18,
233:10, 235:11,
235:16, 240:14,
241:3, 242:12,
246:3, 246:20,
250:7, 251:3,
255:10, 257:2,
260:8, 260:16,
264:24, 267:19,
268:15, 268:16,
272:19, 273:16,
275:13, 287:4,
291:10, 299:8,
317:6, 317:13,
319:21, 325:4,
330:1, 332:24,

334:20, 334:23,
336:11, 337:20,
338:1, 339:11,
340:22, 341:9,
341:13, 342:3,
345:4, 355:15
**old**
98:4, 98:5,
100:15, 100:20,
206:24, 238:9
**older**
271:21
**omitting**
273:10
**on-off**
217:8
**on-the-job**
30:13, 30:17
**once**
17:14, 17:19,
18:2, 18:10,
49:9, 69:12,
70:1, 177:21,
222:23, 310:11,
322:6, 349:18
**one**
8:13, 9:7,
10:10, 19:8,
34:3, 38:7,
46:12, 48:22,
51:7, 54:7,
57:20, 57:24,
58:23, 61:7,
61:19, 66:16,
67:21, 72:16,
74:4, 79:24,
81:13, 85:8,
85:16, 86:13,
94:6, 99:7,
105:3, 116:5,
132:12, 135:18,
137:13, 143:14,
145:13, 147:18,
150:8, 153:18,
155:14, 159:4,
159:21, 179:2,
188:9, 202:6,
226:20, 226:21,

228:7, 230:13,
238:15, 255:10,
259:22, 271:3,
278:4, 280:19,
281:3, 289:18,
290:8, 290:11,
302:2, 312:5,
329:6, 340:13,
344:3, 346:3,
347:21, 348:1,
348:9, 348:13,
349:16, 349:24,
350:17, 351:7,
351:20, 351:21,
353:17, 354:4
**ones**
57:24
**ongoing**
186:20
**only**
13:9, 34:4,
47:9, 57:6,
57:22, 78:24,
82:12, 92:16,
95:16, 123:5,
138:21, 140:15,
159:3, 170:13,
178:20, 184:5,
186:3, 195:12,
202:8, 220:3,
221:11, 229:20,
249:15, 254:5,
271:19, 307:1,
310:9, 310:12,
310:14, 310:19,
311:3, 319:15,
319:19, 340:8,
349:3, 353:17
**onset**
330:23
**onslaught**
356:12
**onward**
25:19
**open**
81:20, 81:23,
143:20, 170:11,
171:5, 190:4,

228:8, 242:11,
265:18, 268:3,
268:13, 268:21,
269:7, 290:2,
291:22, 294:4
**open-ended**
55:1, 63:6,
168:24, 170:2
**opened**
269:19
**operated**
145:23
**opine**
294:14
**opining**
284:9
**opinion**
72:20, 72:21,
73:9, 151:15,
151:17, 250:12,
269:19, 293:13,
294:20, 301:23,
313:22, 346:21
**opinions**
301:20, 346:10,
346:17, 346:23,
350:11
**opportunity**
35:5, 115:5,
132:4, 174:7,
250:5, 306:21,
307:21, 326:16,
326:24, 336:8,
345:9
**opposed**
33:22, 95:24,
189:5, 192:18
**oral**
31:12, 31:14,
32:2, 37:16,
47:10, 52:4,
52:11, 53:24,
142:11, 143:5,
143:10, 150:7,
282:6, 282:8
**orally**
86:10, 241:22,
289:15, 291:3

**orchestrated**
285:11
**order**
32:23, 44:15,
51:7, 79:2,
122:11, 122:15,
244:10, 244:16,
299:3, 330:4,
331:21
**organize**
153:3
**oriented**
120:22
**original**
341:13, 341:14,
341:16, 357:13
**originally**
28:2, 92:19
**originals**
227:11
**orthodox**
20:13, 25:9
**os**
112:9
**other's**
51:8
**others**
116:15
**otherwise**
67:9, 359:15
**out**
10:4, 19:15,
19:19, 19:20,
26:9, 27:15,
29:24, 32:18,
33:4, 33:21,
34:1, 42:16,
44:8, 49:24,
52:12, 52:14,
52:16, 52:20,
53:1, 53:15,
58:1, 64:3,
66:14, 67:10,
68:8, 73:15,
76:1, 76:8,
84:2, 89:14,
98:18, 122:16,
130:22, 131:6,

131:20, 132:3,
140:2, 140:14,
140:15, 143:19,
149:12, 149:24,
150:3, 167:24,
171:19, 177:14,
178:7, 178:8,
183:5, 184:3,
189:10, 189:18,
214:6, 214:18,
222:22, 228:6,
231:7, 249:1,
254:23, 270:5,
276:21, 290:12,
300:20, 312:16,
312:19, 319:17,
322:8, 327:15,
327:16, 328:6,
330:2, 343:12,
345:13, 351:5,
353:24, 354:13
**outcome**
359:15
**outline**
152:22
**outside**
14:19, 14:21,
32:23, 109:10,
109:13, 164:12,
164:19, 165:13,
228:1, 228:3,
336:18, 336:22,
337:8, 337:17
**ovc**
28:1, 28:15,
29:6
**ovc's**
28:12
**over**
9:23, 32:4,
60:13, 64:12,
134:17, 134:22,
166:7, 167:7,
168:2, 168:10,
168:20, 177:20,
217:20, 227:22,
258:22, 330:12,
341:18, 358:1

**overall**
148:9
**overborne**
332:2
**overlapped**
271:20
**overly**
143:1, 238:8
**own**
20:14, 20:16,
20:19, 25:14,
25:20, 51:8,
56:10, 60:3,
117:19, 118:5,
118:23, 120:13,
132:8, 249:18,
256:18, 318:23,
347:17, 357:16

---

**P**

**p**
219:8
**page**
5:2, 5:10,
10:2, 32:16,
32:17, 32:19,
76:10, 85:11,
97:1, 100:19,
100:21, 108:24,
116:12, 139:2,
154:13, 154:15,
156:18, 156:22,
156:24, 157:9,
157:13, 157:20,
157:24, 159:6,
159:7, 159:13,
159:23, 164:1,
172:10, 172:13,
173:17, 174:1,
176:11, 176:13,
187:7, 187:8,
187:9, 192:7,
193:19, 195:3,
195:4, 199:13,
199:18, 199:19,
203:3, 209:8,
209:17, 209:18,
210:15, 212:19,

218:24, 240:19,
241:10, 242:10,
242:14, 244:7,
244:8, 244:20,
244:21, 245:24,
246:14, 246:22,
251:8, 251:9,
252:4, 252:6,
252:9, 254:9,
260:17, 260:18,
262:2, 263:14,
265:13, 265:14,
266:24, 278:6,
278:7, 278:15,
288:9, 288:10,
288:11, 288:15,
288:16, 290:7,
290:14, 297:2,
297:6, 297:8,
297:11, 298:15,
307:15, 307:22,
334:9, 334:23,
340:23, 341:3
**pager**
76:22, 77:6
**pagers**
76:23
**pages**
1:23, 192:7,
236:3, 246:21,
251:2
**paid**
17:2, 17:3,
17:5, 17:18,
18:12, 18:15,
18:19, 19:3
**pair**
195:16
**paluck**
189:14, 190:2,
192:13, 192:14
**paluck's**
190:3
**panicked**
242:4, 291:8
**pants**
109:8, 163:23,
164:1

**paper**
80:15, 80:16,
80:20
**papers**
64:2
**paragraph**
32:11, 33:12,
33:15, 33:21,
34:18, 85:13,
86:16, 97:2,
100:19, 199:15,
240:22, 241:6,
241:7, 241:10,
242:13, 242:14,
244:7, 244:8,
244:20, 244:21,
251:15, 252:14,
278:14, 278:15,
278:18, 288:12,
288:16, 290:14
**paragraphs**
34:3, 34:7,
34:8, 245:1
**park**
20:13, 20:18
**parking**
78:9, 79:8
**parlance**
130:11
**parroting**
63:16
**parsed**
68:17
**part**
50:5, 65:9,
83:2, 159:7,
159:21, 191:9,
207:7, 231:21,
232:1, 232:2,
232:7, 232:13,
232:22, 233:10,
265:15, 282:22,
288:5, 290:8,
323:14, 328:10,
332:6, 332:19,
333:2
**partially**
44:9

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

133

participate
328:17
participation
230:6, 286:20
particular
21:21, 68:2,
73:12, 113:24,
159:21, 184:11,
221:2
parties
56:7, 359:14
partner
69:17, 70:8,
70:11, 70:13,
71:12, 152:18,
351:2
partnering
26:19
partners
26:8
partnership
27:5, 27:6
parts
227:19
party
55:22, 85:24,
114:11, 116:15,
116:18, 155:16,
165:20, 199:21,
201:16, 289:4
partying
201:10
pass
311:20
passing
314:20, 351:5
past
21:13, 27:16,
28:21, 217:11,
217:13, 218:4
pat
7:24, 128:19,
129:13
patrick
4:3
pattern
98:21
paula
1:24, 2:12,

7:10, 359:3
pause
172:20, 336:17,
337:5
pay
28:13, 28:15,
114:18, 220:15,
300:23
paying
300:24
payroll
27:18
pc
3:12, 4:12
peer
16:21, 17:6
pencils
226:4
pending
11:5, 194:21,
194:23, 208:11,
232:20, 239:22,
266:16, 274:19,
323:10
people
47:6, 47:8,
57:21, 67:7,
67:22, 69:23,
78:17, 87:13,
87:24, 88:18,
136:17, 137:9,
141:9, 142:14,
148:18, 148:19,
183:21, 189:17,
192:21, 192:22,
202:6, 211:2,
253:22, 271:9,
295:1, 305:2,
316:24, 317:2,
318:13, 318:15,
318:16, 350:23,
356:23
percent
95:14
perceptions
13:18, 13:19
perfect
298:16

performed
193:4, 203:7
perhaps
186:9, 213:6,
352:11
period
18:18, 19:1,
74:5, 134:14,
255:15, 255:23,
263:17, 264:5,
264:9, 354:7,
354:9
periodically
28:20
perpetrated
346:7
person
36:7, 36:10,
36:18, 38:2,
38:5, 52:1,
58:13, 60:6,
64:12, 72:7,
122:19, 159:10,
166:11, 195:12,
197:13, 197:19,
202:5, 204:11,
219:23, 287:12,
292:20, 333:17,
350:17, 351:7
person's
106:23
personal
35:13, 35:17,
71:15, 80:22,
84:22, 97:23,
99:23, 101:2,
101:7, 107:24,
108:8, 108:11,
110:20, 111:22,
115:13, 119:9,
120:7, 131:24,
133:10, 135:15,
139:7, 151:22,
160:19, 168:1,
175:5, 175:8,
176:2, 176:3,
176:15, 177:9,
177:10, 180:11,

180:15, 190:20,
195:22, 198:17,
202:24, 225:12,
228:15, 228:16,
233:21, 233:22,
243:6, 244:12,
244:14, 245:13,
245:17, 255:5,
255:8, 256:13,
256:15, 263:10,
268:5, 270:11,
270:15, 284:9,
299:16, 306:19,
306:24, 307:11,
340:6, 348:3,
357:16
personalitywise
26:23
personally
84:4, 137:7
perspective
42:24, 319:22
persuade
305:11, 318:20
persuaded
329:5
peterson
20:18
ph
12:11
phone
64:12, 64:14,
64:16, 64:19,
69:3, 69:8,
69:11, 69:14,
77:3, 77:5,
77:8, 77:9,
136:1, 136:6,
136:12, 136:13,
137:3, 137:5,
137:9, 137:11,
137:17, 137:21,
138:5, 180:20,
181:5, 181:12,
181:17, 181:20,
182:1, 182:2,
349:18
phones
76:24, 77:1

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

134

photo
280:3, 347:9,
348:1, 348:4,
348:13
photograph
5:21, 175:12,
347:21
photographs
347:13, 347:16,
348:17
photos
164:23, 165:1,
279:9, 279:10,
328:5
physical
65:23, 66:1,
195:15, 195:18,
196:2, 197:3,
197:12, 198:15,
198:19, 210:8,
303:14
physically
341:18
pick
79:2, 79:5,
220:17
picked
73:20, 217:19
picture
36:1, 36:4,
127:23, 172:19,
175:21, 191:13,
191:14, 191:20,
347:22
pictures
279:20
piece
43:1, 130:1,
130:23, 131:4,
131:5, 188:20,
193:6, 193:16,
194:8, 194:14,
195:2, 197:3,
203:5, 203:23,
239:8, 319:23
pieces
195:18, 197:12,
209:11, 209:13,

209:16, 209:17,
209:19, 209:23
pink
109:12, 164:18,
165:12
pipe
93:22, 106:18,
193:20, 206:19,
206:20, 274:8,
274:12, 274:15,
274:21, 275:15,
275:23
piques
28:22
place
123:24, 153:11,
159:20, 177:21,
186:5, 187:21,
203:5, 223:16,
275:22, 288:18,
338:13, 349:21
placed
93:21, 93:22,
127:7, 175:14,
186:6, 274:6,
274:7, 274:11,
274:20, 275:15,
278:2
places
78:24
placing
92:16
plaintiff
1:6, 3:2, 3:10,
7:17, 8:7,
173:18, 174:3,
219:1, 254:10,
260:19, 262:3,
263:15, 312:1,
334:24, 355:19
plan
237:14
planet
2:4, 7:7, 7:11
play
41:2, 304:16,
308:10, 308:23
played
192:24

pleas
302:7
please
8:9, 10:18,
39:14, 85:3,
100:3, 112:1,
121:1, 127:20,
129:15, 185:24,
190:6, 227:18,
235:17, 239:21,
246:15, 271:24,
278:4, 297:7,
298:6, 307:14,
308:7, 313:14,
316:4, 316:12,
323:1, 323:3,
342:10
plenty
169:7
plus
30:8, 80:15,
270:16
poetic
203:15
point
58:4, 82:4,
84:11, 97:5,
106:9, 111:13,
117:19, 118:16,
143:24, 167:10,
167:12, 167:16,
167:17, 167:22,
176:16, 179:22,
200:1, 200:3,
216:5, 216:15,
227:19, 234:19,
237:10, 240:10,
250:9, 253:9,
263:6, 274:23,
275:12, 291:14,
292:19, 327:22,
343:11, 354:11,
356:14
pointing
292:24
polaroid
36:1, 226:7,
347:5, 347:8

pole
186:6
police
1:14, 34:20,
41:9, 41:14,
41:18, 41:24,
42:7, 84:5,
96:6, 101:1,
101:18, 107:15,
120:11, 121:13,
121:21, 122:16,
123:3, 135:21,
136:12, 138:22,
177:18, 178:20,
179:12, 180:14,
188:20, 188:22,
189:3, 189:4,
189:10, 190:2,
198:14, 210:3,
210:9, 212:1,
230:4, 230:9,
230:13, 230:19,
231:17, 231:19,
231:24, 232:7,
232:24, 237:14,
249:4, 249:20,
253:7, 258:9,
258:23, 277:11,
277:24, 296:10,
302:24, 303:12,
309:9, 309:22,
311:8, 311:10,
315:3, 315:6,
315:11, 315:14,
325:4, 328:12,
330:20, 330:22,
331:1, 336:19,
356:21
politely
129:15
polygraph
328:8
ponder
162:19
poor
309:4
pop
84:2, 147:8

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

135

popped
61:9, 351:4
portion
91:7, 173:17,
296:23, 308:23
portions
89:24, 287:23
pose
115:6
posed
11:1
position
17:11, 17:19,
18:12, 56:2,
294:19
positions
14:24
possession
96:17, 340:6,
342:5
possible
50:22, 68:15,
75:18, 84:3,
101:17, 108:10,
127:1, 140:16,
189:9, 189:23,
191:14, 205:12,
261:1, 264:7,
264:22, 266:12,
273:20, 326:17,
343:21, 345:3,
345:5
possibly
40:16, 40:17,
70:11, 138:21,
220:3, 294:18
post
6:9, 28:16,
298:10, 299:18,
299:22, 300:13,
300:24, 301:6
posted
29:4, 299:2,
299:5, 299:6,
300:18, 300:23
posting
28:24, 301:5,
301:14

postmortem
156:5, 193:4
posts
28:8, 28:9,
28:14, 28:19
posture
324:17
potential
46:20, 87:13
potentially
44:10, 73:20
powerful
43:4, 319:23
powers
356:13
practice
98:21, 347:15,
347:17
practiced
319:16
practicing
25:23, 80:15
practitioner
24:16, 25:24,
26:1
practitioners
15:1
precedent
42:19, 122:8,
355:11
precise
296:19, 314:15
precisely
215:20
precision
344:24, 345:1
preclude
33:18
precluded
34:10
precursor
322:12
preliminary
23:7, 23:8,
23:9, 23:13,
23:14, 23:15,
23:16, 23:19,
24:11, 80:19

premises
210:4
prep
268:7
preparation
84:6, 268:2,
268:9, 269:3,
269:24
prepare
32:23, 33:7,
59:10, 60:11
prepared
243:3, 243:23,
270:12
presence
32:24, 33:4,
89:8, 103:23,
154:5, 264:1,
336:19, 336:23,
337:8, 337:18
present
4:18, 50:10,
51:5, 60:18,
61:4, 88:7,
119:5, 119:10,
167:18, 170:13,
253:8, 254:14,
293:15, 350:17,
350:24, 351:7,
351:22
presented
135:1, 198:13,
299:4
press
356:1, 356:2,
356:3, 356:13,
356:16
presumably
216:1, 300:10,
300:12
pretrial
307:9, 342:22,
345:6
pretty
30:10, 184:11,
296:13, 296:15,
296:17, 309:4,
325:10

preventing
118:21, 216:17
previous
108:19, 226:13,
254:24, 354:3
previously
47:18, 48:2,
49:21, 63:8,
146:17, 254:8,
329:22
printer
340:19
prints
340:18
prior
47:20, 61:6,
63:4, 84:23,
84:24, 108:2,
122:3, 132:2,
132:4, 132:20,
148:1, 167:12,
213:12, 218:6,
248:9, 248:17,
251:9, 251:24,
257:16, 258:6,
258:14, 268:13,
307:12, 307:19,
345:10
prison
63:22, 72:12
private
81:5
privilege
310:9, 310:15,
310:19
privileged
310:4, 311:1
probability
168:11
probable
346:11, 346:18,
346:24
probably
15:16, 22:12,
28:21, 33:5,
49:19, 57:13,
57:15, 57:16,
75:19, 75:20,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                                                    136

79:7, 79:15,
84:19, 119:8,
119:11, 148:8,
182:18, 182:19,
183:2, 186:3,
190:3, 192:14,
205:10, 227:12,
344:2
**probative**
320:3
**problem**
129:9, 129:10,
305:15
**problematic**
305:18
**procedure**
146:23, 179:3,
179:5, 347:8,
347:12
**procedures**
13:7, 13:14
**process**
62:18, 317:4
**procure**
52:4, 118:18
**procurement**
71:3
**product**
141:5, 151:12
**professional**
2:14, 82:12,
357:3
**professionally**
349:4, 357:3
**profile**
72:3, 72:6,
355:23
**profit**
299:19, 300:2,
300:11, 300:15
**program**
12:11, 12:17,
14:2, 14:11,
14:15
**progress**
6:10
**prohibits**
355:12

**projects**
148:18
**promise**
152:9, 355:9
**promises**
354:16, 354:22,
355:1, 355:12
**promote**
55:6
**proof**
319:24
**proper**
303:9, 316:18
**prophylactically**
36:24
**propounded**
268:22
**propriety**
316:5
**prosecute**
321:24
**prosecuted**
322:5, 324:13
**prosecuting**
321:11, 321:19,
322:12
**prosecution**
43:5, 43:8,
44:16, 46:21,
197:19, 209:24,
319:22, 321:5,
323:17
**prosecutor**
16:15, 24:22,
25:1, 34:19,
43:2, 45:2,
46:14, 47:6,
80:21, 236:18,
269:18, 280:17,
295:23, 296:8,
319:17, 323:16,
324:6, 324:12,
331:20
**prosecutor's**
46:17, 212:7
**prosecutors**
17:21
**protective**
228:10

**protocol**
178:23, 220:14,
223:7, 223:8,
223:14, 223:19
**protocols**
223:15
**provide**
40:7, 43:23,
45:22, 45:24,
46:2, 49:15,
71:14, 126:17,
196:6, 198:16,
211:7, 237:6,
239:1, 250:1,
250:5, 259:7,
273:22, 287:11,
329:5, 330:11,
330:16, 331:18
**provided**
29:21, 31:8,
38:6, 40:10,
45:10, 45:14,
46:6, 47:1,
47:18, 47:20,
48:2, 49:22,
55:12, 56:6,
61:22, 62:20,
63:15, 63:17,
82:6, 152:1,
154:9, 197:7,
197:8, 198:21,
198:23, 237:9,
239:16, 249:19,
251:18, 255:6,
261:20, 263:9,
315:23, 316:16,
317:10, 319:7,
331:2, 333:20
**provides**
251:11, 253:1,
257:4
**providing**
47:14, 143:24,
239:10, 250:10,
250:13, 295:2
**psychology**
12:5, 12:24,
13:1, 13:2

**public**
2:14, 15:6,
22:4, 301:22,
310:6, 310:8,
310:11, 310:12,
310:13, 310:18,
356:19, 359:1,
359:5, 359:23
**publicity**
356:8
**publicly**
61:24, 62:1,
62:4
**pulling**
248:24
**punctual**
75:18
**punitive**
311:14
**purchase**
201:13, 201:14
**purple**
109:12, 164:18,
165:13
**purpose**
12:9, 36:18,
36:21, 42:21,
51:18, 59:5,
69:4, 122:23,
123:2, 147:6,
300:3, 300:4,
300:5
**purposes**
58:23, 89:22
**pursuant**
2:12
**pushing**
255:17
**put**
103:22, 106:18,
156:17, 172:14,
172:17, 179:20,
186:3, 186:11,
192:11, 193:19,
226:20, 228:3,
275:12, 310:11,
311:19
**putting**
156:8, 219:8

| Q | R | | |
|---|---|---|---|
| **quarters** | **rabbi** | 33:11, 33:14, | 153:16, 222:3, |
| 116:13 | 9:13, 9:15, | 33:16, 33:17, | 222:7 |
| **questionable** | 9:18 | 33:21, 33:22, | **real** |
| 302:8 | **rabbit** | 34:1, 34:4, | 26:14, 119:9, |
| **questioned** | 206:15 | 34:9, 35:1, | 170:3, 296:18, |
| 304:19 | **radio** | 39:13, 39:15, | 331:6 |
| **questions** | 21:10 | 59:12, 59:14, | **really** |
| 30:20, 42:11, | **radios** | 59:15, 59:18, | 26:21, 27:3, |
| 55:1, 63:7, | 21:2 | 59:19, 59:22, | 43:3, 48:5, |
| 71:19, 135:7, | **raise** | 60:7, 64:1, | 72:15, 72:20, |
| 135:13, 135:15, | 314:17 | 85:9, 89:24, | 73:9, 158:2, |
| 135:23, 148:5, | **raised** | 91:7, 102:23, | 162:18, 162:22, |
| 152:23, 153:3, | 117:23, 132:16, | 107:19, 107:20, | 204:12, 220:7, |
| 158:16, 167:3, | 134:12, 314:19 | 108:18, 108:21, | 229:18, 229:21, |
| 167:8, 168:24, | **ran** | 121:17, 157:15, | 230:3, 282:3, |
| 169:22, 169:23, | 86:13, 88:19, | 159:6, 159:16, | 287:18, 287:19, |
| 170:2, 171:15, | 147:9, 242:4, | 159:18, 173:16, | 294:17, 294:19, |
| 182:2, 196:18, | 242:19, 289:17, | 185:21, 185:22, | 295:6, 327:4, |
| 200:13, 204:20, | 290:5, 291:8, | 187:6, 218:22, | 329:14, 335:20, |
| 244:4, 262:1, | 291:24, 293:7 | 235:17, 235:18, | 338:16, 349:6 |
| 262:14, 262:21, | **random** | 239:19, 239:20, | **reask** |
| 265:5, 266:8, | 221:16 | 239:22, 246:16, | 10:19 |
| 311:22, 324:2, | **rap** | 250:4, 251:15, | **reason** |
| 326:8, 339:24, | 121:5 | 263:11, 265:15, | 24:6, 33:24, |
| 340:1, 341:4, | **rape** | 267:17, 267:18, | 43:11, 44:1, |
| 350:21, 357:24, | 207:10, 207:11 | 278:11, 287:23, | 46:12, 67:23, |
| 358:2, 358:3 | **raped** | 288:1, 288:5, | 96:2, 103:13, |
| **quetsch** | 186:4, 274:6, | 296:23, 296:24, | 166:16, 185:13, |
| 1:24, 2:12, | 275:11, 275:14 | 299:6, 299:24, | 214:14, 225:7, |
| 7:10, 359:3 | **rapes** | 301:23, 314:23, | 229:2, 249:22, |
| **quick** | 72:8 | 316:13, 326:18, | 249:23, 250:3, |
| 49:1, 61:10, | **rather** | 326:24, 353:21, | 255:24, 256:8, |
| 171:14, 171:18 | 33:11, 131:14, | 353:22 | 256:14, 279:19, |
| **quickly** | 321:4 | **readily** | 280:12, 294:1, |
| 30:11, 171:7, | **rds** | 331:2 | 304:12, 327:12, |
| 171:24 | 288:16, 288:20 | **reading** | 334:17, 335:24, |
| **quite** | **re-mirandize** | 33:18, 34:5, | 339:21, 340:4, |
| 30:23, 84:2, | 168:21 | 34:11, 111:21, | 342:3, 345:12, |
| 101:17, 181:3, | **reach** | 139:11, 143:18, | 345:18, 347:24, |
| 189:9, 189:23, | 122:16, 312:16, | 157:8, 172:18, | 348:8, 349:7, |
| 191:14, 205:12, | 312:19 | 242:13, 262:18, | 353:23, 354:12, |
| 264:7, 343:21 | **reached** | 276:3, 288:19, | 357:8, 357:18 |
| **quote** | 184:3 | 359:11 | **reasonable** |
| 144:16 | **read** | **readings** | 120:23, 225:11, |
| **quotes** | 28:19, 28:23, | 13:8 | 330:13, 330:15 |
| 186:12 | 32:11, 32:12, | **reads** | **reasonably** |
| | | 290:15 | 120:22, 331:4 |
| | | **ready** | **reasons** |
| | | 75:23, 153:13, | 143:14, 337:13 |

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

138

**recall**
76:3, 76:13,
79:13, 80:4,
82:16, 82:21,
83:4, 83:8,
83:12, 83:17,
83:22, 83:24,
84:15, 98:2,
98:4, 102:2,
107:22, 115:10,
116:9, 116:10,
121:17, 123:18,
123:20, 127:2,
133:15, 134:2,
144:16, 144:18,
152:8, 173:12,
189:3, 215:11,
216:16, 224:7,
234:23, 235:3,
235:7, 235:19,
236:7, 312:13,
325:16, 336:9,
340:14, 350:10,
350:16, 350:23
**receive**
12:1, 12:4,
12:6, 142:1,
340:15
**received**
64:19, 64:20,
222:17, 222:19,
223:21, 224:1,
224:8, 234:17,
309:8, 309:19,
352:10, 352:16,
353:9, 353:18,
354:8
**receiving**
78:2
**recess**
49:4, 105:7,
169:17, 236:23,
297:18
**recognize**
306:6
**recollection**
71:15, 76:17,
80:22, 94:16,

97:23, 101:4,
101:8, 101:15,
101:22, 102:6,
107:24, 108:8,
108:12, 108:14,
114:24, 120:7,
131:24, 133:10,
135:15, 138:18,
139:4, 139:7,
139:12, 160:9,
160:19, 170:4,
174:10, 175:5,
184:16, 198:18,
219:13, 233:21,
233:22, 236:2,
238:1, 240:13,
242:14, 243:10,
255:1, 261:17,
263:13, 264:3,
295:11, 295:20,
297:4, 297:12,
306:8, 307:11,
307:24, 334:8,
345:14, 351:24,
352:4, 353:20
**record**
8:10, 49:3,
49:5, 105:6,
105:8, 158:8,
159:21, 169:16,
169:18, 209:7,
227:18, 236:22,
236:24, 295:5,
297:16, 297:17,
297:19, 303:19,
311:19, 320:17,
358:11, 359:8
**recorded**
154:6, 352:5
**recovered**
72:2, 113:3
**rectangular**
130:12, 130:19,
131:6
**red**
109:8, 164:8,
164:11
**reduce**
31:15, 356:8

**reduced**
359:10
**redundant**
244:5
**refer**
76:10, 95:9,
182:13, 182:17,
182:24, 183:9,
207:22, 210:12,
210:19, 276:4
**reference**
188:16, 189:4,
211:5, 213:1,
221:14, 276:5,
336:7, 343:21
**referenced**
187:11, 187:12,
188:9, 189:10,
191:5, 193:14,
195:1
**references**
187:7, 246:4
**referred**
130:21, 159:10,
193:16, 242:9
**referring**
20:12, 30:15,
160:7, 190:24,
199:11
**reflecting**
181:15
**reflection**
128:5, 305:18
**reflectively**
317:3, 330:21
**refresh**
101:14, 101:22,
108:13, 115:8,
138:17, 174:10,
184:15, 184:20,
219:13, 242:14,
243:10, 245:1,
255:1, 261:17,
264:3, 295:11,
306:8, 307:24,
345:14
**refreshed**
173:14, 296:4

**refreshes**
114:23, 139:4,
139:9, 139:12,
236:2, 240:13,
243:24, 263:13,
295:17, 295:20,
296:1, 297:3,
297:8, 297:11,
334:8
**refreshing**
243:5
**regard**
228:13, 243:17,
284:22, 296:5,
311:14
**regarding**
30:21, 82:7,
89:8, 100:1,
106:13, 106:16,
187:2, 189:1,
196:7, 200:24,
222:17, 222:19,
222:20, 224:1,
231:8, 239:6,
252:21, 258:13,
280:9, 297:10,
310:6, 310:17,
312:16, 312:24,
314:6, 352:17
**regardless**
141:18, 264:10,
301:7, 315:22,
316:15, 317:10
**regards**
36:15, 71:1,
178:4, 178:5,
210:20, 214:14,
214:19, 224:18,
228:12, 234:14,
243:7, 265:17,
267:3, 267:7,
304:14, 307:9,
310:2
**regions**
30:4
**registered**
2:13
**regular**
356:20

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                                    139

**rehearsal**
168:3
**rehearse**
167:3, 168:13
**reinitiated**
215:9
**reiterate**
340:1
**reject**
42:5, 122:24,
149:24, 178:23
**rejected**
48:21, 59:9,
312:11
**rejecting**
42:20, 120:15,
224:20
**rejoined**
19:23
**relate**
55:14, 314:21
**related**
129:2, 149:15,
241:4, 252:12,
359:13
**relations**
104:3
**relationship**
99:3, 99:5,
99:6, 99:16,
102:8, 103:7,
103:14, 119:19
**relative**
68:17, 215:14,
322:2
**relaxed**
147:8
**release**
64:8
**released**
62:5, 63:22,
72:12
**relevance**
110:21, 129:5,
129:6, 162:22,
165:23
**relevant**
99:8, 101:12,

122:4, 161:18,
163:18, 182:3,
215:14, 231:10,
333:12
**reliability**
285:16
**reliable**
302:7
**relying**
98:6
**remain**
22:7, 23:1,
74:4, 218:8,
317:14
**remainder**
297:2
**remained**
86:14, 289:19,
341:19
**remaining**
25:6
**remembered**
109:4, 350:8
**remembering**
35:12
**remembers**
109:6, 109:11,
168:23
**remorseful**
286:7, 286:12
**removed**
342:16
**repeat**
39:11, 171:22,
172:2, 263:24,
266:19, 316:4,
316:12
**repeatedly**
274:5, 275:11,
275:13
**rephrase**
10:19
**report**
5:12, 5:19,
6:1, 48:8,
48:13, 48:14,
48:15, 48:17,
48:18, 48:21,

62:5, 66:12,
66:18, 76:20,
77:14, 84:20,
85:8, 85:11,
87:10, 87:14,
87:22, 88:6,
88:14, 88:15,
89:16, 90:2,
101:17, 101:18,
102:4, 107:12,
108:1, 108:3,
108:10, 108:16,
112:5, 121:12,
122:1, 138:22,
138:23, 189:20,
189:24, 190:2,
190:9, 191:11,
240:13, 242:9,
243:2, 243:16,
244:7, 244:17,
250:20, 251:5,
252:8, 255:7,
256:18, 265:18,
267:2, 268:4,
268:13, 268:21,
269:7, 269:20,
270:2, 273:10,
277:6, 277:16,
288:15, 292:8,
293:11, 293:15,
342:8
**reported**
1:24, 31:20,
32:3, 37:17,
47:11, 51:16,
51:20, 52:5,
52:11, 54:6,
59:14, 60:8,
70:19, 71:3,
71:8, 76:3,
88:8, 88:9,
89:9, 89:19,
91:21, 91:22,
92:3, 93:2,
94:23, 126:10,
126:15, 126:19,
126:24, 127:5,
135:14, 142:7,

142:8, 143:4,
144:11, 144:13,
146:5, 147:4,
148:1, 150:6,
160:18, 161:3,
161:23, 162:5,
163:1, 167:2,
167:8, 167:13,
169:23, 170:8,
170:14, 170:17,
171:1, 171:3,
171:21, 172:1,
172:8, 173:21,
175:6, 176:10,
176:12, 176:14,
177:5, 177:13,
181:14, 181:19,
185:6, 186:22,
187:3, 187:12,
187:15, 187:17,
191:17, 195:6,
195:24, 198:20,
239:16, 239:18,
241:5, 250:4,
252:13, 282:6,
282:8, 320:9,
321:6, 326:13,
326:23, 340:5,
340:8, 340:15,
340:16, 340:23,
343:15, 343:23,
344:6, 357:17,
357:19
**reporter**
2:13, 2:14,
7:10, 7:13,
10:16, 39:15,
146:7, 146:8,
146:11, 146:14,
146:18, 146:24,
147:1, 147:5,
152:15, 153:6,
153:7, 153:12,
154:3, 154:6,
154:7, 159:3,
167:15, 167:16,
171:8, 171:12,
173:1, 173:3,

173:7, 176:1,
176:5, 185:7,
188:7, 209:6,
259:22, 272:1,
316:13, 340:17,
359:1, 359:4
**reporter's**
138:14, 185:10
**reporting**
156:3, 240:23,
241:6, 252:13,
288:13, 288:19,
288:20
**reports**
6:10, 84:5,
107:15, 107:17,
107:18, 107:21,
108:1, 111:21,
114:23, 188:20,
188:23, 189:3,
189:4, 189:10,
273:13
**represent**
136:17, 175:12
**representation**
91:6, 111:4
**representative**
34:3
**represented**
302:18
**representing**
81:7
**represents**
47:6, 95:16
**reproduce**
166:3
**reputation**
9:16, 273:15
**request**
51:2, 142:6,
143:14, 146:10,
252:18
**requested**
142:5, 183:11,
223:4, 223:5,
252:17, 265:18,
265:22, 265:23,
265:24, 267:3,

318:5, 333:22,
359:12
**requesting**
266:5
**requests**
312:17
**require**
244:11, 294:17,
327:5, 329:12
**requires**
115:8
**research**
12:12, 12:13,
12:18, 16:1,
148:18, 148:24
**residence**
186:8, 201:10,
201:12, 201:16,
202:12, 203:4,
207:11
**resist**
331:13
**resisted**
331:9
**respect**
257:16, 292:21
**respective**
67:20
**responded**
86:20, 113:4
**response**
40:9, 40:20,
124:24, 125:1,
125:15, 168:12,
260:3
**responses**
23:20, 23:23
**responsibilities**
324:12
**rest**
86:15, 187:9,
289:19
**restaurant**
75:21, 76:6,
78:23
**restaurants**
75:22
**restroom**
235:10

**result**
193:5, 283:15,
283:16, 302:23,
332:3
**results**
18:4, 18:6,
18:21, 71:23
**retain**
301:5
**retained**
27:23
**retina**
13:16
**retired**
149:7
**retrieved**
342:8, 342:9,
342:12, 344:3,
344:11, 344:15
**return**
201:16, 202:12
**returned**
21:24, 85:20,
86:3, 179:21,
203:4, 288:24,
289:7
**reveals**
191:18
**revenue**
301:9
**reverse**
137:23
**reversed**
57:21, 57:22
**review's**
48:4, 220:14
**reviewed**
60:7, 172:12,
172:21, 174:11,
175:6, 177:24,
183:11, 187:18,
188:22, 189:2,
268:3, 268:9,
268:13, 269:7,
295:7, 296:21,
306:15, 345:18
**reviewing**
84:15, 84:23,

85:1, 107:22,
108:1, 108:23,
175:18, 268:6,
295:10, 306:20,
306:24, 307:12,
307:19, 328:5
**reviews**
179:11
**rhyme**
67:23, 166:16
**richard**
3:22
**rick**
4:19, 7:11
**ridiculous**
316:23
**right-hand**
112:6
**rights**
26:13, 26:21,
87:3, 125:18,
125:20, 135:18,
154:10, 241:4,
246:16, 246:21,
252:12, 274:2
**rigs**
20:16
**ring**
124:4, 124:15
**rises**
120:14
**road**
3:13, 323:17
**rock**
4:4
**rogers**
20:13, 20:18
**role**
9:10, 30:1,
41:2, 44:4,
44:5, 44:12,
59:9, 118:17,
119:20, 119:24,
120:4, 125:8,
192:24, 210:6,
229:3, 304:16,
308:10, 308:23,
324:11, 325:13

**romantic**
99:16, 102:8,
103:7, 103:14,
117:1
**room**
15:24, 16:3,
32:1, 32:22,
33:7, 81:17,
81:23, 123:16,
123:18, 123:20,
124:5, 124:9,
124:10, 124:11,
124:12, 124:14,
126:9, 167:15,
170:6, 170:20,
170:22, 170:24,
171:2, 171:4,
171:6, 199:22,
234:9, 238:13,
238:17, 239:7,
240:1, 240:5,
248:24, 252:20,
254:15, 254:23,
255:8, 261:2,
261:4, 261:5,
263:1, 263:17,
263:19, 263:20,
263:22, 263:23,
264:11, 264:13,
264:15, 267:6,
286:5, 337:23,
338:20, 339:1,
339:2, 339:10,
343:13, 343:14
**rooms**
16:13
**rose**
9:5
**rot**
282:15, 282:20
**rotated**
148:12
**rotor**
64:22
**roundtable**
30:20
**rpr**
1:24, 359:4

**rule**
35:18, 42:16,
45:12, 52:2,
52:19, 53:11,
67:3, 122:8,
304:22, 320:19,
320:20, 320:22
**rules**
9:23, 25:11,
25:12, 31:17,
323:5
**run**
52:8
**running**
149:5, 294:7,
355:13
**russ**
206:14
**russell**
3:3, 7:14,
169:5, 266:7,
266:17
**ryan**
3:20, 7:22

---

**S**

**s**
142:1, 143:19,
143:24
**sabbath**
25:12
**said**
24:3, 31:16,
32:6, 33:13,
37:13, 39:2,
39:19, 44:20,
44:24, 46:10,
46:15, 50:19,
53:23, 54:5,
64:17, 64:19,
68:11, 68:23,
72:4, 72:10,
82:2, 89:7,
92:20, 93:24,
94:3, 97:13,
102:20, 110:4,
119:15, 119:24,
125:1, 125:23,

126:3, 126:4,
126:5, 126:8,
144:17, 144:19,
144:24, 145:5,
145:19, 145:21,
152:7, 152:8,
152:10, 154:4,
154:18, 158:24,
179:4, 187:20,
188:15, 188:22,
197:9, 202:4,
202:6, 205:14,
205:18, 205:22,
223:2, 235:14,
236:19, 238:21,
243:5, 244:15,
256:4, 257:18,
258:1, 259:4,
265:4, 265:22,
267:11, 286:10,
286:11, 312:6,
312:23, 313:1,
314:11, 317:12,
322:7, 323:20,
325:1, 327:18,
330:21, 335:24,
336:4, 339:1,
339:9, 349:16,
357:8, 357:11,
359:9
**sake**
138:14
**salary**
18:20
**salient**
166:13
**same**
10:2, 10:11,
10:13, 56:3,
65:2, 65:10,
68:21, 81:8,
101:24, 104:10,
113:11, 114:10,
129:23, 157:24,
159:20, 170:6,
170:22, 188:14,
219:23, 223:1,
238:17, 241:5,

244:5, 252:13,
271:18, 275:7,
288:18, 295:2,
306:4, 311:14,
311:18, 317:11,
321:22, 337:2,
346:20, 347:1,
350:14
**sample**
72:2
**sanford**
219:8, 284:8
**sat**
18:5
**save**
20:15
**savini**
64:11, 69:8,
348:22, 349:12,
350:18, 351:9,
351:10, 351:14,
351:18, 351:24,
352:7
**saw**
86:4, 223:15,
242:2, 289:8,
290:1, 291:6,
291:12, 312:20,
341:1
**saying**
41:17, 45:24,
46:6, 47:5,
51:8, 55:23,
87:11, 88:17,
89:22, 92:11,
92:13, 92:16,
96:11, 96:14,
106:10, 114:6,
115:5, 123:3,
128:9, 129:14,
131:1, 154:21,
155:2, 155:13,
156:1, 157:7,
158:14, 171:23,
181:10, 205:10,
212:1, 224:7,
225:18, 229:3,
241:9, 242:17,

243:21, 245:3,
245:11, 247:6,
251:24, 260:8,
260:9, 266:19,
268:12, 268:14,
269:3, 269:23,
275:13, 276:12,
286:13, 289:23,
291:11, 296:12,
314:12, 316:7,
318:4, 322:21,
328:16, 344:14,
345:1

**saying"**
229:10

**says**
85:18, 86:18,
97:2, 98:5,
106:12, 107:5,
109:1, 112:21,
156:18, 156:22,
157:2, 157:4,
157:9, 157:10,
157:13, 157:20,
159:8, 159:13,
159:15, 179:13,
188:1, 194:14,
195:2, 201:7,
203:8, 206:19,
210:22, 219:8,
251:16, 255:7,
266:10, 274:2,
277:11, 278:6,
278:12, 288:12,
290:1, 298:15,
321:2, 332:15,
339:5

**scared**
242:19, 290:4,
291:24, 293:7,
294:7

**scenarios**
294:22

**scene**
48:20, 86:14,
89:8, 140:14,
164:22, 207:8,
242:4, 250:21,

251:6, 279:9,
279:10, 280:3,
285:14, 285:15,
289:18, 291:9,
307:3, 328:5,
328:6, 328:7

**schedule**
73:15, 75:7,
217:9

**scheduled**
214:24

**schedules**
69:20

**schematic**
30:3

**school**
11:13, 11:18,
12:10, 12:19,
13:23, 14:5,
14:10, 14:13,
14:17, 14:18,
15:13, 17:1,
18:19, 208:7,
319:18

**schreier**
16:10

**scientific**
13:15

**screen**
182:11, 182:14

**screwed**
110:7

**seal**
359:17

**second**
81:16, 89:1,
97:1, 97:2,
100:19, 108:24,
123:17, 209:8,
209:18, 278:4,
278:14, 278:18,
288:16, 294:10

**section**
121:13, 130:17,
130:20, 188:16,
193:4, 226:20,
227:16, 227:17,
275:20, 276:6,

338:16, 339:5,
339:16

**secure**
31:11, 254:24,
258:10

**see**
55:16, 56:3,
61:22, 67:11,
73:6, 85:13,
86:16, 87:7,
87:9, 87:21,
90:1, 92:22,
97:1, 97:10,
106:14, 107:6,
109:1, 109:15,
112:5, 114:22,
116:12, 116:19,
121:7, 121:14,
139:4, 142:15,
152:18, 157:14,
157:18, 157:20,
157:21, 157:22,
158:19, 159:2,
159:5, 159:7,
159:9, 159:15,
159:23, 164:15,
164:16, 186:12,
190:3, 190:12,
192:3, 193:20,
194:24, 199:8,
199:10, 199:18,
201:19, 201:20,
203:8, 203:9,
206:20, 207:14,
217:17, 233:12,
236:1, 237:4,
240:12, 241:7,
242:5, 244:3,
246:1, 246:8,
246:11, 246:18,
247:14, 247:15,
252:22, 252:23,
263:12, 265:6,
272:7, 272:20,
274:8, 274:9,
274:14, 279:10,
288:2, 289:20,
289:21, 292:1,

292:11, 292:16,
293:22, 298:12,
298:15, 298:19,
326:19, 334:8,
334:19, 335:11,
335:12, 343:17

**seeing**
26:19, 109:4,
109:6, 109:11,
189:3, 192:23,
326:22

**seek**
41:20

**seeking**
41:14, 62:18,
325:6, 356:8

**seem**
244:4

**seemed**
24:17

**seems**
197:10, 344:10

**seen**
111:18, 113:12,
114:10, 165:20,
191:20, 222:24,
279:9, 280:3,
306:7, 312:5

**sees**
86:7, 289:11,
291:19, 291:20,
291:22

**segue**
24:23

**seizer**
303:8

**seizure**
303:7

**semester**
15:12, 15:17,
16:23, 17:22

**send**
211:17, 212:2

**sending**
210:13, 352:22

**senior**
12:14

**sense**
16:17, 17:22,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                    143

19:5, 25:15,
30:6, 120:23,
218:14, 340:2
**sent**
353:23
**seo**
299:3
**separate**
317:22
**sergeant's**
248:24
**service**
301:5, 301:6
**services**
299:24
**session**
169:21
**set**
69:5, 123:23,
153:12, 210:16,
210:22, 212:15,
212:20, 212:24,
213:4, 241:5,
252:13, 359:16
**setting**
69:15
**seven**
208:6, 316:20
**several**
23:12, 29:7,
48:22, 59:12,
69:2, 72:7,
115:24, 312:10,
314:7, 357:14
**sex**
23:16, 52:3,
52:6, 88:1,
88:18, 149:15,
242:18, 290:4,
291:23, 293:6,
294:3, 294:6
**sexton**
174:21, 175:3,
246:15, 270:17,
270:18, 271:6,
271:13, 271:18,
271:19, 272:20,
273:1, 283:24,

284:5, 284:7,
312:4, 312:8,
312:14, 313:12,
313:20, 314:6
**sexual**
99:12, 104:3
**sexually**
103:24
**shape**
13:14, 13:19
**shaping**
13:7, 13:13
**shaunice**
5:15, 59:17,
99:22, 100:7,
100:15, 100:24,
101:4, 101:5,
101:8, 101:9,
101:15, 102:7,
102:15, 102:24,
103:2, 103:6,
103:14, 103:23,
115:11, 116:8,
116:17, 116:23,
154:21, 155:1,
155:11, 212:15,
213:5, 227:7,
306:11
**sheet**
121:5
**shift**
52:22, 65:16,
65:17, 65:18,
65:19, 73:12,
73:13, 73:14,
73:16, 73:17,
73:21, 73:24,
74:1, 74:3,
74:4, 74:18,
74:21, 74:22,
74:24, 75:2,
75:6, 75:9,
75:14, 75:20,
213:14, 213:15,
213:21, 214:5,
217:21
**shifts**
65:16

**ship**
160:4, 160:10,
186:3, 186:4,
186:6, 186:12,
186:16, 186:20,
186:24, 187:3,
187:12, 199:22,
201:18, 203:3,
203:6, 206:19
**shirts**
348:19
**shoes**
164:6, 294:17,
327:6, 327:13,
329:13, 330:6
**shoot**
240:15
**short**
26:5, 86:9,
241:20, 289:13,
290:24
**shorthand**
2:13, 359:3
**shortly**
64:8, 146:8
**should**
28:21, 34:14,
42:2, 52:18,
59:8, 92:22,
273:6, 322:4
**shouldn't**
322:4, 351:2
**show**
34:5, 36:4,
38:4, 55:14,
84:20, 104:22,
239:17, 245:18,
247:16, 247:19,
248:12, 249:9,
249:22, 249:24,
265:9
**showed**
71:11, 245:4,
245:6, 245:8,
245:10, 245:12,
245:15, 250:3,
260:22
**showing**
85:6, 95:4,

100:6, 105:12,
112:4, 121:4,
153:21, 182:7,
218:21, 272:6,
298:9, 305:24,
308:22, 326:17,
327:11
**shown**
71:8, 71:9,
248:8
**shuttle**
16:14
**sic**
163:22, 164:17,
209:23, 256:2
**sick**
216:16
**side**
10:23, 22:6,
22:8, 22:11,
22:15, 66:2,
66:3, 68:16,
183:18
**sign**
340:22, 341:9,
341:11
**signature**
56:10, 172:14,
172:15, 341:3,
358:8, 358:9
**signature-mig2k**
359:21
**signatures**
172:9, 172:14,
172:18
**signed**
32:16, 106:6,
106:10, 109:19,
175:13, 175:14,
176:9, 176:11,
176:13, 187:18,
329:11
**significance**
110:23
**significant**
192:24
**signing**
95:24, 359:12

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

144

silent
317:14
silly
329:15
similar
12:18, 174:1,
284:20, 288:2,
288:7, 292:12
similarities
292:1
similarly
332:24
simply
158:20, 179:20,
242:17
simultaneous
209:5, 273:14
since
27:3, 80:7,
80:9, 80:10,
165:17, 208:6,
212:11, 220:5,
225:4, 243:21
single
44:1, 128:24,
150:20, 151:10,
271:3, 286:9,
286:10
sit
17:23, 18:1,
30:19, 32:9,
32:10, 266:20,
282:4, 335:13
site
300:13
sitting
18:13, 161:18
situation
58:9, 315:13
situations
310:5, 337:16
six
20:10, 20:23,
65:17, 65:18,
65:20, 312:15
sixth
57:2, 57:5,
303:8, 304:6,

304:15, 320:15
ski
109:12, 164:18,
165:13
skill
35:3
skilled
305:1
skills
26:14, 26:16
skokie
20:19
sleep
38:18, 38:19,
38:23, 39:1,
39:3, 39:18,
39:20, 132:4,
132:10, 132:11,
132:15, 132:20,
133:4, 133:7,
216:2, 217:3,
333:21, 333:22
sleeping
216:17
slept
216:6, 216:10,
216:11
sloppy
188:11, 273:12
small
19:1, 116:15
smart
229:11
social
300:21
socialize
349:5, 356:23
socialized
349:5, 356:21
socially
348:24
sole
25:24, 26:1
solely
66:18, 98:6
solo
14:24, 24:16
some
8:16, 8:22,

10:20, 17:17,
19:16, 26:20,
27:14, 29:22,
35:13, 35:17,
35:20, 36:16,
37:5, 67:7,
69:17, 70:13,
71:23, 74:20,
93:15, 94:23,
98:14, 101:18,
107:14, 108:11,
108:16, 108:19,
111:17, 113:14,
117:19, 130:12,
138:22, 143:24,
147:8, 163:14,
163:16, 166:15,
167:12, 167:16,
167:17, 167:22,
173:6, 176:16,
179:22, 188:16,
202:7, 214:14,
216:2, 216:5,
216:24, 218:13,
221:13, 234:19,
256:22, 270:3,
303:21, 305:7,
305:8, 339:24,
340:1, 354:10
somebody
54:20, 58:10,
63:24, 122:9,
122:15, 134:21,
198:7, 224:17,
249:19, 249:20,
273:3, 300:24
somehow
220:6, 221:4,
221:15, 346:3
someone
56:1, 309:14,
329:19
something
12:16, 38:9,
38:13, 40:1,
56:2, 69:20,
79:16, 81:8,
88:11, 113:22,

129:2, 132:24,
143:16, 149:19,
152:21, 162:4,
162:24, 168:9,
169:10, 192:13,
194:16, 210:23,
216:17, 218:14,
226:2, 230:19,
249:3, 255:4,
330:13, 331:16,
356:3, 356:19
sometime
79:15, 95:18,
105:19, 235:22,
235:23, 248:17
sometimes
25:10, 41:24,
42:2, 45:1,
66:23, 66:24,
78:17, 148:17,
217:11, 217:13
somewhere
75:19, 234:6,
234:24, 261:15,
317:1
son
80:23
sorry
19:15, 28:5,
46:4, 49:1,
65:5, 66:20,
91:5, 92:19,
103:1, 105:1,
107:21, 113:23,
120:3, 138:12,
146:13, 147:20,
156:15, 168:6,
176:13, 178:13,
181:7, 203:1,
207:9, 209:18,
219:12, 235:13,
235:17, 242:23,
257:11, 257:23,
258:18, 266:17,
271:17, 272:2,
278:7, 281:12,
288:4, 291:20,
319:3

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

145

sort
167:23
sotos
4:12
sound
24:4, 146:21,
236:9, 282:1,
288:2, 288:7
sounds
107:1, 116:21
source
107:14, 202:3,
202:8
south
66:2, 66:4,
66:7, 66:9,
66:12, 66:16,
66:21, 67:23,
68:3, 68:8,
68:12, 68:16
south-side
68:15
sox
190:17, 191:3
speak
9:12, 9:14,
25:14, 31:24,
34:21, 53:19,
58:13, 69:10,
90:15, 90:20,
94:9, 94:18,
96:6, 103:20,
115:17, 115:20,
118:17, 122:2,
124:10, 125:20,
147:16, 171:13,
175:3, 176:24,
177:14, 178:6,
179:13, 220:13,
230:1, 243:4,
252:17, 257:3,
260:24, 265:19,
267:3, 273:2,
273:7, 302:1,
313:6, 314:10,
317:15, 335:3,
336:9, 336:12,
336:15, 336:18,

336:22, 337:8,
337:14, 337:17,
350:4, 355:21
speaking
128:8, 128:14,
128:16, 128:21,
128:24, 129:15,
132:21, 171:7,
171:18, 171:24,
198:18, 209:5,
221:9, 229:9,
237:15, 238:2,
295:15
speaks
90:14, 292:8,
293:11
specific
47:12, 53:10,
74:24, 126:12,
135:15, 148:3,
151:23, 170:4,
220:23, 221:17,
287:20
specifically
113:21, 161:23,
175:22, 220:18,
223:9, 276:4,
304:18
specificity
282:5
speculate
202:22, 234:20
speculating
145:20
speculation
87:18, 88:3,
88:22, 89:15,
90:12, 91:9,
99:9, 99:19,
102:12, 103:10,
103:17, 104:5,
104:18, 110:1,
110:17, 112:15,
113:16, 114:15,
117:5, 127:13,
130:15, 133:2,
141:7, 141:15,
141:23, 142:17,

148:11, 148:21,
150:23, 151:14,
154:23, 156:11,
161:5, 161:11,
162:8, 163:8,
165:8, 171:9,
175:1, 177:16,
178:17, 181:22,
196:5, 197:21,
198:12, 202:14,
202:20, 203:12,
203:18, 204:2,
207:19, 211:19,
212:18, 216:19,
220:2, 220:12,
223:12, 230:18,
231:23, 232:12,
244:9, 248:4,
249:12, 250:23,
255:20, 256:12,
259:1, 263:4,
265:8, 270:9,
275:18, 279:5,
279:24, 284:24,
298:2, 299:1,
305:6, 309:12,
318:9, 321:16,
322:16, 327:3,
327:24, 354:20,
357:21
speech
171:20
speed
225:10, 311:22
spell
8:9
spelled
65:7, 201:18
spend
20:24
spending
201:9
spent
98:7, 98:10,
100:24, 319:18,
348:24
split
67:9

spoke
40:15, 69:2,
94:12, 94:14,
96:2, 96:7,
96:23, 107:16,
107:22, 119:2,
119:6, 126:13,
145:6, 147:23,
151:18, 151:20,
152:12, 170:7,
179:4, 184:5,
202:16, 228:19,
233:20, 237:11,
255:14, 256:1,
256:10, 284:6,
285:20, 285:21,
308:4, 312:3,
312:10, 314:13,
321:4, 325:18,
335:15, 349:16,
350:17, 351:14,
352:8
spoken
125:24, 147:10
st
66:6, 67:17,
68:9, 191:3
stamp
288:10
stan
83:24
stand
294:17, 299:14
standard
347:12
standing
241:21, 242:2,
291:2, 291:7,
294:4
stands
58:1, 171:19,
353:24, 354:13
start
18:11, 53:1,
66:21, 75:2,
75:6, 75:20,
89:3, 95:19,
138:10, 166:7,

182:16, 213:10,
217:12, 239:10,
242:8, 248:24,
272:15
**started**
14:11, 14:13,
14:16, 18:15,
19:15, 29:22,
67:5, 73:18,
175:18, 175:22,
185:7, 216:6,
222:13
**starter**
109:8, 114:12,
164:9, 164:11
**starting**
11:22, 173:11,
215:1, 236:3,
246:1, 288:9,
335:2, 343:8
**starts**
85:14, 130:22,
131:6, 265:15,
288:16
**state**
2:15, 8:9,
25:21, 25:23,
34:24, 47:7,
47:8, 136:17,
241:14, 241:17,
304:22, 359:5,
359:24
**state's**
3:21, 7:18,
7:21, 15:3,
15:9, 15:14,
15:18, 15:22,
16:12, 17:4,
17:10, 18:12,
19:2, 19:7,
19:12, 19:18,
22:1, 23:18,
24:9, 24:14,
41:4, 41:21,
50:2, 51:22,
64:1, 67:16,
67:19, 80:12,
84:18, 86:19,

87:2, 119:15,
119:17, 122:14,
122:17, 122:22,
136:14, 136:15,
141:3, 141:21,
143:23, 150:21,
151:4, 184:8,
231:7, 231:9,
233:11, 268:7,
270:23, 270:24,
271:1, 274:3,
303:16, 303:22,
304:13, 304:15,
304:20, 309:10,
309:22, 332:17
**stated**
85:21, 85:24,
86:3, 86:9,
87:4, 87:6,
97:8, 158:8,
241:12, 241:19,
289:1, 289:4,
289:7, 289:13,
290:16, 290:23
**statements**
31:1, 31:6,
31:9, 31:10,
32:5, 37:22,
38:22, 39:17,
47:10, 48:9,
54:8, 56:6,
56:17, 57:14,
57:15, 57:18,
58:24, 71:11,
73:3, 96:20,
133:14, 143:9,
155:6, 156:2,
166:5, 211:3,
220:5, 225:20,
227:4, 227:6,
227:7, 227:9,
229:20, 229:24,
230:5, 230:15,
250:11, 281:11,
281:14, 282:7,
284:10, 285:12,
295:12, 302:6,
303:5, 303:6,

320:3, 325:2,
328:10, 334:12,
340:8, 340:11,
341:14, 357:17
**states**
1:1, 97:7,
116:13, 116:17,
251:5, 305:15
**stating**
255:22
**station**
59:6, 78:22,
101:1, 131:16,
131:21, 133:6,
149:24, 210:5,
328:10, 333:1,
333:2
**stations**
30:5, 66:16
**statistics**
281:21, 281:23,
281:24
**status**
86:22, 200:24
**statute**
89:11
**stay**
24:24, 25:5,
78:21, 218:4,
221:20, 224:4
**stayed**
214:15, 227:10,
227:12, 241:19,
290:24
**steer**
293:20
**stem**
302:12
**stenographically**
359:10
**step**
255:10, 327:5,
327:13, 329:13,
330:6
**stepped**
343:12
**steps**
98:18, 222:11

**stick**
13:22
**still**
56:2, 66:4,
106:1, 130:24,
203:2, 215:17,
217:16
**stint**
23:4
**stipulation**
311:14
**stocky**
120:20
**stomach**
356:7
**stop**
128:8, 129:15,
239:9
**store**
86:2, 156:23,
289:6
**stories**
292:2
**story**
87:23, 228:21,
293:4, 294:3,
295:2, 314:14
**street**
2:5, 3:5, 4:5,
16:6, 66:10,
66:13, 67:1,
67:10, 75:21,
76:5, 78:9,
78:22, 79:8,
86:2, 183:7,
241:16, 241:19,
289:6, 290:20,
290:23, 342:1,
349:22, 349:23
**strike**
78:1, 116:23,
120:3, 231:18,
249:23, 263:22,
294:22, 307:3,
337:14
**string**
317:3
**strong**
27:2

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                                      147

**student**
15:23, 149:4
**studied**
26:22
**study**
12:23
**studying**
13:5, 13:12,
13:13
**subject**
321:1
**submitting**
273:12
**subsequent**
43:5, 80:16,
189:24, 338:17
**substance**
114:23, 312:22,
313:9
**substantive**
34:24, 42:17,
70:14, 70:16,
280:10, 297:10
**substantively**
25:5, 26:21,
234:2
**successful**
57:17, 57:23
**successfully**
74:18
**suffocate**
279:3, 279:8,
279:22
**suffocation**
193:5
**suggest**
37:11, 104:2,
165:15, 276:12
**suggested**
37:10, 247:23
**suggesting**
113:13, 197:9,
197:10, 224:6,
258:7, 346:2
**suggestive**
104:1
**suggests**
184:12

**suit**
312:24
**suite**
2:6, 3:14, 4:6,
4:14, 7:8
**summarize**
166:2, 166:5,
166:9
**summary**
143:9, 143:10,
143:13, 185:17,
185:19, 185:23,
186:24, 187:20,
198:21, 198:23,
199:6, 200:20,
200:22, 256:21,
273:22, 275:8,
278:1
**summer**
15:19
**sun**
191:1
**sup**
5:12, 84:10,
84:12, 84:16,
85:8, 87:10,
102:4, 240:13
**super**
271:20
**supervisor**
51:12, 51:15,
51:19, 52:5,
61:8, 120:13,
122:13, 140:3,
140:7, 140:14,
140:15, 144:3,
144:5, 144:9,
144:14, 144:19,
145:7, 145:13,
145:16, 146:2,
146:4, 148:9,
148:14, 148:16,
149:8, 177:23,
183:24, 184:1,
184:17, 271:8,
273:7, 284:12,
284:13, 284:15,
284:17, 284:21,

285:3, 317:16,
318:3, 325:3
**supervisor's**
318:23, 319:5
**supervisors**
30:19, 35:10,
52:8, 141:1,
145:14, 184:2,
184:5, 184:17
**supplemental**
138:22
**supply**
49:17
**support**
22:3, 22:4,
22:7
**suppose**
49:14, 50:13,
50:14, 292:9
**supposed**
33:6, 33:20,
63:11, 100:22,
273:18
**supposedly**
157:3, 157:6,
157:11, 264:20
**suppress**
6:7, 56:16,
56:24, 57:4,
57:5, 57:14,
57:23, 59:20,
59:21, 60:2,
84:13, 84:17,
84:22, 84:24,
173:24, 174:2,
174:22, 200:9,
261:24, 262:24,
265:1, 265:6,
265:19, 266:22,
267:1, 267:10,
267:20, 268:1,
268:3, 268:10,
268:14, 268:23,
269:6, 269:17,
270:1, 270:12,
302:20, 303:4,
303:6, 303:21,
303:24, 304:2,

304:3, 304:5,
304:17, 307:10,
307:13, 307:20,
311:6, 325:17,
334:12, 345:6
**suppressing**
57:14, 57:18
**suppression**
304:9
**sure**
10:1, 11:6,
25:17, 25:20,
32:19, 33:15,
35:10, 35:19,
39:13, 43:20,
43:22, 44:23,
47:16, 49:2,
51:3, 52:7,
58:7, 58:8,
62:6, 63:14,
64:16, 64:19,
65:15, 68:12,
74:9, 75:17,
80:14, 80:16,
80:17, 82:15,
82:20, 83:16,
85:12, 89:2,
91:13, 96:9,
105:2, 114:20,
119:18, 122:3,
124:17, 124:19,
138:9, 139:23,
140:12, 147:15,
157:23, 159:19,
165:5, 169:14,
171:1, 171:2,
171:6, 203:22,
207:2, 208:12,
209:10, 211:5,
211:6, 225:20,
235:19, 255:4,
257:11, 260:13,
264:19, 270:21,
275:3, 277:9,
281:10, 297:1,
302:12, 302:15,
307:14, 313:15,
313:17, 319:13,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

148

320:7, 320:17,
328:24, 332:6,
332:16, 339:2,
339:13, 340:3,
341:2, 341:4,
344:1, 345:11,
347:18, 349:14,
350:16, 351:1,
351:7, 353:11
**surprised**
71:20
**surprises**
168:8
**surrounding**
70:18, 70:20,
126:1, 221:18
**suspect**
35:14, 35:15,
35:23, 38:1,
42:9, 43:8,
43:12, 44:2,
45:8, 46:21,
47:1, 47:4,
47:5, 47:7,
47:14, 47:18,
47:20, 48:1,
54:3, 54:12,
58:4, 62:19,
62:20, 120:9,
120:16, 123:6,
133:3, 134:13,
134:18, 135:1,
138:5, 144:7,
150:5, 153:8,
168:12, 179:7,
179:9, 181:4,
197:11, 231:19,
237:20, 239:5,
252:24, 287:10,
305:12, 322:22,
323:12, 326:8,
328:18, 328:24,
329:4, 329:5,
332:2, 332:3,
332:8, 332:18,
332:19, 333:1,
336:22, 337:6,
338:21, 340:21,

340:22, 347:9,
348:13
**suspect's**
44:15, 332:2
**suspects**
40:4, 137:15,
168:2, 229:23,
230:5, 230:10,
231:24, 232:8,
233:1, 233:12,
253:9, 259:6,
287:21, 309:21,
337:21, 346:3,
348:17, 354:16
**suspicious**
292:16, 292:17,
292:18
**suspiciously**
292:12
**switch**
74:5, 116:4
**switched**
74:21
**sworn**
8:4, 8:6,
17:16, 17:20,
18:14
**synonyms**
188:6, 188:8,
188:10
**syntax**
309:5
**system**
20:14, 20:19,
20:20, 298:16,
305:19
**szybist**
152:16, 154:3

**T**

**table**
124:3, 124:17,
124:18
**tables**
17:7
**tachistoscope**
13:8
**tactic**
253:21

**tactics**
237:19, 239:1,
239:4, 253:21
**taint**
62:17
**take**
18:8, 21:18,
36:1, 39:8,
48:24, 50:17,
53:12, 53:13,
53:15, 53:17,
53:18, 53:21,
54:10, 59:14,
78:11, 78:14,
79:9, 79:10,
96:24, 98:18,
104:24, 105:5,
108:24, 113:19,
114:1, 133:23,
139:3, 144:15,
144:17, 146:8,
149:12, 150:3,
153:10, 158:9,
159:4, 159:24,
166:23, 171:1,
171:3, 176:18,
190:2, 191:19,
198:7, 218:17,
221:24, 222:10,
223:16, 229:20,
235:10, 235:12,
236:21, 251:2,
255:10, 279:18,
281:1, 281:12,
281:15, 282:13,
306:5, 319:5,
322:21, 323:11,
325:2, 334:3,
338:12, 347:8,
347:13, 348:17,
349:20, 351:24
**taken**
7:3, 9:21,
28:24, 49:4,
79:1, 91:20,
94:21, 100:10,
105:7, 105:13,
105:17, 106:12,

106:16, 126:11,
147:5, 152:11,
153:23, 169:17,
172:19, 175:13,
175:20, 180:3,
191:13, 236:23,
252:21, 254:24,
297:18, 306:2,
348:1, 348:13,
359:7, 359:10
**takes**
177:21, 206:19,
324:20, 338:13
**taking**
46:18, 52:10,
70:19, 70:20,
105:3, 113:20,
140:24, 145:4,
146:5, 167:12,
177:4, 177:12,
198:3, 220:4,
317:4, 347:15,
347:20, 347:22,
348:3, 352:8
**talk**
51:6, 70:16,
89:18, 153:9,
162:5, 180:7,
224:23, 229:12,
246:23, 316:5,
323:21, 323:23,
356:5, 356:9
**talked**
70:22, 105:19,
164:23, 169:21,
176:6, 184:9,
184:12, 187:6,
236:14, 237:13,
242:15, 276:7,
276:13, 284:11,
284:14
**talking**
10:11, 86:5,
127:18, 132:5,
159:21, 246:6,
289:9, 341:23,
356:3
**talks**
156:24

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                    149

**tandem**
41:22
**target**
31:13, 31:16,
32:8, 32:10,
32:14, 32:24,
33:11, 33:17,
34:1, 34:18,
35:1, 35:4,
35:8, 35:15,
35:21, 35:23,
37:12, 37:20,
40:10, 40:21,
42:22, 45:8,
45:9, 45:14,
46:6, 47:7,
47:13, 53:23,
54:8, 55:11,
55:14, 55:15,
55:16, 55:22,
55:23, 56:6,
58:10, 61:14,
63:3, 63:9,
63:12, 63:16,
63:19, 96:8,
111:5, 120:9,
122:2, 133:3,
134:16, 149:13,
151:11, 166:9,
166:10, 179:2,
179:6, 179:9,
180:13, 181:4,
239:5, 253:1,
281:15, 287:11,
305:9, 323:12,
326:8, 336:18,
337:6, 338:21,
347:9
**targets**
30:3, 38:14,
38:17, 38:22,
39:17, 39:22,
40:5, 43:23,
49:8, 49:12,
50:11, 51:4,
51:7, 59:1,
133:13, 137:10,
137:15, 137:17,

137:21, 179:1,
287:21, 337:21
**tats**
191:16
**tattoo**
191:15, 191:20
**taylor**
242:12, 242:18,
274:4, 274:23,
275:1, 275:5,
275:9, 275:13,
275:23, 278:6,
278:13, 290:1,
291:12, 291:19,
291:20, 291:23
**taylor's**
242:21
**team**
65:2, 65:14,
67:4, 67:19,
68:19, 68:21,
83:2, 220:24
**teams**
65:15, 65:20,
65:22
**telephone**
64:20, 69:1,
136:23
**tell**
29:3, 64:14,
70:23, 71:22,
72:6, 85:23,
87:5, 91:1,
91:15, 91:23,
91:24, 92:6,
92:9, 92:10,
93:4, 93:8,
93:13, 93:16,
97:20, 97:21,
101:9, 108:6,
115:9, 120:4,
120:8, 120:9,
122:24, 126:3,
139:17, 153:13,
155:4, 160:15,
166:18, 169:24,
177:3, 190:16,
190:18, 194:18,

204:21, 214:11,
219:22, 221:20,
222:2, 228:13,
233:18, 248:10,
261:12, 280:19,
280:24, 284:17,
287:12, 289:2,
306:6
**telling**
46:22, 56:1,
58:8, 62:18,
92:5, 92:6,
102:15, 145:16,
151:24, 155:8,
156:6, 158:19,
198:15, 275:20,
286:22, 296:5,
310:2, 331:7
**tells**
251:24
**tempo**
225:10
**tended**
126:22
**tender**
141:21
**tendered**
141:13, 141:19
**tenure**
37:15, 63:2,
149:9, 329:3
**term**
189:12, 193:7,
193:11, 193:20,
282:23, 282:24,
315:4, 315:7,
326:7
**terminated**
37:16, 37:17,
39:5
**terms**
55:10, 220:4,
247:3, 287:20,
307:10, 311:18,
356:13
**test**
197:13
**tested**
229:15, 229:22

**testified**
8:6, 84:17,
144:21, 145:15,
146:17, 173:10,
200:10, 254:8,
256:15, 264:14,
264:19, 266:21,
267:19, 268:8,
270:13, 306:10,
320:11, 321:7,
323:14, 323:23,
325:10, 329:18,
342:22, 343:21,
344:9, 344:23,
345:5, 345:15,
347:4
**testify**
11:9, 84:13,
169:1, 174:1,
262:23, 264:12,
267:24
**testifying**
263:6, 324:4,
325:16, 342:10,
342:11
**testimonial**
55:20, 55:21,
324:23
**testimony**
6:6, 6:7,
41:16, 44:18,
45:5, 59:3,
59:20, 60:3,
84:24, 110:1,
111:10, 118:9,
134:9, 135:11,
168:18, 173:9,
173:12, 173:17,
173:24, 174:1,
174:22, 174:23,
188:24, 194:10,
198:12, 200:8,
200:9, 213:12,
218:23, 231:4,
245:23, 246:2,
254:2, 256:1,
256:9, 256:23,
260:18, 263:14,

264:19, 264:24,
265:1, 265:7,
265:20, 265:21,
265:24, 266:1,
266:6, 266:14,
267:1, 267:4,
267:8, 267:10,
268:7, 269:4,
269:5, 269:15,
269:17, 270:13,
277:12, 279:5,
279:24, 280:21,
295:5, 299:21,
301:18, 307:9,
307:10, 307:12,
307:19, 307:20,
315:24, 316:3,
316:19, 324:15,
328:9, 329:9,
331:11, 334:11,
338:3, 338:19,
338:24, 359:9
**text**
352:16, 352:18
**tgi**
17:7
**th**
16:6, 66:10,
66:13, 67:1,
67:10, 67:13,
75:10, 75:21,
76:5, 76:14,
78:9, 78:22,
79:8, 79:10,
86:1, 86:3,
96:24, 107:2,
108:6, 109:18,
109:23, 110:11,
111:17, 111:18,
112:7, 112:13,
112:20, 113:5,
113:12, 113:14,
114:6, 115:12,
115:18, 116:14,
132:21, 163:4,
163:13, 165:17,
183:7, 183:11,
200:15, 201:13,

202:17, 207:4,
213:9, 213:19,
213:23, 213:24,
214:1, 214:4,
214:24, 215:6,
215:13, 217:6,
219:3, 219:16,
222:14, 225:22,
235:5, 235:21,
241:16, 241:18,
245:16, 246:17,
255:13, 255:15,
256:2, 256:11,
256:20, 257:19,
276:8, 276:16,
277:3, 289:5,
289:6, 290:20,
290:23, 315:16,
317:15, 334:2,
340:7, 341:19,
341:22, 341:23,
342:21, 349:22,
349:23, 359:17
**thank**
110:8, 138:14,
219:9, 274:18,
288:8, 313:18,
346:22
**thanks**
133:22
**theft**
52:1, 149:16
**themselves**
7:12, 54:21,
58:15, 281:16
**theory**
13:2, 46:17,
57:1, 57:2, 57:3
**thereafter**
271:10, 359:10
**therefore**
118:15, 182:2,
267:7, 336:4
**therein**
295:12
**thin**
238:7, 238:8
**thing**
10:3, 10:8,

37:8, 37:24,
94:11, 101:24,
108:21, 129:13,
138:21, 146:1,
153:4, 188:14,
220:3, 226:22,
229:20, 230:13,
251:22, 251:23,
254:5, 286:9,
286:10
**things**
44:14, 44:15,
155:14, 311:22,
317:5, 340:1
**thinking**
327:7
**third**
55:22, 56:7,
155:16
**third-party**
96:15
**thorough**
273:19
**thought**
12:14, 13:3,
42:4, 44:24,
106:22, 141:17,
141:19, 147:9,
163:17, 178:2,
178:24, 202:4,
205:19, 250:7,
250:9, 328:2,
356:15
**thoughtful**
131:12
**thoughts**
152:21
**thousands**
298:17, 298:21,
299:9, 299:15,
299:17
**three**
21:15, 31:10,
37:22, 54:8,
60:13, 74:23,
75:3, 75:5,
116:12, 144:9,
150:8, 195:18,

201:10, 207:8,
207:18, 207:22,
209:11, 209:17,
209:18, 209:23,
258:16, 314:8,
319:19, 335:4
**three-day**
213:18, 217:8
**threw**
205:13, 354:11
**through**
11:22, 11:23,
14:8, 15:1,
21:4, 32:13,
54:3, 74:3,
97:4, 115:15,
115:16, 120:13,
123:6, 125:17,
131:19, 133:5,
149:5, 172:13,
172:16, 217:18,
246:20, 266:24,
306:6, 339:12,
340:20, 342:21
**throughout**
187:9, 193:8,
231:1, 351:8
**throwing**
354:12
**timeline**
71:2, 71:6
**times**
18:1, 18:8,
33:1, 43:20,
43:22, 49:16,
49:19, 57:8,
59:12, 60:13,
69:2, 69:10,
69:22, 191:1,
253:16, 253:19,
255:22, 312:10,
328:7, 351:22,
354:4
**tired**
38:19, 38:24,
39:3, 39:23,
40:5, 40:6,
40:11, 40:14,

40:21, 133:9,
133:13, 133:17,
133:20, 134:3,
134:23
**titled**
298:12
**titles**
192:5
**to-6:-p**
214:5
**today**
7:9, 11:10,
84:23, 133:12,
263:7, 268:8,
306:10, 308:1,
323:14, 325:10,
326:1, 335:13,
336:7, 344:23,
345:1, 345:10,
345:15
**together**
26:20, 65:1
**told**
23:20, 24:1,
32:8, 33:10,
33:20, 38:1,
38:24, 41:1,
46:11, 47:5,
55:14, 70:24,
71:1, 72:1,
73:4, 77:12,
77:15, 85:19,
88:10, 90:17,
90:21, 91:16,
91:18, 91:21,
92:2, 92:19,
93:10, 93:11,
97:6, 97:12,
97:16, 97:17,
98:14, 99:6,
102:7, 103:2,
108:10, 108:14,
109:17, 111:5,
115:12, 120:2,
120:8, 120:16,
127:3, 127:7,
132:9, 133:12,
137:16, 137:19,

138:2, 138:15,
140:2, 144:5,
144:8, 144:11,
147:3, 153:15,
160:24, 161:9,
162:2, 166:10,
166:14, 168:22,
169:3, 172:4,
177:8, 178:24,
187:24, 190:20,
201:21, 202:5,
202:10, 202:18,
222:6, 222:8,
222:9, 222:22,
224:3, 224:13,
224:15, 224:16,
224:21, 229:9,
249:2, 263:24,
283:24, 284:5,
288:23, 310:17,
313:2, 313:3,
313:5, 314:21,
325:18, 330:23,
343:14
**took**
18:7, 21:14,
21:15, 22:5,
53:20, 89:9,
113:22, 133:14,
142:14, 150:20,
151:10, 152:10,
170:8, 171:6,
171:7, 177:7,
178:11, 178:15,
179:21, 215:8,
221:10, 221:13,
227:13, 255:2,
274:4, 275:10,
329:18, 348:9
**tool**
43:10, 230:16
**top**
76:9, 95:9,
100:21, 106:12,
157:9, 159:14,
182:10, 187:8,
187:9, 195:3,
207:4, 240:22,

244:8, 244:20,
251:8, 272:7,
278:14, 278:16,
280:22
**topic**
34:16, 182:3
**topics**
308:1
**total**
65:20
**totality**
161:16
**touched**
145:3
**touching**
103:24
**toward**
291:6
**towards**
98:19, 163:20,
242:1, 287:21,
324:13, 324:16
**trace**
25:18
**traffic**
19:16, 299:3,
299:23, 300:5,
300:14, 300:19,
301:7
**trained**
24:22, 24:24,
30:13, 30:24,
31:5, 31:22,
32:22, 33:6,
34:13, 34:16,
34:17, 35:13,
35:16, 35:22,
41:1, 41:2,
41:4, 49:7,
52:12, 52:13,
52:16, 54:11,
54:19, 54:24,
55:10, 137:13,
181:4, 182:1,
339:18
**training**
29:21, 29:22,
29:23, 30:7,

30:13, 30:17,
31:8, 137:16,
137:20, 138:2,
138:16
**transcript**
5:8, 60:5,
60:8, 85:5,
95:3, 100:5,
105:10, 112:3,
121:3, 127:22,
128:20, 128:22,
153:20, 182:6,
190:8, 218:20,
245:21, 262:17,
263:11, 265:12,
265:14, 268:15,
269:2, 272:5,
298:8, 305:23,
308:9, 308:21,
358:4, 359:8
**transitioning**
75:7
**translating**
288:20
**transparent**
250:17
**trauma**
106:24
**traveled**
344:5
**treated**
36:7, 36:11,
36:13, 36:15,
36:18, 37:2,
73:4, 98:23,
135:21, 141:4,
148:5, 160:23,
295:17, 295:19,
296:9, 330:20,
330:21, 330:22,
335:22
**treats**
51:22
**trial**
6:5, 9:6,
15:24, 16:3,
44:5, 44:10,
44:12, 46:13,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

152

59:20, 60:3,
84:22, 84:24,
128:10, 128:13,
173:10, 174:23,
184:2, 200:8,
210:10, 210:11,
211:1, 218:23,
235:24, 245:22,
254:9, 257:18,
260:17, 260:18,
263:14, 264:14,
264:19, 264:24,
265:21, 265:23,
266:2, 266:3,
266:5, 266:14,
267:4, 267:7,
267:8, 269:6,
269:16, 269:23,
269:24, 270:13,
271:7, 271:20,
279:16, 307:10,
307:13, 307:19,
320:1, 320:11,
320:12, 321:8,
322:9, 324:14,
324:16, 324:17,
342:12
**trials**
342:23
**triangular**
130:23, 193:6,
193:16, 194:8
**triangulate**
165:18
**tribune**
191:1
**tried**
50:20, 75:18,
229:24, 273:16,
273:19, 345:7
**trier**
11:14, 211:1
**truck**
16:21
**true**
72:18, 136:19,
136:21, 154:14,
180:16, 180:17,

213:2, 233:15,
233:17, 258:12,
301:13, 320:12,
326:15, 332:16,
333:2, 359:8
**truly**
188:10
**trust**
8:22, 9:3, 9:8,
42:7
**trusting**
262:17
**trustworthy**
231:11
**truth**
62:18, 85:23,
87:6, 92:1,
92:5, 92:6,
92:10, 143:23,
152:1, 287:18,
289:3
**truthful**
43:3, 44:9,
46:15, 47:9,
47:17, 48:11,
55:7, 61:17,
61:21, 85:22,
111:4, 117:24,
118:19, 144:6,
145:17, 147:13,
150:16, 150:22,
151:6, 168:12,
169:1, 172:4,
250:2, 250:6,
250:10, 250:17,
251:12, 251:16,
252:2, 259:7,
260:3, 284:1,
285:6, 285:9,
285:13, 285:23,
287:1, 287:6,
289:2, 325:2,
326:16, 327:2,
345:7, 356:17
**truthfully**
11:9
**truthfulness**
62:16, 284:5,

284:9, 293:14
**try**
10:13, 118:18,
229:23, 230:14,
231:20, 232:8,
233:1, 237:20,
270:4, 318:20,
355:23
**trying**
37:4, 47:3,
68:7, 70:3,
113:9, 129:11,
159:19, 165:18,
171:15, 192:10,
194:24, 214:18,
230:5, 230:9,
256:7, 277:1,
279:20, 327:9,
345:4
**tuesday**
1:20
**turn**
85:10, 226:15,
226:17, 240:19,
245:24, 265:13,
294:16, 334:23
**turned**
44:8, 97:3,
242:1, 291:6,
340:9
**turner**
83:24, 84:4
**turning**
108:5, 195:17
**turquoise**
109:8, 114:11,
164:1
**twice**
20:6, 186:11,
349:18
**two**
11:16, 26:8,
32:12, 33:12,
33:14, 33:15,
33:21, 34:3,
34:8, 60:13,
60:17, 60:24,
61:1, 65:15,

67:22, 87:12,
87:24, 88:17,
106:23, 155:6,
184:8, 186:2,
192:7, 201:17,
208:5, 213:7,
287:23, 292:11,
294:5, 294:22,
295:1, 314:8,
314:15, 335:3,
342:6, 344:5
**type**
8:22, 16:2,
140:4, 140:23,
142:23, 150:17,
185:6, 193:19,
331:17
**typed**
172:21, 173:21,
309:4
**typer**
309:4
**types**
31:10, 37:22
**typewriting**
359:11
**typical**
124:11
**typically**
35:9, 63:6,
73:24, 220:9,
220:13, 221:9
**typographical**
358:5

---
U
---

**uh-huh**
185:5, 210:18
**ultimately**
22:17, 41:20,
327:19
**unable**
258:10
**unborn**
356:7
**uncommon**
131:22, 253:15,
337:10, 337:12

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

153

**under**
12:21, 13:10,
30:5, 89:11,
143:15, 144:22,
152:4, 183:17,
185:1, 260:3,
260:6, 272:17,
273:21, 276:9,
276:11, 282:4,
297:22, 297:23,
302:8, 310:24,
318:1, 333:11,
345:5, 359:11
**underlined**
112:16
**underneath**
199:21
**understand**
10:18, 10:21,
25:11, 35:2,
43:16, 58:7,
61:15, 61:19,
62:24, 70:22,
82:3, 88:14,
89:20, 123:2,
129:11, 133:20,
133:24, 134:1,
137:4, 158:2,
158:21, 171:23,
181:11, 197:22,
255:7, 256:7,
259:16, 260:6,
276:24, 304:4,
327:6, 331:20,
337:4, 353:7
**understandable**
171:16
**understanding**
34:6, 118:19,
125:21, 320:21,
326:1, 350:3,
350:6
**understood**
10:24, 32:13,
87:4, 119:18,
125:18, 125:23,
127:10, 135:17
**undue**
37:5

**unequivocally**
344:4
**uneventful**
286:18
**unfortunately**
272:16
**unilaterally**
50:19, 132:9
**unique**
35:21, 347:17
**unit**
22:8, 64:5,
69:24, 86:20,
120:11, 122:23,
123:3, 220:23,
271:18, 313:24,
350:7
**united**
1:1, 305:15
**university**
11:17, 11:20,
11:24, 12:2,
12:9, 12:13,
12:17, 12:20,
14:11
**unknown**
274:7, 274:11,
274:20, 275:6,
275:15, 276:5
**unless**
39:19, 73:19,
98:14, 134:12,
140:13, 169:6,
218:4, 257:17,
320:11, 321:1,
321:7, 356:3
**unlicensed**
19:3
**unnecessary**
196:13
**unpaid**
17:5, 17:11,
17:17, 17:18,
17:19
**unsalient**
166:15
**until**
10:9, 10:14,

22:8, 77:9,
111:17, 138:7,
154:22, 155:9,
177:22, 179:10,
197:1, 197:16,
218:8, 233:20,
250:9, 250:21,
251:6, 255:13,
259:10, 323:9,
323:10
**untruthful**
47:2, 47:14,
241:13, 290:17
**untruthfulness**
293:14
**unusual**
253:15, 292:18
**update**
225:3, 225:8
**upper**
112:6
**upstairs**
79:22
**use**
35:6, 129:11,
137:2, 148:6,
192:3, 195:7,
195:8, 237:20,
253:21, 315:3,
315:6, 315:11,
315:14, 321:5,
328:8, 333:19
**uses**
195:5
**using**
231:1, 238:24,
344:21
**usually**
73:23

---
**V**
---

**v-a-c-i**
65:8
**vacate**
313:24
**vacated**
72:17
**vaci**
65:4, 65:6

**vagina**
106:18, 186:4,
186:6, 206:20,
274:8, 274:12,
274:21, 275:16,
275:24
**vaginal**
94:2, 94:3,
203:7, 241:23,
291:4
**varied**
53:5, 53:8,
66:23
**variety**
301:19
**various**
14:22
**vary**
53:9
**verb**
326:2, 326:3
**verdict**
9:5, 9:20
**verify**
32:12, 147:11,
256:16, 275:4,
336:22
**version**
228:20
**versions**
292:11
**versus**
52:1, 94:22
**victim**
85:19, 85:20,
86:4, 86:5,
86:8, 86:10,
88:1, 88:18,
93:17, 99:3,
99:16, 102:9,
102:16, 103:3,
103:4, 103:8,
103:15, 103:24,
110:21, 111:7,
113:10, 114:4,
116:7, 117:2,
117:3, 147:14,
150:17, 152:3,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

154

160:15, 160:24,
161:9, 161:10,
162:2, 163:3,
163:13, 163:15,
165:17, 166:3,
166:4, 166:18,
186:4, 186:7,
201:8, 201:11,
201:12, 201:14,
201:15, 201:22,
202:10, 203:4,
203:8, 206:20,
241:22, 241:24,
242:19, 274:5,
274:6, 274:7,
275:10, 275:11,
275:14, 278:2,
282:14, 282:19,
283:5, 283:10,
288:23, 288:24,
289:8, 289:9,
289:11, 289:14,
290:1, 290:4,
291:3, 291:4,
291:13, 291:23,
293:6, 294:3,
294:6, 336:6,
357:20
**victim's**
72:3, 111:16,
117:15, 117:18,
118:5, 118:22,
127:8, 165:12,
166:2, 187:22,
188:21, 189:5,
274:8, 274:12,
274:21, 275:16,
275:22, 275:23,
321:12, 321:20,
356:7
**victims**
166:5
**video**
7:2
**videographer**
4:19, 7:2,
7:11, 49:3,
49:5, 105:6,

105:8, 169:16,
169:18, 236:22,
236:24, 297:17,
297:19, 355:18
**videotaped**
1:18, 2:1
**view**
46:18
**violate**
332:5, 355:3
**violated**
304:22
**violation**
304:18
**violations**
303:7
**violent**
86:20, 87:23,
88:16, 90:3,
219:4
**vitiate**
155:20
**volume**
21:5
**voluntarily**
44:3, 331:23,
331:24, 332:9,
332:14, 332:20,
333:13
**voluntary**
47:21, 284:2
**volunteer**
19:21

---
W
---

**w3**
210:22
**wait**
10:9, 10:14,
55:16, 56:3,
67:1, 67:11,
138:7, 153:13,
194:13, 197:1,
197:16, 257:10,
259:10, 323:9
**waited**
18:21, 152:17,
152:20, 153:5,

176:5
**waiting**
17:7, 17:16,
175:24
**waive**
125:20, 310:8,
310:10, 310:15,
310:18, 358:7,
358:9, 358:10
**walked**
157:4, 201:11
**walking**
170:15
**wall**
123:23, 124:5,
124:16
**walls**
123:23, 124:4,
124:15
**want**
9:23, 24:19,
25:4, 25:8,
38:12, 46:16,
46:20, 50:19,
51:6, 62:17,
89:18, 89:24,
96:18, 99:8,
104:15, 114:19,
114:20, 117:14,
117:17, 118:4,
118:11, 121:24,
123:4, 129:11,
134:17, 134:23,
138:1, 142:12,
142:13, 155:15,
155:24, 157:23,
158:9, 176:24,
178:6, 181:9,
185:22, 197:11,
198:4, 209:22,
211:9, 211:13,
214:10, 225:13,
225:16, 225:17,
225:19, 229:7,
231:12, 235:10,
235:18, 236:1,
255:4, 259:6,
259:9, 259:12,

259:14, 267:17,
287:24, 290:6,
296:18, 301:9,
301:22, 302:1,
305:20, 314:15,
316:6, 316:9,
327:17, 329:14,
332:24, 333:7,
333:8, 334:8,
337:13, 345:3,
348:8, 350:21,
355:21
**wanted**
24:16, 24:17,
24:22, 25:4,
32:6, 34:2,
34:9, 35:10,
37:7, 38:9,
41:10, 47:9,
47:16, 49:9,
53:12, 61:15,
63:14, 85:22,
87:5, 91:24,
92:9, 96:6,
96:12, 99:1,
99:4, 99:15,
111:1, 111:3,
111:7, 116:22,
116:24, 132:24,
137:9, 137:11,
137:21, 140:1,
140:5, 140:23,
144:12, 152:4,
162:4, 177:13,
178:16, 179:1,
196:1, 196:11,
197:2, 197:6,
197:8, 210:5,
224:17, 225:14,
229:2, 230:1,
237:5, 247:21,
249:6, 249:22,
249:23, 250:14,
250:17, 259:24,
260:2, 260:9,
260:13, 260:24,
287:8, 289:2,
326:15, 329:6,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

155

329:10, 329:14,
329:20, 330:14,
330:16, 336:12,
336:14, 337:17,
350:4, 350:8
**wanting**
312:9
**wants**
153:8, 235:12,
289:24, 291:11
**war**
19:21
**warnings**
170:1, 186:2
**warrant**
303:7
**watched**
156:23, 157:4,
157:10, 196:8,
290:2, 290:3
**watching**
294:5
**water**
147:8
**wave**
77:2
**way**
10:20, 36:23,
41:17, 55:3,
72:16, 103:22,
104:8, 114:2,
116:13, 123:5,
133:4, 144:11,
144:12, 147:13,
152:3, 152:15,
179:10, 220:15,
223:2, 233:6,
266:21, 268:18,
275:4, 286:24,
287:7, 287:20,
290:12, 292:10,
294:16, 308:16,
309:3, 317:5,
323:16, 329:4
**ways**
61:20
**we'll**
104:23, 129:16,

129:17, 129:19,
214:16, 245:18,
262:19, 265:10,
322:22, 358:10
**we're**
10:2, 10:11,
10:15, 20:16,
21:2, 21:5,
48:24, 55:19,
89:20, 129:8,
153:15, 157:23,
159:19, 203:2,
206:15, 246:2,
246:13, 255:15,
304:11
**we've**
20:14, 81:12,
95:4, 100:6,
105:12, 112:4,
153:21, 167:2,
182:7, 182:16,
184:21, 218:21,
240:22, 270:2,
272:6, 272:19,
298:9, 305:24,
306:3, 308:1,
308:22, 311:15
**weapon**
193:19
**wearing**
109:5, 109:7,
109:11, 109:23,
110:5, 110:6,
110:10, 110:22,
113:11, 113:13,
114:4, 114:5,
114:9, 163:3,
163:13, 163:15,
163:23, 164:5,
164:8, 164:18
**website**
27:9, 27:20,
28:14, 28:17,
29:4, 298:10,
299:3, 299:5,
299:7, 299:18,
299:22, 300:6,
300:18, 301:1,

301:15
**week**
21:13, 354:9
**weeks**
60:17
**weight**
163:20, 163:21
**welcome**
85:9, 114:21,
139:3, 164:1
**well-groomed**
120:21
**went**
9:6, 9:20,
11:16, 12:10,
12:11, 14:12,
14:16, 18:22,
19:4, 19:9,
19:20, 22:16,
22:23, 25:20,
30:17, 49:24,
73:19, 74:8,
78:4, 80:19,
86:2, 86:7,
86:9, 86:12,
87:5, 88:1,
91:17, 92:24,
94:14, 115:20,
125:6, 125:17,
157:6, 157:11,
160:20, 168:1,
178:23, 201:12,
201:13, 201:14,
202:10, 214:12,
214:13, 214:15,
216:1, 216:3,
220:7, 220:24,
225:22, 241:14,
241:16, 241:20,
241:24, 242:3,
242:4, 276:21,
289:6, 289:10,
289:13, 289:16,
290:18, 290:21,
291:1, 291:5,
291:7, 291:9,
293:7, 303:6,
322:7, 340:11,

343:13, 344:10
**wentworth**
66:6, 67:18,
68:10
**weren't**
18:20, 19:2,
39:20, 40:14,
63:11, 78:16,
107:19, 134:5,
138:4, 208:2,
257:5, 327:10,
339:18
**west**
4:13, 11:14,
66:2, 68:9,
68:12, 107:6,
186:8, 207:12,
241:16, 241:18,
274:5, 275:10,
290:20, 290:23
**whatever**
24:13, 66:17,
107:17, 169:11,
197:7, 230:24,
250:8, 277:10,
287:16, 328:12
**whereof**
359:16
**wherever**
76:20, 250:16
**whether**
38:22, 39:17,
39:22, 49:10,
54:9, 68:2,
72:17, 72:21,
92:23, 103:20,
104:13, 109:22,
111:12, 113:11,
132:20, 135:1,
139:11, 141:19,
143:4, 143:20,
161:17, 180:19,
186:15, 186:19,
186:20, 195:23,
209:21, 212:13,
214:12, 221:16,
221:17, 237:5,
237:8, 240:8,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                                    156

240:9, 243:16,
243:23, 244:6,
244:11, 250:12,
251:4, 263:5,
263:7, 264:10,
267:9, 269:19,
270:14, 301:7,
301:24, 304:10,
306:8, 310:3,
318:13, 318:15,
321:24, 322:1,
322:4, 324:20,
327:1, 332:13,
332:19, 333:12,
333:18, 333:19,
333:20, 333:21,
336:21, 337:1,
337:2, 350:10,
356:15
**whichever**
49:8, 284:14
**white**
190:17, 191:3
**whoa**
208:20
**whoever**
220:10, 220:17
**whole**
108:21, 191:2
**whore**
356:2
**wide**
301:19
**wield**
318:21
**wildman's**
28:1
**william**
1:15
**williams**
5:15, 59:17,
86:1, 99:22,
100:7, 100:15,
100:24, 101:5,
101:8, 101:9,
101:16, 101:20,
102:19, 103:2,
115:11, 116:8,

116:18, 212:15,
213:5, 213:6,
227:7, 289:5,
306:11
**willing**
42:9, 68:22,
230:1, 329:24,
330:5
**window**
97:4, 215:19,
235:23
**windpipe**
193:7
**wished**
35:6
**witching**
217:20
**withdraw**
54:17, 203:20
**withdrawing**
46:5
**within**
60:17, 108:20,
115:16, 126:10,
301:8
**without**
52:5, 161:20,
179:17, 253:7,
326:23, 344:8
**witness**
8:4, 8:18,
8:23, 8:24,
9:11, 28:7,
39:11, 49:16,
50:18, 87:12,
87:24, 88:17,
89:2, 92:16,
96:5, 98:22,
105:22, 111:5,
113:20, 113:24,
115:6, 118:9,
138:9, 138:12,
156:15, 158:4,
158:12, 158:13,
158:14, 158:18,
159:18, 160:1,
169:11, 169:14,
181:5, 194:10,

196:16, 196:23,
197:18, 197:23,
201:8, 201:9,
201:10, 201:11,
201:16, 202:12,
206:17, 208:12,
210:16, 210:21,
210:22, 212:14,
233:6, 235:12,
235:16, 239:8,
239:9, 249:11,
251:17, 257:11,
257:23, 269:14,
274:17, 293:5,
310:22, 311:21,
319:3, 334:20,
334:22, 358:6,
358:9, 359:16
**witnessed**
117:1, 154:1,
242:17
**witnesses**
49:8, 49:12,
50:6, 50:11,
93:8, 93:12,
93:13, 111:14,
115:1, 115:14,
115:18, 118:15,
118:18, 132:14,
133:5, 134:13,
155:8, 155:10,
185:15, 210:13,
211:2, 212:6,
213:7, 231:7,
306:4, 306:10
**woman**
69:18, 70:9,
102:20, 115:22,
145:6, 210:7,
322:2, 351:3,
351:12, 352:7
**women**
155:6
**wonder**
154:20
**wondered**
154:24
**word**
20:15, 66:3,

192:3, 195:6,
195:7, 195:8,
195:9, 199:21,
203:10, 203:13,
203:15, 205:22,
315:11, 315:14,
325:23, 325:24,
328:22, 331:6,
339:2, 343:19
**words**
106:22, 152:20,
327:2, 344:24,
345:2
**work**
12:16, 14:16,
16:15, 19:6,
20:5, 20:10,
21:1, 21:4,
21:7, 24:23,
25:4, 25:8,
25:15, 26:9,
26:13, 26:21,
27:14, 65:16,
66:21, 67:5,
73:12, 74:3,
74:6, 75:3,
75:16, 76:3,
78:17, 78:18,
79:17, 81:5,
84:3, 141:5,
204:12, 205:11,
213:10, 213:16,
214:24, 216:6,
217:7, 217:11,
217:13, 222:14,
271:10, 271:13,
271:15, 271:18,
287:19, 295:24
**worked**
14:22, 14:24,
15:24, 16:8,
16:9, 16:11,
16:12, 19:8,
19:12, 20:3,
24:1, 27:3,
41:18, 41:22,
42:6, 42:7,
67:3, 71:6,

73:11, 73:13,
73:15, 74:13,
74:23, 75:14,
80:7, 80:20,
80:23, 81:4,
81:12, 82:17,
82:19, 82:23,
83:6, 83:10,
83:14, 83:19,
84:9, 149:4,
190:17, 191:2,
204:10, 204:14,
204:17, 204:19,
204:22, 204:24,
205:1, 205:3,
205:4, 205:7,
205:16, 205:17,
205:18, 205:22,
214:19, 214:20,
214:22, 220:19,
221:8, 222:21,
283:5, 283:11,
347:5

**working**
17:6, 17:9,
34:20, 66:11,
66:12, 67:8,
75:9, 79:17,
80:1, 84:1,
119:16, 152:16,
192:19, 205:20,
205:24, 206:11,
213:13, 213:19,
213:20, 213:23,
214:3, 214:4,
214:23, 217:9,
218:5, 221:12,
331:1

**workwise**
25:14

**worries**
10:7

**wouldn't**
43:11, 45:13,
57:11, 66:18,
81:4, 103:13,
115:19, 121:24,
125:9, 134:11,

134:15, 134:22,
141:21, 142:20,
151:7, 152:11,
155:20, 161:8,
170:18, 178:6,
184:10, 202:22,
216:13, 218:4,
220:18, 221:3,
225:7, 229:2,
285:2, 294:8,
307:5, 355:5,
355:7

**wow**
26:7

**write**
16:16, 32:7,
100:18, 100:22,
188:12, 227:23,
228:1, 274:20,
277:10, 301:1,
308:16

**writers**
27:22, 28:3,
28:10, 28:11,
28:12

**writing**
16:1, 31:15,
95:20, 135:6

**written**
37:17, 47:10,
107:13, 142:14,
143:5, 143:10,
223:15

**wrong**
46:4, 147:22,
158:18

**wrongdoing**
9:18

**wrongful**
298:13, 301:21,
302:2, 305:14,
305:17, 350:7

**wrote**
89:16, 193:4,
193:24, 194:1,
207:16, 277:24

**X**

**x'd**
32:18

**Y**

**yard**
205:13

**yeah**
10:7, 14:20,
16:20, 17:12,
23:24, 24:5,
24:13, 30:17,
39:7, 56:18,
57:19, 64:23,
65:1, 76:23,
78:15, 80:6,
81:19, 81:21,
92:8, 96:16,
96:19, 100:20,
100:23, 102:23,
105:4, 106:10,
112:10, 114:3,
114:19, 117:11,
142:4, 143:12,
145:8, 149:3,
154:11, 157:15,
157:18, 166:5,
185:7, 186:10,
187:5, 193:18,
193:24, 195:3,
195:14, 199:4,
200:18, 201:4,
204:16, 204:18,
206:13, 214:17,
238:6, 245:6,
245:10, 256:8,
260:15, 266:3,
266:14, 273:20,
278:20, 282:24,
288:18, 303:23,
308:13, 309:17,
313:8, 319:19,
329:17, 340:17,
341:6, 341:12,
341:24, 343:5,
344:12, 346:16,
347:7, 348:7,
348:11, 350:5

**year**
12:14, 12:21,
13:10, 15:16,

17:8, 17:21,
19:8, 19:9,
19:11, 20:2,
22:5, 24:12,
26:7, 65:21,
298:16, 298:23,
299:11, 299:16,
319:18

**year-old**
98:10

**years**
8:15, 8:21,
13:21, 19:6,
19:10, 20:10,
20:23, 27:23,
27:24, 29:7,
29:8, 29:12,
30:9, 55:19,
80:15, 93:15,
98:5, 100:15,
100:20, 102:3,
145:12, 161:18,
162:21, 183:16,
206:24, 208:5,
208:6, 212:11,
215:18, 216:4,
216:20, 234:22,
238:9, 258:16,
258:17, 258:18,
258:19, 258:21,
258:22, 270:16,
280:14, 284:19,
287:22, 304:21,
304:23, 319:19,
335:21, 353:3,
353:11

**yelling**
287:7

**yep**
154:17, 343:7

**young**
115:22, 207:22,
208:3, 238:7

**yourself**
25:8, 25:15,
66:15, 92:23,
124:23, 125:4,
185:15, 221:12,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019                    158

249:5, 253:7,
280:20, 281:6,
296:9, 296:24,
297:7, 348:21

**Z**

**zellner**
3:12
**zisl**
26:11

**0**

**00**
73:19, 74:2,
75:20, 79:11,
79:15, 79:16,
154:18, 154:21,
155:3, 155:9,
155:13, 156:1,
213:14, 213:16,
213:20, 213:21,
214:5, 215:1,
217:7, 217:10,
217:11, 217:12,
217:13, 218:4,
218:6, 235:22,
236:5, 236:9,
236:19, 237:3,
255:14, 276:8,
335:6
**000478**
174:3
**001987**
173:18
**003733**
359:4
**004300**
219:1
**004303**
254:10
**004315**
260:19
**004316**
263:15
**004823**
262:3
**00998**
1:7, 7:5

**010**
254:9
**022**
260:17
**023**
263:14
**04**
49:3, 49:4
**05**
175:15, 175:21
**0615**
182:16
**07**
218:24
**08**
236:3
**084**
359:4
**09**
236:3

**1**

**1**
77:17, 79:3,
124:6, 169:16,
169:17, 275:11
**1's**
201:16, 202:12,
274:7, 278:2
**10**
1:21, 6:1,
7:10, 8:15,
49:4, 49:5,
60:14, 105:17,
105:20, 106:2,
148:8, 154:22,
190:6, 190:7,
236:5, 236:9,
236:19, 237:3,
246:6, 255:14,
265:16, 266:24,
276:8, 278:5,
278:11, 278:16,
278:17, 334:20,
335:6, 353:11
**100**
5:15, 95:14,
282:11

**1000**
4:8
**101**
6:11, 6:12,
308:12, 309:6
**105**
5:17
**11**
6:3, 19:22,
20:2, 49:3,
49:4, 49:5,
107:5, 107:6,
107:8, 109:6,
109:23, 110:11,
111:18, 113:12,
113:14, 114:6,
116:14, 155:3,
155:9, 156:3,
156:9, 163:4,
163:13, 165:17,
173:12, 173:20,
174:1, 174:6,
174:18, 174:19,
174:22, 175:7,
218:18, 218:19,
218:22, 274:17,
278:8, 295:7,
334:18
**111**
66:10, 353:10
**112**
5:19
**12**
6:5, 23:3,
65:16, 85:11,
105:6, 105:7,
105:8, 139:2,
175:15, 175:21,
235:23, 245:19,
245:20, 245:22,
245:24, 288:9,
288:10, 288:11,
288:15, 288:16,
334:14, 334:18,
334:19
**121**
5:20
**1212**
3:16

**1240**
4:14
**127**
5:21
**13**
6:7, 174:4,
265:10, 265:11,
334:7, 334:10,
334:14, 334:15,
334:16, 334:22,
343:4
**14**
6:8, 23:3,
183:7, 241:10,
242:14, 244:7,
244:20, 251:2,
251:9, 252:4,
252:6, 272:1,
272:2, 272:4,
272:6, 290:7,
290:14, 341:19,
341:22, 341:23
**141**
4:13
**1415**
182:23, 213:8
**15**
6:9, 79:12,
111:17, 119:3,
138:19, 157:14,
166:21, 183:1,
195:3, 195:4,
215:21, 224:5,
240:19, 244:8,
244:21, 251:2,
251:8, 252:9,
254:19, 255:2,
257:3, 258:11,
271:24, 297:2,
297:6, 297:8,
297:11, 298:6,
298:7, 298:9,
359:17
**153**
5:22
**16**
6:10, 100:15,
100:20, 254:12,

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

159

297:17, 297:18,
305:21, 305:22,
306:1, 306:6,
306:22, 307:17,
307:22, 359:20
**17**
1:13, 6:11,
7:6, 98:5,
98:10, 105:6,
105:7, 219:1,
246:14, 308:7,
308:8, 335:2
**18**
1:7, 1:21,
6:12, 7:5, 7:10,
207:4, 308:19,
308:20, 308:22,
308:24
**180**
2:5, 7:7
**182**
5:23
**190**
6:1
**1901**
3:13
**1947**
112:20
**1981**
11:19
**1986**
14:9
**1987**
14:8, 14:9
**1989**
14:8
**1990**
18:16
**1992**
22:2
**1993**
22:10, 24:2
**1994**
24:2, 75:10,
76:14, 80:10,
82:11, 96:24,
107:2, 107:5,
108:6, 109:6,

109:18, 109:23,
110:11, 112:7,
112:13, 112:20,
113:12, 113:14,
114:6, 115:12,
115:18, 116:14,
121:7, 132:22,
163:4, 163:13,
165:17, 183:12,
200:15, 202:17,
219:3, 246:17,
270:20, 271:11,
271:14, 272:7,
276:16, 277:3,
306:7, 319:9,
320:8, 320:14
**1995**
25:19, 25:20
**1997**
245:23
**1st**
272:7, 342:21

---

**2**
169:17, 169:18,
183:1, 215:21,
224:5, 334:18
**2's**
201:10
**20**
30:8, 169:9,
169:12, 254:19,
255:3, 257:4,
258:22, 270:16
**2019**
1:20, 7:9,
359:18
**2021**
359:20
**21**
191:3
**218**
6:3
**22**
343:8
**2200**
4:6

**23**
169:17, 169:18,
173:17, 236:3
**2350**
276:16, 277:3,
277:15, 277:17
**24**
21:2
**243**
3:8
**245**
6:5
**25**
29:12, 30:9,
57:13, 57:15,
80:15, 102:3,
105:17, 105:20,
106:2, 145:12,
161:18, 162:21,
206:24, 207:6,
207:7, 208:4,
215:18, 216:4,
216:20, 280:14,
284:19, 304:21,
304:23, 335:21
**26**
16:6, 66:13,
67:1, 67:10,
67:13, 75:21,
76:5, 78:9,
78:22, 79:8,
79:10, 183:7,
238:9, 238:10,
341:23, 349:22,
349:23
**265**
6:7
**270734**
1:22
**272**
6:8
**28**
111:17, 112:7,
112:13, 112:20,
113:5, 121:6,
207:10, 297:18,
297:19
**29**
75:10, 76:14,

80:10, 82:11,
96:24, 107:2,
108:6, 109:18,
115:12, 115:18,
132:21, 200:15,
202:17, 213:9,
213:24, 215:6,
215:13, 245:16,
246:17, 255:13,
256:2, 256:11,
256:20, 257:19,
340:7, 342:21
**298**
6:9
**2nd**
66:17

---

**3**

**3**
236:22, 236:23,
236:24
**30**
74:1, 74:2,
75:19, 105:7,
105:8, 154:18,
154:21, 154:22,
155:3, 155:9,
155:14, 156:1,
156:19, 213:19,
213:23, 214:1,
214:4, 214:24,
217:6, 217:22,
219:3, 219:5,
219:6, 219:9,
219:16, 222:6,
222:14, 225:22,
225:23, 233:19,
233:20, 235:5,
235:21, 246:7,
255:13, 255:15,
255:16, 255:17,
256:2, 256:10,
257:18, 264:9,
276:8, 276:16,
277:3, 282:9,
315:16, 317:15,
334:2
**305**
6:10

Transcript of Harold Mark Garfinkel
Conducted on December 3, 2019

160

**308**
6:11, 6:12
**311**
3:5
**312**
3:8, 3:24, 4:8,
4:16, 5:4
**321**
4:5
**3300**
4:16
**34**
21:6
**35**
235:23, 261:16
**355**
5:5
**359**
1:23
**36**
134:17, 134:22,
245:6, 245:10,
255:16
**365**
65:21
**3700**
2:6, 7:8
**3767**
2:8
**38**
255:17, 258:8
**381**
257:6
**39**
236:22, 236:23
**3rd**
3:6, 7:9

---
**4**

**4**
108:18
**40**
173:12, 173:20,
174:6, 174:18,
174:19, 174:22,
175:7, 255:18,
257:2, 358:11
**401**
129:7

**402**
129:7
**42**
23:14
**433**
2:8
**44**
23:13, 169:16,
169:17
**45**
95:8, 95:16,
95:18, 119:4,
138:19, 261:16,
263:17, 264:5,
264:9
**47**
112:7
**48**
23:13
**4803**
335:2
**494**
4:8

---
**5**

**5**
74:1, 74:2,
75:19, 217:22,
260:20, 297:17,
297:18, 297:19
**50**
23:14, 57:15,
281:22, 282:1
**500**
3:22
**51**
66:6, 67:17,
68:9, 355:18
**55**
86:3, 107:6,
107:8, 156:3,
156:9, 201:13,
241:16, 241:18,
289:6, 290:20,
290:23
**5527**
3:24
**56**
86:1, 289:5

**560**
193:5
**57**
153:23, 185:8,
343:6
**58**
236:23, 236:24
**5900**
3:8
**5th**
66:17

---
**6**

**6**
73:19, 74:2,
75:20, 79:11,
213:16, 215:1,
217:7, 217:10,
217:11, 217:12,
217:13, 218:4,
218:6, 355:18,
358:11
**603**
3:24
**60515**
3:15
**60601**
2:7
**60602**
3:23
**60604**
4:15
**60607**
3:7
**60654**
4:7
**630**
3:16
**650**
3:14
**66**
23:16
**68**
334:9, 334:23
**69**
207:5
**6:-a**
213:20, 214:5

**6:-p**
213:21
**6:-to-6**
213:14

---
**7**

**7**
79:15, 95:8,
95:16, 95:18,
112:7, 246:7,
255:13, 255:16,
256:2, 256:10,
257:18
**711**
15:4, 16:2,
17:11, 17:17,
17:18, 149:4
**735**
4:16
**75**
183:9, 183:11
**77**
272:18
**7th**
245:23

---
**8**

**8**
79:16, 187:4,
235:22
**81**
11:23
**82**
11:22, 20:8
**83**
245:24
**84**
11:23, 11:24,
246:14, 246:21
**85**
5:12, 11:24,
12:7, 246:22
**86**
14:1, 14:14,
246:22
**8696**
1:13, 7:6
**87**
14:14, 14:17,

15:1
**88**
262:2, 265:13,
266:24
**888**
2:8
**89**
15:1, 15:4,
17:24, 18:5,
18:7, 18:14

**9**

**9**
79:15, 153:23,
154:18, 154:21,
155:13, 155:14,
156:1, 185:8,
219:5, 219:6,
219:9, 219:16,
222:6, 225:23,
233:19, 233:20,
255:17
**90**
18:7, 18:23,
19:8, 142:1,
143:19, 143:24,
319:18
**908**
192:7
**91**
19:8, 19:18
**917**
107:6, 186:8,
207:12, 241:16,
241:18, 274:5,
275:10, 290:20,
290:23
**92**
19:24, 22:12
**93**
22:13, 22:23,
141:3
**94**
22:21, 22:22,
22:23, 141:3,
193:5, 207:10
**95**
5:13, 24:10

**955**
3:16
**9:**
156:19

```
 1    STATE OF ILLINOIS  )
                         )  SS:
 2    COUNTY OF COOK     )

 3              IN THE CIRCUIT COURT OF COOK COUNTY
                  COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE  )
 5    STATE OF ILLINOIS  )
                         )
 6                       )  Indictment No. 92 8344
            VS           )
 7                       )  Charge:  Murder
      HAROLD HILL,       )
 8    DAN YOUNG          )

 9              REPORT OF PROCEEDINGS

10          BE IT REMEMBERED that on the 19th day of

11    September A.D., 1994, this cause came on for trial

12    before the Honorable THOMAS P. DURKIN, Judge of said

13    court, and juries, upon the indictment herein, the

14    defendants having entered pleas of not guilty.

15          APPEARANCES:

16              HON. JACK O'MALLEY,
                State's Attorney of Cook County, by
17              MS. LAURA LAMBUR and MS. LYNDA PETERS,
                Assistant State's Attorneys,
18                  appeared for the People;

19              HON. RITA A. FRY,
                Public Defender of Cook County, by
20              MR. WOODWARD JORDAN and
                MS. CHERYL BORMANN,
21              Assistant Public Defenders,
                    appeared for the Defendant Hill;
22
                MR. STEVEN GREENBERG,
23                  appeared for the Defendant Young.

24
```



PLAINTIFF'S
EXHIBIT
*A*

1          (A discussion was had between

2          the court and counsel off

3          the record, out of the

4          hearing of the jury and the

5          court reporter.)

6          MR. GREENBERG:  Judge, I would call

7   Mr. Young.

8          THE COURT:  Mr. Young, do you want to walk

9   over here, please.  Raise your right hand to be sworn.

10          (Witness sworn.)

11          THE COURT:  Please be seated.  State your

12   full name.

13          TH WITNESS:  My name is Dan Young.

14          DAN YOUNG,

15   one of the defendants herein, called as a witness in

16   his own behalf, having been first duly sworn, was

17   examined and testified as follows:

18          DIRECT EXAMINATION

19          BY MR. GREENBERG:

20     Q    Mr. Young, please make sure that you speak

21   up?

22     A    My name is Dan Young.

23     Q    Mr. Young, where do you live?

24     A    55th and Halsted.

9

| | | |
|---|---|---|
| 1 | Q | Who do you live with? |
| 2 | A | With my guardian. |
| 3 | Q | Who is that? |
| 4 | A | Wardell Moore. |
| 5 | | THE COURT: Wardell? Is that Wardell Moore? |
| 6 | | THE WITNESS: Uh-uh. |

BY MR. GREENBERG:

        Q    Is that where you're living now, Mr. Young?

        A    I moved off of 55th and Halsted.

        Q    Where are you living now, Mr. Young?

        A    Nowhere now.

        Q    Where did you sleep last night?

        A    Last night? In jail.

        Q    Now, I want to turn your attention -- Do you
know what day it is?

        A    No.

        Q    Do you know where you were a year ago?

        A    In jail.

        Q    How about two years ago?

        A    In jail.

        Q    How about three years ago?

        A    In jail.

        Q    How about four years ago, that would be in
1990?

```
 1          A     1990 I was living in a boarding house.

 2          Q     In a boarding house?

 3          A     Uh-huh.

 4          Q     In September of 1990?

 5          A     Yeah.

 6          Q     Do you remember where that boarding house

 7    was?

 8          A     On 55th and Halsted.

 9          Q     Okay.  Is that where you were living with

10    Reverend Moore?

11          A     Uh-uh.  I was living with a couple more guys.

12          Q     Okay.  Do you know Harold Hill?

13          A     No.

14          Q     And when I say Harold Hill I mean the other

15    gentleman who has been sitting in this courtroom, do

16    you know him?

17          A     No.

18          Q     Do you know anyone named Peter Williams?

19          A     No.

20                MR. GREENBERG:  May I approach, judge?

21                THE COURT:  You may.

22

23

24
```

1    BY MR. GREENBERG:

2        Q    I'm going to show you what was previously

3    marked in this trial as Defendant's Exhibit 4.  Do you

4    know what that is?

5        A    I sure don't.

6        Q    Is it a picture?

7        A    A picture of a guy.

8        Q    Do you know who that is?

9        A    No.

10       Q    Did you look at the picture good?

11       A    Yeah.

12       Q    Did you ever see this picture before?

13       A    No.

14       Q    Mr. Young, I'm going to show you what was

15   previously marked as People's Exhibit No. 78.  Do you

16   know what that is?

17       A    Harold Hill.

18       Q    Okay.  You know that's Harold Hill?

19       A    Yeah.

20       Q    And you signed the back of that; is that

21   right?

22       A    No.

23       Q    Is that your signature?

24       A    No.

12

1      Q     I'm going to show you what was previously

2  marked as People's Exhibit 77.

3      A     I don't know that lady.

4      Q     Okay.  Do you recognize that picture, have

5  you ever seen it before?

6      A     No.  I ain't never seen that lady in my life.

7      Q     Is this your signature on the back?

8      A     No.

9      Q     Do you know whose signature this is below

10 yours?

11     A     I sure don't.

12     Q     Do you remember being brought to the police

13 station on March 23rd of 1990?

14     A     I was walking down 55th to my apartment --

15     Q     To your apartment?

16     A     Uh-huh.  -- and then the police said -- they

17 had got me, they had me handcuffed.  They carried

18 me -- They carried me to jail.

19     Q     Did they take you to the police station

20 before they took you to jail?

21     A     They took me to the police station today.

22     Q     Today?

23     A     The police station.

24     Q     I'm sorry.  I didn't catch that.

13

1   A They carried me to the police station.

2   Q Okay.  Do you remember where they took you at

3 the police station?  Did they take you to a room?

4   A They carried me to a room.

5   Q Do you remember what that room was like?

6   A Big old room.  (Indicating.)

7   Q You're indicating with your hands.  Is it a

8 big room or small room?

9   A A small room.

10   Q Were you put in that room with anybody or

11 were you put in there alone?

12   A I was put in there alone.

13   Q Were you in handcuffs or not in handcuffs?

14   A Handcuffs.

15   Q Now, do you remember how long you were in

16 that room?

17   A I think five hours.

18   Q For only about five hours; is that right?

19   A Yeah.

20   Q And what did you do while you were in that

21 room?

22   A Sitting down.  They had bought me a pop.

23   Q They bought you a pop?

24   A Uh-huh.  I was sitting down looking out the

14

1     window.

2           Q     I didn't hear --

3                 THE COURT:   I was sitting down looking out

4     the window.

5     BY MR. GREENBERG:

6           Q     For five hours?

7           A     Yeah.

8           Q     Did you ever talk to the police while you

9     were in that room?

10          A     Uh-uh.

11          Q     Did you ever talk to the state's attorney

12    while you were in that room?

13          A     Uh-uh.  No.

14          Q     I'm going to show you what was previously

15    marked as Exhibit 76, which was identified as a

16    written statement.  Can you read by the way, Dan?

17          A     I can't read.

18          Q     Can you write?

19          A     I can write but I can't read.

20          Q     Okay.  How well can you write?

21          A     I can write my name.

22          Q     Can you write anything else?

23          A     No.

24          Q     Can you tell what time it is now?

                            15

1          A     I think it's about 10:00 o'clock.

2          Q     Here's a clock, Mr. Young, can you take a

3     look at it and tell us what time it is?  You've got to

4     stay there though.

5          A     10:00 o'clock.

6                MR. GREENBERG:  If the record could reflect,

7     judge, that it's ten to 11:00?

8     BY MR. GREENBERG:

9          Q     You don't where glasses, do you?

10         A     Uh-uh.

11         Q     Mr. Young, that statement that I gave you,

12    did you write that statement out?

13         A     Right here?

14         Q     Yeah.

15         A     No.  This not my handwriting.

16         Q     Okay.  Do you remember anyone ever reading

17    that statement to you?

18         A     I can't remember.

19         Q     Did you sign that statement?

20         A     I had signed a statement, that was a mistake.

21         Q     It was a mistake to sign it?

22         A     Yeah.

23         Q     Is that your signature on that statement?

24         A     Right here?

16

1      Q   On that piece of paper you're holding, is

2  your signature on there?

3      A   That's not my handwriting.

4      Q   That's not your handwriting.  Is this your

5  handwriting here where it says Dan Young?

6      A   This might be here.  This not.

7      MR. GREENBERG:  So indicating for the record

8  the very top line where it's printed Dan Young.

9  BY MR. GREENBERG:

10     Q   Is this maybe your signature here?

11     A   Yeah.

12     Q   Is this maybe your signature here?

13     A   Right here it is.

14     Q   It is or isn't?

15     A   This right here is my handwriting.

16     Q   Okay.  Now, Mr. Young, do you remember

17  signing this?

18     A   Signing this?

19     Q   Signing this whole paper here.

20     A   Right here?

21     Q   Yeah.

22     A   I signed it.  It was a mistake.

23     Q   Why did you sign it?

24     A   Because if I don't sign that paper I could

1      have got jumped on.  The police could have jumped on

2      me.

3          Q    Before you signed that statement did the

4      police ever touch you?

5          A    Yeah.  Uh-huh.

6          Q    What did they do to you?

7          A    They kick me, they hit me in my stomach.

8      They tore my fifty dollar coat up.

9          Q    They tore your fifty dollar coat?

10         A    Yeah.

11         Q    How did they tear your coat?

12         A    They ripped it.

13         Q    They ripped it?

14         A    Yeah.

15         Q    How many times did they kick you in your

16     stomach?

17         A    Two times.

18         Q    Was that while you were in that room?

19         A    Yeah.

20         Q    Now, you said they told you they would jump

21     on you if you didn't sign this?

22         A    Yeah.  Uh-huh.

23         Q    Did they tell you anything else about signing

24     it?

                              18

```
 1        A     That's --

 2        Q     Do you remember anything else?

 3        A     No.  I can't remember everything.

 4              MR. GREENBERG:  Okay.  Judge, can I approach

 5     again?

 6              THE COURT:  Uh-huh.

 7                          (A discussion was had between

 8                           the court and counsel off

 9                           the record, out of the

10                           hearing of the jury and the

11                           court reporter.)

12              MR. GREENBERG:  Judge, can I approach?

13              THE COURT:  Proceed, please.

14     BY MR. GREENBERG:

15        Q     Mr. Young, I'm going to show you what was

16     previously marked as Exhibit 8 for identification.  Do

17     you recognize that person?

18        A     I don't know that person.  A hundred times, I

19     don't know that person.

20        Q     Mr. Young, I'm going to show you what was

21     previously marked as Exhibit 2 for identification.

22     That's a building, isn't it?

23        A     Yeah, it's a building.

24        Q     Do you know that building?
```

19

1       A   I remember that building since back in 1978.

2  I passed by Bishop walking in 1978, that's the only

3  time I go back by Bishop walking, I was about eighteen

4  years old.

5       Q   So in 1978 you went walking by that building?

6       A   Uh-huh.  I had a girlfriend used to live over

7  there.

8       Q   Do you remember her name?

9       A   Huh?

10       Q   Do you remember her name, the girlfriend's

11  name?

12       A   Jackie.

13       MR. GREENBERG:  Judge, if I can just have one

14  second?

15  BY MR. GREENBERG:

16       Q   Mr. Young, the lady who's in that picture you

17  were just shown a minute ago, you said you don't know

18  her?

19       A   I'm sure I don't know that lady.  I ain't

20  never seen that lady in my life.

21       Q   You're sure you didn't participate in killing

22  her?

23       A   I didn't kill that lady.  I was living by

24  myself.  I don't even know that lady.

1      Q     Did you ever have sex with that lady?

2      A     No.  I ain't never stuck my penis in that

3  lady.

4      Q     I'm going to show you another picture,

5  Mr. Young.

6            THE COURT:  Is there an exhibit number?

7            MR. GREENBERG:  Yeah.  It's People's Group

8  75.

9  BY MR. GREENBERG:

10     Q     Mr. Young, take a look at those pictures.

11  Tell me if you recognize anyone in those pictures?

12     A     No.  I don't know them people.

13     Q     Mr. Young, on October 14th of 1990 did you go

14  to a party?

15     A     No, I didn't.  I never went to no party.

16     Q     To a party?

17     A     To a party?

18     Q     Yes.

19     A     No.  I ain't never went to no party.

20            THE COURT:  Party.  Do you know what a party

21  is?

22            THE WITNESS:  Yeah, I know what a party is

23  but I ain't never went to no party.

24

21

BY MR. GREENBERG:

Q    Did you ever beat a woman that night?

A    No.  I was not there.  Got me mixed up with somebody else.

MR. GREENBERG:  I have nothing else, judge.

THE COURT:  Cross.

CROSS-EXAMINATION

BY MS. LAMBUR:

Q    Mr. Young, your mother lives at -- what's your mother's address?

A    5436 South Justine.

Q    How long about has your mom lived there?

A    I think about sixteen years.

Q    About sixteen years or so?

A    Uh-huh.

Q    Now, Mr. Young, do you remember when the police came and picked you up and brought you to the police station a couple of years ago?

A    I was on my way home to wash my clothes.  You know, I got a little job, a little packing job.  They pay me every two weeks I get paid --

Q    And a couple police came by and they brought you to the police station, didn't they?

A    Yeah.  Uh-huh.

1    Q    And those two police were pretty nice to you,

2    weren't they?

3    A    They bought me a pop.  The police start

4    showing me them pictures of that girl.  I told them a

5    hundred times I don't even know that lady.

6    Q    You told them that a hundred times, right?

7    A    Yeah.  I don't even know that lady.

8    Q    And you never, ever told the police that you

9    participated in this murder, did you?

10   A    I ain't never told them nothing.  I don't

11   believe in murdering nobody.  I always been by myself.

12   Q    Because when somebody says you did something

13   wrong and you know you didn't you say you didn't do

14   it, right?

15   A    I didn't do it.  I swear to God, I swear to

16   God in Jesus name I didn't do it.

17   Q    Mr. Young, even if the police said to you you

18   can go home if you admit this, you still wouldn't

19   admit it, would you?

20   A    I don't even know nothing about it.

21   Q    You said the police gave you a pop when you

22   were at the police station, right?

23   A    Yeah.  Uh-huh  They ask me you thirsty, so

24   they bought me a pop.

23

1   Q Do you remember them giving you some White

2 Castle hamburgers?

3   A Yeah, I remember that night.

4   Q Do you remember them giving you some french

5 fries?

6   A Yeah.  Uh-huh.

7   Q Do you remember that one man, the state's

8 attorney, Mike Rogers, being there?

9   A I sure don't.

10   Q Well, you do remember the police and some

11 other man giving you the food, don't you?

12   A Yeah.  Uh-huh.

13   Q Those people were really nice to you too,

14 weren't they?

15   A Yeah.  But they lied on me.

16   Q They lied on you, huh?

17   A Uh-huh.

18   Q Because you told them all along a hundred

19 times you didn't do anything like this, right?

20   A Yeah.  I don't believe in doing anything like

21 that.  What would I take somebody's life for?

22   Q Now, you said somebody started to beat you

23 up, is that what you're saying?

24   A Yeah.  Uh-huh.

1    Q    They were punching you in the face a bunch of

2    times?

3    A    Yeah.

4    Q    And punching you in the body a bunch of

5    times?

6    A    Yeah.

7    Q    You had a bunch of bruises on your face and

8    stuff, right?

9    A    Right here.  (Indicating.)

10   Q    And you never went to a doctor --

11        MR. GREENBERG:  Where is he indicating,

12   judge?

13        THE COURT:  Indicating the left area below

14   the-eye area, below the left eye.

15   BY MS. LAMBUR:

16   Q    You never told a doctor later on that you had

17   been beaten up, did you, Mr. Young?

18   A    I didn't get a chance to see the doctor.

19   Q    You don't have any photographs of those

20   injuries on your face either, do you, Mr. Young?

21   A    Sure don't.

22   Q    And that swollen part on your face, it was

23   near your left eye?

24   A    Right here.  (Indicating.)

1       Q    Was it all swole up?

2       A    My side and things.  My side was kind of

3  sore.

4       Q    And you never told anybody about that though

5  either, did you?

6       A    Uh-uh.

7       Q    Do you remember when you left the police

8  station and then you went over to the jail?

9       A    They got me in the morning time, carried me

10  to jail in the morning time.

11       Q    And they brought you over to the jail, didn't

12  they?

13       A    Yeah.  Uh-huh.

14       Q    Do you remember having your picture taken

15  over at the jail?

16       A   I had -- To tell you the truth I had got

17  locked up.  I lived on 55th, that used to be -- I rent

18  from a white man.  I had my own apartment on 55th and

19  Halsted.

20       Q    Okay.  But, Mr. Young, after this time, after

21  the police gave you the hamburgers and the pop and the

22  french fries when you went over to jail you remember

23  having your picture taken, don't you?

24       A    They showed me my picture.  The police

1  already had my picture already.

2          MS. LAMBUR:  May I approach, judge?

3          THE COURT:  You may.  Do you have a number?

4          MS. LAMBUR:  For the record, People's 79.

5  BY MS. LAMBUR:

6      Q    Mr. Young, I'm going to show you what I've

7  marked as People's 79.  Do you recognize who's in that

8  photo?

9      A    That's me.

10      Q    And that was you the day that you went into

11  jail for this, isn't it?

12      A    Yeah.

13      Q    And that photo doesn't show any bruises

14  around your face, does it?

15      A    Small bruises.

16      Q    It was a small bruise?

17      A    Yeah.

18      Q    I thought they hit you a lot of times in your

19  face?

20      A    But they tore my fifty dollar coat up.

21      Q    What else did they do to you?

22      A    Kicked me in my stomach.

23      Q    And the people over at the jail who took your

24  picture and checked you into the jail, you never told

1    them though that you had got beaten up, did you?

2        A    No.

3        Q    You were living over at Halsted and 55th

4    Street about four years ago, is that what you said?

5        A    Yeah.  I used to live on 51st and Halsted and

6    55th and Halsted.

7        Q    And that's just about six or seven blocks

8    from this building where all this happened, right?

9        A    Yeah.

10       Q    You could walk there from your house,

11   couldn't you?

12       A    Huh?

13       Q    Like you could walk --

14       A    I walked that way.  I go see my parents.

15       Q    You could walk to this building from where

16   you were living back then, couldn't you?

17       A    I used to walk down there in the

18   neighborhood.  I don't even go by the neighborhood

19   now.

20       Q    When did you stop going by that building?

21       A    Since 1989.

22       Q    So since before this murder?

23       A    Yeah.

24       Q    Did you hear in the neighborhood about the

1    murder?

2        A    No.  I was -- No, I didn't.

3        Q    Didn't hear from anybody on the street?

4        A    No.

5        Q    Nobody came up and said did you hear what

6    happened last night?

7        A    No.  I was in --

8            MR. GREENBERG:  Objection.  Asked and

9    answered.

10            THE WITNESS:  I was in the bed sleep.

11    BY MS. LAMBUR:

12        Q    You were in bed asleep that night?

13        A    I was in bed sleep that night.  I don't even

14    know anything about it.

15            MS. LAMBUR:  Nothing further.

16            THE COURT:  Redirect.

17                    REDIRECT EXAMINATION

18                    BY MR. GREENBERG:

19        Q    Mr. Young, when they hit you, when the police

20    officers hit you did it hurt?

21        A    It hurt a little bit.  They grabbed -- They

22    jaked me by the collar.  They jaked me by the collar.

23        Q    Were you scared?

24        A    Yes, I was scared.

1    Q    Now, do you remember the guy who came in here

2    and testified on Friday wearing a suit and read

3    something to the jury?

4         A    No.

5         Q    You don't remember from last Friday?

6         A    No.

7         Q    Do you remember any of the witnesses from

8    last Friday?

9         A    No.

10        Q    Is that -- Were you sleeping Friday?

11        A    I didn't get enough sleep.  They had to wake

12   me up about 5:00 o'clock in the morning.

13        Q    So you haven't been getting enough sleep?

14        A    No.  For breakfast, that's all.

15             MR. GREENBERG:  Nothing further, judge.

16             THE COURT:  Any Recross?

17             MS. LAMBUR:  No, your Honor.

18             THE COURT:  Please return over with your

19   lawyer.

20                           (Witness excused.)

21             THE COURT:  Call your next witness.

22             MR. GREENBERG:  Judge, can we approach again?

23             THE COURT:  Sure.

24

30

```
 1    STATE OF ILLINOIS   )
                          )  SS:
 2    COUNTY OF COOK      )

 3           IN THE CIRCUIT COURT OF COOK COUNTY
             COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE   )
 5    STATE OF ILLINOIS   )
                          )
 6                        )   Indictment No. 95-88-44  FILED
             VS           )
 7                        )   Charge:  Murder    JUL 21 1995
      DANIEL YOUNG,       )
 8    Impleaded           )          AURELIA PUCINSKI
                                     CLERK OF CIRCUIT COURT
 9                  REPORT OF PROCEEDINGS

10           BE IT REMEMBERED that on the 19th day of

11    September A.D., 1994, this cause came on for trial

12    before the Honorable THOMAS P. DURKIN, Judge of said

13    court, and juries, upon the indictment herein, the

14    defendants having entered pleas of not guilty.

15           APPEARANCES:

16                  HON. JACK O'MALLEY,
                    State's Attorney of Cook County, by
17                  MS. LAURA LAMBUR and MS. LYNDA PETERS,
                    Assistant State's Attorneys,
18                     appeared for the People;

19                  HON. RITA A. FRY,
                    Public Defender of Cook County, by
20                  MR. WOODWARD JORDAN and
                    MS. CHERYL BORMANN,
21                  Assistant Public Defenders,
                       appeared for the Defendant Hill;
22
                    MR. STEVEN GREENBERG,
23                     appeared for the Defendant Young.

24
```

K/

1          (A discussion was had between

2              the court and counsel off

3              the record, out of the

4              hearing of the jury and the

5              court reporter.)

6      MR. GREENBERG: Judge, I would call

7  Mr. Young.

8      THE COURT: Mr. Young, do you want to walk

9  over here, please. Raise your right and to be sworn.

10              (Witness sworn.)

11      THE COURT: Please be seated. State your

12  full name.

13      TH WITNESS: My name is Dan Young.

14              DAN YOUNG,

15  one of the defendants herein, called as a witness in

16  his own behalf, having been first duly sworn, was

17  examined and testified as follows:

18              DIRECT EXAMINATION

19              BY MR. GREENBERG:

20      Q    Mr. Young, please make sure that you speak

21  up.

22      A    My name is Dan Young.

23      Q    Mr. Young, where do you live?

24      A    55th and Halsted.

K-9

```
1       A    1990 I was living in a boarding house.

2       Q    In a boarding house?

3       A    Uh-huh.

4       Q    In September of 1990?

5       A    Yeah.

6       Q    Do you remember where that boarding house

7  was?

8       A    On 55th and Halsted.

9       Q    Okay.  Is that where you were living with

10 Reverend Moore?

11      A    Uh-uh.  I was living with a couple more guys.

12      Q    Okay.  Do you know Harold Hill?

13      A    No.

14      Q    And when I say Harold Hill I mean the other

15 gentleman who has been sitting in this courtroom, do

16 you know him?

17      A    No.

18      Q    Do you know anyone named Peter Williams?

19      A    No.

20           MR. GREENBERG:  May I approach, judge?

21           THE COURT:  You may.

22

23

24
```

K-11

1    Q    I'm going to show you what was previously

2    marked as People's Exhibit 77.

3    A    I don't know that lady.

4    Q    Okay.  Do you recognize that picture, have

5    you ever seen it before?

6    A    No.  I ain't never seen that lady in my life.

7    Q    Is this your signature on the back?

8    A    No.

9    Q    Do you know whose signature this is below

10   yours?

11   A    I sure don't.

12   Q    Do you remember being brought to the police

13   station on March 23rd of 1990?

14   A    I was walking down 55th to my apartment --

15   Q    To your apartment?

16   A    Uh-huh.  -- and then the police said -- they

17   had got me, they had me handcuffed.  They carried

18   me -- They carried me to jail.

19   Q    Did they take you to the police station

20   before they took you to jail?

21   A    They took me to the police station today.

22   Q    Today?

23   A    The police station.

24   Q    I'm sorry.  I didn't catch that.

K-13

1      A    They carried me to the police station.

2      Q    Okay.  Do you remember where they took you at

3 the police station?  Did they take you to a room?

4      A    They carried me to a room.

5      Q    Do you remember what that room was like?

6      A    Big old room.  (Indicating.)

7      Q    You're indicating with your hands.  Is it a

8 big room or small room?

9      A    A small room.

10     Q    Were you put in that room with anybody or

11 were you put in there alone?

12     A    I was put in there alone.

13     Q    Were you in handcuffs or not in handcuffs?

14     A    Handcuffs.

15     Q    Now, do you remember how long you were in

16 that room?

17     A    I think five hours.

18     Q    For only about five hours; is that right?

19     A    Yeah.

20     Q    And what did you do while you were in that

21 room?

22     A    Sitting down.  They had bought me a pop.

23     Q    They bought you a pop?

24     A    Uh-huh.  I was sitting down looking out the

1    window.

2         Q    I didn't hear --

3              THE COURT:   I was sitting down looking out

4    the window.

5    BY MR. GREENBERG:

6         Q    For five hours?

7         A    Yeah.

8         Q    Did you ever talk to the police while you

9    were in that room?

10        A    Uh-uh.

11        Q    Did you ever talk to the state's attorney

12   while you were in that room?

13        A    Uh-uh.   No.

14        Q    I'm going to show you what was previously

15   marked as Exhibit 76, which was identified as a

16   written statement.   Can you read by the way, Dan?

17        A    I can't read.

18        Q    Can you write?

19        A    I can write but I can't read.

20        Q    Okay.   How well can you write?

21        A    I can write my name.

22        Q    Can you write anything else?

23        A    No.

24        Q    Can you tell what time it is now?

K-15

1      Q    On that piece of paper you're holding, is

2   your signature on there?

3      A    That's not my handwriting.

4      Q    That's not your handwriting.  Is this your

5   handwriting here where it says Dan Young?

6      A    This might be here.   This not.

7           MR. GREENBERG:  So indicating for the record

8   the very top line where it's printed Dan Young.

9   BY MR. GREENBERG:

10     Q    Is this maybe your signature here?

11     A    Yeah.

12     Q    Is this maybe your signature here?

13     A    Right here it is.

14     Q    It is or isn't?

15     A    This right here is my handwriting.

16     Q    Okay.  Now, Mr. Young, do you remember

17  signing this?

18     A    Signing this?

19     Q    Signing this whole paper here.

20     A    Right here?

21     Q    Yeah.

22     A    I signed it.  It was a mistake.

23     Q    Why did you sign it?

24     A    Because if I don't sign that paper I could

K-17

1  A  I remember that building since back in 1978.

2 I passed by Bishop walking in 1978, that's the only

3 time I go back by Bishop walking, I was about eighteen

4 years old.

5  Q  So in 1978 you went walking by that building?

6  A  Uh-huh. I had a girlfriend used to live over

7 there.

8  Q  Do you remember her name?

9  A  Huh?

10  Q  Do you remember her name, the girlfriend's

11 name?

12  A  Jackie.

13    MR. GREENBERG: Judge, if I can just have one

14 second?

15 BY MR. GREENBERG:

16  Q  Mr. Young, the lady who's in that picture you

17 were just shown a minute ago, you said you don't know

18 her?

19  A  I'm sure I don't know that lady. I ain't

20 never seen that lady in my life.

21  Q  You're sure you didn't participate in killing

22 her?

23  A  I didn't kill that lady. I was living by

24 myself. I don't even know that lady.

K-20

1        Q    Did you ever have sex with that lady?

2        A    No.  I ain't never stuck my penis in that

3    lady.

4        Q    I'm going to show you another picture,

5    Mr. Young.

6             THE COURT:  Is there an exhibit number?

7             MR. GREENBERG:  Yeah.  It's People's Group

8    75.

9    BY MR. GREENBERG:

10       Q    Mr. Young, take a look at those pictures.

11   Tell me if you recognize anyone in those pictures?

12       A    No.  I don't know them people.

13       Q    Mr. Young, on October 14th of 1990 did you go

14   to a party?

15       A    No, I didn't.  I never went to know party.

16       Q    To a party?

17       A    To a party?

18       Q    Yes.

19       A    No.  I ain't never went to no party.

20            THE COURT:  Party.  Do you know what a party

21   is?

22            THE WITNESS:  Yeah, I know what a party is

23   but I ain't never went to no party.

24

K-21

1    BY MR. GREENBERG:

2         Q    Did you ever beat a woman that night?

3         A    No.  I was not there.  Got me mixed up with

4    somebody else.

5              MR. GREENBERG:  I have nothing else, judge.

6              THE COURT:  Cross.

7                        CROSS-EXAMINATION

8                        BY MS. LAMBUR:

9         Q    Mr. Young, your mother lives at -- what's

10   your mother's address?

11        A    5436 South Justine.

12        Q    How long about has your mom lived there?

13        A    I think about sixteen years.

14        Q    About sixteen years or so?

15        A    Uh-huh.

16        Q    Now, Mr. Young, do you remember when the

17   police came and picked you up and brought you to the

18   police station a couple of years ago?

19        A    I was on my way home to wash my clothes.  You

20   know, I got a little job, a little packing job.  They

21   pay me every two weeks I get paid --

22        Q    And a couple police came by and they brought

23   you to the police station, didn't they?

24        A    Yeah.  Uh-huh.

1       Q    Do you remember them giving you some White

2   Castle hamburgers?

3       A    Yeah, I remember that night.

4       Q    Do you remember them giving you some french

5   fries?

6       A    Yeah.  Uh-huh.

7       Q    Do you remember that one man, the state's

8   attorney, Mike Rogers being there?

9       A    I sure don't.

10      Q    Well, you do remember the police and some

11  other man giving you the food, don't you?

12      A    Yeah.  Uh-huh.

13      Q    Those people were really nice to you too,

14  weren't they?

15      A    Yeah.  But they lied on me.

16      Q    They lied on you, huh?

17      A    Uh-huh.

18      Q    Because you told them all along a hundred

19  times you didn't do anything like this, right?

20      A    Yeah.  I don't believe in doing anything like

21  that.  What would I take somebody's life for?

22      Q    Now, you said somebody started to beat you

23  up, is that what you're saying?

24      A    Yeah.  Uh-huh.

1      Q      They were punching you in the face a bunch of

2   times?

3      A      Yeah.

4      Q      And punching you in the body a bunch of

5   times?

6      A      Yeah.

7      Q      You had a bunch of bruises on your face and

8   stuff, right?

9      A      Right here.  (Indicating.)

10      Q      And you never went to a doctor --

11             MR. GREENBERG:  Where is he indicating,

12   judge?

13             THE COURT:  Indicating the left area below

14   the-eye area, below the left eye.

15   BY MS. LAMBUR:

16      Q      You never told a doctor later on that you had

17   been beaten up, did you, Mr. Young?

18      A      I didn't get a chance to see the doctor.

19      Q      You don't have any photographs of those

20   injuries on your face either, do you, Mr. Young?

21      A      Sure don't.

22      Q      And that swollen part on your face, it was

23   near your left eye?

24      A      Right here.  (Indicating.)

K-25

1       Q     Was it all swole up?

2       A     My side and things.  My side was kind of

3    sore.

4       Q     And you never told anybody about that though

5    either, did you?

6       A     Uh-uh.

7       Q     Do you remember when you left the police

8    station and then you went over to the jail?

9       A     They got me in the morning time, carried me

10   to jail in the morning time.

11      Q     And they brought you over to the jail, didn't

12   they?

13      A     Yeah.  Uh-huh.

14      Q     Do you remember having your picture taken

15   over at the jail?

16      A     I had -- To tell you the truth I had got

17   locked up.  I lived on 55th, that used to be -- I rent

18   from a white man.  I had my own apartment on 55th and

19   Halsted.

20      Q     Okay.  But, Mr. Young, after this time, after

21   the police gave you the hamburgers and the pop and the

22   french fries when you went over to jail you remember

23   having your picture taken, don't you?

24      A     They showed me my picture.  The police

K-26

1    already had my picture already.

2             MS. LAMBUR:  May I approach, judge?

3             THE COURT:  You may.  Do you have a number?

4             MS. LAMBUR:  For the record, People's 79.

5    BY MS. LAMBUR:

6       Q    Mr. Young, I'm going to show you what I've

7    marked as People's 79.  Do you recognize who's in that

8    photo?

9       A    That's me.

10       Q    And that was you the day that you went into

11    jail for this, isn't it?

12       A    Yeah.

13       Q    And that photo doesn't show any bruises

14    around your face, does it?

15       A    Small bruises.

16       Q    It was a small bruise?

17       A    Yeah.

18       Q    I thought they hit you a lot of times in your

19    face?

20       A    But they tore my fifty dollar coat up.

21       Q    What else did they do to you?

22       A    Kicked me in my stomach.

23       Q    And the people over at the jail who took your

24    picture and checked you into the jail, you never told

1     them though that you had got beaten up, did you?

2          A     No.

3          Q     You were living over at Halsted and 55th

4     Street about four years ago, is that what you said?

5          A     Yeah.  I used to live on 51st and Halsted and

6     55th and Halsted.

7          Q     And that's just about six or seven blocks

8     from this building where all this happened, right?

9          A     Yeah.

10         Q     You could walk there from your house,

11    couldn't you?

12         A     Huh?

13         Q     Like you could walk --

14         A     I walked that way.  I go see my parents.

15         Q     You could walk to this building from where

16    you were living back then, couldn't you?

17         A     I used to walk down there in the

18    neighborhood.  I don't even go by the neighborhood

19    now.

20         Q     When did you stop going by that building?

21         A     Since 1989.

22         Q     So since before this murder?

23         A     Yeah.

24         Q     Did you hear in the neighborhood about the

K-28

1    murder?

2         A    No.  I was -- No, I didn't.

3         Q    Didn't hear from anybody on the street?

4         A    No.

5         Q    Nobody came up and said did you hear what

6    happened last night?

7         A    No.  I was in --

8              MR. GREENBERG:  Objection.  Asked and

9    answered.

10             THE WITNESS:  I was in the bed sleep.

11   BY MS. LAMBUR:

12        Q    You were in bed asleep that night?

13        A    I was in bed sleep that night.  I don't even

14   know anything about it.

15             MS. LAMBUR:  Nothing further.

16             THE COURT:  Redirect.

17                    REDIRECT EXAMINATION

18                    BY MR. GREENBERG:

19        Q    Mr. Young, when they hit you, when the police

20   officers hit you did it hurt?

21        A    It hurt a little bit.  They grabbed -- They

22   jaked me by the collar.  They jaked me by the collar.

23        Q    Were you scared?

24        A    Yes, I was scared.

K-29

```
 1        Q    Now, do you remember the guy who came in here
 2   and testified on Friday wearing a suit and read
 3   something to the jury?
 4        A    No.
 5        Q    You don't remember from last Friday?
 6        A    No.
 7        Q    Do you remember any of the witnesses from
 8   last Friday?
 9        A    No.
10        Q    Is that -- Were you sleeping Friday?
11        A    I didn't get enough sleep.  They had to wake
12   me up about 5:00 o'clock in the morning.
13        Q    So you haven't been getting enough sleep?
14        A    No.  For breakfast, that's all.
15             MR. GREENBERG:  Nothing further, judge.
16             THE COURT:  Any Recross?
17             MS. LAMBUR:  No, your Honor.
18             THE COURT:  Please return over with your
19   lawyer.
20                        (Witness excused.)
21             THE COURT:  Call your next witness.
22             MR. GREENBERG:  Judge, can we approach again?
23             THE COURT:  Sure.
24
```

1    (A discussion was had between
2    the court and counsel off
3    the record, out of the
4    hearing of the jury and the
5    court reporter.)
6    THE COURT: Ladies and gentlemen, we're going
7    to recess this matter for a few minutes so I can hear
8    some evidence in the other matter. Please go back to
9    the jury room. Remember you can't discuss the case.
10    (Young jury excused.)
11    THE COURT: All right. Sheriff, if you would
12    be kind enough to take Mr. Young back and bring
13    Mr. Hill out.
14    MR. GREENBERG: Judge, based upon the
15    evidence that you've heard --
16    THE COURT: Mr. Young's case is in recess.
17    MR. GREENBERG: I'm sorry.
18    THE COURT: Where is Mr. Jordan or
19    Miss Bormann.
20    MR. JORDAN: I'm going to call Mr. Hill now,
21    judge.
22    THE COURT: Let the record reflect Mr. Hill
23    is present personally and by his attorneys, Mr. Young
24    is not, Mr. Greenberg is, however. While the jury is

K-31

1    in the process of being -- Mr. Jordan will you please
2    pay attention to me.

3            MR. JORDAN: Yes, sir.

4            THE COURT: While your jury was in the
5    process of being brought over this morning some
6    females were standing in the corridor and as the jury
7    went by they yelled innocent, innocent. I don't know
8    if they did this merely as a caprice or they had some
9    intent to influence the jury in this case, but in any
10   event they are now in custody, those women are. The
11   sheriff continued with the jury and brought them over.

12           If in fact it occurred I have no idea
13   what their motives were, but I regard it as an
14   extremely serious attempt by them to intrude upon the
15   jury system, which I will treat with appropriate
16   severity in the event the State is able to demonstrate
17   this direct contempt of court later on, but I feel
18   duty bound to advise you, although I suppose the State
19   is the one who is probably most likely to have been
20   affected by it. So let the record reflect I have
21   advised both.

22           MR. JORDAN: Judge, I'd just like to make the
23   record -- I'd like the record to indicate that I also
24   saw those people when they were in the back and they

K-32

1    have nothing to do with my client. They have nothing

2    to do with this case and I've never seen these people

3    before in my life.

4            THE COURT: Perhaps they thought it was

5    funny, I don't think they'll think so later on but in

6    any event you're on notice.

7            MR. JORDAN: Yes, sir.

8            THE COURT: Is the jury here?

9            THE CLERK: They're on their way over.

10           THE COURT: Okay. I'm going to have to voir

11   dire the jury. The sheriff was informed by the jury.

12           MS. LAMBUR: Judge, I did have a motion in

13   limine that needed to be addressed before Defendant

14   Hill took the stand, it pertained to certain lines of

15   cross-examination by the State.

16           THE COURT: You certainly can inquire as to

17   the arrest, not the charges.

18           MS. LAMBUR: The arrest of the --

19           THE COURT: Absolutely. It may very well

20   come to that.

21                          (The following proceedings

22                           were had in the presence and

23                           hearing of the jury:)

24

K-33

1    THE COURT: Good morning. The record should

2    reflect that the Hill jury is present.

3                    As you probably have discovered,

4    something that I was well aware of, what they call

5    simultaneous double juries, which is what we're going

6    through here, presents some unusual logistical

7    difficulties, one of which was highlighted to the

8    extreme this morning. I am informed by the sheriff

9    that when you were coming over some persons in the

10   hallway communicated to you. Is anybody aware of

11   this?

12                         (An affirmative response was

13                         given.)

14       THE COURT: From what I understand there were

15   three women standing there who apparently, from what

16   I've been able to gather, had absolutely nothing to do

17   with this case. It was apparently something that they

18   thought was funny at the time.

19                    Counsel for the defendants want me to

20   tell you for sure that they went and took a look at

21   the women and they want you to know that they have

22   absolutely nothing to do with it. They don't know who

23   they are. They don't know why they did it and they

24   would not want you to draw any kind of inference from