**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Derrell Fulton, AKA Darryl Fulton, | ) | |
| | ) | Case No. 17 CV 8696 |
| Plaintiff, | ) | |
| | ) | Hon. Judge Pacold |
| v. | ) | |
| | ) | Magistrate Judge Harjani |
| City of Chicago, et al., | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| Nevest Coleman, | ) | |
| | ) | Case No. 18 CV 998 |
| Plaintiff, | ) | |
| | ) | Hon. Judge Pacold |
| v. | ) | |
| | ) | Magistrate Judge Harjani |
| City of Chicago, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**THE OFFICER DEFENDANTS' RESPONSE TO PLAINTIFFS'
STATEMENT OF ADDITIONAL MATERIAL FACTS UNDER LR 56.1(b)(3)**

Defendants JOHN HALLORAN, KENNETH BOUDREAU, JAMES O'BRIEN,

GERALD CARROLL, WILLIAM MOSER, ALBERT GRAF, MICHAEL CLANCY, THOMAS

BENOIT, THOMAS KELLY, and GERI LYNN YANOW, as independent administrator of the

Estate of WILLIAM FOLEY (collectively the "Officer Defendants"), through their undersigned

attorneys, hereby submit Defendants' Responses to Plaintiffs' Statement of Additional Material

Facts: [1]

---

[1] For purposes of their motion for summary judgment only, including this response to Plaintiffs' Joint Statement of Additional Facts, Defendants do not dispute certain of Plaintiff's allegations. Any instance in which the Defendants do not dispute an allegation is not an admission that the allegation is true. Defendants reserve the right to challenge each and every allegation at trial.

1

1.      Derrell Fulton is innocent of the rape and murder of Antwinica Bridgeman. Ex. 32, Fulton COI; Ex. 34, 11/29/17 ISP DNA Report; Ex. 35, 7/18/17 ISP DNA Report; Ex. 36, 9/25/17 ISP DNA Report; Ex. 37, 12/14/17 ISP DNA Report; Ex. 2, Fulton Dep., at 89:3-7; PPSOAF 2, 4-7, 131-135.

**RESPONSE:** Denied.  The record citations do not establish that Plaintiff Fulton is innocent of the rape and murder of Antwinica Bridgeman.  The Conviction Integrity Unit ("CIU") of the Cook County State's Attorney's Office ("CCSAO") concluded that Plaintiffs are not innocent of the rape and murder of Antwinica Bridgeman.  (*See* DSOF 127; Ofc. Def's Ex. 58, CIU Report and recommendation, pp. 21-22; Ofc. Def's Ex. 50, Rotert Dep., 165:16-175:2).  First Assistant Eric Sussman and his team concluded that Plaintiffs' confessions are valid and were not coerced, and that Plaintiffs are likely guilty of the crime.  (DSOF, ¶¶124, 126, 134-35, 140-41, 143-47).  The official position of the CCSAO to the public was that, despite agreeing to *nolle* the case, the CCSAO did *not* conclude Plaintiffs are innocent of the crime.  (DSOF, ¶¶146, 160) (emphasis added).  Sussman also testified that the CCSAO frequently did not oppose certificates of innocence (COI) for reasons other than innocence, such as a lack of resources and budgetary concerns, and the CCSAO did not receive any new evidence between the date the criminal charges were *nolle'd* for reasons other than innocence and the date the COIs were granted, unopposed.  (DSOF, ¶¶150-152).  Finally, Plaintiff Fulton signed a statement wherein he confessed to participating in the rape and homicide of Ms. Bridgeman.  (*See* Ofc. Def's Ex. 48, Fulton Handwritten Statement taken May 1, 1994).

2.      Nevest Coleman is innocent of the rape and murder of Antwinica Bridgeman. PPSOAF 1, 4-8, 131-135; Ex. 55, Coleman 2021.08.03 Affidavit; Ofc. DSOF 109, 114, 118; Pls.' Resp. to Ofc. DSOF 109, 118, 119; COI; Ex. 31, Coleman 2018.01.18 Affidavit; Ex. 34, 2017.11.29 DNA Report, at Fulton 7279; Ex. 33, Coleman COI. At the time of his arrest in 1994, Mr. Coleman had been working full-time as a groundskeeper for the Chicago White Sox for two seasons, and had been continuously employed since he graduated high school. He was 25 years old and had never before been convicted of a crime. Ex. 31, Coleman 2018.01.18 Affidavit; Ex. 1, Coleman Dep., at 51:13-22; Ex. 9, All GPRs, at DEFS 376, 387.

**RESPONSE:** Admitted in part and denied in part. The record citations do not establish that Plaintiff Fulton is innocent of the rape and murder of Antwinica Bridgeman. The Conviction Integrity Unit ("CIU") of the Cook County State's Attorney's Office ("CCSAO") concluded that Plaintiffs are not innocent of the rape and murder of Antwinica Bridgeman. (*See* DSOF 127; Ofc. Def's Ex. 58, CIU Report and recommendation, pp. 21-22; Ofc. Def's Ex. 50, Rotert Dep., 165:16-175:2). First Assistant Eric Sussman and his team concluded that Plaintiffs' confessions are valid and were not coerced, and that Plaintiffs are guilty of the crime. (DSOF, ¶¶124, 126, 134-35, 140-41, 143-47). The official position of the CCSAO to the public was that, despite agreeing to *nolle* the case, the CCSAO did *not* conclude Plaintiffs are innocent of the crime. (DSOF, ¶¶146, 160) (emphasis added). Sussman also testified that the CCSAO frequently did not oppose certificates of innocence (COI) for reasons other than innocence, such as a lack of resources and budgetary concerns, and the CCSAO did not receive any new evidence between the date the criminal charges were *nolle'd* for reasons other than innocence and the date the COIs were granted, unopposed. (DSOF, ¶¶150-152). Coleman also gave a court-reported statement wherein he admitted to participating in the rape and murder of Ms. Bridgeman. (*See* Def's Ex. 1, Coleman's Court Reported Statement). Finally, the citations to the record do not establish that Coleman was "working full-time," that "he had been continuously employed since he graduated high school," and that he "had never before been convicted of a crime." At the time of his arrest, Coleman's employment with the Chicago White Sox was seasonal and he did not work for most of the baseball off-season. (Plf's Ex. 1, Coleman Dep., at 51:13-52: 1).

<b>Forensic Testing of the Physical Evidence Performed<br>Prior to Trial Excluded Plaintiffs and Eddie Taylor</b>

3. On April 28, 1994, Plaintiff Coleman and Michael Barber viewed a body through a window looking into the basement of the Coleman residence. *See* Ex. 57, Foley Supp. Report dated 4/29/94; Ex. 4, Barber Trial Tr., H11:14–H14:2. Defendants Foley and Clancy learned at

3

the scene that the basement is seldom used and vacant, and that the basement door did not have a lock on it. *See* Ex. 57, Foley Supp. Report dated 4/29/94. After a canvass of the area, Antwinica Bridgeman's family made a tentative identification of her at the scene. *See* Ex. 57, Foley Supp. Report dated 4/29/94.

**RESPONSE:** Admitted.

4.      Police discovered two condoms—both of which appeared to have been used—at the scene. Police found one of the condoms in the room adjacent to where Bridgeman's body was found. Police found the other condom on the wooden stairs leading down to the basement. Police collected the condoms as evidence. *See* Ex. 71, Excerpts of Officer Stella's 5/6/97 Trial Testimony, "Stella Trial Tr.", H75:9–76:8; *see* Ex. 27, Supplementary Report dated 6/9/94, "6/9/94 Supp. Report", pp. 4, 9. In December of 1994, biologist Pamela Fish examined the condoms recovered from the scene for the presence of spermatozoa. *See* Ex. 72, Excerpts of Pamela Fish 5/8/97 Trial Testimony, "Fish Trial Tr.", 87:2–99:17. Fish observed spermatozoa on a sample taken from the inside of the condom found at the bottom of the stairs. *See* Ex. 72, Fish Trial Tr., 87:17–89:18, 94:19–95:15. DQ Alpha testing and DNA testing performed by a private lab excluded Bridgeman, Taylor, and Plaintiffs Fulton and Coleman from contributing to the DNA obtained from the outside and inside of that condom. *See* Ex. 72, Fish Trial Tr., 91:1–92:19, 96:16–100:14, 105:12–15, 107:22–108:6; *see* Ex. 73, LabCorp Report dated 3/13/97. Fish's examination of the condom located in the room adjacent to where Bridgeman's body was found was negative for the presence of spermatozoa and, for that reason, was not tested for DNA. *See* Ex. 72, Fish Trial Tr., 96:9–15, 116:4–9.

**RESPONSE:** Admitted.

5.      The pathologist who performed Bridgeman's autopsy collected several items of evidence, including the following: 1) one vial of Bridgeman's blood; 2) a sample of Bridgeman's head hair; 3) a sample of Bridgeman's pubic hair; 4) fingernails from Bridgeman's right and left hands; and 5) several items of Bridgeman's clothing, including one pair of brown boots, one pair of white long-johns, three pairs of socks, one pink pullover, one pair of blue pants, one red jacket, one blue jacket, one white bra, and one pair of white and blue underwear. *See* Ex. 74, Off. Small Supp. Report dated 4/28/94; *see* Ex. 75, Det. Kelly Crime Scene Processing Report dated 4/29/94; *see* Ex. 76, Cogan Trial Tr., pp. I-7, I-32–33, I-51–52, I-67–70.

**RESPONSE:** Admitted.

6.      In 1994, police sent Bridgeman's clothing, the pipe, and the rock to the Chicago Police Department Crime Laboratory. *See* Ex. 77, Chicago Police Crime Laboratory Report dated 11/26/94, "11/26/94 Lab Report", p. 1. Police also submitted head and pubic hair standards from Bridgeman, Taylor, and Plaintiffs Fulton and Coleman to the lab. *See* Ex. 77, 11/26/94 Lab Report, pp. 1–2. Microscopic examination of Bridgeman's clothing, the pipe, and the rock revealed the presence of hairs and fibers. *See* Ex. 77, 11/26/94 Lab Report, pp. 2–3. Microscopic comparisons between the unknown hairs recovered from the evidence and the submitted standards eliminated Plaintiff Fulton as the contributor of the unknown hairs. *See* Ex. 77, 11/26/94 Lab Report, p. 3. None of the unknown hairs were consistent with Plaintiff Coleman's head hair or Taylor's pubic hair. *See* Ex. 77, 11/26/94 Lab Report, p. 3. Due to similarities between Bridgeman's and Plaintiff Coleman's head hairs and

4

Bridgeman's and Taylor's pubic hairs, no other conclusions could be made. *See* Ex. 77, 11/26/94 Lab Report, p. 3.

**RESPONSE:** Admitted.

7.      Evidence technicians processed several larger items at the scene for fingerprints, without obtaining any prints suitable for comparison. *See* Ex. 71, Stella Trial Tr., H78:24–80:22. Evidence collected from the scene—including Bridgeman's eyeglasses, two juice bottles, and two beer cans—were processed for fingerprints. *See* Ex. 78, Off. Codina Crime Scene Processing Report dated 4/29/94, "4/29/94 Codina Report"; *see* Ex. 79, Excerpts of Officer Codina's 5/8/97 Trial Testimony, "Codina Trial Tr.", L14:6–19:9. The results were negative, except that a partial print was recovered from one of the beer cans. *See* Ex. 78, 4/29/94 Codina Report; *see* Ex. 79, Codina Trial Tr., L14:6– 19:9. The fingerprint did not match Bridgeman, Taylor, or Plaintiffs Fulton and Coleman. *See* Ex. 80, Excerpts of Officer Patterson's 5/8/97 Trial Testimony, 35:1–36:24. The rock and the pipe were also processed for fingerprints, the results of which were negative. *See* Ex. 79, Codina Trial Tr., L19:20– 20:10.

**RESPONSE:** Admitted.

### Defendants Coerced and Fabricated Plaintiff Coleman's "Confession"[2]

8.      Mr. Coleman was questioned by Boudreau and Halloran his first time at Area 1, and then taken home. Foley and Clancy picked him up at his house a few hours later and brought him back to Area 1. Ofc. DSOF 27, 52; Pls.' Resp. to Ofc. DSOF 28, 52.

**RESPONSE:** Admitted in part, denied in part.  Defendants Boudreau and Halloran spoke with

Coleman for approximately 15 minutes his first time at Area 1 but did not question him about the

victim or the crime.  (*See* Ofc. DSOF 27-30; Ofc. Def's Ex. 7, Boudreau Dep., 162:21-163:11;

200:21-201:7; Def's Ex. 6, Halloran Dep., 118:20-119:6; 120:24-121:3; Def's Ex. 2, Coleman Dep.,

312:8-315:5; Attached Supp to Def's Ex. 10, Clancy Dep., 128:15-195:15, 152:23-162:23; Def's Ex.

23, Foley Crim. Tr., 76:19-77:13; Def's Ex. 31, Foley Mtn. to Supp. Tr., 32:10-33:22, 34:21-35:10).

9.      Defendant Clancy's general progress report, "GPR", indicates that he and Defendant Foley transported Plaintiff Coleman to Area 1 at 11:45 p.m. on April 28, 1994. *See* Ex. 9, Clancy's Timeline GPR, at DEFS 384-85.

**RESPONSE:** Admitted.

---

[2] To the extent these headings could be construed to contain statements of facts, Defendants object to each and every heading and subheading as they are improper conclusory statements in violation of Local Rule 56.1(b)(3)(C).  *See Malec v. Sanford*, 191 F.R.D 581,585 (N.D. Ill. 2000).

5

10. The Defendant Detectives placed Plaintiff Coleman in a room with tables and chairs. *See* Ex. 1, Coleman Dep. at 374:21–375:16. Defendants Clancy and Foley brought in a photo album and showed Plaintiff Coleman two pictures. *See* Ex. 1, Coleman Dep. at 376:7–22, 377:15–378:20. The pictures were of Plaintiff Fulton and Eddie Taylor. *See* Ex. 1, Coleman Dep., 378:21–22. Defendants Clancy and Foley asked Plaintiff Coleman if he knew "these two guys," and he said, "Yeah." *See* Ex. 1, Coleman Dep. 378:23–379:3.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec v. Sanford*, 191 F.R.D. 581, 584-85 (N.D. Ill. 2000). In addition, the citations relied on by Plaintiffs do not establish that all Officer Defendants or any specific one placed Coleman in the room. Defendants also object to this paragraph because it contains facts related only to the conduct of Clancy and Foley, which are immaterial to the outcome of Defendants' motion. *See Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 715 (N.D. Ill. 2016) citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) ("The nonmovant's statement of additional facts must be … limited to material facts—that is, facts that are relevant to the outcome of the issues presented by the movant's summary judgment motion").

11. Defendants Clancy and Foley left the room, returned, handcuffed Plaintiff Coleman, and moved Plaintiff Coleman to a different, smaller room with one table and two or three chairs. *See* Ex. 1, Coleman Dep., 379:8–381:11. At that time, a total of approximately eight detectives, including Defendants Foley, Clancy, Halloran, and Boudreau, and four other Defendants entered the room. *See* Ex. 1, Coleman Dep., 381:12–21; *see* Ex. 11, Excerpts of Nevest Coleman Testimony at 6/28/96 Suppression Hearing, "Coleman MTS Testimony," J-20:10–24; *see* Ex. 81, Coleman Arrest Report; Pls.' Resp. to Ofc. DSOF 54, 60, 87. The windowless room was small, with a metal bench, a locked door, a ring on the wall for handcuffs, and no bedding. Ex. 8, Boudreau Dep., at 212:17-215:23.

**RESPONSE:** Admitted in part, denied in part. Defendants object to the facts in this paragraph related only to the conduct of Clancy and Foley because those facts are immaterial to the outcome of Defendants' motion. *See Boyd*, 225 F. Supp. 3d at 715 citing *Waldridge*, 24 F.3d at 921. Defendants deny that Halloran and Boudreau, or any of the other named Defendants except Clancy and Foley were among the eight detectives who allegedly entered the room because (1) the citations

6

included in this paragraph do not support this allegation; and (2) Coleman has never been able to describe or name any of the eight officers besides Clancy and Foley. (Def Ofc's Ex. 2: Coleman Dep., 34:13-35:8, 381:4-384:24, Ex. 26: Coleman Mtn. to Supp. Tr., 20:10-24:22). Defendants Boudreau, Halloran, O'Brien, and Carroll were not at Area 1 during Coleman's questioning. (*See* DSOF 70; Def's Ex. 6, Halloran Dep., 125:15-142:18, 193:18-196:12; Def's Ex. 36, Halloran Trial Tr., 16:9-18:5; Def's Ex. 7, Boudreau Dep., 145:14-156:11, 160:7-172:23, 199:8-200:20; Def's Ex. 8, O'Brien Dep., 100:7-101:21, 120:6-21, 199:22-203:12; Attached Supp. To Def's Ex. 8, O'Brien Dep., 146:22-147:16; Def's Ex. 9, Carroll Dep., 107:22-112:15, 135:3-138:13, 164:17-165:11; Def's Ex. 10, Clancy Dep., 223:8-20; Def's Ex. 11, Kelly Dep., 88:22-89:7, 92:11-17; Attached Supp. To Def's Ex. 31, Foley Mtn. to Supp. Tr., 58:7-17; Def's Ex. 21, Clancy Timeline GPR; Def's Ex. 40, O'Brien GPR; Def's Ex. 13, 6/9/1994 Supp Report). Finally, Coleman's affidavit and supplementary answer to Boudreau Interrogatory No. 4 must be stricken because they contradict Coleman's 2020 deposition testimony and his 1996 motion to suppress testimony. Each time he testified that he could not remember, recognize or even describe the detectives who questioned him during his first visit to Area 1. (*See* Coleman's Dep. 312:8-313:1, attached as Ex. 2 to DSOF; Coleman MTSS Tr., 52:5-18, attached as Ex. 26 to DSOF)*See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.").

12.     Defendant O'Brien admitted that it would be intimidating to a criminal suspect to be interrogated about a murder in a room with eight detectives standing over him. Ex. 17, O'Brien Dep., at 57:17-59:24.

**RESPONSE:** Admitted.  .

13.     Defendants Clancy and Foley asked Plaintiff Coleman what happened. Plaintiff Coleman asked them, "What do you mean, what happened?" *See* Ex. 1, Coleman Dep., 382:1–6. Defendants Clancy and Foley brought up the name Antwinica Bridgeman. Because Plaintiff

7

Coleman did not know the victim by that name, he denied knowing anything about her. *See* Ex. 1, Coleman Dep., 383:21–384:8.

**RESPONSE:** Denied. According to Coleman's friend Michael Barber and Coleman's sister, Coleman knew the victim by her name, Antwinica Bridgeman. (*See* Attached Supp. to Defs' Ex. 15, Barber Dep., 130:2-17, 160:13-17; *see also* attached Def's Ex. 66, Jennice Coleman Dep. p. 166: 3 – 167: 22, attached hereto).

14. Defendants Clancy, Foley, and one of the other Defendant Detectives started yelling and screaming at Coleman. *See* Plf.'s Ex. 1, Coleman Dep., 384:9–24; *see* Ex. 11, Coleman MTS Testimony, J-22:24–23:6. Coleman continued to deny involvement when they questioned him about the murder. *See* Ex. 1, Coleman Dep., 385:3–10. Eventually, all the Defendant Detectives left the room. *See* Ex. 1, Coleman Dep., 385:17–386:8.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, the citations relied on by Plaintiffs do not support the assertion that all Officer Defendants or any specific one place were yelling and screaming at Coleman other than Foley and Clancy. Coleman has never been able to name or identify any detective that allegedly came into the room, other than Clancy and Foley. (*See* Ofc. Def's Ex. 2, Coleman Dep: 384:19-24 ("Q Who was yelling and screaming? A The two officers and one of the detectives that was walking around. Q: Okay. Do you remember what the one walking around looked like? A. No.); *see also* DSOF 54; Def's Ex. 2, Coleman Dep., 34:13-35:8, 381:4-384:24; Def's Ex. 26, Coleman Mtn. to Supp. Tr., 20:10-24:22; Resp. to PSOAF ¶ 11). Moreover, Coleman lacks the requisite personal knowledge to make the assertion. *Malec*, 191 F.R.D. at 584-85 (testimony used to oppose summary judgment must be based on personal knowledge).

15. The two detectives who questioned Mr. Coleman together the first time he was at Area 1—Boudreau and Halloran—were two of the detectives among the eight present in the interrogation room when Clancy and Foley were interrogating him. Ex. 55, Coleman 2021.08.03 Affidavit; Ex. 50, Coleman Supp. Resp. to Boudreau Interrog., at 4; Pls.' Resp. to Ofc. DSOF 54.

8

**RESPONSE**: Denied.  Coleman's affidavit and supplementary answer to Boudreau Interrogatory No. 4 must be stricken because both contradict Coleman's 2020 deposition testimony and his 1996 motion to suppress testimony.  Each time he testified that he could not remember, recognize or even describe the detectives who questioned him during his first visit to Area 1.  (*See* Coleman's Dep. 312:8-313:1, attached as Ex. 2 to DSOF; Coleman MTSS Tr., 52:5-18, attached as Ex. 26 to DSOF)*See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.").  Coleman also has never been able to name or identify any of the other detectives that came into the room, other than Clancy and Foley.  (*See* DSOF 54; Def's Ex. 2, Coleman Dep., 34:13-35:8, 381:4-384:24; Def's Ex. 26, Coleman Mtn. to Supp. Tr., 20:10-24:22; Resp. to PSOAF, ¶11; (citing DSOF 54; Def Ofc's Ex. 2: Coleman Dep., 34:13-35:8, 381:4-384:24, Ex. 26: Coleman Mtn. to Supp. Tr., 20:10-24:22)).  Therefore, Plaintiffs' assertion that Boudreau and Halloran were two of the detectives among the eight in the interrogation room is speculation, which cannot be relied upon to oppose summary judgment.  *Rand v. CF Indus., Inc.,* 42 F. 3d 1139, 1146 (7th Cir. 1994) (explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors.; *see Malec*, 191 F.R.D. at 584-85 (testimony used to oppose summary judgment must be based on personal knowledge).  Excluding the sham-affidavit, the evidence shows that Defendants Boudreau and Halloran were not at Area 1 during Coleman's questioning, and therefore could not have been present in Coleman's interrogation room.  (Resp. to PSOAF, ¶11; DSOF, ¶70; Def's Ex. 6, Halloran Dep., 125:15-142:18, 193:18-196:12; Def's Ex. 36, Halloran Trial Tr., 16:9-18:5; Def's Ex. 7, Boudreau Dep., 145:14-156:11, 160:7-172:23, 199:8-200:20; Def's Ex. 8, O'Brien Dep., 100:7-101:21, 120:6-21, 199:22-203:12; Attached Supp. to Def's Ex. 8, O'Brien Dep., 146:22-147:16; Def's Ex. 9, Carroll Dep., 107:22-112:15, 135:3-138:13, 164:17-165:11; Def's Ex. 10, Clancy Dep., 223:8-20; Def's Ex. 11, Kelly Dep., 88:22-89:7, 92:11-17;

Attached Supp to Def's Ex. 31, Foley Mtn. to Supp. Tr., 58:7-17; Def's Ex. 21, Clancy Timeline GPR; Def's Ex. 40, O'Brien GPR; Def's Ex. 13, 6/9/1994 Supp Report).

16.     At some point, another Defendant Detective entered the room. *See* Ex. 1, Coleman Dep., 387:3–388:18; *see* Ex. 11, Coleman MTS Testimony, J-25:4–15. The Defendant Detective—who fits the description of Defendant O'Brien—hit Plaintiff Coleman hard on the right side of his face. *See* Ex. 1, Coleman Dep., 387:20–389:12; Ex. 11, Coleman Mot. to Supp. Tr., at 25:1-27:21; Pls.' Resp. to Ofc. DSOF 60; PSOF 33. Defendant O'Brien called Plaintiff Coleman "a lying-ass nigger." Plaintiff Coleman asked him, "Why? I'm not lying." Defendant O'Brien then hit Plaintiff Coleman again. *See* Ex. 1, Coleman Dep., 389:13–17; *see* Ex. 1, Coleman MTS Testimony, J-26:19–22, 27:16–28:1. Mr. Coleman balled up in the fetal position, with his hands covering his face. Ex. 11, Coleman Mot. to Supp. Tr., at 28:11-19. Defendant O'Brien then moved Plaintiff Coleman to another room and left him there. *See* Ex. 1, Coleman Dep., 392:1–9.

**RESPONSE**: Denied.  Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C).  *See Malec*, 191 F.R.D. at 585.  O'Brien was not present for any portion of Coleman's or Fulton's interviews or interrogations.  (DSOF, ¶96, Attached Supp. to Def's Ex. 8, O'Brien's Dep, 147: 22 – 148: 12; Def's Ex. 8, O'Brien's Dep, 159: 17-24).  Coleman's description of the detective who physically abused him does not match Detective O'Brien.  Plaintiff testified that the detective who returned to the room and struck him and called him this slur was tall, approximately 6-foot-5 to 6-foot-6 inches tall, white, wore glasses, had black hair slicked to the side, and had a slim to medium build.  Although Defendant O'Brien is white and was 6'5", none of the other descriptive details Coleman provided match O'Brien.  In 1994, O'Brien had reddish-brown hair that was greying and weighed 240 pounds.  (*See* DSOF 59, Def's Ex. 2: Coleman Dep., 387:3-388:18; 391:3-8; Def's Ex. 26: Coleman Mtn. to Suppress Tr., 25:12-26:18).  Lastly, Defendant O'Brien was not the only detective at Area 1 during that time that was around 6-foot-5 inches tall, and he primarily wore contacts, not glasses.  (*See* DSOF 63; Attached Supp. to Def's Ex. 8, O'Brien Dep., 22:1-26:2, 26:22-28:14).  Coleman testified

10

that this incident involved a single officer who entered the room alone after the eight officers had left the room. (Resp. to DSOF, ¶¶59-60).

17. Defendants Foley and Clancy entered the room. *See* Ex. 1, Coleman Dep., 392:10–20. They asked Plaintiff Coleman what happened. Plaintiff Coleman told them how he found the body, and he denied any involvement in the crime. *See* Ex. 1, Coleman Dep., 392:21–393:6. Defendants Foley and Clancy yelled and screamed obscenities at Plaintiff Coleman and told him that he was lying. *See* Ex. 1, Coleman Dep., 393:7–19.

**RESPONSE**: Defendants object to this paragraph because it contains facts related only to the conduct of Clancy and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken v. Debt Mgmt. Partners, LLC*, 2015 WL 433508, at *2 (C.D. Ill. Feb. 2, 2015) (court refusing to deem undisputed facts from summary as admitted at trial); *Brown v. Navarro*, 2012 WL 3987427, at *3 (N.D. Ill. Sept. 11, 2012) (court refusing to deem undisputed facts from prior summary judgment motion as admitted for new summary judgment motion); *Koch-Weser v. Board of Educ. of Riverside Brookfield High School Dist. 208,* 2002 WL 31133143,

11

at *8 (N.D.Ill.2002)(refusing a request to read a statement of material facts at trial as undisputed facts).

18.    At that point in time, Plaintiff Coleman learned that "Mikey" was Antwinica Bridgeman. *See* Ex. 1, Coleman Dep., 394:15–20. Plaintiff Coleman explained to Defendants Foley and Clancy that he did not know that Mikey's name was Antwinica Bridgeman. *See* Ex. 1, Coleman Dep., 394:21–395:6.

**RESPONSE**: Denied.  Defendants object to this paragraph because it contains facts related only to the conduct of Clancy and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.  ,

The record shows that Coleman knew 'Mikey' was Antwinica Bridgeman during his first visit to Area 1 and well before this "point in time".  (*See* Attached Supp. to Defs' Ex. 15, Barber Dep., 130:2-17, 160:13-17; *see also* attached Def's Ex. 66, Jennice Coleman Dep. p. 166: 3 – 167: 22).

19.    Defendants Foley and Clancy told Plaintiff Coleman that Bridgeman had been found with a brick in her mouth and a pipe in her vagina, although they used the word "pussy." *See* Ex. 1, Coleman Dep., 401:4–13. Defendants Foley and Clancy also told Plaintiff Coleman that they did not want him, *i.e.*, Plaintiff Coleman, but that they wanted "Chip and Dap," *i.e.*, Taylor and Plaintiff Fulton. *See* Ex. 1, Coleman Dep., 403:3–9. Defendants Foley and Clancy informed Plaintiff Coleman that they wanted Coleman to help them by saying that he acted as a lookout while Taylor and Plaintiff Fulton raped and killed Bridgeman. *See* Ex. 1, Coleman Dep., 404:9–16.

**RESPONSE**: Defendants object to this paragraph because it contains facts related only to the conduct of Clancy and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph.  *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.  As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy.  *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The

12

court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

20. Defendants Foley and Clancy then gave Plaintiff Coleman "the whole statement" about the crime. *See* Ex. 1, Coleman Dep., 404:17–24; Pls.' Resp. to Ofc. DSOF 57. Defendants Foley and Clancy told Plaintiff Coleman to say that he met up with Plaintiff Fulton, Taylor, and Bridgeman. *See* Ex. 1, Coleman Dep., 406:17–24. Coleman could not recall for certain, but they told him to say that either Plaintiff Fulton shoved a brick in Bridgeman's mouth and Taylor shoved the pipe in her or the other way around. *See* Ex. 1, Coleman Dep., 406:17–407:4. They also told Plaintiff Coleman to say that he "smacked" Bridgeman. *See* Ex. 1, Coleman Dep., 407:5–10.

**RESPONSE**: Defendants object to this paragraph because it contains facts related only to the conduct of Clancy and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact

will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

21.     At some point, the "short little white officer" entered the room. Ex. 11, Coleman Mot. to Supp. Tr., at 29:10-30:1. Of the detectives involved in the Bridgeman investigation, Boudreau was the only shorter officer, standing around 5'9". Ex. 8, Boudreau Dep., at 62:21-63:7, 69:9-18; Ex. 17, O'Brien Dep., at 22:9-23:9; Ex. 18, Clancy Dep., at 40:12-19, 41:1-2, 42:23-43:3; Pls.' Resp. to Ofc. DSOF 54, 63; Ofc. DSOF 63 64.

**RESPONSE**: Denied.  Coleman's description is too generic and speculative to create a triable issue of fact that Boudreau was the "short little white officer." The evidence shows that Boudreau was away from Area 1 when the incident would have happened.  (*See* Def's Resp. to PSOAF ¶21; DSOF, ¶70; Def's Ex. 6, Halloran Dep., 125:15-142:18, 193:18-196:12; Def's Ex. 36, Halloran Trial Tr., 16:9-18:5; Def's Ex. 7, Boudreau Dep., 145:14-156:11, 160:7-172:23, 199:8-200:20; Def's Ex. 8, O'Brien Dep., 100:7-101:21, 120:6-21, 199:22-203:12; Attached Supp. to Def's Ex. 8, O'Brien's Dep., 146:22-147:16; Def's Ex. 9, Carroll Dep., 107:22-112:15, 135:3-138:13, 164:17-165:11; Def's Ex. 10, Clancy Dep., 223:8-20; Def's Ex. 11, Kelly Dep., 88:22-89:7, 92:11-17; Attached Supp to Def's Ex. 31, Foley Mtn. to Supp. Tr., 58:7-17; Def's Ex. 21, Clancy Timeline GPR; Def's Ex. 40, O'Brien GPR; Def's Ex. 13, 6/9/1994 Supp Report; *See* Def's Resp. to PSOAF ¶ 11).  *See McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (the court is not required to draw every conceivable inference from the record and "mere speculation or conjecture will not defeat a summary judgment motion"). Boudreau was not little or short in 1994 or by today's standards.  According to the United States Department of Health and Human Services, Center for Disease Control, in 1994 and as recently as 2016, the average height for all males and white males in the United States was 69 inches or 177cm, which is 5' 9".  (*See* Vital and Health Statistics, Series 11, No. 249, "Anthropometric Reference Data for Children and Adults: United States 1988-1994" p. 16; National Health

14

Statistics Report, Vol. 122, Dec. 20, 2018, "Mean Body Weight, Height, Waist Circumference, and Body Mass Index Among Adults: United States, 1999–2000 Through 2015–2016" at p. 7).[3] Moreover, at the hearing on his Motoin to Suppress, Coleman stipulated to the accuracy of information in the physical and history taken for Coleman at the Cook County Jail, sometimes called a "bruise sheet," which indicated his height as 5'11". (*See* attached Supp. to Def's Ex. 26, Coleman's MTS Testimony, p. 73: 13 – 74: 16). Coleman's description of the third person in the room with Foley and Clancy therefore excludes Boudreau. Finally, Coleman has never been able to identify any other Defendant detective besides Defendants Clancy and Foley present in the interrogation room during his questioning. (*See* DSOF, ¶54; Def's Resp. to PSOAF ¶11). He therefore lacks the requisite personal knowledge to make this assertion. *See Malec*, 191 F.R.D. at 584-85; *Rand.*, 42 F. 3d at 1146 (explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors).

22.     Defendants Foley, Clancy, and Boudreau promised Plaintiff Coleman that if he helped them, he would be able to go home. *See* Ex. 1, Coleman Dep., 409:21–410:9; *see* Ex. 11, Coleman MTS Testimony, J-29:10–30:1; Pls.' Resp. to Ofc. DSOF 54, 66. Plaintiff Coleman told them that he was scared and that he wanted to go home, and they told him he could go home after he finished giving them "this story." *See* Ex. 1, Coleman Dep., 411:3–11.

**RESPONSE**: Denied. Boudreau was not the "short little white officer" in the room when this promise was allegedly made. (See Resp. to PSOAF, ¶21 above). Further, at his deposition, Coleman testified that Clancy, Foley, and Garfinkel were the only individuals present when he was promised that he could go home if he gave Garfinkel "the story." (*See* Plf.'s Ex. 1, Coleman Dep, 409:1-410:2). Defendants object to the remainder of this paragraph because it contains facts related only to the conduct of

---

[3]  S*ee*  www.cdc.gov/nchs/data/series/sr_11/sr11_249.pdf  and  www.cdc.gov/nchs/data/nhsr/nhsr122-508.pdf.  The Court can take judicial notice of facts from government websites and sources. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (stating a court may take judicial notice of government websites); *Bodnar v. Lake County Jail*, 2:20-CV-157-PPS-APR, 2020 U.S. Dist. LEXIS 70820, *4 (N. D. Ind. April 22, 2020) (taking judicial notice from the CDC's website).

Clancy and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

23.     Coleman was questioned almost continuously between when he was hit in the face and when Defendant Garfinkel arrived. Ex. 1, Coleman Dep., at 392:1-20; 400:13-401:3.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Clancy and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The

court must take care that [it] does not interfere with a party's ability to accept a fact for purposes

of the motion only.  A nonmovant, for example, may feel confident that a genuine dispute as to

one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all

facts stated by the movant. This position should be available without running the risk that the fact

will be taken as established under subdivision (g) or otherwise found to have been accepted for

other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at \*2; *Brown*, 2012 WL 3987427, at

\*3; *Koch-Weser,* 2002 WL 31133143, at \*8.  Coleman testified that he was questioned almost

continuously by *Foley and Clancy* from when he was hit in the face and when Defendant Garfinkel

arrived. (Pls' Ex. 1, Coleman Dep., 400:13-22 (emphasis added)).

24.     Later, Defendant Garfinkel entered the interrogation room by himself. *See* Ex. 1,
Coleman Dep., 408:8–10. According to the 6/9/94 Supplementary Report, Mr. Coleman did not adopt
any inculpatory statements until after Garfinkel arrived to speak to him. Ex. 27, 6/9/94 Supplementary
Report, at DEFS 212. Plaintiff Coleman asked Defendant Garfinkel who he was, and Defendant
Garfinkel told Plaintiff Coleman that he was there to help Plaintiff Coleman. *See* Ex. 1, Coleman Dep.,
408:11–15. Plaintiff Coleman did not know what a "prosecutor" was. *See* Ex. 1, Coleman Dep., 422:3-
5. Plaintiff Coleman told Defendant Garfinkel that the police hit him twice in the face, and Defendant
Garfinkel responded along the lines of, "We'll deal with that matter later." *See* Ex. 1, Coleman Dep.,
408:16–23; *see* Ex. 11, Coleman MTS Testimony, 31:8–20, 32:17–21. By the time Defendant
Garfinkel told Plaintiff Coleman, "We'll deal with that later," Defendant Clancy had returned and was
standing in the room. *See* Ex. 1, Coleman Dep., 408:24–409:4, 414:14–20; *see* Ex. 11, Coleman MTS
Testimony, J-31:21–32:5.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Foley, Clancy and Garfinkle, which are immaterial to the outcome of Defendants' motion

because there is no evidence to suggest the other Officer Defendants were involved in the events

described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

As such, and because Foley and Clancy are parties to the motion only as to the malicious

prosecution claim, the Officer Defendants should not be required to incur the cost of disputing

facts that are not material to the outcome of the motion, and which are better suited for resolution

at trial between Plaintiffs and Foley and Clancy.  *See* the Advisory Committee Notes to

17

Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8. Moreover, the record establishes that Coleman made an inculpatory statement to Defendant Foley around 1:30 a.m. once Coleman was confronted with evidence that refuted his alibi, prior to Garfinkel's arrival. (*See* Ofc. Def's Ex. 31, Foley MTS Tr., 43:16-44:19; Ofc. Def's Ex. 21, Clancy Timeline GPR). Defendants further deny that Coleman did not know what a "prosecutor" was or that Garfinkel told Coleman that he was there to help him. (*See* Ofc. Def's Ex. 42, Hal Garfinkel MTS Tr., H-6:21-H-7:4).

25.     Right before Plaintiff Coleman gave his court reported statement, Defendants Foley and Clancy—while Defendant Garfinkel was in the room—told Plaintiff Coleman that they would relocate him, his son, and his son's mother. *See* Ex. 1, Coleman Dep., 416:6–17.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Foley, Clancy and Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to

Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

26. Defendant Garfinkel did not document anywhere Mr. Coleman's statement that he had been hit by police or the Detectives' promise to relocate Coleman and his family members in Garfinkel's presence. Ex. 46, Coleman Felony Review Jacket; Ex. 47, Coleman Felony Minute Sheet.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Foley, Clancy and Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found

19

to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*,

2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

27.     Up until Defendant Garfinkel took Plaintiff Coleman's court reported statement, none of the Defendants had read Plaintiff Coleman his *Miranda* rights. Ex. 11, Mot. to Supp. Tr., at 19:115; 22:5-23; 53:16-54:20; Ex. 1, Coleman Dep., at 420:4-15.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Foley, Clancy and Garfinkle, which are immaterial to the outcome of Defendants' motion

because there is no evidence to suggest the other Officer Defendants were involved in the events

described in this paragraph.  *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

As such, and because Foley and Clancy are parties to the motion only as to the malicious

prosecution claim, the Officer Defendants should not be required to incur the cost of disputing

facts that are not material to the outcome of the motion, and which are better suited for resolution

at trial between Plaintiffs and Foley and Clancy.   *See* the Advisory Committee Notes to

Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to

accept a fact for purposes of the motion only.  A nonmovant, for example, may feel confident that

a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of

detailed response to all facts stated by the movant. This position should be available without

running the risk that the fact will be taken as established under subdivision (g) or otherwise found

to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*,

2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

28.     After nearly 10 hours of interrogation and no sleep for nearly 36 hours, Plaintiff Coleman agreed to give the fabricated court-reported statement because he was tired of being yelled at, disrespected, and hit, and because he was scared that it was going to get worse if he did not cooperate. *See* Ex. 1, Coleman Dep., at 290:13-17, 393:13-19, 416:1-17; 422:14-423:8; Ex. 11, Coleman Supp. Hrg. Tr., at 23:3-24:6, 29:10-16, 33:21-24:6, 45:19-23, 60:23-61:12; Ex. 9, All GPRs, at DEFS 385; Ex. 30, Coleman Typed Statement, at Plaintiff 2660. He believed that if he gave the fabricated statement, he would be allowed to go home. Ex. 1, Coleman Dep., 409:12-411:11; 414:4-11; 421:19423:8; Ex. 11, Mot. to Supp. Tr., at 63:19-64:8. Defendant Garfinkel

20

also told Mr. Coleman that if he signed the statement, he could go home. Ex. 11, Coleman Mot. to Supp. Tr., at 31:8-12, 39:3-17, 63:1464:8.

**RESPONSE:** Denied.  Defendants object to this paragraph because it contains facts related only to the conduct of Clancy, Foley, and Garfinkel, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph.  *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.  The citations do not support this statement because Coleman also lacks the requisite personal knowledge to say he was subjected to "nearly 10 hours of interrogation and no sleep for nearly 36 hours."  Coleman testified that he does not know when the detectives started asking him questions or how long the questioning lasted and there was no clock in the room when he was being questioned.  (*See* DSOF 68; Ofc. Def's Ex. 2, Coleman Dep., 375:13-377:1).  *See Malec*, 191 F.R.D. at 584-85 (testimony used to oppose summary judgment must be based on personal knowledge).  Finally, Coleman testified that of the Defendant Officers, only Detectives Clancy and Foley were present when any promises were made to him.  (Pls' Ex. 1, Coleman Dep, 409:1-410:2).

**Defendant Detectives Involved in Coercing
and Fabricating Plaintiff Coleman's "Confession"**

29.     The following Defendant Detectives are listed as "Arresting Officers" in the arrest report documenting Plaintiff Coleman's arrest, which states that his arrest occurred at Area 1 Detective Headquarters, 5101 S. Wentworth, and is signed by Defendant Foley: Defendants Foley, Clancy, Halloran, Boudreau, Moser, Graf, O'Brien, and Carroll. *See* Ex. 81, Coleman Arrest Report. Each of the foregoing Defendant Detectives is also listed as contributing to the supplementary report detailing the investigation leading up to Plaintiffs Coleman's and Fulton's "confessions." *See* Ex. 27, 6/9/94 Supp. Report, p. 16.

**RESPONSE**: Admitted in part, denied in part.  The June 9, 1994, Supplementary Report does not list Defendants Foley, Clancy, Halloran, Boudreau, Moser, Graf, O'Brien, and Carroll as "contributing to the supplementary report;" rather, they are only listed as "arresting officers." (Defs' Ex. 30: First Supp. Report, p. 16).  Furthermore, no one other than Clancy and Foley wrote

or prepared that report. (Defs' Ex. 10: Clancy Dep., 93:15-97:24, 111:9-116:13; Defs' Ex. 31: Foley Mtn. to Supp. Tr., 60:14-61:11; Defs' Ex. 6: Halloran Dep., 86:24-87:16; Defs' Ex. 7: Boudreau Dep., 22:15-24, 24:9-16, 187:17-22; Defs' Ex. 9: Carroll Dep., 16:5-13; Defs' Ex. 11: Kelly Dep., 176:3-11). Plaintiff does not dispute that it was common practice in 1994 to list any officer who assisted or participated in various portions of the investigation as an arresting officer, and that it does not mean these were present for the arrest. (Plf.'s Resp. to DSOF ¶71; Ofc. Defs' Ex. 11, Kelly Dep., 94:5-96:12; Defs' Ex. 10, Clancy Dep., 99:18-100:17, 107:11-13; Ofc. Defs' Ex. 8, O'Brien Dep., 125:10-19, 149:20-150:22; Ofc. Defs' Ex. 7, Boudreau Dep., 228:2-230:23; Ofc. Defs' Ex. 6, Halloran Dep., 162:18-163:1).

30.     Defendant Garfinkel listed the following detectives as "Investigators" in his felony review jacket pertaining to Plaintiff Coleman: Defendants Boudreau, O'Brien, Graf, and Moser. *See* Ex. 46, Garfinkel Felony Review Jacket – CCSAO 906, 908. Defendant Garfinkel listed Defendant Clancy as an "Arresting Officer" in his felony review jacket pertaining to Plaintiff Coleman. *See* Ex. 46, Garfinkel Felony Review Jacket – CCSAO 906. Asked why he listed the foregoing detectives on his felony review jacket, Defendant Garfinkel testified, "They might— you know, there were lots of people. It was—you know, it was a big case; there were lots of people there that night—that day. I just remember seeing those figures that played a significant role." *See* Ex. 42, Garfinkel Dep., 192:16– 24.

**RESPONSE**: Admitted in part, denied in part. Garfinkel did not list Defendants Boudreau, O'Brien, Graf, and Moser as "Investigators" on the felony review jacket; he listed them as "detectives." (*See* Plf.'s Ex. 42, Garfinkel Dep, 191:22-192:24). Plaintiffs also do not dispute that Garfinkel arrived at Area 1 between 7:00 a.m. and 8:00 a.m. on April 28, 1994. (Resp. to DSOF, ¶68). Therefore he could not have bene present for the entire investigation and his belief as to which detectives played a "significant role" is speculation, which cannot be relied upon to oppose summary judgment. *Rand*, 42 F. 3d at 1146 (explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors).

31.     Coleman described the Defendant Detective who struck him as being a white male between 6'4" and 6'6" tall with a slim or medium build, no facial hair, black hair, and glasses. *See* Ex.

22

1, Coleman Dep., 387:5–388:1; *see* Ex. 11, Coleman MTS Testimony, J-25:8–26:15. Back in April of 1994, Defendant O'Brien was one of the tallest detectives at Area 1, and the tallest detective involved in the Bridgeman investigation. *See* Ex. 17, O'Brien Dep., 27:11–14; *see* Ex. 8, Boudreau Dep., 66:17–20. Defendant O'Brien described his appearance in 1994 as 6'4" or 6'5" with dark brown hair starting to gray and no facial hair. Defendant O'Brien also wore both glasses and contact lenses. *See* Ex. 17, O'Brien Dep., 26:4–21, 28:11–14. Other Defendant Detectives described Defendant O'Brien as having dark hair—either brown or black—and a medium build. *See* Ex. 18, Clancy Dep., 42:6–11; *see* Ex. 12, Carroll Dep., 47:14–19; *see also* Pls.' Resp. to Ofc. DSOF 60.

**RESPONSE**: Admitted in part, denied in part. Although Coleman provided a description of the person who struck him as being a white male between 6'4" and 6'6" tall with a slim or medium build, no facial hair, black hair, and glasses, he has no basis to say that person was O'Brien. Apart from skin color and height, none of the other descriptive identifiers Coleman provided match O'Brien. In 1994, O'Brien was 6'5", but he did not have a "slim to medium build" or "short black hair." He weighed 240 pounds, had salt and pepper hair "turning grey at that point" and he "tended to wear contacts more often." (*See* Pls' Ex. 17, O'Brien Dep., 26:4-16). O'Brien also testified that before his hair started turning gray, it was "reddish brown." (Pls' Ex. 17, O'Brien Dep., 26:17-21; *see also* DSOF ¶63).

32. Defendant O'Brien was the only Area 5 detective who participated in the Bridgeman investigation who was 6'4" or taller. He was the tallest of the Area 1 detectives who participated in the Bridgeman investigation. Ex. 7, Kelly Dep., at 74:6-15, 111:24-112:4; Ex. 1, Coleman Dep., at 387:5-388:24; Ex. 9, Boudreau Dep., at 64:12-18; 66:17-20; Ex. 18, Clancy Dep., at 41:16-42:11; Ex. 12, Carroll Dep., at 206:23-207:6; Ofc. DSOF 71; Pls.' Resp. to Ofc. DSOF 60; *see also* PSOAF 33.

**RESPONSE**: Admitted in part, denied in part. Defendant O'Brien was not an Area 5 detective, was not the only Area 1 detective who participated in the Bridgeman investigation who was 6'5" and he was not the tallest detective at Area 1. Detective Turner and Detective Kelly were also approximately 6'4" tall. (*See* Plf.'s Ex. 17, O'Brien Dep., 24:20-25:5).

33. Defendant O'Brien has hit, punched, or slapped numerous people in the face, head, and body. For instance, Dan Young testified that Defendant O'Brien was among a group of people who kicked him and hit him until he agreed to sign a false, inculpatory statement. Ex. 43, Dan Young Testimony, at 17:16-18:8; Ex. 52, Dan Young Statement. Jerry Gillespie also alleged that O'Brien was among the Area 1 officers who physically abused him in order to obtain a false statement in which Mr. Gillespie stated that he acted as the lookout during a shooting. Ex. 44, Gillespie Mot. to Hold in Abeyance, at ¶¶6, 8, 15; Ex. 45, Gillespie Petition for Post-Conviction Relief, at ¶¶32, 35, 36.

23

**RESPONSE**: Denied. Defendants object to this paragraph because it contains inadmissible propensity and hearsay evidence, which is inadmissible and must be excluded. *United States v. Klebig*, 600 F.3d 700 (7th Cir. 2010) (propensity evidence generally inadmissible for the purpose of proving action in conformity with that character); *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996) (a party may not rely upon inadmissible hearsay to oppose summary judgment). Further, the only court to have adjudicated such allegations through an evidentiary hearing rejected them. (*See* attached Def's Ex. 67, Order dated 1/20/2020 re: Referral from the Illinois Torture Relief and Inquiry Commission in *People v. Anderson*, Circuit Court of Cook County, Illinois, Nos. 94 CR 22460 and 94 CR 22152, Findings of Fact at ¶¶69, 70, 115, 118, 120, 125, 127, 136, 139, 142, 147, Conclusions of Law at ¶¶13, 15, 17 and Conclusion at p. 53). Finally, O'Brien denied the alleged abuse at his deposition. (Attached Def's Supp. to Ex. 8, p. 160: 5 – 184: 13)

### Defendants Coerced and Fabricated Plaintiff Fulton's "Confession"

34. In the evening hours of April 28, 1994, Defendants Foley and Clancy went to Plaintiff Fulton's residence at 5517 S. Sangamon. *See* Ex. 2, Fulton Dep., 74:7–9; 277:5–279:5; *see* Ex. 82, Excerpts of Derrell Fulton Testimony at 4/16/96 Suppression Hearing, "Fulton MTS Testimony", A17:19–18:7;[1] *see* Ex. 112, Foley 5/7/97 Trial Tr., J-77:13–78:17, K-28:14–31:11. Defendants Foley and Clancy asked Plaintiff Fulton when the last time was that he saw Eddie Taylor. *See* Ex. 2, Fulton Dep., 279:6–280:3; *see* Ex. 82, Fulton MTS Testimony, A18:7–11. Plaintiff Fulton told Defendants Foley and Clancy that it had been a while since he had seen Taylor. *See* Ex. 2, Fulton Dep., 280:3–6. Defendants Foley and Clancy told Plaintiff Fulton that they would be back if they learned that he was lying. *See* Ex. 2, Fulton Dep., 281:8–13; *see* Ex. 82, Fulton MTS Testimony, A18:12–17.

**RESPONSE**: Defendants object to this paragraph because it contains facts related only to the conduct of Foley and Clancy, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described

---

[1] During the hearing on Fulton's motion to suppress, Fulton's attorney asked him about how he ended up at the Area on April 30, 1994. Based on the police reports, trial testimony, and depositions conducted in this lawsuit, it is undisputed that Fulton arrived at the Area in the morning on April 29, 1994, and that his attorney misspoke during the suppression hearing.

in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

35. Later that evening, Plaintiff Fulton went to bed. *See* Ex. 2, Fulton Dep., 284:8–17; *see* Ex. 82, Fulton MTS Testimony, A18:18–20. Early the next morning, while Plaintiff Fulton was in bed, the police came back to his residence. *See* Ex. 2, Fulton Dep., 284:18–20; *see* Ex. 82, Fulton MTS Testimony, A18:22–19:4. Four or five officers came up to Plaintiff Fulton's bedroom and asked him if he would have any problems coming down to the police station. *See* Ex. 2, Fulton Dep., 284:21– 285:4, 286:13–287:16. Plaintiff Fulton told them that he did not have any problem with coming down to the police station. *See* Ex. 2, Fulton Dep., 285:5–7; *see* Ex. 82, Fulton MTS Testimony, A19:4–10.

**RESPONSE**: Admitted in part and denied in part. Detective Halloran testified that he encountered Fulton on the back porch of his residence at 5517 S. Sangamon where he took Fulton into custody. (*See* Defs' Ex. 36: Halloran Trial Tr., 16:6-18:2).

36. Defendants Foley, Clancy, Halloran, Boudreau, O'Brien, and Carroll were among the officers who went to Plaintiff Fulton's residence the morning of April 29, 1994. *See* Ex. 112, Foley Trial Tr., U-81:13–82:2; *see* Ex. 94, Excerpts of William Foley Testimony at 4/16/96 Suppression Hearing, "Foley 4/16/96 MTS Testimony", A93:1–94:3. Defendants Foley and Clancy transported Plaintiff Fulton to Area 1 in an unmarked squad car. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A93:1–94:3. According to Defendant Foley, Plaintiff Fulton was placed under arrest at his residence before being transported to Area 1. *See* Ex. 24, Foley Trial Tr., U-81:13–82:5.

**RESPONSE**: Admitted.

37.     After Plaintiff Fulton arrived at the Area, he was placed in a room by himself for a while. *See* Ex. 2, Fulton Dep., 289:9–13. Two Defendant Detectives then entered the room, at which time Plaintiff Fulton was placed in handcuffs. *See* Ex. 2, Fulton Dep., 289:14–20, 294:22–295:10; *see* Ex. 82, Fulton MTS Testimony, A20:6–21:24, 52:6–10.

**RESPONSE**: Admitted in part, denied in part.  Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C).  *See Malec*, 191 F.R.D. at 585.  In addition, Plaintiffs' record citations do not support the assertion that all Officer Defendants or any specific one was involved in the events described in this paragraph.  Fulton admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white, and therefore he has no basis to say whether these detectives are the same as the Officer Defendants.  (*See* Resp. to DSOF, ¶82). Detective Clancy testified that Fulton was not handcuffed while he was in the interview room. (*See* Defs' Ex. 10: Clancy Dep., 152:1-153:8; *see* Plf.'s Ex. 112, Foley Tr., J-82:20-83:14). Detective Foley testified that he and Clancy were the two detectives that first entered the room after Fulton arrived at the Area.  (*See* Plf.'s Ex. 112, Foley Tr., J-82:20-83:14).

38.     Over the course of about the next 40 hours, the Defendant Detectives interrogated Plaintiff Fulton approximately four or five times before Defendant Garfinkel arrived. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A93:1–92:15; *see* Ex. 83, Fulton Statement, p. 1; *see* Ex. 2, Fulton Dep., 290:17–291. None of the Defendant Detectives ever gave Plaintiff Fulton his *Miranda* rights. *See* Ex. 2, Fulton Dep., 349:14–18.

**RESPONSE:** Denied.  Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C).  *See Malec*, 191 F.R.D. at 585.  In addition, Plaintiffs' record citations do not support the assertion that all Officer Defendants or any specific one was involved in the events described in this paragraph.

26

Fulton was not questioned for 40 hours continuously. He was questioned on four separate occasions each time for approximately 15 to 20 minutes before Defendant Garfinkle arrived. (*See* Resp. to DSOF ¶82; Ofc. Defs' Ex. 30: Fulton's Supplemental Answers to Defendant Boudreau's First Set of Interrogatories, p. 2). Fulton also admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white, and therefore he has no basis to say who any of the detectives who questioned him are. (Resp. to DSOF, ¶82). Plaintiff Fulton was read his *Miranda* rights by Defendant Foley. (Plf.'s Ex. 112, Foley Tr., J-83:10-17, J-84:17-J-86:4).

39. During the first interrogation session, the Defendant Detectives made statements to Plaintiff Fulton such as, "We know you did it," and, "We know you were there." *See* Ex. 2, Fulton Dep., 295:14–19; *see* Ex. 82, Fulton MTS Testimony, A21:17–20, 24:4–10. Plaintiff Fulton told the Defendant Detectives that he did not know what they were talking about and denied whatever it was they were accusing him of. *See* Ex. 2, Fulton Dep., 295:14–22.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, Plaintiffs' record citations do not support the assertion that all Officer Defendants or any specific one was involved in the events described in this paragraph. Fulton admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white, and therefore he has no basis to say whether these detectives are the same as the Officer Defendants. (*See* Resp. to DSOF, ¶82). Detective Foley testified that he and Clancy were the two detectives that first entered the room after Fulton arrived at the Area. (Plf.'s Ex. 112, Foley Tr., J-82:20-83:14).

37. During the second round of questioning, the Defendant Detectives repeated their accusations against Plaintiff Fulton over and over again. (*See* Ex. 2, Fulton Dep., 299:10–19. Plaintiff Fulton again denied their accusations. *See* Ex. 2, Fulton Dep., 299:20–22).

**RESPONSE:** Denied. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, Plaintiffs' record citations do not support the assertion that all Officer Defendants or any specific one was involved in the events described in this paragraph. Fulton admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white. (*See* Resp. to DSOF, ¶82).

38.     Hours later, during the third round of questioning, the Defendant Detectives continued accusing Plaintiff Fulton of the crime, and Plaintiff Fulton continued to deny any involvement in it. *See* Ex. 2, Fulton Dep., 305:6–308:1. Towards the end of the third and going into the fourth interrogation, the Defendant Detectives started "hollering" at Plaintiff Fulton and telling him about the victim, Antwinica Bridgeman. *See* Ex. 2, Fulton Dep., 309:19–310:11; *see* Ex. 82, Fulton MTS Testimony, A23:19–23.

**RESPONSE:** Denied. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, Plaintiffs' record citations do not support the assertion that all Officer Defendants or any specific one was involved in the events described in this paragraph. Fulton admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white. (*See* Resp. to DSOF 82). Fulton also testified that Antwinica Bridgeman was not brought up during the third interview. (*See* Defs' Ex. 5: Fulton Dep., 311:5-23).

39.     During the second or third round of questioning, an African American Detective—Defendant Turner based on his description—entered the room, struck Plaintiff Fulton on the side of his head, and threatened to take Fulton somewhere and put a bullet in his brain. *See* Ex. 2, Fulton Dep., 64:16–18, 298:10–18, 301:7–20; *see* Ex. 82, Fulton MTS Testimony, A24:13–22, 26:20–27:2; *see* Ex. 84, Fulton Arrest Report. Defendant Turner punched Plaintiff Fulton on the left side of Plaintiff Fulton's face with a closed hand. *See* Ex. 2, Fulton Dep., 291:19–292:24. Defendant Turner struck Plaintiff Fulton because Plaintiff Fulton "did not give him a direct answer or the answer he was looking for." *see* Ex. 82, Fulton MTS Testimony, A24:13–22.

28

**RESPONSE:** Denied. Defendants object to this paragraph because it contains facts related only to the conduct of the African American detective, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. According to Fulton, Detectives Clancy and Foley were the only other detectives in the interrogation room when the African-American detective allegedly punched and threatened Fulton, according to Plaintiffs. (Resp. to DSOF, ¶88). Fulton also admits that a "definitive identification of Turner could not be made," and therefore he has no basis to say the detective who struck him is Detective Turner as opposed to any other African-American detective. (*See* Resp. to PSOAF, ¶58). Finally, as Plaintiffs admit, Turner has not been served and therefore is not a proper party or a Defendant. (*See* Plf's Resp. to DSOF, ¶6 (not disputing n. 3 that Turner is not a proper defendant); see also Fulton's Resp., Dkt. 338, p. 10, n. 3).

43. Based on the arrest report documenting Plaintiff Fulton's arrest, Defendants Foley and Clancy were in the room when Defendant Turner struck Plaintiff Fulton and threatened to put a bullet in his brain. *See* Ex. 2, Fulton Dep., 301:21–302:4; *see* Ex. 84, Fulton Arrest Report. Defendants Foley and Clancy did not intervene when Defendant Turner struck and threatened to shoot Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 302:5-7.

**RESPONSE:** Denied. Defendants object to this paragraph because it contains facts related only to the conduct of Foley, Clancy and Turner, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to

29

Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8. Further, as Plaintiffs admit, Turner has not been served and therefore is not a proper party or a Defendant. (*See* Plf's Resp. to DSOF, ¶6 (not disputing n. 3 that Turner is not a proper defendant); see also Fulton's Resp., Dkt. 338, p. 10, n. 3). Finally, Fulton admits that a "definitive identification of Turner could not be made," and therefore he has no basis to say the detective who struck him is Detective Turner as opposed to any other African-American detective. (*See* Resp. to PSOAF, ¶58) .

44. Hours later, during the fourth interrogation, the Defendant Detectives continued to "holler" at Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 312:24–313:2, 315:14–1. One of the Defendant Detectives asked Plaintiff Fulton if he knew Nevest Coleman. *See* Ex. 2, Fulton Dep., 316:9–317:24. The Defendant Detectives told Plaintiff Fulton that a girl was killed, and they knew that he had killed her. *See* Plf.'s Ex. 2, Fulton Dep., 318:1–5.

**RESPONSE:** Denied. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, the citations relied on by Plaintiffs do not support the assertion that any Officer Defendant was involved in the events described in this paragraph. To the extent Plaintiffs allege Foley and Clancy are the detectives involved in these events, Defendants object because these facts are related only to the conduct of Foley and Clancy, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer

Defendants were involved. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

Fulton also admits that he cannot describe what any of the detectives who interviewed him looked

like, other than that they were white. (*See* Resp. to DSOF, ¶82).

45. Before Defendant Garfinkel arrived at the Area, Plaintiff Fulton had minimal sleep, was not given anything to drink or eat since the beginning of his interrogation and had not used the restroom. *See* Plf.'s Ex. 2, Fulton Dep., 289:21–290:6, 322:4–19.

**RESPONSE:** Denied. Fulton admits that he was provided a cup of coffee and a hamburger upon

arriving at the Area. (Resp. to DSOF, ¶81; Plf.'s Ex. 2, Fulton Dep., 289:9-290:1). Moreover, in

Plaintiffs' Response to DSOF, they admit that Fulton was allowed to use the restroom but,

ironically, took the position that this fact is immaterial. (Resp. to DSOF, ¶91). Plaintiffs also

admit that Fulton was allowed to get water and was able to sleep. (Resp. to DSOF, ¶¶ 86, 91, 93;

Plf.'s Ex. 2, Fulton Dep., 295:4-297:17, 312:24-315:13; 319:7-16, 322:4-11).

46. Plaintiff Fulton was taken to another room to speak with Defendant Garfinkel. *See* Ex. 2, Fulton Dep., 336:5–11. The Defendant Detective did not introduce Defendant Garfinkel to Plaintiff Fulton or say anything. *See* Ex. 2, Fulton Dep., 337:5–12. Defendant Garfinkel told Plaintiff Fulton that he was an attorney. *See* Ex. 2, Fulton Dep., 338:16–23. Defendant Garfinkel told the Defendant Detective to leave the room. *See* Ex. 2, Fulton Dep., 337:13–17. The Defendant Detective then left the room. *See* Ex. 2, Fulton Dep., 338:2–5.

**RESPONSE:** Denied. Defendants object to this paragraph on the basis that Plaintiffs' use of the

generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific

Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See*

*Malec*, 191 F.R.D. at 585. The citations do not establish that the "Defendant Detective" can be

identified as a Defendant in this case. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d

at 921. Fulton admits that he cannot describe what this "Defendant Detective" looked like, other

than that they were white. (Resp. to DSOF, ¶82). Finally, Defendants object to this paragraph

because it contains facts related only to the conduct of Garfinkle and an unidentified person, which

are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the

31

other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F.

Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are

parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not

be required to incur the cost of disputing facts that are not material to the outcome of the motion,

and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the

Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not

interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for

example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion,

and prefer to avoid the cost of detailed response to all facts stated by the movant. This position

should be available without running the risk that the fact will be taken as established under

subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken,*

*LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143,

at *8.

47.     Defendant Garfinkel did not give Plaintiff Fulton his *Miranda* rights before he started speaking with Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 349:19–350:3. Defendant Garfinkel told Plaintiff Fulton that he knew Plaintiff Fulton "did it." *See* Ex. 2, Fulton Dep., 341:8–22. Plaintiff Fulton "constantly" told Defendant Garfinkel that he did not know anything about the crime. *See* Ex. 2, Fulton Dep., 27:15–28:9. At that point, Plaintiff Fulton knew Defendant Garfinkel was on the side of the police. *See* Ex. 2, Fulton Dep., 341:23–342:6.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is

no evidence to suggest the other Officer Defendants were involved in the events described in this

paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and

because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the

Officer Defendants should not be required to incur the cost of disputing facts that are not material

to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs

and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at \*2; *Brown*, 2012 WL 3987427, at \*3; *Koch-Weser,* 2002 WL 31133143, at \*8.

48.     Defendant Garfinkel left the room to retrieve Coleman's court reported statement from his briefcase. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A57:22–58:3. Garfinkel showed Plaintiff Coleman's court reported statement to Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 363:15–17; Ex. 82, Fulton MTS Testimony, A37:13–16. Plaintiff Fulton glanced or scanned the statement enough to know that it alleged his involvement in the assault of the victim. *See* Ex. 2, Fulton Dep., 363:18– 364:21; Fulton MTS Testimony, 29:3–17. Plaintiff Fulton continued to tell Defendant Garfinkel that he was not involved in the crime. *See* Ex. 2, Fulton Dep., 37:13–22.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by

33

the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

49. Defendant Garfinkel told Plaintiff Fulton that if he did not cooperate, Defendant Garfinkel would charge him with murder, he would "never see the streets again," and that he would "surely get the death penalty." *See* Ex. 2, Fulton Dep., 342:17–24; *see* Ex. 82, Fulton MTS Testimony, A25:15–23, 37:22–38:12.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

50. Defendant Garfinkel's threats, along with Defendant Turner hitting Plaintiff Fulton, Defendant Turner threatening to put a bullet in Plaintiff Fulton's brain in front of Defendants Clancy and Foley, and the length of time Plaintiff Fulton had been in custody "messed" with Plaintiff Fulton

34

and wore him down. *See* Ex. 2, Fulton Dep., 343:1–24. Plaintiff Fulton felt as though he did not have a way out. *See* Ex. 2, Fulton Dep., 344:1–6. He felt "scared to death" for his life. *See* Ex. 2, Fulton Dep., 345:2–20.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Foley, Clancy, Turner and Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

51. After Defendant Garfinkel threatened him, Plaintiff Fulton tried to give Defendant Garfinkel a statement by making one up. *See* Ex. 2, Fulton Dep., 350:4–15. Defendant Garfinkel did not like the statement, so he balled up the paper on which he was writing and threw it to the side. *See* Ex. 2, Fulton Dep., 350:15–17; *see* Ex. 82, Fulton MTS Testimony, A31:8–11.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and

because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

52.     Defendant Garfinkel wrote down a second statement. *See* Ex. 83, Handwritten Statement Attributed to Derrell Fulton, "Fulton Statement", pp. 1–3. Defendant Garfinkel told Plaintiff Fulton that the statement had to say that the victim gave him oral sex. *See* Ex. 2, Fulton Dep., 350:4–17; *see* Ex. 82, Fulton MTS Testimony, A31:4–13. The statement includes an allegation that Plaintiff Fulton told Defendant Garfinkel that the victim performed oral sex on him. *See* Ex. 83, Fulton Statement, p. 2. The statement indicates that Plaintiff Fulton confessed to participating in the assault and murder with Plaintiff Coleman and Taylor. *See* Ex. 83, Fulton Statement, pp. 1–3.

**RESPONSE:** Defendants admit that Fulton confessed to Garfinkel and included in his statement that the victim performed oral sex on him. Defendants object to the remainder of this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better

36

suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory

Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with

a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may

feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to

avoid the cost of detailed response to all facts stated by the movant. This position should be

available without running the risk that the fact will be taken as established under subdivision (g)

or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL

433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

53.     Defendant Garfinkel told Plaintiff where to sign the statement. *See* Ex. 82, Fulton MTS Testimony, A52:22–53:11. Plaintiff Fulton's statement is dated May 1, 1994. *See* Ex. 83, Fulton Statement, p. 1. Plaintiff Fulton signed the statement at about 1:30 a.m., which was approximately 42 hours after Plaintiff Fulton was first brought to the Area. *See* Ex. 120, Excerpts of Garfinkel 5/13/97 Trial Testimony, "Garfinkel 5/13/97 Trial Tr.", O-86:5–16; *see* Ex. 112, Foley Trial Tr., J-81:13–82:5. The statement was signed by Plaintiff Fulton, Defendant Garfinkel, and Defendant Foley. *See* Ex. 83, Fulton Statement; *see* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-29:8–18.

**RESPONSE:** Admitted.

54.     Apart from his age and that he obtained his GED, Plaintiff Fulton did not give Defendant Garfinkel any of the information that is in the statement. *See* Ex. 2, Fulton Dep., 351:5– 23; *see* Ex. 83, Fulton Statement. Defendant Garfinkel wrote the statement without Plaintiff Fulton volunteering a single fact. *See* Ex. 2, Fulton Dep., 352:3–8. Plaintiff Fulton did not read the statement before signing it, and Defendant Garfinkel did not read the statement to Plaintiff Fulton before Plaintiff Fulton signed it. *See* Ex. 2, Fulton Dep., 358:21–359:11; *see* Ex. 82, Fulton MTS Testimony, A36:23– 37:3. After Defendant Garfinkel wrote out the statement, he told Plaintiff Fulton where to sign it. *See* Ex. 2, Fulton Dep., 53:6–11. Although Defendant Foley signed the statement, he was not in the room when Plaintiff Fulton signed it. *See* Ex. 2, Fulton Dep., 359:12–14.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is

no evidence to suggest the other Officer Defendants were involved in the events described in this

paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and

because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the

Officer Defendants should not be required to incur the cost of disputing facts that are not material

to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

55.     Plaintiff Fulton signed the statement because he felt that he did not have anything "left in [him]" after being "locked up for all of that time" despite his repeated denials and, moreover, because he feared for his life after Defendant Turner struck him, threatened to put a bullet in his brain, and Defendant Garfinkel threatened to charge him with a murder for which Plaintiff Fulton could receive the death penalty. *See* Ex. 2, Fulton Dep., 428:19–429:17; *see* Ex. 82, Fulton MTS Testimony, A26:20–27:10, 37:4–7, 37:20–24.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and Turner, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of

38

detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

**Defendant Detectives Involved in Coercing
and Fabricating Plaintiff Fulton's "Confession"**

56.     Four or five white Defendant Detectives rotated in and out to interrogate Plaintiff Fulton. *See* Ex. 2, Fulton Dep., 294:22–295:3, 306:3–10, 315:14–21; *see* Ex. 82, Fulton MTS Testimony, A:23:4–18.

**RESPONSE:** Denied.   Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C).  *See Malec*, 191 F.R.D. at 585. Fulton admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white.  (*See* Resp. to DSOF, ¶82).  Fulton also testified that there were never more than three detectives in the room with him at any time. (*See* Ofc. Defs' Ex. 5, Fulton Dep., 291:16-297:17, 302:8-306:23; Ofc. Defs' Ex. 30, Fulton's Supplemental Answers to Defendant Boudreau's First Set of Interrogatories, p. 2).   Plaintiffs' citation to his own, self-serving, testimony without pointing to factual support in the record is improper and not enough to defeat summary judgment. *Weeks v. Samsung Heavy Industries,* 126 F.3d 926, 939 (7th Cir. 1997) (a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment).

57.     The following Defendant Detectives are listed as "Arresting Officers" in the arrest report documenting Plaintiff Fulton's arrest signed by Defendant Clancy: Defendants Clancy, Foley, Halloran, Boudreau, O'Brien, Carroll, Moser, Graf, and Turner. *See* Ex. 84, Fulton Arrest Report. The arrest report lists the time of arrest as 11:50 p.m. on April 30, 1994. *See* Ex. 84, Fulton Arrest Report. Each of the foregoing Defendant Detectives is also listed as contributing to the supplementary report

detailing the investigation leading up to Plaintiffs Coleman's and Fulton's "confessions." *See* Ex. 27, 6/9/94 Supp. Report.

**RESPONSE:** Admitted in part, denied in part. Plaintiffs admit that Turner has not been served and therefore is not a proper party or a Defendant. (*See* Plf's Resp. to DSOF, ¶6 (not disputing n. 3 that Turner is not a proper defendant); see also Fulton's Resp., Dkt. 338, p. 10, n. 3). The arrest report documenting Plaintiff Fulton's arrest does not list Defendants Clancy, Foley, Halloran, Boudreau, O'Brien, Carroll, Moser, Graf, and Turner as "contributing to the supplementary report," rather, they are only listed as "arresting officers." (*See* Defs' Ex. 30: First Supp. Report, p. 16). Furthermore, no one other than Clancy and Foley wrote or prepared that report. (Defs' Ex. 10: Clancy Dep., 93:15-97:24, 111:9-116:13; Defs' Ex. 31: Foley Mtn. to Supp. Tr., 60:14-61:11; Defs' Ex. 6: Halloran Dep., 86:24-87:16; Defs' Ex. 7: Boudreau Dep., 22:15-24, 24:9-16, 187:17-22; Defs' Ex. 9: Carroll Dep., 16:5-13; Defs' Ex. 11: Kelly Dep., 176:3-11). Plaintiffs also do not dispute that it was common practice in 1994 to list any officer in the reports who assisted or participated in various portions of the investigation as an arresting officer and that it does not mean they were present for the arrest. (Plf.'s Response. To DSOF, ¶71; Ofc. Defs' ex. 11, Kelly Dep., 94:5-96:12; Ofc Defs' Ex. 10, Clancy Dep., 99:18-100:17, 107:11-13; Ofc. Defs' Ex. 8, O'Brien Dep., 125:10-19, 149:20-150:22; Ofc. Defs' Ex. 7, Boudreau Dep., 228:2-230:23; Ofc. Defs' Ex. 6, Halloran Dep., 162:18-163:1). Further, Plaintiffs do not dispute that only Defendants Clancy and Foley wrote or typed this report. (Resp. to DSOF, ¶105).

58.     Of the Defendant Detectives listed on Defendant Clancy's arrest report documenting Fulton's arrest, Defendant Turner is the only African American detective listed. *See* Ex. 12, Carroll Dep., 56:24–58:4; *see* Ex. 18, Clancy Dep., 43:20–44:5. Although a definitive identification of Turner could not be made, a crime scene photograph was taken of what appears to be an African American detective walking down the front stairs of the Coleman residence. *See* Ex. 8, Boudreau Dep., 201:21–206:4; *see* Ex. 23, Scene Photo.

**RESPONSE:** Admitted in part, denied in part. The record citations do not establish that the African American person in the photo was Turner. Boudreau testified that he was guessing it was Turner in the photo. (Plf's Ex. 8, p. 205: 21 - 206: 4).

59.     In preparation for his deposition in this lawsuit, Defendant Clancy reviewed the supplementary reports, general progress reports, Defendant Foley's trial testimony, and Plaintiffs Fulton's and Coleman's "confessions" to refresh his recollection. *See* Ex. 18, Clancy Dep., 26:1–32:11. Despite his review, Defendant Clancy could not recall Defendant Turner's role in the investigation. *See* Ex. 18, Clancy Dep., 112:8–113:20.

**RESPONSE:** Admitted in part, denied in part. The citations to Clancy's deposition, at p. 112: 8 – 113: 30, do not estblaish that he singled out Turner. Rather, Clancy testified that he could not remember what any role any of the detectives played in the investigation. (See Pl's Ex. 18, p. 111: 9 – 113: 20).

60.     Neither the 6/9/94 supplementary report, the general progress reports, arrest reports, nor any other report indicate what role Defendant Turner had in the investigation to explain his being listed on Plaintiff Fulton's arrest report apart from his having been involved in the interrogation of Plaintiff Fulton. *See* Ex. 27, 6/9/94 Supp. Report; *see* Ex. 81, Coleman Arrest Report; *see* Ex. 84, Fulton Arrest Report; *see* Ex. 9, Additional General Progress Reports at DEFS 339.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph because it contains an improper argument that Detective Turner was involved in Fulton's interrogation based on Plaintiffs' opinions and speculation about what the facts mean, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. None of the records cited establish that Turner was involved in Fulton interrogation. Fulton has no basis for his statement that Turner was involved in his interrogation. Fulton admits that a "definitive identification of Turner could not be made." (*See* PSOAF, ¶58). Fulton cannot even describe what any of the detectives looked like. (*See* Resp. to DSOF, ¶82).

61.     Given that Defendant Clancy credited Defendant Turner as being involved in Plaintiff Fulton's arrest—and, therefore, Plaintiff Fulton's interrogation—in the arrest report, Defendant Clancy was one of the Defendant Detectives present when Defendant Turner struck Plaintiff Fulton and threatened to put a bullet in his brain. *See* Ex. 84, Fulton Arrest Report. Moreover, because Defendant

41

Clancy was partnered with Defendant Foley and the two interrogated Plaintiff Fulton together, Defendant Foley was the other officer present when Defendant Turner struck Plaintiff Fulton and threatened to put a bullet in his brain. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A89:9– 17, 98:19–99:8; *see* Ex. 18, Clancy Dep., 54:3–11.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, Foley and Turner, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8. Defendants further object to this paragraph because it contains an improper argument that Detective Turner was involved in Fulton's interrogation based on Plaintiffs' opinions and speculation about what the facts mean, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. Fulton admits that a "definitive identification of Turner could not be made." (*See* PSOAF ¶ 58). Fulton cannot even describe what any of the detectives looked like. (*See* Resp. to DSOF 82). *Rand ,* 42 F. 3d at 1146

42

(explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors).

62.      Defendants O'Brien and Carroll interviewed Kimberly Johnson concerning Plaintiff Fulton's whereabouts on April 11, 1994. Defendant Carroll prepared a GPR summarizing the interview. *See* Ex. 12, Carroll Dep., 128:5–129:4; *see* Ex. 9, GPRs at DEFS 339.

**RESPONSE:** Admitted.

63.      The supplementary report detailing the investigation leading up to Plaintiffs Coleman's and Fulton's "confessions" states in part as follows:

> The R/Ds then had occasion to locate and interview Kimberly JOHNSON and at that time she stated that at the date and time of this incident FULTON was not with her and that she did not know anything about FULTONs whereabouts at the time of this incident. FULTON was then confronted with K. JOHNSONs account and at that time stated that he had been un-truthful in his account of the night of the incident. He went on to say that on the date and time of this incident he was in the alley behind 917 W. 55th St. He then went on to say that he then observed "Chip" and Nevest and Antwinica go into the basmt. at 917 W. 55th St. He then stated that he stayed in the alley for a short time and that he then went down into the basement and while he was standing in the basement door way he observed the victim orally copulating "Chip" and Nevest COLEMAN was having vaginal intercourse with the victim. He then went on to say that "Chip" and Nevest COLEMAN turned towards FULTON and saw that FULTON was standing in the doorway. FULTON then went on to say that he then panicked and ran from the scene and went home.

*See* Ex. 27, 6/9/94 Supp. Report, p. 14.

**RESPONSE:** Admitted in part and denied in part.  Although this paragraph accurately quotes the report, the record citations do not establish that Kimberly Johnson's interview "lead up" to Plaintiff Coleman's confession.  Coleman started confessing around 2:00 a.m. on April 29, 1994 and gave his court-reported confession at 9:57 a.m.  (*See* Defs' Ex. 21: Clancy Timeline GPR Defs' Ex. 1: Coleman Crt. Rptd. Stmt).  Plaintiffs do not dispute that Fulton was arrested around 7:00 a.m. on April 29, 1994.  (*See* Resp. to DSOF, ¶78).  Nor do Plaintiffs dispute that Kimberly Johnson was

43

not located until the evening hours on April 29, 1994. (Resp. to DSOF, ¶97). Fulton did not confess until May 1, 1994, just after midnight.

64. Defendant Foley took notes and/or prepared GPRs related to the investigation on plain paper, *i.e.*, a non-standard Chicago Police Department GPR form. *See* Ex. 18, Clancy Dep., 187:15–189:1; *see* Ex. 9, (All GPRs) at DEFS 339. An unsigned note on a non-standard GPR form consistent with Defendant Foley's other notes states as follows:

> Fulton
> Carroll & O'Brien
> denial
> in alley
> Left alley bsmt
> seen
> stood till [ ] turned
> Confession

*See* Ex. 87, Foley Timeline GPR.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph because it contains an improper argument that notes were taken on "non-standard Chicago Police Department GPR form," which is based on Plaintiffs' opinions and speculation about what a "non-standard form" is, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585.

65. Given that, 1, Defendants Carroll and O'Brien spoke with Johnson, 2, the Defendant Detectives allege that Fulton was then confronted with the information Johnson ostensibly provided to the Defendant Detectives, and 3, the Foley timeline GPR could be construed as indicating that Carroll and O'Brien questioned Fulton, Defendants Carroll and O'Brien were the two other Defendant Detectives involved in Fulton's interrogations. *See* Ex. 9, GPRs at DEFS 339; *see* Ex. 27, 6/9/94 Supp. Report, p. 14; *see* Ex. 87, Foley Timeline GPR.

**RESPONSE:** Denied. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. Defendants also object to this paragraph because it contains an improper argument that Carroll and O'Brien were involved in Fulton's interrogation based on Plaintiffs' opinions and speculation about what the facts mean, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. The fact that Carroll and O'Brien questioned Johnson does not lead to

44

a reasonable inference that they also confronted Fulton with Johnson's account or otherwise questioned him. Indeed, Fulton admits he cannot identify or describe any detective who questioned other than being white. (*See* Resp. to DSOF, ¶82). Thus, Plaintiffs' belief that Carroll and O'Brien may have questioned Fulton is pure speculation and must be stricken. *Rand,* 42 F. 3d at 1146 (explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors). In addition, Defendant Carroll left Area 1 after Fulton was located at his home. He had no conversations with Fulton and no contact with Fulton once Fulton was at Area 1. Carroll did not return to work until the afternoon of April 29, 1994, at which point he and O'Brien were asked to locate Fulton's girlfriend and alibi witness, Kimberly Johnson. They did not locate Kimberly Johnson until the evening hours of April 29, 1994, and they did not return to Area 1 until later in the night on April 29, 1994. (Def's Ex. 8, O'Brien Dep., 96:24-97:7, 101:19-102:12, Def's Ex. 9, Carroll Dep., 116:20-127:10, 169:13-23; Def's Ex. 46, GPR by Carroll and O'Brien regarding interview of Kimberly Johnson, dated April 29, 1994, CCSAO 982). Finally, Plaintiffs' Exhibit 87 ("Foley's Timeline GPR") contains no indication as to the author of this GPR or what it purports to document. (Pls' Ex. 87: Foley Timeline GPR).

66. Although Fulton believes that Defendants O'Brien and Carroll are the other two detectives who participated in his interrogation, a reasonable jury could conclude that it was either Defendants Boudreau and Halloran or Moser and Graf. Defendants Boudreau and Halloran claim that they spoke with Fulton to obtain his biographical information when he was first brought to the Area, and that Fulton denied involvement in the murder. *See* Ofc. DSOF 83. During his time at the Area when he wrote out Plaintiff Fulton's statement, Defendant Garfinkel denied that he dealt primarily with Defendants Foley and Clancy. Rather, Defendant Garfinkel testified that "[t]here were a number of detectives who were coming in" of whom he asked questions which they answered. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., 82:10–20. In his felony review jacket pertaining to Plaintiff Fulton, Defendant Garfinkel listed Defendants Foley, Moser, Boudreau, and O'Brien as "Arresting Officer(s)," and he further listed Defendants Graf and Halloran as "Investigator(s)." *See* Ex. 88, Fulton Felony Review Jacket – Fulton, p. 1.

**RESPONSE:** Denied. Plaintiff's theories about which detectives were present during his interrogation and what a reasonable jury might conclude are improper and speculative arguments

45

that are not supported by the record citations in violation of Local Rule 56.1(b)(3)(C). *See Weeks*, 126 F.3d at 942. (a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment); *see also Malec*, 191 F.R.D at 585; *Rand*, 42 F. 3d at 1146 (explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors). Fulton admits that he cannot describe what any of the detectives who interviewed him looked like, other than that they were white. (*See* Resp. to DSOF, ¶82). Also, the citations to the record do not identify any detectives who were "coming in," where they were going, what information they provided or where they had been, and therefore do not establish that Moser, Boudreau, Graf, Halloran, and O'Brien had any involvement in interviewing or interrogating Fulton. Additionally, Defendants Moser and Graf were not present at any point when Fulton was interviewed at Area 1 and they did not participate in his interviews at Area 1. (Defs' Ex. 24: Declaration of William Moser, ¶¶ 16-22; Defs' Ex. 25: Declaration of Al Graf, ¶¶ 28-34). Halloran and Boudreau's involvement in the investigation ended after their brief conversation with Fulton shortly after he arrived at Area 1. (Defs' Ex. 6: Halloran Dep., 10:11-12:4, 137:4-14, 153:9-155:3, 159:23-161:1, 161:9-13; Defs' Ex. 7, Boudreau Dep., 90:17-20, 209:19-21, 288:2-11). Defendants Carroll and O'Brien had no contact with Plaintiff Fulton while he was at the Area. (PSOAF ¶ 65).

### The Record Evidence Corroborates Plaintiffs' Claims That Their "Confessions" Were Coerced and Fabricated

*The Defendants' Various Descriptions of the Confessions are Inconsistent*

67.    Defendant Clancy's timeline GPR indicates that Plaintiff Coleman admitted to "his part in [the] crime" at 0200 hours, *before* Defendant Garfinkel arrived at the Area. *See* Ex. 9, All GPRs, at DEFS 384-385. Defendant Clancy's timeline GPR states that Plaintiff Coleman gave another statement admitting that he hit the victim twice and told Plaintiff Fulton to put concrete in the victim's mouth *before* Defendant Garfinkel arrived at the Area. *See* Ex. 9, All GPRs, at DEFS 384-385.

**RESPONSE:** Admitted.

46

68. The 6/9/94 supplementary report indicates that Plaintiff Coleman told the Defendant Detectives that he observed the victim orally copulating "Chip" and that "Dap" was engaged in anal intercourse with her. *See* Ex. 27, 6/9/94 Supp. Report, p. 12. The supplementary report states that Plaintiff Coleman told the Defendant Detectives that he "became frightened" and ran into his apartment one floor above the crime scene. *See* Ex. 27, 6/9/94 Supp. Report, p. 12. The supplementary report indicates that only *after* Defendant Garfinkel arrived did Plaintiff Coleman admit his involvement in the offense by acting as a lookout, slapping the victim in the face, sexually assaulting her, and telling "Dap" to put a piece of concrete in her mouth. *See* Ex. 27, 6/9/94 Supp. Report, pp. 12–13.

**RESPONSE:** Admitted.

69. At the hearing on Plaintiff Fulton's motion to suppress his statements, Defendant Garfinkel testified that prior to Plaintiff Fulton making any admissions, he asked Defendant Foley to leave the room so he could express to Plaintiff Fulton that he had a court-reported statement taken from another individual who had participated in the crime and that Plaintiff Fulton might feel more comfortable speaking with him about the situation. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A58:7–59:6. At the same hearing, Defendant Garfinkel contradicted himself and testified that Defendant Foley was present initially when Defendant Garfinkel confronted Plaintiff Fulton with Plaintiff Coleman's statement, but then left. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A87:24– 88:6. Contradicting himself further, Defendant Garfinkel testified that neither he nor Plaintiff Fulton asked Defendant Foley to leave the room. *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A88:7–10.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact

47

will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

70.     At the hearing on Plaintiff Fulton's motion to suppress his statements, Defendant Foley testified that he did not remember Defendant Garfinkel confronting Plaintiff Fulton with Plaintiff Coleman's court reported statement. *See* Ex. 94, Foley 4/16/96 MTS Testimony, A109:4–12. At Plaintiff Fulton's later criminal trial, Defendant Foley testified that he was present when Defendant Garfinkel confronted Plaintiff Fulton with Plaintiff Coleman's court reported statement. *See* Ex. 112, Foley Trial Tr., J-101:6–18.

**RESPONSE:** Denied.  Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkel and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph.  *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.  In addition, the paragraph does not accurately or completely cite Foley's testimony.  He testified that he did not remember Defendant Garfinkel confronting Plaintiff Fulton with "*in fact specifics* from Mr. Coleman's written statement or court-reported statement."  (*See* Plf.'s Ex. 94, Foley 4/16/96 MTS Testimony, A109:1-12).

71.     At Plaintiff Fulton's criminal trial, Defendant Foley testified that Plaintiff Fulton dictated his handwritten statement to Defendant Garfinkel. *See* Ex. 112, Foley 5/7/97 Trial Tr., K62:6–15. Per Defendant Foley, the handwritten statement was not word-for-word what Plaintiff Fulton said, but that Defendant Garfinkel wrote out the statement while Plaintiff Fulton was sitting next to him. *See* Ex. 112, Foley 5/7/97 Trial Tr., K-62:16–63:1.

**RESPONSE:** Admitted.

72.     At Plaintiff Fulton's criminal trial, Defendant Garfinkel testified that he wrote two-and-a-half pages of Plaintiff Fulton's statement—the portion of the statement related to the assault and murder of Bridgeman—outside of Plaintiff Fulton's and Defendant Foley's presence. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-23:13–27:24, 28:22–29:7, 53:4–54:5. At Plaintiff Fulton's motion to suppress hearing, Defendant Garfinkel testified that he wrote the entire statement outside of Plaintiff Fulton's and Defendant Foley's presence, although Defendant Foley may have stopped by to ask him if the "statement [was] clear." *See* Ex. 85, Garfinkel 4/16/96 MTS Testimony, A61:3–64:18, A.85:8–86:3. Foley, however, testified that Garfinkel wrote the statement in Fulton's presence when they were sitting "side by side." *See* Ex. 112, Foley Trial Tr., K-62:9–63:1.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and Turner, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

*Miraculously Similar False Stories*

73.     The 6/9/94 supplementary report indicates that Plaintiffs Coleman and Fulton gave nearly identical false stories about what occurred. Per the supplementary report, Plaintiff Coleman told the Defendant Detectives that he observed Plaintiff Fulton and Taylor speaking with Ms. Bridgeman and watched them go into the basement; that after a short time he went to the basement door and saw the victim orally copulating Taylor while Plaintiff Fulton had anal intercourse with her; and that Plaintiff Coleman became frightened and ran up to his apartment. *See* Ex. 27, 6/9/94 Supp. Report, p. 12. The Defendant Detectives then contacted Defendant Garfinkel and, after Garfinkel arrived, Coleman "confessed" to the rape and murder. *See* Ex. 27, 6/9/94 Supp. Report, pp. 12–14. Per the supplementary report, Plaintiff Fulton told the Defendant Detectives that he observed Plaintiff Coleman and Taylor go into the basement; after a short time, he went to the basement door and saw the victim orally copulating Taylor while Plaintiff Coleman had vaginal intercourse with her; and Plaintiff Fulton panicked and ran home. *See* Ex. 27, Supp Report dated

6/9/94, p. 14. The Defendant Detectives then contacted Defendant Garfinkel and, after Garfinkel arrived, Fulton "confessed" to the rape and murder. *See* Ex. 27, Supp. Report dated 6/9/94, p. 15.

**RESPONSE:** Denied. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. Defendants also object to this paragraph on the basis that it contains fourteen lines of additional facts and therefore violates Local Rule 56.1(d)(1)'s requirement that Plaintiffs' statement of additional facts consists of "concise numbered paragraphs." Defendants further object to this paragraph on the basis that it contains improper argument and speculation that the confessions are similar or that the similarities are evidence of coercion or fabrication, which are not supported by the record citations in violation of Local Rule 56.1(b)(3)(C). *See Weeks,* 126 F.3d at 942. (a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment); *see also Malec*, 191 F.R.D at 585; *Rand,* 42 F. 3d at 1146 (explaining inferences and conjecture must be grounded on more than speculation, hunches, intuitions, or rumors). Defendants deny that the supplementary report indicates that Plaintiffs Coleman and Fulton's stories are "nearly identical and false." Moreover, the Director of the CIU, Mark Rotert, testified it is not unusual to have dueling confessions that are similar in most material respects, except that each confessor tries to minimize his own involvement by assuming the most limited role. (*See* Plf's Ex. 25, Rotert Dep., p. 326: 2 – 328: 12).

74. Bridgeman's body was found with a triangular piece of concrete in her mouth measuring approximately four by three by one-and-a-half inches. *See* Ex. 76, Cogan Trial Tr., I-9:10– 10:15. Despite the object being a triangular piece of concrete, in Plaintiff Coleman's court reported statement he described instructing Plaintiff Fulton to put a medium-sized "brick" in Bridgeman's mouth. *See* Ex. 30, Coleman's Statement, 14–15. Likewise, in Plaintiff Fulton's handwritten statement, he is reported as having told Defendant Garfinkel that Plaintiff Coleman instructed Taylor to insert a brick in Bridgeman's mouth. *See* Ex. 83, Fulton's Statement, p. 2.

**RESPONSE:** Admitted in part, denied in part. The assertion that Coleman instructed Fulton to put a medium-sized "brick" in Bridgeman's mouth mischaracterizes the record. Coleman's court reported statement states Coleman instructed Plaintiff Fulton to put a "medium size" "*piece of a brick*" in Bridgeman's mouth. (Pls' Ex. 30: Coleman's Statement, p. 15) (emphasis added). It does not refer to a full-size brick or suggest the piece of brick is not triangular shaped.

*Plaintiff Fulton's Statement Includes an Impossibility*

75. In Fulton's handwritten statement, it states:

> Derrell states that on the evening of April 11, 1994 at approximately 11:30 P.M. at the location of 55th, between Sangamon and Peoria, he met Nevest Coleman, Eddie Taylor, and Antwinica Bridgeman. Derrell states that Antwinica Bridgeman agreed to go back to Nevest Coleman's residence located at 917 W. Garfield with Eddie Taylor and Derrell Fulton. Derrell states that *once inside Nevest Coleman's residence*, Antwinica, along with Eddie Taylor, Nevest Coleman, and Derrell Fulton, *went downstairs to Nevest Coleman's basement.*

*See* Ex. 83, Fulton Statement, pp. 1–2 (emphasis added). However, the basement could only be accessed from *outside* Coleman's residence. *See* Ex. 1, Coleman Dep., 204:2–10.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph because it contains an an improper argument that Fulton's statement that someone "went downstairs to Nevest Coleman's basement" once inside Coleman's residence is inconsistent with the fact that the basement can only be accessed from outside. *See* Local Rule 56.1(b)(3)(C); *Malec*, 191 F.R.D. at 585. Although the basement could not be accessed directly from Coleman's apartment on the first floor, Coleman admits door to the basement was located inside an enclosed porch at the rear of Coleman's building at the bottom of the stairs, and that it was the basement to Coleman's home. (Plf's Ex. 1, Coleman Dep., p. 40: 15-18; 202: 7 – 204: 19).

### Plaintiffs Would Not Have Been Prosecuted or Convicted Absent the Coerced and Fabricated "Confessions"

76. Brian Sexton was assigned to prosecute the criminal cases against Plaintiffs Coleman and Fulton. *See* Ex. 89, Sexton Dep., 120:8–23.

**RESPONSE:** Admitted.

77.     Sexton agreed that he would not have been able to prosecute Plaintiff Coleman without Plaintiff Coleman's statement. *See* Ex. 89, Sexton Dep., 64:15–23. None of the physical evidence connected Plaintiff Coleman to the crime scene, and no witnesses testified that they observed him participate in the assault and murder of Bridgeman. *See* Ex. 89, Sexton Dep., 64:24–65:22. Fulton's statement was also inadmissible against Coleman unless Fulton testified. *See* Ex. 42, Garfinkel Dep., 320:8–13.

**RESPONSE:** Admitted in part, denied in part. The record citations do not establish the assertion that Sexton agreed that he would not have been able to prosecute Coleman without Coleman's statement. (Pls' Ex. 89: Sexton Dep., 64:15-23). Moreover, the victim's body, which certainly counts as "physical evidence," was found in Coleman's basement, connecting Coleman to the crime, and Coleman was the last person known to have been seen with the victim the night she disappeared. (*See* Resp. to DSOF, ¶3 (disputing whether someone else saw Bridgeman but not denying that Coleman left the party with Bridgeman and was the last known person to have seen her alive; Resp. to DSOF, ¶8 (not disputing that Bridgeman was found in Coleman's basement).

78.     Sexton agreed that he would not have been able to prosecute Plaintiff Fulton without Plaintiff Fulton's statement. (Ex. 89, Sexton Dep., 72:2–73:2). None of the physical evidence connected Plaintiff Fulton to the crime scene, and no witnesses testified that they observed him participate in the assault and murder of Bridgeman. *See* Ex. 89, Sexton Dep., 73:3–21. Coleman's statement against Fulton was inadmissible against Fulton unless Fulton testified. *See* Ex. 42, Garfinkel Dep., 320:8–13.

**RESPONSE**: Admitted in part, denied in part. Coleman's statement would not have been admissible against Fulton even if Fulton had testified. *See Bruton v. United States*, 391 U.S. 123, (1968).

79.     Sexton was compelled to drop the charges against Eddie Taylor because he could not use Plaintiffs Coleman's or Fulton's statements against him, and there was no physical evidence establishing his presence at the crime scene. *See* Ex. 89, Sexton Dep., 66:3–23.

**RESPONSE**: Admitted.

**The Defendant Detectives Fabricated Other Evidence
to Bolster the Prosecution and Conceal the Fabrication
and Coercion of Coleman's and Fulton's Confessions**

80.    Sexton's actions in prosecuting Plaintiffs Coleman and Fulton were based on information provided to him by the Defendant Detectives and Defendant Garfinkel. *See* Ex. 89, Sexton Dep., 39:6–19.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C).  *See Malec*, 191 F.R.D. at 585.  .  In addition, the citations relied on by Plaintiffs do not support the assertion that all Officer Defendants or any specific one was involved in the events described in this paragraph.  Sexton's testimony does not establish that his actions were based on information provided to him by any specific Officer Defendant.  Sexton testified only that his actions in prosecuting Plaintiffs were based upon information provided to him by "the detectives investigating the case," and Sexton did not specify, and was not asked, to which detectives he was referring.  (Plf.'s Ex. 89, Sexton Dep., 39:12-15).

*Fabrication of Barber Statement re: "I think that it may be a body"*

81.    On April 19, 1994, at approximately 7:45 a.m., Defendant Garfinkel prepared a handwritten statement signed by Michael Barber and witnessed by Defendant Graf. *See* Ex. 41, Michael Barber Handwritten Statement. The statement indicates as follows:

> Michael states that on April 28, 1994 at 5:30 p.m. at the residence of Nevest Coleman that he had a conversation exclusively with Nevest Coleman out in front of Nevest Coleman's residence. Michael Barber states that Nevest Coleman told Michael Barber that, "There is a real bad smell coming from the basement of my house and I think that it may be a body."

*See* Ex. 41, Michael Barber Handwritten Statement.

**RESPONSE:** Admitted in part, denied in part.  Garfinkel prepared Barber's handwritten statement on April 29, 1994, not April 19, 1994.  (Plf.'s Ex. 42, Garfinkel Dep., 95:10-18).

53

Furthermore, Graf did not witness what Garfinkele wrote into Barber's statement, and the record

citations do not establish that Graf was present for Garfinkel's entire conversation with Barber or

that Graf did anything more than witness Garfinkle read the statement to Barber. Plaintiffs admit

that Barber gave his handwritten statement only to ASA Garfinkel, that Garfinkel, alone, wrote

out the statement that Barber signed, and that Detective Graf is identified only as a witness to

Barber's statement. (Pls' Resp. to DSOF, ¶15).

82. Sexton argued at Plaintiffs Coleman's and Fulton's criminal trials that the statement, "I think that it may be a body," was crucial to the prosecution's case. "He says the defendant is saying there's a body in there before there's even discovered there's anything in there at all." *See* Ex. 4, Michael Barber 5/6/97 Trial Testimony, "Barber Trial Tr.", 15:2–17:17.

**RESPONSE:** Admitted in part, denied in part. This paragraph misleadingly suggests Sexton

made the argument before the jury and that it had an impact on the outcome of the trial, neither

of which is true. Although Sexton made the statement attributed to him at Plaintiffs' trials, he

made it during a sidebar while arguing an objection raised by Plaintiffs over the admissibility of

Barber's statement "I think it may be a body." The State lost the objection and the the jury never

heard the argument that Sexton made at sidebar. (Plf's Ex. 4, Michael Barber 5/6/97 Trial

Testimony, "Barber Trial Tr.", 15:2–19:6)

83. Two GPRs reflect prior interviews of Michael Barber. *See* Ex. 9, (All GPRs) at DEFS 375, 378. Neither report indicates that Barber told police that Plaintiff Coleman said to him that Plaintiff Coleman thought the smell may be a body before the body was discovered; instead, they are consistent with Mr. Coleman's initial account. *See* Ex. 9, (All GPRs) at DEFS 375, 378. The 6/9/94 supplementary report, which summarizes Barber's interviews with police, does not indicate that Barber told police that Plaintiff Coleman said to him that Plaintiff Coleman thought the smell coming from the basement may be a body, but rather provides an account that was consistent with Mr. Coleman's initial account. *See* Ex. 27, 6/9/94 Supp Report, pp. 10–11; Pls.' Resp. to Ofc. DSOF 16.

**RESPONSE:** Admitted in part, denied in part. Defendants object to Plaintiffs' improper argument

that the GPR's reflecting Barber's statements are "consistent with" Coleman's initial account,

which is a violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. The record

citations do not establish that Barber's prior statements are consistent with Coleman's initial account.

84. Plaintiff Coleman did not tell Barber that he thought there was a body in the basement before they went and checked out the smell coming from the basement. *See* Ex. 1, Coleman Dep., 249:19–250:2; Pls.' Resp. to Ofc. DSOF 16.

**RESPONSE:** Denied. According to Barber's handwritten statement to ASA Garfinkel, before Barber and Plaintiff Coleman found Ms. Bridgeman's body in Coleman's basement, Plaintiff Coleman told Barber that "there is a bad smell coming from the basement of my house and I think it might be a body." (*See* Defs' Ex. 15, Barber Dep., 150:10-24; Ofc. Def's Ex. 27, Barber Crim Tr., 15:20-23:15). Barber has never denied telling ASA Garfinkel that Coleman said, "there is a bad smell coming from the basement of my house and I think it may be a body." Nor has he ever claimed that what he told Garfinkle is fabricated. Barber further testified at Plaintiff's trial that he read over his statement to ASA Garfinkel, that it was accurate and that he signed it because it was what he told the ASA. (Defs' Ex. 15, Barber Dep., 150:10-24; Defs' Ex. 27, Barber Crim Tr., 14:22-23:15, 30:13-32:24, 37:1-9; Defs' Ex. 16, Barber Grand Jury Tr., 7:9-9:7).

85. On May 18, 1994, Michael Barber testified before the grand jury. Barber did not testify that Plaintiff Coleman told him that Plaintiff Coleman thought the bad smell coming from his basement was a body. *See* Ex. 3, Barber 5/18/94 Grand Jury Testimony. Barber later testified at Plaintiffs Coleman's and Fulton's criminal trials that he had no recollection of telling Defendant Garfinkel that Plaintiff Coleman told him that Plaintiff Coleman thought the smell coming from his basement was a body. *See* Ex. 4, Barber Trial Tr., 19:22–22:21. At his deposition, Barber testified he had no memory of telling Defendant Garfinkel that Plaintiff Coleman told him "there's a real bad smell coming from the basement of my house, and I think that it may be a body." *See* Ex. 5, Barber Dep., 150:2–151:2.

**RESPONSE:** Admitted.

86. Neither Garfinkel nor anyone else provided an explanation for why 17-year-old Barber changed his statement from an account consistent with Mr. Coleman's exculpatory statement to claiming Mr. Coleman said "I think it may be a body" when he signed his handwritten statement at 7:45 a.m. after spending the night at Area 1 detective headquarters. Ex. 41, Barber Handwritten Statement; Ex. 27, 6/9/94 Supp. Report., at DEFS 205, 207; Ex. 9, All GPRs, at DEFS 375, 378; Ofc. DSOF 14; Ex. 42, Garfinkel Dep., at 95:4-23, 96:10-97:15.

**RESPONSE:** Defendants object to Plaintiffs' improper argument that Barber changed his account, that his account was consistent with Coleman's account, or that an explanation was requested or required. *See Malec*, 191 F.R.D at 585; Local Rule 56.1(b)(3). Further, the record citations do not establish that Barber "changed" his statement from an account consistent with Coleman's. Rather, Barber testified at Plaintiff's trial that he read over his statement to ASA Garfinkel, that it was accurate and that he signed it because it was what he told the ASA. Barber also did not deny telling ASA Garfinkel that Coleman said "there is a bad smell coming from the basement of my house and I think it may be a body" in his testimony. (*See* Defs' Ex. 15, Barber Dep., 85:8-87:16, 150:10-24, 184:8-14; Defs' Ex. 27, Barber Crim Tr., 14:22-23:15, 30:13-32:24, 37:1-9; Defs' Ex. 16, Barber Grand Jury Tr., 7:9-9:7). Finally, Plaintiffs also do not dispute that Barber testified that his handwritten statement to ASA Garfinkle was given voluntarily, and that he was treated well by both ASA Garfinkle and the police. (*See* Resp. to DSOF ¶18).

*Fabrication of Latham Statements*

87. On April 28, 1994, Defendant Foley interviewed Chester Latham, the victim's boyfriend, at the morgue. *See* Ex. 18, Clancy Dep., 290:13–293:6; *see* Ex. 27, Supp. Report dated 6.9.1994; Ex. 6, Latham Dep., at 20:18-23. Although Defendant Clancy testified that he had no recollection of the investigation, he was Defendant Foley's partner and the two conducted their investigation—including several other interviews—together. *See* Ex. 18, Clancy Dep., 80:12–18; *see* Ex. 27, Foley 5/7/97 Trial Tr., J-71:24–72:14, 75:4–16, 77:1–15, 87:13–88:8, 89:3–6, 99:20–24. Defendant Clancy was present at the morgue when the interview of Latham occurred. *See* Ex. 27, Foley 5/7/97 Trial Tr., J-75:4–16.

**RESPONSE:** Admitted in part, denied in part. Defendants object to Plaintiffs' improper argument that Clancy must have also interviewd Latham simply because he was Foley's partner. *See Malec*, 191 F.R.D at 585; Local Rule 56.1(b)(3). The record citations do not establish that Clancy also interviewed Latham.

88. The 6/9/94 supplementary report documents that Chester Latham provided the following information to Defendants Foley and Clancy:

> While at the morgue the R/Ds had occasion to interview the boyfriend of the victim Chester LATHAM who related the following in summary; He related that the last time he saw the victim was on the day before the victims birthday April 10, 1994 and at that time he dropped her off at approx. 2000hrs at her mothers house 852 w. 54th Plf. He then went on to say that while he was with her he noticed that the victim had a bruise, hickey, on her neck. He then asked her how she got the bruise and the victim stated that she had been assaulted several days prior by a M/1 by the name of "Chip" or "Ship". She then told LATHAM that "CHIP" had tried to forcibly sexually assault the victim but she had fought him off and ran away from "Chip". LATHAM then related that the victim had been a member of the Gangster Disciples and had changed allegiances to the Vice Lords. LATHAM concluded this interview by stating that the victim mentioned that "Chip" and "Dap" were Gangster Disciples and they had been bothering her for changing gangs.

*See* Ex. 27, 6/9/94 Supp Report, pp. 9–10.

**RESPONSE:** Admitted in part, denied in part. Although the supplementary report is accurately quoted, Defendants object to Plaintiffs' improper argument that Clancy must have also interviewd Latham simply because he was Foley's partner. *See Malec*, 191 F.R.D at 585; Local Rule 56.1(b)(3). The record citations do not establish that Clancy also interviewed Latham.

89.     The information Latham allegedly provided to Defendant Foley as documented in the 6/9/94 supplementary report contributed to Sexton's decision to prosecute Plaintiffs Coleman and Fulton and Sexton's belief that they were guilty because it "point[ed] the police into that direction of Eddie Taylor and Derrell Fulton." *See* Ex. 89, Sexton Dep., 148:8–150:3. Sexton also testified that Latham's statements contributed to probable cause to arrest Plaintiff Fulton. *See* Ex. 89, Sexton Dep., 160:15–24.

**RESPONSE:** Denied. Sexton testified that he, "looked at everything" in deciding whether to prosecute Plaintiffs when asked about Latahm's information, and twice indicated Latham's statement would not be admissible in evidence. (Plf's Ex. 89, p. 148: 8 – 150: 3). Further, at page 160 of his deposition, Sexton agreed only that Latham's information would have contributed to probable cause to arrest Fulton, not as a basis to prosecute him. Demie.

90.     Chester Latham denied telling police that "Chip" and "Dap" were Gangster Disciples that were bothering Bridgeman because she changed gangs. *See* Ex. 6, Latham Dep., 70:8–12. Latham did not tell police anything about a guy named "Dap," nor did he say anything about Gangster Disciples harassing Bridgeman. *See* Ex. 6, Latham Dep., 86:12–87:3. Latham had

57

no knowledge of Bridgeman ever switching her allegiance or affiliation to the Vice Lords, and he did not say anything to police about Bridgeman switching gangs. *See* Ex. 6, Latham Dep., 31:11–32:2, 47:16–22; *see also* Pls.' Resp. to Ofc. DSOF 22, 23.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at \*2; *Brown*, 2012 WL 3987427, at \*3; *Koch-Weser,* 2002 WL 31133143, at \*8.

*Fabrication of Calimee and Williams Statements*

91. According to Defendants Boudreau and Halloran, late in the evening on April 28, 1994, Francine Calimee and Shaunice Williams approached Defendants Boudreau and Halloran near the Coleman residence. *See* Ex. 8, Boudreau Dep., 147:4–148:2, 169:20–170:16; *see* Ex. 10, Halloran Dep., 130:2–15; *see* Ex. 13, Halloran Trial Tr., J-12:15–14:8. According to Defendant Boudreau, Calimee and Williams told Defendants Boudreau and Halloran that they could not talk earlier because they were afraid of Plaintiff Coleman. *See* Ex. 8, Boudreau Dep., 171:6–9. According to Defendant Halloran, Calimee told them that she was afraid of the Gangster Disciples and that she would be the next victim. *See* Ex. 10, Halloran Dep., 130:16–21; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

**RESPONSE:** Admitted.

92.    Calimee, who was 18-years old, and Williams, who was 16-years old, were then transported to Area 1 by Boudreau and Halloran. *See* Ex. 8, Boudreau Dep., 172:3–23; *see* Ex. 10, Halloran Dep., 135:9–136:1; *see* Ex. 13, Halloran Trial Tr., J-14:9–5; Ex. 48, Calimee Handwritten Statement, at Plaintiff 5224; Ex. 49, Williams Handwritten Statement, at CCSAO 898. Defendant Foley interviewed Calimee and Williams at the Area. *See* Ex. 24, Foley Trial Tr., 85:11–89:1. Although Defendant Clancy could not recall whether he participated in the interviews with Calimee and Williams during his deposition, he was Defendant Foley's partner and the two conducted their investigation— including several other interviews—together. *See* Ex. 18, Clancy Dep., 80:9–11; *see* Ex. 24, Foley Trial Tr., 71:24–72:14, 75:4–16, 77:1–15, 87:13–88:8, 89:3–6, 99:20–24. After being at the station all night, Calimee and Williams each signed handwritten statements in front of Defendant Garfinkel, and either Defendant O'Brien or Defendant Boudreau. Ex. 48, Calimee Handwritten Statement; Ex. 49, Williams Handwritten Statement. Calimee signed her handwritten statement at 10:25 a.m. Ex. 48, Calimee Handwritten Statement.

**RESPONSE:** Admitted in part, denied in part.  Defendants object to the improper characterization that Calimee and Williams were "there all night," because the phrase is imprecise and open to interpretation.  *See Malec*, 191 F.R.D at 585; Local Rule 56.1(b)(3)(C).  The record citations establish that they arrived at either 11:45 p.m. on April 28, 1994, or 1:00 a.m. on April 29, 1993, and that Calimee gave a written statement at 10:25 a.m. on April 29, 1994.  (Ofc. Def's Ex. 6, Halloran Dep., 132:14-23, 135:21-136:14; Ofc. Def's Ex. 7, Boudreau Dep., 145:14-153:4; 162:21-172:23; 199:8-200:20; Ofc. Def's Ex. 23, Foley Crim. Tr., 77:1-79:16; Ofc. Def's Ex. 31, Foley Mtn. to Supp. Tr., 36:14-37:8; Ofc. Def's Ex. 21: Clancy Timeline GPR; *see also* Resp. to DSOF, ¶45).

93.    The 6/9/94 supplementary report documents that Francine Calimee and Shaunice Williams provided the following information to Defendants Foley, Clancy, Halloran, and Bourdeau:

> The R/Ds then had occasion to reinterview both Francine CALIMEE and Shaunice WILLIAMS and at that time both girls stated that when they were first interviewed by the R/Ds then withheld information regarding this investigation. They then went on to say that they were both afraid of the Gangster Disciples and that the victim had left the party at CALIMEEs house with a GD, Nevest COLEMAN on the night that she disappeared. [WILLIAMS] and CALIMEE then related that they were extremely afraid for their safety and that is the reason that they never told anyone that COLEMAN had left the party with the victim. They both were afraid that they would be the next victims.

*See* Ex. 27, 6/9/94 Supp Report, p. 11.

**RESPONSE:** Admitted in part, denied in part. The record citations do not establish that Calimee and Williams provided the information contained in the 6/9/94 Supp Report to Halloran and Boudreau. Defendants Halloran and Boudreau were not present at Area 1 when Calimee and Williams were interviewed; they had left to look for Eddie Taylor after transporting Calimee and Williams to Area 1. (*See* Defs' Ex. 40, O'Brien GPR, RFC_179; Defs' Ex. 6, Halloran Dep., 126:14-130:10, 140:17-24; 193:18-196:12; Defs' Ex. 9, Carroll Dep., 107:22-112:15). Finally, Plaintiffs do not dispute that only Clancy and Foley typed the June 9, 1994 Supp. Report. (*See* Resp. to DSOF, ¶105).

94.    Sexton viewed the fact that Calimee and Williams were afraid of Plaintiff Coleman as a significant piece of information. *See* Ex. 89, Sexton Dep., 157:4–9. Sexton relied on the 6/9/94 supplementary report to form a belief that Calimee and Williams were afraid of Plaintiff Coleman, and he considered that fact in opining that there was probable cause to arrest and prosecute Plaintiff Coleman. *See* Ex. 89, Sexton Dep., 155:3–156:12. Sexton viewed the information as "very incriminating." *See* Ex. 89, Sexton Dep., 181:19–183:14.

**RESPONSE:** Denied. Sexton had no involvement in the decision to arrest or charge Plaintiffs and had not even been assigned to their cases when those decisions were made. (Attached Supp to Defs' Ex. 43, Garfinkel Dep., 41:13-42:5, 48:17-23, 59:5-9, 122:10-123:10, 179:24-180:6; Defs' Ex. 13: Cleared Open Supp. Rep., pp. 15-16). Therefore, he has no personal knowledge or basis to say the statements contributed to probable cause to arrest Coleman. In addition, not only is Sexton's opinion irrelevant, but he also got the facts wrong. Plaintiffs overstate Sexton's testimony to suggest he offered an opinion on the factual basis to *prosecute* Plaintiffs. But Sexton did not offer an opinion on probable cause to charge or prosecute; he offered one on probable cause to *arrest* Coleman at the moment when Coleman was brought back to Area 1 a second time. (Ex. 89 to PSOAF, Sexton's Dep, p. 155: 3 – 157: 3). The statements of Calimee and Williams could not have formed the basis for "arresting" Coleman at that point, however, because Coleman admits

he was not under arrest when he returned to Area 1. Rather, it is undisputed that Coleman returned to Area 1 the second time for questioning *voluntarily*. (Resp. to DSOF, ¶54).

95.     There are no GPRs that indicate that Francine Calimee told any of the Defendant Detectives that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 9, All GPRs,. Calimee's handwritten statement does not indicate that she was afraid of the Gangster Disciples or Coleman. *See* Ex. 48, Francine Calimee Handwritten Statement. Calimee did not testify at trial that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 90, Francine Calimee Trial Testimony; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, the citations relied on by Plaintiffs do not establish that any Officer Defendant was involved in interviewing Calimee and Williams, other than Foley, Clancy, and Garfinkel. Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

96.     Francine Calimee was never afraid of Plaintiff Coleman or the Gangster Disciples. Although Calimee could not remember exactly what she told police, she would not have told them that she was afraid of the Gangster Disciples or Plaintiff Coleman because that was not true. *See* Ex. 14, Calimee Dep., 48:19–50:8. Calimee was surprised or thought it was strange to find out that the police reported that she said to them that she was afraid of Plaintiff Coleman because she does not remember saying that and it is not true. *See* Ex. 14, Calimee Dep., 144:21–145:4; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

**RESPONSE:** Denied. Defendants object to this paragraph because Plaintiffs' use of the generic phrase "police" is improper and fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition,

61

the citations relied on by Plaintiffs do not support the assertion that any Officer Defendant was involved in interviewing Calimee and Williams, other than Foley, Clancy, and Garfinkel. The citations to the record do not establish that Calimee "would not have told" police that she was afraid of the Gangster Disciples or Plaintiff Coleman. Rather, Calimee stated she could not remember exactly what she told police and she could not remember whether she told police she was afraid of Coleman. (Defs' Ex. 3, Calimee Dep., 46:5-50:8, 133:17-135:5; attached Supp. To Defs' Ex. 3, Calimee Dep., 29:5-36:24). Calimee also never denied saying these things to the police, rather she testified that she was surprised or thought it strange that this was reported because "*I don't remember saying it.*" (*See* Pls' Ex. 14: Calimee Dep., 144:21-145:2).

97. There are no GPRs that indicate that Shaunice Williams told any of the Defendant Detectives that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 9, All GPRs,. Williams's handwritten statement does not indicate that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 49, Shaunice Williams Handwritten Statement. Williams did not testify at trial that she was afraid of the Gangster Disciples or Plaintiff Coleman. *See* Ex. 91, Shaunice Williams Trial Testimony; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

**RESPONSE:** Admitted in part, denied in part. Admit that no GPRs refer to the Wiliams' fear of the Gangster Disciples or Coleman. Defendants object to the remainder of this paragraph on the basis that Plaintiffs' use of the generic, undefined phrase "Defendant Detectives" is improper because it fails to identify the specific Defendant or person alleged to have been involved, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. In addition, the citations relied on by Plaintiffs do not support the assertion that any Officer Defendant was involved in interviewing Calimee and Williams, other than Foley, Clancy, and Garfinkel.

98. In 1994, after Bridgeman's body was found, Shaunice Williams was not afraid of Plaintiff Coleman or the Gangster Disciples. Williams did not tell the police that she was afraid of the Gangster Disciples. Williams did not tell police that she had withheld information because she was afraid of Plaintiff Coleman. *See* Ex. 15, Williams Dep., 278:21–280:2. Williams denied telling police the statements attributed to her in the 6/9/94 supplementary report about being afraid of the Gangster Disciples and Plaintiff Coleman. *See* Williams Dep., 281:3–282:20; *see also* Pls. Resp. to Ofc. DSOF 44, 50.

62

**RESPONSE:** Admitted in part, denied in part. Williams did not deny telling police that she withheld information because she was afraid of Coleman. She testified that she could not recall telling police that she withheld information because she was afraid of Coleman. (Pls' Ex. 15: Williams Dep., 282:6-12).

*Fabrication of Coleman Statements re: Last Time he Saw Bridgeman*

99. Per the 6/9/94 supplementary report, on April 28, 1994, Defendants Foley and Clancy interviewed Plaintiff Coleman at Area 1. *See* Ex. 24, Foley 5/7/97 Trial Tr., V-85:11–89:19. The 6/9/94 supplementary report documents that Plaintiff Coleman made the following statements to Defendants Foley and Clancy during the interview:

> The R/Ds then had occasion to ask COLEMAN if he knew the victim Antwinica BRIDGEMAN and at that time COLEMAN stated that in fact he did know the victim and that he knew her for several years. He then related that he had not seen her for sometime at least several months.
> * * *

*See* Ex. 27, 6/9/94 Supp Report, p. 10. According to the report, Defendants Foley and Clancy then reinterviewed Plaintiff Coleman after he was brought back to the Area. *See* Ex. 24, Foley 5/7/97 Trial Tr., V-90:18–92:20. The 6/9/94 supplementary report documents that Plaintiff Coleman made the following statements to Defendants Foley and Clancy during the interview:

> The R/Ds then had occasion to reinterview COLEMAN and after again advising him of his cons. rights, which he again stated that he understood. He then was confronted with the accounts of 11 APR 94 by CALIMEE and WILLIAMS and at that time COLEMAN stated that he had lied to the police and that in fact he had left the party at CALIMEEs house with the victim.

*See* Ex. 27, 6/9/94 Supp Report, pp. 10–12.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Foley and Clancy, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not

material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

100. Sexton relied on the 6/9/94 supplementary report to form a belief that Plaintiff Coleman lied about the last time he saw the victim. *See* Ex. 89, Sexton Dep., 39:23–40:18, 155:3–156:12. Sexton introduced Plaintiff Coleman's alleged lie about the last time he saw the victim through Defendant Foley's testimony at the hearing on Plaintiff Coleman's motion to suppress and Coleman's criminal trial. *See* Ex. 16, Foley 6/5/96 MTS Testimony, 32:12–34:5; *see* Ex. 24, Foley 5/7/97 Trial Tr., V-89:12–90:17, 92:12–93:8.

**RESPONSE:** Denied. Defendants object to this paragraph because it contains facts related only to the conduct of Foley and Clancy, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. The citations to the record do not establish that Sexton relied on the 6/9/94 supplementary report to form a belief that Plaintiff Coleman lied about the last time he saw the victim. Sexton testified that his belief that Coleman was lying about when he last saw the victim alive was based on the contrary accounts of Calimee and Williams. (*See* Plf.'s Ex. 89, Sexton Dep., 39:23-40:18, 155:3-156:12). The citations to the record also do not establish that Coleman's lie was introduced at Coleman's criminal trial. (*See* Ex. 16, Foley 6/5/96 MTS Testimony, 32:12–34:5; *see* Ex. 24, Foley 5/7/97 Trial Tr., V-89:12–90:17, 92:12–93:8).

64

101. During his interviews at Area 1, Plaintiff Coleman did not tell Defendants Foley and Clancy that he had not seen "Mikey"—the name by which he knew Antwinica Bridgeman— for a couple of months. *See* Ex. 11, Coleman MTS Testimony, J-52:5–53:2; *see* Ex. 1, Coleman Dep., 398:8– 14. Defendant Foley's GPR reflecting the interview does not indicate that Coleman stated that he had not seen the victim "in months," but rather only that Plaintiff Coleman "hasn't seen V." and "hasn't been around the] neighborhood." *See* Ex. 18, Clancy Dep., 188:22–189:24; *see* Ex. 9, All GPRs, at DEFS 371. *See also* Pls.' Resp. to Ofc. DSOF 72.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Foley and Clancy, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

*Concealment of Defendant Turner's Role in Investigation*

102. Based on his custom and practice, Sexton likely spoke with Defendant Foley before calling Defendant Foley to testify at the hearing on Plaintiff Fulton's motion to suppress. *See* Ex. 89, Sexton Dep., 137:16–24. During the hearing on Plaintiff Fulton's motion to suppress centered around Futlon's [sic] claim he was struck by an African American detective, Sexton asked Defendant Foley, "Just so we're clear, was there ever an African American detective even assigned remotely to this case?" Defendant Foley answered, "No, sir." *See* Ex. 94, Foley 4/16/96 MTS Testimony, A101:10–16.

65

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Sexton and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8. Defendants also object to the improper argument that Sexton spoke with Foley before Foley's testimony. The citations to the record establish only that Sexton had a practice of speaking to his witnesses before they testified, not that he actually spoke to Foley before the trial or that they spoke about the presence or absence of an African American detective at that time.

*Fabrication of Fulton's Attempt to Avoid Apprehension*

103.     Defendant Halloran has met with Sexton on multiple occasions regarding various cases. *See* Ex. 10, Halloran Dep., 101:4–13. The two worked together "quite a bit" in the gang unit. *See* Ex. 10, Halloran Dep., 101:14–22. Defendant Halloran would meet with an assistant state's attorney before testifying at trial if the prosecutor wanted to meet. *See* Ex. 10, Halloran Dep., 101:23– 102:6. Sexton met with lay witnesses and detectives before calling them as witnesses to testify at Coleman's and Fulton's criminal proceedings. *See* Ex. 10, Sexton Dep., 13:1–10; 137:16–24.

**RESPONSE:** Defendants object to this paragraph because it contains facts related to other cases involving Sexton and Halloran and their work in the gang unit, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921; *see also Malec,* 191 F.R.D. at 583 (56.1 materials should be limited to facts that are pertinent to the outcome of the issues identified in the summary judgment motion); *Tarau v. Coltea*,2017 WL 3521410 at * 1 (N.D. Ill. Aug. 16, 2017) (Gottschall, J.) (explaining the Court need not be bothered with disputes about immaterial facts). The citations to the record do not establish that Sexton actually did meet with lay witnesses and detectives before calling them to testify at Plaintiffs' criminal proceedings; rather, Sexton testified that it was his custom and practice to meet with witnesses and that he met with Defendant Foley prior to the motion to suppress. (Pls' Ex. 89, Sexton Dep., 13:1-10; 137:16-24).

104.    Based on his custom and practice, Sexton likely spoke with Defendant Halloran before calling Halloran to testify at the hearing on Plaintiff Fulton's trial. *See* Ex. 89, Sexton Dep., 137:16–24. At Plaintiffs Fulton's and Coleman's criminal trials, Defendant Halloran testified that on April 29, 1994, at approximately 7:00 a.m., he and Defendants Boudreau, Foley, Clancy, Carroll, O'Brien, Moser, and Graf went to Plaintiff Fulton's residence at 5517 S. Sangamon. *See* Ex. 13, Halloran Trial Tr., J-16:9–18. Defendant Halloran testified that while his fellow officers were entering through the front of Plaintiff Fulton's house, he observed Plaintiff Fulton enter the residence through the rear. *See* Ex. 13, Halloran Trial Tr., J-17:2–15. According to Halloran, he and Defendant Boudreau went up to the back porch, and as they got up to the back porch, Plaintiff Fulton came out the rear of the residence. *See* Ex. 13, Halloran Trial Tr., J-17:16–21. Per Halloran, he and Defendant Boudreau stopped Plaintiff Fulton from fleeing. *See* Ex. 13, Halloran Trial Tr., J-17:22–23.

**RESPONSE:** Admitted in part, denied in part. Defendants object to this paragraph because it contains an improper argument that Sexton spoke to Halloran based on his custom and practice, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at 585. The record also does not establish that Sexton actually spoke to Halloran before he testified or that Sexton became aware of the encounter from this purported pretrial conversation with Halloran. Fulton is speculating

that this specific conversation occurred simply because Sexton agreed at his deposition that he would normally talk to witnesses about their testimony before putting them on the stand. *See McCoy,* 341 F.3d at 604 (the court is not required to draw every conceivable inference from the record and "mere speculation or conjecture will not defeat a summary judgment motion"). More importantly, the actual trial record does not support Fulton's speculation. When Halloran testified on direct examination, Sexton asked Halloran open ended questions about each step he took in the investigation. He did not try to lead Halloran to a specific conclusion. And when he reached the point where Halloran encountered Fulton, Sexton asked more open-ended questions, "What did you observe, sir?" and "what, if anything, did you do at that time?" (Resp. to PSOAF, ¶104; Plf's Ex. 13, p. 17: 10-23). Right after that exchange, Sexton asked Halloran to make the required in-court identification of Fulton. (*Id*., Ex. 13, p. 18: 1-11). There was no mention in this testimony of Fulton attempting to evade police.

105.     Defendant Halloran did not prepare a GPR documenting his allegation that he observed Plaintiff Fulton enter and then exit the rear of his residence as other detectives entered the front of the residence. *See* Ex. 9, All GPRs,. The 6/9/94 supplementary report does not document Defendant Halloran's allegation that he observed Plaintiff Fulton enter and then exit the rear of his residence as other detectives entered the front of the residence. *See* Ex. 27, 6/9/94 Supp Report, p. 14.

**RESPONSE:** Admitted.

106.     Defendant Halloran's testimony was false; Plaintiff Fulton was in his bedroom at the time the Defendant Detectives arrived at his residence and never tried to flee. *See* Ex. 82, Fulton MTS Testimony, A17:11–19:12; Ex. 2, Fulton Dep., 284:8–285:7, 286:13–20; *see* Ex. 92, Davis Dep., 164:10–167:2; *see* Ex. 93, Griffin Dep., 133:10–134:9. The Defendant Detectives did not document in their supplementary report that they stopped Fulton as he was trying to leave his residence. *See* Ex. 27, Supp. Report dated 6/9/94.

**RESPONSE:** Admitted in part, denied in part. Admit that Fulton claims he was in his bedroom when he was found and that there is no documentation in a report of Halloran's encounter with Fulton. Defendants object to the remainder of this paragraph because it contains an improper argument that

68

Halloran's testimony was false, in violation of Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D. at

585. Although Fulton may dispute Halloran's testimony, that does not mean Halloran's testimony is

false, nor can the Court make such a determination at this stage. <u>*Anderson v. Liberty Lobby, Inc.*</u>,

477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986) ("at the summary judgment stage the judge's

function is not to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial"). Defendants further object to this paragraph because

Plaintiffs' use of the generic phrase "Defendant Detectives," an undefined term, is improper and fails

to identify the specific Defendant or person alleged to have been involved, also in violation of

Local Rule 56.1(b)(3)(C).

### Additional Evidence that Defendant Garfinkel was <u>Acting as an Investigator and not a Prosecutor</u>

*Felony Review Acting as an Investigative Body*

107.     Sexton worked in felony review in approximately 1990 and then returned to felony review as a trial supervisor in approximately 1994. *See* Ex. 89, Sexton Dep., 102:6–16. Sexton testified that in felony review, he was never trained that there was a line between acting as a prosecutor and acting as a detective. *See* Ex. 89, Sexton Dep., 106:2–5. Sexton agreed that felony review prosecutors would confront a suspect with evidence in an effort to get the suspect to tell "the truth" or to "get to the bottom of what happened." *See* Ex. 89, Sexton Dep., 107:3–108:5. Sexton could not explain the difference between how felony review prosecutors interviewed suspects and how detectives interview suspects. *See* Ex. 89, Sexton Dep., 108:6–13.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Sexton and Garfinkle, which are immaterial to the outcome of Defendants' motion

because there is no evidence to suggest the other Officer Defendants were involved in the events

described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

As such, and because Foley and Clancy are parties to the motion only as to the malicious

prosecution claim, the Officer Defendants should not be required to incur the cost of disputing

facts that are not material to the outcome of the motion, and which are better suited for resolution

at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser*, 2002 WL 31133143, at *8. In addition, the citations to the record do not establish that Sexton could not explain the difference between how a felony review prosecutor interviewed suspects and how detectives interview suspects. (Plf.'s Ex. 89, Sexton Dep., 108:6-13).

108. Lisette Mojica joined the Cook County State's Attorney's Office as a prosecutor in November of 1997. *See* Ex. 69, Excerpts of Lisette Mojica 1/12/05 Trial Testimony in *People v. Roberto Mata*, 02-CR-9220, "Mojica Trial Tr.", 53:2–14. In March of 2002, Mojica was assigned to felony review. *See* Ex. 69, Mojica Trial Tr., 53:19–54:1. Mojica testified that as a prosecutor in the felony review unit, her duties were to assist the Chicago Police Department in their investigations by speaking to victims, witnesses, and defendants who chose to speak with her. *See* Ex. 69, Mojica Trial Tr., 54:2–11.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Lisette Mojica from an entirely different case with a 2002 case number, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for

70

resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at \*2; *Brown*, 2012 WL 3987427, at \*3; *Koch-Weser,* 2002 WL 31133143, at \*8.

109.     Patrick Waller joined the Cook County State's Attorney's Office as a prosecutor in approximately March of 2006. *See* Ex. 70, Excerpts of Patrick Waller 1/12/05 Trial Testimony in *People v. Clint Massey*, 14-CR-06853-01, "Waller Trial Tr.", 110:23–111:12. Waller was assigned to the felony review unit in January to July of 2104. *See* Waller Trial Tr., 111:20–112:3. Waller testified that the felony review unit "works with police agencies throughout Cook County during the investigation portion of cases, and for certain cases, specifically violent crimes. We'll go out to police stations, interview witnesses and take statements as well." *See* Waller Trial Tr., 112:4–11. Waller further testified that felony review prosecutors "work with police agencies during the investigation of criminal offenses, and to respond in certain situations to interview witnesses and take statements where appropriate." *See* Waller Trial Tr., 112:6–21.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Patrick Waller from an entirely different case with a 2014 case number, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability

to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident

that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost

of detailed response to all facts stated by the movant. This position should be available without

running the risk that the fact will be taken as established under subdivision (g) or otherwise found

to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2;

*Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

*Defendant Garfinkel's Admissions that He was Acting as an Investigator*

110. At Plaintiff Fulton's motion to suppress hearing, Defendant Garfinkel testified that prior to interviewing Plaintiff Fulton he told Plaintiff Fulton that he was a lawyer, he was assigned as an assistant state's attorney, and he was "assigned to investigate the homicide." *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, A56:1–57:2.

**RESPONSE:** Admitted.

111. At Plaintiff Fulton's trial, Defendant Garfinkel agreed that on April 29, 1994, he was assigned to assist in the investigation of Bridgeman's murder. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-6:24–7:3. Defendant Garfinkel agreed that on April 30, 1994, he was present at the Area "in conjunction with the investigation of the murder[.]" *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-7:17– 8:2. During his testimony, Defendant Garfinkel testified that he is aware of procedures that a felony review prosecutor engages in in a criminal investigation. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O41:11–16. Defendant Garfinkel testified that he was interested in "finding out the truth involved in this investigation." *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-45:18–21.

**RESPONSE:** Admitted in part, denied in part. Defendants deny that Defendant Garfinkel agreed that

on April 29, 1994, he was assigned to assist in the investigation of Bridgeman's murder as this is not

supported by the citation relied upon. Rather, Defendant Garfinkel was asked if he had the opportunity

to assist in the murder investigation and he stated that he did. (*See* Plf.'s Ex. 120, Garfinkel 5/13/97

Trial Tr., O-6:24-7:3).

112. Defendant Garfinkel testified at his deposition that as a felony review prosecutor, he worked "hand-in-hand" and "in tandem" with the police department. *See* Ex. 42, Garfinkel Dep., 41:13–23.

**RESPONSE:** Admitted.

*Defendant Garfinkel's Actions Were Inconsistent with Those of a Prosecutor*

113. In 1994, if a suspect told a felony review prosecutor that they had been abused by police, protocol required the prosecutor to immediately cease interviewing the suspect and notify their trial supervisor and the deputy supervisors on felony review of the allegation. *See* Ex. 89, Sexton Dep., 143:11–145:3; *see* Ex. 42, Garfinkel Dep., 37:9–23.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and the CCSAO, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

114. A felony review prosecutor's job was to document statements they believed to be truthful and credible. *See* Ex. 42, Garfinkel Dep., 47:24–48:12. A felony review prosecutor was not supposed to feed facts to a suspect. *See* Ex. 42, Garfinkel Dep., 63:10–13.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is

no evidence to suggest Officer Defendants were involved in the events described in this paragraph.

*See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

115.    As a felony review prosecutor, it was inappropriate for Defendant Garfinkel to respond to Plaintiff Coleman's report of abuse by telling him, "We'll deal with that later." *See* Ex. 89, Sexton Dep., 145:4–18.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Garfinkel, which are immaterial to the outcome of Defendants' motion because there is

no evidence to suggest Officer Defendants were involved in the events described in this paragraph.

*See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

116.    Defendant O'Brien testified during his deposition that if a suspect had not made an inculpatory statement, a detective would not contact felony review to have a felony review prosecutor come speak with a suspect. *See* Ex. 17, O'Brien Dep., 192:2–193:20. Defendant O'Brien agreed that based on the 6/9/94 supplementary report, Plaintiff Fulton did not implicate himself in the assault and murder of Bridgeman before Defendant Garfinkel arrived at the Area. *See* Ex. 17, O'Brien Dep., 197:14–198:15; *see* Ex. 27, (6.9.1994 Supp. Report), pp. 14–15. Based on his experience and the information in the supplementary report, Defendant O'Brien testified that he did not know why felony review would have been contacted to interview Plaintiff Fulton. *See* Ex. 17, O'Brien Dep., 198:16–24.

**RESPONSE:** Admitted in part, denied in part.  Defendants object to this paragraph on the basis that

O'Brien's inability to explain why felony review was called is speculation, which cannot be relied

upon to oppose summary judgment.  *Rand.,* 42 F.3d at 1146 (explaining inferences and conjecture

must be grounded on more than speculation, hunches, intuitions, or rumors); *see Malec,* 191 F.R.D.

at 584-85 (testimony used to oppose summary judgment must be based on personal knowledge).

**Additional Evidence of Defendant Garfinkel's
Participation in the Conspiracy to Frame Coleman and Fulton**

117.    Prior to the Bridgeman homicide investigation, Defendant Garfinkel had worked on other cases with Defendants Clancy, Foley, Boudreau, Halloran, Graf, O'Brien, Moser. *See* Ex. 42, Garfinkel Dep., 82:10–83:23.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the

conduct of Garfinkle and some named Defendants in the context of other unrelated cases, which

74

are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser*, 2002 WL 31133143, at *8; *see also Malec*, 191 F.R.D. at 583 (56.1 materials should be limited to facts that are pertinent to the outcome of the issues identified in the summary judgment motion.); *Tarau*, 2017 WL 3521410 at * 1 (Gottschall, J.) (explaining the Court need not be bothered with disputes about immaterial facts). Subject to these objections, admitted.

118. Defendant Garfinkel started his investigation into the Bridgeman homicide on April 29, 1994 at 6:15 a.m. *See* Ex. 88, Fulton Felony Review Jacket — Coleman, p. 1. Plaintiff Coleman did not give his court reported statement until 9:57 a.m. *See* Ex. 30, Coleman Statement, p. 1. According to Garfinkel, he had a conversation with Coleman about the "facts and circumstances surrounding" Bridgeman's death before obtaining Coleman's court reported statement. *See* Ex. 42, Garfinkel Dep., 125:3–126:16. In the "Incident Summary" portion of Garfinkel's felony review jacket, he wrote in part the following:

> On above [date, time and location], [Shaunice Williams] and [Nevest Coleman] left [the] home of [Francine Calimee] after spending three hours

> at [Francine Calimee's] residence "partying." [Bridgeman] and [Coleman] walked [Williams] to her residence, and [Bridgeman] and [Coleman] went to purchase beer at 55th [and] Halstead. [Coleman] went to purchase beer while [Bridgeman] went to her home to change her clothes. [Bridgeman] and [Coleman] decided to return to [Williams's] [sic] residence to party again, when they met two of [Coleman's] friends "Dap" [and] "Ship."

*See* Ex. 46, Coleman Felony Review Jacket, pp. 1, 3–4; *see* Ex. 42, Garfinkel Dep., 200:20–201:18.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

119. Contrary to the summary of information supposedly provided by Coleman as memorialized in the "Incident Summary" portion of Defendant Garfinkel's felony review jacket, Bridgeman was found dressed in the same clothes she had been wearing when she left the gathering at Francine Calimee's residence on April 11, 1994. *See* Ex. 90, Francine Calimee 5/5/97 Trial Testimony, 96:21–97:1. By the time Defendant Garfinkel took Coleman's statement at approximately 9:57 a.m. on

April 29, 1994, Plaintiff Coleman said nothing about Bridgeman going home to change clothes before the assault occurred. *See* Ex. 30, Coleman Court Reported Statement, pp. 5–7.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

120. Defendant Garfinkel's felony review jacket indicates that when he was at the Area the morning of April 29, 1994, he was aware that Plaintiff Fulton was already in custody but had not been charged. *See* Ex. 88, Fulton Felony Review Jacket — Coleman, p. 1.

**RESPONSE:** Denied. Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkel, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. Defendants also

deny that Garfinkel's felony review jacket indicates he was at the Area the morning of April 29, 1994, and that he was aware that Plaintiff Fulton was already in custody but had not been charged because this is not supported by the citation to the record. (Plf.'s Ex. 88, Fulton Felony Review Jacket – Coleman).

121.     In 1994, felony review was comprised of teams that worked 12-hour shifts: a morning shift and an evening shift. *See* Ex. 42, Garfinkel Dep., 65:13–21. The morning shift started at 6:00 a.m., and the evening shift started at 6:00 p.m. *See* Ex. 42, Garfinkel Dep., 73:16–74:3. A prosecutor would do a month of day shifts, and then a month of night shifts. *See* Ex. 42, Garfinkel Dep., 74:4–9.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and the CCSAO, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

122.     On April 29, 1994, when Defendant Garfinkel had his first contact in the Bridgeman investigation, he was assigned to the morning shift. *See* Ex. 42, Garfinkel Dep., 75:11–23. Defendant Garfinkel testified that he arrived at Area 1 at approximately 8:00 a.m. *See* Ex. 42, Garfinkel Dep., 79:13–16. However, the notes from his felony review jacket indicate that his "Start Time" for his investigation was 6:15 a.m. *See* Ex. 88, Fulton Felony Review Jacket – Coleman, p. 1.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph.  *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.  As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy.  *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only.  A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

123.     If Defendant Garfinkel were scheduled to work in felony review on April 30, 1994—the date he obtained Plaintiff Fulton's statement—he would have been scheduled to work the day shift starting at 6:00 a.m. *See* Ex. 42, Garfinkel Dep., 214:23–215:2. Working the day shift, Defendant Garfinkel would not have worked beyond 6:00 p.m. unless he received an assignment prior to 6:00 p.m. *See* Ex. 42, Garfinkel Dep., 217:11–218:10. Nevertheless, on April 30, 1994, between approximately 9:00 p.m. and 10:00 p.m., Defendant Garfinkel arrived at Area 1. *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, 55:14–56:7.

79

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser*, 2002 WL 31133143, at *8.

124. After Defendant Garfinkel arrived at Area 1 on April 30, 1994, he spoke with Plaintiff Fulton in the presence of Defendant Foley. *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, 56:8–18. Defendant Garfinkel ultimately prepared a handwritten statement which Plaintiff Fulton signed at approximately 1:30 a.m. on May 1, 1994. *See* Ex. 85, Garfinkel 4/16/94 MTS Testimony, A57:22– 61:22; *see* Ex. 120, Garfinkel 5/13/97 Trial Tr., O-86:5–16; *see* Ex. 83, Fulton Statement, p. 1.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle and Foley, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921.

As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at *2; *Brown*, 2012 WL 3987427, at *3; *Koch-Weser,* 2002 WL 31133143, at *8.

125. Defendant Garfinkel could not remember how he was assigned to take Fulton's statement. *See* Ex. 42, Garfinkel Dep., 219:22–220:8. Defendant Garfinkel admitted that although he usually would not get specifically assigned to work on a case he had worked on previously, there were a couple of exceptions when an officer asked him to handle a case even though he was not on that specific unit or team. *See* Ex. 42, Garfinkel Dep., 220:9–24.

**RESPONSE:** Defendants object to this paragraph because it contains facts related only to the conduct of Garfinkle, which are immaterial to the outcome of Defendants' motion because there is no evidence to suggest the other Officer Defendants were involved in the events described in this paragraph. *See Boyd*, 225 F. Supp. 3d at 715 *citing Waldridge*, 24 F.3d at 921. As such, and because Foley and Clancy are parties to the motion only as to the malicious prosecution claim and the facts in this paragraph are likely inadmissible at trial, the Officer Defendants should not be required to incur the cost of disputing facts that are not material to the outcome of the motion, and which are better suited for resolution at trial between Plaintiffs and Foley and Clancy. *See* the

Advisory Committee Notes to Fed.R.Civ.P 56(g) ("The court must take care that [it] does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes."); *see also Aitken, LLC*, 2015 WL 433508, at \*2; *Brown*, 2012 WL 3987427, at \*3; *Koch-Weser,* 2002 WL 31133143, at \*8.

### Plaintiffs' Convictions and Sentences

126.    Plaintiffs Coleman's and Fulton's statements were admitted at their respective criminal trials as substantive evidence of their guilt. *See* Ex. 120, Garfinkel 5/13/97 Trial Tr., M-23:12–20, 28:22–50:6, O-31:8–39:12. The prosecutors at Plaintiffs' criminal trials relied almost entirely on the statements in arguing Plaintiffs' guilt. *E.g.*, *see* Ex. 95, Prosecutor's Closing Arguments dated 5/12/97, at Z-15:7–19:6; Ex. 103, Prosecutor's Closing Arguments dated 5/13/1997 Closing Argument, at O135:9–141:21.

**RESPONSE:** Admitted in part, denied in part. Defendants object to the improper argument in this paragraph that prosecutors "relied almost entirely" on Plaintiffs' confessions because it violates Local Rule 56.1(b)(3)(C). *See Malec*, 191 F.R.D at 585. Also, the citations to the record do not establish that prosecutors relied almost entirely on the confessions.

127.    The jury convicted both Plaintiffs of criminal sexual assault and first-degree murder. *See* Ex. 96, Coleman Verdict Forms. The State sought the death penalty. Ex. 53, Coleman Sentencing Tr., at CC25. The trial court sentenced both Plaintiffs to terms of natural life on the murder convictions, and a consecutive 30-year term on the criminal sexual assault convictions. *See* Ex. 97, Coleman Sentencing Order; *see* Ex. 98, Fulton Sentencing Order.

**RESPONSE:** Admitted.

**The Physical and Forensic Evidence Exonerates
Plaintiffs and Establishes Clarence Neal's Guilt**

*The Physical Evidence Implicates Neal*

128. Police observed condoms in Bridgeman's pockets at the scene. *See* Ex. 27, Supp. Report dated 6/9/94, p. 9. During Bridgeman's autopsy, the pathologist recovered two packaged condoms from the pocket of Bridgeman's outer jacket. *See* Ex. 99, Autopsy Report, p. 1; *see* Ex. 76, Cogan Trial Tr., pp. I-8, I-31.

**RESPONSE:** Admitted.

129. Consistent with the nature of the assault, evidence at the scene was that Bridgeman fought with her attacker. Police found a pink ponytail holder, Bridgeman's broken eyeglasses, and a broken fingernail next to her body. *See* Ex. 27, Supp. Report dated 6/9/94, p. 8; *see* Ex. 71, Stella Trial Tr., p. H58. A broken stepladder was partially resting on Bridgeman's right arm. *See* Ex. 27, Supp. Report dated 6/9/94, p. 8; *see* Ex. 71, Stella Trial Tr., p. H69. The pathologist noted during Bridgeman's autopsy that the artificial fingernail over Bridgeman's right thumb was missing, again indicating that Bridgeman struggled with the perpetrator. *See* Ex. 99, Autopsy Report, p. 2; *see* Ex. 76, Dr. Cogan's Trial Tr., p. I-61–62.

**RESPONSE:** Admitted in part, denied in part. The citations to the record do not establish that

there was only one "attacker."

130. In 2016, clothing and samples of clothing Bridgeman wore during the assault were sent to the Illinois State Police Division of Forensic Services, ("the ISP Lab"). *See* Ex. 21, ISP Lab Report dated 5/31/17 ("5/31/17 Lab Report"). Bridgeman's nail clippings were also sent to the ISP Lab. *See* Ex. 21, 5/31/17 Lab Report. Testing indicated the presence of semen on Bridgeman's sweatshirt, red/black "Bulls" coat, and underwear. *See* Ex. 21, 5/31/17 Lab Report.

**RESPONSE:** Admitted in part, denied in part. The testing occurred in 2017, not 2016. (*See* Plf.'s

Ex. 21, 5/31/17 Lab Report).

131. Subsequent DNA testing performed on the semen in Bridgeman's underwear, Lab Exhibit 5K1, yielded a profile from which convicted serial rapist Clarence Neal cannot be excluded. *See* Ex. 34, ISP Lab Report dated 11/29/17, "11/29/17 Lab Report", pp. 2–4. The expected frequency of occurrence for the male DNA profile found in Bridgeman's underwear, calculated for the African American, Caucasian, and Hispanic population groups, was found to be no more common than approximately 1 in 1.7 septillion unrelated individuals. *See* Ex. 34, 11/29/17 Lab Report, p. 2.

**RESPONSE**: Admitted in part, denied in part. The record citations do not establish that Clarence

Neal is a "convicted serial rapist."

83

132.    DNA testing performed on Bridgeman's left hand nail clippings, Lab Exhibit 3B, yielded a profile from which Neal cannot be excluded. *See* Ex. 34, 11/29/17 Lab Report, p. 4; *see* Ex. 21 5/31/17 Lab Report, p. 2. The expected frequency of occurrence for the male DNA profile found in Bridgeman's underwear, calculated for the African American, Caucasian, and Hispanic population groups, was found to be no more common than approximately 1 in 180,000 unrelated individuals. Coleman, Fulton, and Taylor were excluded as possible contributors. *See* Ex. 34, 11/29/17 Lab Report, p. 4.

**RESPONSE:** Admitted in part, denied in part.  The record citations do not establish that the DNA profile was not more common than approximately 1 in 180,000.  (*See* Plf.'s Ex. 34, 11/29/17 Lab Report, p 4).

133.    Although less probative than the above results, DNA testing on the following items also yielded profiles from which Neal could not be excluded: 1) a swabbing from the pipe used to impale Bridgeman, Lab Exhibit 7A; 2) a swabbing from the rock shoved into Bridgeman's mouth, Lab Exhibit 12A; 3) the non-sperm fraction of a cutting from Bridgeman's sweatshirt where semen was indicated, Lab Exhibit 5B1; and 4) the non-sperm fraction of a different cutting from Bridgeman's sweatshirt where semen was indicated, Lab Exhibit 5B2. *See* Ex. 34, 11/29/17 Lab Report, p. 4; *see* ISP Lab Report dated 7/18/17, 7/18/17 Lab Report", p. 1; *see* Ex. 101, ISP Lab Report dated 3/2/18, "3/2/18 Lab Report", pp. 2–3.

**RESPONSE:** Admitted.

134.    Y-STR testing was also performed on extracted DNA from three cuttings of Bridgeman's sweatshirt where semen was indicated, Lab Exhibits 5B2A and 5B9A. *See* Ex. 37, ISP Lab Report dated 12/14/17 ("12/14/17 Lab Report"). The testing of the non-sperm fractions of all three samples yielded a mixture of Y-STR DNA haplotypes from which Neal could not be excluded. *See* Ex. 37, 12/14/17 Lab Report.

**RESPONSE:** Admitted in part, denied in part.  The record citations indicate Neal, Fulton and Coleman could not be exckuded from the results, not just Neal. Further, 5B2A (cutting B) was a mixture of three males, 5B2A (cutting B) was a mixture of five males, and 5B9A (cutting A) was a mixture of three males.  (*See* Plf.'s Ex. 37, 12/14/17 Lab Report).

135.    The postconviction DNA and forensic testing either excluded Plaintiffs Coleman and Fulton entirely or failed to yield any probative evidence connecting them to the scene or the crime. *See* Ex. 19, Sussman Dep., 187:11–188:11.

**RESPONSE:** Admitted.

*Neal's Prior Violent Rapes*

135. On July 3, 1998, at approximately 11:30 p.m., a woman, hereinafter referred to as "Victim A", was violently sexually assaulted in an abandoned building. A summary of the incident she provided to police, in relevant part, is as follows:

> Victim related to R/O's that while walking home from 45th Street, at St. Lawrence Victim was approached from behind by Offender with a box cutter in his hand and he stated to victim "If you don't get in the car, I'll kill you." Victim A proceeded to the offender's car. Victim proceeded to offender's car . . . Offender took victim to address of occurrence and took victim to 2nd floor of abandoned building. . . Offender began kissing her neck and victim asked him to stop. Offender requested victim to take off her clothes or he would kill her. Offender told victim that she was going to suck his **** or **** him and asked which did she prefer. Victim replied neither. Offender picked up an empty wine bottle and began hitting victim about the leg and upward to thigh and arm. After a tussle on the bed offender demanded victim take off all her clothes or he was going to cut her. . . Offender then got on top of victim and sexually assaulted her.

*See* Ex. 68, Officer Santana's General Offense Case Report. A sexual assault kit was collected from Victim A after the assault. *See* Ex. 61, Supplementary Report dated 2/4/99, Bates Nos. City 653–55, p. 2.

**RESPONSE:** Defendants object to this paragraph because it conains inadmissible hearsay, which

cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied

upon in support of or opposition to summary judgment must be of the type admissible at trial; a

party may not rely upon inadmissible hearsay").

136. On October 19, 1998, at approximately 4:00 a.m., a woman, hereinafter referred to as "Victim F", was violently sexually assaulted in an alley by multiple offenders. A summary of the incident she provided to police, in relevant part, is as follows:

> Victim related to O/O's that she went to pick up her God sister at 103rd [&] Michigan and got out of the car and started walking E/B on 103rd Street when she was approached by Offenders #1 and #2 who asked victim did she think she was too good to talk to them. Victim then related that the offenders punched her in the stomach and arm knocking her to the ground. Offenders then picked victim up and put her into offenders car in the back seat. Once victim got into vehicle she noticed a 3rd offender. They then drove victim to alley at about 107th [&] Michigan where offender #1 had intercourse and oral sex with victim followed by offender #2 having oral sex then intercourse with victim.

85

*See* Ex. 59, Officer Jones's General Offense Case Report. A sexual assault kit was collected from Victim F after the assault. *See* Ex. 67, Supplementary Report dated 8/31/04, Bates Nos. City1568–70.

**RESPONSE:** Defendants object to this paragraph because it conains inadmissible hearsay, which cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay").

138.    On August 17, 2001, at approximately 5:25 a.m., a woman, hereinafter referred to as "Victim E", was violently sexually assaulted in an alley. A summary of the incident she provided to police, in relevant part, is as follows:

> Victim related to R/O that she was waiting for the bus at 117th & Michigan when offender picked her up as a livery cab. Victim paid offender to take her to 95th [&] Dan Ryan El. Upon missing train offender offered to catch train at 63rd. Upon arrival at 67th [&} State, Offender made a right turn on Wabash and doubled back into the alley between State/Wabash . . . Victim began requesting to get out of vehicle . . . [the] Offender then parked at a garage placing Victim's door against the garage making it impossible for her ot exit vehicle. He then stated after they argued, "I just want my **** sucked then I will let you go. If you are in love, it's not worth you getting beat up, and me choking you, I can still do it." Victim responded, "Just do what you're going to do to me, cause I'm not doing it." He then pulled out an orange screwdriver and put it up to her neck and stated "It's not worth your life, you either going to **** or ****."

*See* Ex. 60, Officer Stubbs's General Offense Case Report. Victim E went on to tell police that, after the sexual assault, the Offender told her, "You can flag the police if you want to. I know I'm going back to prison. I was sentenced 85 years and I did 12 years straight for double murder. *See* Ex. 60, Officer Stubbs's General Offense Case Report. A sexual assault kit was collected from Victim E after the assault. *See* Ex. 64, Supplementary Report dated 8/27/01, Bates Nos. City685–88.

**RESPONSE:** Defendants object to this paragraph because it conains inadmissible hearsay, which cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay").

139.    In approximately April 2002, the ISP Lab notified police that testing of the vaginal swabs from the rape kits of Victims A, F, and E yielded the same DNA profile. *See* Ex. 62,

86

Supplementary Report dated 4/9/02, Bates Nos. City1600–03, p. 2. In approximately July 2004, the ISP Lab notified police that the suspect profile hit on CODIS offender Clarence Neal. *See* Ex. 102, Supplementary Report dated 9/7/04, Bates Nos. City1604–06, pp. 2–3; Ex. 66, Supplementary Report dated 8/31/04, Bates Nos. City1568–70, p. 2; *see* Ex. 63, Supplementary Report dated 8/9/04, Bates Nos. City 1138–42, p. 3.

**RESPONSE:** Defendants object to this paragraph because it conains inadmissible hearsay, which cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay").

140.    On July 30, 2004, Victim E viewed a photo array and identified Clarence Neal as the person who sexually assaulted her. *See* Ex. 65, Supplementary Report dated 8/29/04, Bates Nos. City 1143–45, pp. 2–3. On August 29, 2004, Victim E viewed a photo array and again identified Neal as the person who sexually assaulted her. *See* Ex. 65, Supplementary Report dated 8/29/04, Bates Nos. City 1143–45, pp. 2–3. On July 22, 2005, Neal pled guilty to the aggravated criminal sexual assault of Victim E. *See* Ex. 56, 7/22/05 Guilty Plea Transcript, 2:7–3:4.

**RESPONSE:** Admitted in part, denied in part.  Admit that Neal pleaded guilty to criminal sexual assault.  Defendants object to the remainder of this paragraph because it conains inadmissible hearsay, which cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay")..

141.    On September 7, 2004, Victim F viewed a lineup of six individuals, including Neal. She was unable to make an identification. *See* Ex. 104, Supplementary Report dated 9/8/04, Bates Nos. City 1571–74, p. 3. Law enforcement's investigation of Victim F's assault was suspended after they made multiple unsuccessful attempts to contact her. *See* Ex. 105, Supplementary Report dated 9/18/17.

**RESPONSE:** Defendants object to this paragraph because it conains inadmissible hearsay, which cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay").

142.    On June 3, 2012, police were able to locate Victim A. *See* Ex. 106, Supplementary Report dated 6/24/12, p. 3. Victim A viewed a photo array and identified Clarence Neal as her

attacker. *See* Ex. 106, Supplementary Report dated 6/24/12, p. 3. An investigative alert was issued for Neal. *See* Ex. 106, Supplementary Report dated 6/24/12, p. 3. Police located Neal, who was living in North Carolina. *See* Ex. 107, Supplementary Report dated 8/20/12, pp. 3–4. After Victim A learned that Neal was living in another state, had been charged in two other cases, and had served 7 years for another rape, she decided that she no longer wished to pursue charges but requested information on counseling. *See* Ex. 107, Supplementary Report dated 8/20/12, pp. 3–4.

**RESPONSE:** Defendants object to this paragraph because it conains inadmissible hearsay, which cannot be relied upon to oppose summary judgment. *See Bombard*, 92 F.3d at 562 ("evidence relied upon in support of or opposition to summary judgment must be of the type admissible at trial; a party may not rely upon inadmissible hearsay").

### *Clarence Neal's Admissions*

143. Clarence Neal was interviewed by the Conviction Integrity Unit ("CIU") on August 28, 2017. *See* Ex. 58, Neal Interview, 2:1–4. Neal initially stated that he was locked up doing four years in prison when Bridgeman was murdered. *See* Ex. 58, Neal Interview, 53:17–54:10. The CIU investigators pointed out that according to court records, Neal was not incarcerated at the time of Bridgeman's murder. *See* Ex. 58, Neal Interview, 57:6–60:8, 67:4–68:4.

**RESPONSE:** Admitted.

144. Neal denied having a relationship with Bridgeman. *See* Ex. 58, Neal Interview, 65:23– 66:10. Then Neal stated that he had known Bridgeman not long, "not even a month," and he only saw her in passing. *See* Ex. 58, Neal Interview, 77:8–22. Neal denied having any kind of physical relationship with Bridgeman. *See* Ex. 58, Neal Interview, 78:17–79:6. Neal explicitly denied having sex with Bridgeman. *See* Ex. 58, Neal Interview, 81:14–22.

**RESPONSE:** Admitted in part, denied in part. Although he initially denied having a relationship with Bridgeman and denied having sex with her, Neal subsequently admitted to sometimes drinking beers with her and "kicking it," that he'd also knock on her door, and that he had a "quickie" with Ms. Bridgeman that happened one time at his house. (Plf.'s Ex. 58, Neal Interview, 66-67, 98:14-17, 99:24-100:3).

145. After again being confronted with the fact that his DNA was on Bridgeman's clothing, Neal stated that "if anything happened," he and Bridgeman may have stuck their hands down each other's pants. *See* Ex. 58, Neal Interview, 81:23–82:11, 85:4–20. Neal again denied having had sex with Bridgeman. *See* Ex.58, Neal Interview, 85:15–86:5. Asked again if it was fair to say that there was something going on between you and her of a sexual nature, Neal stated, "That was not our relationship." *See* Ex. 58, Neal Interview, 91:9–15. The CIU investigators then led Neal to agree that

he had, on one occasion during the summer, had a "quickie" with Bridgeman. *See* Ex. 58, Neal Interview, 97:15–98:17, 99:12–100:3, 143:23–144:4. But Neal again denied that he and Bridgeman had intercourse. *See* Ex. 58, Neal Interview, 100:4–12.

**RESPONSE:** Admitted.

146.    The CIU investigators asked Neal about Victim E. *See* Ex. 58, Neal Interview, 160:10– 17. Neal denied that he raped Victim E, and claimed that he "could" have had consensual sex with her. *See* Ex. 58, Neal Interview, 160:18–25.

**RESPONSE:** Admitted.

147.    During his deposition in this lawsuit, Neal testified that he only had oral sex with Bridgeman on one occasion. *See* Ex. 26, Neal Deposition, "Neal Dep.", 53:10–23. Neal denied that Bridgeman removed any of her clothes during the encounter. *See* Ex. 26, Neal Dep., 168:22–169:18. Neal was unable to explain how his semen ended up in Bridgeman's underwear. *See* Ex. 26, Neal Dep., 56:25–57:5.

**RESPONSE:** Admitted in part, denied in part.  Although Neal was unable to explain how his semen ended up in Bridgeman's underwear at his deposition, he admitted in an interview with the CIU to having a "quickie" with Ms. Bridgeman that happened one time at his house.  (Plf.'s Ex. 58, Neal Interview, 98:14-17, 99:24-100:3).

### Plaintiffs' Convictions Were Vacated, the Charges Dismissed, and COIs Granted

148.    On November 17, 2017, based on the results of the CIU's investigation, the Cook County State's Attorney's Office moved to vacate Plaintiffs' convictions and agreed to a new trial. *See* Ex. 108, Transcripts from 11/17/17 Court Hearing, 2:14–20.

**RESPONSE**: Admitted in part, denied in part.  The decision to vacate the convictions and agree to a new trial was not based only on the results of the CIU investigation.  It also involved discussions among First Assistant Sussman and a team that he assembled that included Rotert, Savini, John Brasil, and Steven Block and John Brassil.  (Plf.'s Ex. 19, Sussman Dep., 174: 23 – 175: 9).

149.    The CIU made a recommendation about whether the CCSAO should move to vacate the convictions, but the decision to move to vacate Plaintiff's convictions was made by Cook County State's Attorney Kimberly Foxx. Likewise, Sussman, Brassil, and Block recommended to SA Kim Foxx that the CCSAO should not retry Plaintiffs. However, the ultimate

decision not to retry Plaintiffs was made by Foxx. Ex. 19, Sussman Dep., at 141:19-142:24, 153:2-14, 174:18-175:9, 232:6-18; Ex. 25, Rotert Dep., at 69:22-72:11, 120:9-123:1, 255:16-8.

**RESPONSE**: Admitted in part, denied in part.  The citations to the depositions of Sussman and Rotert do not establish that Foxx made the ultimate decision not to retry Plaintiffs.  Sussman testified the decision not to retry Plaintiffs was based on separate discussions and analysis he had with Steven Block and John Brassil.  (Plf's Ex. 19, Sussman Dep., 174: 23 – 175: 9).  Sussman also testified he and his team made the decision to not retry Plaintiffs, and then sought the State's Attorney's approval before going to court:

> Q: So prior to going to court on December 1st, 2017, you would have made the State's Attorney aware of what you as a group had decided, right?
>
> A: Right.
>
> Q: Okay. And obviously since you worked for her, did you need her approval before going to court to announce that decision?
>
> A: Yes.
>
> Q: Okay. And did you explain to the State's Attorney your reasoning for the decision that you had reached?
>
> A: Yes.
>
> Q: Did you explain to the State's Attorney also that, you know, you believed these individuals were guilty, but based on the fact that you weren't -- you didn't think you could meet the burden of proof for a new trial, that the conclusion was to not retry them?
>
> A: Yes.

(Pls. Ex. 19, Sussman Dep., 232: 6 – 233: 5).  The State's Attorney had some questions but did not push back on Sussman's decision.  (Pls. Ex. 19, Sussman Dep., 235: 17 – 236: 11).  The State's Attorney agreed with the decision Sussman and his team had made.  (Pls. Ex. 19, Sussman Dep., 236: 7-13).

90

150.     On December 1, 2017, the Cook County State's Attorney's Office moved to dismiss the charges against Plaintiffs because the State "would be unable to meet [its] burden of proof on retrial." *See* Ex. 109, Transcripts from 12/1/17 Court Hearing, 2:20–3:5. The trial court dismissed the charges upon the State's motion. *See* Transcripts from 12/1/17 Court Hearing, 3:16.

**RESPONSE**: Admit in part, deny in part.  Although Sussman said the CCSAO would be unable to meet its burden of proof on a retrial the day he appeared in court, this is not the complete reason the charges were dismissed.  At his deposition, Sussman testified that, although he and his team believed Plaintiffs were guilty, the decision to not retry Plaintiffs was based on their belief that "in this day and age," a contested confession, combined with DNA evidence that matched a known sex offender, would be insufficient to meet the burden of proof.  By "this day and age," Sussman clarified that confessions, in general, do not hold the same weight they did 26 years ago when Plaintiffs were originally tried due to the history of alleged misconduct against the Chicago Police Department.  (*See* Resp. to DSOF, ¶¶134, 135) (plaintiffs objecting to the "opinion" testimony from Sussman but not denying what he said).

151.     On December 1, 2017, Plaintiff Fulton filed a Petition for Certificate of Innocence. *See* Ex. 110, Fulton Petition for Certificate of Innocence. On January 19, 2018, Plaintiff Coleman filed a Petition for Certificate of Innocence. *See* Ex. 111, Coleman Petition for Certificate of Innocence. The CCSAO did not oppose them. Ofc. DSOF 156. On March 9, 2018, the Circuit Court of Cook County entered an order granting the petitions for certificates of innocence, and certificates of innocence were issued to both Plaintiffs. *See* Ex. 32, Order Granting Fulton Petition for Certificate of Innocence; *see* Ex. 33, Order Granting Coleman Petition for Certificate of Innocence. Mr. Coleman's and Mr. Fulton's COIs state that each "has satisfied his burden under 735 ILCS 5/2-702 and is entitled to a Certificate of Innocence." *See* Ex. 32, Order Granting Fulton Petition for Certificate of Innocence; *see* Ex. 33, Order Granting Coleman Petition for Certificate of Innocence.

**RESPONSE:** Admitted.

> Respectfully submitted,
>
> JOHN HALLORAN, KENNETH BOUDREAU, JAMES O'BRIEN, GERALD CARROLL, WILLIAM MOSER, ALBERT GRAF, MICHAEL CLANCY, THOMAS BENOIT, THOMAS KELLY and GERI LYNN YANOW,

91

as independent administrator of the Estate of WILLIAM FOLEY

_s/ *Patrick R. Moran*_____
One of their attorneys

Eileen E. Rosen
Patrick R. Moran
Andrew J. Grill
*Special Assistant Corporation Counsel*
Attorneys for Officer Defendants
ROCK FUSCO & CONNELLY LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
T: 312-494-1000
erosen@rfclaw.com
pmoran@rfclaw.com
agrill@rfclaw.com

92