**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DERRELL FULTON, a.k.a. DARRYL FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-8696 |
| | ) | |
| GERI LYNN YANOW, as Independent Administrator of the Estate of WILLIAM FOLEY, Deceased, CHICAGO POLICE, et al., | ) | Honorable Martha M. Pacold, Judge Presiding. |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF CONCERNING THE**
**USE OF COLEMAN'S FABRICATED STATEMENT AT TRIAL**

Plaintiff submits this supplemental brief concerning the use of Coleman's fabricated statement against Plaintiff at Plaintiff's criminal trial. (Doc. 416).

"If fabricated evidence . . . is used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). A due process fabrication claim requires the plaintiff to prove that the fabricated evidence was used to deprive him of liberty "in some way." *Moran v. Calumet City*, 54 F.4th 483, 498 (7th Cir. 2022) (citation omitted). The fabricated evidence also must be material. *Id*. Fabricated evidence is material if there is a reasonable likelihood that it affected the judgment of the jury. *Id*.

At Plaintiff's trial, Defendant Garfinkel testified that on April 29, 1994, he spoke with Coleman. (Doc. 339-8 at 50). He then testified that on April 30, after speaking with Plaintiff for 15 to 20 minutes, he obtained a copy of Coleman's court-reported statement. (*Id*. a 54). The court allowed Garfinkel to testify that he told Plaintiff that Coleman gave a statement that implicated Plaintiff . (*Id*. at 54–65). The jury was instructed that it could only use the testimony as evidence

bearing on Plaintiff's state of mind. (*Id*.). Garfinkel subsequently testified, "All I did was use Nevest Coleman's court-reported statement to tell Mr. Fulton, hey, there's a person saying you are involved in this." (*Id*. at 126). During closing argument, the prosecution used Garfinkel's testimony to argue that Plaintiff gave a voluntary handwritten confession. (Doc. 339-7 at 154).

Based on the foregoing, Coleman's fabricated statement was introduced and used against Plaintiff at Plaintiff's criminal trial. The jury was allowed to use the fabricated statement as evidence weighing against Plaintiff's assertion that his "confession" was unreliable and signed under duress. The fabricated statement was material because there is a reasonable likelihood that the jury used it to credit Fulton's handwritten statement. In other words, Coleman's court-reported statement was used in "some way" to deprive Plaintiff of liberty. At a minimum, there is a genuine issue of material fact that precludes summary judgment on this issue.

Any argument by Defendants that Plaintiff waived this claim is a nonstarter. Plaintiff's complaint alleges that Defendants fabricated Coleman's statement implicating Plaintiff, and that the fabricated statement was used against Plaintiff at Plaintiff's trial. (Doc. 230 at ¶¶ 42–69, 92–93). Defendants issued a contention interrogatory asking him to identify "the full factual basis for the claims in your Complaint that the Defendant Officers fabricated evidence[.]. Plaintiff identified Coleman's court reported statement as one of the pieces of evidence that Defendants fabricated. *See* excerpt of Plaintiff's answers to interrogatories, attached as Exhibit A. Plaintiff did not address this issue in summary judgment briefing because Defendants did not argue that Coleman's statement was not used against Plaintiff at trial as a substantive basis for summary judgment. (Doc. 316 at Argument III(C)). Nor did Defendants assert as an undisputed fact that Coleman's statement was not used at Plaintiff's trial; if they had, Plaintiff would have disputed the assertion with the citations to the record identified in this supplemental brief.

2

Respectfully submitted,

/s/ Nicholas Curran
Nicholas Curran, ARDC# 6291492
One attorney for Plaintiff
Kathleen T. Zellner & Associates, P.C.
2001 Butterfield Road, Suite 1025
Downers Grove, Illinois 60515
(Ph) (630) 955-1212
(E) nick@zellnerlawoffices.com

## **Certificate of Service**

Plaintiff certifies that on February 25, 2024, he filed the foregoing **Plaintiff's Supplemental Brief Concerning the Use of Coleman's Fabricated Statement at Trial** using the Court's ECF system, which will serve a copy on all counsel of record.

Respectfully submitted,

/s/ Nicholas Curran
Nicholas Curran, ARDC# 6291492

3

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DERRELL FULTON, a.k.a. DARRYL FULTON, | ) ) | |
| | ) | Case No. 17-cv-8696 |
| Plaintiff, | ) ) | |
| v. | ) ) | Honorable Martha M. Pacold, Judge Presiding. |
| CHICAGO POLICE OFFICERS WILLIAM FOLEY, #20450, et al., | ) ) | Honorable Sunil R. Harjani, |
| Defendants. | ) | Magistrate Judge. |

**PLAINTIFF FULTON'S FIRST SUPPLEMENTAL
OBJECTIONS AND ANSWERS TO DEFENDANT
BOUDREAU'S FIRST SET OF INTERROGATORIES**

Plaintiff, Derrell Fulton, by and through his attorneys, Kathleen T. Zellner & Associates, P.C., serves the following first supplemental objections and answers to Defendant Boudreau's First Set of Interrogatories:

**Interrogatories**

1.  Identify each physically coercive tactic each Defendant Officer used with you, and for each one, provide the following information:

(a)  a detailed description of each discrete physically coercive tactic and its effect on you;

(b)  the identity of each Defendant Officer who employed the physically coercive tactic;

(c)  the identities of any Defendant Officers or any other person who witnessed the physically coercive tactic;

(d)  the date, time and location of each physically coercive tactic; and

(e)  a description of each injury you claim to have suffered as a result of the coercive tactic.

1
Exhibit A

murder of Antwinica Bridgeman, which in turn resulted in the damages he alleges in this case.

See transcripts of Plaintiff's testimony at his motion to suppress hearing and his deposition for additional information responsive to this Interrogatory.

3.     State the full factual basis for the claims in your Complaint that the Defendant Officers fabricated evidence, including but not limited to:

(a)    a detailed description of each discrete piece of fabricated evidence;

(b)    the identity of each Officer who you believe fabricated the evidence;

(c)    the reason(s) you believe the evidence is fabricated; and

(d)    each fact supporting your belief that the evidence is fabricated.

**Answer:**  Plaintiff objects to this Interrogatory on the basis that it is overly broad and unduly burdensome.  See *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 273 F.R.D. 367, 369 (S.D.N.Y. 2010) (requests for every fact, piece of evidence, and witness supporting the party's position is overly broad and unduly burdensome).  Plaintiff objects to this Interrogatory to the extent it seeks the thoughts and mental impressions of counsel, and therefore invades the attorney work product doctrine.

Without waiving and subject to the foregoing objections, Plaintiff, through counsel, answers as follows:

**Supplementary Report (City1821–36):**

The Defendant Officers included false information in their reports, and/or fabricated their reports as listed below.

The Defendant Officers fabricated the report of Defendants Foley and Clancy's interview of Chester Latham.  Per the Defendant Officers' supplementary report:

> Latham then related that the victim had been a member of the Gangster Disciples and had changed allegiances to the Vice Lords.  Latham concluded this interview by stating that the victim mentioned that "Chip" and "Dap" were Gangster Disciples and they had been bothering her for changing gangs.

Latham disputed that he told the police the foregoing during his deposition. Latham testified that he had no knowledge of the victim changing gangs and

5

did not tell police that "Chip" and "Dap" were bothering the victim for changing gangs. Latham also testified at his deposition that he did not know anything about a guy named "Dap," and he therefore could not have told Defendants Foley and Clancy that "Dap" was bothering the victim.

Additional evidence supporting the claim that the Defendant Officers fabricated the Latham interview are the discrepancies between Foley's general progress report concerning his interview of Latham and the supplementary report.

Plaintiff Fulton will testify at trial that he did not know anything about the victim being in a gang or switching gangs, and that he did not bother her for changing gangs. This is additional evidence supporting the claim that the Defendant Officers fabricated the Latham interview.

Plaintiff also anticipates that Eddie Taylor will testify at trial that he did not know anything about the victim being in a gang or switching gangs, and that he did not bother her for changing gangs. This is additional evidence supporting the claim that the Defendant Officers fabricated the Latham interview.

The Defendant Officers fabricated the report of Defendants Foley and Clancy's initial interview of Nevest Coleman. Per the Defendant Officers' supplementary report:

> The R/Ds then had occasion to ask Coleman if he knew the victim Antwinica Bridgeman and at that time Coleman stated that in fact he did know the victim and that he knew her for several years. He then related that he had not seen her for sometime at least several months.

Coleman disputed during his deposition that he told police that he had not seen the victim "in several months."

Additional evidence supporting the claim that the Defendant Officers fabricated the Coleman interview are the discrepancies between the general progress report concerning interviews of Coleman and the supplementary report.

The Defendant Officers fabricated the reports of Defendants Foley, Clancy, and Boudreau's interviews of Francine Calimee and Shaunice Williams. Per the Defendant Officers' supplementary report:

> The R/Ds then had occasion to reinterview both Francine Calimee and Shaunice Williams and at that time both girls stated that when they were first interviewed by the R/Ds then withheld

6

> information regarding this investigation. They then went on to say that they were both afraid of the Gangster Disciples and that the victim had left the party at Calimees house with a GD, Nevest Coleman on the night that she disappeared… She and Calimee then related that they were extremely afraid for their safety and that is the reason that they never told anyone that Coleman had left the party with the victim. They both were afraid that they would be the next victims.

Williams and Calimee disputed during their depositions that they were afraid of the Gangster Disciples or Nevest Coleman. Williams and Calimee disputed during their depositions that they told police that they were afraid of the Gangster Disciples or Nevest Coleman. Williams and Calimee disputed during their depositions that they withheld information from police because they were afraid of the Gangster Disciples or Nevest Coleman. Williams and Calimee disputed during their depositions that they told police that they withheld information from police because they were afraid of the Gangster Disciples or Nevest Coleman. Williams disputed that she told police that the victim left the party with a GD.

Additional evidence supporting the claim that the Defendant Officers fabricated the Calimee and Williams interviews are the discrepancies between (1) the general progress reports concerning the interviews of Calimee and Williams, (2) the handwritten statements of Calimee and Williams, and (3) Calimee's and Williams's trial testimony.

The Defendant Officers fabricated any portions of their supplementary report attributing statements to Nevest Coleman that he was involved in, or had knowledge of, the victim's assault and murder, including the following:

> The R/Ds then confronted Coleman with the fact that the family of the victim told the R/Ds that the victim never returned home on that night and at that time Coleman stated that he again was not truthful and he now wanted to tell the R/Ds the entire truth. He stated that after he left the party with Williams and Calimee he left them at 56th and Green St. and went to the liquor store at 55th St and Halstead. He then stated that he returned to the area and at that time he saw the victim Bridgeman and "Chip" and "Dap" go into his basement. He then stated that after a short time he went to the basement door and observed the victim orally copulating "Chip" and she was also engaged with "Dap" in anal intercourse. He then went on to say that he then became frightened and ran into his apt. one floor above the crime scene where he remained for the rest of the night.

7

The R/Ds then notified A.S.A. Garfinkel of the Felony Review Unit who responded to the A/1 Violent Crimes… [Coleman] went on to say that he left the party at Francines house int eh company of Nice (Shaunice Williams) and Mikey (The victim Antwinica Bridgeman). He then went on to say that he and Mickey (Victim) then walked Nice home and he and Mickey then walked to the corner of 55th and Peoria and then to the liquor store at 55th and Halstead St. He then related that he went to the liquor store and Mickey (Victim) went home.

Coleman then stated that after he went to the liquor store he was walking around and again met up with Mickey (Victim). He then added that he met up with her at 55th and Peoria and that they then walked back towards Francines house. On the way back to Francines they meet up with "Chip" (Eddie Taylor). He then went on to say that the victim and "Chip" had a private conversation out of his hearing range and that during the course of that conversation "Dap" appeared on the scene and he also began to talk to the victim and "Chip". Coleman then stated that he thought that "Chip" and "Dap" were cousins or some sort of blood relation. He then continued that "Dap" then approached Coleman and asked where they could go to have sex with the victim and at that time he suggested the basement of his house at 917 W. Garfield Blvd.

Coleman then went on to say that that the all, "Chip", "Dap" himself and the victim then went into the basement. He then stated that "Chip", "Dap" and the victim went into the back part of the basement and that "Chip" and "Dap" were rubbing the victim breasts and crotch area both inside and outside of her clothing for a long time. He then went on to say that he then observed the victim orally copulating "Chip" and then he saw "Dap" pull down the victims pants and have anal intercourse with the victim simultaneously Coleman then stated that while this was taking place he was standing as a lookout to warn the others if someone was to come into the bsmt. Coleman then related that this activity lasted about ten minutes and at that time the victim stated that she did not want to engage in any more sex and at that point Coleman stated that he became very angry and left the bsmt. He then went on to say that he remained outside in the back yard for about 5 minutes and that he became increasingly more angry and returned to the bsmt. where the victim and "Chip" and "Dap" had remained while he was outside.

Coleman then related that he then confronted the victim and began to argue with her over her not performing any sexual acts on him and that he then continued to get angrier and at that point he slapped the victim in the face twice. He then stated that at that point "Dap" grabbed her and the "Chip" grabbed her and took the victims pants and shoes off forcibly. He then stated that they then asked him if he wanted "Some of this pussy" and Coleman responded Yes. At that point Coleman stated that "Chip" got on the victim face to face and started to have vaginal intercourse with the victim while "Dap" was holding the victims mouth shut. Coleman then stated that he was acting as a look-out while they were assaulting the victim. He then went on to say that "Dap" then got on top of the victim and had vaginal intercourse with the victim while "Chip" held her mouth closed."

Coleman then went on to say that "Dap" got off the victim and again sexually assaulted the victim. Coleman then went on to say that at that point he told "Dap" take this piece of concrete and put it in her mouth so that she will quit screaming. He then went on to say that the brick ( concrete) was a medium piece and that "Dap" did put the brick into the mouth of the victim. Coleman then stated that "Chip" then stated to the victim "You want something long and Hard" and at that time he picked up a piece of pepe that was laying on the floor and he then inserted that pipe into her vagina. Coleman then went on to say that he was continuing to act as a look-out and he then observed the victims body shaking and jerking, with her eyes open and a lot of blood coming from her vaginal area. He then stated that he and "Chip" and "Dap" ran from the basement and he went to his girlfriends at 56th and Sangamon St. He then added that "Dap" and "Hip" ran from the scene together and that he did not know where they went to after leaving the scene. This statement was then reduced to a handwritten statement.

Coleman testified during his deposition that he denied to police any knowledge of or involvement in the victim's murder. The last time Coleman observed the victim, she was north of Garfield close to a vacant lot next to Visitation School.

Coleman further testified that when he was interviewed at the Area, eight detectives surrounded him in an interrogation room while he was handcuffed, and that they yelled and screamed at him. The detectives left the room. Based on the deposition testimony, the GPRs, the supplementary reports, and the other discovery in this case, it is reasonable to infer that the detectives who surrounded Coleman and yelled at him are Defendants Foley, Clancy, Halloran, Boudreau, O'Brien, Carroll, Moser, and Graf.

9

Later, one of the detectives returned, punched Coleman twice, and called him a "lying ass nigger." Based on the deposition testimony, GPRs, supplementary reports, and the other discovery in this case, it is reasonable to infer that the detective who struck Coleman and called him a "lying ass nigger" is Defendant O'Brien.

Coleman testified that he was taken to another room, where Defendants Foley and Clancy continued to yell at Coleman as he denied involvement in the crime.

Coleman testified that Defendants Foley and Clancy fed him details of the murder, including the fact that a brick was found in the victim's mouth and a pipe in her "pussy."

Coleman testified that Defendants Foley and Clancy told him that they did not want him, *i.e.*, Coleman, but that they wanted Chip and Dap. They told Coleman that they wanted him to say he was a lookout while Chip and Dap raped and killed the victim.

Coleman also testified that Defendants Clancy and Foley told him what to say to ASA Garfinkel. Defendants Clancy and Foley told Coleman to say either that Dap shoved a brick in the victim's mouth and Chip shoved a pipe in her, or the other way around. Defendants Clancy and Foley also told Coleman to say that he, *i.e.*, Coleman, "smacked her." Coleman testified that almost his whole statement consisted of information he was fed by the Defendants.

Coleman also testified during the motion to suppress hearing prior to his criminal trial that one of the officers told him that if he answered the officers' questions correctly, he could go home. This is additional evidence supporting the claim that the Defendant Officers fabricated Coleman's statements to them as reflected in the supplementary report

Additional evidence supporting the claim that the Defendant Officers fabricated Coleman's statements to them as reflected in the supplementary report are (1) the discrepancies between the GPRs related to Coleman's interrogations and the supplementary report, and (2) the discrepancies between the supplementary report and Coleman's court-reported statement.

Additional evidence supporting the claim that the Defendant Officers fabricated Coleman's statements to them as reflected in the supplementary report is Derrell Fulton's deposition testimony that the Defendant Detectives physically and mentally coerced a statement from him. See Plaintiff's answers to Interrogatory Nos. 1 and 2, above.

Additional evidence supporting the claim that the Defendant Officers fabricated Coleman's statements to them as reflected in the supplementary

report is Eddie Taylor's deposition testimony that detectives attempted to obtain a confession from him through the use of mental and physical coercion.

Plaintiff anticipates that Nevest Coleman and Eddie Taylor will testify at trial that they were not involved in the rape and murder of the victim. Plaintiff anticipates that Nevest Coleman and Eddie Taylor will testify at trial that they have no personal knowledge of who raped and murdered the victim. This is additional evidence supporting the claim that the Defendant Officers fabricated the portions of their supplementary report attributing statements to Nevest Coleman that he was involved in, or had knowledge of, the victim's murder.

Plaintiff will testify that he was not involved in, and has no knowledge of, the rape and murder of the victim. This is additional evidence supporting the claim that the Defendant Officers fabricated the portions of their supplementary report attributing statements to Nevest Coleman that he was involved in, or had knowledge of, the victim's murder.

Additional evidence supporting the claim that the Defendant Officers fabricated Coleman's statements to them as reflected in the supplementary report is the results of postconviction DNA testing. This includes the fact that Plaintiff, Nevest Coleman, and Eddie Taylor were excluded from every probative DNA profile obtained from the physical evidence that was tested.

Additional evidence supporting the claim that the Defendant Officers fabricated Coleman's statements to them as reflected in the supplementary report is evidence that Clarence Neal raped and murdered the victim. This evidence includes, but is not limited to: (1) the results of postconviction DNA testing, *i.e.*, Clarence Neal could not be excluded from DNA profiles obtained from semen located on the victim's underwear and under her fingernails; (2) Neal having been convicted of one violent sexual assault and, through DNA evidence, implicated in two other violent sexual assaults; and (3) Neal's evolving stories about his involvement with the victim, including that (a) he initially told CIU investigators that he did not have sex with the victim; (b) he then told CIU investigators that he and the victim touched each other's genitals with their hands only; (c) he then told the CIU investigators that on one occasion he had a vague sexual encounter—which was not intercourse—with the victim, during which neither of them took off their pants; (d) he then told CIU investigators that he was "almost certain" his one vague sexual encounter with the victim occurred during the summer; (e) Neal testified during his deposition that during his one sexual encounter with the victim, all it consisted of was oral sex; (f) during his deposition, Neal testified that the victim did not remove her clothes during their one sexual encounter; (g) during his deposition, Neal testified that he ejaculated on his own clothes at the end of his one sexual encounter with the victim; (h) during his deposition, Neal

11

could not provide an explanation for how his semen ended up in the victim's underwear; (i) Neal testified during his deposition that he did not ejaculate into the victim's underwear; (j) Neal testified that he lied to the CIU investigators when he told them he had intercourse with the victim; and (k) during his deposition, Neal denied knowing Alicia Parker, Felicia Pittman, and Erika Earl, all of whom reported having been violently raped; subsequent DNA testing linked Neal to all three victims.

See Nevest Coleman's motion to suppress testimony and his deposition testimony for additional evidence related to the fabrication of his confession.

The Defendant Officers fabricated any portions of their supplementary report attributing statements to Plaintiff that he was involved in, or had knowledge of, the victim's assault and murder, including the following:

> Fulton was then confronted with K. Johnsons account and at that time stated that he had been un-truthful in his account of the night of this incident. He then went on to say that on the date and time of this incident he was in the alley behind 917 W. 55th St. He then went on to say that he then observed "Chip" and Nevest and Antwinica go into the bsmt. At 917 W. 55th St. He he then went down into the basement and while he was standing in the basement door way he observed the victim orally copulating "Chip" and Nevest Coleman was having vaginal intercourse with the victim. He then went on to say that "Chip" and Nevest Coleman turned towards Fulton and saw that Fulton was standing in the doorway. Fulton then went on to say that he then panicked and ran from the scene and went home.

> The R/Ds then had occasion to interview Fulton along with A.S.A. Garfinkel and at that time after being advised of his cons. Rights he related basically the same set of facts as reported to the R/Ds in the above paragraph. Fulton was then advised of the content of Colemans statement and at that time Fulton requested to speak to A.S.A. Garfinkel alone.

> This request was then granted and after that interview the R/Ds were then called back into the interview room and the following statement by Fulton was taken regarding this incident. He related that on the date and time of this incident he was in the alley between Sangamon and Peoria, on the south side of 55th St. He then stated that he met up with Nevest Coleman, Eddie Taylor "Chip", and Antwinica Bridgeman and that they all decided to go to the bsmt of Nevest Coleman to have sex. He stated that once in the bsmt. Bridgeman began to orally copulate Fulton. Fulton

while Taylor stood nearby watching. He then stated that while he was being copulating Coleman was having vaginal intercourse with the victim. Fulton then stated that Taylor wanted to have sexual relations with Bridgeman and that the victim wanted to leave Coleman's bsmt.

At that point Taylor and Coleman forced the victim to the ground. Coleman then forced the victim to orally copulatehim and at the same time Taylor was having vaginal intercourse with the victim Bridgeman. Fulton then stated that while this was going on he was acting as a look-out so that he cold warn the others if someone came to investigate the screams of the victim. Fulton then went on to say that the victim continued to scream and at that point Coleman directed Taylor to insert a brick or piece of concrete in the mouth of the victim to silence her screams. Fulton then related that as the victim and Taylor and Coleman were laying on the floor he was again acting as a look-out. At that point he stated that Taylor got up off the ground picked up a piece of pipe laying next to the victim and told the victim "You want something long and hard, I'll give you something long and hard." At that point Taylor jammed the pipe into the vagina of the victim Bridgeman.

Fulton then went on to say that as Taylor was inserting the pipe into the vagina of the victim he was again acting as a look-out. He definitively stated repeatedly that it was in fact Taylor who inserted the pipe into the victim and he definitely didn't insert the pipe into the vagina of the victim. Fulton then went on to say that after the pipe was in the victim he observed the victims body begin to shake and shiver. He then saw blood coming from the vaginal area of the victim and at that time he and Coleman left the bsmt. and they each respectively went home.

For evidence that the Defendant Officers fabricated portions of their supplementary report attributing statements to Plaintiff that he was involved in, or had knowledge of, the victim's murder, see Plaintiff's answers to Interrogatory Nos. 1 and 2, above.

Evidence that the Defendant Officers fabricated portions of their supplementary report attributing statements to Nevest Coleman that he was involved in, or had knowledge of, the victim's murder also supports Plaintiff's claim that the Defendant Officers fabricated portions of their supplementary report attributing statements to Plaintiff that he was involved in, or had knowledge of, the victim's murder. See above.

Additional evidence supporting this claim is Plaintiff's deposition testimony that during his interrogation, he continuously denied the Defendant Officers' accusations, including those related to the victim.

Plaintiff will testify at trial that he did not make the statements attributed to him in the supplementary report. This is additional evidence that the Defendant Officers fabricated portions of their supplementary report attributing statements to Plaintiff that he was involved in, or had knowledge of, the victim's murder.

The Defendant Officers did not generate any GPRs memorializing statements they claim that Plaintiff made to them, including inculpatory statements. This is additional evidence that the Defendant Officers fabricated portions of their supplementary report attributing statements to Plaintiff that he was involved in, or had knowledge of, the victim's murder.

See Plaintiff's motion to suppress testimony and his deposition testimony for additional evidence related to the fabrication of his confession.

**Handwritten Statement of Michael Barber (City 1867–69):**

Defendant Graf, along with Defendant Garfinkel, fabricated the handwritten statement of Michael Barber insofar as it indicates that Barber told police that Nevest Coleman told him that Coleman thought the smell coming from his basement was a dead body. Per the handwritten statement:

> Michael Barber states that Nevest Coleman told Michael Barber that, "there is a real bad smell coming from the basement of my house and I think that it may be a dead body."

Barber testified during his deposition that he had no memory of making this statement. None of the GPRs related to interviews of Barber performed before the handwritten statement was prepared reflect that Barber told police that Coleman said he thought the smell may be a dead body. Barber did not testify before the grand jury that Coleman told him he thought the smell may be a dead body. And, Barber did not testify at trial that Coleman told him he thought that the smell may be a dead body.

Additional evidence supporting this claim is that Nevest Coleman testified at his deposition that he did not tell Barber he thought that the smell might be a dead body.

**Nevest Coleman's Court-Reported Statement (City 1849–66):**

The Defendant Officers fabricated Nevest Coleman's court-reported statement by coercing a confession from him they knew to be false. The evidence that the

Defendant Officers fabricated portions of their supplementary report attributing statements to Nevest Coleman that he was involved in, or had knowledge of, the victim's murder also supports the claim that the Defendant Officers fabricated Nevest Coleman's court-reported statement. See above.

**GPR (City1948):**

Defendant Clancy generated a GPR related to the interrogation of Nevest Coleman, which indicates as follows:

> 0200 hrs. – [Coleman] admits to his part in crime
>
> 0300 hrs. – Gives another statement stating he hits her twice and tells Fulton to put conc. In victims mouth.
>
> ASA Garfinkel arrives

Defendant Clancy fabricated the portions of his GPR attributing statements to Coleman that he had knowledge of, or participated in, the victim's assault and murder. Evidence supporting this claim is the same as that supporting the claim that the Defendant Officers fabricated the portions of the supplementary report that Coleman made statements indicating that he had knowledge of, or participated in, the victim's assault and murder.

**Derrell Fulton's Handwritten Statement (City1874–76):**

The Defendant Officers fabricated Plaintiff's handwritten statement by coercing him to sign it knowing it to be false. See Plaintiff's answers to Interrogatory Nos. 1 and 2, above.

The evidence that the Defendant Officers fabricated portions of their supplementary report attributing statements to Plaintiff that he was involved in, or had knowledge of, the victim's assault and murder also supports the claim that the Defendant Officers fabricated Plaintiff's handwritten statement. See above.

**GPR (City1899, 1952) and Supplementary Report (City1816–20):**

The Defendant Officers fabricated their supplementary report of their interrogation of Eddie Taylor stating that Taylor admitted to lying to them about his whereabouts the night the victim was murdered:

> Taylor then related that he did not know the victim. He then went on to say that he had heard about this murder several days after the body was found. Taylor then related that he thought that on 11 Apr 94 he was at his girlfriends house Latoya Davis,

Without waiving and subject to the foregoing objections, Plaintiff, through counsel, answers as follows:

See Plaintiff's answers to Interrogatory Nos. 1–4, above.

6. Identify and describe, with specificity, what conduct you attribute to each Defendant Officer, which you claim led to your arrest, prosecution, and conviction for the murder of Antwinica Bridgeman.

**Answer:** Plaintiff objects to this Interrogatory on the basis that it is overly broad and unduly burdensome. See *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 273 F.R.D. 367, 369 (S.D.N.Y. 2010) (requests for every fact, piece of evidence, and witness supporting the party's position is overly broad and unduly burdensome). Plaintiff objects to this Interrogatory to the extent it seeks the thoughts and mental impressions of counsel, and therefore invades the attorney work product doctrine.

Plaintiff objects to this Interrogatory on the basis that it is duplicative of Interrogatory Nos. 1-4.

Without waiving and subject to the foregoing objections, Plaintiff, through counsel, answers as follows:

See Plaintiff's answers to Interrogatory Nos. 1–5, above.

Respectfully submitted,

Dated: November 20, 2020

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Attorney for Plaintiff
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
Phone: (630) 955-1212
Email: attorneys@zellnerlawoffices.com

22

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DERRELL FULTON, a.k.a. DARRYL FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-8696 |
| | ) | |
| CHICAGO POLICE OFFICERS WILLIAM FOLEY, #20450, et al., | ) | Honorable Martha M. Pacold, Judge Presiding. |
| Defendants. | ) | |

## Certificate of Service

To:     See attached service list.

The undersigned certifies under penalties of perjury that on November 20, 2020, she served the following documents via email:

- Plaintiff's First Supplemental Objections and Answers to Defendant Boudreau's First Set of Interrogatories;
- Plaintiff's First Supplemental Objections and Answers to Defendant Clancy's First Set of Interrogatories;
- Plaintiff's Objections and Answers to Defendant Carroll's First Set of Interrogatories; and,
- Plaintiff's Objections and Answers to Defendant Halloran's First Set of Interrogatories

Respectfully submitted,

Dated:  November 20, 2020          /s/ Kathleen T. Zellner
                                   Kathleen T. Zellner
                                   Attorney for Plaintiff Fulton
                                   Kathleen T. Zellner & Associates, P.C.
                                   1901 Butterfield Road, Suite 650
                                   Downers Grove, Illinois 60515
                                   Phone: (630) 955-1212
                                   Email: attorneys@zellnerlawoffices.com

1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DERRELL FULTON, a.k.a. DARRYL FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CV-8696 |
| | ) | |
| CHICAGO POLICE OFFICERS WILLIAM FOLEY, #20450, et al., | ) | Honorable Martha M. Pacold, Judge Presiding. |
| Defendants. | ) | |

## Service List

**On Behalf of Plaintiff Coleman:**
Russell Ainsworth – russell@loevy.com
Ruth Brown – ruth@loevy.com
Rachel Brady – brady@loevy.com
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607

**On Behalf of Defendant City:**
James Gus Sotos - jsotos@jsotoslaw.com
Jeffrey Neil Given - jgiven@jsotoslaw.com
Lisa Marie Meador - LMeador@jsotoslaw.com
Sara J. Schroeder - sschroeder@jsotoslaw.com
The Sotos Law Firm, P.C.
141 W. Jackson Boulevard
Suite 1240A
Chicago, Illinois 60604

**On Behalf of Defendant Officers:**
Eileen Ellen Rosen - erosen@rfclaw.com
Andrew Joseph Grill - agrill@rfclaw.com
Austin Gordon Rahe - arahe@rfclaw.com
James Bryan Novy - jnovy@rfclaw.com
Patrick R. Moran - pmoran@rfclaw.com
Rock Fusco & Connelly LLC
321 N. Clark Street, Suite 220
Chicago, Illinois 60654

2

**On Behalf of Defendant Cook County:**
Timothy Andrew Horvat – timothy.horvat@cookcountyil.gov
David Adelman – david.adelman@cookcountyil.gov
Cook County State's Attorney's Office
500 Daley Center
Chicago, Illinois 60602

**On Behalf of Defendant Garfinkel:**
Amy M. Kunzer – amkunzer@tribler.com
William B. Oberts – woberts@tribler.com
Tribler Orpett & Meyer, P.C.
225 W. Washington Street
Suite 2550
Chicago, Illinois 60606