**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NEVEST COLEMAN,

               Plaintiff,

               v.

CITY OF CHICAGO et al.,

               Defendants.

Case No. 18-cv-00998

Judge Martha M. Pacold

DERRELL FULTON,

               Plaintiff,

               v.

CITY OF CHICAGO et al.,

               Defendants.

Case No. 17-cv-08696

Judge Martha M. Pacold

## AMENDED MEMORANDUM OPINION AND ORDER

In 1994, 20-year-old A.B.[1] was brutally raped and murdered. Derrell Fulton and Nevest Coleman received life sentences for the crime. Twenty-three years later, DNA evidence cast doubt on their convictions, and they were released. They then filed these two suits against those they believe responsible for their convictions. The defendants moved for summary judgment (though two defendants did so on only some claims). The court holds that plaintiffs are entitled to a trial on some (but not all) of their claims against some (but not all) defendants.

## BACKGROUND

Before summarizing the facts, two warnings are appropriate. First, the facts of the underlying crime are unusually disturbing. Second, because most of the facts giving rise to this case occurred decades ago, the factual record is muddled and often contradictory. The parties agree on very few of the underlying facts. Because of this, the court draws the following factual summary primarily from its own review of the

---

[1] To respect the privacy of the victim's family, the court will refer to A.B. using only her initials.

record, with occasional resort to the parties' Local Rule 56.1 statements of facts, *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). In crafting this summary, the court views the record in the light most favorable to the plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, the facts recounted below are not the court's own factual conclusions; they are a summary of what a jury could (but need not) find, if it resolves all credibility determinations and draws all reasonable inferences in favor of the nonmovants (here, plaintiffs). *See White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). When the resolution of a factual dispute is especially pertinent, the relevant evidence is considered in greater detail in the Discussion section of this opinion.

## I. Discovery of A.B.'s Body

In April 1994, 25-year-old Nevest Coleman lived with his parents, sister, and two brothers. [288-11] at 7; [288-30] at 3.[2] He was a member of the Gangster Disciples street gang and had been since he was about fourteen. [288-1] at 22–23, 40. Sometime in the evening on April 28th, Coleman was at home playing video games with Michael Barber. *Id.* at 61. Barber, who at the time was seventeen, was "good friends" with Coleman and was also a Gangster Disciple. [288-5] at 9, 28; [288-41] at 1. While the two were playing, Coleman's mother asked him to go to the basement and investigate a bad smell. [288-1] at 62; [288-9] at 13. She had noticed the smell a few days prior and thought it might be a dead cat; on several occasions, animals had gotten into the basement and died, and Coleman was usually tasked with cleaning it up. [288-1] at 52; [288-9] at 13; [288-57].

The basement was seldom used and had no lock. [288-57]. According to Coleman, the only way in or out was through a door on the back porch. [288-1] at 52. Although the porch was supposed to be enclosed, the side of the house had been torn off, leaving the porch unenclosed and the basement door accessible from the outside. *Id.* As a result, others used the basement without permission from the Colemans. *Id.* For example, Coleman's cousin (who lived next door) would sometimes use the basement to do drugs. *Id.* at 53.

When Coleman and Barber arrived at the basement door, they could not get in because it was blocked. [288-4] at 7; [288-9] at 24. Pointing a flashlight through the window, they saw a dead body. [288-4] at 7–8. The two then went and told Coleman's mother, who called the police. *Id.* at 8. Officers Mark Mora and Dan Paluch were the first to arrive. *See* [288-119] at 4–5. Coleman led the officers to the basement door, which Mora had to push "hard" to open. *Id.* at 5; *see* [288-27] at 7.

---

[2] Numbers in square brackets, [], refer to docket entries on the *Coleman v. City of Chicago*, No. 18-cv-00998, docket. Numbers in angle brackets, <>, refer to docket entries on the *Fulton v. City of Chicago*, No. 17-cv-08696, docket. Page numbers refer to the CM/ECF page number. For consistency, the court will cite to the *Coleman* docket wherever possible.

Upon opening the door, Mora saw a female body. [288-119] at 6. The body was lying three or four feet from the door. *Id.* at 6. By this time, it was "badly decomposed." [288-57]. The victims' legs were spread, and she was lying in a pool of blood. [288-27] at 8. A piece of pipe about half an inch thick and six inches in length had been shoved into her vagina, causing a laceration. *Id.*; [288-99] at 1. She had bruising on her face and neck. [288-27] at 8. Pieces of concrete were on her face and in her hair, and a large piece of concrete had been shoved into her mouth. *Id.* The medical examiner later opined that the likely cause of death was suffocation due to the concrete shoved into the victim's mouth. [288-99] at 3. Several of her teeth had also been knocked out and were lying next to her body. [288-27] at 8.

The victim was wearing a black winter coat. *Id.*; [288-99] at 1. Underneath, she was wearing a red Chicago Bulls jacket with A.B.'s first name embroidered on it, as well as a pink sweater, a gold sweatshirt, and a white bra. [288-27] at 8; [288-99] at 1. Her underwear, pants, socks, and boots had been partially removed. [288-27] at 8; [288-99] at 1. Near the body, police found a pair of broken eyeglasses, a pink plastic ponytail holder, pieces of concrete, and a broken stepladder. [288-27] at 8.

## II.  Police Investigation

### A.  Identification of A.B.

At around 8:00 p.m., Detectives William Foley, Michael Clancy, John Halloran, Kenneth Boudreau, James O'Brien, Gerald Carroll, William Moser, and Al Graf arrived on the scene. [266] ¶ 12; [291] ¶ 12. Halloran, Boudreau, O'Brien, Carroll, Moser, and Graf canvassed the surrounding area, looking for anyone who knew a young woman whose name matched the name on the jacket. [288-57]. Eventually, they found a woman who told them that her daughter, A.B., had gone to a party on April 11th and had not been seen since. [288-27] at 9. They took A.B.'s mother to the scene, where she tentatively identified her daughter's body. *Id.*

Foley and Clancy then went to the morgue, where arrangements had been made to meet with A.B.'s family. [288-112] at 6. At the morgue, the family formally identified A.B. [228-27] at 9. However, because of the body's decomposition, they could do so only by her clothing. [288-57].

### B.  Police Interview Latham

A.B.'s boyfriend, Chester Latham, was also at the morgue, and Foley interviewed him. [288-112] at 6–7. The parties dispute whether Clancy was also involved in this interview. Latham stated that he had last seen A.B. the night before she disappeared. [288-6] at 10. He also said that about a week before her disappearance, he had noticed a hickey on A.B.'s neck and confronted her about it, and that she told him that someone named "Chip" had tried to sexually assault her, but she fought him off. *Id.* (Though Latham did not know this at the time, *id.* at 24, "Chip" was the nickname of Eddie Taylor. [266] ¶ 24; [292] ¶ 24.) A police

3

supplementary report dated June 9, 1994 (the "First Supp Report"), states that Latham also told detectives that A.B. had been a Gangster Disciple but had recently changed gang allegiances to the Vice Lords. [288-27] at 10. It also states that Latham said two Gangster Disciples, "Chip" and "Dap," had been bothering A.B. for changing gangs. *Id.* (Again unbeknownst to Latham, "Dap" was the nickname of Derrell Fulton. [288-6] at 22; [266] ¶ 24; [292] ¶ 24.) At his deposition, however, Latham denied making these statements. [288-6] at 8, 18.

## C. Coleman Goes to Area 1

From the crime scene, Mora transported Coleman and Barber to the Area 1 police headquarters. [288-119] at 7. Both Coleman and Barber went with Mora voluntarily. [288-4] at 19; [288-11] at 5–6. Coleman first spoke with Detective Thomas Kelly. [266] ¶ 25; [292] ¶ 25. Based on the general progress report (GPR) Kelly prepared, *see* [288-113], he estimates the interview lasted "five minutes at the most." [288-7] at 44. Though their filings are not entirely clear on this point, the parties appear to dispute whether Boudreau was present during this interview. Boudreau wrote a GPR recounting a conversation with Coleman nearly identical to the one reported in Kelly's GPR. *See* [288-9] at 24. However, Kelly testified that he likely would have noted Boudreau's presence in his own GPR if Boudreau had indeed been present. [288-7] at 23. While at Area 1, Coleman also spoke with Halloran and Boudreau, who interviewed him together for about fifteen minutes. [288-10] at 31. There is conflicting testimony as to whether Coleman also spoke with Foley and Clancy at this time; Halloran testified that he did, *id.*, but Coleman testified that he did not encounter Foley or Clancy until they picked him up from his house later that night. [288-11] at 8. Coleman was not in custody during these interviews. *Id.* at 5.

The First Supp Report includes an account of a conversation between Coleman and detectives (whom the report does not identify) during Coleman's first trip to Area 1. [288-27] at 10. According to the report, the detectives asked Coleman if he knew A.B., and Coleman responded that he had known her for several years but had not seen her in at least several months. *Id.* Also according to the report, the detectives asked Coleman if he knew anyone with the nickname "Chip" or "Ship," and Coleman responded that he knew someone called "Chip" who had just gotten out of prison for a crime that Coleman thought might be rape. *Id.* However, Coleman testified that he was not asked about A.B., that he did not tell detectives he had not seen her for several months, and that he was not asked about Chip. [288-1] at 80; [288-11] at 45.

When police had finished speaking with Coleman, two detectives drove him home. [288-1] at 80. According to the First Supp Report, Coleman took detectives to Chip's home on the way back to his own home. [288-27] at 10. However, Coleman denies that police asked him to help find Chip or asked him anything about Chip. [288-11] at 45.

4

### D.     Barber Goes to Area 1

Meanwhile, according to Barber's testimony, Barber was taken to a small room and handcuffed to the wall. [288-5] at 36. He spent the night at Area 1, and detectives questioned him on multiple occasions during the night. *Id.* at 36–37; [288-4] at 20. However, Barber could not recall which detectives questioned him. [288-4] at 19.

Sometime between 6:00 a.m. and 7:00 a.m., Assistant State's Attorney (ASA) Harold Garfinkel arrived at Area 1. [288-114] at 4; [288-86] at 6. At the time, Garfinkel was assigned to the Cook County State's Attorney's Office (CCSAO)'s Felony Review Unit. [288-114] at 4. His duties as a felony review ASA included going to the police station and other sites to interview potential witnesses, take statements, and decide (together with police) whether there was enough evidence to bring charges. [288-86] at 5; *see also Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1134 (N.D. Ill. 2022) (discussing the responsibilities of felony review ASAs). He spoke with Foley and Clancy and was brought up to speed on the investigation. [288-18] at 144; [288-114] at 4.

At 7:45 a.m., Garfinkel wrote a statement for Barber, which Barber signed. [288-41].[3] Graf was present when Barber signed this statement, and Graf also signed it as a witness. *Id.* at 1–3. The statement recounts Barber and Coleman going to the basement to find out the source of the smell. *Id.* at 1–2. Notably, it also describes Coleman telling Barber: "There is a real bad smell coming from the basement of my house and I think that it may be a body." *Id.* Before the grand jury, Barber testified that he reviewed this statement with Garfinkel. [288-3] at 7–8. At his deposition, however, Barber denied having an opportunity to review the statement before signing. [288-5] at 18. He also testified both at the criminal trial and in his deposition that he did not recall saying that Coleman said the smell could be a body. [288-4] at 16–17; [288-5] at 39. The statement does not appear in any police reports, and Coleman testified that he never said the smell might be a body. [288-1] at 64.

### E.     Calimee and Williams Give an Initial Statement

While Coleman and Barber were being taken to Area 1, 16-year-old Shaunice Williams and 18-year-old Francine Calimee saw the police activity at the Coleman home. [266] ¶ 33; [292] ¶ 33. Looking through the window into the basement, they recognized A.B.'s body from her clothing. [266] ¶ 33; [292] ¶ 33. Eventually, Carroll and O'Brien noticed Williams and Calimee and asked them if they knew "a young girl who has a red Bulls jacket, and [A.B.'s first name] across the front of it." [266] ¶ 33; [292] ¶ 33; [288-12] at 26. Williams and Calimee then went toward the rear of a nearby house, and Carroll and O'Brien followed them. [266] ¶ 36; [292] ¶ 36. Carroll also waved Foley over. [266] ¶ 36; [292] ¶ 36. Other detectives may also have been

---

[3] Having a witness sign a statement that was handwritten by a felony review ASA was apparently standard practice. *See* [288-42] at 9–10; *see also Brown*, 633 F. Supp. 3d at 1139 n.13.

present. [266] ¶ 36; [292] ¶ 36. Calimee and Williams told the detectives that A.B. was their friend and that they had last seen her at her birthday party, which was held at Calimee's house on April 11th. [266] ¶ 37; [292] ¶ 37. They reported that A.B. had left the party sometime between 11:00 p.m. and midnight, and that they had never seen her again. [288-9] at 18.

### F.   Calimee and Williams Give Subsequent Statements

Subsequently, Halloran and Boudreau spoke with Calimee and Williams at the crime scene. [288-8] at 44; [288-10] at 34; [288-27] at 11. At some point, Calimee and Williams agreed to go to Area 1 for further questioning. [288-8] at 44. At about 11:45 p.m., Halloran and Boudreau transported Calimee to Area 1, while Williams was transported separately. *See* [288-8] at 44; [288-9] at 22; [288-13] at 9–10. While at Area 1, Calimee and Williams were questioned by detectives, including Foley. [288-14] at 11; [288-112] at 130–31. It is not clear which statements attributed to Calimee and Williams are alleged to have been made at the crime scene and which at Area 1. At some point, however, Calimee and Williams revealed that A.B. and Coleman left the party together on the night A.B. disappeared. [288-9] at 21. According to the First Supp Report, Calimee and Williams also told police that they had not originally disclosed this information because they feared the Gangster Disciples and "were afraid that they would be the next victims." [288-27] at 11. However, Calimee testified at her deposition that she was never afraid of Coleman or the Gangster Disciples and that she was never afraid that she would be the next victim. [288-14] at 13–14. She does not remember what she told police but testified that she would not have told them she was afraid of Coleman. *Id.* at 14. She was surprised to learn that police reported she had told them she was afraid of Coleman. *Id.* at 37.

The record contains conflicting evidence as to when Calimee and Williams were taken to Area 1. A timeline GPR prepared by Clancy indicates 11:45 p.m., while Boudreau's testimony indicates some time shortly after 1:00 a.m. the following morning. [288-8] at 39; [288-9] at 22. After arriving, Calimee and Williams remained at Area 1 overnight. [288-14] at 10. At 10:25 a.m., Calimee signed a statement in which she indicated that A.B. and Coleman walked Williams home at about 11:00 p.m. on the night of A.B.'s disappearance, and that this was the last time she saw A.B. [288-48]. Williams signed a similar statement, though hers does not indicate the time at which it was given. [288-49]. According to Williams's statement, the group parted ways at the corner of 56th and Green. *Id.* at 2. Williams walked the rest of the way to her home, while A.B. and Coleman headed westbound on 56th Street. *Id.* Like Calimee's, Williams's statement indicates that she never saw A.B. again. *Id.*

### G.   Detectives Visit Fulton's Home

After Coleman was returned home, Foley and Clancy went to a house across the alley to look for "Chip." [288-24] at 8–9. In the home lived twenty-six-year old

Derrell Fulton, along with his parents and sister. [288-2] at 70; [288-82] at 3–4. According to the First Supp Report, the detectives spoke with Fulton's parents, who identified "Chip" as Eddie Taylor. [288-27] at 11. They told detectives that Taylor had recently been paroled from prison and had stayed with them on several occasions since then, though he was not living with them anymore. *Id.* They indicated that they thought he might now be living somewhere on Chicago's west side. *Id.*

Foley testified that he had gone in search of "Chip or Dap" but did not find either. [288-24] at 9. However, Fulton testified that two white detectives knocked on his door that evening and asked him when he had last seen Eddie Taylor. [288-2] at 71; *see* [288-82] at 4. According to his testimony, Fulton responded that it had "been awhile" since he had seen Taylor, and the detectives replied that they would return if they learned he was lying. [288-2] at 71; *see* [288-82] at 4. Fulton testified that the detectives did not ask Fulton anything else, though they may have asked his name. [288-2] at 72. Fulton also testified that he then resumed his normal routine and went to bed around midnight. *Id.*; [288-82] at 4.

## H. Coleman Returns to Area 1

### 1. Coleman's Interrogation

According to Coleman, about two hours after Coleman arrived home from Area 1, Foley and Clancy returned to his home. [288-11] at 6. Coleman's mother answered the door and, when the detectives asked if Coleman was home, allowed them in. *Id.* at 7, 9. They told Coleman they had additional questions for him, and he returned with them to Area 1. *Id.* at 9–10. Coleman recounted that when the three arrived at Area 1, he was taken upstairs to a large interview room. *Id.* at 10–11; [288-1] at 79. Subsequently, he was moved to a smaller room that had a bench, a table, a chair, some files, and a ring on the wall. [288-11] at 10–11. At this point, Coleman was not handcuffed. *Id.* at 11.

Coleman testified that Foley and Clancy brought him a photo album and showed him two pictures—one of Fulton and one of Taylor. [288-1] at 96. They asked Coleman if he knew Fulton and Taylor, and he said that he did. *Id.* Foley and Clancy then left the room. *Id.* Shortly thereafter, they returned, handcuffed Coleman, and moved him to another, smaller room with a table and three chairs, where he remained handcuffed. *Id.* at 96–97. According to Coleman, six other detectives then entered the room, where they stood around Coleman as Foley and Clancy spoke to him. *Id.* at 97. The parties vigorously dispute the identity of these six detectives.

According to Coleman, Foley and Clancy asked Coleman what happened, and Coleman responded that he did not know what they were talking about. *Id.* Eventually, they brought up A.B.'s name, and Coleman denied knowing anything

about her. *Id.*[4] Coleman testified that Foley, Clancy, and another detective began yelling and screaming at Coleman. *Id.* The other detectives did not speak to Coleman, and instead simply walked around the room. *Id.* Eventually, the detectives left the room, leaving Coleman alone. *Id.* at 98.

Coleman testified that, sometime later, one detective returned. *Id.* At the motion to suppress hearing, Coleman estimated this detective was 6'5" or 6'6"; at his deposition in this case, Coleman estimated the detective was 6'4". *Id.*; [288-11] at 16. Coleman also testified that this detective wore glasses, had short black hair that was slicked to the sides, no facial hair, and a slim-to-medium build. [288-11] at 17. According to Coleman, when this detective entered the room, he punched Coleman hard on the right side of the face and called him a "lying-a** [N-word]." *Id.*; [288-1] at 98–99. Coleman denied he was lying, and the detective again struck him on the face. [288-1] at 99. Coleman balled up into the fetal position in his chair. *Id.*; [288-11] at 19. The detective then took Coleman to another room and left him there. [288-1] at 99.

Shortly thereafter, Coleman testified, Foley and Clancy entered the room where Coleman had been taken and again asked him what happened. *Id.* Coleman continued to deny involvement in the murder, and Foley and Clancy resumed shouting at him and insisting that he was lying. *Id.* at 100. According to Coleman, he learned A.B.'s real name for the first time during this interview. *Id.* He told officers that he was at a get together with A.B. on the night A.B. disappeared and that he saw A.B. and Williams leaving, and he walked them home before going to a liquor store. *Id.* at 101.

Foley and Clancy then informed Coleman that A.B.'s body had been found with concrete in her mouth and a pipe in her vagina. *Id.* at 102. According to Coleman, Foley and Clancy told him that they "didn't want" him but rather "wanted Chip and Dap." *Id.* They said they wanted his help building a case against Fulton and Taylor, and that he should say that he was a lookout while Fulton and Taylor raped and murdered A.B. *Id.* Coleman testified that Foley and Clancy told him to say that he had smacked A.B., and either that Fulton had shoved concrete into A.B.'s mouth and Taylor had shoved a pipe into her vagina, or vice versa (Coleman could not recall which). *Id.* at 103.

At some point, Foley and Clancy promised Coleman he could go home if he told them the story they wanted to hear. *Id.* at 104. Coleman also testified that at some

---

[4] At both the hearing on his motion to suppress in his criminal case and his deposition in this case, Coleman testified that he denied knowing A.B. because he knew her only by her nickname, "Mikey," rather than by her legal name. [288-1] at 97; [288-11] at 44. (The nickname "Mikey" does not resemble A.B.'s legal name.) However, Coleman's sister testified at her deposition that while Coleman was at home between his two trips to Area 1, he had told his family the victim's legal name. [303-1] at 143. Coleman denies making this statement. [288-1] at 81–82.

point a "short little white officer" entered the room and made a similar promise. [288-11] at 20. It is not clear whether these promises were made at the same time or in different interviews.

At about 8:15 a.m., after taking Barber's statement, Garfinkel began speaking to Coleman. [288-114] at 5. On entering the room, Garfinkel introduced himself to Coleman. *Id.*; [288-1] at 105. As Garfinkel tells the story, he advised Coleman that he was an ASA and a prosecutor, and that he was not Coleman's lawyer. [288-114] at 5–6. But according to Coleman, Garfinkel claimed to be there to help and never told him he was a prosecutor. [288-1] at 105–06. Coleman testified that he told Garfinkel that a detective had hit him in the face, but Garfinkel responded "That's another issue. We will deal with that later, but right now, we are going to deal with this problem right here." [288-11] at 23. According to Coleman, Clancy was also present when Coleman told Garfinkel he had been hit in the face. [288-1] at 103–04.

With Garfinkel present, Coleman testified, Foley and Clancy promised Coleman that if he told the story they asked him to tell, they would help relocate him, his son, and his son's mother. *Id.* at 105. Soon thereafter, Coleman gave a court-reported statement. *Id.* at 106. As he began taking Coleman's statement, Garfinkel advised Coleman of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Coleman indicated that he understood his rights and nevertheless wished to give a statement. [288-30] at 2–3. The evidence is conflicting as to whether Coleman had been given *Miranda* warnings before this, but he testified that he had not. [288-1] at 106.

## 2. Coleman's Statements

In addition to the court-reported statement, the First Supp Report attributes three other statements to Coleman, some of which Coleman denies making. It is not clear when during the interrogation Coleman is alleged to have made these statements.

### a. First Statement

In the first statement, the First Supp Report portrays Coleman saying that he left the gathering at Calimee's house with A.B. and Williams, that he and A.B. dropped Williams off at the corner of 56th and Green, and that he walked A.B. to the corner of 55th and Green, where they parted ways. [288-27] at 12. He goes on to say that he saw A.B. walking toward her home and that he left to go to the liquor store. *Id.*

### b. Second Statement

According to the First Supp Report, detectives responded to Coleman's first statement by informing him that A.B.'s family said she had never returned home on the night of the party at Calimee's house. *Id.* In response, Coleman allegedly

confessed that he had not been entirely truthful and that he wanted to tell detectives "the[] entire truth." *Id.* He went on to say that after returning from the liquor store, he saw A.B. in the alley behind his house, speaking with Taylor and Fulton. *Id.* He then said that he saw A.B. go into the basement with Taylor and Fulton, and that he went to the basement door and saw A.B. performing oral sex on Taylor while having anal sex with Fulton. *Id.* He said that he became afraid and ran into his home, where he remained for the rest of that night. *Id.*

### c. Third Statement

In the third statement (the only one for which the First Supp Report indicates that Garfinkel was present), the First Supp Report indicates that Coleman again stated that he "wanted to tell the entire truth" and then gave the following account. *See id.* He arrived at the party at Calimee's house sometime between 6:00 p.m. and 7:00 p.m. on April 11th. *Id.* Eventually, he left the party with A.B. and Williams. *Id.* After walking Williams home, he and A.B. walked together to the corner of 55th and Peoria and then to the liquor store. *Id.* He went into the liquor store while A.B. returned home. *Id.*

After going to the liquor store, he walked around and again encountered A.B., and the two started walking toward Calimee's house. *Id.* at 12–13. On their way, they encountered Taylor. *Id.* at 13. While A.B. and Taylor spoke privately (out of earshot of Coleman), Fulton arrived and also began to speak to A.B. and Taylor. *Id.* Fulton then approached Coleman and asked where they could go to have sex with A.B., and Coleman suggested his basement. *Id.* The four then entered the basement, where Coleman watched as A.B. performed oral sex on Taylor while having anal sex with Fulton. *Id.* During this time, Coleman acted as a lookout. *Id.*

After about ten minutes, A.B. stated that she did not want to continue having sex, and Coleman became angry and left the basement. *Id.* Coleman remained outside for about five minutes, during which time he became increasingly angry. *Id.* He then returned to the basement and confronted A.B., arguing with her over her refusal to perform sexual acts on him. *Id.* During this confrontation, Coleman slapped A.B. on the face twice. *Id.* Taylor and Fulton then grabbed A.B. and forcibly removed her pants and shoes. *Id.* Taylor then began to rape A.B. while Fulton held her mouth shut, after which Fulton began to rape A.B. while Taylor held her mouth shut. *Id.* The two then switched places again. *Id.* During this time, Coleman resumed serving as lookout. *Id.*

At this point, Coleman suggested shoving a nearby piece of concrete into A.B.'s mouth to stop her from screaming, and Fulton did so. *Id.* at 13–14. Taylor then found a piece of pipe on the floor and shoved it into A.B.'s vagina. *Id.* at 14. A.B.'s body began shaking and jerking, and Coleman saw a significant amount of blood coming from her vagina. *Id.* The three men then fled the basement, with Coleman returning

home and Fulton and Taylor running off together (though Coleman did not know where). *Id.*

### d.    Fourth Statement

The last statement (which Coleman does not deny giving, though he denies its veracity and voluntariness) is Coleman's court-reported statement. [288-30]. It essentially repeats the third statement.

## I.    Fulton Goes to Area 1

At around 7:00 a.m. that morning, while Fulton was in bed, Foley, Clancy, Halloran, Boudreau, O'Brien, Carroll, Moser, and Graf returned to Fulton's home. [288-13] at 11. The detectives knocked on the door, and Fulton's mother let them in. [288-82] at 4. Halloran and Boudreau remained outside while the other detectives went inside. *See* [288-13] at 12. The record contains conflicting evidence as to what happened next. According to Fulton, the detectives went up to his bedroom and asked if he was willing to go down to the police station to answer further questions. [288-2] at 73; [288-82] at 5. Fulton agreed, telling the detectives that he had nothing to hide. [288-82] at 5.

In his trial testimony, however, Halloran told a somewhat different story. According to Halloran, while the other detectives were inside, he saw Fulton enter the residence through the back door. [288-13] at 12. He and Boudreau then went around to the back porch and stopped Fulton as he tried to exit through the rear door. *Id.* The First Supp Report, for its part, says only that Fulton "was located at his home" and "agreed to assist" the detectives. [288-27] at 14.

In any case, Foley and Clancy then transported Fulton to Area 1. [288-13] at 13; [288-27] at 14; [288-82] at 5. Fulton was not handcuffed during the ride to Area 1. [288-2] at 73. The First Supp Report indicates that he was read his *Miranda* rights both when he agreed to assist detectives and when he arrived at Area 1. [288-27] at 14. However, Fulton testified that the detectives never advised him of his rights. [288-2] at 88; [288-82] at 12. Upon arrival, Fulton was placed in a room by himself and given a hamburger and a cup of coffee. [288-2] at 73–74; [288-82] at 5.

According to Fulton, after about 45 minutes, two detectives entered the room and handcuffed him. [288-2] at 73; [288-82] at 6–7. Fulton testified that these detectives told him "we know you did it" and "we know you were there." [288-2] at 75; [288-82] at 7, 10. Fulton denied any involvement and told the detectives that he did not know what they were talking about. [288-2] at 75. After fifteen to twenty minutes, the detectives left the room, leaving Fulton handcuffed. *Id.*; [288-82] at 9. Later that morning, Fulton testified, detectives returned and continued to tell him that they knew he was involved, and Fulton continued to deny involvement. [288-2] at 76.

11

During the third round of questioning (which according to Fulton did not occur until hours later) Fulton continued to deny any knowledge of the rape and murder. *Id.* at 77–78. Fulton testified that near the end of the third round of questioning and through to the fourth round, the detectives began shouting at him. *Id.* at 78–79. During the fourth round, one of the white detectives asked Fulton if he knew Coleman, and Fulton said that he did. *Id.* at 80.

In total, Fulton testified that he was questioned four or five times before Garfinkel's arrival, with each round of questioning lasting somewhere between 15 and 20 minutes. [288-2] at 74. This questioning took place over approximately thirty-six hours. [288-82] at 8. On each occasion, two or three detectives entered the room. [288-2] at 77. The detectives who questioned Fulton would "rotate" or "swap out" each round of questioning. [288-2] at 75, 77; [288-82] at 9, 33. In total, Fulton estimates that he was questioned by four or five detectives. [288-2] at 78. Though Fulton could not recall much about the detectives who questioned him, he testified that one of them was "African American, heavyset, [probably] middle age" and two others "were white, middle age." [288-82] at 8. One of the white detectives was "tall" with "dark hair" and "no mustache." *Id.*

Fulton testified that during either the second or third round of questioning, the African-American detective struck Fulton on the face when Fulton denied involvement. [288-82] at 10. Fulton also testified that this detective told him, "You're lucky I don't take you somewhere and put a bullet in your brain." [288-2] at 74–75. According to Fulton, two other detectives were present when this threat was made. *Id.* at 76–77.

### 1. Fulton's Alibi and Initial Statement

At some point while he was being questioned (it is not clear during which round of questioning), Fulton told detectives that he was with his girlfriend, Kimberly Johnson, on the night of the murder. [288-20] at 2; [288-94] at 11. Carroll and O'Brien were tasked with locating and interviewing Johnson. [288-12] at 31. Sometime on the evening of April 29th, Carroll and O'Brien located Johnson at her apartment and asked her about Fulton. *Id.* Carroll prepared a GPR summarizing this interview. *See* [288-9] at 1.

According to the GPR, Johnson told Carroll and O'Brien that she broke off her relationship with Fulton on April 3rd, but he "continue[d] to call her, hang around her and harrass [sic] her." [288-9] at 1. Johnson had recently moved into a new apartment and allowed Fulton to stay the night when she left to work night shifts. *Id.* She told Carroll and O'Brien that Fulton had not stayed overnight in approximately two weeks but had done so on several occasions toward the beginning of the month. *Id.* She did not recall whether he stayed the night on April 11th. *Id.* She also told Carroll and O'Brien that her relationship with Fulton "took a bad turn" sometime the week before police contacted her, after Fulton "confronted" her on the

12

street "and attempted to relieve her of her" money. *Id.* She told Carroll and O'Brien that she had put up a struggle and scratched Fulton's face and upper body, and that the two were eventually separated by police. *Id.*

Although Carroll's GPR reports that Johnson did not know whether Fulton had stayed with her on the night of the murder, the First Supp Report records that Fulton was not with her and that she did not know anything about his whereabouts at the time of the murder. [288-27] at 14. According to the First Supp Report, Fulton was later "confronted with" this version of Johnson's account. *Id.* The First Supp Report does not indicate who confronted Fulton. Foley testified that he did so (with Clancy also present). [288-94] at 11–12. Fulton testified that he learned from Garfinkel that Johnson did not confirm his alibi. [288-2] at 96. However, Fulton and Coleman contend that O'Brien and Carroll confronted Fulton with this version of Johnson's statement. *See* [290] ¶ 65.

According to the First Supp Report, upon being confronted with Johnson's account, Fulton changed his story. [288-27] at 14. He stated that he saw Coleman, Taylor, and A.B. enter Coleman's basement, and when he went down to the basement and was standing at the door, he saw A.B. performing oral sex on Taylor while Coleman had vaginal sex with her. *Id.* When Taylor and Coleman saw Fulton standing in the doorway, he panicked and ran away. *Id.* Fulton, however, denies that he indicated knowing anything about the crime. *See* [288-2] at 78.

## 2.    Garfinkel Speaks with Fulton

Fulton testified that, after the first four or five rounds of questioning, he was left alone for hours, during which time he got only "minimal sleep." [288-2] at 82. At around 10:00 p.m. on April 30th (the day after he arrived at Area 1), Fulton was taken to another room, where Garfinkel and Foley were waiting for him. *Id.* at 85–86; [288-85] at 4. Garfinkel asked Foley to leave, and Foley did so. [288-2] at 85–86.[5] Garfinkel told Fulton he was an attorney. *Id.* at 86; [288-85] at 4.

Fulton provided the following account of what happened next: Garfinkel told Fulton that if he "wanted to get up out of this, [he] would have to talk to him." [288-82] at 11. Garfinkel said that, if Fulton didn't cooperate, he would charge him with murder and he would likely receive the death penalty. [288-2] at 87. Although Fulton told Garfinkel "constantly" that he was not there, Garfinkel responded, "Well, if you don't comply with me, I'm going to charge you with murder, and you will never see the streets again." [288-82] at 11.

At some point, Garfinkel left the room and retrieved Coleman's statement from his briefcase. [288-85] at 5–6. Garfinkel told Fulton that Coleman had given a statement and showed him the statement. [288-2] at 92; [288-82] at 15. Fulton

---

[5] The First Supp Report indicates that Fulton, not Garfinkel, requested that Foley leave the room. [288-27] at 15.

glanced at several pages of the statement, but Garfinkel did not allow him to read it. [288-82] at 15; [288-85] at 6. However, he was able to glean that it indicated he was involved in assaulting A.B. [288-2] at 92. Fulton testified that, despite Coleman's statement, Fulton continued to deny any involvement. [288-82] at 16, 23.

According to Fulton, after Garfinkel mentioned the death penalty, Fulton began giving a handwritten statement, but he advised Garfinkel that he could only "make things up." [288-2] at 89; [288-82] at 16–17. Apparently unsatisfied with the original statement, Garfinkel destroyed it. [288-2] at 89; [288-82] at 17. After destroying the first statement, Garfinkel told Fulton that the statement had to say that A.B. performed oral sex on him. [288-2] at 89; [288-82] at 17. Garfinkel then wrote a second statement for Fulton. [288-82] at 17; *see* [288-83]. The final statement, Fulton testified, did not contain any of his own words except for his name and age. [288-2] at 89. The rest was provided by Garfinkel. *Id.*

The final statement says that Fulton met Coleman, Taylor, and A.B. at the corner of 55th and Peoria at about 11:30 p.m. on April 11th. [288-83] at 1. The group then walked to Coleman's basement. *Id.* at 1–2. In the basement, A.B. performed oral sex on Fulton while having vaginal sex with Coleman. *Id.* at 2. A.B. then decided to leave, but Taylor told her "No, you aren't going anywhere." *Id.* The three men then forced A.B. to the ground and forced her to perform oral sex on Coleman while Taylor had vaginal sex with her. *Id.* During this time, Fulton acted as a lookout. *Id.* When A.B. began shouting, Coleman instructed Taylor to put a brick in her mouth. *Id.* At this point, Taylor picked up a metal pipe and inserted it into A.B.'s vagina. *Id.* at 2–3. Fulton then stood over A.B. "to make sure she wasn't yelling." *Id.* at 3. A.B. began to shake, at which point Fulton and Coleman left the basement. *Id.* The statement does not indicate when Taylor left the basement.

## J.    Police Interview Taylor

Shortly after Fulton's arrest, Taylor came to Fulton's aunt's house nearby to pick up some clothes. [288-9] at 3; [288-29] at 7. After Fulton's cousin told Taylor that police were looking for him, Taylor left and stayed with friends on the west side. [288-29] at 27, 31. Taylor testified that he thought police believed he was involved in the murder because of his criminal history (he had recently been released after a unrelated murder conviction). *Id.*

After several weeks, Taylor decided to turn himself in, concluding that he "shouldn't have to run and hide." *Id.* at 8. Just after midnight on June 6, he turned himself in to police at the 11th District. *Id.*; [288-28] at 3. He was put in lockup until approximately 10:00 that morning, when he was transported to Area 1. [288-28] at 3.

At about 11:45 a.m., Foley and Clancy interviewed Taylor. [288-9] at 25. He denied involvement in or knowledge of the murder. *Id.*; [288-28] at 3. According to a handwritten GPR and a supplementary report dated June 10, 1994 (the "Second Supp

14

Report"), Taylor said he had been with his girlfriend on the night of the murder and had not left until the following morning. [288-9] at 25; [288-28] at 3.

Both reports also mention a later interview, conducted at about 2:00 p.m., in which Taylor admitted that he had lied about being with his girlfriend and that he did not remember where he was. [288-9] at 25; [288-28] at 3. Foley and Clancy told Taylor about Coleman's statement, and Taylor said that he knew Coleman but was not particularly close with him. [288-9] at 25; [288-28] at 3. However, Taylor continued to deny involvement in or knowledge of the murder. [288-9] at 25; [288-28] at 3.

At about 3:00 p.m., Clancy and Foley interviewed Taylor again. [288-9] at 3; [288-28] at 4. This time, the reports say that Taylor told detectives he saw Fulton and Coleman in the alley near Coleman's basement on the night of the murder. [288-9] at 3; [288-28] at 4. Taylor said that a few girls were in the alley with them, but did not know whether A.B. was among them. [288-9] at 3; [288-28] at 3. Taylor was asked if he was willing to take a polygraph test, and Taylor agreed. [288-28] at 4. According to the Second Supp Report, the polygraph technician concluded that Taylor "was untruthful in each and every response with regard to this investigation." *Id.* After the polygraph, Taylor was returned to Area 1. *Id.*

Another felony review ASA (not Garfinkel) was then called to Area 1 and questioned Taylor. *Id.* at 5. When Taylor refused to respond to questions, he was charged and taken to county jail. *Id.*; [288-29] at 13.

Although he did not describe which events occurred during which interviews, Taylor described an experience at Area 1 broadly similar to the experiences Fulton and Coleman described: different detectives questioned him at different times, usually two or three at a time; the detectives beat him; they told him about Fulton's and Coleman's statements and said that he would get the death penalty, but that they could help him if he cooperated. [288-29] at 8–10. Taylor testified that he asked to speak with a lawyer, but instead an ASA entered the room. *Id.* at 10. The ASA gave him a prewritten confession to sign, but he continued to refuse to give a statement. *Id.* at 11–12.

## III. State Court Proceedings

### A. Criminal Charges

On April 29th, Garfinkel approved charges against Coleman for first degree murder and aggravated criminal sexual assault. [288-81]. The next day, at an initial bond hearing, Judge Fox found probable cause for these charges, relying (apparently exclusively) on Coleman's confession. [362] ¶¶ 4–6. On May 1, Garfinkel approved the same charges against Fulton. [288-84]. At an initial bond hearing held later that day, Judge Fox similarly found probable cause for these charges, relying (again, apparently exclusively) on Fulton's confession. [362] ¶¶ 4–6. Several weeks later,

after Taylor was arrested, he was charged with the same offenses. [288-28] at 5. Because the State could not rely on Fulton's and Coleman's confessions to prosecute Taylor, *see, e.g.*, *Lilly v. Virginia*, 527 U.S. 116 (1999), it dropped the charges against Taylor. [288-89] at 18.

**B.    Pretrial Forensic Testing**

At the crime scene, police had discovered two used condoms—one in the basement in a room adjacent to where A.B.'s body was found, and the other on the stairs leading down to the basement. *See* [288-71] at 26. Forensic biologist Pamela Fish examined the condoms and found sperm on the inside of the condom from the stairs, but not on the other condom. [288-72] at 15–16. She sent the condom from the stairs to a private lab for testing, and the lab's testing excluded Coleman, Fulton, and Taylor as contributors to the sperm sample, and excluded A.B. as a contributor to DNA on the outside of the condom. *Id.* at 19.

Several other pieces of evidence were submitted to the Chicago Police Department's crime lab for forensic testing, including A.B.'s clothing, the pipe that had been inserted into her vagina, and the piece of concrete that had been placed in her mouth. [288-77] at 1. Alongside this evidence, police submitted head and pubic hair samples from A.B., Coleman, and Taylor. *Id.* at 1–2. Microscopic examination of the clothing, pipe, and piece of concrete revealed hairs and other fibers. *Id.* at 2–3. However, because of similarities between A.B. and Coleman's head hairs and between A.B. and Taylor's pubic hairs, the lab could draw only limited conclusions, noting "dissimilarities" between the unknown hairs and Coleman's head hair, Fulton's head hair, Fulton's pubic hair, and Taylor's pubic hair. *Id.* at 3.

Evidence technicians also dusted the crime scene for fingerprints but did not find any that were suitable for comparison. [288-71] at 30–31. However, a partial fingerprint was recovered from a beer can found at the scene. [288-79] at 6–7. This fingerprint did not match A.B., Coleman, Fulton, or Taylor. [288-80] at 4. The pipe and piece of concrete were also tested for fingerprints, but none were found. [288-79] at 8–9.

**C.    Trial**

Eventually, Fulton and Coleman were tried simultaneously before two different juries. Because the summary judgment record in this case discloses only bits and pieces of the trial transcript, the court cannot summarize the evidence presented at trial. Ultimately, both defendants were convicted and sentenced to natural life on the murder charges and 30 years on the aggravated criminal sexual assault charges, to run consecutively. [288-97]; [288-98].

16

## IV.    Subsequent Developments

### A.    The CIU Reinvestigates

Years later, Fulton saw a news report about the Conviction Integrity Unit (CIU) of the CCSAO. [288-20] at 3. As its name suggests, the CIU is responsible for examining the integrity of convictions previously obtained by the CCSAO. [288-19] at 18. This includes both claims of actual innocence and issues regarding how the convictions were obtained, even if the defendants are in fact guilty. *Id.* In 2013, after nearly twenty years in prison, Fulton wrote to the CIU asking them to look into his case. [288-20] at 4. Eventually, the CIU began an investigation. [288-25] at 24–25.

In 2017, A.B.'s clothing was sent to the Illinois State Police Division of Forensic Services ("ISP Lab") for testing. *See* [288-21]. Testing of her sweatshirts, jacket, and underwear indicated the presence of semen. *Id.* DNA testing of the semen from her underwear excluded Fulton, Coleman, and Taylor. *Id.* Later, the DNA sample was run through the Combined DNA Index System ("CODIS"), where it returned a hit: Clarence Neal. [288-19] at 27, 34. Neal had previously pleaded guilty to an aggravated criminal sexual assault that occurred in 2001. [288-56] at 2–3. He has also been implicated in several other rapes. *See* [288-59] (sealed); [288-60] (sealed); [288-61] (sealed); [288-62] (sealed); [288-63] (sealed); [288-64] (sealed); [288-65] (sealed); [288-66] (sealed); [288-67] (sealed); [288-68] (sealed).[6] Further DNA testing could not exclude Neal as a contributor to the DNA profile identified in the semen sample, while Fulton, Coleman, Taylor, and Latham were all excluded. [288-34] at 2–3. The expected frequency of occurrence for the DNA profile was no more common than approximately 1 in 1.7 septillion unrelated individuals. *Id.* at 2. Though less probative, testing of other DNA found on A.B.'s clothing and fingernail clippings also could not exclude Neal. *See* [288-35].

On August 28, 2017, the CIU interviewed Neal. [288-58] at 2 (sealed). Initially, Neal told investigators that he had known A.B. for only about a month, had seen her only in passing, and never spoke to her. *Id.* at 77. He denied having any sort of sexual relationship with her. *Id.* at 81. However, he later said that "if anything happened," he had stuck his hand down A.B.'s pants or vice versa. *Id.* at 85. He subsequently agreed that he may have had a "quickie" with A.B. at some point. *Id.* at 98. (During his deposition in this case, Neal explained that A.B. had never removed her clothes

---

[6] When the court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. The court discusses information from these documents only to the extent necessary to explain the path of the court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

during this encounter and had only performed oral sex on him. [288-26] at 54, 170 (sealed).)[7]

### B. Fulton's and Coleman's Convictions are Vacated

On November 17, 2017, the CCSAO moved to vacate Fulton's and Coleman's convictions and sentences. [288-108] at 2. ASA Eric Sussman explained that the CCSAO had "concluded that the new DNA evidence could change the results of the trial." *Id.* The state court granted the motion and ordered a new trial. *Id.* at 3. Both Fulton and Coleman were then released on $50,000 bonds. *Id.* Two weeks later, the CCSAO moved to dismiss the charges *nolle prosequi.* [288-109] at 3. Sussman explained that the CCSAO had "concluded that [it] would be unable to meet [its] burden of proof on a retrial." *Id.* The court allowed the *nolle prosequi. Id.*

That same day, Fulton filed a petition for a certificate of innocence. [288-110]; *see* 735 ILCS § 5/2-702. On January 19, 2018, Coleman likewise filed a petition for a certificate of innocence. [288-111]. The state did not oppose either petition, and the state court entered agreed orders granting both petitions. [288-32]; [288-33].

## V. Proceedings in this Court

On December 1, 2017—the same day charges against him were dropped and he filed his petition for a certificate of innocence—Fulton filed this lawsuit. <1>. The operative fourth amended complaint, <230>, names Foley,[8] Clancy, Halloran, Boudreau, O'Brien, Carroll, Moser, Graf, Turner,[9] Garfinkel, other unidentified Chicago police officers, the City of Chicago, and Cook County as defendants. It contains ten counts: (1) fabrication of evidence; (2) coerced confession; (3) conspiracy to deprive constitutional rights; (4) failure to intervene; (5) *Monell* liability;[10] (6) state law malicious prosecution; (7) state law intentional infliction of emotional destress; (8) state law conspiracy; (9) indemnification; and (10) *respondeat superior*.

Just over three months later, Coleman filed his own § 1983 suit. [1]. The operative second amended complaint in that case, [144], names the same defendants as in Fulton's case, with the addition of Kelly and Thomas Benoit. It raises thirteen claims: (1) false confession; (2) fabrication of a false witness statement; (3) deprivation of liberty without probable cause; (4) due process; (5) failure to intervene; (6) conspiracy to deprive constitutional rights; (7) supervisory liability; (8)

---

[7] The CIU wrote a memorandum explaining the conclusions of its investigations. [281-1] (sealed). However, because this memorandum is confidential and the court ultimately concludes that it is not dispositive, the court will not recite its contents here.

[8] Foley is deceased. Thus, both operative complaints name Geri Lynn Yanow, the independent administrator of his estate. For clarity, however, the court will refer to claims against the estate as claims against Foley.

[9] Turner has not been served in either case and is thus not before the court at this time.

[10] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

policy and practice (under *Monell*); (9) state law malicious prosecution; (10) state law intentional infliction of emotional distress; (11) state law conspiracy; (12) *respondeat superior*; and (13) indemnification.

Judge Valdez, who at that time was the assigned magistrate judge, stayed discovery on both plaintiffs' *Monell* claims until the conclusion of discovery on the underlying constitutional claims. [102], <106>. After non-*Monell* discovery closed, defendants Foley, Clancy, Halloran, Boudreau, O'Brien, Carroll, Moser, Graf, Benoit, Kelly, and the City of Chicago (the "Officer Defendants") moved for partial summary judgment in both cases. [262]; <311>. Shortly thereafter, defendants Garfinkel and Cook County (the "County Defendants") likewise moved for summary judgment. [269]; <318>.

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 56

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and footnotes omitted). Construing the evidence and facts supported by the record in favor of the nonmoving party, the court gives the nonmoving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White*, 829 F.3d at 841 (citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

### II. Local Rule 56.1

Because the parties have engaged in significant satellite litigation on the topic, the court will also briefly address the requirements of Local Rule 56.1, which "delineat[es] the obligations of parties in summary judgment proceedings." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000).

The Federal Rules of Civil Procedure enable "a district court, acting by a majority of its district judges" to "adopt and amend rules governing its practice." Fed.

R. Civ. P. 83(a)(1). Such rules "must be consistent with—but not duplicate—federal statutes and rules adopted under" the Rules Enabling Act. *Id.* Pursuant to that authority, the judges of this court adopted Local Rule 56.1. Among other things, the rule requires the movant to attach a statement of material facts, N.D. Ill. R. 56.1(a)(2), which "must consist of concise numbered paragraphs," N.D. Ill. R. 56.1(d)(1). The factual assertions "must be supported by citation to . . . specific evidentiary material," and "should not contain legal argument." N.D. Ill. R. 56.1(d)(2), (4). Similarly, the nonmovant must file "a response to the LR 56.1(a)(2) statement of material facts," N.D. Ill. R. 56.1(b)(2), which "must consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's statement, "admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact," and, for each disputed fact, "cite specific evidentiary material that controverts the fact," N.D. Ill. R. 56.1(e). The nonmovant may also file "a statement of additional material facts," which must meet the same requirements as the movant's statement of material facts. N.D. Ill. R. 56.1(b)(3). If the nonmovant does so, the movant must file a response to the statement of additional material facts, which must meet the same requirements as the nonmovant's response to the movant's statement of material facts. N.D. Ill. R. 56.1(c)(2). The rule's requirements are elaborated in detail in *Malec*, 191 F.R.D. at 582–87.

The rule serves an "important function . . . in organizing the evidence and identifying disputed facts," *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005), enabling the court to accurately and efficiently "identify cases that can be resolved without a trial," which is "the purpose of summary judgment proceedings," *Malec*, 191 F.R.D. at 582. Thus, the rule is not a mere technicality. Noncompliance can result in, among other things, deeming facts admitted for purposes of the summary judgment motion. *See Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023). A district court may "require[e] strict compliance" with the Rule. *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016). "[L]itigants," on the other hand, "have no right to demand strict enforcement of local rules by district judges." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). Rather, "the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion," *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995), so long as the court does not "enforce (or relax) the rules unequally as between the parties," *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

The dockets in these two cases are replete with litigation over the application of Local Rule 56.1. *See, e.g.*, [308] at 8–12; [313] at 2. For two reasons, the court concludes that this case presents the unusual circumstance in which the proper course is to decide the motions on the merits without resort to strict enforcement of Local Rule 56.1. First, the accusations of noncompliance are so numerous that evaluating each of them would place an enormous strain on judicial resources, undermining the rule's goal of promoting efficiency. *Cf.* Fed. R. Civ. P. 1 ("These rules . . . should be construed, administered, and employed by the court and the

parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). Second, violations are prevalent in both sides' filings, meaning that tracing out the implications of mutual forfeiture would be little less laborious than resolving the parties' arguments on the merits and would result in an outcome that is largely arbitrary. Thus, the court will proceed to decide the pending motions on the merits, forgiving the parties' noncompliance with the Local Rules. *See Little*, 71 F.3d at 641; *cf. Wood v. Milyard*, 566 U.S. 463, 471 n.5 (2012) ("[A] federal court has the authority to resurrect . . . forfeited defenses."). To the extent the Local Rule 56.1 statements contain meritorious objections to the evidence in the record, the court will disregard the objectionable evidence.[11]

## DISCUSSION

Some of defendants' arguments concern which of Fulton's and Coleman's claims are viable. The court will address these arguments first. The court will then consider whether any defendant is entitled to summary judgment on a claim that otherwise survives summary judgment.

## I.     Viability of Fulton's and Coleman's Claims

The court will first turn to the viability of Fulton's and Coleman's claims. Importantly, Foley and Clancy moved for summary judgment on only the suppression and malicious prosecution claims. *See* [262] ¶¶ 3, 7. Thus, the remaining claims against Foley and Clancy survive summary judgment, and the court addresses the viability of those claims only to determine whether the other defendants are entitled to summary judgment on them.

### A.     Coerced Confessions

The heart of each plaintiff's case is their contention that the defendants coerced them to confess to the rape and murder of A.B., in violation of their rights under the Fifth and Fourteenth Amendments. "The Fifth Amendment, made applicable to the States by the Fourteenth Amendment . . . bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion." *Vega v. Tekoh*, 597 U.S. 134, 141 (2022). Likewise, "[t]he Due Process Clause of the Fourteenth Amendment forbids the admission of an involuntary confession in evidence in a criminal prosecution." *Dassey v. Dittman*, 877 F.3d 297, 303 (7th Cir. 2017) (en banc).

---

[11] Relatedly, the parties make a variety of forfeiture arguments, as well as at least one accusation of violating Federal Rule of Civil Procedure 11(b). *See* <359> at 4. Except to the extent described elsewhere in this opinion, the court finds the waiver and forfeiture arguments unpersuasive. Moreover, briefing on dispositive motions is not an appropriate venue for accusing opposing counsel of violating Rule 11. *See* Fed. R. Civ. P. 11(c)(2).

A confession is involuntary[12] if the "totality of the circumstances . . . reveal that the interrogated person's will was overborne." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018)). The relevant circumstances include "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (collecting factors).

The voluntariness of a confession is a question of law, rather than one of fact. *Miller v. Fenton*, 474 U.S. 104, 110 (1985). Accordingly, a court may determine voluntariness at summary judgment. *See Dick v. Conseco, Inc.*, 458 F.3d 573, 580 (7th Cir. 2006). However, "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony." *Miller*, 474 U.S. at 117. In resolving those subsidiary questions at summary judgment, the court must "draw[] all inferences in favor of the nonmoving party to the extent supportable by the record." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

A few stray remarks in the County Defendants' brief could be construed as arguing that Coleman's confession was voluntary. To the extent the County Defendants make that argument, they do not develop it. Accordingly, it is forfeited. *See Ostrowski v. Lake Cnty.*, 33 F.4th 960, 966 (7th Cir. 2022). In any event, it is unpersuasive. Viewing the facts in the light most favorable to Coleman, a jury could find that a detective punched Coleman in the face twice while interrogating him. "Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law." *Stein v. New York*, 346 U.S. 156, 182 (1953), *overruled on other grounds*, *Jackson v. Denno*, 378 U.S. 368 (1964). Accordingly, "[p]hysically abusive interrogation tactics would constitute coercion *per se*." *Dassey*, 877 F.3d at 303; *see Stein*, 346 U.S. at 182 ("When present, there is no need to weigh or measure its effects on the will of the individual victim."). Thus, this fact alone, if found by a jury, would render Coleman's confession involuntary, to say nothing of other factors—such as Coleman's testimony that detectives promised him he could go home and that they would help relocate his son and his son's mother if he told them the story they wanted to hear—that might bolster a finding of involuntariness. *See Hadley v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (noting that a confession is involuntary "where police extract a confession in exchange for a false promise to set the defendant free"); *Dassey*, 877 F.3d at 304 ("False promises may be evidence of involuntariness, at least when paired with more coercive practices or especially vulnerable defendants as part of the totality of the circumstances.").

---

[12] Courts "use[] the terms 'coerced confession' and 'involuntary confession' interchangeably 'by way of convenient shorthand.'" *Arizona v. Fulminante*, 499 U.S. 279, 287 n.3 (1991) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960)).

The County Defendants *do* clearly argue that Fulton's confession was voluntary. Viewing the facts in the light most favorable to Fulton, however, the court cannot conclude at this stage that Fulton's confession was voluntary. Several factors support that conclusion. First, Fulton testified that he was interrogated repeatedly over the course of about 36 hours. As the Seventh Circuit has recognized, "prolonged detention paired with repeated but relatively short questioning" is sometimes a "tactic[] designed to exhaust suspects physically and mentally." *Id.* at 304; *see also Clewis v. Texas*, 386 U.S. 707, 711 (1967) (suspect's initial statement followed "38 hours of intermittent interrogation"). Second, Fulton testified that he was never advised of his *Miranda* rights—another factor supporting a finding of involuntariness. *See Withrow v. Williams*, 507 U.S. 680, 693–94 (1993). Third, Fulton testified that a detective struck him on the face when he denied involvement and threatened to "take [him] somewhere and put a bullet in [his] brain." [288-2] at 17. If credited (as is required at this stage), that is just the sort of "[p]hysical violence or threat of it" that "invalidates confessions that otherwise would be convincing," *Stein*, 346 U.S. at 182, and "constitute[s] coercion *per se*." *Dassey*, 877 F.3d at 303. Fourth, Fulton testified that he received only "minimal sleep" between interrogations. [288-2] at 82; *see Clewis*, 386 U.S. at 712 (holding that "inadequate sleep" may have "impaired" "petitioner's faculties" so as to render a confession involuntary); *Koh*, 933 F.3d at 846 ("[S]leep . . . [is] relevant to the inquiry of whether an individual is susceptible to coercion."). Fifth, Fulton was told that Johnson refuted his alibi, when in fact she neither confirmed nor denied it. Although "[o]f the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary," it is nevertheless "one factor to consider among the totality of circumstances." *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992); *see Frazier v. Cupp*, 394 U.S. 731, 739 (1969).

Finally, a jury could find that Garfinkel threatened Fulton with the death penalty. Fulton testified as much at his deposition. [288-2] at 10. The County Defendants argue that this testimony cannot create a genuine dispute of material fact because it is a "misconception" that the Seventh Circuit "long ago buried—or at least tried to bury." *Berry v. Chi. Trans. Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The County Defendants base their argument on *Weeks v. Samsung Heavy Industries*, 126 F.3d 926 (7th Cir. 1997), and *Weaver v. Champion Pet Foods, USA*, 3 F.4th 927 (7th Cir. 2021). *Weeks* does have some language that supports the County Defendants' argument. *See* 126 F.3d at 941–42 ("[Plaintiff] offers only his own unsubstantiated and self-serving testimony, with no other supporting evidence, and therefore has not established the existence of a genuine issue of material fact."). However, the Seventh Circuit has since clarified that it was "not the self-serving nature" of the testimony in *Weeks* and similar cases that required granting summary judgment, but rather that it was "not based on personal knowledge." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). Here, by contrast, Fulton's testimony about threats to which he was subjected is clearly within his personal knowledge. And *Weaver* is entirely inapposite; it rejected a plaintiff's reliance on the allegations in the complaint, not on sworn deposition testimony.

23

3 F.4th at 938. It is thus a reiteration of the well-established principle that a plaintiff cannot "rest on his allegations" to defeat summary judgment, *Anderson*, 477 U.S. at 249, not a *sub silentio* overruling of *Payne*. *See Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022) (relying on *Payne*'s holding regarding self-serving testimony after *Weaver*).

The County Defendants also argue that Fulton's testimony should be rejected because Fulton did not include this allegation "in any of his prior testimony or submissions to the court." [301] at 13. The court is not aware of any authority allowing a federal court to discredit sworn testimony merely because a deposition was the first time the witness gave that testimony. The County Defendants cite two cases, *Lasky v. Smith*, 407 Ill. 97 (1950), and *Mannen v. Norris*, 338 Ill. 322 (1930), in support of the proposition that "[c]ourts are not required to accept as true testimony which contains such inherent improbability as to impeach itself." [301] at 10. However, both cases were decided under "state procedural rules," which are "simply inapplicable" in federal court, *Blaz v. Michael Reese Hosp. Found.*, 191 F.R.D. 570, 572 (N.D. Ill. 1999), and neither involved summary judgment. In any event, the absence of prior testimony or allegations to the same effect does not render Fulton's subsequent testimony inherently improbable. At most, such omissions undermine the credibility of Fulton's testimony. Credibility determinations, however, are the province of the jury. *Payne*, 337 F.3d at 770. Thus, taking Fulton's testimony as true (as the court is required to do at this stage), Garfinkel's alleged threat supports a finding of involuntariness.

In addition to contesting Fulton's testimony, the County Defendants point to Fulton's prior confession to another crime, which they contend makes it implausible that he would have been tricked or coerced into confessing to the A.B. murder. As a teenager, Fulton pleaded guilty to attempted aggravated indecent liberties with a child. [288-115]. Although he confessed, he later asserted that his waiver of his *Miranda* rights was not knowing and voluntary. *See* [288-116]. The County Defendants argue that Fulton's prior experience with a confession leading to a conviction render his claim of coercion implausible. To be sure, a suspect's "prior experience with the legal process, and familiarity with the *Miranda* warnings," is relevant to a confession's voluntariness. *See Miller*, 474 U.S. at 117. That factor would carry greater weight, however, if Fulton claimed (as he did with his confession to the previous crime) that he was tricked into believing that he could confess without facing significant consequences. But that is not his assertion; instead, he essentially asserts that he confessed due to exhaustion and fear of even worse consequences (such as receiving the death penalty or having a detective "take [him] somewhere and put a bullet in [his] brain," [288-2] at 17). It is not clear how defendants argue Fulton's previous experience with the justice system inoculated him against coercion of that type; while it may have diminished the allure of false promises, it may not have meaningfully diminished the effect of improper threats. Moreover, another inference is available from Fulton's allegedly involuntary confession to the previous crime; that he is particularly susceptible to coercive police tactics. *See Dassey*, 877 F.3d at 304

("In assessing voluntariness, courts must weigh the tactics and setting of the interrogation alongside any particular vulnerabilities of the suspect."). At summary judgment, the court must draw inferences in Fulton's favor, not the defendants'. *See White*, 829 F.3d at 841.

Viewing the facts in the light most favorable to Fulton, the court cannot conclude at this stage that his confession was voluntary.

## B.    Fabricated Evidence

Next, Fulton and Coleman contend that the defendants fabricated several pieces of evidence against them: (1) the entire First Supp Report; (2) certain statements in Clancy's timeline GPR; (3) the Second Supp Report; (4) a GPR dated June 6, 1994; (5) Fulton's handwritten statement; (6) Coleman's court-reported statement; and (7) Halloran's statement that he saw Fulton exiting his home through the back door as officers entered through the front.[13] *See* [362-1] at 2. Because the first four pieces of evidence concern only Foley and Clancy (who did not move for summary judgment on the fabrication claims), only the latter three are at issue in this motion. *See id.*[14]

The "hallmark of a fabrication case" is that "officers created evidence that they knew to be false." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). Recent Seventh Circuit cases have "clarified the contours of constitutional claims based on allegations of evidence fabrication." *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020). Such claims can proceed under any of three theories, each with its own requirements. First, "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). For clarity, the court will refer to this theory as a "freestanding

---

[13] Originally, Fulton and Coleman also brought fabrication claims based on statements from Barber, Calimee, and Williams, as well as other portions of police reports that did not involve their confessions. However, they subsequently withdrew their opposition to defendants' (other than Foley and Clancy) argument that they are entitled to summary judgment on these claims. [359] ¶¶ 6, 8; <413> ¶¶ 6–7. Accordingly, the court grants summary judgment to all defendants except Foley and Clancy on these portions of plaintiffs' fabrication claims.

[14] The filings are unclear whether Fulton and Coleman continue to oppose summary judgment on the fabrication claims arising out of Halloran's statement. The attachment to the parties' joint supplemental brief, [362-1], indicates that Fulton and Coleman each withdrew their opposition to defendants' request for summary judgment on those claims, citing the plaintiffs' respective notices of withdrawal of opposition, [359], <413>. However, the notices of withdrawal do not reference this evidence. Because only "intentional relinquishment or abandonment of a known right" constitutes waiver, *Wood*, 566 U.S. at 474 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004)), and the court is uncertain whether Fulton and Coleman have intentionally relinquished their fabrication claims based on Halloran's statement, the court will consider that claim on its merits. *See id.* at 471 n.5 (noting courts' "authority to resurrect" arguments that are "forfeited" but not "waived").

25

fabrication theory." Second, "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady v. Maryland*, 373 U.S. 83 (1963) . . . if government officials suppressed evidence of the fabrication." *Lewis v. City of Chicago*, 914 F.3d 472, 480 (7th Cir. 2019). Finally, "false arrest or pretrial detention based on fabricated evidence" may violate "the Fourth Amendment right to be free from seizure without probable cause." *Patrick*, 974 F.3d at 834.

Although the parties' briefs are not "precise in their terminology" regarding which theory underlies each fabrication claim, "the true nature of the claim matters." *Petty*, 754 F.3d at 423. Thus, the court will consider each theory for each alleged fabrication. *See Reed v. Goertz*, 598 U.S. 230, 236 (2023) ("[T]he Court focuses first on the specific constitutional right alleged to have been infringed.").

### 1.     The Other Plaintiff's Confession

First, both Fulton and Coleman contend that the other's confession was fabricated. *See* [362-1]. In response, defendants argue that, even if the confessions were fabricated, they do not give rise to a constitutional claim by the *other* plaintiff, because neither plaintiff's confession was introduced against the other at trial.

Fulton contends that Coleman's court-reported statement *was* admitted against him at trial. He points to Garfinkel's testimony that, while speaking with Fulton, he left the room to retrieve Coleman's statement, and "informed Mr. Fulton that Mr. Coleman had implicated him." [288-120] at 10. After overruling Fulton's objection, the trial court instructed the jury that it could consider this testimony only insofar as it shed light on the "facts and circumstances of any subsequent statement" given by Fulton and thus was relevant "for the purpose of evaluating the weight to be given to any subsequent statement." *Id.* at 19. The trial court expressly instructed the jury that it could not consider what Garfinkel said to Fulton as evidence that Coleman "did say something implicating Mr. Fulton." *Id.*

The law assumes "that jurors can be relied upon to follow the trial judge's instructions," including instructions about the "limited purpose" for which evidence is admitted. *Samia v. United States*, 599 U.S. 635, 646 (2023); *see Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting "the almost invariable assumption of the law that jurors follow their instructions"). Thus, the court must assume that the jury, following the trial judge's instructions, considered Garfinkel's testimony only in assessing the circumstances surrounding Fulton's handwritten statement. *Cf. Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("In making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the judge or jury acted according to law.").

Recognizing this, Fulton argues that the jury would have used Garfinkel's testimony about what he told Fulton as evidence that Fulton's confession was reliable. *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("[T]he physical and

psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence."). First, that is no longer an argument that Coleman's allegedly fabricated statement was introduced against Fulton; instead, it is an argument about Garfinkel's testimony concerning the circumstances of Fulton's handwritten statement. But that testimony is protected by absolute testimonial immunity. *See Briscoe v. LaHue*, 460 U.S. 326, 326 (1983). Moreover, there is no evidence it was fabricated; Coleman's court-reported statement *did* implicate Fulton, and Fulton himself testified (both at the motion to suppress hearing and in his deposition) that Garfinkel presented him with Coleman's statement. [288-2] at 92; [288-82] at 15. Second, it is unclear why Garfinkel confronting Fulton with a statement implicating him would render Fulton's handwritten statement more reliable, rather than further suggesting coercion. *See Frazier*, 394 U.S. at 739 (holding that an interrogator's false statement that the suspect had been implicated by another suspect, though "insufficient . . . to make this otherwise voluntary confession inadmissible," was relevant evidence of coercion).

Accordingly, there is insufficient evidence that either plaintiff's confession was admitted against the other at trial to allow a reasonable juror to find in either plaintiff's favor on that point. That leaves the legal question of whether either plaintiff can nevertheless bring a fabrication claim (under any of the three theories). They cannot.

### a.    Freestanding Fabrication and *Brady*

Defendants are correct that the nonuse of one plaintiff's confession at the other's trial forecloses a fabrication claim based on due process, whether on a freestanding fabrication theory or under *Brady*. "Not every act of evidence fabrication offends one's due process rights." *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015). Rather, "[a] deprivation of liberty is a necessary element of a due-process claim premised on allegations of evidence fabrication." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016). So, for example, "[i]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." *Whitlock*, 682 F.3d at 582 (citing *Buckley v. Fitzsimmons* ("*Buckley IV*"), 20 F.3d 789, 795 (7th Cir. 1994)).

Whether brought on a freestanding fabrication theory or under *Brady*, due process evidence fabrication claims require materiality. *See Patrick*, 974 F.3d at 835. Freestanding fabrication claims are derived from the Supreme Court's decisions in *Mooney v. Holohan*, 294 U.S. 103 (1935), *Pyle v. Kansas*, 317 U.S. 213 (1942), and *Napue v. Illinois*, 360 U.S. 264 (1959). *See Whitlock*, 682 F.3d at 581. Accordingly, they follow the same materiality standard, which asks whether "there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick*, 974 F.3d at 835 (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). And evidence (including evidence of fabrication) is material under *Brady* only if there is a "reasonable

27

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion)).

Applying the "reasonable likelihood" standard, the Seventh Circuit has held that fabricated evidence that "was not introduced at the trial . . . could not have influenced the jury's verdict" and thus is not material. *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022). That holding controls this case.[15] And because such evidence is not material under the "much friendlier" standard applicable to freestanding fabrication claims, *see United States v. Freeman*, 650 F.3d 673, 681 (7th Cir. 2011), it is *a fortiori* not material under *Brady*'s "reasonable probability" standard. *Cf. Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000) ("The *Agurs* standard is different from that in *Bagley* and sets a lower threshold for determining materiality."). That result makes sense because "[t]he essence of a due-process evidence fabrication claim is that the accused was *convicted and imprisoned* based on knowingly falsified evidence, violating his right to a *fair trial* and thus depriving him of liberty without due process." *Patrick*, 974 F.3d at 835 (emphases added).

In response, Fulton and Coleman point to *Armstrong v. Daly*, 786 F.3d 529 (7th Cir. 2015). In *Armstrong*, the court allowed the plaintiff's due process claim to proceed even though the alleged constitutional violation occurred after his first trial, and no retrial occurred. *See id.* at 551–55. But the *Armstrong* plaintiff's claim was for destruction of exculpatory evidence under *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984), not for fabrication. *See Armstrong*, 786 F.3d at 551 ("The constitutional violation that Armstrong asserts is the deprivation of his liberty without due process of law, as the result of the destruction of evidence by a state actor."). That is an important distinction: while the heart of a fabrication claim is the *use* of fabricated evidence, *see Whitlock*, 682 F.3d at 582, the heart of a destruction claim is that the evidence *cannot* be used. Accordingly, while both types of due process fabrication claims require materiality, *see Patrick*, 974 F.3d at 835, destruction of evidence claims do not, *see Nichols v. Wiersma*, 108 F.4th 545, 554 (7th Cir. 2024) (listing the elements of a *Youngblood/Trombetta* claim). The *Armstrong* court drew just this distinction. *See* 786 F.3d at 552 ("In this respect, the *Brady* cases involving failures to disclose evidence are plainly distinguishable from this case involving destruction of evidence."). While freestanding fabrication and

---

[15] *See Cruz v. Guevara*, No. 1:23-cv-004268, 2024 WL 4753672, at *6 (N.D. Ill. Nov. 12, 2024) ("Although it may be possible for evidence to satisfy a due process claim's materiality requirement without the evidence having been introduced at trial, the Seventh Circuit has strongly implied otherwise."). Because neither Fulton nor Coleman pled guilty, the court has no occasion to consider whether there is an exception for fabricated evidence that leads to a guilty plea, as some courts in this district have held. *See Mendoza v. City of Chicago*, No. 1:23-cv-002441, 2024 WL 1521450, at *3 (N.D. Ill. Apr. 8, 2024); *In re Watts Coordinated Pretrial Proc.*, No. 1:19-cv-001717, 2022 WL 9468206, at *7 (N.D. Ill. Oct. 14, 2022); *Saunders v. City of Chicago*, No. 1:12-cv-09158, 2014 WL 3535723, at *4–5 (N.D. Ill. July 11, 2014).

28

*Brady* fabrication claims are not complete until the evidence is used, "bad-faith destruction of exculpatory evidence is an immediate constitutional violation." *Id.*

Relatedly, Fulton and Coleman argue that the fabrication of the other's confession harmed them "in some way," *Whitlock*, 682 F.3d at 580, because they faced pretrial detention which, they argue, they would not otherwise have faced. However, the Seventh Circuit has repeatedly held that fabricated evidence that leads only to pretrial detention can create only a Fourth Amendment claim, not a due process claim. *See, e.g.*, *Lewis*, 914 F.3d at 475; *Young v. City of Chicago*, 987 F.3d 641, 645–46 (7th Cir. 2021); *Manuel v. City of Joliet* ("*Manuel II*"), 903 F.3d 667, 670 (7th Cir. 2018); *cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."). Thus, Fulton's and Coleman's pretrial detention cannot support a due process claim. *See Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017) ("[T]he due-process violation wasn't complete until the [fabricated evidence] was introduced at [plaintiff's] trial.").

Coleman cites a litany of authorities in support of his contrary argument, but they are unavailing. First, he cites *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018). But *Hurt* has been expressly overruled on precisely this point. *See Lewis*, 914 F.3d at 475. Next, he cites language from *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014), where the Seventh Circuit observed that "the fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him." *Id.* at 1112. In context, however, *Fields* was discussing the "principle that there is no tort without an actionable injury caused by the defendant's wrongful act," *id.* at 1111, not the requirements for establishing a constitutional violation. But "harm is a separate issue." *Armstrong*, 786 F.3d at 552; *see Buckley IV*, 20 F.3d at 796 ("Just as there is no common law tort without injury, there is no constitutional tort without injury." (citations omitted)); *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) ("Courts considering whether the deprivation of a plaintiff's liberty is the legally cognizable result of a government officer's misconduct have approached the issue in either of two ways: (1) as a separate issue of causation, or (2) as part of the right allegedly violated."). Coleman's citation to *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), is unavailing for similar reasons: the court there found it "unnecessary . . . to examine" whether the plaintiff had shown a due process violation, because the defendants had conceded that point. *Id.* at 992. Instead, it addressed only tort causation principles. *See id.* Next, Coleman cites *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013). But *Julian* did not deal with fabricated evidence that was not used to obtain a conviction. Rather, it concerned only the application of the since abrogated rule that "a federal claim for malicious prosecution is actionable only if the state fails to provide an adequate alternative." *Id.* at 845; *see Newsome v. McCabe*, 256 F.3d 747, 750–51 (7th Cir. 2001), *abrogated by Manuel v. City of Joliet* ("*Manuel I*"), 580 U.S. 357 (2017).

Coleman also cites two out-of-circuit decisions, *Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014), and *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006). But this issue has engendered an active circuit split, with the Third and Sixth Circuits taking positions opposite of the Seventh. *See* Jorge Pereira, Comment, *Seizure or Due Process? Section 1983 Enforcement Against Pretrial Detention Caused by Fabricated Evidence*, 90 U. Chi. L. Rev. 2313, 2337–41 (2023) (detailing the split). In such situations, this court follows the Seventh Circuit's approach. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

Finally, Coleman cites two district court opinions. But "[a] decision of a federal district judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quotation omitted). Moreover, both decisions predate *Moran*, which held that evidence not introduced at trial is not material for purposes of a due process fabrication claim.[16] *See* 54 F.4th at 499.[17]

---

[16] Coleman also cites language he purports to be from *Whitlock* to the effect that the Due Process Clause "forbids the state from depriving a person of liberty (including by pretrial detention) based on manufactured evidence." [289] at 39. This language, however, is from *Hurt*, not *Whitlock*, *see Hurt*, 880 F.3d at 843, and it was overruled by *Lewis*. *See* 914 F.3d at 475.

[17] Coleman also argues that the fabrication of Fulton's confession prevented Coleman from calling Fulton as a witness in his defense. It appears (though it is not entirely clear) that this argument was made in support of Coleman's (since withdrawn) *Brady* claim, rather than his fabrication claim. In any event, the argument is unpersuasive. First, it is not clear what evidence Coleman argues was suppressed. On the one hand, if it is Fulton's account of the circumstances of his statement, then Coleman would have been made aware of it by Fulton's testimony at the hearing on his motion to suppress, and thus it was not "suppressed" within the meaning of *Brady*. *See Avery*, 847 F.3d at 443 ("We've held, however, that evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant."). That awareness distinguishes this case from *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019), on which Coleman relies, because the *Anderson* court held only that "[d]ue process entitled the plaintiffs to *learn*" of the coercive circumstances of a witness's testimony. *Id.* at 507 (emphasis added). On the other hand, if Coleman argues that the detectives and Garfinkel suppressed their own account of the circumstances of Fulton's confession, then the argument is squarely foreclosed by *Saunders-El*, which rejected an argument that "police officers' failure to admit their misdeeds . . . amounts to a withholding of exculpatory evidence in violation of *Brady*." *Saunders-El*, 778 F.3d at 561–62. Although Coleman invites the court to disregard *Saunders-El*, *see* [289] at 57 ("*Saunders-El* is unpersuasive and should not be followed."), the court lacks the authority to do so, *see Reiser*, 380 F.3d at 1029.

Second, Coleman has not provided any evidence of how Fulton would have testified—or even that he would have testified, rather than invoking his Fifth Amendment privilege against self-incrimination. *See Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (per curiam) ("[W]e have never held . . . that the privilege is unavailable to those who claim innocence."). In the

### b.     Fourth Amendment

The remaining question, then, is whether Fulton's and Coleman's pretrial detention gives rise to a Fourth Amendment claim based on the other's confession. It does not.

"The Fourth Amendment prohibits unreasonable 'seizures.'" *Torres v. Madrid*, 592 U.S. 306, 309 (2021). "A person is 'seized' whenever an official 'restrains his freedom of movement' such that he is 'not free to leave.'" *Lewis*, 914 F.3d at 476 (quoting *Brendlin v. California*, 551 U.S. 249, 254–55 (2007)). "[P]retrial detention is a 'seizure'—both *before* formal legal process and *after*." *Id.* at 477 (emphasis in original). Thus, "[t]he Fourth Amendment . . . establishes 'the standards and procedures' governing pretrial detention." *Manuel I*, 580 U.S. at 360 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

"[T]he general rule" is "that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 213 (1979). Pretrial detention is no exception. *See Williams v. Dart*, 967 F.3d 625, 632 (7th Cir. 2020) ("The standard for pretrial detention is probable cause."). An arresting officer's determination of probable cause is not sufficient; rather, "the Fourth Amendment mandates a prompt 'judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.'" *Mitchell v. Doherty*, 37 F.4th 1277, 1279–80 (7th Cir. 2022) (quoting *Gerstein*, 420 U.S. at 114). Once they occur, "[j]udicial determinations of probable cause are ordinarily entitled to a presumption of validity." *Washington v. City of Chicago*, 98 F.4th 860, 869 (7th Cir. 2024). Here, Judge Fox made probable cause determinations as to both Fulton and Coleman at their respective bond hearings. [362] ¶ 4. Those determinations gave rise to a presumption of validity. *See Washington*, 98 F.4th at 869.

"[T]his presumption," however, "is rebuttable." *Id.* A plaintiff can rebut it by satisfying the "*Beauchamp* test," named after the Seventh Circuit's decision in *Beauchamp v. City of Noblesville*, 320 F.3d 733 (7th Cir. 2003), which first articulated the test. *Washington*, 98 F.4th at 864 n.1. Under the *Beauchamp* test, "plaintiffs must show 'that the officer who sought the [probable cause finding] [1] "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [2] that the false statements were necessary to the judicial officer's determination that probable cause existed for the [detention].""'" *Id.* at 863 (quoting *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)).

Neither Fulton nor Coleman can satisfy the second prong of the *Beauchamp* test as to the other's confession because Judge Fox's probable cause determinations were based on each plaintiff's own confession, not on the other plaintiff's confession.

---

absence of that evidence, a jury's assessment of the materiality of Fulton's potential testimony would be pure speculation.

*See* [362] ¶ 6. Accordingly, neither plaintiff can bring a fabrication claim based on the other's confession under the Fourth Amendment.

### 2. Each Plaintiff's Own Confession

Next, each plaintiff argues that his own confession was fabricated. Those claims may proceed under a freestanding fabrication theory and under the Fourth Amendment, but not under *Brady*.

### a. Freestanding Fabrication

Each plaintiff's claim based on his own confession may proceed on a freestanding fabrication theory. Because each plaintiff's confession was introduced against him at trial and formed the heart of the case against him, a jury could find that the confessions were material. *See Kidd v. Gomez*, 2 F.4th 677, 680 (7th Cir. 2021) ("A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).

Defendants argue, however, that even if the confessions were *coerced*, they were not *fabricated*. *See e.g.*, *Coleman v. City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019) ("Coerced testimony is not necessarily fabricated."). Although coercive interrogation techniques like those allegedly employed here "may contribute to wrongful convictions . . . [e]vidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true." *Whitlock*, 682 F.3d at 584. How a plaintiff labels his allegation is not dispositive. *See Petty*, 754 F.3d at 423 ("Although Petty's case appears to be a fabrication case because he alleges that the police 'manufactured false evidence' and used 'false identification' to prosecute him, a deeper look reveals that the case is more accurately described as a coercion case.").

In this case, however, there is a genuine dispute as to whether the defendants engaged in fabrication, rather than only coercion. As to Coleman's confession, a jury could find that the defendants told him what to say. *See* [288-1] at 102–03. And the record does not reflect any reason for defendants to have believed the version of events they allegedly supplied Coleman was correct. Thus, even if they could not have ruled out the version of events they allegedly supplied Coleman, a jury could find that they manufactured it on their own. Therefore, Coleman's freestanding fabrication claim based on his own confession survives summary judgment. *See Fields*, 740 F.3d at 1110 (holding that "testimony that is made up" is "equivalent" to "testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it"); *Smith v. Burge*, 222 F. Supp. 3d 669, 684 (N.D. Ill. 2016) ("In short, Plaintiff has sufficiently alleged that Defendant Officers knew his confession was false because Defendant Officers manufactured it themselves.").

32

By the time Fulton confessed, Coleman had already confessed. In a vacuum, it would thus be arguable that the officers and Garfinkel merely confronted Fulton "with direct questions about information supplied by others"—a "standard" and lawful technique. *See Coleman*, 925 F.3d at 346. However, if a jury believes Coleman's testimony about the circumstances of *his* confession, it could reasonably conclude that Fulton's interrogators nevertheless knew the information they convinced him to provide was false. In addition, Fulton testified that the final statement consisted almost entirely of information supplied by Garfinkel—he himself supplied only his name and age. *See* [288-2] at 89. Yet the statement purports to be a summary of what Fulton said. *See* [288-83] at 1. Thus, even if the police and Garfinkel believed that the words the statement attributed to Fulton were true, a jury could conclude that they nevertheless knew Fulton had never said them. Thus, Fulton's claim based on fabrication of his own confession can proceed on a freestanding fabrication theory.

### b.     Fourth Amendment

Insofar as each plaintiff's claim based on his own confession seeks damages resulting from pretrial detention, those claims may also proceed under the Fourth Amendment. As discussed above, pretrial detention is a "seizure" requiring probable cause. *See Lewis*, 914 F.3d at 477; *Williams*, 967 F.3d at 632. Because Judge Fox made a probable cause determination as to both Fulton and Coleman, [362] ¶ 4, probable cause is presumptively established. *See Washington*, 98 F.4th at 869.

That presumption, however, "takes the affiant's good faith as its premise." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). Thus, when the judge who makes the probable cause determination relies on information that "contains material lies," the "assessment of probable cause" is "contaminate[d]." *Rainsberger v. Benner*, 913 F.3d 640, 651 n.6 (7th Cir. 2019). Under *Beauchamp*, the presumption of probable cause can be rebutted by showing "'that the officer who sought the [probable cause finding] [1] knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [2] that the false statements were necessary to the judicial officer's determination that probable cause existed for the [detention].'" *Washington*, 98 F.4th at 863 (quotation omitted).

A jury could find the first prong of *Beauchamp* satisfied for the same reason that these claims may proceed on a freestanding fabrication theory: there is a genuine dispute as to whether at least some defendants knew the confessions were false and yet submitted them (or caused them to be submitted) to Judge Fox anyway. A jury could also find the second prong satisfied. Each confession was presented to Judge Fox at Fulton's and Coleman's respective bond hearings. [362] ¶ 6. And the record does not indicate that any other evidence was presented at the bond hearings. Thus, even if evidence that was not allegedly fabricated could have been presented to support probable cause, the court cannot consider it in deciding whether the

fabricated confessions were material to the probable cause determination. *See Rainsberger*, 913 F.3d at 650.

### c. *Brady*

However, plaintiffs' fabrication claims based on their own confessions cannot proceed under *Brady*. Under Seventh Circuit precedent, evidence that was "otherwise available to the defendant through the exercise of reasonable diligence" is not "suppressed" and thus cannot form the basis for a *Brady* claim. *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001); *accord Moran*, 54 F.4th at 492; *Holloway v. City of Milwaukee*, 43 F.4th 760, 768 (7th Cir. 2022). Of course, neither plaintiff can claim that he was unaware of the allegedly coercive circumstances of his own confession. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006); *Wallace v. City of Chicago*, 440 F.3d 421, 429–30 (7th Cir. 2006), *aff'd sub nom Wallace v. Kato*, 549 U.S. 384 (2007); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 965 (N.D. Ill. 2010) ("Importantly, however, a coerced confession alone cannot constitute a *Brady* violation, as no 'suppression' occurs because the plaintiff is aware of his own confession."). Indeed, each of them testified to those circumstances at the hearings on their respective motions to suppress. *See* [288-11]; [288-82]. Thus, plaintiffs' own confessions cannot serve as the basis for a *Brady* fabrication claim.

### 3. Halloran's Statement

Finally, Fulton and Coleman argue that Halloran's statement that he saw Fulton exiting his home through the back door as officers entered through the front door was fabricated. However, this claim is barred by absolute immunity.

Halloran gave this account at trial. *See* [288-13] at 11–13. The testimony itself is clearly protected by absolute immunity. *See Briscoe*, 460 U.S. at 326 ("[W]itnesses are absolutely immune from damages liability based on their testimony."). Fulton and Coleman thus attempt to reframe their claims, basing them instead on a conversation they claim Halloran had with Brian Sexton (the trial prosecutor) before testifying, in which Halloran allegedly told Sexton the same story he later told the jury. Telling the story to Sexton, Fulton and Coleman argue, was the act of fabrication, and is not immunized.

Fulton and Coleman have not produced sufficient evidence to allow a jury to conclude that Halloran in fact had this conversation with Sexton. They point to Sexton's usual practice of meeting with witnesses before calling them to testify, *see* [288-89] at 4, as well as Halloran's practice of making himself available to meet with the prosecutor before testifying, *see* [288-10] at 27. But those practices at most suggest that Halloran spoke with Sexton prior to testifying; they do not indicate what was said. For that point, Fulton and Coleman argue only that Sexton would not have known to ask about Halloran's observations had Halloran not previously recounted them to Sexton. But that inference "veers too far into speculation to survive summary

judgment." *Jones v. Van Lanen*, 27 F.4th 1280, 1286 (7th Cir. 2022). Moreover, accepting it would gut *Briscoe* by allowing a nonimmunized act to be inferred from nothing more than the fact of an immunized one.

Moreover, even assuming that the conversation between Halloran and Sexton occurred just as Fulton and Coleman claim, it would itself be protected by absolute immunity. Absolute immunity covers a prosecutor's "preparation for its presentation at trial," *Buckley v. Fitzsimmons* ("*Buckley III*"), 509 U.S. 259, 273 (1993), and generally affords police officers the same protections as prosecutors when they are engaged in the same tasks, *see id.* at 276. Although Fulton and Coleman correctly note that an officer may not insulate himself from liability for fabricating evidence by authenticating that evidence at trial, *see Avery*, 847 F.3d at 441–42, that does not mean that an officer may subject himself to liability for his testimony (which is immune) by preparing for it (which is also immune). The Seventh Circuit has squarely rejected such "attempts to circumvent *Briscoe*." *Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022).

\* \* \* \* \*

Having concluded that each plaintiff's fabrication claim based on his own confession may proceed on both freestanding fabrication and Fourth Amendment theories, the court will address the question of which officers these claims may proceed against later in this opinion.

## C.   Suppressed Evidence

In Count IV of his complaint, Coleman also brought a *Brady* suppression of evidence claim. *See* [144] ¶¶ 127–36. However, he subsequently withdrew his opposition to defendants' requests for summary judgment on that claim. [359] ¶ 6. Accordingly, the court grants summary judgment for all defendants on Coleman's suppression claim.

## D.   Malicious Prosecution

Next, all defendants argue that they are entitled to summary judgment on Fulton's and Coleman's malicious prosecution claims. Fulton and Coleman bring these claims under Illinois law, which requires a plaintiff to prove (1) commencement or continuation of a judicial proceeding; (2) favorable termination; (3) absence of probable cause; (4) malice; and (5) damages. *Hurlbert v. Charles*, 238 Ill. 2d 248, 255 (2010).

### 1.    Favorable Termination

First, all defendants argue that neither plaintiff can demonstrate that the proceedings against him terminated in his favor.[18] Unlike a federal malicious prosecution claim, which requires only "that the criminal prosecution ended without a conviction," *Thompson v. Clark*, 596 U.S. 36, 49 (2022), Illinois law requires a disposition "indicative of the innocence of the accused." *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996).

Here, both prosecutions ended via *nolle prosequi*—"a procedure which restores the matter to the same state which existed before the Government initiated the prosecution" but "is not a final disposition." *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997). A *nolle prosequi* is a favorable termination "unless the abandonment is for reasons not indicative of the innocence of the accused." *Beaman v. Freesmeyer* ("*Beaman III*"), 2021 IL 125617, ¶ 109. Thus, it is "the *circumstances surrounding* the entry of the *nolle prosequi* that must be examined and not the mere form or title of the disposition." *Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill. 2d 267, 280 (1997) (emphasis in original). For example, a *nolle prosequi* resulting from "an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial" is not a favorable termination. *Swick*, 169 Ill. 2d at 513. A *nolle prosequi* based on "purely technical grounds, such as lack of jurisdiction or defective pleading" is likewise not a favorable termination. *Beaman III*, 2021 IL 125617, ¶ 109.

Because plaintiffs bear the burden of proof, "bare use of the *nolle prosequi* order[s], which did not state [the] reasons for [their] entry," is not sufficient. *Swick*, 169 Ill. 2d at 514. Rather, plaintiffs must present "evidence . . . regarding the reasons for the entry of the *nolle prosequi*[s]," from which a factfinder could conclude that the *nolle prosequis* were indicative of innocence. *Id.* Here, two points could support a conclusion that the *nolle prosequi* orders were indicative of innocence.

The first is the circumstances surrounding the *nolle prosequi*. In *Beaman III*, the Illinois Supreme Court relied in part on the outcome of the postconviction proceedings, which had vacated the prior convictions on the ground that there was "a reasonable probability that the result of the trial would have been different" if newly discovered evidence had been presented. 2021 IL 125617, ¶ 110. Although Fulton and Coleman cannot point, as did the plaintiff in *Beaman III*, to a decision of the Illinois Supreme Court expressly questioning the integrity of their convictions, they can point to the fact that their convictions were vacated in light of new DNA evidence. That sort of evidence suggests—even though it may not definitively establish—innocence.

---

[18] More specifically, the County Defendants adopted the Officer Defendants' argument on this point. [270] at 32–33.

See Dist. Att'y's Off. v. Osborne, 557 U.S. 52, 55 (2009) (noting DNA's "unparalleled ability to . . . exonerate the wrongly convicted"); Hayes v. Battaglia, 403 F.3d 935, 938 (7th Cir. 2005) (suggesting that "biological (DNA) evidence" may "demonstrate innocence so convincingly that no reasonable jury could convict").

The certificates of innocence provide further support. An Illinois statute allows one who was "convicted and subsequently imprisoned for one or more felonies . . . which he or she did not commit" to "request a certificate of innocence finding that the petitioner was innocent of all offenses for which he or she was incarcerated." 735 ILCS 5/2-702(b). Before issuing a certificate of innocence, the court must find by a preponderance of the evidence that the petitioner is innocent of the charged offense. Id. § 5/2-702(g)(3). In Patrick, the Seventh Circuit addressed the use of certificates of innocence as evidence of favorable termination. The Patrick court held that certificates of innocence are "directly probative on an element of [a] malicious-prosecution claim"—namely, favorable termination. 974 F.3d at 834. Thus, while it acknowledged that certificates of innocence can be "misunderstood," it rejected a challenge to their admissibility under Federal Rule of Evidence 403. Id. at 832–33.

Defendants argue, in essence, that Patrick should be limited to its precise facts. They rely on the Seventh Circuit's formulation of its holding as relating to "Patrick's certificate of innocence," rather than certificates of innocence generally. See id. at 832–33 (emphasis added). To be sure, the Seventh Circuit, like any federal court, decides "only the case before [it] in light of the record before [it]." Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 818 (2019). But a decision's precedential value derives from its reasoning, not merely its precise facts and result. See Ramos v. Louisiana, 590 U.S. 83, 104 (2020) (plurality opinion) ("It is usually a judicial decision's reasoning—its ratio decidendi—that allows it to have life and effect in the disposition of future cases."). No part of Patrick's reasoning was limited to the particular certificate of innocence before the Seventh Circuit. Instead, it relied on a feature—the judicial determination of innocence—common to all certificates of innocence. See Patrick, 974 F.3d at 832.

Less than a year after Patrick, the Illinois Supreme Court addressed similar questions in Beaman III. In Beaman III, as in this case, the State did not oppose the certificate of innocence. 2021 IL 125617, ¶ 111. Nevertheless, the court relied on the certificate's finding that the plaintiff was "innocent of the offenses charged in the indictment" as support for a finding that the nolle prosequi entered in the underlying criminal prosecution constituted a favorable termination. Id. Though Beaman III is a state case governed by state procedural rules, it arose in a procedural posture— summary judgment—more akin to this one than the challenge to an evidentiary ruling at issue in Patrick. See id. ¶ 113.

The County Defendants argue that the certificates do not support a finding of favorable termination because they were wrongly issued. They rely on a case from

the Illinois Appellate Court, *People v. Amor*, 2020 IL App (2d) 190475,[19] which held that 735 ILCS 5/2-702(g)(4) barred a criminal defendant who had confessed from receiving a certificate of innocence. Section 702(g)(4) prohibits issuing a certificate of innocence to one who "by his or her own conduct voluntarily cause[d] or br[ought] about his or her conviction." 735 ILCS 5/2-702(g)(4). As the Illinois Supreme Court later explained, however, the defendant in *Amor* "confessed but did not raise claims of police abuse." *People v. Washington*, 2023 IL 127952, ¶ 39. Thus, the court could conclude that he brought about his conviction "voluntarily." Here, by contrast, the entire gravamen of this case is Fulton's and Coleman's claims that their confessions were *not* voluntary. If their confessions were involuntary under the federal standard, they were involuntary *a fortiori* under the lower standard the *Washington* court adopted for Section 702(g)(4). *See* 2023 IL 127952, ¶ 45.

Moreover, even if the certificates of innocence in this case had been issued in violation of Section 702(g)(4), it is not clear why that would undermine their probative value on the favorable termination question, since that probative value is based on the required finding of innocence, *see Patrick*, 974 F.3d at 832, an entirely separate "element of the cause of action for a certificate of innocence," *Amor*, 2020 IL App (2d) 190475, ¶ 15.

The court is cognizant of the "important limits to the probative value of" the certificates. *Patrick*, 974 F.3d at 833. They have no *res judicata* effect outside the Illinois Court of Claims. 735 ILCS 5/2-702(j). Because only "[t]he Attorney General and the State's Attorney of the county where the conviction was had" have a right to intervene, *id.* ¶ 5/2-702(e), the defendants in an eventual malicious prosecution suit are not afforded the opportunity to contest the issuance of the certificates. Where, as here, the State does not oppose the petition, the certificates of innocence do "not really reflect a factual finding arising from the crucible of the adversarial process," and may even be issued without a hearing. *Patrick*, 974 F.3d at 833. Moreover, a jury in a malicious prosecution or § 1983 suit "need not decide the plaintiff's innocence but instead is asked to determine whether one or more of the defendants violated his federal constitutional or state-law rights." *Id.* Thus, as *Patrick* explained, "[w]ell-crafted jury instructions" may be necessary to prevent a jury from giving them weight they cannot bear. *Id.*; *see Harris v. City of Chicago*, No. 14-cv-4391, 2018 WL 2183992, at *4–*6 (N.D. Ill. May 11, 2018) (discussing jury instructions on the limits of certificates of innocence). But they remain "directly probative" of favorable termination. *Patrick*, 974 F.3d at 834.[20]

---

[19] The other case on which the County Defendants rely, *People v. Washington*, 2020 IL App (1st) 163024, was reversed by the Illinois Supreme Court after briefing on this motion concluded. *See People v. Washington*, 2023 IL 127952.

[20] Defendants also object that the certificates of innocence are inadmissible hearsay. However, "[w]hether a statement is hearsay and, in turn, inadmissible, will most often hinge on the purpose for which it is offered." *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998). A statement is hearsay only if "a party offers [it] in evidence to prove the truth of the

In response, the defendants place great weight on the CCSAO's continuing belief in Fulton's and Coleman's guilt. First, that argument assumes that the favorable termination inquiry is subjective, rather than based on objective indications. But even accepting that assumption, there is a difference between subjective beliefs about a defendant's guilt and subjective reasons for taking a particular action (here, entering a *nolle prosequi*). Even if the CCSAO believed Fulton and Coleman were guilty, a reasonable factfinder could certainly doubt that this belief was *why* the CCSAO declined to retry Fulton and Coleman. "[F]avorable termination does not stand or fall with the prosecutor's . . . subjective beliefs about the criminal defendant's innocence." *Sanchez v. Duffy*, 416 F. Supp. 3d 1131, 1147 (D. Colo. 2018); *see Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 928–29 (N.D. Ill. 2013) (granting summary judgment to plaintiff on favorable termination despite prosecutor's testimony that she did not believe the plaintiff was innocent).

While members of the CCSAO may have subjectively believed in Fulton's and Coleman's guilt, their purported *reason* for not retrying them was a lack of confidence in their ability to meet the burden of proof on retrial. As a draft press release—which Sussman testified at his deposition "represent[s] the official position of" the CCSAO, [288-19] at 80—explained, while the CIU "did not conclude that the defendants are innocent," the CCSAO nevertheless believed that "it would be unable to meet its burden of proof." [305-3] at 4. Sussman explained that this was because "in this day and age, a confession, particularly one that was contested, was not going to be sufficient to convict either Mr. Coleman or Mr. Fulton, particularly when combined with the DNA evidence that matched a known sex offender." [288-19] at 55. In other words, the CCSAO did not believe it could prove Fulton and Coleman guilty beyond a reasonable doubt. "[I]nability to 'meet the burden of proof' falls within those reasons Illinois courts recognize as favorable to the accused." *Fulton v. Bartik*, No. 20-cv-3118, 2024 WL 1242637, at *33 (N.D. Ill. Mar. 22, 2024) (internal alterations omitted).

Defendants resist this conclusion, relying on Sussman's explanation that he expected the confession to have less weight because the "general population[] has become more familiar with the idea of false confessions and coerced confessions given the extensive history that's been documented in the Chicago Police Department of false confessions and people who have been tortured." [288-19] at 55. Defendants paint this explanation as an expectation that "jurors would [not] be able to set aside their negative impressions of the Chicago Police Department and focus on the facts." [343] at 12 (sealed). That argument is not persuasive. If Sussman had allowed the acquittals he expected to in fact occur, there would be no doubt that Fulton and Coleman had satisfied the favorable termination element. *See Logan v. Caterpillar,*

---

matter asserted in the statement." Fed. R. Evid. 801(c)(2). Here, the certificates of innocence are being offered to demonstrate the circumstances surrounding the *nolle prosequi*, not the truth or falsity of the matter asserted (namely, plaintiffs' innocence). The court expresses no view on whether the certificates of innocence are admissible for any other purpose or whether another rule not raised by defendants at this stage may undermine their admissibility.

*Inc.*, 246 F.3d 912, 926 (7th Cir. 2001) ("[A]n acquittal is clearly sufficient to show favorable termination."). A prosecutor cannot evade a favorable termination by simply dismissing a prosecution he expects will end in an acquittal, even if that expectation is based on his belief that the "judgment of a jury," to which defendants are entitled, will prove inferior to "the more tutored but perhaps less sympathetic reaction of the single judge." *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968).

Defendants also argue that the prosecution's perceived inability to meet its burden of proof demonstrates that the *nolle prosequi* resulted from "the impossibility or impracticability of bringing the accused to trial," which is not a favorable termination. *Swick*, 169 Ill. 2d at 513. But, as the Second Restatement of Torts— which the Illinois Supreme Court finds persuasive on issues regarding favorable termination, *see id.*; *Cult Awareness Network*, 177 Ill. 2d at 277–78—explains, that category is "most commonly applied when the impossibility of bringing the accused to trial is due to his absence from the jurisdiction." Restatement (Second) of Torts § 661 cmt. a (Am. L. Inst. 1977). Although the Second Restatement recognizes the possibility of "other reasons why it is impossible to bring the accused to trial," it mentions only other reasons making it impossible to actually hold the trial, such as if the defendant "conceals himself and cannot be found" or "leaves the jurisdiction." *Id.* It never suggests that the rule applies when the only obstacle to holding a trial is that the defendant would be acquitted.

In an attempt to fit this case within the "impossibility or impracticability" category, defendants rely on a series of cases where a *nolle prosequi* followed a successful motion to suppress or quash. *E.g.*, *Woods v. Vill. of Bellwood*, 502 F. Supp. 3d 1297, 1318 (N.D. Ill. 2020) (collecting cases). But here, the confessions were never suppressed, and Sussman apparently believed that at least Coleman's confession was admissible. *See* [288-19] at 62. Even if the confessions had been suppressed, the cases defendants cite involve "suppression of evidence *for reasons unrelated to reliability*— especially prophylactic rules like *Miranda v. Arizona* and the Fourth Amendment's exclusionary rule." *Rosado v. Mora*, No. 17-cv-2210, 2019 WL 4450523, at *6 (N.D. Ill. Sept. 17, 2019) (emphasis added). To be sure, "the constitutional principle of excluding confessions that are not voluntary" is not based primarily on concern that "such confessions are unlikely to be true," but rather on the incompatibility of "the methods used to extract them" with "an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system." *Rogers v. Richmond*, 365 U.S. 534, 540–41 (1961). However, the involuntariness of a confession is not a "reason[] unrelated to reliability." *Rosado*, 2019 WL 4450523, at *6. Rather, as the Supreme Court has explained, "[w]e require exclusion of coerced confessions *both* because we disapprove of such coercion *and* because such confessions tend to be unreliable." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349 (2006) (emphasis added); *see also Watkins v. Sowders*, 449 U.S. 341 (1981) ("[A]n involuntary confession is inadmissible in part because such a confession is likely to be unreliable . . . ."); *Jackson*, 378 U.S. at 385–86 ("It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only

because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the strongly felt attitude of our society that important human values are sacrificed where an agency of the government . . . wrings a confession out of an accused against his will." (quotation omitted)); *Fulminante*, 499 U.S. at 296 (noting "the risk that the confession is unreliable"); *Buckley IV*, 20 F.3d at 795 ("Confessions wrung out of their makers may be less reliable than voluntary confessions . . . ."). Thus, the cases defendants cite are inapposite. "If a confession is suppressed because involuntarily coerced, then the evidence was not reliable and a subsequent voluntary dismissal based on lack of evidence would be indicative of innocence." *Dobiecki v. Palacios*, 829 F. Supp. 229, 235 (N.D. Ill. 1993).

To be sure, the Seventh Circuit in *Washington v. Summerville* found no favorable termination when the *nolle prosequi* followed suppression of an allegedly coerced confession. 127 F.3d at 557–58. But *Washington* is inapposite for two reasons. First, the confession in *Washington* was suppressed on a technicality. The officer who had taken the confession invoked his own Fifth Amendment privilege against self-incrimination, leaving the trial judge with "no choice" but to grant the motion to suppress. *Id.* at 558. Before that problem arose, the trial court had found the plaintiff's allegations of coercion "to be unbelievable." *Id.* Second, the plaintiffs in *Washington* presented no other evidence of favorable termination. *See id.* Thus, the court's conclusion was that the *nolle prosequi* following suppression was not enough, by itself, for a reasonable factfinder to conclude that the prosecution had terminated favorably to the accused. *Id.* The court did not reach the conclusion the defendants are seeking here: that problems with a confession by themselves *establish* that the prosecution did *not* terminate favorably to the accused.

The defendants point to one additional reason on which they claim the CCSAO relied in deciding not to seek retrial: the idea that Fulton and Coleman had aged out of dangerousness. But the testimony from Sussman on which they rely undercuts this contention. Sussman explained that the topic of Fulton's and Coleman's dangerousness "did not come up as a[n] 'I can't believe we have to let this guy out of jail even though he's guilty.'" [288-19] at 58. Instead, "the decision itself was made based on an evaluation of the evidence, whether [the CCSAO] could meet [its] burden, and what [its] ethical duties were as prosecutors." *Id.*

At summary judgment, "all evidence must be construed in the light most favorable to the party opposing summary judgment." *Matsushita*, 475 U.S. at 601. Viewed in that light, the evidence creates a genuine dispute as to whether Fulton's and Coleman's criminal prosecutions were terminated in their favor.

### 2. Probable Cause

The County Defendants also argue that they are entitled to summary judgment on the malicious prosecution claims because Garfinkel had probable cause to

prosecute Fulton and Coleman. Because the Officer Defendants do not make a similar argument (and, even if they did, the analysis would potentially be different for each defendant), the court will consider that argument when it turns to determining against which defendants plaintiffs' malicious prosecution claims may proceed.

### E.    Intentional Infliction of Emotional Distress

Fulton and Coleman also bring state law claims for intentional infliction of emotional distress (IIED). Under Illinois law, an IIED claim has three elements. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 50.

The defendants do not (at least for purposes of summary judgment) dispute that the conduct to which Fulton and Coleman were allegedly subjected satisfies these elements. *See, e.g.*, *Fox v. Tomczak*, No. 04-cv-7309, 2006 WL 1157466, at *6 (N.D. Ill. Apr. 26, 2006) ("Allegations that a state official fabricated false or misleading evidence of guilt or concealed exculpatory evidence would be sufficiently 'outrageous' to support an IIED claim."). Instead, they argue only that there is insufficient evidence that certain defendants were involved in that conduct. The court will address those arguments when it considers each defendant's entitlement to summary judgment.[21]

### F.    Conspiracy

Next, both sets of defendants argue that they are entitled to summary judgment on Fulton's and Coleman's § 1983 and state law conspiracy claims. "A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.'" *Beaman v. Freesmeyer* ("*Beaman I*"), 776 F.3d 500, 510 (7th Cir. 2015) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Id.* Similarly, civil conspiracy under Illinois law requires "an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999).

Defendants argue first that the conspiracy claims are derivative of the underlying § 1983 and state law claims and thus cannot survive summary judgment if those claims do not survive. It is true that neither § 1983 nor Illinois law creates

---

[21] Originally, the Officer Defendants argued that the IIED claims were untimely. *See* [343] at 32–33 (sealed). They withdrew this argument in their reply brief, however. [308] at 54 n.18; *see, e.g.*, *Walker v. City of Chicago*, 559 F. Supp. 3d 747, 753 (N.D. Ill. 2021).

civil liability for conspiracy in the absence of an underlying constitutional violation or tort. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 432 (2000) ("Where, as here, a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails."). However, as explained above, several of Fulton's and Coleman's underlying claims (under both state and federal law) survive summary judgment. Thus, this argument is unavailing. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) ("Because we reverse the dismissal of the equal protection claim, we also reverse the dismissal of the dependent conspiracy claim.").

The Officer Defendants also argue that only officers who themselves committed constitutional violations or torts can be liable for conspiracy. That is, in essence, an argument that a conspirator is liable only for his own actions and not for the actions of his coconspirators. But the very function of conspiracy liability is to "extend[] liability in tort *beyond* the active tortfeasor." *Fiala v. Bickford Senior Living Grp., LLC*, 2015 IL App (2d) 150067, ¶ 62 (emphasis added); *see Hostrop v. Bd. of Junior Coll. Dist. No. 515*, 523 F.2d 569, 576 (7th Cir. 1975); *Tillman v. Burge*, 813 F. Supp. 2d 946, 989 (N.D. Ill. 2011) ("That the allegations may not have been sufficient to state a substantive *Brady* violation against [defendant] himself does not mean they were insufficient to allege his role in a conspiracy that included *Brady* violations."). Thus, once a conspiracy has formed, the liability of each conspirator is defined not by that conspirator's own actions but by "the scope of the conspiracy." *Proffitt v. Ridgeway*, 279 F.3d 503, 507 (7th Cir. 2002).

Defendants' stronger argument is that neither plaintiff has presented evidence of an agreement—"a necessary and important element" of a conspiracy. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994). Under both federal and Illinois law, "[c]onspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons." *Ziglar v. Abassi*, 582 U.S. 120, 153 (2017); *see McClure*, 188 Ill. 2d at 133. The agreement can be either express or implied. *See, e.g.*, *Scherer*, 840 F.2d at 441. A "general conspiratorial objective," though necessary, is not sufficient. *See Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013).

That Fulton and Coleman cannot present *direct* evidence of an agreement is not dispositive. "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy." *Beaman III*, 776 F.3d at 511; *see McClure*, 188 Ill. 2d at 134 ("A conspiracy is almost never susceptible to direct proof."). For the state law conspiracy claim, however, the circumstantial evidence of an agreement "must be clear and convincing." *McClure*, 188 Ill. 2d at 134. Thus, "a federal court ruling on a summary judgment motion must ask 'whether the evidence presented is such that a reasonable jury might find that [an agreement] had been shown with convincing clarity.'" *Jean v. Dugan*, 20 F.3d 255, 263 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 257). No

such heightened burden of proof governs the § 1983 conspiracy claim. *See Crawford-El v. Britton*, 523 U.S. 574, 594 (1998) ("Neither the text of § 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provide any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself.").

There is sufficient circumstantial evidence from which a jury could (but need not) find the existence of an agreement—whether express or implied—under either burden of proof. Though they disagree about the identity of those detectives, all parties agree that a jury could find that multiple detectives were involved in the interrogations of Fulton, Coleman, and Taylor. Given that, as discussed above, a jury could also find that those involved in the interrogations coerced and knowingly manufactured false evidence, a jury could conclude that the detectives involved in that coercion and fabrication shared a common purpose to frame Fulton, Coleman, and Taylor. *See Hill v. City of Chicago*, No. 06-cv-6772, 2009 WL 174994, at *9–10 (N.D. Ill. Jan. 26, 2009). Conspiracy liability does not require a more specific agreement "on the details of the conspiratorial scheme," so long as the conspirators "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." *Jones*, 856 F.2d at 992. The potential inference of a tacit agreement in this case could be reinforced by the interrogating detectives' collective failure to call attention to the misconduct.

Even if proved, however, the existence of an agreement does not by itself establish that each defendant was party to that agreement. Only those who were party to the agreement can be held liable for conspiracy, *see Adcock*, 164 Ill. 2d at 64, and the court cannot infer agreement from mere participation in the investigation, *see Beaman I*, 776 F.3d at 512–13. Because the arguments regarding who was party to the conspiracy overlap with the more general arguments about personal involvement, the court will address them as part of its discussion of each individual defendant.[22]

---

[22] The Officer Defendants also argue that Halloran, Boudreau, O'Brien, Carroll, Moser, and Graf are entitled to qualified immunity on the conspiracy claims "to the extent Plaintiffs are attempting to conflate the appropriate and lawful investigation of a homicide with an unlawful conspiracy to frame them." [308] at 48. The Officer Defendants raise qualified immunity only in their reply brief, and then only perfunctorily. *See id.* at 48–49. Accordingly, the argument is forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court was entitled to find that [defendants] waived the qualified immunity defense in the summary judgment proceedings because they failed to raise the issue before their reply brief."); *Batson v. Live Nation Ent.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."). Moreover, as discussed below, neither plaintiff argues—and the court does not hold—that any defendant may be held liable for conspiracy merely because of his involvement in the investigation.

## G.    Failure to Intervene

Fulton and Coleman also seek to hold individual defendants liable on a "failure to intervene" theory. "[U]nder certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "To succeed on this claim, [plaintiffs] must demonstrate that the [d]efendants (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

The Officer Defendants argue that, because a jury could not find that any Officer Defendant other than Foley and Clancy was involved in eliciting either confession, no other officer can be held liable for failure to intervene. However, failure to intervene liability attaches to an officer's *omissions*, not his actions. *See Yang*, 37 F.3d at 285 ("Omissions as well as actions may violate civil rights."). It recognizes "the duty imposed by [a police officer's] office . . . to stop *other officers*" from violating constitutional rights. *See Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) (emphasis added). Accordingly, even officers who were not directly involved in eliciting either confession could be liable on a failure to intervene theory, so long as they both "knew that a constitutional violation was committed" and "had a realistic opportunity to prevent it." *Gill*, 850 F.3d at 342. Because questions of which defendants had that knowledge and realistic opportunity are closely intertwined with questions of personal involvement, the court will consider those questions later in this opinion.

## H.    Supervisory Liability

Coleman also brings a claim for supervisory liability against Benoit and "other Unknown Supervisory Defendants." [144] ¶ 150. However, he has not identified any other supervisory defendant, and (as discussed below) he does not oppose granting summary judgment to Benoit. [289] at 12 n.1. Accordingly, the court grants summary judgment for Benoit on Coleman's supervisory liability claim.

## I.    *Respondeat Superior*

Fulton and Coleman also seek to hold the City of Chicago and Cook County liable under the doctrine of *respondeat superior*. Because there is no *respondeat superior* liability for § 1983 claims, *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997), *respondeat superior* is only available for plaintiffs' state law claims. The County argues that it cannot be held liable under *respondeat superior* because Garfinkel was not its employee. "Absent an employment relationship, the doctrine does not apply." *Moy v. County of Cook*, 159 Ill. 2d 519, 524 (1994). Because ASAs like Garfinkel "are officers who perform the general duties of the State's Attorney's Office, not employee-agents who perform a particular act or duty," the County cannot be held "liable for the . . . actions of an assistant State's Attorney under the *respondeat superior* doctrine." *Biggerstaff v. Moran*, 284 Ill. App. 3d 196,

200 (1996); *see Burger v. Cnty. of Macon*, 942 F.3d 372, 375 (7th Cir. 2019); *People ex rel. Landers v. Toledo, St. L. & W.R. Co.*, 267 Ill. 142 (1915). Thus, the court grants summary judgment for the County on Fulton's and Coleman's *respondeat superior* claims against it.[23]

### J. Indemnification

Finally, Fulton and Coleman bring indemnification claims against the City and County under 745 ILCS 10/9-102. Because Foley and Clancy did not move for summary judgment on most of the claims against them, the City still may be required to indemnify them. *See, e.g.*, *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 748 (N.D. Ill. 2016). Because the indemnification claims against the County hinge on the claims against Garfinkel, the court will address those claims later in this opinion, after addressing the claims against Garfinkel.

## II. Arguments Regarding Particular Defendants

As noted throughout the above discussion, the defendants make several arguments that particular defendants are entitled to summary judgment because the record does not sufficiently establish their liability for the various constitutional violations and torts that Fulton and Coleman allege. The court will now turn to those arguments.

"[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)). Thus, "[t]he plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

Fulton and Coleman offer several legal theories under which, they argue, the personal involvement requirement is satisfied for the various defendants. First, a defendant whose own "tortious conduct was an actual and proximate cause of the plaintiff's injury" under state law, *Woods v. Cole*, 181 Ill. 2d 512, 519 (1998), or who was directly "personally responsible for the deprivation of a constitutional right," *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)), may be held liable.

A "lack of *direct* participation" makes it "more difficult" to prevail, but not impossible. *Minix*, 597 F.3d at 833 (emphasis added). For example, a defendant who is not directly involved may nevertheless be liable for conspiracy under either § 1983 or state law. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his

---

[23] The City does not argue that it is entitled to summary judgment on plaintiffs' *respondeat superior* claims.

constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman I*, 776 F.3d at 510. And under Illinois law, liability for civil conspiracy requires "an agreement and a tortious act committed in furtherance of that agreement." *McClure*, 188 Ill. 2d at 133. "[I]n any alleged conspiracy, each member is liable for the other members' acts that are foreseeable and in furtherance of the shared goal." *Am. Alt. Ins. Corp. v. Metro Paramedic Servs., Inc.*, 75 F. Supp. 3d 833, 843 (N.D. Ill. 2014).

Finally, "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang*, 37 F.3d at 285. To be liable for failure to intervene, a defendant must have "(1) [known] that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill*, 850 F.3d at 342. Even under a failure to intervene theory, "a plaintiff still must make an individual identification of the officers who failed to act." *Colbert*, 851 F.3d at 659–60.

In assessing potential liability, the court "must consider each defendant independently." *Whitfield*, 76 F.4th at 706.

## A.    Foley and Clancy

Neither Foley nor Clancy argues that he did not have sufficient involvement in the alleged constitutional violations and torts to render him potentially liable. Accordingly, the claims against Foley and Clancy survive summary judgment to the extent laid out above.

## B.    Halloran

Fulton and Coleman point to four ways in which they argue Halloran was involved in the alleged constitutional violations and torts. First, they argue that Halloran was involved in eliciting Coleman's confession. Second, they argue Halloran was involved in eliciting Fulton's confession. Third, they argue that Halloran was involved in fabricating statements from Calimee and Williams. Finally, they argue that Halloran fabricated his own statement about having seen Fulton exit his home through the back as officers entered through the front. The court will first consider whether these assertions are adequately supported by the record, such that a reasonable jury could agree with them (i.e., whether the factual disputes are "genuine"), and then consider their implications for the claims against Halloran (i.e., whether the factual disputes are "material").

### 1.    Factual Disputes

#### a.    Coleman's Confession

First, Fulton and Coleman argue that Halloran was among the eight detectives involved in Coleman's interrogation. As they acknowledge, the "linchpin" of this

theory is Coleman's affidavit dated August 3, 2021. [312] at 4. In the affidavit, Coleman states: "The two detectives who interviewed me together the first time I was at Area 1 were also among the eight detectives in the interrogation room." [288-55] ¶ 6. He also states that he "was prepared to testify at [his] deposition about which detectives were part of the group of eight detectives, but [he] was not asked." *Id.* ¶ 7. The Officer Defendants do not dispute that Boudreau and Halloran were the two detectives who interviewed Coleman during his first visit to Area 1. *See* [303] ¶ 8. Instead, they take aim at Coleman's affidavit, arguing that it cannot be considered because it is a "sham affidavit."

Ordinarily, an affidavit can be used to oppose summary judgment if it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The "sham affidavit rule," however, "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). The rule's rationale is that "[a]ffidavits, though signed under oath by the affiant, are typically . . . written by the affiant's lawyer, and when offered to contradict the affiant's deposition [or other testimony] are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). By refusing to consider such affidavits, courts can "weed out unfounded claims, specious denials, and sham defenses," which is "the very purpose of the summary judgment motion." *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985). The sham affidavit rule ensures that "a *genuine* issue of material fact cannot be conjured out of nothing." *James*, 959 F.3d at 316 (emphasis in original).

Applying the rule too aggressively, however, "would usurp the trier of fact's role in determining which portion of the testimony was most accurate and reliable." *Castro v. DeVry Univ.*, 786 F.3d 559, 572 (7th Cir. 2015). An affidavit should be disregarded only when the affiant "has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). The contradictions must be "so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment." *Castro*, 786 F.3d at 571. As with any summary judgment motion, "the ambiguities should be construed in [the nonmovant's] favor." *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 603 (7th Cir. 1999). Otherwise, the sham affidavit exception would swallow the general rule forbidding courts from "mak[ing] credibility determinations, weigh[ing] the evidence, or decid[ing] which inferences to draw from the facts" on summary judgment. *Payne*, 337 F.3d at 770. Those tasks remain "jobs for a factfinder." *Id.*

First, the Officer Defendants point to the following exchange during Coleman's testimony at the state court hearing on the motion to suppress:

48

Q: You remember going back to the station right after finding the bodies [sic], right?

**A: Right.**

Q: And talking to some detectives in the area, right?

**A: Right**

Q: And do you remember what detectives you talked to?

**A: No, I don't.**

Q: Can you describe them?

**A: I said I don't know who I talked to.**

Q: Can you describe the first guys that you talked to?

**A: A middle young white guy.**

[288-11] at 43.

Next, they point to this exchange from Coleman's deposition in this case, taken nearly two-and-a-half decades after the motion to suppress hearing:

Q: All right. Let's talk about the first time you were at Area 1. Did you speak with detectives more than once about your discovery of the body?

**A: Once.**

Q: How many detectives did you speak with?

**A: Two.**

Q: Do you remember what they looked like?

**A: No.**

Q: Do you remember their names?

**A: No.**

Q: Was one short or tall?

**A: I just told you, I don't know what they looked like.**

Q: Was one short or tall?

**A: Don't know.**

Q: Do you remember their skin color?

**A: White.**

Q: Do you remember their hair color?

**A: No.**

Q: Do you remember whether they looked slim or heavier set?

**A: Don't know.**

[288-1] at 79–80.

While these exchanges do not bolster the credibility of Coleman's affidavit, they do not directly contradict it. Coleman's affidavit claims only that "[t]he two detectives who interviewed [him] together the first time [he] was at Area 1 were also among the eight detectives in the interrogation room." [288-55] ¶ 6. If the affidavit claimed that Coleman could *identify* the officers who interviewed him during his first visit to Area 1, then perhaps it would qualify as a sham affidavit—though even then, it could perhaps be explained as "correction of a memory failure." *Castro*, 786 F.3d at 571. So, too, if the affidavit claimed to offer a detailed description of those officers. But the affidavit makes a different claim: that, whatever Coleman does not know about the officers who initially interviewed him or the officers who were involved in the later interrogation, he knows that the first group is a subset of the second. At no point in his earlier testimony did Coleman contradict that claim. Instead, he was simply never asked. And "[w]ithout that question having been asked and answered to ensure that his deposition testimony exhausted his memory of the subject, his later declaration . . . simply did not contradict any specific testimony in his deposition." *Id.*[24]

The Officer Defendants also argue that Halloran and Boudreau could not have been among the six detectives who crowded into the room with Coleman, Foley, and Clancy because they were not at Area 1 at the time. This argument has two factual premises: (1) that Coleman's encounter with the eight detectives occurred at 12:45 a.m. and (2) that Halloran and Boudreau were away from Area 1 at 12:45 a.m. However, both premises are in genuine dispute, and thus this argument does not entitle Halloran to summary judgment.

---

[24] The sham affidavit rule applies to affidavits that contradict "the *party's* prior deposition or other sworn testimony." *James*, 959 F.3d at 316 (emphasis added). Thus, it is not clear whether it could justify disregarding the affidavit in Fulton's suit, to which Coleman is not a party. Because the affidavit does not fall within the narrow confines of the sham affidavit rule as to either Fulton or Coleman, it is not necessary to address that question.

In support of the first premise—that Coleman's encounter with the eight detectives occurred at 12:45 a.m., the Officer Defendants cite a timeline GPR authored by Clancy. *See* [288-9] at 22. However, this timeline only indicates that Coleman gave a statement at 12:45 a.m.; it does not connect that statement to the encounter with the eight detectives. *See id.* Next, they cite Coleman's deposition testimony. But Coleman testified that the questioning began "right away" after he arrived at Area 1, [288-1] at 95, which Coleman testified was around midnight, *id.*, and Clancy's timeline indicates was at 11:45 p.m., [288-9] at 22. Finally, they point to Foley's testimony at the hearing on Coleman's motion to suppress, which describes an interview with Coleman that occurred at 12:45 a.m. [288-16] at 16. However, Foley testified that only he and Clancy (not six other detectives) were present for this interview. *Id.* There is nothing in this testimony indicating that the interview about which Foley testified is the same interview for which Coleman alleges Halloran and Boudreau were present. Thus, rather than supporting the conclusion that Coleman's encounter with the eight detectives occurred at 12:45 a.m., Foley's testimony could support the conclusion that the 12:45 a.m. interview mentioned in Clancy's timeline GPR was separate from the eight detectives interview. The Officer Defendants have not conclusively established that Coleman's encounter with the eight detectives occurred at 12:45 a.m. Rather, a jury could conclude that it happened nearly an hour earlier—at the same time Clancy's timeline indicates Halloran and Boudreau transported Calimee and Williams to Area 1. [288-9] at 22; *see* [288-8] at 44; [288-13] at 9–10.

Even assuming that Coleman's encounter with the eight detectives occurred at 12:45 a.m., the Officer Defendants have not definitively established that Halloran and Boudreau were away from Area 1 at that time. Rather, Boudreau testified that he and Halloran brought Calimee and Williams to Area 1 at approximately 1:00 a.m. [288-8] at 39. Depending on how approximate that estimate is, it could place Halloran and Boudreau at Area 1 at 12:45 a.m., thus enabling them to participate in Coleman's interview if (as they claim) it occurred at that time.

For these reasons, Coleman's affidavit creates a genuine dispute about whether Halloran was among the eight detectives in the room during Coleman's interrogation.

### b. Fulton's Confession

Next, Fulton argues that Halloran is (along with Boudreau) one of the two white detectives (besides Foley and Clancy) who interrogated him. He points to two pieces of evidence in support of this conclusion. First, Halloran testified that he and Boudreau interviewed Fulton when he first arrived at Area 1. [288-10] at 4, 39, 41. According to Halloran, Fulton gave them basic biographical information (name, date of birth, address, etc.), denied any involvement in A.B.'s murder, and told Halloran and Boudreau that he was with Johnson at the time of A.B.'s disappearance. *Id.* at 4. Second, Halloran and Boudreau are each listed as "Arresting Detectives" on Fulton's

arrest report, [288-84], and as an "Investigator" and an "Arresting Officer," respectively, on a felony review jacket signed by Garfinkel, [288-88].

This information at most demonstrates, however, that Halloran and Boudreau were part of the investigation. Absent more, reasonable jurors cannot infer from mere participation in an investigation that they were involved in particular wrongdoing, even where the number of officers involved in the investigation is limited and multiple officers allegedly engaged in wrongdoing. *See Colbert*, 851 F.3d at 657–59. Thus, there is not sufficient evidence for a reasonable jury to conclude that Halloran was involved in eliciting Fulton's confession.

### c. Calimee and Williams's Statements

Next, Fulton and Coleman argue that Halloran was involved (alongside Boudreau) in fabricating Calimee and Williams's statement that they had not originally disclosed that they saw Coleman and A.B. leave the party together on the night of A.B.'s disappearance because they were afraid of Coleman and the Gangster Disciples. Although plaintiffs have withdrawn their fabrication claims based on these statements, they nevertheless may be relevant as evidence of conspiracy. *See Geinosky*, 675 F.3d at 750. This statement appears in the First Supp Report. *See* [288-27] at 11. The First Supp Report, in turn, was written by Foley and Clancy. *See* [266] ¶ 105; [292] ¶ 105. Nevertheless, a reasonable jury could conclude that Halloran and Boudreau were the sources of this information, because both have testified to it in this litigation. [288-8] at 44; [288-10] at 34–35. A reasonable jury could also conclude that these statements were fabricated. Calimee testified that she was never afraid of Coleman or the Gangster Disciples, and that she would not have told police that she was. [288-14] at 13–14.

### d. Halloran's Testimony

Finally, Fulton points to Halloran's trial testimony that he saw Fulton exiting his home through the back door as officers entered through the front. As discussed above, that testimony is protected by absolute immunity. Because it is protected by absolute immunity, it also cannot serve as the basis for conspiracy liability. *See Gill*, 850 F.3d at 342. However, it may nevertheless be used to prove the existence of an agreement. *See Geinosky*, 675 F.3d at 750.

The parties dispute whether this testimony was false. However, Fulton testified that he was in his bedroom when police came and brought him to Area 1. [288-2] at 73; [288-82] at 5. That conflict between Fulton's testimony and Halloran's creates a factual dispute about the truth of Halloran's testimony, and the dispute cannot be resolved at summary judgment.

### 2. Legal Analysis

Drawing all of the above inferences in plaintiffs' favor, a jury could find Halloran liable for coercing both confessions, as well as for malicious prosecution, failure to intervene, and conspiracy. It could not, however, find him liable for fabricating either confession.

### a. Coerced Confessions

Assessing personal involvement in a coerced confession case is difficult. Ordinarily, such claims arise as objections in criminal prosecutions. *See, e.g.*, *Dassey*, 877 F.3d at 310; *Stechauner v. Smith*, 852 F.3d 708, 712 (7th Cir. 2017). They are, however, also cognizable under § 1983. *See White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979); *Peck v. Robinson*, 641 F. Supp. 3d 467, 471 (N.D. Ill. 2022). In the former context, the analysis can focus on the "coercive activity of the State" as a whole. *See Colorado v. Connelly*, 479 U.S. 157, 165 (1986). But in the § 1983 context, the court must determine not just whether the confession was voluntary, but what sort of involvement in eliciting an involuntary confession renders an individual defendant liable. *See Minix*, 597 F.3d at 833.

The court concludes that two additional requirements (beyond the showing that the confession was involuntary) must be satisfied before an individual defendant can be held liable under § 1983 for direct participation in eliciting an involuntary confession. First, the defendant must have personally engaged in "coercive police activity." *See Connelly*, 479 U.S. at 167. Second, the individual defendant's coercive activity must have caused the involuntary confession under ordinary principles of tort liability. *See Richman v. Sheahan*, 512 F.3d 876, 884–85 (7th Cir. 2008).

The first requirement is part of the constitutional analysis. Not every confession that is not "totally rational and properly motivated" is coerced. *Connelly*, 479 U.S. at 166. Rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167; *see Stechauner*, 852 F.3d at 718. In other words, "the police interrogator must have committed wrongful acts in order for a confession to be suppressed as the product of coercion." *Pole v. Randolph*, 570 F.3d 922, 942 n.7 (7th Cir. 2009). So, for example, when a suspect is tricked into confessing by his own lawyer's bad advice, the confession is not constitutionally involuntary. *United States v. Stadfeld*, 689 F.3d 705, 710 (7th Cir. 2012). "[T]he element of coercion is 'crucial' to a determination that a confession was involuntary." *Allen v. Buss*, 558 F.3d 657, 669 (7th Cir. 2009) (quoting *Withrow*, 507 U.S. at 693).

Although this requirement was articulated in the context of evaluating the "coercive activity of the State" as a whole, *Connelly*, 479 U.S. at 165, the court concludes that an individual defendant's own coercive activity is also a threshold requirement for § 1983 liability. Otherwise, mere participation in an investigation

53

that involved other officers behaving unconstitutionally would make an officer liable. *But see Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992) ("Proximity to a wrongdoer does not authorize punishment."); *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) ("But showing that [defendants] 'conspired' to investigate [plaintiff], which is lawful and part of their duties as law enforcement officers, is a far cry from showing that [defendants] agreed to fabricate, and then maliciously prosecute [plaintiff] for, a bribery crime he did not commit."). An officer who performs a lawful arrest and then clocks out for the day is not liable when the fact that the suspect is under arrest supports a finding that a later confession is involuntary. Nor is an officer who conducts himself appropriately in the early stages of an interrogation and then departs liable because the total length of interrogation supports a finding of involuntariness.

This does not mean, however, that an officer can be held directly liable only when he or she physically abuses the suspect. "[C]oercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960); *see White*, 592 F.2d at 383 (noting that a coerced confession claim can prevail "even though no physical force was used in the extraction of the confession"). Rather, any "physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will," *United States v. Chaoqun*, 107 F.4th 715, 733 (7th Cir. 2024) (quoting *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000)), can satisfy this threshold requirement.

In addition to meeting the "coercive police activity" threshold, the individual defendant's conduct must be "causally related to the confession." *Connelly*, 479 U.S. at 164; *see Richman*, 512 F.3d at 884–85. That requirement derives both from the constitutional test, *see Connelly*, 479 U.S. at 164, and from common law tort principles, *see Richman*, 512 F.3d at 884–85. And, of course, the plaintiff must show that his confession was actually involuntary—that is, that his "will was overborne." *Koh*, 933 F.3d at 844.Applying those principles to Halloran, a jury could (but need not) conclude that he is responsible for eliciting Coleman's confession, but not Fulton's.

### i. Coleman's Confession

As to Coleman's confession, a reasonable factfinder could find that, on the facts of this case, the presence of eight officers in the room was an intimidation tactic designed to coerce a confession and thus satisfies the threshold requirement of some coercive police activity. *See Chaoqun*, 107 F.4th at 733 (holding that "psychological intimidation" constitutes coercive police activity under *Connelly*). In several contexts, courts have recognized that the "presence of several officers" can be "threatening." *E.g.*, *United States v. Campbell*, 110 F.4th 964, 971 (7th Cir. 2024) (quoting *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016)). For example, the "threatening presence of several officers" is relevant to determining whether consent to a search

54

was voluntarily given. *United States v. Yusuff*, 96 F.3d 982, 985 (7th Cir. 1996); *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006). This is especially relevant because the voluntariness of consent to a search is evaluated using the same standard as the voluntariness of a confession. *See Bustamante*, 412 U.S at 223–24.

Courts also consider the presence of multiple officers in determining whether a suspect is in custody under *Miranda*, a "closely-related inquiry." *United States v. Wyatt*, 179 F.3d 532, 535 (7th Cir. 1999); *see, e.g.*, *Campbell*, 110 F.4th at 971. This suggests that it contributes to a "police-dominated atmosphere" that is "inherently coercive." *Howes v. Fields*, 565 U.S. 499, 509, 511 (2012) (quoting *Miranda*, 384 U.S. at 456). Additionally, the presence of multiple officers suggests that a Fourth Amendment seizure has occurred. *See, e.g.*, *Kaupp v. Texas*, 538 U.S. 626, 630 (2003); *United States v. Ahmad*, 21 F.4th 475, 479 (7th Cir. 2021). That inquiry likewise turns in part on "coercive conduct on the part of the police." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008).

The court thus concludes that the appearance of eight officers in the interrogation room with Coleman may, on the facts of this case, serve as the sort of "coercive police activity" that is a "necessary predicate" to a finding of involuntariness, *Connelly*, 479 U.S. at 167—and thus, as explained above, to a finding of personal involvement. *See United States v. Wilson*, 806 F. App'x 450, 453 (6th Cir. 2020) ("Coercive behavior includes the threatening presence of several officers . . . ." (quotation omitted)); *United States v. Williams*, 525 F. App'x 330, 334 (6th Cir. 2013) (listing "the threatening presence of several officers" among the "paradigmatic examples of coercive actions"). In *United States v. Borostowski*, 775 F.3d 851 (7th Cir. 2014), the Seventh Circuit observed that "[t]he arrival of thirteen law enforcement officers in a single family home could hardly be described otherwise" than as "a show of force." *Id.* at 860. A jury could conclude that the same was true of the arrival of eight officers in a small interrogation room in this case.

Of course, coercive police activity must also be "calculated to overcome the defendant's free will." *Chaoqun*, 107 F.4th at 733 (quotation omitted). But Halloran does not argue that the officers in the room with Coleman were not there to intimidate him into confessing; instead, he argues only that he was not among the officers in the room. As discussed above, that is a question for a jury,

That leaves the causation requirement, which derives from ordinary principles of tort law rather than from the Constitution. *See Richman*, 512 F.3d at 884 (noting that "most principles of the common law of torts" are "applicable to a constitutional tort case brought under 42 U.S.C. § 1983"). When multiple officers are allegedly involved in coercing a confession, it is difficult to ascertain which officers' activity caused the involuntary confession. However, by analogy to "the principle of *Summers v. Tice*, 199 P.2d 1 (Cal. 1948) . . . that persons who commit a negligent act . . . may be liable to a victim of one of their number even if the victim cannot prove which of the defendants caused his harm," *Hessel*, 977 F.2d at 305, a factfinder could

reasonably find each of the officers involved in the aforementioned eight-detective interrogation liable without needing to determine whose coercive activity pushed Coleman over the edge. Of course, a factfinder could also conclude that Coleman's confession, if involuntary, was caused instead by other tactics detectives allegedly used while interrogating him, such that the presence of eight officers in the room did not cause the alleged constitutional violation. However, because a factfinder could potentially reach either conclusion, this is not one of the "rare[]" cases where "summary judgment on the issue of causation" is "appropriate." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022). Summary judgment for Halloran on Coleman's coerced confession claim is improper.

### ii. Fulton's Confession

Because, as discussed above, there is no evidence that Halloran was involved in interrogating Fulton beyond collecting basic biographical information when Fulton first arrived at Area 1, there is no basis to conclude that he engaged in any coercive tactics that would subject him to liability for coercing Fulton's confession. Thus, the court grants summary judgment to Halloran on Fulton's coerced confession claim.

### b. Fabricated Evidence

Likewise, a jury could not find Halloran liable for fabricating either confession, because there is no evidence he knew that the confessions were false or that he supplied the information contained therein. Assuming (as the court is required to for purposes of summary judgment) that Halloran was one of the eight detectives in the room with Coleman, that encounter happened at a very early stage in the interrogation, and there is no indication that Halloran supplied any information for Coleman to include in the confession. And Fulton testified that the information in his confession came from Garfinkel, not Halloran. [288-2] at 89. There is no basis to conclude that Halloran participated in fabricating—as opposed to only coercing— either confession. *See Coleman*, 925 F.3d at 346 ("Coerced testimony is not necessarily fabricated.").

### c. Malicious Prosecution

Next, a jury could (but need not) find Halloran liable to both plaintiffs for malicious prosecution. To be found liable for malicious prosecution, a defendant must have "commenced or continued an original criminal or civil judicial proceeding" against the plaintiff. *Hurlbert*, 238 Ill. 2d at 255. "[B]ecause the State's Attorney, not the police, prosecutes a criminal action," the Seventh Circuit has observed that "a malicious prosecution action against police officers is 'anomalous.'" *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (quotation omitted). However, "a person can be liable for commencing or continuing a malicious prosecution even if that person does not ultimately wield prosecutorial power." *Beaman v. Freesmeyer* ("*Beaman II*"), 2019 IL 122654, ¶ 43. Specifically, "[l]iability for malicious prosecution extends to

anyone who played a 'significant role' in causing the prosecution." *Del Prete v. Vill. of Romeoville*, No. 17-cv-6145, 2025 WL 446260, at *17 (N.D. Ill. Feb. 10, 2025) (quoting *Fulton v. Bartik*, 547 F. Supp. 3d 799, 821 (N.D. Ill. 2021)).

This analysis "calls for a commonsense assessment of those persons who played a significant role in the criminal case." *Beaman II*, 2019 IL 122654, ¶ 45 (quotation omitted). For example, a defendant can be held liable for malicious prosecution, provided the other elements are satisfied, if he "[1] improperly exerted pressure on the prosecutor, [2] knowingly provided misinformation to him or her, [3] concealed exculpatory evidence, or [4] otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution." *Id.* ¶ 44 (quotation omitted).

Applying that standard, a jury could (but need not) find Halloran liable to Coleman for malicious prosecution. Coleman's confession was the heart of the case against him, and a jury could conclude that Halloran participated in coercing that confession. If the jury believes that account, it could also conclude that Halloran "engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution" and is thus liable. *Id.*

Though a tougher call, a jury could also find Halloran liable to Fulton for malicious prosecution. To do so, it would have to find that Halloran's alleged misconduct proximately caused the prosecution of Fulton. *See id.* ¶ 33. It is a "well-established principle that the determination of proximate cause is the province of the jury," *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 349 (7th Cir. 1996), and a court can resolve that issue at summary judgment only "in extreme circumstances," *Shick v. Ill. Dep't of Hum. Servs.*, 307 F.3d 605, 615 (7th Cir. 2002).

Here, the causal chain is not remarkably direct, but a jury could nevertheless conclude that the prosecution of Fulton was a foreseeable consequence of Halloran's misconduct. *See Suzik*, 89 F.3d at 349 ("Whenever the injury-causing accident is of the kind that the defendant could reasonably foresee, proximate cause is a question for the jury."). First, a jury could conclude from Foley and Clancy asking whether Coleman recognized Taylor and Fulton that Fulton was already a suspect when Coleman was being questioned. That suggests that a prosecution of Fulton was a foreseeable result of coercing a statement from Coleman. Second, Fulton's testimony suggests that his confession was prompted, in part, by showing him Coleman's statement implicating him. And third, the prosecution of Fulton was based primarily on his confession. While a jury could find that this chain of causation is too attenuated, the court cannot reach that conclusion as a matter of law at this stage. A jury could reasonably conclude that the causal chain is direct enough to subject Halloran to liability.

### d. IIED

Because a jury could find that Halloran was involved in coercing Coleman's confession and maliciously prosecuting both plaintiffs, it could also find him liable to both plaintiffs for IIED. *See Olson v. Cross*, 714 F. Supp. 3d 1034, 1064 (N.D. Ill. 2024) (denying summary judgment on IIED claim because plaintiff had "put forth sufficient evidence . . . to survive summary judgment on his Fifth Amendment due process claim for coercion and his state law claim for malicious prosecution").

### e. Failure to Intervene

If a jury believes this version of events, it could find Halloran liable for failing to intervene to prevent the coercion of Coleman's confession, but not for failing to intervene to prevent the coercion of Fulton's confession or the fabrication of either confession. The first element of a failure to intervene claim is that the defendant "knew that a constitutional violation was committed." *Gill*, 850 F.3d at 342. Fulton has not pointed to any evidence that Halloran knew other detectives or Garfinkel coerced Fulton's confession. Moreover, there is no evidence that Halloran knew either confession was fabricated or manufactured. However, because a jury could conclude that Halloran was personally involved in coercing Coleman's confession, it could likewise conclude that he was aware Coleman's confession was coerced. Thus, a jury could find the first element satisfied only as to Coleman's confession.

The second element, that the defendant "had a realistic opportunity to prevent" the constitutional violation, *id.*, is also satisfied for Coleman's confession. If the jury credits Coleman's account, it could find that Halloran had the opportunity to intervene to prevent the harm from occurring by speaking up about the coercion before or during the trial. *See Fulton*, 2024 WL 1242637, at *28 ("In this case, for example, any officer who was aware that a confession, statement, or report was false or the product of fabrication or coercion (or both) could have intervened at least until plaintiffs' criminal proceedings concluded.").

### f. Conspiracy

Finally, a jury could find that Halloran agreed with other defendants to build a case against Fulton and Coleman by coercing their statements. A jury can make that inference—even in the absence of "affirmative evidence of such an agreement"—based on a defendant's own participation in the alleged misconduct. *See Hurt*, 880 F.3d at 843 (emphasis deleted). In *Hampton v. City of Chicago*, No. 12-cv-5650, 2017 WL 2985743 (N.D. Ill. July 13, 2017), the court found sufficient evidence of a conspiracy where the alleged members of the conspiracy "worked together using coercive techniques" to get a witness to identify the plaintiff. *Id.* at *25. A jury could find that Halloran's involvement here was similar, and that he worked, along with other detectives, to coerce Coleman to both confess and identify Fulton. Thus, in order to find for Halloran on the conspiracy claims, a jury would have to find either that he

was not involved in the ways described above or that he and the other investigators involved in coercing the confessions "were all acting *independently* when coercing the allegedly false confessions"—an inference that, "[a]lthough theoretically possible," cannot be drawn in the movant's favor at this stage. *Fulton*, 2024 WL 1242637, at *32 (emphasis in original). Accordingly, summary judgment for Halloran on Fulton's and Coleman's conspiracy claims is not appropriate.

### C.    Boudreau

The analysis of the claims against Boudreau is largely the same as the analysis of the claims against Halloran, because the evidence tying each of them to the various constitutional violations and torts is almost identical. The only evidence discussed above that applies to Halloran but not Boudreau is Halloran's testimony. However, that evidence is not necessary to the conclusion that a reasonable jury could find Halloran was involved in the conspiracy against Fulton and Coleman. Thus, a reasonable jury could find Boudreau liable to the same extent it could find Halloran liable.

### D.    Carroll

Fulton's and Coleman's arguments for Carroll's liability rely on the theory that he was (along with O'Brien) one of the two white detectives (besides Foley and Clancy) who interrogated Fulton.[25] However, the evidence of Carroll and O'Brien's involvement in Fulton's confession is too thin to present a genuine dispute. Fulton and Coleman rely first on a paper containing notes written by Foley during the investigation. In their entirety, those notes read as follows:

> Fulton
> Carroll & O'Brien
> denial
> in alley
> Left alley        bsmt
>                     seen
>                     stood till turned
> Confession

[288-87]. These notes are far "too cryptic to advance the ball." *Abdullah v. Wolf*, No. 19-cv-00418, 2020 WL 13513286, at *2 (N.D. Ill. Mar. 27, 2020). Fulton and Coleman suggest that the reference to "Carroll & O'Brien" indicates that they joined the interrogation of Fulton. To accept that inference without some other indication of the notes' meaning, however, "would be to cross the line separating reasoned

---

[25] Fulton also suggests in passing that Carroll and O'Brien were among the eight officers in the room with Coleman. However, the only evidence he points to for that proposition is that Carroll and O'Brien were listed on Coleman's arrest report, which suggests at most that they were involved in the investigation, not that they were involved in any misconduct.

inference from speculation." *Testerman v. EDS Prods. Corp.*, 98 F.3d 297, 306 (7th Cir. 1996).

Fulton and Coleman also argue that, because Carroll and O'Brien were the two detectives who interviewed Johnson about Fulton's alibi, they must also have been the unnamed Reporting Detectives who the First Supp Report indicates "confronted" Fulton with a version of Johnson's statement. *See* [288-27] at 14. However, Foley testified that he and Clancy, not Carroll and O'Brien, confronted Fulton with this information. [288-94] at 11–12. Moreover, there is nothing in the record to suggest that Carroll and O'Brien did not inform other detectives what Johnson had told them. Accordingly, a jury could only speculate that Carroll and O'Brien participated in Fulton's interrogation.

That leaves only general evidence that Carroll and O'Brien were part of the investigation. But mere participation in an investigation does not subject one to liability under any theory. *See Beaman I*, 776 F.3d at 512–13; *Colbert*, 851 F.3d at 657–59; *Grider*, 618 F.3d at 1260. Accordingly, the court grants summary judgment for Carroll on all claims against him.

### E.    O'Brien

#### 1.    Factual Disputes

Fulton's and Coleman's claims against O'Brien rest on two factual assertions. First, that O'Brien (along with Carroll) participated in Fulton's interrogation. The evidence of that assertion with regard to O'Brien is identical to the evidence with regard to Carroll. As discussed above, that evidence is insufficient. That leaves the second factual claim: that O'Brien was the detective who punched Coleman and called him the N-word.

Coleman described the detective who punched him as a "[t]all white guy"— about 6'5" or 6'6"—with glasses; no facial hair; a slim-to-medium build; and short, slicked back black hair. [288-11] at 16–17. Some aspects of this description undisputedly match O'Brien: like the detective Coleman described, O'Brien is white, *see* [288-94] at 15, and in 1994, he was 6'5". [288-17] at 8. He also sometimes wore glasses (though he preferred contacts) and did not have facial hair. *Id.*

The Officer Defendants argue, however, that several purported mismatches between Coleman's description and O'Brien foreclose the conclusion that Coleman was describing O'Brien. First, they argue that O'Brien's hair color and style do not match Coleman's description. O'Brien testified that in 1994 he had "salt-and-pepper hair" that was "turning gray" but had been dark and "reddish brown" before graying. *Id.* However, Kelly testified that O'Brien had "black hair," [288-7] at 20, and Clancy testified that O'Brien had "dark hair," though he could not remember whether it was brown or black. [288-18] at 43. The court cannot weigh these competing descriptions

60

at summary judgment; that is a task for the jury. *See Payne*, 337 F.3d at 770. Thus, the court must assume for now that O'Brien's hair was black.

The Officer Defendants also urge the court to rely on "O'Brien's testimony that his hair was not 'slicked back' in 1994." [308] at 30 (sealed). However, they do not cite any testimony to that effect, and O'Brien's deposition is devoid of any reference to whether he wore his hair slicked back. *See generally* [288-17]. Even if O'Brien had testified to that effect, it would be for the jury to evaluate his credibility. *See Payne*, 337 F.3d at 770.

Next, the Officer Defendants argue that O'Brien did not have a medium build. They point to his testimony that he weighed about 230 or 240 pounds. *See id.* at 8. They do not explain, however, why it would be unusual to refer to someone who is 6'5" and between 230 and 240 pounds as of "medium" build. Indeed, O'Brien's partner, Carroll, described his build as "[n]ot slender, but not fat." [288-12] at 13.

Finally, the Officer Defendants point to two other detectives involved in the investigation who were approximately as tall as O'Brien: Turner and Kelly. *See* [288-17] at 7–8 (describing Turner's and Kelly's heights). Turner, however, is black, *id.* at 7, and so could not have been the "tall white guy" who punched Coleman. And the evidence conflicts on Kelly's height. Although O'Brien described him as 6'3", *id.* at 8, Kelly himself testified that he was about 6'2", [288-7] at 19, and Carroll testified that he was "about 6'1." Moreover, the parties agree that Kelly left work at 1:00 a.m. on the night of Coleman's interrogation. [266] ¶ 95; [292] ¶ 95. Thus, neither provides a good alternative candidate.

A jury thus could (but need not) find that O'Brien was the detective who punched Coleman and called him the Nword.[26]

## 2. Legal Analysis

If a jury makes that finding, it could find O'Brien liable on Coleman's coerced confession claim (and Coleman's failure to intervene claim based on the coercion of his confession), both plaintiffs' malicious prosecution claims, and both plaintiffs' conspiracy claims. It could not, however reasonably hold him liable for coercing Fulton's confession or fabricating either confession.

### a. Coerced Confessions

First, the above facts, if credited, could be sufficient to subject O'Brien to liability for coercing Coleman's confession. "It needs no extended citation of cases to

---

[26] Because the court reaches this conclusion without reliance on the evidence Fulton and Coleman proffer about O'Brien's alleged misconduct in other cases, the court does not reach the Officer Defendants' argument that those prior instances of misconduct are impermissible propensity evidence. *See* Fed. R. Evid. 404.

show that a confession produced by violence . . . is involuntary." *Sims v. Georgia*, 389 U.S. 404, 407 (1967). Such tactics "constitute coercion *per se*." *Dassey*, 877 F.3d at 303; *see Stein*, 346 U.S. at 182. However, because a jury could not reasonably conclude that O'Brien was involved in eliciting Fulton's confession, O'Brien cannot be held liable on Fulton's coerced confession claim. The court thus grants O'Brien summary judgment on Fulton's coerced confession claim.

### b.    Fabricated Evidence

A jury could not find that O'Brien participated in *fabricating* Coleman's confession, because there is no evidence he either knew it was false or manufactured it. Even coerced confessions "may turn out to be true." *Whitlock*, 682 F.3d at 584. And Coleman did not recount the officer who punched him supplying any information to include in a later confession. To conclude that O'Brien knew when he allegedly abused Coleman that any resulting confession would be false would be an exercise in speculation. Thus, summary judgment for O'Brien is proper on Coleman's fabrication claim.

And, of course, because a jury could not conclude that O'Brien was involved in eliciting or reporting Fulton's confession, it could not find that he fabricated the confession. Thus, summary judgment for O'Brien is proper on Fulton's fabrication claim.

### c.    Malicious Prosecution

The analysis of the malicious prosecution claims against O'Brien largely mirrors the analysis of the same claims against Halloran and Boudreau. Like Halloran and Boudreau, O'Brien could be found to have "engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution." *Beaman II*, 2019 IL 122654, ¶ 44. That alleged misconduct directly caused the prosecution of Coleman and, as discussed above, a jury could conclude that it proximately caused the prosecution of Fulton. Accordingly, a jury could find O'Brien liable to both plaintiffs for malicious prosecution.

### d.    IIED

Because a jury could find that O'Brien was involved in coercing Coleman's confession and in maliciously prosecuting both plaintiffs, it could also find him liable to both plaintiffs for IIED. *See Olson*, 714 F. Supp. 3d at 1064.

### e.    Failure to Intervene

Just as a jury could find O'Brien liable for coercing Coleman's confession but not for fabricating it, a jury could find him liable for failure to intervene in the coercion of Coleman's confession, but not the fabrication. Because a jury could find that O'Brien was involved in interrogating Coleman and himself engaged in coercive

tactics, it could reasonably infer that he was aware that the other interrogators were engaged in coercion. *See United States v. Santos*, 553 U.S. 507, 521 (2008) ("[K]nowledge must almost always be proved[] by circumstantial evidence."). And because of that knowledge, a jury could conclude that he had the opportunity to prevent the harm by speaking up about the coercion before or during the trial. *See Fulton*, 2024 WL 1242637, at *28. However, because there is no basis to conclude that O'Brien knew Coleman's confession would be false (as opposed to simply coerced) or that other officers would manufacture Coleman's statement, a jury could not find O'Brien liable for failure to intervene in the fabrication of Coleman's confession.

And for the same reason a jury could not find O'Brien liable for either coercing or fabricating Fulton's confession, it could not find him liable for failure to intervene in either constitutional violation. There is insufficient evidence that O'Brien was involved in the interrogations where the alleged coercion and fabrication occurred, and Fulton has pointed to no evidence that O'Brien even knew of the interrogations. Thus, he cannot be liable for failure to intervene. *See Gill*, 850 F.3d at 342 (noting that knowledge of the violation is a prerequisite for failure to intervene liability).

### f.    Conspiracy

A jury could also infer from O'Brien's alleged conduct that he was a member of the conspiracy to frame Fulton and Coleman. As with Halloran and Boudreau, a jury could find that he worked together with others involved in the investigation to coerce Coleman's confession. That is sufficient for a jury to infer an agreement to engage in that coercion. *See Hampton*, 2017 WL 2985743, at *25. And because a jury could find that O'Brien was a member of the conspiracy, it could hold him liable for all of the acts committed by other conspirators within the scope of the conspiracy— even ones relating exclusively to Fulton. *See Proffitt*, 279 F.3d at 507.

### F.    Moser

Next, Fulton bases his argument for Moser's liability on the assertion that a jury could reasonably conclude that he was (along with Graf) one of the two white detectives (besides Foley and Clancy) who interrogated him. (For his part, Coleman does not oppose granting summary judgment to Moser. [289] at 12 n.1.) However, the evidence Fulton provides in support of this proposition—that Moser and Graf were listed on the arrest report and Garfinkel's felony review jacket and that they were present at Area 1—shows only that they were involved in the investigation, which is not enough to create liability under any theory. *See Beaman I*, 776 F.3d at 512–13; *Colbert*, 851 F.3d at 657–59; *Grider*, 618 F.3d at 1260. Accordingly, the court grants summary judgment to Moser on all claims against him.

### G.    Graf

Fulton's and Coleman's theory for Graf's liability rests on two factual assertions. The first is that he was (along with Moser) one of the two white detectives

(besides Foley and Clancy) who interrogated Fulton. As discussed above, however, the evidence does not support that assertion. That leaves only the assertion that Graf helped fabricate Barber's purported statement that Coleman had told him he thought the smell in the basement might be a body. Although Fulton and Coleman withdrew their fabrication claims based on Barber's statement, they argue that Graf's involvement in fabricating the statement indicates that he was involved in the conspiracy to frame them.

There is no evidence, however, that this portion of Barber's statement was fabricated. The statement could be fabricated in either of two ways. First, it could have been entirely fictitious—in other words, something Barber never said. Second, Barber could have made the statement because his interrogators told him to do so despite knowing the statement would be false. Fulton and Coleman have not presented evidence of either scenario.

As to the first scenario, Fulton and Coleman rely heavily on Barber's testimony that he does not remember saying that Coleman said, "I think that it may be a body." *See* [288-4] at 16–17; [288-5] at 39. But "[t]estimony that one does not recall certain events is not equivalent to testimony that it did not happen." *U.S. Equal Emp. Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 642 n.6 (W.D. Pa. 2017) (collecting cases); *see Chi. United Indus., Ltd v. City of Chicago*, 669 F.3d 847, 853 (7th Cir. 2012); *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002); *Gilbert v. City of Chicago*, 404 F. Supp. 3d 1215, 1219 (N.D. Ill. 2019). And, while Barber does not specifically remember telling investigators that Coleman said "I think that it may be a body," he has affirmed the accuracy of the statement under oath. *See* [288-4] at 25. Fulton and Coleman argue that, unlike the witnesses in the cases refusing to find that a witness's failure to remember creates a genuine dispute, Barber should be expected to remember saying Coleman had told him he thought the smell might be a body. But those courts did not ask what a witness should be expected to recall. *See Chi. United*, 669 F.3d at 853 ("Should he have recalled it? Who knows?"). Instead, they note only that such evidence, standing alone, "does not raise a genuine issue." *Tinder*, 305 F.3d at 736.

Coleman objects that this reasoning "use[s] Barber's lack of memory against" him, impermissibly drawing inferences in the movant's favor. [289] at 38. But there is a difference between drawing an inference in the movant's favor (which is not permitted on summary judgment) and determining that a particular inference would veer into speculation (which is). This is the latter: Barber's failure to remember does not support an inference either that he never attributed the "I think that it may be a body" remark to Coleman or that he did so.

Fulton and Coleman also rely on the remark's absence from police reports. They argue that, if Barber had quoted Coleman as saying, "I think that it may be a body," that remark would have been included in police reports. However, one could

just as easily argue that, if the remark had been included in Barber's statement (whether because Barber said it or otherwise), it would have been included in police reports. But plaintiffs agree that Barber's statement (including Coleman's alleged remark) was signed on the morning of April 29th. [290] ¶ 81. Yet even police reports written after that time—most notably, the First Supp Report, which was filed on June 9th and included a description of Barber's interview, [288-27] at 1, 10–11—do not mention it. Thus, to the extent the omission of the remark from police reports is puzzling, that puzzle is not solved by suggesting that the statement was fabricated.

The court recognizes that "it can be difficult to prove a negative." *United States v. Moreno-Padilla*, 602 F.3d 802, 809 (7th Cir. 2010). However, "at the summary judgment stage that is exactly what [a plaintiff] has to do." *Stoner v. Wal-Mart Stores, Inc.*, No. 06-4053, 2008 WL 11374375, at *3 (C.D. Ill. Aug. 18, 2008). Because Fulton and Coleman have not done so, they have not produced sufficient evidence that Barber never said Coleman told him he thought the smell might be a body.

That leaves the second possibility: that Barber made the statement, but only because his interrogators told him to. There is some evidence that the statement was false—Coleman denies making it. [288-1] at 64. Fulton and Coleman have supplied no evidence, however, that Garfinkel or Graf (or any other defendant) *knew* the statement was false, or that they manufactured it themselves. Even if a jury believes Coleman that he never made the "I think that it may be a body" comment, inferring that Graf and Garfinkel fabricated that portion of Barber's statement would be pure speculation.

In the absence of either of those findings, Fulton and Coleman can show only that Graf was involved in the investigation—which, again, is not enough to create liability under any theory. *See Beaman I*, 776 F.3d at 512–13; *Colbert*, 851 F.3d at 657–59; *Grider*, 618 F.3d at 1260. Accordingly, the court grants summary judgment to Graf on all claims against him.

### H.    Kelly

Kelly (who is a defendant only in Coleman's case) argues that he is entitled to summary judgment because no evidence implicates him in any wrongdoing. Coleman does not oppose granting summary judgment to Kelly. [289] at 12 n.1. Accordingly, the court grants summary judgment in favor of Kelly on all of Coleman's claims against him.

### I.    Benoit

Next, Benoit (who, like Kelly, is a defendant only in Coleman's case) argues that he was erroneously named as a defendant, and that Coleman mistook him for another officer with the same last name. [343] at 32 (sealed). Coleman does not oppose granting summary judgment to Benoit. [289] at 12 n.1. Accordingly, the court grants summary judgment in favor of Benoit on all of Coleman's claims against him.

### J.     Garfinkel

Next, the court turns to Fulton's and Coleman's claims against Garfinkel. Garfinkel argues (1) that he is entitled to absolute immunity, (2) that he is entitled to qualified immunity, (3) that he was not sufficiently personally involved in the alleged constitutional violations and torts, and (4) that the malicious prosecution claims against him are defeated by the existence of probable cause.

#### 1.     Absolute Immunity

The court begins by addressing Garfinkel's argument that he is entitled to absolute immunity. "Prosecutors, like judges, enjoy absolute immunity from federal tort liability." *Fields*, 740 F.3d at 1110. That immunity is founded on "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976). However, "a prosecutor's absolute immunity is limited to the performance of his prosecutorial duties, and not to other duties to which he might be assigned by his superiors or perform on his own initiative, such as investigating a crime before an arrest or indictment." *Fields*, 740 F.3d at 1111. Prosecutors receive only qualified immunity for actions taken in performing nonprosecutorial duties such as investigation. *Id.*

"In determining whether actions taken by government officials enjoy absolute immunity or qualified immunity, [courts] appl[y] a 'functional approach.'" *Jones v. Cummings*, 998 F.3d 782, 787 (7th Cir. 2021) (quoting *Buckley III*, 509 U.S. at 269). "[A]ctivities 'intimately associated with the judicial phase of the criminal process'" are shielded by absolute immunity. *Id.* (quoting *Imbler*, 424 U.S. at 430). "In contrast, prosecutors acting in the role of . . . investigator are entitled only to qualified immunity." *Id.* Garfinkel argues that his only roles were purely prosecutorial: evaluating evidence already gathered by the police, interviewing witnesses, and deciding whether to bring charges.

#### a.     Coleman's Confession

First, Garfinkel argues that he is entitled to absolute immunity for claims arising out of Coleman's confession because he did not arrive until after Coleman had confessed. He relies primarily on *Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991). In *Hunt*, the police had interrogated and allegedly beaten the plaintiff, who gave a coerced confession. *Id.* at 693. The prosecutor was not present at this time. *Id.* at 692–93. Instead, he "was called down to the police station merely to review and approve or disapprove the actions of the police, and possibly issue the charges the police sought." *Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997) (discussing *Hunt*). The court held that the prosecutor's acts were taken "toward 'initiating a prosecution

and in presenting the State's case'" and thus granted absolute immunity. *Hunt*, 926 F.2d at 693 (quoting *Imbler*, 424 U.S. at 431).

*Hunt* might well be dispositive if the timeline is as Garfinkel claims—that is, if he did not arrive until after Coleman confessed. But that is a factual dispute, and the evidence is conflicting. On the one hand, Garfinkel points to a timeline of Coleman's interrogation prepared by Clancy. [305-1] at 785–88; *see* [292] ¶ 77 (admitting that Clancy authored the timeline). One entry in that timeline says that Coleman "admit[ted] to his part in [the] crime" at 2:00 a.m., and another says that at 3:00 a.m. Coleman gave "another statement stating he hit[] [A.B.] twice and [told] Fulton to put conc[rete] in [A.B.'s] mouth." [305-1] at 788. It is only in the next entry (which does not have a specified time) that "ASA Garfinkel arrive[d]." *Id.* This timeline suggests what Garfinkel claims: that he did not arrive until after Coleman had confessed.

But on the other hand, Coleman testified at the motion to suppress hearing that he did not confess until "Garfinkel came in there." [288-11] at 26. That testimony is corroborated by the First Supp Report, which portrays Coleman claiming to have left a party with A.B. but to have parted ways with her on the corner of 55th and Green but then changing this story to say that he had seen Fulton and Taylor having sex with A.B. in the basement. [288-27] at 12. Next, it reports that the detectives "then notified A.S.A. Garfinkel," who arrived at Area 1. *Id.* Only then does the report tell of Coleman "go[ing] on to say that he wanted to tell the entire truth" and subsequently confessing. *Id.* at 12–14. Although the First Supp Report does not expressly state that Coleman did not confess until Garfinkel arrived, it does suggest as much by failing to report any pre-Garfinkel confessions.

In response, the County Defendants point to a portion of Coleman's testimony at the hearing on the motion to suppress, where he responded "No" to the question "But I thought the first time that you confessed or the first time that you said anything about this was when you talked to the state's attorney?" [288-11] at 48. However, this answer is ambiguous: it could mean "No, that was not the first time I confessed," as the County Defendants argue, or "No, I did not confess before then." The latter reading could find some support in the next line of Coleman's answer, where he tells the prosecutor: "You are talking about when I first answered these questions." *Id.* At minimum, however, this excerpt from Coleman's testimony is ambiguous and thus does not refute Coleman's testimony at the same hearing that he did not confess until Garfinkel arrived.

If Coleman's testimony and the supplementary report are to be credited—as is required at summary judgment—*Hunt* is distinguishable because the prosecutor there "was not present at the particular time [the plaintiff] allege[d] he gave his coerced confession." 926 F.2d at 693; *see Hill v. Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010) ("[A] determination that Hill did not confess until his meeting with Rogers would indicate that Rogers was likely acting in the role of an investigator

searching for more evidence, activities to which only the qualified immunity analysis applies."); *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 832 (N.D. Ill. 2023) (distinguishing *Hunt* on this ground); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1045–46 (N.D. Ill. 2016) (same); *see also Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("[A] showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity."). Thus, absolute immunity is not appropriate at the summary judgment stage.

### b.    Fulton's Confession

Garfinkel's argument for absolute immunity as to claims arising out of Fulton's confession is essentially the same: he did not arrive until after Fulton had confessed, and therefore he receives absolute immunity under *Hunt*. Like his argument regarding Coleman's confession, however, this argument is based on disputed factual issues not properly resolved at summary judgment.

Garfinkel points to Foley's trial testimony, but that testimony does not establish that Garfinkel did not arrive until after Fulton had confessed. According to Foley's trial testimony, Foley returned from speaking to Johnson at about 9:00 p.m. on April 29th and, along with Clancy, resumed interviewing Fulton. [288-112] at 22–23. When told that Johnson did not support his alibi, Fulton explained that he had previously lied, and gave a story like the one Coleman had given: that he had seen Taylor and Coleman having sex with A.B. in the basement but had run away scared. *Id.* at 27–28. Foley then notified the Felony Review Unit, and Garfinkel arrived at around 9:30 p.m. *Id.* at 31. At around 10:00 p.m., Garfinkel began interviewing Fulton with Foley present. *Id.* at 31–32. Garfinkel then informed Fulton of Coleman's statement implicating him, and Fulton asked to speak to Garfinkel alone. *Id.* at 32–33. After they spoke alone for forty-five minutes to an hour, Garfinkel brought Foley back into the room and Fulton confessed to serving as a lookout. *Id.* at 33–37.

In this version of events—which a jury could reasonably believe—Fulton did not confess until after Garfinkel arrived. If that proves true, *Hunt* will be inapposite and Garfinkel will not be entitled to absolute immunity. Accordingly, absolute immunity is not appropriate at the summary judgment stage.

### c.    State Law Claims

"In Illinois, immunity is either the same as, or harder to obtain, than it is in a federal court." *Whitlock*, 682 F.3d at 587; *see Kitchen v. Burge*, 781 F. Supp. 2d 721, 737 (N.D. Ill. 2011) ("[T]he Illinois and federal doctrines of prosecutorial immunity are coterminous . . . ."); *Bianchi v. McQueen*, 2016 IL App (2d) 150646, ¶ 50–56 (applying federal case law to determine extent of immunity under state law); *White v. City of Chicago*, 369 Ill. App. 3d 765, 769–78 (2006) (same). Thus, because absolute immunity does not provide a basis for summary judgment on the federal claims, it

does not provide a basis for summary judgment on the state law claims, which arise out of the same conduct.

### 2. Qualified Immunity

Next, the County Defendants argue that Garfinkel is entitled to qualified immunity on Fulton's and Coleman's failure to intervene and § 1983 conspiracy claims. *See Fields*, 740 F.3d at 1111 (holding that prosecutors receive only qualified immunity when they act as investigators). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To defeat qualified immunity, the relevant federal right must have been "'clearly established' at the time of [the] alleged misconduct." *Id.* In determining whether a right was clearly established, the court "look[s] first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Est. of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010). The court must "analyze whether precedent squarely governs the facts at issue, mindful that [the court] cannot define clearly established law at too high a level of generality." *Strand v. Minchuk*, 910 F.3d 909, 917 (7th Cir. 2018).

First, Garfinkel is entitled to qualified immunity on plaintiffs' failure to intervene claims. In the context of failure to intervene liability, a defendant is entitled to qualified immunity unless "the law clearly established that he was legally obligated to prevent" the constitutional violation. *Stewardson v. Titus*, 126 F.4th 1264, 1277 (7th Cir. 2025). In 1994, it was not clearly established that a prosecutor—as opposed to a police officer—could be held liable for failure to prevent a police officer from violating a suspect's constitutional rights. *See Abrego v. Guevara*, 2024 WL 3566679, at *11 (N.D. Ill. July 29, 2024) ("For that reason, district courts widely hold that the law was not clearly established in 1999 that prosecutors acting as investigators had a duty to intervene in another officer's wrongdoing.").[27]

To be sure, by 1994 the Seventh Circuit's decision in *Byrd* "had been on the books for twenty years," *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1039 (N.D. Ill. 2018), and decisions prohibiting coercing confessions, *see, e.g.*, *Brown v. Mississippi*, 297 U.S. 278 (1936), and fabricating evidence, *see, e.g.*, *Mooney*, 294 U.S. at 112–13, had been on the books for even longer. But *Byrd* spoke only of the duties of police officers, not prosecutors. *See* 466 F.2d at 11 ("[O]ne who is given the badge of authority of *a police officer* may not ignore the duty imposed by his office and fail to stop other officers . . . ." (emphasis added)); *Serrano*, 315 F. Supp. 3d at 1039 ("The

---

[27] *See also Ezell v. City of Chicago*, No. 18-cv-1049, 2024 WL 278829, at *14–15 (N.D. Ill. Jan. 24, 2024) (finding that this obligation was not clearly established in 1995); *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1038–39 (N.D. Ill. 2018) (same in 1993); *Harris v. City of Chicago*, 330 F.R.D. 508, 516 n.8 (N.D. Ill. 2018) (same in 2001); *Wilson*, 667 F. Supp. 3d at 834 (same in 1988); *Brown*, 633 F. Supp. 3d at 1154–55 (same in 1988); *Bouto v. Guevara*, No. 23-cv-1740, 2024 WL 4346561, at *11 (N.D. Ill. Sept. 30, 2024) (same in 1993); *Patrick*, 213 F. Supp. 3d at 1054–55 (same in 1992).

reference to police officers is clear, but it is not clear that prosecutors acting as investigators would also be subject to the duty."). And "the issue is not just whether the plaintiffs' rights were clearly established, but also whether any reasonable official standing in the prosecutors' shoes" in 1994 "would have known that their actions— or inaction, as it were—would violate plaintiffs' rights." *Serrano*, 315 F. Supp. 3d at 1038.[28]

In addition to *Byrd*, Coleman cites four other cases in an attempt to show that a prosecutor's duty to intervene was clearly established in 1994. (For his part, Fulton cites only one case—*Whitlock*.) Three of those cases, however—*Saunders v. City of Chicago*, No. 12-cv-9158, 2013 WL 6009933 (N.D. Ill. Nov. 13, 2013), *Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179 (N.D. Ill. 2013), and *Wilkinson v. Ellis*, 484 F. Supp. 1072 (E.D. Pa. 1980)—are district court decisions, which "do not render the law clearly established." *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007); *see Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995). That leaves only *Whitlock*, which was decided in 2012—nearly twenty years too late to have clearly established Garfinkel's obligations in 1994, *see Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam)—and did not involve a failure to intervene claim. *See Brown*, 633 F. Supp. 3d at 1155 ("*Whitlock* does not address whether prosecutors, even while acting in an investigatory function, were on notice of their duty to intervene in police officer misconduct in 1993."). *Whitlock*'s remark that "the police and investigating prosecutors are subject to the same constraints" relied on the Supreme Court's 1993 decision in *Buckley III*, *see Whitlock*, 682 F.3d at 581. But *Buckley III* concerned only the availability of absolute immunity; it expressly "assum[ed]" (without deciding) that the allegations "allege[d] constitutional violations for which § 1983 provides a remedy." 509 U.S. at 261. Thus, *Buckley III* provides no clearly established law on a prosecutor's duty to intervene to prevent a constitutional violation by police officers. *Cf. Kernan v. Cuero*, 583 U.S. 1, 8 (2017) (per curiam) (holding, in context of federal habeas review, that where a subsequent decision noted that a question remains open, the decision leaving that question open does not create clearly established law). Nor can the court conclude that a prosecutor's duty to intervene was obvious. *See Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (noting that qualified immunity can be overcome when "the alleged misconduct constituted an obvious violation of a constitutional right"). Rather, it was (and is) "a tangled legal issue."

---

[28] Coleman argues that only the underlying constitutional right must be clearly established. However, "[t]he dispositive question is whether the violative nature of particular *conduct* is clearly established," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted; original emphasis deleted; emphasis added), not merely whether the right itself was clearly established in the abstract. *See Ziglar*, 582 U.S. at 154–55 (finding qualified immunity because the applicability of conspiracy liability to a particular context was not clearly established); *Stewardson*, 126 F.4th at 1277 (asking whether "the law clearly established that [defendant] was legally obligated to prevent" the constitutional violation).

*Ezell v. City of Chicago*, No. 18-cv-1049, 2024 WL 278829, at *15 (N.D. Ill. Jan. 24, 2024).

Insofar as Garfinkel's conduct may have violated Fulton's and Coleman's clearly established rights, it was his own alleged misconduct—not his failure to intervene in the Officer Defendants' misconduct—that did so. Accordingly, the court grants summary judgment for Garfinkel on both plaintiffs' failure to intervene claims.

The conspiracy claims are on a different footing, however. A reasonable person would have been on notice no later than 1988—when the Seventh Circuit decided *Jones v. City of Chicago*—that conspiracy liability attaches to any "voluntary participant in a common venture," even one who did not "agree[] on the details of the conspiratorial scheme," so long as he "underst[oo]d the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [his] part to further them." 856 F.2d at 992. The conduct that a jury could (but need not) find that Garfinkel engaged in falls within *Jones*'s holding.

### 3. Personal Involvement

Garfinkel also argues that he was not sufficiently involved in the alleged constitutional violations and torts to be held liable for them. Most of his arguments to that effect rely on a disputed version of the facts that cannot support summary judgment. However, the court agrees on one point: there is no record evidence that Garfinkel knew Coleman's confession was false. Thus, he cannot be held liable for direct participation in fabricating Coleman's confession. *See Petty*, 754 F.3d at 423.

Fulton and Coleman claim that their innocence demonstrates that Garfinkel fabricated Coleman's confession. But proving the statements' falsity does not demonstrate that Garfinkel was aware of that falsity, as required for him to be directly liable for fabricating Coleman's confession. They also point to their account of Garfinkel's alleged use of coercive tactics, but that elides the distinction between coercion and fabrication. *See, e.g.*, *Coleman*, 925 F.3d at 346. Additionally, they argue that a jury can infer from their account of Garfinkel manufacturing Fulton's confession that he also manufactured Coleman's. But Coleman himself testified that it was Foley and Clancy who fed him details of the story they wanted him to tell Garfinkel. [288-1] at 10–11, 102–03. By contrast, he testified that Garfinkel never told him what to put in his statement. *Id.* at 105.

Fulton and Coleman also point to a statement in the "Incident Summary" section of Garfinkel's felony review jacket, which indicates that A.B. went home to change clothes after leaving the party at Calimee's home with Coleman. *See* [288-46] at 1. This statement, Coleman argues, is inconsistent with Calimee's trial testimony that A.B.'s body was discovered wearing the same clothes she was wearing when she left Calimee's home. *See* [288-90] at 7–8. But it is not clear the remarks on the felony

review jacket are inconsistent with Calimee's testimony: the "Incident Summary" indicates that after A.B. changed clothes, she "returned to W1 [i.e., Williams's] residence to party again." [288-46] at 1. Because the record does not indicate that there was a party at Williams's residence, it appears likely that Garfinkel simply mistakenly wrote "W1," meaning Williams, instead of "W2," meaning Calimee. In that case, the narrative on the felony review jacket is perfectly consistent with Calimee's testimony—A.B. may have initially left the party, changed clothes, returned to the party, and then left wearing the same clothes she was wearing when her body was found. But even if a jury believed them to be contradictory, inferring that Garfinkel must have known that Coleman's *confession* was false would veer into speculation. Accordingly, the court grants Garfinkel summary judgment on Coleman's fabrication claim.

The claim that Garfinkel fabricated Fulton's confession, by contrast, has enough evidentiary support to survive summary judgment. Fulton testified that Garfinkel wrote the statement on his own, without input from Fulton, and then attributed the statement to Fulton. [288-2] at 89. If the jury credits that testimony, it could conclude that Garfinkel knowingly manufactured Fulton's statement.

The coercion claims based on Garfinkel's alleged direct participation also survive summary judgment. Coleman testified that Garfinkel promised him that if he "answered everything correctly" he could go home. [288-11] at 30; *see also id.* at 22, 54. Such "false promise[s] of leniency" are precisely the sort of coercive activity that "[g]iven the right circumstances . . . may be sufficient to overcome a person's ability to make a rational decision about the courses open to him" and thus render a confession involuntary. *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009). Similarly, as discussed above, Fulton testified that Garfinkel threatened him with the death penalty if he didn't "comply," and the court is required to accept this testimony for purposes of summary judgment. [288-82] at 11.

Because a jury could find that Garfinkel was involved in coercing both confessions and fabricating Coleman's, it could also find that Garfinkel played a significant role in commencing the charges against both Fulton and Coleman, separate and apart from his actual charging decisions. *See Beaman II*, 2019 IL 122654, ¶ 46. A jury could also conclude that these actions subject Garfinkel to liability for IIED. *See Olson*, 714 F. Supp. 3d at 1064. Additionally, taken together and taken as true, these actions could suggest that Garfinkel tacitly agreed to help coerce Fulton and Coleman to confess and to wrongfully prosecute them for the rape and murder of A.B. *See Fulton*, 2024 WL 1242637, at *32.

### 4.   Probable Cause

Finally, Garfinkel argues that he cannot be held liable for malicious prosecution because he had probable cause to believe both plaintiffs were involved in A.B.'s rape and murder. "It is well established that the existence of probable cause

forms a complete defense to a malicious prosecution claim." *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015); *accord Howard v. Firmand*, 378 Ill. App. 3d 147, 149 (2007) ("Probable cause is a complete defense to an action for malicious prosecution."); *see also Chiaverini v. City of Napoleon*, 602 U.S. 556, 558 (2024). It exists whenever "the facts and circumstances that are known to" an official "reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Braun v. Vill. of Pallatine*, 56 F.4th 542, 548 (7th Cir. 2022) (quoting *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007)). A finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). When (as here) "the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *accord Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008).

The court will consider each plaintiff separately. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").

### a. Coleman

In arguing for probable cause as to Coleman, the County Defendants point first to Coleman's confession. However, as discussed previously, a jury could (but need not) find that Garfinkel both knew of and was involved in coercing both confessions. And evidence that was "the product of coercion" cannot "supply probable cause." *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015); *see also Gilliam v. Sealey*, 932 F.3d 216, 234 (4th Cir. 2019) ("A coerced or fabricated confession that police know to be coerced . . . does not give police probable cause to arrest the suspect as a matter of law."); *Santos v. Thomas*, 830 F.3d 987, 1001 (9th Cir. 2016) ("[A] coerced statement . . . cannot support probable cause."); *Livers v. Schenck*, 700 F.3d 340, 358 (8th Cir. 2012) ("No reasonable officer could believe statements from a coerced confession could alone provide probable cause . . . ."). Thus, the court will disregard Coleman's confession in evaluating whether Garfinkel had probable cause to believe he was involved in the rape and murder of A.B.

Even leaving aside the confession, however, a jury could not reasonably conclude that Garfinkel lacked probable cause to believe that Coleman raped and murdered A.B. Two factors support that conclusion. First, Coleman was the last person known to have been seen with A.B. before her disappearance. Although that fact cannot establish probable cause by itself, *see People v. Dace*, 153 Ill. App. 3d 891, 899 (1987), it is nevertheless highly relevant to the probable cause analysis, as numerous courts have recognized. *See, e.g.*, *People v. Buss*, 187 Ill. 2d 144, 206 (1999); *People v. Myrick*, 274 Ill. App. 3d 983, 990 (1995); *People v. Harvey*, 209 Ill. App. 3d

73

733, 741 (1991); *People v. Pietryzk*, 153 Ill. App. 3d 428, 434 (1987).[29] Second, A.B.'s body was found in Coleman's basement. Coleman "relies heavily on the well-settled proposition that mere proximity to suspected criminal activity does not, without more, generate probable cause," *United States v. Richards*, 719 F.3d 746, 757 (7th Cir. 2013). That "rule does not apply to him," however. *Id.* "There was far more" tying Coleman to the crime than "mere physical proximity," *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir. 1992)—namely, Coleman's existing relationship with A.B. and being the last person seen with her on the night she disappeared.

Although neither being the last person seen with A.B. nor her body being found in his basement would be enough for probable cause standing alone, *see Dace*, 153 Ill. App. 3d at 899; *Richards*, 719 F.3d at 757, the combination more than "reasonably support[s] a belief," *Braun*, 56 F.4th at 548, that Coleman was involved in A.B.'s rape and murder. *See United States v. Howard*, 883 F.3d 703, 708 (7th Cir. 2018) ("Standing alone, any one of those facts may not give rise to probable cause. But together, they provide ample support for the officers' belief . . . ."); *cf. United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). Though there are other explanations for these facts, probable cause does not require "an actual showing" of criminal activity; it "requires only a probability or substantial chance" of such activity. *Gates*, 462 U.S. at 243 n.13. By linking Coleman to both the victim and the time and place of the murder, the facts known to Garfinkel amply demonstrated such a probability. Accordingly, the court grants summary judgment to Garfinkel on Coleman's malicious prosecution claim. However, because the existence of probable cause depends on what each defendant knew, *see Braun*, 56 F.4th at 548, the fact that Garfinkel had probable cause does not mean that the other defendants did. Because no other defendant makes the same argument, the court will not make it for them.

**b.    Fulton**

By contrast, a jury could find that Garfinkel lacked probable cause to believe that Fulton raped and murdered A.B. In arguing to the contrary, the County Defendants point first to Fulton's and Coleman's confessions. But, as discussed previously, a jury could (but need not) find that Garfinkel participated in coercing those confessions—or at least was aware that they were coerced. Thus, the confessions cannot establish probable cause at this stage. *See Hart*, 798 F.3d at 588; *Gilliam*, 932 F.3d at 234; *Santos*, 830 F.3d at 1001; *Livers*, 700 F.3d at 358. They also point to Latham's statement that "Chip" and "Dap" had been bothering A.B. for changing gangs. But whether Latham ever made that statement is disputed; he

---

[29] *See also, e.g.*, *Bishop v. Wainwright*, 511 F.2d 664, 667 (5th Cir. 1975); *McKenna v. Clayton Cnty.*, 657 F. Supp. 221, 224 (N.D. Ga. 1987); *State v. Turner*, 263 So. 3d 337, 406 (La. 2018); *Grim v. State*, 971 So. 2d 85, 105 (Fla. 2007).

denies having done so. [288-6] at 18, 22. Thus, it cannot be considered in this posture. *See Maxwell*, 998 F.2d at 434.

Next, the County Defendants argue that Johnson's failure to confirm Fulton's alibi supports probable cause. But according to the GPR from her interview, Johnson did not deny that Fulton was with her on the night A.B. disappeared; she said that Fulton stayed with her several nights around that time but could not recall whether he stayed with her on that specific night. [288-9] at 1. It is difficult to see how Johnson's failure to remember whether Fulton stayed with her on a particular night supports an inference that Fulton raped and murdered A.B. on that night. Finally, the County Defendants point to the confrontation between Johnson and Fulton, which resulted in the end of their relationship. But again, it is difficult to see how that fight justifies an inference that Fulton raped and murdered A.B.

The court cannot conclude as a matter of law that Garfinkel had probable cause to prosecute Fulton.[30] Thus, summary judgment for Garfinkel is improper on Fulton's malicious prosecution claim.

## K.    Municipal Defendants

That leaves only the municipal defendants—the City of Chicago and Cook County. As discussed above, plaintiffs' *respondeat superior* claims against the County must be dismissed. *See Biggerstaff*, 284 Ill. App. 3d at 200. However, because some claims against both the Officer Defendants and Garfinkel survive summary judgment, so too do the indemnification claims, *see Grayson*, 157 F. Supp. 3d at 748, and the *respondeat superior* claims against the City, *see Walden v. City of Chicago*, 391 F. Supp. 2d 660, 680–81 (N.D. Ill. 2005).

---

[30] Originally, the County Defendants argued that Fulton's prior sexual assault conviction supported probable cause. [270] at 32. However, they later withdrew that argument. <366> at 4–5; *see United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005) (holding that "little weight can be given" to criminal history). Relatedly, the County Defendants argued that there was probable cause because Latham "told detectives that Fulton had just gotten out of prison for that [sexual assault] conviction." [270] at 32. Not only does this argument run into the same problems as reliance on the conviction itself, but the court also cannot discern its evidentiary basis. The County Defendants do not cite any evidence or portion of their statement of facts suggesting Latham made such a statement, the statement is not referenced in any party's statement of facts, and the court has not discovered any reference to it in the record. Garfinkel appears to have confused what Coleman told police about Taylor—that he "had just gotten out of prison for what [Coleman] thought was rape," [288-27] at 10, for what Latham told police about Fulton.

## CONCLUSION

For the reasons explained above, defendants' motions for summary judgment, [262], [269], <311>, <318>, are granted in part and denied in part. Plaintiffs' claims may proceed as laid out below.

### I. *Coleman v. City of Chicago*, No. 18-cv-00998

Summary judgment is granted to the following defendants on the following counts:

- To defendants Geri Lynn Yanow, as independent administrator of the Estate of William Foley, and Michael Clancy on Count IV (Due Process).
- To defendants John Halloran, Kenneth Boudreau, and James O'Brien on Count II (Fabrication of a False Witness Statement) and Count IV (Due Process).
- To defendants Gerald Carroll, William Moser, Albert Graf, Thomas Kelly, and Thomas Benoit on all counts.
- To defendant Harold Garfinkel on Count II (Fabrication of a False Witness Statement), Count IV (Due Process), Count V (Failure to Intervene), and Count IX (Malicious Prosecution).
- To defendant Cook County on Count XI (*Respondeat Superior*).

As to all other claims and defendants for which summary judgment was sought, summary judgment is denied, and plaintiff Coleman's claims may proceed consistent with this opinion.

### II. *Fulton v. City of Chicago*, No. 17-cv-08696

Summary judgment is granted to the following defendants on the following claims:

- To defendants John Halloran, Kenneth Boudreau, and James O'Brien on Count I (Fabrication of Evidence), Count II (Coerced Confession), and Count IV (Failure to Intervene).
- To defendants Gerald Carroll, William Moser, and Albert Graf on all counts.
- To defendant Harold Garfinkel on Count I (Fabrication of Evidence) except to the extent it is based on the fabrication of plaintiff's handwritten statement, and Count IV (Failure to Intervene).
- To defendant Cook County on Count X (*Respondeat Superior*).

As to all other claims and defendants for which summary judgment was sought, summary judgment is denied, and plaintiff Fulton's claims may proceed consistent with this opinion.

Dated: August 20, 2025                    /s/ Martha M. Pacold